# Exhibit 21

## Declaration of Abdirizak Aden Farah

I, Abdirizak Aden Farah, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I was born on ▓▓▓▓▓▓ 1987 in Kismayo, Somalia. On or about December 31, 2009, at the age of 22, I presented myself at the southern border of the United States and I indicated my intention to apply for asylum.

3. I first faced persecution as a child living Somalia on the basis of my family's membership in the Marehan clan, a minority clan in Mogadishu. In 1991, after the civil war broke out in Somalia, my family fled Somalia's capital out of fear that members of the Hawiye, a powerful majority clan in Mogadishu, would attack us. Eventually, my family settled in Kismayo, a city in Somalia where the Hawiye have less power. Five years later, my father was shot and killed by members of the Hawiye clan when he briefly returned to Mogadishu to try to sell our family home.

4. I ultimately fled Somalia in order to escape al-Shabaab—an Islamic insurgency group trying to take over Somalia and actively fighting against the Somali Transitional Federal Government (TFG) and the African Union Mission to Somalia.

5. In 2007, members of al-Shabaab shot and killed my brother because he worked as a driver for the TFG. During the attack, the al-Shabaab slashed my right wrist with a knife when attempting to kill me. After this attack, al-Shabaab members continued to threaten me and accuse me of working for the TFG. I was told that if I was not working with TFG then I would have to join al-Shabaab.

6. In 2009, al-Shabaab militants entered my shop, where I worked as a tailor to support my wife, Amina Farah Mohamud, and my infant daughter, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. When I refused to join al-Shabaab, the militants beat me up. On their last visit in 2009, the militants told me that the next time they

11

1

1    returned, they would kill me if I did not join them.

2         7.    Fearing that the al-Shabaab would try to hunt me down and kill me, I
3    fled Somalia in April of 2009.

4         8.    When I arrived at the U.S. border several months later, I presented
5    myself to Customs and Border Patrol and requested asylum.  An asylum officer
6    found my claims credible  and then referred my case for a full asylum hearing
7    before an immigration judge ("IJ").

8         9.    My first immigration hearing took place in March 2010 but was
9    continued because I did not have an attorney.  Since that time, I have had several
10   other hearings in front of the IJ, some of which were continued because I was still
11   looking for an attorney and some of which were cancelled because the judge or
12   translator was not present.  My next master calendar hearing is scheduled for
13   October 27, 2010.

14        10.    Throughout the last ten months in detention, I have not been given a
15   hearing regarding whether my detention is justified.  I applied for release on
16   parole, hoping to reunite with a close family friend who currently lives in
17   Minnesota, but an Immigration and Customs Enforcement Officer denied my
18   application without any meaningful explanation.

19        11.    I have been told by my immigration attorney that I am being detained
20   under 8 U.S.C. 1225.  Since entering detention, I have met several other people in
21   my same situation—there are many other Somalis and people of other
22   nationalities who are also being detained while they apply for asylum. In my
23   country, if someone puts you in jail, it is better to die. I  do not understand why
24   here in the United States the government continues to detain me–I have never
25   committed a crime or caused harm to anyone else.  I am only here because in
26   Somalia I was afraid for my life.

27        12.    On account of my detention, I have not been able to establish contact
28   with my wife or my baby daughter for over ten months.  I do not know how they

2

1    are doing or whether they are safe.

2        13.    I do not want other people to have to be in the same situation as me.

3    Because of the frustration, fear, and sadness I have experienced over the last

4    several months due to being held in detention while I try to fight my asylum case,

5    I am willing to be a class representative in this lawsuit. I understand that as a class

6    representative my job is to stay updated and informed about the case.  I am willing

7    to do what is necessary to represent other members of the class adequately and

8    fairly.

9

10        I declare under penalty of perjury of the laws of the State of California and

11    the United States that the foregoing is true and correct.  Executed this 12th day of

12    October, 2010 in Lancaster, California.

13

14    _____

15    Abdirizak Aden Farah

16    A# 087-747-794

17

18

19

20

21

22

23

24

25

26

27

28

3

# Exhibit 22

### Declaration of Alejandro Rodriguez

I, Alejandro Rodriguez, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I was born on ▮xxxxxxxxxx▮ 1978 in Juarez, Mexico.  In 1979, at the age of 1, my parents brought me to the United States, and I have lived here ever since.

