AHILAN T. ARULANANTHAM (SBN 237841)
Email: aarulanantham@aclu-sc.org
JENNIFER STARK (SBN 267062)
Email: jstark@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Tel: (213) 977-5211
Fax: (213) 977-5297

**Attorneys For Petitioners**
(Additional counsel listed on following page)

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

ALEJANDRO RODRIGUEZ, ABDIRIZAK ADEN FARAH, YUSSUF ABDIKADIR, ABEL PEREZ RUELAS, JOSE FARIAS CORNEJO, ANGEL ARMANDO AYALA, for themselves and on behalf of a class of similarly-situated individuals,

              Petitioners,

      v.

ERIC HOLDER, United States Attorney General; JANET NAPOLITANO, Secretary, Homeland Security; THOMAS G. SNOW, Acting Director, Executive Office for Immigration Review; TIMOTHY ROBBINS, Field Office Director, Los Angeles District, Immigration and Customs Enforcement; WESLEY LEE, Officer-in-Charge, Mira Loma Detention Center; et al.; RODNEY PENNER, Captain, Mira Loma Detention Center; SANDRA HUTCHENS, Sheriff of Orange County; OFFICER NGUYEN, Officer-in-Charge, Theo Lacy Facility; CAPTAIN DAVIS NIGHSWONGER, Commander, Theo Lacy Facility; CAPTAIN MIKE KREUGER, Operations Manager, James A. Musick Facility; ARTHUR EDWARDS, Officer-in-Charge, Santa Ana City Jail; RUSSELL DAVIS, Jail Administrator, Santa Ana City Jail,

              Respondents.

Case No. CV 07-3239-TJH (RNBx)

**THIRD AMENDED COMPLAINT**

Honorable Terry J. Hatter

1  Additional Counsel:

2  JUDY RABINOVITZ
   AMERICAN CIVIL LIBERTIES FOUNDATION
3  IMMIGRANTS' RIGHTS PROJECT
   125 Broad Street, 18th Floor
4  New York, NY 10004
   Telephone: (212) 549-2618
5  Facsimile: (212) 549-2654

6  JAYASHRI SRIKANTIAH (SBN 189566)
   STANFORD LAW SCHOOL
7  IMMIGRANTS' RIGHTS CLINIC
   Crown Quadrangle
8  559 Nathan Abbott Way
   Stanford, CA 94305-8610
9  Telephone: (650) 724-2442
   Facsimile: (650) 723-4426

10
   STEVEN A. ELLIS (SBN 171742)
11 WILLIAM TRAN (SBN 245104)
   BRIAN K. WASHINGTON (SBN 248960)
12 SIDLEY AUSTIN LLP
   555 West Fifth Street, Suite 4000
13 Los Angeles, California  90013-1010
   Telephone: (213) 896-6000
14 Facsimile: (213) 896-6600

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURISDICTION AND VENUE**

1.    Petitioners Alejandro Rodriguez, Abdirizak Farah, Yussuf Abdikadir, Jose Farias Cornejo, Abel Perez Ruelas, and Angel Ayala are non-citizens who have been subjected to prolonged incarceration at the hands of the Immigration and Customs Enforcement division of the Department of Homeland Security ("ICE").  Each of them has been incarcerated for more than six months while their immigration proceedings have been on-going without a hearing where the government has had to justify their prolonged detention.  They challenge their prolonged detention without adequate process on statutory and constitutional grounds, on behalf of themselves and a class of similarly-situated detainees.

2.    This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. 2241 (habeas corpus), 28 U.S.C. 1651 (All Writs Act), and the Suspension Clause of Article I of the U.S. Constitution.  INS v. St. Cyr, 533 U.S. 289, 304 (2001); Demore v. Kim, 538 U.S. 510, 516-17 (2003).  This Court also has jurisdiction to hear this case under 28 U.S.C. 1331, which confers jurisdiction to consider federal questions.  Walters v. Reno, 145 F.3d 1032, 1052 (9th Cir. 1998); cf. Wilkinson v. Dotson, 544 U.S. 74, 82 (2005) (challenges to parole release procedures cognizable under Section 1983).[1]

3.    This Court may grant relief under 28 U.S.C. 1331 (federal question), 28 U.S.C. 1651 (All Writs Act), 28 U.S.C. 2241 and 2243 (habeas corpus), and 28 U.S.C. 2201-02 (declaratory relief).

4.    Venue is proper in the Central District of California pursuant to 28 U.S.C. 2241(d) because Petitioners and all other class members are incarcerated at Immigration and Customs Enforcement (ICE) detention facilities within this District.

---

[1] This action is both a complaint for declaratory and injunctive relief under 28 U.S.C. 1331 and a petition for writ of habeas corpus under 28 U.S.C. 2241, although for ease of reference the complaint refers to "Petitioners" and "Respondents" rather than "Plaintiffs" and "Defendants."

1

1   Venue is proper pursuant to 28 U.S.C. 1391(b) because a substantial part of the events

2   giving rise to these claims occurred in this District.

3                                    **INTRODUCTION**

4   5.     Petitioner Alejandro Rodriguez is a citizen of Mexico who came to the United

5   States at the age of one.  Prior to the filing of the original complaint in this case, he

6   was detained for over three years without a hearing concerning whether his prolonged

7   detention was justified.  During that time, the government refused even to consider

8   him for release while he litigated his removal case, despite the fact that it presented a

9   complex and novel question of law explicitly left open by the Supreme Court and the

10  Ninth Circuit.

11  6.     The government released Mr. Rodriguez shortly after he filed a motion for class

12  certification in this case, but continued to subject him to serious restraints on his

13  liberty without allowing him to challenge them in a detention hearing.  It then argued

14  that his case was moot.  The Ninth Circuit disagreed, rejected the government's other

15  objections, and found class certification warranted.  Rodriguez v. Hayes, 578 F.3d

16  1032 (9th Cir. 2009).

17  7.     This Court subsequently certified the class and directed the formation of sub-

18  classes.  By this complaint, five other detainees now join Mr. Rodriguez as class

19  representatives in this action.  Each of them has been detained for more than six

20  months while their removal cases remain pending, yet none of them has been

21  afforded a hearing where the government has had to justify their prolonged detention

22  under sufficiently-rigorous procedures.

23  8.     These detainees are far from alone.  On any given day, there are at least

24  approximately 350 people, if not more, in immigration prisons throughout the Central

25  District who have been incarcerated for more than six months – many of them for

26

27

28

                                              2

1    years – while their cases remain pending.[2]

2    9.    None of these people have received a hearing to determine whether their

3    prolonged detention is warranted, and the vast majority have not received any hearing

4    at all.[3] Thus, the government routinely incarcerates people for months or years

5    without demonstrating why their extended detention is necessary either to secure

6    their presence at the time of removal or to protect the public safety -- a dubious

7    concern given that many class members have no criminal history, and even those who

8    have been convicted have necessarily finished serving their sentences before their

9    transfer to immigration detention.

10    10.    Petitioners, like all the detainees they seek to represent, are purportedly

11    detained under one of four general immigration detention statutes that govern the

12    detention of most non-citizens whom the government is trying to remove. See 8

13    U.S.C. 1225(b) (authorizing detention of aliens seeking admission); 8 U.S.C. 1226(a)

14    (authorizing detention of aliens pending a determination of removability); 8 U.S.C.

