# Exhibit 45

**Declaration of Jennifer Stark**

I, Jennifer Stark, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am employed as an Equal Justice Works Fellow and Attorney at the ACLU of Southern California.

3.      On April 30, 2010, pursuant to the Court's Stipulated Protective Order Concerning Roster of Detainees [Dkt. # 78, Apr. 19, 2010], Respondents sent Petitioners a roster of the names, alien numbers, locations, and attorney contact information for all immigration detainees who, on April 21, 2010, had been detained for six months or longer in the Central District of California.  This roster contained the names of approximately 350 adult detainees as well as information concerning possible attorneys of record for some of the detainees.

4.      The attorneys working on this case sought to obtain more information about their clients but, because of the constraints created by class members' detention at distant locations and the attendant difficulties in meeting with them, decided to meet with a random sample of approximately twenty percent of the 350 detainees named on the roster.

5.      On May 22, 2010, Erin Mohan, a Stanford law student working with Petitioners, used a computer-generated random sample program to compile a list of 354 numbers randomly selected from within the range 1 to 354.  Using this list of random integers, Ms. Mohan ordered the names of adults included in the roster of immigration detainees produced by the government pursuant to the Stipulated Protective Order dated April 19, 2010.

6.      We then used this random sample to generate a list of 70 detainees with whom we would meet in an effort to gather information relevant to the lawsuit and identify potential class-representatives.

7.      On May 24, 2010, May 25, 2010, and May 26, 2010, I traveled to the Mira Loma Detention Facility with two Stanford law students, three ACLU summer law student interns, and three translators.  Over the course of those three days we managed to interview 57 detainees.  Whenever a person on our list was no longer in detention, either because they had been released,

1   bonded out, or deported, we would proceed to the next person included in our random sample.

2   We continued to do this until we met with the requisite number of detainees. In total, we

3   collectively dedicated more than 200 hours to this process.

4       8.    On May 28, 2010, I traveled to the Santa Ana Detention Facility with three law

5   student interns to meet with detainees. While the security guards gave me access, the guards

6   denied our law student interns access to the detainees. Consequently, I was able to meet with

7   less than half of the detainees I had planned to meet to finish the random sample.

8       9.    Unfortunately, in many instances a single interview with a detainee proved

9   insufficient to accurately determine the procedural posture of that detainee's immigration case.

10  Because many detainees did not have a clear understanding of the procedural posture of their

11  own immigration cases, after interviewing detainees we generally had to supplement the

12  information obtained from those interviews with further interviews and review of their

13  documents. In addition, because most detainees did not have critical documents from their "A"

14  files in their possession at the time of the interview, we often had to make several requests of the

15  detainees to send follow-up information from their "A" files, which they attempted to obtain

16  from their family members, lawyers, or their deportation officers.

17      10.   Given the problems with access to the detention facilities and challenges in

18  securing reliable information from the detainees, my supervisor Ahilan Arulanantham and I – as

19  well as five summer law student interns – needed to make several subsequent visits to the Santa

20  Ana Detention Facility, the Mira Loma Detention Facility, and the Theo Lacy Detention Facility.

21  We made additional visits to these detention facilities on June 14, 2010, June 15, 2010, June 28,

22  2010, July 1, 2010, July 27, 2010, August 4, 2010, August 19, 2010, August 28, 2010, and

23  August 31, 2010. I went on five of these occasions and Mr. Arulanantham went on five of these

24  occasions (on one occasion we went together). On most of these occasions we were

25  accompanied by one or more student interns.

26      11.   On these visits, we met the remaining detainees necessary to complete the random

27  sample, conducted numerous follow-up interviews of the detainees in our sample in order to

28  ensure that we had a reasonably complete understanding of their cases, and also interviewed

1   several other detainees who appeared to be suitable class representatives. We collectively

2   devoted more than 150 more hours collecting information from detainees through this process.

