# Exhibit A

## Respondents' Contentions

### Egyptian Asylum Applicant Sues U.S.

### By Sandra Hernandez
### Daily Journal Staff Writer

LOS ANGELES, Feb. 4, 2008:- An Egyptian man is suing the U.S. Department of Homeland Security, saying immigration agents turned over confidential details of his asylum application to officials in his homeland.

In a federal lawsuit filed Tuesday in the U.S. District Court for the Central District, in Los Angeles, Nagy Aziz Metry said immigration officials contacted the Egyptian consulate in early 2004 and turned over parts of his asylum application. Metry v. U.S., CV08-00585 (C.D. Cal., filed Jan. 29, 2008).

Metry said he became aware of the alleged breach after Egyptian officials contacted him at a Lancaster detention center, where he was being held, according to the complaint.

Metry said he felt threatened after an Egyptian official referred to Metry's asylum claim and said he "and his family would be 'taken care of' upon his return to Egypt," the complaint states.

Thom Mrozek, a spokesman for the U.S. attorney's office in Los Angeles, said officials declined to comment.

Asylum applications are based on a fear of persecution, and the Department of Homeland Security's regulations prohibit disclosing details that could put an applicant in danger.

Metry fled Egypt in 1991, after he said he was threatened and tortured because of his Christian faith.

He applied for asylum in 1992, using a notary public and an attorney who has since resigned from the State Bar.

Metry's asylum claim was denied in 1995, and he lost his appeal to the Board of Immigration Appeals in 1996.

Immigration agents detained Metry in March 2004 and sent him to the Mira Loma detention center just north of Los Angeles.

While he was at the facility, Metry said, deportation officers contacted the Egyptian consulate in San Francisco, according to the complaint.

1

Metry since has been released and is living in Orange County while continuing to fight his immigration claim.

Deportation officers routinely contact consulates or embassies and provide information such as names, fingerprints and criminal background information. But they are not allowed to provide confidential information about asylum applications.

However, Metry's new lawyer, Leon Hazany, said the deportation officers provided some or all of Metry's asylum file to the Egyptian consular official, the complaint states.

"DHS may also have given the Egyptian government full access to the files pertaining to Mr. Metry," Hazany wrote in the complaint.

In 2006, Metry told the Daily Journal he was contacted by an Egyptian official, who asked, "Why did you say those terrible things about your country? Why did you ask for asylum?"

Hazany said the family is seeking a jury trial, $4 million in damages and attorney fees.

"The family wants to be made whole again," Hazany said. "And they want to send a message to the U.S. government that these rules are there for a reason. It affects people. It affects families. This isn't just a bureaucratic procedure we are talking about. This is about protecting families, about protecting lives."

Legal observers said the lawsuit underscores the need for confidentiality for asylum seekers.

"These kind of lawsuits are rare," said Stephen Yale-Loehr, a professor at Cornell Law School. "However, if the U.S. government did turn over information to the foreign government, someone should be held liable for their mistakes."

Ahilan Arulanantham, a lawyer with the American Civil Liberties Union of Southern California, said similar reports surfaced in the past.

"There is a serious concern that the government does not take any steps, on a regular basis, to ensure that confidential information that could endanger the immigrant is kept out of the file provided to the home country," Arulanantham said.

**********

(c) 2008 Daily Journal Corporation. All rights reserved.

2

# Exhibit B

## Respondents' Contentions

**U.S. Department of Homeland Security**
20 Massachusetts Avenue, NW
Washington, DC 20529



HQASM 120/12.8

# Interoffice Memorandum

To:     Asylum Office Directors
        Deputy Directors

From:   Joseph E. Langlois  /s/
        Director, Asylum Division
        Office of Refugee, Asylum, and International Operations

Date:   June 15, 2005

Re:     <u>Fact Sheet on Confidentiality</u>

In order to clarify the rules governing the disclosure of asylum-related information to third parties, the Asylum Division has developed a comprehensive fact sheet on the confidentiality regulations at 8 CFR 208.6. This confidentiality fact sheet contains a synopsis of the regulations, the regulations in their entirety, and responses to some frequently asked questions, which cover a broad array of issues and scenarios.

Please review this fact sheet and share it with your staff. Please also distribute this fact sheet, as appropriate, to individuals or groups (e.g. law enforcement agencies, representatives, non-governmental organizations, and members of the general public) who are seeking asylum-related information on individuals and to whom the confidentiality regulations may need to be clarified.

Attachment: *Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants,* Asylum Division, June 3, 2005

Prepared by the USCIS Asylum Division
Date:  June 3, 2005

### Fact Sheet:  Federal Regulations Protecting the Confidentiality of Asylum Applicants

### Synopsis

The federal regulations at 8 CFR 208.6 generally prohibit the disclosure to third parties of information contained in or pertaining to asylum applications, credible fear determinations, and reasonable fear determinations—including information contained in RAPS or APSS[1]—except under certain limited circumstances.  These regulations safeguard information that, if disclosed publicly, could subject the claimant to retaliatory measures by government authorities or non-state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin.  Moreover, public disclosure might, albeit in rare circumstances[2], give rise to a plausible protection claim where one would not otherwise exist by bringing an otherwise ineligible claimant to the attention of the government authority or non-state actor against which the claimant has made allegations of mistreatment.

According to established guidance, confidentiality is breached when information contained in or pertaining to an asylum application (including information contained in RAPS or APSS) is disclosed to a third party in violation of the regulations, and the unauthorized disclosure is of a nature that allows the third party to link the identity of the applicant to:  (1) the fact that the applicant has applied for asylum; (2) specific facts or allegations pertaining to the individual asylum claim contained in an asylum application; or (3) facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum.  The same principles generally govern the disclosure of information related to credible fear and reasonable fear determinations, as well as to applications for withholding or deferral of removal under Article 3 of the Convention Against Torture, which are encompassed within the asylum application.

In the absence of the asylum applicant's written consent or the Secretary of Homeland Security's[3] specific authorization, disclosure may be made only to United States government officials or contractors and United States federal or state courts on a need to know basis related to certain administrative, law enforcement, and civil actions.  In some instances, interagency arrangements have been established – such as the arrangement between the former INS and the FBI -- to facilitate the proper disclosure of asylum-related information to United States agencies pursuant to the regulations.  The release of information relating to an asylum application,

---

[1]RAPS is the system for maintenance of records concerning aliens who affirmatively seek asylum by applying for the benefit with USCIS.  APSS is the system for maintenance of records concerning aliens referred to a USCIS asylum officer for a credible fear or reasonable fear screening determination after having expressed a fear of return to the intended country of removal because of fear of persecution or torture during the expedited removal process under INA sec. 235(b) or administrative removal processes under INA sec. 238(b) or INA sec. 241(a)(5).

