# Exhibit 49

## DECLARATION OF MICHAEL KAUFMAN
## OF AUGUST 8, 2011

I, Michael Kaufman, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am an attorney at the American Civil Liberties Union of Southern California.

3.    I represent the Petitioners in *Rodriguez v. Holder*, CV 07-3239-TJH (RNBx).

4.    On August 2, 2011, I spoke by phone with Theodore Atkinson, counsel for Respondents.  Mr. Atkinson informed me that, in Respondents' view, the Court's July 25, 2011 Order permits Respondents to withhold the entire A file of asylum, VAWA, "U" and "T" visa applicants.

5.    On the same call, Mr. Atkinson denied our request to provide a list of class members with asylum, VAWA, "U" and "T" visa applications, which would enable counsel for Petitioner to contact those class members to obtain written consent for the release of their confidential information.  Instead, Mr. Atkinson stated that Respondents would provide a list of current class members, and help to facilitate the delivery of consent forms to individuals still in detention.

6.    For individuals released from detention and currently in the United States, Mr. Atkinson stated that Respondents would provide a list of the individuals' last known address and/or attorney contact information.  Mr. Atkinson acknowledged that this information is frequently out of date or incorrect.

7.    Mr. Atkinson stated that the government does not maintain contact information for individuals who are removed from the country, and acknowledged that it therefore may be impossible for counsel for Petitioner to contact these individuals.

1    8.    On August 4, 2011, I again spoke by phone with Mr. Atkinson.  Mr.

2  Atkinson informed me that Respondents had reviewed approximately 450 A files

3  to date, and that approximately 100 contained asylum related information.  Mr.

4  Atkinson stated that he had no reason to believe that the 450 A files reviewed

5  were not representative of the entire pool of A files.  Mr. Atkinson was unable to

6  provide an estimate of the number of A files with VAWA, "U" and "T" visa

7  information, but indicated that the number is relatively small.

8

9    I declare under penalty of perjury of the laws of the State of California and

10  the United States that the foregoing is true and correct to the best of my

11  knowledge and belief.  Executed this 8th day of August, 2011 in Los Angeles,

12  California.

13

14                    /s/ Michael Kaufman
                     MICHAEL KAUFMAN

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 50

# DECLARATION OF DR. NINA SIULC

I, Nina Siulc, Ph.D., pursuant to 28 U.S.C. § 1746, declare under penalty of
perjury that the following statements are true to the best of my knowledge,
information, and belief:

1.      I am Assistant Professor of Political Science in Legal Studies at the

University of Massachusetts, Amherst.  I hold a Ph.D. in cultural

anthropology and am a university professor and social scientific researcher

with more than fifteen years experience researching immigration legal

processes from a variety of professional positions.  I was formerly Director

of Research at the Center on Immigration and Justice at the Vera Institute of

Justice, where I participated in evaluation of the U.S. Department of

Justice's Legal Orientation Program and previously served as supervision

officer and research assistant on the Appearance Assistance Project.  I have

received peer-reviewed grants for my academic research projects and

research articles based on that academic work have been accepted into peer-

reviewed journals.

2.      I have previously conducted analysis of data contained in files

assembled by various federal agencies, including paper A-files created by

the legacy Immigration and Naturalization Service (INS) and U.S.

Department of Homeland Security (DHS), and electronic databases

maintained by INS, DHS, Executive Office of Immigration Review (EOIR),

1

and the Division for Unaccompanied Children's Services, which tracks

immigration removal information for unaccompanied minors.  I am not an

attorney and am not speaking to the potential merits of any legal claims.  I

would make the same observations were I asked to do so by the respondents

in this case.  My assessment is intended to be value-neutral about any claims

made or points of view held by each party.

3.      The opinions I am giving here are based on two datasets providing

historical data on current and former class members in this action: (1) a

Microsoft Excel spreadsheet containing information extracted from the U.S.

