# EXHIBIT 1

RECEIVED

SEP 21 2011

U.S. ATTORNEY
CRIMINAL DOCKETS

FILED
CLERK, U.S. DISTRICT COURT

SEP - 8 2011

CENTRAL DISTRICT OF CALIFORNIA
BY             DEPUTY

1  Frederick Ngaywa
   BK #: 25 97 017
2  IN PRO PER
   James A. Musick Facility
3  13502 James Musick Road
   Irvine, CA 92618

4                    Case No.
          (Related Case No.: SACV11-01287-DSF(FMO))
5
6            UNITED STATES DISTRICT COURT
            DISTRICT OF CENTRAL CALIFORNIA
7                 WESTERN DIVISION

8                              ) DETAINED
                               )
9                              )    SACV11-1287 DSF(FMO)
                               )
   IN THE MATTER OF:           ) DHS FILE NO.: A 095 722 629
10                             )
   Frederick Ngaywa,           )
11                             )  Amended Petition for Release
                               )
12                  Petitioner,)  Petition for Writ of Habeas
                               )           Corpus
13                             )
                               )
14              v.             )
                               )
15 Eric H. HOLDER, Attorney General of )
                               )
16            the United States, )
                               )
17 Troy LUND, Los Angeles Field Office )
                               )
18  Director, Immigration and Customs )
                               )
19               Enforcement, )
                               )
20 Janet NAPOLITANO, Secretary of )
                               )
21         Homeland Security, )
                               )
22 Sandra HUTCHENS, Sheriff and Coroner )
                               )
23 of Orange County.          )
                               )
24               Respondents, )
                               )
25                             )

FILED
CLERK, U.S. DISTRICT COURT

SEP - 8 2011

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

DOCKETED ON CM

SEP 1 4 2011

BY              028

- 1 -

1  Petitioner, Frederick Ngaywa, submits the following amended petition.

2      Mr. Frederick Ngaywa integrates by reference all of his allegations and

3  exhibits contained in his original petition ("Writ of Habeas Corpus" filed on

4  August 26th, 2011. See Document 1 (Case No.: SACV11-01287-DSF(FMO)). To those

5  allegations, Mr. Frederick Ngaywa adds the following:

6

7  **VERIFIED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR**

8  **DECLARATORY AND INJUNCTIVE RELIEF**

9  1.A writ of habeas corpus may be issued when an individual is "*in custody in*

10  *violation of the constitution or laws or treaties of the United States.*" 28

11  U.S.C. 2241(c)(3). An individual in federal custody pending removal may

12  challenge the constitutionality of his confinement pursuant to 28 U.S.C 2241.

13  See <u>INS v. St. Cyr</u>, 533 U.S. 289, 308-309, 150 L. Ed. 2d 347, 121 S. Ct. 2271

14  (2001) (holding that title of provision, "Elimination of Custody Review by

15  Habeas Corpus" along with broad statement of intent to preclude review was

16  not sufficient to bar review of habeas corpus petitions).

17      The Petitioner may also seek a stay of removal pending habeas

18  proceedings and release pursuant to FRAP Rule 23(b).

19  The Federal District Court could release the Petitioner pursuant to Federal

20  Rule of Appellate Procedure 23(b) (FRAP Rule 23(b)).

21  This court has authority to order such a release pursuant to Fed. R. App. P.

22  23(b), which provides:

23  (b) **Detention or Release Pending Review of Detention Not to Release:** While a

24  decision not to release a prisoner is under review, the court or judge

25  rendering the decision, or the court of appeals, or the Supreme Court, or a

1  judge justice of either court, may order that the prisoner be: (1) detained

2  in the custody from which release is sought; (2) detained in other

3  appropriate custody; (3) released on personal recognizance, with or without

4  surety.

5      Given the text of the rule, the Government's argument that *"this Court*

6  *should not consider, let alone grant, extraordinary relief by motion where*

7  *entitlement vel non to release is the very issue on appeal,"* is baffling:

8  such a release is precisely what the rule contemplates. See also In re Roe,

9  257 F.3d 1077, 1080 (9th Cir. 2001) (holding, assuming that federal court had

10 the authority to release a state prisoner on bail pending resolution of

11 habeas proceedings, that circumstances in inmate's case did not make such

12 release appropriate); United States v. Mett, 41 F.3d 1281, 1282 (9th Cir.1994)

13 *("Fed. R. App. P. 23 governs the issue of the release or detention of a*

14 *prisoner, state or federal, who is collaterally attacking his or her criminal*

15 *conviction.");* Marino v. Vasques, 812 F.2d 499, 508 (9th Cir. 1987) ("Rule 23

16 establishes the authority of the federal courts to release both successful

17 and unsuccessful habeas Petitioner's pending appeal."); Mapp v. Reno, 241

18 F.3d 221, 224 – 25 (2d. Cir. 2001) (holding that the federal courts have the

19 inherent authority to admit to bail habeas Petitioner's being detained by

20 ICE/DHS).

21 *Opinion by Judge THOMAS.*

22

23 2. This honorable Court's consideration of Petitioner's request is governed

24 by Maharaj v. Ashcroft, 295 F.3d 963, 965 (9th Cir. 2002) in which we

25 determined the proper standard for evaluating a similar motion was *"the*

1   *traditional standard for interim injunctive relief, [according to which] the*

2   *moving party must show either (1) a probability of irreparable harm, or (2)*

3   *that serious legal questions are raised and the balance of hardships tips*

4   *sharply in the moving party's favor."* 295 F3d. at 966. As we have explained,

5   *"the two alternatives present extremes of a single continuum, rather than two*

6   *separate tests."* Immigrant Assistance Project of Los Angeles County Fed'n of

7   {443 F.3d 1084} Labor v. INS, 306 F.3d 842, 873 (9th Cir. 2002) (internal

8   quotation marks and citation omitted). Under this analysis, *"the greater the*

9   *relative hardship to the moving party, the less probability of success must*

10  *be shown."* Id. (internal quotation marks and citation omitted).

11          As indicated by the analysis of Petitioner's habeas corpus claims, this

12  honorable Court may conclude that he has shown a probability of success on

13  the merits.

14          The Federal Court must also conclude that in the absence of any the

15  general detention statutes' relied upon by the Government do authorize

16  detention and indefinite detention of Petitioner and when examined under the

17  analysis prescribed by the Supreme Court, Petitioner's detention is

18  unreasonable, unjustified, and in violation of federal law.

19

20  **INTRODUCTION**

21  3.Petitioner, Mr. Frederick Ngaywa, appearing PRO SE, hereby petitions this

22  honorable Court for a *"Writ of Habeas Corpus"* pursuant to 28 U.S.C. § 2241,

23  to challenge the lawfulness of his detention and seeks declaratory and

24  injunctive relief to review the lawfulness of his detention by the United

25  States Department of Homeland Security (DHS), Immigration and Customs

- 4

1    Enforcement (ICE) for eleven (11) months. His punitive incarceration lasted

2    one (1) day. Thus Petitioner's detention by ICE/DHS is 339 TIMES LONGER (as

3    of September 5, 2011 and counting) than his punitive incarceration. This

4    period is well beyond the short period of detention pending a determination

5    of removability that the Supreme Court assumed was typical when it decided

6    Demore v. Kim. Petitioner's eleven (11) month detention also is far longer

7    than the six (6) month presumptively reasonable period of post-removal

8    detention set forth by the Court in Zadvydas (see URITSKY, 286 F. Supp. 2d

9    842;2003 US Dist LEXIS 176982003 U.S. Dist. LEXIS 17698). Mr. Frederick

10   Ngaywa is entitled to immediate release from detention, and he would be

11   released but for ICE/DHS's unlawful interpretation of the Immigration and

12   Nationality Act (INA). In support of this Petition and Complaint, Petitioner

13   alleges as follows:

14

15   4. Petitioner is in the physical custody of Respondent's and detained at the

16   James A. Musick Facility County Facility (13502 James A. Musick Road, Irvine,

17   CA 92618) (hereinafter, James A. Musick Facility), pursuant to a contractual

18   agreement with the Department of Homeland Security (DHS).

19

20   5. Mr. Frederick Ngaywa was taken into custody because he was drunk in

21   public. Because of this minor infraction Mr. Frederick Ngaywa is incarcerated

22   since eleven (11) months. Because of this minor infraction Mr. Frederick

23   Ngaywa is deemed a danger to society and a flight risk by ICE/DHS.

24   Governments position is frivolous and their arguments have no merit. To

25   incarcerate Petitioner for eleven (11) months because of the minor infraction

of *"drunk in public"* shows that <u>frivolousness</u> and <u>unreasonableness</u> permeates every aspect of the Government's litigating position in defense of its <u>egregiously wrongheaded agency/client, DHS/ICE</u>. His punitive incarceration lasted one (1) day. Thus Petitioner's detention by ICE/DHS is <u>339 TIMES LONGER</u> (as of September 5, 2011 and counting) than his punitive incarceration. Petitioner has been held in custody from September 30, 2010 to the present date. His ongoing incarceration is unreasonable and not justified to any degree that could satisfy a reasonable person. Government's decision to continue detention has neither been in accordance either with Due Process requirements as interpreted by <u>Zadvydas v. Davis</u> nor in compliance with DHS/ICE's own regulations. The continued detention of Mr. Frederick Ngaywa without bond has caused and will continue to cause extreme and irreparable hardship to Mr. Frederick Ngaywa and his United States citizen wife his and his three (3) United States citizen children (20, 18, 12 years old) and to his beloved United States citizen grandchild which is now 4 months old. The continued detention of Mr. Frederick Ngaywa is not consistent with *"the Constitution and laws of the United States."*

**PARTIES**

6. Mr. Frederick Ngaywa is a native and citizen of Kenya. He entered the United States on June 1996 as a non-immigrant visitor for pleasure and has lived in the United States ever since. Petitioner overstayed his visa. He is being held in detention at the Department of Homeland Security detention facility James A. Musick in Irvine, California.

7. Defendant Troy Lund, Los Angeles Field Office Director, is sued in his official capacity as the Field Office Director within the State of California for the Immigration and Customs Enforcement, an office of the Department of Homeland Security. Defendant Troy Lund is charged by law with the implementation and enforcement of the immigration laws, and he is the officer who has custody over Petitioner.

8. Defendant Eric Holder, Attorney General, is sued in his official capacity as the Attorney General of the United States. He has authority over the Board of Immigration Appeals, and he has authority to direct the Board to hold bond hearings and establish bond conditions.

9. Defendant Janet Napolitano, DHS Secretary, is sued in her official capacity as the Secretary of the Department of Homeland Security. She is the executive officer who has been given authority to manage and control the Immigration and Customs Enforcement. As such, he is the ultimate legal custodian of the Petitioner.

10. Defendant Sandra Hutchens, Sheriff and Coroner of Orange County, is sued in her official capacity as the Sheriff of Orange County. She is the executive officer who has been given authority to manage and control the Orange County Sheriff's Department and thus the James A. Musick Facility in Irvine California, East-Delta barracks in which Petitioner is incarcerated, thus she is the ultimate physical custodian of the Petitioner.

1  **JURISDICTION**

2  11. This honorable Court has jurisdiction pursuant to 28 U.S.C. 2241

3  (habeas corpus jurisdiction); 28 U.S.C. 1331 (federal question jurisdiction);

4  and 28 U.S.C. 1361 (jurisdiction over actions for mandamus).

5

6  12. Venue in the Irvine, California district is appropriate under 28 U.S.C.

7  1391(e)(1) and (2) because the defendant Troy Lund, ICE Field Office

8  Director, resides in this district and because petitioner is being held in

9  detention in the Central District of California.

10

11  **FACTUAL BACKGROUND**

12  13. Mr. Frederick Ngaywa is a native and citizen of Kenya. He entered the

13  United States on June 1996 as a non-immigrant visitor for pleasure and has

14  lived in the United States ever since. Petitioner overstayed his visa. He is

15  being held in detention at the Department of Homeland Security detention

16  facility James A. Musick in Irvine, California. He is detained since eleven

17  (11) months. To incarcerate Petitioner for eleven (11) months shows that

18  frivolousness and unreasonableness *("The entire process, not merely the*

19  *original removal hearing, is subject to the constitutional requirement of*

20  *reasonability.") (quoted in Oyedeji, 332 F. Supp.2d at 754)* permeates every

21  aspect of the Government's counsels litigating position in defense of its

22  egregiously wrongheaded agency/client, DHS/ICE.

23

24  14. Mr. Frederick Ngaywa does have a criminal history. Petitioner has no

25  crimes of violence, no crimes of a sexual nature or involving drugs that bar

- 8 -

1  him from adjusting his status and indeed the honorable Immigration Judge

2  advised him that his crimes are eligible for waiver via Waiver form I-601

3  pursuant to INA § 212(h).

4

5  15. Mr. Frederick Ngaywa was apprehended by DHS/ICE in September 2010 and

6  charged with overstaying his visa. Due to Mr. Frederick Ngaywa's marriage to

7  a United States citizen wife and Mr. Frederick Ngaywa's having three (3)

8  United States citizen children combined with other equitable factors in Mr.

9  Frederick Ngaywa's favor, he is statutorily eligible to adjust his status to

10  that of Lawful Permanent Resident (LPR). Petitioner has an Immediate Relative

11  Visa Petition (I-130) pending stating him as the beneficiary, that has been

12  submitted to the United States Citizenship and Immigration Services (USCIS),

13  by his United States citizen wife. This fact also prevents the Director of

14  ICE from effectuating Petitioner's removal due to the pending I-130, as per

15  ICE regulations. The conclusive adjudication of petitioner's I-130 is an

16  unforeseeable event and such adjudications are known to take years in some

17  cases, therefore the removal of Mr. Frederick Ngaywa is an unforeseeable

18  event and thus there is *no significant likelihood of removal in the*

19  *reasonably foreseeable future.*" See <u>Zadvyadas</u>. Therefore the continued

20  incarceration of Mr. Frederick Ngaywa is and will be indefinite and therefore

21  in violation of statute and of DHS/ICE's own regulations and is in violation

22  of the Constitution of the United States, and is causing irreparable injury

23  and extreme hardships to the Petitioner and Petitioner's United States

24  citizen family. The Petitioner was arrested for being drunk in public. The

25  Petitioner spend one (1) day in jail. He was sentenced to time served. After

sentencing, for this *minor* infraction, a misdemeanor, Mr. Frederick Ngaywa

was taken into the custody of ICE/DHS. His punitive incarceration lasted one

(1) day. Thus Petitioner's civil detention by ICE/DHS is <u>339 TIMES LONGER</u> (as

of September 5, 2011 and counting) than his punitive incarceration.

Therefore, the length of his civil detention far exceeds the length of any

possible period of punitive incarceration. See <u>Ly</u>, 351 F.3d at 271 *(granting*

*habeas relief where 500 days of mandatory detention followed 12 months of*

*incarceration associated with two criminal sentences);* <u>Vongsa</u>, 009 U.S. Dist.

LEXIS 109899, 2009 WL 4049143, at *10 *(holding detention to be unreasonable*

*when it lasted "ten times as long as [Petitioner's] original 60-day*

*sentence").*


16. The DHS's refusal to establish a bond is unjustified and contrary to law.

But for the fact that the Department of Homeland Security has wrongfully

interpreted and applied the statute, a bond amount would be established and

Mr. Frederick Ngaywa would be released from detention. Petitioner is still

incarcerated by ICE/DHS. The continued detention of Mr. Frederick Ngaywa has

caused and will continue to cause extreme and irreparable hardship to Mr.

Frederick Ngaywa and his United States citizen family, and it violates the

statute and the United States Constitution.


17. The Petitioner's appeal at the Board of Immigration Appeals, and any

subsequent appeal to the federal Courts, may be pending for a period of two

years or more. Therefore the removal of Mr. Frederick Ngaywa is an

unforeseeable event and thus there is *"no significant likelihood of removal*

*in the reasonably foreseeable future."* See <u>Zadvyadas</u>. An alien who would not normally be subject to indefinite detention cannot be so detained merely because he seeks to explore avenues of relief that the law makes available to him. Further, although an alien may be responsible for seeking relief, he is not responsible for the amount of time that such determinations may take. The decision by the Respondent's to continue Petitioner's **incarceration** veers dangerously close to penalizing him for attempting to exercise his constitutional right to petition the federal Courts for redress.

18. Frederick Ngaywa is entitled to a bond amount which is reasonable and proportional to Petitioner's means and cost of living, because the Ninth Circuit has correctly suggested that *"serious questions may arise concerning the reasonableness of the amount of bond if it has the effect of preventing an alien's release."* <u>Doan v. INS</u>, 311 F. 3d 1160, 1162 (9th Cir. 2002).

