PETER J. ELIASBERG (SBN 189110)
Email: peliasberg@aclu-sc.org
AHILAN T. ARULANANTHAM (SBN 237841)
Email: aarulanantham@aclu-sc.org
MICHAEL KAUFMAN (SBN 254575)
Email:  mkaufman@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017
Tel: (213) 977-5211
Fax: (213) 977-5297

**Attorneys for Petitioners**
(Additional counsel listed on following page)

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALEJANDRO RODRIGUEZ, et al., | ) Case No. CV 07- 3239-TJH (RNBx) |
| Petitioners, | ) **PETITIONERS' MEMORANDUM** |
| | ) **OF POINTS AND AUTHORITIES** |
| vs. | ) **IN SUPPORT OF MOTION FOR** |
| | ) **PRELIMINARY INJUNCTION** |
| TIMOTHY ROBBINS, et al., | ) **REDACTED** |
| Respondents. | ) Honorable Terry J. Hatter, Jr. |
| | ) Hearing Date: August 13, 2012 |
| | ) Hearing Time: UNDER SUBMISSION |

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................ 1

II.  LEGAL BACKGROUND ........................................................................... 1

    A.   Mandatory Detention Under Section 1226(c) ............................. 3

    B.   Detention Without Bond Hearings under Section 1225(b) ....................... 5

III. ARGUMENT ............................................................................................ 7

    A.   PETITIONERS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THEIR CLAIM THAT THE IMMIGRATION DETENTION STATUTES MUST BE CONSTRUED TO REQUIRE RIGOROUS BOND HEARINGS FOR THE PI SUBCLASSES MEMBERS ............................ 7

        1.   All Applicable Immigration Detention Statutes Must Be Construed to Require Rigorous Bond Hearings for Detention Beyond Six Months ......................... 7

            i.   Prolonged Detention Without Rigorous Bond Hearings is Unconstitutional ............................ 7

            ii.  Detention Becomes Prolonged at Six Months .......... 10

    B.   The Court Should Construe Section 1226(c) to Avoid the Constitutional Problem Raised by Prolonged Mandatory Detention ............................... 12

    C.   The Court Should construe Section 1225(b) to Authorize Rigorous Bond Hearings at Six Months ........................................................... 15

IV.  PETITIONERS WILL CONTINUE TO SUFFER IRREPARABLE HARM AS A RESULT OF THEIR PROLONGED DETENTION, AND THE BALANCE OF HARDSHIPS TIPS SHARPLY IN THEIR FAVOR ............ 20

V.   AN INJUNCTION IS IN THE PUBLIC INTEREST ................................... 24

VI.  CONCLUSION .......................................................................................... 24

i

# TABLE OF AUTHORITIES

**CASES**

*Alliance for the Wild Rockies v. Cottrell,*
    622 F.3d 1045 (9th Cir. 2010)..............................................................7, 23

*Associated General Contractors of Calif., Inc. v. Coalition for Economic Equity,*
    950 F.2d 1401 (9th Cir. 1991)....................................................................20

*Califano v. Yamasaki,*
    442 U.S. 682 (1979).............................................................................9, 10

*Camins v. Gonzales,*
    500 F.3d 872 (9th Cir. 2007)...................................................................6, 16

*Casas-Castrillon v. DHS,*
    535 F.3d 942 (9th Cir. 2008)..............................................................*passim*

*Centeno-Ortiz v. Culley,*
    2012 WL 170123 (S.D. Cal. Jan. 19, 2012)..................................................20

*Clark v. Martinez,*
    543 U.S. 371 (2005)............................................................. 10, 11, 16, 17

*Crespo v. Baker,*
    2012 WL 1132961 (S.D. Cal. Apr. 3, 2012).................................................20

*Demore v. Kim,*
    538 U.S. 510 (2003)............................................................. 4, 11, 14, 15

*Diouf v. Napolitano,*
    634 F.3d 1081 (9th Cir. 2011)...........................................................*passim*

*Foucha v. Louisiana,*
    504 U.S. 71 (1992)..................................................................................9

*Franco-Gonzales v. Holder,*
    2011 WL 5966657 (C.D. Cal. Aug 2, 2011)..................................................14

*Franco-Gonzales v. Holder,*
    767 F.Supp.2d 1034 (C.D. Cal. 2010) .........................................................13

*Franco-Gonzales v. Holder*,
  828 F.Supp.2d 1133 (C.D. Cal. 2011) ........................................... 13

*Goldberg v. Kelly*,
  397 U.S. 254 (1970) ................................................................. 9

*Golden Gate Rest. Ass'n v. City and County of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008) ................................................... 23

*Goldie's Bookstore, Inc. v. Superior Court of the State of Calif.*,
  739 F.2d 466 (9th Cir. 1984) ..................................................... 20

*Gonzalez v. O'Connell*,
  355 F.3d 1010 (7th Cir. 2004) .................................................... 14

*Idema v. Dreamworks, Inc.*,
  162 F.Supp.2d 1129 (C.D. Cal. 2001) ........................................... 14

*Kansas v. Hendricks*,
  521 U.S. 346 (1997) ................................................................. 9

*Krolak v. Ashcroft*,
  No. 04-C-6071 (N.D. Ill. Dec. 1, 2004) ........................................ 15

*Kwong Hai Chew v. Colding*,
  344 U.S. 590 (1953) ................................................................. 19

*Landon v. Plasencia*,
  459 U.S. 21 (1982) ................................................................. 16

*Ma v. Ashcroft*,
  257 F.3d 1095 (9th Cir. 2001) .................................................... 20

*Manimbao v. Ashcroft*,
  329 F.3d 655 (9th Cir. 2003) ...................................................... 10

*Matter of Carlos Alberto Flores-Lopez*,
  2008 WL 762690 (BIA Mar 05, 2008) ............................................ 5

*Matter of Joseph*,
  22 I. & N. Dec. 799 (BIA 1999) ...........................................*passim*

*Matter of X-K*,
  23 I&N Dec. 731 (BIA 2005) ...................................................... 19

iii

*Memphis Light, Gas and Water Division v. Craft*,
   436 U.S. 1 (1978)............................................................................9

*Murray v. The Schooner Charming Betsy*,
   6 U.S. (2 Cranch) 64 (1804)..........................................................20

*Nadarajah v. Gonzales*,
   443 F.3d 1069 (9th Cir. 2006).................................................*passim*

*Nat'l Ctr. for Immigrants Rights, Inc. v. INS*,
   743 F.2d 1365 (9th Cir. 1984)......................................................22

*Phelps-Roper v. Nixon*,
   545 F.3d 685 (8th Cir. 2008)........................................................24

*Preminger v. Principi*,
   422 F.3d 815 (9th Cir. 2005)........................................................24

*S.O.C. Inc. v. County of Clark*,
   152 F.3d 1136 (9th Cir. 1998)......................................................21

*Sammartano v. First Judicial District Court*,
   303 F.3d 959 (9th Cir. 2002)........................................................21

*Tijani v. Willis*,
   430 F.3d 1241 (9th Cir. 2005).................................................*passim*

*United States v. Bogle*,
   855 F.2d 707 (11th Cir. 1998)......................................................21

*United States v. Salerno*,
   481 U.S. 739 (1987)........................................................................9

