# Exhibit 45

Confidential

```
 1    because I'm not a hundred percent sure what you're     9:49:53AM

 2    talking about.  But we'll figure it out.

 3            You're employed now by DHS; is that correct?

 4       A.   I sure am.

 5       Q.   How long have you been employed by DHS?       9:50:03AM

 6       A.   I was employed with INS when DHS became

 7    established in 2003.

 8       Q.   How long were you employed by INS?

 9       A.   Since 1988.

10       Q.   What is your current title?               9:50:12AM

11       A.   I am Assistant Field Office Director here in

12    L.A.

13       Q.   How long have you been the AFOD?

14       A.   I came here, I think, in April 2007.

15       Q.   What was your position before that?        9:50:36AM

16       A.   Before that I was the unit chief over the

17    Fugitive Operation Support Center in Burlington,

18    Vermont.

19       Q.   How long did you hold that?

20       A.   From two thousand -- probably 2006 until I    9:50:52AM

21    came here to Lancaster, April 2007.

22       Q.   A little over a year?

23       A.   No.  I came here in 2009.  Did I say '7?

24       Q.   Yeah.  So you were about three years working

25    as the Fugitive Operations unit chief in Vermont.      9:51:14AM
```

Page 12

25

Confidential

| | | |
|---|---|---|
| 1 | A.   Well, there's many levels of review, but a | 9:58:32AM |
| 2 | supervisor is the one that actually signs off on the | |
| 3 | recommendation.  But it's reviewed after that. | |
| 4 | Q.   Okay.  I guess in the other situations you've | |
| 5 | described, people below -- for example, on parole -- | 9:58:46AM |
| 6 | people below you are making a recommendation, but | |
| 7 | you're making the final decision? | |
| 8 | MR. ATKINSON:  Object to the form of the | |
| 9 | question. | |
| 10 | THE WITNESS:  I didn't understand. | 9:59:00AM |
| 11 | BY MR. ARULANANTHAM: | |
| 12 | Q.   With parole recommendations, with parole | |
| 13 | decisions, as you have described it -- and tell me if | |
| 14 | I'm wrong -- people below you make the recommendation, | |
| 15 | but you make the final decision? | 9:59:10AM |
| 16 | A.   On paroles, yes. | |
| 17 | Q.   So with respect to the initial detention | |
| 18 | decision, who is analogous to you? | |
| 19 | A.   Say that again. | |
| 20 | Q.   Who is analogous to you?  Who makes the final | 9:59:22AM |
| 21 | decision with respect to initial detention? | |
| 22 | A.   Initial -- | |
| 23 | MR. ATKINSON:  I'm sorry.  Give me a second | |
| 24 | to get my objection in. | |
| 25 | Object to the form. | 9:59:31AM |

Page 18

Confidential

```
 1              You can answer.                              10:28:09AM
 2              THE WITNESS:  On criminality I don't really
 3      know if there's been any tracking crimes that were
 4      committed by people that were released because we
 5      thought they weren't going to be a danger.  Definitely 10:28:20AM
 6      there would be some statistics on people that were
 7      released because we didn't think they were going to be
 8      a flight risk and were a flight risk.
 9      BY MR. ARULANANTHAM:
10         Q.   Have the custody decisions changed over time 10:28:33AM
11      to reflect information about the absconder rate for
12      people who are released and then found to be a flight
13      risk?
14              MR. ATKINSON:  Object to the form of the
15      question on the same basis and on other bases.         10:28:51AM
16              You can answer.
17              THE WITNESS:  I think the custody decision
18      really has always been the same.  It's just -- it's
19      really just been how much bed space you have.  Like I
20      say, you're allocated "x" amount of dollars.  I mean  10:29:05AM
21      definitely our department is an enforcement arm for
22      immigration law, so that is what we do, that's what
23      the taxpayers pay us for.
24              So, you know, we -- definitely if we had the
25      funding, I think the mission would be what we're       10:29:21AM
```

Page 40

Confidential

```
 1    are there spellings or anything that you need right      12:04:15PM

 2    now while we have a moment?

 3            THE REPORTER:  I can't think of anything at

 4    this moment.

 5            MR. ARULANANTHAM:  If you can spell my name,      12:04:25PM

 6    it's all downhill from there.

 7        Q.   Who is eligible for release on parole?

 8        A.   Who is eligible?

 9        Q.   Yeah.

10            MR. ATKINSON:  Object to the form.                12:04:45PM

11            THE WITNESS:  Just generally?

12    BY MR. ARULANANTHAM:

13        Q.   Yeah.

14        A.   An arriving alien would be eligible.

15        Q.   So when someone comes into your custody,        12:04:55PM

16    meaning into the ICE field office custody, how do they

17    know -- how does ICE know this is a person who is

18    parole-eligible as opposed to, you know, one of the

19    other categories?

20            MR. ATKINSON:  Object to the form.                12:05:14PM

21            THE WITNESS:  Well, 99 percent of our cases

22    that come in that would be eligible for parole have

23    come in at a port of entry and have claimed they were,

24    you know, put into expedited removal and then claimed

25    a credible fear and were referred to ICE to see an       12:05:42PM
```

Page 97

Confidential

```
 1   asylum officer.  So it kind of triggers it for us.    12:05:48PM
 2   BY MR. ARULANANTHAM:
 3       Q.   If a person is coming over the land border in
 4   San Diego, then they would have gone through that
 5   process before they got to the L.A. field office;     12:05:56PM
 6   right?
 7       A.   True.
 8       Q.   So how then when they get to the L.A. field
 9   office do you know that they're parole eligible as
10   opposed to detainees who would be subject to 236(a) or 12:06:08PM
11   some other process?
12       A.   Their paperwork comes with them.
13       Q.   So someone reviews -- someone in the L.A.
14   field office reviews that paperwork after they arrive?
15       A.   Yes, they do.                                 12:06:25PM
16       Q.   Tell me about that.  How does that process
17   work?
18       A.   Most of the Los Angeles field office's
19   detainees come through staging at our office downtown.
20   So especially if they're coming from San Diego, they   12:06:41PM
21   would come downtown or if they're coming from LAX they
22   would come downtown.  And the officers there would
23   review the cases before they send them out to the
24   detention facilities.  And then they're reviewed again
25   once they get out to the detention facilities.         12:06:58PM
```

Page 98

Confidential

```
 1            (Recess taken.)                            12:15:45PM

 2            MR. ATKINSON:  Okay.  Sorry.

 3   BY MR. ARULANANTHAM:

 4       Q.   If, for example, the address didn't check

 5   out, that's not something that the officer would write  12:15:54PM

 6   in the parole denial; right?

 7       A.   In the --

 8       Q.   That's not something that the officer would

 9   write down in the parole denial typically?

10            MR. ATKINSON:  Object to the form of the     12:16:07PM

11   question.

12            THE WITNESS:  This decision letter has

13   changed.  It's a little bit more detailed now, so

14   there are more checked boxes.  So there may be a

15   checked box on there that says they haven't provided  12:16:23PM

16   an address in the U.S.

17   BY MR. ARULANANTHAM:

18       Q.   But other than what the checked boxes

19   provide, the officers don't write other explanations

20   for the denial, for parole denials; is that true?     12:16:38PM

21            MR. ATKINSON:  Object to the form of the

22   question.

23            THE WITNESS:  The decision that the detainee

24   gets is just the decision letter.  Like I say, the

25   decision letter has been changed.  Once policies come  12:16:53PM
```

Page 106

Confidential

```
 1    out, things change when you see that they need to be    12:16:57PM

 2    changed.

 3          So now it -- the decision letter is still a

 4    checked box, but it definitely has a little bit

 5    more -- it's broken down in more details so it gives    12:17:06PM

 6    them an opportunity.  But they're interviewing these

 7    people so the decision letter might not go into

 8    detail.  But definitely the detainee knows what the

 9    issues are unless they're of a national security

10    concern.                                                12:17:24PM

11    BY MR. ARULANANTHAM:

12        Q.    So the detainee might orally hear more about

13    why they're being denied parole.  But I'm only asking

14    again because I don't think you actually answered my

15    question kind of precisely, although I understood what  12:17:39PM

16    you said, that any explanation other than the checking

17    of the boxes would not appear in the decision letter;

18    is that correct?

19        A.    There's another decision letter besides this

20    one --                                                  12:17:56PM

21        Q.    Right.

22        A.    -- but the checked boxes that are on there is

23    all we're doing right now.  That's our procedure.

24        Q.    There's no other document that is in the file

25    that explains the decision beyond the decision letter;  12:18:17PM
```

Page 107

Confidential

```
 1              THE WITNESS:  I would assume that if they      12:33:25PM

 2    discovered something that needed to be changed, they

 3    would notify the field to make that change.  That's

 4    probably why they made the one change on the decision

 5    letter.                                                  12:33:36PM

 6    BY MR. ARULANANTHAM:

 7         Q.   If everything else were fine, you would know

 8    that too?

 9              MR. ATKINSON:  Object to the form.

10              THE WITNESS:  I would only know what they      12:33:44PM

11    tell me.

12    BY MR. ARULANANTHAM:

13         Q.   How are officers trained in making parole

14    determinations?

15         A.   I would say it starts at the academy, and     12:34:06PM

16    then as you go through your career you'll get updated

17    training throughout, depending on what office you're

18    in and what unit you're in as the frequency of that

19    training.

20              When this new policy came out, there was       12:34:24PM

21    training with this new policy.  It changed our parole

22    a little bit.

23         Q.   Right.  You said earlier that each parole

24    packet, set of documents, gets sent to headquarters.

25    That's not for the purpose of headquarters deciding to  12:34:43PM
```

                                                    Page 118

32

Confidential

```
 1   change that decision; is that right?                    12:34:47PM

 2        A.   That's correct, it's not.  It's for the

 3   analysis.

 4        Q.   So is it -- or have you ever seen a decision

 5   that was made at the field office level get changed by  12:35:00PM

 6   people at headquarters with respect to parole?

 7        A.   I have not.

 8        Q.   Do you know if that ever happens?

 9        A.   I haven't seen it.

10             MR. ARULANANTHAM:  We can stop for lunch.      12:35:13PM

11             MR. ATKINSON:  That's a good idea.

12             MR. ARULANANTHAM:  I'm not quite done with

13   parole stuff, but why don't we stop.

14             (The luncheon recess was taken at

15             1:02 P.M.)                                      1:02:25PM

16

17

18

19

20

21

22

23

24

25

                                               Page 119
```

Confidential

1      A.    Yes.

2      Q.    And to prepare for this deposition you

3    familiarized yourself with the positions of -- the

4    positions of and the information available to

5    Immigrations and Customs Enforcement and Department of

6    Homeland Security in order to be able to testify about

7    those topics; is that correct?

