STUART F. DELERY
Acting Assistant Attorney General
Civil Division
DAVID J. KLINE
Director, Office of Immigration Litigation
District Court Section
VICTOR M. LAWRENCE
Principal Assistant Director
THEODORE W. ATKINSON
Senior Litigation Counsel
United States Department of Justice
Office of Immigration Litigation,
District Court Section
     P.O. Box 868, Ben Franklin Station
     Washington, DC 20044
     Phone: (202) 532-4135
     theodore.atkinson@usdoj.gov

Attorneys for Respondents

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

|  |  |
|---|---|
| ALEJANDRO RODRIGUEZ, *et al.*,<br><br>       Petitioners,<br><br>     vs.<br><br>TIMOTHY S. ROBBINS, *in his capacity as U.S. Immigration and Customs Enforcement, Los Angeles District Field Office Director, et al.*,<br><br>      Respondents. | Case No. CV 07-3239-TJH (RNBx)<br><br>**RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Hon. Terry J. Hatter, Jr.<br><br>Hearing Date: August 13, 2012<br>Hearing Time: UNDER SUBMISSION |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STANDARD OF REVIEW .................................................................................. 2

ARGUMENT ......................................................................................................... 3

I. PETITIONERS CANNOT MEET THEIR BURDEN WITH RESPECT TO IRREPARABLE HARM, A BALANCE OF HARDSHIPS, AND THE PUBLIC INTEREST ................................................................................ 3

II. PETITIONERS CANNOT SUCCEED ON THEIR CLAIM THAT CRIMINAL ALIENS AND ARRIVING ALIENS ARE ENTITLED TO BOND HEARINGS AT SIX MONTHS IN ALL CASES .................... 5

A. Overview of the constitutional jurisprudence of detention challenges. ....................................................................................... 5

B. Petitioners are not likely to succeed on their claim that the Due Process Clause entitles all criminal aliens detained under section 1226(c) to a bond hearing at six months ................................. 7

1. Constitutional and statutory background ........................... 7

2. The detention of certain criminal aliens during the pendency of their removal proceedings is constitutional because such detention is not indefinite and continues to serve a valid and compelling statutory purpose ............................. 10

3. There is no support for Petitioners' claim that the Constitution requires bond hearings for pre-order aliens at six months or when aliens make a colorable challenge to removal ......................... 14

a. Petitioners' proposed six-month rule for pre-order detention is unsupported and has been rejected by other courts. ................ 14

b. There is no support for Petitioners' alternative proposal for an order declaring that that an alien's entitlement to a bond hearing is tied to the likelihood of successfully challenging removal ....................................................................... 20

C. Petitioners cannot succeed on their claim that the Due Process Clause entitles all arriving aliens detained under section 1225(b) to a bond hearing at six months. ................................ 21

1. Constitutional and statutory background ......................... 21

2. As provided in section 1225(b), the detention of arriving aliens during the pendency of their removal proceedings is constitutional because such detention is not indefinite and falls within Congress's broad authority over decisions of admission and exclusion ................................................. 25

i

    3. Petitioners' challenge to the sufficiency of parole procedures
       misses the mark, but in any event is without merit ........................... 29

III. THE CANON OF CONSTITUTIONAL AVOIDANCE DOES NOT
     APPLY TO SUPPORT A CONSTRUCTION OF SECTIONS 1226(c)
     OR 1225(b) AS DISCRETIONARY DETENTION STATUTES. ............. 31

   A. Constitutional avoidance cannot be applied to section 1226(c) as
      Petitioners claim, because section 1226(c) unambiguously excludes
      bond for criminal aliens detained during removal proceedings ............. 32

   B. Constitutional avoidance is also inapplicable in construing section
      1225(b) because the statute is non-discretionary, and any discretion
      to release arriving aliens arises under a statute not being challenged  ... 33

CONCLUSION ................................................................................................. 35

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

## CASES

*Abdi v. Napolitano*,
No. C10-1722RSL, 2011 WL 1584433 (W.D. Wash. Apr. 26, 2011) ............. 28

*Agyeman v. I.N.S. Assistant District Director Coachman*,
4 F. App'x 691, 694 (9th Cir. 2003) ................ 12

*Ahmed v. Holder*,
569 F.3d 1009 (9th Cir 2009) ......................... 19

*Albathani v. I.N.S.*,
318 F.3d 365 (1st Cir. 2003) ......................... 25

*Alli v. Decker*,
644 F. Supp. 2d. 535 (M.D. Pa. 2010), *reversed on other grounds*, 650
F.3d 1007 (3d Cir.2011) ......................... 19

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998) ......................... 32

*Alvarez-Garcia v. Ashcroft*,
378 F.3d 1094 (9th Cir. 2004) ......................... 25, 26

*American Hospital Management Corp. v. Harris*,
638 F.2d 1208 (9th Cir. 1981) ......................... 35

*Anderson v. United States*,
612 F.2d 1112 (9th Cir. 1979) ......................... 2

*Andrus v. Glover Constr. Co.*,
446 U.S. 608 (1980) ......................... 10

*Barrera-Echavarria v. Rison*,
44 F.3d 1441 (9th Cir. 1995) ......................... 25, 26, 29

*Benas v. Shea Mortg., Inc.*,
No. 11-cv-1461, 2012 WL 528244 (S.D. Cal. Feb. 16, 2012) ......................... 3

*Carcieri v. Salazar*,
129 S. Ct. 1058 (2009) ......................... 32

*Casas-Castrillon*,
535 F.3d 942 (9th Cir. 2008) ......................... 17, passim

*Centeno-Ortiz v. Culley*,
No. 11-CV-1970, 2012 WL 170123 (S.D. Cal. Jan. 19, 2012) ......................... 33

*Clark v. Suarez-Martinez*,
543 U.S. 371 (2005) ......................... 27, 33

*Crespo v. Baker*,
No. 11-CV-3019, 2012 WL 1132961 (S.D. Cal. Apr. 03, 2012) ......................... 27

iii

*Crespo v. Baker*,
No. 12-56132 (9th Cir.) .................................................................. 27

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989) .................................................................. 32

*Demore v. Kim*,
538 U.S. 510 (2003) ........................................................... 4, passim

*Diop v. ICE/Homeland Security*,
656 F.3d 221 (3d Cir. 2012) .................................................. 7, 18, 21

*Diouf v.Napolitano*
634 F.3d 1081 (9th Cir. 2012) ........................................... 15, passim

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .................................................................. 32

*Fernandez-Roque v. Smith*,
734 F.2d 576 (11th Cir.1984) ....................................................... 29

*Fiallo v. Bell*,
430 U.S. 787 (1977) .............................................................. 7, 21

*Flores-Powell v. Chadbourne*,
677 F. Supp. 2d 455 (D. Mass. 2010) ........................................... 18

*Foucha v. Louisiana*,
504 U.S. 71 (1992)         .......................................................... 12

*Gonzalez-Galindo*,
No. 1 2010 WL 4977023 (S.D. Cal. Dec. 1, 2010) ......................... 19

*Holder v. Humanitarian Law Project*,
130 S. Ct. 2705 (2010) .............................................................. 32

*Jean v. Nelson*,
727 F.2d 957 (11th Cir.1984), *aff'd*, 472 U.S. 846 (1985) ......... 29, 35

*Johnson v. Kay*,
860 F.2d 529 (2d Cir. 1988) ......................................................... 2

*Kansas v. Hendricks*,
521 U.S. 346 (1997) .................................................................. 12

*Kaplan v. Tod*,
267 U.S. 228 (1925) .................................................................. 23

*Landon v. Plasencia*,
459 U.S. 21 (1982)         ........................................................ 4, 22

*Leng May Ma v. Barber*,
357 U.S. 185 (1958) ............................................................. 22, 25

iv

*Ly v. Hansen,*
351 F.3d 263 (6th Cir. 2003) ........................................................ 7, 19, 22

*Lydo Enterprises, Inc. v. City of Las Vegas,*
745 F.2d 1211 (9th Cir. 1984) ............................................................. 4

*Martinez v. Gonzales,*
504 F. Supp. 2d 887 (C.D. Cal. 2007) ...................................... 19, 20

*Matter of E-R-M- & L-R-M-,*
25 I. & N. Dec. 520 (BIA 2011)        ......................................... 24, 26

*Matter of Rivens,*
25 I. & N. Dec. 623 (BIA 2011) ....................................................... 23

*Matter of X-K-,*
23 I. & N. Dec. 731 (BIA 2005) ....................................................... 34

*Nadarajah v. Gonzales,*
443 F.3d 1069 (9th Cir. 2006) ............................................... 6, passim

*Ngo v. INS,*
192 F.3d 390 (3rd Cir. 1999) ........................................................... 26

*Nken v. Holder,*
129 S. Ct. 1749 (2009) ....................................................................... 4

*Oakland Tribune, Inc. v. Chronicle Pub. Co.,*
762 F.2d 1374 (9th Cir. 1985) ............................................................ 3

*Prieto-Romero,*
534 F.3d 1053 (9th Cir. 2008) ......................................................... 27

*Shaughnessy v. U.S. ex rel. Mezei,*
345 U.S. 206 (1953) ................................................................ 22, passim

*Sierra On-Line, Inc. v. Phoenix Software, Inc.,*
739 F.2d 1415 (9th Cir. 1984) ............................................................ 2

*Soberanes v. Comfort,*
388 F.3d 1305 (10th Cir. 2004) ....................................................... 12

*Sports Form, Inc. v. United Press Intern., Inc.,*
686 F.2d 750 (9th Cir. 1982) ............................................................. 5

*TRW Inc. v. Andrews,*
534 U.S. 19 (2001) .......................................................................... 10

*Tijani v. Willis,*
430 F.3d 1241 (9th Cir. 2005) ................................................ 18, passim

*Transwestern Pipeline Co., LLC v.17.19 Acres,*
550 F.3d 770 (9th Cir. 2008) ............................................................. 2

v

*United States v. Broncheau,*
   645 F.3d 676 (4th Cir. 2011) ............................................................ 32

*United States v. Locke,*
   471 U.S. 84 (1985)     ................................................................... 35

*United States v. Rumely,*
   345 U.S. 41 (1953) ................................................................... 32

*United States v. Salerno,*
   481 U.S. 739 (1987) ................................................................... 12

*Winter v. NRDC, Inc.,*
   129 S. Ct. 365 (2008) ................................................................... 2, 4

*Zadvydas v. Davis,*
   533 U.S. 678 (2001) ............................................................ 6, passim

