# Exhibit A

to
Respondents' Opposition to Petitioners'
Motion for a Preliminary Injunction

*Rodriguez v. Robbins, et al.*, No. 07-cv-3239-TJH (C.D. Cal.)

Electronic Copy - For Print Color Is Set To Grayscale Current Page
ID #:3324

# DEPARTMENT OF HOMELAND SECURITY

# Office of Inspector General

## DETENTION AND REMOVAL
## OF
## ILLEGAL ALIENS

U.S. Immigration and Customs Enforcement (ICE)



## Office of Audits

**OIG-06-33**

**April 2006**

*Office of Inspector General*

**U.S. Department of Homeland Security**
Washington, DC 20528



April 14, 2006

Preface

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the Homeland Security Act of 2002 (*Public Law 107-296*) by amendment to the Inspector General Act of 1978.   This is one of a series of audit, inspection, and special reports prepared as part of our oversight responsibilities to promote economy, efficiency, and effectiveness within the department.

This report assesses DHS's Immigration and Customs Enforcement program for detaining and removing illegal aliens apprehended in the United States and at ports of entry. It is based on interviews with employees and officials of relevant agencies and institutions, direct observations, and a review of applicable documents.

The recommendations herein have been developed to the best knowledge available to our office, and have been discussed in draft with those responsible for implementation. It is our hope that this report will result in more effective, efficient, and economical operations. We express our appreciation to all of those who contributed to the preparation of this report.

*Richard L. Skinner*

Richard L. Skinner
Inspector General

# Table of Contents/Abbreviations

Executive Summary ........................................................................................................... 1

Background ....................................................................................................................... 3

Results of Audit ................................................................................................................ 4

    Detention and Removal of Illegal Aliens .................................................................... 4

    ICE Budget Shortfall in FY 2005 ............................................................................. 11

    Expansion of the Criminal Alien Program ................................................................ 14

    Other Factors Impacting the Repatriation of Illegal Aliens ..................................... 15

    Availability of Critical Data to Monitor DRO Performance ...................................... 19

    DRO's Strategic Plan ............................................................................................... 22

Conclusions and Recommendations ................................................................................ 23

Management Comments and OIG Analysis ..................................................................... 24

## Appendices

Appendix A    Types of Apprehensions ................................................................. 28
Appendix B    Apprehensions Released .................................................................. 30
Appendix C    ICE Apprehension, Detention, and Removal Process ...................... 32
Appendix D    BTS Detention Prioritization and Requirements Memorandum ........ 33
Appendix E    Purpose, Scope, and Methodology ................................................... 37
Appendix F    Management's Comments ................................................................. 39
Appendix G    Major Contributors to this Report .................................................... 46
Appendix H    Report Distribution .......................................................................... 47

## Abbreviations

| | |
|---|---|
| ACAP | Alien Criminal Apprehension Program |
| BOP | Bureau of Prisons |
| BORCAP | Border Patrol Criminal Alien Program |
| BTS | Border and Transportation Security |
| CAP | Criminal Alien Program |
| CBP | Customs and Border Protection |
| DACS | Deportable Alien Control System |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| DRO | Office of Detention and Removal (ICE) |
| EOIR | Executive Office of Immigration Review |
| EREM | Enforce Removal Module |
| FTE | Full Time Equivalent |
| FY | Fiscal Year |
| GAO | Government Accountability Office |
| HHS | Health and Human Services |
| ICE | Immigration and Customs Enforcement |
| IEA | Immigration Enforcement Agent |
| IJ | Immigration Judge |
| INA | Immigration and Nationality Act |
| INS | Immigration and Naturalization Service |
| IRP | Institutional Removal Program |
| LACJ | Los Angeles County Jail |
| OI | Office of Investigation (ICE) |
| OIG | Office of Inspector General |
| OTM | Other Than Mexican |
| SIC | Special Interest Countries |
| SST | State Sponsors of Terrorism |
| USCIS | United States Citizenship and Immigration Services |

# OIG

**Audit Report**

*Department of Homeland Security*
*Office of Inspector General*

## Executive Summary

This report presents the results of our review of DHS's Immigration and Customs Enforcement (ICE) program for detaining and removing illegal aliens[1] apprehended in the United States and at ports of entry. The program is administered through ICE's Office of Detention and Removal (DRO). The objective of our review was to determine the extent to which DRO is performing its mission to remove all illegal aliens who are removable, including those that pose a potential national security or public safety threat to the U.S.

Currently, DRO is unable to ensure the departure from the U.S. of all removable aliens. Of the 774,112 illegal aliens apprehended during the past three years, 280,987 (36%) were released largely due to a lack of personnel, bed space, and funding needed to detain illegal aliens while their immigration status is being adjudicated. This presents significant risks due to the inability of Customs and Border Patrol (CBP) and ICE to verify the identity, country-of-origin, and terrorist or criminal affiliation of many of the aliens being released. Further, the declining personnel and bed space level is occurring when the number of illegal aliens apprehended is increasing. For example, the number of illegal aliens apprehended increased from 231,077 in FY 2002 to 275,680 in FY 2004, a 19 percent increase. However, during the same period, authorized personnel and funded bed space levels declined by 3 percent and 6 percent, respectively. These shortfalls encourage illegal immigration by increasing the likelihood that apprehended aliens will be released while their immigration status is adjudicated.

Further, historical trends indicate that 62 percent of the aliens released will eventually be issued final orders of removal by the U.S. Department of Justice Executive Office of Immigration Review (EOIR) and later fail to surrender for removal or abscond. Although DRO has received additional funding to

---

[1] For the purposes of this report, "illegal aliens" is a comprehensive term intended to include those foreign-born individuals who enter, reside, or work in the United States without complying with U.S. immigration law; "removable aliens" are those illegal aliens who have been adjudicated as subject to removal from the U.S.; "criminal aliens" are those illegal aliens who have been convicted of a crime in the U.S.; and "high risk aliens" includes both criminal aliens and other illegal aliens, such as those from state sponsors of terrorism or special interest countries.

enhance its Fugitive Operations Program, it is unlikely that many of the released aliens will ever be removed. As of December 30, 2005, there were more than 544,000 released aliens with final orders of removal who have absconded.

Declining bed space and personnel levels are also making it difficult for ICE/DRO to detain and remove illegal aliens that are from countries other than Mexico (OTM) including aliens from countries whose governments support state sponsored terrorism (SST) or who promote, produce, or protect terrorist organizations and their members (SIC). Of the 605,210 OTMs apprehended between FY 2001 and the first six months of FY 2005, 309,733 were released of which 45,008 (15%) purportedly originated from SST and SIC countries.

DRO estimates that in FY 2007 there will be 605,000 foreign-born individuals admitted to state correctional facilities and local jails during the year for committing crimes in the U.S. Of this number, DRO estimates half (302,500) will be removable aliens. Most of these incarcerated aliens are being released into the U.S. at the conclusion of their respective sentences because DRO does not have the resources to identify, detain, and remove these aliens under its Criminal Alien Program (CAP). It is estimated that DRO would need an additional 34,653 detention beds, at an estimated cost of $1.1 billion, to detain and remove all SST, SIC, and CAP aliens.

Additionally, DRO's ability to detain and remove illegal aliens with final orders of removal is impacted by (1) the propensity of illegal aliens to disobey orders to appear in immigration court; (2) the penchant of released illegal aliens with final orders to abscond; (3) the practice of some countries to block or inhibit the repatriation of its citizens; and (4) two recent U.S. Supreme Court decisions which mandate the release of criminal and other high-risk aliens 180 days after the issuance of the final removal order except in "Special Circumstances." Collectively, the bed space, personnel and funding shortages coupled with the other factors, has created an unofficial "mini-amnesty" program for criminal and other high-risk aliens.

DRO's goal is to develop the capacity to remove all removable aliens, and it has developed a strategic plan covering 2003-2012 entitled "Endgame," to accomplish that goal. However, the plan identifies several significant challenges beyond its control, including the need for sufficient resources, political will, and the cooperation of foreign governments. Current resources, including those included in the FY 2006 Appropriations Act and the Administration's FY 2007 budget request, are not sufficient to detain all high-risk aliens, including those from SST and SIC countries.

We are recommending that the Assistant Secretary (ICE) develop a plan to provide ICE with the capacity to: (1) detain and remove high-risk aliens; (2)

intensify its efforts to develop alternatives to detention; and (3) resolve with the State Department issues that are preventing or impeding the repatriation of illegal OTMs.  Also, we are recommending that DRO expedite its efforts to implement a data management system that is capable of meeting its expanding data collection and analysis needs relating to the detention and removal of illegal aliens. Such a system would significantly enhance DRO's ability to support future budget requests, identify emerging trends, and assess its overall mission performance.

# Background

The mission of ICE's DRO is to promote public safety and national security by ensuring the departure from the United States of all removable aliens through the fair and effective enforcement of the nation's immigration laws. [2] This is accomplished through the detention and timely processing of all illegal aliens with final orders of removal.

Each year more than one million aliens attempt to illegally enter the United States without proper documentation - or enter legally but overstay or violate their visas.[3] Although other state, local, or federal agencies are frequently involved in the identification, apprehension, and detention of illegal aliens, the primary responsibility belongs to DHS and its subordinate agencies ICE and CBP. Appendix C to this report illustrates the process from the point of apprehension through the actual removal of an illegal alien from the United States.

The shortage of detention bed space and its impact on DRO's ability to remove illegal aliens with final orders of removal were problems long before the merger of the legacy INS into DHS. As early as 1996, a Department of Justice (DOJ) OIG report cited the shortage of detention bed space as impacting DOJ's ability to deport illegal aliens with final orders of removal. Specifically, the DOJ OIG concluded that the legacy INS program for deporting illegal aliens had been largely ineffective, finding that 89 percent of the non-detained aliens released into the U.S. who were subsequently issued final orders of removal were not removed (absconded). Between 1999 and FY 2002, the U.S. Attorney General identified the lack of detention bed space as a top management issue for the DOJ.

---

[2] Illegal aliens are removable after they have been issued a final order of removal, deportation, or exclusion.
[3] Source: February 2003 U.S. DOJ report titled *"The Immigration and Naturalization Service's Removal of Aliens Issued Final Orders"*. Report Number I-2003-004

# Results of Audit

## Detention and Removal of Illegal Aliens

**Bed Space and Personnel Levels Fail to Keep Pace with Increase in Alien Apprehensions.** The number of illegal aliens apprehended has increased from 231,077 in FY 2002 to 275,680 in FY 2004, a 19 percent increase.[4] During the same period, authorized DRO personnel levels decreased by 3 percent while funded bed space levels declined by 6 percent. These resource shortfalls are having a negative impact on the number of illegal aliens that are being released into the U.S. population. For example, between FY 2002 and FY 2004, the number of illegal aliens released by DRO increased from 78,977 to 108,891, a 38 percent increase. Chart 1 shows the trend in alien apprehensions and releases from FY 2002 through FY 2004.

**Chart 1 – Alien Apprehensions and Releases
(FY 2002 through FY 2004)**



Source: DRO

Table 1 shows the number of apprehensions and the number of authorized personnel and funded bed space available for DRO use between FY 2002 and FY 2004. The data shows that authorized personnel and funded bed space declined while the number of apprehensions increased.

