# Exhibit D

to
Respondents' Opposition to Petitioners'
Motion for a Preliminary Injunction

*Rodriguez v. Robbins, et al.*, No. 07-cv-3239-TJH (C.D. Cal.)

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

ALEJANDRO RODRIGUEZ, et al.,

        Petitioners,         No. CV 07-3239-TJH(RNBx)

vs.

TIMOTHY ROBBINS, et al.,

        Respondents.

**CERTIFIED TRANSCRIPT**

DEPOSITION of WESLEY J. LEE

Los Angeles, California

Thursday, January 12, 2012

Volume I

Reported by:

IRMA C. HOGAN

CSR No. 4877

Job No. 130811

PAGES 1-141, 149-247

(PAGES 142-148 are Confidenital and bound separately)

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ALEJANDRO RODRIGUEZ, et al.,

 5              Petitioners,         No. CV 07-3239-TJH(RNBx)

 6      vs.

 7   TIMOTHY ROBBINS, et al.,

 8              Respondents.

 9

10

11

12   _____

13

14          Deposition of WESLEY J. LEE, Volume 1, taken

15   on behalf of Petitioners, at 1313 West Eighth Street,

16   Los Angeles, California, beginning at 9:44 A.M. and

17   ending at 4:30 P.M. on Thursday, January 12, 2012, before

18   IRMA C. HOGAN, Certified Shorthand Reporter No. 4877.

19

20

21

22

23

24

25
                                                      Page 2
```

```
 1   APPEARANCES:
 2   For Petitioners:
 3       ACLU FOUNDATION OF SOUTHERN CALIFORNIA
 4       BY:  AHILAN T. ARULANANTHAM, ESQ.
 5            MICHAEL KAUFMAN, ESQ.
 6       1313 West Eighth Street
 7       Los Angeles, California 90017
 8       (213) 977-5211
 9       aarulanantham@aclu-sc.org
10       mkaufman@aclu-sc.org
11
12   For Respondents:
13       UNITED STATES DEPARTMENT OF JUSTICE
14       OFFICE OF IMMIGRATION LITIGATION, DISTRICT COURT SECTION
15       BY:  THEODORE W. ATKINSON, SENIOR LITIGATION COUNSEL
16       Box 868, Ben Franklin Station
17       Washington, D.C., 20044
18       (202) 532-4135
19       theodore.atkinson@usdoj.gov
20
21   Also Present:
22       JOANNA B. HALL, U.S. Immigration and Customs Enforcement
23       JULIA CONTRERAS, U.S. Immigration and Customs Enforcement
24       GENEVA TIEN
25       PHAEDRA POLYCHRONIS
```

Page 3

| | | |
|---|---|---|
| 1 | You can answer. | 10:28:09AM |
| 2 | THE WITNESS: On criminality I don't really | |
| 3 | know if there's been any tracking crimes that were | |
| 4 | committed by people that were released because we | |
| 5 | thought they weren't going to be a danger.  Definitely | 10:28:20AM |
| 6 | there would be some statistics on people that were | |
| 7 | released because we didn't think they were going to be | |
| 8 | a flight risk and were a flight risk. | |
| 9 | BY MR. ARULANANTHAM: | |
| 10 | Q.   Have the custody decisions changed over time | 10:28:33AM |
| 11 | to reflect information about the absconder rate for | |
| 12 | people who are released and then found to be a flight | |
| 13 | risk? | |
| 14 | MR. ATKINSON: Object to the form of the | |
| 15 | question on the same basis and on other bases. | 10:28:51AM |
| 16 | You can answer. | |
| 17 | THE WITNESS: I think the custody decision | |
| 18 | really has always been the same.  It's just -- it's | |
| 19 | really just been how much bed space you have.  Like I | |
| 20 | say, you're allocated "x" amount of dollars.  I mean | 10:29:05AM |
| 21 | definitely our department is an enforcement arm for | |
| 22 | immigration law, so that is what we do, that's what | |
| 23 | the taxpayers pay us for. | |
| 24 | So, you know, we -- definitely if we had the | |
| 25 | funding, I think the mission would be what we're | 10:29:21AM |

Page 40

