# Exhibit E

to
Respondents' Opposition to Petitioners'
Motion for a Preliminary Injunction

*Rodriguez v. Robbins, et al.*, No. 07-cv-3239-TJH (C.D. Cal.)

**U.S. Department of Justice**

Executive Office for Immigration Review

*Office of the General Counsel*

---

*5107 Leesburg Pike, Suite 2600*
*Falls Church, Virginia 22041*

March 19, 2012

Mary Meg McCarthy
Executive Director
National Immigrant Justice Center
208 South LaSalle, Suite 1818
Chicago, IL 60604

    Re:    *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

Dear Ms. McCarthy:

This letter responds to your March 15, 2010, petition entitled *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers* (Petition).[1] In the Petition, you requested that the Department of Justice (the Department or DOJ) initiate a rulemaking proceeding and adopt a rule authorizing immigration judges to review the custody of arriving aliens who enter the United States at a port of entry and seek asylum based upon a credible fear of persecution or torture in their home countries. Petition at 2. In addition, the Petition urged establishing a regulatory presumption that the release of such an alien is in the public interest after the alien has established his or her identity. *Id.* at 19. As explained below, upon careful consideration of the Petition, the Department has decided not to initiate such a rulemaking proceeding.

**The Current Statutory and Regulatory Scheme for Expedited Removal**

The Petition focuses on the credible fear process, which is part of the overall procedure for expedited removal of certain inadmissible aliens. Accordingly, we begin with a discussion of the current state of the law with respect to aliens screened for expedited removal who have been found to have a credible fear of persecution or torture.

As detailed below, section 235 of the Immigration and Nationality Act (Act or INA), 8 U.S.C. § 1225, governs inspections of aliens and provides for expedited removal of two classes

---

[1] Also on March 15, 2010, you submitted a related petition to the Department of Homeland Security (DHS), entitled *Petition for Rulemaking to Promulgate Regulations to Create Presumption of Parole for Arriving Alien Asylum Seekers who Pass a Credible Fear Interview.* That petition requested that DHS promulgate regulations codifying the standards for granting parole to arriving aliens who have been found to have a credible fear of persecution or torture. DHS denied the petition by letter dated December 10, 2010.

Case 2:07-cv-03239-TJH-KES   Document 250-7   Filed 07/18/12   Page 3 of 13   Page ID #:3408

Re: *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

of aliens: (1) certain arriving aliens; and (2) certain "other aliens" as designated by the Secretary of the Department of Homeland Security (DHS).

### *Arriving Aliens*

An "arriving alien" is defined as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport." 8 C.F.R. §§ 1.2, 1001.1(q). In general, an arriving alien is subject to expedited removal if a DHS immigration officer determines that the alien is inadmissible under section 212(a)(6)(C) of the Act, 8 U.S.C. § 1182(a)(6)(C) (for fraud or misrepresentation) or 212(a)(7) of the Act, 8 U.S.C. § 1182(a)(7) (for lacking proper travel documents for admission). Section 235(b)(1)(A)(i) of the Act; 8 C.F.R. §§ 235.3(b), 1235.3(b). If the officer determines that the alien is inadmissible on these grounds, "the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 [of the Act] or a fear of persecution." Section 235(b)(1)(A)(i) of the Act.[2]

If an arriving alien subject to expedited removal expresses a fear of persecution or torture, or a desire to apply for asylum, the alien is promptly interviewed by an asylum officer with U.S. Citizenship and Immigration Services (USCIS), a component of DHS, to determine whether he or she has a credible fear of being persecuted or tortured if removed from the United States. Sections 235(b)(1)(A)(i), (ii), (b)(1)(B) of the Act; 8 C.F.R. §§ 208.30, 235.3(b)(4). If the asylum officer finds that the alien has demonstrated a credible fear, the alien is taken out of the expedited removal process and placed into regular removal proceedings before an immigration judge under section 240 of the Act, 8 U.S.C. § 1229a, in which he or she can apply for various forms of immigration relief and protection, including asylum, withholding of removal, and protection from removal under regulations implementing U.S. obligations under Article 3 of the Convention Against Torture. *See* 8 C.F.R. § 208.30(f).[3]

Section 235(b)(1)(B)(ii) of the Act provides that an alien who is found to have a credible fear of persecution "shall be detained for further consideration of the application for asylum." However, such an alien can apply to DHS to be paroled into the United States and released from

---

[2] In the exercise of prosecutorial discretion, even if an arriving alien is inadmissible and subject to expedited removal, DHS can choose to place the alien into regular removal proceedings under section 240 of the Act, 8 U.S.C. § 1229a. *Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520 (BIA 2011).

