1  PETER J. ELIASBERG (SBN 189110)
   Email: peliasberg@aclu-sc.org
2  AHILAN T. ARULANANTHAM (SBN 237841)
   Email: aarulanantham@aclu-sc.org
3  MICHAEL KAUFMAN (SBN 254575)
   Email:  mkaufman@aclu-sc.org
4  ACLU FOUNDATION OF SOUTHERN CALIFORNIA
   1313 West Eighth Street
5  Los Angeles, California 90017
   Tel: (213) 977-5211
6  Fax: (213) 977-5297

7  **Attorneys for Petitioners**
   (Additional counsel listed on following page)

8

9

10              **UNITED STATES DISTRICT COURT**

11        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12                  **WESTERN DIVISION**

13

14  ALEJANDRO RODRIGUEZ, et al.,        ) Case No. CV 07- 3239-TJH (RNBx)
                                        )
15          Petitioners,                ) **PETITIONERS' REPLY IN**
                                        ) **SUPPORT OF MOTION FOR**
16      vs.                             ) **PRELIMINARY INJUNCTION**
                                        )
17                                      ) Honorable Terry J. Hatter, Jr.
    TIMOTHY ROBBINS, et al.,            )
18                                      ) Hearing Date: September 10, 2012
            Respondents.                )
19                                      ) Hearing Time:  10:00 a.m.
                                        )
20  _____)

21

22

23

24

25

26

27

28

---

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1 | Additional Counsel:

2 | JUDY RABINOVITZ
MICHAEL TAN
3 | AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
4 | 125 Broad Street, 18th Floor
New York, NY 10004
5 | Telephone: (212) 549-2618
Facsimile: (212) 549-2654

6 |
JAYASHRI SRIKANTIAH (SBN 189566)
7 | STANFORD LAW SCHOOL
IMMIGRANTS' RIGHTS CLINIC
8 | Crown Quadrangle
559 Nathan Abbott Way
9 | Stanford, CA 94305-8610
Telephone: (650) 724-2442
10 | Facsimile: (650) 723-4426

11 | SEAN COMMONS (SBN 217603)
CODY JACOBS (SBN 272276)
12 | SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
13 | Los Angeles, California  90013-1010
Telephone: (213) 896-6000
14 | Facsimile: (213) 896-6600

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.   Petitioners are Substantially Likely to Prevail on Their Claim that the Immigration Detention Statutes Must be Construed to Require Rigorous Bond Hearings for Section 1226(c) Subclass Members................. 3

    A.   Prolonged Mandatory Detention of the Section 1226(c) Subclass Members is Unconstitutional and, at a Minimum, Raises Serious Constitutional Problems. ............................................... 3

    B.   Section 1226(c) Should Be Construed to Not Apply to Detainees Whose Cases Have Gone On for More than Six Months. ...................................................................................... 9

II.  Petitioners are Substantially Likely to Prevail on Their Claim that the Immigration Detention Statutes Must be Construed to Require Rigorous Bond Hearings for the Section 1225(b) Subclass Members. ........ 15

    A.   Prolonged Detention Without Bond Hearings of Section 1225(b) Subclass Members is Likely Unconstitutional, and at a Minimum Raises Serious Constitutional Problems. ........................... 15

    B.   Section 1225(b) Should Be Construed to Authorize Release via Bond Hearings When Detention Reaches Six Months. ...................... 20

III. Petitioners Will Continue to Suffer Irreparable Harm as a Result of Their Prolonged Detention, the Balance of Hardships Tips Sharply in Their Favor, and an Injunction is in the Public Interest................................ 22

    A.   Purported Delays Do Not Excuse Constitutional Deprivations.......... 22

    B.   Respondents Should Not Be Allowed To Postpone Relief Until Summary Judgment or Trial. .............................................................. 24

i

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

*Abdi v. Napolitano*,
    No. C10-1722RSL, 2011 WL 1584433 (W.D. Wash. Apr. 26, 2011)............... 18

5

6

*Alli v. Decker*,
    644 F. Supp. 2d 535 (M.D. Pa. 2009) ................................................................ 12

7

8

*Alvarez-Garcia v. Ashcroft*,
    378 F.3d 1094 (9th Cir. 2004)........................................................................... 16

9

10

*Barrera-Echavarria v. Rison*,
    44 F.3d 1441 (9th Cir. 1995) (en banc)............................................................ 16

11

12

*Benas v. Shea Mortg., Inc.*,
    11CV1461-IEG BGS, 2012 WL 528244 (S.D. Cal. Feb. 16, 2012)................. 23

13

14

*Bete v. Holder*,
    CIV. 11-6405 SRC, 2012 WL 1067747 (D.N.J. Mar. 29, 2012) ...................... 13

15

16

*Casas-Castrillon v. DHS*,
    535 F.3d 942 (9th Cir. 2008)......................................................................passim

17

18

*Centeno-Ortiz v. Culley*,
    No. 11-CV-1970, 2012 WL 170123 (S.D. Cal. Jan. 19, 2012).......................... 18

19

*Cheff v. Schnackenberg*,
    384 U.S. 373 (1966) (plurality opinion)............................................................ 12

20

21

*County of Riverside v. McLaughlin*,
    500 U.S. 44 (1991) ............................................................................................ 12

22

23

*Demore v. Kim*,
    538 U.S. 510 (2003) ............................................................................5, 6, 10, 14

24

25

*Diop v. ICE/Homeland Security*,
    656 F.3d 221 (3d Cir. 2011) ......................................................................... 11, 12

26

27

*Diouf v. Mukasey*,
    542 F.3d 1222 (9th Cir. 2008)............................................................................. 9

28

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Diouf v. Napolitano*,
   634 F.3d 1081 (9th Cir. 2011) ............................................................ passim

*Goldie's Bookstore, Inc. v. Superior Court*,
   739 F.2d 466 (9th Cir. 1984) ............................................................ 22

*Gonzales v. O'Connell*,
   355 F.3d 1010 (7th Cir. 2004 ............................................................ 14

*Kaplan v. Tod*,
   267 U.S. 228 (1925) ............................................................ 18, 19

*Krolak v. Ashcroft*,
   No. 04-C-6071 (N.D. Ill. Dec. 1, 200 ............................................................ 14

*Kwong Hai Chew v. Colding*,
   344 U.S. 590 (1953) ............................................................ 22

*Landon v. Plasencia*,
   459 U.S. 21 (1982) ............................................................ 2, 18, 19

*Leslie v. Attorney General*,
   678 F.3d 265 (3d Cir. 2012) ............................................................ 13

*Lisa Frank, Inc. v. Impact Intern., Inc.*,
   799 F. Supp. 980 (D. Ariz. 1992) ............................................................ 23

*Ly v. Hansen*,
   351 F.3d 263 (6th Cir. 2003) ............................................................ 11

*Lydo Enterprises, Inc. v. City of Las Vegas*,
   745 F.2d 1211 (9th Cir. 1984) ............................................................ 24

*Madrane v. Hogan*,
   520 F. Supp. 2d 654 (M.D. Pa. 2007) ............................................................ 12

*Matter of X-K*,
   23 I&N Dec. 731 (BIA 2005) ............................................................ 21

*Nadarajah v. Gonzalez*,
   443 F.3d 1069 (9th Cir. 2006) ............................................................ 5, 10, 11, 17

*Nivar v. Weber*,
   CIV.A. 10-825 FLW, 2010 WL 4 024771 (D.N.J. Oct. 13, 2010) .................... 12

iii

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................ 24

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
   762 F.2d 1374 (9th Cir. 1985) ........................................................ 23

*Occelin v. Dist. Dir. for Immigration Custom Enforcement*,
   C.A. No. 1:09–CV–164, 2009 WL 1743742 (M.D. Pa. June 17, 2009) ........... 13

*Papazoglou v. Napolitano*,
   No. 1:12-cv-00892, 2012 WL 1570775 (May 03, 2012) ................................. 14

*Phelps-Roper v. Nixon*,
   545 F.3d 685 (8th Cir. 2008) .......................................................... 24

*Pierre v. Sabol*,
   No. 1:10-cv-2634, 2011 WL 4498822 (M.D. Pa. Sept. 27, 2011) ................... 13

*Preminger v. Principi*,
   422 F.3d 815 (9th Cir. 2005) .......................................................... 24

*Rubbermaid Commercial Products, Inc. v. Contico Intern.*, Inc.,
   836 F.Supp. 1247 (W.D.Va. 1993) .................................................. 23

