1  **AHILAN T. ARULANANTHAM (SBN 237841)**
   aarulanantham@aclu-sc.org
2  **MICHAEL KAUFMAN (SBN 254575)**
   mkaufman@aclu-sc.org
3  **ACLU FOUNDATION OF SOUTHERN CALIFORNIA**
   **1313 West Eighth Street**
4  **Los Angeles, CA 90017**
   **Telephone:  (213) 977-9500**
5  **Facsimile:  (213) 977-5297**

6  *Attorneys for Petitioners*
   **(Additional Counsel listed on following page)**
7

8              UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                  WESTERN DIVISION

11  ALEJANDRO RODRIGUEZ,                )   Case No. CV-07-3239-TJH (RNBx)
    ABDIRIZAK ADEN FARAH, YUSSUF        )
12  ABDIKADIR, ABEL PEREZ RUELAS,       )
    JOSE FARIAS CORNEJO, ANGEL          )
13  ARMANDO AYALA, for themselves and   )   **PETITIONERS' NOTICE OF**
    on behalf of a class of similarly-situated )   **MOTION AND MOTION FOR**
14  individuals,                        )   **SUMMARY JUDGMENT OR, IN**
                                        )   **THE ALTERNATIVE,**
15          Petitioners,                )   **SUMMARY ADJUDICATION;**
                                        )   **MEMORANDUM OF POINTS**
16          v.                          )   **AND AUTHORITIES IN**
                                        )   **SUPPORT THEREOF**
17  ERIC HOLDER, United States Attorney )
    General; JANET NAPOLITANO,          )   Honorable Terry J. Hatter
18  Secretary, Homeland Security; THOMAS )
    G. SNOW, Acting Director, Executive )   Date:  May 6, 2013
19  Office for Immigration Review;      )   Time:  Under Submission
    TIMOTHY ROBBINS, Field Office       )
20  Director, Los Angeles District Immigration )
    and Customs Enforcement; WESLEY LEE, )
21  Officer-in-Charge, Mira Loma Detention )
    Center; et al.; RODNEY PENNER,      )
22  Captain, Mira Loma Detention Center; )
    SANDRA HUTCHENS, Sheriff of Orange  )
23  County; OFFICER NGUYEN, Officer-in- )
    Charge, Theo Lacy Facility; CAPTAIN )
24  DAVIS NIGHSWONGER, Commander,        )
    Theo Lacy Facility; CAPTAIN MIKE    )
25  KREUGER, Operations Manager, James A. )
    Musick Facility; ARTHUR EDWARDS,    )
26  Officer-in-Charge, Santa Ana City Jail; )
    RUSSELL DAVIS, Jail Administrator,  )
27  Santa Ana City Jail,                )
                                        )
28          Respondents.                )

1  JUDY RABINOVITZ
   JRabinovitz@aclu.org
2  AMERICAN CIVIL LIBERTIES FOUNDATION
   IMMIGRANTS' RIGHTS PROJECT
3  125 Broad Street, 18th Floor
   New York, NY  10004
4  Telephone:  (212) 549-2618
   Facsimile:  (212) 549-2654
5
   MICHAEL TAN (SBN 284869)
6  mtan@aclu.org
   AMERICAN CIVIL LIBERTIES FOUNDATION
7  IMMIGRANTS' RIGHTS PROJECT
   39 Drumm St.
8  San Francisco, CA  94111
   Telephone:   (415) 343-0779
9  Facsimile:   (415) 395-0950

10 JAYASHRI SRIKANTIAH (SBN 189566)
   jsrikantiah@law.stanford.edu
11 STANFORD LAW SCHOOL
   IMMIGRANTS' RIGHTS CLINIC
12 Crown Quadrangle
   559 Nathan Abbott Way
13 Stanford, CA  94305-8610
   Telephone:  (650) 724-2442
14 Facsimile:  (650) 723-4426

15 SEAN COMMONS (SBN 217603)
   scommons@sidley.com
16 CODY JACOBS (SBN 272276)
   cjacobs@sidley.com
17 JONATHAN FEINGOLD (SBN 286302)
   jfeingold@sidley.com
18 SIDLEY AUSTIN LLP
   555 West Fifth Street, Suite 4000
19 Los Angeles, CA  90013-1010
   Telephone:  (213) 896-6000
20 Facsimile:  (213) 896-6600

21 *Attorneys for Petitioners*

22

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT, before the Honorable Terry J. Hatter Jr., in Courtroom 17 of the United States District Court for the Central District of California, located at 312 N. Spring Street, Los Angeles, California, Petitioners will and hereby do move the Court under Rule 56 of the Federal Rule of Civil Procedure for summary judgment or, in the alternative, summary adjudication (the "Motion"). Pursuant to the Court's order, this matter is deemed "under submission" until such time as the Court sets the matter for hearing, if at all.

This Motion is made on the following grounds:

- That the failure to provide "*Casas*" bond hearings to all class members no later than six months after being detained violates the Immigration and Nationality Act and the Due Process Clause.

- That, even when class members receive *Casas* bond hearings, those bond hearings lack certain minimal substantive and procedural protections, and therefore violate the Immigration and Nationality Act and the Due Process Clause.

This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities,[1] the concurrently-filed declarations of Ahilan T. Arulanantham, Mercedes Victoria Castillo, Luis E. Gonzalez, Talia Inlender, Cody Jacobs, Michael Kaufman, Dr. Susan Long, Byron Merida, Michael Tan, and Stacy Tolchin, the declaration of Stacy Tolchin filed in opposition to Respondents' request for a stay of this Court's preliminary injunction ruling (Ninth Circuit Case No. 12-56734: Dkt. 3-4), all pleadings and other documents on file with this Court, as well as any other evidence or argument that may be presented before or at the time of the hearing on this Motion.

---

[1] Pursuant to a stipulation approved by the Court, Petitioners obtained permission to file a Memorandum up to fifty (50) pages in length. Dkts. 277-278.

1    This Motion is made following the conference of counsel pursuant to L.R. 7-3,

2    which took place telephonically on several occasions, including Thursday, January 10,

3    2013 and Monday, January 14, 2013.  Respondents oppose this Motion.

4                                                    Respectfully submitted,

5    Dated:   February 8, 2013                        SIDLEY AUSTIN LLP

6

7                                                    By:    /s/ SEAN A. COMMONS

8                                                           SEAN A. COMMONS
                                                           Counsel for Plaintiffs-Petitioners

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF FACTS ......................................................................3

    A.    The Certified Class Is Made Up of Several Hundred Individuals Subject to Prolonged Incarceration In The Central District Each Day. ................................................................................................3

        1.    The Section 1226(c) Subclass .............................................4

        2.    The Section 1225(b) Subclass .............................................7

        3.    The Section 1226(a) and 1231(a) Subclasses .........................10

    B.    The Average Length of Detention Far Exceeds Six Months .............11

    C.    Class Members Endure Detention Under Prison-Like Conditions.....12

    D.    Class Members Do Not Receive Adequate Bond Hearings. ..............15

        1.    Immigration Courts are not required to consider factors relevant to any adequate bond determination. ..........................15

        2.    Immigration courts are not required to ensure certain minimal procedural protections. ................................................19

    E.    Providing Adequate Bond Hearings Will Not Impose a Substantial Burden on Respondents.......................................................20

STANDARD...........................................................................................21

ARGUMENT.........................................................................................21

I.    The General Immigration Detention Statutes and the Due Process Clause Require The Protections of *Casas* Hearings for all Class Members. ..................................................................................................21

    A.    Prolonged Detention Without a *Casas* Hearing Violates Due Process....................................................................................................21

    B.    The Court Should Construe the Immigration Detention Statutes At Issue Here to Require a *Casas* Hearing. ..................................24

II.    The Court Should Construe the INA to Require Protections in Addition to Those Provided in *Casas* To Avoid the Constitutional Problems That Would Otherwise Be Presented.......................................................26

    A.    The Court Should Require a More Robust Substantive Standard at Prolonged Detention Bond Hearings To Avoid the Due Process Problems That Would Otherwise Be Presented.................................27

i

B.   As a Threshold Matter, Immigration Judges Should Not Permit Detention Unless a Noncitizen Is Significantly Likely to Be Removed Upon the Conclusion of Proceedings in His Case. ............29

C.   At Prolonged Detention Bond Hearings, the Immigration Judge Must Consider the Length of Past and Likely Future Detention. .......31

D.   Before Approving Continued Prolonged Detention, an Immigration Judge Must Find that No Conditions Short of Incarceration Would Satisfy the Government's Interests in Preventing Danger and Flight. ...........................................35

III.   The Court Should Construe the INA to Require Additional Procedural Protections Beyond Those Provided in *Casas* Hearings, to Avoid the Due Process Problems That Would Otherwise Result. .................................39

A.   The Private Interest, Freedom From Prolonged Detention, is Substantial. ...........................................40

B.   The Government's Failure to Provide Periodic Hearings and Sufficient Notice Creates a High Risk of Erroneous Deprivation. ......40

C.   Substitute Procedures Would Place a Minimal Burden on the Government. ...........................................46

CONCLUSION ..................................................................................47

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3
CASES

4
*Aguilar v. U.S. Immigration & Customs Enforcement*,

5
510 F.3d 1 (1st Cir. 2007)..................................................................28

6
*Califano v. Yamasaki*,

7
442 U.S. 682 (1979).........................................................................3

8
*Camins v. Gonzales*,

9
500 F.3d 872 (9th Cir. 2007) .............................................................10

10
*Casas-Castrillon v. DHS*,

11
535 F.3d 942 (9th Cir. 2008) ......................................................*passim*

12
*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).......................................................................21

13
*Clark v. Martinez*,

14
543 U.S. 371 (2005).......................................................................24

15
*Correctional S'vces Corp. v. Malesko*,

16
534 U.S. 61 (2001).........................................................................44

17
*Demore v. Kim*,

18
538 U.S. 510 (2003)................................................................*passim*

19
*Diouf v. Mukasey*,

20
542 F.3d 1222 (9th Cir. 2008) ...........................................................34

21
*Diouf v. Napolitano (Diouf II)*,
634 F.3d 1081 (9th Cir. 2011) ....................................................*passim*

22

23
*Doe v. Gallinot*,
657 F.2d 1017 (9th Cir. 1981) ...........................................................41

24

25
*Foucha v. Louisiana*,
504 U.S. 71 (1992).........................................................................23

26
*French v. Blackburn*,

27
428 F.Supp. 1351 (M.D.N.C. 1977) ....................................................44

28

iii

*Goldberg v. Kelly*,
   397 U.S. 254 (1970)...................................................................................23

*Gonzalez v. O'Connell*,
   355 F.3d 1010 (7th Cir. 2004) ..............................................................25

*Guzman-Martinez v. Corr Corp. of Am.*,
   CV 11-02390-PHX-NVW,
   2012 WL 2873835 (D. Ariz July 13, 2013).........................................13

*In re Gault*,
   387 U.S. 1 (1967)...................................................................................39

*Jones v. Blanas*,
   393 F.3d 918 (9th Cir. 2004) ................................................................36

*Kane v. Winn*,
   319 F. Supp. 2d 162 (D. Mass 2004)....................................................28

*Martinez de Bojorquez v. Ashcroft*,
   365 F.3d 800 (9th Cir. 2004) .........................................................44, 46

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)........................................................................31, 40

*Matter of Carlos Alberto Flores-Lopez*,
   2008 WL 762690 (BIA Mar 05, 2008)...................................................6

*Matter of Guerra*,
   24 I. & N. Dec. 37 (BIA 2006) ....................................................*passim*

*Matter of Joseph*,
   22 I. & N. Dec. 799 (BIA 1999) ..................................................*passim*

*Memphis Light, Gas and Water Division v. Craft*,
   436 U.S. 1 (1978)...................................................................................23

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)...............................................................................42

*Nadarajah v. Gonzales*,
   443 F.3d 1069 (9th Cir. 2006) .......................................10, 23, 25, 30

iv

*Orantes-Hernandez v. Gonzales*,
    504 F.Supp. 2d 805 (C.D. Cal. 2007) ................................................................. 43

*Orantes-Hernandez v. Smith*,
    541 F.Supp. 351 (C.D. Cal. 1982) ..................................................................... 42

*Owino v. Napolitano*,
    575 F.3d 952 (9th Cir. 2009) ........................................................... 27, 29, 36

*Padilla-Agustin v. INS*,
    21 F.3d 970 (9th Cir. 1994) .............................................................................. 42

*Range Road Music, Inc. v. East Coast Foods, Inc.*,
    668 F.3d 1148 (9th Cir. 2012) ......................................................................... 21

*Stanley v. Illinois*,
    405 U.S. 645 (1972) .......................................................................................... 13

*Tijani v. Willis*,
    430 F.3d 1241 (9th Cir. 2005) ................................................................ *passim*

*United States v. Ailemen*,
    165 F.R.D. 571 (N.D. Cal. 1996) ................................................................. 33, 36

*United States v. Hare*,
    873 F.2d 796 (5th Cir. 1989) ........................................................................... 33

*United States v. Miller*,
    991 F.2d 552 (9th Cir. 1993) ........................................................................... 13

*United States v. Ojeda Rios*,
    846 F.2d 167 (2d Cir. 1988) ............................................................................ 33

*United States v. Salerno*,
    481 U.S. 739 (1987) ............................................................................ 22, 27, 35

*United States v. Wehrbein*,
    61 F. Supp. 2d 958 (D. Neb. 1999) ................................................................. 28

*V. Singh v. Holder*,
    638 F.3d 1196 (9th Cir. 2011) ................................................................ *passim*

