1 | **AHILAN T. ARULANANTHAM (SBN 237841)**
aarulanantham@aclu-sc.org
2 | **MICHAEL KAUFMAN (SBN 254575)**
mkaufman@aclu-sc.org
3 | **ACLU FOUNDATION OF SOUTHERN CALIFORNIA**
1313 West Eighth Street
4 | Los Angeles, CA 90017
Telephone: (213) 977-9500
5 | Facsimile: (213) 977-5297

6 | *Attorneys for Petitioners*
(Additional Counsel listed on following page)

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ALEJANDRO RODRIGUEZ, ABDIRIZAK ADEN FARAH, YUSSUF ABDIKADIR, ABEL PEREZ RUELAS, JOSE FARIAS CORNEJO, ANGEL ARMANDO AYALA, for themselves and on behalf of a class of similarly-situated individuals, | Case No. CV-07-3239-TJH (RNBx) |
| | **DECLARATION OF BYRON MERIDA** |
| | Honorable Terry J. Hatter |
| Petitioners, | |
| v. | Date: May 6, 2013 |
| | Time: Under Submission |
| ERIC HOLDER, United States Attorney General; JANET NAPOLITANO, Secretary, Homeland Security; THOMAS G. SNOW, Acting Director, Executive Office for Immigration Review; TIMOTHY ROBBINS, Field Office Director, Los Angeles District Immigration and Customs Enforcement; WESLEY LEE, Officer-in-Charge, Mira Loma Detention Center; et al.; RODNEY PENNER, Captain, Mira Loma Detention Center; SANDRA HUTCHENS, Sheriff of Orange County; OFFICER NGUYEN, Officer-in-Charge, Theo Lacy Facility; CAPTAIN DAVIS NIGHSWONGER, Commander, Theo Lacy Facility; CAPTAIN MIKE KREUGER, Operations Manager, James A. Musick Facility; ARTHUR EDWARDS, Officer-in-Charge, Santa Ana City Jail; RUSSELL DAVIS, Jail Administrator, Santa Ana City Jail, | |

JUDY RABINOVITZ
JRabinovitz@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2618
Facsimile: (212) 549-2654

JAYASHRI SRIKANTIAH (SBN 189566)
STANFORD LAW SCHOOL
IMMIGRANTS' RIGHTS CLINIC
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 724-2442
Facsimile: (650) 723-4426

SEAN COMMONS (SBN 217603)
CODY JACOBS (SBN 272276)
JONATHAN FEINGOLD (SBN 286302)
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013-1010
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

*Attorneys for Petitioners*

DECLARATION OF BYRON MERIDA

## DECLARATION OF BYRON MERIDA

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. My name is Byron Merida. I am originally from Guatemala. I came to the United States in 1986 on a tourist visa and have lived here since that time. My entire immediate family lives in the United States including my mother Amparo (age 72) and my father Rafael (age 72), and my sisters Helga (age 52), and Aida (age 51) my brothers Rafael (age 53) and Oscar (age 40), and my brother in law Audenago (age 45), and my sister in law Rosa (age 35), and my nieces Helga-Livier (age 20), Maura (age 19), Jasmine (age 17) and Rosi (age 3) and Vini (age 1). Most of them are United States citizens and the rest are legal permanent residents. My ex-wife Gladis Espino is a United States citizen, but she divorced me after I had been in immigration detention for approximately 2 years.

3. During my time in the United States, I have built several businesses in the financial and computer industries. Among the business in which I was involved, I founded Mortgage Financial Group, Inc., in 2004,. The company provided mortgage and real estate services, and employed approximately 10-15 people.

4. At the end of 2008, due to the economic downturn and financial pressure I was under, I made some bad decisions that I regret. In March 3rd 2009 I was convicted of Second Degree commercial burglary and sentenced to 365 days in jail. It is my only criminal conviction. In April 2009 I was about to be release from county jail, when I got notify that I had an Immigration hold and in June 29, 2009 I was transferred to immigration custody and placed in removal proceedings.

5. In the beginning of my case, the immigration judge told me that my criminal conviction was an "aggravated felony" and that, as a result, I could not adjust my status or be released on bond. The immigration judge ordered me removed in May 11, 2011.

6. I appealed the immigration judge's ruling to the BIA, and the BIA affirmed the decision in September 30th 2011. I appealed to the Ninth Circuit in October 17th 2011. In October 2012, the Ninth Circuit granted my petition for review and remanded my case to

the BIA. I filed a brief with the BIA in November 2012. I just learned that I have an immigration court hearing on March 13th 2013.

7. After I appealed to the Ninth Circuit, I received a notice of custody determination from ICE that said that they had decided not to release me.

8. From my experience working in the law library and reading legal materials, I knew I could request a *Casas* bond hearing after I appealed to the Ninth Circuit. However, I thought that the immigration judge would likely deny me release or set a very high bond because of what the judge had said to me about the seriousness of my criminal conviction. My family is currently under a lot of financial stress because my sister-in-law is very ill with multiple sclerosis and they have to spend the little money they have taking care of her. Even if the judge set a high bond, I was worried that my family would have to choose between my bond or my sister-in-law's medical care.

9. In October 2012, I received notice that I would get a bond hearing due to the *Rodriguez* case. At that point I had been detained over three years in immigration detention. I decided I would try to ask the judge to release me on a low bond because I could not stand to be in detention any longer, but I did not want to give up my immigration case and the chance to stay here with my family.