3.    I grew up and received all of my education entirely in the United States, and I consider myself an American.  My father became a naturalized United States citizen on September 17, 1986 and my mother is a Lawful Permanent Resident.  I became a Lawful Permanent Resident on June 4, 1987.  My brother is also a Lawful Permanent Resident and my younger sister was born here in the United States.  I have 3 U.S. citizen children: my son ▮xxxxx▮ is 11 years old; my other son ▮xxxxx▮ is 5 ½ years old, and my daughter ▮xxxxx▮ is  2 ½ years old. Before my immigration troubles, I had a good job working as a dental assistant.

4.    I have made some mistakes in my life.  In 1998, when I was 20 years old, I was caught driving a stolen car.  On July 29, 1998, I pled guilty to a violation of California Vehicle Code 10851(A) and was sentenced to 6 months, with 3 years of probation.  In 2001, with just a few months left, I was found to be in violation of my probation and was sentenced to 2 years, of which I served 10 months.

5.    In 2003, when I was about 24, I began to get involved with drugs.  In October 2003, I pled no contest to and was convicted of Possession of a Controlled Substance, California Health & Safety Code 11377(a), for which I received 5 years of probation under California Prop 36, requiring me to take a course for drug rehabilitation.  I no longer take or even associate myself with drugs, and I deeply regret ever being involved in the first place.

6.    Before I had a chance to finish my drug classes under Proposition 36, I was turned over to ICE custody, on or about April 10, 2004.  I was moved to the San Pedro Processing Center five days later, on or about April 15, 2004.  At that time, an ICE officer told me that I

**EXHIBIT 1**

**1**

14

1 could get out on $15,000 bond. However, I did not have that much money and could not pay it at

2 that time. I have been detained ever since then -- a time period of over three years.

3       7.    At my hearing in June 2004, I believed the judge was going to grant me release

4 because I was eligible for cancellation of removal. However, the government attorney then

5 brought up my charges from 1998. The government also submitted evidence that, in October

6 2003, I was convicted of being under the influence of a controlled substance in violation of

7 Health and Safety Code section 11550(a), for which the sentence was 120 days.

8       8.    The judge decided in July 2004 that I was not eligible for cancellation because she

9 said that my theft conviction was an aggravated felony, and she ordered me deported to Mexico.

10 I was confused and did not know what to do. I could not comprehend how I could be sent to live

11 in a country I did not know, where I had not lived since I was one year old.

12       9.    I appealed my case to the BIA, but in December 2004 I lost. The BIA agreed I

13 was an aggravated felon and ineligible for cancellation. Although I was beginning to become

14 depressed about my ongoing detention, I appealed my case to the Ninth Circuit because the only

15 other option would be to accept deportation to a country I have never known. I honestly believe

16 that my crime is not an aggravated felony, and I decided to fight so I could stay in my home

17 country and be near my children and family.

18       10.    My case has been pending at the Ninth Circuit for a long time because the

19 government kept asking to hold my case in abeyance until the Supreme Court decided a similar

20 case. After more than two years during which I waited in detention, the Supreme Court made its

21 decision around February 2007. But from what my lawyer told me, the Court did not decide the

22 main issue in my case, which is whether a joyriding violation of Cal. Vehicle Code 10851 is a

23 theft offense under the immigration laws. Now I have to appeal once again to the Ninth Circuit,

24 which I understand could add another year or more to my detention.

25       11.    On March 10, 2005 an officer handed me a piece of paper and told me that I was

26 going to stay in detention until I was removed. I figured out that this was called a custody

27 determination, and I have become very familiar with these in my 3 years in detention. Before

28 this custody determination, I had been given a questionnaire which asked about my family, my

1   previous employment, and my address. I filled it out, explaining that I had family in the area,

2   that I could live with my mother if released, and that I had held a job as a dental assistant. I

3   really felt that this would be enough to allow me to be released. Unfortunately, my paper

4   determination informed me that I would remain detained until the Ninth Circuit decides my case.

5   I wish it had told me what else I could prove in order to be released, as I desperately just wanted

6   to see my family, especially my new baby girl, who had just been born while I was in ICE

7   detention.

8          12.    I received 3 more custody determinations during my detention. In September

9   2005 and March 2006, I was told verbally that I would remain detained because I was a flight

10  risk, but I was not given any papers regarding these custody determinations. In March 2007, I

11  received my fourth custody determination, which was given to me in writing like my first one.