15    1226(c) (authorizing "mandatory" detention, without hearings, of certain aliens who,

16

---

17    [2] This Court ordered the government to provide a list of detainees to Petitioner. That

18    list showed that over 350 people were detained in immigration prisons throughout the
Central District as of April 21, 2010.

19

20    [3] Petitioners refer interchangeably throughout this complaint to a hearing to determine

21    whether "prolonged detention" is justified, a "constitutionally-adequate" hearing, and
an "adequate" hearing to justify prolonged detention. See Rodriguez, 578 F.3d at

22    1039 (noting that "Petitioner's requested relief includes . . . providing all members of

23    the class constitutionally-adequate individual hearings before an immigration judge").
A hearing that is adequate to justify prolonged detention would include, at a

24    minimum, notice to detainees of their right to the hearing, an adversarial, transcribed,
in-person hearing before an immigration judge or other impartial adjudicator, counsel

25    for detainees who are unrepresented at that hearing, and a substantive standard

26    requiring the government to show by clear and convincing evidence that no set of
release conditions could reasonably assure the detainee's presence in the event of

27    removal or protect the community from serious danger, taking into account the length

28    of detention at issue.

1  inter alia, have been convicted of specified triggering offenses); 8 U.S.C. 1231(a)

2  (authorizing detention of aliens with final orders of removal during and after the

3  removal period). In keeping with the Ninth Circuit's terminology, these four statutes

4  are referred to herein as the "general immigration detention statutes." See generally

5  Nadarajah v. Gonzales, 443 F.3d 1069, 1078, 1080-81 (9th Cir. 2006) (contrasting

6  general immigration detention statutes that do not explicitly authorize prolonged

7  detention with specific statutes at 8 U.S.C. 1226a and 8 U.S.C. 1531-37 that

8  authorize prolonged detention on, inter alia, national security grounds).

9  11.    Petitioners contend that because none of these general immigration detention

10  statutes explicitly authorize prolonged detention, they cannot be interpreted to

11  authorize detention of longer than six months absent a hearing where the government

12  shows, under a suitably-rigorous standard, that further prolonged detention is

13  justified. See generally Casas-Castrillon v. Dep't of Homeland Sec., 535 F.3d 942,

14  950 (9th Cir. 2008) (construing general detention statutes to require bond hearings

15  where government bears burden of proof because "[w]e conclude that prolonged

16  detention without adequate procedural protections would raise serious constitutional

17  concerns"). Moreover, if these statutes did authorize prolonged detention they would

18  violate the Due Process Clause, at least absent substantially greater procedural

19  constraints. See generally Zadvydas v. Davis, 533 U.S. 678, 690-92 (2001) (finding

20  "severe and obvious" problems with prolonged and indefinite detention under limited

21  administrative procedures).

22  12.    Respondents, in contrast, maintain a policy or general practice – which

23  Petitioners contend is unlawful – of detaining people for prolonged time periods

24  without providing them adequate hearings. Pursuant to this unlawful policy or

25  general practice, Respondents have incarcerated the Petitioners and each of the class

26  members they represent pursuant to one of the general immigration detention statutes

27  for more than six months. Pursuant to Respondents' policy or general practice,

28  during that time neither Petitioners nor any other similarly-situated person have had a

4

hearing where the government has had to show that their prolonged detention remains
justified.

13.    Respondents' general policies and practices of prolonged detention without
hearings are in violation of the statutory and constitutional rights of the Petitioners
and other class members.  To remedy this on-going violation of the law, Petitioners
bring this action seeking declaratory and injunctive relief on behalf of themselves and
a class of similarly-situated persons.

**PARTIES**

14.    Petitioner Alejandro Rodriguez is a citizen of Mexico.  He was detained for
over three years while litigating his removal case prior to the filing of the original
complaint in this case.  He has never been afforded a hearing to determine whether
his prolonged detention is justified.  He is currently residing in Los Angeles under
extremely restrictive release conditions while his removal proceedings remain
pending.

15.    Petitioner Abdirizak Aden Farah is a Somalian refugee who has been
incarcerated at Mira Loma Detention Center for over eight months without a hearing
to determine that his detention is warranted.  Indeed, he has received no explanation
of any kind as to why he cannot be released pending completion of his removal
hearings, despite having a close family friend in Minnesota willing to house him and
no criminal history of any kind.

16.    Petitioner Yussuf Abdikadir is another Somalian refugee who has been
incarcerated by ICE for approximately six months without a hearing to determine
whether his detention is warranted.  He too has received no explanation of any kind
as to why he cannot be released pending completion of his removal proceedings,
despite having a sponsor in San Diego willing to house him and no criminal history
of any kind.

17.    Petitioner Abel Perez Ruelas is a Mexican national who entered the United

5

States on a visitor's visa approximately eight years ago and is now married to a U.S. citizen. He has been incarcerated for 16 months pending completion his removal proceedings. He received a bond hearing where he bore the burden to prove that he was not a danger or flight risk, but the judge denied bond, and later set it at an amount he could not pay. Although he is without doubt eligible to adjust status, he remains detained, even though the government has never had to justify his prolonged detention.

18.    Petitioner Jose Farias Cornejo is also a Mexican national, but is a lawful permanent resident of this country, where he has lived since before his first birthday. He has been convicted of relatively minor offenses, the most serious of which is possession of a controlled substance, for which he was sentenced to 180 days in jail. However, he has spent more than twice that amount of time in immigration prison while awaiting a final decision in his immigration case. Although the government does not dispute that he is eligible for cancellation of removal and has stated in immigration court that it does not intend to oppose his application, he remains in detention awaiting a final decision in his case without having received a detention hearing of any kind. As the government interprets the immigration laws, his drug conviction renders him ineligible even to be considered for release from detention, even though it does not bar him from obtaining relief to remain.

19.    Petitioner Angel Armando Ayala is a citizen of El Salvador who has lived in the United States since the age of eleven. He has never received a criminal sentence of longer than 90 days, but has been incarcerated by immigration authorities for over 18 months while litigating his removal case. During that time he has never seen an immigration judge, let alone been afforded an adequate bond hearing in light of his prolonged detention. He is prima facie eligible for relief allowing him to become a lawful permanent resident, but remains detained while the Ninth Circuit considers whether his prior lawyer's failure to advise him as to the filing deadline constitutes ineffective assistance of counsel, such that his failure to meet it does not bar him

6

1    from obtaining relief for which he is otherwise-eligible.

2    20.    Respondent Eric Holder is the Attorney General of the United States and the

3    head of the Department of Justice, which encompasses the Board of Immigration

4    Appeals ("BIA") and immigration judges as a subunit – the Executive Office of

5    Immigration Review.  Mr. Holder shares responsibility for implementation and

6    enforcement of the immigration laws along with Respondent Napolitano.  Mr. Holder

7    is a legal custodian of Petitioners.  Mr. Holder is sued in his official capacity.

8    21.    Respondent Janet Napolitano is the Secretary of Homeland Security and heads

9    the Department of Homeland Security, the arm of the federal government responsible

10    for enforcement of immigration laws.  Ms. Napolitano is the ultimate legal custodian

11    of Petitioners.  Ms. Napolitano is sued in her official capacity.

12    22.    Defendant Thomas G. Snow is the Acting Director for the Executive Office for

13    Immigration Review ("EOIR"), which is the federal agency that operates the

14    immigration courts.  Mr. Snow is responsible for the supervision of the Deputy

15    Director, the Chairman of the BIA, the Chief Immigration Judge, the Chief

16    Administrative Hearing Officer, and all agency personnel in the execution of their

17    duties.  Mr. Snow is sued in his official capacity.