3       12.     Based on the information from the interviews and supplemental information

4   mailed to us by detainees and their family members, I classified each of the first seventy

5   detainees we met from our random sample according to the general immigration statute under

6   which they appeared to be detained. I then discussed my classifications with Mr. Arulanantham.

7   In approximately 25 cases where I perceived ambiguity, Mr. Arulanantham independently

8   reviewed my classification by examining the underlying records and, in a handful of cases,

9   altered the classification. Through this process, we have ascertained each of the 70 detainees'

10  procedural postures and classified them accordingly to the best of our knowledge.

11      13.     According to our analysis, the random sample of 70 detainees contains 11 people

12  detained under 8 U.S.C. § 1225(b), at least 5 of whom were applying for asylum. I believe that

13  some of the other individuals detained under 8 U.S.C. § 1225(b) may have also been applying for

14  asylum, though I cannot say for sure because some of the individuals did not understand the

15  immigration system well enough to explain whether or not they were applying for this form of

16  relief. In addition, a significant number of all the individuals with whom we met stated that they

17  are applying for asylum.

18      14.     On or around February 24, 2011, Respondents again sent Petitioners a roster of

19  the names, alien numbers, locations, and attorney contact information for all immigration

20  detainees who, on February 24, 2011, had been detained for six months or longer in the Central

21  District of California. This roster also contained the names of approximately 350 adult detainees

22  as well as information concerning possible attorneys of record for some of the detainees.

23      15.     On or around March 20, 2011, Michael Kaufman, one of the attorneys on used the

24  same computer-generated random sample program to compile a list of approximately 355

25  numbers randomly selected from within the range 1 to 355. Using this list of random integers,

26  Mr. Kaufman ordered the names of adults included in the roster of immigration detainees

27  produced by the government on February 24, 2011.

28      16.     We then used this random sample to generate a list of approximately 74 detainees

3

1  with whom we would meet in an effort to gather information relevant to the lawsuit and identify

2  potential class-representatives.

3       17.    On March 21, 2011 and March 23, 2011, I traveled to the Mira Loma Detention

4  Facility with five UCLA law students, three Loyola law student interns, and three other

5  practicing attorneys.  Over the course of those two days we managed to interview approximately

6  52 detainees.  Whenever a person on our list was no longer in detention, either because they had

7  been released, bonded out, or deported, we would proceed to the next person included in our

8  random sample.  We continued to do this until we met with the requisite number of detainees.

9       18.    On May 24, 2011, I traveled to the Theo Lacy Detention Facility with two interns

10  to meet with detainees and Mr. Kaufman traveled to the James A. Musick Detention Facility with

11  a UCLA law student.   Collectively, we met with about 10 detainees.

12       19.    On May 25, 2011, Mr. Kaufman and I traveled to the Santa Ana City Jail with

13  three Loyola Law Student Interns and met with about 12 detainees.

14       20.    In total, we collectively dedicated  at least 275 hours in this process.

15       21.    Based on the information from the interviews and supplemental information

16  mailed to us by detainees and their family members, I classified each of the seventy-three

17  detainees we met from our random sample according to the general immigration statute under

18  which they appeared to be detained.  I then discussed my classifications with Mr. Arulanantham

19  and Mr. Kaufman.

20       22.    According to our analysis, the second random sample of about 74 detainees

21  contained 13 people detained under 8 U.S.C. § 1225(b), at least 6 of whom were refugees from

22  Northern and Eastern Africa, and 11 of whom were applying for asylum.  In addition, at least 33

23  of the individuals with whom we met stated that they are applying for asylum.

24       23.    Based on our analysis, I believe that it is safe to conclude that the majority of

25  individuals detained under 8 U.S.C. § 1225(b) are applying for asylum.  In addition, almost half

26  of the entire class appears to be applying for asylum.