[2] Public disclosure alone will rarely be sufficient to establish *sur place* protection claims under U.S. asylum laws. The applicant would have to establish, in light of this disclosure, that he or she has a well-founded fear of persecution on account of one of the protected grounds.

[3]By operation of section 1512(d) of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, 2310, the Attorney General's authority under 8 C.F.R. § 208.6(a) to authorize disclosure of confidential asylum information held by the former Immigration and Naturalization Service (INS)—and now held by the Department of Homeland Security (DHS)—was transferred to the Secretary of DHS.

Prepared by the USCIS Asylum Division
Date:  June 3, 2005

credible fear determination, or reasonable fear determination (including information contained in RAPS or APSS) to an official of another government or to any entity for purposes not specifically authorized by the regulations without the written consent of the claimant requires the express permission of the Secretary of Homeland Security.

**Code of Federal Regulations, Title 8**
Sec. 208.6 *Disclosure to third parties*.

   (a) Information contained in or pertaining to any asylum application, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General [now the Secretary of DHS].

   (b) The confidentiality of other records kept by the [Immigration and Naturalization] Service [now DHS] and the Executive Office for Immigration Review that indicate that a specific alien has applied for asylum, received a credible fear or reasonable fear interview, or received a credible fear or reasonable fear review shall also be protected from disclosure. The Service [now DHS] will coordinate with the Department of State to ensure that the confidentiality of those records is maintained if they are transmitted to Department of State offices in other countries.

   (c) This section shall not apply to any disclosure to:

   (1) Any United States Government official or contractor having a need to examine information in connection with:

   (i) The adjudication of asylum applications;

   (ii) The consideration of a request for a credible fear or reasonable fear interview, or a credible fear or reasonable fear review;

   (iii) The defense of any legal action arising from the adjudication of, or failure to adjudicate, the asylum application, or from a credible fear determination or reasonable fear determination under § 208.30 or § 208.31;

   (iv) The defense of any legal action of which the asylum application, credible fear determination, or reasonable fear determination is a part; or

   (v) Any United States Government investigation concerning any criminal or civil matter; or

   (2) Any Federal, State, or local court in the United States considering any legal action:

   (i) Arising from the adjudication of, or failure to adjudicate, the asylum application, or from a credible fear or reasonable fear determination under § 208.30 or § 208.31; or (ii) Arising from the proceedings of which the asylum application, credible fear determination, or reasonable fear determination is a part.

**Frequently Asked Questions**


**1.  Q:  Why do the regulations protect asylum-related information from disclosure?**
**A:**  Public disclosure of asylum-related information may subject the claimant to retaliatory measures by government authorities or non-state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin.  Moreover, public disclosure might, albeit in rare circumstances (see footnote #2), give rise to a plausible protection claim where one would not otherwise exist by bringing an otherwise ineligible claimant to the attention of the government authority or non-state actor against which the claimant has made allegations of mistreatment.

**2.  Q:  Under what specific circumstances can asylum-related information be disclosed to third parties?**

**A:**  In general, asylum-related information must not be shared with third parties without the asylum applicant's written consent or the Secretary of Homeland Security's specific authorization.  However, this general prohibition does not apply to the following limited circumstances as established by the regulations at 8 CFR 208.6:

"(1) Any United States Government official or contractor having a need to examine information in connection with:

(i) The adjudication of asylum applications;

(ii) The consideration of a request for a credible fear or reasonable fear interview, or a credible fear or reasonable fear review;

(iii) The defense of any legal action arising from the adjudication of, or failure to adjudicate, the asylum application, or from a credible fear determination or reasonable fear determination under § 208.30 or § 208.31;

(iv) The defense of any legal action of which the asylum application, credible fear determination, or reasonable fear determination is a part; or

(v) Any United States Government investigation concerning any criminal or civil matter; or

(2) Any Federal, State, or local court in the United States considering any legal action:

(i) Arising from the adjudication of, or failure to adjudicate, the asylum application, or from a credible fear or reasonable fear determination under § 208.30 or § 208.31; or

(ii) Arising from the proceedings of which the asylum application, credible fear determination, or reasonable fear determination is a part."

**3.  Q:  To what extent may asylum-related information be disclosed to personnel within the Department of Homeland Security (DHS), such as the Immigration and Customs Enforcement (ICE) or Customs or Border Protection (CBP) personnel?**

**A:**  Protected asylum-related information may be disclosed to CBP and ICE, as they are not considered "third parties" for purposes of 208.6 and, therefore, requesters from those former INS components need not demonstrate a "need to examine" protected asylum information. Information may also be disclosed to offices within the direct policy and legal chains of command of DHS, such as DHS Office of General Counsel, the Office of the Undersecretary for Border and Transportation Security (BTS), Office of the Deputy Secretary, and the Office of the Secretary.

**4.  Q:  If none of the regulatory exceptions applies, what information about an asylum applicant, if any, may be shared with third parties without breaching confidentiality?**

**A:**  According to established guidance, confidentiality is breached when information contained in or pertaining to an asylum application is disclosed to a third party in violation of the regulations, and the unauthorized disclosure is of a nature that allows the third party to link the identity of the applicant to:  (1) the fact that the applicant has applied for asylum; (2) specific facts or allegations pertaining to the individual asylum claim contained in an asylum application; or (3) facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum.  The same principles govern the disclosure of information related to credible fear and reasonable fear determinations.  They also generally apply to

applications for withholding or deferral of removal under Article 3 of the Convention Against
Torture, which are encompassed within the asylum application.

**5.  Q:  Under the regulation's exceptions, can asylum-related information be disclosed to
state law enforcement agencies or other state agencies?**

**A:**  No.  The confidentiality regulations do not allow disclosure of asylum-related information to
state agencies, including state law enforcement agencies, except with the asylum applicant's
written consent or the Secretary of Homeland Security's specific authorization.  The regulations
at 208.6(c)(2) do, however, allow for disclosure to state or local courts in certain circumstances.