Department of Homeland Security's (DHS) electronic databases and (2) a

series of Microsoft Access tables containing information extracted from the

Executive Office for Immigration Review's (EOIR) electronic databases,

including data on Board of Immigration Appeals actions.  Both datasets

reflect information regarding individuals who had been detained for 180

days or more in the Los Angeles area between April 21, 2010 and April 18,

2011, when the data were apparently extracted.  The DHS data production

includes a footnote that the IIDS v1.6 data extract occurred on April 20,

2011, "which is an EID extract as of 4/18/2011."  It appears that EOIR

extracted data using the alien numbers (A numbers) generated by DHS.  The

DHS spreadsheet includes persons who appear to have entered ICE custody

between October 2007 and October 2010, which is information I derived from the variable " First Entered ICE Custody" in the DHS spreadsheet.

4.      I have been asked to give my opinion, based on my preliminary analysis, about the percentage of the 1026 class members included in the DHS data who were released from custody at the time of data extraction.  I was also asked to estimate how many of these 1026 class members are outside the United States.  Since updated, current information has not been provided on these persons, I can only make statements about what was known about their custody status as of April 18, 2011.

5.      Working with a data analyst, I conducted a series of analyses to address these questions.  This involved basic counts of single variables and co-occurrences of multiple variables and was conducted using Microsoft SQL, which is a robust relational database program capable of matching data across various tables.  Anomalous findings—such as obvious data entry errors or duplicate records—were examined in greater detail using basic functions in Excel and Access.  A summary of initial findings and description of each analysis are included below.  While I am confident that the numbers reported here accurately reflect what DHS reports about the custody status of class members, it is important to emphasize that these findings are preliminary in nature and may be revised based on further

analysis once I have completed more sophisticated matching of DHS and

EOIR data that will allow me to check for discrepancies in information

reported by the two agencies.

**Summary**

6.      My initial findings may be summarized as follows:

- DHS records show that at least 671 of the 1026 class members, or 65 % of the class, were out of ICE custody (not detained) as of the date of data extraction.

- DHS records show that at least 23% of the class (at least 232 persons)—and possibly more than 33% of the class (more than 342 persons)—had already been released from custody for removal/ deportation/ voluntary departure from the United States at the time of data extraction. This means approximately 1 in 4 to 1 in 3 of the class members identified in the DHS data were already overseas as of April 18, 2011. The number of class members overseas is now likely larger given that the data were extracted several months ago.

7.      As set forth in more detail below, 23% is a cautious and low estimate

of the number of class members already removed from the United States.

The range of class members removed from the United States (23% - 33%)

that I report here is the result the fact that not all of the persons coded by

DHS as released from custody for deportation/ removal / voluntary departure

were also coded as having "final orders." While it is likely that DHS has

simply failed to populate the "final order" variable, I cannot be certain of the

accurate number until I complete more sophisticated data matching analyses

4

that would allow me to compare DHS's "final order" variable with EOIR's records on case completions in front of the immigration judge and Board of Immigration Appeals. I can, however, confidently state that 33% of the class was coded by DHS as having been released from custody for removal/ deportation/ voluntary departure.

### Explanation of Analysis I: Number of Class Members Out of Custody at the Time of Data Extraction, Per DHS Data

8.    The first analysis examines the number of class members released from custody at the time the data were extracted, per the DHS data. DHS provided two variables that report on reasons detainees have been released from custody: "reason for release from ICE custody" and "reason for release from custody in [Los Angeles Area of Responsibility (LOS AOR)]."

9.    Because DHS did not provide a memo or lookup tables that explain how to interpret its data, I am required to infer the meaning of the values indicated by these variables. "Reason for release from ICE custody" appears to describe the reason for the final or latest release from custody, whereas "reason for release from custody in LOS AOR" describes the reason for release from the Los Angeles area. This latter reason may be duplicative of the reason for release from ICE custody—for example, if a detainee in the Los Angeles area was released from custody following a final immigration judge decision in his case both variables might be populated with a value of

"deported/removed."  However, "reason for release from custody in LOS

AOR" may also be used to record the transfer of a class member from a

detention facility in the Los Angeles area to a facility located elsewhere, or

from ICE custody to custody of another federal agency.  Thus, in order to

assess which class members are actually physically out of custody, I looked

at "the reason for release from ICE custody."  It is reasonable to assume that

the variable "reason for release from ICE custody" accurately reflects the

custody status of class members as of the date the data were extracted.  To

verify that persons coded as released from ICE custody were actually

released, I checked data in this variable against data in the variable "released

from ICE custody," which is a numeric data field that is populated with the

date of release from custody.