In a bond hearing, the burden is on the detainee to show to the satisfaction of the Immigration Judge that he or she warrants release on bond. See <u>Matter of Guerra</u>, 24 I&N Dec. 37, 40 (BIA 2006). In making a bond decision, *"an Immigration Judge must consider whether an alien who seeks a change in custody status is a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk."* <u>Matter of Guerra</u>, 24 I&N Dec. at 40 (citing <u>Matter of Patel</u>, 15 I&N Dec. 666 (BIA 1976)). The factors commonly considered in making a bond decision include: "

a) whether the alien has a fixed address in the United States (*Mr. Frederick Ngaywa has a fixed address in the United States*);

b) the alien's length of residence in the United States (*Mr. Frederick Ngaywa lives since 15 years in the United States*);

c) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future (*Mr. Frederick Ngaywa has strong family ties in the United States. He is married since September 2009 to a United States citizen, has three United States citizen children in the age of 20, 18 and 12. Friends and supporters will ensure all his appearances at all hearings and interviews*);

d) the alien's employment history (*Mr. Frederick Ngaywa has an employment history going back to the 1996*);

e) the alien's record of appearance in court (*Mr. Frederick Ngaywa never missed a court date in his life*);

f) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses (*Mr. Frederick Ngaywa does have a criminal history. He is not involved in drugs and he has not been convicted of any crimes of violence*);

g) the alien's history of immigration violations;

h) any attempts by the alien to flee persecution or otherwise escape authorities (*Mr. Frederick Ngaywa always cooperated with the authorities, never tried to escape*), and

i) the alien's manner of entry to the United States (*Mr. Frederick Ngaywa entered the United States legally as a visitor*)."

Matter of Guerra, 24 I&N Dec. at 40., 24 I&N Dec. at 40.

In light of the Mr. Frederick Ngaywa's answers to these nine considerations, it is obvious that Petitioner

*"has equities in the United States and those equities far outweigh any adversities".*

The denial of the request for release on his Own Recognizance or for a reasonable bond within his means is therefore a Gross Miscarriage of Justice.

That Mr. Frederick Ngaywa was not granted a release from civil detention after eleven (11) months, which is 339 TIMES LONGER than his punitive incarceration, is a Gross Miscarriage of Justice. A *"Miscarriage of Justice"* is a *"decision or outcome of legal proceeding that is prejudicial or inconsistent with substantial rights of party."* Black's Law Dictionary, 5th Edition 1979.

Looking at the facts shows a gross miscarriage of justice against Mr. Frederick Ngaywa. Mr. Frederick Ngaywa's punitive incarceration lasted one (1) day. Thus it is a gross miscarriage of justice, that Petitioner's civil detention by ICE/DHS is 339 TIMES LONGER than his punitive incarceration.

Furthermore, it is a gross miscarriage of justice against Mr. Frederick Ngaywa, because he had several forms of relief available which the Immigration Judge should have considered at a bond hearing. Mr. Frederick Ngaywa is eligible for adjustment of status and should not have been ordered removed because:

a) Mr. Frederick Ngaywa is married to a United States citizen spouse and they have three United States citizen children and one United States citizen granddaughter.

b) Mr. Frederick Ngaywa has continuously resided in the United States for fifteen (15) years.

c) Mr. Frederick Ngaywa has a pending Immediate Relative Visa Petition pending with United States Citizenship and Immigration Services (USCIS).

d) Mr. Frederick Ngaywa has no crimes of violence, of a sexual nature or involving drugs that bar him from adjusting his status and indeed the Immigration Judge advised him that his minor crimes were eligible for waiver via Waiver form I-601 pursuant to INA 212(h).

e) Mr. Frederick Ngaywa is thus otherwise statutorily eligible to adjust his status to that of Legal Permanent Resident.

f) Mr. Frederick Ngaywa is not a threat to the national security of the United States of America.

Mr. Frederick Ngaywa remains eligible to adjust his status because of the above equities in his favor amongst others.

If Mr. Frederick Ngaywa could argue his eligibility to adjust his status, he could show that the Immigration Judge should not have ordered him removed prematurely despite Petitioner's **prima facie** showing of eligibility to adjust status. Because the Immigration Judge denied to hear Mr. Frederick Ngaywa, he was denied due process and therefore the Judge's order to remove Mr. Frederick Ngaywa is a gross miscarriage of justice.

19. The refusal of ICE/DHS to establish a bond amount is <u>arbitrary</u> and <u>capricious</u>, based on an <u>erroneous</u> interpretation of the law, and constitutes abuse of discretion. In refusing to establish a bond amount, ICE/DHS has acted in violation of the Immigration and Nationality Act, and in violation of the Eighth Amendment, in violation of the Due Process Clause of the United States Constitution and in violation of the constitutional requirement of reasonability. *"The entire process, not merely the original removal hearing, is subject to the constitutional requirement of reasonability." (quoted in Oyedeji, 332 F. Supp.2d at 754).*

20. Mr. Frederick Ngaywa filed applications and waivers during his removal proceedings. His United States citizen wife submitted an application I-130, which is still pending, and Petitioner submitted an application I-485. Because of these pending applications he is statutorily no longer deportable pending the conclusive adjudication of the before mentioned applications. Despite the fact that petitioner is not removable because of his pending applications, the Immigration Judge erroneously closed Petitioner's case and ordered him removed. The Immigration Judge denied Mr. Frederick Ngaywa any further opportunities to argue his case or to request a bond hearing. The aforementioned applications are still pending and Petitioner is appealing the Immigration Judge's ruling to the Board of Immigration Appeals. Because Petitioner is pursuing further appeals of his removal order and to proof his eligibility to receive Legal Permanent Resident status under the Immigration and Nationality Act and follow up all avenues of relief the law makes available to him, with this honorable court and other courts and authorities

which may have more jurisdiction than this one to conduct such a review,

there is no *"significant likelihood of removal in the reasonably foreseeable*

*future"* of the petitioner, Mr. Frederick Ngawya. His detention is statutorily

unauthorized under Zadvydas because the Government cannot demonstrate to any

degree of certainty when Mr. Frederick Ngawya's judicial review will end. An

alien who would not normally be subject to indefinite detention cannot be so

detained merely because he seeks to explore avenues of relief that the law

makes available to him. Further, although an alien may be responsible for

seeking relief, he is not responsible for the amount of time that such

determinations may take. The decision by the Respondent's to continue

Petitioner's incarceration veers dangerously close to penalizing him for

attempting to exercise his constitutional right to petition the Board of

Immigration Appeals and the federal Courts for redress.


21. Petitioner, in PRO SE, is detained since eleven (11) months by ICE/DHS.

Petitioner, who is unable to obtain an immigration attorney due to the fact

that he was not able to work and thus does not have any money to pay for

counsel. Therefore Petitioner relies for the purposes of pursuing further

appeals of his removal proceedings and to proof his eligibility to receive

LPR status under the Immigration and Nationality Act on PRO BONO immigration

attorneys. On August 12, 2011, a group of PRO BONO immigration attorneys came

to the James A. Musick Facility, in Irvine California. These PRO BONO

immigration attorneys intended to volunteer for the establishment of a *"Law*

*Clinic"* at this location. Within the framework of such a *"Law Clinic"* these

PRO BONO immigration attorneys planned to offer free legal counsel for the

1  Petitioner in his removal proceedings. Notwithstanding the fact that the

2  Petitioner has a right to counsel, this group of PRO BONO immigration

3  attorneys was denied entry to this location by the Respondent's. By doing so,

4  the Respondent's violated Petitioner's right to counsel and his Fifth

5  Amendment right for due-process. These volunteers who came to help the

6  Petitioner were turned around and banned from the James A. Musick Facility

7  indefinitely. This denial of PRO BONO counsel for the Petitioner is grossly

8  defective in constitutional terms and thus is unreasonable *("The entire*

9  *process, not merely the original removal hearing, is subject to the*

10 *constitutional requirement of reasonability.")* (quoted in Oyedeji, 332 F.

11 Supp.2d at 754). This renders Petitioner's removal proceedings fundamentally

12 and constitutionally unfair and is in violation of federal law for all the

13 foregoing reasons.

14

15 22. During Mr. Frederick Ngaywa's removal proceedings, he requested a

16 continuance to obtain legal counsel. The Immigration Judge rejected this

17 request out of hand, without bothering to say what due process rights the

18 Petitioner possesses. The search for legal counsel is for Petitioner more

19 challenging and time consuming, as he relies, as before mentioned in 21., on

20 PRO BONO legal counsel. Thus the proceedings are not consistent with *"the*

21 *Constitution and laws of the United States."* Denying the Petitioner more time

22 to retain legal counsel de facto means razing the system of constitutional

23 protections for the Petitioner and thus it does not satisfy the Due Process

24 Clause. Thus Petitioner is forced to pursue avenues of relief to which he is

25 legally entitled in PRO SE. In order to work on his case, for research and

writing his appeals and motions, Petitioner is required, due to the erroneous

decision of the Immigration Judge, to rely on the *"Law Library"* at the James

A. Musick Facility, in Irvine California, East-Delta and East-Echo barracks.

But for legal work the setup of the Law Library is ineffective and deficient

on so many levels:

   a) The Law Library is open every day only for two hours or less. The

      guards of the East-Delta and East-Echo barracks decide on <u>arbitrary</u> and

      <u>capricious</u> factors if they are opening the Law Library at all, at what

      time they are opening it and when to close it. Often Petitioner is

      punished for going to the Law Library by not allowing him to shave and

      by withholding of hygiene products. Petitioner often goes for days

      without shaving because he rather works on his case the Law Library.

      Also during the Law Library time the guards of the East-Delta and East-

      Echo barracks perform the so-called *"Clothing Exchange"*. At this point

      Petitioner has to choose between having fresh clothes and miss at least

      30 minutes of valuable Law Library time or use the Law Library time to

      its fullest extent and wear dirty clothes. The matters of immigration

      law are very complex. Thus research for his immigration case takes much

      longer compared to the legal professional, the counsel who represents

      ICE/DHS. Still, ICE/DHS and the Orange County Sheriffs Department is

      only opening the Law Library for two (2) hours each day or less. Which

      average immigration detainee without legal schooling is able to mount a

      viable defense in his immigration case against a well educated legal

      professional at the Chief Counsels Office of ICE/DHS when the alien is

      only allowed to use the Law Library for two (2) hours or less and this

- 18

1    not even for every day, because of the long waiting list for the Law

2    Library. Under these circumstances is no structured and methodical

3    working on a project to pursue avenues of relief the Petitioner is

4    entitled to by law, possible. Out of this situation is arising the

5    serious constitutional problem that, Petitioner's right to effective

6    counsel and his Fifth Amendment right for due-process is violated in

7    these circumstances, which causes an indefinite, perhaps permanent,

8    deprivation of human liberty without any [procedural] protection. This

9    renders Petitioner's removal proceedings fundamentally and

10   constitutionally unfair.

11   b) Petitioner has to share six (6) computer terminals with more than two

12   hundred and fifty (250) detainees. Assuming that only about half of

13   these detainees are invoking their right to research and write appeals

14   and petitions for relief, as to be expected as a natural part of the

15   process, every of these detainees would have every day, assuming the

16   Law Library is open for two (2) hours, about one (1) minute time

17   available to work on their appeals and petitions. This situation does

18   NOT fulfill the constitutional requirement of reasonability ("The

19   entire process, not merely the original removal hearing, is subject to

20   the constitutional requirement of reasonability.") (quoted in Oyedeji,

21   332 F. Supp.2d at 754), it is grossly defective in constitutional

22   terms. Furthermore, although an alien may be responsible for seeking

23   relief, he is not responsible for the amount of time that such research

24   for relief may take. The mere fact that ICE/DHS and the Orange County

25   Sheriffs Department makes six (6) computer terminals for more than 250

1    detainees available, does not mean that Petitioner is able to explore

2    all avenues of relief that the law makes available to him. Because the

3    entire process is subject to the constitutional requirement of

4    reasonability, this situation it is not reasonable. It is <u>NOT</u>

5    reasonable to provide for more than 250 detainees only with six

6    computer terminals accessible for 2 hours or less a day. Because of a

7    long waiting list, resulting from this situation, Petitioner was not

8    granted enough time in the Law Library in order to be able to explore

9    all avenues of relief that the law makes available to him. Again, out

10   of this situation is arising the serious constitutional problem that,

11   Petitioner's right to effective counsel and his Fifth Amendment right

12   for due-process is violated in these circumstances, which causes an

13   <u>indefinite</u>, perhaps <u>permanent</u>, <u>deprivation of human liberty</u> without any

14   [procedural] protection. This renders Petitioner's removal proceedings

15   fundamentally unfair.

16   c) The detainees at the James A. Musick Facility are not able to file

17   their appeals and petitions electronically (e-filing) with the Courts

18   like the Board of Immigration Appeals (BIA), whereas the counsel of

19   ICE/DHS has this ability. This renders Petitioner's removal proceedings

20   fundamentally unfair and amounts to a violation of his Fifth Amendment

21   right for due-process. When for example the BIA grants in their

22   briefing schedule 21 days for both parties to file a brief, only the

23   counsel for ICE/DHS can enjoy the full amount of 21 days to write and

24   submit their appeals and petitions. On the 21st day the counsel for

25   ICE/DHS has only to "press" a button to send their petitions, appeals

and motions and they are seconds later electronically on-time received

at the BIA (by e-filing). The Petitioner has only one unsatisfactory

option: the Law Library. But this Library has NO electronic filing

system (e-filing) for Petitioner's appeals and petitions available to

him. The only means for him to send his appeals and petitions to the

Board is using United States Postal Service 1st Class Mail. This is the

only means provided by ICE/DHS and the Orange County Sheriffs

Department to all detainees. In order to be on time with the filing

deadlines in the briefing schedule Petitioner has to mail his petitions

and motions at least 10 days before the filing deadline. Thus

Petitioner has not only to suffer from an grossly defective, in

technical and in constitutional terms, unreasonable Law Library setup

and layout, he also has to suffer from having available much less time

preparing for his petitions. 21 days minus 10 days equals 11 days to

research and write his petitions, appeals and motions. Whereas the well

educated counsel of ICE/DHS has unlimited resources to research and

write their appeals and petitions, because of them having available

electronic filing, the counsel of ICE/DHS can enjoy the full 21 days

and the Petitioner has to suffer a great shortage of time. He has

effectively only 11 days to research and write his petitions. Again,

out of this situation is arising the serious constitutional problem

that, Petitioner's right to effective counsel and his Fifth Amendment

right for due-process is violated in these circumstances, which causes

an indefinite, perhaps permanent, deprivation of human liberty without

any [procedural] protection. This renders Petitioner's removal

proceedings fundamentally and constitutionally unfair.

d) Due to negligent and unqualified maintenance by the Orange County

Sheriff's Department Computer Services the already limited use of the

Law Library is further reduced, to nothing. Since May 31, 2011 to the

present day the East-Delta and East-Echo barracks at the James A.

Musick Facility have technically not anymore a Law Library. The heart

of the Law Library is the LexisNexis system. Since May 31, 2011 the

access to the *BICE* Electronic Law Books is not anymore available due to

licensing issues and all Immigration Cases, the case law, is deleted

from the LexisNexis system. There is no more practical use of the

LexisNexis system. The computer terminals in the Law Library are merely

*"glorified"* typewriters. The Petitioner is not able to do any research

for his petitions, appeals and motions. Furthermore, the Petitioner was

handed by the Orange County Sheriffs Department a re-writable Compact

Disc to back up his files pertaining to his immigration case. Since

three weeks the CD/DVD drive which is needed to *"read"* the re-writable

Compact Discs is not anymore functional. Petitioner is not able to

access his files anymore. Furthermore as Petitioner writes this

petition, the only printer in the Law Library is since three (3) days

out of toner. Since three (3) days Petitioner is not able to print this

petition. Since three (3) days officers of the Orange County Sheriffs

Department refused to order new toner. On the fourth day Petitioner was

not allowed to go to the Law Library because too many detainees signed

up for the Law Library. On the 5th day Petitioner was allowed access to

the Law Library, but was told that nothing can be printed today because
the printer is out of paper and for this day no more paper can be
ordered. In total, since five (5) days Petitioner is prevented by the
Orange County Sheriffs Department and ICE/DHS to print and thus send
this petition to this honorable court. This situation is NOT justified
to any degree that could satisfy a reasonable person. Government's
unwillingness to supply Petitioner on a regular basis with a computer
terminal to work with, unwillingness to supply paper and toner has not
been in accordance with the Fifth Amendment Due Process requirements.
Petitioner has to observe filing deadlines with this with this
honorable court and other courts and authorities and cannot afford to
miss these filing deadlines because of the Government's unwillingness
to supply Petitioner on a regular basis with a computer terminal to
work with and unwillingness to supply paper and toner. Again, out of
this situation is arising the serious constitutional problem that,
Petitioner's right to effective counsel and his Fifth Amendment right
for due-process is violated in these circumstances, which causes an
indefinite, perhaps permanent, deprivation of human liberty without any
[procedural] protection. This renders Petitioner's removal proceedings
fundamentally and constitutionally unfair.

e) This Law Library is predominantly used by ICE/DHS and the Orange County
Sheriffs Department as a *"show piece"* during tours by members of the
ACLU, various consulates and other immigration rights advocate groups
to show *"how good the detainees are treated"*. At least once a month
representatives of the Orange County Sheriffs Department and ICE/DHS

show this non working example of a Law Library to "tour groups" from

the outside. In the speeches held during these tours by the

representatives of the Orange County Sheriffs Department and ICE/DHS it

is always pointed out that a lot of money and effort is spend to

facilitate this Law Library which consists out of six (6) terminals and

a *"Server Tower"*. The term *"Server Tower"* was coined by one of the

Orange County Sheriffs during one of these tours. In fact the Server

Tower is only a $400 Windows PC. To this cheap home PC (aka Server

Tower) are connected six (6) monitors, six (6) keyboards and six (6)

computer mice. This is the setup of the Law Library at the James A.