*V. Singh v. Holder*,
   638 F.3d 1196 (9th Cir. 2011).................................................*passim*

*Winter v. NRDC, Inc.*,
   129 S. Ct. 365 (2008)......................................................................7

*Zadvydas v. Davis*,
   533 U.S. 678 (2001).................................................................8, 13

**STATUTES**

8 U.S.C. § 1101(a)(13)(C) ...............................................................6

8 U.S.C. § 1182(a)(2)(A)(i)(I) ...............................................................4

8 U.S.C. § 1182(a)(2)(C) ........................................................................4

8 U.S.C. § 1182(d)(5)(A) ...........................................................6, 15, 18

8 U.S.C. § 1225(b) ..........................................................................*passim*

8 U.S.C. § 1226a .................................................................................13

8 U.S.C. § 1226(a) .........................................................1, 12, 18, 19

8 U.S.C. § 1226(c) .........................................................................*passim*

8 U.S.C. § 1226(c)(1) ...........................................................................4

8 U.S.C. § 1227(a)(2)(A)(iii) ...............................................................4

8 U.S.C. §§ 1531-1537 .......................................................................13

18 U.S.C. § 3142(g)(3)(A) ..................................................................10

REGULATIONS

8 C.F.R. § 1.2 ........................................................................................6

8 C.F.R. § 1003.19 ..............................................................................19

8 C.F.R. § 1003.19(h)(2)(i)(B) ............................................................6

8 C.F.R. § 1003.19(h)(2)(ii) .................................................................4

8 CFR § 212.5 .....................................................................................18

OTHER AUTHORITIES

Richard A. Boswell, Essentials of Immigration Law 49 (2006) ...........4

Julie Dona, Making Sense of "Substantially Unlikely": An Empirical
    Analysis of the Joseph Standard in Mandatory Detention Custody
    Hearings 5 (June 1, 2011), http:// ssrn.com/abstract=1856758 .........5

UNHCR's Revised Guidelines on Applicable Criteria and Standards Relating to
    the Detention of Asylum-Seekers, Guideline 5 (February 1999)............... 20

Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc.
    A/810, Article 9 (3d sess. 1948).........................................................20

International Covenant on Civil and Political Rights art.9(1), 999 U.N.T.S.
171................................................................................................................20

Dep't of Homeland Security, U.S. Immigration and Customs Enforcement
Salaries and Expenses, Fiscal Year 2012 Congressional Budget
Justification, p. 57, http://www.dhs.gov/xlibrary/assets/dhs-
congressional-budget-justification-fy2012.pdf. ...............................................23

Anil Kalhan, Columbia Law Review, ―Rethinking Immigration Detention (July,
21, 2010), p. 55, http://www.columbialawreview.org/assets/
sidebar/volume/110/42_Anil_Kal han…………………………………………..23

Dora Schriro, U.S. Dep't of Homeland Sec., Immigration Detention Overview and
Recommendations 10, 15 (2009)……………………………………………..23

## I.   INTRODUCTION

Petitioners hereby move for a preliminary injunction requiring the government to provide rigorous bond hearings to subclass members detained pursuant to 8 U.S.C. §§ 1226(c) and 1225(b) (the "PI Subclasses").  Members of the PI Subclasses have *never* had the necessity of their detention assessed by an Immigration Judge, even though the government has detained all of them for at least six months, and many for far longer.  The Ninth Circuit has held that the immigration statutes cannot be construed to authorize detention for more than six months without providing a bond hearing before an Immigration Judge with authority to grant release unless the government shows, by clear and convincing evidence, that continued detention is justified.  *See Diouf v. Napolitano*, 634 F.3d 1081, 1086 (9th Cir. 2011).  Despite this, the government continues to misconstrue Sections 1226(c) and 1225(b) to authorize detention of the PI Subclasses members beyond six months without providing bond hearings of any kind.  The Court should grant this motion and put a stop to a shameful practice that deprives individuals of fundamental rights protected by the Constitution.  The harm to the class members is clear, and the law overwhelmingly supports their position.[1]

## II.   LEGAL BACKGROUND

This motion concerns individuals detained under two different legal regimes

---

[1] The PI Subclasses contain the only class members who continue to be subject to prolonged detention without bond hearings of any kind: class members detained under Section 1226(a) are eligible for release on bond pursuant to existing regulations, while class members detained under Section 1231 are now eligible for release on bond pursuant to the recent *Diouf* decision.  After additional discovery, Petitioners will move for complete relief on behalf of all class members, including greater procedural protections at bond hearings for those who already receive them.  But given the difficulties in obtaining discovery from Respondents, the irreparable harm presently occurring, and the settled precedent now clearly requiring rigorous bond hearings after six months for persons detained under 8 U.S.C. §§ 1226(c) and 1225, Petitioners cannot continue to wait to secure basic protections for the PI Subclass members.

1  that, in the government's view, do not permit an Immigration Judge to hold a

2  rigorous bond hearing, or indeed a bond hearing of any kind, to determine whether

3  further detention is warranted.[2]

4         The first legal regime applies to members of the Section 1226(c) subclass,

5  which forms roughly half of the class as a whole, *see* Dkt. 101, Ex.26 [Stark Decl.

6  ¶ 15].  A detainee becomes subject to Section 1226(c) if ICE officials believe he

7  has been convicted of any one of a broad range of crimes, including simple drug

8  possession offenses and certain misdemeanors, as well as more serious crimes.  As

9  matters stand, the government provides these individuals with *no* avenue to

10  challenge whether their detention is justified based on lack of danger to the

11  community or flight risk, regardless of its length.  Respondents detained Petitioner

12  Jose Farias Cornejo – a member of the Section 1226(c) Subclass – for more than

13  15 months without a bond hearing, even though he is a long-time lawful permanent

14  resident with strong family ties and a successful school and work history.  He

15  ultimately won relief from removal.  *See* Dkt. 148; 158 (observing Farias was

16  released after he won his case and DHS declined to appeal).

17         The second legal regime concerns members of the Section 1225(b) subclass

18  – most of whom are arrested at ports of entry coming into the United States, often

19  because they seek asylum.  They too receive no bond hearings notwithstanding

20  prolonged detention.  Unlike the 1226(c) class members, these individuals are

21  eligible for release, but only based on the unfettered discretion of Department of

22  Homeland Security officers.  Should an officer decide to detain a 1225(b) subclass

23  member, even for years, the government provides no in-person hearing of any kind

24  _____

25  [2] Petitioners use "rigorous bond hearing" as shorthand for the hearings required

26  under existing Ninth Circuit law for those subject to prolonged detention.  Under

   existing law, such hearings must take place before an Immigration Judge, must be

27  recorded, and must place the burden of proof on the government by clear and

   convincing evidence.  *See generally V. Singh v. Holder*, 638 F.3d 1196, 1203, 1209

28  (9th Cir. 2011).