8      A.    I would say, yes, I did familiarize myself.

9           MR. ATKINSON:  We just want to make one

10   notation on the record:  That we had originally

11   designated Mr. Lee with respect to eight and nine just

12   to speak for the department with respect to

13   notification provided to persons eligible for such

14   hearings, but we understand the scope went beyond that

15   and -- which is fine.

16          MR. ARULANANTHAM:  Then to that end actually,

17   let me just clean this up and ask that one question

18   then.

19     Q.    Once a detainee has been determined to be

20   subject to mandatory detention under 236(c), are they

21   given notice of that?

22     A.    Yes.

23     Q.    How?

24     A.    It's on the custody determination.

25     Q.    On the sheet it says what?

Page 207

34

Confidential

```
 1       A.   It's a checked box that says you've been

 2   determined to be mandatory detention.  I don't think

 3   it specifically says 236(c), but --

 4       Q.   Is the detainee informed of any ability to

 5   seek redetermination of that determination?

 6       A.   On 236(c)?  No.

 7            MR. ARULANANTHAM:  Can we go off the record

 8   for one second?

 9            MR. ATKINSON:  Sure.

10            (Discussion held off the record.)

11   BY MR. ARULANANTHAM:

12       Q.   Does the detainee have the opportunity to

13   argue to ICE that he's not subject to mandatory

14   detention?

15       A.   Does he have the opportunity to?

16       Q.   Yes.

17       A.   He can argue that to the officer that's

18   writing him up.  I don't know -- on the custody

19   determination if we're going to place them in 236(c)

20   mandatory detention because we believe the crime

21   places them there, there's a check box on there that

22   says they're mandatory detention.  And there are

23   little check boxes on the form if you guys have a copy

24   of one.  And if they're not 236(c), it has on there

25   that you have a right to, you know, an immigration
```

Page 208

35

Confidential

1    hearing with an IJ, Department of Homeland Security.

2            On that particular one if we determine

3    they're 236(c), it says they cannot have a bond

4    hearing.

5        Q.   You said the detainee can argue with the

6    officer who's writing him up?

7        A.   Yeah.

8        Q.   Is there an interview?  Or how does that

9    happen?

10       A.    There's an interview done between the

11   detainee and the arresting officer, even if it's at a

12   detention facility, and we have 287(g) there, and

13   there's discussion about, you know, what are your

14   crimes; and then they'll be verified and they'll

15   discuss their -- why they're being charged and then

16   they'll sign their notice to appear and their custody

17   determination.

18            So definitely you're talking to the detainee

19   in a large majority of the cases.  There are instances

20   where you may not.  An NTA may be written up without

21   talking to the detainee.

22       Q.    This is the same decision -- the process that

23   you're talking about now when the officer is talking

24   to the detainee -- that's the same time when the

25   officer is deciding whether the person is going to be

                                              Page 209

Confidential

1     Q.    In fact, at Mira Loma you have approximately
2     800 beds that are not currently filled; is that
3     correct?
4     A.    That's correct.
5           MR. ARULANANTHAM:  Objection to form.
6           MR. ATKINSON:  Did you get his answer?
7           THE REPORTER:  Yes.
8           MR. ATKINSON:  Okay.
9           No further questions.
10          MR. ARULANANTHAM:  I have one question.  Do
11    you have any?
12          MR. KAUFMAN:  No.
13
14                 EXAMINATION (CONTINUING)
15    BY MR. ARULANANTHAM:
16    Q.    Earlier when we spoke about a notice for
17    detainees subject to mandatory detention, you said
18    that the Notice of Custody Determination form says on
19    it that you cannot get a review by an Immigration
20    Judge if you're subject to mandatory detention; is
21    that correct?
22    A.    Yes.
23          MR. ARULANANTHAM:  Nothing else.
24          MR. ATKINSON:  We're going to read and sign
25    the deposition.

Page 243

# Exhibit 46

1   PETER J. ELIASBERG (SBN 189110)
    Email: peliasberg@aclu-sc.org
2   AHILAN T. ARULANANTHAM (SBN 237841)
    Email: aarulanantham@aclu-sc.org
3   MICHAEL KAUFMAN (SBN 254575)
    Email: mkaufman@aclu-sc.org
4   ACLU FOUNDATION OF SOUTHERN CALIFORNIA
    1313 West Eighth Street
5   Los Angeles, California 90017
    Tel: (213) 977-5211
6   Fax: (213) 977-5297

7   **Attorneys For Petitioners**
    (Additional counsel listed on following
8   page)

9                  **UNITED STATES DISTRICT COURT**

10                  **CENTRAL DISTRICT OF CALIFORNIA**

11

12   ALEJANDRO RODRIGUEZ, et. al.,          )   Case No. CV 07- 3239-TJH (RNBx)
                                            )
13              Petitioners,                )   Assigned to the Honorable Judge Robert
                                            )   N. Block
14        vs.                               )
                                            )   **AMENDED NOTICE OF**
15                                          )   **DEPOSITION TO RESPONDENT**
     TIMOTHY ROBBINS, et. al.,              )   **U.S. DEPARTMENT OF**
16                                          )   **HOMELAND SECURITY**
                Respondents.                )
17                                          )   Fed. R. Civ. Proc. 30(b)(6)
                                            )
18

19

20

21

22

23

24

25

26

27

28

---

1  Additional Counsel:
2  JUDY RABINOVITZ
   MICHAEL TAN
3  AMERICAN CIVIL LIBERTIES FOUNDATION
   IMMIGRANTS' RIGHTS PROJECT
4  125 Broad Street, 18th Floor
5  New York, NY 10004
   Telephone: (212) 549-2618
6  Facsimile: (212) 549-2654
7
   JAYASHRI SRIKANTIAH (SBN 189566)
8  STANFORD LAW SCHOOL
9  IMMIGRANTS' RIGHTS CLINIC
   Crown Quadrangle
10 559 Nathan Abbott Way
   Stanford, CA 94305-8610
11 Telephone: (650) 724-2442
12 Facsimile: (650) 723-4426
13
   SEAN COMMONS (SBN 217603)
14 CODY JACOBS (SBN 272276)
   SIDLEY AUSTIN LLP
15 555 West Fifth Street, Suite 4000
16 Los Angeles, California 90013-1010
   Telephone: (213) 896-6000
17 Facsimile: (213) 896-6600
18
19
20
21
22
23
24
25
26
27
28

-2-

AMENDED NOTICE OF DEPOSITION TO RESPONDENT U.S. DEPARTMENT OF HOMELAND SECURITY

1  TO RESPONDENTS AND THEIR ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil

3  Procedure 30(b)(6), Petitioner Alejandro Rodriguez will take the deposition upon oral

4  examination of Respondent U.S. Department of Homeland Security ("DHS")

5  commencing at 9:00am (EST) on October 26, 2011 at the offices of Sidley Austin

6  LLP at 1501 K Street, N.W., Washington, D.C. 20005. The deposition will be taken

7  upon oral examination before a notary public or duly qualified officer, authorized to

8  administer oaths, and will be recorded by the stenographic method and videotape.

9  The deposition will continue from day to day until completed, Saturdays, Sundays,

10  and holidays excepted.

11          PLEASE TAKE FURTHER NOTICE that DHS is requested to designate

12  the person or persons most knowledgeable and prepared to testify on their behalf on

13  the matters set forth in Schedule A below.

14          PLEASE TAKE FURTHER NOTICE that DHS is requested to make

15  available at the deposition(s) the documents, electronically stored information, or

16  objects identified in Schedule B below, and permit their inspection and copying.

17          PLEASE TAKE FURTHER NOTICE that, pursuant to 6 C.F.R.

18  § 5.45(a), Petitioner hereby states that he seeks testimony that is reasonably calculated

19  to lead to admissible evidence relevant to Petitioners' claims that the Respondents'

20  existing custody review procedures fail to comply with the immigration laws and due

21  process. Topics 1 and 2 seek testimony regarding databases maintained by DHS that

22  contain information related to the Petitioners, and from which Respondents have

23  agreed to produce certain information. Such testimony will include, but is not limited

24  to, DHS's policies, procedures and practices with respect to the maintenance, entry

25  and extraction of database information. The information is relevant to the above-

26  captioned matter because it is reasonably calculated to lead to admissible evidence

27  regarding Petitioners' claims. In particular, DHS has already produced database

28  information about Petitioners that is relevant to the sufficiency of the Respondents'

-3-

AMENDED NOTICE OF DEPOSITION TO RESPONDENT U.S. DEPARTMENT OF HOMELAND SECURITY

1  existing custody review procedures, and whether the Petitioners present a sufficient

2  danger or flight risk to warrant their prolonged detention. The information sought will

3  reveal, among other things, how DHS maintains, enters and extracts this information,

4  and explain, clarify and/or describe the database information that DHS has already

5  produced.

6          Topic 3 seeks information regarding DHS's policies and practices related

7  to the maintenance of Alien files ("A files"). Such testimony will include, but is not

8  limited to, the documents regularly kept in A-files, the procedures for storing and

9  organizing A-files and the procedures or practices for entering the content of A-files

10  into any database. The information is relevant to the above-captioned matter because

11  it is reasonably calculated to lead to admissible evidence regarding Petitioners' claims.

12  The information in A files is relevant, for example, to the sufficiency of the

13  Respondents' existing custody review procedures, and whether the Petitioners present

14  a sufficient danger or flight risk to warrant their prolonged detention. The information

15  sought will reveal, among other things, how DOJ maintains A-files, and provide

16  information regarding the A file documents that the Respondents have been ordered to

17  produce to Petitioner.

18          Topics 4, 5, 6, 10, 11, and 12 seek testimony regarding DHS's policies

19  and practices related to custody review procedures, custody determinations and

20  conditions of release including, but not limited to, parole determinations, post-order

21  custody reviews, release on bond, release on conditions of supervision or alternatives

22  to detention programs such as the Intensive Supervision Appearance Program

23  ("ISAP"), and the ICE Intake Risk Assessment and Classification Tool. Such

24  testimony will include, but is not limited to, the standards applied in such reviews, the

25  process for conducting such reviews, the training ICE officers receive with respect to

26  those reviews, and any records maintained of those reviews. The information is

27  relevant to the above-captioned matter because it is reasonably calculated to lead to

28  admissible evidence regarding Petitioners' claims. The information sought is central

-4-

1    to legal issues at the heart of this case: assessing whether Respondents' existing

2    custody procedures – including parole determinations, post-order custody reviews and

3    release on bond and/or conditions of supervision – comply with the immigration laws

4    and the Due Process Clause.  The information sought will reveal, among other things,

5    what DHS' policies and procedures are for custody review procedures and custody

6    determinations, and how they work in practice.