## STATUTES

8 U.S.C. § 1101(a)(13)(C) ................................................................... 22

8 U.S.C. § 1182(a)(2) ................................................................... 23

8 U.S.C. § 1182(a)(6)(C) ................................................................... 23, 24

8 U.S.C. § 1182(a)(7) ................................................................... 23, 24

8 U.S.C. § 1182(d)(5)(A) ................................................................... 1, passim

8 U.S.C. § 1182(h) ................................................................... 23

8 U.S.C. § 1225(b) ................................................................... 1, passim

8 U.S.C. § 1225(b)(1)(B)(ii) ................................................................... 24, 34

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ................................................................... 34

8 U.S.C. § 1225(b)(1)(A)(i) ................................................................... 24

8 U.S.C. § 1225(b)(2)(A) ................................................................... 24, 34

8 U.S.C. § 1226(a) ................................................................... 1, passim

8 U.S.C. § 1226(c) ................................................................... 1, passim

8 U.S.C. § 1226(c)(1) ................................................................... 10, 12

8 U.S.C. § 1226(c)(2) ................................................................... 10, 33

8 U.S.C. § 1229a ................................................................... 23

8 U.S.C. § 1229b(a) ................................................................... 23

8 U.S.C. § 1231 ................................................................................ 7, 16

8 U.S.C. § 1231(a) ........................................................................... 18, 21

8 U.S.C. § 1231(a)(1) ............................................................................ 35

8 U.S.C. § 1231(a)(6) ................................................................... 12, passim

8 U.S.C. § 1252(a) ................................................................................. 8

8 U.S.C.A. § 1551 ................................................................................ 10

28 U.S.C. § 1292(a)(1) ............................................................................ 5

**Anti-Drug Abuse Act of 1988**

Pub. L. No. 100-690, Tit. VII, § 7343(a), 102 Stat. 4470 ....................................... 8

**Antiterrorism and Effective Death Penalty Act of 1996**

Pub. L. No. 104-132, 110 Stat. 1214 ............................................................. 9

Div. C, 110 Stat. 3009-546 (Sept. 30, 1996) .................................................... 29

**Homeland Security Act of 2002**

Pub. L. No. 107-296, 116 Stat. 2135 ............................................................ 10

**Illegal Immigration Reform and Immigrant Responsibility Act of 1996**

Pub. L. No. 104-208 ............................................................................ 25

**Immigration Act of 1990**

Pub. L. No. 101-649, 104 Stat. 4978 ............................................................. 8

**Immigration Technical Corrections Act of 1991**

Pub. L. No. 102-232 ............................................................................. 8


## REGULATIONS

8 C.F.R. § 1.2(q) ............................................................................. 23

8 C.F.R. § 208.30(f) ......................................................................... 24

8 C.F.R. § 212.5(b) ....................................................................... 25, 26

8 C.F.R. § 235.3(b) .......................................................................... 24

8 C.F.R § 235.3(b)(2)(iii) ................................................................... 25

8 C.F.R. § 235.3(c) ................................................................. 25, 26

8 C.F.R. § 235.6(a)(1) ................................................................ 25

8 C.F.R. § 236.1(c)(1)(i) ............................................................. 13

8 C.F.R. § 236.1(c)(10) .............................................................. 11

8 C.F.R. § 236.1(d)(1) ............................................................... 11

8 C.F.R. § 236.1(d)(3) ............................................................... 11

8 C.F.R. § 241.4 ...................................................................... 19

8 C.F.R. § 1001.1(q) ................................................................. 23

8 C.F.R. § 1003.19 ................................................................... 36

8 C.F.R. § 1003.19(a) ............................................................... 11

8 C.F.R. § 1003.19(b) ............................................................... 11

8 C.F.R. § 1003.19(h)(2)(i)(B) ............................................... 25, 26, 36

8 C.F.R. § 1003.19(h)(2)(ii) ........................................................ 11

8 C.F.R. § 1003.19(h)(2)(i)(B) .................................................. 29, 41

8 C.F.R. § 1003.29 ................................................................... 20

8 C.F.R. § 1235.3(b) ................................................................. 28

## MISCELLANEOUS

133 Cong. Rec. 28,840 (1987) ..................................................... 8

H.R. Rep. No. 22, 104th Cong., 1st Sess. 12 (1995) ............................. 9

H.R. Rep. No. 22, *supra* ............................................................. 9

H.R. 3529, 100th Cong. 1st Sess. (1987) ........................................... 8

H.R. Rep. No. 469, 104th Cong., 2d Sess., Pt. 1, at 123 (1996) ................ 9

# <u>INTRODUCTION</u>

Petitioners seek a preliminary injunction that would read 8 U.S.C. §§ 1225(b) and 1226(c) to require bond hearings[1] before immigration judges for two distinct classes of aliens – arriving aliens and certain criminal aliens – once those aliens have been detained for six months.  This Court should deny Petitioners' motion.

Section 1226(c) unambiguously excludes certain criminal aliens from having a right to a bond hearing during the pendency of their removal proceedings.  Similarly, section 1225(b) unambiguously mandates the detention of arriving aliens without a bond hearing, although Congress authorized the Secretary of Homeland Security to parole arriving aliens detained under section 1225(b) at her discretion.  8 U.S.C. § 1182(d)(5)(A).  Congress did not provide that the detention rules imposed by sections 1226(c) or 1225(b) expire such that arriving and criminal aliens are entitled to a bond hearing before a determination of their removal has been made.  Moreover, Petitioners' claim that an entitlement to a bond hearing takes hold at six months – regardless of the immigration statute at issue, the purpose of the detention, or the alien's circumstances – finds no support in in the Immigration and Nationality Act (INA) or due process jurisprudence.  To the contrary, Petitioners' claims are undermined by Supreme Court and Ninth Circuit cases that recognize important distinctions between sections 1225(b) and 1226(c) and other *discretionary* immigration detention statutes that specifically provide for bond hearings, introduce a risk of indefinite detention, and serve different purposes.  The clear statutory text and applicable precedent require that this Court reject Petitioners' claims and deny the preliminary injunction motion.

---

[1] Petitioners specifically seek bond hearings with the burden on the government to demonstrate by clear and convincing evidence that those individuals present a danger or flight risk to justify continued detention, but do not provide any legal basis for requiring a standard that is contrary to what is provided to individuals detained during removal proceedings under 8 U.S.C. § 1226(a).

1  Moreover, contrary to Petitioners' contentions, the Court cannot apply the
2  doctrine of constitutional avoidance to read into the challenged statutes a requirement
3  for bond hearings before an immigration judge at six months. Constitutional
4  avoidance is merely a canon of statutory interpretation available when there is an
5  alternative, plausible interpretation of the statute that Congress may have intended.
6  Nowhere in either statute is there room to conclude Congress intended the limitations
7  that Petitioners advance.  As such, the Court must address the constitutionality of the
8  statutory provisions.

9  **STANDARD OF REVIEW**

10  Preliminary injunctions are intended to preserve the relative positions of the
11  parties until a trial on the merits can be held.  *Sierra On–Line, Inc. v. Phoenix*
12  *Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir.1984) ("A preliminary injunction . . . is
13  not a preliminary adjudication on the merits but rather a device for preserving the
14  status quo and preventing the irreparable loss of rights before judgment.").  A
15  prohibitory injunction preserves the status quo.  *Johnson v. Kay*, 860 F.2d 529, 541
16  (2d Cir.1988).  A mandatory injunction – such as the one Petitioners seek  – "goes
17  well beyond simply maintaining the status quo Pendente lite [and] is particularly
18  disfavored."  *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979).

19  This Court may not award a preliminary injunction unless Petitioners show: (1)
20  a strong likelihood of their success on the merits, (2) that they are likely to suffer
21  irreparable injury absent preliminary relief, (3) a balance of hardships favoring them,
22  and (4) advancement of the public interest.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20
23  (2008).  Petitioners must satisfy each factor.  *Id*.  Additionally, because Petitioners
24  seek a mandatory injunction, they must demonstrate that "the facts and law clearly
25  favor the moving party."  *Transwestern Pipeline Co., LLC v.17.19 Acres*, 550 F.3d
26  770, 776 (9th Cir. 2008).  Petitioners do not meet this standard.

27
28

## ARGUMENT

**I.    PETITIONERS CANNOT MEET THEIR BURDEN WITH RESPECT TO IRREPARABLE HARM, A BALANCE OF HARDSHIPS, AND THE PUBLIC INTEREST**

Petitioners' motion for a preliminary injunction comes more than four years into this case, more than two years after it was remanded to the district court for further proceedings, and less than six months before the parties are expected to brief all issues on summary judgment – including those presented in the pending motion. As such, Petitioners have failed to meet their burden of showing irreparable harm. *See Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (a moving party's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *see also Benas v. Shea Mortg., Inc.*, No. 11-cv-1461, 2012 WL 528244, at * 5 (S.D. Cal. Feb. 16, 2012) (seven months delay in seeking emergency injunctive relief weighs heavily against irreparable harm).

Instead, at this late stage in the litigation, Petitioners' motion for a preliminary injunction – which seeks relief that is nearly identical to the relief they seek in final judgment – is an attempt to circumvent the remainder of discovery and proceed to a determination on the merits on the core of Petitioners' claims.  Petitioners have provided no explanation why they have waited four years to seek preliminary injunctive relief or why their claims should not be adjudicated on the merits in a few months.

Notably, Petitioners' chose to file this motion after obtaining extensive discovery from Respondents, including information responsive to discovery requests and depositions of agency witnesses.  At the same time, however, Petitioners have refused to provide meaningful responses to Respondents' written discovery requests, leading to a discovery dispute.  Declaration of Theodore W. Atkinson at ¶ 2.  The motion also comes before the start of expert discovery, which Petitioners have acknowledged as an important aspect to this case.  *See, e.g.,* Joint Stipulation of the Parties, ECF # 165, at 19, 26-29 (Petitioners' Contentions).

All of this is evidence that Petitioners' motion is timed not to avoid irreparable harm, but to short-circuit the litigation process years after the case was filed, and less than four months before discovery is set to be completed.  Accordingly, while the Court should also deny the motion on the basis that Petitioners cannot succeed on the merits of their claims, the Court need not reach that issue because Petitioners cannot meet their burden of showing irreparable harm.  *See Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984) (courts must consider delay in weighing the propriety of preliminary injunctive relief).