---

[4] For purposes of this review, only apprehensions that are placed as active cases under DRO for detention, case processing, or removal were considered (See Appendix A).

| | Table 1 Apprehensions, Authorized Personnel, and Funded Bed Space Levels (FY 2002 to FY 2004) | | |
|---|---|---|---|
| **Fiscal Year** | **Number of New Illegal Aliens Apprehended During the Fiscal Year** | **DRO Authorized Personnel Levels** | **DRO Funded Bed Space[5]** |
| 2002 | 231,077 | 4,203 | 19,081 |
| 2003 | 267,355 | 4,087 | 18,000 |
| 2004 | 275,680 | 4,087 | 18,000 |

Source: ICE and DRO

Bed space and personnel shortages will continue through FY 2007 despite efforts by the Administration and Congress to fund more beds and personnel. For example, the Administration's FY 2005 budget request for DRO included $24 million to fund 534 additional detention beds and 66 personnel. Congress added $16 million to the Administration's request for a total planned increase of 1,216 beds for FY 2005. However, the increased funding for additional bed space and support personnel did not flow to DRO until the last quarter of FY 2005 due to an ICE budget shortfall estimated at about $500 million. The delay in the disbursement of enhancement funding prevented DRO from increasing its detention bed space levels during most of FY 2005. The FY 2006 budget will increase the total funded bed space level to 20,800.[6] The Administration's FY 2007 budget request will, if approved by Congress, increase total funded bed space levels to 27,500, well short of the 34,653 additional detention beds needed to detain all SIC, SST, and CAP aliens that pose a potential national security or public safety risk to the U.S.

**Increase in the Number of Illegal Aliens Requiring Mandatory Detention.**
A sharp increase in the number of aliens requiring mandatory detention may soon limit DRO's ability to detain non-mandatory aliens who pose a potential national security or public safety risk.[7] From October 2003 to June 2005, the percentage of detention bed space devoted to mandatory detainees increased from 63 percent to 87 percent. The increase is significant because it further

---

[5] Excludes detention bed space funded by the Bureau of Prisons (BOP) and Health and Human Services (HHS).
[6] Excludes beds funded by BOP and HHS
[7] The aliens who are detained are referred to as mandatory detainees. According to the INA (P.L. 82-414, June 27, 1952 as amended) §236 and §236A, the government is required to detain certain illegal aliens who pose a national security risk or commit crimes in the U.S. Criminal aliens include those that have been convicted of crimes involving moral turpitude, drug smuggling, murder, and other aggravated felonies, however, some criminal aliens convicted of less serious crimes may not require mandatory detention. The government is also required to detain certain illegal aliens with final orders while awaiting removal during the 90-day removal period.

limits ICE's ability to detain high risk/high priority aliens that CBP and DRO officials believe pose a potential national security or public safety risk to the U.S.

DRO's ability to detain high-risk aliens is impacted by the mandatory detention requirements set by the Immigration and Nationality Act (INA). Further, detention guidelines issued by the former Border and Transportation Security (BTS) directorate (see Appendix D for BTS Detention Guidelines) established high, medium, and low detention priorities for all other non-mandatory categories of aliens. For example, the BTS detention guidelines do not require the mandatory detention of "High Priority" aliens despite the fact that they could exhibit specific, articulable intelligence-based factors for terrorism or national security concerns.

These guidelines also do not require the mandatory detention of aliens who are associated with ongoing criminal investigations, have committed fraud, are apprehended as part of work-enforcement arrest, are suspected alien or narcotic smugglers, or have demonstrated a marked propensity to abscond. Taken together, the high threshold for mandatory detention set by the INA and BTS guidelines, the increasing number of aliens requiring mandatory detention, and ongoing bed space and personnel shortages, are forcing DRO to release thousands of non-mandatory aliens that normally would have been detained while their immigration status was being adjudicated. Table 2 compares mandatory to non-mandatory detainees during October 2003 and June 2005.

| Table 2<br>Comparison of Mandatory Versus Non-Mandatory Aliens Detained<br>In October 2003 and June 2005 | | |
|---|---|---|
| | Number/Percentage of Mandatory Detainees | Number/Percentage Non-Mandatory Detainees |
| October 2003 | 12,873 - 63% | 7,431 - 37% |
| June 2005[8] | 16,021 - 87% | 2,487 - 13% |
| Percent Change | 24% Increase | 67% Decrease |

Source: DRO

---

[8] DRO Population report dated June 15, 2005.

**Detention and Release of Criminal Aliens.** Of the 345,006 criminal aliens apprehended from FY 2001 through FY 2004, 27,947 (8%) were released. Whether they were released because of a lack of detention bed space or for some other reason could not be determined because such information is not tracked by ICE/DRO. What is known, however, is that the number of criminal aliens being apprehended and released has increased sharply and that 20,967 (75%) of these criminal aliens originated from countries where the notorious Mara Salvatrucha (MS-13) gang members are known to be active.[9] Given the percentage of illegal aliens with final orders that abscond each year and given that ICE/DRO has relatively few resources to expend on the apprehension of absconders in general, it is unlikely that many of the criminal aliens apprehended and released to date will ever be removed. Table 3 provides a breakdown of the criminal aliens apprehended and released from FY 2001 through FY 2004.

| Table 3 Breakdown of Criminal Aliens Apprehended and Released FY 2001 – FY 2004 | | |
|---|---|---|
| **Fiscal Year** | **Criminal Apprehensions** | **Number/Percentage Criminals Released** |
| 2001 | 82,990 | 5,429 / 7% |
| 2002 | 81,819 | 5,394 / 7% |
| 2003 | 90,712 | 7,736 / 9% |
| 2004 | 89,485 | 9,388 / 10% |
| **Totals** | **345,006** | **27,947 / 8%** |

Source: DRO

Table 4 identifies the number of criminal aliens apprehended and released from selected countries from October 1, 2001 through September 30, 2004.

---

[9] Mara Salvatrucha gang members are known to be active in Canada, El Salvador, Guatemala, Honduras, and Mexico.

| Table 4<br>Criminal Aliens Apprehended and Released from Selected Countries<br>From October 1, 2001 through September 30, 2004 | | | |
|---|---|---|---|
| **Country** | **Total Alien Apprehensions** | **Total Criminal Apprehensions** | **Total Number / % Criminal Released** |
| Canada | 4,725 | 2,726 | 1,003 / 37% |
| Columbia | 33,540 | 5,121 | 298 / 6% |
| Cuba | 23,893 | 3,969 | 537 / 14% |
| Dominican Republic | 16,372 | 8,926 | 1,101 / 12% |
| El Salvador | 58,013 | 9,573 | 556 / 6% |
| Guatemala | 47,923 | 6,417 | 322 / 5% |
| Honduras | 65,313 | 8,232 | 555 / 7% |
| Jamaica | 7,734 | 5,734 | 522/ 9% |
| Mexico | 480,563 | 257,718 | 18,531 / 7% |
| Nicaragua | 5,227 | 1,281 | 116 / 9% |
| Philippines | 4,792 | 1,990 | 260 / 13% |
| **Totals** | **748,095** | **311,687** | **23,801 / 8%** |

Source: DRO

**Influx of Illegal Aliens From Countries Other than Mexico.** Another factor impacting DRO's ability to detain and remove aliens who could pose a national security or public safety risk is the increasing number of illegal aliens from countries other than Mexico who are being apprehended and released. For example, between FY 2001 and FY 2004, the number of OTMs apprehended increased from 114,266 to 145,367, a 27 percent increase. The increase poses a significant workload issue for DRO since OTMs, unlike apprehended Mexican aliens, cannot be turned around and returned at the border. Instead, they are often released into the U.S. population while their immigration status is adjudicated. From FY 2001 and through the first six months of FY 2005, 605,210 OTMs were apprehended, of which, 309,733 (51%) were released.

The rate in which OTMs are being apprehended and released (OTM release rate) is also a growing concern. Between FY 2001 and FY 2004, the OTM release rate increased from 42 percent to 54 percent. Further, the data shows that the OTM release rate continues to increase. During the first 6 months of FY 2005, the OTM release rate jumped from 54 percent to an unprecedented 68 percent. As a result, more OTMs than ever before are being released of which a majority will eventually receive final orders and abscond. Table 5

shows the number of OTM apprehensions and the number and percentage of OTM releases from FY 2001 through the first 6 months of FY 2005.

| Table 5 OTMs Apprehended and Released (FY 2001 through March 31, 2005) | | | |
|---|---|---|---|
| **Fiscal Year** | **Total OTM Apprehensions** | **Total OTMs Released** | **OTM Release Rate %** |
| 2001 | 114,266 | 47,721 | 42% |
| 2002 | 117,916 | 54,511 | 46% |
| 2003 | 140,369 | 69,448 | 49% |
| 2004 | 145,367 | 78,566 | 54% |
| 2005 (6 mo) | 87,292 | 59,487 | 68% |
| **Total** | **605,210** | **309,733** | **51%** |

Source: DRO

DRO lacks the requisite detention bed space and support personnel needed to detain OTMs apprehended along the northern and southwest borders and within the U.S. It is not clear the extent to which decisions to release OTMs are being made on a risk-based versus resource-based manner. Even if risk is considered, the high release rate could undermine the public's confidence in the department's ability to secure our northern and southern borders.

**Illegal Aliens from Special Interest Countries and State Sponsors of Terrorism Countries.** A significant number of OTMs that are apprehended and released each year originate from SIC and SST. From FY 2001 through the first half of FY 2005, 91,516 SIC and SST aliens were apprehended of which 45,000 (49%) were later released. It is not known exactly how many of these SIC and SST aliens were ultimately issued final orders of removal and were actually removed since such data is not tracked by DRO. However, assuming SIC and SST aliens are being removed at the same rate as other apprehended and released aliens, 85 percent of the SIC and SST aliens released who eventually receive final orders of removal will abscond. Table 6 provides a breakdown of OTMs from SIC and SST countries that were apprehended and released from FY 2001 through the first 6 months of FY 2005.

| | Table 6 OTMs Apprehended and Released by DRO From SIC and SST (FY 2001 thru March 31, 2005) | | | | |
|---|---|---|---|---|---|
| Fiscal Year | SIC[10] Apprehensions | SST Apprehensions | Total SIC and SST Apprehension | Total Released From SIC and SST | Percent SIC and SST Aliens Apprehended and Released |
| 2001 | 9,419 | 6,233 | 15,652 | 7,499 | 48% |
| 2002 | 11,962 | 6,574 | 18,536 | 8,807 | 48% |
| 2003 | 24,102 | 8,718 | 32,820 | 19,319 | 59% |
| 2004 | 8,078 | 7,717 | 15,795 | 6,099 | 39% |
| 2005[11] | 3,824 | 4,889 | 8,713 | 3,284 | 38% |
| Total | 57,385 | 34,131 | 91,516 | 45,008 | 49% |

Source: DRO

Immigration officials run background checks on each apprehended alien, including SIC and SST aliens, to determine whether they have a criminal record in the U.S. or are listed in various terrorist watch lists. However, the effectiveness of these background checks is uncertain due to the difficulty that CBP and ICE have in verifying the identity, country-of-origin, terrorist or criminal affiliation of aliens in general. Therefore the release of these OTMs poses particular risks. For example, a DHS official testified that U.S. intelligence assessments indicate terrorist organizations, including those operating within SIC and SST countries, believe illegal entry into the U.S. is more advantageous than legal entry for operations reasons.[12]

Mandatory detention for the current number of OTMs entering the U.S. from SST and SIC would require an additional 1,503 detention beds based on a 90-day detention stay and would cost approximately $50 million annually for the additional beds.[13]

---

[10] Excludes OTM aliens apprehended from SIC countries that are also classified as state sponsors of terrorism (Iran, Libya, Sudan, Syria)

[11] First six months of FY 2005

[12] Statement of the former DHS Deputy Secretary on the World Wide Threat on February 16, 2005, before the U.S. Senate Select Committee on Intelligence.