```
1    funded for, to enforce immigration laws.  So I don't      10:29:24AM
2    really -- I don't think anything has changed since I
3    was in in '88.  The same people were being released
4    back then because of not enough resources as are being
5    released today because of not enough resources.           10:29:40AM
6    BY MR. ARULANANTHAM:
7        Q.   Except that, I suppose, as the bed
8    capacity -- because the bed capacity has increased
9    dramatically since 1988; right?
10       A.   Definitely.  So has the immigration problem.     10:29:47AM
11       Q.   Right.  So in that sense the number of people
12   that you're detaining, the raw number of people, has
13   gone up?
14       A.   I would hope so, since the program has gone
15   way up.                                                   10:30:02AM
16       Q.   On the same topic about change or lack
17   thereof in custody determination decision-making, if,
18   for example, at a Casas hearing case ICE decides to
19   keep the person detained but then the Immigration
20   Judge redetermines that and orders the person released    10:30:30AM
21   on bond, does that decision, the fact that the
22   Immigration Judge reached a different decision -- does
23   that get back to the ICE officers?
24       A.   Yes.  Like I say, the judges are at our
25   facilities.  So, you know, the officers are working       10:30:50AM
```

Page 41

1   A.   That's correct.                                    10:36:43AM

2   Q.   Is there any other type of custody

3  determination that has that time trigger?

4        MR. ATKINSON:  Object to the form.

5        THE WITNESS:  Well, on your parole decisions   10:36:52AM

6  we have a time frame that they are noticed and they

7  are reviewed and a decision is made.

8  BY MR. ARULANANTHAM:

9   Q.   For the initial decision; right?

10  A.   Yes.                                           10:37:03AM

11  Q.   What about after it's been made?

12  A.   After a decision is made they can -- any time

13  they want to request they have more information -- a

14  lot of the cases that I see it's because they can't

15  find a sponsor.  So we have to make a decision.  And  10:37:17AM

16  we'll fudge that because if they're trying to find a

17  sponsor, we'll give them time.  But ultimately we need

18  to make a decision because we have a deadline.  So

19  we'll make a decision.  And then any time that they

20  can find a sponsor they come back to the deportation   10:37:33AM

21  officer and we'll review it.

22  Q.   You said you have a deadline.  What's that

23  referring to?

24  A.   You have to give a decision, you have to give

25  a notice of an interview and then you're supposed to   10:37:42AM

```
 1   are there spellings or anything that you need right      12:04:15PM
 2   now while we have a moment?
 3          THE REPORTER:  I can't think of anything at
 4   this moment.
 5          MR. ARULANANTHAM:  If you can spell my name,      12:04:25PM
 6   it's all downhill from there.
 7      Q.   Who is eligible for release on parole?
 8      A.   Who is eligible?
 9      Q.   Yeah.
10          MR. ATKINSON:  Object to the form.                12:04:45PM
11          THE WITNESS:  Just generally?
12   BY MR. ARULANANTHAM:
13      Q.   Yeah.
14      A.   An arriving alien would be eligible.
15      Q.   So when someone comes into your custody,         12:04:55PM
16   meaning into the ICE field office custody, how do they
17   know -- how does ICE know this is a person who is
18   parole-eligible as opposed to, you know, one of the
19   other categories?
20          MR. ATKINSON:  Object to the form.                12:05:14PM
21          THE WITNESS:  Well, 99 percent of our cases
22   that come in that would be eligible for parole have
23   come in at a port of entry and have claimed they were,
24   you know, put into expedited removal and then claimed
25   a credible fear and were referred to ICE to see an      12:05:42PM
```

Page 97

```
 1   asylum officer.  So it kind of triggers it for us.       12:05:48PM

 2   BY MR. ARULANANTHAM:

 3        Q.   If a person is coming over the land border in

 4   San Diego, then they would have gone through that

 5   process before they got to the L.A. field office;        12:05:56PM

 6   right?

 7        A.   True.

 8        Q.   So how then when they get to the L.A. field

 9   office do you know that they're parole eligible as

10   opposed to detainees who would be subject to 236(a) or   12:06:08PM

11   some other process?

12        A.   Their paperwork comes with them.

13        Q.   So someone reviews -- someone in the L.A.

14   field office reviews that paperwork after they arrive?

15        A.   Yes, they do.                                  12:06:25PM

16        Q.   Tell me about that.  How does that process

17   work?

18        A.   Most of the Los Angeles field office's

19   detainees come through staging at our office downtown.

20   So especially if they're coming from San Diego, they     12:06:41PM

21   would come downtown or if they're coming from LAX they

22   would come downtown.  And the officers there would

23   review the cases before they send them out to the

24   detention facilities.  And then they're reviewed again

25   once they get out to the detention facilities.           12:06:58PM
```

Page 98

```
 1   BY MR. ARULANANTHAM:                                    12:08:00PM

 2       Q.   Right.  And obviously if someone's caught at

 3   LAX, then the credible fear interview would typically

 4   also happen in Los Angeles; right?