[3] If the asylum officer determines that the alien has not demonstrated a credible fear, the alien can request that an immigration judge review DHS' negative credible fear determination. Section 235(b)(1)(B)(iii)(III) of the Act; 8 C.F.R. §§ 208.30(g), 1208.30(g). If, after reviewing DHS' negative credible fear determination, the immigration judge finds that the alien has a credible fear, the alien is taken out of the expedited removal process and placed into removal proceedings. 8 C.F.R. §§ 1003.42(f), 1208.30(g)(2)(iv)(B). On the other hand, if the immigration judge concurs with DHS that the alien has not demonstrated a credible fear, the alien remains subject to expedited removal. Section 235(b)(1)(B)(iii) of the Act; 8 C.F.R. § 1208.30(g)(2)(iv)(A).

Re: *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

custody. Section 212(d)(5)(A) of the Act; 8 C.F.R. §§ 212.5(b), 235.3(c). DHS has issued guidelines, effective January 4, 2010, entitled *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* (2010 Parole Guidelines), covering these parole determinations.[4] The 2010 Parole Guidelines provide that each arriving alien found to have a credible fear of persecution or torture will automatically be considered for possible parole. The guidelines also list the factors to consider in the parole determination.

As noted, arriving aliens who are found to have a credible fear are placed into regular removal proceedings before an immigration judge, in which they may present their claim for asylum or other relief or protection from removal. Under longstanding regulations, "an immigration judge may not redetermine conditions of custody" for "arriving aliens in removal proceedings." 8 C.F.R. § 1003.19(h)(2)(i)(B); *see also Procedures for the Detention and Release of Criminal Aliens by the Immigration and Naturalization Service and for Custody Redeterminations by the Executive Office for Immigration Review*, 63 Fed. Reg. 27441, 27448 (May 19, 1998). Thus, an arriving alien who establishes a credible fear of persecution or torture can only be released from detention if paroled by DHS or if the alien is granted relief from removal on the merits in the removal proceedings. In this respect, arriving aliens are analogous to "excludable" aliens under the pre-1996 immigration laws.[5] The regulations historically did not provide immigration judges with the authority to hold custody hearings with respect to aliens who were stopped at a port of entry and placed in exclusion proceedings. This is in contrast to aliens in removal proceedings other than arriving aliens. With limited exceptions, detained aliens in removal proceedings, other than arriving aliens, can obtain a custody redetermination hearing before an immigration judge under section 236(a) of the Act, seeking to be released on bond of at least $1,500, if they are not subject to mandatory detention under section 236(c) of the Act.

### *Other Designated Aliens*

In addition to arriving aliens, certain "other aliens," as designated by the Secretary of Homeland Security, are subject to expedited removal. Section 235(b)(1)(A)(i), (iii) of the Act; 8 C.F.R. §§ 235.3(b)(1)(ii), 1235.3(b)(1)(ii).[6] Pursuant to this authority, DHS has identified the following class of "designated aliens" who are subject to expedited removal even though not apprehended at a port of entry:

---

[4] The 2010 Parole Guidelines are available at http://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.

[5] The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (Sept. 30, 1996), created a single new proceeding known as a removal proceeding to replace the previously separate administrative standards for exclusion proceedings and deportation proceedings. Under the prior law, exclusion proceedings were used for aliens who were stopped at a port of entry and thus who had not yet effected an entry into the United States. *See Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206, 208, 212-15 (1953).