*Shatzer v. Maryland*,
   130 S. Ct. 1213 (2010) .................................................................... 12

*Shaughnessy v. U.S. ex rel. Mezei*,
   345 U.S. 206 (1953) ...................................................................... 18

*Tijani v. Willis*,
   430 F.3d 1241 (9th Cir. 2005) .................................................... passim

*V. Singh v. Holder*,
   638 F.3d 1196 (9th Cir. 2011) ...................................................... 3, 6

*Xi v. INS*,
   298 F.3d 832 (9th Cir. 2001) .......................................................... 16

**STATUTES**

8 U.S.C. § 1225 ............................................................................ passim

8 U.S.C. § 1226 ............................................................................ passim

iv

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1

# OTHER AUTHORITIES

66 Fed. Reg. 54,909 ................................................................................ 8

67 Fed. Reg. 31,157 ................................................................................ 8

8 C.F.R. pts. 3, 236, 240, 241 ................................................................ 8

8 C.F.R. § 1003.19 ..............................................................................22

Criminal Aliens in the United States: Hearings Before the Permanent
    Subcomm. on Investigations of the Senate Comm. on Governmental
    Affairs,103d Cong. 21 (1993) ........................................................7

Congressional Task Force on Immigration Reform, Report to the Speaker
    44-45 (1995) ...................................................................................7

Congressional Research Service, Immigration Related Detention (January
    12, 2012), p. 12, available at http://www.fas.org/irp/crs/ ...................8

GAO, No. GAO/GGD-92-85, Immigration Control: Immigration Policies
    Affect INS Detention Efforts 41 (1992)..........................................7

U.S. Immigration and Customs Enforcement, Secure Communities: A
    Comprehensive Plan to Identify and Remove Criminal Aliens (July 21,
    2009), available at http://www.ice.gov/doclib/foia/secure_communities/
    securecommunitiesstrategicplan09.pdf ............................................8

Permanent Subcomm. on Investigations of the Comm. on Governmental
    Affairs, Criminal Aliens in the United States, S. Rep. No. 104-48 (1995)..........6

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1    Respondents' opposition shows a remarkable disregard for both the Ninth
2    Circuit authority governing prolonged detention and this Court's prior order
3    denying Respondents' Motion to Dismiss under Rule 12(c).  Literally every
4    argument made by Respondents has been rejected by the Ninth Circuit in *Diouf v.*
5    *Napolitano*, 634 F.3d 1081 (9th Cir. 2011) ("*Diouf II*") and *Casas-Castrillon v.*
6    *DHS*, 535 F.3d 942 (9th Cir. 2008), this Court in its 12(c) ruling, or (usually) both.
7    Three basic principles derived from those prior authorities dictate the result here.
8    First, the Ninth Circuit *already* has construed Section 1226(c) to apply only
9    to expeditious proceedings, and has applied that rule to individuals with cases
10   pending before the immigration courts.  Dkt. 232 at 12 (citing *Casas*, 535 F.3d at
11   948).  After *Casas*, the *only* question left open is *when* detention becomes
12   prolonged and triggers the right to a bond hearing.  This Court recognized as much
13   in its 12(c) ruling.  Dkt. 155 at 3 ("Since many immigrants are held without a
14   hearing for years, it is incumbent on this Court to construe the statute to require
15   bond hearings when detention becomes unreasonable.").
16   Second, *Diouf II* resolved the question of *when* a detention becomes
17   unreasonable.  It held that a detention becomes prolonged at six months.
18   Respondents attempt to cabin *Diouf II* to its facts, but ignore *Diouf II*'s broad
19   language coupled with its reliance on cases addressing detention under a variety of
20   immigration statutes.  Remarkably, Respondents do not even mention *Diouf II* until
21   page 15 of their brief, and never address its reliance and discussion of Supreme
22   Court and Ninth Circuit authority.  *Compare* Dkt. 232 at 10-11 (describing *Diouf*
23   *II*'s holding with respect to prolonged detention and the cases on which it relies,
24   including *Demore* and *Casas*) *with* Dkt. 250 at 15-16 (purporting to distinguish
25   *Diouf II*, but failing to explain its citation to *Demore* and *Casas*).
26   Third, Respondents ignore both this Court's 12(c) ruling on Section
27   1225(b)—which held that members of that subclass can bring a due process
28   challenge to prolonged detentions—and the fact that the Section 1225(b) subclass

1

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1   includes lawful permanent residents who indisputably have due process rights.  *See*

2   Dkt. 232 at 16-17 (citing *Landon v. Plasencia*, 459 U.S. 21, 32-33 (1982)).

3   Respondents' entire Section 1225(b) argument hinges on their assertion—in a

4   footnote—that returning lawful permanent residents have no due process rights.

5   Dkt. 250 at 23 n.9.  This assertion is wholly at odds with the Supreme Court's

6   holding in *Landon*, which recognized that "once an alien gains admission to our

7   country and begins to develop the ties that go with permanent residence his

8   constitutional status changes accordingly," 459 U.S. at 32, and held that due

9   process protects the rights of a returning lawful permanent resident seeking

10  admission in exclusion proceedings.

11         Finally, Respondents ask this Court to allow unconstitutional detentions to

12  continue unabated on the theory that Petitioners should have filed this motion

13  earlier and can move for summary judgment.  Dkt. 250 at 3.  Respondents, not

14  Petitioners, bear responsibility for the delays in this case.  Moreover, Respondents

15  neglect to mention that *Diouf II* became final only in late February 2012, when the

16  government declined to seek a petition for a writ of certiorari, and Petitioners

17  promptly brought this motion after it became apparent that post-*Diouf II* settlement

18  discussion were fruitless.  Regardless, delay is never a valid basis to deny a

19  preliminary injunction where, as here, ample authority establishes both that

20  prolonged detention without a bond hearing constitutes irreparable harm, and that

21  the public interest always favors injunctive relief where important constitutional

22  rights are at stake.

23         The Court therefore should grant the preliminary injunction and direct

24  Respondents to provide members of the Section 1226(c) and 1225(b) subclasses

25  with bond hearings.

26

27

28

2

1

**I.    PETITIONERS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON**

2

**THEIR CLAIM THAT THE IMMIGRATION DETENTION**

3

**STATUTES MUST BE CONSTRUED TO REQUIRE RIGOROUS**

4

**BOND HEARINGS FOR SECTION 1226(c) SUBCLASS MEMBERS.**

5

**A.    Prolonged Mandatory Detention of the Section 1226(c) Subclass**

6

**Members is Unconstitutional and, at a Minimum, Raises Serious**

7

**Constitutional Problems.**

8

The constitutional problems presented by the prolonged mandatory detention

9

of the Section 1226(c) subclass members are at least as serious as the problems

10

recognized by the Ninth Circuit in *Tijani v. Willis*, 430 F.3d 1241 (9th Cir. 2005),

11

*Casas*, *Diouf II*, and *V. Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011).  *See* Dkt.

12

232 at 7-8.  Indeed, the petitioners in *Tijani*, *Casas*, and *Singh* were all convicted

13

of offenses classified as aggravated felonies, but the Ninth Circuit nonetheless held

14

that they were entitled to rigorous bond hearings due to prolonged detentions.

15

The government argues that *Casas* and, implicitly, *Tijani* and *V. Singh* are

16

distinguishable because they did not involve individuals with removal cases

17

pending before immigration courts.  *See* Dkt. 250 at 15-16.  This is incorrect as a

18

factual and legal matter.  First, *Casas* involved a petitioner with a case in

19

immigration court following a remand from the Ninth Circuit.  *See Casas*, 535

20

F.3d at 945 ("As of the time that this opinion is filed, Casas is now back before the

21

BIA after this court granted his petition for review of his final order of removal.").

22

Thus, the petitioner in *Casas* was *not* a post-order detainee at the time the Ninth

23

Circuit recognized his right to a bond hearing.  Indeed, the Ninth Circuit

24

specifically rejected the government's argument that Mr. Casas-Castrillon again

25

became subject to mandatory detention under Section 1226(c) after his case

26

returned to the immigration courts, explaining that because his detention had gone

27

on too long to be considered "expeditious" it was not authorized by that statute.

28

*See id.* at 949  Thus, the Ninth Circuit has *already held* that an individual with a

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1  case pending before the immigration courts is entitled to a bond hearing when a

2  detention becomes prolonged, even if that individual is removable due to a

3  mandatory detention offense.