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ................................................................. 42, 44

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972).............................................................................. 13

*Zadvydas v. Davis,*
   533 U.S. 678 (2001)......................................................................*passim*


**FEDERAL STATUTES, RULES & REGULATIONS**

8 U.S.C. § 1101(a)(13)(C) ....................................................................10

8 U.S.C. § 1182(a)(2) ..............................................................................4

8 U.S.C. § 1182(d)(5)(A) .........................................................................7

8 U.S.C. § 1225(b) ...........................................................................*passim*

8 U.S.C. § 1226(a) ...........................................................................*passim*

8 U.S.C. § 1226(c) ...........................................................................*passim*

8 U.S.C. § 1226a .....................................................................................3

8 U.S.C. § 1227(a)(2)(A)(iii) ..................................................................4

8 U.S.C. § 1231(a) ...........................................................................*passim*

8 U.S.C. §§ 1531-37 ................................................................................3

18 U.S.C. § 3142................................................................................35-36

8 C.F.R. § 1.2 ..........................................................................................7

8 C.F.R. § 241.4(f) ................................................................................34

8 C.F.R. § 1003.19(h)(2)..................................................................... 5-7

Fed. R. Civ. P. 56................................................................................21

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

1

STATE STATUTES

2

Cal. Penal Code § 1270(a) (2012) ................................................................38

3

Conn. Gen. Stat. § 54-63b..........................................................................38

4

725 Ill. Comp. Stat. .....................................................................................38

5

Ky. R. Crim. Pro. 4.12 ................................................................................38

6

Or. Rev. Stat. § 135.245..............................................................................38

7

8

9

OTHER AUTHORITIES

10

Dora Schriro, U.S. Dep't of Homeland Sec., Immigration Detention Overview
     and Recommendations 10, 15 (2009), *available at*
     http://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf ..........20

11

12

Executive Office for Immigration Review FY 2011 Statistical Yearbook G1,
     *available at* http://www.justice.gov/eoir/statspub/syb2000main.htm...............40

13

14

James Austin et al., The JFA Institute, Florida Pretrial Risk Assessment
     Instrument (2012), *available at*
     http://www.pretrial.org/Setting%20Bail%20Documents/FL%20Pretrial%20
     Risk%20Assessment%20Report%20(2012).pdf .................................................35

15

16

17

Judicial Business of the United States Courts, App. B-4C, *available at*
     http://www.uscourts.gov/Statistics/ ......................................................32

18

19

Julie Dona, *Making Sense of "Substantially Unlikely":  An Empirical Analysis
     of the Joseph Standard in Mandatory Detention Custody Hearings* 5 (June 1,
     2011) (forthcoming in Georgetown Immigration Law Journal), *available at*
     http://ssrn.com/abstract=1856758 ..................................................... 6-7

20

21

22

Partnership for Community Excellence, Pretrial Detention & Community
     Supervision:  Best Practices and Resources for California Counties,
     *available at* http://caforward.3cdn.net
     /7a60c47c7329a4abd7_2am6iyh9s.pdf. ...........................................38

23

24

25

Pretrial Services of Harris County, Texas, 2011 Annual Report 20-21, *available
     at h*ttp://www.harriscountytx.gov/CmpDocuments/59/Annual%20Reports
     /2011%20Annual%20Report-0410.pdf ...............................................38

26

27

28

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

1

Restatement 2nd Torts § 693 cmt. f..........................................................................13

2

Richard A. Boswell, Essentials of Immigration Law 49 (2006) ...............................4

3

U.S. Dep't of Justice – Bureau of Justice Statistics, Pretrial Release and
    Misconduct in Federal District Courts, 2008-2010 (Nov. 2012), *available at*
    http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail..................................................35

Vera Institute of Justice, Testing Community Supervision for the INS:  An
    Evaluation of the Appearance Assistance Program (Aug. 1, 2000), *available
    at* www.vera.org/download?file=211/aap.pdf............................................19, 37

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

# INTRODUCTION

This motion seeks to vindicate the most basic protection universally afforded to incarcerated persons:  the right to be heard in a meaningful manner regarding whether further incarceration is necessary.  Petitioners are a class of immigrants whom Respondents have incarcerated for more than six months while their cases remain pending.  Petitioners seek to vindicate their rights in two respects.  *First*, they seek an order requiring Respondents to provide class members the protections already due to them under settled Ninth Circuit law:  a transcribed hearing before an Immigration Judge where the government must show, by clear and convincing evidence, that continued detention is justified (known as a "*Casas* hearing").  *Casas-Castrillon v. ICE*, 535 F.3d 942 (9th Cir. 2008); *V. Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011). *Second*, they seek an order compelling Respondents to make those hearings constitutionally *adequate*, which requires providing certain minimal substantive and procedural protections beyond those already specified under *Casas* and its progeny.

The answer to the first question presented – whether all class members are entitled to a *Casas* hearing – is clear given existing Ninth Circuit Law as well as this Court's recent preliminary injunction ruling.  The Ninth Circuit already requires *Casas* hearings for individuals detained under two of the four statutes the government has used to incarcerate class members – 8 U.S.C. §§ 1231(a) and 1226(a).  *See Diouf v. Napolitano (Diouf II)*, 634 F.3d 1081 (9th Cir. 2011); *Casas-Castrillon*, 535 F.3d 942.  For class members incarcerated under the remaining two detention statutes, 8 U.S.C. §§ 1226(c) and 1225(b), this Court held in its preliminary injunction ruling that these same authorities require *Casas* hearings for those detainees as well.  Dkt. 255.  Because that precedent dictates the result here, the Court should grant summary judgment as to Petitioners' claim that all class members are entitled to *Casas* hearings. *See infra* Argument Section § I.

Similarly, the Court does not need to wade through disputed questions of fact to resolve the second form of relief Petitioners seek – adequate hearings.  Petitioners

contend *first*, as a substantive matter, that the standard Immigration Judges apply in *Casas* hearings should (a) require release if removal is not significantly likely (because, for example, the detainee is from a country with which the United States lacks diplomatic relations); (b) consider the length of past and likely future detention; and (c) require release unless the government can demonstrate that no conditions short of detention can satisfy its interests in preventing danger and flight. *Second*, as a procedural matter, prolonged detention bond hearings (a) should occur automatically—without incarcerated class members having to make a request, (b)periodically, every six months for those detained for a year or more, and (c) that Respondents should be required to provide adequate notice of the hearings in plain language, sufficient to inform detainees about the hearings and to afford them an opportunity to prepare for them.

It is undisputed that Respondents do not require Immigration Judges to consider those basic factors as part of the substantive standard governing bond hearings, and similarly undisputed that they do not follow the basic procedural practices Petitioners advocate, because Respondents do not believe they are required to do so. Respondents do not require Immigration Judges to consider whether physical removal is significantly likely, the length of detention, or the possibility of alternatives to detention.  Respondents also do not notify class members that they can request bond hearings at six months, or make such hearings available at further six month intervals for individuals detained for over a year.  And the method of Respondents' notice – when any notice is provided – sheds no light on the nature of a bond hearing or the bond hearing process; it contains one vague sentence about the right to seek review of detention.

Consequently, Petitioners seek relief through this motion for summary judgment or, alternatively, summary adjudication.

**STATEMENT OF FACTS**

This motion turns on Respondents' policies and procedures, which do not afford class members detained for six months or longer adequate bond hearings. While the material facts needed to resolve this motion are few, Petitioners also set forth the context and background for these policies to underscore the irreparable harm they have caused and continue to cause class members and their families.

A.    **The Certified Class Is Made Up of Several Hundred Individuals Subject to Prolonged Incarceration In The Central District Each Day.**

This action is brought on behalf of a class of immigrant detainees in the Central District of California who are or will be incarcerated for more than six months pursuant to four general immigration detention statutes – 8 U.S.C. §§ 1225(b), 1226(a), 1226(c), and 1231(a) – and have not been afforded an adequate hearing to determine whether their prolonged detention is justified.  Dkt. 101-1 at 8.  The class definition excludes persons detained pursuant to certain national security detention statutes – 8 U.S.C. §§ 1226a, 1531-37 – and people subject to final orders of removal who have not obtained stays of those removal orders such that the government has present authority to deport them.  *Id*. at 15.

Rosters of class members produced by Respondents confirm that the class consists of several hundred such individuals on any given day, some of whom have been detained for years without ever being afforded a bond hearing.  Declaration of Ahilan Arulanantham Dec. ¶¶ 2-3; Expert Report of Professor Susan B. Long at 6 (Declaration of Susan B. Long Ex. A).

In addition, Petitioners obtained extensive discovery through the course of this litigation that has made possible a detailed description of the system they challenge and the harms that class members suffer in it.  Petitioners obtained extensive information concerning a group of approximately 1,000 detainees (hereinafter the "studied class members") including large portions of their immigration files ("A files") and extensive database information that tracked their cases over the course of

3

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

two and a half years.  Dr. Susan Long, the co-director of the Transactional Records Access Clearinghouse, the country's foremost resource for statistical analysis of immigration detention data, conducted a thorough evaluation of the data concerning those individuals.  *See* Long Dec. ¶ 4 Exs. A-B.

### 1.    *The Section 1226(c) Subclass*

Respondents detain roughly half of the class under the mandatory detention regime of 8 U.S.C. § 1226(c) (the "Section 1226(c) Subclass").  *See* Long Rep. at 17 (Long Dec. Ex. A); Declaration of Michael Kaufman ¶¶ 6-25 (explaining procedures for identifying members of the Section 1226(c) Subclass); Declaration of Jennifer Stark ¶ 15 (Dkt. 101, Ex. 26).  Immigrants become subject to Section 1226(c) if Immigration and Customs Enforcement ("ICE") officials believe that they have been convicted of any one of a broad range of crimes, including not only "aggravated felonies" – which need not be either "aggravated" or "felonies" – but also  simple drug possession offenses and certain misdemeanors.  8 U.S.C. §§ 1182(a)(2)(A)(i)(I), 1182(a)(2)(C), 1226(c)(1), 1227(a)(2)(A)(iii).[2]  ICE officers may classify detainees as subject to mandatory detention without even speaking with the detainees themselves.  Deposition of Wesley Lee at 208:12-209:21 (Jacobs Dec. Ex. F).[3]

Prior to this Court's preliminary injunction order, if an ICE officer (not an attorney) determined that a class member had been convicted of an offense triggering mandatory detention, the class member was classified as a "mandatory detainee" and deemed ineligible for release on bond, regardless of their individual circumstances.  *See* Deposition of Eric Saldana at 37:12-20 (Declaration of Michael Tan Ex. F).  In other words, Respondents provided these individuals with *no* avenue to challenge detentions based on lack of danger to the community, lack of flight risk, the likelihood

---

[2] *See generally* Richard A. Boswell, Essentials of Immigration Law 49 (2006).

[3] ICE officers unsure about how to classify detainees based on criminal history rely on the opinions of the same ICE attorneys who prosecute immigration cases.  *See* Deposition of Eric Saldana at 52:10 – 53:16 (Declaration of Michael Tan Ex. F).

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

of prevailing on their claims, the likelihood that they were not removable, or the fact that they won their case but remained detained only because ICE had appealed. *See* Deposition of Thomas Fong at 46:6-9, 88:23-89:21 (Jacobs Dec. Ex. E).

For example, Respondents detained Petitioner Jose Farias Cornejo – a member of the Section 1226(c) Subclass who ultimately obtained relief from removal – for more than 15 months without a bond hearing, even though he is a long-time lawful permanent resident with strong family ties and a successful school and work history. *See* Dkt. 148; *see also* Tan Dec. ¶¶ 19-20; 31-35 (summarizing A file information showing that a large number of Section 1226(c) Subclass members have family ties, including U.S. spouses and children, and lengthy periods of residence in the United States). The government did not oppose his request for relief from removal, yet continued to detain him. *See* Arulanantham Dec. ¶¶ 22-25; Dkt. 156 (Notice of Withdrawal of Motion for a Preliminary Injunction) (observing that Farias was released after he won his case and ICE declined to appeal). Other studied class members – members of the group of approximately 1,000 detainees about whom Petitioners obtained detailed information – experienced similar fates. One individual, for instance, was subjected to mandatory detention for nearly eleven months even though ICE lacked proof that he had been convicted of a triggering offense from the outset and eventually did not oppose his motion to terminate the proceedings. Arulanantham Dec. ¶¶ 59-64. Indeed, Dr. Long's study concluded that more than 10% of the studied class members in the Section 1226(c) Subclass won their cases by obtaining terminations of the proceedings brought against them. Long Rep. at B-4 (Long Dec. Ex. A). About 1 in 3 won their cases by obtaining relief from removal – relief which in many cases the government chose not to appeal. Long Rep. at B-4, Tables 24 & 25 (Long Dec. Ex. A).

But for this Court's preliminary injunction order, however, class members subject to removal and classified as mandatory detainees under Section 1226(c) would only be able to challenge their *classification* as mandatory detainees. *See* 8 C.F.R.