10. In approximately late October 2012, I had my *Rodriguez* bond hearing and the judge ordered me released on a $2,500 bond. I was released several weeks later in November 2012. I spent a total of three years and 4 months in detention. I am now living with my sister. I am very thankful to be able to be able to continue fighting my case outside of detention.

11. During my time in detention, I was detained in Mira Loma for approximately a little more than 2 years and detained in Adelanto for approximately a little more than one year.

12. At Mira Loma, I would frequently visit the law library to work on my case. Due to the limitation and access of legal material I purchase my own legal books and then I

DECLARATION OF BYRON MERIDA

gradually learned a lot about the immigration process. However, most of the detainees I met in Mira Loma understood very little about their cases and the immigration process. Many did not have attorneys, speak or read English, or understand the steps for applying for relief, bond or for appeals. During my time in Mira Loma, I helped many people research their cases because I had learned a lot of about the immigration process, the legal materials available at Mira Loma, and because I could read and write English fluently. In total, over the course of my time in at Mira Loma, I would estimate that I informally assisted more than 500 people with their immigration cases.

13. At Adelanto, I also informally assisted many detainees with their cases. I worked at two law libraries during my time in Adelanto. For the approximately first six or seven months I was detained, I worked at the law library in Building 1. After that, I was moved to a different housing unit, and worked at the law library in Building 2. I worked at the law library in Building 2 for approximately seven to eight months. Because of my work in the law library, I had frequent contact with detainees who were attempting to use the library materials.

14. The law library in Building 1 was open from 8 AM to 4 PM, Monday through Friday. The law library consisted of eight computer terminals. There were no paper books or materials available in the law library. Each of the computer terminals had a LEXIS program that contained some legal materials.

15. Approximately 300 detainees had access to the law library in Building 1. If a detainee wanted to use the law library, he had to sign a schedule that had 1-hour periods. Each hour, the law librarian would pick up the people assigned for the hour and take them to the law library. Because it usually took time to return the detainees to their housing units and pick up the new detainees, detainees would only be able to use the computer terminals on average for 25-30 minutes of the hour period. Each detainee was permitted only one hour per day at the law library.

DECLARATION OF BYRON MERIDA

16. The law library in Building 2 was open from 8 AM to 4 PM, Monday through Friday. The law library consisted of six computer terminals. There were some paper books available in Building 2, but they were mostly fiction novels. I do not believe there were any paper legal materials available.

17. Approximately 300 detainees had access to the law library in Building 2. Access for the law library in Building 2 was different than in Building 1. Detainees were permitted to use the law library for 2 hours each day. In addition, because the law library adjoined the housing units, the law librarian did not need to escort detainees to and from the library.

18. The only way to access legal materials at the computer terminals in the law library was through LEXIS. During my time in Adelanto, there were often problems accessing the legal materials on the LEXIS program. On three occasions, the facility did not renew the subscription and login information for the LEXIS program, and the program was completely inaccessible until the subscription was renewed. I would notify the person in charge of the law library when the program did not work, but it would usually take a significant amount of time to fix it. The first two times this occurred, we had no access to the LEXIS program for approximately two weeks. The last time this occurred, in approximately September-October 2012, we had no access to the LEXIS program for between one to two months. During these times, we had no access to any legal materials in the law libraries, apart from our own files and notes.

19. One of the legal materials available on the LEXIS program is the Immigration Court Practice Manual. The document contains information about the immigration court process, and has sample forms. On occasion, I would review the Manual when helping people to find legal materials relevant to their cases. In my experience, detainees found the Manual difficult to understand because it contained a lot of legal terminology. For that reason, I would usually rely on notes and forms I had previously collected, rather than the Manual, when helping people to find forms and legal materials relevant to their cases.

DECLARATION OF BYRON MERIDA

20. During my time in detention, I regularly met detainees who had appealed their cases to the Ninth Circuit. Many of the detainees did not realize that they could request a *Casas* hearing and ask to be released on bond. I would estimate that I spoke to dozens of people who did not know they could request a *Casas* hearing. Some reported not receiving any notice of a *Casas* custody determination from ICE. Some others reported receiving a notice, but did not understand that they could request a *Casas* hearing in immigration court.

21. Of the people who did not realize they could request a *Casas* hearing, many already had been detained for a significant period of time after they had filed their Ninth Circuit appeal. Several had been detained for at least 3-4 months, and a couple had been detained for more than a year after they filed their petitions for review and stays of removal. After I told them that they could request a *Casas* hearing, I explained how they could file a motion for a *Casas* hearing if they wanted to request one. I also explained how they could prepare for the bond hearing, including by gathering documents and identifying witnesses. Several of the people I assisted were granted a *Casas* bond and released.

22. I feel fortunate that I could assist the other detainees as a law librarian because of my fluency in English, my education, and my ability to read and understand the legal materials. Most of the other detainees I met struggled to understand and represent themselves in immigration court. I would estimate that I had contact with many hundreds of individuals during my time in immigration detention. Of the individuals I encountered, I would estimate that most were not proficient in English, and many were not literate in any language.

23. In my experience, detainees in Adelanto received notices from the immigration court through the mail, and not by hand delivery.

DECLARATION OF BYRON MERIDA

1
2   I declare under penalty of perjury of the laws of the State of California and the
3   United States that the foregoing is true and correct to the best of my knowledge and belief.
4   Executed this 7th day of February, 2013 in the city of Van Nuys, California.
5
6
7
8   
9   _____
    Byron Merida
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF BYRON MERIDA