12  Aside from the different dates on them, they were so similar that they seemed like carbon copies

13  of each other. I was never given another questionnaire to fill out, and I was never interviewed in

14  relation to any of my custody determinations. The last one, in March 2007, also claimed that my

15  removal was imminent. But I know this is not true, because my case has been set for more

16  briefing in the Ninth Circuit, in light of a recent Supreme Court case.

17         13.    I have learned a lot during the years since those convictions. I have already

18  missed my baby daughter's first smile, her first words, and her first steps. I am fighting my case

19  so hard because I am fighting to stay in her life. I can not imagine being forced to live in a

20  country I do not know, deported from my homeland, and unable to see my children grow up. I

21  know that I have made mistakes in the past, but I will never do anything to separate me from my

22  loved ones again. I am desperate to be released from detention so I can be a part of my family's

23  lives again. If given another opportunity, I know I will make better decisions.

24         14.    During my years in detention, I have seen at least dozens of other people who had

25  been held for more than six months. Many of them were held for years like me. Based on my

26  conversations with these men, I know that many of them never got bond hearings, while others

27  got hearings at the beginning of their detention, but not afterwards.

28

1        I declare under penalty of perjury of the laws of the State of California and the United

2    States that the foregoing is true and correct.  Executed this 10th day of May, 2007 in Los

3    Angeles, California.

4                                                  Alejandro Rodriguez

5

6    DATED: 5-10-07

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

**EXHIBIT 1**

4

17

# Exhibit 23

# Declaration of Abel Perez Ruelas

I, Abel Perez Ruelas, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so completely as follows:

2.    I was born on ▮xxxxxxxxxxx▮ 1967 in Jalisco, Mexico.  I was admitted to the United States in 2002 on a visitor's visa.

3.    In 1996, I began a relationship with Maria del Rosario and we had a daughter, ▮xxxxxxxxxxxxxxxx▮, one year later.  In 2000, we broke up and I lost contact with Ms. del Rosario.  In 2007, my mother informed me that Ms. del Rosario had died in childbirth and my daughter was living with her mother's parents.  It is my great hope that someday I can bring my daughter to live with me in the United States.

4.    On December 22, 2008, I married Maria Yolanda Perez Navichoque, a United States citizen.  She works as a nurse at the Los Angeles Jewish Home, a non-profit senior living facility in Reseda, California.  In February 2009, we filed to adjust my immigration status to a lawful permanent resident based on our marriage.

5.    After marrying Ms. Perez, I became a stepfather to her four children, who are all United States citizens.  The two youngest children live with me and my wife in our home in Reseda, California.

6.    During the eight years I have lived in the United States, I have worked in construction jobs involving cement and tile work.  Prior to my immigration troubles, I regularly attended church with my wife in Pacoima and Reseda.

7.    I have made some mistakes in the last few years that I greatly regret.  I have been convicted of driving under the influence on three occasions.  I served three months of probation for the first offense in 1994, served 15 days in jail for the second offense in 2004, and served 60 days in jail for the third offense four years later.  I know that I foolishly put myself and others at risk by driving under

18

1  the influence and I deeply regret my decision to abuse alcohol.

2  8.      After completing my sentence for my last conviction, I have diligently

3  attended Alcoholics Anonymous meetings for over a year and have continued

4  attending AA meetings while in immigration detention to further my

5  rehabilitation. I am determined not to repeat my mistakes.

6       9.      When I was released from jail on approximately April 8, 2009, ICE

7  immediately took me into immigration custody even though I was in the process

8  of adjusting my status to become a lawful permanent resident, and even though

9  DUI is not a removable offense.  For the past 18 months, I have been held in ICE

10  custody at Mira Loma Detention Center. My attorneys tell me that I am being held

11  under 8 U.S.C. 1226(a).

12      10.      On April 21, 2009, I was given a bond hearing where I bore the

13  burden of proving that I was not a danger to the community or a flight risk. The

14  judge denied my bond, finding that I was a danger to society based on my prior

15  DUI convictions, even though the immigration judge knew I was married to a

16  United States citizen and had a pending application to adjust my status to become

17  a lawful permanent resident.