18    23.    Respondent Timothy Robbins is the Field Office Director for the Los Angeles

19    District of ICE.  In his official capacity, Mr. Robbins is authorized to release

20    Petitioners and has legal custody of him.  He is sued in his official capacity.

21    24.    Respondent Lee Baca is the Sheriff of Los Angeles County, and therefore the

22    officer responsible for the operation of the Mira Loma Detention Center in Lancaster,

23    California.  Mira Loma's website acknowledges that it houses immigration detainees.

24    However, it states that "[w]e function as a regular County jail with the exception that

25    the individuals we house are identified as detainees."  Sheriff Baca is a legal

26    custodian of people detained at that facility, and is sued in his official capacity.

27    25.    Respondent Wesley Lee is the Officer-in-Charge at the Mira Loma Detention

28    Center, and therefore the highest-ranking ICE officer at the facility.  He is a legal

7

custodian of a number of class members. Mr. Lee is sued in his official capacity.

26.    Respondent Rodney Penner is the Captain of the Mira Loma Detention Center, and the highest ranking Sheriff's Department official at the facility. Captain Penner is a legal custodian of a number of class members, and is sued in his official capacity.

27.    Respondent Sandra Hutchens is the Sheriff of Orange County, and therefore the officer responsible for the operation of the Theo Lacy Facility and the James Musick facility, both of which incarcerate class members in Orange County. She is a legal custodian of people detained at those facilities, and is sued in her official capacity.

28.    Respondent Officer Nguyen is the Officer-in-Charge at the Theo Lacy facility, and therefore the highest-ranking ICE officer at the facility. He is a legal custodian of Mr. Ayala and other class members. Mr. Nguyen is sued in his official capacity.

29.    Respondent Captain Davis Nighswonger is the commander of the Theo Lacy Facility, which is, according to its own website, the largest "correctional institution" in Orange County. Nonetheless, Theo Lacy incarcerates a number of immigration detainees, including Angel Ayala. Captain Nighswonger is a legal custodian of Mr. Ayala and other class members, and is sued in his official capacity.

30.    Respondent Captain Mike Kreuger manages the operations of the James A. Musick Facility, another prison in Orange County. According to its website, the Musick facility incarcerates "pre-trial and sentenced" inmates. Nonetheless, upon information and belief, it also houses class members, none of whom are criminal detainees. Mr. Kreuger is a legal custodian of those class members, and is sued in his official capacity.

31.    Respondent Arthur Edwards is the Officer-in-Charge at the Santa Ana City Jail and therefore the highest-ranking ICE officer at the facility. He is a legal custodian of a number of class members. Mr. Edwards is sued in his official capacity.

32.    Respondent Russell Davis is the Jail Administrator of the Santa Ana City Jail, whose stated goal is to fulfill the "incarceration needs" of the Santa Ana Police Department. Nonetheless, the Santa Ana Jail incarcerates several dozen class

8

members on any given day.  Therefore, Mr. Davis is a legal custodian of a number of

class members, and is sued in his official capacity.[4]

## FACTS AND PROCEDURAL HISTORY

**Alejandro Rodriguez**

33.    Petitioner Alejandro Rodriguez was detained for over three years while he

challenged the government's efforts to deport him to Mexico, a country where he has

not lived since he was a baby.

34.    Mr. Rodriguez came to this country in September 1979, when was one year old.

He became a lawful permanent resident on June 4, 1987, when he was nine years

old.[5]

35.    On or about July 29, 1998, Mr. Rodriguez pled guilty to Unlawful Driving or

Taking of a Vehicle under section 10851(A) of the California Vehicle Code (CVC).

For this crime he was sentenced to two years.  Five years later, on or about October

21, 2003, he pled no contest and was convicted of Possession of a Controlled

Substance under California Health and Safety Code section 11377(A), for which he

received formal probation of 5 years under the conditions of California Prop 36.  He

was transferred to DHS custody after his arrest, on April 10, 2004.  He was detained

for over three years after that transfer, until the government released him shortly after

---

[4] The government has taken conflicting positions in detention litigation concerning
who the proper Respondent should be in habeas petitions challenging immigration
detention.  Petitioners have sued every official who could constitute an appropriate
respondent under the different theories advanced by the government, as well as the
officials who constitute the proper defendants for a complaint under Section 1331.

[5] Mr. Rodriguez narrowly missed becoming a citizen due to events beyond his control.
He would have gained automatic citizenship, through his father, if his parents had
legally separated prior to his 18th birthday, or if he had been under the age of 18 at the
time of the enactment of the Child Citizenship Protection Act of 2000.  However, his
parents formally separated shortly after he turned 18, and he was 23 by the time the
Act passed.  See 8 U.S.C. 1431.

1   the filing of the class certification motion in this case.

2   36.   The government charged Mr. Rodriguez with being removable based on his

3   drug offense on April 15, 2004. At his removal hearing, Mr. Rodriguez contested

4   that his conviction rendered him removable, and argued in the alternative that he was

5   eligible for relief from removal.[6]

6   37.   The government received a continuance to alter the charging documents in his

7   case, after which it charged Mr. Rodriguez with being deportable on an additional

8   ground based on his 1998 conviction for theft. Subsequently, on July 21, 2004, an

9   immigration judge ordered him removed, holding that both his drug offense and his

10  theft offense rendered him removable. The Judge held that the drug offense was a

11  controlled substance offense triggering removal and that the theft conviction was an

12  aggravated felony, triggering mandatory removal.[7] The immigration judge ordered

13  him deported to Mexico. Mr. Rodriguez appealed that decision to the BIA.

14  38.   On December 21, 2004, the Board reversed the Judge's decision that the drug

15  possession conviction rendered Mr. Rodriguez removable, but upheld the decision

16

17  [6]An ICE officer initially deemed him eligible for release on bond, and set the bond at

18  $15,000. However, Mr. Rodriguez was unable to afford the bond in that amount, and an immigration judge denied his request to lower the bond amount. Shortly after the

19  BIA decided his case in 2004, the government revoked that bond order and ordered

20  him detained without bond under the mandatory detention provision codified at 8 U.S.C. 1226(c).

21

22  [7]Although not charged in the immigration charging document, the government also presented evidence from court records that, on or about October 24, 2003, a man using

23  the name Alejandro Rodriguez (who also used another name as an alias) pled guilty to

24  California Health and Safety Code section 11550(a), Under the Influence of a Controlled Substance, and was sentenced to 120 days in jail, which he served during

25  the same time that Mr. Rodriguez was released and reporting to the court for his

26  conviction of October 21, 2003. The date of conviction makes it highly unlikely that Mr. Rodriguez was in fact convicted of this offense. Nonetheless, the IJ ruled that this

27  conviction constituted a second drug offense, rendering Petitioner removable on the

28  basis of the drug convictions.

10

1  that his theft conviction was an aggravated felony.

2  39.    On December 28, 2004, Mr. Rodriguez timely petitioned for review of the

3  Board's decision to the Ninth Circuit, arguing inter alia that his crime was not an

4  aggravated felony as defined by the Immigration and Nationality Act.  Mr. Rodriguez

5  then sought a stay of removal, which the government opposed.  Thereafter, the Ninth

6  Circuit granted his request for a stay of removal, and therefore necessarily found that

7  his case presents substantial legal claims.  See Maharaj v. Ashcroft, 295 F.3d 963,

8  966 (9th Cir. 2002).