27       24.    For those individuals applying for asylum, particularly those who are refugees

28  who have been stopped at the border, our interviews did not reveal significant detail about

4

1  individuals' asylum claims, credible fear interviews, or other case-related information.  Most

2  detainees did not have a copy of their A-file or their asylum application and supporting

3  documents.  Most detainees were unable to recall case-related information in the absence of these

4  documents..

5

6      I declare under penalty of perjury of the laws of the State of California and the United

7  States that the foregoing is true and correct.  Executed this 8th day of July, 2011 in Los Angeles,

8  California.

9

10  Jennifer Stark

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

# Exhibit 46

## DECLARATION OF JUDY LONDON IN SUPPORT OF PETITIONER

### Rodriguez v. Hayes, Case No. CV 07-3239

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. My name is Judy London. Since 2002, I have served as the Directing Attorney of the Immigrants' Rights Project at Public Counsel, a nonprofit organization in Los Angeles, California. For the past five years, I also have taught a clinical course in immigration law as an Adjunct Professor at UCLA School of Law.

3. I graduated from UCLA School of Law in 1990 and began practicing immigration law in 1994. From 1996 to 2000, I was the Legal Director of the Central American Resource Center ("CARECEN") in Los Angeles, where I handled asylum (8 U.S.C. § 1158), Temporary Protected Status ("TPS") (8 U.S.C. § 1254), Violence Against Women Act ("VAWA") (8 U.S.C. § 1154(a)), Nicaraguan Adjustment and Central American Relief Act ("NACARA") (8 U.S.C. § 1101(a)(51)(F)), and cancellation of removal (8 USC § 1229b) cases. After leaving CARACEN, I briefly ran my own immigration law practice before joining Public Counsel in 2002.

4. At Public Counsel, I currently supervise four attorneys, one paralegal, and one administrative assistant working in the Immigrants' Rights Project ("IRP"). I also provide technical assistance to volunteer pro bono attorneys who staff our cases. At any given time, I would estimate that there are approximately 400 pro bono attorneys working on cases referred by IRP. My practice includes asylum, TPS, VAWA, U- and T-visa (8 U.S.C. § 1101(a)(15)(U)-(T)), special immigrant juvenile (8 U.S.C. § 1101(a)(27)(J)) and cancellation of removal cases.

1

5.  I regularly assist individuals with preparing asylum applications. I also regularly review asylum applications that have already been completed in order to assess the strength of claims of individuals seeking legal representation. Over the course of my career, I have represented hundreds of asylum seekers before the United States Citizenship and Immigration Services ("USCIS"), Immigration Judges, the Board of Immigration Appeals, and the Ninth Circuit. In addition, I have reviewed well over a thousand asylum applications.

6.  While at CARECEN, I provided technical assistance to thousands of Salvadorans seeking TPS, which included reviewing their applications, and personally prepared approximately 30 TPS applications. At Public Counsel, the Immigrants' Rights Project has about 12 TPS applications pending, many of which I have reviewed. I also prepare TPS applications on occasion.

7.  Each year, I supervise the preparation and filing of dozens of VAWA applications completed by Public Counsel attorneys and pro bono attorneys. In my career, I have prepared approximately 30 VAWA applications myself.

8.  At Public Counsel, I am responsible for the oversight of our work with immigrant crime victims. Currently, IRP directly represents or provides technical assistance to approximately 200 T- and U-visa applicants. I have personally prepared a handful of T- and U-visa applications.

9.  I am familiar with Seasonal Agricultural Worker ("SAW") and Legalization programs passed as part of a 1986 immigration law. Although I have not personally prepared SAW and Legalization applications, I regularly review such applications in my work because many individuals currently in deportation proceedings have obtained legal

2

status through these programs.  In addition, I am currently representing an individual appealing the denial of her legalization application.

10. In addition to this work, throughout my career, I have reviewed asylum, TPS, VAWA, U- and T-visa applications prepared by pro se individuals and other attorneys.