**6.  Q:  How can a United States Government official or contractor, who is seeking asylum-
related information and to whom asylum-related information may be disclosed under
the regulations, obtain asylum-related information from USCIS?**

**A:**  Unless there is a pre-existing interagency arrangement or protocol (such as the arrangement
between the former INS and the FBI), federal agency officials or contractors should request
asylum-related information about specific aliens directly from the appropriate United States
Citizenship and Immigration Services (USCIS) Asylum Office Director with jurisdiction over
the alien's application.  Requests for asylum-related information concerning groups of aliens that
match certain identified criteria must be made to the Director of the Asylum Division of USCIS
by the appropriate official in the requesting agency.

**7.  Q:  If asylum-related information is properly disclosed to a third party pursuant to the
regulations, what is the third party's obligation with respect to confidentiality?**

**A:**  As the new custodian of the asylum-related information, the third-party recipient is bound by
the confidentiality regulations under 8 CFR 208.6.  The recipient must not disclose the asylum-
related information to other parties, except pursuant to the regulations.  When making an
authorized disclosure of asylum-related information to a third party, USCIS officials should alert
the third party to the confidentiality requirements of 8 CFR 208.6.

**8.  Q:  What are the obligations of U.S. government officials or contractors who work with
or are responsible for maintaining asylum-related data in U.S. government systems?**

**A:**  U.S. government officials or contractors who encounter asylum-related data in their work are
bound by the confidentiality regulations under 8 CFR 208.6.  These handlers of asylum-related
data must not disclose the asylum-related information to third parties, except in keeping with the
regulations.

**9.  Q:  Are non-USCIS custodians of asylum-related information required to obtain
authorization from USCIS before disclosing the asylum-related information to another
party pursuant to the regulations?**

**A:**  No.  However, the transmitter of information should take reasonable steps to ensure that the
new recipient of information is aware of the confidentiality rules described in this document to
prevent unauthorized disclosure by the new recipient.  In fact, it might be prudent to provide the
new recipient this document for that purpose.

**10. Q:  What is the special arrangement between the FBI and USCIS concerning the
disclosure of asylum-related information?**

**A:**  As established in an October 8, 2001 memorandum, the Attorney General has used his discretionary authority under 8 CFR 208.6 (now belonging to the Secretary of Homeland Security) to provide the FBI access to asylum applications filed with USCIS for the purpose of gathering foreign counterintelligence or international terrorism information unrelated to pending criminal or civil litigation.  Where the request relates to a specific alien, the request should be made to the Director of the appropriate USCIS Asylum Office and be approved by the FBI Field Office Special Agent in Charge or an appropriate Assistant Special Agent in Charge.  Where the request relates to an explicitly identified group of aliens, the request will be made to the Director of the Asylum Division of USCIS and be approved by the FBI Field Office Special Agent in Charge or an appropriate Assistant Special Agent in Charge.

**11. Q:  Can asylum-related information be shared with foreign governments or international organizations (such as INTERPOL)?**
**A:**  Asylum-related information cannot be shared with foreign governments or international organizations without the written consent of the asylum applicant, except at the discretion of the Secretary of Homeland Security.  To date, the Secretary has exercised his discretion to permit regular sharing of asylum-related information with a foreign government only with respect to Canada.  The arrangement is in the form of a *Statement of Mutual Understanding on Information Sharing* (SMU) and an Annex to the SMU, which together permit Canada's Department of Citizenship and Immigration Canada (CIC) and USCIS to exchange asylum-related records on both a case-by-case and systematic basis.

**12. Q:  Why is there a special information-sharing agreement with Canada?**
**A:**  Sharing information on asylum seekers was included as an initiative in the agreement signed by Attorney General Ashcroft and former Minister of Citizenship and Immigration Caplan on December 2, 2001.  It is also one of the thirty initiatives included in the Ridge-Manley Smart Border Action Plan.  In furtherance of this initiative, the United States and Canadian governments entered into a formal arrangement in 2003 that permits USCIS and CIC to systematically share information on individuals seeking asylum in Canada and the United States. By gaining access to this key information, USCIS and CIC will enhance their abilities to prevent abuse of the asylum process in their respective countries and to make accurate asylum eligibility determinations, thereby strengthening the integrity of both countries' asylum systems.

**13. Q:  What is the status of the implementation of the information-sharing arrangement with Canada?**
**A:**  USCIS and CIC have already begun to share information on asylum seekers on a case-by-case basis.  With regard to the systematic sharing of information, USCIS and CIC and their technical specialists are working together to develop protocols for the process of comparing and matching biometrically shared data sets.

**14. Q:  Has the Secretary of Homeland Security exercised his discretion to authorize disclosure of information to third parties in other instances (besides disclosure to the FBI and to Canada)?**
**A:**  Yes.  In 2002, the Attorney General authorized the Asylum Division to disclose to the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS) biographical information on individuals granted asylum to enable ORR to meet congressional

Prepared by the USCIS Asylum Division
Date: June 3, 2005

reporting requirements and generate statistical reports used to allocate funding for asylee social benefits. In addition, in 2001 the Attorney General authorized the Asylum Division to disclose to HHS certain biographical information on asylees to enable ORR and the Center for Disease Control (CDC) to provide emergency relief to qualified asylees. The Attorney General and the Secretary have, in rare circumstances, also authorized disclosure on specific asylum seekers on a case-by-case basis for state law enforcement agencies, foreign governments, and members of Congress.

**15. Q: May protected asylum-related information be shared with congressional offices?**
**A:** If the Chairman of a congressional committee with competent jurisdiction submits a written request for protected asylum-related information, then the requested information will generally be provided without regard to the regulation. Written requests for asylum-related by individual Members of Congress or their respective staff members will be considered on a case-by-case basis.

**16. Q: What information can be shared with the press when the applicant has gone public with the asylum claim?**
**A:** Because the regulation currently requires the applicant's "written consent," we generally do not recognize implicit waivers of confidentiality, even when the asylum-related material is a matter of public record.

———————

If you have any questions regarding these policies, please contact Ted Kim at 202.272.1615.

# Exhibit C

## Respondents' Contentions

U.S. Citizenship
and Immigration
Services

Home | Español | Blog | Archive | Index

Search    **Search**

Entire Site ○ Just this section ○

| FORMS | NEWS | RESOURCES | LAWS | OUTREACH | ABOUT US |

Home > Humanitarian > Battered Spouse, Children & Parents        🖨 Printer Friendly

**Refugees & Asylum**

**Victims of Human Trafficking & Other Crimes**

**Temporary Protected Status & Deferred Enforced Departure**

**Battered Spouse, Children & Parents**

**Humanitarian Parole**

**Special Situations**

## Battered Spouse, Children & Parents

As a battered spouse, child or parent, you may file an immigrant visa petition under the Violence against Women Act (VAWA). VAWA allows certain spouses, children and parents of U.S. citizens and permanent residents (green card holders) to file a petition for themselves without the abuser's knowledge. This will allow you to seek both safety and independence from the abuser. The provisions of VAWA apply equally to women and men. Your abuser will not be notified that you have filed for immigration benefits under VAWA.