10.    At the time of data extraction, ICE provided no reason for release for

custody for 313 of 1026 persons, or 30.5% of the class.  It is reasonable to

infer that these persons were still detained when the data were extracted.  A

check of "date of release from custody" confirms that these persons were

still detained, as they had no value in "date of release from custody."

11.    Of the remaining 713 or 69.5% of the 1026 class members, 7 were

coded as "transferred."  Since a transfer does not indicate release from

custody, and since there is no value in "date released from ICE custody" for

these 7 persons, it is reasonable to infer that these persons may have been
inaccurately coded by DHS and may still be detained, perhaps outside of the
Los Angeles area. Adding these persons to the detained group, 320 of 1026
persons, or 31% of the class, were detained when the data were extracted.

12.    An additional 35 persons were listed as having been released from
ICE custody to the custody of the U.S. Marshals or other agency. Some of
these persons subsequently returned to ICE custody. I cannot be certain
from the data provided if these class members are or are not still detained by
the government in some capacity without completing more sophisticated
analyses and have therefore removed them from this analysis.

13.    Excluding the persons who appear to still be detained (i.e. those
showing no reason for release from custody or release from custody date),
those coded as "transferred" with no release date, and those coded as having
been released to the U.S. Marshals or another agency leaves 671 class
members or 65% of the class who appear to have been released from
detention at the time of data extraction.

14.    ICE provided the following reasons for release from ICE custody for
these 671 class members:

- Deported/ Removed: 322 persons or 31.38% of the class
- Voluntary Departure: 20 or 1.95% of the class
- Bonded out: 67 or 6.53% of the class
- Order of Recognizance: 13 or 1.27% of the class

7

39

- Order of Supervision: 62 or 6.04% of the class
- Paroled: 17 or 1.66% of the class
- Proceedings terminated: 168 or 16.37% of the class
- Withdrawal: 2 or .19% of the class

Thus, the DHS data show that 342 persons or 33% of the class members (1 in 3) included in the spreadsheet were either removed/deported or voluntarily departed at the time of data extraction. This number is now likely larger given that the data were extracted several months ago.

**Explanation of Analysis II: Number of Class Members Out of Custody with "Final Orders" at the Time of Data Extraction, Per DHS Data**

15.    A second, more cautious way to assess how many class members are out of the country is to look at the numbers of persons who have been released from ICE custody for deportation/ removal/ voluntary departure and *also* were coded by DHS as having "final orders." It is unclear how DHS defines "final order" for the purposes of the spreadsheet it produced, since some persons coded as having final orders do not appear to have been ordered deported or removed according to EOIR data. For purposes of analysis, I am assuming that a combination of "release from custody" and actionable final orders should provide some certainty that the information in the "reason for release from custody" variable is accurate.

16.    Although I can reasonably assume 671 or 65% of 1026 class members had been "released from custody," ICE indicated only 289 of those released

8

40

class members had "final orders." This represents 28% of the class. Of these 289 class members released with final orders (still excluding those listed as "transferred" or released to the U.S. Marshals or other agency):

- Deported/ Removed: 218 persons or 21% of the class
- Voluntary Departure: 14 or 1%
- Bonded out: 6 or less than 1%
- Order of Recognizance: 3 or less than 1%
- Order of Supervision: 38 or 3.7%
- Paroled: 5 or less than 1%
- Proceedings Terminated: 5 or less than 1%

17.    This second analysis shows that 232 class members, or 23% of the class (just under 1 in 4), were released for deportation/ removal or voluntarily departure *with* "final orders." This represents the minimum number of class members out of the country at the time of data extraction. Since these data were extracted a few months ago the number of class members with "final orders" and located outside the United States is likely much greater than 1 in 4.


Nina Siulc, Ph.D

9 – August – 2011

Date


9

41

# Exhibit 51

## Declaration of Jennifer Stark

I, Jennifer Stark, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I have been employed as an Equal Justice Works Fellow and Attorney at the ACLU of Southern California for the last two years.  As part of my work, I have participated in the collection of evidence from class members for the *Rodriguez* litigation, and supervised a number of law student interns and younger attorneys assisting us with that collection.  Based on my experience in gathering such information, and in particular my experience in two concerted efforts we made to gather information by meeting with a large number of detainees, I believe that obtaining written authorization from hundreds of individuals who are applying for asylum or whose cases include VAWA, "U," and "T" visa information would be incredibly burdensome, and perhaps impossible given the present resource constraints of our office.