Musick Facility. One cheap home PC runs the whole Law Library. During

these visits this $400 setup is described by representatives of the

Orange County Sheriffs Department and ICE/DHS to the members of the

tours as a *"State of the Art"* computer network with a centralized

*"Server Tower"*. It is never mentioned in these speeches that more than

250 detainees are waiting to use these six (6) computer terminals and

what kind of functionality and benefits this Law Library is to provide

to the 250 detainees. While listening to these speeches it is easy to

see that the representatives of ICE/DHS and the Orange County Sheriffs

Department themselves have no idea, knowledge or plan what these six

(6) terminals are supposed to do for the 250 detainees. It seems that

just the physical presence of something what resembles a computer,

working or not, is considered a good thing by ICE/DHS and the Orange

County Sheriffs Department; it is something that will benefit all the

250 detainees somehow. It is erroneous to believe that the mere

presence of six (6) computer terminals with a word processor, some

immigration forms and an immigration database will benefit a population

of more than 250 detainees, to which they have access only for two (2)

hours or less every day, if one of the 250 detainees is lucky enough to

secure a spot at one of the six (6) terminals. It is never mentioned in

these speeches by the representatives of Orange County Sheriffs

Department and ICE/DHS that there are no instructions given whatsoever

in how to use the Law Library. It is never mentioned in these speeches

that most detainees are barred from using this Law Library because

there are only six (6) computer terminals for more than 250 detainees

and because of their intellectual incompetence to comprehend

complicated matters as in the immigration law, poor or no-existent

education and language barrier. In these speeches it will be never

mentioned that a group of PRO BONO immigration attorneys came on August

12, 2011 to the James A. Musick Facility to counsel the Petitioner and

other detainees with their removal proceedings in order to give

Petitioner and the other detainees a chance in succeeding in their

cases. In these speeches it will be never mentioned that upon their

arrival at the James A. Musick Facility these PRO BONO immigration

attorneys were prohibited to enter the facility and thus were not

allowed to give to the Petitioner and other detainees legal counsel for

their removal proceedings. In these speeches it will be never mentioned

that within the framework of a "Law Clinic" these PRO BONO immigration

attorneys would have offered free legal advise for the Plaintiff's and

other detainees removal proceedings.

1

2       All the foregoing amounts for the Petitioner to prejudice and resulting

3   from it, it adds up to a violation of Petitioner's right to counsel and his

4   Fifth Amendment right to due process. The deficient setup of the "Law

5   Library" at the James A. Musick Facility makes it impossible for the

6   Petitioner pursuing avenues of relief to which he is entitled by law. In

7   order to avoid a violation of Petitioner's right to counsel and his "Due

8   Process Rights", Petitioner must be released immediately to pursue his

9   research for his case on the "outside" with all the resources available to

10  him.

11

12  23. Petitioner did complain about the lack of a "Law Clinic" supported by PRO

13  BONO immigration attorneys and the lack of a reasonable functioning "Law

14  Library" to the Respondent's with no avail. Thus, Petitioner filed on July

15  29, 2011 with this honorable Court a "Writ of Mandamus", a "Petition to Order

16  the Adjudication of Entitlement for Reasonable use of the Law Library" (Case

17  No.: SACV11-1211UA(FMO)), on August 26, 2011 Petitioner filed with this

18  honorable Court a "Writ of Habeas Corpus", a "Petition for Release" (Case

19  No.: SACV11-01287-DSF(FMO)). Petitioner is asking this honorable Court to

20  accept this instant "Writ of Habeas Corpus" as amended and combine it with

21  the August 26, 2011 habeas (Case No.: SACV11-01287-DSF(FMO)) because

22  Petitioner is presenting many additional arguments, supported by case law,

23  with this instant "Writ of Habeas Corpus".

24

25

24. In sum, even if all legal avenues of relief were rebutted, Mr. Frederick Ngaywa requests <u>humanitarian relief</u>. Mr. Frederick Ngaywa is 38 years old. He lives since 15 years in the United States. He simply overstayed his visa. He was arrested because he was drunk in public. After sentencing for this <u>minor</u> infraction, Mr. Frederick Ngaywa was taken into the custody of ICE/DHS. He is now since eleven (11) months by ICE/DHS incarcerated. Petitioner's punitive incarceration lasted one (1) day. Thus Petitioner's civil detention by ICE/DHS is <u>339 TIMES LONGER</u> (as of September 5, 2011 and counting) than his punitive incarceration. Therefore, the length of his civil detention far exceeds the length of any possible period of punitive incarceration. See <u>Ly</u>, 351 F.3d at 271 *(granting habeas relief where 500 days of mandatory detention followed 12 months of incarceration associated with two criminal sentences)*; <u>Vongsa</u>, 009 U.S. Dist. LEXIS 109899, 2009 WL 4049143, at *10 *(holding detention to be unreasonable when it lasted "ten times as long as [Petitioner's] original 60-day sentence")*. To incarcerate a human being for eleven (11) months for a <u>minor</u> infraction *"like drunk in public"* is <u>frivolous</u> and <u>unreasonable</u>. <u>Frivolousness</u> and <u>unreasonableness</u> permeates every aspect of the Government's litigating position in defense of its <u>egregiously</u> <u>wrongheaded</u> agency/client, DHS/ICE. Mr. Frederick Ngaywa's case is the type for which humanitarian exceptions were created. Mr. Frederick Ngaywa has presented compelling reasons, rooted in the long-lasting incarceration, Mr. Frederick Ngaywa's incarceration is not justified by any means and causes him extraordinary suffering and Petitioner should be released on humanitarian considerations in order to be able to join his United States citizen wife, his United States citizen family in the United States. For these reasons, Mr.

Frederick Ngaywa respectfully asks to consider "deferred action,"

"humanitarian parole," or any other discretionary remedy that may be granted

on humanitarian grounds. See, e.g., Recommendation from the CIS Ombudsman to

the Director, USCIS, Apr. 6, 2007, (last visited Aug. 3, 2010) (describing

the deferred action); Reno v. American-Arab Anti-Discrimination Comm., 525

U.S. 471, 484-85, 119 S. Ct. 936, 142 L. Ed. 2d 940 (1999) (quoting 6 C.

GORDON, S. MAILMAN, & S. YALE-LOEHR, IMMIGRATION LAW AND PROCEDURE §

72.03[2][a] (1998)) (same); Botezatu v. INS, 195 F.3d 311 (7th Cir. 1999)

(discussing humanitarian parole).


**IRREPARABLE INJURY**

25. Petitioner is suffering and will continue to suffer irreparable injury

because of the Governments actions. Every day that Mr. Frederick Ngaywa is

held in custody he suffers further injury, which is irreparable.


**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

26. Petitioner has exhausted all administrative remedies and no further

administrative remedies are available to him.



COUNT ONE

**(Detention in Violation of the Statute and Regulations)**

27.Petitioner repeats and re-alleges the allegations contained in paragraphs

1 through 26 above as though set forth fully herein.


- 28

28. The Due Process Clause of the Fifth Amendment to the United States
Constitution provides that "[n]o person shall . . . be deprived of life,
liberty, or property, without due process of law." U.S. Const. amend. V. The
Due Process protections of the Fifth Amendment extend, not just to American
citizens, but to all persons within the territory of the United States,
including aliens. Wong Wing v. United States, 163 U.S. 228, 238, 16 S. Ct.
977, 41 L. Ed. 140 (1896).

29. The Due Process Clause includes two types of protections, substantive due
process and procedural due process. Substantive due process prevents the
Government from engaging in conduct that *shocks the conscience*" or
interferes with rights *"implicit in the concept of ordered liberty."* United
States v. Salerno, 481 U.S. 739, 746, 107 S. Ct. 2095, 95 L. Ed. 2d 697
(1987); Rosales-Garcia, 322 F.3d at 410-11. It is well established that
"freedom from imprisonment . . . lies at the heart of the liberty that Clause
protects." Zadvydas, 533 U.S. at 690. Because even aliens have a fundamental
liberty interest in being free from physical restraint, the Government must
show a compelling state interest in infringing that interest. Danesh v.
Jenifer, No. 00-CV-74409-DT, 2001 U.S. Dist. LEXIS 6762, at *17 (E.D. Mich.
March 27, 2001).

30. The Zadvydas Court construed Section 1231 as "limiting an alien's post-
removal-period detention to a period reasonably necessary to bring about that
alien's removal from the United States." Id. at 689. The Court held that the
statute does not permit indefinite detention. Id. Interpreting the statute as

permitting indefinite detention of an alien, the Court concluded, would raise
serious constitutional concerns. Id. at 690. Thus the Court held that "once
removal is no longer reasonably foreseeable, continued detention is no longer
authorized by the statute." Id. at 699.

The Court acknowledged that habeas courts might have difficulty
determining when an alien's removal no longer is reasonably foreseeable;
therefore, the Court established a detention period that the courts could
consider presumptively reasonable. Looking to Congress' decision in 1996 to
shorten the removal period from six months to ninety days, the Court
concluded that Congress doubted the constitutionality of detention for more
than six months. Id. at 701. The Court held that "after this 6-month period,
once the alien provides good reason to believe that there is no significant
likelihood of removal in the reasonably foreseeable future, the Government
must respond with evidence sufficient to rebut that showing." Id.
In reaching its decision that Section 1231 does not permit indefinite
detention, the Zadvydas Court analyzed the two regulatory goals set forth in
the statute-- "ensuring the appearance of aliens at future immigration
proceedings" and "preventing danger to the community." The Court found that
neither goal justified indefinite civil detention as administered by the
statute. Id. at 690. With respect to the first goal of ensuring the alien's
appearance, the Court determined that this goal *is weak or nonexistent where
removal seems a remote possibility at best."* Id. While recognizing that the
second justification does not necessarily diminish because the alien is non-
removable, the Court adhered to its prior holdings in which it *"upheld
preventive detention based on dangerousness only when limited to specially*

1  *dangerous individuals and subject to strong procedural protections.*" Id. at

2  691 (citations omitted).

3      As the Court subsequently would do in Kim, the Zadvydas Court

4  distinguished Section 1231 from Section 1226(c). First, the Court noted that

5  Section 1231 applied not only to terrorists and criminals, but also to

6  ordinary visa violators. Id. at 697. More importantly to the Court, post-

7  removal-period detention pursuant to Section 1231, unlike detention pending a

8  determination of removability pursuant to Section 1226(c), in certain cases

9  has no obvious termination point." Id. As the Supreme Court noted in Kim,

10 while the period of detention at issue in Zadvydas was "indefinite" and

11 "potentially permanent," detention pending a determination of removability

12 not only has a definite termination point but in the majority of cases it

13 lasts for less than the ninety days the Court considered presumptively valid

14 in Zadvydas. Kim, 123 S. Ct. at 1720.

15

16 31. Section 241 of the Immigration and Nationality Act permits the detention

17 of an alien with a final order of removal for a period of 90 days. Beyond the

18 statutory period, the Supreme Court has held that six months is a

19 presumptively reasonable period of detention for the Government to effect

20 removal. Zadvydas v. Davis, 533 U.S. 678, 701 (2001). Once six months have

21 passed, the alien must be released if there is no reasonable likelihood of

22 removal in the reasonably foreseeable future. Zadvydas, 533 U.S. at 699-700.

23 In this case, ICE has detained Petitioner for more than eleven (11) months.

24 His punitive incarceration lasted one (1) day. Thus Petitioner's civil

25 detention by ICE/DHS is 339 TIMES LONGER (as of September 5, 2011) than his

1  punitive incarceration. His detention is statutorily unauthorized under

2  Zadvydas because the Government cannot demonstrate to any degree of certainty

3  when Mr. Frederick Ngaywa's judicial review will end. Therefore, Mr.

4  Frederick Ngaywa's ultimate deportation is an "unforeseeable" event, and his

5  detention likewise indefinite.

6

7  32. No special circumstances exist to justify petitioners continued detention:

8      a) Petitioner is not an alien with a highly contagious disease or any

9         disease at all posing a danger to the public. See 8 C.F.R. 241.14(b).

10     b) Petitioner's release would not cause serious adverse foreign policy

11        consequences. See 8 C.F.R. 241.14(c)(1)(ii). There is no indication

12        that Petitioner's release would have serious adverse foreign policy

13        consequences.

14     c) Petitioner was never and is not now detained on account of security or

15        terrorism concerns. See 8 C.F.R. 241.14(d)(1).

16     d) Petitioner has not committed a violent crime, as defined in 18 U.S.C.

17        16 as would classify him as specially dangerous. See 8 C.F.R.

18        241.14(f)(1). His release therefore would not pose a special danger to

19        the public. See 8 C.F.R. 241.14(f).

20

21 33. Because there is no significant likelihood of removal in the reasonably

22 foreseeable future, and because none of the special circumstances exist here

23 to justify Petitioner's continued detention, continued detention is no longer

24 authorized. Clark v. Suarez Martinez, 543 U.S. 378; see also Xi v. INS, 298

25 F.3d 832, 834 (9th Cir. 2002). The presumptive period during which the

1  detention of an alien is reasonably necessary to effectuate his removal is

2  six (6) months; after that, the alien is eligible for conditional release if

3  he can demonstrate that there is *"no significant likelihood of removal in the*

4  *reasonably foreseeable {160 L. Ed. 2d 745} future."* Id., at 701, Zadvydas v.

5  Davis, 150 L. Ed. 2d 653, 121 S. Ct. 2491. Petitioner's detention is

6  statutorily unauthorized under Zadvydas because the Government cannot

7  demonstrate to any degree of certainty when Mr. Frederick Ngaywa's judicial

8  review will end. Therefore, Mr. Frederick Ngaywa's ultimate deportation is an

9  "unforeseeable" event, and his detention likewise indefinite. Serious

10 constitutional questions are raised by indefinite mandatory detention,

11 detention of an alien beyond an expedited period ceases to be mandatory under

12 Section 1226(c) and instead becomes discretionary under Section 1226(a). See

13 Casas-Castrillon, 535 F.3d at 951; Tijani, 430 F.3d at 1242.

14

15 34. Even if *"Government action depriving a person of life, liberty, or*

16 *property survives substantive due process scrutiny, it must still be*

17 *implemented in a fair manner."* Salerno, 481 U.S. at 746; Rosales-Garcia, 322

18 F.3d at 410-11. This requirement has traditionally been referred to as

19 procedural due process.

20     More specifically, *"the Fifth Amendment permits detention only where*

21 *'heightened, substantive due process scrutiny' finds a 'sufficiently*

22 *compelling' governmental need."* Id. at 1731-32 (quoting Flores, 507 U.S. at

23 316).

24     Each statute authorizing detention, including § 1226(a) and § 1226(c),

25 carries its own procedural protections. This honorable Court must determine

1  whether those procedures were applied in a fair manner so as to satisfy

2  procedural due process. In the instant matter, they were not.

3      Detention of an alien pending a decision on whether he is to be removed

4  from the United States is governed by 8 U.S.C. § 1226. Under § 1226(a), *"in*

5  *the case of non-criminal aliens subject to removal proceedings, the Attorney*

6  *General retains discretion to decide whether they should be detained,*

7  *released on bond, or released on conditional parole."* Agyeman v. INS, 74 F.

8  App'x 691, 693 (9th Cir. 2003). That discretion is generally exercised in the

9  form of an individualized bond hearing. See Contant v. Holder, 352 F. App'x

10  692, 695 (3d Cir. 2009) *(finding that "§ 1226(a) provides for individualized*

11  *detention determinations");* Casas-Castrillon v. DHS, 535 F.3d 942, 946 (9th

12  Cir. 2008) (recognizing that non-criminal aliens being detained by § 1226(a)

13  are given a bond hearing before an IJ). Once the Attorney General exercises

14  his discretion as to whether the alien who be detained or released, the

15  *"alien may seek review of this decision by an Immigration Judge."* Pisciotta

16  v. Ashcroft, 311 F. Supp. 2d 445, 449 (D.N.J. 2004); Zavala v. Ridge, 310 F.