1   to challenge that decision.  *See* Ex. 45, excerpts of deposition transcript[3] of Wesley

2   Lee, 18:12-16, Jan. 12, 2012.[4]  Instead, agents render decisions simply by checking

3   a box on a form that contains no specific explanation and reflects no individualized

4   deliberation.  *See* Ex. 45 at 106:18 – 107:23; *see, e.g.*, Ex. 51 (parole decision for

5   class member, Ex. 5 to deposition of Wesley Lee) (to be subsequently filed *under*

6   *seal* pursuant to Stipulated Protective Order (Dkt. 227)).  For example, Section

7   1225(b) Subclass Member ████████ was denied parole as a danger and

8   flight risk despite the fact that he had a very strong claim for asylum, no criminal

9   history, and support within the United States.  Nonetheless, ICE detained him until

10  he won his case, at which point it released him after months of pointless detention.

## A.      Mandatory Detention Under Section 1226(c)

12          For roughly half of the PI subclasses members – those subject to mandatory

13  detention under Section 1226(c) – the government provides no opportunity for

14  release even if such individuals could show that they present no danger or flight

15  risk if given the chance at a hearing.  Rather, individuals become subject to

16  detention without the possibility of release based solely on an ICE officer's review

17  of their criminal history.  If an ICE officer (not an attorney) determines that a non-

18  citizen has been convicted of a triggering offense, the individual is classified as a

19  mandatory detainee and told that they are ineligible for release on bond. *See* Ex.

20  48, excerpts of deposition transcript of Eric Saldana, 37:12-20, Jan. 13, 2012.

---

[3] Because the deposition transcripts are extremely voluminous, Petitioners have submitted only the cited transcript pages.  The whole transcripts can be made available upon the Court's request.

[4] Wesley Lee, the Assistant Field Office Director of the Los Angeles Field Office was designated as the government's 30(b)(6) to testify as the person most knowledgeable concerning the parole and POCR processes, and release determinations and notice provided for *Casas* hearings and *Joseph* hearings.  *See* Ex. 45 at 12:11-12; Ex. 46 (Amended 30(b)(6) deposition notice to Department of Homeland Security); Ex. 47 (email dated January 11, 2012 from Theodore Atkinson to Michael Kaufman)

1    Triggering convictions include nearly all controlled substance offenses, *see* 8

2    U.S.C. 1182(a)(2)(C), all crimes involving moral turpitude, *see* 8 U.S.C.

3    1182(a)(2)(A)(i)(I), and all aggravated felonies, *see* 8 U.S.C. 1227(a)(2)(A)(iii).[5]

4    *See* 8 U.S.C. 1226(c)(1).[6]

5            Under agency regulations and BIA caselaw, a detainee subject to mandatory

6    detention has the right to ask the Immigration Judge to reconsider his or her

7    classification as a mandatory detainee.  *See* 8 C.F.R. § 1003.19(h)(2)(ii) (providing

8    for Immigration Judge hearing over whether detainee is "properly included" under

9    the detention statute); *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999); *see also*

10   *Demore v. Kim*, 538 U.S. 510, 514 n.3 (2003) (describing "*Joseph*" hearings).

11          However, detainees are not informed of their right to seek a *Joseph* hearing,

12   *see* Ex. 45 at 207:19 - 208:6. In fact, the form provided to such detainees

13   specifically states that there is no opportunity to challenge ICE's mandatory

14   detention determination. *See* Ex. 45 at 208:18-209:4 (if [ICE] determines a

15   detainee is subject to mandatory detention under 236(c), the Notice of Custody

16   Determination form specifically "says [a detainee] *cannot* have a bond hearing.")

17   (emphasis added)); *see also* Ex. 45 at 243:16-22.

18          Even if a detainee manages to learn about the existence of this right, the

19   deck is still heavily stacked against the detainee who claims that he is not subject

20   to mandatory detention.  To obtain a bond hearing, the detainee must show the

21   Immigration Judge that the government is "substantially unlikely to prevail" on its

22   claim regarding the classification of the conviction as one triggering mandatory

23

24   [5] Despite its terminology, an "aggravated felony" need not be "aggravated" or a
     "felony" and includes many relatively minor convictions.  *See* Richard A. Boswell,
25   Essentials of Immigration Law 49 (2006).

26   [6] If the ICE officer is unsure about how to classify the detainee's criminal history,
     he or she may consult with one of the attorneys employed by ICE – the same
27   attorneys who prosecute immigration cases for DHS – and base the decision to
28   detain on the ICE attorney's opinion. *See* Ex.48 at 52:10 – 53:16.

detention. *Joseph*, 22 I. & N. Dec. at 799.  As one Ninth Circuit judge has observed, this burden is "all but insurmountable."  *Tijani v. Willis*, 430 F.3d 1241, 1246 (9th Cir. 2005) (Tashima, J., concurring).  *See also Matter of Carlos Alberto Flores-Lopez*, 2008 WL 762690 (BIA Mar 05, 2008) (finding for DHS in *Joseph* challenge despite unpublished decision from governing Circuit Court finding conviction was not a removable offense); Julie Dona, *Making Sense of "Substantially Unlikely": An Empirical Analysis of the Joseph Standard in Mandatory Detention Custody Hearings* 5 (June 1, 2011) (forthcoming in Georgetown Immigration Law Journal), *available at* http://ssrn.com/abstract=1856758 (reviewing *Joseph* decisions reported on Westlaw between November 2006 through October 2010 and finding that the BIA construes the 'substantially unlikely' standard "to require that nearly all legal and evidentiary uncertainties be resolved in favor of the DHS").

In essence, the Board has interpreted the *Joseph* standard to permit the detainee to escape mandatory detention only if the government's argument concerning the triggering conviction is frivolous. That a detainee presents no danger or flight risk, or, relatedly, that the detainee will likely win relief from removal, provides no reason to refrain from imposing mandatory detention. *See* Ex. 49, excerpts of deposition transcript of Chief Immigration Judge Ivan Fong, 88:23-89:21, Feb. 28, 2012 (explaining his "understanding" that a detainee's eligibility for relief "would not be a basis" for finding him or her subject to mandatory detention). These factors remain irrelevant regardless of the length of detention. Ex. 49 at 46:6-9. Indeed, even if a detainee wins before the Immigration Judge and remains detained only because the government has appealed, the mandatory detention regime continues to apply.  *See Joseph*, 22 I. & N. Dec. at 801.

**B.   Detention Without Bond Hearings under Section 1225(b)**

The other subclass of detainees who still receive no bond hearings under the

government's interpretation of the immigration detention statutes are those who are apprehended at a port of entry – typically a border crossing or international airport – and detained under Section 1225(b) as "arriving aliens" who are "seeking admission." *See* 8 C.F.R. § 1.2 (defining term "arriving alien"). As the government interprets Section 1225(b) and 8 C.F.R. § 1003.19(h)(2)(i)(B), non-citizens arrested at a port of entry may be released only by ICE officials, without any possibility for review by an Immigration Judge. *See* Ex. 45 at 18:12-16; 118:23-119:9.

Importantly, this rule applies even to arriving non-citizens who have previously resided in the United States. Thus, even long-time lawful permanent residents returning from brief trips abroad are ineligible for bond hearings if, for example, they have been convicted of crimes involving moral turpitude (a very broad category of offenses) at any point in their past. *See* 8 U.S.C. § 1101(a)(13)(C); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1077 (9th Cir. 2006) (recognizing that lawfully-admitted non-citizens are detained under Section 1225(b)); *Camins v. Gonzales*, 500 F.3d 872, 875 (9th Cir. 2007) (petition for review filed by returning lawful permanent resident who was treated as an "alien seeking admission").