7            Topics 7, 8, and 9 seek testimony regarding DHS's policies and practices

8    with respect to bond hearings, Casas hearings and Joseph hearings.  Such testimony

9    will include, but is not limited to: the notice or other procedures for making eligible

10   persons aware of and available for such hearings; the standards applied at such

11   hearings; the duration of those hearings; the training that DHS officials, including trial

12   attorneys, receive with respect to the rules governing the conduct of such hearings;

13   and any records of such hearings.  The information is relevant to the above-captioned

14   matter because it is reasonably calculated to lead to admissible evidence regarding

15   Petitioners' claims.  The information sought is central to assessing whether

16   Respondents' existing custody procedures -- including bond hearings, Casas hearings,

17   and Joseph hearings – comply with the immigration laws and the Due Process Clause.

18   The information sought will reveal, among other things, what the DOJ's policies and

19   procedures are for bond hearings, Casas hearings and Joseph hearings, and how they

20   work in practice.

21

22   Dated:  November 1, 2011           SIDLEY AUSTIN LLP

23

24                                      By: _____

25                                          SEAN COMMONS

26                                          CODY JACOBS
                                            Attorneys for Petitioners

27

28

-5-

AMENDED NOTICE OF DEPOSITION TO RESPONDENT U.S. DEPARTMENT OF HOMELAND SECURITY

## Schedule A

## DEFINITIONS

1.    "Petitioners" refers to Alejandro Rodriguez and all individuals who are members of the class certified by the U.S. District Court, Central District of California, in Case No. CV07-03239-TJH (RNBx), on April 21, 2010.

2.    "Respondent" refers to the U.S. Department of Homeland Security, respondents in Case No. CV07-03239-TJH (RNBx).

3.    "Relate to," "related to," and "relating to" mean concerning, regarding, reflecting, or referring to in any way, either directly or indirectly.

4.    "And" and "or" shall be construed conjunctively or disjunctively, whichever makes a request inclusive.

5.    "Including" and "include" are illustrative and do not limit the scope of requests.

6.    "CUSTODY DETERMINATION" refers to any hearing pursuant to *Matter of Joseph*, 22 I. & N. Dec. 799, 1999 WL 339053 (BIA 1999), any hearing pursuant to *Casas-Castrillon v. Dep't of Homeland Sec'y*, 535 F.3d 942 (9th Cir. 2008), any custody review pursuant to 8 C.F.R. § 241.4, 8 C.F.R. § 241.7, § 241.13, and/or 8 C.F.R. § 1241.4, any bond hearing under 8 U.S.C. § 1226(a), any parole determination pursuant to 8 C.F.R. § 235.2, 8 C.F.R. § 1235.2, a 8 U.S.C § 1182(d)(5)(A), or any formal or informal process for determining whether a PROLONGED DETAINEE should continue to be detained.

7.    "DATABASE" shall mean any electronic file composed of records, each containing fields together with a set of operations for searching, sorting, recombining, and/or other functions.  Examples of databases include, the EOIR Records and Management Information System (RMIS), the Enforce Integrated Database (EID), the ENFORCE Alien Detention Module (EADM) and ENFORCE Alien Removal Module (EARM), Deportable Alien Control System (DACS), Detention and Removal

1  Information Management System (DRIMS) and the Electronic Travel Document

2  System (eTD).  These examples are illustrative only and in no way preclude or limit

3  the inclusion of other databases within this definition.

4      8.   "DOCUMENT" includes anything that constitutes a "document,"

5  "writing," or "recording" as defined in Rule 34(a) of the Federal Rules of Civil

6  Procedure and Rule 1001(1) of the Federal Rules of Evidence.

7      9.   "PROLONGED DETAINEE" refers to any person (including Petitioners)

8  detained in the Central District of California for longer than six months pursuant to

9  8 U.S.C. § 1226, 8 U.S.C. § 1225, or 8 U.S.C. § 1231, or any subsection of those

10  statutes, pending completion of removal proceedings, including judicial review, if any,

11  of their detention occurred on or after April 21, 2010.

12

13  **TOPICS**

14  **TOPIC NO. 1:**

15      All DATABASES maintained by Respondents containing information

16  related to PROLONGED DETAINEES, including for each such DATABASE:

17      •   its names and location;

18      •   the type of software used to maintain it;

19      •   the type of software used to analyze data extracted from it;

20      •   the operating system on which it runs;

21      •   the person(s) or department(s) who have access to it, including the

22      job titles of individuals who enter data into the database;

23      •   the methods for accessing it (e.g., access through designated

24      terminals versus access via an Internet portal);

25      •   the operations that can be performed on it (e.g., searches or culling

26      of information, ability to export data in electronic formats, etc.);

27      •   the name and description of each field stored within it;

28

-7-

1       •       the reliability and variability of each field stored within the

2               database;

3       •       the source(s) of information used for entering data into it;

4       •       which database fields must be populated per agency policies;

5       •       local or geographical variations in data entry practices;

6       •       the steps (if any) taken to ensure the accuracy of information

7               entered into it and/or to correct variation in entry practices; and

8       •       the measures (if any) to ensure information remains up to date.

9       •       The content of any "screenshot" of any database page that would

10              reveal the categories of information maintained in that database.

11  **TOPIC NO. 2:**

12          Any formal or informal policies and practices for entering information

13  into, maintaining, updating, correcting, using, sharing access to, or analyzing

14  information in any DATABASE covered by Topic No. 1, including the identity and

15  existence of DOCUMENTS relating to any such formal or informal policies or

16  practices, including look-up tables, user manuals, or work-flow charts.

17  **TOPIC NO. 3:**

18          Respondent's, policies and practices, both formal and informal, related to

19  the maintenance of Alien Files (A-Files), including the documents regularly kept in A-

20  Files, the procedures or practices for storing and organizing A-Files, the procedures or

21  practices for verifying the content of A-Files and the procedures or practices for

22  entering the content of A-Files into any DATABASE.

23  **TOPIC NO. 4:**

24          Respondent's polices and practices, both formal and informal, applied in

25  the Central District of California from April 21, 2010 to the present, related to

26  determining initially whether to detain a noncitizen pursuant to 8 U.S.C. § 1226(a),

27  including the standards applied in any such determination, the process for making

28  such a determination, any worksheet or standard form used to make such a

AMENDED NOTICE OF DEPOSITION TO RESPONDENT U.S. DEPARTMENT OF HOMELAND SECURITY

1  determination, the training that ICE officials receive with respect to these

2  determinations, the cost of those determinations and any records kept of those

3  determinations.

4  **TOPIC NO. 5:**

5          Respondent's polices and practices, both formal and informal, applied in

6  the Central District of California from April 21, 2010 to the present, related to parole

7  determinations conducted pursuant to 8 C.F.R. § 235.2, 8 C.F.R. § 1235.2, and/or

8  8 U.S.C § 1182(d)(5)(A), including the standards applied in those determinations, the

9  process for making those determinations, any worksheet or standard form used to

10  make such a determination, the training that ICE officials receive with respect to these

11  determinations, and any records kept of those determinations.

12  **TOPIC NO. 6:**

13          Respondent's polices and practices, both formal and informal, applied in

14  the Central District of California from April 21, 2010 to the present, related to post

15  order custody reviews provided to PROLONGED DETAINEES pursuant to 8 C.F.R.

16  § 241.4, including the standards applied in those reviews, the process for conducting

17  those reviews, any worksheet or standard form used to make such a determination, the

18  training that ICE officials receive with respect to these determinations and any records

19  kept of those reviews.

20  **TOPIC NO. 7:**

21          Respondent's policies and practices, both formal and informal, applied in

22  the Central District of California from April 21, 2010 to the present, related to bond

23  hearings provided under 8 U.S.C. § 1226(a) and any appeals from those hearings,

24  including any notification provided to persons eligible for such hearings or any

25  procedures for making eligible persons available for such hearings, the standards

26  applied in those hearings, the duration of those hearings, the training that ICE

27  officials, including trial attorneys, receive with respect to the rules governing the

28

-9-

1  release of individuals pursuant to Section 1226(a) and the conduct of hearings

2  pursuant to that section, and any record kept of such hearings.

3  **TOPIC NO. 8:**

4        Respondent's policies and practices, both formal and informal, applied in

5  the Central District of California from April 21, 2010 to the present, related to release

6  determinations and hearings conducted pursuant to *Casas-Castrillon v. Dep't of*

7  *Homeland Sec'y*, 535 F.3d 942 (9th Cir. 2008) and any appeals from those hearings,

8  including any notification provided to persons eligible for such hearings or any

9  procedures for making eligible persons available for such hearings, the standards

10 applied in those hearings, the duration of those hearings, the training that ICE

11 officials, including trial attorneys, receive with respect to the rules governing the

12 release of individuals pursuant to *Casas-Castrillon* and the conduct of hearings

13 pursuant to that decision, and any record kept of such hearings.

14 **TOPIC NO. 9:**

15       Respondent's policies and practices, both formal and informal, applied in

16 the Central District of California from April 21, 2010 to the present, related to

17 hearings conducted pursuant to *Matter of Joseph*, 22 I. & N. Dec. 799, 1999 WL

18 339053 (BIA 1999) and any appeals from those hearings, including any notification

19 provided to persons eligible for such hearings or any procedures for making eligible

20 persons available for such hearings, the standards applied in those hearings, the

21 duration of those hearings, the training that ICE officials, including trial attorneys,

22 receive with respect to the rules governing the conduct of hearings pursuant to *Matter*

23 *of Joseph*, and any record kept of such hearings.

24 **TOPIC NO. 10:**

25       Respondent's policies and practices, both formal and informal, applied in

26 the Central District of California from April 21, 2010 to the present, related to setting

27 or seeking the amount of bond for PROLONGED DETAINEES, including any

28 worksheet or formula utilized to make an assessment of bond amount.

-10-

AMENDED NOTICE OF DEPOSITION TO RESPONDENT U.S. DEPARTMENT OF HOMELAND SECURITY

**TOPIC NO. 11:**

Respondent's policies and practices, both formal and informal, applied in the Central District of California from April 21, 2010 to the present, related to the release of PROLONGED DETAINEES on conditions of supervision or alternative to detention programs such as the Intensive Supervision Appearance Program ("ISAP") II, including the imposition of release conditions and the procedures for monitoring compliance with and enforcing those requirements.

**TOPIC NO. 12:**

Respondent's plans, policies, and practices, both formal and informal, related to the development and implementation of the new ICE Intake Risk Assessment and Classification Tool, including the piloting and testing of the risk assessment tool, the evaluation of existing custody determinations, the framework to be applied in these risk assessments, the process for conducting these risk assessments, the training that ICE officials have received or will receive with respect to these risk assessments, and any records kept of these risk assessments.

## Schedule B

DHS is requested, at the time of the deposition(s), to make available for copying and inspection the following documents:

**REQUEST NO. 1:**

All DOCUMENTS describing the operation, updating, or maintenance of any DATABASE containing information about PROLONGED DETAINEES including look-up tables, user manuals, work-flow charts, or protocols for maintaining such DATABASES.