Similarly, Petitioners cannot show that the balance of the harms and the public interest weigh in favor of a preliminary injunction before a determination of this case on the merits.  *See Nken v. Holder*, 556 U.S. 418, 420 (2009) (explaining that "harm to the opposing party" and "the public interest" "merge when the Government is the opposing party" because harm to the Government is harm to the public interest).  In exercising its discretion to grant or deny preliminary injunctive relief, this Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.

Apart from the fact that the challenged detention is constitutional, granting a preliminary injunction requiring administrative relief not found in the statutes or regulations governing the detention of criminal and arriving aliens would be extraordinary.  The Supreme Court upheld mandatory detention of criminal aliens in part because criminal aliens released on bond pending removal frequently failed to appear for proceedings or, worse, committed or assisted in other crimes.  *Demore v. Kim*, 538 U.S. 510, 518 (2003).  Similarly, the congressional interest in controlling the nation's borders – which the detention of arriving aliens furthers – "is a sovereign prerogative."  *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).  Granting the preliminary injunction would conflict with important Congressional interests and would provide every detainee within the sections 1226(c) and 1225(b) subclasses with what amounts to full and complete relief *before* summary judgment.  The public interest is served by

**4**

deciding a case of such scope and constitutional importance after the parties have completed discovery and submitted the case on the merits, rather than considering essentially final relief on a preliminary basis.

Finally, given the significance of the constitutional issues involved, and the fact that Petitioners seek to obtain essentially final relief rather than to preserve the *status quo*, Respondents may appeal the grant of such relief under 28 U.S.C. § 1292(a)(1). Such an appeal may "result in unnecessary delay to the parties and inefficient use of judicial resources," when the case "could have proceeded to a disposition on the merits in far less time than it took to process th[e] appeal." *Sports Form, Inc. v. United Press Intern., Inc.*, 686 F.2d 750, 753 (9th Cir. 1982). This would lead to even greater delay, the very harm Petitioners claim they seek to avoid.

## II. PETITIONERS CANNOT SUCCEED ON THEIR CLAIM THAT CRIMINAL ALIENS AND ARRIVING ALIENS ARE ENTITLED TO BOND HEARINGS AT SIX MONTHS IN ALL CASES.

Petitioners seek a uniform, one-size-fits-all rule that all criminal aliens and arriving aliens – regardless of their individual circumstances – are entitled to a bond hearing at six months. Petitioners' proposed six-month rule – which courts have repeatedly rejected – fails to account for the very distinctions that make criminal and arriving aliens different from citizens, and even from other aliens. These distinctions make detention without a bond hearing under sections 1226(c) and 1225(b) constitutional, even if such detention lasts beyond six months.

## A. Overview of the constitutional jurisprudence of detention challenges.

Contrary to Petitioners' suggestion that there is a unitary "bedrock principle" entitling all aliens to bond hearings before immigration judges at six months, decisions of the Supreme Court, the Ninth Circuit, and other courts of appeals support the constitutionality of detention beyond six months under 8 U.S.C. §§ 1226(c) and 1225(b). Specifically, those courts have considered that such detention is not indefinite, serves a different statutory purpose than other statutes where a six month

rule has been imposed, and that due process is flexible and cannot be determined using a one-size-fits all framework.

First, detention under either statute is not *indefinite*.  Although the Supreme Court and the Ninth Circuit have concluded that potentially indefinite detention raises constitutional concerns, the statutes at issue here do not give rise to potentially indefinite detention.  *See Zadvydas v. Davis*, 533 U.S. 678, 692 (2001) (explaining that a "serious constitutional problem" arises when a statute "permits an indefinite" form of detention); *Nadarajah v. Gonzales*, 443 F.3d 1069 (9th Cir. 2006).  The constitutional concerns addressed in those decisions arose when the aliens faced indefinite detention, because they could not be removed, *Zadvydas*, 533 U.S. at 690, or there was a lack of any process providing an end to detention, *see Nadarajah*, 443 F.3d at 1081.  By contrast, when detention lasts only as long as the pendency of removal proceedings, as it does under both sections 1225(b) and 1226(c), it includes "a definite termination point" and remains constitutional.  *Demore*, 538 U.S. at 529 (upholding the constitutionality of mandatory detention under section 1226(c)).  Accordingly, Petitioners cannot claim that aliens facing detention beyond six months under either sections 1225(b) or 1226(c) face indefinite detention because both statutes authorize detention only during removal proceedings.  *Cf.* 8 U.S.C. § 1231 (providing for detention after a removal order becomes administratively final).

Second, and relatedly, detention under the challenged statutes serves statutory purposes that do not fade when detention has continued beyond six months.  "Where detention's goal is no longer practically attainable, detention no longer bears a reasonable relation to the purpose for which the individual was committed." *Zadvydas*, 533 U.S. at 690 (internal citations and quotations omitted).  The detention of criminal aliens under section 1226(c) serves the important purpose of ensuring that criminal aliens do not flee or commit other crimes pending their removal proceedings. *Demore*, 538 U.S. at 518.  The detention of arriving aliens pending a determination of their removal allows the government to effectively exercise the power to exclude or

admit, a "fundamental sovereign attribute." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Unlike the detention of an alien ordered removed but who cannot be removed in the reasonably foreseeable future, detention in the context of removal proceedings continues to serve the statutory purpose of ensuring that an alien cannot flee prior to the termination of such proceedings. *Demore*, 538 U.S at 527 (distinguishing *Zadvydas*). Petitioners cannot claim that detention of arriving and criminal aliens during the removal proceeding process no longer serves the important statutory purposes underlying sections 1226(c) and 1225(b).

Third, courts recognize that due process is flexible and depends upon the circumstances of the individual case. Courts have been careful to consider as-applied challenges to detention based on the particular facts presented in each individual case. *See Demore*, 538 U.S. at 530-31 (noting that the detention at issue was lengthened because the alien "himself had requested a continuance of his removal hearing."). This flexibility that has led courts that have addressed mandatory detention during removal proceedings – including the Third and Sixth Circuits – to reject the notion that the Constitution demands the blanket six-month rule Petitioners seek. *See*, *e.g.*, *Ly v. Hansen*, 351 F.3d 263, 271-73 (6th Cir. 2003) (rejecting a six-month rule in a pre-order detention challenge to section 1226(c)); *Diop v. ICE/Homeland Security*, 656 F.3d 221, 234 (3d Cir. 2012) (same). With these principles in mind, Respondents turn to the statutes at issue.

**B.    Petitioners are not likely to succeed on their claim that the Due Process Clause entitles all criminal aliens detained under section 1226(c) to a bond hearing at six months.**

### 1.    Constitutional and statutory background

Removable criminal aliens have long posed a special congressional concern. Until the late 1980s, section 242 of the INA authorized the Attorney General to release criminal aliens from custody during their deportation proceedings. The law provided that "[p]ending a determination of deportablity" in administrative proceedings, an alien "may, upon warrant of the Attorney General, be arrested and

taken into custody." 8 U.S.C. § 1252(a) (1982). Under that language the Attorney General – through the former Immigration and Naturalization Services ("INS") – had discretion whether to keep the alien in custody, release the alien on bond, or release the alien on conditional parole. *Id.*

In 1988, Congress limited the Attorney General's discretion over custody determinations as part of the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, Tit. VII, § 7343(a), 102 Stat. 4470. In doing so, Congress took careful note of the fact that "[a]ll too often, [criminal] aliens – whether here legally or illegally – who are arrested for various felonious crimes, evade deportation, dodge trials, and continue with their recidivist activities." 133 Cong. Rec. 28,840 (1987) (statement of Rep. Smith) (discussing H.R. 3529, 100th Cong., 1st Sess. (1987)). Additionally, a sponsor of the amendments noted that criminal aliens operated major narcotics syndicates throughout the United States and "have been connected with money laundering, racketeering, weapons sales, prostitution rings, and a host of other heinous crimes." *Id.* at 28,840 (statement of Sen. Chiles). "[O]ften," he observed, criminal aliens "are able to pay expensive bonds and disappear under a new identity" until arrested again "with a different name and a new offense." *Ibid.*; *see id.* at 8771.

Congress enacted several amendments to the INA in 1990 and 1991 that expanded the definition of "aggravated felony" under the INA and provided the Attorney General discretion to detain or release certain criminal aliens under narrow conditions. Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978; Immigration Technical Corrections Act of 1991, Pub. L. No. 102-232. However, in 1996, Congress amended the INA again, noting the weakness of the 1990 and 1991 amendments – and particularly provisions allowing the release of criminal aliens in the Attorney General's discretion – in addressing problems posed by criminal aliens.[2]

---

[2] Congress concluded that the 1990 and 1991 amendments restoring the Attorney General's discretion to release some aliens on bond had "weakened substantially" the government's efforts to deport criminal aliens and to protect public safety. Criminal

*(Footnote continued)*

**8**

In passing the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, Congress considered specific evidence of the consequences of allowing discretionary release of criminal aliens during their deportation proceedings.  As the Supreme Court later noted, in enacting the provisions that would become section 1226(c), Congress "had before it evidence that one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings." *Demore*, 538 U.S. at 519.  Moreover, "[o]ne 1986 study showed that, after criminal aliens were identified as deportable, 77% were arrested at least once more and 45% – nearly half – were arrested multiple times before their deportation proceedings even began." *Id.* at 518.

To address these concerns, Congress adopted section 1226(c), which removed the authority of the Attorney General – now the Department of Homeland Security ("DHS")[3] – to release certain criminal aliens on bond.   On this point the statute is clear and unambiguous, as exemplified by the contrasting provisions in section 1226(a) that were enacted at the same time.  Section 1226(a) specifies that the

_____

Aliens in the United States: Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs ("1993 Senate Hearing"), 103d Cong., 1st Sess. 15, 26 (1993); see H.R. Rep. No. 22, 104th Cong., 1st Sess. 12 (1995).  The Senate Governmental Affairs Committee found that as a result of the 1990 and 1991 amendments, and because of a shortage of space in immigration detention facilities, "many [criminal aliens] who should be detained [during deportation proceedings] are released on bond."  H.R. Rep. No. 22, *supra*, at 2; see, at 21 (staff report) ("Although detaining a criminal alien pending his removal proceeding guarantees that the alien will actually appear at that proceeding, this option is often not available due to [the Immigration and Naturalization Service's] chronic lack of detention space."). The House Judiciary Committee agreed that the failure to detain aliens during their deportation proceedings was "[a] chief reason why many deportable aliens are not removed from the United States."  H.R. Rep. No. 469, 104th Cong., 2d Sess., Pt. 1, at 123 (1996).