[13] On average, the detention time for illegal aliens from developing nations in regular INA 240 removal proceedings takes 89 days. Source: Testimony of Acting Director of Detention and Removal Operations before the Senate Subcommittee on Terrorism, Technology, and Homeland Security and Subcommittee on Immigration, Border Security, and Citizenship, 7 June 2005. One thousand detention beds cost approximately $33 million per year.

DRO's ability to monitor OTMs from SIC and SST could benefit from advances in DRO's Alternatives to Detention programs, too.[14] As noted in the following section, ICE's FY 2005 budget constraints postponed the distribution of $11 million worth of enhancement funding that had been authorized by the Congress to expand the Alternatives to Detention program. The FY 2006 Appropriations Act includes a total of $28 million for this program.

## ICE Budget Shortfall in FY 2005

According to ICE, it had a budget shortfall of almost $500 million during FY 2005.[15] To compensate for the lack of funding, ICE placed strict limits on detention bed space, recruitment, training, travel, and the expansion of critical programs.[16] As a result, average bed space levels fell below 2003 levels, critical vacancies were left unfilled, and the planned expansion of the fugitive operations programs were postponed.[17]

Additionally, ICE postponed transferring the IRP and ACAP programs from the Office of Investigations to DRO. These programs prevent the release of criminal aliens into the community through the identification, processing, and removal of criminal aliens incarcerated in federal, state, and local correctional facilities. The IRP had been criticized in past Department of Justice IG reports for not identifying and removing thousands of criminal aliens incarcerated in state, county, and local jails who are removable but who are not being removed at the conclusion of their respective sentences due to insufficient personnel resources.

In an effort to further minimize the effect of its FY 2005 budget shortfall, ICE withheld from DRO $124 million worth of program enhancement funding provided by the Congress to increase detention bed space levels and expand DRO's Fugitive Operations and Criminal Alien Program capabilities.  ICE also withheld DRO's funding to cover overhead and support costs by $132 million. After ICE withholdings and payroll costs, DRO was left with $610 million for general detention and removal operations. This was $165 million less funding than DRO had spent on general detention and removal operations during FY 2004. As a result of the decreased operating budget, DRO's bed space level was well below the 19,216 detention beds intended by Congress

---

[14] Intensive Supervision Appearance Program and Electronic Monitoring Device Program. This pilot program is exploring alternative ways of rationalizing DRO custody management resources.

[15] ICE estimate as of April 2005.

[16] In FY 2004, ICE had a budget shortfall of almost $416 million (OIG-05-32, dated August 2005).

[17] DRO's average daily bed space levels dropped to 18,000 during the first 8½ months of FY 2005. In comparison, DRO maintained an average daily bed space level of 18,269 during FY 2003. These numbers included only DRO directly funded beds and excludes BOP and HHS funded beds.

during FY 2005.[18]  Table 7 contains a comparison of DRO funding levels for FY 2003 through FY 2005.

| Table 7<br>Comparison of DRO Funding<br>(FY 2003 –FY 2005) | | | |
|---|---|---|---|
| | FY 2003<br>($000) | FY 2004<br>($000) | FY 2005[19]<br>($000) |
| DRO Funding | $1,072 | $1,217 | $1,231 |
| Enhancements Withheld | 0 | 0 | (124) |
| Overhead & Support Withheld | (97) | (141) | (132) |
| Payroll | (269) | (301) | (365) |
| Total Available for DRO Operations | $706 | $775 | $610 |

Source: ICE

On May 11, 2005, the President signed into law an emergency supplemental appropriations act (P.L. 109-13) that significantly improved the ICE and DRO funding situation by providing ICE with an additional $369 million to address its base budget shortfalls and improve its border enforcement capabilities.[20] Congress was aware that ICE had been unable to obligate funds for FY 2005 enhancements and initiatives due to the uncertainty of its financial condition and a pending reprogramming.  Congress specified in the conference report that $93 million (25%) of the supplemental funding is to add 1,950 detention beds; 50 new criminal investigators; and 168 immigration enforcement agents and deportation officers.[21] Also, $11 million and 79 FTEs are to be used to ease the effects of the hiring freeze put in place during FY 2004 and FY 2005. The conference report also directed ICE to make available an additional $54 million from fee collections and implements the Department's March 11, 2005, request to realign $84 million in funding to detention bed space (Custody Management) and $73 million to DRO's Fugitive Operations and CAP Programs.

According to ICE's final budget execution plan, DRO will receive $83 million over and above the original FY 2005 appropriation.[22] Further, ICE will no longer withhold DRO's original enhancement funding of $124 million and $103 million in funding that was previously withheld to cover overall ICE

---

[18] DRO had 18,000 funded beds in FY 2004 (excludes BOP and HHS funded beds). Congress provided $40 million worth of funding for 1,216 additional detention beds in the original FY 2005 appropriation.

[19] Includes DRO's original FY 2005 appropriation. Excludes supplemental funding and reflects the status of DRO funding and ICE withholdings as of June 15, 2005.

[20] Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005.    P.L. 109-13.

[21] H.R. Rep. No. 109-72, at 137-138.

[22] As of September 16, 2005.

overhead and support funding shortages. Tables 8 and 9 outline the effect of the Emergency Supplemental on DRO in FY 2005.

| Table 8 Emergency Supplemental Effects on DRO in FY 2005 ($ in millions) | | | |
|---|---|---|---|
| | FY 2005 Enacted | End Result[23] | Net Increase/ Decrease |
| Custody Management | $504 | $666 | $162 |
| Case Management | 192 | 125 | (67) |
| Fugitive Operations | 35 | 78 | 43 |
| Criminal Alien Program | 34 | 53 | 19 |
| Alternatives to Detention | 14 | 11 | (3) |
| Transportation & Removal | 312 | 187 | (125) |
| Subtotal | $1,091 | $1,120 | $29 |
| Breached Bond Detention Fund | 70 | 114 | 44 |
| User Fees | 70 | 80 | 10 |
| Total | $1,231 | $1,314 | $83 |

Source: ICE

| Table 9 Comparison of DRO FY 2005 Funding Before and After the Supplemental ($ in millions) | | |
|---|---|---|
| | Before the Supplemental[24] | After the Supplemental[25] |
| DRO Funding | $1,231 | $1,314 |
| Enhancements Withheld | (124) | (-0-) |
| Overhead & Support Withheld | (132) | (100) |
| Payroll | (365) | (369) |
| Total Available for DRO Operations | $610 | $845 |

Source: ICE

The additional funding provided by the supplemental allowed DRO to maintain average detention bed space levels of approximately 18,500 for the remainder of FY 2005 or 581 beds less than what was authorized by Congress during FY 2002. As a result, DRO is also well short of the bed space levels

---

[23] Excludes $13.6 million of supplemental funds delayed until FY 2006.
[24] DRO's original FY 2005 Appropriation. Excludes supplemental funding and reflects the status of DRO funding and ICE withholdings as of June 15, 2005.
[25] DRO's original FY 2005 Appropriation plus $83 million in supplemental funding. It also reflects the status of DRO funding and ICE withholdings as of September 16, 2005.

needed to address the increasing workload associated with OTMs and other high risk aliens.

## Expansion of the Criminal Alien Program

The difficulty that DRO is having detaining, processing, and removing illegal aliens is expected to escalate once it implements a plan to expand its CAP.[26] The CAP identifies and processes criminal aliens incarcerated in federal, state, and local correctional institutions and jails who have no legal right to remain in the U.S. after serving out their sentence. DRO estimates that in FY 2007 there will be 605,000 foreign-born individuals admitted to state correctional facilities and local jails during the year for committing crimes in the U.S. Of this number, DRO estimates half (302,500) will be removable aliens.[27] Currently, most of these incarcerated aliens are being released into the U.S. at the conclusion of their respective sentences due to the lack of DRO resources.

To date, the ICE budget provides for 261 immigration enforcement agents (IEAs) to support the CAP through FY 2006. Each IEA is expected to process 300 criminal aliens annually for a total of 78,300 criminal alien cases per year by FY 2008.[28] In the short-term, DRO estimates that it will need a total of 8,581 detention beds to support its efforts to detain CAP aliens over the next two years. In the long term, DRO estimates that it will need a total of 1,008 IEAs and 33,150 CAP detention beds to identify, detain, process, and remove all criminal aliens incarcerated in state and local correctional institutions and jails who are removable.[29]

Currently, ICE does not have the detention beds or support personnel needed for the planned expansion of the CAP in its FY 2006 and FY 2007 budgets. DHS and ICE need to ensure that any planned increase in DRO's ability to identify and remove criminal aliens be accompanied by a comparable increase in support personnel, detention bed space, equipment, infrastructure, and funding to ensure the timely removal of criminal aliens from the U.S. Table 10 contains DRO's CAP caseload estimates based on IEAs to be hired,

---

[26] DRO's CAP is currently working to combine the Institutional Removal Program (IRP), the Alien Criminal Apprehension Program (ACAP), and the Border Patrol Criminal Alien Program (BORCAP) into one program. These programs are responsible for identifying and removing criminal aliens who have completed their respective sentences that are removable.

[27] Excludes the 25,000 criminal aliens who are expected to be arrested and incarcerated in Federal correctional facilities.

[28] Each IEA is expected to screen 600 incarcerated aliens per year of which 300 (50%) are expected to qualify for removal.

[29] At an estimated cost of $1.1 billion (at $33 million per 1,000 detention beds). Estimate excludes the cost of support personnel.

trained, and deployed during FY 2005 and FY 2006. Table 11 includes DRO's estimate of the number of additional detention beds it will need to accommodate the expansion of its CAP through the end of FY 2008.

| | | | | | |
|---|---|---|---|---|---|
| **Table 10** <br> **CAP Caseload Estimates** <br> **FY 2006 thru FY 2007** | | | | | |

| Fiscal Year Hired | IEAs Hired | FY2006 Caseload Estimates | FY 2007 Caseload Estimates | FY 2008 Caseload Estimates |
|---|---|---|---|---|
| FY 2005 | 161 | 26,565 | 48,300 | 48,300 |
| FY 2006[30] | 100 | 6,750 | 27,000 | 30,000 |
| Total | 261 | 33,315 | 75,300 | 78,300 |

Source: DRO Estimates as of October 18, 2005

| | | | |
|---|---|---|---|
| **Table 11** <br> **CAP Detention Bed Space Needed** <br> **FY 2006 thru FY 2008[31]** | | | |

| | FY 06 | FY 07 | FY 08 |
|---|---|---|---|
| Detention Beds Needed | 3,651 | 8,252 | 8,581 |

Source: DRO Estimates as of October 18, 2005.

## Other Factors Impacting the Repatriation of Illegal Aliens

Other factors impact DRO's ability to detain and remove illegal aliens with final orders of removal, including: (1) the failure of illegal aliens to obey orders to appear in immigration court;[32] (2) the propensity of released illegal aliens with final orders to abscond; (3) the practices of some countries to block or inhibit the repatriation of its citizens; and (4) two recent decisions by the U.S. Supreme Court which mandate the release of aliens whose removal

---

[30] FY 2006 staffing of 100 IEAs is based on the FY 2006 Budget Appropriation.

[31] Length of stay for bed space calculated at 40 days.