 5       A.   I would say yes.                               12:08:08PM

 6       Q.   The standard for release on parole -- does it

 7   also include danger and flight risk?  Is that right?

 8            MR. ATKINSON:  Object to the form.

 9            You can answer.

10            THE WITNESS:  Yes.  It's identity.  It's your  12:08:24PM

11   identity and flight risk and it does have danger to

12   the community, yes.

13   BY MR. ARULANANTHAM:

14       Q.   Are there other factors involved in the

15   parole detention decision which are different from the 12:08:38PM

16   236(a) detention decision?

17            You said identity, danger, flight risk.  Is

18   there anything else?

19       A.   There's actually a lot of factors that go

20   into that decision.  But, yeah, that's kind of pretty  12:08:57PM

21   much what we look at:  Danger, the criminal history

22   or -- well, both of them can include national security

23   concerns.

24       Q.   I'm going to hand you what we will mark as

25   Exhibit 5.                                             12:09:26PM
```

Page 100

```
 1            "are paroled from detention."                    12:11:52PM
 2       Q.   Go to the third page.  Can you describe what
 3  that page is generally?
 4       A.   This is a notice that they are going to be
 5  reviewed for parole.                                       12:12:12PM
 6       Q.   It's also a questionnaire, isn't it?
 7            Oh, sorry, you're on the second page.
 8            MR. ATKINSON:  It's the third page.
 9            MR. ARULANANTHAM:  You're right.  I see.  Got
10  it.                                                        12:12:22PM
11       Q.   So this third page -- is that provided to
12  every person who is parole eligible?
13       A.   It should be, yes.
14       Q.   And it's provided in advance of the parole
15  decision?                                                  12:12:37PM
16       A.   Yes.  It's provided in advance of the parole
17  recommendation.
18       Q.   The fourth page -- tell me what that is.
19       A.   Was there a question?
20       Q.   Tell me what this is.                            12:13:05PM
21       A.   This is a questionnaire that we give to every
22  person that's considered for parole for them to fill
23  out.
24       Q.   And obviously that's filled out in advance of
25  the parole determination?                                  12:13:20PM
```

Page 103

1   A.   Yes.                                                12:13:22PM

2   Q.   And in advance of the recommendation as well?

3   A.   It's really done in advance of the interview.

4   Q.   Is every detainee interviewed for parole?

5   A.   I would say that almost all, yeah.                  12:13:32PM

6   Q.   Is that pursuant to policy, guidance?

7   A.   I don't recall if you have to interview.

8   Q.   But in practice you do?

9   A.   In practice the officers interview, yeah.

10  Q.   This particular individual listed an address        12:13:50PM

11  at the top of the form.  Do you see that?

12  A.   I do.

13  Q.   And the person says they have no criminal

14  history.  Second-to-last question of the form.  Do you

15  see that?                                                12:14:12PM

16  A.   Yes, I see that.

17  Q.   So why do you think the person was found a

18  flight risk?

19       MR. ATKINSON:  Objection to the form of the

20  question.                                                12:14:23PM

21       THE WITNESS:  I don't have that A-File here

22  so I don't really -- I don't see what happened.  But

23  it could be because this sponsor that he gave -- this

24  wasn't a good address or name; or when they called

25  him, they said they didn't know them.  Could be that.    12:14:42PM

Page 104

BY MR. ARULANANTHAM:                                                  12:14:45PM

Q. What do you think about danger? Why do you think the person would have been denied danger?

MR. ATKINSON: Object to the form of the question.                     12:14:52PM

THE WITNESS: Again I don't have the A-File to see, but it could have been that there was a -- some information that we have on this individual.

BY MR. ARULANANTHAM:

Q. What other source of information would there    12:15:02PM
be besides criminal history?

MR. ATKINSON: Object to the form of the question.

THE WITNESS: There could have been some Department of Defense information. There could have    12:15:17PM
been some FBI information.

BY MR. ARULANANTHAM:

Q. That's information that would come through the JTTF, would it?

A. It would, most of it.                                              12:15:28PM

Q. If, for example, the address didn't check out --

MR. ATKINSON: I'm sorry, before you get your question out, I just want to -- there may be a question of privilege here.                                         12:15:41PM