[6] The authority to designate classes of "other aliens" subject to expedited removal was transferred from the Attorney General to the Secretary of DHS pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. *See Notice Designating Aliens For Expedited Removal*, 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004).

3

Re: *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

> Aliens who are inadmissible under sections 212(a)(6)(C) or (7) of the Act, who are physically present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter.

*Notice Designating Aliens For Expedited Removal*, 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004). In addition, the former Immigration and Naturalization Service (INS) previously designated for expedited removal certain aliens who arrive unlawfully by sea. *See Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act*, 67 Fed. Reg. 68924 (Nov. 13, 2002).

Such designated aliens are subject to the same expedited removal procedures, including credible fear determinations, as arriving aliens, and these designated aliens are placed in removal proceedings under section 240 of the Act if found to have a credible fear.

In *Matter of X-K-*, 23 I&N Dec. 731 (BIA 2005), the Board of Immigration Appeals (BIA or Board) held that immigration judges can redetermine the custody conditions for "designated aliens" who have established a credible fear of persecution or torture, even though immigration judges cannot redetermine custody conditions for arriving aliens with such a fear. The Board reasoned that, although the regulations specifically preclude arriving aliens in removal proceedings from obtaining a custody hearing before an immigration judge, nothing in the detention provisions in 8 C.F.R. §§ 1003.19, 1235.3 and 1236.1 precludes the "designated aliens" who were apprehended within the United States by DHS and placed in removal proceedings from obtaining such a hearing, even though they also may have initially been screened for expedited removal. *Matter of X-K-*, 23 I&N Dec. at 735.

**The Petition**

In the Petition, you asked the Department to amend 8 C.F.R. § 1003.19(h)(2)(i)(B) to provide that immigration judges have the authority to review DHS's custody determinations for arriving aliens "who have been found to have a credible fear pursuant to 8 C.F.R. § 208.30." Petition at 18. You also asked the Department to add a new regulatory provision at 8 C.F.R. § 1003.19(h)(2)(iii) that would state that an arriving alien who has been found to have a credible fear shall benefit from certain presumptions in favor of release. *Id.* at 19. You raised objections to the current scheme under constitutional and international law, as well as on policy grounds.

*Constitutionality*

You challenge the constitutionality of the current regulatory scheme governing the detention of arriving aliens, given that a "designated alien" who has been found to have a credible fear of persecution or torture after having been apprehended within the United States can receive a custody hearing before an immigration judge while an "arriving alien" who has

4

Re: *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

been found to have a credible fear after being stopped at a port of entry cannot. You assert that this distinction is "arbitrary and illogical" and "results in different treatment for similarly situated individuals without rational basis," and you conclude that "[t]his type of disparate treatment is inconsistent with due process and equal protection provisions." *Id.* at 13-14. However, as set forth below, we do not believe that the current scheme raises such due process or equal protection concerns.

### A. Due Process

We believe that the current regulations are in accord with longstanding case law holding that an alien who is apprehended at a United States port of entry lacks the ability to challenge, on due process grounds, his or her detention. The Supreme Court has long distinguished between aliens seeking admission at a port of entry and aliens who have entered the United States, with the Court finding that aliens seeking admission lack constitutional rights. For an alien seeking admission into the United States, the decisions of executive officers, acting within powers conferred by Congress, constitute due process of law. *Nishimura Ekiu v. U.S.*, 142 U.S. 651, 660 (1892); *see Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206, 208, 212-15 (1953) (holding that the potentially indefinite detention of an alien at a port of entry, without a hearing, does not deprive the alien of any constitutional rights, even though the alien previously lived in the United States); *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 539, 544 (1950). In contrast, aliens who have come within the territory of the United States and developed substantial connections with this country receive certain constitutional protections. *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990); *see also Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950) (recognizing that aliens are "accorded a generous and ascending scale of rights as [they] increase[] [their] identity with our society").[7]

Similarly, in *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court stated that, while the Government is not authorized to detain indefinitely an alien who was admitted to the United States but then ordered removed, "[a]liens who have not yet gained initial admission to this country would present a very different question." *Id.* at 682. The Court then elaborated that:

> The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. But once an alien enters the country, the legal circumstance changes, for the Due

---

[7] The Supreme Court has recognized that Congress, in the exercise of its broad power over naturalization and immigration, "regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976) (regarding aliens' eligibility for certain Medicare benefits); *see Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (regarding the treatment of illegitimate children and their natural fathers under the Act). In addition, the Court has held that the "Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *U.S. v. Flores-Montano*, 541 U.S. 149, 152 (2004) (regarding authority of U.S. customs officials to conduct searches without reasonable suspicion at an international border port of entry into the United States).