4       Respondents next assert that detainees subject to final orders of removal

5  have stronger claims against prolonged detention than detainees litigating removal

6  cases in the immigration courts. *See* Dkt. 250 at 15-16. This makes no sense. As

7  recognized in *Diouf II*, detainees subject to final orders of removal, if anything,

8  may "at the margin . . . have a *lesser* liberty interest in freedom from detention"

9  than individuals who have not received final orders. 634 F.3d at 1086-87. Indeed,

10  the government endorsed this very position in *Diouf II*. *See* Answering Brief of

11  Respondents-Appellees at 33, *Diouf II* (No. 09-56774) (asserting post-final order

12  detainees have a "decreased interest in remaining free in the United States").

13       Likewise, the analysis in *Casas* and *Tijani* of detainees with removal orders

14  stayed pending judicial review applies with equal if not greater force to Section

15  1226(c) class members with cases before immigration courts who have not yet

16  sought judicial review. The Ninth Circuit has unequivocally held that Section

17  1226(c)'s mandatory detention provision must be narrowly construed to apply only

18  to "expeditious" removal proceedings because of the significant constitutional

19  concerns raised by prolonged detentions without hearings. *Tijani*, 430 F.3d at

20  1242 (construing Section 1226(c) to apply only to "expeditious" proceedings to

21  avoid serious constitutional problems that would otherwise arise); *Casas*, 535 F.3d

22  at 948-49 (construing Section 1226(c) not to apply in cases where detainee has

23  sought judicial review of removal order because "prolonged detention without

24  adequate procedural protections would raise serious constitutional concerns";

25  holding 1226(c) "was intended to apply for only a limited time"). This Court has

26  recognized that *Casas* and *Tijani* limit Section 1226(c) to expeditious proceedings.

27  *See* Dkt. 155 at 3 (observing that "the authority to detain immigrants [under

28  Section 1226(c)] is limited" and that the Ninth Circuit has "held that bond hearings

4

1    are required when detention becomes prolonged, in order to avoid due process

2    issues") (citing *Casas*).

3        While prolonged detention in the absence of a bond hearing is always

4    "constitutionally doubtful"—regardless of the stage at which it occurs—it is even

5    more problematic when it happens to individuals with pending administrative

6    proceedings; such individuals have not lost their immigration cases at the

7    administrative level, and face the prospect of *longer* detentions as they wait for

8    both administrative *and* judicial review to complete.  *Cf. Tijani*, 430 F.3d at 1242

9    (noting anticipated length of future proceedings and detention in assessing due

10   process claim).

11       Apart from grossly misreading *Casas*, Respondents argue that Petitioners

12   seek relief inconsistent with *Demore* itself.  Dkt. 250 at 10-11.  *Demore* upheld the

13   constitutionality of "brief" mandatory detentions during administrative removal

14   proceedings—i.e., detentions expected to range on average between one-and-a-half

15   to five months.  *Demore*, 538 U.S. at 530.  *Demore* did not authorize prolonged

16   mandatory detentions—a period the Ninth Circuit has now explicitly defined as

17   detentions beyond six months.  *See Diouf II*, 634 F.3d at 1091-92; *see also*

18   *Nadarajah*, 443 F.3d at 1080 ("*Demore* endorses the general proposition of 'brief'

19   detentions, with a specific holding of a six month period as presumptively

20   reasonable"); *Casas*, 535 F.3d at 950 ("references to the brevity of mandatory

21   detention under Section 1226(c) run throughout *Demore*").[1]

22   _____

23   [1] Indeed, the government's briefing in *Demore* itself emphasized that the length of
     detention was critical to distinguishing *Demore* from *Zadvydas*.  *See* Brief for the

24   Petitioner at 48, *Demore* (No. 01-1491) ("*Zadvydas* illustrates that the duration of
     detention in aid of removal is another factor bearing upon its constitutionality,

25   *because prolonged detention imposes a greater burden upon the alien* and
     (depending upon the circumstances) may at some point not serve the underlying

26   governmental purpose. . . .") (emphasis added).  In contrast to the "prolonged

27   detention" at issue in *Zadvydas,* the government maintained that "detention under

28   Section 1226(c) generally lasts approximately one month or less, which

                                                                          (cont'd)

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1    Respondents place great weight on evidence of flight risk for criminal aliens

2    cited in *Demore* as support for mandatory detention.  *See* Dkt. 250 at 8, 9, 13

3    (citing *Demore*, 538 U.S. 518-19).  But Petitioners are not trying to relitigate

4    *Demore* or the evidence offered in that case, which Respondents have never

5    introduced in this litigation.  Even assuming the accuracy and applicability at the

6    time of the flight risk data cited in *Demore*, the Supreme Court did not rely on such

7    data as support for the kind of prolonged mandatory detentions at issue here, but

8    instead merely to uphold "brief" mandatory detentions typically necessary to

9    conclude removal proceedings.  *Demore*, 538 U.S. at 513.  Thus, data cited in

10   those proceedings does not support Respondent's argument for subjecting the

11   Section 1226(c) subclass to prolonged mandatory detentions without hearings.[2]

12   In addition, the data is outdated and does not reflect significant changes in

13   the years since it was collected and Section 1226(c) was first enacted.  Along with

14   the lack of detention space—which has since dramatically increased—at the time

15   of Section 1226(c)'s enactment, the agency had no reliable system in place for

16   identifying criminal aliens upon their release from incarceration or thereafter.  *See,*

17   *e.g.*, Permanent Subcomm. on Investigations of the Comm. on Governmental

18   Affairs, Criminal Aliens in the United States, S. Rep. No. 104-48, at 3 (1995)

19   (finding, among other things, that the agency was "unable to even identify most of

20   the criminal aliens eligible for deportation . . . . [C]riminal aliens who come in

21   contact with state and local law enforcement officials are often not identified as

22   aliens because it is difficult for untrained personnel to accurately determine

---

23   distinguishes *Zavydas* and strongly supports the statute's constitutionality."  *Id.*;

24   *see also* Reply Brief for the Petitioners at 15, *Demore* (No. 01-1491) ("[I]f there

are exceptional cases in which the duration of detention would present special due

25   process concerns, such cases would appropriately be addressed on their own

26   facts.").

[2] Unsurprisingly, the Ninth Circuit did not find this kind of data relevant in

27   concluding that the petitioners in *Tijani*, *Casas*, and *V. Singh* were entitled to bond

28   hearings.

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1  citizenship.  Consulting INS is often fruitless since the INS file system, which is

2  name based, cannot reliably be used to identify criminal aliens because of the

3  widespread use of aliases by such aliens.").  In addition, even when individuals

4  were apprehended by ICE, detention decisions were made on the basis of the

5  availability of bed space, rather than any individualized determination of danger or

6  flight risk.  *See, e.g.*, GAO, No. GAO/GGD-92-85, Immigration Control:

7  Immigration Policies Affect INS Detention Efforts 41 (1992) ("GAO 1992")

8  (noting that due to limited detention space, INS "did not detain all criminal

9  aliens").[3]  Thus, the statistics in question are based on an outdated system of

10 detention in which "criminal aliens" were not taken into immigration custody when

11 criminal incarceration ended, and in which immigration authorities often never

12 made a determination as to whether release or detention was appropriate because

13 release decisions solely turned on the availability of bed space.

14       Since that time, Congress and the immigration authorities have adopted

15 measures designed to address the problem of immigrants who fail to appear for

16 removal, and to identify "criminal aliens" upon release from incarceration and

17 thereafter.  These measures include not only a massive increase in detention bed

18 space, but also the adoption of regulations targeted to improve appearance rates;

19 the implementation of new data sharing and reporting systems (like the "Secure

20 Communities" program), which ameliorate the concern that noncitizens with

21 criminal convictions will escape identification and removal; and the advent of

22 alternatives to detention programs like the Intensive Supervision Appearance

---

[3] *See also* Criminal Aliens in the United States: Hearings Before the Permanent
Subcomm. on Investigations of the Senate Comm. on Governmental Affairs, 103d
Cong. 21 (1993) ("The lack of INS detention space in many of its districts puts
pressure on the INS to release, rather than detain, criminal aliens."); Congressional
Task Force on Immigration Reform, Report to the Speaker 44-45 (1995) (noting
that INS "does not have adequate resources for holding facilities" and
recommending "that Congress appropriate sufficient funds to expand INS
detention facilities to at least 9,000 beds").