§ 1003.19(h)(2)(ii).  In general, the only possible escape from mandatory detention is to show that the government is "substantially unlikely to establish" the charges allegedly triggering mandatory detention.  *Matter of Joseph*, 22 I. & N. Dec. 799, 801 (BIA 1999).  Such a challenge can occur in what is known as a "*Joseph*" hearing.  *See Demore v. Kim*, 538 U.S. 510, 514 n.3 (2003) (describing "*Joseph*" hearings). However, individuals classified as "mandatory detainees" are not informed of their right to request a *Joseph* hearing.  *See* Lee Dep. at 207:19 - 208:6 (Jacobs Dec. Ex. F). The form provided to immigrants simply does not disclose that right.  *See* Lee Dep. at 208:18-209:4 (Jacobs Dec. Ex. F).  Instead, it states that they "cannot have a bond hearing," discouraging them from pursuing any recourse whatsoever.  *Id.*; *see also* Lee Dep. at 243:16-22 (Jacobs Dec. Ex. F).  Notably, despite twenty years of service as an Immigration Judge, the Assistant Chief Immigration Judge for a large portion of the western United States could not recall ever having conducted a *Joseph* hearing or receiving a question from another judge about a *Joseph* hearing.  Fong Dep. at 68:9-24 (Jacobs Dec. Ex. E).

*Joseph* hearings also are not equivalent to normal bond hearings.  To obtain a bond at a *Joseph* hearing, detainees must convince an Immigration Judge that the government is "substantially unlikely to prevail" on its decision to classify them as mandatory detainees.  *Joseph*, 22 I. & N. Dec. at 799.  This burden is "all but insurmountable."  *Tijani v. Willis*, 430 F.3d 1241, 1246 (9th Cir. 2005) (Tashima, J., concurring).  In effect, to prevail, a detainee needs to prove that ICE's classification of him as a mandatory detainee was frivolous.  *See, e.g.*, *Matter of Carlos Alberto Flores-Lopez*, No. A43738693, 2008 WL 762690, at * (BIA Mar 05, 2008) (finding for ICE in *Joseph* challenge despite unpublished decision from governing Circuit Court finding triggering conviction was not a removable offense); Julie Dona, *Making Sense of "Substantially Unlikely":  An Empirical Analysis of the Joseph Standard in Mandatory Detention Custody Hearings* 5 (June 1, 2011) (forthcoming in Georgetown Immigration Law Journal), *available at* http:// ssrn.com/abstract=1856758 (reviewing

6

*Joseph* decisions reported on Westlaw between November 2006 through October 2010 and finding that the BIA construes the 'substantially unlikely' standard "to require that nearly all legal and evidentiary uncertainties be resolved in favor of the ICE"). Examination of the studied class members' files reveals examples of individuals with strong challenges to the charges against them who nonetheless remained subject to mandatory detention. Arulanantham Dec. ¶¶ 20-71 (providing nine summaries of the files of individuals subject to mandatory detention for prolonged periods of time who suffered great hardship (as did their families) before winning their cases).

## 2. *The Section 1225(b) Subclass*

Many class members have been detained under 8 U.S.C. § 1225(b) ("Section 1225(b)") as "arriving aliens" who are "seeking admission." *See* 8 C.F.R. § 1.2 (defining term "arriving alien"). Most of the individuals in the Section 1225(b) Subclass were arrested at ports of entry into the United States, often while seeking asylum. The overwhelming majority have no criminal history and have come here to seek refuge from their home countries. Lee Dep. at 33:11-12 (Jacobs Dec. Ex. F).

Prior to this Court's preliminary injunction order, Respondents incarcerated those asylum seekers for months or years without providing bond hearings. Respondents interpret Section 1225(b) and 8 C.F.R. § 1003.19(h)(2)(i)(B) as granting unfettered discretion to ICE officers about whether to detain or release class members, without *any* possibility for review by an Immigration Judge. *See* Lee Dep. at 18:12-16, 118:23-119:9 (Jacobs Dec. Ex. F).[4] The officers determine if detainees are eligible for release on parole – a form of discretionary released under 8 U.S.C. § 1182(d)(5)(A), which requires a showing that release is necessary for an "urgent

---

[4] Wesley Lee, the Assistant Field Office Director of the Los Angeles Field Office, was designated as the government's 30(b)(6) witness to testify as the person – most – knowledgeable concerning the parole and POCR processes, release determinations, and notice provided for *Casas* hearings and *Joseph* hearings. *See* Lee Dep. at 12:11-12 (Jacobs Dec. Ex. F); Petitioners' Motion for a Preliminary Injunction, Exhibits 46-47 (Dkt. 232-2).

7

humanitarian reason" or to create a "significant public benefit" – using "worksheets" approved by supervisory officers who typically do not interview detainees.  Lee Dep. at 16:3-10, 134:16-20 (Jacobs Dec. Ex. F).

ICE officers considering such parole requests generally focus on evidence of identity, the existence of a community "sponsor" for the detainee, as well as danger or flight risk.  Lee Dep. at 100:10-23 (Jacobs Dec. Ex. F).  In practice, those factors permit ICE officers to deny parole for a variety of reasons.  For example, officers denied release to one torture victim from Ethiopia because he allegedly failed to present "incontrovertible" evidence of an address where he would reside with a sponsor and failed to prove his identity – despite having submitted a government identity document with his photograph.  *See* Arulanantham Dec. ¶ 94.  He won his case, but spent six additional months in detention after being denied release on parole. *Id.* [5]  Some parole decisions are influenced by available bed space at detention facilities, Lee Dep. at 40:10-41:5 (Jacobs Dec. Ex. F), or an officer's prior experience with other detainees allegedly of the same nationality.  Arulanantham Dec. ¶¶ 88, 94.  ICE officers do *not* consider how long an individual has been detained, Lee Dep. at 124:14-16, whether or not the individual is likely to win his or her case, whether the individual can even be repatriated in the event they lose their case, or whether an alternative to detention could satisfy the government's interests in preventing danger or flight risk.  Lee Dep. at 100:10-23 (Jacobs Dec. Ex. F); Arulanantham Dec. ¶¶ 72-76.

The procedures governing parole decisions are equally deficient.  Based on the documents obtained during discovery, officers are not required to keep formal records of conversations with detainees.  *See* Arulanantham Dec. ¶¶ 73, 88.  For these and other reasons, "there's no way" to catch investigative errors by these officers, Lee

---

[5] In contrast, the presence or absence of evidence of a sponsor plays no role in the Post Order Custody Review process.  Lee Dep. at 129:1-7 (Jacobs Dec. Ex. F).

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

Dep. at 175:5-12 (Jacobs Dec. Ex. F), who may interview non-native English speakers in English or without reliable translation services. Arulanantham Dec. ¶ 101 (describing documents showing that officers used other detainees to translate for asylum seekers requesting release pending decision on their cases); ¶ 97 (describing asylum seeker denied parole where parole documents mentioned name of some other person; asylum seeker won his case after 319 days of incarceration). Officers make final parole decisions simply by checking a box on a form that contains no specific explanation and reflects no individualized deliberation. *See* Lee Dep. at 106:18 - 107:23 (Jacobs Dec. Ex. F); *see, e.g.*, Arulanantham Dec. ¶¶ 74, 82-83, 88, 94, 97. No procedure exists for disclosing to detainees what evidence an officer considered or relied upon to reach a decision. Lee Dep. at 108:8-12 (Jacobs Dec. Ex. F).[6] Class members cannot appeal these decisions. *See* Lee Dep. at 18:12-16; 97:15 - 98:15; Arulanantham Dec. ¶ 73.

Based on the more than 1,000 records produced by Respondents concerning the studied class members, over 96% of the individuals in the 1225(b) Subclass applied for relief from removal, and over 60% won their cases. Long Rep. at C-1 (Long Dec. Ex. A).[7] Even in instances when individuals lost on the merits, many were released from detention because they could not be removed. Long Rep. at C-3. Only 10% of the 1225(b) Subclass members in the studied class member group were ultimately deported during the time period during which the data was drawn, Long Rep. at C-3,

---

[6] In contrast, Immigration Judges generally do not consider secret evidence in bond hearings. Fong Dep. at 176:24 - 177:24 (Jacobs Dec. Ex. E).

[7] For the class as a whole, more than 70% applied for relief, and approximately a third won their cases. Long Rep. at 9, 15, Table 7 (Long Dec. Ex. A); Rebuttal Report of Professor Susan B. Long at 14 (Long Dec. Ex. B). In contrast, amongst all immigration detainees held at the Mira Loma detention facility (the detention center with the highest population of class members during the time period when the data was drawn) only 7% win their cases. Long Rep. at 15 (Long Dec. Ex. A). In contrast, *less than half* of the studied class members were actually removed during the time period from which data was drawn. Expert Report of Susan Long, at 12 (Long Dec. Ex. A).

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

1  yet members of the Subclass as a whole were detained on average for nearly one year.

2  Long Rep. at C-1.[8]

3  ### 3.   *The Section 1226(a) and 1231(a) Subclasses*

4  The remaining class members are incarcerated under 8 U.S.C. § 1226(a) and 8

5  U.S.C. § 1231(a).  These subclass members should already receive *Casas* hearings

6  under existing Ninth Circuit law.  In 2008, *Casas* construed Section 1226(a) to require

7  a bond hearing where the government bears the burden of proof in a case involving an

8  individual subject to prolonged detention.  *Casas*, 535 F.3d at 951.  In 2011, *Diouf II*

9  extended the rule established in *Casas* to detainees held under Section 1231(a)(6).

10 *Diouf II*, 634 F.3d at 1086.  *Diouf II* also held that detention becomes "prolonged"

11 after six months, and therefore held that detainees incarcerated under Section

12 1231(a)(6) are also entitled to "*Casas*" bond hearings.

13 Before *Casas* and *Diouf II*, some individuals in the Section 1226(a) and 1231(a)

14 subclasses received only what is known as a Post Order Custody Review ("POCR")

15 process for determining whether they could be released from detention.  The

16 government applied the POCR process to all individuals incarcerated pending judicial

17 review of their removal cases prior to *Casas* in 2008, and continued to use it as the

18 exclusive method for review of a subset of such cases until *Diouf II* in 2011.  *See*

19 Arulanantham Dec. ¶¶ 103-05, 157-58.  At the present time, to the extent the

20 government is complying with those decisions, all individuals in those subclasses

21 should be receiving *Casas* hearings once they have been detained for six months.[9]

22

23 [8] ICE also uses the parole process for arriving non-citizens who have previously resided in the United States.  Thus, even long-time lawful permanent residents returning from brief trips abroad are ineligible for bond hearings if, for example, they

24 have been convicted of crimes involving moral turpitude (a very broad category of offenses) at any point in their past.  *See* 8 U.S.C. § 1101(a)(13)(C); *Nadarajah v.*

25 *Gonzales*, 443 F.3d 1069, 1077 (9th Cir. 2006) (recognizing that lawfully-admitted non-citizens are detained under Section 1225(b)); *Camins v. Gonzales*, 500 F.3d 872,

26 876 (9th Cir. 2007) (petition for review filed by returning lawful permanent resident who was treated as an "alien seeking admission" subject to detention under Section

27 1225(b) and therefore ineligible for a bond hearing).

28 [9] Since this Court granted Petitioners' Motion for Preliminary Injunction on behalf of

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

### B.   The Average Length of Detention Far Exceeds Six Months

Even applying a method described by Respondents' expert that undoubtedly undercounts many individuals' detention length, the data concerning the studied class members shows that they have been detained on average for at least 334 days – *approximately eleven months* – without being afforded adequate bond hearings. Rebuttal Report of Dr. Chester Palmer at 6, Table L-2 (Kaufman Dec. Ex. M).[10]  The average was far higher for roughly a third of the studied class members, who pursued appeals either to the BIA – 448 days – or the Ninth Circuit – 667 days.  Long Rep. at 8 (Long Dec. Ex. A).  Indeed, over 20% of the studied class members were detained for *at least 18 months*, while close to 10% were detained for *more than two years*. *Id.* at 7.

These numbers, however, do not fully capture the average length of detentions because the statistical data Petitioners obtained during discovery represent only a snapshot in time for a limited period.  *Id.* at 1-5.  Roughly 5% of the studied class

---

the class members who still do not receive at least some bond hearing, *see* Dkt. 255, the government has attempted to limit the effect of that order by excluding certain class members from the class through an implausibly narrow interpretation of the class definition.  Respondents' counsel has claimed that the phrase "removal proceedings" in the class definition is itself a technical term that must be read narrowly to encompass only one particular form of proceedings amongst the government's typology of proceedings that take place for the purpose of determining whether to remove people from the United States.  As a result, Immigration Judges have continued to deny bond hearings to some individuals detained for six months with pending cases even after this Court's preliminary injunction ruling, based on the claim that such individuals are not in "removal proceedings."  *See* Kaufman Dec. ¶ 30.  For this reason, Petitioners request that the Court clarify that, as Petitioners unambiguously stated when they sought the preliminary injunction, *see* Dkt. 232, the class definition encompasses *all* immigration detainees other than those explicitly exempted from the definition – those detained under two specific national security statutes and those detained even though the government has authority to deport them.

[10] Petitioners' expert Dr. Long determined the average length of detention to be 404 days and the median to be 345 days – i.e., that more than half of the class had been detained for nearly one year without a bond hearing.  Long Rep. at 3, 6 (Long Dec. Ex. A).  Dr. Long's rebuttal report explains in detail why her methodology more accurately summarizes the experience of class members than does the government's expert.  *See* Long Rebuttal Rep. at 17-22 (Long Dec. Ex. B).  The discrepancy, however, is not material for this motion, because Petitioners seek to establish as a matter of law the right to a *Casas* hearing at six months.

---

11

members remained in detention at the time the data was taken. *Id.* at 5, 6. In fact, one of the individuals in the data who remained in detention at the time of the snapshot had already been detained for 1,585 days – more than four years. *Id.* at 6.