18      11.      With the help of an attorney I applied for a bond reduction in

19  February 2010.  At the hearing the immigration judge set bond at $5,000, an

20  amount too high for my family to pay, especially given that I am in detention and

21  not available to work to support my family.  Because of my inability to pay, I have

22  remained in immigration detention for 18 months while waiting adjudication of

23  my case.  My last hearing was on approximately September 2, 2010. At the

24  hearing, my attorney informed the judge that my application to adjust status had

25  been granted, and presented letters from my family and my tax records. But the

26  judge refused to reduce my bond, based on my prior DUI convictions. My next

27  hearing is scheduled for December 3, 2010.

28      12.      On July 30, 2010, my wife and I received news that my application to

19

2

1  adjust my status had been approved, with a priority date of March 22, 2009. I am

2  overjoyed that I will be able to remain in the United States as a permanent resident

3  with my family. However, even though I am able to adjust my status immediately,

4  I remain in ICE detention because the immigration judge set a high bond, which

5  my family still cannot afford to pay. I don't understand why ICE continues to hold

6  me even though my application to adjust has been granted.

7       13.    It has been very difficult to be separated from my wife and my step-

8  children for so long. My detention has been a tremendous burden on my family,

9  who depend on me to support them. I miss being with my family and I am

10  anxiously waiting to be re-united with them. I also have found it difficult to stay in

11  touch with my attorney to fight my removal case while at Mira Loma. I am very

12  thankful that my application to adjust status has been granted, even with all the

13  difficulties I have faced in detention.

14       14.    While at Mira Loma, I have learned that there are many other people

15  like me who are held in detention for long periods of time even though they don't

16  present a flight risk or danger, and have strong claims to remain in the United

17  States. I don't think it is right for ICE to hold people for long periods without

18  giving them a hearing where ICE has to justify the detention.

19       15.    I understand that I am a named plaintiff in this class action lawsuit

20  and I understand my responsibilities. I have spoken with my attorneys about my

21  role, and know that I need to stay informed with what is happening in the case and

22  to make decisions that are in the best interests of the class as a whole. I am

23  prepared to fulfill these duties and represent the class.

24       I declare under penalty of perjury of the laws of the State of California and

25  the United States that the foregoing is true and correct. Executed this 12th day of

26  October, 2010 in Lancaster, California.    *Abel Perez Ruelas*

27                                               Abel Perez Ruelas

28                                               A# 095-788-558

1    Declaration of Caitlin Patler

2

3        I, Caitlin Patler, hereby declare:

4        1.    I make this declaration based on my own personal knowledge and if called to

5    testify I could and would do so competently as follows:

6        2.    I am fluent in Spanish and English, and am competent at translation.

7        3.    I translated into English the declaration of Abel Perez Ruelas on October 12,

8    2010. The translation is a true and complete representation of Abel Perez Ruelas's statement.

9

10        I declare under penalty of perjury of the laws of the State of California and the United

11    States that the foregoing is true and correct. Executed this 12th day of October, 2010 in Los

12    Angeles, California.

13

14

15        Caitlin Patler

16

17

18

19

20

21

22

23

24

25

26

27

28

21

# Exhibit 24

# Declaration of Jose Farias Cornejo

I, Jose Farias Cornejo, hereby declare:

1.  I make this declaration based on my own personal knowledge and if called to testify I could and would do so completely as follows:

2.  I was born on ▮▮▮▮▮▮▮▮ 1984 in Michoacan, Mexico. Prior to my first birthday my parents brought me to the United States, where I have lived ever since. I have never left the United States.

3.  I grew up and received all of my education in the United States and I consider myself an American. I spent part of my childhood in Washington and my adolescence in San Diego and Montclair, California because my parents were migrant farm workers. I took special education classes in high school to overcome my diagnosed learning disability, dyslexia.

4.  After I came to the United States, my mother and I both became lawful permanent residents. I have four siblings, three brothers and one sister, who all are United States citizens. Prior to my immigration troubles, I worked at a variety of jobs, including construction work, making artwork, manufacturing Jacuzzis, and working as a landscaper.

5.  I have made some mistakes in my life. I began using drugs when I was 18 years old and was convicted of possession of methamphetamine in 2007. After my arrest, I was given the opportunity to receive substance abuse treatment under California Proposition 36. I successfully completed my drug treatment classes but could not afford to pay the mandatory $2000 fine, and therefore was sentenced to 180 days in jail.