9  40.    While Mr. Rodriguez's case was pending at the Ninth Circuit, that court decided

10  another case holding that Mr. Rodriguez's theft conviction was not an aggravated

11  felony.  The government then moved to hold his case in abeyance while it sought en

12  banc review of that decision.  The Ninth Circuit granted the motion, even though he

13  had already been detained for 15 months at that time.  After en banc review failed,

14  the government sought Supreme Court review in the other case, and again requested

15  that Mr. Rodriguez's case be held.  After the Supreme Court granted cert, his case

16  was held still further.  In the end, his case was held in abeyance for over two years,

17  but none of the decisions for which it was held established that he was subject to

18  mandatory removal, as the immigration courts had found.

19  41.    Eventually, the government largely conceded that Mr. Rodriguez's convictions

20  did not subject him to mandatory removal, and it agreed to remand his case to the

21  immigration courts on this basis.  His case is now back before an immigration judge,

22  who will consider his (exceedingly strong) application for cancellation of removal in

23  January 2011.

24  42.    During the three years of Mr. Rodriguez's detention, the government never held

25  a hearing as to whether his prolonged detention is justified.  In fact, the only process

26  Mr. Rodriguez received with respect to his detention was what the government calls

27  "File Custody Reviews."  The first of these occurred on March 10, 2005, when an

28  ICE agent presumably read through his file and issued a "Decision to Continue

11

Detention." No ICE official interviewed Mr. Rodriguez, let alone held a hearing, prior to making this decision. Instead, ICE merely gave him a questionnaire to fill out, asking for information regarding family members, employment experience, and any outstanding probation requirements. Although Mr. Rodriguez documented his work as a dental assistant and his extensive family ties, including his U.S. citizen father and sister, and his lawful permanent resident mother and brother, ICE denied his request for release, stating simply that he would remain detained until the Ninth Circuit rendered its decision. The notice offered no further explanation for the decision to continue detention, made no mention of how long Mr. Rodriguez had been detained (eleven months at that time), and offered no suggestions as to what steps he might take to effect a different outcome in any future decisions.

43.    In September 2005, ICE conducted another file custody review, which it apparently denied for similar reasons, and in March 2006 the process was repeated again. In each of these instances, the government did not even provide Mr. Rodriguez with a written decision as to why he would remain incarcerated for many more months. In March 2007 the government chose to continue Mr. Rodriguez's detention again. At the time of that last custody decision he had been detained for nearly three years, yet the decision made no mention of this fact. Instead, the decision asserted that continued detention was justified because the Ninth Circuit would decide his case soon, which was entirely incorrect.

44.    Shortly after the original class complaint in this case was filed, the government released Mr. Rodriguez from detention, but continued to subject him to severe restraints on his liberty which remain in effect, including a requirement that he abide by a strict curfew and wear an electronic monitoring device at all times. The government has continued to require that he abide by these restrictions, and has never afforded him a hearing before an immigration judge to determine if they are necessary to ensure his appearance at his final removal hearing, where he will likely be granted cancellation of removal.

12

**Abdirizak Aden Farah**

45.    Abdirizak Aden Farah is a Somali refugee who has been detained for over eight months at the Mira Loma facility without any kind of hearing to determine whether his detention is justified.

46.    Mr. Farah was born on May 5, 1987 in Kismayo, Somalia. His family lived in Mogadishu for the early part of his childhood. Thousands of refugees have fled Somalia since the country's civil war erupted approximately twenty years ago. Today, there is no functioning government in most of Somalia, and the country exists in a state of constant civil war and virtual anarchy. The United Nations High Commission for Refugees issued guidelines in May 2010 largely advising against the return of anyone from central or southern Somalia, including even asylum seekers whose claims had been rejected. With respect to the capital of Mogadishu (where Mr. Farah lived prior to suffering persecution), a Human Rights Watch researcher has stated that "Mogadishu is one of the world's most dangerous places . . . Returning people there is not just risky; it's a potential death sentence."

47.    Mr. Farah first faced persecution in Somalia as a child, when his family was forced to flee Mogadishu because they were members of the minority Marehan clan who faced danger from members of the Hawiye, a powerful majority clan in Somalia. Eventually, the family was able to settle in Kismayo, a city in Somalia where the Hawiye were not powerful. Several years later, his father was shot and killed by members of a Hawiye sub-clan when he returned briefly to Mogadishu to try to sell the family home.

48.    Mr. Farah fled Somalia in April 2009 in order to escape the al-Shabaab, a militant Islamic organization that is trying to take over Somalia. Al-Shabaab militants shot and killed his brother Mohamed because he worked as a driver for the Somali Transitional Federal Government (TFG) in the summer of 2007. These same militants nearly killed Mr. Farah in the same attack by slashing his wrist with a knife. Afterward, al-Shabaab members repeatedly accused him of working for the TFG and

13

1  finally threatened to kill him if he did not join them.

2  49.    After the last of these threats, Mr. Farah's uncle sent money for him to flee.

3  With the assistance of several people, he arrived by a circuitous route at the southern

4  border of the United States, where he presented himself at the border and requested

5  asylum on or about December 31, 2009.  An asylum officer found his claim credible,

6  and referred him for a full asylum hearing before an immigration judge.

7  50.    Mr. Farah has had several hearings in his immigration case, the first of which

8  took place in March 2010.  At several of these, the immigration judge continued his

9  hearing because he did not have a lawyer, while others were cancelled because the

10  judge or the translator were not present.  His next hearing is scheduled for late

11  October 2010.

12  51.    Mr. Farah has applied for release on parole under 8 C.F.R. 212(d)(5)(A).  Under

13  these procedures, the decision whether or not to release him is made by a single

14  officer, with no appeal process, and without providing a hearing of any kind.  An ICE

15  officer denied him release without meaningful explanation.

16  52.    Mr. Farah's wife and baby daughter remain in Somalia.  He has been unable to

17  establish any contact with them because of his detention.

18  **Yussuf Abdikadir**

19  53.    Yussuf Abdikadir is also a Somalian refugee.  He has been detained by

20  immigration authorities since early March 2010, and also has not received a detention

21  hearing of any kind.

22  54.    Mr. Abdikadir was born on October 5, 1980.[8]  He lived with his family –

23  including his parents and five siblings -- as a child in Mogadishu.  He is also a

24  member of a minority clan in Somalia.

25  55.    In 1991, as the Somali political structure disintegrated, a militia associated with

26  a dominant clan, the Hawiye, attacked Mr. Abdikadir's family.  They killed his two

27

28  _____
[8] Yussuf is his given name, while Abdikadir is his father's given name.

14

1    older brothers, his father, and his grandmother. They also severely mistreated other

2    members of the family, and raped his mother.

3    56.    Mr. Abdikadir and his surviving family members then fled to Kenya, where

4    they lived in various refugee camps for most of the next two decades. He married

5    Shukri Hussein, also a Somalian refugee, while in the camps, and the couple had

6    three children. (Ms. Hussein also has a son from a prior relationship, who is now Mr.

7    Abdikadir's step-son).

8    57.    Life in the refugee camps was very hard for Mr. Abdikadir and his family.

9    Kenya granted them no permanent status, and as a result they were forced to live in

10    the camps and denied the right to work. At the same time, the Kenyan government

11    and international agencies failed to provide sufficient food for the refugees. He and

12    his family would have to wait for hours during the heat of the day to obtain their

13    small food rations, and often were mistreated by the Kenyan authorities while

14    waiting. Mr. Abdikadir occasionally worked illegally in order to supplement his

15    family's meager provisions, but Kenyan authorities arrested and punished him for

16    doing so. The Kenyan authorities also did little if anything to stop the bandits who

17    would raid the camps at night, raping camp residents and pillaging their belongings.