Asylum Applications

11. Asylum is a form of immigration relief that permits certain individuals who fear persecution in their home countries to remain in the United States and eventually apply for permanent residence.  See 8 U.S.C. § 1158.  Individuals may apply affirmatively before USCIS or defensively before the immigration court after being placed in removal proceedings.

12. Based on my experience preparing and reviewing asylum applications, a typical successful application is likely to include the completed I-589 application form; a detailed declaration by the applicant, which often ranges from 8 to 20 pages long; and extensive supporting documentation that corroborates the applicant's claims.

13. The I-589 form contains basic biographical information, including the applicant's date of entry, residence, employment history, education history, criminal history, and information about family members, including the residence and immigration status of the applicant's spouse and children.  Although the form also requests information regarding the applicant's fear of persecution, typically the most important information about such fear is provided in the applicant's detailed declaration.

14. Although the applicant's declaration focuses on his or her experiences of persecution, the declaration typically also provides information about the individual equities of the applicant's case, including information about the applicant's family background,

3

cultural background, and family members' residences and immigration status. In cases where the applicant did not file for asylum within a year of entry into the United States, as required by law, but seeks to establish an exception to this one-year deadline, the declaration contains additional details about the applicant's time in the United States. This additional information often addresses the applicant's employment, education, and health history, as well as family ties in the United States.

15. The supporting documentation submitted with an asylum application is often hundreds of pages long and includes records that corroborate every aspect of the applicant's claim. For example, the supporting documentation often includes declarations from witnesses (including family and community members), the birth certificates and green cards of relatives, school diplomas, letters from past employers, criminal court documents, and extensive information about country conditions.

Temporary Protected Status (TPS) Applications

16. Temporary Protected Status is a temporary immigration status that is available to certain nationals of designated countries experiencing armed conflict, natural disasters, or other extraordinary conditions. See 8 U.S.C. § 1254. A country can be designated for a period of 6 to 18 months. When a country's designation is extended, TPS recipients from that country must re-register. To be eligible for TPS, individuals must have been continuously present in the United States since the effective date of the designation of their home country. Individuals who have been convicted of certain crimes or who pose a security threat are ineligible for TPS.

17. The main function of the Form I-821 TPS application is to establish the applicant's identity and citizenship, and that the individual entered the United States by the

4

required date and has been continuously present since that date. When individuals re-register for TPS, they must again demonstrate their continued presence in the United States. To document their presence, individuals generally produce documents that contain their name and a date. For example, individuals may submit employment records (such as pay stubs and tax returns), medical bills, school records, or correspondence from the Department of Homeland Security. If none of these documents are available, as is sometimes the case for low-income individuals, applicants may submit detailed declarations instead.

18. There is a fee to apply for TPS, but a fee waiver is available for individuals who are unable to pay. A fee waiver request includes a declaration about the applicant's financial circumstances, including information about their spouse, children and other dependents. The declaration is generally supplemented by documents such as pay stubs, rent receipts, and copies of food stamp cards, which document the applicant's salary, living expenses, and eligibility for means-tested benefits.

19. In the context of TPS applications, an RFE from USCIS often requests additional documentation of the individual's identity, continuous presence in the United States, and the individual's criminal history.

20. In response to such an RFE, an applicant typically submits, if available, additional information about continuous residence, including financial papers (such as bank statements), rent or lease agreements, employment records, tax records, and information relevant to identity and criminal history, including declarations of family and friends, police and court records.

Violence Against Women Act (VAWA) Applications

5

21. The Violence Against Women Act allows spouses, children, and parents who have been battered or subjected to extreme cruelty by U.S. citizens or permanent residents to file visa petitions. See 8 U.S.C. § 1154(a). In addition to showing battery or extreme cruelty, applicants must demonstrate that they have good moral character for the three years preceding the filing of the applications, and spouses must demonstrate that they entered into the marriage in good faith.

22. The Form I-360 VAWA application elicits basic biographical information, including the applicant's address history, marriage history, and biological information relating to the applicant's spouse and children.