Help is also available from the National Domestic Violence Hotline at 1-800-799-7233 or 1-800-787-3224 (TDD). The hotline has information about shelters, mental heath care, legal advice and other types of assistance, including information about filing for immigration status. For more information, visit the National Domestic Violence 🔗 website.

### Those Eligible to File

- **Spouse:** You may file for yourself if you are, or were, the abused spouse of a U.S. citizen or permanent resident. You may also include on your petition your unmarried children who are under 21 if they have not filed for themselves.

- **Parent:** You may file for yourself if you are the parent of a child who has been abused by your U.S. citizen or permanent resident spouse. You may include on your petition your children, including those who have not been abused, if they have not filed for themselves. You may also file if you are the parent of a U.S. citizen, and you have been abused by your U.S. citizen son or daughter.

- **Child:** You may file for yourself if you are an abused child under 21, unmarried and have been abused by your U.S. citizen or permanent resident parent. Your children may also be included on your petition. You may file for yourself as a child after age 21 but before age 25 if you can demonstrate that the abuse was the main reason for the delay in filing.

### Eligibility Requirements for a Spouse

- **You are:**
  - married to a U.S. citizen or permanent resident abuser

  or

  - your marriage to the abuser was terminated by death or a divorce (related to the abuse) within the 2 years prior to filing, or
  - your spouse lost or renounced citizenship or permanent resident status within the 2 years prior to filing due to an incident of domestic violence, or
  - you believed that you were legally married to your abusive U.S. citizen or permanent resident spouse but the marriage was not legitimate solely because of the bigamy of your abusive spouse.

- **You:**
  - have been abused in the United States by your U.S. citizen or permanent resident spouse, or
  - have been abused by your U.S. citizen or permanent resident spouse abroad while your spouse was employed by the U.S. government or a member of the U.S. uniformed services, or
  - are the parent of a child who has been subjected to abuse by your U.S. citizen or permanent spouse.

- You entered into the marriage in good faith, not solely for immigration benefits.

- You have resided with your spouse.

- You are a person of good moral character.

### Eligibility Requirements for a Child

- **You:**
  - are the child of a U.S. citizen or permanent resident abuser
  - were the child of a U.S. citizen or permanent resident abuser who lost citizenship or lawful permanent resident status due to an incident of domestic violence
  - have been abused in the United States by your U.S. citizen or permanent resident parent
  - have been abused by your U.S. citizen or permanent resident parent abroad while your parent was employed by the U.S. government or a member of the U.S. uniformed services
  - have resided with the abusive parent
  - have evidence to prove your relationship to your parent
  - must provide evidence of good moral character if you are over the age of 14

### Eligibility Requirements for a Parent

- You are the parent of a U.S. citizen son or daughter or were the parent of a U.S. citizen son or daughter who lost or renounced citizenship status related to an incident of domestic violence or died within 2 years prior to filing
- You have been abused by your U.S. citizen son or daughter
- You have resided with the abusive son or daughter
- You are a person of good moral character

### Filing Process

- You must complete the Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, including all supporting documentation
- You must file the form with the Vermont Service Center (VSC)

**More Information**

- Immigration Options for Victims of Crimes Brochure ( PDF)

**Forms**

- Form I-730, Refugees/Asylee Relative Petition
- Form I-485, Application to Register for Permanent Residence or Adjust Status
- Form I-765, Application for Employment Authorization

**Other USCIS Links**

- Working in the U.S.
- Glossary
- Fact Sheet: USCIS Issues Guidance for Approved VAWA Self-Petitioners
- Immigration and Nationality Act: Section 204 - Procedure for Granting Immigra Part 204 Sec.204.2 Petitions for relatives, widows, widowers and abused spouses and children
- Policy and Procedural Memoranda on Battered Spouses
- Questions and Answers: Battered Spouses, Children and Parents Under the Violence Against Women Act (VAWA)
- Resources for Battered Spouse, Children & Parents

**Non-USCIS Links**

- National Domestic Violence Website 🔗
- Department of State: Visa Information

🔲 Add Our RSS Feed

- If you meet all filing requirements, you will receive a notice (Prima Facie Determination Notice) valid for 150 days that you can present to government agencies that provide certain public benefits to certain victims of domestic violence
- If your Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant is approved and you do not have legal immigration status in the United States, we may place you in deferred action, which allows you to remain in the United States

**Working in the United States**

If you have an approved Form I-360 and have been placed in deferred action, you are eligible to apply to work in the United States. To apply to work in the United States, you must file the Form I-765, Application for Employment Authorization, with the Vermont Service Center.

Your children listed on your approved Form I-360, may also apply for work authorization. For more information on working in the United States, visit our Working in the U.S. page.

**Permanent Residence (Green Card)**

If you have an approved Form I-360, you may be eligible to file for a green card. Your children listed on your approved Form I-360 may also be eligible to apply for a green card. For information about filing for a green card, see the Immigration Options for Victims of Crimes Brochure.

For more information on battered spouse, children and parents, visit our Questions & Answers: Battered Spouses & Children page.

Last updated: 04/07/2011

| | | | |
|---|---|---|---|
| InfoPass | Citizenship | U.S. Department of Homeland Security | Freedom of Information Act (FOIA) |
| My Case Status | Green Card | U.S. Customs & Border Protection | No FEAR Act |
| Change of Address | Family | U.S. Immigration & Customs Enforcement | Website Policies |
| Visa Bulletin | Working in the U.S. | White House | Privacy and Legal Disclaimers |
| Passports | Humanitarian | U.S. Department of State | Accessibility |
| E-Verify | Adoption | USA.gov | Plug-ins |
| Careers at USCIS | Military | | Adobe Reader |
| Site Map (Index) | Avoid Scams | | Windows Media Player |
| Contact Us | Genealogy | | Archive |
| | Visit the U.S. | | |

# Exhibit D

## Respondents' Contentions



[Women's Rights](#) | [Violence Against Women](#)

# ACLU Written Testimony Submitted to the Senate Judiciary Committee Regarding the Violence Against Women Act of 2005

**July 23, 2005**

Written Testimony of the American Civil Liberties Union
Before the Committee on the Judiciary U.S. Senate