3.    I first engaged in an extensive effort to gather information from class members in the spring of last year.  On April 30, 2010, pursuant to the Court's Stipulated Protective Order Concerning Roster of Detainees [Dkt. # 78, Apr. 19, 2010], Respondents sent Petitioners a roster of the names, alien numbers, locations, and attorney contact information for all immigration detainees who, on April 21, 2010, had been detained for six months or longer in the Central District of California.  This roster contained the names of approximately 350 adult detainees as well as information concerning possible attorneys of record for some of the detainees.

4.    On May 24, 2010, May 25, 2010, and May 26, 2010, I traveled to the Mira Loma Detention Facility with two Stanford law students, three ACLU summer law student interns, and three translators.  Over the course of those three days we interviewed 57 detainees.  In total, we collectively dedicated more than

43

1    200 hours to this process.

2        5.    On May 28, 2010, I traveled to the Santa Ana Detention Facility with

3    three law student interns to meet with detainees.  While the security guards gave

4    me access, the guards denied our law student interns access to the detainees.

5    Consequently, I was able to meet with less than half of the detainees I had planned

6    to meet.

7        6.    Given the problems with access to the detention facilities and

8    challenges in securing reliable information from the detainees, my supervisor

9    Ahilan Arulanantham and I – as well as five summer law student interns – needed

10    to make several subsequent visits to the Santa Ana Detention Facility, the Mira

11    Loma Detention Facility, and the Theo Lacy Detention Facility.  We made

12    additional visits to these detention facilities on June 14, 2010, June 15, 2010, June

13    28, 2010, July 1, 2010, July 27, 2010, August 4, 2010, August 19, 2010, August

14    28, 2010, and August 31, 2010.  I went on five of these occasions and Mr.

15    Arulanantham went on five of these occasions (on one occasion we went

16    together).  On most of these occasions we were accompanied by one or more

17    student interns.   We collectively devoted more than 150 more hours collecting

18    information from detainees through this process. Ultimately, from May 2010

19    through August 2010, we visited approximately 70 unique individuals in Southern

20    California detention facilities.

21        7.    During these visits to the local detention facilities, most of the

22    individuals with whom we met agreed to sign the Authorization to Release

23    Information.  However, a number of people did not want to sign the authorization

24    until they consulted with their individual attorneys or family members.  In

25    addition, several people expressed concern about signing the authorization forms

26    for fear of retaliation by the Department of Homeland Security.

27        8.    On or around February 24, 2011, Respondents again sent Petitioners a

28    roster of the names, alien numbers, locations, and attorney contact information for

2

44

1    all immigration detainees who, on February 24, 2011, had been detained for six

2    months or longer in the Central District of California. This roster also contained

3    the names of approximately 355 adult detainees as well as information concerning

4    possible attorneys of record for some of the detainees. With six UCLA law

5    students, five Loyola law student interns, and three other practicing attorneys, we

6    again attempted to meet with at least twenty percent of all of the detainees on the

7    roster. In total, we collectively dedicated at least 275 hours in this process. My

8    experiences during that process were very similar to those from the first round of

9    interviews.

10    \

11    \

12    \

13    \

14    \

15    \

16    \

17    \

18    \

19    \

20           9.     Because visiting the various detention facilities in which these

21    individuals are detained would require hundreds of hours and the assistance of

22    numerous attorneys and student interns, it is doubtful that we would have the

23    resources to collect in-person written consent from the individuals at issue in this

24    discovery dispute, particularly if we will not know who the individuals at issue

25    are. As almost all of our law clerks have already finished their summer

26    internships, we will not have the same level of assistance as we have had in the

27    past to meet with large numbers of detainees simultaneously. Moreover, it is

28    unlikely that I will be able to assist with obtaining written consent from class

members because my fellowship ends this month. This is significant because I have been the one attorney at the ACLU of Southern California who has been most responsible for providing assistance to individuals in the local detention facilities for the past two years--particularly in the context of working on this lawsuit--and the ACLU does not currently have a replacement for my position.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 8th day of August, 2011 in Los Angeles, California.

\s\ Jennifer Stark

Jennifer Stark

4

46