17  Supp. 2d 1071, 1074 (N.D. Cal. 2004). Therefore, if Petitioner is held under

18  § 1226(a), he is entitled to a proper custody determination assessing his

19  dangerousness and risk of flight and review of that determination by an IJ.

20      Section 1226(c), which provides for mandatory detention of certain

21  criminal aliens, does not provide procedural protections, such as a bond

22  hearing or any assessment of dangerousness. However, any alien who claims not

23  to be subject to detention under § 1226(c) must be immediately provided a

24  *"Joseph hearing,"* in order to determine the applicability of the mandatory

25  detention provision. Gonzalez v. O'Connell, 355 F.3d 1010, 1013 (7th Cir.

1   2004) (citing In re Joseph, 22 I. & N. Dec. 799 (B.I.A. 1999)). Section

2   1226(c)(2) provides that the Attorney General may only release an alien in

3   certain circumstances, and that the alien must show that he will not pose a

4   danger or flee. 8 U.S.C. § 1226(c)(2).

5        The Sixth Circuit has found that a criminal alien subject to mandatory

6   detention must still be given an individualized hearing, if warranted by the

7   circumstances. Hansen, 351 F.3d at 267-68. A hearing is warranted if the

8   process takes an unreasonably long time or in the case of unreasonable delay

9   by the INS. Id. at 268; Uritsky, 286 F. Supp. 2d at 846. Therefore, the

10  Government must be able to justify the deprivation of liberty. Diomande v.

11  Wrona, No. 05-73290, 2005 U.S. Dist. LEXIS 33795, at *6-*7 (E.D. Mich. Dec.

12  12, 2005).

13

14  35. A court should look to five factors which suggest unreasonable delay,

15  including: (1) the overall length of detention; (2) whether the civil

16  detention is for a longer period than the criminal sentence for the crimes

17  resulting in the deportable status; (3) whether actual removal is reasonably

18  foreseeable; (4) whether the immigration authority acted promptly to advance

19  its interests; and (5) whether the Petitioner engaged in dilatory tactics in

20  the Immigration Court. Hansen, 351 F.3d at 271-72.

21

22       Based upon these factors, a hearing is warranted by the circumstances

23  even if Petitioner's detention is pursuant to § 1226(c). The first factor,

24  the overall length of detention, weighs in favor of finding a due process

25  violation. Petitioner has been detained since September 2010, a period of

1  eleven (11) months. This period is well beyond the short period of detention

2  pending a determination of removability that the Supreme Court assumed was

3  typical when it decided Kim, 123 S. Ct. at 1720, (The alien in Kim had been

4  detained for six (6) months prior to the district court's order granting

5  habeas corpus relief). Petitioner's eleven (11) month detention also is far

6  longer than the six (6) month presumptively reasonable period of post-removal

7  detention {286 F. Supp. 2d 847} set forth by the Court in Zadvydas. A

8  detention of eleven (11) months is longer than detentions in several other

9  cases in which the court found the detention to be unreasonable. See Uritsky,

10  286 F. Supp. 2d at 846-47 (finding 11-12 month detention unreasonable); see

11  ALKARIM PIRBHAI LAKHANI v. MIKE O'LEARY, et al. (2010 U.S. Dist. LEXIS

12  83480), (Petitioner was detained at the time of filing for and being granted

13  habeas relief for seven (7) months); see Parlak v. Baker, 374 F. Supp. 2d

14  551, 561-62 (E.D. Mich. 2005)(granting habeas relief after approximately 10

15  months of detention), vacated as moot, No. 05-2003, 2006 U.S. App. LEXIS

16  32285, 2006 WL 3634385 (6th Cir. Apr. 27, 2006). Thus the detention in the

17  instant case does not serve its purported immigration purpose. In so holding,

18  this honorable Court should reject the Government's claim that, by detaining

19  the Petitioner involved, it could prevent Petitioner from fleeing prior to

20  his removal. The Court should determine that where, as here, *"detention's*

21  *goal is no longer practically attainable, detention no longer bears a*

22  *reasonable relation to the purpose for which the individual was committed."*

23

24  The second factor, whether the civil detention is longer than the

25  criminal sentence for the crimes resulting in the deportable status, also

favors Petitioner. His punitive incarceration lasted one (1) day. Thus Petitioner's civil detention by ICE/DHS is 339 TIMES LONGER (as of September 5, 2011 and counting) than his punitive incarceration. Therefore, the length of his civil detention far exceeds the length of any possible period of punitive incarceration. See Hansen, 351 F.3d at 271 *(finding "the fact that his criminal sentences were shorter than the length of time spent in INS custody" to be important factor in finding detention to be unconstitutional).*

The third factor, whether actual removal is reasonably foreseeable, favors neither party. If Petitioner eventually obtains a final order of removal, his removal will be foreseeable. Petitioner appealed the decision of the Immigration Judge against him to the to the Board of Immigration Appeals. However, at least one court found the Petitioner's removal to not be reasonably foreseeable when his final order of removal was pending in the BIA. Flores-Powell, 677 F. Supp. 2d at 472.

The fourth factor, whether the Government acted promptly to advance its interests, weighs against finding a Due Process violation. The Government has not engaged in delay tactics and has acted promptly.

The fifth factor, whether the Petitioner engaged in dilatory tactics in the Immigration Court, favors Petitioner. Petitioner has not engaged in dilatory tactics. In Hansen, the Sixth Circuit held that *"the time taken for appeals and petitions for relief do not take away from the unconstitutionality of the detention."* Hansen, 351 F.3d at 272. Another court

- 37 -

1  found a three year detention to be unconstitutional, despite the fact that

2  Petitioner had *"contributed to the length of time it has taken to adjudicate*

3  *his challenges"* to removal. Madrane v. Hogan, 520 F. Supp. 2d 654, 666-67

4  (M.D. Pa. 2007).

5

6      Thus, the balance of factors weigh in favor of Petitioner. Petitioner

7  is entitled to an individual hearing whether he is being detained by §

8  1226(a) or § 1226(c). If an individualized hearing is mandated under §

9  1226(a), or § 1226(c), that hearing must actually assess the alien's

10 dangerousness to the community and risk of flight. A perfunctory file review

11 is insufficient to satisfy due process. Casas-Castrillon, 535 F.3d at 951;

12 see also Alaka v. Elwood, 225 F. Supp. 2d 547, 559 (E.D. Pa. 2002) (finding

13 that due process is not satisfied *"by rubber stamp denials of release based*

14 *on cursory review of an alien's file"*). Superficial review relying on

15 previous criminal history or *"temporally distant offenses"* and removal status

16 to summarily conclude detention is necessary does not satisfy due process.

17 Ngo v. INS, 192 F.3d 390, 398-99 (3d Cir. 1999); Duong v. INS, 118 F. Supp.

18 2d 1059, 1067 (S.D. Cal. 2000).

19

20 36. Under these circumstances, under the Fifth Amendment, Petitioner is

21 entitled to an individualized determination that his detention is necessary

22 to further a sufficiently compelling governmental need.

23

24

25

COUNT TWO

## (Substantive Due Process Violation)

37. Petitioner repeats and re-alleges the allegations set forth in paragraphs 1 through 26 as though set forth fully herein.

38. The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process protections of the Fifth Amendment extend, not just to American citizens, but to all persons within the territory of the United States, including aliens. Wong Wing v. United States, 163 U.S. 228, 238, 16 S. Ct. 977, 41 L. Ed. 140 (1896).

39. The substantive due process requirement of the Fifth Amendment prohibits the Government from subjecting persons to preventative detention for a potentially indefinite period. See United States v. Salerno, 481 U.S. 739, 746 (1987). Furthermore, civil detention must be narrowly drawn to serve a legitimate and compelling governmental interest, such as ensuring that detainees if released will not present a danger to the community or abscond from future immigration proceedings. See Zadvydas, 533 U.S. at 690-91; Salerno, 481 U.S. at 747.

40. In civil cases involving potentially indefinite detention, the goal of preventing danger to the community, without more, is insufficient to justify continued detention; rather, the dangerousness rationale must also be

accompanied by some other special circumstance, such as mental illness, that helps to create the danger. Zadvydas, 533 U.S. at 691. Thus, an aliens mere status as removable, which bears no relationship to his dangerousness, is not a sufficient basis to justify indefinite detention. Id at 691-92. Similarly, where removal is, at most, a remote possibility, prevention of flight is a weak or non-existent justification for continued detention. Id. at 690.

41. As a person in the United States, Petitioner is protected by the Due Process Clause of the Fifth Amendment. There can be no doubt that individual liberty is one of the most fundamental rights protected by the constitution. See Zadvydas v. Davis, 533 U.S. 678, 690, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001) (**"Freedom from imprisonment – from Government custody, detention, or other forms of physical restraint – lies at the heart of the liberty [the Due Process] Clause protects."**). Joseph, which has been decided prior to Zadvydas, gives that right little or no weight. Instead, it establishes a system of *"detention by default"* by placing the burden fully on the alien to prove that he should not be detained. When such a fundamental right is at stake, however, the Supreme Court has insisted on heightened procedural protections to guard against the erroneous deprivation of that right. In particular, the Supreme Court has time and again rejected laws that place on the individual the burden of protecting his or her fundamental rights.

As early as 1892, U.S. courts addressed an issue of statutory construction with the realization that "foreigners who have become domiciled in a country other than their own, acquire rights and must discharge duties

in many respects the same as possessed by and imposed upon the citizens of
that country, and no restrictions on the footing upon which such persons
stand by reason of their domicile of choice . . . is to be presumed." Lau Ow
Bew v. United States, 144 U.S. 47, 61-62, 36 L. Ed. 340, 12 S. Ct. 517. Fifty
years later in dealing with a question of evidentiary competence in Bridges
v. Wixon, 326 U.S. 135, 89 L. Ed. 2103, 65 S. Ct. 1443 (1945), the court said
that "*the notions of fairness on which our legal system is founded*" applied
with full force to "aliens whose roots may have become, as {538 U.S. 546}
they are in the present case, deeply fixed in this land," id., at 154, 89 L
Ed 2103, 65 S. Ct. 1443. And in Kwong Hai Chew v. Colding, 344 U.S. 590, 97
L. Ed. 576, 73 Ct. 472 (1953), the court read the word "*excludable*" in a
regulation as having no application LPR's, since such a reading would have
been questionable given "*a resident alien's constitutional right to due
process.*" Id., at 598-599, 97 L. Ed. 576, 73 S. Ct. 472. {123 S. Ct. 1730}
Kwong Hai Chew adopted the statement of Justice Murphy, concurring in
Bridges, that "'once an alien lawfully enters and resides in this {155 L. Ed.
2d 753} country he becomes invested with the rights guaranteed by the
constitution to all people within our borders. Such rights include those
protected by the First and Fifth Amendments and by the due process clause of
the Fourteenth Amendment. None of these provisions acknowledges any
distinction between citizens and resident aliens. They extend their
inalienable privileges to all "*persons*" and guard against any encroachment on
those rights by federal or state authority.'" 344 U.S., at 596-597, n. 5, 97
L. Ed. 576, 73 S. Ct. 472 (quoting Bridges, supra, at 161, 89 L. Ed. 2103, 65
S. Ct. 1443). See also United States v. Verdugo-Urquidez, 494 U.S. 259, 271,

- 41

1    108 L. Ed. 2d 222, 110 S. Ct. 1056 (1990) ("Aliens receive constitutional

2    protections when they have come within the territory of the United States and

3    developed substantial connections with this country"); Woodby, supra, at 285,

4    17 L. Ed. 2d 362, 87 S. Ct. 483 (holding that deportation orders must be

5    supported by clear, unequivocal, and convincing evidence owing to the

6    "drastic deprivations that may follow when a resident of this country is

7    compelled by our government to forsake all the bonds formed here and go to a

8    foreign land where he often has no contemporary identification"); Johnson v.

9    Eisentrager, 339 U.S. 763, 770-771, 94 L. Ed. 1255, 70 S. Ct. 936 (1950)

10   ("The alien, to whom the United States has been traditionally {538 U.S. 547}

11   hospitable, has been accorded a generous and ascending scale of rights as he

12   increases his identity with our society. . . At least since 1886, courts have

13   extended to the person and property of resident aliens important

14   constitutional guarantees – such as the due process of law of the Fourteenth

15   Amendment").

16

17       The United Nations High Commissioner for Refugees, which likewise

18   countenanced detention only "in cases of necessity" and stated under a

19   heading entitled "Guideline 3: Exceptional Grounds for Detention": "There

20   should be a presumption against detention. Where there are monitoring

21   mechanism which can be employed as viable alternatives to detention, (such as

22   reporting obligations or guarantor requirements . . .), these should be

23   applied first unless there is evidence to suggest that such alternative will

24   not be effective in the individual case. Detention should therefore only take

25   place after a full consideration of all possible alternatives, or when

1    monitoring mechanisms have been demonstrated not to have achieved the lawful

2    and legitimate purpose." United Nations High Commissioner for Refugees,

3    Guidelines on Applicable Criteria and Standards Relating to the Detention of

4    Asylum Seekers (Feb. 1999) (hereinafter Detention Guidelines) (emphasis in

5    original), cited in Zadvydas, 533 U.S., at 721, 150 L. Ed. 2d 653, 121 S. Ct.

6    2491 (opinion of Kennedy, J.). The High Commissioner also referred to the

7    "minimum procedural guarantee" for a detainee *either personally or through a*

8    *representative, to challenge the necessity of the deprivation of liberty at*

9    *the review hearing, and to rebut any findings made."* Detention Guidelines,

10   Guideline 5: Procedural Safeguards.

11

12       Excludable aliens, like all aliens – are clearly protected by the Due

13   Process Clauses of the Fifth and Fourteenth Amendments: The fourteenth

14   amendment to the constitution is not confined to the protection of citizens.

15   It says: *"Nor shall any state deprive any person of life, liberty, or*

16   *property without due process of law; nor deny to any person within its*

17   *jurisdiction the equal protection of the laws."* These provisions are

18   universal in their application, to all persons within the territorial

19   jurisdiction, without regard to any differences of race, of color, or of

20   nationality; and the equal protection of the laws is a pledge of the

21   protection of equal laws. Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S. Ct.

22   1064, 30 L. Ed. 220 (1886).

23

24       Equally apparent to this court is the harm that has be fallen the

25   Petitioner. See Partible, 600 F.2d at 1096; Cobourne, 779 F.2d at 1566.

1    There can be no doubt that individual liberty is one of the most

2 fundamental rights protected by the constitution. See <u>Zadvydas v. Davis</u>, 533

3 U.S. 678, 690, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001) **("Freedom from**

4 **imprisonment — from Government custody, detention, or other forms of physical**

5 **restraint — lies at the heart of the liberty [the Due Process] Clause**

6 **protects.")**. ICE/DHS has detained Petitioner for eleven (11) months. His

7 punitive incarceration lasted one (1) day. Thus Petitioner's civil detention

8 by ICE/DHS is <u>339 TIMES LONGER</u> (as of September 5, 2011) than his punitive

9 incarceration. Therefore, the length of his civil detention far exceeds the

10 length of any possible period of punitive incarceration. The Supreme Courts

11 decision in <u>Zadvydas</u>, limits the time a detainee can be detained who are

12 aliens subject to *"final orders of removal."* This is the presumptive period

13 during which the detention of an alien is reasonably necessary to effectuate

14 his removal is six (6) months; after that, the alien is eligible for

15 conditional release if he can demonstrate that there is *"no significant*

16 *likelihood of removal in the reasonably foreseeable future"*. The <u>Zadvydas</u>

17 Court went on, however, to say that "for detention to remain reasonable, as

18 the period of prior post removal confinement grows, what counts as the

19 'reasonably foreseeable future' conversely would have to shrink." <u>Zadvydas</u>,

20 533 U.S. at 701.

21    Petitioner has been detained since September 2010, a period of eleven

22 (11) months. This period is well beyond the short period of detention pending

23 a determination of removability that the Supreme Court assumed was typical

24 when it decided <u>Kim</u>, 123 S. Ct. at 1720, (The alien in Kim had been detained

25 for six (6) months prior to the district court's order granting habeas corpus

1  relief). Petitioner's eleven (11) month detention also is far longer than the

2  six (6) month presumptively reasonable period of post-removal detention {286

3  F. Supp. 2d 847} set forth by the Court in Zadvydas. A detention of eleven

4  (11) months is longer than detentions in several other cases in which the

5  court found the detention to be unreasonable. See Uritsky, 286 F. Supp. 2d at

6  846-47 (finding 11-12 month detention unreasonable), see ALKARIM PIRBHAI

7  LAKHANI v. MIKE O'LEARY, et al. (2010 U.S. Dist. LEXIS 83480), (Petitioner

8  was detained at the time of filing for and being granted habeas relief for

9  seven (7) months), see Parlak v. Baker, 374 F. Supp. 2d 551, 561-62 (E.D.