The Section 1225(b) subclass also includes a large number of asylum seekers who have fled their home countries because of persecution, have no criminal history of any kind in the United States, and will ultimately win the right to reside here under the asylum laws. Under the government's view, they too have no right to a bond hearing before an Immigration Judge. Instead, the government leaves the decision to detain members of the Section 1225(b) subclass, even for prolonged periods, entirely in the hands of their jailers. The government reads the immigration statutes to permit the release of such individuals only if they qualify for "parole" under 8 U.S.C. § 1182(d)(5)(A), which permits discretionary release where doing so satisfies an "urgent humanitarian reason" or creates a "significant

1   public benefit."  DHS officers decide whom to parole based only on a review of

2   the detainee's file and, occasionally, an informal discretionary interview; they

3   provide no hearing before an Immigration Judge to determine whether detention is

4   warranted.  Nor is there an appeal of any kind from parole denials.  *See* Ex.45 at

5   97:15 – 98:15; 18:12-16.  Indeed, according to the government, the officer who

6   decides to detain someone pursuant to this 'process' need only check a box on a

7   form; the decision to detain such individuals for months or years can be made with

8   no further explanation.  *See* Ex.45 at 106:18-107:23.

9   **III.   ARGUMENT**

10          To obtain a preliminary injunction, Petitioners must demonstrate that (1)

11  they are likely to succeed on the merits, (2) they are likely to suffer irreparable

12  harm in the absence of preliminary relief, (3) the balance of equities tips in their

13  favor, and (4) an injunction is in the public interest. *Winter v. NRDC, Inc.*, 129 S.

14  Ct. 365, 374 (2008).  Where the balance of hardships tips sharply in Plaintiffs'

15  favor, the Court should issue the injunction as long as Plaintiffs raise "serious

16  questions" on the merits.  *Alliance for the Wild Rockies v. Cottrell*, 622 F.3d 1045,

17  1052 (9th Cir. 2010) ("A preliminary injunction is appropriate when a plaintiff

18  demonstrates . . . that serious questions going to the merits were raised and the

19  balance of hardships tips sharply in the plaintiff's favor" and meets the other

20  *Winter* factors).  Here, Petitioners easily satisfy these standards.

21       **A.    Petitioners are Substantially Likely to Prevail on Their Claim that
22            the Immigration Detention Statutes Must be Construed to
             Require Rigorous Bond Hearings for the PI Subclasses Members**

23            **1.    All Applicable Immigration Detention Statutes Must Be
24                  Construed to Require Rigorous Bond Hearings for
                   Detention Beyond Six Months**

25                 **i.    Prolonged Detention Without Rigorous Bond
26                       Hearings is Unconstitutional**

27  The Ninth Circuit has repeatedly and unequivocally held that prolonged

28  immigration detention without a bond hearing raises serious constitutional

1    concerns.  *See Casas-Castrillon v. DHS*, 535 F.3d 942, 951 (9th Cir. 2008)

2    (holding  that "prolonged detention of an alien without an individualized

3    determination of his dangerousness or flight risk would be 'constitutionally

4    doubtful,'" and therefore construing detention statute "as *requiring* the Attorney

5    General to provide the alien with such a hearing") (citing *Tijani v. Willis*, 430 F.3d

6    1241, 1242 (9th Cir. 2005)) (emphasis in original)); *V. Singh v. Holder*, 638 F.3d

7    1196, 1203 (9th Cir. 2011) (holding that government must bear burden of proof by

8    clear and convincing evidence at *Casas* hearing); *Diouf v. Napolitano*, 634 F.3d

9    1081, 1086 (9th Cir. 2011) (holding that "prolonged detention under § 1231(a)(6),

10   without adequate procedural protections, would raise 'serious constitutional

11   concerns,'" and therefore construing statute as "requiring an individualized bond

12   hearing, before an immigration judge, for aliens facing prolonged detention under

13   that provision.").

14        The holdings of *Tijani*, *Casas*, *V. Singh*, and *Diouf* rest on bedrock

15   constitutional principles that are applicable to any detention scheme in which the

16   government detains people for lengthy periods.  Because "freedom from

17   imprisonment . . . lies at the heart of the liberty that [the Due Process] Clause

18   protects," *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), "even where detention is

19   permissible . . . due process requires 'adequate procedural protections' to ensure

20   that the government's asserted justification for physical confinement 'outweighs

21   the individual's constitutionally protected interest in avoiding physical restraint.'"

22   *Casas*, 535 F.3d at 950 (quoting *Zadvydas*, 533 U.S. at 690).

23        That fundamental principle applies equally to the PI Subclasses members,

24   just as it did to the petitioners in *Tijani*, *Casas*, *V. Singh*, and *Diouf*.  Indeed,

25   nowhere in our legal system does the law permit detention of the lengths at issue

26   here without an in-person hearing where the government bears the burden of proof.

27   Pre-trial detainees, people who are dangerous due to mental illness, and even child

28   sexual predators all receive far greater procedural protections in regard to their

1   detention than do Sections 1226(c) and 1225(b) subclass members under the

2   government's system.  *See United States v. Salerno*, 481 U.S. 739, 750-52 (1987)

3   (upholding a federal bail statute permitting pretrial detention in part because the

4   statute required strict procedural protections for detention, including prompt

5   hearings before a judicial officer where the government bore the burden of proving

6   dangerousness by clear and convincing evidence); *Foucha v. Louisiana*, 504 U.S.

7   71, 81-83 (1992) (striking down a civil insanity detention statute because it placed

8   the burden on the detainee to prove eligibility for release); *Kansas v. Hendricks*,

9   521 U.S. 346 353, 368 (1997) (upholding involuntary civil commitment for certain

10  sex offenders, but  requiring "strict procedural safeguards" including a right to a

11  jury trial and proof beyond a reasonable doubt).

12          Even in situations where far lesser interests are at stake, the Supreme Court

13  has held that due process requires in-person hearings.  The government may not

14  terminate welfare benefits or public utilities, or even recover excess Social

15  Security benefits, without providing an in-person hearing.  *See, e.g.*, *Goldberg v.*

16  *Kelly*, 397 U.S. 254, 268 (1970) (government's failure to provide an in-person

17  hearing prior to termination of welfare benefits was "fatal to the constitutional

18  adequacy of the procedures"); *Memphis Light, Gas and Water Division v. Craft*,

19  436 U.S. 1, 16 (1978) (due process requires, at minimum, an opportunity for utility

20  clients to argue their cases prior to termination of service); *Califano v. Yamasaki*,

21  442 U.S. 682, 696 (1979) (in-person hearing required for recovery of excess Social

22  Security payments where beneficiary was at fault because "written review hardly

23  seems sufficient to discharge the Secretary's statutory duty to . . . assess the

24  absence of 'fault'").  It follows from these cases that the Due Process Clause

25  requires the government to provide a rigorous in-person hearing to justify the

26  prolonged incarceration of people who may present no danger or flight risk,

27  especially when some of them will ultimately win their immigration cases and be

28

1    allowed to remain in the United States.[7]

2         Given the serious due process concerns presented by prolonged detention

3    without individualized hearings, this Court must construe the immigration

4    detention statutes so as to avoid those serious constitutional problems, so long as

5    such a construction is fairly possible.  As the Supreme Court explained in *Clark*,

6    the canon of constitutional avoidance "is not a method of adjudicating

7    constitutional questions" but rather one of statutory interpretation – "a tool for

8    choosing between competing plausible interpretations of a statutory text, resting on

9    the reasonable presumption that Congress did not intend the alternative which

10   raises serious constitutional doubts."  *Clark v. Martinez*, 543 U.S. 371, 381 (2005).