**REQUEST NO. 2:**

All DOCUMENTS related to the standards for setting the amount of PROLONGED DETAINEES' bonds including any chart or table describing standard bond amounts.

AMENDED NOTICE OF DEPOSITION TO RESPONDENT U.S. DEPARTMENT OF HOMELAND SECURITY

**REQUEST NO. 3:**

      All DOCUMENTS identifying, implementing, or describing policies and procedures, both formal and informal, related to the Intensive Appearance Supervision Program II described in Topic No. 10.

**REQUEST NO. 4:**

      All DOCUMENTS identifying, implementing, or describing policies and procedures, both formal and informal, related to the new ICE Intake Risk Assessment and Classification Tool described in Topic No. 11.

AMENDED NOTICE OF DEPOSITION TO RESPONDENT U.S. DEPARTMENT OF HOMELAND SECURITY

LA1 2307869v.1

49

# Exhibit 47

## Michael Kaufman

| | |
|---|---|
| **From:** | Atkinson, Theodore (CIV) [Theodore.Atkinson@usdoj.gov] |
| **Sent:** | Wednesday, January 11, 2012 8:32 AM |
| **To:** | Michael Kaufman; Lawrence, Victor (CIV) |
| **Cc:** | Ahilan Arulanantham |
| **Subject:** | Re: Rodriguez: deposition logistics |

Michael,

There will be at least three counsel attending in addition to the two designees.

Assistant Field Office Director Wesley Lee will be the first designee, Thursday, as he covers most topics. He will be the designee as to the following:

- Topic 5
- Topic 6
- Topics 8 and 9 (with respect to "release determinations" and "notification provided" under Casas and Joseph)

Assistant Field Office Director Eric Saldana will testify as to the following topics:

- Topic 7
- Topic 10
- Topic 11

As you know, we have already had depositions regarding topics 1 and 2. The deposition of Korie Young will cover topic 3. Topics 8 and 9 were, except as noted above, already covered in the DOJ deposition. We will not provide a designee on topics 12 or 13.

Ted

---

**From:** Michael Kaufman [mailto:mkaufman@aclu-sc.org]
**Sent:** Tuesday, January 10, 2012 03:07 PM
**To:** Lawrence, Victor (CIV)
**Cc:** Ahilan Arulanantham <aarulanantham@ACLU-SC.ORG>; Atkinson, Theodore (CIV)
**Subject:** FW: Rodriguez: deposition logistics

Victor,

I take it from this morning's email exchange that Ted is on email, but I wanted to forward you my email below in case you will be handling the depositions this week. We are trying to finalize the logistics for the depositions, and would appreciate responses to the questions below as soon as practicable.

Thanks, Michael

---

**From:** Michael Kaufman
**Sent:** Monday, January 09, 2012 3:35 PM
**To:** 'Atkinson, Theodore (CIV)'
**Cc:** Ahilan Arulanantham; Geneva Tien
**Subject:** Rodriguez: deposition logistics

Ted,

# Exhibit 48

```
 1    or would not allow them to be released, and for the
 2    most part they understand the thought process of the
 3    person making that decision.  And if there's something
 4    outside the norm, they'll usually make that
 5    recommendation, give that information to the
 6    determining official.
 7            The processing officer does just that,
 8    processes the case, prepares the forms, prepares the
 9    worksheets, puts the A-File together and gives that to
10    the supervisor, the SDDO, who then reviews everything
11    and then he's the one who does the determination.
12        Q.   So he would make a determination whether
13    someone was subject to mandatory detention, for
14    example?
15        A.   Yes.
16        Q.   Would he also be the person if someone, let's
17    say, released on bond that would make the
18    determination as to whether to release that person and
19    the amount of bond?
20        A.   Yes.
21        Q.   When the SDDO makes those initial
22    determinations, besides the processing agent are there
23    any other ICE officials involved in the
24    decision-making process?
25        A.   There may be discussions with other
```

Page 37

```
 1    relief in making a determination?
 2        A.   Yes.
 3        Q.   In what circumstances would that be?
 4        A.   That would be where somebody has long family
 5    ties or long residency here in the country, the arrest
 6    or crime is minor or an infraction, and that in
 7    discussions with our attorneys they would recommend or
 8    they would advise us that this person would more
 9    likely be eligible.
10        Q.   So is it policy or practice for ICE officials
11    to consult with attorneys in determining whether
12    someone is eligible for relief prior to making a
13    custody determination?
14        A.   Not in all cases.  But it is practice to the
15    point where we have an attorney that is now embedded
16    in the field office to answer those types of
17    questions.
18        Q.   Would you say -- how often would you say that
19    occurs?
20        A.   Discussions with an attorney?
21        Q.   About eligibilities for relief in connection
22    with making a custody determination.
23        A.   I'm not sure if I could estimate that.  That
24    would depend on the caseload for the day.  Every day
25    is a little bit different.  If we have a number of
```

                                                    Page 52

```
 1   cases coming from the county jail where there is a
 2   relatively minor criminal history, then that would be
 3   a higher day compared to somebody's coming out of
 4   state prison which would be obviously a lower day.
 5          So I don't know if I can give you that.  But
 6   I would say it is not uncommon.
 7      Q.   Would you say it happens more often than not?
 8      A.   No.
 9      Q.   When you mention that the official might
10   consult with an ICE attorney, what attorney -- what
11   sort of title of the attorney are you referring to?
12          Are you speaking of ICE trial attorneys?
13          MR. ATKINSON:  Object to the form.
14          THE WITNESS:  I believe it's ICE trial
15   attorney.  Depends on their network, their contacts.
16   May be all the way up to deputy chief counsel.
17   BY MR. KAUFMAN:
18      Q.   So I want to turn now your attention back to
19   this document that we're looking through.
20          MR. ATKINSON:  Exhibit 14.
21          MR. KAUFMAN:  Exhibit 14.
22      Q.   In Section B can you read the first question
23   that's listed there?
24      A.   Section B:  "Is a petition or application
25   pending for this alien or family member?  Explain."
```

Page 53

```
 1    ISAP's, but it's an ICE agent or officer actually
 2    doing the review of the cases.
 3    BY MR. KAUFMAN:
 4        Q.    In your experience has the use of ATDs in the
 5    L.A. field office changed the way that officials go
 6    about assessing flight risk in that initial
 7    determination?
 8        A.    I think I could say yes to that.
 9        Q.    In what way?
10        A.    It's another option.  The concern for anybody
11    who has to set bond or decide whether somebody is
12    going to stay in custody or not is am I making the
13    correct decision, is this person that will be released
14    on his own recognizance, whether it's under a bond or
15    something else, will they come back and re-offend,
16    one; will they come back for their hearing.
17             I think, although it isn't the case every
18    time, ATD has shown to be more of a positive influence
19    for those individuals taking part in the program.  We
20    see a good success rate on that.  So therefore I think
21    it makes the supervisors more comfortable to use that
22    program.  But then again there are issues that come up
23    where people take advantage of the system, which also
24    puts them back.
25        Q.    When you say success rate, what do you mean
```

Page 111

```
 1    by that?
 2        A.   Success rate traditionally has been tracked
 3    with what they call a compliance rate.  And a
 4    compliance rate for B.I. -- they manage a number of
 5    different performances that they consider compliance,
 6    whether it has to do with people showing up for
 7    interviews, home visits, or whether the alien goes to
 8    their court hearing.
 9             It's -- I think it's been successful in terms
10    of compliance to get people to their court
11    proceedings.  It's a very impressive system.
12             Earlier this year my specific office in San
13    Bernardino -- we had a compliance rate of about
14    60 percent for people going to their immigration
15    hearing.  We had a brainstorming session and thought
16    about existing protocols in the program and how we
17    could use them to better increase that particular
18    number.  And by making some changes we are at, if not
19    close to, 100 percent compliance rate for people to go
20    to their immigration court hearing pre-order.
21        Q.   Is that in the San Bernardino area or --
22        A.   That's in the San Bernardino area.  And
23    throughout Los Angeles it's probably in the 90th
24    percentile, I would estimate.
25             MR. ATKINSON:  I'm sorry, I'm trying to jump
```

Page 112

# Exhibit 49

```
 1    the individual a danger to the community or a flight
 2    risk?
 3            It is certainly unfortunate that anyone is held
 4    in detention any longer than necessary, but I don't
 5    normally see a correlation -- I can't see one and I'm
 6    sure there probably might be an exception, but I can't
 7    see, in my view, whether prolonged detention has anything
 8    to do with whether someone is a flight risk or someone
 9    who maybe a danger to the community.
10            When I say that, if someone is going to be
11    released within the next few days versus being held for a
12    prolonged period, as some of the cases have discussed, is
13    the person going to be a danger to the community whether
14    he is released X number of days versus X number of
15    months?
16            Unless there is some change in circumstances or
17    material change, I don't see how prolonged detention
18    would fall into that category.  Is the person still going
19    to be a danger to the community X number of months from
20    now versus tomorrow, if I release them?
21            So that -- I say to you, I don't think of that.
22    Those to me are not -- to me, prolonged detention is not
23    an issue.  It's -- is he going to be, if released, a
24    danger to the community or a flight risk.
25    BY MR. ARULANANTHAM:
```

                                                            Page 46

1    detention, the judge's -- what should the judge be

2    analyzing to make that determination?

3         A    Are you referring to Matter of Joseph now?

4    Because when that term --

5         Q    Yeah, Matter of Joseph.

6         A    Matter of Joseph is limited to lawful permanent

7    resident individuals, from my understanding.  So I'm not

8    sure whether you are referring to -- or in the context of

9    Matter of Joseph, or you are referring to it as a general

10   proposition?

11        Q    As a general proposition.

12        A    Again, what I have always done is look at the

13   Ninth Circuit board decisions that tell me, let alone

14   reading the statute and regulations, what they give me as

15   guidance.

16             There are certain case -- certain cases that

17   have specifically stated a specific violation of law is a

18   mandatory detention.  That was an easy one.

19             When it comes to the others, I have to interpret

20   the statute and any case law that comes with it; does

21   this fall into that category or is it one that appears to

22   fall in that category.

23        Q    Is there anything other than the person's

24   criminal history which is relevant to that determination?

25        A    From my understanding, it is not.  If a

                                                    Page 88

1    mandatory detention deals with a criminal conviction of

2    some kind or kinds, the other factors are not relevant.

3    It is the crime that's committed that, my understanding

4    is, the mandatory detention issue upon -- pursuant to the

5    statutory language that is used.

6        Q    As I understand it, some of the offenses which

7    trigger mandatory detention do not render the respondent

8    ineligible for cancellation or removal, but other ones

9    do.

10       A    That is my understanding, also.

11       Q    And the fact that a detainee may be eligible for

12   cancellation of removal would not be a basis, then, I

13   take it, for finding that the mandatory detention does

14   not apply?