[3] In creating the DHS, Congress transferred all immigration functions, with few exceptions, to the Secretary of Homeland Security.  Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135; *see also* 8 U.S.C.A. §1551, note.

Secretary of Homeland Security "may" detain an alien arrested under the general immigration arrest provisions and "may release the alien" on bond or conditional parole. Section 1226(c), by contrast, includes no authority to release aliens on bond, and provides that DHS "*shall* take into custody" any alien who commits certain offenses enumerated in the statute during the pendency of his or her removal proceedings, and "may release" such individuals "only" when necessary in specific instances where the alien has provided material assistance in a criminal matter. 8 U.S.C. § 1226(c)(1). The specific inclusion of a provision for the release of a narrow class of aliens subject to detention under section 1226(c)(2) makes clear that other aliens falling within the scope of section 1226(c) may not be released.[4] *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (quoting *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–617 (1980)) ("'Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'").

Criminal aliens detained under section 1226(c) are not without available process, however, and may challenge whether they are properly included within the reach of section 1226(c) before DHS and in a subsequent hearing before an immigration judge, and then to the Board of Immigration Appeals. *See* 8 C.F.R. §§ 1003.19(a), (b), and (h)(2)(ii); 236.1(c)(10), (d)(1), and (d)(3).

### 2. The detention of certain criminal aliens during the pendency of their removal proceedings is constitutional because such detention is not indefinite and continues to serve a valid and compelling statutory purpose.

The constitutionality of mandatory detention under section 1226(c) was settled by the Supreme Court in *Demore*. In *Demore*, detainees argued that mandatory

---

[4] Section 1226(c)(2) provides in pertinent part that "[t]he Attorney General may release an alien described in paragraph (1) *only if* the Attorney General decides . . . that release of the alien from custody is necessary to provide" protection to witnesses or those assisting in investigations and their family and associates.

detention for criminal aliens was unconstitutional "because it results in *prolonged detention* of a wide array of lawful permanent residents who pose no danger or flight risk, who are raising bona fide challenges to removal, and who often prevail in those challenges." *See* Brief of Respondents in *Demore*, 2002 WL 31455525, * 11 (emphasis added); *see also Demore*, 538 U.S. at 523.

The Supreme Court disagreed, concluding that "Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that persons such as respondent be detained for the brief period *necessary for their removal proceedings*." *Id.* at 512 (emphasis added).  Congress's broad authority over immigration, combined with a definable and valid statutory purpose that addressed the specific problems of criminal aliens facing removal, makes the detention of criminal aliens during the course of removal proceedings constitutional.  *Demore*, 538 U.S. at 524-25.

In upholding mandatory detention under section 1226(c), the Court also specifically distinguished between the pre-final order detention under section 1226(c) and the post-order, but potentially indefinite, detention under section 1231(a)(6) considered in *Zadvydas*.  As the Court explained, the aliens in *Zadvydas* were "ones for whom removal was 'no longer practically attainable,'" and thus "detention there did not serve its purported immigration purpose."  *Demore*, 538 U.S. at 527 (citing *Zadvydas*, 533 U.S. at 690).  Aliens detained under section 1226(c), by contrast, are detained pending their removal proceedings, and thus their detention "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed."  *Demore*, 538 U.S. at 528.  The Supreme Court further distinguished *Zadvydas* by explaining that while "post-removal-period detention, unlike detention pending a determination of removability, has no obvious

termination point," pre-final order detention under section 1226(c) has "a definite

termination point." *Id.* at 529.

Because the termination of removal proceedings is definite, as opposed to

potentially indefinite, and because it continues to serve the statute's purpose, detention

under section 1226(c) raises no greater constitutional concern than post-final order

detention where removal is foreseeable. *See also Soberanes v. Comfort*, 388 F.3d

1305, 1311 (10th Cir. 2004) (alien's detention "is clearly neither indefinite nor

potentially permanent," but "has a definite and evidently impending termination point

. . . akin to detention during the administrative review process"); *Agyeman v. I.N.S.*

*Assistant District Director Coachman*, 74 F. App'x 691, 694 (9th Cir. 2003)

("Moreover, his detention has a definite termination point.  Thus, his detention meets

substantive due process requirements.").

*Demore* revisited a thread of reasoning running through its immigration

detention cases showing that due process must be examined in a way appropriately

reflective of Congress's broad immigration authority under the Constitution.  Because

of that authority, *Demore* and in cases preceding it gave great deference to Congress,

allowing Congress to address immigration issues in a way it deemed necessary.  The

Court rejected the argument Petitioners now advance that due process requires

individualized determinations.  *Demore*, 538 U.S. at 527-28.  To the contrary, the

Court explained that Congress could detain non-citizens by reference to a statutory

purpose in pursuit of Congress's immigration authority, even if that statutory purpose

forecloses the possibility of an individualized determination that detention is not

necessary in any particular alien's case.  *Id.*[5]  Petitioners offer nothing to suggest that

---

[5] Petitioners argue that due process requires individualized determinations, citing
*United States v. Salerno*, 481 U.S. 739 (1987); *Foucha v. Louisiana*, 504 U.S. 71
(1992); and *Kansas v. Hendricks*, 521 U.S. 346 (1997)).  *Demore* rejected that
argument.  538 U.S. at 531.  The other cases Petitioners cite at p. 9 of their motion
should be rejected for the same reason: they involve cases brought by citizens and fall
outside the immigration context considered in *Demore*.

the Supreme Court would now view Congress's broad immigration prerogatives found constitutional in *Demore* in a different light.

Nor do Petitioners make any attempt to show that one of the primary statutory purposes behind section 1226(c) – to address the problem of a high percentage of criminal aliens, having obtained release on bond, failing to attend removal proceedings – has lessened with time.  That problem persists.  In an April 2006 report, DHS's Office of the Inspector General found that "historical trends indicate that 62 percent of the aliens released will eventually be issued final orders of removal . . . and later fail to surrender for removal or abscond."  DHS OIG, Detention and Removal of Illegal Aliens, at 1 (Report OIG-06-33, Apr. 2006) (attached as Exhibit A).  More recently, in 2011 Immigration and Customs Enforcement (ICE) arrested more than 40,000 fugitive aliens who failed to leave the United States when ordered removed or failed to report to ICE as required.  *See* ICE Fact Sheet: ICE Fugitive Operations Program (Nov. 7, 2011) (attached as Exhibit B).  However, nearly 480,000 fugitive alien cases remained pending at the end of fiscal year 2011.  *Id.*  Although these figures are not limited to criminal aliens, they show that a compelling problem Congress sought to address in 1996 – flight by criminal aliens – remains a problem that *Demore* recognized Congress had authority to address through mandatory detention.

Detention under section 1226(c) beyond six months has the same effect of ensuring that criminal aliens appear for removal proceedings and do not commit crimes during the pendency of such proceedings.  Petitioners' six-month rule fails to address the problems that animated the *Demore* Court.  To the contrary, Petitioners' bright-line six-month rule would mean that the problems Congress addressed in 1996 would increase as criminal aliens become subject to discretionary detention, just as they were before AEDPA was enacted.  *See supra* at 8-9 (describing failure of discretionary detention to prevent absconsion and additional crime).

3.    **There is no support for Petitioners' claim that due process requires bond hearings for pre-order aliens at sixth months or when aliens make a colorable challenge to removal.**

a.    **Petitioners' proposed six-month rule for pre-order detention is unsupported and has been rejected by other courts.**

Petitioners' claim that all aliens detained pursuant to sections 1226(c) and 1225(b) are entitled to a bond hearing before an immigration judge at six months finds no support in constitutional jurisprudence.  In *Demore*, the Supreme Court upheld the mandatory detention of the alien challenging the statute, even though he had been detained pursuant to section 1226(c) for longer than six months at the time he filed his habeas petition.  *Demore*, 538 U.S. at 530-31.  Even if this Court could conclude from *Demore* that the Court was somehow concerned with the idea of "prolonged" detention – a concern not addressed anywhere in the Court's decision – there is nothing in *Demore* to suggest that at a specific, predetermined point detention somehow becomes unconstitutional.  The Court did not state that the length of removal proceedings was a touchstone of constitutionality.  The Court's reference to the "average" length of detention was a reference point to show that detention *during* removal proceedings, unlike the post-order detention at issue in *Zadvydas*, was not potentially indefinite.  *Demore*, 538 U.S. at 529.  Moreover, by referring to the "average" length of detention the Court tacitly acknowledged that some removal proceedings would last longer than five months, and yet *Demore* does not separately or differently address the constitutionality of detention that lasts longer than the "average."  Thus, *Demore* undercuts – rather than supports – Petitioners' claim.

Nor can Petitioners point to *Zadvydas* for support.  Although *Zadvydas* declared post-order detention to be presumptively constitutional up to six months, and constitutional beyond that presumptive period so long as removal remained reasonably foreseeable, *Zadvydas* considered indefinite detention and in no way concluded that pre-order detention beyond six months raises constitutional concerns *per se*.  There

the question concerned whether continued detention would facilitate removal, the purpose of 8 U.S.C. § 1231 under which the alien was detained.  The Supreme Court concluded that in determining when to continue detention, it was "practically necessary to recognize some presumptively reasonable period of detention," specifically six months.  533 U.S. at 701.  The Supreme Court determined that "[a]fter this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing."  *Id.*  Thus, *Zadvydas* raised the possibility that detention beyond six months with a final order of removal could raise constitutional concerns, but it did not identify a temporal moment when detention *per se* raises constitutional concerns.

Because Petitioners can find no support in Supreme Court decisions for their six-month rule, they rely largely on Ninth Circuit cases.  For example, Petitioners claim that the Ninth Circuit's declaration in *Diouf v. Napolitano*, 634 F.3d 1081 (9th Cir. 2012), that without certain procedural safeguards, detention beyond 180 days "would 'raise serious constitutional concerns,'" *Diouf*, 634 F.3d 1091, applies no matter what statute is at issue, and regardless of the alien's circumstances.  However, *Diouf* is distinguishable on several grounds.