[32] Of the 461,556 immigration judge decisions and administrative closures by the Executive Office of Immigration and Review (EOIR) between FY 2001 and FY 2004, 39 percent (181,807) were issued to aliens who had been released on bond, released on recognizance, or never detained and later failed to appear at their respective hearings.

orders could not be executed within a 180-day period without a determination that the alien meets the exceptionally stringent "Special Circumstances" requirements.[33]

**Failure of Illegal Aliens to Obey Orders to Appear in Immigration Court.**
Each year, thousands of illegal aliens fail to respond to orders to appear at their scheduled immigration hearing. In most of these cases, the Immigration Judge (IJ) will conduct an *in absentia* (in the absence of) hearing and order the alien removed from the U.S. However, a failure to appear does not always result in an *in absentia* order. In 4 percent of the cases the IJ may also administratively close a failure to appear case without ordering the alien removed.[34] Of the 461,556-immigration judge decisions and administrative closures issued by the Executive Office of Immigration and Review (EOIR) between FY 2001 and FY 2004, 39 percent (181,807) were issued to illegal aliens who had been released but later failed to appear at their respective immigration hearings.[35] Table 12 shows a comparison of the failures to appear rates for released aliens between FY 2001 and FY 2004.

| Table 12 Comparison of Failure to Appear Rates for Released Aliens (FY 2001-FY 2004) | | | | |
|---|---|---|---|---|
| **Fiscal Year** | **IJ Decisions/ Administrative Closures** | **Failures to Appear** | **Percentage Of Total** | **Annual Percent Increase** |
| 2001 | 96,703 | 42,030 | 43% | -0- |
| 2002 | 106,068 | 43,873 | 41% | 4.3% |
| 2003 | 124,601 | 43,014 | 35% | 1.9% |
| 2004 | 134,184 | 52,890 | 39% | 22.9% |
| **Total** | **461,556** | **181,807** | **39%** | ------- |

Source: U.S. Department of Justice

Although the percentage of released aliens who failed to appear at their respective hearings has declined in recent years, the total number of aliens failing to appear is increasing. During FY 2001, 42,030 aliens failed to appear

---

[33] According to 8 CFR 241.14, Special Circumstances aliens are those individuals: (1) that have a highly contagious disease that threatens public safety; (2) whose release would have adverse foreign policy implications; (3) present a significant threat to national security; or (4) are violent criminals with a mental disorder.

[34] Between FY 2000 and FY 2004, administrative closures comprised 4 percent of the 935,119 Immigration Judge decisions issued.

[35] Includes individuals who have not been in physical custody of DHS or the Department of Justice Institutional hearing Program. It also includes aliens who were detained at some point during proceedings and subsequently released on bond or personal recognizance.

compared to 52,890 who failed to appear during FY 2004, a 26 percent increase.

**Propensity of Illegal Aliens With Final Orders to Abscond.** Based on past history, the vast majority of illegal aliens who are released that are later issued final orders of removal by the EOIR will abscond. This is because DRO lacks the trained personnel, infrastructure, and funding needed to detain all apprehended aliens while their immigration status is being adjudicated. For example, DRO statistics indicate that 73 percent of the immigration cases for released illegal aliens brought before the immigration judge resulted in the issuance of final orders of removal. According to DRO, 85 percent of the illegal aliens released that have been issued final orders of removal, will abscond. Between FY 2002 and FY 2004, 280,987 illegal aliens were released of which 174,212 are likely to abscond based on past statistics. As of December 30, 2005, there were more than 544,000 absconders in the U.S.[36]

**Countries Blocking or Inhibiting Repatriation of Illegal Aliens.** Thousands of criminal aliens with final orders are released because of the unwillingness of some countries to issue travel documents necessary for repatriation.[37] These countries employ a variety of means to delay the removal process. For example, Ethiopia will only issue travel documents to persons who prove that their parents were born in Ethiopia, provide proof of birth in Ethiopia, are able to speak the language, and prove that they have family still residing in Ethiopia today. Eritrea will not grant the requisite travel documents to any individual who was not issued a "blue identity card" or a passport that was obtained after Eritrea gained its independence from Ethiopia in 1991.

Other methods for blocking repatriation include:

- requiring illegal aliens to produce overwhelming documentary evidence of their nationality (Iran);
- imposing a slow and problematic travel document issuance process (Iran, China, Jamaica, India);
- limiting the number of travel interviews being conducted (Ethiopia);
- refusing to repatriate nationals (Laos and Vietnam).

As a result of these barriers to removal, DRO is being forced to devote a significant percentage of its funded detention bed space (14%) to illegal aliens whose countries are either slow and/or unwilling to issue travel documents needed for removal. During FY 2003, the detention of criminal and non-criminal aliens from the top eight uncooperative countries that block or inhibit repatriation consumed 981,202 detention days and $83 million.[38] Table 13

---

[36] Includes officially designated absconders, unexecuted orders estimated to be absconders but not officially designated as such, and unconfirmed voluntary departures.
[37] These countries include Ethiopia, Eritrea, China, India, Iran, Jamaica, Laos. And Vietnam,
[38] The equivalent of 2,688 detention beds or 14 percent of the 19,444 funded bed space authorized during FY 2003.

contains a breakdown of FY 2003 detention days and estimated resources devoted to illegal aliens from eight countries that block or inhibit the repatriation of illegal aliens issued final orders of removal.

| Table 13<br>Breakdown of FY 2003 Detention Days and Estimated Resources Devoted to Aliens From Eight Countries That Block or Inhibit Repatriation | | |
|---|---|---|
| **Eight Countries** | **Detention Days FY 2003** | **Estimated Annual Cost @ ($85/day)** |
| Vietnam | 137,280 | $11,668,800 |
| Jamaica | 241,114 | $20,494,690 |
| Iran | 42,884 | $ 3,641,740 |
| India | 99,482 | $ 8,455,970 |
| Ethiopia | 34,761 | $ 2,954,685 |
| Eritrea | 6,401 | $    544,085 |
| China | 366,540 | $31,155,900 |
| Laos | 52,740 | $ 4,482,900 |
| **Total** | **981,202** | **$83,398,770** |

Source: DRO

The difficulty that DRO is experiencing removing illegal aliens with final orders has, in effect, created a mini-amnesty program for tens of thousands of illegal aliens that are subject to removal from the U.S. It also encourages individuals from non-cooperating countries such as China, India, and Iran to make attempts to enter the U.S. illegally. As of June 2004, more than 133,662 illegal aliens with or pending final orders of removal had been apprehended and released into the U.S. and who are unlikely to ever be repatriated if ordered removed because of the unwillingness of their country of origin to provide the documents necessary for repatriation.  Table 14 contains a breakdown of the detained/non-detained aliens from eight countries that block or inhibit the repatriation of its citizens from the U.S.

| Table 14 Breakdown in the Number of Illegal Aliens From Countries That Block or Inhibit Repatriation (As of June 29, 2004) | | | |
|---|---|---|---|
| **Eight Countries** | **Detained Criminal/Non-Criminal** | **Non-Detained Criminal/Non-Criminal** | **Total** |
| Vietnam | 352 | 5,807 | 6,159 |
| Jamaica | 715 | 11,568 | 12,283 |
| Iran | 105 | 7,039 | 7,144 |
| India | 253 | 28,540 | 28,793 |
| Ethiopia | 108 | 4,454 | 4,562 |
| Eritrea | 21 | 637 | 658 |
| China | 885 | 72,315 | 73,200 |
| Laos | 140 | 3,302 | 3,442 |
| **Total** | **2,579** | **133,662** | **136,241** |

Source: DRO

**Impact of the U.S. Supreme Court Decisions.** Two U.S. Supreme Court decisions - Zadvydas v. Davis 533 U.S. 678 (2001), and Clark v. Martinez, 543 U.S. 371 (2005), mandate the release of criminal and other high-risk aliens 180 days after the issuance of the final removal order, if their repatriation to their country of origin is not likely to occur in the reasonably foreseeable future except in "Special Circumstances." Exactly how many criminal and other high-risk aliens have been released as a result of the Zadvydas and Martinez decisions is not known since DRO did not begin tracking these releases until FY 2005.[39]

## Availability of Critical Data to Monitor DRO Performance

The Office of Detention and Removal's Deportable Alien Control System lacks the ability to readily provide DRO management with data analysis capabilities to manage the detention and removal program in an efficient and effective manner. The lack of reliable program and analysis capabilities could detrimentally affect DRO's ability to identify emerging trends, and to assess its resource requirements.

The Deportable Alien Control System (DACS), a 20-year old mainframe system, was placed into operation by legacy INS in 1984 and continues to be used by DRO to track docket control functions associated with the apprehension, detention, and deportation of illegal aliens. However, DACS does not contain or is not capable of readily furnishing key information for

---

[39] DRO has reported that 696 illegal aliens were released into the U.S. during the first 6 months of FY 2005 as a result of these two Supreme Court decisions.

reliable assessments of the detention and removal program. For example, DACS cannot provide statistical data related to (1) the number of aliens categorized as mandatory, high, medium, or low priority as specified in current detention guidelines; (2) the number of aliens who failed to show for immigration hearings; (3) the source of apprehension, i.e. Border Patrol, Investigations; and (4) the number released into the U.S population due to a lack of resources. Because the aging mainframe system has limited query capabilities, it cannot readily provide statistical detention and removal information, such as the number of aliens apprehended by year, their detention and release status, and their country of origin. Although this information is stored in DACS, in order to provide the requested data DRO had to rely on special programs written by DRO personnel or contractors to download, compile, manipulate, and analyze information stored in the system.

Furthermore, information stored in DACS is not always accurate and up to date. According to DRO, data quality problems are largely the result of: repetitive data entry functions, incomplete data entry, delays in the actual entry of detention and removal data, and the ability of DRO staff to delete or edit historical information stored in the DACS system. Although we did not independently assess the controls in place to ensure the reliability of data maintained in DACS, GAO and the legacy INS Office of Internal Audit (OIA) reported significant problems with DACS data reliability,[40] including:

- no assurance that all aliens in the removal process are entered into DACS;
- final alien removal actions were not always recorded in DACS;
- inadequate controls to ensure timely data entry;
- insufficient training for DACS users; and
- lack of written standards to ensure the quality of the data entered into DACS.

Recognizing the shortcomings of DACS, in FY 2001, DRO undertook an effort to improve its data collection and analytical capability. The Enforce Removal Module project (EREM) as it is called, is intended to replace DACS with an automated data collection and analysis system capable of providing more timely, accurate and complete analysis of immigration-related data including the ability to monitor all actions and decisions relating to individual alien cases and provide DRO with the statistical information it needs to optimize its operations.

---

[40] Source: February 2003 U.S. DOJ report titled *"The Immigration and Naturalization Service's Removal of Aliens Issued Final Orders"*. Report Number I-2003-004.

Implementation of the EREM project has been has been delayed due to system performance and compatibility problems. As a result of these problems, DRO allowed the existing developer contract to lapse in April 2004, accepted new contract bids, and awarded a new contract to a different developer in September 2004. However, due to the time required to obtain security clearances for its personnel, the new developer was not able to begin work until late December 2004. To date, DRO has invested more than $15 million into the EREM project with little to show for its effort. Further, DRO could not predict when the EREM project will be fully implemented or at what additional cost.

GAO Standards for Internal Control in the Federal Government and the Government Performance Results Act of 1993 require that agencies ensure the integrity of information for use by management in controlling operations and making decisions and that each agency be able to assess the level of success in achieving set performance goals, respectively.

In order to allow management sufficient oversight over the detention and removal program, DRO should expedite its efforts to develop, test, and implement a data management system that is capable of meeting DRO's data collection and analysis requirements. The data management system, at a minimum, should be able to provide the following immigration-related data with improved data quality for each illegal alien:

- country of origin;
- date apprehended, released, or removed;
- detention location;
- information detailing the results of the risk assessments for illegal aliens detained and released (by risk category –high-medium-low priority);
- the type and category of crime(s) committed (for criminal aliens);
- the rationale underlying DRO's decision to release an alien from detention (if applicable);
- the rationale underlying DRO's decision not to detain individual aliens;
- the date when individual final orders of removal were issued; and
- the date when the final order of removal was executed.