```
 1              (Recess taken.)                          12:15:45PM
 2          MR. ATKINSON:  Okay.  Sorry.
 3   BY MR. ARULANANTHAM:
 4      Q.   If, for example, the address didn't check
 5   out, that's not something that the officer would write 12:15:54PM
 6   in the parole denial; right?
 7      A.   In the --
 8      Q.   That's not something that the officer would
 9   write down in the parole denial typically?
10          MR. ATKINSON:  Object to the form of the      12:16:07PM
11   question.
12          THE WITNESS:  This decision letter has
13   changed.  It's a little bit more detailed now, so
14   there are more checked boxes.  So there may be a
15   checked box on there that says they haven't provided  12:16:23PM
16   an address in the U.S.
17   BY MR. ARULANANTHAM:
18      Q.   But other than what the checked boxes
19   provide, the officers don't write other explanations
20   for the denial, for parole denials; is that true?     12:16:38PM
21          MR. ATKINSON:  Object to the form of the
22   question.
23          THE WITNESS:  The decision that the detainee
24   gets is just the decision letter.  Like I say, the
25   decision letter has been changed.  Once policies come 12:16:53PM
```

Page 106

1  out, things change when you see that they need to be    12:16:57PM
2  changed.
3       So now it -- the decision letter is still a
4  checked box, but it definitely has a little bit
5  more -- it's broken down in more details so it gives    12:17:06PM
6  them an opportunity. But they're interviewing these
7  people so the decision letter might not go into
8  detail. But definitely the detainee knows what the
9  issues are unless they're of a national security
10 concern.                                                12:17:24PM
11 BY MR. ARULANANTHAM:
12    Q.  So the detainee might orally hear more about
13 why they're being denied parole. But I'm only asking
14 again because I don't think you actually answered my
15 question kind of precisely, although I understood what  12:17:39PM
16 you said, that any explanation other than the checking
17 of the boxes would not appear in the decision letter;
18 is that correct?
19    A.  There's another decision letter besides this
20 one --                                                  12:17:56PM
21    Q.  Right.
22    A.  -- but the checked boxes that are on there is
23 all we're doing right now. That's our procedure.
24    Q.  There's no other document that is in the file
25 that explains the decision beyond the decision letter;  12:18:17PM

Page 107

```
 1   is that correct?                                    12:18:20PM
 2           MR. ATKINSON:  Object to the form.
 3           THE WITNESS:  There will be officer notes,
 4   yeah.
 5   BY MR. ARULANANTHAM:                                12:18:28PM
 6       Q.   But those are -- that's not something that a
 7   detainee would see or that anybody outside of ICE
 8   would see; is that right?
 9       A.   It's not.
10       Q.   That's going to look funny on the record.  12:18:44PM
11           When you say it's not, you mean it isn't
12   anything -- no one else will see that; is that
13   correct?
14       A.   It's law enforcement privileged.  I don't
15   think anybody will see it.                          12:18:55PM
16       Q.   Is the danger standard used -- actually,
17   strike that question.
18           You had said earlier that information might
19   come to you about a detainee through the JTTF?
20       A.   Yes.                                       12:19:18PM
21       Q.   How often does that happen in a parole
22   decision?
23       A.   Early on for certain nationalities it's
24   pretty often until they're cleared.
25       Q.   What does "early on" mean?                 12:19:36PM
```

Page 108

```
 1   agreement.                                              1:13:38PM
 2       Q.   Is the flight risk standard that you apply in
 3   parole decisions different than the flight risk
 4   standard that you apply with respect to other custody
 5   determination processes?                                1:13:55PM
 6            MR. ATKINSON:  Object to the form.
 7            You can answer.
 8            THE WITNESS:  Only on the parole?  I would
 9   say yes.
10   BY MR. ARULANANTHAM:                                   1:14:01PM
11       Q.   How is it different?
12       A.   Our parole policy is very liberal now.  So
13   if -- pretty much if the -- after a determination of
14   credible fear they can provide a sponsor, an address
15   to go to, that's going to satisfy the flight risk.    1:14:15PM
16       Q.   Whereas more would be required for 236(a)
17   determination?
18       A.   It would.
19       Q.   Is the danger standard that you apply in
20   parole cases different than the danger standard that  1:14:29PM
21   you apply in other cases, in other custody
22   determination processes?
23            MR. ATKINSON:  Object to the form.
24            You can answer.
25            THE WITNESS:  I would say it is just because 1:14:40PM
```

Page 123