5

Case 2:07-cv-03239-TJH-KES Document 250-7 Filed 07/18/12 Page 7 of 13 Page ID #:3412

Re: *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

*Id.* at 693 (citations omitted); *see also Matter of D-J-*, 23 I&N Dec. 572, 583 (A.G. 2003) (noting that an alien who has not yet been admitted to the United States does not qualify for the due process protection extended under *Zadvydas* to an alien admitted, but subsequently ordered removed).[8]

### B. Equal Protection

The Department also believes that the current regulations are consistent with the Equal Protection Clause. The Supreme Court has consistently held that the ability to challenge, on equal protection grounds, the actions of the Federal Government derives from the Fifth Amendment's Due Process Clause. Indeed, the Court has described the Equal Protection Clause as a "component" of the Due Process Clause. *See, e.g., Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009) (referring to "the equal protection component of the Due Process Clause of the Fifth Amendment"); *Davis v. Passman*, 442 U.S. 228, 234 (1979) (stating that, "[i]n numerous decisions, this Court has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws" (quotations omitted)); *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73, 75 n.1 (1977) (stating that "Fifth Amendment equal protection claims are cognizable under the Amendment's Due Process Clause"); *see also Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Since an arriving alien who has not effected an entry into the United States lacks certain protections under the due process clause, the alien is similarly limited with respect to equal protection claims. *See, e.g., Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094, 1098 (9th Cir. 2004) (stating that "the well-established 'distinction between an alien who has effected an entry into the United States and one who has never entered'" under *Zadvydas* mandates the denial of the petitioner's equal protection challenge to the regulations governing applications for adjustment of status for aliens in exclusion proceedings, and commenting that, "[i]f Alvarez-Garcia could successfully invoke the Due Process Clause's equal protection component to defeat the current adjustment of status application process, any procedural dissimilarity between exclusion and deportation proceedings would be vulnerable as well").

Even if an arriving alien could challenge, on equal protection grounds, the regulatory scheme governing his or her detention, there are rational bases for why a "designated alien" who entered the United States unlawfully before being apprehended can receive a bond hearing before an immigration judge, but an arriving alien who was stopped at a port of entry before

---

[8] In *Clark v. Martinez*, 543 U.S. 371, 378 (2005), the Supreme Court held that section 241(a)(6) of the Act, 8 U.S.C. § 1231(a)(6), which authorizes detention of certain aliens after they have been ordered removed, does not permit the indefinite detention of an arriving alien who is the subject of a final order of removal, but for whom DHS has not been able to effectuate removal. That decision was based on the Court's interpretation of the statute, and not on a finding that arriving aliens have any constitutional right to be free from detention, an issue the Court did not address.

Case 2:07-cv-03239-TJH-KES  Document 250-7  Filed 07/18/12  Page 8 of 13  Page ID #:3413

Re: *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

entering the United States cannot.[9] First, under section 103(a)(5) of the Act, 8 U.S.C. § 1103(a)(5), DHS has the "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." *See Matter of D-J-*, 23 I&N Dec. at 573 (noting that the "authority to enforce and administer the INA and other laws related to the immigration and naturalization of aliens [was] transferred to the Secretary of Homeland Security" from the Attorney General under the Homeland Security Act of 2002). Given this division of authority, the current regulatory scheme rationally provides for DHS to have full responsibility for inspecting arriving aliens and deciding whom to parole into the United States, and whom to detain, and for the Department of Justice not to play a role in these initial determinations.