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1   Program (ISAP II), which have had remarkable success rates here in the Central

2   District of California. *See* Congressional Research Service, Immigration Related

3   Detention (January 12, 2012), p. 12, available at http://www.fas.org/irp/crs/

4   RL32369.pdf (from FY 2001 - 2012 "the number of funded beds increased from

5   19,702 to 34,000"); 67 Fed. Reg. 31,157 (proposed May 9, 2002) (to be codified at

6   8 C.F.R. pts. 3, 236, 240, 241) (imposing new penalties on aliens who fail to

7   comply with surrender orders); 66 Fed. Reg. 54,909 (Oct. 31, 2001) (codified at 8

8   C.F.R. 3.19(i)(2)) (authorizing INS to automatically stay any release decision by an

9   immigration judge); U.S. Immigration and Customs Enforcement, Secure

10  Communities: A Comprehensive Plan to Identify and Remove Criminal Aliens

11  (July 21, 2009), available at http://www.ice.gov/doclib/foia/secure_communities/

12  securecommunitiesstrategicplan09.pdf (describing Secure Communities as "a

13  major initiative to significantly reduce the criminal alien population in the United

14  States"); Ex. 48 at 111:4-112:24 (DHS is "at, if not close to, [a] 100 percent

15  compliance rate" for noncitizens enrolled in the ISAP II program in San

16  Bernardino, and at around a 90 percent compliance rate for those in the Los

17  Angeles area).

18          Respondents claim problems regarding appearance rates "persist." Dkt. 250

19  at 13. But their evidence does not support that claim. For example, Respondents

20  cite to a statement from a 2006 report by the DHS Office of the Inspector General

21  that "historical trends indicate that 62 percent of the aliens released will eventually

22  be issued final orders of removal . . . and later fail to surrender for removal or

23  abscond." Dkt. 250 at 13. Respondents provide no underlying evidence for this

24  inadmissible hearsay statement about "historical" data, nor any evidence that the

25  "historical" data relates to appearance rates after the adoption of Section 1226(c)

26  and the other recent significant changes designed to improve appearance rates. To

27  the contrary, that very same report observes that "the percentage of released aliens

28  who failed to appear at their respective hearings has declined in recent years."

8

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1   Dkt. 250-3 at 21.  Further, as Respondents concede, these statistics are "not limited

2   to criminal aliens," Dkt. 250 at 13, nor to "criminal aliens" who are detained for

3   prolonged periods and, as such, have no application to this case.[4]

4        **B.    Section 1226(c) Should Be Construed to Not Apply to Detainees**

5               **Whose Cases Have Gone On for More than Six Months.**

6        Respondents claim that the canon of constitutional avoidance cannot be

7   applied to Section 1226(c) because "[S]ection 1226(c) unambiguously excludes

8   bond for criminal aliens during removal proceedings."  Dkt. 250 at 32.  This

9   completely ignores that both this Court and the Ninth Circuit, twice, have found to

10  the contrary.  *See* Dkt. 155 at 3 (Section 1226(c) "can be interpreted to require a

11  bond hearing after a certain amount of time, not only to comply with precedent, but

12  to avoid constitutional concerns as well").  In both *Casas* and *Tijani*, the Ninth

13  Circuit construed Section 1226(c) in a manner that afforded bond hearings to

14  individuals with aggravated felony convictions.  *See Tijani*, 430 F.3d at 1242;

15  *Casas*, 535 F.3d at 948-49 (holding that the statute should be read to apply only to

16  "expeditious" proceedings due to the significant constitutional concerns of

17  prolonged immigration detention).  Respondents' failure even to address these

18  holdings is telling proof that they have no plausible way to distinguish them.[5]

19       Respondents further seek to deny the import of the Ninth Circuit's holding

20  in *Diouf II* that detention becomes prolonged at six months, by attempting to cabin

---

21  [4] Respondents also ignore that the Ninth Circuit has ordered bond hearings even

22  where flight risk exists.  The petitioner in *Diouf*, for example, failed to appear after
    being ordered removed, resulting in the breach of his bond.  *See Diouf v. Mukasey*,

23  542 F.3d 1222, 1225-26 (9th Cir. 2008).  Nonetheless, when he received a bond

24  hearing pursuant to this Court's Order, an immigration judge ordered him released
    on bond, and the Ninth Circuit affirmed that he was entitled to a bond hearing.  *See*

25  *Diouf II*, 634 F.3d at 1092.  In all events, Petitioners seek to vindicate the right to a

26  hearing, not a right to release.
    [5] Respondents suggest that Section 1226(c)(2) clearly requires prolonged detention,

27  *see* Dkt. 250 at 33, but if that was true, then the Ninth Circuit could not have

28  recognized a right to a bond hearing in *Casas* or *Tijani*.

---

9

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1    *Diouf II* to the detention statute at issue in that case, Section 1231(a)(6).  *See* Dkt.

2    250 at 24.  However, *Diouf II* specifically relied on case law from several

3    contexts—in particular *Demore*'s upholding of the constitutionality of mandatory

4    detention under Section 1226(c) for only a "brief" period of one-and-a-half to five

5    months; *Casas*'s holding that Section 1226(c) does not authorize prolonged

6    detention; and *Zadvydas*' creation of a presumptively reasonable six-month period

7    of detention under section 1231(a).  *See* Dkt. 232-1 at 11 (citing *Diouf II*, 634 F.3d

8    at 1091).[6]  The fact that *Diouf II* relied on these authorities underscores that its six-

9    month rule is not limited to Section 1231(a)(6) cases.  Although Respondents

10   purport to distinguish the cases *Diouf II* cites, *see* Dkt. 250 at 16-18, the question is

11   not whether the government believes those statutory contexts could be

12   distinguished, but rather whether the Court in *Diouf II* considered them

13   distinguishable, and it did not.[7]

14        Respondents also assert that *Demore* precludes the relief Petitioners seek

15   here because it upheld the mandatory detention of a petitioner who had been

16   detained six months at the time he filed a habeas petition.  *See* Dkt. 250 at 14.  This

17   assertion is incorrect.  First, the Supreme Court decided *Demore* on constitutional

18   grounds alone; the Court did not consider a statutory challenge to mandatory

19   detention because the petitioner in that case had conceded he was subject to

20   mandatory detention statute.  *See Demore*, 538 U.S. at 513-14.  The Court,

21   therefore, did not address the statutory argument Petitioners raise here, which is

22   based on the doctrine of constitutional avoidance.  Second, even if a six month

---

23   [6] Notably, Judge Fisher wrote the opinion for the Court in both *Diouf II* and *Casas*,
24   and was a member of the panel on the class certification appeal in this case, so the
     Court was fully apprised of the details of each of the cases relied upon in *Diouf II*.
25   [7] Moreover, although *Nadarajah* involved potentially-permanent detention, the
26   Ninth Circuit strongly suggested that it would adopt the bright line rule that it
     subsequently adopted in *Diouf*.  *See Nadarajah*, 443 F.3d at 1079-80 (holding that
27   the "general detention statutes" only authorize detention pending removal
     proceedings for a "brief and reasonable" period of presumptively six months).
28

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1    mandatory detention is not *per se* unconstitutional in all circumstances—such

2    detentions would raise serious constitutional problems in many cases, particularly

3    where detainees raise challenges to removal that, if successful, would render them

4    nondeportable.  Thus, the statute must be read to avoid these constitutional

5    problems, so long as such a construction is fairly possible.  *See Clark*, 543 U.S. at

6    381.  Third, and significantly, the Ninth Circuit already has read *Demore* as

7    authorizing mandatory detention for only the "brief" period of time necessary for

8    removal proceedings—approximately a period of up to six months.  *See* Dkt. 232-1

9    at 11; *see also Diouf II*, 634 F.3d at 1091; *Casas*, 535 F.3d at 950; *Nadarajah*, 443

10   F.3d at 1079-80.  In doing so, the Ninth Circuit expressly considered that the

11   petitioner in *Demore* was detained for six months, and went on to establish six

12   months as the point at which a detainee must be afforded a bond hearing.  *Diouf II*,

13   634 F.3d at 1091.[8]

14        Respondents also cite decisions by the Sixth and Third Circuits that reject a

15   bright-line rule for when a detention becomes prolonged.  *See Ly v. Hansen*, 351