The data concerning the studied class members also revealed that a remarkably large number of them win their cases. By one measure, more than 30% of the studied class were ultimately found to have a right to remain in this country. Long Rebuttal Rep. at 15 (Long Dec. Ex. A). Some of these individuals remain detained for extremely long periods of time. Named plaintiff Alejandro Rodriguez, for example, won his case after being detained for 1,189 days. *See* Arulanantham Dec. ¶¶ 159-64; *see also id.* at ¶¶ 53-54, 55-56, 78-84, 117-35, 165-70 (summarizing examples of class members held for 512, 561, 608, 682, 764, and 796 days). In other cases, class members spent years incarcerated before being released on bond after they finally won the right to a bond hearing because their case had reached the Court of Appeals and became eligible for a *Casas* hearing. One such individual was detained for 796 days despite having served only four days for the conviction that triggered his removal proceeding. He was released when he finally received a *Casas* bond hearing before an Immigration Judge. *See id.* at ¶¶ 148-50.

## C. Class Members Endure Detention Under Prison-Like Conditions.

The class members subject to prolonged detentions live under conditions not meaningfully distinguishable from those in prisons – which is unsurprising given that many are housed in jails used to house criminal inmates. Immigration detention centers in the Central District are locked-downed facilities, several of which are run by county sheriff or city police officials. Declaration of Talia Inlender ¶¶ 6-7. Immigration detainees are required to wear jail uniforms at all times. *Id.* at ¶ 7. Their movements are limited to certain areas, and, at some facilities, severely restricted, such that some detainees spend most of their days in cells or dorms. *Id.* Detainees have limited access to libraries, which have sparse resources. *Id.* at ¶ 11; Declaration of Byron Merida ¶¶ 13-18. Similarly, internet access is either non-existent or limited.

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

Inlender Dec. ¶ 11.  At certain facilities, library access to legal information has been unavailable for weeks or months.  Merida Dec. ¶ 18; *see generally Guzman-Martinez v. Corr Corp. of Am.*, CV 11-02390-PHx-NVW, 2012 WL 2873835, at *7 (D. Ariz. July 13, 2012) (describing published accounts concerning the conditions of immigration detention facilities, which "found that the lack of resources, insufficient standards, and failure to adequately staff and monitor personnel and practices at immigration detention facilities present serious risks to the health, well-being, and legal rights of all detainees, especially for vulnerable populations and transgender women detainees.").

Like other persons subjected to prison-like conditions, class members experience innumerable personal deprivations.  Class members and their families necessarily suffer from the loss of each other's day-to-day society, companionship, and affection – fundamental rights protected at common law, under Constitutional jurisprudence, and under international law.  *See Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972); *Wisconsin v. Yoder*, 406 U.S. 205, 213-14, 232 (1972); Restatement 2nd Torts § 693 cmt. f; *see also, e.g.*, *United States v. Miller*, 991 F.2d 552, 553 n.1 (9th Cir. 1993) ("disruption of the parental relationship when a parent is imprisoned almost always exposes children to the risk of psychological harm"), *abrogated on other grounds*, 518 U.S. 81 (1996)

Information from the files of studied class members showed that, leaving aside the asylum seekers who have no prior contact with the United States, nearly 60% of those on whom data was available had U.S. citizen children.  Tan Dec. ¶¶ 15-20 (summarizing A file information showing class members' family ties).  Class members generally are permitted only limited contact with their children and other family and friends – they talk by phone through a see-through window for, at most, a few hours per week.  Inlender Dec. ¶¶ 8-9.  Direct, in-person contact with family and friends generally is not permitted.  *Id.*  In addition, class members cannot participate in important family and social functions.  For example, one studied class member who

13

PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION

had cared for his mother prior to his arrest was denied a temporary release to attend his mother's funeral. His sister pled for his temporary release, but ICE denied it, even as they stipulated that he was eligible for relief from removal in a court filing only a few weeks later. He ultimately won his immigration case, but was denied the last chance to mourn his own mother's passing. Arulanantham Dec. ¶¶ 47-52.

Class members generally are permitted only limited contact with family and friends by phone through a see-through window for, at most, a few hours per week. Inlender Dec. ¶¶ 8-9. Direct, in-person contact with family and friends generally is not permitted. *Id.* In addition, class members cannot participate in important family and social functions. For example, one studied class member was denied a temporary release to attend his mother's funeral, despite his sister having pled for his temporary release, even though ICE had stipulated that he was eligible for relief from removal. He later won his immigration case, but did not attend his mother's funeral. Arulanantham Dec. ¶¶ 47-52.

Beyond the physical and psychological deprivations, prolonged detentions impair other important rights of class members. Immigration courts in the Central District hear many matters involving detainees by video conference, impairing detainees' ability to readily consult with legal counsel. Tolchin Dec. ¶¶ 10, 13. And when detainees attend in person, they arrive in shackles after being forced to awake early for the long trip from the detention facility to immigration court - sometimes as early as 3 a.m. *Id.* at ¶ 12. As a practical matter, detainees also have fewer opportunities than non-detained immigrants to gather evidence, locate witnesses, locate counsel, and confer with counsel (if they are fortunate enough to be able to afford an attorney). Tolchin Dec. ¶ 11. These challenges place detainees in a Catch-22 of needing more time to locate counsel and prepare their cases, thus requiring them to request continuances, which in turn prolong their detentions, particularly if the individual is raising a substantial challenge to removal that can require multiple court hearings to resolve, or, if the Immigration Judge's calendar results in a lengthy

continuance longer than the detainee otherwise would want or need.  Inlender Dec. ¶¶ 17-23 (describing immigration case processing and reporting that cases in which a detainee raises a substantial defense to removal typically require multiple hearings to resolve); Castillo Dec. ¶¶ 3-8 (reporting that immigration judges in the Central District routinely encourage *pro se* detainees to take continuances to find an attorney where they appear to be eligible for relief); Long Rep. at 10 (reporting longer detention lengths for class members who apply for relief).

### D.    Class Members Do Not Receive Adequate Bond Hearings.

Absent this Court's preliminary injunction, most of the class members would not receive any form of bond hearing.  But even for those class members who secured the right to bond hearings through this Court's preliminary injunction order, or through rulings by the Ninth Circuit during the pendency of this action, the hearings they receive lack certain basic elements of fairness.

#### 1.    *Immigration Courts are not required to consider factors relevant to any adequate bond determination.*

For those class members who have received bond hearings, the hearing is equivalent to an immigration hearing commonly referred to as a "*Casas*" hearing. *Casas-Castrillon v. ICE*, 535 F.3d 942 (9th Cir. 2008).  With respect to the substantive standard employed in *Casas* hearings, Immigration Judges are required to consider only the "*Guerra* factors."  *See Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006); *see also Casas*, 535 F.3d at 952 (citing *Guerra*).  The *Guerra* factors focus on evidence bearing on dangerousness and flight risk.  *Id.*  They do *not* require Immigration Judges to consider at least three critical factors relevant to an adequate determination about whether to subject individuals to prolonged detentions: (1) likelihood of ultimate removal; (2) length of past and likely future detentions; and (3) viability of alternatives to detention.

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

### a.    Likelihood of removal

The *Guerra* factors do not require Immigration Judges to consider whether individuals seeking release are likely to ever be removed, either because they are from countries that will not likely take them back or because they will win their cases and therefore retain the right to reside in the United States.  *See* Fong Dep. at 50:1-52:7 (Jacobs Dec. Ex. E).  As a result, class members from certain countries with which the United States lacks a repatriation agreement – or otherwise refuse to accept back their nationals – have spent years in detention litigating removal cases, only to be released after receiving removal orders – because there is no way to return them to their home countries.  The studied class members include numerous such individuals from countries such as Vietnam, Cambodia, and Somalia.  Arulanantham Dec. ¶¶ 176-187.  Similarly, individuals who win their cases before the Immigration Judge remain incarcerated while ICE appeals the judge's decision, even though the fact that they have won makes it unlikely that they will ever be removed.  *Id.* at ¶¶ 98-100 (Somali asylum seeker detained 456 days, including seven months after he won before the Immigration Judge).

### b.    Length of past detentions or likely future detentions

The *Guerra* factors also do not require Immigration Judges to consider the length of past detention or likely length of future detention, even though certain class members may already have been detained for years, or inevitably face additional detention of months or years before their cases are finally resolved.  For example, an individual who has just received a stay of removal pending judicial review can anticipate lengthy additional detention before his or her case is resolved.  Yet this is not a factor that Immigration Judges consider in a *Casas* hearing.  Dr. Long's statistical analysis of studied class member records revealed that more than 50% of those detained at 7 months continued to be detained at 12 months; 23% continued to be detained at 18 months; and 10% continued to be detained at 24 months.  Long Rep. at 6 (Long Dec. Ex. A).  Not surprisingly, the average detention length also increased

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

1   for those individuals who filed applications for relief from removal.  *Id.* at 10 (509 vs.

2   320 days).

3      **c.**  ***Alternatives to Detention***

4      The *Guerra* factors also do not require Immigration Judges to consider

5   alternatives to detention that would be sufficient to alleviate danger to the community

6   or flight risk, even though numerous such alternatives exist.  Deposition of Assistant

7   Chief Immigration Judge Jack Weil at 113:5-12 (Tan Dec. Ex. G); Fong Dep. at

8   57:11-58:22 (Jacobs Decl. Ex. E).  This is true even as to detainees with "major ties to

9   the community" who have raised substantial challenges to removal and, thus, even

10  from Respondents' perspective, pose a minimal danger or flight risk.  *See* Saldana

11  Dep. at 139:4-12 (Tan Dec. Ex. F) (from "ICE's perspective . . . a minimal flight risk

12  [is] somebody who has major ties to the community who may have a question as to

13  removability . . . [or] is awaiting a benefit").  Here, as already summarized, numerous

14  class members have raised substantial challenge to removal – challenges on which

15  they often prevail.

16     In addition, substantial numbers of studied class members for whom relevant

17  information could be extracted from their files have extensive family ties within the

18  United States.  *See* Tan Dec. ¶¶ 15-33.  Many of them entered the United States at a

19  young age.  *See* Tan Dec. ¶ 35 (over half of class members, 51%, were age 21 or

20  under at entry; 30% were 18 or under).  Leaving aside the asylum seekers who

21  typically have no prior contact with the United States, the vast majority of other class

22  members have resided in the country for years – often for  decades.  *Id.* ¶ 31 (75% of

23  non-Section 1225(b) class members had resided in United States for more than five

24  years prior to detention; 55% for more than 10 years; and 26% for more than 20

25  years).  Nearly *two thirds* of other class members have United States citizen children.

26  *See* Tan Dec. ¶ 17 (58% of non-Section 1225(b) class members have US citizen

27  children).

28

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

Furthermore, Respondents produced no evidence of criminal history for many class members subject to prolonged detentions. As to the remainder, over half of the records produced by Respondents for class members in the sample did not disclose convictions for crimes serious enough to warrant sentences of over six months – the minimum length of their immigration detention. Jacobs Dec. ¶ 7. In some instances, class members were detained without the possibility of a bond hearing for years based on convictions for minor controlled substance offenses for which they were sentenced to only a few months in jail. Arulanantham Dec. ¶¶ 22-25 (detainee brought here as a child, put in removal proceedings for minor drug offense, detained 15 months before winning his case), 28-31 (detainee who came as child from El Salvador after his father was assassinated, placed in removal proceedings based on misdemeanor drug possession offense, detained ten months before winning his case, during which time he was unable to care for his sick mother), 47-52 (438 days' detention based on drug offense prior to winning relief from removal); Jacobs Dec. ¶ 7 (summarizing data and describing individual with sentence of 30 days for drug offense detained for 646 days before winning his case, another individual with sentence of 90 days for drug offense detained 764 days before winning his case, and third individual with sentence of 90 days for drug offense detained 600 days before winning his case).

In addition, Respondents' own 30(b)(6) witness testified that individuals released under a program available to certain immigrants in this district as an alternative to detention have appeared when required at future hearings "at, if not close to, 100%" of the time. Saldana Dep. at 112:18-20 (Tan Dec. Ex. F). This success rate is consistent with reports generated by Respondents' exclusive contractor for detention facilities, as well as a Department of Justice report, which studied the success of alternatives to detention. *Id.* at 112:18-20; Kaufman Dec. Ex. E ("ISAP II Annual Report – Contract year 2011) (reporting 99.4% attendance rate for 2011 at all Immigration Judge hearings and a 96.0% attendance rate for final court decisions); Kaufman Dec. Ex. D ("ISAP II Annual Report – Contract Year 2010") (reporting 99%

attendance rate for 2010 at all Immigration Judge hearings and a 94% attendance rate for final court decisions); *see also* Vera Institute of Justice, Testing Community Supervision for the INS:  An Evaluation of the Appearance Assistance Program (Aug. 1, 2000) (reporting 91% attendance rate at all immigration court hearings for pilot alternative to detention program that included immigrants with criminal convictions), *available at*

http://www.vera.org/sites/default/files/resources/downloads/finalreport.pdf.

### 2.    *Immigration courts are not required to ensure certain minimal procedural protections.*

As previously noted, when most class members receive bond hearings, they are equivalent to *Casas* hearings.  Respondents fail to follow at least three practices necessary to make such bond hearings adequate:  (1) Respondents require detainees to request bond hearings, rather than scheduling them automatically; (2) even when detainees do make such requests, Respondents do not provide adequate notice; and (3) Respondents do not provide for periodic hearings for individuals who remain detained after their first *Casas* hearing.