6.  In 2009, I was convicted of a misdemeanor theft offense and spent 14 days in jail. That same year I was also convicted of being under the influence of a controlled substance and spent 60 days in jail for that offense. I regret getting involved with drugs, and I am deeply sorry for the pain that I have caused my family. I have learned a lot from these mistakes, and I am determined not to

22

1    repeat them.

2         7.    After completing my last criminal sentence in September 2009, ICE

3    initiated removal proceedings against me.  I was placed in ICE custody at the Mira

4    Loma Detention Center on September 14, 2009. My attorneys tell me that ICE

5    claims authority to detain me under 8 U.S.C. 1226(c), because I have a drug

6    conviction.

7         8.    While I was in detention, I learned that I was eligible for cancellation

8    of removal, but I didn't understand the process and needed an attorney to help me.

9    However, I struggled greatly to find an attorney to assist me with completing the

10   application.

11        9.    After five months in detention, I found an attorney to help me but she

12   failed to file my application and was eventually fired from her law firm.  I was

13   ultimately successful in finding another attorney to complete my cancellation of

14   removal application in June of 2010.  This attorney finally filed my application for

15   cancellation of removal ten months after I entered an ICE detention facility.

16        10.   At my last hearing, the ICE trial attorney stated that ICE does not

17   oppose my application for cancellation of removal, and I understand that it is very

18   likely that I will be granted the relief.

19        11.   On August 17, 2010, the immigration judge informed me that while

20   he had no objection to my application, he refused to adjudicate my application

21   because I had an outstanding warrant.  The immigration judge postponed my

22   hearing until November 15, 2010, to allow me to resolve the outstanding warrant,

23   which was filed in error. My attorney is currently working to resolve the warrant

24   with the criminal court.

25        12.   I have now been in detention for more than a year. During that time, I

26   have never had a hearing before an immigration judge or other official to

27   determine whether my detention is justified. I am not a flight risk or danger to the

28   community. I don't understand why ICE continues to hold me, especially because

23

2

1  they have said that they will not oppose my application for cancellation of
2  removal.

3        13.     The time that I have spent in detention has been very hard on my
4  family. It has been very difficult to be separated from my mother, siblings and my
5  fiancé. I feel guilty that I cannot be there to help support them. I also have found
6  it very difficult to fight my removal case while in detention. I struggled to find an
7  attorney to help me while I've been in detention, which has delayed my case
8  several months. I wish I could fight my case outside of detention, where I could be
9  with my family and maintain better contact with my attorney.

10        14.     During my time in detention, I have become aware that there are
11  many other people like me who are being held without any justification. I believe
12  that ICE should have to provide some meaningful review so that people who, like
13  me, are not a flight risk or danger should not be kept in detention.

14        15.     I understand that I am a named plaintiff in this class action lawsuit. I
15  understand that means I need to stay informed with what is happening in the case
16  and that I need to think about the interests of the other class members and act on
17  those interests. I am prepared to represent the class in this case and will take my
18  responsibilities seriously.

19
20

21       I declare under penalty of perjury of the laws of the State of California and
22  the United States that the foregoing is true and correct. Executed this 12th day of
23  October, 2010 in Lancaster, California.

24
25
26          Jose Farias Cornejo
27          A# 773-330-641
28

24

3

# Exhibit 25

**Declaration of Angel Armando Ayala**

I, Angel Armando Ayala, hereby declare:

    1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

    2. I was born on ☒ⅹⅹⅹⅹⅹⅹⅹⅹ, 1976 in El Salvador. I came to the United States with my family at the age of eleven and have never left the country. I completed junior high and high school in Southern California.

    3. Prior to my arrest by immigration authorities, I was living with my mother, Maria, who is a United States citizen. I am close to my two siblings, a brother and sister, who live in Southern California. I also have an older brother who lives in El Salvador.

    4. I have worked in the United States my entire adult life. I have worked various construction jobs that have involved driving a forklift and handling construction materials. I have also worked as a landscaper and have held a shipping and receiving position.

    5. I was arrested in 1994 during a work site raid and detained in the San Pedro Detention facility. I was released by an immigration judge because I was eligible for relief under the Nicaraguan and Cuban Adjustment Relief Act ("NACARA") since my mother had included me on her original asylum application. The judge advised me to find a lawyer to assist me with applying for relief.