18    58.    After life in the camps became too difficult, Mr. Abdikadir's mother managed

19    to sell some land the family owned in Somalia, and used these proceeds to procure

20    funds to allow her son to escape. Unable to return to Somalia or survive further life

21    in the Kenyan refugee camps, Mr. Abdikadir fled. He traveled a circuitous route in

22    search of a country with refugee protections, and ultimately arrived at the southern

23    border of the United States seeking asylum.

24    59.    At the border crossing from Tijuana he presented a birth certificate and applied

25    for asylum, entering ICE detention in March 2010. He was sent to Mira Loma

26    shortly afterward, and passed his credible fear interview several weeks later, in

27    approximately April 2010.

28    60.    Mr. Abdikadir has been before an immigration judge several times since then,

15

but has yet to even submit an application for asylum, because he was unable to find a
lawyer to represent him and speaks virtually no English.

61.    Mr. Abdikadir has also applied for release on parole under 8 C.F.R.
212(d)(5)(A). As with Mr. Farah, the decision whether or not to release Mr.
Abdikadir is made by a single officer, with no appeal process, and without a hearing
of any kind. Mr. Abdikadir requested release from this officer, and in doing so
provided his birth certificate as well as a sworn affidavit from a friend of his who
lives in San Diego and is willing to house and assist him. Nonetheless, his parole
request was denied. The sole explanation provided was a check mark in a box next to
a paragraph which states "You have not established to ICE's satisfaction that you will
appear as required for immigration hearings, enforcement appointments, or other
matters, if you are paroled from detention." Other than requesting a redetermination
based on changed circumstances, Mr. Abdikadir has no recourse to any further
process for appeal.

62.    Mr. Abdikadir has suffered during his time in detention, not only because of the
traumatic effects of detention in general on those who have suffered past persecution,
but also because of his medical problems. Mr. Abdikadir has some kind of problem
concerning his eyes – perhaps tied to light sensitivity -- that causes them to be
constantly red and irritated. Although he has sought medical attention for this
problem at the Mira Loma Detention Center, the clinic there has not provided him
with any medication that has addressed the problem.

63.    Mr. Abdikadir has been unable to communicate with his family while in
detention. He awaits the opportunity to win his release and his status, so that he can
begin to recover from the years of suffering he has faced, and also so that he can
speak with and hopefully some day re-unite with his wife and children. Given that he
has not even submitted an asylum application yet, he will remain incarcerated
without a hearing for months more absent this Court's intervention.

**Abel Perez Ruelas**

64.    Abel Perez Ruelas is a citizen of Mexico. He has been in immigration detention at Mira Loma Detention Center for 17 months, since April 8, 2009.

65.    Mr. Perez Ruelas was born on January 25, 1967 in Jalisco, Mexico. In 1996, he met Maria del Rosario, with whom he had a daughter, Azirit Lessandra, one year later.

66.    He was admitted to the United States in 2002 on a visitors' visa, two years after he broke up and lost contact with with Ms. del Rosario.

67.    In approximately 2007, about five years after Mr. Perez-Ruelas came to live in the United States, he received a call from his mother, who told him that Ms. del Rosario had died in childbirth in Mexico, and that his daughter had been sent to live with her mother's parents. Since then, Mr. Perez Ruelas has been living with the hope that one day he may bring his daughter to the United States to live with him.

68.    On December 22, 2008, Mr. Perez Ruelas married Maria Navichoque Perez, a U.S. citizen. She is a nurse at the Los Angeles Jewish Home, a non-profit senior living facility in Reseda, California.  The couple filed to adjust his status based on their marriage in approximately February 2009.

69.    After his marriage, Mr. Perez Ruelas became the stepfather of Maria Perez's four children, all of whom are U.S. citizens by birth. The two youngest children, Hector and Emily, live with Mr. Perez Ruelas and his wife in their home in Reseda, California.

70.    Mr. Perez Ruelas has lived and worked in the United States for almost eight years. He works in construction, primarily with cement and tiles.  Prior to his detention, he regularly attended church with his wife in Pacoima and Reseda.

71.    Mr. Perez Ruelas has had three prior convictions for driving under the influence of alcohol, none for which he spent more than two months in jail. Mr. Perez Ruelas served three months of probation for his first offense in 1994; he served 10 days in jail for his second, a decade later in 2004; and he served 60 days in jail for his third,

17

which occurred four years later. Pursuant to his sentence for the last conviction, Mr. Perez Ruelas has diligently attended Alcoholics Anonymous for over a year, and has continued attending AA meetings even while in immigration detention.

72.   On or about April 8, 2009, Mr. Perez Ruelas was released from jail for his last offense. Immigration and Customs Enforcement officials immediately took him into immigration custody, notwithstanding his pending application to adjust his status based on his marriage. At the time, Mr. Perez-Ruelas was in the process of becoming a lawful permanent resident of the United States.

73.   Mr. Perez Ruelas was given a bond hearing on April 21, 2009, pursuant to 8 U.S.C. 1226(a), at which he bore the burden to prove that he was not a danger or flight risk. Upon information and belief, the immigration judge knew that Mr. Perez Ruelas was married to a U.S. citizen and that he had a pending adjustment application, but nonetheless the judge denied him release on bail. He told Mr. Perez Ruelas that his prior DUI convictions made him a danger to society, even though his sentence had long since expired.

74.   With the assistance of his attorney, Mr. Perez Ruelas applied for a bond reduction in February 2010. At that hearing, the immigration judge set a bond of $5,000, an amount too high for Mr. Perez Ruelas's family to pay.

75.   Because he could not pay, Mr. Perez Ruelas remained in immigration detention – where he has been for the past 16 months awaiting adjudication of his case. His last hearing was over four months ago, on April 15, 2010.

76.   On July 30, 2010, Mr. Perez Ruelas and his wife received notice that their application to adjust his status had been approved, with a priority date of March 22, 2009. Although he is entitled to adjust status immediately and will no doubt ultimately prevail in his immigration case, he nonetheless remains detained for no apparent reason, merely because under the stringent standard applied at his bond hearing he cannot pay the bond that the immigration judge set in his case.

18

**Jose Farias Cornejo**

77.    Jose Farias Cornejo is a citizen of Mexico and a lawful permanent resident of
the United States. He has been in immigration detention at Mira Loma Detention
Center for over eleven months, since September 14, 2009.

78.    Mr. Farias Cornejo was born on August 14, 1984 in Michoacan, Mexico. He
was brought to the United States prior to his first birthday by his parents, who were
migrant farm workers. He has never left this country, and speaks fluent English.

79.    Mr. Farias Cornejo has four siblings. All four are U.S. citizens.  Mr. Farias
Cornejo's mother is also a lawful permanent resident of the United States.

80.    Mr. Farias Cornejo spent his childhood years in Washington and his
adolescence in California because his parents were migrant farm workers. He
attended elementary school in San Diego for a few years before moving to Montclair,
California to attend middle school and high school. He took special education classes
at Montclair High School because of his diagnosed learning disability.

81.    After graduating from high school, Mr. Farias Cornejo worked at various jobs
near his hometown in California, including in construction -- manufacturing jacuzzis
and landscaping.