23. In addition to the Form I-360, a complete VAWA application includes a declaration by the applicant that details the abuse that he or she suffered. It is also common to include in the declaration facts relevant to the good moral character and bona fide marriage requirements. These facts often address the applicant's background, including employment, education, residence, and immigration history, which help to build a coherent narrative.

24. Because a VAWA applicant must establish that he or she is a person of good moral character, and because the good moral character determination is a discretionary decision, the declaration often goes into great detail about the applicant's personal background and circumstances. Negative equities, such as criminal history or prior immigration violations, and positive equities, such as strong community ties or family members in the United States relying on the applicant's support, all factor into the decision. The more criminal history that exists, the more the applicant must emphasize the positive equities in his or her history.

6

25. A spouse petitioning for VAWA relief must demonstrate that the marriage was a bona fide marriage, not one that was entered into for immigration benefits. Thus, applicants generally produce documentation of joint checking accounts, joint credit cards, or lease agreements bearing the names of both spouses. Low-income individuals who do not have these documents can submit pieces of mail addressed to both spouses, or can attest to the marriage's good faith in the declaration.

26. There is no fee to apply for VAWA, but once granted VAWA relief, there are then fees for the subsequent applications for employment authorization and adjustment of status. A fee waiver is available for individuals who are unable to pay the filing fees for these applications. A fee waiver request includes a declaration about the applicant's financial circumstances, including information about their spouse, children and other dependents. The declaration is generally supplemented by documents such as pay stubs, rent receipts, and copies of food stamp cards, which document the applicant's salary, living expenses, and eligibility for means-tested benefits.

27. A VAWA applicant sometimes receives an RFE from USCIS asking for additional evidence relevant to the elements required to establish VAWA eligibility. Declarations from family members are very useful and are commonly submitted in response to FREs. Court and police records are often requested in an RFE when an applicant has disclosed an arrest or other criminal history.

U-Visa Applications

28. U-visas are available to victims of serious crimes who meet certain criteria. To receive a U-visa, an individual must be the victim of a qualifying criminal activity, must have suffered substantial physical or mental abuse as a result, and must assist the

government with the investigation or prosecution of the crime. See 8 U.S.C. § 1101(a)(15)(U). Three years after receiving a U-visa, an individual may apply for adjustment to permanent resident status.

29. A complete U-visa application includes the I-918 form; certification from a law enforcement agency that the applicant was or will be helpful in the prosecution of the case; a declaration from the applicant; and supporting documentation.

30. The I-918 form elicits biographical information, including biological information on the applicant's spouse and children, address, immigration and criminal history.

31. Based on my experience preparing and supervising the preparation of U-visa applications, the declaration is usually lengthy and describes in detail the criminal activity and the substantial abuse that it inflicted on the applicant. The declaration sometimes also discusses the impact of the crime on the victim's family members.

32. The supporting documentation consists of evidence that corroborates the applicant's claims, including police reports and restraining orders that demonstrate the severity of the crime; hospital records and psychiatric evaluations that document the abuse that the applicant suffered; declarations of lay and expert witnesses; and proof of identity such as a passport, consular card, or birth certificate.

33. An individual who is inadmissible to the United States must also apply for a waiver of inadmissibility. In my experience, individuals who seek U-visas almost always need to apply for waivers of inadmissibility and must do so using the Form I-192. Often, the individual will submit a separate declaration in support of the waiver application, which discusses the particular ground of inadmissibility for which a waiver is needed. The standard for granting a waiver is whether the grant is in the public or national

8

interest. In addition, the grant of the waiver is a discretionary act and therefore the individual's declaration filed in support of a waiver application must discuss all of the equities that go into the decision. Every aspect of the person's life, including employment history, education history, and community ties, is potentially relevant. If the individual has a criminal history or some other serious ground of inadmissibility applies, it is particularly important to demonstrate that he or she is a good person and is contributing to the community. Waiver applications often emphasize family ties in the United States, which enhance the public interest rationale for granting the waiver, and are supplemented by birth certificates, naturalization records, or green cards of U.S. citizen and permanent resident family members.