Hearing to Consider S. 1197 Violence Against Women Act of 2005

**Caroline Fredrickson, Director**
ACLU Washington Legislative Office

**LaShawn Warren, Legislative Counsel**
ACLU Washington Legislative Office

**Lenora M. Lapidus, Director**
ACLU Women's Rights Project

The ACLU is a national, nonpartisan public interest organization of more than 400,000 members, dedicated to protecting the constitutional rights of individuals. Through its Women's Rights Project, founded in 1972 by Ruth Bader Ginsburg, the ACLU has long been a leader in the legal battles to ensure women's full equality. This commitment includes fighting for equal housing and employment opportunities for women and working to protect the rights of battered women. In recent years, the ACLU Women's Rights Project has taken a leading role at the local, state, and national levels in working to ensure safety and improve access to housing and employment opportunities for survivors of domestic violence and their children. Through these efforts, the ACLU has been at the forefront of efforts to establish that discrimination against domestic violence victims is a form of gender discrimination.

Case 2:07-cv-03239-TJH-KES    Document 193-1    Filed 07/20/11    Page 17 of 26    Page
ID #:2558

The ACLU offers its full support for the Violence Against Women Act (VAWA) of 2005. VAWA 2005 reauthorizes VAWA 1994, a strikingly effective piece of legislation enacted to end domestic violence, dating violence, sexual assault, and stalking. VAWA 1994 has dramatically improved law enforcement's response to violence against women and has provided critical services necessary to support women and their children in their struggle to overcome and escape domestic abuse. Because VAWA remains an essential tool for combating domestic violence, it is important for Congress to continue programs established under VAWA 1994 and to build upon the success of the law by passing VAWA 2005. Indeed, the very lives of women and children are dependent on the Senate's reauthorization of this important legislation.

The ACLU's work on behalf of battered women and their families has focused on securing safe housing, employment opportunities, and responsive police procedures for survivors of domestic violence. A woman's ability to escape an abusive relationship will often depend on socio-economic factors such as her success in finding and keeping a job and in obtaining a home that provides safety to her and her children. Obstacles to obtaining adequate employment and affordable housing leave women more vulnerable to domestic violence, because these obstacles constrict their economic independence and limit their choices. Once in a violent relationship, lack of housing options or living wage employment can make it all but impossible for women to escape the abuse and achieve independence, even when their lives and the lives of their children are in danger. Victims of domestic violence face further obstacles to escaping a violent relationship and ensuring their physical safety when the broader community, including law enforcement, fails to provide an adequate response or appropriate resources to address the violence. Poor women and immigrant women are especially vulnerable to being trapped in cycles of abuse because of inadequate housing, employment, and community resources. VAWA 2005 effectively addresses these barriers faced by survivors of domestic violence as they seek to escape abusive relationships and protect themselves and their children from further violence.

Studies show that domestic violence is the immediate cause of homelessness for between 22 and 57 percent of homeless women.[1] Some women and children lose their homes when they flee abuse and cannot subsequently find affordable transitional or long-term housing at a time when housing for low-income individuals and families is increasingly scarce. Other domestic violence survivors become homeless as the result of ""zero tolerance"" housing policies that permit the eviction of all members of the household when any crime occurs in the home, without regard to whether the tenant was victim or perpetrator.[2] Such policies are too often misapplied to evict innocent victims of domestic violence from public and federally-subsidized housing, thus punishing them for being battered. Victims of domestic violence are thus forced to choose between keeping the abuse secret and risking homelessness. Such housing discrimination against domestic violence survivors undermines a battered woman's efforts to successfully separate herself from the abuse and enhances the danger to her and her children.

Employers also frequently demonstrate ""zero tolerance"" for victims of domestic violence, especially victims in low-wage positions. Some employers fire women because of the violence against them. In fact, three studies collected by the U.S. General Accounting Office found that 52 percent of victims of domestic violence reported that they were either fired or had to quit their jobs as a result of the abuse they experienced.[3] Many employers refuse to accommodate survivors' need for time off to attend court dates or doctors' appointments, thus making it all but impossible for survivors to address the violence in

their lives while maintaining the income they need to support themselves independently. Domestic violence thus renders women economically vulnerable. Indeed, studies indicate that a sizeable proportion of welfare recipients have been or are victims of abuse by an intimate partner. [4]

When landlords and employers deny housing and jobs to domestic violence survivors, battered women are forced to make the difficult choice between suffering in silence and risking loss of their homes and jobs. Victims of domestic violence are thus discouraged from reporting their abuse or otherwise taking steps to protect themselves. Battered women are further isolated and endangered when law enforcement and other community agencies fail to respond appropriately to protect them from their abusers. Through its housing, employment, and police responsiveness provisions, VAWA 2005 takes important steps toward removing these obstacles to safety for domestic violence survivors.

Below we elaborate on five sections of VAWA that are particularly important to the work of the ACLU and the women and children whom we serve.

### VAWA 2005 Expands Housing Opportunities and Safety for Battered Women and Their Children

Title VI of VAWA 2005 will offer substantial assistance to domestic violence survivors attempting to obtain and keep safe, secure, and affordable housing and will eliminate many of the obstacles that survivors of domestic violence currently face in attempting to reach this goal. As a crucial part of this effort, Title VI prohibits public housing authorities and Section 8 voucher landlords from discriminating against, and thus revictimizing, battered women and their children by evicting them from their homes on the basis of the violence against them. Such provisions are an important and much-needed step toward addressing the profound impact of the current nationwide housing crisis on victims of domestic violence.

Specifically, Title VI would amend the Low Income Housing Assistance Voucher Program and the Public Housing program to specify that a victim of domestic violence may not be evicted, denied program assistance, or have her lease terminated simply because of the violence against her. In addition, these sections make clear that if a voucher holder must flee her home in violation of her lease because her safety is threatened by domestic violence, she may take her voucher to another jurisdiction in order to protect her safety. VAWA 2005 thus recognizes that individuals should not face homelessness merely because they have been the victims of crime. Title VI makes clear, however, that public housing authorities and Section 8 voucher landlords may terminate assistance to or evict an abuser based on his violent acts. Moreover, in order to ensure that the protection from eviction offered by these provisions goes only to individuals who are in fact victims of domestic violence and their dependents, a public housing authority or landlord can require an individual to provide documentation of the abuse, such as a police report or a statement from a victim advocate. See §§ 606,607.