10 Mich. 2005)(granting habeas relief after approximately 10 months of

11 detention), vacated as moot, No. 05-2003, 2006 U.S. App. LEXIS 32285, 2006 WL

12 3634385 (6th Cir. Apr. 27, 2006). Thus the detention in the instant case does

13 not serve its purported immigration purpose. In so holding, this honorable

14 Court should reject the Government's claim that, by detaining the Petitioner

15 involved, it could prevent Petitioner from fleeing prior to his removal. The

16 Court should determine that where, as here, *"detention's goal is no longer*

17 *practically attainable, detention no longer bears a reasonable relation to*

18 *the purpose for which the individual was committed."*

19

20 **Conclusion**

21 42. There is no significant likelihood that Petitioner's removal will occur

22 in the reasonably foreseeable future. Petitioner does not pose a danger to

23 the community or a risk for flight, and no special circumstances exist to

24 justify his continued detention. As Petitioner is not dangerous, not a flight

25 risk, and cannot be removed, his indefinite detention is not justified and

violates substantive due process. See Zadvydas, 533 U.S. at 690-91.

Petitioner's punitive incarceration lasted one (1) day. Thus Petitioner's

civil detention by ICE/DHS is 339 TIMES LONGER (as of September 5, 2011 and

counting) than his punitive incarceration. Detaining the Petitioner 339 TIMES

LONGER in civil detention by the Respondent's, compared to his punitive

incarceration, de facto means razing the system of constitutional protections

for the Petitioner and thus it does not satisfy the Due Process Clause and is

therefore *"structurally not sound"* in constitutional terms. These

constitutional protections are one of the most precious possessions our

nation has. It is the foundation of freedom. Yours, your honor, the

Respondent's and the Petitioner's. If the Respondent's are allowed to hold

Petitioner 339 TIMES LONGER in civil detention, compared to his punitive

incarceration, if the Respondent's are allowed to deny a group of PRO BONO

immigration attorneys entry to the James A. Musick Facility who wanted to

provide free legal counsel to Petitioner, to strip Petitioner of his right to

counsel, his First and Fifth Amendments rights and the due process clause of

the Fourteenth Amendment, if the Petitioner is denied the constitutional

protections, then the United States would cease to exist as a free nation.

**REQUEST FOR RELIEF**

43. WHEREFORE, Petitioner requests that this honorable Court to grant the

following relief:

   a) Issue an Order, declaring that Petitioner's continued detention is not

      authorized by the INA and/or violates the Fifth Amendment of the

      Constitution;

b) that this honorable Court issue a *"Writ of Habeas Corpus"* directing the Respondent's to bring the Petitioner to this honorable Court at a time to be specified and explain why the Petitioner should not be released from custody immediately;

c) granting this petition for a Writ of Habeas Corpus and releasing Petitioner immediately;

d) that this honorable Court orders the Government to release Petitioner immediately on his own recognizance;

e) declaring that Petitioner's continued indefinite detention without a hearing before an impartial adjudicator infringes upon his right to procedural due process in violation of the Fifth Amendment;

f) that this honorable Court issue a declaratory judgment stating that Petitioner is eligible to be released on bond and that ICE/DHS's interpretation of the Immigration and Nationality Act is <u>arbitrary</u> and <u>capricious</u>, an <u>erroneous</u> interpretation of law, and <u>violates</u> the Eighth Amendment and the Due Process Clause of the Constitution of the United States;

g) that this honorable Court issues a "<u>Temporary Restraining Order</u>" against ICE/DHS for the duration of the proceedings to prevent that Mr. Frederick Ngaywa can be re-arrested and deported from the United States by ICE/DHS;

h) in the alternative that a bond hearing be held immediately before an immigration judge to set a bond amount which is proportional to Petitioner's means and cost of living, because the Ninth Circuit has correctly suggested that *"serious questions may arise concerning the*

*reasonableness of the amount of bond if it has the effect of preventing*

*an alien's release.*" <u>Doan v. INS</u>, 311 F. 3d 1160, 1162 (9th Cir. 2002);

i) in the alternative that this honorable Court considers "*deferred*

*action,*" "*humanitarian parole,*" or any other discretionary remedy that

may be granted on humanitarian grounds; and

j) grant any other and further relief this honorable Court may deem

appropriate.

I affirm, under penalty of perjury, that the foregoing is true and correct.

_____
(sign your name)
Petitioner,
FREDERICK NGAYWA
(print your name)
A# 095 722 629
(your alien number)
13502 MUSICK ROAD,
(use these two lines to write your mailing address)
IRVING, CA. 92618.

September 5th 2011
(todays date)

# CERTIFICATE OF SERVICE

THE UNDERSIGNED DECLARES:

On September 5, 2011 I served a copy of

**PETITION FOR RELEASE; PETITION FOR WRIT OF HABEAS CORPUS**

Frederick Ngaywa v. Eric H. HOLDER et al.

by depositing it as 1st class mail in the detention facilities mail box at James A. Musick Facility, Delta-Barracks, in Irvine California, in an envelope bearing the requisite postage, addressed as follows:


Eric HOLDER

Attorney General of the United States

950 Pennsylvania Ave. NW

Washington, DC 20530-0001


Field Office Director Troy Lund

Immigration and Customs Enforcement

Department of Homeland Security

300 N. Los Angeles, CA 90012


Secretary of Homeland Security Janet Napolitano

Dep. Of Homeland Security

245 Murray Drive, SE. Bld. 410

Washington, DC 20538

1

2      Office of Chief Counsel

3      Immigration and Customs Enforcement

4      606 South Olive Street, 15th Floor

5      Los Angeles, CA 90014

6

7      Office of Immigration Litigation

8      P O BOX 848

9      Washington, DC 20044

10

11     Sandra HUTCHENS

12     Sheriff and Coroner of Orange County

13     550 Flower Street

14     Santa Ana, CA 92703

15

16         I declare under penalty of perjury that the foregoing is true and

17     correct. Executed in Irvine, California on September 5, 2011.

18

19

20     ............................../..............................................
       Frederick Ngaywa
21     BK #: 25 97 017
       IN PRO PER
22     James A. Musick Facility
       13502 James Musick Road
23     Irvine, CA 92618

24

25

# EXHIBIT 2

AHILAN T. ARULANANTHAM (SBN 237841)
Email: aarulanantham@aclu-sc.org
JENNIFER STARK (SBN 267062)
Email: jstark@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Tel: (213) 977-5211
Fax: (213) 977-5297

**Attorneys For Petitioners**
(Additional counsel listed on following page)

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| ALEJANDRO RODRIGUEZ, ABDIRIZAK ADEN FARAH, YUSSUF ABDIKADIR, ABEL PEREZ RUELAS, JOSE FARIAS CORNEJO, ANGEL ARMANDO AYALA, for themselves and on behalf of a class of similarly-situated individuals, <br><br> Petitioners, <br><br> v. <br><br> ERIC HOLDER, United States Attorney General; JANET NAPOLITANO, Secretary, Homeland Security; THOMAS G. SNOW, Acting Director, Executive Office for Immigration Review; TIMOTHY ROBBINS, Field Office Director, Los Angeles District, Immigration and Customs Enforcement; WESLEY LEE, Officer-in-Charge, Mira Loma Detention Center; et al.; RODNEY PENNER, Captain, Mira Loma Detention Center; SANDRA HUTCHENS, Sheriff of Orange County; OFFICER NGUYEN, Officer-in-Charge, Theo Lacy Facility; CAPTAIN DAVIS NIGHSWONGER, Commander, Theo Lacy Facility; CAPTAIN MIKE KREUGER, Operations Manager, James A. Musick Facility; ARTHUR EDWARDS, Officer-in-Charge, Santa Ana City Jail; RUSSELL DAVIS, Jail Administrator, Santa Ana City Jail, <br><br> Respondents. | Case No. CV 07-3239-TJH (RNBx) <br><br> **THIRD AMENDED COMPLAINT** <br><br> Honorable Terry J. Hatter |

Additional Counsel:

JUDY RABINOVITZ
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2618
Facsimile: (212) 549-2654

JAYASHRI SRIKANTIAH (SBN 189566)
STANFORD LAW SCHOOL
IMMIGRANTS' RIGHTS CLINIC
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 724-2442
Facsimile: (650) 723-4426

STEVEN A. ELLIS (SBN 171742)
WILLIAM TRAN (SBN 245104)
BRIAN K. WASHINGTON (SBN 248960)
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013-1010
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

# JURISDICTION AND VENUE

1.     Petitioners Alejandro Rodriguez, Abdirizak Farah, Yussuf Abdikadir, Jose Farias Cornejo, Abel Perez Ruelas, and Angel Ayala are non-citizens who have been subjected to prolonged incarceration at the hands of the Immigration and Customs Enforcement division of the Department of Homeland Security ("ICE").  Each of them has been incarcerated for more than six months while their immigration proceedings have been on-going without a hearing where the government has had to justify their prolonged detention.  They challenge their prolonged detention without adequate process on statutory and constitutional grounds, on behalf of themselves and a class of similarly-situated detainees.

2.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. 2241 (habeas corpus), 28 U.S.C. 1651 (All Writs Act), and the Suspension Clause of Article I of the U.S. Constitution.  INS v. St. Cyr, 533 U.S. 289, 304 (2001); Demore v. Kim, 538 U.S. 510, 516-17 (2003).  This Court also has jurisdiction to hear this case under 28 U.S.C. 1331, which confers jurisdiction to consider federal questions.  Walters v. Reno, 145 F.3d 1032, 1052 (9th Cir. 1998); cf. Wilkinson v. Dotson, 544 U.S. 74, 82 (2005) (challenges to parole release procedures cognizable under Section 1983).[1]

3.     This Court may grant relief under 28 U.S.C. 1331 (federal question), 28 U.S.C. 1651 (All Writs Act), 28 U.S.C. 2241 and 2243 (habeas corpus), and 28 U.S.C. 2201-02 (declaratory relief).

4.     Venue is proper in the Central District of California pursuant to 28 U.S.C. 2241(d) because Petitioners and all other class members are incarcerated at Immigration and Customs Enforcement (ICE) detention facilities within this District.

---

[1] This action is both a complaint for declaratory and injunctive relief under 28 U.S.C. 1331 and a petition for writ of habeas corpus under 28 U.S.C. 2241, although for ease of reference the complaint refers to "Petitioners" and "Respondents" rather than "Plaintiffs" and "Defendants."

1  Venue is proper pursuant to 28 U.S.C. 1391(b) because a substantial part of the events
2  giving rise to these claims occurred in this District.

3  **INTRODUCTION**

4  5.  Petitioner Alejandro Rodriguez is a citizen of Mexico who came to the United
5  States at the age of one.  Prior to the filing of the original complaint in this case, he
6  was detained for over three years without a hearing concerning whether his prolonged
7  detention was justified.  During that time, the government refused even to consider
8  him for release while he litigated his removal case, despite the fact that it presented a
9  complex and novel question of law explicitly left open by the Supreme Court and the
10 Ninth Circuit.

11 6.  The government released Mr. Rodriguez shortly after he filed a motion for class
12 certification in this case, but continued to subject him to serious restraints on his
13 liberty without allowing him to challenge them in a detention hearing.  It then argued
14 that his case was moot.  The Ninth Circuit disagreed, rejected the government's other
15 objections, and found class certification warranted.  <u>Rodriguez v. Hayes</u>, 578 F.3d
16 1032 (9th Cir. 2009).

17 7.  This Court subsequently certified the class and directed the formation of sub-
18 classes.  By this complaint, five other detainees now join Mr. Rodriguez as class
19 representatives in this action.  Each of them has been detained for more than six
20 months while their removal cases remain pending, yet none of them has been
21 afforded a hearing where the government has had to justify their prolonged detention
22 under sufficiently-rigorous procedures.

23 8.  These detainees are far from alone.  On any given day, there are at least
24 approximately 350 people, if not more, in immigration prisons throughout the Central
25 District who have been incarcerated for more than six months – many of them for

26
27
28

2

1   years – while their cases remain pending.[2]

2   9.      None of these people have received a hearing to determine whether their

3   prolonged detention is warranted, and the vast majority have not received any hearing

4   at all.[3]  Thus, the government routinely incarcerates people for months or years

5   without demonstrating why their extended detention is necessary either to secure

6   their presence at the time of removal or to protect the public safety  -- a dubious

7   concern given that many class members have no criminal history, and even those who

8   have been convicted have necessarily finished serving their sentences before their

9   transfer to immigration detention.

10  10.     Petitioners, like all the detainees they seek to represent, are purportedly

11  detained under one of four general immigration detention statutes that govern the

12  detention of most non-citizens whom the government is trying to remove.  See 8

13  U.S.C. 1225(b) (authorizing detention of aliens seeking admission); 8 U.S.C. 1226(a)

14  (authorizing detention of aliens pending a determination of removability); 8 U.S.C.

15  1226(c) (authorizing "mandatory" detention, without hearings, of certain aliens who,

16

17  [2] This Court ordered the government to provide a list of detainees to Petitioner.  That
18  list showed that over 350 people were detained in immigration prisons throughout the
    Central District as of April 21, 2010.
19

20  [3] Petitioners refer interchangeably throughout this complaint to a hearing to determine
    whether "prolonged detention" is justified, a "constitutionally-adequate" hearing, and
21  an "adequate" hearing to justify prolonged detention.  See Rodriguez, 578 F.3d at
22  1039 (noting that "Petitioner's requested relief includes . . . providing all members of
    the class constitutionally-adequate individual hearings before an immigration judge").
23  A hearing that is adequate to justify prolonged detention would include, at a
24  minimum, notice to detainees of their right to the hearing, an adversarial, transcribed,
    in-person hearing before an immigration judge or other impartial adjudicator, counsel
25  for detainees who are unrepresented at that hearing, and a substantive standard
26  requiring the government to show by clear and convincing evidence that no set of
    release conditions could reasonably assure the detainee's presence in the event of
27  removal or protect the community from serious danger, taking into account the length
28  of detention at issue.

3

*inter alia*, have been convicted of specified triggering offenses); 8 U.S.C. 1231(a) (authorizing detention of aliens with final orders of removal during and after the removal period). In keeping with the Ninth Circuit's terminology, these four statutes are referred to herein as the "general immigration detention statutes." See generally Nadarajah v. Gonzales, 443 F.3d 1069, 1078, 1080-81 (9th Cir. 2006) (contrasting general immigration detention statutes that do not explicitly authorize prolonged detention with specific statutes at 8 U.S.C. 1226a and 8 U.S.C. 1531-37 that authorize prolonged detention on, *inter alia*, national security grounds).

11.    Petitioners contend that because none of these general immigration detention statutes explicitly authorize prolonged detention, they cannot be interpreted to authorize detention of longer than six months absent a hearing where the government shows, under a suitably-rigorous standard, that further prolonged detention is justified. See generally Casas-Castrillon v. Dep't of Homeland Sec., 535 F.3d 942, 950 (9th Cir. 2008) (construing general detention statutes to require bond hearings where government bears burden of proof because "[w]e conclude that prolonged detention without adequate procedural protections would raise serious constitutional concerns"). Moreover, if these statutes did authorize prolonged detention they would violate the Due Process Clause, at least absent substantially greater procedural constraints. See generally Zadvydas v. Davis, 533 U.S. 678, 690-92 (2001) (finding "severe and obvious" problems with prolonged and indefinite detention under limited administrative procedures).

12.    Respondents, in contrast, maintain a policy or general practice – which Petitioners contend is unlawful – of detaining people for prolonged time periods without providing them adequate hearings. Pursuant to this unlawful policy or general practice, Respondents have incarcerated the Petitioners and each of the class members they represent pursuant to one of the general immigration detention statutes for more than six months. Pursuant to Respondents' policy or general practice, during that time neither Petitioners nor any other similarly-situated person have had a

4

hearing where the government has had to show that their prolonged detention remains justified.

13.    Respondents' general policies and practices of prolonged detention without hearings are in violation of the statutory and constitutional rights of the Petitioners and other class members.  To remedy this on-going violation of the law, Petitioners bring this action seeking declaratory and injunctive relief on behalf of themselves and a class of similarly-situated persons.

## PARTIES

14.    Petitioner Alejandro Rodriguez is a citizen of Mexico.  He was detained for over three years while litigating his removal case prior to the filing of the original complaint in this case.  He has never been afforded a hearing to determine whether his prolonged detention is justified.  He is currently residing in Los Angeles under extremely restrictive release conditions while his removal proceedings remain pending.