11   Under the canon, a court must reject any interpretation of a statute that raises

12   serious constitutional problems so long as an alternative construction is "fairly

13   possible."  *Nadarajah*, 443 F.3d at 1076.  Because it follows from *Tijani*,

14   *Nadarajah*, *Casas*, *V. Singh*, and *Diouf* that the prolonged detention without

15   hearings of the PI Subclasses members raises serious constitutional problems,

16   those statutes can and should be construed to require rigorous bond hearings for

17   people subject to prolonged detention , i.e., hearings where the government bears

18   the burden of justifying their continued imprisonment.

19              **ii.      Detention Becomes Prolonged at Six Months**

20         While it has been well-established for years in the Ninth Circuit that

21

22   _____
     [7] The justification for an in-person hearing in the prolonged detention context is

23   particularly strong given that the hearing may well call for determinations
     concerning a non-citizen's credibility, as it relates to his or her willingness to

24   appear for removal should the government ultimately prevail in the immigration
     case.  *See, e.g.*, *Califano*, 442 U.S. at 697 (paper review failed to satisfy due

25   process because determination at issue "usually requires an assessment of the
     recipient's credibility").  *Cf.* 18 U.S.C. § 3142(g)(3)(A) (treating "character" of

26   defendant as relevant criteria in assessing bail eligibility); *Manimbao v. Ashcroft*,
     329 F.3d 655, 661 (9th Cir. 2003) (holding, in the asylum context, that

27   immigration judges are in a "superior position" to assess credibility).

28

"prolonged" immigration detention without a bond hearing raises serious constitutional concerns, the Ninth Circuit has now definitively resolved any dispute as to *when* detention becomes prolonged.  In *Diouf*, the court held that an immigration custody determination system that does not provide for rigorous bond hearings *at six months* "raise[es] serious constitutional concerns."  634 F.3d at 1091.  *Diouf* therefore construed Section 1231(a)(6) – the detention statute that governs for a different subclass of the detainees in this case – to require rigorous bond hearings at six months.  *Id*. at 1091-92.

While *Diouf* did not involve a detainee held under Section 1226(c), the Court relied heavily on the time periods described in *Demore* and *Casas*, both of which did involve Section 1226(c).  *Id*. at 1091 (noting that *Demore* "upheld a six month detention with the specific understanding that § 1226(c) authorized mandatory detention only for the 'limited period of [the detainee's] removal proceedings,' which the Court estimated 'lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal' his removal order to the BIA") (citing *Casas*); *see also Nadarajah*, 443 F.3d at 1079-80  (holding that all the "general detention statutes" only authorize detention pending completion of removal proceedings for a "brief and reasonable" period, and concluding that such a period is presumptively six months, based on *Zadvydas*, *Clark*, and *Demore*, as well as Congress' express authorization of detention beyond six months in the national security detention statutes).

Thus, clear Ninth Circuit authority establishes that detention becomes "prolonged" at six months, such that the more rigorous procedural protections afforded by a bond hearing where the government bears the burden of proof must

1  be provided to continue detention beyond that point.[8]

2  **B.    The Court Should Construe Section 1226(c) to Avoid the
         Constitutional Problem Raised by Prolonged Mandatory
3        Detention**

4         Section 1226(c) should be construed to avoid the same constitutional

5  problems recognized in *Casas*, *Tijani*, *V. Singh*, and *Diouf*.  While not every

6  detainee held under Section 1226(c) has precisely the same immigration status, the

7  government's misapplication of the statute plainly results in the detention of

8  lawfully-admitted individuals, including long-time lawful permanent residents like

9  Named Plaintiffs Rodriguez and Farias Cornejo.  *See, e.g.*, Dkt. 101 Ex. 22

10  [Rodriguez Decl. ¶ 3]; Dkt. 101 Ex. 24 [Farias Cornejo Decl. ¶ 4].  Therefore, it

11  undoubtedly raises the same serious constitutional problems that the Ninth Circuit

12  has repeatedly recognized in similar contexts.

13         As in those cases, this Court must adopt any "fairly possible" construction

14  of Section 1226(c) that reads it to govern only in cases involving brief  (i.e., non-

15  prolonged) detention. The Court can accomplish this by simply applying the

16  construction already adopted in *Casas*, which held that Section 1226(c) only

17  applies in cases of "expeditious" proceedings, *Casas*, 535 F.3d at 951, and that in

18  cases of prolonged detention the government's authority "shifts" to Section

19  1226(a), which in turn must be construed to "require" a bond hearing in such cases.

20  *Casas*, 535 F. 3d at 951.  Importantly, the court adopted that construction not only

21  for people whose removal cases were pending before the Ninth Circuit on petition

22  for review, but also for those whose cases had been remanded, and were once

23  again before the immigration courts.  *Id.* at 948.  Such a construction follows

24  logically from the fact that Section 1226(c), unlike the immigration detention

25

26  ―――――――――――――――――
   [8] Indeed, the court in *Diouf* urged the government to "afford an alien a hearing
27  before an immigration judge *before* the [six-month mark] if it is practical to do so
   and it has already become clear that the alien is facing [future] prolonged
28  detention."  *Diouf*, 634 F.3d at 1092 n.13 (emphasis added).

statutes involving national security, is silent with respect to the procedures required when detention is *prolonged*.  Compare 8 U.S.C. § 1226a *and* 8 U.S.C. §§ 1531-1537 (legislation specifically authorizing detention for longer than six months without a hearing in a narrow set of cases implicating national security).  The Supreme Court has previously found that silence is not a basis for assuming that Congress intended to authorize unlimited detention.  *Zadvydas*, 533 U.S. at 698-99; *cf. Nadarajah*, 433 F.3d at 1076 ("Congress cannot authorize indefinite detention in the absence of a clear statement").  That same rationale requires a limiting construction of Section 1226(c) here.

Indeed, the Section 1226(c) subclass members have a stronger claim for a bond hearing than did the petitioners in *Tijani*, *Casas*, and *V. Singh*, because, unlike the petitioners in those cases, they have not lost their immigration cases at the administrative level, but rather are still challenging their removal before the immigration courts.  Thus, none of them have a final order of removal, and in fact many of them never will – they will defeat the charges against them or win relief from removal and retain their immigration status.  There is no reason to deny them even the opportunity to show that they should be released when the law already affords that opportunity to people in a weaker position, who have already lost before the immigration courts.

Another district judge in this Court recently adopted these arguments in a set of preliminary injunctions involving individuals with serious mental disabilities subject to prolonged detention under Section 1226(c).  Although the Plaintiffs in that case (represented by counsel undersigned) face unique circumstances due to their mental disabilities, the Court's reasoning with respect to their right to a bond hearing was not premised on that fact, but instead involved a straightforward application of the same generally-applicable Ninth Circuit cases on which Petitioners here rely.  *See Franco-Gonzales v. Holder*, 767 F.Supp.2d 1034, 1060 (C.D. Cal. 2010); *Franco-Gonzales v. Holder*, 828 F.Supp.2d 1133  (C.D. Cal.