15       A    That is my understanding, also, of what has been

16   prescient decision interpretation.  The issue, though, is

17   the statute and congressional mandate that indicates

18   certain crimes require a mandatory detention by DHS.  We

19   are to review that -- as immigration judges, our

20   authority is to review that to ensure that that is a

21   proper determination by the government.

22            And obviously, that's the issue, but my

23   understanding, it does not then -- that they are not

24   joined together.  There's not a nexus or relationship

25   between the statute that requires mandatory detention

Page 89

```
 1    cases in which relief is granted.
 2              And just looking at the first page first --
 3              MR. ATKINSON:  Just for the record, Exhibits 5,
 4    6, and 7 have not -- at least we haven't established that
 5    Judge Fong has ever seen these before, and he has
 6    certainly not been asked to nor being offered to
 7    authenticate these documents.
 8    BY MR. ARULANANTHAM:
 9        Q    So the first page of Exhibit 7, do you see the
10    case length times there listed for cases for which relief
11    was granted?
12        A    Yes.
13        Q    And you'd agree that the numbers shown here are
14    substantially longer than the numbers shown in Exhibit 6,
15    right, the removals?
16        A    Yes.
17        Q    In your experience, are cases where relief is
18    granted taking longer to finish than cases where the
19    detainee is ordered removed?
20        A    That is not surprising at all, because by
21    definition, someone who has been granted relief has to
22    apply for some relief or release, which means there are
23    additional hearings that have to be held, additional
24    continuances to prepare evidence, to present witnesses
25    and the like, so not surprising at all.
```

Page 130

1          For instance, someone who is charged with an

2     aggravated felony, no relief available, he can ask for

3     all the relief he wants, but there is nothing available

4     to him.  At the most, it would be a pretermitted

5     application, so it would be clearly a shorter hearing

6     than versus someone who was eligible for relief, granted

7     the opportunity to file the application to prepare it,

8     gather his witnesses' evidence, present his case and

9     testimony and presentation.

10         And so not surprising it would take longer.  I

11    wouldn't expect nothing -- nothing less than that.

12    Q    You said, "At the most, it would be a

13    pretermitted application."

14         Can you explain that?

15    A    When I gave you the example of an individual who

16    was convicted of an aggravated felon -- a felony, who was

17    not a permanent resident, he is precluded from much

18    available relief in that often the only thing he might be

19    available for is deferral of removal on a -- on a

20    withholding of removal case.

21         Well, he can apply for cancellation of removal,

22    but he would be, by definition, ineligible.  So in

23    another division, he could file his application, but the

24    judge would at that point not hold a full hearing,

25    because by definition he was not statutorily eligible.

                                                    Page 131

# Exhibit 5

**(to Deposition of Judge Fong)**





# Immigration Court Processing Time by Outcome

**About the Data**
through December 31st, 2011

**What to tabulate:**
- ○ Completed Cases
- ◉ Average Days

**Outcome Type:**
- ◉ All
- ○ Removals
- ○ Voluntary Departures
- ○ No Grounds for Removal (Terminations)
- ○ Relief Granted
- ○ Administrative/Other Closure

**Starting with:**
- ◉ States
- ○ Nationalities

**Graph As:**
- ◉ Time series
- ○ Top 10

California ▶ Mira Loma Detention Facility



Avg. Days To Completion

Fiscal Year

**Fiscal Year 2012**
click on column headings to sort

**State = California**
click on column headings to sort

**State = California, Hearing Location = Mira Loma Detention Facility**
click on column headings to sort

http://trac.syr.edu/phptools/immigration/court_backlog/court_proctime_outcome.php

2/27/2012

Page 1 of 2



# Immigration Court Processing Time by Outcome

| State | | Court Location | | Hearing Location | | Nationality | |
|---|---|---|---|---|---|---|---|
| Entire US | 530 | All Courts | 611 | | | All Nationalities | 611 | 187 |
| Massachusetts | 845 | Los Angeles | 747 | | | Mexico | 747 | 239 |
| Ohio | 839 | San Francisco | 563 | | | Guatemala | 563 | 162 |
| Illinois | 676 | San Diego | 492 | | | El Salvador | 492 | 133 |
| Michigan | 670 | Imperial | 208 | | | | |
| New York | 640 | Lancaster | 181 | | | | |
| California | 611 | | | Hearing Location | | | |
| Maryland | 603 | | | Los Angeles, California | 853 | | |
| Virginia | 579 | | | San Francisco, California | 582 | | |
| Minnesota | 554 | | | San Diego, California | 511 | | |
| Oregon | 537 | | | San Francisco Annex | 464 | | |
| Tennessee | 529 | | | San Francisco Detained | 286 | | |
| Colorado | 520 | | | El Centro, California | 241 | | |
| Florida | 498 | | | Imperial, California | 214 | | |
| Nebraska | 480 | | | California DGC - San Ysidro | 210 | | |

Copyright 2012, TRAC Reports, Inc.



# TRAC Immigration

**IMMIGRATION PROCESSING TIME**

## Immigration Court Processing Time by Outcome

**About the Data**
*through December 31st, 2011*

**What to tabulate:**
- ○ Completed Cases
- ● Average Days

**Starting with:**
- ● States
- ○ Nationalities

**Outcome Type:**
- ● All
- ○ Removals
- ○ Voluntary Departures
- ○ No Grounds For Removal (Terminations)
- ○ Relief Granted
- ○ Administrative/Other Closure

**Graph As:**
- ● Time series
- ○ Top 10

California ► Adelanto Detention Facility East



Avg. Days To Completion

Fiscal Year

**Fiscal Year 2012**
*click on column headings to sort*

**State = California**
*click on column headings to sort*

**State = California, Hearing Location = Adelanto Detention Facility East**
*click on column headings to sort*

# Immigration Court Processing Time by Outcome

| State | Avg. Days To Completion |
|---|---|
| Entire US | 375 |
| Oregon | 691 |
| Massachusetts | 611 |
| New York | 610 |
| Tennessee | 591 |
| California | 535 |
| Ohio | 532 |
| Maryland | 514 |
| North Carolina | 504 |
| Virginia | 489 |
| Colorado | 443 |
| Puerto Rico | 442 |
| Missouri | 431 |
| Illinois | 414 |
| Hawaii | 383 |

| Court Location | Avg. Days To Completion |
|---|---|
| All Courts | 535 |
| Los Angeles | 702 |
| San Francisco | 555 |
| San Diego | 343 |
| Imperial | 73 |
| Lancaster | 55 |

| Hearing Location | Avg. Days To Completion |
|---|---|
| Los Angeles, California | 977 |
| San Francisco, California | 698 |
| San Francisco Annex | 437 |
| San Diego, California | 436 |
| Lompoc Federal Correctional Institution | 301 |
| Imperial, California | 247 |

| Nationality | Avg. Days To Completion |
|---|---|
| All Nationalities | 33 |
| Honduras | 90 |
| El Salvador | 61 |
| Guatemala | 57 |
| Syria | 48 |
| Argentina | 46 |
| Philippines | 40 |
| Belize | 40 |
| Iran | 39 |
| South Korea | 38 |
| Azerbaijan | 37 |
| Bulgaria | 31 |
| Panama | 29 |
| Mexico | 28 |
| India | 28 |

Copyright 2012, TRAC Reports, Inc.

Immigration Court Processing Time by Outcome



# TRAC Immigration

## Immigration Court Processing Time by Outcome

**What to tabulate:**
- ○ Completed Cases
- ◉ Average Days

**Starting with:**
- ◉ States
- ○ Nationalities

**Outcome Type:**
- ◉ All
- ○ Removals
- ○ Voluntary Departures
- ○ No Grounds For Removal (Terminations)
- ○ Relief Granted
- ○ Administrative/Other Closure

**About the Data**
*through December 31st, 2011*

**Graph As:**
- ◉ Time series
- ○ Top 10

California ▶ Orange County Detained

Avg. Days To Completion

**Fiscal Year**

**Fiscal Year 2012**
*click on column headings to sort*

**State = California**
*click on column headings to sort*

**State = California, Hearing Location = Orange County Detained**
*click on column headings to sort*

http://trac.syr.edu/phptools/immigration/court_backlog/court_proctime_outcome.php

2/27/2012

Page 1 of 2

# Immigration Court Processing Time by Outcome

| State | Avg. Days To Completion | Court Location | Avg. Days To Completion | Nationality | Avg. Days To Completion |
|---|---|---|---|---|---|
| Entire US | 375 | All Courts | 535 | All Nationalities | 45 |
| Oregon | 691 | Los Angeles | 702 | Somalia | 153 |
| Massachusetts | 611 | San Francisco | 555 | El Salvador | 140 |
| New York | 610 | San Diego | 343 | Lebanon | 114 |
| Tennessee | 591 | Imperial | 73 | Egypt | 78 |
| California | 535 | Lancaster | 55 | Peru | 70 |
| Ohio | 532 | | | Dominican Republic | 66 |
| Maryland | 514 | **Hearing Location** | **Avg. Days To Completion** | China | 56 |
| North Carolina | 504 | Los Angeles, California | 977 | Jamaica | 45 |
| Virginia | 489 | San Francisco, California | 698 | Honduras | 44 |
| Colorado | 443 | San Francisco Annex | 437 | Guatemala | 44 |
| Puerto Rico | 442 | San Diego, California | 436 | South Korea | 43 |
| Missouri | 431 | Lompoc Federal Correctional Institution | 301 | Poland | 42 |
| Illinois | 414 | Institution | | Colombia | 42 |
| Hawaii | 383 | Imperial, California | 247 | Portugal | 39 |

Copyright 2012, TRAC Reports, Inc.

http://trac.syr.edu/phptools/immigration/court_backlog/court_proctime_outcome.php

2/27/2012

67

# Exhibit 6
**(to Deposition of Judge Fong)**



# Immigration Court Processing Time by Outcome

**TRAC Immigration**

**About the Data**
through December 31st, 2011

**What to tabulate:**
Outcome Type:
○ All
◉ Removals
○ Voluntary Departures
○ No Grounds For Removal (Terminations)
○ Relief Granted
○ Administrative/Other Closure

○ Completed Cases
◉ Average Days

**Starting with:**
◉ States
○ Nationalities

**Graph As:**
◉ Time series
○ Top 10

Fiscal Year 2012
*click on column headings to sort*

State = California
*click on column headings to sort*

State = California, Hearing Location = Mira Loma Detention Facility
*click on column headings to sort*

http://trac.syr.edu/phptools/immigration/court_backlog/court_proctime_outcome.php

Immigration Court Processing Time by Outcome

| State | Avg. Days To Removal |
|---|---|
| Entire US | 188 |
| Oregon | 551 |
| Tennessee | 517 |
| Ohio | 414 |
| New York | 412 |
| Massachusetts | 338 |
| North Carolina | 336 |
| Maryland | 320 |
| Hawaii | 300 |
| Virginia | 299 |
| Michigan | 298 |
| Illinois | 279 |
| California | 275 |
| Puerto Rico | 267 |
| Florida | 230 |

| Court Location | Avg. Days To Removal |
|---|---|
| All Courts | 275 |
| Los Angeles | 422 |
| San Francisco | 314 |
| San Diego | 137 |
| Imperial | 55 |
| Lancaster | 48 |

| Hearing Location | Avg. Days To Removal |
|---|---|
| San Francisco Annex | 789 |
| Los Angeles, California | 788 |
| San Francisco, California | 563 |
| Lompoc Federal Correctional Institution | 301 |
| Imperial, California | 251 |
| San Diego, California | 230 |

| Nationality | Avg. Days To Removal |
|---|---|
| All Nationalities | 46 |
| Lebanon | 518 |
| Peru | 415 |
| Armenia | 351 |
| Somalia | 280 |
| Philippines | 204 |
| Eritrea | 171 |
| El Salvador | 123 |
| Guatemala | 63 |
| Honduras | 51 |
| Ghana | 50 |
| India | 42 |
| Mexico | 38 |
| Colombia | 20 |
| Argentina | 20 |

Copyright 2012, TRAC Reports, Inc.