First, in *Diouf*, the Ninth Circuit construed a different statute, 8 U.S.C. § 1231(a)(6), and related regulations found at 8 C.F.R. § 241.4 providing for post-order custody reviews.  *Id.* at 1085, 1089-90.  The Ninth Circuit made this clear in the same sentence that Petitioners now seek to apply generally to sections 1225(b) and 1226(c). *See Diouf* at 1085-86 (explaining that "detention *under section 1231(a)(6),* without adequate procedural protections, would raise  'serious constitutional concerns.'") (citing *Casas-Castrillon*, 535 F.3d at 950) (emphasis added).   Moreover, the *Diouf* Court's concerns centered on the adequacy of the post-order detention regulations, which are not at issue here.  *Id.*  The fact that *Diouf* considered prolonged detention in a post-order setting was significant, because the Court acknowledged that "it may take

1    years for the petitions for review to be resolved," *Id.* at 1088, and the regulations did
2    not provide a meaningful review of an alien's continued detention under those
3    circumstances. *Id.* at 1089-90 (noting the fact that the post-order review process, once
4    concluded, permitted continued detention without further review for up to an
5    additional year). The Court in *Diouf* carefully limited its holding to aliens in post-
6    order detention, as it did in *Casas-Castrillon*, 535 F.3d 942, 950 (9th Cir. 2008)
7    (identifying issue before it as "whether legal permanent residents such as Casas, who
8    have been subjected to prolonged detention pending judicial review of their final order
9    of removal or agency reconsideration on remand…"). The Ninth Circuit did not
10   extend *Diouf* to the question of aliens detained under pre-order statutes.

11            Second, *Diouf* is distinguishable because at issue was a discretionary – not
12   mandatory – detention statute. The Court compared discretionary post-order detention
13   under section 1226(a) with the discretionary post-order detention under section
14   1231(a)(6) and concluded that there was no basis for withholding from aliens
15   discretionarily detained under section 1231(a)(6) the same safeguards available to
16   aliens under discretionary detention in section 1226(a). *Id.* at 1086. Here, by contrast,
17   section 1226(c) includes non-discretionary language fueled by congressional concerns
18   about criminal aliens who present high risks of flight and additional criminal offenses
19   while awaiting the conclusion of removal proceedings. *Demore*, 538 U.S. at 518.
20   Thus, Petitioners' reliance on *Diouf* is misplaced because it considered a discretionary
21   detention statute and concomitant regulations in a post-order setting, and did not
22   consider the pre-order mandatory detention provisions of sections 1226(c) and
23   1225(b), which have their own statutory purposes and their own constitutional
24   considerations.

25            The decision in *Casas-Castrillon* is also distinguishable. As in *Diouf*, the Court
26   in *Casas-Castrillon* considered the issue of prolonged detention under a statute not
27   challenged here, in that case 8 U.S.C. § 1226(a). That statute, like section 1231(a)(6)
28   considered in *Diouf*, is a discretionary detention statute, not a mandatory one. Also as

1    in *Diouf*, the alien was no longer in removal proceedings but was instead seeking

2    judicial review with a concomitant stay of removal.

3        The alien's placement in the removal process mattered to the Ninth Circuit in

4    *Casas-Castrillon*, because, citing *Demore*, the Court concluded that "[t]he Supreme

5    Court similarly recognized . . . that section 1226(c) was intended only to 'govern[ ]

6    detention of deportable criminal aliens *pending their removal proceedings*,'…."

7    *Casas*, 535 F.3d at 948 (quoting *Demore*, 538 U.S. at 527-28) (emphasis in original).

8    Once "*Casas*' *proceedings before the BIA were complete*, the Attorney General's

9    authority to detain him under § 1226(c) ended and that authority shifted instead to §

10   1226(a)." *Id.* (emphasis added).  Accordingly, the Ninth Circuit concluded that

11   because "neither § 1231(a) nor § 1226(c) governs the prolonged detention of aliens

12   *awaiting judicial review of their removal orders*, …Casas' detention was authorized

13   during this period under the Attorney General's general, discretionary detention

14   authority under § 1226(a)." *Casas*, 535 F.3d at 948.

15       Apart from these distinctions, Petitioners are incorrect that *Diouf* supports the

16   conclusion that a six-month bright-line rule would be adopted by the Ninth Circuit in

17   a pre-order context under either of the statutes challenged here.  There is no evidence

18   in *Diouf* that the Ninth Circuit would extend its reasoning to sections 1226(c) or

19   section 1225(b).  The *Diouf* Court cited *Zadvydas*, *Casas-Castrillon*, and, to a lesser

20   extent, *Demore*, in concluding that detention becomes prolonged at six months under

21   section 1231(a)(6).  For reasons discussed above, *Zadvydas* does not aid Petitioners'

22   argument for a six-month rule in a pre-order context, particularly when the *Zadvydas*

23   Court stated that detention beyond six months does not raise constitutional concerns

24   unless and until removal is no longer reasonably foreseeable.  533 U.S. at 701.

25   *Diouf*'s citation of *Demore* is equally unavailing.  The Supreme Court's examination

26   of the facts at issue in *Demore* (including the alien's request for a continuance that

27   prolonged his detention) and the existence of a definite point at which proceedings

28   will terminate undercuts the conclusion that section 1226(c) becomes

17

unconstitutionally prolonged at six months.  Finally, *Casas-Castrillon* offers
Petitioners no support for a six-month standard.  The Ninth Circuit in that case did not
articulate a standard for determining when detention under section 1226(a) becomes
prolonged, *Casas-Castrillon*, 535 F.3d at 948 (stating that seven years' detention was
"prolonged by any measure"), let alone articulate a standard that suggests six months
is the constitutional limit.[6]  Accordingly *Diouf* does not support Petitioners' claim that
detention under the challenged statutes becomes unconstitutionally "prolonged" at 180
days.

Petitioners' argument for a six-month blanket rule has also been rejected by
other courts.  *See Ly v. Hansen*, 351 F.3d 263, 271-73 (6th Cir. 2003) (rejecting a six-
month rule, concluding that "[a]bright-line time limitation . . . would not be
appropriate for the pre-removal period" because "an easily administrable bright-line
rule cannot be based on time, given the inevitable elasticity of the pre-removal
period"); *Diop v. ICE/Homeland Security*, 656 F.3d 221, 234 (3d Cir. 2012) (declining
"to adopt such a one-size-fits-all approach" because the constitutionality of detention
under section 1226(c) "is a fact-dependent inquiry requiring an assessment of all of
the circumstances of any given case."); *Flores-Powell v. Chadbourne*, 677 F. Supp. 2d
455 (D. Mass. 2010) (citing the Sixth Circuit's rejection of a bright-line rule based
solely on length of detention).  As the Middle District of Pennsylvania recently stated,
Courts have been correct to reject the six-month rule Petitioners propose because
"there is no expression of Congress's doubts as to the constitutionality of detention of

---

[6] Nor can support for a six-month standard be found in *Tijani v. Willis*, 430 F.3d 1241
(9th Cir. 2005).  The decision in *Tijani* was only two paragraphs, accompanied by a
dissent and separate concurrence, and articulated no discernible standard for when an
alien challenging an order of removal was detained for an unconstitutionally
"prolonged" period.  *Id.* at 1243-44.  As in *Casas-Castrillon*, the Ninth Circuit simply
declared that the period of the alien's detention – in *Tijani*, three years – was
"prolonged by any measure."  *Tijani*, 430 F.3d at 1244.  *Tijani* has appropriately been
limited in its application in other cases, and the Ninth Circuit itself has noted that
*Tijani*'s reasoning was "sparse."  *Casas-Castrillon*, 935 F.3d at 948.

deportable criminal aliens for more than six months," and because "[a] bright-line rule, and likely even a rule based solely on whether detention is 'prolonged,' run the risk of ignoring . . . considerations" of "relevant factors beyond the length of detention, such as the alien's conduct during removal proceedings and the likelihood that proceedings will result in an order of removal." *Alli v. Decker*, 644 F. Supp. 2d. 535, 542-43 (M.D. Pa. 2010), *reversed and remanded on other grounds*, 650 F.3d 1007 (3d Cir. 2011). This Court should also reject Petitioners' argument for a six-month bright-line rule in this case.

A rigid six-month limit conflicts with the practical realities of removal proceedings. As the Sixth Circuit observed, "hearing schedules and other proceedings must have leeway for expansion or contraction as the necessities of the case . . . warrant." *Ly*, 351 F.3d at 271; *See also, e.g., Gonzalez-Galindo*, No. 10CV1875, 2010 WL 4977023 at *3 (S.D. Cal. Dec. 1, 2010) (holding 12-month detention reasonable where alien "sought a change of venue early in the proceedings and has challenged his removal by filing an application for cancellation of removal").

Further, aliens can prolong their removal proceedings and consequently their detention regardless of agency diligence – a fact noted in *Demore*. 538 U.S. at 530 n.14 ("Prior to the enactment of § 1226(c), when the vast majority of deportable criminal aliens were not detained during their deportation proceedings, many filed frivolous appeals in order to delay their deportation."). Indeed, in this Circuit, immigration judges generally must grant a continuance at the alien's request for good cause. *See Ahmed v. Holder*, 569 F.3d 1009, 1014-15 (9th Cir 2009); 8 C.F.R. § 1003.29. Consequently, aliens may easily circumvent detention pursuant to section 1226(c) by filing continuances until the six-month threshold is breached.[7] This Court has acknowledged this concern. *Martinez v. Gonzales*, 504 F. Supp. 2d 887, 898

---

[7] Discovery to Petitioners in this case shows that aliens seek multiple continuances throughout removal proceedings for any number of reasons – to obtain representation, to obtain new representation, to file a claim for relief from removal, because their

*(Footnote continued)*

19

(C.D. Cal. 2007) (Hatter, J.) (stating that "[a] court must 'be sensitive to the possibility' that a removable alien may engage in 'dilatory tactics' in order to 'compel a determination' that his detention was unreasonably long.") (quoting *Ly*, 351 F.3d at 272).  It should do so again here.

> **b.**    **There is no support for Petitioners' alternative argument that an alien's entitlement to a bond hearing is tied to the likelihood of successfully challenging removal.**

Perhaps recognizing that their proposed six-month, one-size-fits-all rule is not sound, Petitioners alternatively argue that this Court could instead fashion a rule that aliens detained under section 1226(c) must be afforded a bond hearing unless the government can establish that a detainee "lacks a colorable challenge to his removal." Pet. Memo at 15.  Petitioners cite no authority for their proposal, which would require this Court to improperly legislate substantial changes to the immigration process.  The Court should reject Petitioners' alternative argument.