The data management system should also be able to provide the following information regarding the entire population of illegal aliens in DRO custody on a monthly and annual basis:

- bed space turnover rate for mandatory and non-mandatory detainees;
- the number/percentage of detainees that were detained from apprehension to removal; and
- the number of mandatory and non-mandatory aliens apprehended and detained.

The use of an improved information technology system, coupled with quality controls, would greatly enhance DRO's ability to support resource requirements, identify emerging trends, and assess the success of its overall mission.

## DRO's Strategic Plan

In June 2003, DRO released its 2003-2012 Strategic Plan, entitled "Endgame," establishing a goal of developing within 10 years the capacity to remove all removable aliens. The plan includes specific objectives for optimizing the means for detaining illegal aliens, including:

- Ensuring sufficient and appropriate bed space is available based on detention category, characteristic, and condition of release;
- Enhancing partnerships with other federal detention agencies for better use of their resources, to include facilities and training; and
- Developing a National Custody Management Plan promoting the effective utilization of available bed space and alternative detention settings.

However, the plan identified several significant challenges, many beyond DHS' control, including the number of aliens to remove, limited resources, political will, foreign governments, and non-removable aliens. For these reasons, DHS needs to intensify its efforts to provide ICE with the resources and interagency support needed to overcome these challenges.

## Conclusions and Recommendations

DRO has developed a comprehensive plan to detain and remove illegal aliens, but its success depends on sufficient resources and other factors beyond its control.  Congress has appropriated funds to advance the plan, but those funds still fall far short of the amount needed to detain and remove all high-risk aliens. Further, DRO lacks the analytical capability to manage the program effectively.  Additional actions are needed to mitigate the risks created by these circumstances.

**We recommend that the Assistant Secretary, ICE:**

**Recommendation #1**: Develop a detailed plan to ensure that ICE has the capacity to detain, process, and remove aliens that pose a potential national security or public safety risk to the U.S., including SIC, SST, and CAP aliens. The plan should include personnel, training, equipment, infrastructure and funding requirements.

**Recommendation #2:**  Intensify efforts to obtain the resources needed to expedite the development of alternatives to detention to minimize required detention bed space levels.

**Recommendation #3:**  In collaboration with the Department of State, develop a detailed plan to resolve travel document and related issues that are preventing or impeding ICE's ability to repatriate OTM aliens.  The plan should include timelines, milestone dates, the identity of personnel and organizations responsible for creating and implementing the plan, and any funding requirements.

**Recommendation #4:** Expedite efforts to develop and implement a data management system that is capable of meeting its expanding data collection and analyses needs relating to the detention and removal of illegal aliens.  The plan should include timelines, milestone dates, equipment and infrastructure requirements, a bi-annual reporting requirement outlining the progress being made on the project, the identity of the organizational entities to be responsible for implementing the planned upgrade, and any short and long-term funding requirements.

## Management Comments and OIG Analysis

We issued a draft version of the report to the Department on December 28, 2005. The Department provided its written response on February 21, 2006. (See appendix F.) These comments were extremely useful and were incorporated into the final report, as appropriate. The final report is based on the analysis of information provided to us through March 13, 2006.

We are pleased to learn of the Department's commitment to provide ICE with resources it desperately needs to detain, process, and remove aliens that pose a potential national security or public safety risk to the U.S. This commitment is demonstrated by the Department's concurrence with recommendations 1, 3, and 4, and its partial concurrence with recommendation 2. However, we are concerned that the Department's response does not specifically outline the steps it will take to implement these recommendations, the resources that will be directed at these efforts, and the timeline for their completion. Our comments are as follows.

**Recommendation 1:**  Develop a detailed plan to provide ICE with the capacity to detain, process, and remove aliens that pose a potential national security or public safety risk to the U.S., including SIC, SST, and CAP aliens. The plan should include personnel, training, equipment, infrastructure and funding requirements.

**DHS Comments:** The Department concurred with the recommendation. Under the Department's Secure Border Initiative (SBI) program, DRO is doing precisely that.  DRO, as part of the SBI process, has made progress in creating models to determine bed space needs, staffing requirements, infrastructure, removal requirements and funding requirements based on expectant arrest numbers as provided by the initiating agency.  It is also engaging with other federal law enforcement agencies such as the Bureau of Prisons (BOP), U.S. Citizenship and Immigration Services (USCIS), the Department of State, and the Department of Justice to jointly develop a more efficient complex detention and removal system.

**OIG Comments:**  The OIG is pleased that DRO is making progress to better identify its requirements and the recommendation is considered resolved. However, the intent of our recommendation is not completely addressed in the response.  Specifically, the response does not include specific actions the Department will take to provide ICE with the personnel, training, equipment, infrastructure, and funding needed to provide ICE with the capacity to detain, process, and remove aliens that pose a potential national security or public safety risk to the U.S.  The recommendation will remain open until the Department provides the specific actions it plans to take to address the recommendation.

**Recommendation 2:**  Intensify efforts to provide ICE with the resources needed to expedite the development of alternatives to detention to minimize required detention bed space levels.

**DHS Comments:**  The Department partially concurred with the recommendation.  Currently, ICE employs alternative means of release (the preferred term vice "alternatives to detention"), such as the Intensive Supervision Appearance Program (ISAP) and the Electronic Monitoring Device (EMD) Program.  DRO is still evaluating these pilot programs.  Once evaluation is complete, decisions will be made about further expansion.

**OIG Comments:**  We understand the need to evaluate the ongoing pilot programs and examine the results before deciding whether to expand these efforts and/or embark on other alternative programs.  Nevertheless, we remain concerned about the degree to which these pilots have been funded in the past as well as the timeliness of these efforts.  The ISAP Program has been ongoing since June 2004.  The EMD pilot, on the other hand, dates back to May 2003.  We look forward to learning the results of these pilots and the Department's plans to move forward in the development of cost-effective alternatives to detention.  This recommendation is considered resolved but will remain open until the Department provides its plan for using alternative means of release.

**Recommendation 3:**  In collaboration with the Department of State, develop a detailed plan to resolve travel document and related issues that are preventing or impeding ICE's ability to repatriate OTM aliens.  The plan should include timelines, milestone dates, the identity of personnel and organizations responsible for creating and implementing the plan, and any funding requirements.

**DHS Comments:**  The Department concurred with the recommendation.  Under the Department's SBI program, DRO is working closely with the Department of State (DOS) to address travel document and related issues preventing or impeding the repatriation of illegal OTM aliens.  Great strides have been made in this area with Central and South American countries.  The initiation of video teleconferencing, dedicated consulate staffs as well as soon to be implemented electronic travel documents have greatly decreased the time needed for the issuance of a travel document.

Additionally, DRO participates in a Sanctions Working Group, which includes representatives from ICE, DOS, the National Security Council, and Homeland Security Council.  This group's focus on Jamaica resulted in the resolution of issues associated with that country's issuance of travel documents, and the Government of Jamaica now issues travel documents within acceptable timeframes.  Current efforts are now focused on Ethiopia, with visa sanctions as a distinct possibility if no increased cooperation is seen in the near future.

**OIG Comments:**  We are pleased to learn of the progress being made by the Department to resolve longstanding travel document issues, which have resulted in the release of many OTM aliens into the U.S.  However, these efforts have yet to fully address the potential national security and public safety risks associated with the Department's inability to remove tens of thousands of illegal aliens from China, Iran, and India from the U.S. due to travel document-related issues. Many of these are criminal aliens who have been issued final orders of removal but have not been removed due to the inability of authorities to obtain the necessary travel documents.  We believe the Department needs to develop and implement a plan of action to resolve the travel document issues and to ensure that detention personnel and bed space are used effectively and to expedite the removal of criminal aliens and other high-risk aliens.  Therefore, the recommendation is considered resolved but will remain open until the Department develops and implements the plan of action.

**Recommendation 4:**  Expedite efforts to develop and implement a data management system that is capable of meeting its expanding data collection and analyses needs relating to the detention and removal of illegal aliens. The plan should include timelines, milestone dates, equipment and infrastructure requirements, a bi-annual reporting requirement outlining the progress being made on the project, the identity of the organizational entities to be responsible for implementing the planned upgrade, and any short and       long-term funding requirements.

**DHS Comments:**  The Department concurred with the recommendation.  The ICE Office of Chief Information Officer (OCIO) is preparing a project plan for DRO that reflects efforts to expedite the development and deployment of enhanced information technology (IT) solutions capable of meeting the expanding data collection and analysis needed relating to the detention and removal of illegal aliens. The new system will allow users to capture, search, and review information in important functional areas.

**OIG Response:**  We are pleased to learn of ICE's plan to develop an automated data management system that will be capable of meeting its expanding data collection and analysis needs relating to the detention and removal of illegal aliens.   The current system is more than 20 years old and either does not contain or does not easily provide key information needed for reliable assessments of ICE's detention and removal program. Further, we remain concerned that previous efforts by ICE to develop such a system were largely unsuccessful despite 5 years of effort and the expenditure of at least $15 million.   If properly designed, the system should significantly enhance ICE's ability to support future budget requests, identify emerging trends, and assess its overall mission performance.   We are hopeful that the latest effort

will be more successful and look forward to seeing ICE's plan for making it happen. This recommendation is resolved but will remain open until the ICE project plan is approved.

## Other Comments

The Department/ICE proposed a number of technical comments in response to the draft report. We have worked closely with the Department to address their concerns and revised the report where necessary.

The Department/ICE stated on page 2 of their comments that there appears to be a lack of differentiation between an alien's pre- and post-order status as it relates to the release statistics throughout the report, and stated that mixing the discussion and analysis of pre- and post-order status throughout the report may lead to the reader's confusion. We have discussed this issue with DRO officials. Based on these discussions, we have determined that this issue has no impact on our findings or conclusions and would represent only an insignificant change to the data presented in Chart 1, Tables 3 through 6, and Table 15.

The Department/ICE stated on page 3 of their comments that the release rates used in our report may be slightly inflated, as they would include release premised on factors outside the control of DRO. As stated in the Department/ICE comments, every effort was made to take these numbers out of the statistics. We agree with the Department/ICE position that the statistics could be slightly inflated and that the release numbers might be fewer than quoted. However, we do not believe that any differences in the release statistics affect the overall conclusions and recommendations in this report. To minimize reader confusion and identify the limitations of the statistics in this report, we have included a detailed explanation in Appendix B regarding the reasons and circumstances that cause aliens both pre- and post-final order to be released.

Appendix A
Types of Apprehensions

_____

There are numerous types of apprehensions made by a number of different sources within DHS. Not all apprehensions require DRO intervention in terms of detention, case management, or removal services. The apprehensions that do require DRO services are referred to in this report as active cases under DRO for detention (if resources available), case processing, and removal (if ordered removed). All apprehension statistics in this report include only those placed as active cases under DRO. The various types of apprehensions and their consideration in this report are as follows:

- _Aliens apprehended by ICE in the United States in violation of the INA due to unlawful presence in the United States_. Most of these apprehensions would be processed for an immigration hearing before an immigration judge and either placed in detention or released into the U.S. population on bond or own recognizance. These are placed as active cases under DRO and are included in the apprehension statistics for purposes of this report.