In addition, in general, aliens in the immigration system may rationally be subject to differing procedures depending on distinctions in their location and status, even when such aliens are seeking the same relief. For example, an alien who is living in El Paso, Texas, and applying for lawful permanent resident status, would be interviewed at the USCIS office in El Paso in connection with that application. By contrast, an alien living a few miles away in Ciudad Juarez, Mexico, and similarly seeking lawful permanent resident status, would attend a consular interview conducted by the Department of State in Ciudad Juarez. Similarly, an alien at a port of entry is in different circumstances, and at a different point in the immigration system, than one who entered the United States unlawfully before being apprehended; the Government may rationally provide for different procedures governing their detention even if both aliens are ultimately seeking asylum or related relief in the United States.

Finally, it is rational for the Government to conserve resources by having DHS officials conduct custody determinations for arriving aliens with a credible fear, and by denying those aliens a custody hearing before an immigration judge and an appeal to the Board of the resulting decision. *See Skelly v. INS*, 168 F.3d 88, 91-92 (2d Cir. 1999) (rejecting an alien's argument that, under the Equal Protection Clause, she had the right to apply for suspension of deportation in exclusion proceedings, and citing the "legitimate aim of saving resources" as a rational basis for the differing procedures).

---

[9] When equal protection analysis does apply to distinctions between classes of aliens, courts have repeatedly held that such distinctions are subject to rational basis review. *See, e.g., Abebe v. Mukasey*, 554 F.3d 1203 (9th Cir. 2009) (en banc) (applying rational basis review in finding that interpreting former section 212(c) of the Act to provide additional immigration relief to aliens who temporarily leave the United States and try to reenter (i.e., aliens facing inadmissibility), but not to aliens who remain in the United States (i.e., aliens facing deportation), does not violate equal protection); *Malagon de Fuentes v. Gonzales*, 462 F.3d 498, 503-04 (5th Cir. 2006) (applying rational basis review to a "congressionally-drawn distinction among aliens" in rejecting the challenge of the petitioner, a lawful permanent resident, to her classification as an arriving alien under section 101(a)(13)(C) of the Act following a brief trip abroad); *Gonzalez v. Chertoff*, 454 F.3d 813, 818 (8th Cir. 2006) (applying rational basis review in rejecting a challenge to section 238(b) of the Act, which permits the expedited removal of certain aliens). Case law also suggests that distinctions between classes of aliens made by administrative agencies, in addition to those made by Congress, are subject to rational basis review. *See Kandamar v. Gonzales*, 646 F.3d 65, 73-74 (1st Cir. 2006) (employing rational basis review in rejecting the petitioner's challenge to the National Security Entry-Exit Registration System); *Viera Garcia v. INS*, 239 F.3d 409, 414 (1st Cir. 2001) (employing rational basis review in upholding the Board's construction of the statutory term "conviction.").

Re: *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

### *International Law*

In addition, you challenge, under international law, the current regulatory scheme on the grounds that "detention without procedural safeguards is prohibited." Petition at 14. However, the Department does not believe the current scheme raises concerns under international law. First, the authorities to which you cite are not self-executing and do not create any legally enforceable rights. *See, e.g., Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004) (stating that the International Covenant on Civil and Political Rights is "not self-executing and [does] not itself create obligations enforceable in the federal courts"); *Matter of D-J-*, 23 I&N Dec. at 584 n.8 (stating that the Universal Declaration of Human Rights "is merely a nonbinding expression of aspirations and principles, rather than a legally binding treaty," and that the 1967 Protocol Relating to the Status of Refugees "does not afford respondent any rights beyond what he is afforded under the federal immigration laws."). Further, contrary to your argument, there already are procedural safeguards covering the detention of arriving aliens who have been found to have a credible fear of persecution or torture. Specifically, as noted above, all such aliens are considered for release on parole by DHS under section 212(d)(5)(A) of the Act. *See* 8 C.F.R. §§ 212.5(b), 235.3(c). DHS's parole decisions are governed by DHS's 2010 Parole Guidelines, which establish extensive procedural safeguards.[10]

### *Policy Considerations*

You make several policy arguments in favor of your proposed regulatory amendments. Specifically, you state that, "[i]n comparison to the detained population overall, asylum seekers who file applications for relief in the United States stand to face a lengthy amount of time in detention while their asylum claims are adjudicated in the U.S. courts." Petition at 11. In addition, you emphasize the harmful psychological effects of detention on arriving aliens with legitimate asylum claims. *Id.* at 11-12. Finally, you argue that your proposed regulatory amendments, by leading to lower detention rates of arriving aliens, would save the Government money. *Id.* at 12-13.