16   F.3d 263 (6th Cir. 2003); *Diop v. ICE/Homeland Security*, 656 F.3d 221 (3d Cir.

17   2011).[9]  But *Ly* and *Diop* hurt rather than help the government: both reject the

18   government's argument that Section 1226(c) imposes *no* limit on the length of

19   mandatory detentions, and both construed Section 1226(c) to require bond hearings

20   when removal proceedings become unreasonably prolonged.  *See Ly*, 351 F.3d at

21   270; *Diop*, 656 F.3d at 235.  Moreover, although the Third Circuit declined to

22   adopt a bright line six-month rule as a constitutional matter, *see id*. at 234, it did

23   ─────────────────────────────
     [8] It is possible to read *Demore* to authorize an even briefer period of mandatory

24   detention.  *See Ly v. Hansen*, 351 F.3d 263, 275 (6th Cir. 2003) (concluding that

25   *Demore* authorizes only 47 days of mandatory detention before the immigration
     judge and  120 days of mandatory detention where the detainee appeals to the BIA)

26   (Haynes, J., concurring in part and dissenting in part).
     [9] *But see Ly*, 351 F.3d at 273 (Haynes, J., concurring in part and dissenting in part)

27   (arguing for a bright line rule that mandatory detention exceeding the average

28   periods contemplated in *Demore* was not authorized).

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

not expressly preclude such a rule as a matter of statutory interpretation.  Rather, it merely held that, to avoid serious constitutional problems, Section 1226(c) needed to be construed to authorize detention only for a "reasonable" period of time, leaving open for future resolution what is "reasonable."  *See id*. at 235.

Prudential considerations weigh strongly in favor of a six-month rule.  A six-month rule will provide greater consistency in decision-making and minimize the burden on district courts and detainees, the overwhelming majority of whom are *pro se* and face significant obstacles in challenging unlawfully prolonged detentions on habeas.  Notably, the Supreme Court in *Zadvydas* itself cited practical considerations such as "uniform administration" as support for establishing a six-month rule in the post-final-order detention context.  533 U.S. at 701; *cf. Shatzer v. Maryland*, 130 S. Ct. 1213, 1222 (2010) (holding that a suspect who asserts his *Miranda* rights cannot be re-interrogated following a break in custody for 14 days in order to provide "certainty" to police officers); *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-58 (1991) (adopting requirement that probable cause hearings occur within 48 hours of arrest in order to provide "a degree of certainty" to states and counties crafting hearing procedures); *Cheff v. Schnackenberg*, 384 U.S. 373, 379-80 (1966) (adopting rule that right to jury trial extends to all cases in which sentence of six months or greater is imposed) (plurality opinion). [10]

---

[10] Indeed, the case-by-case approach in *Diop*, which district courts were essentially applying prior to the Third Circuit's decision, has resulted in inconsistent decisions on a range of issues.  These include the relevance of (a) requests for continuances by detainees; *compare Nivar v. Weber*, CIV.A. 10-825 FLW, 2010 WL 4024771, *7 (D.N.J. Oct. 13, 2010) (denying bond hearing where detainee requested a continuance) *with Madrane v. Hogan*, 520 F. Supp. 2d 654 (M.D. Pa. 2007) (granting habeas petition where alien had requested several continuances); (b) likely future detentions; *compare Alli v. Decker*, 644 F. Supp. 2d 535, 543 (M.D. Pa. 2009) (considering "probable extent of future removal proceedings"), *with Pierre v. Sabol*, No. 1:10-cv-2634, 2011 WL 4498822, at *1 (M.D. Pa. Sept.

(cont'd)

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1    Nonetheless, Respondents assert that a six-month rule will encourage

2    dilatory conduct by detainees to secure bond hearings. *See* Dkt. 250 at 19-20. But

3    the government's own examples prove exactly the opposite—i.e., that individuals

4    seek continuances for reasons *other than* to obtain a bond hearing. The individuals

5    the government cites are presently barred from obtaining a bond hearing under the

6    existing system, yet they sought many continuances. Respondents also ignore that

7    many individuals seek continuances for legitimate reasons. *See, e.g.*, *Leslie v.*

8    *Attorney General*, 678 F.3d 265, 272 (3d Cir. 2012) (declining to fault detainee for

9    five-week continuance for medical reasons). And Respondents ignore that many

10   individuals experience delays due to requests for continuances by the government.

11   *See, e.g.*, Exh. 51 (Declaration of Talia Inlender) at ¶¶ 3-6 (reporting that

12   immigration judges in the Central District have continued cases for upwards of

13   four months at a time). In short, the evidence on continuances shows that courts

14   grant them for diverse and case-specific reasons. Surely it is preferable for

15   immigration judges to determine, on a case-by-case basis, whether continuances

16   reflect dilatory conduct, instead of adopting a presumption that all detainees

17   subjected to prolonged detentions request continues in the hopes of someday

18   obtaining a bond hearing that by no means guarantees their release.

19   Ultimately, however, the question before this Court is not whether a bright

20   line six-month rule is good policy, but rather whether it is required by Ninth

21   Circuit law. The Ninth Circuit has held that detention becomes prolonged at six

22

23   _____

24   27, 2011) (detention pending future proceedings of "no relevance"); and (c)
     success in removal proceedings; *compare Bete v. Holder*, CIV. 11-6405 SRC, 2012

25   WL 1067747, *8 (D.N.J. Mar. 29, 2012) (finding detention reasonable because the
     period of detention beyond six months did not result from the petitioner's

26   successful appeals) *with Occelin v. Dist. Dir. for Immigration Custom*

27   *Enforcement,* C.A. No. 1:09–CV–164, 2009 WL 1743742 (M.D. Pa. June 17,
     2009) (ordering a bond hearing where most of the detention beyond six months

28   occurred while adjudicating claims the detainee lost).

13

1    months, and that holding resolves the issue for purposes of this Motion.[11]

2

3

4

5

6

7

8    [11] Respondents also mischaracterize Petitioners' request in the alternative that this
Court construe Section 1226(c) to require mandatory detention only where the
9    government shows a detainee lacks a substantial challenge to removal.  Petitioners
do *not* argue, as Respondents claim, that "the constitutionality of prolonged
10   detention should be measured solely by an alien's likelihood of success in
challenging removal."  Dkt. 250 at 20.  As an initial matter, Petitioners are making
11   a *statutory* argument, not a constitutional one.  Moreover, they do not seek to make
a detainee's merits case a factor—much less the "sole" or "dispositive" factor—for
12   determining whether detention is unreasonably prolonged.  Rather, Petitioners ask
that this Court alternatively grant relief from prolonged mandatory detention by
13   generally limiting Section 1226(c) to detainees who lack a substantial removal
challenge, as such relief—albeit imperfect in scope—would apply to many
14   members of the Section 1226(c) subclass.  *See* Dkt. 232-1 at 14-15.

15        Respondents incorrectly assert that there is no authority for this proposed
statutory construction.  Dkt. 250 at 20.  The avoidance canon of statutory
16   construction requires it because the mandatory detention of individuals with
substantial removal challenges raises serious due process concerns that were not
17   addressed in *Demore*.  *See Gonzales v. O'Connell*, 355 F.3d 1010, 1020-21 (7th
Cir. 2004) (noting that this "important issue" was left open in *Demore*); *Demore*,
18   538 U.S. at 578 (Breyer, J., dissenting) (concluding immigration statute should be
construed in this way); *Papazoglou v. Napolitano*, No. 1:12-cv-00892, 2012 WL
19   1570778, *5 (May 03, 2012), *vacated on other grounds* (May 10, 2012) (holding
mandatory detention of noncitizen who presents a "legitimate and good faith"
20   challenge to removal violates due process); *Krolak v. Ashcroft*, No. 04-C-6071
(N.D. Ill. Dec. 1, 2004) (same, where individual has "colorable" challenge to
21   removal).

22        Nor do Petitioners ask the Court to "legislate" new custody procedures, Dkt.
250 at 21, but rather to construe the immigration detention statutes to require such
23   hearings to avoid constitutional problems.  Such an application of the avoidance
canon is "a means of giving effect to congressional intent, not of subverting it."
24   *Clark*, 543 U.S. at 381.