Under Respondents' current procedures, after ICE conducts an internal custody review, detainees must affirmatively request a *Casas* hearing by filing a written request in immigration court or by requesting it orally.  The only notice that ICE provides detainees is a short letter stating that ICE has completed its internal review— which typically consists of only a recitation of any criminal history and an assessment of whether travel documents will ultimately be available should removal be ordered— followed by a statement that the individual "may request a review of [the] custody determination from an Immigration Judge."  Kaufman Dec. Ex. N; *see also* Arulanantham Dec. ¶¶ 116-150 (summary of ICE *Casas* reviews for class members.).[11]

---

[11] Some detainees do not receive even this notice.  *See* Merida Dec. ¶¶ 20-21; Tolchin Dec. ¶ 6.

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

Beyond providing a citation to Chapter 9 of the Immigration Court Practice Manual, the notice does not inform detainees how to request the hearing, nor of their rights to present evidence and obtain representation by counsel.  If the detainee does not affirmatively request the hearing, none is provided.  *See* Tolchin Dec. ¶ 6; Merida Dec. ¶¶ 20-21.  In such circumstances, the detainee faces additional prolonged incarceration even if he would have been able to obtain release in a hearing before an Immigration Judge.  Similarly if a detainee does not win release on bond at an initial *Casas* hearing, Respondents' procedures do not provide for subsequent periodic hearings, even if the detention lasts for years.[12]

### E.    Providing Adequate Bond Hearings Will Not Impose a Substantial Burden on Respondents.

Respondents have stipulated that the relief Petitioners seek is not more expensive than the current system.  *See* Dkt. 165 at 4.  In fact, Respondents likely would save tens of millions of dollars each year if they did not adhere to a policy of subjecting immigrants to prolonged incarceration without adequately determining whether to release them on their own recognizance or under an alternative to detention.  Respondents spend at least $122 per day per detainee to incarcerate class members.  Kaufman Dec. ¶ 31.  In contrast, release on alternatives to detention costs no more than $14 per day, even for the most costly of the alternative detention systems.  *See* Dora Schriro, U.S. Dep't of Homeland Sec., Immigration Detention Overview and Recommendations 10, 15 (2009), *available at* http://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.

Looking solely at the studied class members, Respondents paid for over 184,000 aggregate days of detention during the one year period following their sixth

---

[12] The same is true of Respondents' parole process:  after an initial review, individuals are not granted periodic reviews regardless of the length of their detention.  *See* Arulanantham Dec. ¶¶ 72-101 (summarizing review of files in which individuals received parole determinations).

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

month in detention.  Kaufman Dec. ¶¶ 32-33.  At $122 per day, that amounts to more than $20,000,000 in detention costs.  Moreover, much of this money paid for the detention of class members who *won* their cases, as such individuals were detained on average 342 days, at a cost of over $40,000 per detainee per year.  *Id.*  For individuals who won at the BIA, they were detained an average of 509 days, at a cost of over $60,000 per detainee for that year.  *Id.*  By providing a bond hearing that typically lasts 10 to 15 minutes.  *See* Tolchin Dec. ¶ 9.  Respondents could have saved millions of dollars just in the first year alone.

## STANDARD

Summary judgment is proper where, as here, no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1152 (9th Cir. 2012).  To successfully oppose summary judgment, the nonmoving party must "go beyond the pleadings and, by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

## ARGUMENT

**I.    The General Immigration Detention Statutes and the Due Process Clause Require The Protections of *Casas* Hearings for all Class Members.**

For reasons largely recognized in this Court's preliminary injunction ruling, Petitioners are entitled to summary judgment on both their statutory and constitutional claims that all class members are entitled to bond hearings consistent with the protections enunciated in *Casas-Castrillon v. ICE*, 535 F.3d 942 (9th Cir. 2008).

**A.    Prolonged Detention Without a *Casas* Hearing Violates Due Process.**

The Ninth Circuit has repeatedly and unequivocally held that prolonged immigration detention without a *Casas* hearing raises serious constitutional concerns.  *See Casas*, 535 F.3d at 951 (holding that government has burden to justify prolonged

detention in bond hearing); *V. Singh*, 638 F.3d at 1203 (holding that government must satisfy burden at *Casas* hearing by clear and convincing evidence and that record of bond hearing is required for purpose of appellate review); *Diouf II*, 634 F.3d at 1086 (extending *Casas* to people detained under § 1231(a)(6) and finding that detention becomes prolonged after six months).

The holdings of *Casas*, *V. Singh*, and *Diouf II* rest on bedrock constitutional principles that apply to any prolonged detention scheme. Because "[f]reedom from imprisonment . . . lies at the heart of the liberty that [the Due Process] Clause protects," *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), "even where detention is permissible . . . due process requires 'adequate procedural protections' to ensure that the government's asserted justification for physical confinement 'outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Casas*, 535 F.3d at 950 (quoting *Zadvydas*, 533 U.S. at 690). In this case, by definition, class members have suffered detentions in excess of six months. All of them have suffered a substantial deprivation of liberty under a straightforward application of Ninth Circuit case law. And the deprivation of their liberty interests is profound. Class members face incarceration in prison-like conditions, often for years. *See supra* Statement of Facts § C. They are separated from families and friends, deprived of economic opportunities, and impaired in their ability to locate and consult with counsel, as well as gather documents and identify witnesses to build their cases. *See id.*

The fundamental principle that due process requires certain minimal procedural protections in the face of such massive deprivations of liberty applies equally to all class members, just as it did to the petitioners in *Tijani*, *Casas*, *V. Singh*, and *Diouf II*. Indeed, nowhere in our legal system does the law permit detention of the lengths at issue here without an in-person hearing. Pre-trial detainees, people who are dangerous due to mental illness, and even child sexual predators all receive far greater procedural protections in regard to their detention than did class members incarcerated under Sections 1226(c) and 1225(b) prior to the Court's preliminary injunction order. *See,*

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

*e.g.*, *United States v. Salerno*, 481 U.S. 739, 750-52 (1987) (upholding a federal bail statute permitting pretrial detention in part because the statute required strict procedural protections for detention, including prompt hearings before a judicial officer where the government bore the burden of proving dangerousness by clear and convincing evidence); *Foucha v. Louisiana*, 504 U.S. 71, 81-83 (1992) (striking down a civil insanity detention statute because it placed the burden on the detainee to prove eligibility for release).[13]

Even in situations where far lesser interests are at stake, the Supreme Court has held that due process requires in-person hearings.  The government cannot terminate welfare benefits or public utilities, or seek to recover excess Social Security benefits, without providing an in-person hearing.  *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 268 (1970) (government's failure to provide an in-person hearing prior to termination of welfare benefits was "fatal to the constitutional adequacy of the procedures"); *Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1, 16 (1978) (same for utility subsidies); *Califano v. Yamasaki*, 442 U.S. 682, 696 (1979) (same recovery of excess Social Security payments).  It follows that the Due Process Clause requires the government to provide an in-person hearing to justify prolonged incarceration particularly where, as here, the detained individuals may present no danger or flight risk, and a significant number will win their cases and thereby secure the right to remain in the United States permanently.

---

[13] Respondents detain lawful permanent residents under each of the statutes at issue in this case.  Therefore, even if the Court did not agree with Petitioners that all class members are entitled to these basic protections, it must still construe each statute at issue in light of the constitutional problems that would arise from prolonged detention of lawful permanent residents under the procedures of that statutory regime.  *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1078 (9th Cir. 2006) (in case involving arriving asylum seeker, construing Section 1225(b) in light of constitutional problems created by detention of lawfully-admitted non-citizens under that statute).

### B. The Court Should Construe the Immigration Detention Statutes At Issue Here to Require a *Casas* Hearing.

Given the serious due process concerns presented by prolonged detention without individualized hearings, this Court must construe the immigration detention statutes so as to avoid those serious constitutional problems, so long as such a construction is "fairly possible." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Because it follows from *Tijani*, *Nadarajah*, *Casas*, *V. Singh*, and *Diouf II* that prolonged detention without hearings raises serious constitutional problems, each of the statutes at issue here can and should be construed to require bond hearings as provided under *Casas*, *Diouf II*, and *V. Singh*. For Sections 1226(a), 1226(c) and 1231(a), this Court need only follow Ninth Circuit law to construe the relevant statutes. *Casas* held that Section 1226(c) only applies in cases of "expeditious" proceedings and that in cases of prolonged detention the government's authority "shifts" to Section 1226(a), which in turn must be construed to "require" a bond hearing in such cases. 535 F. 3d at 951. Similarly, *Diouf II* held that Section 1231(a) should be read to require *Casas* hearings for individuals detained for more than six months. 634 F.3d at 1092.

With respect to Section 1225(b), this Court already construed that statute to require "*Casas*" bond hearings for class members detained for more than six months in granting the preliminary injunction order. It can do so again in one of two ways. First, it could construe Section 1225(b) itself to require adequate bond hearings. The Ninth Circuit adopted that approach in *Diouf II* with respect to Section 1231(a)(6). 634 F.3d at 1092. Alternatively, it could construe Section 1225(b) to not apply to cases involving prolonged detention, such that detention "shifts" to Section 1226(a). The Ninth Circuit used that approach in *Casas* with respect to Section 1226(c). 535 F.3d at 951. Both constructions are "fairly possible," allowing the Court to easily construe Section 1225(b) to authorize the adequate bond hearings that due process demands.

1    The hearings Petitioners seek must occur at six months, given that the Ninth

2    Circuit has now definitively resolved any dispute as to *when* detention becomes

3    prolonged.  *Diouf II*, 634 F.3d at 1091-92 (construing Section 1231(a)(6) to require

4    *Casas* hearings at six months).  As this Court has already recognized, there is no

5    conceivable rationale for treating any of the other detention statutes as not subject to

6    the same basic rule of interpretation, given that *Diouf II* relied heavily on the time

7    periods described in *Demore* and *Casas*, both of which involved statutes not at issue

8    in *Diouf II*.  *Id.*; *see also Nadarajah*, 443 F.3d at 1079-80 (in case involving detainee

9    held under Section 1225(b), holding that all the "general detention statutes" only

10   authorize detention pending completion of removal proceedings for a "brief and

11   reasonable" period, and concluding that such a period is presumptively six months,

12   based on *Zadvydas*, *Clark*, and *Demore*, as well as Congress' express authorization of

13   detention beyond six months in the national security detention statutes).[14]

14       *Casas* hearings incorporate several critical protections that should be extended

15   to all class members.  The hearings are adversarial and before an Immigration Judge,

16   and the government bears the burden of showing that a detainee constitutes a

17   sufficient danger or flight risk to justify continued detention.  *See Diouf II*, 634 F.3d at

18   1091 ("adequate procedural safeguards" for prolonged detainees require "an in-person

19   hearing," placement of the burden of proof on the government, and "a decision by a

20   neutral arbiter such as an Immigration Judge."); *Casas*, 535 F.3d at 951 (same); *see*

21

_____

22   [14] Because most 1226(c) subclass members are pursuing substantial challenges to
     removal, even if this Court declined to construe Section 1226(c) to require a bond
23   hearing at six months, it should still grant relief from prolonged mandatory detention
     to these subclass members by construing 1226(c) as requiring mandatory detention
24   only where the government shows that a detainee lacks a substantial challenge to
     removal.  *See Demore*, 538 U.S. at 514 n.3 (declining to address the BIA's standard
25   for applying mandatory detention in *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA
     1999)); *see also Gonzalez v. O'Connell*, 355 F.3d 1010, 1020-21 (7th Cir. 2004)
26   (noting that this "important issue" was left open in *Demore*); *Tijani v. Willis*, 430 F.3d
     1241, 1246-47 (9th Cir. 2005) (Tashima, J., concurring) (advocating "substantial
27   question" standard in light of "egregiously" unconstitutional *Joseph* decision);
     Petitioners' Motion for a Preliminary Injunction at 12-15 (Dkt. 232-1).

28

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

1  *also Tijani*, 430 F.3d at 1242.  The government must meet a clear and convincing

2  evidence standard of proof in justifying continued detention, and a record of hearings

3  must be available to allow for appellate review.  *V. Singh*, 638 F.3d at 1203-06,

4  1208.[15]

5  **II.  The Court Should Construe the INA to Require Protections in Addition to**
   **Those Provided in *Casas* To Avoid the Constitutional Problems That**
6  **Would Otherwise Be Presented.**

7          In addition to the protections already required under the Ninth Circuit's

8  decisions in *Casas*, *Diouf II*, and *V. Singh*, the Court should interpret the INA to

9  require that prolonged detention bond hearings incorporate adequate substantive and

10  procedural protections to avoid the due process problems that would otherwise result.

11         *First*, the Immigration Judge should be required to consider additional

12  substantive criteria prior to approving continued detention.  As a threshold matter,

13  detention should not be permitted under the INA when the noncitizen is unlikely to be

14  removed to his country of origin, as the government's interest in preventing flight in

15  _____

16  [15]  Most class members who now receive bond hearings when their detention becomes
    prolonged would not have received such hearings prior to the *Casas* decision in 2008
17  and/or the *Diouf II* decision in 2011.  When this case was first filed, the government
    asserted authority to detain without bond hearings all individuals with final BIA
    removal orders, including those seeking review at the Court of Appeals.  It determined
18  whether or not to release such individuals using the POCR process.  *See*
    Arulanantham Dec. ¶ 104.  Because that process focuses primarily on whether the
19  individual can be repatriated, *see* Lee Dep. 189:21-190:3 (Jacobs Dec. Ex. F);
    Arulanantham Dec. ¶ 155, it resulted in the effectively-mandatory detention of
20  individuals seeking judicial review of their removal orders whose removal had been
    judicially stayed.  *See* Arulanantham Dec. ¶¶ 157-175.  At the present time,
21  individuals with final BIA removal orders are eligible for bond hearings under *Casas*
    and *Diouf II*.  Such individuals first receive an ICE *Casas* review to determine if they
22  should be detained, and then can seek Immigration Judge review of ICE's decision.
    ICE's *Casas* review process, like the POCR process that preceded it for individuals
23  detained pending judicial review of their removal orders, suffers from very serious
    defects.  *See* Arulanantham Dec. ¶¶ 102-150.  Because the government may argue at
24  some future stage of this litigation that individuals who presently receive the ICE
    *Casas* review (and who used to receive the POCR process) should not receive bond
25  hearings, Petitioners have included evidence in this record to establish the deficiency
    of both of those custody determination systems.  *See* Arulanantham Dec. ¶¶ 102-150,
26  157-175.  However, because existing law already prevents the government from
    utilizing such procedures in the absence of review by Immigration Judges, this Court
27  need not rule on the adequacy of either the POCR process or the ICE *Casas* review
    system.