    6. When I went to the federal immigration building, I met a man who was acting as an attorney, Jose Quinones. He offered to file my NACARA application for a fee. Mr. Quinones filed my application based on my mother's eligibility under NACARA and a hearing was set for around October 29, 1999.

    7. Right before my court date my mother fell gravely ill and I had to take her to the hospital. Unfortunately, on account of this emergency, I missed my court date. At the hearing the judge ordered me removed in absentia, despite the fact that I met the statutory eligibility criteria for NACARA relief.

8. A few days after the hearing my mother's condition improved and I called Mr. Quinones to discuss my case. He informed me that my case would have to be reopened and that he would charge me several thousand dollars to pursue my case. When I told Mr. Quinones of my inability to pay, he told me to only contact him again if I had enough money to pay for his services. He never informed me that I had to file a motion to reopen within 180 days, or that I could be deported if I did not file such a motion.

9. Mr. Quinones was subsequently suspended from practicing before the immigration courts by the Executive Office of Immigration Review and was presumably disbarred, if he ever even was an attorney.

10. I continued to live and work in the United States for the next decade. I made some mistakes and was convicted several times for the misdemeanor offense of driving without a license.

11. On February 14, 2009, I was arrested at the home I share with my mother in Pomona based on my outstanding removal order from the previous decade. I was transferred to the custody of Immigration and Customs Enforcement (ICE) at the Mira Loma Detention Center and have been detained at that facility and then at the Theo Lacy facility in Orange County for nearly twenty months.

12. With the help of a non-profit legal services worker from Catholic Charities, I filed a motion to reopen my case based on ineffective assistance of counsel. My motion was denied by an immigration judge. The BIA affirmed this decision despite my eligibility for NACARA relief. The BIA held that my motion was untimely and that I was not entitled to equitable tolling based on my claim of ineffective assistance of counsel. The BIA decided my attorney had no duty to inform me of the filing deadline for the motion to reopen my case because the attorney had not agreed to represent me on it.

13. I have since hired the attorney Shan Potts to represent me before the Ninth Circuit Court of Appeals. The Ninth Circuit has granted a stay of my removal in my case. My attorney filed an opening brief on September 15, 2010. Given the substantial backlog in the Ninth Circuit, my attorney has told me that the petition will likely take well over a year to be

26

reviewed.

14. Since entering detention in February 2009, I have never seen an immigration judge or received any sort of hearing to determine whether my detention is justified. My attorney tells me that I am being detained pursuant to 8 U.S.C. 1231(a)(6).

15. My 20-month detention poses a tremendous hardship on my United States citizen mother, who lived with me prior to my arrest. My mother has had difficulty paying rent during my detention and suffers from the absence of my emotional and familial support. I have also found my detention very difficult. I wish that I could litigate my case from outside of a detention facility while also supporting my elderly mother. I am neither a danger to the community nor a flight risk, and do not understand the purpose of my ongoing detention.

16. Because I believe that other people like me should be able to have some sort of meaningful review of their prolonged detention, I am willing to be a named class representative plaintiff in this lawsuit. I know that as a named plaintiff I am here to represent the class, which means that I need to stay informed about what is happening in the case and that I need to think about the interests of the other class members and act on those interests. I am prepared to represent the class in this case and I will do what I need to do to serve in that role.

17. During the past twenty months, I have met many other people who have been subjected to prolonged detention. I have seen people give up fighting their cases, even when they had seemed to have valid claims for relief, simply because they could not stay in detention any longer. I have observed other people get very anxious and depressed, and have seen people's families fall apart because they could not provide their family members with emotional and financial support.

18. My primary goal in being part of this lawsuit is to try to do what I can to make sure that other people do not have to wait as many months and years being incarcerated as me. I yearn to return to my mother, to take care of her and be with her in the later years of her life. I do not think that it is right that people should be held in detention facilities for such a long time without having any real opportunity to contest the basis for their detention. At the very least, I believe that we should be given a hearing before an immigration judge in which the government

27

1   has to prove that we are a danger or a flight risk.  For these reasons, I am prepared to represent

2   this class.