82.    Mr. Farias Cornejo has had several prior convictions. In 2007, he was convicted
of possession of methamphetamine and was given the opportunity to receive
substance abuse treatment as an alternative to incarceration under California
Proposition 36. Mr. Farias Cornejo diligently completed his drug treatment classes,
but because he could not afford to pay the mandatory fine, he was sentenced to 180
days in jail.

83.    Upon information and belief, in 2009 Mr. Farias Cornejo was convicted of a
misdemeanor California theft offense, for which he spent 14 days in jail.  In that
same year, he was convicted of being under the influence of a controlled substance,
for which he spent 60 days in jail.

19

84.   Shortly after serving his last sentence, in September 2009, federal immigration officials initiated removal proceedings against him and placed him in immigration detention, citing their authority to mandatorily detain any individual with a prior controlled substance offense under 8 U.S.C. 1226(c).

85.   Although the government contends that Mr. Farias Cornejo is subject to "mandatory detention" without a bond hearing under that provision, it has acknowledged that he is eligible for relief from removal in the form of cancellation of removal under 8 U.S.C. 1229b, because he has not been convicted of an "aggravated felony."

86.   Mr. Farias Cornejo was given a cancellation application on October of 2009, but struggled to find an attorney to assist him in completing it.  After five months in detention, he finally found an attorney, but that attorney did not file his application. Eventually Mr. Farias Cornejo found a different attorney to represent him, in June of this year.  Through his new attorney Mr. Farias Cornejo finally filed his cancellation application, nearly ten months after he was placed into immigration detention.

87.   Upon information and belief, at his cancellation hearing on August 17, 2010, the government stated that it had no objection to his application.  However, the immigration judge told Mr. Farias Cornejo that he had an outstanding warrant, and therefore refused to adjudicate the application.  Instead, the judge set his next court hearing for November 15, 2010, apparently on the assumption that his warrant would be resolved prior to that time.

88.   Although Mr. Farias Cornejo poses no flight risk, is not a danger to the community, and is eligible for relief from removal, he remains subject to continued detention. He has never had a hearing to determine whether his detention remains justified even though he has now been incarcerated for nearly a year.

**Angel Armando Ayala**

89.   Angel Armando Ayala is a citizen of El Salvador who was born on August 20, 1976.  He came to the United States with his family at the age of eleven and has

20

1    never left.  He attended junior high and high school in Southern California.

2    90.    Prior to his arrest by immigration authorities, Mr. Ayala lived with his mother,

3    Maria, who is a United States citizen, and was also frequently in touch with his

4    brother and sister, both of whom live in Southern California.  (He also has an older

5    brother who lives in El Salvador).

6    91.    Mr. Ayala has worked in the United States his entire adult life, engaging in a

7    variety of construction-related jobs including forklift driving, materials handling,

8    landscaping, and in shipping and receiving.

9    92.    Immigration officials arrested Mr. Ayala in what apparently was a worksite raid

10   in approximately 1994.  At that time, government officials detained him at the San

11   Pedro Detention facility.  He eventually had a hearing before an immigration judge

12   who ordered him released on bond because he was eligible for relief under the

13   Nicaraguan and Cuban Adjustment Relief Act ("NACARA").  The judge instructed

14   him to find a lawyer to help him apply.

15   93.    Shortly afterward, when Mr. Ayala went to the federal immigration building, he

16   met a man acting as an attorney named Jose Quinones.  Mr. Quinones offered to file

17   Mr. Ayala's NACARA application for a fee.

18   94.    Mr. Quinones eventually filed the application, which was based on Mr. Ayala's

19   mother's eligibility for NACARA.   A hearing on the application was set for October

20   29, 1999.

21   95.    Shortly before the hearing, Mr. Ayala's mother became seriously ill.  Because

22   he had to take his mother to the hospital and attend to her, Mr. Ayala could not attend

23   the court hearing.  At the hearing, the immigration judge ordered him removed in

24   absentia, notwithstanding the fact that he was prima facie eligible for NACARA

25   relief.

26   96.    A few days after the hearing, after his mother's condition had stabilized, Mr.

27   Ayala called Mr. Quinones to discuss his immigration case.  Mr. Quinones stated that

28   the case now had to be re-opened, and that he would charge Mr. Ayala several

21

thousand dollars to do this.  When Mr. Ayala stated that he did not have such funds available, Mr. Quinones told him to contact him when he had saved up the money. He did not mention that Mr. Ayala had to file the motion within 180 days, as is required, or that he could be deported if he did not file the motion.

97.    Several years later, Mr. Quinones was suspended from practicing before the immigration courts by the Executive Office of Immigration Review.  If he ever was a licensed attorney, he has presumably been disbarred.

98.    Mr. Ayala continued to live and work in the United States for the ensuing decade.  Upon information and belief, he received several misdemeanor convictions for driving without a license during this time, but was not convicted of any other offense.

99.    On February 14, 2009, immigration authorities arrested Mr. Ayala at his home in Pomona, which he shares with his mother, based on his outstanding removal order from ten years earlier.  They transferred him to the Mira Loma Detention Center.

100.  With the assistance of non-profit legal service provider Catholic Charities, Mr. Ayala filed a motion to reopen his case based on ineffective assistance of counsel. However, the immigration judge denied the motion, and the BIA affirmed the decision, asserting that the motion was untimely and not subject to tolling based on ineffective assistance.  According to the Board, the attorney had no duty to inform Mr. Ayala of the filing deadline for the motion to reopen because the attorney never agreed to represent him with respect to the motion.  Thus, the Board declined to reopen his case, notwithstanding the fact that Mr. Ayala is eligible for NACARA relief.[9]

101.  Mr. Ayala subsequently hired attorney Shan Potts, who now represents him before the Ninth Circuit.  The Ninth Circuit granted Mr. Ayala a stay of removal, but

---

[9] Upon information and belief, Mr. Ayala has one misdemeanor conviction for drug possession from approximately 1996 and several convictions for driving without a license.  None of these render him ineligible for NACARA.

22

1  briefing has not yet begun in his petition for review of the BIA's decision.  His case

2  will likely take well over a year to decide at the Ninth Circuit, given the court's

3  substantial case backlog.

4  102.  Mr. Ayala's incarceration has worked a great hardship on his U.S.-citizen

5  mother, with whom he lived prior to his arrest.  She has had difficulty paying rent for

6  the apartment they shared, and also has suffered from the absence of his emotional

7  support.

8

9  <strong>CLASS-WIDE ALLEGATIONS</strong>

10  103.  Petitioners are amongst approximately at least 350 detainees, if not more, in the

11  Central District on any given day whom the government has incarcerated for more

12  than six months without proving at an adequate hearing that their prolonged detention

13  is justified.[10]  Indeed, it is the government's policy or practice to detain non-citizens

14  under the general immigration detention statutes for prolonged periods of time

15  pending completion of their removal proceedings without providing them with such

16  hearings.

17  104.  In response, Petitioners bring this action on behalf of themselves and all other

18  persons similarly-situated, pursuant to Federal Rules of Civil Procedure 23(a) and

19  23(b)(2), or in the alternative, as a representative action pursuant to a procedure

20  analogous to that provided in Rules 23(a) and 23(b)(2).  See Rodriguez v. Hayes, 578

21  F.3d 1032, 1047 (9th Cir. 2009) (allowing this case to proceed as a class action

22  [10] This Court ordered the government to produce a "snapshot" list of all class

23  members on a particulate date, which the government produced for the date of April
   21, 2010.  As of that day, there were 352 class members – people incarcerated in ICE

24  custody in the Central District who had been in ICE custody for at least 180 days, and
   whose cases remained pending either before the immigration courts or before the

25  federal courts with a stay of removal in effect.  The list also included a number of

26  people who were not class members because they were not incarcerated in detention
   centers at all, but rather in juvenile facilities, and also two people who were not class

27  members because they were had final removal orders with no stay of removal in

28  effect.