34. When adjudicating applications for waivers of inadmissibility, USCIS sometimes issues RFEs requesting additional information, typically relating to criminal history and immigration history. In response to these RFEs, applicants may submit additional evidence of family and community ties, including school records of children, rent or lease agreements, proof of community or church work, and police and court records. The exact nature of what is provided depends on the specific RFE.

35. Although there is no fee to petition for the U-visa itself, there are fees associated with applying for work authorization and for a waiver of inadmissibility. Fee waivers are available and the process for obtaining them is similar to the TPS fee waiver process. The applicant submits evidence of income, expenses, and means-tested benefits, and may submit a declaration if other documentation is unavailable. As my clients are low-income individuals, they almost always request fee waivers.

36. To adjust to permanent resident status, a U-visa holder must establish three years of continuous physical presence in the United States and continued cooperation with law enforcement's reasonable requests for assistance. At Public Counsel, we typically try to submit at least five documents, such as rent, gas, or phone bills, or correspondence from the government, for each year. Adjustment of status is a discretionary determination, so the applicant's declaration will attempt to demonstrate that the balance of equities favors granting the benefit.

T-Visa Applications

37. T-visas are available to victims of human trafficking who assist in law enforcement's investigation or prosecution of the crime and would suffer extreme hardship if removed from the United States. See 8 U.S.C. § 1101(a)(15)(T).

38. The T-visa process is very similar to the U-visa process – the applicant submits a form, detailed declaration and supporting documentation, applies for a waiver of inadmissibility if necessary, and requests a fee waiver if necessary.

39. The Form I-914 T-visa application like the U-visa application form, includes biographical information, such as marital status, residence information, immigration and criminal history, and information relating to the reporting of the trafficking crime.

40. However, there are a few differences between T- and U-visas. First, law enforcement certification is not required for the T-visa. For this reason, T-visa applications tend to contain more supporting documentation, including information on the incidence of trafficking in the applicant's home country and evidence of the actual trafficking, such as receipts for payments to traffickers, psychiatric evaluations, and corroborating declarations from family members.

10

41. Second, at the adjustment of status phase, a T-visa holder must demonstrate that he or she has been a person of good moral character since receiving the T-visa. To establish good moral character, the applicant's declaration will discuss his or her criminal history, family ties, community ties, and other relevant circumstances.

42. Although there is no fee to petition for the T-visa itself, there are fees associated with applying for work authorization and for a waiver of inadmissibility. Fee waivers are available and the process for obtaining them is similar to the TPS fee waiver process. The applicant submits evidence of income, expenses, and means-tested benefits, and may submit a declaration if other documentation is unavailable. As my clients are low-income individuals, they almost always request fee waivers.

43. To adjust to permanent resident status, a T-visa holder must establish three years of continuous physical presence in the United States, good moral character for the three years preceding the adjustment application, and continued cooperation with law enforcement's reasonable requests for assistance. At Public Counsel, we typically try to submit at least five documents, such as rent, gas, or phone bills, or correspondence from the government, for each year. Adjustment of status is a discretionary determination, so the applicant's declaration will attempt to demonstrate that the balance of equities favors granting the benefit.

<u>SAW/Legalization Applications</u>

44. The SAW and Legalization programs were passed as part of a 1986 immigration law. The SAW program provides a means for certain agricultural workers to obtain temporary residence status and later adjust to permanent residence status. See 8 U.S.C. § 1160. The Legalization program provides a means for individuals who meet certain

11

residency requirements and other qualifications a means to obtain temporary residence status and later adjust to permanent residence status. See 8 U.S.C. § 1255a.