The ACLU offers its strongest support for these provisions. Too many of our clients have been evicted from public housing or had their Section 8 leases terminated after they have reported domestic abuse to the police, sought civil protection orders against their abusers, or taken other protective measures encouraged by VAWA.

ACLU Written Testimony Submitted to the Senate Judiciary Committee Regarding the Vi... Page 4 of 9
Case 2:07-cv-03239-TJH-KES    Document 193-1    Filed 07/20/11    Page 19 of 26    Page
ID #:2560

For instance, the ACLU of Michigan represented Aaronica Warren, a single mother and VISTA worker who lived in public housing operated by the Ypsilanti Housing Commission in Ypsilanti, Michigan. One evening in 2000, an ex-boyfriend appeared at her door after she put her son to bed and immediately became argumentative and abusive. He threw Ms. Warren into her entertainment center, picked her off the ground, dragged her outside, and threw her face first onto the pavement. Thereafter he fled, and Ms. Warren called the police. When the Ypsilanti Housing Commission learned about the violence, instead of seeking to assist Ms. Warren by banning her abuser from the property, or perhaps relocating her to another unit in order to help her evade her abuser, the Housing Commission sought to evict Ms. Warren and her son based on the ""one strike"" provision in Ms. Warren's lease. As a result of the ACLU's involvement, Ms. Warren was permitted to remain in her home and the Ypsilanti Housing Commission ultimately agreed in 2003 to stop enforcing the one-strike provision against domestic violence victims. Ms. Warren, however, was among the fortunate few. Her case demonstrates the risk of homelessness too often faced by victims of domestic violence in public housing.

Unfortunately, Ms. Warren's story is not unique. The ACLU currently represents ""Tina,"" a woman living in public housing with her three children in St. Louis, Missouri. Tina is currently facing eviction because her physically abusive ex-boyfriend is stalking her and has repeatedly broken her apartment windows from the outside. Although Tina has called the police each time her home has been vandalized, filed complaints against her ex-boyfriend, sought and obtained civil protective orders barring him from the property, reported each incident to apartment management, and requested that she be moved to a different unit in order to conceal her location from her ex-boyfriend, the public housing authority is still seeking to evict Tina, claiming that the ex-boyfriend that she barred from her home was her ""guest,"" and that she is therefore responsible for his actions.

Similarly, previously this year, the ACLU represented ""Denise,"" who lived in an apartment in Cincinnati, Ohio, subsidized by a Section 8 housing voucher. In 2004, the Cincinnati Metropolitan Housing Authority (CMHA) terminated her voucher, rendering her homeless. CMHA reasoned that although Denise was the victim of repeated attacks by her ex-boyfriend, and although he was ultimately jailed for domestic abuse, she had disturbed the ""peaceful enjoyment of neighbors"" and should thus be terminated from the Section 8 voucher program. We have also recently consulted on a similar case in Baltimore, where in 2004 a voucher recipient called the police for assistance on multiple occasions in response to repeated violence by her abuser. Her landlord complained to the housing authority about the police visits, and as a result, the woman lost her voucher and thus her home.

Sometimes, a public housing authority endangers victims of domestic violence by requiring unreasonable levels of documentation to prove that violence is occurring in the household. For instance, the ACLU represented Rubi Hernandez, who lived in Modesto, California with her children in public housing operated by the Housing Authority of the County of Stanislaus. When her abusive estranged husband repeatedly physically attacked her, Ms. Hernandez fled to an emergency shelter with her children and obtained a protective order. She then sought from the housing authority an emergency transfer to alternative housing, in an attempt to flee her husband. The housing authority refused the request, saying that despite Ms. Hernandez's protective order and the fact that she had fled to shelter, she had failed to prove that she was in danger from her husband because she did not have a police report documenting her ex-husband's violation of the protective

order. In fact, Ms. Hernandez had deliberately not called the police to report her husband's abusive behavior, which she knew violated the protective order, for several reasons. First, her husband had pulled the phones out of the wall and had taken Ms. Hernandez's cell phone away from her. Additionally, Ms. Hernandez knew from experience that the local police often responded slowly to domestic violence calls. Finally, she feared her husband would violently retaliate against her or their children for making the violence public. After the ACLU's intervention in the case, the housing authority agreed that its initial denial was inappropriate and helpfully cooperated in finding a solution that protected Ms. Hernandez's safety. Ms. Hernandez's case, however, demonstrates the danger posed when housing authorities demand unreasonable levels of documentation to prove that domestic violence is occurring in the household.

These cases are only the tip of a much larger iceberg. In the past six months alone, the ACLU has consulted on similar cases involving domestic violence victims threatened with the loss of public and subsidized housing in Illinois, Texas, Michigan, Delaware, and Arizona. Legal services attorneys report that they see such cases on a regular basis. Title VI of VAWA 2005 thus fills an important gap by granting housing security to poor victims of domestic violence otherwise faced with the impossible choice between living in terror at home and living homeless on the streets.

Moreover, the other provisions of Title VI also importantly serve this goal. VAWA 2005 would provide $10 million for public and Indian housing authorities and federally-subsidized housing providers to take appropriate action to address domestic violence, thus enhancing public and subsidized housing responsiveness to the needs of survivors consistent with guidance promulgated by the U.S. Department of Housing and Urban Development (HUD) in 2003.[5] Grants would be available to provide education and training to agency staff, promote the development of improved housing admission and occupancy policies and ""best practices,"" enhance collaboration with victim service providers, and reduce evictions and denials of housing to victims based on crimes committed by their abusers. The best practices enabled by Title VI will serve as important models to public and subsidized housing providers across the country. See § 41405.

Title VI of VAWA 2004 would also provide $10 million to the Department of Health and Human Services to fund local collaboratives to develop long-term housing solutions for domestic violence survivors. These funds would provide battered women and their children with assistance in their search for housing; financial assistance for security deposits and utilities; transportation, child care, and counseling services; and funds for purchasing, building, or renovating affordable housing units. Such support is crucial for efforts to help women and their children establish lives free from abuse. See § 41404.

Title VI would also expand the current transitional housing options available to victims and increase the funding for transitional housing programs from $30 million to $40 million. Individuals who must flee their homes because of domestic abuse but have no immediate permanent housing options overwhelmingly depend on emergency shelters and other transitional housing options. Due to limited funds, however, emergency shelters have been unable to satisfy the dire need for transitional housing. In 2004, for example, 32 percent of homeless families that requested emergency shelter were unsuccessful in obtaining it.[6] Title VI appropriately responds to this need. See § 602.