15.    Petitioner Abdirizak Aden Farah is a Somalian refugee who has been incarcerated at Mira Loma Detention Center for over eight months without a hearing to determine that his detention is warranted.  Indeed, he has received no explanation of any kind as to why he cannot be released pending completion of his removal hearings, despite having a close family friend in Minnesota willing to house him and no criminal history of any kind.

16.    Petitioner Yussuf Abdikadir is another Somalian refugee who has been incarcerated by ICE for approximately six months without a hearing to determine whether his detention is warranted.  He too has received no explanation of any kind as to why he cannot be released pending completion of his removal proceedings, despite having a sponsor in San Diego willing to house him and no criminal history of any kind.

17.    Petitioner Abel Perez Ruelas is a Mexican national who entered the United

5

States on a visitor's visa approximately eight years ago and is now married to a U.S. citizen. He has been incarcerated for 16 months pending completion his removal proceedings. He received a bond hearing where he bore the burden to prove that he was not a danger or flight risk, but the judge denied bond, and later set it at an amount he could not pay. Although he is without doubt eligible to adjust status, he remains detained, even though the government has never had to justify his prolonged detention.

18.    Petitioner Jose Farias Cornejo is also a Mexican national, but is a lawful permanent resident of this country, where he has lived since before his first birthday. He has been convicted of relatively minor offenses, the most serious of which is possession of a controlled substance, for which he was sentenced to 180 days in jail. However, he has spent more than twice that amount of time in immigration prison while awaiting a final decision in his immigration case. Although the government does not dispute that he is eligible for cancellation of removal and has stated in immigration court that it does not intend to oppose his application, he remains in detention awaiting a final decision in his case without having received a detention hearing of any kind. As the government interprets the immigration laws, his drug conviction renders him ineligible even to be considered for release from detention, even though it does not bar him from obtaining relief to remain.

19.    Petitioner Angel Armando Ayala is a citizen of El Salvador who has lived in the United States since the age of eleven. He has never received a criminal sentence of longer than 90 days, but has been incarcerated by immigration authorities for over 18 months while litigating his removal case. During that time he has never seen an immigration judge, let alone been afforded an adequate bond hearing in light of his prolonged detention. He is prima facie eligible for relief allowing him to become a lawful permanent resident, but remains detained while the Ninth Circuit considers whether his prior lawyer's failure to advise him as to the filing deadline constitutes ineffective assistance of counsel, such that his failure to meet it does not bar him

6

1  from obtaining relief for which he is otherwise-eligible.

2  20.    Respondent Eric Holder is the Attorney General of the United States and the

3  head of the Department of Justice, which encompasses the Board of Immigration

4  Appeals ("BIA") and immigration judges as a subunit – the Executive Office of

5  Immigration Review.  Mr. Holder shares responsibility for implementation and

6  enforcement of the immigration laws along with Respondent Napolitano.  Mr. Holder

7  is a legal custodian of Petitioners.  Mr. Holder is sued in his official capacity.

8  21.    Respondent Janet Napolitano is the Secretary of Homeland Security and heads

9  the Department of Homeland Security, the arm of the federal government responsible

10 for enforcement of immigration laws.  Ms. Napolitano is the ultimate legal custodian

11 of Petitioners.  Ms. Napolitano is sued in her official capacity.

12 22.    Defendant Thomas G. Snow is the Acting Director for the Executive Office for

13 Immigration Review ("EOIR"), which is the federal agency that operates the

14 immigration courts.  Mr. Snow is responsible for the supervision of the Deputy

15 Director, the Chairman of the BIA, the Chief Immigration Judge, the Chief

16 Administrative Hearing Officer, and all agency personnel in the execution of their

17 duties.  Mr. Snow is sued in his official capacity.

18 23.    Respondent Timothy Robbins is the Field Office Director for the Los Angeles

19 District of ICE.  In his official capacity, Mr. Robbins is authorized to release

20 Petitioners and has legal custody of him.  He is sued in his official capacity.

21 24.    Respondent Lee Baca is the Sheriff of Los Angeles County, and therefore the

22 officer responsible for the operation of the Mira Loma Detention Center in Lancaster,

23 California.  Mira Loma's website acknowledges that it houses immigration detainees.

24 However, it states that "[w]e function as a regular County jail with the exception that

25 the individuals we house are identified as detainees."  Sheriff Baca is a legal

26 custodian of people detained at that facility, and is sued in his official capacity.

27 25.    Respondent Wesley Lee is the Officer-in-Charge at the Mira Loma Detention

28 Center, and therefore the highest-ranking ICE officer at the facility.  He is a legal

7

custodian of a number of class members. Mr. Lee is sued in his official capacity.

26.    Respondent Rodney Penner is the Captain of the Mira Loma Detention Center, and the highest ranking Sheriff's Department official at the facility. Captain Penner is a legal custodian of a number of class members, and is sued in his official capacity.

27.    Respondent Sandra Hutchens is the Sheriff of Orange County, and therefore the officer responsible for the operation of the Theo Lacy Facility and the James Musick facility, both of which incarcerate class members in Orange County. She is a legal custodian of people detained at those facilities, and is sued in her official capacity.

28.    Respondent Officer Nguyen is the Officer-in-Charge at the Theo Lacy facility, and therefore the highest-ranking ICE officer at the facility. He is a legal custodian of Mr. Ayala and other class members. Mr. Nguyen is sued in his official capacity.

29.    Respondent Captain Davis Nighswonger is the commander of the Theo Lacy Facility, which is, according to its own website, the largest "correctional institution" in Orange County. Nonetheless, Theo Lacy incarcerates a number of immigration detainees, including Angel Ayala. Captain Nighswonger is a legal custodian of Mr. Ayala and other class members, and is sued in his official capacity.

30.    Respondent Captain Mike Kreuger manages the operations of the James A. Musick Facility, another prison in Orange County. According to its website, the Musick facility incarcerates "pre-trial and sentenced" inmates. Nonetheless, upon information and belief, it also houses class members, none of whom are criminal detainees. Mr. Kreuger is a legal custodian of those class members, and is sued in his official capacity.

31.    Respondent Arthur Edwards is the Officer-in-Charge at the Santa Ana City Jail and therefore the highest-ranking ICE officer at the facility. He is a legal custodian of a number of class members. Mr. Edwards is sued in his official capacity.

32.    Respondent Russell Davis is the Jail Administrator of the Santa Ana City Jail, whose stated goal is to fulfill the "incarceration needs" of the Santa Ana Police Department. Nonetheless, the Santa Ana Jail incarcerates several dozen class

members on any given day.  Therefore, Mr. Davis is a legal custodian of a number of class members, and is sued in his official capacity.[4]

## FACTS AND PROCEDURAL HISTORY

**Alejandro Rodriguez**

33.  Petitioner Alejandro Rodriguez was detained for over three years while he challenged the government's efforts to deport him to Mexico, a country where he has not lived since he was a baby.

34.  Mr. Rodriguez came to this country in September 1979, when was one year old. He became a lawful permanent resident on June 4, 1987, when he was nine years old.[5]

35.  On or about July 29, 1998, Mr. Rodriguez pled guilty to Unlawful Driving or Taking of a Vehicle under section 10851(A) of the California Vehicle Code (CVC). For this crime he was sentenced to two years.  Five years later, on or about October 21, 2003, he pled no contest and was convicted of Possession of a Controlled Substance under California Health and Safety Code section 11377(A), for which he received formal probation of 5 years under the conditions of California Prop 36.  He was transferred to DHS custody after his arrest, on April 10, 2004.  He was detained for over three years after that transfer, until the government released him shortly after

---

[4] The government has taken conflicting positions in detention litigation concerning who the proper Respondent should be in habeas petitions challenging immigration detention.  Petitioners have sued every official who could constitute an appropriate respondent under the different theories advanced by the government, as well as the officials who constitute the proper defendants for a complaint under Section 1331.

[5] Mr. Rodriguez narrowly missed becoming a citizen due to events beyond his control. He would have gained automatic citizenship, through his father, if his parents had legally separated prior to his 18th birthday, or if he had been under the age of 18 at the time of the enactment of the Child Citizenship Protection Act of 2000.  However, his parents formally separated shortly after he turned 18, and he was 23 by the time the Act passed.  See 8 U.S.C. 1431.

1    the filing of the class certification motion in this case.

2    36.    The government charged Mr. Rodriguez with being removable based on his

3    drug offense on April 15, 2004.  At his removal hearing, Mr. Rodriguez contested

4    that his conviction rendered him removable, and argued in the alternative that he was

5    eligible for relief from removal.[6]

6    37.    The government received a continuance to alter the charging documents in his

7    case, after which it charged Mr. Rodriguez with being deportable on an additional

8    ground based on his 1998 conviction for theft.  Subsequently, on July 21, 2004, an

9    immigration judge ordered him removed, holding that both his drug offense and his

10   theft offense rendered him removable.  The Judge held that the drug offense was a

11   controlled substance offense triggering removal and that the theft conviction was an

12   aggravated felony, triggering mandatory removal.[7]  The immigration judge ordered

13   him deported to Mexico.  Mr. Rodriguez appealed that decision to the BIA.

14   38.    On December 21, 2004, the Board reversed the Judge's decision that the drug

15   possession conviction rendered Mr. Rodriguez removable, but upheld the decision

16

17   [6]An ICE officer initially deemed him eligible for release on bond, and set the bond at

18   $15,000.  However, Mr. Rodriguez was unable to afford the bond in that amount, and
     an immigration judge denied his request to lower the bond amount. Shortly after the
19   BIA decided his case in 2004, the government revoked that bond order and ordered
     him detained without bond under the mandatory detention provision codified at 8
20   U.S.C. 1226(c).

21

22   [7]Although not charged in the immigration charging document, the government also
     presented evidence from court records that, on or about October 24, 2003, a man using
23   the name Alejandro Rodriguez (who also used another name as an alias) pled guilty to
     California Health and Safety Code section 11550(a), Under the Influence of a
24   Controlled Substance, and was sentenced to 120 days in jail, which he served during
25   the same time that Mr. Rodriguez was released and reporting to the court for his
     conviction of October 21, 2003.  The date of conviction makes it highly unlikely that
26   Mr. Rodriguez was in fact convicted of this offense.  Nonetheless, the IJ ruled that this
     conviction constituted a second drug offense, rendering Petitioner removable on the
27
     basis of the drug convictions.
28

                                            10

1   that his theft conviction was an aggravated felony.

2   39.   On December 28, 2004, Mr. Rodriguez timely petitioned for review of the

3   Board's decision to the Ninth Circuit, arguing <u>inter alia</u> that his crime was not an

4   aggravated felony as defined by the Immigration and Nationality Act.  Mr. Rodriguez

5   then sought a stay of removal, which the government opposed.  Thereafter, the Ninth

6   Circuit granted his request for a stay of removal, and therefore necessarily found that

7   his case presents substantial legal claims.  <u>See</u> <u>Maharaj v. Ashcroft</u>, 295 F.3d 963,

8   966 (9th Cir. 2002).

9   40.   While Mr. Rodriguez's case was pending at the Ninth Circuit, that court decided

10  another case holding that Mr. Rodriguez's theft conviction was not an aggravated

11  felony.  The government then moved to hold his case in abeyance while it sought en

12  banc review of that decision.  The Ninth Circuit granted the motion, even though he

13  had already been detained for 15 months at that time.  After en banc review failed,

14  the government sought Supreme Court review in the other case, and again requested

15  that Mr. Rodriguez's case be held.  After the Supreme Court granted cert, his case

16  was held still further.  In the end, his case was held in abeyance for over two years,

17  but none of the decisions for which it was held established that he was subject to

18  mandatory removal, as the immigration courts had found.

19  41.   Eventually, the government largely conceded that Mr. Rodriguez's convictions

20  did not subject him to mandatory removal, and it agreed to remand his case to the

21  immigration courts on this basis.  His case is now back before an immigration judge,

22  who will consider his (exceedingly strong) application for cancellation of removal in

23  January 2011.

24  42.   During the three years of Mr. Rodriguez's detention, the government never held

25  a hearing as to whether his prolonged detention is justified.  In fact, the only process

26  Mr. Rodriguez received with respect to his detention was what the government calls

27  "File Custody Reviews."  The first of these occurred on March 10, 2005, when an

28  ICE agent presumably read through his file and issued a "Decision to Continue

11

Detention." No ICE official interviewed Mr. Rodriguez, let alone held a hearing, prior to making this decision. Instead, ICE merely gave him a questionnaire to fill out, asking for information regarding family members, employment experience, and any outstanding probation requirements. Although Mr. Rodriguez documented his work as a dental assistant and his extensive family ties, including his U.S. citizen father and sister, and his lawful permanent resident mother and brother, ICE denied his request for release, stating simply that he would remain detained until the Ninth Circuit rendered its decision. The notice offered no further explanation for the decision to continue detention, made no mention of how long Mr. Rodriguez had been detained (eleven months at that time), and offered no suggestions as to what steps he might take to effect a different outcome in any future decisions.

43.   In September 2005, ICE conducted another file custody review, which it apparently denied for similar reasons, and in March 2006 the process was repeated again. In each of these instances, the government did not even provide Mr. Rodriguez with a written decision as to why he would remain incarcerated for many more months. In March 2007 the government chose to continue Mr. Rodriguez's detention again. At the time of that last custody decision he had been detained for nearly three years, yet the decision made no mention of this fact. Instead, the decision asserted that continued detention was justified because the Ninth Circuit would decide his case soon, which was entirely incorrect.

44.   Shortly after the original class complaint in this case was filed, the government released Mr. Rodriguez from detention, but continued to subject him to severe restraints on his liberty which remain in effect, including a requirement that he abide by a strict curfew and wear an electronic monitoring device at all times. The government has continued to require that he abide by these restrictions, and has never afforded him a hearing before an immigration judge to determine if they are necessary to ensure his appearance at his final removal hearing, where he will likely be granted cancellation of removal.

12

## Abdirizak Aden Farah

45.   Abdirizak Aden Farah is a Somali refugee who has been detained for over eight months at the Mira Loma facility without any kind of hearing to determine whether his detention is justified.

46.   Mr. Farah was born on May 5, 1987 in Kismayo, Somalia.  His family lived in Mogadishu for the early part of his childhood.  Thousands of refugees have fled Somalia since the country's civil war erupted approximately twenty years ago. Today, there is no functioning government in most of Somalia, and the country exists in a state of constant civil war and virtual anarchy.  The United Nations High Commission for Refugees issued guidelines in May 2010 largely advising against the return of anyone from central or southern Somalia, including even asylum seekers whose claims had been rejected.  With respect to the capital of Mogadishu (where Mr. Farah lived prior to suffering persecution), a Human Rights Watch researcher has stated that "Mogadishu is one of the world's most dangerous places . . . Returning people there is not just risky; it's a potential death sentence."

47.   Mr. Farah first faced persecution in Somalia as a child, when his family was forced to flee Mogadishu because they were members of the minority Marehan clan who faced danger from members of the Hawiye, a powerful majority clan in Somalia. Eventually, the family was able to settle in Kismayo, a city in Somalia where the Hawiye were not powerful.  Several years later, his father was shot and killed by members of a Hawiye sub-clan when he returned briefly to Mogadishu to try to sell the family home.

48.   Mr. Farah fled Somalia in April 2009 in order to escape the al-Shabaab, a militant Islamic organization that is trying to take over Somalia. Al-Shabaab militants shot and killed his brother Mohamed because he worked as a driver for the Somali Transitional Federal Government (TFG) in the summer of 2007. These same militants nearly killed Mr. Farah in the same attack by slashing his wrist with a knife. Afterward, al-Shabaab members repeatedly accused him of working for the TFG and

1    finally threatened to kill him if he did not join them.

2    49.    After the last of these threats, Mr. Farah's uncle sent money for him to flee.

3    With the assistance of several people, he arrived by a circuitous route at the southern

4    border of the United States, where he presented himself at the border and requested

5    asylum on or about December 31, 2009. An asylum officer found his claim credible,

6    and referred him for a full asylum hearing before an immigration judge.

7    50.    Mr. Farah has had several hearings in his immigration case, the first of which

8    took place in March 2010. At several of these, the immigration judge continued his

9    hearing because he did not have a lawyer, while others were cancelled because the

10    judge or the translator were not present. His next hearing is scheduled for late

11    October 2010.

12    51.    Mr. Farah has applied for release on parole under 8 C.F.R. 212(d)(5)(A). Under

13    these procedures, the decision whether or not to release him is made by a single

14    officer, with no appeal process, and without providing a hearing of any kind. An ICE

15    officer denied him release without meaningful explanation.

16    52.    Mr. Farah's wife and baby daughter remain in Somalia. He has been unable to

17    establish any contact with them because of his detention.