2011); *Franco-Gonzales v. Holder*, 2011 WL 5966657, *5 (C.D.Cal. Aug 2, 2011).

Finally, because most 1226(c) subclass members are pursuing substantial challenges to removal, even if this Court declined to construe Section 1226(c) to require a bond hearing at six months, it should still grant relief from prolonged mandatory detention to these subclass members by construing 1226(c) as requiring mandatory detention only where the government shows that a detainee lacks a substantial challenge to removal.  *See* Dkt. 111 at 32 (Prayer For Relief) (requesting any other appropriate relief); *Cf. Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1142 (C.D. Cal. 2001) ("It need not appear that [a] plaintiff can obtain the specific relief demanded as long as the court can ascertain from the face of the complaint that some relief can be granted.") (internal citation and quotation marks omitted).

Section 1226(c) requires the mandatory detention of noncitizens who are "deportable" or "inadmissible" under the designated criminal grounds.  8 U.S.C. § 1226(c).  In *Demore*, the Supreme Court upheld the constitutionality of mandatory detention where the detainee had *conceded* both that he was deportable and that he was properly subject to mandatory detention under the statute.  *Demore*, 538 U.S. at 513-14.[9]  As a result, the Court had no occasion to address the permissibility of applying mandatory detention to a noncitizen with a *substantial challenge* to removal—that is, a substantial challenge to the removability charge, or a substantial claim to relief that would allow them to retain or obtain lawful permanent resident status.  *See Demore*, 538 U.S. at 514 n.3 (declining to address the BIA's standard for applying mandatory detention in *Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999)); *see also Gonzalez v. O'Connell*, 355 F.3d 1010, 1020-21

---

[9] The only relief for which he was applying was withholding of removal, which merely protects someone from removal to a country where they would face persecution, without providing any of the rights that accompany lawful permanent residence.  A person who is granted withholding of removal remains under a final removal order; the order's execution has merely been withheld.

(7th Cir. 2004) (noting that this "important issue" was left open in *Demore*).  In light of such detainees' heightened liberty interests, their prolonged mandatory detention raises particularly serious constitutional problems.  *Demore*, 538 U.S. at 577 (Breyer, J., dissenting); *see also Krolak v. Ashcroft*, No. 04-C-6071 (N.D. Ill. Dec. 1, 2004) (holding mandatory detention unconstitutional where individual had "colorable" challenge to removal).

Thus, should this Court decline to adopt the six month rule Petitioners advocate, it should still construe Section 1226(c) to apply only where the government shows that a detainee lacks a colorable challenge to his removability, both because of the constitutional problems with prolonged mandatory detention and because of the absence of any evidence that Congress intended to impose it in cases where detainees had substantial challenges to removal. *See also Demore,* 538 U.S. at 578 (Breyer, J., dissenting) (advocating "substantial question" standard, which was never rejected by majority, in part because "the relevant statutes literally say nothing about an individual who, armed with a strong argument against deportability, might, or might not, fall within their terms"); *accord Tijani v. Willis*, 430 F.3d 1241, 1246 (9th Cir. 2005) (Tashima, J., concurring) (same, in light of "egregiously" unconstitutional *Joseph* standard).

### C.    The Court Should Construe Section 1225(b) to Authorize Rigorous Bond Hearings at Six Months

For largely the same reasons applicable to the Section 1226(c) subclass, the detention of Section 1225(b) subclass members without affording them rigorous bond hearings also presents serious constitutional problems.  As described above, *see supra* Section I.B., Section 1225(b) class members also receive no hearing before an Immigration Judge with respect to their detention, regardless of its length.  Instead, the government interprets Section 1225(b) to authorize release only pursuant to the parole determination procedures set forth in Section 1182(d)(5)(A) – procedures that do not permit an Immigration Judge to conduct a

1   hearing to determine whether the class members' detention is warranted.  Notably,

2   parole determinations are made by the same ICE officials who are in charge of

3   ensuring the detainees' removal.  Unsurprisingly, that legal regime presents serious

4   constitutional problems, for several reasons.

5   First, the government's detention scheme for Section 1225(b) class members

6   is plainly unlawful under two closely related Ninth Circuit cases.  First, in

7   *Nadarajah*, the Ninth Circuit held that Section 1225(b) must be construed in light

8   of the fact that it applies not only to asylum seekers and other first-time entrants,

9   but also to returning lawful permanent residents and other lawfully-admitted non-

10   citizens, whose prolonged detention indisputably raises serious due process

11   problems.  443 F.3d at 1077.  Such individuals are subject to prolonged detention

12   under Section 1225(b) because they can be treated as "arriving aliens."  *Id.*; *see*

13   *also Camins v. Gonzales*, 500 F.3d 872, 875 (9th Cir. 2007) (petition for review

14   filed by returning lawful permanent resident who was treated as arriving alien).

15   Thus, the statute must be construed to avoid those problems – regardless of

16   whether it would raise the same constitutional problems with respect to "arriving

17   aliens" who are first time entrants. [10]  In reaching this conclusion *Nadarajah* relied

18   heavily on the Supreme Court's decision in *Clark v. Martinez*, which had already

19

20   [10] Petitioners do not concede that government can subject any noncitizen to
     prolonged detention without triggering serious due process concerns, including

21   "arriving aliens" who are first time entrants.  *See* Dkt 149 at 28 (citing, *inter alia*,

22   *Kwai Fun Wong v. United States*, 373 F.3d 952, 971 (9th Cir. 2004) (holding that
     "excludable" aliens retain Fifth Amendment rights)); Dkt. 155 at 2 (order denying

23   Respondents' Rule 12(c) motion) (holding that "the Entry Fiction Doctrine does
     not preclude Plaintiff from bringing procedural due process claims under 8 U.S.C.

24   § 1225(b), regardless of the sub-class's immigration status").  However, the Court
     need not reach the question given *Nadarajah*'s recognition that the government

25   
26   also detains lawful permanent residents under Section 1225.  The Supreme Court
     held over thirty years ago that returning lawful permanent residents were entitled

27   to due process, and the statute must therefore be construed with such individuals in
     mind.  *Landon v. Plasencia*, 459 U.S. 21, 32-33 (1982).

28

16

1    construed Section 1225 (albeit in a slightly different context) to avoid

2    constitutional problems arising from its applicability to lawfully-admitted non-

3    citizens.  *See Clark*, 543 U.S. at 378 ("The operative language of [§ 1225] applies

4    without differentiation to all . . . categories of aliens that are its subject.").

5            Second, as explained in detail above, the Ninth Circuit has already held that

6    the immigration detention statutes must be construed to provide rigorous bond

7    hearings for lawfully-admitted non-citizens subject to prolonged detention.  *See,*

8    *e.g.*, *Casas*, 535 F.3d at 950; *Diouf*, 634 F.3d at 1088-89.  It follows that this Court

9    must construe Section 1225(b) to authorize the same protections found necessary

10   in *Casas* and *Diouf*, so long as the statute can reasonably construed in such a

11   manner.