70



TRAC Immigration

IMMIGRATION PROCESSING TIME

# Immigration Court Processing Time by Outcome

**About the Data**
through December 31st, 2011

**What to tabulate:**
○ Completed Cases
◉ Average Days

**Starting with:**
◉ States
○ Nationalities

**Outcome Type:**
○ All
◉ Removals
○ Voluntary Departures
○ No Grounds For Removal (Terminations)
○ Relief Granted
○ Administrative/Other Closure

**Graph As:**
◉ Time series
○ Top 10



California ▶ Orange County Detained

**Fiscal Year 2012**
click on column headings to sort

**State = California**
click on column headings to sort

**State = California, Hearing Location = Orange County Detained**
click on column headings to sort

71

Immigration Court Processing Time by Outcome

| State | Avg. Days To Removal |
|---|---|
| Entire US | 188 |
| Oregon | 551 |
| Tennessee | 517 |
| Ohio | 414 |
| New York | 412 |
| Massachusetts | 338 |
| North Carolina | 336 |
| Maryland | 320 |
| Hawaii | 300 |
| Virginia | 299 |
| Michigan | 298 |
| Illinois | 279 |
| California | 275 |
| Puerto Rico | 267 |
| Florida | 230 |

| Court Location | Avg. Days To Removal |
|---|---|
| All Courts | 275 |
| Los Angeles | 422 |
| San Francisco | 314 |
| San Diego | 137 |
| Imperial | 55 |
| Lancaster | 48 |

| Hearing Location | Avg. Days To Removal |
|---|---|
| San Francisco Annex | 789 |
| Los Angeles, California | 788 |
| San Francisco, California | 563 |
| Lompoc Federal Correctional Institution | 301 |
| Imperial, California | 251 |
| San Diego, California | 230 |

| Nationality | Avg. Days To Removal |
|---|---|
| All Nationalities | 38 |
| Somalia | 153 |
| Lebanon | 114 |
| Egypt | 78 |
| Colombia | 73 |
| Dominican Republic | 66 |
| Cuba | 60 |
| El Salvador | 54 |
| Vietnam | 53 |
| Honduras | 48 |
| China | 47 |
| Armenia | 47 |
| Jamaica | 45 |
| Guatemala | 41 |
| Portugal | 39 |

Copyright 2012, TRAC Reports, Inc.

# Exhibit 7
**(to Deposition of Judge Fong)**



**TRAC Immigration**

**IMMIGRATION PROCESSING TIME**

# Immigration Court Processing Time by Outcome

**About the Data**

through December 31st, 2011

**What to tabulate:**
- ○ Completed Cases
- ● Average Days

**Outcome Type:**
- ○ All
- ○ Removals
- ○ Voluntary Departures
- ○ No Grounds For Removal (Terminations)
- ● Relief Granted
- ○ Administrative/Other Closure

**Starting with:**
- ● States
- ○ Nationalities

**Graph As:**
- ● Time series
- ○ Top 10

California ▶ Mira Loma Detention Facility

Avg. Days To Relief

Fiscal Year: 98 99 00 01 02 03 04 05 06 07 08 09 10 11 12

**Fiscal Year 2012**
click on column headings to sort

**State = California**
click on column headings to sort

**State = California, Hearing Location = Mira Loma Detention Facility**
click on column headings to sort

http://trac.syr.edu/phptools/immigration/court_backlog/court_proctime_outcome.php

Immigration Court Processing Time by Outcome



| State | Avg. Days To Relief |
| --- | --- |
| Entire US | 794 |
| California | 1,019 |
| Oregon | 992 |
| Massachusetts | 927 |
| Ohio | 914 |
| Colorado | 904 |
| Illinois | 901 |
| Nebraska | 901 |
| Pennsylvania | 833 |
| Virginia | 827 |
| Tennessee | 809 |
| New York | 782 |
| Georgia | 760 |
| Utah | 759 |
| Missouri | 753 |

| Court Location | Avg. Days To Relief |
| --- | --- |
| All Courts | 1,019 |
| Los Angeles | 1,224 |
| San Francisco | 777 |
| San Diego | 588 |
| Imperial | 287 |
| Lancaster | 186 |

| Hearing Location | Avg. Days To Relief |
| --- | --- |
| Los Angeles, California | 1,281 |
| San Francisco, California | 818 |
| San Diego, California | 687 |
| Imperial, California | 592 |
| San Francisco Annex | 358 |
| Corrections Corporation of America–San Diego,ca | 188 |

| Nationality | Avg. Days To Relief |
| --- | --- |
| All Nationalities | 186 |
| Sierra Leone | 523 |
| El Salvador | 428 |
| Mexico | 190 |
| Cuba | 175 |
| Syria | 132 |
| Armenia | 128 |
| Guatemala | 112 |
| Somalia | 101 |
| Nigeria | 98 |
| South Korea | 89 |
| Philippines | 60 |
| Burma (Myanmar) | 37 |
| Eritrea | 24 |

Copyright 2012, TRAC Reports, Inc.



# Immigration Court Processing Time by Outcome

**About the Data**
through December 31st, 2011

**What to tabulate:**
○ Completed Cases
◉ Average Days

**Outcome Type:**
○ All
◉ Removals
○ Voluntary Departures
○ No Grounds For Removal (Terminations)
○ Relief Granted
○ Administrative/Other Closure

**Starting with:**
◉ States
○ Nationalities

**Graph As:**
◉ Time series
○ Top 10



California ► Adelanto Detention Facility East

Avg. Days To Relief

Fiscal Year

**Fiscal Year 2012**
*click on column headings to sort*

**State = California**
*click on column headings to sort*

**State = California, Hearing Location = Adelanto Detention Facility East**
*click on column headings to sort*



76

# Immigration Court Processing Time by Outcome

| State | Avg. Days To Relief |
|---|---|
| Entire US | 794 |
| California | 1,019 |
| Oregon | 992 |
| Massachusetts | 927 |
| Ohio | 914 |
| Colorado | 904 |
| Illinois | 901 |
| Nebraska | 901 |
| Pennsylvania | 833 |
| Virginia | 827 |
| Tennessee | 809 |
| New York | 782 |
| Georgia | 760 |
| Utah | 759 |
| Missouri | 753 |

| Court Location | Avg. Days To Relief |
|---|---|
| All Courts | 1,019 |
| Los Angeles | 1,224 |
| San Francisco | 777 |
| San Diego | 588 |
| Imperial | 287 |
| Lancaster | 186 |

| Hearing Location | Avg. Days To Relief |
|---|---|
| Los Angeles, California | 1,281 |
| San Francisco, California | 818 |
| San Diego, California | 687 |
| Imperial, California | 592 |
| San Francisco Annex | 358 |
| Corrections Corporation of America-San Diego,ca | 188 |

| Nationality | Avg. Days To Relief |
|---|---|
| All Nationalities | 76 |
| Mexico | 85 |
| Philippines | 59 |
| Guatemala | 56 |
| Iran | 42 |
| Vietnam | 39 |



Copyright 2012, TRAC Reports, Inc.

Immigration Court Processing Time by Outcome



TRAC Immigration

**IMMIGRATION PROCESSING TIME**

# Immigration Court Processing Time by Outcome

**About the Data**

through December 31st, 2011

**What to tabulate:**

**Outcome Type:**
- ○ Completed Cases    ○ All
- ◉ Average Days    ○ Removals
- ○ Voluntary Departures
- ○ No Grounds For Removal (Terminations)
- ○ Relief Granted
- ○ Administrative/Other Closure

**Starting with:**
- ◉ States
- ○ Nationalities

**Graph As:**
- ◉ Time series
- ○ Top 10



**Fiscal Year 2012**
*click on column headings to sort*

**State = California**
*click on column headings to sort*

**State = California, Hearing Location = Orange County Detained**
*click on column headings to sort*

Immigration Court Processing Time by Outcome

| State | Avg. Days To Relief |
|---|---|
| Entire US | 794 |
| California | 1,019 |
| Oregon | 992 |
| Massachusetts | 927 |
| Ohio | 914 |
| Colorado | 904 |
| Illinois | 901 |
| Nebraska | 901 |
| Pennsylvania | 833 |
| Virginia | 827 |
| Tennessee | 809 |
| New York | 782 |
| Georgia | 760 |
| Utah | 759 |
| Missouri | 753 |

| Court Location | Avg. Days To Relief |
|---|---|
| All Courts | 1,019 |
| Los Angeles | 1,224 |
| San Francisco | 777 |
| San Diego | 588 |
| Imperial | 287 |
| Lancaster | 186 |

| Hearing Location | Avg. Days To Relief |
|---|---|
| Los Angeles, California | 1,281 |
| San Francisco, California | 818 |
| San Diego, California | 687 |
| Imperial, California | 592 |
| San Francisco Annex | 358 |
| Corrections Corporation of America-San Diego, ca | 188 |

| Nationality | Avg. Days To Relief |
|---|---|
| All Nationalities | 151 |
| Mexico | 199 |
| El Salvador | 104 |
| Guatemala | 71 |
| Honduras | 35 |

Copyright 2012, TRAC Reports, Inc.

http://trac.syr.edu/phptools/immigration/court_backlog/court_proctime_outcome.php

2/27/2012

Page 2 of 2.