First, there is no support for the view that the constitutionality of prolonged detention should be measured solely by an alien's likelihood of success in challenging removal.  Courts that have rejected Petitioners' proposed six-month rule have not adopted a standard that considers likelihood of success in challenging removal as a dispositive factor in considering constitutionality of continued detention.  *See, e.g., Ly*, 351 F.3d 263, 271-73 (identifying a number of factors to be considered in addition

---

attorney is not prepared or is not in attendance, including other reasons.  Because expert discovery in this case has not yet begun, a full statistical analysis of the effect of continuances by the aliens in the discovery universe has not been done.  However, as two examples from discovery show, aliens seek repeated continuances that result in their proceedings being delayed over six months.  Declaration of Benjamin B. McDowell (summarizing examples).  In the examples cited, one alien sought three continuances that delayed removal proceedings by more than four months, *id.* ¶ 4, and one alien sought at least six continuances, delaying proceedings by nearly 12 months. *Id.* ¶ 5.  Respondents expect that at the end of discovery, the evidence will show that the practice of seeking continuances that delay removal cases significantly is widespread.

to likelihood of success in removal proceedings); *Diop*, 656 F.3d 221, 234-35 (same).
Petitioners can cite no decision that supports their view, relying instead on concurring
and dissenting opinions. *See*, *Demore*, 538 U.S. at 578 (Breyer, J., dissenting); *Tijani*,
430 F.3d at 1246 (Tashima, J., concurring).

Second, Petitioners' alternative proposal would require this Court to engage in
legislative decisionmaking with respect to administrative procedures outside its
jurisdiction. For example, Petitioners proposal would require DHS trial attorneys to
present, and immigration judges to consider, substantial evidence regarding an alien's
challenge to removal, often in the absence of a formal claim for immigration relief,
and well before those claims are properly adjudicated at a merits hearing. In short,
Petitioners' proposal seeks to legislate significant and specific changes to the
administrative process not by Congress or the Executive, but by an Article III court.
This is anathema to courts' longstanding recognition that the authority over
immigration rests with the political branches. *See Fiallo v. Bell*, 430 U.S. at 792.

**C.   Petitioners cannot succeed on their claim that the Due Process Clause entitles all arriving aliens detained under section 1225(b) to a bond hearing at six months.**

Separate and distinct from the considerations raised by the detention of criminal
aliens are the long-standing principles surrounding the special constitutional position
of arriving aliens and the issues concerning their detention. These distinctions require
this Court to weigh the constitutional and statutory issues posed in the case of arriving
aliens on their own terms, and foreclose the application of Petitioners' blanket six-
month rule to the detention of arriving aliens under 8 U.S.C. § 1225(b).

**1.   Constitutional and statutory background**

The Supreme Court has consistently recognized that "our immigration laws
have long made a distinction between those aliens who have come to our shores
seeking admission . . . and those who are within the United States after an entry,
irrespective of its legality. In the latter instance, the Court has recognized additional
rights and privileges not extended to those in the former category who are merely 'on

the threshold of initial entry.' " *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) (quoting *Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206, 212 (1953)).  In *Mezei*, the Supreme Court noted that "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."  345 U.S. at 212.  An arriving alien, however, "stands on a different footing: 'Whatever the procedure authorized by Congress is [regarding admission or exclusion], it is due process as far as an alien denied entry is concerned.'"  *Id.* (quoting *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)). *See also Landon*, 459 U.S. 21, 32 (1982) ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application . . . [H]owever, once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly.").

In exercising its broad authority over arriving aliens, Congress established separate provisions for the detention of such individuals.  Section 1225(b) governs inspections of aliens and provides for the expedited removal of two types of aliens: (1) certain arriving aliens; and (2) certain "other aliens" as designated by the Secretary of Homeland Security.

An "arriving alien" is defined as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport."  8 C.F.R. §§ 1.1(q), 1001.1(q).  This category includes lawful permanent resident aliens in limited circumstances when the alien is returning to the United States and falls within one of six specific categories.[8]  In removal proceedings, DHS bears the burden of proving by

---

[8] 8 U.S.C. § 1101(a)(13)(C).  An alien lawfully admitted for permanent residence shall not be regarded as seeking admission to the United States unless the alien: "(i) has

*(Footnote continued)*

22

clear and convincing evidence that a returning lawful permanent resident falls within one of these six categories.  *Matter of Rivens*, 25 I. & N. Dec. 623, 625 (BIA 2011).[9]

In general, an arriving alien is subject to expedited removal if a DHS immigration officer determines that the alien is inadmissible under section 1182(a)(6)(C) (fraud or misrepresentation) or  section 1182(a)(7) (lack of proper documents for admission).  8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. §§ 235.3(b), 1235.3(b).  If the officer determines that the alien is subject to expedited removal, the officer then orders the alien removed from the United States.  8 U.S.C. § 1225(b)(1)(A)(i).  However, if an arriving alien subject to expedited removal expresses a fear of persecution or torture, or a desire to apply for asylum, and demonstrates a credible fear, the alien is taken out of the expedited removal process and placed into regular removal proceedings before an immigration judge under 8 U.S.C. § 1229a.  See 8 C.F.R. § 208.30(f).

Section 1225(b)(2)(A) provides for the mandatory detention of arriving aliens generally.  8 U.S.C. 1225(b)(2)(A) ("…if the examining immigration officer

---

abandoned or relinquished that status, (ii) has been absent from the United States for a continuous period in excess of 180 days, (iii) has engaged in illegal activity after having departed the United States, (iv) has departed from the United States while under legal process seeking removal of the alien from the United States . . ., (v) has committed an offense identified in section 1182(a)(2) of this title, unless since such offense the alien has been granted relief under section 1182(h) or 1229b(a) of this title, or (vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer."  *Id.*

[9] Petitioners admit that such aliens are arriving aliens because they seek admission. Constitutionally, the Supreme Court has treated this type of arriving alien the same as an alien who first reaches our shores.  For example, in *Mezei* the detainee had resided in the United States for 25 years, before leaving the country for a 19-month stay in Hungary.  Upon his return, he was excluded and denied readmission, which the Supreme Court upheld.  345 U.S. at 208.  Similarly, in *Kaplan v. Tod*, 267 U.S. 228, 230 (1925), despite nine years' presence in the United States, an "excluded" alien "was still in theory of law at the boundary line and had gained no foothold in the United States." *Id.* at 257-58.

determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding…").  Similarly, section 1225(b)(1)(B)(ii) provides that an alien who is found to have a credible fear of persecution "shall be detained for further consideration of the application for asylum." However, all arriving aliens can apply to DHS to be paroled into the United States and released from custody.  8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. §§ 212.5(b), 235.3(b)(2)(iii), 235.3(c).  In particular, DHS public guidelines directly address parole determinations with regard to arriving aliens found to have a credible fear.  *See* DHS, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* ("2010 Parole Guidelines") (Exhibit C).  The 2010 Parole Guidelines provide that each arriving alien found to have a credible fear of persecution or torture will automatically be considered for possible parole.

Under longstanding regulations, "an immigration judge may not redetermine conditions of custody" for "arriving aliens in removal proceedings."  8 C.F.R. § 1003.19(h)(2)(i)(B).  Thus, an arriving alien can only be released from detention if paroled by DHS or if the alien is granted relief from removal on the merits in the removal proceedings.  In this respect, arriving aliens are analogous to "excludable" aliens before Congress amended the immigration laws in 1996.  Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), 110 Stat. 3009–546 (1996); 8 U.S.C. § 1229a.  The regulations historically did not provide immigration judges with the authority to hold custody hearings with respect to aliens who were stopped at a port of entry and placed in exclusion proceedings.

Similarly, arriving aliens who are not subject to expedited removal due to being inadmissible for grounds other than 8 U.S.C. §§ 1182(a)(6)(C) and 1182(a)(7) are detained and placed in removal proceedings.  8 C.F.R. 235.6(a)(1).  Likewise, DHS can decide to place aliens subject to expedited removal into traditional removal proceedings.  *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520 (BIA 2011).  In such cases, the alien is similarly situated to aliens who have been found to have a credible

1  fear.  DHS may parole from custody such individuals, although an immigration judge

2  may not re-determine custody.   8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. §§ 212.5(b),

3  235.3(c); 1003.19(h)(2)(i)(B).

4  **2.    The detention of arriving aliens under section 1225(b)**

5  **during the pendency of their removal proceedings is constitutional**

6  **because such detention is not indefinite and falls within Congress's**

   **broad authority over decisions of admission and exclusion.**

7      The unique constitutional position of arriving aliens permits their detention

8  pending their removal proceedings, even if such detention lasts beyond six months.

9  *See, e.g., Zadvydas*, 533 U.S. at 694 ("The distinction between an alien who has

10  effected an entry into the United States and one who has never entered runs

11  throughout immigration law."); *Ma*, 357 U.S. 185, 187-88 (1958) (alien "paroled" into

12  the United States pending admissibility had not effected an "entry"); *see also*

13  *Albathani v. I.N.S.*, 318 F.3d 365, 375 (1st Cir. 2003) ("As an unadmitted alien

14  present in the United States, [petitioner's] due process rights are limited.").

15      Following these principles, the Ninth Circuit has held that Congress's wide

16  latitude in detaining arriving aliens permits the prolonged detention of such aliens,

17  given their unique position.  In *Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1445 (9th

18  Cir. 1995) (en banc), *superseded by statute as stated in Wong v. INS*, 373 F.3d 952,

19  972 n. 26 (9th Cir. 2004), the Ninth Circuit considered a Mariel Cuban's challenge to

20  his lengthy detention, construing, in part, section 1225(b) and section 1182(d)(5)(A).

21  The Court found it "significant that Congress has for at least four decades been aware

22  of instances of long-term detention of excludable aliens by the executive branch," and

23  concluded that, consistent with *Mezei*, the alien had "no right to be free from detention

24  pending his deportation."  *Id.* at 1448.  The Court concluded that prolonged detention

25  was constitutionally sound, noting that aliens like Barrera had an opportunity to be

26  considered for parole.  *Id.* at 1450-51.

27      Any doubts as to whether the Ninth Circuit would continue to hold these views

28  in a post-*Zadvydas* era were put to rest in *Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094,

1097 (9th Cir. 2004). There the Court reiterated its view that "[u]nder controlling precedent, excludable aliens have no constitutional right to the same procedures afforded deportable aliens in the admission process," explaining that "our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission and those who are within the United States after an entry, irrespective of its legality." *Id.* at 1097 (citing *Barrera-Echavarria*, 44 F.3d at 1448). Citing *Zadvydas*, the Ninth Circuit noted what it described as a "fundamental distinction" running throughout immigration laws "between an alien who has effected an entry into the United States and one who has never entered." *Alvarez-Garcia*, 378 F.3d at 1097 (citing *Zadvydas*, 533 U.S. at 693). The Ninth Circuit further explained that the entry fiction doctrine "provides that although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Id.*

The relief that Petitioners now seek – a rule entitling all arriving aliens to a bond hearing at six months – would thus conflict not only with the unambiguous language and Congressional intent expressed in section 1225(b), it would also conflict with existing Ninth Circuit precedent finding the premise of that statute constitutional. Indeed, other circuit courts have reached similar conclusions as well. *See, e.g., Ngo v. INS*, 192 F.3d 390, 395 (3rd Cir. 1999) (prolonged detention of arriving aliens is constitutional, provided there is no risk of indefinite detention and appropriate parole procedures are followed).