- _Aliens apprehended by Border Patrol between the ports of entry for entry without inspection_. Most of these aliens (primarily Mexicans) will voluntarily return (depart) under safeguard back to their country. A voluntary return under safeguard is an administrative removal at the request of the alien. No formal immigration hearing before an immigration judge is required. Other than sometimes providing transportation services to the border, voluntary returns are not placed as active cases under DRO and are therefore excluded from the apprehension statistics for purposes of this report. If the alien does not voluntarily return, then the alien is processed for an immigration hearing before an immigration judge and either placed in detention or released into the U.S. population on bond or own recognizance. Those that do not voluntarily return are placed as active cases under DRO and are included in the apprehension statistics for purposes of this report.

- _Aliens apprehended by CBP Officers at ports of entry._ Most of these aliens are immediately removed by CBP Officers without any intervention by DRO. These are placed as active cases under DRO and are excluded from the apprehension statistics for purposes of this report. If for any reason the alien is placed into removal proceedings, then the alien is placed as an active case under DRO and is included in the apprehension statistics for purposes of this report. Two examples are if the alien claims

Appendix A
Types of Apprehensions

---

Legal status or if the alien claims asylum, but the claim is denied or otherwise referred for an asylum hearing.

- *Aliens apprehended that are incarcerated.* The federal or state institution detains the alien while the criminal sentence is served, but DRO provides actual case processing and removal services. These are placed as active cases under DRO and are included in the apprehension statistics for purposes of this report.

- *Aliens denied asylum or referred for an asylum hearing after filing a claim with DHS Citizenship and Immigration Services (USCIS).* These are placed as active cases under DRO and are included in the apprehension statistics for purposes of this report.

Appendix B
Apprehensions Released

_____

Apprehended individuals are released into the U.S. population in a number of
ways. An individual can be released into the population at the time of initial
apprehension. An individual can be detained by DRO either at time of
apprehension or at a later date and subsequently released into the population
on bond, on own recognizance, on orders of supervision, or on parole. The
release could occur while the individual's immigration status is being
adjudicated or after receiving a final order of removal.

For purposes of this review, the release statistics in this report in Chart 1 and
Tables 3 through 6 only include those individuals that were released at time of
initial apprehension and had not been detained by DRO as of November 2004
for the FY 2001 through FY 2004 apprehensions or April 2005 for FY 2005
apprehensions (first six months).  Many of these individuals were released
into the U.S. population.  Some were not released into the U.S. population
because they were immediately issued an administrative or reinstated removal
order and removed from the U.S. shortly following apprehension without the
need for DRO detention.

DRO could not quantify how many individuals were removed under these
circumstances.  To the extent possible, individuals not actually released into
the U.S. population were excluded from the release statistics.  Specifically,
expedited removals, voluntary returns, IRP removals, and incarcerated aliens
were excluded from the release statistics because while these individuals were
not detained by DRO they also were not released into the U.S. population.

Further, DRO could not identify releases into the U.S. population due to a
lack of resources because such information is not tracked.  While many were
released into the U.S. population due to resource shortages, some were
released into the U.S. population because the individual did not appear to pose
a flight, public safety, or national security risk.

For purposes of this review, the release statistics in Chart 1 and Tables 3
through 6 do not include individuals that DRO detained at time of
apprehension or at a later date and subsequently released into U.S. population
on bond, own recognizance, order of supervision, or parole. Some of these
releases into the U.S. population are due to resource shortages, but there are
several other possible reasons for the release from detention.

According to DRO, releases from detention on parole are not likely to be due
to resources at all, but rather for humanitarian or some other compelling

Appendix B
Apprehensions Released

_____

reason. Some of the primary non-resource driven reasons that DRO releases individuals from detention on bond, own recognizance, or order of supervision are as follows:

- Immigration judges ordered the individuals released from detention.

- The INA and Supreme Court decisions mandate that DRO release most aliens if not removed within a specified period following issuance of a final order of removal.

- In the professional judgment of DRO, the alien does not pose a flight or known safety risk to the public.

Because DRO does not track the specific reason an individual is released from detention, it is not possible to determine exactly how many of the releases on bond, own recognizance, or order of supervision, were due to a lack of detention resources. Therefore, these types of releases are excluded from Chart 1 and Tables 3 through 6 even though some are likely due to detention resource limitations. Table 15 contains the number of releases for individuals detained at time of apprehension that were later released on bond, own recognizance, or under an order of supervision from FY 2001 through FY 2004.

| Table 15 Aliens Apprehended, Detained and Later Released On Bond, Own Recognizance (OR), and Order of Supervision (OS) (FY 2001 –FY 2004) | | | |
|---|---|---|---|
| | Apprehensions | Detained and Released On Bond, OR, and OS | Percentage Released On Bond, OR, and OS |
| Total Apprehensions | 998,481 | 80,594 | 8% |
| OTM Apprehensions | 517,918 | 65,159 | 13% |
| Criminal Apprehensions | 345,006 | 15,483 | 4% |
| Criminal Apprehensions from select countries listed in Table 4 | 311,687 | 10,060 | 3% |
| SIC and SST Apprehensions | 82,803 | 10,420 | 13% |

Source: DRO

If DRO tracked the number of individuals released into the U.S. population, including those specifically due to resources or other factors, then DRO could more precisely quantify problem areas and the impact on the effectiveness of DRO operations.

Appendix C
ICE Apprehension, Detention, and Removal Process



**Source:** INS Detention and Removal Program, Critical Influences on INS Detention, May 2001, page 4, and DHS-OIG Analysis

Appendix D
BTS Detention Prioritization and Requirements Memorandum

U.S. Department of Homeland Security
Washington, DC 20528



Homeland
Security

OCT 18 2004

MEMORANDUM TO:    Robert C. Bonner
                  Commissioner
                  U.S. Customs and Border Protection

                  Michael J. Garcia
                  Assistant Secretary
                  U.S. Immigration and Customs Enforcement

FROM:             Asa Hutchinson
                  Under Secretary for Border and Transportation Security

RE:               Detention Prioritization and Notice to Appear Documentary
                  Requirements

This memorandum provides priorities for the detention of aliens and outlines
documentary requirements that must be met when transferring custody of aliens to
Immigration and Customs Enforcement (ICE), Office of Detention and Removal
Operations (DRO). The guidance in this memo supercedes all outstanding guidance
regarding priorities for the detention of aliens within Border and Transportation Security
(BTS). All BTS personnel must adhere to legal authorities and the procedures set forth
below in making decisions regarding whether to detain an alien.[1]

*I. Detention Priorities*

The following guidelines provide priority categories for the detention of aliens subject to
detention. An alien being considered for detention should be placed in the highest
numbered priority within the top category possible (i.e., an alien found to have a credible
fear of persecution with an aggravated felony conviction would still meet the
requirements of Mandatory, #2). In the case of mandatory detention, the Director of ICE
DRO is to heed the guidelines strictly. In all other cases, the DRO Director retains the
discretionary authority with respect to allocation of bed space and other detention-related
resources. In all cases, the DRO Director is to heed these guidelines to the greatest
extent possible when determining detention priorities.

---

[1] This policy does not supercede any requirement to release an alien under Zadvydas v. Davis, 533 U.S.
678 (2001) and implementing guidance in 8 CFR §§ 241.4, 241.13 and § 241.14 nor does it apply to
unaccompanied juveniles.

www.dhs.gov

**Detention and Removal of Illegal Aliens**

Appendix D
BTS Detention Prioritization and Requirements Memorandum

All such aliens must be detained unless they fall within one of the exceptions to mandatory detention. There are no priority designations among categories of cases subject to mandatory detention. Questions as to whether a given alien falls under one of these categories and must be detained should be directed to local legal counsel.

**Mandatory**

- Aliens subject to mandatory detention under INA 236A[2]
- Aliens in expedited removal (INA § 235) with limited exceptions[3]
- Aliens subject to mandatory detention in removal and deportation proceedings under INA 236(c)[4]
- Aliens who have final orders of removal subject to mandatory detention under INA 241(a)(2), whether ordered removed pursuant to INA 238 or 240 proceedings[5]

**High Priority**

1. National Security Interest aliens including aliens who are subject to an ongoing national security investigation or who, by virtue of specific information or intelligence specific to the alien in question raise a national security concern, as identified either by 1) the Joint Terrorism Task Force, 2) Immigration and Customs Enforcement, or 3) by U.S. Customs and Border Protection (CBP).[6]
2. Continued detention of aliens with final administrative orders past 180 days on account of special circumstances (i.e. 8 CFR 241.14).
3. Aliens who have been issued final removal orders over 90-days old, where removal is foreseeable.
4. Aliens who present an articulable danger to the community (claimant agency must be able to articulate the danger)
5. Aliens who exhibit specific, articuable intelligence-based risk factors for terrorism or national security concern not solely based on the alien's race, ethnicity, nationality or religion (as identified by either 1) the Joint Terrorism Task Force, 2) Immigration and Customs Enforcement, or 3) by U.S. Customs and Border Protection.
6. Aliens associated with ongoing significant criminal investigations;

---

[2] Prior approval of the ICE National Security Unit and the ICE Office of the Principal Legal Advisor is required before charges may be brought under either INA § 212(a)(3) or INA § 237(a)(4).
[3] Not all aliens in expedited removal proceedings are subject to mandatory detention, however. See, for example 8 CFR § § 235.3(b)(2)(iii), 235.3(b)(4)(ii), and 235.3(b)(5)(i) allowing for parole in limited circumstances of medical emergency, or where necessary for a legitimate law enforcement objective.
[4] Note that INA 236(c)(2) authorizes release to provide for protection of a witness, etc., where the alien does not pose a danger to the safety of others or to property and is likely to appear for any scheduled proceedings.
[5] This includes aliens ordered removed under INA 240 and criminal aliens ordered removed under INA 238. These aliens may not be released under any circumstances during the 90-day removal period set forth in INA 241(a)(2). Following the 90-day period, the continued detention of such aliens should be determined pursuant to criteria in Zadvydas, supra and implementing guidance in 8 CFR §§ 241.4, 241.13, and 241.14.
[6] ICE and CBP shall track all cases where the two bureaus disagree on whether a particular alien poses a national security threat. CBP and ICE shall review these cases on a quarterly basis.

2

**Detention and Removal of Illegal Aliens**

Appendix D
BTS Detention Prioritization and Requirements Memorandum

---

7. Remaining criminal aliens not subject to 236(c) ;
8. Aliens whose detention is essential to national border enforcement initiatives;

**Medium Priority**

1. Suspected alien and narcotics smugglers
2. Aliens who committed fraud
3. Inadmissible, non-criminal aliens (other than expedited removal cases)

**Lower Priority**

1. Worksite enforcement arrests
2. Final orders (beyond 179 days-not likely to remove)
3. Aliens placed in expedited removal found to have a credible fear and referred for full 240 proceedings.
4. Other aliens not subject to required detention

II. Documentary requirements.

Each component must ensure apprehended aliens are processed efficiently and placed in the appropriate and most expedient removal process. (e.g. stipulated, reinstatement, administrative, expedited) At a minimum, the following documents must be completed by the apprehending entity and presented to DRO to ensure each case moves swiftly through the removal process:

- Original charging documents;
- Completed Form I-213 (Record of Deportable/Inadmissible Alien) or approved equivalent;
- 2 completed Forms FD-249 (fingerprint cards);
- R-84 Form with prints and biographical information completed;
- Print out of results, including negative responses, of name search in IBIS "SQ11" function.
- IAFIS printout relating to criminal history; if IAFIS is not available, print out of results, including negative responses, based on name search in either NCIC or NLETS.
- Record of Fingerprint Identification Number (FIN) generated by the Automated Biometric Identification System (IDENT);
- 4 photographs;
- Completed Form I-217 (Information for Travel Document or Passport if required);
- Documentation of Consular Notification;
- Certified conviction records, when applicable. In the event that conviction records are not immediately available, the arresting officer must provide written notification to the file that a Certified Copy of the Conviction Document has been requested, and include in the administrative file the following information: the exact date and jurisdiction where the alien was convicted, the name and telephone number of the referring officer and the supervisor, the name and contact

3

Appendix D
BTS Detention Prioritization and Requirements Memorandum

___

information of the agency official responsible for procuring the conviction record. Furthermore, the arresting agency must produce the actual conviction record within 30 days of issuance of the NTA;[7]

- Documentation reflecting that appropriate record checks (Central Index System (CIS), Non-Immigrant Information System (NIIS), National Crime Information Center (NCIC), IDENT, Interagency Border Inspection System (IBIS), etc.) have been completed;
- Completed Form I-203 or I-203A [Order to Detain or Release Alien(s)] bearing the appropriate official's signature must accompany each detainee presented for detention;
- Notice of Custody Determination (Form I-286), indicating date and time custody decision was made and probable charges against alien;
- And any other relevant documents pertaining to the detainee.