The Department has considered your arguments. We recognize, as a matter of policy, the arguments in favor of revising the regulations to provide that arriving aliens found to have a credible fear of persecution or torture can obtain bond redetermination hearings. However, as

---

[10] Under the guidelines, all arriving aliens with a credible fear of persecution or torture are considered for release on parole within seven days of the credible fear finding. 2010 Parole Guidelines at 5-6. The guidelines state that an alien "should be paroled" if DHS personnel determine "that the alien's identity is sufficiently established, the alien poses neither a flight risk nor a danger to the community, and no additional factors weigh against release of the alien." *Id.* at 6. The guidelines provide that, in certain instances, an alien can establish his or her identity based on credible statements, if he or she lacks government-issued identification or other evidence of identity. *Id.* at 7. In addition, with respect to whether the alien poses a flight risk, the guidelines state that DHS personnel "shall consider whether setting a reasonable bond and/or entering the alien in an alternative-to-detention program would provide reasonable assurances that the alien will appear at all hearings and depart from the United States when required to do so." *Id.* Finally, all denials of parole must be in writing, and the alien must be provided with notice that he or she can request redetermination of parole. *Id.* at 6.

Re: *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

detailed below, the Department believes that, on balance, policy considerations do not warrant changing the regulations as currently written.

First, the Department believes that the current scheme, under which DHS releases on parole a substantial majority of arriving aliens found to have a credible fear of persecution or torture, provides an appropriate mechanism for releasing such aliens when warranted. Specifically, the Department does not have reason to believe that, under DHS's 2010 Parole Guidelines, substantial numbers of arriving aliens with bona fide asylum claims are unable to secure release from detention. Since DHS's 2010 Parole Guidelines took effect, it appears that arriving aliens with a credible fear of persecution or torture have been released from detention at a rate substantially higher than the rate at which arriving aliens with a credible fear have been granted relief from removal on the merits. DHS advises that, as of October 2011, it had considered for parole under the 2010 Parole Guidelines 1,836 arriving aliens with a credible fear of persecution or torture, and released 1,404, for a release rate of approximately 76 percent. By contrast, between fiscal year 2004 and April 21, 2011, immigration judges granted relief from removal in only 45 percent of cases involving arriving aliens with a credible fear. In fiscal year 2009, this grant rate was 44 percent and, in 2010, it was 41 percent.

Second, your proposals would carry negative consequences, the most obvious being that they might increase the rates at which aliens fail to appear at their hearings before immigration judges, or fail to leave the United States after being ordered removed. According to the *FY 2011 Statistical Year Book* released by the Executive Office for Immigration Review (EOIR Statistical Year Book), between fiscal years 2007 and 2011, the rate at which aliens who were released on bond or their own recognizance failed to appear in immigration proceedings ranged from a high of 29 percent to a low of 21 percent. EOIR Statistical Year Book at H3. Accordingly, when an alien is released from detention, there is generally some risk that he or she will fail to appear at his or her immigration hearing. In the present context, DHS already is granting parole to approximately three-fourths of the arriving aliens found to have a credible fear of persecution, and the aliens who would be granted hearings as proposed in the Petition are those who already have been found by DHS to be flight risks or otherwise not to warrant release on parole. In addition, arriving aliens who have been found to have a credible fear of persecution have a more limited chance—generally less than 45 percent—of being granted relief from removal,[11] which could lead some such arriving aliens to choose not to appear for their immigration hearing. Finally, increasing the rates at which aliens are released could lead to an increase in the rate at which aliens fail to leave the United States after being ordered removed, as it is generally more difficult for DHS to remove non-detained aliens than detained aliens after they have been denied relief and ordered removed.[12]

---

[11] As explained further below, the credible fear evaluation has been described as "deliberately generous" in nature, and a great majority of aliens who assert a credible fear of persecution or torture are found by DHS to have such a fear.