25

26

27

28

14

1  **II.    PETITIONERS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON**

2  **THEIR CLAIM THAT THE IMMIGRATION DETENTION**

3  **STATUTES MUST BE CONSTRUED TO REQUIRE RIGOROUS**

4  **BOND HEARINGS FOR THE SECTION 1225(b) SUBCLASSS**

5  **MEMBERS.**

6  **A.    Prolonged Detention Without Bond Hearings of Section 1225(b)**

7  **Subclass Members is Likely Unconstitutional, and at a Minimum**

8  **Raises Serious Constitutional Problems.**

9      As with their arguments with respect to Section 1226(c), Respondents'

10 argument that prolonged detention under Section 1225(b) does not present serious

11 constitutional concerns ignores this Court's order denying Respondents' Rule 12(c)

12 motion, as well as binding Supreme Court and Ninth Circuit precedent.

13     This Court already has rejected Respondents' argument that the "Entry

14 Fiction" precludes the Section 1225(b) subclasses' due process claims. *Compare*

15 Dkt. 250 at 34-35 (citing the "Entry Fiction" and arguing that the "unique

16 constitutional position of arriving aliens permits" their prolonged detention) *with*

17 Dkt. 155 at 2 ("the Entry Fiction Doctrine does not preclude Plaintiff from

18 bringing procedural due process claims under 8 U.S.C. § 1225(b), regardless of the

19 sub-class's immigration status").  As this Court recognized, "this doctrine only

20 applies to procedure for admitting aliens, not their substantive rights," and "[n]on-

21 admitted aliens are able to bring substantive Fourteenth Amendment claims, such

22 as equal protection and due process."  Dkt. 155 at 2 (citing *Kwai Fun Wong v.*

23 *United States*, 373 F.3d 952, 974 (9th Cir. 2004)).  Like the deportable noncitizens

24 in *Zadvydas*, inadmissible noncitizens possess a liberty interest in being free from

25 prolonged imprisonment that is distinct from any right to admission.  *Cf. Zadvydas*,

26 533 U.S. at 696.  Thus, even if Section 1225(b) authorized the detention of *only*

27 arriving non-citizens who had never been admitted—which Respondents

28 themselves concede is not the case, Dkt. 250 at 22—it still would have to be

15

1   construed to require rigorous release procedures for people subject to prolonged

2   detention.

3       As they did in their Rule 12(c) motion, the Respondents rely on *Barrera-*

4   *Echavarria v. Rison*, 44 F.3d 1441 (9th Cir. 1995) (en banc).  *See* Dkt. 131 at 21.

5   But that decision is weak precedent insofar as the Supreme Court struck down the

6   indefinite detention of excludable non-citizens in *Clark*, 543 U.S. at 380.  *See Xi v.*

7   *INS*, 298 F.3d 832, 837-38 (9th Cir. 2001) (acknowledging that *Barrera* no longer

8   controls).  *Barrera*'s statement that "an alien who has not been paroled must by

9   definition be detained," construed the predecessor statute 1225(b) and thus does

10  not apply here.  44 F.3d at 1446.  In any event, *Barrera* could not control here

11  because it held only that excludable noncitizens who had lost their cases lacked a

12  substantive due process right to be *released* from immigration detention.  In

13  contrast, Section 1225(b) subclass members are non-citizens who may well win

14  their cases and seek only the right to a *hearing* to be considered for release.  *Id.* at

15  1450.[12]

16      Respondents also have no answer to the fact that the Section 1225(b)

17  subclass includes returning lawful permanent residents, and that the statute must be

18  construed with their rights in mind.  *See* Dkt. 232 at 26 (citing *Nadarajah*, 443

19  F.3d. at 1077; *Clark*, 543 U.S. at 378); *Diouf II*, 634 F.3d 1081 (rejecting the

20  _____

21  [12] Respondents claim that that the Ninth Circuit reaffirmed *Barrera* in *Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094 (9th Cir. 2004), but the case actually
22  undermines Respondents' arguments.  *Alvarez-Garcia* involved a limited challenge to admissions procedures, not substantive constitutional rights, *see* 378 F.3d at
23  1096-97, precisely the distinction that this Court drew in rejecting Respondents' Rule 12(c) motion.  Dkt. 155 at 2.  The Court in *Alvarez-Garcia* acknowledged that
24  under Ninth Circuit precedent "'the entry doctrine does not categorically exclude non-admitted aliens from all constitutional coverage, including coverage by equal
25  protection guarantees,'" but "'[t]he entry fiction . . . appears determinative of the
26  *procedural* rights of aliens with respect to their applications for admission.'"  *Id*. at
27  1088 (quoting *Wong v. United States*, INS, 373 F.3d 952, 971-72 (9th Cir. 2004))
28  (emphasis in original).

1   government's argument that petitioner had lesser right to a bond hearing because

2   he was not a lawful permanent resident because Section 1231(a)(6) "applie[d] to

3   some lawful permanent residents" and thus had to be construed in light of their

4   rights).  As all these cases make clear, the avoidance canon requires that a statute

5   be construed to avoid constitutional problems that would apply to certain classes of

6   people subject to the statute, even if those problems would not arise for every class

7   of individuals subject to the statute.  *See Clark*, 543 U.S. at 380-81 (where

8   possible, courts must avoid statutory constructions that "would raise a multitude of

9   constitutional problems . . . whether or not those constitutional problems pertain to

10  the particular litigant before the Court").

11       Unless a statute expressly distinguishes between different classes of

12  individuals—which is not the case with Section 1225(b)—the statute must be

13  construed to avoid constitutional problems that would arise from prolonged

14  detention of returning lawful permanent residents without bond hearings.

15  Respondents' contrary interpretation "would abrogate the holding and reasoning in

16  *Clark* by treating some detentions authorized by the same statute differently,

17  depending on the identity and status of the detainee." *Nadarajah,* 443 F.3d. at

18  1078.[13]  Tellingly, Respondents' only response to *Clark* is hidden in a footnote

19

20  _____

    [13] Respondents attempt to downplay *Nadarajah* by suggesting that it "does not

21  extend to cases involving a challenge to pre-order detention."  Dkt. 250 at 36.  But
    this is both factually and legally wrong.  At the time the Ninth Circuit decided his

22  case, Mr. Nadarajah's removal case was pending in administrative proceedings
    before the Attorney General, *see Nadarajah*, 443 F.3d at 1075, and thus he was

23  still subject to pre-order detention under Section 1225(b).  But even if *Nadarajah*
    could be read as limited to the post-order context, there is no reason why the

24  principle it applies—that Section 1225(b) must be construed in light of the fact that
    it applies to returning lawful permanent residents and other lawfully-admitted non-

25  citizens—would apply differently to pre-order detainees.  If anything, such

26  detainees have greater due process rights due to the fact that they have not been
    ordered removed and retain their lawful immigration status.  *See Diouf II*, 634 F.3d

27  at 1086-87.

28

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1    asserting that *Clark* is distinguishable because it involved post-order detention

2    under a different statute, Section 1231(a)(6).  *See* Dkt. 250 at 27 n.10. Yet

3    Respondents fail to provide *any* reason why the statutory construction principles

4    applied in *Clark* would differ for pre-order detention under Section 1225(b).

5    　　　Respondents are on even shakier ground in arguing that returning lawful

6    permanent residents are treated, for constitutional purposes, as equivalent to

7    asylum seekers and other first-time entrants.  Dkt. 250 at 23 n.9.  Respondents cite

8    to *Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206 (1953) and *Kaplan v. Tod*, 267

9    U.S. 228 (1925), but ignore that the Supreme Court's subsequent decision in

10   *Landon v. Plasencia* squarely addressed this issue and held that returning lawful

11   permanent residents *do* have due process rights, even with respect to their

12   admission.  459 U.S. 21, 32-34 (1982) (holding that a lawful permanent resident

13   who had been out of the country for a "few" days could bring due process

14   challenge to the procedures for admission).  As the Court explained, "once an alien

15   gains admission to our country and begins to develop the ties that go with

16   permanent residence his constitutional status changes accordingly."  *Id*. at 32.

17   While the Court acknowledged that an extended absence may deprive a returning

18   lawful permanent resident of his or her constitutional status, it firmly rejected that

19   returning lawful permanent residents have no due process rights at all.  *Id*.