28

such cases is minimal.  *See Owino v. Napolitano*, 575 F.3d 952, 955 (9th Cir. 2009). In addition, because Respondents' deprivation of class members' liberty becomes more severe as the period of incarceration lengthens, *see Diouf II*, 634 F.3d at 1091, the judge should be required to consider the length of past and likely future detention in determining whether further incarceration is justified.  Finally, consistent with Supreme Court precedent in the pretrial detention context, *see Salerno*, 481 U.S. at 750, the Immigration Judge must be required to conclude that no conditions short of detention would satisfy the government's interest in preventing flight and danger.

*Second*, the government should be required to provide procedural protections beyond those in *Casas* hearings. The hearings should be set to occur automatically upon the passage of six months; detainees should not have to request the hearings in order to receive them.  Hearings should recur periodically at six-month intervals for those detainees who remain in detention beyond their first hearing.  And detainees must receive adequate advance notice of the hearing in order to seek counsel (if necessary) and adequately prepare for the hearings.

### A.    The Court Should Require a More Robust Substantive Standard at Prolonged Detention Bond Hearings To Avoid the Due Process Problems That Would Otherwise Be Presented.

The Court should interpret the INA to require a more protective substantive standard than that now applied in *Casas* hearings.  Immigration judges in *Casas* hearings currently consider factors relevant only to whether a prolonged detainee poses a danger or flight risk, the same substantive standard that governs regular bond hearings for individuals not detained for prolonged periods. *See Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006).  Because of the substantial deprivation of liberty that prolonged detention imposes, due process requires a more rigorous standard.

The rigorous standard required by due process has three components.  First, and as a threshold matter, the Immigration Judge should not permit detention when it is significantly unlikely that a noncitizen will ever be deported.  In such circumstances, the government's regulatory interest in preventing flight is negligible; detention based

on danger alone is impermissible under due process absent a "special justification" that, in rare circumstances, may permit incarceration without trial. *See Zadvydas*, 533 U.S. at 690-91. Second, the judge should consider both the length of a noncitizen's past detention and the anticipated length of his future detention pending conclusion of proceedings the case. Third, the judge should be required to conclude that detention is actually necessary, *i.e.*, that no conditions of release would satisfy the government's interests in preventing danger and flight risk, prior to permitting continued prolonged incarceration.

These substantive requirements—requiring consideration of likelihood of removal, detention length, and alternatives to detention—derive from the strict limits on prolonged civil detention imposed by due process. *See generally Zadvydas*, 533 U.S. at 690-91. The liberty interest at stake – "freedom from prolonged detention" – is "unquestionably substantial." *V. Singh*, 638 F.3d at 1208. As explained *supra*, prolonged detention imposes not only lengthy physical incarceration, but also separation from family and community, loss of income and the ability to provide financial support to children and family, and medical and psychological damage to the detainee and his family. *See supra* Statement of Facts § C; *see also Aguilar v. U.S. Immigration & Customs Enforcement*, 510 F.3d 1, 22 (1st Cir. 2007) ("Every such detention of a parent, like every lawful arrest of a parent, runs the risk of interfering in some way with the parent's ability to care for his or her children. That a detention has an impact on the cohesiveness of a family unit is an inevitable concomitant of the deprivation of liberty inherent in the detention itself.") (citations omitted); *United States v. Wehrbein*, 61 F. Supp. 2d 958, 979-80 (D. Neb. 1999) (collecting examples of extraordinary harms caused to children and family stability from prolonged incarceration). Prolonged detentions also expose class members to a variety of physical and mental risks, such as the risks of sexual abuse or other forms of violence. *Kane v. Winn*, 319 F. Supp. 2d 162, 184-89 (D. Mass 2004) (surveying government studies and scholarly research).

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

1    To ensure that the government's interests in preventing flight and danger

2    actually justify the massive deprivation of this liberty interest created by prolonged

3    incarceration, due process requires a substantive standard that only permits the

4    government to impose continued prolonged incarceration after an Immigration Judge

5    considers likelihood of removal, detention length, and alternatives to detention.

6    **B.    As a Threshold Matter, Immigration Judges Should Not Permit
         Detention Unless a Noncitizen Is Significantly Likely to Be Removed
7         Upon the Conclusion of Proceedings in His Case.**

8    Governing Ninth Circuit law already recognizes that the immigration statutes

9    do not authorize detention where removal is unlikely.  In *Owino v. Napolitano*, the

10   Ninth Circuit held that, when a noncitizen is "not significantly likely to be removed"

11   upon conclusion of judicial and administrative review, continued detention is

12   unreasonable "and no longer authorized by statute."  575 F.3d 952, 955 (9th Cir.

13   2009) (citations and quotations omitted).  It follows that Immigration Judges must

14   determine, as a threshold matter, whether a detainee's removal would be likely were

15   ICE to prevail in the removal case.  If an Immigration Judge concludes that removal is

16   not significantly likely, the judge must order release.

17   Removal is not significantly likely in at least two circumstances.  First, when a

18   noncitizen is unlikely to be able to obtain travel documents from her country of origin

19   (or is stateless), removal is not significantly likely.  *See id.*; *Zadvydas*, 533 U.S. at

20   701.  The Court should reject Respondents' current practice of subjecting such

21   individuals to continued prolonged detention.  *See Fong Dep.* at 50:1-51:7 (Jacobs

22   Dec. Ex. E) (stating that consideration of likelihood of removal in bond hearing is

23   "presumptuous" and that consideration of only danger and flight risk is sufficient);

24   Lee Dep. at 45:20-46:16 (testifying that it is not ICE's policy to consider likelihood of

25   removal in parole determinations).  Respondents' position, which is directly contrary

26   to *Owino*, has resulted in the needless prolonged incarceration of individuals who

27   were and eventually will be released, whether or not they win their cases.  *See, e.g.*,

28   Arulanantham Dec. ¶¶ 176-187 (detailing examples of class members from Vietnam,

Cambodia, and Somalia who were subjected to prolonged detention even though removal to those countries was not significantly likely).

Second, a noncitizen is significantly unlikely to be removed if he has prevailed in his asylum, withholding, or Convention Against Torture (CAT) claim before the Immigration Judge, and is significantly likely to prevail in his case upon administrative or judicial review.  In such cases, the noncitizen's removal to his country of origin will likely not be effectuated because the prospect of persecution or torture would render such a removal prohibited under both the INA and international law.  *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1080 (9th Cir. 2006).  Yet Respondents detain such individuals even after they have won their cases before the Immigration Judge, while ICE appeals.  *See*, *e.g.*, Arulanantham Dec. ¶¶ 98-100.

Individuals whose removal is not significantly likely—either because of travel documents or the prospect of persecution or torture—are unlikely to pose more than a minimal risk of flight.  *See Diouf II*, 634 F.3d at 1088 (connecting risk of flight with likelihood of success in challenging removal).  Detention based on danger alone is not authorized under the statutes at issue in this case and, in any event, is not constitutionally permissible absent special circumstances that are not present with class members.  *See Zadvydas*, 533 U.S. at 690 (immigration detention based on danger alone not permissible without a special justification).[16]  To avoid the due process problem that would result from Respondents' detention of individuals who are not significantly likely to be removed, the Court should require Immigration Judges in prolonged detention bond hearings to consider the likelihood of removal as a threshold factor.

---

[16] For similar reasons, prolonged detainees who have prevailed on other types of claims before the Immigration Judge and remain detained pending ICE's appeal should be released, as they too pose a minimal flight risk.  Approximately a third of class members ultimately prevailed in their cases.  *See* Long Rep. at 12 (Long Dec. Ex. A).

### C. At Prolonged Detention Bond Hearings, the Immigration Judge Must Consider the Length of Past and Likely Future Detention.

Due process also requires Immigration Judges in prolonged detention hearings to consider the length of past and likely future detention. As past or anticipated future detention length increases, so does the extent of the deprivation of a noncitizen's liberty. *See Diouf II*, 634 F.3d 1091 ("When the period of detention becomes prolonged, 'the private interest that will be affected by the official action' . . . is more substantial.") (quoting and citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). To avoid the due process problem that would otherwise be presented, the government should be required to provide a more substantial justification for detention—a showing of greater flight risk or danger—as the length of past or anticipated future detention increases.

It is undisputed that some class members are incarcerated for far more than six months. The government's deprivation of their "freedom from prolonged detention" is unquestionably greater than those detained for shorter periods of time. Petitioners' expert, Dr. Long, estimates that 47% of the studied class members were detained for 12 months or more, and 9% were detained for 24 months or more.[17] Long Rep. at 6 (Long Dec. Ex. A). The average period of incarceration for studied class members was 404 days, well in excess of six months. *Id.* Lead Petitioner Alejandro Rodriguez, for example, was detained for 1,189 days; he ultimately prevailed in his case. *See* Arulanantham Dec. ¶¶ 159-164. Similarly, class member Mr. "G" was detained for 561 days before prevailing on his claim for discretionary relief. *Id.* ¶¶ 53-54. Detention lengths were even longer for individuals who ultimately won their cases on appeal (by the noncitizen or the government) to the BIA; these individuals spent an average of 509 days in detention. Long Rep. at 13 (Long Dec. Ex. A).

---

[17] These numbers likely undercount the length of detention because some class members continued to be detained even past the window of Dr. Long's data set. Long Rep. at 5 (Long Dec. Ex. A). Dr. Long observes that "[e]ven these under-estimated detention times . . . were still very long, ranging from 558 days to 1,585 days." *Id.*

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

The parties also do not dispute that many class members face prolonged anticipated future detention as their cases wind through proceedings before Immigration Judges, the BIA, and the courts of appeals.  Dr. Long's analysis of studied class members' cases reveals that 53% of class members detained for 7 months are still detained at 12 months; 23% of them are still detained at 18 months, and 10% are still detained at 24 months.[18]  Long Rep. at 7 (Long Dec. Ex. A).  Not surprisingly, Dr. Long reported that the average length of detention increased as studied class members' cases were appealed to the BIA and the Ninth Circuit.  *Id.* at 8 (330 days average detention time for individuals with only immigration court proceedings, 448 days average for those with BIA appeals, and 667 days for those with Ninth Circuit appeals).  In 2011, the median time for the Ninth Circuit's resolution of agency appeals, such as petitions for review from the BIA, was 29.2 months.  Judicial Business of the United States Courts, App. B-4C, *available at* http://www.uscourts.gov/Statistics/JudicialBusiness.aspx#appTables (Kaufman Dec. Ex. G).  As the Ninth Circuit has observed, "[w]hen . . . we grant a stay of removal in connection with an alien's petition for review from a denial of a motion to reopen, the alien's prolonged detention becomes a near certainty."  *Diouf II*, 634 F.3d at 1091 n.13.

In the case of class members detained for more than six months, or those who face prolonged projected future periods of detention, due process requires the government to provide a stronger justification for continued prolonged detention.  The Ninth Circuit and Supreme Court have repeatedly recognized the balancing between length of detention and governmental justification in assessing the constitutionality of prolonged detention.  *See, e.g.*, *Zadvydas*, 533 U.S. at 701 (reasoning, in post-final-

---

[18] Detention length also increased for those studied class members who filed applications for relief from removal, 32% of which were granted.  Long Rep. at 10 (Long Dec. Ex. A) (for individuals who won their cases, average detention length is 320 days for those with only immigration court proceedings and 509 days for those who prevailed before the BIA).

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

1    order context, that "for detention to remain reasonable, as the period of . . .

2    confinement grows," the permissible length of future detention "conversely would

3    have to shrink"); *Demore*, 538 U.S. at 690-91 (upholding detention under Section

4    1226(c) for "the brief period necessary for their removal proceedings"); *Diouf II*, 634

5    F.3d 1081 (acknowledging relationship between "stage of the [noncitizen's]

6    proceedings" and flight risk posed by the noncitizen); *id.* at 1091 (recognizing "the

7    serious constitutional concerns raised by continued detention" at the "180-day

8    juncture" given that, under the government's procedures, an unfavorable detention

9    review "authorizes detention for an additional year").  In recognition of the

10   importance of length of detention in the due process analysis, courts in the pretrial

11   detention context have required the consideration of length of past and anticipated

12   future detention as factors in deciding whether a detainee should be released.  *See,*

13   *e.g.*, *United States v. Hare*, 873 F.2d 796, 801 (5th Cir. 1989) ("In determining

14   whether due process has been violated, a court must consider not only factors relevant

15   in the initial detention decision, . . . but also additional factors such as the length of the

16   detention that has in fact occurred or may occur in the future [and] . . . the non-

17   speculative nature of future detention."); *United States v. Ojeda Rios*, 846 F.2d 167,

18   169 (2d Cir. 1988) (reversing trial court decision to continue pretrial detention and

19   clarifying due process standard as "requir[ing] the court to . . . consider[] . . . the

20   length of detention that has occurred and the non-speculative nature of future

21   detention"); *United States v. Ailemen*, 165 F.R.D. 571, 589 (N.D. Cal. 1996)

22   (conducting exhaustive analysis of due process inquiry in pretrial detention context,

23   and considering as part of that inquiry "how long [the detainee] is likely, on a non-

24   speculative basis, to remain in custody before conclusion of his trial").