3

4   I declare under penalty of perjury of the laws of the State of California and the United States

5   that the foregoing is true and correct.  Executed this 14th day of October, 2010 in Orange

6   County, California.

7

8                                                                    Angel Armando Ayala

9                                                                    A# 073-802-672

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28

4

# Exhibit 26

| | |
|---|---|
| 1 | **Declaration of Jennifer Stark** |
| 2 | I, Jennifer Stark, hereby declare: |
| 3 | 1. I make this declaration based on my own personal knowledge and if called to |
| 4 | testify I could and would do so competently as follows: |
| 5 | 2. I am employed as an Equal Justice Works Fellow and Attorney at the ACLU of |
| 6 | Southern California. |
| 7 | ~~3.    On April 30, 2010, pursuant to the Court's Stipulated Protective Order~~ |
| 8 | Concerning Roster of Detainees [Dkt. # 78, Apr. 19, 2010], Respondents sent Petitioners a roster |
| 9 | of the names, alien numbers, locations, and attorney contact information for all immigration |
| 10 | detainees who, on April 21, 2010, had been detained for six months or longer in the Central |
| 11 | District of California.  This roster contained the names of approximately 350 adult detainees as |
| 12 | well as information concerning possible attorneys of record for some of the detainees. |
| 13 | 4. On May 3, 2010, counsel for Petitioners sent letters to all detainees and attorneys |
| 14 | of record on the Government's roster, requesting information that would assist Petitioners in |
| 15 | identifying suitable sub-class representatives and obtaining other information relevant to the |
| 16 | lawsuit.  Since that date, Petitioners gathered responses to these questionnaires and answered |
| 17 | numerous phone calls from detainees and their relatives.  Approximately 125 detainees—just |
| 18 | over one-third of the individuals on the Government's roster—ultimately responded to this |
| 19 | questionnaire either individually or through family members.  Approximately 30 attorneys |
| 20 | responded to this request. |
| 21 | 5. Although 125 detainees responded, the overwhelming majority of the responses |
| 22 | submitted by detainees or their family members were too incomplete or inaccurate to serve as a |
| 23 | basis for determining the procedural posture of the individual's immigration case.  Similarly, a |
| 24 | large number of the responses from attorneys consisted of letters or phone calls informing us that |
| 25 | they were no longer representing the named individual or could not provide us with all of their |
| 26 | client's documents because they were too voluminous. |
| 27 | 6. After reviewing these responses, the attorneys working on this case began a |
| 28 | process of interviewing detainees to try to obtain more accurate information.  Because of the |

1   constraints created by class members' detention at distant locations and the attendant difficulties

2   in meeting with them, we lacked the resources to meet with all 350 detainees named on the

3   Stipulated Protective Order.  Consequently, we decided to meet with a random sample of

4   detainees in order to approximate how many individuals are being held pursuant to each of the

5   general immigration statutes–8 U.S.C. § 1225(b), 8 U.S.C. § 1226(a), 8 U.S.C. § 1226(c), and 8

6   U.S.C. § 1231(a).

7         7.   ~~On May 22, 2010, Erin Mohan, a Stanford law student working with Petitioners,~~

8   used a computer-generated random sample program to compile a list of 354 numbers randomly

9   selected from within the range 1 to 354.  Using this list of random integers, Ms. Mohan ordered

10   the names of adults included in the roster of immigration detainees produced by the government

11   pursuant to the Stipulated Protective Order dated April 19, 2010.

12         8.   We then used this random sample to generate a list of 70 detainees, or

13   approximately twenty percent of the detainees listed on the Respondent's roster, with whom we

14   would meet in an effort to establish whether each sub-class was sufficiently "numerous" for the

15   purpose of Rule 23(b), as well as to gather information relevant to the lawsuit and identify

16   potential class-representatives.

17         9.   On May 24, 2010, May 25, 2010, and May 26, 2010, I traveled to the Mira Loma

18   Detention Facility with two Stanford law students, three ACLU summer law student interns, and

19   three translators.  Over the course of those three days we managed to interview 57 detainees.

20   Whenever a person on our list was no longer in detention, either because they had been released,

21   bonded out, or deported, we would proceed to the next person included in our random sample.

22   We continued to do this  until we met with the requisite number of detainees.  In total, we

23   collectively dedicated  more than 200 hours to this process.