23

1  habeas petition).

2  105. Petitioners represent a class of all people within the Central District of

3  California who 1) are or will be detained for longer than six months pursuant to the

4  general immigration detention statutes pending completion of removal proceedings,

5  including judicial review, 2) are not detained pursuant to one of the national security

6  detention statutes at 8 U.S.C. 1226a and 8 U.S.C. 1531-37 and 3) have not been

7  afforded a hearing to determine whether their prolonged detention is justified.

8  106. The class includes people who were present in an ICE detention facility in the

9  Central District on or after the date on which the original complaint was filed as long

10  as they had been detained by ICE for more than six months at that time, even if they

11  are no longer in the Central District; it therefore includes people subject to the mass

12  transfer of detainees from the San Pedro Detention Facility in October 2007, as long

13  as those people remain in an ICE detention facility somewhere and their cases remain

14  pending.

15  107. The class excludes people who have a final order of removal and no stay of that

16  removal order, such that the government has legal authority to remove them.

17  108. The class excludes juveniles who are held under the care of the Office of

18  Refugee Resettlement. It also excludes people imprisoned pursuant to a criminal

19  sentence, including individuals who complete removal proceedings and any judicial

20  review while serving such sentences.

21  109. Pursuant to this Court's directive that the parties propose sub-classes,

22  Petitioners propose that the Court also certify four sub-classes in this action,

23  corresponding to each of the general detention statutes. Petitioners propose to

24  represent a sub-class of class members detained under 8 U.S.C. 1225(b) represented

25  by Mr. Farah and Mr. Abdikadir, a sub-class of class members detained under 8

26  U.S.C. 1226(a) represented by Mr. Rodriguez and Mr. Perez Ruelas, a sub-class of

27  class members detained under 8 U.S.C. 1226(c) represented by Mr. Farias Cornejo,

28  and a sub-class of class members detained under 8 U.S.C. 1231(a) represented by Mr.

1   Ayala.

2   110. For each putative sub-class and each detention statute, Petitioners' counsel

3   estimates that there will be far more than forty other sub-class members in this

4   District who, like each of the Petitioners, have been detained for more than six

5   months, are detained under that particular general detention statute, and have not

6   been afforded a constitutionally-adequate hearing to determine whether their

7   prolonged detention is justified. Indeed, there may well be more than forty members

8   of each sub-class detained in the Central District on any given single day.

9   111. The proposed class and sub-classes meet the requirements of Fed. R. Civ. Pro.

10   23(a)(2). For the class as a whole, there are several common questions of law and

11   fact in the action. These include 1) whether the government has a policy or general

12   practice of detaining non-citizens in removal proceedings for longer than six months

13   under the general immigration detention statutes without providing an adequate

14   hearing to determine whether such prolonged detention is justified, 2) whether any

15   general immigration detention statute authorizes this detention policy or practice, and

16   3) whether this detention policy or practice violates the Due Process Clause.

17   Rodriguez, 578 F.3d at 1048-49 (finding common questions).

18   112. There are additional common questions of law that pertain to each subclass.

19   These include: for Subclass 1, whether 8 U.S.C. 1225(b) authorizes the policy or

20   general practice of detaining non-citizens in removal proceedings for longer than six

21   months without providing a hearing where the government must establish that such

22   detention is justified; for Subclass 2, whether 8 U.S.C. §1226(a) authorizes this

23   detention policy or practice; for Subclass 3, whether 8 U.S.C. §1226(c) authorizes

24   this detention policy or practice; and for Subclass 4 whether §1231(a) authorizes this

25   detention policy or practice.

26   113. The claims of the named representative Petitioners are typical of the claims of

27   each proposed sub-class and of the class as a whole. Like all of the proposed class

28   members, the named Petitioners will have been detained, pursuant to the

1  government's policy and practice, for at least six months under the relevant general

2  immigration detention statutes, without having been afforded an adequate hearing

3  where the government has shown that their prolonged detention is justified.

4  Rodriguez, 578 F.3d at 1048-50.

5  114.  The named Petitioners will fairly and adequately represent the interests of all

6  members of the proposed class and sub-classes because they seek relief identical to

7  the relief sought by all class members, and because they have no interests adverse to

8  other class members.  Moreover, the named Petitioners are represented by pro bono

9  counsel from the ACLU of Southern California, the ACLU Immigrants' Rights

10  Project, the Stanford Law School Immigrants' Rights Clinic, and the law firm of

11  Sidley Austin LLP.  These organizations and the attorneys working for them have

12  extensive experience litigating on behalf of detained immigrants and broad

13  experience litigating class actions.  Rodriguez, 578 F.3d at 1050.

14  115.  Respondents have acted on grounds generally applicable to the class and to

15  each subclass through their policy and practice of detaining non-citizens in removal

16  proceedings for longer than six months under each of the general immigration

17  detention statutes without providing an adequate hearing where the government has

18  shown that their prolonged detention is justified, making class-wide declaratory and

19  injunctive relief appropriate.

20

21                          **LEGAL BACKGROUND**

22  116.  Petitioners argue that the government may not detain them for longer than six

23  months without showing at an adequate hearing that their prolonged detention is

24  justified.  Peititioners make this argument on both statutory and constitutional

25  grounds.

26  117.  With respect to the statute, Petitioners argue that because their removal

27  proceedings have exceeded an "expeditious" period, the general detention statutes

28  under which they are detained must be construed to require an individualized hearing

26

as to whether or not their detention is justified. Several decisions have already construed these statutes to authorize only reasonable detention, and to require individualized hearings to ensure that detention under them remains reasonable. <u>See generally</u> <u>Nadarajah v. Gonzales</u>, 443 F.3d 1069, 1078-79 (9th Cir. 2006) (holding that because 8 U.S.C. 1225(b) is one of "the general immigration detention statutes" it authorizes detention only for a "brief and reasonable" period of time necessary to complete removal proceedings, presumptively six months); <u>Tijani v. Willis</u>, 430 F.3d 1241 (9th Cir. 2005) (construing 8 U.S.C. 1226(c) to require mandatory detention only in cases of "expeditious" removal proceedings, and ordering a hearing to determine whether detention is justified); <u>Casas-Castrillon v. Dep't of Homeland Sec.</u>, 535 F.3d 942, 950 (9th Cir. 2008) (construing general detention statutes to require bond hearings where government bears burden of proof to validate prolonged detention). Because none of the general detention statutes explicitly authorize prolonged detention without individualized hearings, they must all be construed to require such hearings to ensure that detention remains reasonable.

118. In the alternative, Petitioners argue that their prolonged detention without an adequate hearing to determine whether detention is justified violates the Due Process Clause. "Freedom from imprisonment -- from government custody, detention, or other forms of physical restraint -- lies at the heart of the liberty that [the Due Process] Clause protects." <u>Zadvydas</u>, 533 U.S. at 690. For this reason, detention must always be reasonable in relation to its purpose. <u>Jackson v. Indiana</u>, 406 U.S. 715, 738 (1972). <u>See</u> <u>also</u> <u>Demore</u>, 538 U.S. at 527-29 (applying "reasonable relation" test).