45. The Form I-700 SAW application and I-687 Legalization application elicit biographical information, including date of entry into the United States, employment and residence history, criminal and immigration history, and biographical information for spouses, children and siblings.

46. A key factor in qualifying for the SAW and Legalization programs is proof of residence. To document their presence, applicants generally produce documents that contain their name and a date. For example, individuals may submit pay stubs, medical bills, school records, or correspondence from the Department of Homeland Security. If none of these documents are available, as is sometimes the case for low-income individuals, applicants may submit a detailed declaration instead.

47. To qualify for the SAW program, individuals must demonstrate that they participated in qualifying employment. To document their employment, applicants may include pay stubs and letters from employers.


I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed this 8th day of July, 2011 in Los Angeles, California.

Judy London

# Exhibit 47

# DECLARATION OF MICHAEL KAUFMAN
## OF JULY 14, 2011

I, Michael Kaufman, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am an attorney at the American Civil Liberties Union of Southern California.

3. I represent the Petitioners in *Rodriguez v. Holder*, CV 07-3239-TJH (RNBx).

4. On June 14, 2011, I appeared for a hearing before Magistrate Judge Block along with my co-counsel, Ahilan Arulanantham. At the hearing, Mr. Arulanantham and counsel for Respondents, Theodore Atkinson, stated that the parties were close to completing negotiations for a protective order but that the parties could not agree on the production of information restricted from disclosure under certain statutory and regulatory confidentiality provisions. With the Court's consent, the parties proceeded to met and confer at the courthouse to complete negotiations over the protective order, and to develop a proposal for briefing their disagreements with respect to the confidentiality provisions.

5. During the subsequent meet and confer, I requested that the government provide clarification regarding their positions on what type of information is barred from disclosure under the various confidentiality provisions. I indicated that some of the provisions had ambiguous language that could be subject to differing interpretations, specifically pointing to the asylum and VAWA provisions. I stated that Petitioners needed clarification on the Respondents' positions so that we could determine whether the parties could reach agreement on any of the provisions, and to adequately brief the issues in dispute. Mr. Atkinson agreed to discuss the issues with his clients, and advise Petitioners of their positions.

1

6.     The following day, on June 15, 2011, I sent an email to Mr. Atkinson formally requesting the Respondents' positions on the scope of various confidentiality provisions. In the email, I requested that the Respondents provide estimates of the number of SAW and legalization applications in the A files under review, and the number or percentage of the applications that are twenty years old or more.

7.     On June 17, 2011, Mr. Atkinson sent a letter to counsel for Petitioners stating that he was still awaiting further clarification regarding the Respondents' position on the scope of the asylum regulation and the fingerprint and registration provision. In that same letter, Mr. Atkinson proposed that Petitioners agree to carve out from their request SAW and legalization applications decided five or more years prior to the institution of removal proceedings.

8.     On June 27, 2011, I sent an email to Mr. Atkinson in which I observed that the Respondents had still not provided clarification on their positions. I renewed our request for clarification on the Respondents' position with respect to the asylum regulation, VAWA statute and fingerprint and registration statute. In the same email, I stated that Petitioners are willing to carve out from their request SAW applications filed more than 10 years ago, so long as the Respondents agree to disclose the more recent SAW applications.

9.     To date, the Respondents have not responded to our proposal on the SAW and legalization provisions. Additionally, the Respondents have not provided estimates of the number of SAW and legalization applications in the A files under review, or the any concrete information about the age of those applications.

10.    To date, the Respondents have not provided clarification on their position on the scope of the asylum regulation and VAWA statute.

2

11.    On July 8, 2011, the date that the parties agreed to exchange contentions pursuant to Local Rule 37-2, Mr. Atkinson sent an email to counsel for Petitioners in which he purported to provide clarification on the Petitioners' view on the scope of the fingerprint and registration provision.  In response, I sent an email to Mr. Atkinson indicating that Petitioners were still unsure of the Respondents' position, and requesting additional clarification.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief.  Executed this 14th day of July, 2011 in Los Angeles, California.