Title VI would also amend HUD's planning requirements for public housing authorities, thus ensuring that public housing authorities formally address domestic violence and the needs of victims of domestic violence in their regular planning processes. Public and Indian housing authorities would be required to include in their consolidated plans and five-year plans a statement of the goals, objectives, policies, or programs that would enable the housing authority to serve the needs of victims of domestic violence, dating violence, sexual assault, and stalking. Such planning provisions are particularly valuable given the requirement that the community have the opportunity to review and comment on these plans. Requiring housing authorities to address domestic violence during the planning process thus provides valuable transparency and an important opportunity for community collaboration with victim service providers and others in addressing these issues. See §§ 603 and 604.

## VAWA 2005 Improves Economic Security for Victims

The fear of job loss and resulting economic instability prevents many battered women from escaping abusive relationships. Title VII of VAWA 2005 would provide victims with emergency benefits and leave in order to address domestic or sexual violence in their lives. This is an important first step toward ensuring victims the economic security they need to leave their abusers.

Specifically, Title VII would permit eligible employees to take up to 10 days of unpaid leave in a 12-month period to address domestic violence, dating violence, sexual assault, or stalking. Leave is permitted to seek medical or psychological attention, obtain emergency housing, or seek legal or law enforcement assistance. The provision makes clear that an employee would be required to provide reasonable notice to his or her employer, along with certification that the employee or his or her family member is a victim of domestic or sexual violence and that the requested leave is for one of the aforementioned purposes. Employers who refuse to grant the required leave or who retaliate against employees who seek such leave, by firing them or otherwise penalizing them, would be subject to a civil action for monetary damages, such as lost wages, employee benefits, public assistance, or other actual monetary losses sustained by the employee as a direct result of the violation. Employees would also be entitled to equitable relief, such as job reinstatement, in appropriate cases. See §§ 41504, 41505.

In order to lessen the economic burden that taking unpaid leave might place on families, Title VII also permits states to use Temporary Assistance to Needy Families (TANF) dollars to provide nonrecurring short-term emergency benefits to an individual for the duration of leave described above. See § 41506.

Finally, Title VII provides $10 million toward the establishment and operation of a national clearinghouse and resource center designed to provide information and assistance to employers, labor organizations, and advocates to aid victims of domestic and sexual violence in their efforts to maintain their employment in the face of violence. Such information is central to efforts to create and expand employer programs to address the needs of employees threatened with abuse. See § 702.

Through these provisions, Title VII of VAWA 2005 would enhance survivors' economic security and their ability to address the violence in their lives. For example, the ACLU is currently working with ""Louise,"" who was recently fired from her position as a teaching

Case 2:07-cv-03239-TJH-KES    Document 193-1    Filed 07/20/11    Page 22 of 26    Page ID #:2563

assistant at a New York City public school. Although Louise had performed well in her position throughout her 10-year tenure, she was recently fired because she had missed several days of work due to domestic violence in her life. After Louise's husband battered her last year, she had several appointments with doctors, prosecutors, police officers, lawyers, and therapists. Never before had Louise experienced domestic violence, and she was struggling to keep her life together in the midst of this crisis. Having lost her job as the result of her domestic violence related absences, she is now struggling to avoid homelessness and to pay the medical bills associated with the domestic violence. Out of financial necessity, she has sent her son to live in a different city with his grandfather. VAWA 2005 would assist women like Louise to avoid being financially devastated by the violence against them.

## VAWA 2005 Enhances Victims' Privacy Protections

For survivors of domestic violence, the need for informational privacy is particularly acute. Often the safety of a domestic violence victim who has escaped from her abuser hinges on her ability to keep her identity and location confidential. An abuser can use insecure information to track down and further victimize a survivor, and this risk of exposure and retaliation may make survivors less likely to access emergency housing, health care, and other supportive services. Homeless Management Information Systems (HMIS) is a program recently mandated by HUD to track the use of shelters and services by homeless persons, with the result that anyone who has access to local and regional HMIS databases may be able to gain information on the location and movements of a woman who is homeless because she is fleeing abuse. We are gravely concerned that this collection and dissemination of identifying information presents serious safety hazards for survivors of domestic violence.

VAWA 2005 directly responds to these concerns by providing resources to enhance privacy protections for victims of domestic violence, dating violence, sexual violence, and stalking. These protections range from improvements in protocols, procedures, and policies, to incentives to develop more advanced technology and database systems to protect personally identifying information. See § 106.

Similarly, Title VI of VAWA addresses HMIS's impact on victims of domestic violence by amending the McKinney-Vento Homeless Assistance Act to protect the confidentiality of victims of domestic violence, dating violence, sexual assault, and stalking who are seeking housing. Title VI instructs HUD grantees not to disclose personally identifying information about these individuals in HMIS databases. See § 605.

## VAWA 2005 Broadens Services and Outreach to Victims of Domestic Violence

VAWA 2005 makes it possible for victims of domestic violence and sexual assault to gain access to the services they need to escape from violence. It promotes a coordinated approach to domestic violence that brings together federal, state, and local law enforcement agencies and service providers. Specifically, Title II of VAWA 2005 would provide education, training, and enhanced services to end violence against immigrant, rural, disabled, and older women. These segments of the population are particularly vulnerable to violence due to several factors: geographic isolation and resulting inability to access victim services; physical, economic, social, or psychological dependence on others;

Case 2:07-cv-03239-TJH-KES     Document 193-1     Filed 07/20/11     Page 23 of 26     Page
ID #:2564

and language barriers. Title II also increases the resources allocated to support the national domestic violence hotline. See §§ 203-206.

In addition, Title I of VAWA 2005 continues the STOP (Services and Training for Officers and Prosecutors) grants program, which brings police, prosecutors, and victim service providers into close collaboration with one another and works to ensure increased victim safety and support. Title I also provides grants to police departments for the enforcement of protection orders, a proven and necessary tool for increasing victim safety. And, in order to ensure that domestic violence, dating violence, sexual assault, and stalking victims have adequate legal representation, VAWA 2005 would increase support for programs that provide such legal assistance. See §§ 101-103.