18    **Yussuf Abdikadir**

19    53.    Yussuf Abdikadir is also a Somalian refugee. He has been detained by

20    immigration authorities since early March 2010, and also has not received a detention

21    hearing of any kind.

22    54.    Mr. Abdikadir was born on October 5, 1980.[8] He lived with his family –

23    including his parents and five siblings -- as a child in Mogadishu. He is also a

24    member of a minority clan in Somalia.

25    55.    In 1991, as the Somali political structure disintegrated, a militia associated with

26    a dominant clan, the Hawiye, attacked Mr. Abdikadir's family. They killed his two

27

---

28    [8] Yussuf is his given name, while Abdikadir is his father's given name.

14

older brothers, his father, and his grandmother. They also severely mistreated other members of the family, and raped his mother.

56.   Mr. Abdikadir and his surviving family members then fled to Kenya, where they lived in various refugee camps for most of the next two decades. He married Shukri Hussein, also a Somalian refugee, while in the camps, and the couple had three children. (Ms. Hussein also has a son from a prior relationship, who is now Mr. Abdikadir's step-son).

57.   Life in the refugee camps was very hard for Mr. Abdikadir and his family. Kenya granted them no permanent status, and as a result they were forced to live in the camps and denied the right to work. At the same time, the Kenyan government and international agencies failed to provide sufficient food for the refugees. He and his family would have to wait for hours during the heat of the day to obtain their small food rations, and often were mistreated by the Kenyan authorities while waiting. Mr. Abdikadir occasionally worked illegally in order to supplement his family's meager provisions, but Kenyan authorities arrested and punished him for doing so. The Kenyan authorities also did little if anything to stop the bandits who would raid the camps at night, raping camp residents and pillaging their belongings.

58.   After life in the camps became too difficult, Mr. Abdikadir's mother managed to sell some land the family owned in Somalia, and used these proceeds to procure funds to allow her son to escape. Unable to return to Somalia or survive further life in the Kenyan refugee camps, Mr. Abdikadir fled. He traveled a circuitous route in search of a country with refugee protections, and ultimately arrived at the southern border of the United States seeking asylum.

59.   At the border crossing from Tijuana he presented a birth certificate and applied for asylum, entering ICE detention in March 2010. He was sent to Mira Loma shortly afterward, and passed his credible fear interview several weeks later, in approximately April 2010.

60.   Mr. Abdikadir has been before an immigration judge several times since then,

15

1    but has yet to even submit an application for asylum, because he was unable to find a

2    lawyer to represent him and speaks virtually no English.

3    61.   Mr. Abdikadir has also applied for release on parole under 8 C.F.R.

4    212(d)(5)(A).  As with Mr. Farah, the decision whether or not to release Mr.

5    Abdikadir is made by a single officer, with no appeal process, and without a hearing

6    of any kind.  Mr. Abdikadir requested release from this officer, and in doing so

7    provided his birth certificate as well as a sworn affidavit from a friend of his who

8    lives in San Diego and is willing to house and assist him.  Nonetheless, his parole

9    request was denied.  The sole explanation provided was a check mark in a box next to

10   a paragraph which states "You have not established to ICE's satisfaction that you will

11   appear as required for immigration hearings, enforcement appointments, or other

12   matters, if you are paroled from detention."  Other than requesting a redetermination

13   based on changed circumstances, Mr. Abdikadir has no recourse to any further

14   process for appeal.

15   62.   Mr. Abdikadir has suffered during his time in detention, not only because of the

16   traumatic effects of detention in general on those who have suffered past persecution,

17   but also because of his medical problems.  Mr. Abdikadir has some kind of problem

18   concerning his eyes – perhaps tied to light sensitivity -- that causes them to be

19   constantly red and irritated.  Although he has sought medical attention for this

20   problem at the Mira Loma Detention Center, the clinic there has not provided him

21   with any medication that has addressed the problem.

22   63.   Mr. Abdikadir has been unable to communicate with his family while in

23   detention.  He awaits the opportunity to win his release and his status, so that he can

24   begin to recover from the years of suffering he has faced, and also so that he can

25   speak with and hopefully some day re-unite with his wife and children.  Given that he

26   has not even submitted an asylum application yet, he will remain incarcerated

27   without a hearing for months more absent this Court's intervention.

28

16

## Abel Perez Ruelas

64.    Abel Perez Ruelas is a citizen of Mexico. He has been in immigration detention at Mira Loma Detention Center for 17 months, since April 8, 2009.

65.    Mr. Perez Ruelas was born on January 25, 1967 in Jalisco, Mexico. In 1996, he met Maria del Rosario, with whom he had a daughter, Azirit Lessandra, one year later.

66.    He was admitted to the United States in 2002 on a visitors' visa, two years after he broke up and lost contact with with Ms. del Rosario.

67.    In approximately 2007, about five years after Mr. Perez-Ruelas came to live in the United States, he received a call from his mother, who told him that Ms. del Rosario had died in childbirth in Mexico, and that his daughter had been sent to live with her mother's parents.  Since then, Mr. Perez Ruelas has been living with the hope that one day he may bring his daughter to the United States to live with him.

68.    On December 22, 2008, Mr. Perez Ruelas married Maria Navichoque Perez, a U.S. citizen. She is a nurse at the Los Angeles Jewish Home, a non-profit senior living facility in Reseda, California.  The couple filed to adjust his status based on their marriage in approximately February 2009.

69.    After his marriage, Mr. Perez Ruelas became the stepfather of Maria Perez's four children, all of whom are U.S. citizens by birth. The two youngest children, Hector and Emily, live with Mr. Perez Ruelas and his wife in their home in Reseda, California.

70.    Mr. Perez Ruelas has lived and worked in the United States for almost eight years. He works in construction, primarily with cement and tiles.  Prior to his detention, he regularly attended church with his wife in Pacoima and Reseda.

71.    Mr. Perez Ruelas has had three prior convictions for driving under the influence of alcohol, none for which he spent more than two months in jail. Mr. Perez Ruelas served three months of probation for his first offense in 1994; he served 10 days in jail for his second, a decade later in 2004; and he served 60 days in jail for his third,

17

which occurred four years later. Pursuant to his sentence for the last conviction, Mr. Perez Ruelas has diligently attended Alcoholics Anonymous for over a year, and has continued attending AA meetings even while in immigration detention.

72. On or about April 8, 2009, Mr. Perez Ruelas was released from jail for his last offense. Immigration and Customs Enforcement officials immediately took him into immigration custody, notwithstanding his pending application to adjust his status based on his marriage. At the time, Mr. Perez-Ruelas was in the process of becoming a lawful permanent resident of the United States.

73. Mr. Perez Ruelas was given a bond hearing on April 21, 2009, pursuant to 8 U.S.C. 1226(a), at which he bore the burden to prove that he was not a danger or flight risk. Upon information and belief, the immigration judge knew that Mr. Perez Ruelas was married to a U.S. citizen and that he had a pending adjustment application, but nonetheless the judge denied him release on bail. He told Mr. Perez Ruelas that his prior DUI convictions made him a danger to society, even though his sentence had long since expired.

74. With the assistance of his attorney, Mr. Perez Ruelas applied for a bond reduction in February 2010. At that hearing, the immigration judge set a bond of $5,000, an amount too high for Mr. Perez Ruelas's family to pay.

75. Because he could not pay, Mr. Perez Ruelas remained in immigration detention – where he has been for the past 16 months awaiting adjudication of his case. His last hearing was over four months ago, on April 15, 2010.

76. On July 30, 2010, Mr. Perez Ruelas and his wife received notice that their application to adjust his status had been approved, with a priority date of March 22, 2009. Although he is entitled to adjust status immediately and will no doubt ultimately prevail in his immigration case, he nonetheless remains detained for no apparent reason, merely because under the stringent standard applied at his bond hearing he cannot pay the bond that the immigration judge set in his case.

18

**Jose Farias Cornejo**

77.    Jose Farias Cornejo is a citizen of Mexico and a lawful permanent resident of the United States. He has been in immigration detention at Mira Loma Detention Center for over eleven months, since September 14, 2009.

78.    Mr. Farias Cornejo was born on August 14, 1984 in Michoacan, Mexico. He was brought to the United States prior to his first birthday by his parents, who were migrant farm workers. He has never left this country, and speaks fluent English.

79.    Mr. Farias Cornejo has four siblings. All four are U.S. citizens.  Mr. Farias Cornejo's mother is also a lawful permanent resident of the United States.

80.    Mr. Farias Cornejo spent his childhood years in Washington and his adolescence in California because his parents were migrant farm workers. He attended elementary school in San Diego for a few years before moving to Montclair, California to attend middle school and high school. He took special education classes at Montclair High School because of his diagnosed learning disability.

81.    After graduating from high school, Mr. Farias Cornejo worked at various jobs near his hometown in California, including in construction -- manufacturing jacuzzis and landscaping.

82.    Mr. Farias Cornejo has had several prior convictions. In 2007, he was convicted of possession of methamphetamine and was given the opportunity to receive substance abuse treatment as an alternative to incarceration under California Proposition 36.  Mr. Farias Cornejo diligently completed his drug treatment classes, but because he could not afford to pay the mandatory fine, he was sentenced to 180 days in jail.

83.    Upon information and belief, in 2009 Mr. Farias Cornejo was convicted of a misdemeanor California theft offense, for which he spent 14 days in jail.  In that same year, he was convicted of being under the influence of a controlled substance, for which he spent 60 days in jail.

84.   Shortly after serving his last sentence, in September 2009, federal immigration officials initiated removal proceedings against him and placed him in immigration detention, citing their authority to mandatorily detain any individual with a prior controlled substance offense under 8 U.S.C. 1226(c).

85.   Although the government contends that Mr. Farias Cornejo is subject to "mandatory detention" without a bond hearing under that provision, it has acknowledged that he is eligible for relief from removal in the form of cancellation of removal under 8 U.S.C. 1229b, because he has not been convicted of an "aggravated felony."

86.   Mr. Farias Cornejo was given a cancellation application on October of 2009, but struggled to find an attorney to assist him in completing it.  After five months in detention, he finally found an attorney, but that attorney did not file his application. Eventually Mr. Farias Cornejo found a different attorney to represent him, in June of this year.  Through his new attorney Mr. Farias Cornejo finally filed his cancellation application, nearly ten months after he was placed into immigration detention.

87.   Upon information and belief, at his cancellation hearing on August 17, 2010, the government stated that it had no objection to his application.  However, the immigration judge told Mr. Farias Cornejo that he had an outstanding warrant, and therefore refused to adjudicate the application.  Instead, the judge set his next court hearing for November 15, 2010, apparently on the assumption that his warrant would be resolved prior to that time.

88.   Although Mr. Farias Cornejo poses no flight risk, is not a danger to the community, and is eligible for relief from removal, he remains subject to continued detention. He has never had a hearing to determine whether his detention remains justified even though he has now been incarcerated for nearly a year.

**Angel Armando Ayala**

89.   Angel Armando Ayala is a citizen of El Salvador who was born on August 20, 1976.  He came to the United States with his family at the age of eleven and has

20

never left.  He attended junior high and high school in Southern California.

90.   Prior to his arrest by immigration authorities, Mr. Ayala lived with his mother, Maria, who is a United States citizen, and was also frequently in touch with his brother and sister, both of whom live in Southern California.  (He also has an older brother who lives in El Salvador).

91.   Mr. Ayala has worked in the United States his entire adult life, engaging in a variety of construction-related jobs including forklift driving, materials handling, landscaping, and in shipping and receiving.

92.   Immigration officials arrested Mr. Ayala in what apparently was a worksite raid in approximately 1994.  At that time, government officials detained him at the San Pedro Detention facility.  He eventually had a hearing before an immigration judge who ordered him released on bond because he was eligible for relief under the Nicaraguan and Cuban Adjustment Relief Act ("NACARA").  The judge instructed him to find a lawyer to help him apply.

93.   Shortly afterward, when Mr. Ayala went to the federal immigration building, he met a man acting as an attorney named Jose Quinones.  Mr. Quinones offered to file Mr. Ayala's NACARA application for a fee.

94.   Mr. Quinones eventually filed the application, which was based on Mr. Ayala's mother's eligibility for NACARA.   A hearing on the application was set for October 29, 1999.

95.   Shortly before the hearing, Mr. Ayala's mother became seriously ill.  Because he had to take his mother to the hospital and attend to her, Mr. Ayala could not attend the court hearing.  At the hearing, the immigration judge ordered him removed in absentia, notwithstanding the fact that he was prima facie eligible for NACARA relief.

96.   A few days after the hearing, after his mother's condition had stabilized, Mr. Ayala called Mr. Quinones to discuss his immigration case.  Mr. Quinones stated that the case now had to be re-opened, and that he would charge Mr. Ayala several

21

1   thousand dollars to do this. When Mr. Ayala stated that he did not have such funds

2   available, Mr. Quinones told him to contact him when he had saved up the money.

3   He did not mention that Mr. Ayala had to file the motion within 180 days, as is

4   required, or that he could be deported if he did not file the motion.

5   97.  Several years later, Mr. Quinones was suspended from practicing before the

6   immigration courts by the Executive Office of Immigration Review. If he ever was a

7   licensed attorney, he has presumably been disbarred.

8   98.  Mr. Ayala continued to live and work in the United States for the ensuing

9   decade. Upon information and belief, he received several misdemeanor convictions

10  for driving without a license during this time, but was not convicted of any other

11  offense.

12  99.  On February 14, 2009, immigration authorities arrested Mr. Ayala at his home

13  in Pomona, which he shares with his mother, based on his outstanding removal order

14  from ten years earlier. They transferred him to the Mira Loma Detention Center.

15  100.  With the assistance of non-profit legal service provider Catholic Charities, Mr.

16  Ayala filed a motion to reopen his case based on ineffective assistance of counsel.

17  However, the immigration judge denied the motion, and the BIA affirmed the

18  decision, asserting that the motion was untimely and not subject to tolling based on

19  ineffective assistance. According to the Board, the attorney had no duty to inform

20  Mr. Ayala of the filing deadline for the motion to reopen because the attorney never

21  agreed to represent him with respect to the motion. Thus, the Board declined to

22  reopen his case, notwithstanding the fact that Mr. Ayala is eligible for NACARA

23  relief.[9]

24  101.  Mr. Ayala subsequently hired attorney Shan Potts, who now represents him

25  before the Ninth Circuit. The Ninth Circuit granted Mr. Ayala a stay of removal, but

26  

_____

27  [9] Upon information and belief, Mr. Ayala has one misdemeanor conviction for drug possession from approximately 1996 and several convictions for driving without a

28  license. None of these render him ineligible for NACARA.

22

1  briefing has not yet begun in his petition for review of the BIA's decision. His case

2  will likely take well over a year to decide at the Ninth Circuit, given the court's

3  substantial case backlog.

4  102. Mr. Ayala's incarceration has worked a great hardship on his U.S.-citizen

5  mother, with whom he lived prior to his arrest. She has had difficulty paying rent for

6  the apartment they shared, and also has suffered from the absence of his emotional

7  support.

8

9  ### CLASS-WIDE ALLEGATIONS

10  103. Petitioners are amongst approximately at least 350 detainees, if not more, in the

11  Central District on any given day whom the government has incarcerated for more

12  than six months without proving at an adequate hearing that their prolonged detention

13  is justified.[10] Indeed, it is the government's policy or practice to detain non-citizens

14  under the general immigration detention statutes for prolonged periods of time

15  pending completion of their removal proceedings without providing them with such

16  hearings.

17  104. In response, Petitioners bring this action on behalf of themselves and all other

18  persons similarly-situated, pursuant to Federal Rules of Civil Procedure 23(a) and

19  23(b)(2), or in the alternative, as a representative action pursuant to a procedure

20  analogous to that provided in Rules 23(a) and 23(b)(2). See Rodriguez v. Hayes, 578

21  F.3d 1032, 1047 (9th Cir. 2009) (allowing this case to proceed as a class action

22  _____

[10] This Court ordered the government to produce a "snapshot" list of all class
members on a particulate date, which the government produced for the date of April
21, 2010. As of that day, there were 352 class members – people incarcerated in ICE
custody in the Central District who had been in ICE custody for at least 180 days, and
whose cases remained pending either before the immigration courts or before the
federal courts with a stay of removal in effect. The list also included a number of
people who were not class members because they were not incarcerated in detention
centers at all, but rather in juvenile facilities, and also two people who were not class
members because they were had final removal orders with no stay of removal in
effect.

23

1  habeas petition).

2  105.  Petitioners represent a class of all people within the Central District of

3  California who 1) are or will be detained for longer than six months pursuant to the

4  general immigration detention statutes pending completion of removal proceedings,

5  including judicial review, 2) are not detained pursuant to one of the national security

6  detention statutes at 8 U.S.C. 1226a and 8 U.S.C. 1531-37 and 3) have not been

7  afforded a hearing to determine whether their prolonged detention is justified.