12           While the "parole determination" procedures implemented by the

13   government under Section 1225(b) are better than the procedures under Section

14   1226(c) – which prohibit release entirely – they fall far short of constitutional

15   requirements and therefore cannot save the government's interpretation of the

16   statute.  The mere possibility of discretionary release by ICE officials is plainly

17   insufficient to eliminate the serious constitutional problems presented by prolonged

18   detention under existing Ninth Circuit law.  The petitioners in both *Casas* and

19   *Diouf* had some possibility for release during at least a portion of their detention

20   under the post-order custody review process (which constituted the only release

21   procedures available to Section 1231 subclass members prior to *Diouf*).  Just like

22   the parole process, the post-order custody review is simply a form filled out by a

23   DHS bureaucrat.  The Ninth Circuit found that procedure insufficient in the face of

24   prolonged detention.  *See Casas*, 535 F.3d at 951-52 (holding post-order custody

25   review procedure insufficient because it provided for no in-person hearing before a

26   neutral decisionmaker, allowed no administrative appeal, and placed the burden of

27   proof on the detainee); *Diouf*, 634 F.3d at 1091 (same).

28           All of the same deficiencies exist with respect to the parole process.  In

1    contrast to the procedure required by the Due Process Clause – an in-person

2    hearing before an Immigration Judge where the government bears the burden of

3    proof, by clear and convincing evidence, to show that the detainee presents a

4    danger or flight risk, *see V. Singh*, 638 F.3d at 1203, the parole process provides

5    only an unappealable paper review by an ICE official (with an occasional

6    interview if a DHS officer feels so inclined),where the detainee bears the burden to

7    show that his release is in the public's interest or necessitated by urgent

8    humanitarian reasons.  *See* 8 U.S.C. § 1182(d)(5)(A); *see also* 8 CFR § 212.5.

9         Testimony from the government's 30(b)(6) witness confirms that the

10   structural defects in the parole process have practical consequences.  As Assistant

11   Field Office Director Lee candidly admitted, "the custody decision" has always

12   "really just been about how much bed space [ICE has]."  *See* Ex. 45at 40:17-19.

13   Unsurprisingly, the Ninth Circuit has already recognized that a review system that

14   leaves an individual's liberty to the unreviewable decisions of such officers fails to

15   adequately protect against the risk of unnecessary and unwarranted prolonged

16   detention, and therefore cannot satisfy minimal due process standards.  *See Casas*,

17   535 F.3d at 951-52; *Diouf*, 634 F.3d at 1091.

18        Given the serious constitutional problems described above, this Court should

19   construe Section 1225(b) to authorize rigorous bond hearings before Immigration

20   Judges, because such a construction is "fairly possible."  *Nadarajah*, 443 F.3d at

21   1076.  It can do so in one of two ways.  First, it could construe Section 1225(b)

22   itself to require rigorous bond hearings.  The Ninth Circuit adopted that approach

23   in *Diouf* with respect to Section 1231(a)(6).  634 F.3d at 1092.  Alternatively, it

24   could construe Section 1225(b) to not apply to cases involving prolonged

25   detention, such that detention "shifts" to Section 1226(a) in such cases.  The Ninth

26   Circuit used that approach in *Casas* with respect to Section 1226(c).  535 F.3d at

27   951.  Both constructions are "fairly possible," allowing the Court to easily construe

28   Section 1225(b) to authorize the rigorous bond hearings that due process demands.

1    With respect to the first approach, the BIA has already interpreted Section

2    1225(b) to allow bond hearings for noncitizens who were arrested and placed in

3    removal proceedings after their entry. *Matter of X-K*, 23 I&N Dec. 731, 731-32,

4    734-35 (BIA 2005).  Although the BIA also noted that the implementing

5    regulations for Section 1225(b) prohibited IJ bond hearings for "arriving aliens",

6    *see id.* at 735 (citing 8 C.F.R. §§ 1003.19(h)(2)(i)(B), 1235.3(c)), it made clear that

7    *the statute* in no way forecloses bond hearings before an Immigration Judge.  *X-K*,

8    23 I&N Dec. at 734.

9    To the extent that the regulations preclude such review, this Court should

10   hold them inapplicable to cases involving prolonged detention, just as *Casas*

11   construed Section 1226(a) to authorize bond hearings due to the serious

12   constitutional problems posed by prolonged detention, notwithstanding a

13   regulation prohibiting bond hearings for people with administratively final removal

14   orders.  *See* 8 C.F.R. § 1003.19.  Similarly, here the Court should construe Section

15   1225(b) to authorize bond hearings to avoid significant constitutional problems.

16   To the extent that the regulations do bar Immigration Judge review, they are *ultra*

17   *vires* and therefore not dispositive.  *See Kwong Hai Chew v. Colding*, 344 U.S.

18   590, 599 (1953) (construing regulation to avoid constitutional problems).

19   Alternatively, if the Court concludes that Section 1225(b) cannot be

20   construed to authorize bond hearings, the Court should find that it simply does not

21   apply to cases involving prolonged detention – as the Ninth Circuit found with

22   respect to Section 1226(c) in *Casas* and *Tijani* – and therefore that authority for

23   prolonged detention "shifts" to Section 1226(a), under which the detainees are

24   indisputably eligible for bond hearings.  *See* 8 U.S.C. § 1226(a) (authorizing

25   detention "pending a decision" on removal).  Given that Section 1225(b), like

26   Section 1226(c), makes no explicit reference to prolonged detention, its text can

27   easily be read simply not to apply in such cases.  Accordingly, the Court should

28   construe Section 1225(b) so as to require bond hearings for subclass members.

Two recent district court decisions from the Southern District of California have adopted the arguments presented here.  *See Centeno-Ortiz v. Culley*, 2012 WL 170123, *9 (S.D.Cal. Jan. 19, 2012) (requiring that "the Government shall provide Petitioner [an "arriving alien"] with an individualized bond hearing before an immigration judge, where the Government will have the burden of establishing that Petitioner should not be released because he is either a flight risk or will be a danger to the community.") ; *Crespo v. Baker*, 2012 WL 1132961, * 9 (S.D.Cal. Apr. 3, 2012) (same).[11]

## IV.   PETITIONERS WILL CONTINUE TO SUFFER IRREPARABLE HARM AS A RESULT OF THEIR PROLONGED DETENTION, AND THE BALANCE OF HARDSHIPS TIPS SHARPLY IN THEIR FAVOR

Petitioners suffer irreparable harm as their unlawful detention continues, and the balance of hardships tips sharply in their favor.

The Ninth Circuit has made clear that "[a]n alleged constitutional infringement will often alone constitute irreparable harm."  *Goldie's Bookstore, Inc. v. Superior Court of the State of Calif.*, 739 F.2d 466, 472 (9th Cir. 1984); *Associated General Contractors of Calif., Inc. v. Coalition for Economic Equity*,

---

[11] International law further requires that this Court construe the statute to require bond hearings for subclass members.  Arbitrary detention is expressly prohibited under international law.  *See* Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810, Article 9 (3d sess. 1948); International Covenant on Civil and Political Rights ("ICCPR") art. 9(1), 999 U.N.T.S. 171.  Article 9(4) of the ICCPR specifically provides that all detainees are entitled "to take proceedings before a court" on the lawfulness of detention, and international law extends similar protections to refugees and asylum seekers in particular.  *See, e.g.*, UNHCR's Revised Guidelines on Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers, Guideline 5 (February 1999).  The Supreme Court has long held that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."  *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804); *accord Ma v. Ashcroft*, 257 F.3d 1095, 1114 n.30, 1115 (9th Cir. 2001).  Thus, this Court should construe the statute to require bond hearings for PI Subclass members.