79

# Exhibit 50

David A. Martin
Principal Deputy General Counsel
U.S. Department of Homeland Security
Washington, D.C. 20528

**NOT DETAINED**

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## BOARD OF IMMIGRATION APPEALS

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| Luis Felipe Garcia-Arreola ) | File No.: A038 829 033 |
| ) | |
| In Bond Proceedings ) | |
| ) | |

## DEPARTMENT OF HOMELAND SECURITY
## MOTION TO ACCEPT SUPPLEMENTAL BRIEF

AILA InfoNet Doc. No. 10031860. (Posted 03/18/10)

FEB-12-2010  16:44      DHS/ICE/APPELLATE COUNSEL                   703 756 0201      P.03

On August 4, 2009, the U.S. Department of Homeland Security (Department or DHS)
filed an appeal with the Board of Immigration Appeals (Board) of the Immigration Judge's bond
decision, dated July 9, 2009, granting the respondent's request for release from custody on a
$3,000 bond.  The Department timely filed its opening brief on October 15, 2009, and the
respondent filed his reply brief, also timely, on November 5, 2009.

On December 22, 2009, the U.S. Court of Appeals for the First Circuit issued a decision
rejecting the Board's precedent decision in *Matter of Saysana*, 24 I&N Dec. 602 (BIA 2008),
*Saysana v. Gillen*, 590 F.3d 7 (1st Cir. 2009).  In light of that intervening development and to
facilitate the Board's adjudication of this matter, the Department respectfully requests the Board
to accept the accompanying DHS Statement of New Legal Authority and Supplemental Brief,
which clarifies the Department's position in this matter.

Respectfully submitted:

David A. Martin
Principal Deputy General Counsel
U.S. Department of Homeland Security

On Motion:                      2/12/2010

Moira A. Skinner
Appellate Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Scott D. Criss[1]
Assistant Chief Counsel
Office of Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

---

[1]  Service upon DHS should continue to be directed to the U.S. Immigration and Customs Enforcement Office of
Chief Counsel in Charlotte, North Carolina at 5701 Executive Center Drive, 3rd Floor, Charlotte, NC 28212.

2                              A038 829 033

## CERTIFICATE OF SERVICE

I certify that on this date a copy of the foregoing Department of Homeland Security Motion to Accept Supplemental Brief was served on the respondent's attorney by facsimile to 336-334-0036, and by first-class mail, addressed to:

> Gerard M. Chapman, Esq.
> Chapman Law Firm
> P.O. Box 1477
> Greensboro, NC 27402

Date: 2/10/2010

Moira A. Skinner
Appellate Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

3

A038 829 033

FEB 12 2010  10:44          DHS/ICE/APPELLATE COUNSEL                703 756 8281      P.05

David A. Martin                                    **NOT DETAINED**
Principal Deputy General Counsel
U.S. Department of Homeland Security
Washington, D.C.  20528

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### BOARD OF IMMIGRATION APPEALS

In the Matter of                     )
                                     )
Luís Felipe Garcia-Arreola          )          File No.:  A038 829 033
                                     )
In Bond Proceedings                  )
                                     )

### DHS STATEMENT OF NEW LEGAL AUTHORITY
### AND SUPPLEMENTAL BRIEF

FEB-12-2010  16:44          DHS/ICE/APPELLATE COUNSEL          703 756 6281     P.06

## INTRODUCTION

On August 4, 2009, the U.S. Department of Homeland Security (Department or DHS)

filed an appeal with the Board of Immigration Appeals (Board) of the Immigration Judge's bond

decision, dated July 9, 2009, granting the respondent's request for release from custody on a

$3,000 bond.  The Department timely filed its opening brief on October 15, 2009, and the

respondent filed his timely reply on November 5, 2009.  On December 22, 2009, the U.S. Court

of Appeals for the First Circuit issued a decision rejecting the Board's precedent decision in

*Matter of Saysana*, 24 I&N Dec. 602 (BIA 2008).  *Saysana v. Gillen*, 590 F.3d 7 (1st Cir. 2009)

(attached as Appendix A).  To facilitate the Board's adjudication of the case, the Department

submits this supplemental brief, clarifying its position.

## BACKGROUND

Section 236(c)(1) of the Immigration and Nationality Act (INA or Act) requires DHS to

take into custody certain classes of inadmissible and deportable aliens, primarily including aliens

who have been convicted of certain crimes, when they are "released" from a non-DHS custodial

setting.  Although the provision did not take effect until after October 8, 1998, the day the

Transition Period Custody Rules (TPCR) expired,[1] many of the inadmissibility and deportability

grounds defining the classes of aliens subject to mandatory detention thereunder can be satisfied

by actions and convictions occurring prior to that date.  Over the years, INA § 236(c) raised the

question of whether a post-TPCR "release" by a non-DHS custodian would trigger mandatory

detention under INA § 236(c)(1) only if the conviction on which the latest non-DHS custody was

based falls within the particular inadmissibility or deportability grounds listed in § 236(c)(1), or

---

[1]     Section 236(c) was enacted by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996
(IIRIRA), Pub. L. No. 104-28, Div. C, § 303(b)(2), 110 Stat. 3009-546, 3009-586 (Sep. 30, 1996). Section
303(b)(3) of IIRIRA provided temporary custody rules, otherwise known as Transition Period Custody Rules
(TPCR), whereby implementation of INA § 236(c) was deferred for two years.

A038 829 033

AILA InfoNet Doc. No. 10031860. (Posted 03/18/10)

whether *any* post-TPCR release of an alien who is so inadmissible or deportable is sufficient to mandate custody.

In 2008, the Board specifically addressed the issue, holding that *any* post-TPCR release from non-DHS custody, regardless of whether the release was from criminal custody for a conviction that rendered the alien inadmissible or deportable, was sufficient to mandate detention under INA § 236(c)(1). *Matter of Saysana*, 24 I&N Dec. at 606, 608. The respondent in that case filed a habeas petition with the U.S. District Court for the District of Massachusetts, which ruled that INA § 236(c) did not apply to that alien and ordered the government to provide him a bond hearing. *See Saysana v. Gillen*, No. 08-11749, 2008 WL 5484553, at *1 (D. Mass. Dec. 1, 2008). The government appealed to the U.S. Court of Appeals for the First Circuit.

On appeal, the government argued that *Matter of Saysana* was entitled to deference as a reasonable interpretation by the Board of ambiguous statutory language under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). On December 22, 2009, however, the First Circuit rejected the Board's interpretation, concluding instead that the "when...released" language of INA § 236(c)(1), when read in context, unambiguously mandates detention only for aliens released from non-DHS custody after October 8, 1998, for an offense enumerated in subparagraphs 236(c)(1)(A)—(D) and not to "any" offense. *Saysana v. Gillen*, 590 F.3d at 16. Alternatively, the court held that, even if the statute was ambiguous, the Board's interpretation of the statute was not reasonable as it rested upon "a series of speculative conclusions" about Congress' intent in enacting the mandatory custody provision. *Id.* at 17.

Like the First Circuit, a number of U.S. district courts have disagreed with the holding of *Matter of Saysana. See Burns v. Weber*, No. 09-5119, at 10 (D.N.J. Jan. 19, 2010) (finding no nexus between pre-TPCR and post-TPCR releases) (attached as Appendix B); *Garcia v.*

2

A038 829 033

*Shanahan*, 615 F.Supp.2d 175, 180 (S.D.N.Y. 2009) (concluding that "[t]he mandatory detention

provision cannot be retroactively applied to aliens who were released from custody for

removable offenses prior to October 9, 1998—even if they are later released from custody for a

nonremovable offense"); *Oscar v. Gillen*, 595 F.Supp.2d 166, 170 (D. Mass. 2009) (awarding

Equal Access to Justice Act fees to the alien as prevailing party); *Hyung Woo Park v. Hendricks*,

No. 09-4909, 2009 WL 3818084 (D.N.J. Nov. 12, 2009) (respectfully disagreeing with the Board

and finding INA § 236(c) unambiguous); *Ortiz v. Napolitano*, --- F.Supp.2d ---, 2009 WL

3353029, at *3 (D. Ariz. Oct. 19, 2009) ("Consistent with every district court that has considered

this issue, the Court concludes that the mandatory detention provision, 8 U.S.C. § 1226(c), does

not apply to Petitioner because he was released from custody for the removable offense well

before the effective date of the mandatory detention provision."); *Mitchell v. Orsino*, No. 09-

7029, 2009 WL 2474709, at *3 (S.D.N.Y. Aug. 13, 2009) ("Petitioner's release from custody

after the effective date of [INA § 236(c)] for a nonremovable offense does not make him subject

to mandatory detention under the statute."); *Hy v. Gillen*, 588 F. Supp. 2d 122, 127 (D. Mass.

2008) (concluding that the alien was not subject to mandatory detention "[b]ecause the 2007

'release' from state custody is not related to the 1991 offense rendering Petitioner removable");

*Thomas v. Hogan*, No. 08-0417, 2008 WL 4793739, at *3 (M.D. Pa. Oct. 31, 2008) (concluding

that "the date of release from the offense for which the individual is found removable determines

whether the individual is entitled to an individualized bond hearing or subject to the mandatory

detention provision"); *Cox v. Monica*, No. 07-0534, 2007 WL 1804335, at *5 (M.D. Pa. Jun. 20,

2007) (analogizing to INA § 212(c) case law and finding that it would be impermissibly

retroactive to apply INA § 236(c) if the release that relates to the removable offense occurred

prior to the TPCR "because the provision clearly attaches new legal consequences to actions

3                                        A038 829 033

taken before its enactment"); *Cavazos v. Moore*, No. 03-347 (S.D. Tex. Jan. 7, 2005) (attached as

Appendix C) (certifying class of aliens in Harlingen District and imposing an injunction

precluding DHS from arguing mandatory detention for aliens whose post-TPCR release was not

related to a conviction described in INA § 236(c)(1)). *See also Quezada-Bucio v. Ridge*, 317

F.Supp.2d 1221, 1229-30 (W.D. Wash. 2004) (citing to *Pastor-Camarena v. Smith*, 977 F. Supp.

1415, 1417-18 (W.D. Wash. 1997), for the proposition that the "when released" language applies

only to release for the underlying offense, and mandatory detention does not apply to aliens

taken into immigration custody years after they are released from criminal custody); *Alikhani v.

Fasano*, 70 F.Supp.2d 1124, 1130-32 (S.D. Cal. 1999) (finding statute clear and applicable only

prospectively, but concluding that section 236(c) applied in this case because the post-TPCR

release (probation violation) was related to the pre-TPCR conviction). *But see Chivilchez v.

Holder*, No. 09-475, 2009 WL 2244219, at *1 (M.D. Fla. July 27, 2009) (concluding that alien

taken into DHS custody after release from 2009 DWI arrest was properly detained under INA §

236(c) based on pre-October 9, 1998 convictions).