The cases Petitioners rely on to support their constitutional claim are inapposite. First, Petitioners erroneously mischaracterize *Nadarajah* as speaking to the issue of the prolonged detention of arriving aliens. Pet. Memo at 16. But *Nadarajah* was about *indefinite* detention, which, as explained above, is not at issue here. *Nadarajah*, 443 F.3d at 1078 (concluding that "the general detention statutes cannot be read as authorizing *indefinite* detention," and citing *Zadvydas*). Moreover, since deciding

*Nadarajah*, the Ninth Circuit has distinctly downplayed the application of *Nadarajah* to other detention cases, noting in *Prieto-Romero v. Clark*, 534 F.3d 1053 (9th Cir. 2008), that the kind of post-order, potentially indefinite detention at issue in *Nadarajah* does not extend to cases involving a challenge to pre-order detention, because pre-order detention has an "obvious termination point." *Prieto-Romero*, 534 F.3d at 1064-65 (citing *Zadvydas*, 533 U.S. at 697).[10] Furthermore, the court in *Nadarajah* never addressed entitlement to a bond hearing under section 1225(b). The court solely found that DHS's basis for denying parole was not facially legitimate and bona fide and concluded that as in *Zadvydas*, removal for the Nadarajah was no longer foreseeable. As such, it cannot support Petitioners' claim that this court disregard the statutory language of section 1225(b) and impose a remedy Congress did not provide.

Petitioners also rely on two cases decided by the same district judge in which the court found that arriving aliens are entitled to a bond hearing when their detention has become prolonged. *Centeno-Ortiz v. Culley*, No. 11-CV-1970, 2012 WL 170123 (S.D. Cal. Jan. 19, 2012) (Gonzalez, J.), and *Crespo v. Baker*, No. 11-CV-3019, 2012 WL 1132961 (S.D. Cal. Apr. 03, 2012) (Gonzalez, J.). However, in both cases the district court failed to recognize the very distinction that the Ninth Circuit highlighted in *Prieto-Romero*, that *Nadarajah* concerned potentially indefinite detention when there was no longer a significant likelihood of removal, and was distinct from other detention cases that did not challenge indefinite detention. *See Centeno-Ortiz*, 2012 WL 170123, at *9 n.3 (equating prolonged and indefinite detention). Additionally, the decision in *Crespo* is on appeal to the Ninth Circuit, with briefing scheduled for later this year. *Crespo v. Baker*, No. 12-56132 (9th Cir.).

---

[10] Petitioners also cite *Clark v. Suarez-Martinez*, 543 U.S. 371 (2005), as supporting its claim, but *Clark* involved an issue of statutory construction of a different statute, 8 U.S.C. § 1231(a)(6), and its holding is simply that the construction of that statute fixed by the Supreme Court in *Zadvydas* must be the same for arriving aliens with a final order as well as non-arriving aliens with a final order. *Clark,* 543 U.S. 382. The case says nothing about the constitutionality of prolonged detention, under section 1225(b) or otherwise.

1    Nor do the decisions in *Diouf*, *Tijani*, or *Casas-Castrillon* aid Petitioners. None

2   of those cases examined the rights of arriving aliens under section 1225(b). Instead,

3   each of those cases addressed detention in a post-order context where the alien sought

4   judicial review. *See Tijani*, 430 F.3d at 1241 (construing section 1226(c) in the post-

5   order context); *Casas-Castrillon*, 535 F.3d at 949 (construing 8 U.S.C. § 1226(a) in

6   the post-order context); *Diouf*, 634 F.3d at 1092 (construing 8 U.S.C. § 1231(a)(6), a

7   post-order custody statute). Accordingly, this Court should reject Petitioners'

8   challenge to section 1225(b) and should rule instead in the same way as another

9   district court within the Ninth Circuit that correctly addressed the question of whether

10  an arriving alien detained under 1225(b) is entitled to a bond hearing. *See Abdi v.*

11  *Napolitano*, No. C10–1722RSL, 2011 WL 1584433 (W.D. Wash. Apr. 26, 2011).

12  There the district court rejected the alien's argument that he was entitled to a bond

13  hearing because the statute does not provide for such relief, and decided that the cases

14  the alien cited in support of his argument, including *Diouf* and *Tijani*, were

15  distinguishable insofar as they did not involve pre-order detention under section

16  1225(b). 2011 WL 1584433, at *3. The court also distinguished *Nadarajah* on the

17  basis that it had involved indefinite detention, 2011 WL 1584433, at * 3, and did not

18  concern entitlement to a bond hearing under section 1225(b). The district court

19  concluded that due process did not require the government to provide arriving aliens

20  with bond hearings if the government was providing such aliens with the opportunity

21  for parole. *Id.* Petitioners can cite no precedent in the Ninth Circuit or elsewhere for

22  the proposition that arriving aliens are entitled to bond hearings once detention has

23  become prolonged (as opposed to indefinite), let alone that arriving aliens are entitled

24  to bond hearings at six months. More than five decades of law is precisely to the

25  contrary. The Court should deny the motion.

26

27

28

### 3. Petitioners' challenge to the sufficiency of parole procedures misses the mark, but in any event is without merit.

Petitioners are incorrect that this Court can order bond hearings for arriving aliens because the parole procedures – which courts have cited as the *only* mechanism for the release of arriving aliens[11] – are facially insufficient.  First, there is little question that, as a general rule, parole decisions are an integral part of the admissions process and arriving aliens cannot challenge such decisions as a matter of constitutional right.  *Fernandez-Roque v. Smith*, 734 F.2d 576, 582 (11th Cir. 1984); *Jean v. Nelson*, 727 F.2d 957, 966, 972 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985).  Indeed, the Ninth Circuit has recognized that a court can review a parole determination that fails to state a facially legitimate and bona fide reason for denying parole.  *Nadarajah*, 443 F.3d at 1082 (citing *Jean v. Nelson,* 472 U.S. 846, 853 (1985)).  Petitioners, however, are asking this Court to render the parole determination – which is the only statutory avenue for release of an arriving alien – a virtual nullity.  There is no support for such a challenge.  The Ninth Circuit has also recognized that such judicial tampering "would risk frustrating the government's ability to control immigration policy and relations with foreign nations," *Barrera-Echavarria*, 44 F.3d at 1448, and has refused to do so.  This Court should similarly refuse Petitioners' invitation to create an administrative process that negates the Executive's parole authority.

Second, Petitioners are factually incorrect that the parole procedures suffer from "structural defects."  Pet. Memo at 18.  Petitioners make no effort to argue that the denial of parole to any of the section 1225(b) subclass fails to meets the Ninth Circuit's standard.  Instead, Petitioners argue as if that test does not exist, and instead contend that the entire parole consideration process is unconstitutional.  The evidence

---

[11] 8 U.S.C. § 1182(d)(5)(a) "reinforces the conclusion that Congress intended that detention [of arriving aliens to] be the 'default' choice, and parole a discretionary exception."  *Barrera-Echavarria*, 44 F.3d at 1446.

that Petitioners cite for their argument is a snippet of deposition testimony in response to one question – and that answer is taken entirely out of context.  Assistant Field Office Director (AFOD) Wesley Lee did not, as Petitioners maintain, admit that parole determinations are made based on "how much bed space [ICE has]."  Pet. Memo at 18.  Instead, AFOD Lee was responding to a question about whether custody determinations – not *parole* determinations – have "changed over time to reflect information about the absconder rate for people who are released and then found to be a flight risk."  Exhibit D, Deposition of Wesley Lee ("Tr."), 40:10-41:15.  And his full response to that question– which Petitioners notably did not include in their motion – and the follow-up question and response make it clear that AFOD Lee was referring to changes in custody decisions over time due to resources.  *Id.*

In fact, there is ample evidence that ICE officials in the Central District conduct thorough parole determinations and deny parole only for facially valid and bona fide reasons.  This process was described by AFOD Lee in pages of the deposition transcript Petitioners conveniently chose to ignore.  Arriving aliens are eligible for a parole determination, which is typically made when ICE initially processes the alien.  Tr. 97:7-98:12.  ICE then considers a number of factors under section 1182(d)(5)(A), including the alien's flight risk or danger.  Tr.100:10-100:23.  A notice is provided to aliens in advance of the parole decision, advising them that ICE would consider any documents as part of its parole determination, and requests arriving aliens to provide those documents as soon as possible.  Tr. 103:2-Tr.104:9.  Arriving aliens are also provided with a questionnaire requesting that they provide information about, among other things, identity, family in the United States, ties to the community, employment prospects, and educational level.  *Id.* (*see also* Petitioners' Exh. 45, Sample Notice and Questionnaire).  Arriving aliens are – contrary to Petitioners' assertion in their motion – interviewed as a matter of practice to probe the alien's identity and background.  *Id.* A review of the A-File is conducted, and criminal background is checked through various sources.  Tr.104:10-108:4.  All of this is done before the parole decision is

made.  *Id.*  Once the decision is made, the alien is provided with a written notice of the denial, and provided with the reasons for the denial.  Tr. 106:18-108:4.  The alien can also receive a parole redetermination upon presentation of new information. Tr. 47:12-47:21.

Moreover, since implementation of the 2010 Parole Guidelines, which place a presumption in favor of parole for aliens with a credible fear, arriving aliens who demonstrate a credible fear have been released from detention at a rate that is substantially higher than the rate at which those aliens have ultimately been granted relief from removal on the merits.  Exhibit E, Response to Proposed Rulemaking.  For example, as of October 2011, DHS paroled 1,404 out of 1,836 arriving aliens who had demonstrated a credible fear, approximately 76 percent of all cases.  By comparison, in fiscal year 2010, immigration judges granted relief in only 41 percent of all cases involving arriving aliens who had demonstrated a credible fear.  *Id.*at 9.  These figures demonstrate that under the parole process directed by Congress substantial numbers of arriving aliens are able to secure release from detention.  DHS has also testified that as a result of this policy, if, after a determination of credible fear, the arriving alien can provide verifiable information showing sponsorship of the alien by someone in the United States, that will generally be sufficient to satisfy concerns about flight risk. Tr.123:2-123:15.