To ensure maximum efficiency in the use of the Department's finite detention bed resources, it is imperative that this documentation is prepared and presented. Custody responsibility will not be transferred to ICE/Detention and Removal Operations (DRO) until ICE/DRO verifies that all of the above required documentation has either been provided or has been waived by an ICE/DRO authorizing official at the detention site. The arresting or delivering officer will ensure that detainees turned over to the custody of ICE/DRO are accompanied by any personal items, identity documents, baggage and/or prescription medications in that detainee's possession at the time of arrest.

The requirements I issued in my memorandum of March 30, 2004, *Guidance on ICE Implementation of Policy and Practice Changes Recommended by the Department of Justice Inspector General*, remain in effect. You are responsible for ensuring implementation of these requirements.

___

[7] CBP shall establish within 30 days of this memorandum points of contact in each field office to coordinate obtaining conviction records for cases where the conviction record is not timely produced. Contact information shall be provided to the DRO Field Office Directors and the ICE Chief Counsels.

4

**Detention and Removal of Illegal Aliens**

Appendix E
Purpose, Scope, and Methodology

---

The purpose of this audit was to determine whether ICE has sufficient resources and detention facilities available to house detainees. Our audit was designed to determine whether:

- DRO is removing all illegal aliens with final orders of removal.

- Budgetary constraints are impacting DRO's ability to perform the detention and removal mission.

- External factors outside of DRO's control are impacting its ability to perform its detention and removal mission;

- DRO's Deportable Alien Control System is able to provide management with the data analyses needed to measure its effectiveness in performing the detention and removal mission.

We focused our work at the Customs and Border Protection and Immigration and Customs Enforcement headquarters in Washington, D.C.; and, Border and Transportation Security offices in Arizona, Texas, and Florida. Our scope included information and activities through March 13, 2006.

To identify detention and resource issues, we interviewed DHS headquarters officials in the CBP and ICE offices in Washington D.C. At CBP and ICE headquarters, we reviewed agency documents containing budget, staffing, apprehension, release, detention, absconder, and removal information. We relied on the data provided by DRO, ICE, and Department of Justice for purposes of this audit. We did not test the validity or reliability of the data provided.

We interviewed DRO, Border Patrol, CBP officials, and ICE Investigators at numerous field offices. We judgmentally selected the field offices based on those offices with the highest number of apprehensions as reported by DHS data, based on CBP and ICE officials' suggestions, and to ensure audit coverage included air, land, and sea operational environments. During the period January 2004 and April 2004, we made site visits to DRO offices in Dallas, San Antonio, Port Isabel, and Harlingen, Texas; Phoenix and Florence, Arizona; and Miami, Florida.  Additionally, we made site visits to Border Patrol offices in McAllen, Texas, Tucson, Arizona; and Miami, Florida and visited CBP officers at the Brownsville, Texas and Nogales, Arizona ports of entry.

Appendix E
Purpose, Scope, and Methodology

To determine if illegal aliens requiring mandatory detention were being released into United States communities, at each DRO field office visited, we reviewed a random sample from the non-detained population provided by DRO from the DACS that included apprehension and detention information to identify status and classification according to the detention policy. With the exception of comparing DRO field office documentation to the DACS data, we did not test the validity or reliability of the data provided. Based on our limited testing, we conclude the data was sufficiently reliable to meet the audit objective.

We conducted our audit between September 2003 and March 2006 under the authority of the *Inspector General Act of 1978*, as amended, and according to generally accepted government auditing standards.

We would like to extend our appreciation for the cooperation and courtesies extended by ICE to our staff during the review.

Appendix F
Management's Comments



*Office of the Assistant Secretary*

**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

FEB 2 1 2006

MEMORANDUM FOR:   Richard L. Skinner
Inspector General
Department of Homeland Security

THROUGH:   Steven J. Pecinovsky
Director
Department GAO/OIG Liaison Office

FROM:   Julie L. Myers
Assistant Secretary

SUBJECT:   OIG Draft Report: Detention and Removal of Illegal Aliens,
OIG-06-XX, December 2005

This memorandum contains the coordinated response of U. S. Immigration and Customs
Enforcement (ICE) and the Department of Homeland Security (Department). The Department
and ICE welcome the suggestions made by the Office of the Inspector General (OIG).

The Department's responses to the recommendations display a continued commitment toward
effective and efficient detention and removal of illegal aliens.

**Management Comments**

Immigration and Customs Enforcement appreciates the Office of Inspector General's efforts
culminating in the release the **OIG Audit Report: Detention and Removal of Illegal Aliens,
OIG-06-XX**. The duration of the audit highlights the complexity of issues confronting
Detention and Removal Operations and how their efforts impact immigration enforcement more
broadly. ICE welcomes the OIG's overarching concern for the need for adequate resources to
accomplish Detention and Removal Operation's (DRO) mission to "*Promote the public safety
and national security by ensuring the departure from the United States of all removable aliens
through the fair and effective enforcement of the nation's immigration laws.*"

It is important to note at the outset that this audit was conducted from September 2003 to
November 2005. Indeed, after conducting the Second Stage Review of the Department,
Secretary Michael Chertoff concluded that we needed to reform our detention and removal
processes. For that reason, he launched an effort, the Secure Border Initiative (SBI), to tackle the
very problems identified in the report. In particular, he concluded that we needed to streamline
and make more efficient our detention and removal operations. Under Secretary Chertoff's
leadership, SBI is providing an integrated systems approach to the immigration phenomenon,
with national security and public safety as the two overarching priorities. Working in close
coordination with ICE and U.S. Customs and Border protection (CBP), SBI immediately

Appendix F
Management's Comments

---

Subject:  OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
          December 2005

Page 2

established a working group to "re-engineer" the detention and removal system.  We were
pleased that a member of the OIG staff was involved in that effort.

This "re-engineering," which is currently in progress, will result in a more efficient and robust
detention and removal system that is able to detain a higher percentage of apprehended aliens and
remove them swiftly and at a lower cost.  As outlined in these Management Comments and the
Response To Recommendations, steps have already been taken and progress will continue in
improving performance and accountability.  For example, models have been created to determine
bed space, staffing requirements, infrastructure, removal requirements, and funding requirements.
The Department is also exploring the expansion of alternative means to detention, and is working
with the participation of the Department of State (DOS) to resolve travel document and related
issues that prevent or impede the repatriation of illegal Other Than Mexican (OTM) aliens.
Additionally, DRO is working on the development and implementation of a replacement data
management system for the legacy Immigration and Naturalization Service (INS)
Deportable Alien Control System (DACS), to ensure that the data collection and analysis needs
of the Department are fully met.

When reading the OIG report, it is important to note that SBI was not yet fully functional at the
time of the conclusion of the OIG staff's review.  This prevented OIG from evaluating and
incorporating the results of the Department's recent progress in re-engineering our Nation's
immigration enforcement strategy to manage, control, and secure our borders in the most
effective and efficient manner possible.  We note that, through SBI, the Department has already
raised and taken steps to address many of the recommendations and findings of this report.
Under SBI, more than 6,650 non-Mexican individuals have been turned over to ICE custody for
detention in connection with the Expedited Removal program.  Thus far, ICE has removed
roughly 5,800 of these individuals from the country, a removal rate of 99 percent under SBI. The
average length of stay in ICE detention for aliens placed into Expedited Removal is
approximately 20 days, down significantly from the average of 90 days spent in ICE detention by
aliens prior to the creation of the SBI.

The complexity of technical and legal issues particular to DRO makes defining, accumulating,
and analyzing statistical data surrounding DRO a difficult process. The content of the report
contains volumes of statistical data.  In the statistics provided throughout the report there appears
to be a lack of differentiation between an alien's pre- and post-order status as it relates to
releases.  An alien cannot be removed until a final order of removal is granted.  Mixing the
discussion and analysis of pre- and post-order status throughout the report may lead to the
reader's confusion.

Pursuant to the Immigration and Nationality Act (INA), ICE has the authority to detain certain
aliens pre-final order (while their immigration process is pending) and post-final order (after the
alien has received an administrative final order of removal).  As this report correctly illustrates,
DRO presently lacks the personnel and resources to detain all the aliens it has the authority to
detain; thus, it often releases aliens who may legally be kept in detention.  One primary focus of
SBI's efforts to re-engineer the detention and removal system is to eliminate the other types of
releases--those which result from lack of detention space and often termed "catch and release."
However, the INA, regulations, and pertinent case law often require that DRO release aliens,
regardless of resource and/or personnel issues.  Examples of this are cases in which the
Immigration Judge has the jurisdiction to set bond and release an alien; when an alien is granted
an immigration benefit; when prosecutorial discretion has been used; when custody is transferred
to a law enforcement agency to allow the alien to assist with a prosecution; when a final order

Appendix F
Management's Comments

Subject:  OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
December 2005

Page 3

alien has not been issued a travel document during the 90-day statutory removal period and they
are not a risk to the community or a flight risk; and in cases of final order aliens whose removal
is not significantly likely and for whom the post-order detention has been over 6 months. Unless
these releases have been properly accounted for in the statistics, the reflected release rates may b
slightly inflated, as they would include release premised on factors outside the control of DRO.
It was understood that every effort was made to take these numbers out of the statistics, but ICE
is concerned that the release numbers may be fewer than quoted.

**Response To Recommendations**

**RECOMMENDATION # 1:  Develop a detailed plan to provide ICE with the capacity to
detain, process, and remove aliens that pose a potential national security or public safety
risk to the U.S., including SIC, TSC, and CAP aliens. The plan should include personnel,
training, equipment, infrastructure and funding requirements.**

**ORGANIZATION STATUS: Concur.**  Under the Secretary's SBI program, DRO is doing
precisely that.  DRO, as part of the SBI process, has made progress in creating models to
determine bed space needs, staffing requirements, infrastructure, removal requirements and
funding requirements based on expectant arrest numbers as provided by the initiating agency.  It
is also engaging with other federal law enforcement agencies such as the Bureau of Prisons
(BOP), U.S. Citizenship and Immigration Services (USCIS), the Department of State, and the
Department of Justice to jointly develop a more efficient complex detention and removal system

**RECOMMENDATION #2 :  Intensify efforts to provide ICE with the resources needed to
expedite the development of alternative means of detention to minimize required detention
bed space levels.**

**ORGANIZATION STATUS: Partially Concur.**  Currently, ICE employs alternative means o
release (the preferred term vice "alternatives to detention"), such as the Intensive Supervision
Appearance Program (ISAP) and the Electronic Monitoring Program (EMD).  DRO is still
evaluating these pilot programs.  Once evaluation is complete, decisions will be made about
further expansion.