[12] For example, according to a study by the Department's Office of the Inspector General, the former INS was able to remove only three percent of nondetained, unsuccessful asylum seekers with final orders of removal in the group studied, compared with 90 percent of detained aliens in the same group. *See* Office of the Inspector General, Dep't of Justice, *The Immigration and Naturalization Service's Removal of Aliens Issued Final Orders*, Report Number I-2003-004, at 11, 15-16 (2003), *at* http://www.justice.gov/oig/reports/INS/e0304/final.pdf.

9

Re: *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

Third, we disagree with some of the factual assertions in the Petition, which are based on substantially outdated information and studies that do not take account of DHS's current parole policies. Although some arriving aliens who eventually obtain asylum may have faced lengthy periods in detention, we do not believe it is true, as you assert, that "[o]n average, arriving aliens who eventually obtain asylum spend 10 months in detention." Petition at 11. For this proposition, you cite to a 2003 study by Physicians for Human Rights and the NYU Program for Survivors of Torture (NYU Study). The NYU Study tracked 70 detained asylum applicants who were identified to study organizers in 2001 and 2002. By April 2003, 40 of these individuals had been granted asylum. All 40 individuals were apparently detained until their applications were granted. For these individuals, the mean amount of time spent in detention was 10 months. NYU Study at 43, 50. The NYU Study does not appear to claim that, generally speaking, arriving alien asylum seekers are detained for an average of 10 months. Indeed, the study does not appear to make any claim regarding the average length of such individuals' detention. Most significantly, the NYU Study was published long before implementation of DHS's 2010 Parole Guidelines, under which a substantial majority of asylum seekers found to have a credible fear have been granted parole soon thereafter.

Finally, it is not clear, as you argue, that your proposals would save the Government money. Clearly, requiring bond redetermination hearings for arriving aliens with positive credible fear findings would impose substantial costs upon EOIR. Moreover, although DHS may spend less money detaining arriving aliens, DHS would also likely have to spend more money monitoring released aliens and locating those who fail to appear for their immigration hearing or who abscond after being ordered removed. DHS's costs with respect to aliens who are not detained include daily administrative and monitoring costs associated with Alternatives-to-Detention programs, such as the Intensive Supervision Appearance Program. In addition, considerable costs are incurred in locating and apprehending unsuccessful non-detained asylum applicants who abscond after being ordered removed.

### *The Proposed Rebuttable Presumption in Favor of Release*

Finally, you propose to add, at 8 C.F.R. § 1003.19(h)(2)(iii), the following rebuttable presumption in favor of the release of arriving aliens found to have a credible fear of persecution or torture:

> An arriving alien who has passed a credible fear interview shall benefit from a presumption that release is in the public interest, and an individual who has established his or her identity through credible evidence, including by the individual's credible testimony, shall benefit from a presumption that he or she is not a flight risk. Such an alien shall ordinarily be released promptly unless there are specific, articulable reasons to continue detention. The decision of an Immigration Judge to order an alien's release from custody without bond under INA § 236(a)(2)(B) shall not be interpreted to constitute the parole of that individual for purposes of any other purpose under the Act, including INA § 212(d)(5).

10

Re: *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

Petition at 18-19. The Department has concluded that, even if arriving aliens found to have a credible fear of persecution or torture were afforded custody redetermination hearings, there would be strong reasons not to adopt such regulatory presumptions in this situation.