20   (observing that *Mezei* "does not govern this case" because it involved an extended

21   absence and that "[w]e need not now decide the scope of *Mezei*").[14]

22

23   [14] In support of their contrary argument that Section 1225(b) cannot be read to
     authorize bond hearings, Respondents cite a single case from another district court.
24   Dkt. 250 at 37 (citing *Abdi v. Napolitano*, No. C10-1722RSL, 2011 WL 1584433
     (W.D. Wash. Apr. 26, 2011).  As subsequently recognized by another district
25   court, *Abdi* "appears to give insufficient weight to *Diouf II* and *Nadarajah.*"
     *Centeno-Ortiz v. Culley*, No. 11-CV-1970, 2012 WL 170123 at *9 fn.3 (S.D. Cal.
26   Jan. 19, 2012).  For these reasons and the others set forth above, this court should
     decline to follow *Abdi*.   Respondents' reliance on *Kaplan* is similarly misplaced.
27
28   Not only does it predate *Plasencia,* but it did not involve an admitted lawful

                                                                        (cont'd)

                                          18
**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1      Finally, the Court should reject the Respondents' unconvincing attempts to

2   defend the sufficiency of the parole process.  Respondents wrongly claim that

3   Petitioners' sole evidence of the parole process' structural defects is a "snippet" of

4   deposition testimony from Assistant Field Officer Lee in which he stated "the

5   custody decision" has always "really just been about how much bed space [ICE

6   has]"—testimony which they claim Petitioners "take out of context" to apply to

7   "parole determinations"  *See* Dkt. 250 at 31; Dkt. 232 at 21.  However,

8   Respondents do not dispute that parole determinations" are a form of "custody

9   determination," nor do they provide any other reason as to why the distinction

10  should matter.[15]

11      More importantly, however, Respondents completely ignore Petitioners'

12  arguments that the parole process is flawed because it is made by DHS

13  bureaucrats, based only on a review of the detainee's file (and, occasionally, an

14  informal discretionary interview), provides no hearing before an Immigration

15  Judge to determine whether detention is warranted, and lacks an appeals process of

16  any kind.  *See* Dkt. 232 at 6-7, 24-25 (describing parole process flaws).  It is

17  precisely these type of structural defects that the Ninth Circuit has found fail to

18  meet minimum due process standards in the post order custody review process.

19  *See Casas*, 535 F.3d at 951-52 (holding post-order custody review procedure

20  insufficient because it provided for no in-person hearing before a neutral

21  decisionmaker, allowed no administrative appeal, and placed the burden of proof

22

23  permanent resident.  267 U.S. at 229.
[15] In their briefing, Petitioners accurately quoted AFOD Lee's terminology,

24  "custody decision."  *See* Dkt. 232 at 25 ("'the custody decision' has always 'really
    just been about how much bed space [ICE has].'").  In addition to falsely charging

25  the Petitioners with misconstruing AFOD Lee's testimony, Respondents further

26  claim that the statement refers to "changes in custody decisions over time due
    resources."  Dkt. 250 at 39.  But this only lends further support to Petitioners'

27  argument—that ICE "custody decisions" are frequently made based on bed space

28  resources, not on whether individuals are a danger or flight risk.

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1 | on the detainee); *Diouf II*, 634 F.3d at 1091 (same).

2   Contrary to Respondents' contentions, these deficiencies are not cured by

3 AFOD Lee's self-serving testimony that "ICE officials in the Central District

4 conduct thorough parole determinations and deny parole only for facially valid and

5 bona fide reasons," nor by statistics regarding the rates at which individuals with a

6 credible fear are granted parole under the 2010 Parole Guidelines.  *See* Dkt. 250 at

7 30-31.  Those statistics are no comfort to class members who continue to be

8 detained for no justifiable reason.  *See, e.g.*, Exh. 52 (Declaration of Farah) at ¶ 10

9 (parole denied without meaningful explanation despite detainee having a sponsor).

### B.   Section 1225(b) Should Be Construed to Authorize Release Via Bond Hearings When Detention Reaches Six Months.

12   Respondents have also failed to rebut Petitioners' arguments that Section

13 1225(b) can be construed to afford bond hearings to class members, either by

14 construing Section 1225(b) itself to provide bond hearings or by holding that

15 detention authority "shifts" to Section 1226(a) when detention becomes prolonged.

16 *See* Dkt. 232 at 19-20.

17   Respondents claim that such an interpretation would conflict "with the

18 unambiguous language and Congressional intent expressed in Section 1225(b),"

19 Dkt 250 at 35, because "the detention provisions of Section 1225(b) are, like

20 section 1226(c), mandatory," Dkt. 250 at 34.  But this obviously is not the case.

21 First, as Respondents themselves concede, Section 1225(b) indisputably permits

22 release on parole.  *See* Dkt. 250 at 24 (citing "shall detained" language of Section

23 1225(b), but then conceding that "all arriving aliens can apply to DHS to be

24 paroled into the United States and released from custody.").  Instead, Respondents'

25 argument appears to be that the statute permits release on parole, but not bond

26 hearings.  *Id.* at 43.  But there is nothing in the language of Section 1225(b) that

27 limits release to "parole."  Second, Respondents once again ignore that the Ninth

28 Circuit has rejected their argument that Section 1226(c)'s mandatory language

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

authorizes *prolonged* detention.  Likewise here, even if Section 1225(b) were read as authorizing mandatory detention for a short period—with parole the only option for release—the "shall detain" language does not "unambiguously" authorize such detention for a prolonged period of time, particularly without a bond hearing. Rather, the language is silent as for how long such detention is authorized, and what procedures are required if and when detention becomes prolonged.

Moreover, to the extent that there was ever any question as to whether Section 1225(b) could be construed to afford bond hearings, the BIA settled the matter in *Matter of X-K*, 23 I&N Dec. 731 (BIA 2005) by holding that Section 1225(b) allows for bond hearings for noncitizens were arrested and placed in removal proceedings after their entry.  *See* 23 I&N Dec. 731, 731-32, 734-35 (BIA 2005).  In *Matter of X-K*, the BIA first ruled that it was the regulations, *not the statute*, that precluded bond hearings for "arriving aliens."  *See id*. at 735 (citing 8 C.F.R. §§ 1003.19(h)(2)(i)(B), 1235.3(c)).  It then held that those individuals who are subject to detention under Section 1225(b), but who are *not* "arriving aliens," are entitled to bond hearings.  *Id.* at 735-36.

Unable to respond to this decision on the merits, Respondents instead resort to mischaracterizing Petitioners' position, asserting that "Petitioners are flatly incorrect that the BIA ruled that Section 1225(b) does not preclude bond hearings for arriving aliens."  Dkt. 250 at 34 n.12.  But Petitioners never stated that the BIA specifically held that Section 1225(b) permits bond hearings for *"arriving aliens."* Rather, as Petitioners' brief makes clear, Section 1225(b) applies not only to "arriving aliens," but also to other individuals who have entered the country but were never admitted (and therefore are also deemed to be "seeking admission").  It is that class of individuals for whom the BIA found that that Section 1225(b) – notwithstanding its "shall detain" language—does not foreclose bond hearings. *See* Dkt. 232 at 22.

Nonetheless, Respondents continue to rely on the regulations to argue that

21

1  Section 1225(b) class members are not entitled to bond hearings.  Dkt. 250 at 34.

2  But in light of the serious constitutional problems that would be raised by

3  prolonged detention without a bond hearing (*see* Section II.A., *supra*), those

4  regulations must be read to apply only to *brief* detentions, just as the courts in

5  *Diouf II*, *Casas*, and *Tijani*, held that the petitioners subject to prolonged detention

6  in those cases were entitled to bond hearings, notwithstanding a regulation

7  prohibiting bond hearings for people with administratively final removal orders.

8  *See* 8 C.F.R. § 1003.19; *see also Kwong Hai Chew v. Colding*, 344 U.S. 590, 599

9  (1953) (construing regulation to avoid constitutional problems).  If those

10  regulations cannot be construed to permit bond hearings, then they are *ultra vires*.

11  *See* Dkt. 232 at 19.

12  **III.  PETITIONERS WILL CONTINUE TO SUFFER IRREPARABLE**

13  **HARM AS A RESULT OF THEIR PROLONGED DETENTION, THE**

14  **BALANCE OF HARDSHIPS TIPS SHARPLY IN THEIR FAVOR,**

15  **AND AN INJUNCTION IS IN THE PUBLIC INTEREST.**

16  Respondents' discussion of irreparable harm, and in particular their assertion

17  that this motion should be denied due to delay in bringing this motion, ignores the

18  precedent establishing that constitutional deprivations establish irreparable injury.