25        Despite this precedent, Respondents do not provide class members with

26   hearings in which the length of past or anticipated future detention is considered.  For

27   those class members who have received a review of their detention—whether through

28   a POCR review, parole determination, or *Casas* hearing—the standard in those

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

proceedings fails to consider the length of past or likely future detention. The POCR review process does not consider the length of past detention, instead focusing on factors relevant to danger and flight risk, such as prior criminal history, disciplinary infractions, and family ties. *See* 8 C.F.R. § 241.4(f); Lee Dep. at 44:2-45:9 (Jacobs Dec. Ex. F). The result is the prolonged detention of individuals like Amadou Diouf, whose challenge to detention resulted in two Ninth Circuit decisions. *See Diouf II*, 634 F.3d at 1081; *Diouf v. Mukasey*, 542 F.3d 1222 (9th Cir. 2008) (*Diouf I*). After suffering over a year of detention, he received a POCR review, in which ICE decided to detain him based on a cursory and factually inaccurate assessment of danger and flight risk. *See* Arulanantham Dec. ¶¶ 165-170. ICE neither considered that Mr. Diouf had already been detained for over a year nor that he faced considerable additional delays pending resolution of his Ninth Circuit appeal. *See Diouf I*, 542 F.3d at 1227. Mr. Diouf only obtained release on bond pursuant to this Court's grant of a preliminary injunction in his case. *Id.* Studied class members subjected to the POCR process have had similar errors infect their release decisions. *See*, *e.g.*, Arulanantham Dec. ¶¶ 159-164, 171-175.

Similarly, individuals in the Section 1225(b) and 1226(a) subclasses (including those given *Casas* hearings) were provided custody determinations—bond hearings or parole determinations—in which Immigration Judges or ICE agents only considered danger and flight risk, not length of past or anticipated future detention. Wesley Lee, ICE Assistant Field Office Director for the Los Angeles area, testified that in ICE's internal review under *Casas*, or during parole determinations, ICE does not consider length of past or anticipated future detention. Lee Dep. at 44:18-45:9 (Jacobs Dec. Ex. F). Class members fare no better as to consideration of length of detention in *Casas* hearings before Immigration Judges; the factors considered at those hearings focus exclusively on danger and flight risk. *See Guerra*, 24 I. & N. Dec. at 40.

Both the INA and due process require judges to consider past and anticipated future detention length when considering whether to release class members on bond.

Because the length of detention affects the due process balancing, the substantive standard in prolonged detention bond hearings should incorporate a consideration of past detention and anticipated future detention length.

### D. Before Approving Continued Prolonged Detention, an Immigration Judge Must Find that No Conditions Short of Incarceration Would Satisfy the Government's Interests in Preventing Danger and Flight.

Due process also requires an Immigration Judge to determine, in any adequate prolonged detention hearing, that no alternatives to detention would address the government's justifications for detention, namely preventing flight and avoiding danger to the community. The Ninth Circuit and Supreme Court have explained that the government's primary justification for immigration detention is "preventing deportable . . . aliens from fleeing prior to or during their removal proceedings," *Casas*, 535 F.3d at 949, while preventing danger is a valid "secondary" purpose. *Zadvydas*, 533 U.S. at 697; *see also Demore*, 538 U.S. at 531 (Kennedy, J., concurring) (noting that although flight risk and danger are both valid justifications for immigration detention, "the ultimate purpose behind the detention is premised upon the alien's deportability"). Given class members' "unquestionably substantial" liberty interest in being free from prolonged detention, *V. Singh*, 638 F.3d at 1208, the Court should require Immigration Judges to consider whether less restrictive alternatives— such as conditions of supervision or electronic monitoring—can satisfy the government's interests in preventing flight or danger.

In the analogous pretrial detention context, the Supreme Court has upheld the constitutionality of preventive detention, but only while recognizing the Bail Reform Act's requirement that a federal judge must first determine that no conditions of release will "reasonably assure the appearance of such person as required and the safety of any other person and the community." *See United States v. Salerno*, 481 U.S. 739, 750 (1987) (citing 18 U.S.C. § 3142(e)). Even in imposing one or more of the fourteen possible alternatives to pretrial detention in the Bail Reform Act, a federal judge must first determine that they comprise the least restrictive conditions that will

ensure appearance by the defendant and safety of the community.  *See* 18 U.S.C. § 3142(c)(1)(A).  The Ninth Circuit has similarly recognized, in striking down measures to incarcerate civil detainees, that due process requires that the government's objectives could not be "accomplished in . . . alternative and less harsh methods."  *See Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (citations and quotations omitted).  As the Court in *United States v. Aileman* explained in its exhaustive analysis of the due process limits on pretrial detention:  "When courts assess the magnitude of the threat that an individual defendant poses to the government's regulatory interests, . . . the proper focus is not on how big that threat would be if the defendant were released on no conditions, but, instead, . . . on how big that threat would be if the defendant were released on stringent conditions aimed at reducing as much as possible the likelihood of harm to the threatened regulatory interests."  165 F.R.D. 571, 580 (N.D. Cal. 1996).

Despite this due process requirement, no class member has received a hearing in which an Immigration Judge was required to consider less restrictive alternatives before approving continued detention. In *Casas* hearings, the government believes that Immigration Judges are only required to apply the factors enumerated in *Matter of Guerra*, which do not include consideration of less restrictive alternatives prior to imposing detention.  24 I. & N. Dec. 37, 40 (BIA 2006).  Alternatives to detention are also not considered in Section 1226(a) bond hearings.  *See* Weil Dep. at 113:5-21 (Tan Dec. Ex. G); Fong Dep. at 57:11-58:3 (Jacobs Dec. Ex. E).  This is so even in the case of an individual for whom a bond would not be sufficient to ensure appearance, but who would likely qualify for release into an alternatives program.  *See* Fong Dep. at 58:5-59:25.  ICE also does not consider alternatives to detention in POCR reviews. *See* Lee Dep. at 214:4-14 (Jacobs Dec. Ex. F).

Respondents' failure to implement a standard requiring consideration of alternatives is particularly troubling given Respondents' own assessment of the success of alternatives in ensuring the appearance of noncitizens at their removal

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

proceedings.  Eric Saldana, Respondents' designated 30(b)(6) witness on alternatives to detention, has stated that the compliance with ISAP II, ICE's alternatives program, "is at, if not close to 100 percent . . . for people going to their immigration court hearing pre-order" in the San Bernardino area, and estimated that for the Los Angeles area as a whole compliance is at 90 percent.  Saldana Dep. at 112:2-24 (Tan Dec. Ex. F).  He further testified that ICE has substantially increased its use of ISAP II (and its predecessor, ISAP) in the past five years.  *Id.* at 134:2-7; *see also* Kaufman Dec. Ex. F (ICE headquarters directive commenting on "continued success" of ICE ATD program as a "flight risk mitigation tool" and encouraging the use of ATDs for "aliens who pose a significant risk of flight").  BI Incorporated, the company that ICE contracts with for ISAP II, has reported 99% attendance rates at immigration court hearings for ISAP II participants.  *See* Kaufman Dec. Ex. E (ISAP II 2011 annual report) (In 2011, ICE referred 35,380 participants to ISAP II, ICE's alternative to detention supervision program that in its "full service" option produced 99.4% attendance rate at all Immigration Judge hearings and a 96.0% attendance rate at the final court decision); Kaufman Dec. Ex. D (ISAP II 2010 annual report) (In 2010, ICE referred 25,778 participants to ISAP II, an ATD program that in its "full service" option produced 99% attendance rate at all Immigration Judge hearings and a 94% attendance rate at the final court decision);[19] *see also* Vera Institute of Justice, Testing Community Supervision for the INS:  An Evaluation of the Appearance Assistance Program (Aug. 1, 2000) (pilot immigration alternative to detention program that included noncitizens with criminal convictions reporting 91% attendance rate at all immigration court hearings), *available at* http://www.vera.org/sites/default/files/resources/downloads/finalreport.pdf.

---

[19] ICE now contracts exclusively with BI for its alternative to detention program, termed ISAP II.  *See* Saldana Dep. at 106:9-107:18 (Tan Dep. Ex. F).

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

Alternatives to civil detention are also widely used by the federal and state pretrial systems. Both the federal system and several states employ a presumption of release on the least restrictive conditions of bail. *See* 18 U.S.C. § 3142(e) & (c)(1)(A); *see also, e.g.,* Cal. Penal Code § 1270(a) (2012); 725 Ill. Comp. Stat. 5/110-2 (2012); Conn. Gen. Stat. § 54-63b; Ky. R. Crim. Pro. 4.12; Or. Rev. Stat. § 135.245. As in the immigration context, alternatives to detention in the pretrial detention setting have been proven to be effective in preventing danger to the community and flight pending proceedings. *See, e.g.*, Kaufman Dec. Ex. I at 13 tbl. 11 (Department of Justice Report noting that among federal defendants given pretrial release during FY 2008-2010, 4% were rearrested for a new offense (felony or misdemeanor) and 1% failed to make their court appearances.);[20] *see also, e.g.*, Partnership for Community Excellence, Pretrial Detention & Community Supervision: Best Practices and Resources for California Counties (San Francisco County reported less than a 3% failure to appear rate and a 0% long term recidivism rate with its pretrial program)[21]; Pretrial Services of Harris County, Texas, 2011 Annual Report 20-21 (Harris County, which includes Houston, had a 5.0% failure to appear rate and a 3.3% re-arrest rate for pretrial detainees in 2011).[22]

Respondents have detained class members with strong ties to this country, substantial challenges to removal, and minor (if any) convictions, even though Respondents acknowledge the success of alternatives to detention as to such individuals. As Eric Saldana, Respondents' person-most-knowledgeable about alternatives has testified, individuals with "major ties to the community" and "a question about removability" pose, from ICE's perspective, a minimal flight risk.

---

[20] *Available at* http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=4535.

[21] *Available at* http://caforward.3cdn.net/7a60c47c7329a4abd7_2am6iyh9s.pdf.

[22] *Available at* http://www.harriscountytx.gov/CmpDocuments/59/
Annual%20Reports/2011%20Annual%20Report-0410.pdf.

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

Saldana Dep. at 139:4-12 (Tan Decl. Ex. F).  Respondents nevertheless detain such individuals—even those who ultimately prevailed on discretionary claims for relief based on their family ties—for prolonged periods of time until they win their cases. For example, named plaintiff Jose Farias Cornejo is a lawful permanent resident who has been in the United States since before his first birthday.  His immediate family, including his permanent resident mother, four U.S. citizen siblings, and U.S. citizen fiancée, all live in the United States.  Mr. Farias held several jobs in construction and landscaping prior to entering ICE custody.  Despite his deep family and community ties, Respondents detained him for more than 15 months before he prevailed on his claim to discretionary relief.  *See* Arulanantham Dec. ¶¶ 22-25.  Several class members were also subjected to prolonged detention even though they had U.S. citizen family members, employment in the United States, and relatively minor offenses.  *See*, *e.g.*, Arulanantham Dec. ¶¶ 26-52; *see also* Tan Dec. ¶¶15-35 (summarizing information contained in class members' A files on family ties).

The Court should order that Immigration Judges in prolonged detention bond hearings determine that no alternative restrictions can adequately protect against risk of flight and danger in class members' cases prior to imposing additional incarceration.[23]

**III.   The Court Should Construe the INA to Require Additional Procedural Protections Beyond Those Provided in *Casas* Hearings, to Avoid the Due Process Problems That Would Otherwise Result.**

Due process also requires certain critical procedural protections beyond those provided in *Casas* hearings, namely:  automatic hearings; adequate notice; and provision of periodic hearings for individuals detained beyond one year.

---

[23] Class members also believe that due process requires the Immigration Judge to find that a given detainee poses a "special" danger in all cases of prolonged detention; however, that argument was rejected by the Ninth Circuit.  *See V. Singh*, 638 F.3d at 1206-07.

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

To evaluate the constitutional sufficiency of the procedures in *Casas* hearings, the Court must balance:  (1) "the private interest that will be affected;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *V. Singh*, 638 F.3d at 1208 (applying *Mathews* test to hold that *Casas* hearings must be transcribed).  Application of the *Mathews* test here demonstrates that Respondents must provide automatic, periodic hearings and notice that enables a detainee to prepare for the hearing.

### A.    The Private Interest – Freedom From Prolonged Detention – is Substantial.

As the Ninth Circuit has clarified, "[t]he private interest here—freedom from prolonged detention—is unquestionably substantial."  *V. Singh*, 638 F.3d at 1208. Detainees suffer not only physical incarceration, but also separation from their families, loss of income and the ability to serve as wage earners for their families, and the mental and physical health effects of incarceration.  *See, e.g.*, Arulanantham Dec. ¶¶ 22-46, 65-71; *see also* Tan Dec. ¶¶ 15-20 (summarizing A file information on class members' family ties).  They are also detained in facilities with limited access to visitation or legal materials.  *See* Inlender Dec. ¶¶ 8-14.  For most class members, immigration detention is not meaningfully different from prison.

### B.    The Government's Failure to Provide Periodic Hearings and Sufficient Notice Creates a High Risk of Erroneous Deprivation.