24         10.   On May 28, 2010, I traveled to the Santa Ana Detention Facility with three law

25   student interns to meet with detainees.  While the security guards gave me access, the guards

26   denied our law student interns access to the detainees.  Consequently, I was able to meet with

27   less than half of the detainees I had planned to meet to finish the random sample.

28         11.   Unfortunately, in many instances a single interview with a detainee proved

1  insufficient to accurately determine the procedural posture of that detainee's immigration case.

2  Because many detainees did not have a clear understanding of the procedural posture of their

3  own immigration cases, after interviewing detainees we generally had to supplement the

4  information obtained from those interviews with further interviews and review of their

5  documents.  In addition, because most detainees did not have critical documents from their "A"

6  files in their possession at the time of the interview, we often had to make several requests of the

7  detainees to send follow-up information from their "A" files, which they attempted to obtain

8  from their family members, lawyers, or their deportation officers.

9           12.      Given the problems with access to the detention facilities and challenges in

10  securing reliable information from the detainees, my supervisor Ahilan Arulanantham and I – as

11  well as five summer law student interns – needed to make several subsequent visits to the Santa

12  Ana Detention Facility, the Mira Loma Detention Facility, and the Theo Lacy Detention Facility.

13  We made additional visits to these detention facilities on June 14, 2010, June 15, 2010, June 28,

14  2010, July 1, 2010, July 27, 2010, August 4, 2010, August 19, 2010, August 28, 2010, and

15  August 31, 2010.  I went on five of these occasions and Mr. Arulanantham went on five of these

16  occasions (on one occasion we went together).  On most of these occasions we were

17  accompanied by one or more student interns.

18           13.      On these visits, we met the remaining detainees necessary to complete the random

19  sample, conducted numerous follow-up interviews of the detainees in our sample in order to

20  ensure that we had a reasonably complete understanding of their cases, and also interviewed

21  several other detainees who appeared to be suitable class representatives.  We collectively

22  devoted more than 150 more hours collecting information from detainees through this process.

23           14.      Based on the information from the interviews and supplemental information

24  mailed to us by detainees and their family members, I classified each of the first seventy

25  detainees we met from our random sample according to the general immigration statute under

26  which they appeared to be detained.  I then discussed my classifications with Mr. Arulanantham.

27  In approximately 25 cases where I perceived ambiguity, Mr. Arulanantham independently

28  reviewed my classification by examining the underlying records and, in a handful of cases,

3

altered the classification.  Through this process, we have ascertained each of the 70 detainees'

procedural postures and classified them accordingly to the best of our knowledge.

15.    According to our analysis, the random sample of 70 detainees contains 11 people

detained under 8 U.S.C. § 1225(b), 13 people detained under 8 U.S.C. § 1226(a), 37 people

detained under 8 U.S.C. § 1226(c), and 9 people detained under 8 U.S.C. § 1231(a).  Based on

that randomly-generated sample, on April 21, 2010 in the Central District of California there

~~were approximately 55 class members held under 8 U.S.C. § 1225(b), about 65 class members~~

held under U.S.C. § 1226(a), about 186 class members held under 8 U.S.C. § 1226(c), and about

45 class members held under 8 U.S.C. § 1231(a).


I declare under penalty of perjury of the laws of the State of California and the United

States that the foregoing is true and correct.  Executed this 15th day of October, 2010 in Los

Angeles, California.

Jennifer Stark

4

32

# Exhibit 27

10/14/2010 23:14 FAX 6507250953    STANFORD LAW SCHOOL    ✉002/002

# Declaration of Erin Michelle Mohan

I, Erin Michelle Mohan, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    My full name is name is Erin Michelle Mohan, and I am a certified law student working with the Immigrants' Rights Clinic at Stanford Law School under the supervision of Jayashri Srikantiah.

3.    On May 22, 2010 at 10:45AM Pacific Standard Time, I generated a list of random integers using the Random Number Generator available at random.org. Random.org is a true random number service that generates randomness via atmospheric noise.

4.    The Random Number Generator produced a list of 354 numbers randomly selected from within the range of 1 to 354. Using this list of random integers, I ordered the names of adults included in the roster of immigration detainees produced by the government pursuant to the Stipulated Protective Order dated April 19, 2010.

5.    On May 21, 2010, I read and signed the stipulated protective order, and agreed to be bound by its terms.


I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 14th day of October, 2010 in Los Angeles, California.

Erin Michelle Mohan

33