119. In the immigration context, the primary purpose of detention is to effect the alien's deportation in the event that removal proceedings are finally concluded in the government's favor. <u>Zadvydas</u>, 533 U.S. at 699 (holding that the "statute's basic purpose" is "to assure the alien's presence at the moment of removal"); <u>Demore</u>, 538 U.S. at 528 (upholding brief mandatory detention pending completion of removal

proceedings because it "serves the purpose of preventing deportable criminal aliens

from fleeing prior to or during their removal proceedings.").

120.  Because Petitioners and other class members suffer lengthy civil detention, they

must be afforded rigorous procedures to ensure that their detention remains justified.

Zadvydas, 533 U.S. at 690-92 (noting "serious" constitutional problem with

prolonged and indefinite civil detention unless "limited to specially dangerous

individuals and subject to strong procedural protections") (emphasis added); Casas-

Castrillon, 535 F.3d at 950 (holding that "prolonged detention without adequate

procedural protections would raise serious constitutional concerns" and therefore that

"due process requires adequate procedural protections to ensure that the government's

asserted justification for physical confinement outweighs the individual's

constitutionally protected interest in avoiding physical restraint.") (citing Zadvydas).

121.  With respect to what procedures are required for a hearing to be adequate to

justify prolonged detention for both statutory and constitutional purposes, the

government must at a minimum provide advance notice to the detainee and then

provide a transcribed hearing before an immigration judge where it bears the burden

to show by "clear and convincing" evidence that "no conditions of release" are

sufficient to protect the government's interests in preventing flight and danger.  See

Cooper v. Oklahoma, 517 U.S. 348, 363 (1996) ("due process places a heightened

burden of proof on the State in civil proceedings in which the individual interests at

stake . . . are both particularly important and more substantial than mere loss of

money.") (internal quotations omitted); Foucha v. Louisiana, 504 U.S. 71 (1992)

(requiring "clear and convincing evidence" for commitment of insanity acquittee

beyond length of permissible sentence); United States v. Salerno, 481 U.S. 739, 750

(1987) (recognizing that the "no conditions of release" standard strikes appropriate

balance of interests).  In addition, a showing of particularly serious danger is required

– given that detention may last for years -- and a detainee's criminal history alone is

insufficient to make that showing.  Zadvydas, 533 U.S. at 690-91 ("we have upheld

28

1   preventive detention based on dangerousness only when limited to specially

2   dangerous individuals and subject to strong procedural protections"). Perhaps most

3   important, the hearing must require a heightened showing based on the length of

4   detention at issue. Where a detainee has been detained for a long period of time and

5   proceedings may not end in a brief time, the government must make more of a

6   showing to justify the detention at issue. United States v. Accetturo, 783 F.2d 382,

7   388 (3d Cir. 1986) (stating in pre-trial detention context that "[i]n some cases, the

8   evidence admitted at the initial detention hearing, evaluated against the background

9   of the duration of pretrial incarceration and the causes of that duration, may no longer

10  justify detention."); Tijani v. Willis, 430 F. 3d 1241, 1242 (9th Cir. 2005) (ordering

11  bond hearing where government bore burden of proof in part because the "forseeable

12  process [for resolution of Petitioner's removal case] in this Court" was "a year of

13  more").[11]

14  122. In addition, any unrepresented detainee would have to be afforded counsel at

15  the government's expense at a hearing where prolonged detention was at stake. See

16  Lassiter v. Dept of Soc. Serv., 452 U.S. 18, 25 (1981) (noting that "it is the

17  defendant's interest in personal freedom, and not simply the special Sixth and

18  Fourteenth Amendments right to counsel in criminal cases, which triggers the right to

19  appointed counsel").

20

21

22

23  [11] This Court ordered hearings that largely comported with these requirements when it

24  granted preliminary injunctions for four individual prolonged detainees in litigation
    closely related to this case. See, e.g., Order Granting Motion for Preliminary

25  Injunction, Martinez v. Gonzales, CV06-7609 (C.D. Cal. January 4, 2007) (ordering

26  government to release detainee unless "the government shows by clear and convincing
    evidence that he is a sufficient danger or risk of flight to justify his detention in light

27  of how long he has been detained already and the likelihood of his case being finally
    resolved in favor of the government in the reasonably foreseeable future.").

28

                                          29

123.  Absent the provision of such hearings, the government's detention of Petitioners and other class members violates both the immigration statutes and the Due Process Clause.

## FIRST CAUSE OF ACTION

### Violation of Immigration and Nationality Act and Regulations

124.  Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

125.  Respondents' continued detention of Petitioners and other putative class members under the general immigration detention statutes violates the Immigration and Nationality Act, insofar as the statutes under which they are detained do not authorize detention for a prolonged period of time absent an adequate hearing at which the government shows that their detention remains justified.

## SECOND CAUSE OF ACTION

### Violation of Fifth Amendment Due Process (Right to a Constitutionally Adequate Custody Hearing)

126.  Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

127.  Respondents' continued detention of Petitioners and other class members without an adequate hearing where the government shows that their prolonged detention remains justified violates the right to be free of prolonged non-criminal detention without adequate justification and sufficient procedural safeguards, as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution.

# PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request that the Court grant the following relief:

a.      Assume jurisdiction of this matter;

b.      Certify a class and sub-classes as appropriate under Fed. R. Civ. Pro. 23 (or other analogous procedures) consisting of all people within the Central District of California who 1) are or will be detained for longer than six months pursuant to the general immigration detention statutes pending completion of removal proceedings, including judicial review, 2) are not detained pursuant to one of the national security detention statutes at 8 U.S.C. 1226a and 8 U.S.C. 1531-37 and 3) have not been afforded a hearing to determine whether their prolonged detention is justified;

c.      Appoint Petitioners Rodriguez and Perez Ruelas, as representatives of a sub-class of class members detained under 8 U.S.C. 1226(a); Petitioners Farah andAbdikadir as representatives of a sub-class of class members detained under 8 U.S.C. 1225(b); Petitioner Farias Cornejo as the representative of a sub-class of class members detained under 8 U.S.C. 1226(c); and Petitioner Ayala as the representative of a sub-class of class members detained under 8 U.S.C. 1231.

d.      Appoint Petitioners' Counsel as Counsel for the Class and each subclass;

e.      Order Respondents to provide, after giving notice, individual hearings before an immigration judge for Petitioners and each member of the class, at which Respondents will bear the burden to prove by clear and convincing evidence that no reasonable conditions will ensure the detainee's presence in the event of removal and protect the community from serious danger, despite the prolonged length of detention at issue;

f.      Declare that Respondents' failure to provide Petitioners and the members of the class with adequate hearings violates the Immigration and Nationality Act and the Due Process Clause of the Fifth Amendment;

1   g.        Enjoin Respondents from failing to provide Petitioners and each member

2   of the Class, upon notice, with adequate hearings before an immigration judge (as

3   specified above in subsection (e) of this Prayer);

4   h.        Grant Petitioners reasonable attorneys' fees, costs, and other

5   disbursements pursuant to the Equal Access to Justice Act, 28 U.S.C. 2412;

6   i.        Grant such other relief as the Court deems just and equitable.

7                                 Respectfully submitted,

8                                 ACLU OF SOUTHERN CALIFORNIA

9

10   Dated:  October 20, 2010          By

11                                 AHILAN T. ARULANANTHAM
                                     Counsel for Petitioners