/s/ Michael Kaufman
MICHAEL KAUFMAN

# Exhibit 48

| From: | Michael Kaufman |
| --- | --- |
| Sent: | Monday, June 27, 2011 2:58 PM |
| To: | 'Atkinson, Theodore (CIV)' |
| Cc: | Ahilan Arulanantham; Michael Kaufman |
| Subject: | Rodriguez: joint stipulation |

Ted,

Hope you are well. I wanted to follow up with you on several issues related to the Joint Stipulation on the confidentiality provisions. First, I wanted to make sure that we are on the same page with regard to the formatting of the document. For the contentions to be exchanged on Friday, we are envisioning that each party will have an introductory section, followed by sections on each of the confidentiality provisions, in which the parties will lay out their positions with respect to each confidentiality provision (similar to a joint stipulation on discovery disputes, with the confidentiality provisions replacing the discovery requests). We are uncertain, however, how best to include the parties' responses, due July 11. We propose to have the responses follow the initial contentions from both sides (i.e., each section will have the following order: Respondents' initial contention, Petitioners' initial contention, Respondents' response, Petitioners' response). Please let us know if that is agreeable, or if you have other suggestions on the format.

Second, in your June 16, 2011 letter, you stated that the Respondents would provide additional clarification regarding their position on the scope of the asylum and fingerprinting/registration provisions by the following week (the week of June 20th). We have not received this information. As we stated in our June 15, 2011 email, this information will allow us to better understand the Respondents' position and to determine whether the parties can reach agreement with respect to at least one or more of the provisions. Please provide this information as soon as possible. Without it, we will be forced to file on the assumption that you are adopting a broad reading of those provisions.

Third, in your June 16 letter, you stated that "[t]here is good reason to believe that none, or very few, of the A-Files will contain" information subject to the VAWA confidentiality provisions, and, "[a]ccordingly, we don't believe it is worth front-loading those statutes or regulations now." While we appreciate your suggestion, we believe that the parties should brief these provisions at this time absent a further indication from you that you know that there in fact are not any such files. In the absence of such a statement, our assumption is that there will likely be at least one or more A files that contain such information, and because the parties are unlikely to reach an agreement on these provisions absent court intervention, we believe it makes most sense to include this dispute in the Joint Stipulation with the other confidentiality provisions, which involve substantially similar issues. Otherwise, the parties will be forced to submit yet another Joint Stipulation to the court in the future, which would be inefficient and further delay production of (at least some) information in the A files.

Fourth, in your June 16 letter, you requested that "Petitioners agree that all SAW applications decided 5 or more years prior to the institution of removal proceedings simply be carved out of the request altogether." We believe that applications filed 5-10 years ago could contain highly relevant information about the applicants, particularly as they may include information pertaining to family ties that would not otherwise be available in any given A file. Therefore, Petitioners are willing to carve out from their request SAW applications filed more than 10 years ago, so long as the Respondents agree to disclose the more recent SAW applications (under the protective order). Please let us know if the Respondents are amenable to this proposal as soon as possible, as it would eliminate a section of the Joint Stipulation.

Fifth, in our June 15, 2011 email, we requested that the Respondents reevaluate their positions on the asylum and TPS confidentiality provisions, which both permit disclosure subject to court order. We still have not received a response to this request. We are hopeful that, after giving these provisions closer review, Respondents will agree that they are inapplicable to this case. Additionally, we request that the Respondents also reevaluate their position on the tax confidentiality provisions. Our review of the provision and its legislative history make clear that the provision is only intended to bar disclosure by the IRS to other government agencies. In order to eliminate any unnecessary briefing, we request that the Respondents reevaluate their position on these three provisions.

Best, Michael

Michael Kaufman
Attorney / SPILF Fellow
ACLU of Southern California
1313 West 8th Street

1