Such efforts to enhance police and community responsiveness to domestic violence are especially necessary in the aftermath of the Supreme Court's recent decision in *Town of Castle Rock v. Gonzales*. Jessica Gonzales lived in Castle Rock, Colorado, and had a protective order against her estranged husband that ordered him to stay away from her and their three daughters. When her daughters disappeared while playing outside one afternoon, she immediately knew that her husband had taken them, and called the police to seek their help in enforcing the protective order. Despite state law requiring them to make an arrest or seek an arrest warrant in this situation, the police did nothing in response to her repeated, increasingly panicked requests for assistance, even when Ms. Gonzales learned where her husband had taken the girls and informed the police of their location. Instead, the police urged her to wait to see if her daughters would return. Late that night, her husband appeared at the police station, opened fire, and was killed. The bodies of Ms. Gonzales's three daughters were found in his truck; he had murdered them earlier that evening.

Last month, the Supreme Court held that the police department's inaction in the face of state law requiring them to enforce protective orders did not violate the U.S. Constitution. Given this holding, and the lack of police accountability to victims of domestic violence under the Constitution, the importance of efforts pursuant to VAWA to enhance law enforcement and community response to domestic violence has never been greater. These life saving programs must not be permitted to expire.

### VAWA 2005 Provides Crucial Protections for Immigrant Victims

Immigrants who are victims of domestic violence face tremendous obstacles when they attempt to flee abusive relationships. The situation is exacerbated when the abusive partner controls the immigration status of the family and uses the threat of deportation to prevent battered immigrant women from seeking help. Recognizing the multiple problems faced by immigrant domestic violence victims, Congress included immigration provisions in VAWA 1994 and VAWA 2000. These provisions were designed to remove obstacles presented by immigration law that prevent immigrant victims from safely fleeing domestic violence. Crucially, VAWA 2000 allowed victims to obtain immigration relief without their abusers' cooperation or knowledge in certain instances. Although these changes in the law have helped to reduce violence against immigrant women, more remains to be done to prevent VAWA-eligible victims of domestic violence, sexual assault, child abuse, or human trafficking from being deported and to provide an economic safety net for those immigrant victims trying to escape violent situations. Title VII of VAWA 2005 proposes changes to enhance the effectiveness of the immigration relief provided to victims under

VAWA 2000. These provisions would implement policies to stop the deportation of immigrant victims of domestic violence, sexual assault, and human trafficking; extend immigration relief to all victims of family violence; guarantee economic security for immigrant victims and their children; and provide an economic safety net for trafficking victims. See §§ 801-820.

## Conclusion

VAWA 2005 is a landmark piece of legislation that makes great inroads toward ending violence against women. We strongly urge you to support the Violence Against Women Act of 2005. The lives of many battered women and children may depend on your support of this important legislation.

Footnotes

[1] See Emily J. Martin & Naomi S. Stern, *Domestic Violence and Public and Subsidized Housing: Addressing the Needs of Battered Tenants Through Local Housing Policy*, 38 Clearinghouse Rev. J.L. & Pol'y. Nos. 9-10, at 552 (Jan.-Feb. 2005).
[2] *See* Brief of Amici Curiae National Network to End Domestic Violence et al., U.S. Dep't of Hous. & Urban Dev. v. Rucker, 535 U.S. 125 (2002) (Nos. 00-1771 & 00-1871).
[3] Gen. Acct. Off. Health, Educ. & Human Serv. Div., "Research Findings Regarding the Extent to Which Victims of Domestic Abuse Report Specific Impacts of the Abuse on Their Employment," Nov. 1998 [GAO-HEHS-99-12] at 19.
[4] *Id.* at 3.
[5] U.S Department of Housing and Urban Development, Public Housing Occupancy Guidebook 215-21 (Ch. 19: Domestic Violence) (2003).
[6] U.S. Conference of Mayors, *A Status Report on Hunger and Homelessness in America's Cities: A 27-City Survey* (December 2004).

Published on *American Civil Liberties Union* (http://www.aclu.org)
**Source URL:** http://www.aclu.org/womens-rights/aclu-written-testimony-submitted-senate-judiciary-committee-regarding-violence-against

# Exhibit E

## Respondents' Contentions

USCIS - What Will Happen at My Asylum Interview?                    Page 1 of 1

Case 2:07-cv-03239-TJH-KES     Document 193-1     Filed 07/20/11     Page 26 of 26    Page
ID #:2567



FORMS          NEWS          RESOURCES          LAWS          OUTREACH          ABOUT US

Printer Friendly

## Q : What Will Happen at My Asylum Interview?

The interview will generally last at least an hour, although the time may vary depending on the case. You will be asked to take an oath promising to tell the truth during the interview. Your interpreter will also take an oath promising to interpret accurately and truthfully. The Asylum Officer will verify your identity and ask you basic biographical questions. The Asylum Officer will also ask you about the reasons you are applying for asylum. The Asylum Officer will know that it may be difficult for you to talk about traumatic and painful experiences that caused you to leave your country. However, it is very important that you tell the Asylum Officer your experiences so that the Asylum Officer can determine whether you qualify for a grant of asylum. The Asylum Officer will ask you questions to determine if any bars will prevent you from applying for or being granted asylum. For more information on the bars to asylum, see the "Bars to Applying for and Receiving Asylum" info sheet in the links below.

The information you share with the Asylum Officer is protected by confidentiality provisions found in 8 CFR § 208.6. In general, information related to your asylum claim cannot not be shared with third parties without your written consent or specific authorization by the Secretary of Homeland Security. There are certain exceptions to this rule, however, which can be found in the confidentiality regulations cited above. For more information on confidentiality and the asylum process, see the "Fact Sheet on Asylum Confidentiality" and "Is the Information I Provide on My Application Protected?" in the links below.

You and your attorney or representative, if any, will have time at the end of the interview to make a statement or add any additional information. A decision on your case will not be made at the asylum interview. For the legal regulations governing asylum interviews, see 8 CFR § 208.9.

- Return to Asylum Interviews FAQ Page
- Next: What If I Need to Reschedule the Interview?
- Is the Information I Provide on My Application Protected?
- Bars to Applying for and Receiving Asylum

Last updated:09/30/2008

Share This Page

See Email Updates for All Topics

---

InfoPass
My Case Status
Change of Address
Visa Bulletin
Passports
E-Verify
Careers at USCIS
Site Map (Index)
Contact Us

Citizenship
Green Card
Family
Working in the U.S.
Humanitarian
Adoption
Military
Avoid Scams
Genealogy
Visit the U.S.

U.S. Department of Homeland Security
U.S. Customs & Border Protection
U.S. Immigration & Customs Enforcement
White House
U.S. Department of State
USA.gov

Freedom of Information Act (FOIA)
No FEAR Act
Website Policies
Privacy and Legal Disclaimers
Accessibility
Plug-ins
Adobe Reader
Windows Media Player
Archive