8  106.  The class includes people who were present in an ICE detention facility in the

9  Central District on or after the date on which the original complaint was filed as long

10  as they had been detained by ICE for more than six months at that time, even if they

11  are no longer in the Central District; it therefore includes people subject to the mass

12  transfer of detainees from the San Pedro Detention Facility in October 2007, as long

13  as those people remain in an ICE detention facility somewhere and their cases remain

14  pending.

15  107.  The class excludes people who have a final order of removal and no stay of that

16  removal order, such that the government has legal authority to remove them.

17  108.  The class excludes juveniles who are held under the care of the Office of

18  Refugee Resettlement.  It also excludes people imprisoned pursuant to a criminal

19  sentence, including individuals who complete removal proceedings and any judicial

20  review while serving such sentences.

21  109.  Pursuant to this Court's directive that the parties propose sub-classes,

22  Petitioners propose that the Court also certify four sub-classes in this action,

23  corresponding to each of the general detention statutes.  Petitioners propose to

24  represent a sub-class of class members detained under 8 U.S.C. 1225(b) represented

25  by Mr. Farah and Mr. Abdikadir, a sub-class of class members detained under 8

26  U.S.C. 1226(a) represented by Mr. Rodriguez and Mr. Perez Ruelas, a sub-class of

27  class members detained under 8 U.S.C. 1226(c) represented by Mr. Farias Cornejo,

28  and a sub-class of class members detained under 8 U.S.C. 1231(a) represented by Mr.

Ayala.

110. For each putative sub-class and each detention statute, Petitioners' counsel estimates that there will be far more than forty other sub-class members in this District who, like each of the Petitioners, have been detained for more than six months, are detained under that particular general detention statute, and have not been afforded a constitutionally-adequate hearing to determine whether their prolonged detention is justified. Indeed, there may well be more than forty members of each sub-class detained in the Central District on any given single day.

111. The proposed class and sub-classes meet the requirements of Fed. R. Civ. Pro. 23(a)(2). For the class as a whole, there are several common questions of law and fact in the action. These include 1) whether the government has a policy or general practice of detaining non-citizens in removal proceedings for longer than six months under the general immigration detention statutes without providing an adequate hearing to determine whether such prolonged detention is justified, 2) whether any general immigration detention statute authorizes this detention policy or practice, and 3) whether this detention policy or practice violates the Due Process Clause. Rodriguez, 578 F.3d at 1048-49 (finding common questions).

112. There are additional common questions of law that pertain to each subclass. These include: for Subclass 1, whether 8 U.S.C. 1225(b) authorizes the policy or general practice of detaining non-citizens in removal proceedings for longer than six months without providing a hearing where the government must establish that such detention is justified; for Subclass 2, whether 8 U.S.C. §1226(a) authorizes this detention policy or practice; for Subclass 3, whether 8 U.S.C. §1226(c) authorizes this detention policy or practice; and for Subclass 4 whether §1231(a) authorizes this detention policy or practice.

113. The claims of the named representative Petitioners are typical of the claims of each proposed sub-class and of the class as a whole. Like all of the proposed class members, the named Petitioners will have been detained, pursuant to the

25

1   government's policy and practice, for at least six months under the relevant general

2   immigration detention statutes, without having been afforded an adequate hearing

3   where the government has shown that their prolonged detention is justified.

4   Rodriguez, 578 F.3d at 1048-50.

5   114. The named Petitioners will fairly and adequately represent the interests of all

6   members of the proposed class and sub-classes because they seek relief identical to

7   the relief sought by all class members, and because they have no interests adverse to

8   other class members.  Moreover, the named Petitioners are represented by pro bono

9   counsel from the ACLU of Southern California, the ACLU Immigrants' Rights

10  Project, the Stanford Law School Immigrants' Rights Clinic, and the law firm of

11  Sidley Austin LLP.  These organizations and the attorneys working for them have

12  extensive experience litigating on behalf of detained immigrants and broad

13  experience litigating class actions.  Rodriguez, 578 F.3d at 1050.

14  115. Respondents have acted on grounds generally applicable to the class and to

15  each subclass through their policy and practice of detaining non-citizens in removal

16  proceedings for longer than six months under each of the general immigration

17  detention statutes without providing an adequate hearing where the government has

18  shown that their prolonged detention is justified, making class-wide declaratory and

19  injunctive relief appropriate.

20

21                              **LEGAL BACKGROUND**

22  116. Petitioners argue that the government may not detain them for longer than six

23  months without showing at an adequate hearing that their prolonged detention is

24  justified.  Peititioners make this argument on both statutory and constitutional

25  grounds.

26  117. With respect to the statute, Petitioners argue that because their removal

27  proceedings have exceeded an "expeditious" period, the general detention statutes

28  under which they are detained must be construed to require an individualized hearing

                                            26

as to whether or not their detention is justified. Several decisions have already construed these statutes to authorize only reasonable detention, and to require individualized hearings to ensure that detention under them remains reasonable. See generally Nadarajah v. Gonzales, 443 F.3d 1069, 1078-79 (9th Cir. 2006) (holding that because 8 U.S.C. 1225(b) is one of "the general immigration detention statutes" it authorizes detention only for a "brief and reasonable" period of time necessary to complete removal proceedings, presumptively six months); Tijani v. Willis, 430 F.3d 1241 (9th Cir. 2005) (construing 8 U.S.C. 1226(c) to require mandatory detention only in cases of "expeditious" removal proceedings, and ordering a hearing to determine whether detention is justified); Casas-Castrillon v. Dep't of Homeland Sec., 535 F.3d 942, 950 (9th Cir. 2008) (construing general detention statutes to require bond hearings where government bears burden of proof to validate prolonged detention). Because none of the general detention statutes explicitly authorize prolonged detention without individualized hearings, they must all be construed to require such hearings to ensure that detention remains reasonable.

118. In the alternative, Petitioners argue that their prolonged detention without an adequate hearing to determine whether detention is justified violates the Due Process Clause. "Freedom from imprisonment -- from government custody, detention, or other forms of physical restraint -- lies at the heart of the liberty that [the Due Process] Clause protects." Zadvydas, 533 U.S. at 690. For this reason, detention must always be reasonable in relation to its purpose. Jackson v. Indiana, 406 U.S. 715, 738 (1972). See also Demore, 538 U.S. at 527-29 (applying "reasonable relation" test).

119. In the immigration context, the primary purpose of detention is to effect the alien's deportation in the event that removal proceedings are finally concluded in the government's favor. Zadvydas, 533 U.S. at 699 (holding that the "statute's basic purpose" is "to assure the alien's presence at the moment of removal"); Demore, 538 U.S. at 528 (upholding brief mandatory detention pending completion of removal

27

proceedings because it "serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings.").

120.  Because Petitioners and other class members suffer lengthy civil detention, they must be afforded rigorous procedures to ensure that their detention remains justified. Zadvydas, 533 U.S. at 690-92 (noting "serious" constitutional problem with prolonged and indefinite civil detention unless "limited to specially dangerous individuals and subject to strong procedural protections") (emphasis added); Casas-Castrillon, 535 F.3d at 950 (holding that "prolonged detention without adequate procedural protections would raise serious constitutional concerns" and therefore that "due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint.") (citing Zadvydas).

121.  With respect to what procedures are required for a hearing to be adequate to justify prolonged detention for both statutory and constitutional purposes, the government must at a minimum provide advance notice to the detainee and then provide a transcribed hearing before an immigration judge where it bears the burden to show by "clear and convincing" evidence that "no conditions of release" are sufficient to protect the government's interests in preventing flight and danger.  See Cooper v. Oklahoma, 517 U.S. 348, 363 (1996) ("due process places a heightened burden of proof on the State in civil proceedings in which the individual interests at stake . . . are both particularly important and more substantial than mere loss of money.") (internal quotations omitted); Foucha v. Louisiana, 504 U.S. 71 (1992) (requiring "clear and convincing evidence" for commitment of insanity acquittee beyond length of permissible sentence); United States v. Salerno, 481 U.S. 739, 750 (1987) (recognizing that the "no conditions of release" standard strikes appropriate balance of interests).  In addition, a showing of particularly serious danger is required – given that detention may last for years -- and a detainee's criminal history alone is insufficient to make that showing.  Zadvydas, 533 U.S. at 690-91 ("we have upheld

preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections"). Perhaps most important, the hearing must require a heightened showing based on the length of detention at issue. Where a detainee has been detained for a long period of time and proceedings may not end in a brief time, the government must make more of a showing to justify the detention at issue. <u>United States v. Accetturo</u>, 783 F.2d 382, 388 (3d Cir. 1986) (stating in pre-trial detention context that "[i]n some cases, the evidence admitted at the initial detention hearing, evaluated against the background of the duration of pretrial incarceration and the causes of that duration, may no longer justify detention."); <u>Tijani v. Willis</u>, 430 F. 3d 1241, 1242 (9th Cir. 2005) (ordering bond hearing where government bore burden of proof in part because the "forseeable process [for resolution of Petitioner's removal case] in this Court" was "a year of more").[11]

122. In addition, any unrepresented detainee would have to be afforded counsel at the government's expense at a hearing where prolonged detention was at stake. <u>See</u> <u>Lassiter v. Dept of Soc. Serv.</u>, 452 U.S. 18, 25 (1981) (noting that "it is the defendant's interest in personal freedom, and not simply the special Sixth and Fourteenth Amendments right to counsel in criminal cases, which triggers the right to appointed counsel").

---

[11] This Court ordered hearings that largely comported with these requirements when it granted preliminary injunctions for four individual prolonged detainees in litigation closely related to this case. <u>See, e.g.</u>, Order Granting Motion for Preliminary Injunction, <u>Martinez v. Gonzales</u>, CV06-7609 (C.D. Cal. January 4, 2007) (ordering government to release detainee unless "the government shows by clear and convincing evidence that he is a sufficient danger or risk of flight to justify his detention in light of how long he has been detained already and the likelihood of his case being finally resolved in favor of the government in the reasonably foreseeable future.").

123.  Absent the provision of such hearings, the government's detention of Petitioners and other class members violates both the immigration statutes and the Due Process Clause.

## FIRST CAUSE OF ACTION
### Violation of Immigration and Nationality Act and Regulations

124.  Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

125.  Respondents' continued detention of Petitioners and other putative class members under the general immigration detention statutes violates the Immigration and Nationality Act, insofar as the statutes under which they are detained do not authorize detention for a prolonged period of time absent an adequate hearing at which the government shows that their detention remains justified.

## SECOND CAUSE OF ACTION
### Violation of Fifth Amendment Due Process (Right to a Constitutionally Adequate Custody Hearing)

126.  Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

127.  Respondents' continued detention of Petitioners and other class members without an adequate hearing where the government shows that their prolonged detention remains justified violates the right to be free of prolonged non-criminal detention without adequate justification and sufficient procedural safeguards, as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution.

30

# PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request that the Court grant the following relief:

a.      Assume jurisdiction of this matter;

b.      Certify a class and sub-classes as appropriate under Fed. R. Civ. Pro. 23 (or other analogous procedures) consisting of all people within the Central District of California who 1) are or will be detained for longer than six months pursuant to the general immigration detention statutes pending completion of removal proceedings, including judicial review, 2) are not detained pursuant to one of the national security detention statutes at 8 U.S.C. 1226a and 8 U.S.C. 1531-37 and 3) have not been afforded a hearing to determine whether their prolonged detention is justified;

c.      Appoint Petitioners Rodriguez and Perez Ruelas, as representatives of a sub-class of class members detained under 8 U.S.C. 1226(a); Petitioners Farah andAbdikadir as representatives of a sub-class of class members detained under 8 U.S.C. 1225(b); Petitioner Farias Cornejo as the representative of a sub-class of class members detained under 8 U.S.C. 1226(c); and Petitioner Ayala as the representative of a sub-class of class members detained under 8 U.S.C. 1231.

d.      Appoint Petitioners' Counsel as Counsel for the Class and each subclass;

e.      Order Respondents to provide, after giving notice, individual hearings before an immigration judge for Petitioners and each member of the class, at which Respondents will bear the burden to prove by clear and convincing evidence that no reasonable conditions will ensure the detainee's presence in the event of removal and protect the community from serious danger, despite the prolonged length of detention at issue;

f.      Declare that Respondents' failure to provide Petitioners and the members of the class with adequate hearings violates the Immigration and Nationality Act and the Due Process Clause of the Fifth Amendment;

31

g.        Enjoin Respondents from failing to provide Petitioners and each member of the Class, upon notice, with adequate hearings before an immigration judge (as specified above in subsection (e) of this Prayer);

h.        Grant Petitioners reasonable attorneys' fees, costs, and other disbursements pursuant to the Equal Access to Justice Act, 28 U.S.C. 2412;

i.        Grant such other relief as the Court deems just and equitable.

Respectfully submitted,

ACLU OF SOUTHERN CALIFORNIA

Dated:  October 20, 2010          By

AHILAN T. ARULANANTHAM
Counsel for Petitioners

# EXHIBIT 3

# United States District Court
# Central District of California
# Western Division

| | |
|---|---|
| ALEJANDRO RODRIGUEZ, *et al*., | CV 07-03239 TJH (RNBx) |
| Petitioners, | |
| v. | |
| ERIC H. HOLDER, *et al*., | Order<br>[101] |
| Respondents. | |

The Court has considered Plaintiff's motion for class certification, together with the moving papers and Respondents' statement of non-opposition.

To certify a class, it must satisfy commonality, typicality, numerosity, and adequacy requirements. Fed. R. Civ. P. 23(a). For subclasses to exist, each subclass must meet these requirements as well. Fed. R. Civ. P. 23(c)(5). The first requirement, commonality, ensures that all absent members of the class are adequately represented. *Walters v. Reno*, 145 F.3d 1032, 1045 (9th Cir. 1998). This requirement has been construed permissively, as in, it is not necessary for all questions of law and fact to be exactly the same. *Hanlon v. Chrysler Corp.*, 150

F.3d 1011, 1019 (9th Cir. 1998). It is only necessary that there be a common core of operative facts and legal issues. *Hanlon*, 150 F.3d at 1019.

The second requirement, typicality, looks to whether the claims of the class representative adequately represent the claims of the class as a whole. *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001). The claims must, also, share parallel legal arguments. *Armstrong*, 275 F.3d at 849. Typicality is construed permissively as well, and only requires that the claims be reasonably similar, rather than identical. *Hanlon*, 150 F.3d at 1020.

Numerosity is satisfied if joinder of all parties is impractical. Fed. R. Civ. P. 23(a). A large number of plaintiffs generally satisfies this requirement. *Jordan v. Los Angeles County*, 669 F.2d 1311, 1319 (9th Cir. 1982).

Finally, adequacy is fulfilled if the counsel for each named representative is sufficiently qualified, there is a shared interest between representatives and absent class members, and it is unlikely the suit is collusive. *Walters*, 145 F.3d at 1046. Additionally, the Circuit already determined that the class satisfies Rule 23(b)(2)'s requirements, given that the class as a whole seeks declaratory and injunctive relief. *Rodriguez v. Holder*, 951 F.3d 1105, 1125-26 (9th Cir. 2010).

As for numerosity, Plaintiff conducted a random sampling from the government's list of 352 class members, and the result indicated that each subclass would contain at least forty five immigrants. Joinder of all of these people would be impractical, and thus the subclasses satisfy numerosity. The adequacy requirement is met, also, given that counsel consists of lawyers from the American Civil Liberties Union, and each named plaintiff is seeking identical relief as the absentee class members.

The proposed subclasses share a common question of law and fact, as well. The subclasses are divided along statutory lines, with each section containing a

subclass.  Therefore, each subclass member shares a similar factual pattern, having been detained under that section's authority.  Though most situations are not exactly the same, commonality does not mandate that the fact patterns be identical.  *Hanlon*, 150 F.3d at 1019.  Additionally, the questions of law under each section are the same:  Whether that section can be interpreted to require a bond hearing after six months, or, conversely, whether the procedures already in place satisfy due process.  Therefore, the commonality requirement is met.

As for the typicality requirement, each named representative has been detained under the authority of the various sections for over six months.  Thus, the named plaintiff shares a common underlying fact pattern with the absent class members, otherwise he would be detained under a different section.  Furthermore, the remedy the named plaintiff is seeking is identical to the other class members: Declaratory and injunctive relief, mandating a bond hearing after a detention of more than six months.  Therefore, typicality is satisfied.  Thus, all the requirements of Rule 23 are met for each subclass.

It is Ordered that Plaintiff's motion for class certification shall be, and hereby is, Granted.

Date:  March 8, 2011

Terry J. Hatter, Jr.
Senior United States District Judge