950 F.2d 1401, 1412 (9th Cir. 1991) (recognizing presumption of irreparable harm when constitutional infringement alleged); *see, e.g.*, *Sammartano v. First Judicial District Court*, 303 F.3d 959, 973 (9th Cir. 2002) (explaining that the existence of a colorable First Amendment claim is sufficient to establish irreparable harm under Ninth Circuit precedent); *S.O.C. Inc. v. County of Clark*, 152 F.3d 1136,1148 (9th Cir. 1998) (same); *see also* Federal Practice & Procedure, § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Further, as the Eleventh Circuit has held, the "unnecessary deprivation of liberty clearly constitutes irreparable harm." *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1998).

The harm suffered by unlawful detention without adequate process is particularly severe for the class members seeking relief in this preliminary injunction.  Although a comprehensive presentation of data and other information from the voluminous discovery concerning these individuals must await the conclusion of discovery, it is already readily evident that a number of individuals detained in these two subclasses have colorable defenses against removal, including in some cases clear eligibility for relief from removal.  Both Mr. Rodriguez and Mr. Farias, for example, ultimately won their cases (after three years and 15 months, respectively) of detention without a hearing.  Indeed, it is delay created by the need to litigate their claims for relief that often results in their lengthy detention; such that those with stronger immigration cases end up subject to more prolonged detention.  *See* Ex. 49, 130:17-131:11 (stating, in context of data showing greater detention lengths for those who win relief from removal, that it is "not surprising" and that he "would expect nothing less" than for a case where a noncitizen is granted relief to take longer than a case where a detainee is ordered removed); *Id.*; Ex. 49 (Exhibits 5, 6, 7 to deposition of Judge Fong, containing data on detention length).  Such unnecessary detention obviously constitutes irreparable

1    harm.  *Cf. Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1369 (9th

2    Cir. 1984) ("The hardship from being unable to work to support themselves and

3    their dependents, to obtain release bonds, and to pay for legal representation is

4    beyond question.").

5         In contrast to the harm suffered by Petitioner, the government will not suffer

6    irreparable harm should the injunction be entered.  As an initial matter, because the

7    government's detention of these class members is almost certainly illegal under

8    controlling statutory and constitutional authority, it "cannot reasonably assert that

9    it is harmed in any legally cognizable sense by being enjoined from [statutory and]

10   constitutional violations."  *Id.* (holding that district court did not err in enjoining

11   INS practices that probably violated plaintiffs' constitutional rights).

12        Nor can the government argue that relief would result in the release of

13   individuals who present a serious danger or flight risk, because *its own*

14   *Immigration Judges* will have authority to make the final determination as to

15   whether any given individual may be released on bond.  *See* Ex.50 (DHS

16   Statement of New Legal Authority and Supplemental Brief at 7, *In the Matter of*

17   *Garcia-Arreola* (BIA Feb. 10, 2010) ("Adopting this [narrower interpretation of

18   section 1236(c)] would not undercut needed protections against dangerous

19   individuals.  A criminal alien not covered by mandatory detention can nevertheless

20   be detained if the facts and circumstances show that he or she is a flight risk or

21   danger to the community.") .  For those individuals ordered released, the

22   government can utilize sophisticated alternatives to detention, including an

23   "Intensive Supervision Appearance Program" (ISAP II), that ensures extremely

24   high appearance rates.  *See* Ex. 48 at 111:4-112:24 (DHS is "at, if not close to, [a]

25   100 percent compliance rate" for noncitizens enrolled in the ISAP II program in

26   San Bernadino, and at around a 90 percent compliance rate for those in the Los

27   Angeles area).  The government can thus ensure that those class members who

28   obtain release on bond will appear in the event of removal, without subjecting

1  them to prolonged detention.

2        Moreover, to the extent the government claims that providing bond hearings

3  to Section 1226(c) and 1225(b) subclass members would be costly or an

4  administrative burden, the government in fact stands to realize substantial financial

5  savings from the release of individuals in this case.  The average cost of detention

6  per day, not including payroll costs, is $122. *See* Dep't of Homeland Security, U.S.

7  Immigration and Customs Enforcement Salaries and Expenses, Fiscal Year 2012

8  Congressional Budget Justification, p. 57, *available at*

9  http://www.dhs.gov/xlibrary/assets/dhs-congressional-budget-justification-

10  fy2012.pdf. In contrast, the cost of supervision is no greater than $14.  *See* Dora

11  Schriro, U.S. Dep't of Homeland Sec., Immigration Detention Overview and

12  Recommendations 10, 15 (2009); *see also* Anil Kalhan, Columbia Law Review,

13  ―Rethinking Immigration Detention (July, 21, 2010), p. 55, *available at*

14  http://www.columbialawreview.org/assets/sidebar/volume/110/42_Anil_Kalhan.

15  pdf.

16        Of course, even if the financial calculus were different, any harm to the

17  government would pale in comparison to the irreparable harm that Petitioners

18  continue to suffer. *Cf. Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1055

19  (9th Cir. 2010) (holding that the balance of hardships tipped sharply against

20  government because its additional costs of "up to $70,000" were "so small that

21  they cannot provide a significant counterweight to the harm caused" by logging in

22  a forest); *Golden Gate Rest. Ass'n v. City and County of San Francisco*, 512 F.3d

23  1112, 1126 (9th Cir. 2008) ("Faced with . . . a conflict between financial concerns

24  and preventable human suffering, we have little difficulty concluding that the

25  balance of hardships tips decidedly in favor of the latter.") (internal quotation

26  marks omitted).  In any event, the government has stipulated that the cost of bond

27  hearings cannot justify their denial, as a matter of due process.  *See* Dkt. 165 at 4-

28  5.

## V.    AN INJUNCTION IS IN THE PUBLIC INTEREST

Finally, the injunction sought here is in the public interest.  The public has an interest in upholding constitutional rights.  *See Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."); *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) ("[I]t is always in the public interest to protect constitutional rights.").

In addition, the public has an interest in accurate determinations in all legal proceedings, including in the decision of whether to detain individuals during their immigration cases, and in ensuring that the government only expends its resources to detain individuals where it is necessary to prevent danger or flight risk.

## VI.    CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant this preliminary injunction and order Respondents to provide bond hearings consistent with the requirements of *Casas* and subsequent Ninth Circuit authority interpreting that decision to all members of the Section 1226(c) and Section 1225(b) subclasses.  Specifically, Petitioners request that the Court order the government to provide such individuals with bond hearings before Immigration Judges with authority to grant them release on bond unless the government shows by clear and convincing evidence that those individuals present a danger or flight risk sufficient to warrant their continued detention.

Respectfully submitted,

ACLU OF SOUTHERN CALIFORNIA

Dated:  June 25, 2012

/s Ahilan T. Arulanantham
AHILAN T. ARULANANTHAM
Counsel for Petitioners

24