## DISCUSSION

In its notice of appeal and appeal brief, the Department primarily argued that the

Immigration Judge erred by ignoring Board precedent in reliance on non-binding district court

decisions. Alternatively, the Department argued that the Immigration Judge erred in finding that

the facts of this case were distinguishable from *Matter of Saysana* and thus concluding that the

Board's precedent was inapplicable. In support of the Immigration Judge's decision, the

respondent in his reply brief argued that the facts of this case are materially distinguishable from

*Matter of Saysana*, noted the adverse district court decisions, and invited the Board to "clearly

define the limits of the holding in *Saysana*." Respondent's Brief at 6-7 (Resp. Brief). Given the

AILA InfoNet Doc. No. 10031860. (Posted 03/18/10)

federal judiciary's near uniform rejection of *Matter of Saysana*, the Department now asks the Board to revisit, in a superseding precedent decision, the issue of whether a post-TPCR release from non-DHS custody must be for an offense enumerated in sections 236(c)(1)(A)-(D) of the Act in order to trigger mandatory detention.

By asking the Board to revisit *Matter of Saysana*, the Department does not concede that the Board's interpretation was unreasonable. The Department accepts that the statutory language is ambiguous on the issue and that the Board's interpretation was reasonable, in light of that ambiguity. But given the widespread rejection of the decision by the federal judiciary, a superseding precedent is warranted. The Board acts on behalf of the Attorney General to provide "clear and uniform guidance to the [Department], the immigration judges, and the general public on the proper interpretation and administration of the Act and its implementing regulations." 8 C.F.R. § 1003.1(d)(1); *Matter of E-L-H-*, 23 I&N Dec. 814, 825 (BIA 2005). *See also* 8 C.F.R. §§ 1003.1(g) (providing that Board precedent decisions are "binding on all officers and employees of the Department of Homeland Security or immigration judges in the administration of the immigration laws of the United States"). If the Board elects to adopt a position more in line with the First Circuit's order and does so in a precedent decision, the Board can reinstate nationwide uniformity on the issue, and thereby provide clarity to the Department, the immigration courts, and the public.[2]

In its decision, the First Circuit framed the issue by asking "whether the mandatory detention provision [of INA § 236(c)(1)] applies only when an alien is released from a criminal custody the basis for which is one of the offenses listed in [INA § 236(c)(1)(A)-(D)]," or whether

---

[2]  Nationwide uniformity can be critical to DHS operations, particularly in the context of alien detention, as the Department detains aliens in facilities nationwide and may have to transfer aliens to different locations as operational needs arise. A uniform national rule on custody authority helps to settle the expectations of DHS operational personnel, aliens detained by the Department, and their families and representatives.

AILA InfoNet Doc. No. 10031860. (Posted 03/18/10)

any release from criminal custody, regardless of the reason for the detention, could trigger

mandatory detention if the alien had previously been convicted of an offense that falls within §

236(c)(1)(A)-(D). *Saysana v. Gillen*, 590 F.3d at 11.  In rejecting *Matter of Saysana*, the First

Circuit concluded that mandatory detention under section 236(c)(1) arises from a release "for an

offense specified in the statute, not merely *any* release from *any* non-DHS custody." *Id.* at 18.

It also characterized its approach as supporting a Congressional "purpose of preventing the

return to the community of those released *in connection with* the enumerated offenses." *Id.* at 17

(emphasis added); *see also id.* at 15 (criticizing the approach taken in *Matter of Saysana* because

it "read[s] a separate, intervening event—post-TPCR non-DHS custody *unrelated to the*

*enumerated offenses*—into the statute without any direct language to support such a reading")

(emphasis added).[3]  As a whole, the First Circuit's decision stands for the proposition that an

alien's post-TPCR "release" must be release from custody for an offense specified in INA §

236(c)(1) in order to trigger mandatory custody.

Accordingly, the Department respectfully suggests that the Board interpret the statute to

regard mandatory detention under INA § 236(c)(1) as arising from a post-TPCR "release" when

that release is from custody based on an underlying criminal conviction that gives rise to the

qualifying inadmissibility or deportability set out in INA § 236(c)(1)(A)-(D).[4]  While the

---

[3]   By its framing of the issue, the court focused on the criminal provisions of INA § 236(c)(1).  Although it
acknowledged that some of the provisions in INA § 236(c)(1) do not require a conviction, *see Saysana v.
Gillen*, 590 F.3d at 14, the First Circuit did not directly address non-conviction scenarios implicated by section
236(c)(1), such as the "engaged in terrorist activities" provision referred to in INA § 236(c)(1)(D).

[4]   In addition to a pre-October 9, 1998 conviction for which an alien is released post-TPCR after serving the
original sentence, the Department notes that mandatory detention would also apply in the following scenario:
an alien is sentenced to serve time in jail for a pre-October 9, 1998 conviction, but the jail term is suspended
and the alien is released on probation prior to the October 8, 1998 expiration of the TPCR, then violates the
terms of his probation and the original jail sentence is reinstated, resulting in a post-TPCR release from criminal
custody for the offense.  *See, e.g., Alikhani v. Fasano*, 70 F.Supp.2d 1124, 1132 (S.D. Cal. 1999) (concluding
that revocation of probation and cancellation of the suspension of a previously imposed sentence "puts that
sentence into full force and effect," that alien who was taken into custody after violating probation was serving

6                          A038 829 033

Department does not necessarily agree with all of the respondent's arguments on appeal[5] or his characterization of the *Matter of Saysana* decision, the respondent does seem to advocate for such an interpretation.  Resp. Brief at 8-11.

Adopting this interpretation would not undercut needed protections against dangerous individuals.  A criminal alien not covered by mandatory detention can nevertheless be detained if the facts and circumstances show that he or she is a flight risk or danger to the community.  *See* INA § 236(a); *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) (holding that the burden is on the alien to show to the satisfaction of the Immigration Judge and the Board that he or she does not pose a flight risk or danger to the community).  As the Board has acknowledged, "an alien in removal proceedings has no constitutional right to release on bond." *Id.* at 39 (citing to *Carlson v. Landon*, 342 U.S. 524, 534 (1952)).  The nature and extent of any criminal activities or favorable equities developed since the pre-October 9, 1998 offense would be relevant in any discretionary custody determination.  *Matter of Guerra*, 24 I&N Dec. at 40 (including examples of factors that may be relevant in a discretionary INA § 236(a) custody determination).  Congress was concerned about criminal aliens remaining at large and committing additional crimes or not being available for proceedings or deportation if ordered removed.  An alien who has committed additional crimes after the TPCR or evidences a significant risk of flight can be detained under INA § 236(a), which would allay Congress's concerns.  If Congress concludes that the federal

---

time for his original crime, and that therefore his post-TPCR release from that custody was a release from incarceration for the predicate conviction for which he was found to be deportable).

[5]    For example, although the respondent alleges a constitutional violation, *see* Resp. Brief at 8 n.3, the Department does not concede that the holding in *Matter of Saysana* is unconstitutional.  In any event, the Board lacks jurisdiction to rule on the constitutionality of the statutes and regulations it interprets and administers.  *See Matter of Fuentes-Campos*, 21 I&N Dec. 905, 912 (BIA 1997); *Matter of C-*, 20 I&N Dec. 529, 532 (BIA 1992).

AILA InfoNet Doc. No. 10031860. (Posted 03/18/10)

court interpretations and any amended Board decision are not in keeping with its aims, it has the capacity to amend the Act.

In making the suggestion that the Board can take this opportunity to revisit *Matter of Saysana*, the Department does not ask the Board to disturb its prior holdings that an alien need not be convicted of *any* offense in order to be removable as charged and subject to INA § 236(c) mandatory detention. *See, e.g., Matter of Saysana*, 24 I&N Dec. 602, 605 and n.3 (citing to grounds of inadmissibility and deportability that subject an alien to mandatory detention but do not require a criminal conviction); *Matter of Kotliar*, 24 I&N Dec. 124 (BIA 2007) (holding that "an alien need not be charged with the ground that provides the basis for mandatory detention in order to be found 'deportable' on that ground"). For example, an alien who has engaged in or is likely to engage in terrorist activity within the meaning of INA § 212(a)(3)(B), would be subject to mandatory detention. In such cases, however, we would not expect a conviction (or even a non-DHS arrest) to have occurred; as such, no release of any kind is required to trigger mandatory detention.[6] *See, e.g., Grant v. Zemski*, 54 F. Supp. 2d 437, 443 (E.D. Pa. 1999) (citing to *Velasquez v. Reno*, 37 F. Supp. 2d 663, 672 (D.N.J. 1999) for the proposition that INA § 236(c) appears to include aliens who would never be released, such as aliens who have "engaged in" terrorist activities).

Were the Board to revisit *Matter of Saysana* via a superseding precedent decision that substantially adopts the approach advocated herein, the respondent would not be subject to mandatory detention under INA § 236(c) because his post-TPCR release is not related to his pre-TPCR release. Nonetheless, the respondent would need to establish his eligibility for release under INA § 236(a).

---

[6] As explained, *Saysana v. Gillen* involved criminal arrests, and the First Circuit did not address factual scenarios where an alien is described in INA § 236(c)(1) but no arrest, and therefore no release, occurs.

8                                                    A038 829 033

FEB-12-2010  16:46        DHS/ICE/APPELLATE COUNSEL               703 756 6281     P.14

In redetermining bond under INA § 236(a), the Immigration Judge should permit release on bond only if the respondent demonstrates that he does not pose a danger to property or persons. *Matter of Urena*, 25 I&N Dec. 140, 141 (BIA 2009); *Matter of Guerra*, 24 I&N Dec. at 38.



A038 829 033

AILA InfoNet Doc. No. 10031860. (Posted 03/18/10)



Should the Board agree to revisit *Matter of Saysana* in a superseding precedent, the Department would accordingly request that the bond proceedings be remanded to the Immigration Judge for a full assessment of the respondent's eligibility for release under INA § 236(a).

AILA InfoNet Doc. No. 10031860. (Posted 03/18/10)

FEB-12-2010  16:46        DHS/ICE/APPELLATE COUNSEL                703 756 6281      P.16

### CONCLUSION

In light of the current state of federal jurisprudence and the respondent's invitation to the Board to clarify its holding in *Matter of Saysana*, the Department respectfully suggests that the Board take the opportunity to revisit its prior precedent decision, as outlined above. If the Board chooses to revisit its prior precedent and concludes that the respondent is not subject to INA § 236(c) detention, then the Department asks that bond proceedings be remanded for additional fact-finding and a thorough assessment by the Immigration Judge of the respondent's eligibility for release under INA § 236(a).

Respectfully submitted:

David A. Martin
Principal Deputy General Counsel
U.S. Department of Homeland Security

On Brief:

Moira A. Skinner
Appellate Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Scott D. Criss[8]
Assistant Chief Counsel
Office of Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

---

[8] Service upon DHS should continue to be directed to the U.S. Immigration and Customs Enforcement Office of Chief Counsel in Charlotte, North Carolina at 5701 Executive Center Drive, 3rd Floor, Charlotte, NC 28212.

A038 829 033

AILA InfoNet Doc. No. 10031860. (Posted 03/18/10)

94