Petitioners' misguided effort to challenge the parole procedures as *per se* constitutionally infirm finds no case law support, and is factually meritless.

III.    **THE CANON OF CONSTITUTIONAL AVOIDANCE DOES NOT APPLY TO SUPPORT A CONSTRUCTION OF SECTIONS 1226(c) OR 1225(b) AS DISCRETIONARY DETENTION STATUTES.**

If the Court were to grant the preliminary injunction, Petitioners are incorrect that the doctrine of constitutional avoidance permits this Court to construe the mandatory detention provisions of sections 1226(c) and 1225(b) as permitting discretionary detention.  Constitutional avoidance is a canon of statutory construction that does not apply where a statute is clear and unambiguous.  Because sections

1226(c) and 1225(b) are unambiguously mandatory detention provisions, this Court cannot apply constitutional avoidance and must instead address the constitutionality of those statutes as applied.

Under the canon of constitutional avoidance, a court will "read [a challenged] statute to eliminate" any constitutional doubt "so long as such a reading is not plainly contrary to the intent of Congress." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2742 (2010). Constitutional avoidance applies when a statute can be construed in more than one way using ordinary interpretive methods, with the canon instructing selection of the constitutionally permissible construction. *See, e.g., Almendarez-Torres v. United States*, 523 U.S. 224, 237–38 (1998); *United States v. Rumely*, 345 U.S. 41, 45 (1953). As a result, a court is bound not only to choose a construction that is consistent with the plain text of the statute, *see, e.g., Carcieri v. Salazar*, 129 S. Ct. 1058, 1063–64 (2009), but also one that is consistent with the larger statutory scheme of which the provision is part, *see, e.g., Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *see also United States v. Broncheau*, 645 F.3d 676, 686 (4th Cir. 2011) ("[T]he district court erred by invoking the canon of constitutional avoidance to justify creation of its alternative commitment scheme. This canon has no application to the construction of a statute in a manner that is incompatible with its plain terms."). At bottom, the doctrine of constitutional avoidance "is an interpretive tool, counseling that *ambiguous statutory language* be construed to avoid serious constitutional doubts." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). It is not intended to "limit the scope of authorized executive action." *Id.*

### A.    Constitutional avoidance cannot be applied to section 1226(c) as Petitioners claim, because section 1226(c) unambiguously excludes bond for criminal aliens detained during removal proceedings.

There is no plausible reading of section 1226(c) as giving the Executive the discretion to release criminal aliens on bond. Congress intended that certain criminal and terrorist aliens be detained during the entirety of their removal proceedings, amending the INA to eliminate any discretionary release except only in the most

narrow of circumstances under section 1226(c)(2).  Congress twice amended the INA to eliminate any discretion on the part of the Executive to release criminal aliens pending their removal proceedings.  *See supra*, at 8-9 (discussing legislative history).  In passing AEDPA, Congress made it clear that discretion to release criminal aliens should be eliminated to address the concern that criminal aliens, on a widespread basis, failed to appear at removal proceedings and committed additional crimes.

As a result, Congress enacted section 1226(c), which is unambiguous insofar as it precludes release on bond.  The statute itself provides for release from detention only under exceptional circumstances where an alien provides material assistance in a criminal matter.  8 U.S.C. § 1226(c)(2) ("The Attorney General may release an alien described in paragraph 1 *only if*…") (emphasis added).  The statute is not susceptible to more than one interpretation.

To read section 1226(c) any other way stretches constitutional avoidance to the point of misapplication.  The canon of constitutional avoidance is "a means of giving effect to congressional intent, not of subverting it." *Clark v. Martinez*, 543 U.S. 371, 382 (2005).  Reading section 1226(c) to permit release on bond of criminal aliens during the pendency of their removal proceedings subverts Congress's intent as reflected in the unambiguous language of the statute.  Accordingly, if this Court concludes that "prolonged" detention of criminal aliens beyond section 1226(c) is not constitutional, then this Court has no alternative other than to strike down section 1226(c) down as unconstitutional when applied to such aliens.  *Zadvydas* at 696 ("if Congress has made its intent in the statute clear, we must give effect to that intent") (internal citations omitted).

**B.    Constitutional avoidance is also inapplicable in construing section 1225(b) because the statute is non-discretionary, and any discretion to release arriving aliens arises under a statute not being challenged.**

Petitioners argue that this Court may apply constitutional avoidance to ignore the mandatory detention language of section 1225(b), disregard regulations that make clear that immigration judges lack authority to provide bond hearings to arriving

aliens, and instead fashion an administrative remedy from whole cloth.  Petitioners' argument defies statutory provisions and the intent of Congress limiting the decision to release an arriving alien to DHS under its parole authority.  This Court should reject Petitioners' argument.

The detention provisions of section 1225(b) are, like section 1226(c), mandatory.  8 U.S.C. §§ 1225(b)(1)(B)(ii) ("If the officer. . . determines that the alien has a credible fear. . . the alien *shall be detained* for further consideration of the application for asylum.") (emphasis added); 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the [expedited removal] procedures under this clause *shall be detained* pending a final determination of credible fear…") (emphasis added); 1225(b)(2)(A) ("…if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding…") (emphasis added).  Indeed, the BIA has concluded that section 1225(b) mandates the detention of arriving aliens.  *Matter of X-K-*, 23 I. & N. Dec. 731, 734 (BIA 2005) (describing section 235(b)(1)(B)(iii)(IV) as providing for "the *mandatory detention* of aliens who are being processed under section [1225(b)(1)] proceedings…") (emphasis added).[12]

The mandatory language of section 1225(b) cannot plausibly be susceptible to an interpretation permitting the discretionary release of arriving aliens under that statute.  Petitioners seek to avoid the unambiguous language of the statute by contending that this Court can disregard 8 C.F.R. § 1003.19 – which prohibits

---

[12] The BIA also held that the regulations specifically preclude immigration judges from exercising jurisdiction over decisions about bond hearings for arriving aliens.  *Matter of X-K-*, 23 I. & N. Dec. at 734-35 ("[A]rriving aliens in removal proceedings are specifically excluded from the custody jurisdiction of Immigration Judges by 8 C.F.R. § 1003.19(h)(2)(i)(B).").  Petitioners cite *Matter of X-K-* for the proposition that the BIA concluded that aliens in removal proceedings were subject to bond hearings, Pet. Memo at 19, but the BIA limited that decision to "certain other aliens" under the statute, not to arriving aliens.  *Matter of X-K-*, 23 I. & N. Dec. at 735.  Petitioners are flatly incorrect that the BIA ruled that section 1225(b) does not preclude bond hearings for arriving aliens.

1   immigration judges from considering bond for arriving aliens – as "ultra vires."  Pet.

2   Memo. at 19.  Judicial review of the constitutionality of regulations is limited, *see*

3   *American Hospital Management Corp. v. Harris*, 638 F.2d 1208, 1213 (9th Cir.

4   1981).  In no event, however, may this Court create regulatory authority where none

5   exists.  Yet that is just what Petitioners ask this Court to do.  Petitioners want this

6   Court to ignore the mandatory statutory language of section 1225(b), ignore the

7   regulations of section 1003.19, and establish a judicially-created administrative

8   system not authorized by Congress and not contemplated by DHS in rulemaking to

9   implement section 1225(b).

10         Instead, under 8 U.S.C. § 1182(d)(5)(A), DHS has discretionary authority to

11  grant parole to applicants for admission who are detained pursuant to § 1225(b).  That

12  statute does not permit a decision on parole to be made by an immigration judge.  It is

13  impossible to conclude in light of the parole statute that Congress intended section

14  1225(b) to be interpreted as permitting bond hearings before immigration judges at six

15  months.  "The fact that courts should not decide constitutional issues unnecessarily

16  does not permit a court to press statutory construction 'to the point of disingenuous

17  evasion' to avoid a constitutional question."  *Jean v. Nelson*, 472 U.S. 846, 855 (1985)

18  (quoting United States v. Locke, 471 U.S. 84, 96 (1985)).  This Court should not

19  accept Petitioners' invitation to use the doctrine of constitutional avoidance to nullify

20  unambiguous statutes and legislate new administrative processes from the bench.  This

21  Court should deny Petitioners' motion.

## CONCLUSION

22

23         For the foregoing reasons, this Court should deny Petitioners' request for a

24  mandatory preliminary injunction.

25

26

27

28

35

Date: July 18, 2012                    STUART F. DELERY
                                       Acting Assistant Attorney General
                                       Civil Division
                                       DAVID J. KLINE
                                       Director, Office of Immigration Litigation
                                       District Court Section
                                       VICTOR M. LAWRENCE
                                       Principal Assistant Director

                                       */s/ Theodore W. Atkinson*
                                       THEODORE W. ATKINSON
                                       Senior Litigation Counsel
                                       United States Department of Justice
                                       Office of Immigration Litigation,
                                       District Court Section
                                       P.O. Box 868, Ben Franklin Station
                                       Washington, DC 20044
                                       Phone: (202) 532-4135
                                       theodore.atkinson@usdoj.gov

                                       Attorneys for Respondents

36

## <u>CERTIFICATE OF SERVICE</u>

      I certify that on July 18, 2012, I served a copy of the foregoing through the Court's CM/ECF system on the following counsel of record:

Ahilan T. Arulanantham
ACLU Foundation of Southern
California
1616 Beverly Boulevard
Los Angeles, CA 90026
213-977-5211
Fax: 213-977-5297
Email: aarulanantham@aclu-sc.org

Jayashri Srikantiah
Stanford Law School
Immigrants' Rights Clinic,
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
650-724-2442
Fax: 650-723-4426
Email: jsrikantiah@law.stanford.edu

Sean Commons
Sidley Austin
555 West Fifth Street Suite 4000
Los Angeles, CA 90013-1010
213-816-6000
Fax: 213-896-6600
Email: scommons@sidley.com

Judy Rabinovitz
ACLU Immigrants' Rights Project
125 Broad Street 18th Floor
New York, NY 10004
212-549-2618
Fax: 212-549-2654
Email: jrabinovitz@aclu.org

Cody Jacobs
Sidley Austin LLP
555 West Fifth Street Suite 4000
Los Angeles, CA 90013-1010
213-896-6000
Fax: 213-896-6600
Email: cjacobs@sidley.com

*/s/  Theodore W. Atkinson*
Theodore W. Atkinson
Senior Litigation Counsel
United States Department of Justice