**RECOMMENDATION #3 :  In collaboration with the Department of State, develop a
detailed plan to resolve travel document and related issues that are preventing or impedin
the repatriation of illegal OTM aliens.  The plan should include timelines, milestone dates,
equipment and infrastructure requirements, a bi-annual reporting requirement outlining
the progress being made on the project, the identity of the organization entities to be
responsible for implementing the planned upgrade, and any short- and long-term funding
requirements.**

**ORGANIZATION STATUS: Concur.**  Under the Secretary's SBI program, DRO is working
closely with the Department of State (DOS) to address travel document and related issues
preventing or impeding the repatriation of illegal OTM aliens.  Great strides have been made in
this area with Central and South American countries.  The initiation of video teleconferencing,
dedicated consulate staffs as well as soon to be implemented electronic travel documents have
greatly decreased the time needed for the issuance of a travel document.

Additionally, DRO participates in a Sanctions Working Group which includes representatives
from ICE, DOS, the National Security Council, and Homeland Security Council.  This group's

Appendix F
Management's Comments

---

Subject: OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
          December 2005
Page 4

focus on Jamaica resulted in the resolution of issues associated with that countries issuance of travel documents, and the Government of Jamaica now issues travel documents within acceptable timeframes.

**RECOMMENDATION #4 : Expedite efforts to develop and implement a data management system that is capable of meeting its expanding data collection and analyses needs relating to the detention and removal of illegal aliens. The plan should include timelines, milestones dates, equipment and infrastructure requirements, a bi-annual reporting requirement outlining the progress being made on the project, the identity of the organizational entities to be responsible for implementing the planned upgrade, and any short- and long-term funding requirements.**

**ORGANIZATION STATUS: Concur.** The ICE Office of the Chief Information Officer (OCIO) is preparing a project plan for DRO that reflects efforts to expedite the development and deployment of enhanced information technology (IT) solutions capable of meeting the expanding data collection and analysis needs relating to the detention and removal of illegal aliens.

The new system will allow users to capture, search, and review information in the following functional areas:

- DETENTION—Detention-related data such as book-in, book-out, and housing information
- BIO—Subject-related data such as biographic, family, contact, alias, and passport information
- REMOVAL—Case management-related data such as case details, proceedings, custody determination, bonds, and case transfer information
- QUERY and REPORT—Report- and Forms-related data such as generating reports and subject search information, and printing forms
- TRANSPORT—Transportation-related data for the monthly statistics report
- ADMIN—System administration-related data such as adding or modifying dockets and facility information
- EXT SYSTEMS—Interface to IDENT

**Technical Corrections**

1. Page 1, 1st paragraph, 3rd sentence  - Report refers to aliens "eligible for removal". Aliens are eligible for benefits; they are removable or inadmissible for immigration purposes.

2. Page 1, 2nd paragraph, 2nd sentence  - Report discusses aliens in "DRO jurisdiction." Aliens come into DRO custody and may remain as active cases under DRO once released; however, there is no DRO "jurisdiction".

3. Page 1, 2nd paragraph, 2nd sentence  - Report states that release statistics deal with aliens apprehended while their immigration status is pending.  This should be clarified to state that there are many factors contributing to the release of apprehended aliens such as Immigration Judges (IJs) bonding out non-arriving/non-mandatory aliens prior to conclusion of their immigration hearings, and DRO releasing certain aliens considered low priority for detention due to low risk to community or low flight risk such as families seeking asylum in the United States who do not pose a risk to the community.

Appendix F
Management's Comments

Subject: OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
December 2005

Page 5

4. Page 1, 2nd paragraph, 3rd sentence - Report asserts that risks exist because CBP and ICE are releasing aliens for whom they do not have an identity or who present criminal/terrorist risks. This is not supported by any immediate data, nor does it reflect DRO's prioritization of aliens for detention which emphasizes the detention of aliens considered criminal/terrorist risks and those aliens whose identities are unknown.

5. Page 3, 1st paragraph, 1st sentence - Zadvydas does not "mandate the release of criminal and other high risk aliens" but allows for a presumptively reasonable 6-month period in which DRO can effectuate an alien's removal post-final order. After 6 months, if it is determined that the alien's removal is not significantly likely in the reasonably foreseeable future, then the alien must be released, unless he or she fits into the stringent special circumstances criteria for continued detention. See 8 CF.R. §§ 241.13 and 241.14.

6. Page 3, footnote 10 - Footnote 10 cites the money spent on the detention of aliens with final or pending orders, from traditionally "uncooperative" countries unwilling to issue travel documents. However, since DRO cannot begin the repatriation process for aliens with pending final orders this statistic is only useful for final order aliens.

7. Page 6, 3rd paragraph - Report compares the INA's policy on mandatory detention (INA § 236(c)) to BTS guidelines regarding "high priority" detentions. These are not comparable, the INA is a legal mandate from Congress and is law, and DRO must follow it. Border and Transportation Security (BTS) guidelines were issued as policy to most effectively focus DRO's resources on its priority missions.

8. Page 6, 3rd paragraph - Report states that BTS detention guidelines do not require mandatory detention for aliens that pose terrorism or national security concerns. BTS cannot issue guidance requiring mandatory detention; it would be ultra vires. However, the detention priorities place great emphasis on aliens with risk factors including those aliens who are known or suspected terrorists. INA § 236(c) requires mandatory detention for aliens charged under national security grounds.

9. Page 6, footnote 15 - Report states that under the INA, the government is required to detain mandatory aliens who "intend to commit crimes in the US." This is not included in INA § 236(c).

10. Page 6, footnote 15 - Report states that the government must detain all illegal aliens for 90 days post-final order; this is not the case. DRO must only detain aliens inadmissible under § 212(a)(2), 212(a)(3)(B), or deportable under 237(a)(2), or 237(a)(4)(B) for 90 days post-final order.

11. Page 6, footnote 15, last sentence - Report states that "the government is also required to detain illegal aliens for 90 days after receiving a final order of removal". Statement fails to recognize that this detention occurs only if DRO is unable to remove the alien during the time period.

12. Page 8, Table 4 - Report notes the underlying data by Source: DRO then adds "* Denotes those countries where the notorious Mara Salvatrucha (MS-13) gang is active". DRO

Appendix F
Management's Comments

---

Subject:  OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
          December 2005
Page 6

does not track gang data as such. Table implies gang information was received from
DRO.

13. Page 8, 1st paragraph, 4th sentence - Report states that OTMs are generally released into
the population, but then states that only half (51 percent) were. Generally implies
something greater than half.

14. Page 14, 1st paragraph, 3rd sentence - Report states that "It is estimated that there are
605,000 foreign-born aliens incarcerated in state and local facilities in the US …".
Sentence should include **federal** in addition to state and local.

15. Page 14, 1st paragraph, 3rd sentence - Report states that "Each IEA is expected to process
300 criminal aliens annually for a total of 78,300 criminal alien cases per year by
FY2008." Sentence should include **the screening of 600 aliens per year** in addition to
processing.

16. Page 17, 3rd paragraph - Report section titled: "Countries Blocking or Inhibiting
Repatriation of Illegal Aliens," discusses mandatory detention under INA § 236(c)
(pre-final order detention). DRO cannot repatriate non-final order aliens; thus, detention
under § 236(c) is irrelevant in terms of blocked repatriation.

17. Page 18, 1st paragraph - Report discusses countries "accept[ing]" aliens. Post the Jama
decision in the Supreme Court, a country does not need to accept an alien in order for
repatriation to occur. Also, countries do not "take back" their aliens, but issue travel
documents for their nationals to use when being removed.

18. Page 18, 3rd paragraph, 2nd sentence and Title of Table 13- "Recalcitrant" is not a correct
term for countries unwilling to issue travel documents. An alternate word should be
considered.

19. Page 20, 1st paragraph - The Zadvydas opinion is incorrectly stated as previously noted
for Report footnote 10. Zadvydas does not "mandate the release of criminal and other
high risk aliens" but allows for a presumptively reasonable 6-month period in which DRO
can effectuate an alien's removal post-final order. After 6 months, if it is determined that
the alien's removal is not significantly likely in the reasonably foreseeable future, then the
alien must be released, unless he or she fits into the stringent special circumstances
criteria for continued detention.  See 8 C.F.R. §§ 241.13 and 241.14.

20. Page 21, 2nd paragraph, 1st sentence - Report states "…and the ability of DRO staff to
freely delete or edit historical information in the DACS system." As the term "freely"
may inappropriately imply bad faith modifications to DRO databases suggest the word be
changed to read "timely."

21. Page 22, Bullet listing of requirements for the data management system:
--The rationale underlying DRO's decision to release an alien from detention
(if applicable)
--The rationale underlying DRO's decision not to detain individual aliens
These items call for data input on a decision that is not quantifiable. These decisions are
contextual and have to be based on the totality of circumstances applicable to the case. In
fact, there may be multiple reasons for a decision to release, or a decision not to detain.

Appendix F
Management's Comments

_____

Subject:  OIG Draft Report: Detention and Removal of Illegal Aliens, OIG-06-XX,
          December 2005
Page 7

22. Page 24 - Recommendation #2 states that DRO should develop alternative means of
    detention. Possibly OIG means alternative Order of Supervision (O/S) measures. DRO
    believes the statement should be alternative means to detention, not "of detention." ICE
    and the courts consider the ISAP and EMD a release.  There are not alternative means of
    detention, and custody is custody.

23. Page 31, Appendix B Chart, 1st bullet - Report states " Immigration judges ordered the
    individuals released from detention despite DRO's desire to detain the individual."  It is
    not DRO's desire; but rather, it is the government's enforcement of the INA.

24. Page 32, Appendix C Chart - The chart does not reflect Deportation Officers as
    apprehending officers.

Jim Velesz, ICE DRO, (202) 732-2949, is the point of contact available to answer any questions
you might have regarding this review.

Appendix G
Major Contributors to This Report

---

### **Washington, DC Office**

Richard T. Johnson, Director
USCG and Maritime Security Operations Audit Division

### **Miami Field Office**

Julie A. Fleisher, Senior Auditor
Gary L. Cox, Senior Auditor
Danny M. Helton, Auditor

Appendix H
Report Distribution

_____

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy Chief of Staff
General Counsel
Executive Secretary
Assistant Secretary for Public Affairs
Assistant Secretary for Policy
Assistant Secretary for Legislative and Intergovernmental Affairs
Assistant Secretary for ICE
DHS GAO/OIG Liaison
ICE Audit Liaison
Office of Detention and Removal Audit Liaison

### Office of Management and Budget

Chief, Homeland Security Branch
DHS OIG Budget Examiner

### Congress

Congressional Oversight and Appropriations Committees, as appropriate

**Additional Information and Copies**

To obtain additional copies of this report, call the Office of Inspector General (OIG) at (202) 254-4100, fax your request to (202) 254-4285, or visit the OIG web site at www.dhs.gov/oig.

**OIG Hotline**

To report alleged fraud, waste, abuse or mismanagement, or any other kind of criminal or noncriminal misconduct relative to department programs or operations, call the OIG Hotline at 1-800-323-8603; write to DHS Office of Inspector General/MAIL STOP 2600, Attention:  Office of Investigations - Hotline, 245 Murray Drive, SW, Building 410, Washington, DC 20528, fax the complaint to (202) 254-4292; or email DHSOIGHOTLINE@dhs.gov.  The OIG seeks to protect the identity of each writer and caller**.**