Given the summary nature of the credible fear evaluation, your proposed shifting of the burden of proof that normally applies in custody redetermination proceedings would be unwise. Currently, in a custody redetermination hearing before an immigration judge under section 236 of the Act, "[t]he burden is on the alien to show to the satisfaction of the Immigration Judge that he or she merits release on bond." *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006). Your proposal would put the burden on DHS to show why an arriving alien with a credible fear should be detained. But an asylum officer's credible fear evaluation does not encompass an evaluation of whether an alien should be released from detention. Rather, "credible fear of persecution" is defined by section 235(b)(1)(B)(v) of the Act as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208 [of the Act]." The United States Commission on International Religious Freedom (USCIRF) has described the credible fear standard as a "deliberately generous preliminary screening standard used in order to assure that a refugee is not mistakenly returned." USCIRF, *Expedited Removal Study Report Card: 2 Years Later*, at 6 (2007).[13] The great majority of aliens who assert a credible fear of persecution or torture are found to have such a fear; in fiscal year 2009, DHS made positive credible fear findings in 79.7 percent of cases involving arriving aliens that proceeded to a decision. The credible fear evaluation does not include an analysis of many of the factors relevant to detention, e.g., whether an alien presents a danger to persons or property, a threat to national security, or a flight risk. *See Matter of Guerra*, 24 I&N Dec. at 38 (stating that, in a custody redetermination hearing before an immigration judge, the alien "must establish to the satisfaction of the Immigration Judge . . . that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight"); *see also Matter of D-J-*, 23 I&N Dec. at 574 (citing "considerations of sound immigration policy and national security that would be undercut by the release of respondent and other undocumented alien migrants" in denying bond for aliens arriving by boat in large numbers from Haiti); *Matter of Adeniji*, 22 I&N Dec. 1102, 1111-12 (BIA 1999). Accordingly, we believe it is inappropriate to establish a rebuttable presumption of release that results simply because the alien has established a credible fear.

In other respects as well, you have not shown that your proposed presumptions are warranted. You have provided no evidence that an arriving alien with a credible fear who establishes his or her identity is not a flight risk. Indeed, many arriving aliens who are apprehended at a port of entry, even those who have established their identities, have few or no established ties in the United States, which is one of the leading factors in evaluating risk of flight. *See, e.g., Matter of Guerra*, 24 I&N Dec. at 40. Similarly, you have provided no support for the proposition that an arriving alien found to have a credible fear should benefit in every case from a presumption of release after establishing his or her identity merely through

---

[13] The USCIRF's report is available at http://www.uscirf.gov/images/stories/pdf/scorecard_final.pdf.

11

Re: *Petition for Rulemaking to Promulgate Regulations Governing Custody Determinations for Arriving Alien Asylum Seekers*

testimony, without needing to submit any other proof of identity. In general, other aliens in removal proceedings do not benefit from the presumptions you seek to create. You have not provided a rationale for why arriving aliens found to have a credible fear should receive this uniquely favorable treatment, even though other categories of aliens in removal proceedings do not have the benefit of such a presumption.

Finally, we note that the last sentence of the Petition's proposed language – that release of an alien on conditional parole under section 236(a)(2)(B) of the Act shall not be interpreted to constitute the parole of the alien into the United States pursuant to section 212(d)(5) of the Act or for purposes of any other provision – may not be needed as a regulatory clarification, in light of the Board's recent precedent decision interpreting the existing statute and regulations on this very point. *See Matter of Castillo-Padilla*, 25 I&N Dec. 257 (BIA 2010), *aff'd*, 417 F. App'x 888 (11th Cir. 2011).

**Conclusion**

For the reasons given above, the Department has decided not to initiate a rulemaking proceeding at this time to promulgate the proposed regulatory amendments. The Department recognizes the importance of appropriate safeguards to guard against the unwarranted detention of arriving aliens who have been found to have a credible fear of persecution or torture. However, the Department believes that the current regulatory scheme and DHS's 2010 Parole Guidelines provide such safeguards. In addition, the Department must balance your proposal against several other rulemaking initiatives that are currently pending. The Department may revisit this issue over time as more experience is gained with respect to the parole guidelines. However, the Department does not presently believe that the regulatory scheme should be revised as proposed. Although the Department appreciates your advocacy on behalf of arriving aliens seeking asylum in the United States, the petition for rulemaking is denied.

Sincerely,

Robin M. Stutman
General Counsel