19  **A.  Purported Delays Do Not Excuse Constitutional Deprivations.**

20  Purported delays cannot justify denying a preliminary injunction where, as

21  here, Respondents do not dispute that prolonged detentions without hearings alone

22  constitute irreparable harm.  *See Goldie's Bookstore, Inc. v. Superior Court*, 739

23  F.2d 466, 472 (9th Cir. 1984) ("An alleged constitutional infringement will often

24  alone constitute irreparable harm."); Federal Practice and Procedure § 2948.1, at

25  161 (2d. 1995) ("When an alleged deprivation of a constitutional right is involved,

26  most courts hold that no further showing of irreparable injury is necessary.").

27  Indeed, this Court already has found that noncitizens suffer irreparable harm if they

28  are unlawfully detained for prolonged periods without a bond hearing.  *See* Exh. 53

1  (Soeth order); Exh. 54 (Martinez order); Exh. 55 (Diouf order).  As a result,

2  Respondents' arguments about delay amounts to nothing more than a pointless

3  distraction.

4         In any event, Respondents ignore the procedural history of this case.

5  Respondents claim that Petitioners "have waited four years to seek preliminary

6  injunctive relief," Dkt. 250 at 3, but Plaintiffs have had to pursue an appeal, file

7  multiple discovery motions to compel responses, and overcome numerous other

8  obstacles raised by Respondents to arrive here.  Equally significant, *Diouf II*

9  became final only after the government declined to seek certiorari on February 24,

10  2012.  *See* Exh. 56 (Supreme Court docket).  The parties engaged in settlement

11  negotiations in light of *Diouf II*, including an in-person meeting on March 13,

12  2012.  *See* Exh. 57 (letter dated March 6, 2012 from Mr. Arulanantham to Mr.

13  Atkinson); Exh. 58 (Rabinovitz Decl.) at ¶¶ 4-6.  It was only after it became clear

14  that the parties could not reach agreement that Petitioners recognized they would

15  need to seek preliminary injunctive relief.  As a result, there is no delay.  But even

16  if Petitioners should have moved for a preliminary injunction the moment they

17  realized settlement discussions were fruitless, instead of three months later, this

18  motion would be timely even under standards employed in cases involving simple

19  business disputes,[16] not violation of constitutional liberty interests.  *See, e.g*.,

20  *Rubbermaid Commercial Products, Inc. v. Contico Intern., Inc.*, 836 F.Supp. 1247,

21  1257 (W.D.Va. 1993) (8 month delay); *Lisa Frank, Inc. v. Impact Intern., Inc.*, 799

22  F. Supp. 980 (D. Ariz. 1992) (7 months delay).

23         In short, the Ninth Circuit has made clear that delay alone should not defeat

24  _____

25  [16] Respondents' cases are readily distinguishable.  The movants in those cases
    could offer no reason for the delay, were not seeking to halt violation of
26  constitutional rights, and/or failed to establish a likelihood of prevailing on the
    merits.  *See Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1376-77
27  (9th Cir. 1985); *Benas v. Shea Mortg., Inc.*, 11CV1461-IEG BGS, 2012 WL
    528244, at *5 (S.D. Cal. Feb. 16, 2012).
28

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1  a claim for preliminary relief.  *See Lydo Enterprises, Inc. v. City of Las Vegas*, 745

2  F.2d 1211 (9th Cir. 1984).  Proof of delay may warrant "consideration in

3  measuring the claim of urgency," *id*., but, as already demonstrated, constitutional

4  deprivation of rights represents an urgent and irreparable harm that justifies

5  injunctive relief regardless of an alleged delay.  Nor can Respondents genuinely

6  dispute that if this Court finds serious violations of rights bearing on liberty

7  interests, including constitutional rights, then the public interest and the balance of

8  hardships favors an injunction.  *See Preminger v. Principi*, 422 F.3d 815, 826 (9th

9  Cir. 2005) ("Generally, public interest concerns are implicated when a

10  constitutional right has been violated, because all citizens have a stake in

11  upholding the Constitution."); *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir.

12  2008) ("[I]t is always in the public interest to protect constitutional rights.").

13  Respondents badly misread *Nken v. Holder*, 556 U.S. 418, 420 (2009) to

14  advocate for a blanket rule that "harm to the Government is harm to the public

15  interest."  Dkt. 250 at 4.  In fact, the Court in *Nken* simply found that with respect

16  to the specific issue in that case—whether a stay is warranted pending a petition

17  for review—that the "public interest" and "harm to the opposing party" "merge

18  when the Government is the opposing party" because "[t]here is always a public

19  interest in prompt execution of removal orders."  *Id*.  Respondents cannot identify

20  any similar public interest favoring continued violation of Petitioners' rights,

21  especially because the relief Petitioners seek is merely the right to bond hearings,

22  not release.

23    **B.    Respondents Should Not Be Allowed To Postpone Relief Until**

24         **Summary Judgment or Trial.**

25  After accusing Petitioners of delaying, Respondents ironically ask this Court

26  to delay addressing these important issues until summary judgment, including on

27  the ground that the preliminary injunction is "essentially" the same as the final

28  relief sought by Petitioners.  Dkt. 250 at 5.  These are assertions are without merit.

24

1   First, Courts routinely grant preliminary injunctions that provide relief similar or

2   identical to relief sought by way of a final judgment,[17] and Respondents have

3   provided no authority that preliminary relief is not warranted in such

4   circumstances.[18]    Second, the prospect of a future summary judgment is not a valid

5   ground for denying an otherwise meritorious request for a preliminary injunction.

6   Again, Respondents fail to cite any authority for allowing irreparable harm to

7   occur in the hopes of forthcoming summary judgment motions.  Third, the Court

8   should not deny preliminary injunctive relief because Respondents have threatened

9   to delay the progress of this case further by seeking an appeal of a ruling on this

10  motion.  *See* Dkt. 250 at 5 (arguing that grant of a preliminary injunction would

11  result in an inefficient use of judicial resources should Respondents decide to

12  appeal).  This Court can and should allow this case to move forward pending any

13  appeal of a preliminary injunction ruling.  Indeed, that is precisely what happened

14  after this Court granted preliminary injunctions in *Diouf* and other individual

15  habeas cases.  *See, e.g.*, Exh. 59 (Ninth Circuit order consolidating this Court's

16  grants of a preliminary injunction and habeas petition in *Diouf*).[19]

17

18  _____

    [17] Indeed, this Court has granted preliminary injunctions to provide bond hearings

19  for immigrants detained for prolonged periods of time, notwithstanding that this
    was the final relief they sought.  *See* Exh. 53 (Soeth order); Exh. 54 (Martinez

20  order); Exh. 55 (Diouf order).

    [18] Respondents also ignore that Petitioners have sought more limited relief than

21  they plan to seek in final judgment.  The instant motion seeks *Casas* hearings for

22  the section 1225(b) and 1226(c) subclasses, whereas Petitioners ultimately will
    seek a permanent injunction to provide hearings for all class members that include

23  certain additional protections, including that the immigration judge must consider
    alternatives to detention, length of future detention, and possibly access to counsel.

24  *See* Dkt. 111 (Third Amended Complaint, Prayer for Relief).

    [19] In any event, Respondents' timeframe is highly speculative.   The motions for

25
    summary judgment will be submitted no sooner than December 7, 2012, with a

26  hearing on the motions tentatively scheduled for February 1, 2013.  *See* Dkt. 237

27  (scheduling order).   But there is no way to predict how long it will take the Court

28  to decide.  If Respondents fail to account for the fact that throughout this period

                                                                    (cont'd)

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1    Finally, Respondents imply that the Court should not grant a preliminary

2    injunction because its ruling would endanger public safety or impinge on the

3    government's ability to control the borders.  Dkt. 250 at 4.  Such scaremongering

4    ignores that Petitioners seek to establish the right to a bond hearing, not the right to

5    release.  Immigration judges can and undoubtedly will consider public safety

6    before granting release on bond (as they and other judicial officers already do in

7    thousands of cases every year).

8

9    Dated:  August 3, 2012                    Respectfully submitted,

10                                              SIDLEY AUSTIN LLP

11

12                                               /s/ *Sean A. Commons*

13                                              Counsel for Petitioners

14

15

16

17

18

19

20

21

22

23

24

25

26

27    Petitioners will continue to be denied access to bond hearings to which they are

28    now clearly entitled under Ninth Circuit law.

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**