Respondents' current procedures create a high risk of erroneous deprivation in three respects.  First, Respondents impose a burden on detainees to affirmatively request hearings, instead of providing them automatically after six months of detention.  Second, even assuming detainees should be required to bear this burden, Respondents' notice neither adequately informs detainees how to request the hearing

40

nor tells them what the hearing entails.  Third, Respondent do not provide for periodic hearings for individuals detained more than one year.

As a threshold matter, the government has an independent obligation to ensure that detention is justified, whether or not a detainee requests a hearing.  As the Ninth Circuit held in striking down a civil commitment statute that did not require automatic detention review, "[i]t is the state, after all, which must ultimately justify depriving a person of a protected liberty interest by determining that good cause exists for the deprivation."  *Doe v. Gallinot*, 657 F.2d 1017, 1023 (9th Cir. 1981).  By requiring class members to affirmatively request hearings, ICE's procedures make it very likely that at least some individuals who would win release will never have a meaningful opportunity to seek it.  The protection of hearings that detainees must affirmatively request is "illusory" when detainees "cannot realistically be expected to set the proceedings into motion in the first place."  *See id.*  Here, class members are detained for months and years, often without access to counsel or visitation from family members who might otherwise assist them in obtaining hearings.  Many of them are not proficient in English or illiterate, and have only limited access to a law library even if they are able to use one.  *See* Inlender Dec. ¶¶ 10-14; Merida Dec. p 12-18.  Moreover, the legal process for requesting hearings requires an understanding of the highly technical text of the Court Manual.  *See* Merida Dec. ¶ 19.  Respondents' failure to provide an automatic hearing and sufficient notice has resulted in continued incarcerations despite the fact that class members were eligible for a *Casas* hearing upon obtaining a stay of removal from the Ninth Circuit pending consideration of petitions for review.  Arulanantham Dec. ¶¶ 117-28.  For instance, discovery revealed an example where a class member finally obtained release in a *Casas* hearing over a year after he became eligible for the hearing, after suffering 796 days of detention.  *Id.*[24]

---

[24] Along with providing automatic hearings, Respondent should be required to provide notice sufficiently in advance of the bond hearing to enable detainees to prepare.  *See*

1    Even if the Court holds that automatic hearings are not required, the notice that

2    ICE provides falls far short of being "reasonably calculated, under all the

3    circumstances, to apprise . . . [class members] of the pendency of the action and afford

4    them an opportunity to present their objections." *Mullane v. Central Hanover Bank &*

5    *Trust Co.*, 339 U.S. 306, 314 (1950).  The Ninth Circuit has clarified that,

6    "[p]articularly when the alien is representing himself and has language difficulties, as

7    is so often the case . . . a high degree of clarity should be a part of the process

8    accorded."  *Padilla-Agustin v. INS*, 21 F.3d 970, 976 (9th Cir. 1994), *overruled on*

9    *other grounds by Stone v. INS*, 514 U.S. 386 (1995); *see also Orantes-Hernandez v.*

10   *Smith*, 541 F.Supp. 351, 384 (C.D. Cal. 1982) (acknowledging, in immigration

11   detention context that "incarcerated persons[,] though most in need of an opportunity

12   to be heard, are least able to learn about their rights").

13       Respondents' procedures fall far short of clarity, particularly for the substantial

14   number of detainees who lack counsel and do not speak English or are illiterate.  *See*

15   Inlender Dec. ¶ 10; Merida Dec. ¶ 12; *see also* Executive Office for Immigration

16   Review FY 2011 Statistical Yearbook G1 (Kaufman Dec. Ex. 38) (In Fiscal Year

17   2011, only 51% of noncitizens, both detained and non-detained, represented by

18   counsel in proceedings nationwide).  Respondents only notify individuals of their

19   right to a *Casas* hearing in one sentence that cross-references Chapter 9 of the Court

20   Manual.  *Compare Walters v. Reno*, 145 F.3d 1032, 1042 (9th Cir. 1998) (striking

21   down INS procedures regarding document fraud in part because of "confusing

22   references to sections of the INA" without further explanation of those sections).

23

24   *In re Gault*, 387 U.S. 1, 33 (1967) ("Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that

25   reasonable opportunity to prepare will be afforded.").  Given Respondents' practice of failing to give adequate notice prior to the bond hearings ordered by the Court on preliminary injunction, *see* Tolchin Dec. ¶¶ 7-8; Declaration of Luis Gonzalez ¶¶ 3-7,

26   Respondents should be ordered to ensure that noncitizens *receive* notice at least seven

27   days prior to prolonged detention bond hearings so that detainees can prepare documentary evidence, contact witnesses, and attempt to retain counsel.  *See* Tolchin

28   Dec. ¶ 15 (describing preparation for, and conduct of, bond hearings).

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

Although the Court Manual is available on computer terminals through LEXIS CD-ROMs at detention facilities in this district, detainees have restricted access to the terminals. Merida Dec. ¶¶ 13-18. In the Adelanto facility, for example, approximately 300 detainees share eight computer terminals that they can only access 25-30 minutes per day.[25] *Id.* at ¶ 15. Detainees' access has been further limited for weeks or months at a time when the facility fails to update its subscription with LEXIS. *See id.* at ¶ 18; *compare Orantes-Hernandez v. Gonzales*, 504 F.Supp. 2d 825, 875 (C.D. Cal. 2007) (summarizing reports of problems with access to legal materials and finding "a significant number of violations of critical provisions of the injunction [governing Salvadorans and asylum] dealing with detainees' access to legal materials, telephone use, and attorney visits").

Even if detainees are fortunate enough to obtain access to the LEXIS CDs and have the computer proficiency to locate the Manual on the CD, it is written in highly technical legal language that is far from clear. The detainee must wade through legal language about detention generally, detention of juveniles, and jurisdiction to arrive at Section 9.3(c)(i), which provides that a detainee may make a request for a bond hearing in writing or in court.[26] *See* Chapter 9 of the Court Manual (Kaufman Dec. Ex J). That section confusingly states that the Immigration Judge does not have jurisdiction over bond hearings for noncitizens with certain criminal convictions, even though detainees seeking *Casas* hearings may have such convictions. Even if detainees get past this misleading language, the Manual provides three options—listed in legalistic language—for where the detainee should file the request, "in order of

---

[25] Access is similarly restricted at other facilities. *See* Kaufman Dec. ¶¶ 26-29 (estimating population of detainees at each facility); Inlender Dec. ¶ 11 (describing access to legal materials at Santa Ana City Jail, Theo Lacy facility, and Musick facility).

[26] The detainee must know not to confuse a request for a bond redetermination under Section 9.3 with a "Continued Detention Review" under Section 9.4, which is not applicable to pre-final-order detainees.

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

preference:" "the Immigration Court having jurisdiction over the alien's place of
detention," "the Immigration Court with administrative control of the case," or the
"Office of the Chief Immigration Judge." *Id.* In the unlikely event that a detainee
without legal knowledge can determine which court has "jurisdiction" or
"administrative control," the manual does not give the detainee the address of the Los
Angeles Immigration Court (nor does the notice itself). The rest of the
requirements—that the detainee re-file documents he already filed in his removal case
with his request for a bond hearing, that the documents be filed concurrently with the
request, and that the detainee may present witnesses or other evidence—are presented
in similarly technical language. Nowhere is the detainee explicitly told that, if he does
not affirmatively request a hearing, ICE will continue subjecting him to prolonged
incarceration.

    This "concatenation of factors" results in a confusing and legalistic notice that
carries a high risk of failing to inform detainees of exactly how to obtain a prolonged
detention hearing. *Martinez-de Bojorquez v. Ashcroft*, 365 F.3d 800, 804 (9th Cir.
2004) (holding that EOIR failure to provide noncitizen notice of consequences of
departures from United States violated procedural due process); *see also Walters*, 145
F.3d at 1043 (striking down INS procedures in part because "the alien never learns
*how* to take advantage of the . . . procedures because the combined effect of all the
[immigration] forms together is confusion.") (emphasis in original). The notice
neither sufficiently advises detainees of how to request a hearing nor clearly tells them
that they must prepare for it by submitting the necessary legal arguments and
evidence. Detailed documentary and testimonial evidence "can be critically important
to establishing a client's fitness for release and to obtaining a reasonable bond
amount." *See* Tolchin Dec. ¶ 15. Without proper notice, prolonged detainees—who
have already endured months of detention—may never have a chance to obtain
release. *Compare French v. Blackburn*, 428 F.Supp. 1351, 1356 (M.D.N.C. 1977),
*aff'd*, 443 U.S. 901 (1979) (civil commitment case in which court upheld detention

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

only when the government's notice informed the detainee of his right to counsel, and "that he would be given the opportunity to present evidence at the hearing").

For individuals who do not prevail at their first *Casas* hearing, Respondents' procedures impose a risk of additional deprivation. Despite the fact that a detainee's deprivation of liberty becomes greater as his detention length increases, Respondents provide no mechanism for periodic immigration court hearings. Thus, an individual who is detained past six months may be continued in detention for months or even years without any additional hearings before an Immigration Judge. With *Casas* detainees and the parole process, ICE does not appear to review any individual's custody on a periodic basis. Indeed, ICE policy is not to automatically review parole determinations even when a detainee prevails before the Immigration Judge but ICE chooses to appeal to the BIA. *See* Lee Dep. at 56:20-57:1 (Jacobs Dec. Ex. F) (testifying that no automatic parole redetermination procedure exists for when individuals prevail in immigration court). In the case of detainees covered by *Casas*, this means that, after the initial custody review, ICE does not provide notice that the individual is eligible for an Immigration Judge hearing at any further point in time.

An example of the consequences of ICE's failure to provide periodic hearings from the parole context involves a class member who was a refugee from Somalia. ICE initially denied release based on its assessment that he did not have a sponsor if he was released. Arulanantham Dec. ¶¶ 78-82. Two months later, in his asylum application, he submitted a declaration from "an American citizen (and family friend) who pledged to allow him to remain at her residence, expressing that she was 'unconditionally willing to assist [him] once he is out.'" *Id.* at ¶ 83. But because ICE does not conduct periodic custody reviews under its parole procedures, he was subjected to 512 days of incarceration, approximately one year of which was after he submitted documentation of sponsorship. *Id.* at ¶ 84. He only obtained release after he prevailed on his asylum claim before the Immigration Judge. *Id.*

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.    Substitute Procedures Would Place a Minimal Burden on the Government.**

The substitute procedures Petitioners seek—automatic, periodic hearings and adequate notice—impose a minimal burden on the government.  The government has stipulated that it will not argue that "the cost of providing a bond hearing should be considered in this case as a factor weighing in favor of Respondents."  Dkt. 165 at 4-5.  The administrative burden on the government of providing automatic, periodic hearings and notice is low.  Respondents already conduct numerous bond hearings, including *Casas* hearings, and appear to be complying with the terms of the Court's preliminary injunction without having changed Immigration Judge staffing levels.  *See* Kaufman Dec. ¶ 29; Tolchin Dec. ¶ 9.  *Casas* hearings are typically brief, consuming only ten to fifteen minutes.  *See* Tolchin Dec. ¶ 9.  Many hearings are conducted via video conference, and do not require transportation of detainees to the Los Angeles Immigration Court or the physical use of a courtroom.  *See id.* ¶ 10.[27]

Petitioners' proposed changes to Respondents' notice procedures impose even less of a burden.  Requiring Respondents to provide a plain language explanation of detainees' rights likely requires a paragraph of additional text.  *See Martinez de Bojorquez*, 365 F.3d at 805 (cost of adding written notice is "minimal"); *Walters*, 145 F.3d at 1044 ("constitutionally adequate notice requires only minor changes in the content of . . . [INS] forms").

Accordingly, the Court should require Respondents to provide notice in plain language, automatic hearings, and periodic immigration court hearings for those facing immigration incarceration beyond one year.[28]

---

[27] To the extent that the additional procedures that Petitioners seek result in the release of detainees who would otherwise not obtain release or prevail in prolonged detention bond hearings, Respondents will realize a substantial savings.  *See* Long Report at 16 (Long Dec. Ex. A) (Respondents' continued detention of prolonged detention class members in the sample required 184,067 detention beds for the year following the initial six months of detention).

[28] To the extent the Court must make a distinct finding that equity warrants issuance of an injunction in cases involving serious deprivations of liberty, Petitioners' entitlement to an injunction follows from this Court's order granting preliminary

46

1

## CONCLUSION

2        For the foregoing reasons, Plaintiffs respectfully request that the Court grant

3   summary judgment in their favor on the claims asserted herein, that the Court order

4   the government to provide bond hearings to all class members, that it require such

5   hearings to be "adequate," as defined here, and that it order such other relief as set

6   forth in the accompanying proposed order.

7                                    Respectfully submitted,

8   Dated:  February 8, 2013         SIDLEY AUSTIN LLP

9

10                                   By:   /s/ Sean A. Commons
                                           SEAN A. COMMONS
11                                         Counsel for Plaintiffs-Petitioners

12

13

14

15

16

17

18

19

20

21

22

23

24

25   injunctive relief.  For reasons this Court has previously recognized, the class members
     who seek relief by this Motion all have suffered or will suffer irreparable harm for
26   which no remedy at law can compensate them, the balance of equities strongly weighs
     in favor of remedying that harm, and doing so would be in the public interest.  *See*
27   Dkts. 232, 255; *see also Correctional S'vces Corp. v. Malesko*, 534 U.S. 61, 74 (2001)
     ("[I]njunctive relief has long been recognized as the proper means for preventing
28   entities from acting unconstitutionally.").

**PETITIONERS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**