1   **AHILAN T. ARULANANTHAM (SBN 237841)**
    aarulanantham@aclu-sc.org
2   **MICHAEL KAUFMAN (SBN 254575)**
    mkaufman@aclu-sc.org
3   **ACLU FOUNDATION OF SOUTHERN CALIFORNIA**
    **1313 West Eighth Street**
4   **Los Angeles, CA 90017**
    **Telephone: (213) 977-9500**
5   **Facsimile: (213) 977-5297**

6   *Attorneys for Petitioners*
    **(Additional Counsel listed on following page)**

7

8                    UNITED STATES DISTRICT COURT

9             FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                         WESTERN DIVISION

| | |
|---|---|
| 11  ALEJANDRO RODRIGUEZ, ABDIRIZAK ADEN FARAH, YUSSUF | ) Case No. CV-07-3239-TJH (RNBx) |
| 12  ABDIKADIR, ABEL PEREZ RUELAS, JOSE FARIAS CORNEJO, ANGEL | ) **DECLARATION OF MICHAEL** |
| 13  ARMANDO AYALA, for themselves and on behalf of a class of similarly-situated | ) **KAUFMAN** |
| 14  individuals, | ) Honorable Terry J. Hatter |
| 15       Petitioners, | ) Date: May 6, 2013 |
| 16       v. | ) Time: Under Submission |
| 17  ERIC HOLDER, United States Attorney General; JANET NAPOLITANO, | ) |
| 18  Secretary, Homeland Security; THOMAS G. SNOW, Acting Director, Executive | ) |
| 19  Office for Immigration Review; TIMOTHY ROBBINS, Field Office | ) |
| 20  Director, Los Angeles District Immigration and Customs Enforcement; WESLEY LEE, | ) |
| 21  Officer-in-Charge, Mira Loma Detention Center; et al.; RODNEY PENNER, | ) |
| 22  Captain, Mira Loma Detention Center; SANDRA HUTCHENS, Sheriff of Orange | ) |
| 23  County; OFFICER NGUYEN, Officer-in-Charge, Theo Lacy Facility; CAPTAIN | ) |
| 24  DAVIS NIGHSWONGER, Commander, Theo Lacy Facility; CAPTAIN MIKE | ) |
| 25  KREUGER, Operations Manager, James A. Musick Facility; ARTHUR EDWARDS, | ) |
| 26  Officer-in-Charge, Santa Ana City Jail; RUSSELL DAVIS, Jail Administrator, | ) |
| 27  Santa Ana City Jail, | ) |
| 28       Respondents. | ) |

1
JUDY RABINOVITZ
JRabinovitz@aclu.org
2
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
3
125 Broad Street, 18th Floor
New York, NY 10004
4
Telephone: (212) 549-2618
Facsimile: (212) 549-2654
5
MICHAEL TAN (SBN 284869)
6
mtan@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
7
IMMIGRANTS' RIGHTS PROJECT
39 Drumm St.
8
San Francisco, CA 94111
Telephone: (415) 343-0779
9
Facsimile: (415) 395-0950
10
JAYASHRI SRIKANTIAH (SBN 189566)
jsrikantiah@law.stanford.edu
11
STANFORD LAW SCHOOL
IMMIGRANTS' RIGHTS CLINIC
12
Crown Quadrangle
559 Nathan Abbott Way
13
Stanford, CA 94305-8610
Telephone: (650) 724-2442
14
Facsimile: (650) 723-4426
15
SEAN COMMONS (SBN 217603)
16
scommons@sidley.com
CODY JACOBS (SBN 272276)
17
cjacobs@sidley.com
JONATHAN FEINGOLD (SBN 286302)
jfeingold@sidley.com
18
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
19
Los Angeles, CA 90013-1010
Telephone: (213) 896-6000
20
Facsimile: (213) 896-6600
21
***Attorneys for Petitioners***

22

23

24

25

26

27

28

---

**DECLARATION OF MICHAEL KAUFMAN**

# DECLARATION OF MICHAEL KAUFMAN

I, Michael Kaufman, hereby declare:

1.      I am a staff attorney at the American Civil Liberties Union of Southern California and counsel of record for Petitioners in the above-entitled certified class action ("*Rodriguez*"). I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

## Overview

2.      During the course of discovery in *Rodriguez,* Respondents produced information about class members from government databases maintained by the Executive Office for Immigration Review ("EOIR") and Immigration and Customs Enforcement ("ICE"), as well as portions of A-files, for 1,026 people Respondents represented were class members. These individuals are referred to as the "studied class members." Specifically, Respondents represented that the information pertains to noncitizens detained six months or longer in the Central District from approximately April 21, 2011 until approximately April 21, 2012 who spent a substantial portion of their time in detention in the Central District. Petitioners received several "shipments" of data about those individuals, including one on or about August 12, 2011 and another updated one on or about October 11, 2012. Petitioners also received A files for those individuals over the course of several months, although the files were never updated.

3.      The parties have stipulated that the A files produced by Respondents are authentic under Rule 901 of the Federal Rules of Evidence, and, absent a challenge to the reliability of a specific document, admissible under either or both Rule 803(6) and Rule 803(8) of the Federal Rules of Evidence.  True and correct copies of letters between the parties memorializing this stipulation are attached as Exhibit 2 to the Declaration of Ahilan Arulanantham.

4.      Representatives of Respondents testified at deposition that information in the government databases produced to Petitioners is reliable and relied upon by

Respondents in the course of their regularly conducted activities. *See* Deposition of Sean Stephens at 21:24-22:14 (attached as Ex. I to the Declaration of Cody Jacobs); Deposition of Jennifer Sherriff at 14:14-15:1 (Jacobs Decl. Ex. H); Deposition of Benjamin McDowell at 152:17-153:5 (Jacobs Decl. Ex. G).

5.     Respondents produced to Petitioners database information and A file documents related to approximately 1,026 individuals who Respondents represented that they do not maintain database information specifically identifying the detention statute pursuant to which they detain class members (or other detainees). As Government counsel Theodore Atkinson stated in correspondence to us, "Respondents do not maintain electronic records of the detention statute that authorizes or authorized detention." A true and correct copy of that letter, dated March 17, 2011, is attached to the Declaration of Ahilan Arulanantham as Exhibit 1.

6.     In the following paragraphs, I explain how we determined from the information and documents produced by Respondents which individuals fell within certain subclasses, and how we determined which individuals do not qualify as class members, notwithstanding that Respondents produced their information to us.

### Identifying Individuals in the 1225(b) Subclass

7.     The Section 1225(b) subclass includes people who are arrested at a port of entry "seeking admission" to the United States and are detained under 8 U.S.C. § 1225(b) ("Section 1225(b)"). The government decides the custody status of Section 1225(b) subclass members through the parole process, an administrative review conducted by ICE officials.

8.     To identify individuals in the 1225(b) subclass, we determined whether the A files contained parole worksheets. A parole worksheet is a standard form used by ICE to determine the custody status for individuals detained under Section 1225(b). The presence of a parole worksheet in an A file evidences that an individual has been detained under Section 1225(b).

2

9.     We tested the accuracy of our method for determining membership in the Section 1225(b) Subclass through actual review of a sample of the files of individuals we had identified through this method. That review confirmed that the individuals with parole worksheets in their files were members of the Section 1225(b) subclass.

10.     Pursuant to a discovery agreement memorialized in a June 4, 2012 letter from Mr. Atkinson to Mr. Arulanantham, Respondents produced parole worksheets for approximately 68 individuals. In a March 23, 2012 letter, counsel for Respondents represented that these parole worksheets were located within the 1,026 A files based on reasonably diligent and reliable searches. For purposes of the data summarized below, these individuals have been categorized as members of the Section 1225(b) subclass.

11.     True and correct copies of the June 4, 2012 and March 23, 2012 letters from Respondents' counsel are attached hereto as Exhibits A and B.

### Identifying Individuals in the 1226(c) Subclass

12.     The Section 1226(c) subclass includes people who are subject to mandatory detention under 8 U.S.C. § 1226(c).

13.     To identify individuals in the 1226(c) subclass, we needed to consult two pieces of information within database information and A files produced by Respondents. First, we consulted a field within the EOIR Access database produced by Respondents on October 14, 2011 that identifies the statutory provisions under which an individual was charged as removable. We compared the charges listed in the EOIR database for each class member with the charges that qualify as mandatory detention offenses, as provided in 8 U.S.C. § 1226(c)(1). Individuals that had been charged with a mandatory detention offense were detained pursuant to Section 1226(c) at some point during their detention. In the March 17, 2011 letter from Mr. Atkinson to Mr. Arulanantham, Respondents confirmed "the charge against the alien (from EOIR)" could be used to "identify whether the detainee is/was held under mandatory detention."

DECLARATION OF MICHAEL KAUFMAN

14.     Second, we reviewed the EOIR database for records evidencing whether these individuals were detained under Section 1226(c) at any point after they had been detained for at least six months (because the statutory authority for detention in certain circumstances can change over time).  For example, individuals charged with a mandatory detention offense can prevail on a challenge to their removability on that ground, or the government can withdraw the charge against them.  In both cases, the individual would no longer be detained under Section 1226(c) after the mandatory detention charge was dismissed or withdrawn.  To account for these possibilities, we looked at whether any of the individuals with 1226(c) offenses had a bond hearing prior to being detained for six months.  If an individual had a bond hearing, we could reasonably assume that the government did not treat them as detained under Section 1226(c) when he or she became a class member (that is, when their detention exceeded six months).  Conversely, if they had a Section 1226(c) charge and did not have a bond hearing prior to six months, we could reasonably assume that they were Section 1226(c) subclass members.

15.     To determine whether class members had bond hearings prior to six months of detention, we relied on information contained in the ICE and EOIR databases.  This analysis was conducted by a volunteer attorney, Fatima Alloo, under my direction and supervision.  We first determined the initial date of detention for class members by consulting the ICE spreadsheet, which contains the book-in dates for class members.  We then calculated the date on which an individual qualified as a class member by adding 180 days to the book-in dates.

16.     We then exported information from the Bond Table and Case Table Date from the EOIR Access database.  Because the Bond Table identifies detainees by reference to a number known as an IDN case number rather than an A#, we used the Case Table (which contains both IDN case numbers and A#s) to match the information from the Bond Table with the information drawn from the ICE database.  We were then able to create a spreadsheet that contained the names, A#s, book-in

DECLARATION OF MICHAEL KAUFMAN

dates and 180-day dates drawn from the ICE database, and the bond hearing date, decision, "initial bond" and "new bond" amount information drawn from the EOIR Access database. We then analyzed the dates for when each bond hearing occurred, and removed the people who had bond hearings within their first six months of detention. Where the data was ambiguous, we consulted detainee files to confirm whether a bond hearing had occurred (or if, as the data occasionally indicated, the detainee had made an appearance before an immigration judge but the judge had determined that he or she lacked authority to release the individual because he was subject to mandatory detention). The resulting list contained 464 unique individuals whom we categorized as falling within the 1226(c) subclass.

17. That number, which reflects that roughly half of the class are subject to 1226(c), is consistent with my and my co-counsel's experience in interviewing large numbers of class members over the course of the last several years.

18. We tested the accuracy of our method for determining membership in the Section 1226(c) Subclass through actual review of a sample of the files of individuals we had identified through this method. That review confirmed that the individuals we identified had been subjected to mandatory detention and were members of the Section 1226(c) subclass. Several of the individuals selected from the sample are described in the "mandatory detention" section of Mr. Arulanantham's declaration.

**Identifying Individuals in the 1231(a) Subclass**

19. Section 1231(a) subclass members include people who have an administratively final order of removal, but who continue to litigate their removal cases either through filing a motion to reopen ("MTR") or some other mechanism.

20. We made several unsuccessful attempts to identify the Section 1231(a) subclass members. We first consulted information in the Applications Table in the EOIR database, as well as information in class members' A files, to determine which class members had filed MTRs. We next looked for information in the database that evidenced the individual was: (1) someone who filed an MTR to challenge a final

5

1    order after they had been detained for 180 days; (2) someone who filed an MTR

2    before the 180-day mark, but whose MTR remained pending after 180 days; or (3)

3    someone whose MTR was denied prior having been detained 180 days, but who had

4    appealed and received a stay of removal, and the appeal remained pending after 180

5    days.

6        21.    Despite investing significant time and effort to identify individuals within

7    the Section 1231(a) subclass using these and other methods, we concluded that the

8    information produced to date by Respondents during discovery does not provide a

9    reliable, formulaic way to identify persons within the Section 1231(a) subclass the

10   way we could for the 1225(b) Subclass and 1226(c) Subclass. Our conclusion was

11   based on a variety of reasons, including because the database information regarding

12   motions to reopen and stays appears to be inconsistent and incomplete.

13   **Identifying Individuals Who Do Not Fit Within The Subclasses**

14       22.    Based on the information produced by Respondents, 83 of the 1,026

15   people that Respondents identified as class members do not, in fact, appear to be class

16   members for one or more of three reasons: (1) they had not been detained for more

17   than 180 days; (2) their removal cases had completed, and they had no active removal

18   proceedings during the entire time of their detention, even though they were detained

19   longer than 180 days; and (3) they had active removal cases during their detention, but

20   their cases completed prior to their 180th day of detention.

21       23.    The EOIR and ICE database records for 2 of the 1,026 people identified

22   by Respondents as class members evidence that they spent less than 180 days in

23   detention. Those individuals have not been considered class members for purposes of

24   this analysis, or the analysis of Petitioners' expert, Dr. Susan Long.

25       24.    The EOIR and ICE database records for 24 of the 1,026 people identified

26   by Respondents as class members do not appear to contain any evidence of active

27   court proceedings, at any level, during the course of their detention. Those individuals

28

**DECLARATION OF MICHAEL KAUFMAN**

1    have not been considered class members for purposes of this analysis, or the analysis

2    of Petitioners' expert, Dr. Susan Long.

3         25.    In light of these discoveries, we also examined the database records to

4    determine if they included individuals who had been detained more than 180 days in

5    detention, but who had no active removal proceedings after their 180th day of

6    detention.  To determine this from the database, we compared the dates of detainees'

7    180th day of detention to the dates on which their cases completed.  If a detainee's

8    case was completed prior to the 180th day of detention, then he or she did not qualify

9    as a class member because he or she was not in active removal proceedings after the

10   180th day of detention.  The EOIR and ICE database records for 57 of the 1,026

11   people evidence met that criteria, and thus those individuals have not been considered

12   class members for purposes of this analysis, or the analysis of Petitioners' expert, Dr.

13   Susan Long.

14                **Detention Center and Immigration Court Information**

15        26.    I am familiar with the conditions in the immigration detention centers

16   and case processing for detained immigrants through my first-hand experience and

17   communication with immigration detainees, attorneys and legal service providers, and

18   ICE officials.  During the past two and a half years, I have spent extensive time

19   visiting immigration detainees in the Mira Loma, Adelanto, Theo Lacy, Santa Ana

20   and Musick detention centers.  I have also been on "tours" allowing me to inspect the

21   interior portions of Mira Loma, Adelanto, and Musick detention centers, and on

22   separate occasions, have also been to the interior portions of Mira Loma and Adelanto

23   in order to conduct presentations.  I would conservatively estimate that I have met

24   with at least 100 detainees in these facilities.  I also communicate regularly with

25   detainees at these facilities by letter and by phone.  In addition, I regularly

26   communicate with immigration attorneys and legal service providers who have clients

27   or provide services in these detention centers, as well as ICE officials who oversee

28

these facilities, regarding conditions at the detention centers and issues related to individual detainees' cases.

27.   Based on my experience, I believe the bed space capacity for the Adelanto, Theo Lacy, Musick and Santa Ana City Jail facilities is approximately 2,100-2,500.

28.   A true and correct copy of an email dated September 11, 2012, from Department of Justice attorney Victor Lawrence to my co-counsel Ahilan Arulanantham is attached as Exhibit O.  The email reports that, in 2012, the average daily population for the Los Angeles-area facilities is as follows: Theo Lacy (448); Musick (228); and Santa Ana (190).  ICE officials have informed me that, following the closure of the Mira Loma facility and the subsequent transfer of many of its detainees to Adelanto, the Adelanto facility is currently operating near or at its bed space capacity of approximately 1,200-1,300.

29.   Based on my experience, I believe that there are currently at least five immigration judges in the Los Angeles Immigration Court who hear detained cases regularly or exclusively.  In addition, based on the deposition testimony of Assistant Chief Immigration Judge Fong in this case, I understand that additional immigration judges may hear detained cases or hearings when there is a substantial backlog on the detained docket.  Since approximately November 6, 2012, counsel for Respondents Sarah Wilson has provided to me the hearing notices for bond hearings conducted pursuant to the preliminary injunction order in this case.  Based on my review of the hearing notices and my personal experience attending several *Rodriguez* bond hearings in the past two months, I believe that bond hearings conducted pursuant to the *Rodriguez* preliminary injunction since November 6, 2012 have been heard by the five judges who ordinarily hear detained cases.

## Reinstatement and Visa Waiver Cases

30.   In the course of the parties' meeting and conferring pursuant to Local Rule 7-3 with respect to the instant motion, counsel for Petitioners informed

8

DECLARATION OF MICHAEL KAUFMAN

1   Respondents that they intend to move for summary judgment on behalf of all class

2   members, including individuals who have a prior final order of removal reinstated and

3   are in withholding-only proceedings ("reinstatement cases"), and individuals who

4   were admitted to the United States through the visa waiver program and are in

5   asylum-only proceedings ("visa waiver cases").  On January 24, 2012, I spoke by

6   phone with counsel for Respondents, Theodore Atkinson and Sarah Wilson, along

7   with my co-counsel Ahilan Arulanantham, as part of the parties' meet and confer

8   meetings.  Mr. Atkinson stated that Respondents would oppose Petitioners' motion

9   with respect to reinstatement and visa waiver cases on the ground that, in

10  Respondents' view, the class definition applies only to people in removal proceedings

11  under 8 U.S.C. 1229a, and that individuals detained pending adjudication of their

12  reinstatement and visa waiver cases fell outside the class definition because they are

13  not in "removal proceedings" conducted under Section 1229a.   In that conversation,

14  we informed Mr. Atkinson that we would seek an order from the Court specifying that

15  those individuals are class members entitled to the same relief as other class members.

### Cost of Immigration Detention

17      31.    In its "Annual Performance Report" published on February 13, 2012, the

18  Department of Homeland Security ("DHS") estimated that the average daily cost for a

19  bed space at an immigration detention center is $122.  A true and correct copy of

20  excerpts of the DHS "Annual Performance Report" is attached hereto as Exhibit C.

21      32.    According to Dr. Long's Expert Report, the studied class members were

22  detained for approximately 184,067 aggregate days during the year following their

23  180th day in detention.  Based on the average daily cost of bed space as reported by

24  DHS, approximately $ 22,456,174 was spent on detaining the studied class members

25  during the year following their 180th day in detention.  This significantly

26  underestimates the total cost over time of detaining class members because, as Dr.

27  Long explains in her Expert Report, many class members are detained for more than

28  18 months.

33.     According to Dr. Long's Expert Report, the average period of incarceration for studied class members who won their cases was 342 days, and 509 days for the studied class members who won after proceedings at the BIA.  Based on the average daily cost of bed space as reported by DHS, the average cost of detaining the studied class members who won their cases was approximately $ 41,724 per person.  If such individuals had been released after their 180th day of detention, the cost savings to the government would have been approximately $ 19,764.  For class members who won after proceedings at the BIA, the average cost was $ 62,098 per person.  If such individuals had been released after their 180th day of detention, the cost savings to the government would have been approximately $ 40,138.

### Documents

34.     A true and correct copy of the "ISAP II Annual Report – Contract Year 2010" by BI Incorporated is attached as Exhibit D.  The document was produced by Respondents in discovery in this matter.

35.     A true and correct copy of the "ISAP II Annual Report – Contract Year 2011" by BI Incorporated is attached as Exhibit E.  The document was produced by Respondents in discovery in this matter.

36.     A true and correct copy of a memorandum dated February 28, 2011 and entitled "Alternatives to Detention Program Participant Enrollment Guidance" by Gary Mead is attached as Exhibit F.  The document was produced by Respondents in discovery in this matter.

37.     A true and correct copy of a table entitled "Median Time Intervals for Merit Terminations of Administrative Agency Appeals" from the report entitled "Judicial Business of the United States Courts 2011" is attached as Exhibit G.

38.     A true and correct copy of excerpts of a report entitled "Executive Office for Immigration Review FY 2011 Statistical Yearbook" is attached as Exhibit H.

DECLARATION OF MICHAEL KAUFMAN

39.     A true and correct copy of excerpts of a report entitled "Pretrial Release and Misconduct in Federal District Courts, 2008-2010" by U.S. Dep't of Justice – Bureau of Justice Statistics is attached as Exhibit I.

40.     A true and correct copy of excerpts of the "Immigration Court Practice Manual" by the Office of Chief Immigration Judge, Department of Justice is attached as Exhibit J.

41.     A true and correct copy of "Respondents' Answers To Plaintiff's First Set Of Requests For Admission To Respondent Department Of Justice" is attached as Exhibit K.  The document was produced by Respondents in discovery in this matter.

42.     A true and correct copy of "Expert Statistical Report of Dr. Chester I. Palmer" is attached as Exhibit L.  The document was produced by Respondents in discovery in this matter.

43.     A true and correct copy of "Rebuttal Expert Statistical Report of Dr. Chester I. Palmer" is attached as Exhibit M.  The document was produced by Respondents in discovery in this matter.

44.     A true and correct copy of a sample letter regarding "Custody Status Review" is attached as Exhibit N.  The document was produced by Respondents in discovery in this matter.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief.  Executed this 8th day of February, 2013 in Los Angeles, California.

Michael Kaufman

DECLARATION OF MICHAEL KAUFMAN

# EXHIBIT A



**U.S. Department of Justice**
Civil Division
Office of Immigration Litigation
District Court Section

_Box 868, Ben Franklin Station_
_Washington, DC 20044_
_Tel: (202) 532-4135_
_Fax: (202) 305-7000_
_Email: theodore.atkinson@usdoj.gov_

June 4, 2012

**BY E-MAIL**

Ahilan T. Arulanantham
American Civil Liberties Union of Southern California
1313 West Eighth Street
Los Angeles, California 90017

      RE:    _Rodriguez v. Robbins, et. al._, No. 07-cv-3239 (C.D. Cal.)
               Discovery Agreement

Dear Ahilan,

      This letter agreement memorializes the terms of understanding between Petitioners and Respondents concerning several outstanding discovery issues, including issues related to the district court's May 3, 2012 Memorandum and Order ("May 3 Order"). If you agree with the terms of this discovery agreement, please sign and return the letter.

### DISCOVERY AGREEMENT

I.    <u>Scope and Purpose</u> – This agreement is between Petitioners and Respondents in this above-referenced action to resolve certain discovery disputes that have arisen prior to, and in connection with, the Court's May 3, Order.   The May 3 Order vacated Magistrate Judge Block's July 25, 2011 and August 15, 2011 discovery orders related to the production in discovery of certain information restricted from disclosure under various statutes and regulations.

The May 3 Order requires the production in unredacted form of information previously withheld under Magistrate Judge Block's orders, including asylum-related, VAWA-related, and T and U visa related information.[1]  The May 3 Order requires the

---

[1] For the purposes of this agreement, (1) information contained in or pertaining to asylum claims

production of this information in unredacted form based on the Court's factual finding that the asylum information is "a part of" the proceedings from which this litigation arises, and a legal conclusion that disclosure is consistent with the statutory and regulatory language found in 8 U.S.C. § 1367 and 8 C.F.R. § 208.6.   The Court furthered ordered the parties to submit an appropriate protective order within 30 days to govern the production of information pursuant to the Court's May 3 Order.

Because Respondents believe that the May 3 Order was incorrectly decided, Respondents indicated their intention to seek immediate review of the May 3 Order in the Ninth Circuit Court of Appeals on an appeal or on a petition for a writ of mandamus. Respondents also indicated that they would seek a stay of the May 3 Order and would not produce documents containing asylum-related, VAWA-related, or T or U visa related information pending their request for review by the Ninth Circuit or other resolution. Respondents also stated that they would not produce asylum-related, VAWA related, or T or U visa related information in certain discovery matters over which the parties had previously negotiated, including documents related to the Long Term Detention Project, until after any appeal or mandamus, if taken, was resolved.   In an effort to facilitate a compromise and resolve matters regarding Respondents' production of documents, the parties have reached agreement on these discovery matters.   This Discovery Agreement embodies those terms and represents the parties' understanding and agreement with respect to the matters addressed herein.

II.   <u>Joint Stipulation for Partial Vacatur</u> –

a.   The parties agree to submit to the Court a Joint Stipulation for Partial Vacatur of the May 3, 2012 Discovery Order and related Proposed Order ("Joint Stipulation"), in the form attached as Exhibit 1, on or before June 4, 2012.

b.   Through the Joint Stipulation, the parties seek partial vacatur of the May 3 Order with respect to Petitioners' Motion for Review of the July 25 and August 15 discovery orders concerning VAWA-related and T and U visa related information. Accordingly:

1.   Respondents agree that they shall not seek any judicial review of the May 3 Order other than on appeal following final judgment in this action, <u>except</u> that the

---

or applications, including applications for relief under the Convention Against Torture ("CAT") is collectively referred to hereafter as "asylum-related information"); (2) information contemplated by 8 U.S.C. § 1101(a)(51) concerning any abused alien spouse, child or parent, including information regarding the whereabouts of such spouse, child or parent (see 8 U.S.C. § 1367) is referred to hereafter as "VAWA-related information"); and (3) information contained in or pertaining to an application or beneficiary under 8 U.S.C. §§ 1101(a)(15)(T) and (U) (see 8 U.S.C. § 1367) is referred to hereafter as "T or U visa related information").

parties agree that, if the Court denies the Joint Stipulation or if the Court does not rule on the Joint Stipulation before the Respondents' deadline to file an appeal or a petition for a writ of mandamus expires, Respondents may also seek immediate judicial review of the May 3 Order, but only with respect to the production of VAWA-related or T and U visa related information.   Regardless of when and how the Court rules on the Joint Stipulation, Respondents agree not to seek immediate judicial review of non-VAWA and non-T and U visa related information.   If Respondents seek immediate judicial review of the May 3 order with respect to non-VAWA and non-T and U visa related information, Petitioners retain the right to seek enforcement of the order to its fullest extent, notwithstanding any limitations on production of information contained in this agreement.

       2.    The parties agree that, by filing the Joint Stipulation, Respondents should not be deemed to have waived any of their rights to appeal, after final judgment in this action, any portion of the May 3 Order not vacated by the Court.

III.    <u>Discovery of Long-Term Detention Project Information</u> – To resolve issues concerning the discovery of information pertaining to the Department of Homeland Security's Long-Term Detention Project ("LTDP"), the parties agree as follows:

       a.    Respondents agree to produce the documents identified in paragraph IV(b)(1) to 4(b)(3) of this agreement, subject to the provisions of paragraph IV(a).

       b.    Petitioners agree to withdraw Interrogatory No. 22, and in exchange, Respondents agree to provide a witness designated by the Department of Homeland Security to testify under Fed. R. Civ. P. 30(b)(6) with respect to topics concerning the LTDP.   Prior to a notice of deposition's being served with respect to this deposition, the parties agree to negotiate in good faith the Rule 30(b)(6) deposition topics, in part to resolve in advance any disputes regarding deposition testimony information that may be protected by the attorney-client privilege, the deliberative process privilege, or other privileges.   If the parties cannot agree to the topics, nothing in this agreement shall waive a party's right to seek a protective order or to compel in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Court.

IV.    <u>Production of Documents</u> –

       a.    In producing responsive documents identified in subparagraph IV(b) below:

       1.    The parties agree that Respondents may withhold VAWA-related information and T and U visa related information from documents produced in discovery

       (A)    during the period the Joint Stipulation remains pending before the Court;

(B)     if the Joint Stipulation is granted; or

(C)     if the Court denies the Joint Stipulation, or does not rule on the Joint Stipulation before Respondents' deadline for appeal expires, and if Respondents decide to seek immediate further review of the May 3 Order and a stay of the May 3 Order in the Ninth Circuit Court of Appeals, during the period a motion for stay to the Ninth Circuit Court of Appeals remains pending.

Respondents shall produce all documents and other responsive discovery information consistent with the May 3 Order, except as otherwise provided in this agreement. Petitioners agree that Respondents' production of information in accordance with the May 3 Order shall not constitute waiver of any of Respondents' rights to appeal the May 3 Order consistent with paragraph 2 of this agreement.

2.     Nothing in this agreement shall be construed by Petitioners as a waiver of Respondents' right to assert, with respect to documents produced under this agreement or otherwise in discovery, previously stated objections – including, but not limited to, objections on grounds of relevance, burden, and overbreadth – not addressed by the Court in the July 25, 2011 order; the August 15, 2011 order; or the May 3 Order. Nothing in this agreement shall be construed by Petitioners as a waiver of Respondents' right to assert, with respect to documents produced under this agreement or otherwise in discovery, a privilege – including, but not limited to, the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, the law enforcement privilege – not addressed by the Court in the July 25, 2011 order; the August 15, 2011 order; or the May 3 Order.

b.     Subject to paragraph IV(a) above, Respondents agree to produce the below-described documents as follows:

1.     <u>LTDP FOIA Materials</u> – Bates labeled versions of the materials produced in response to the FOIA request, which are labeled ICE.11.FOIA.000001 to ICE.11.FOIA.000276.   The parties also agree that Respondents may redact information protected from disclosure by statute or regulation (e.g., asylum-related information, VAWA-related information, "T" or "U" visa related information, and information pertaining to applications for legalization, special agricultural worker status, or temporary protected worker status) concerning individuals reviewed as part of the LTDP and who were not detained in the Central District of California at the time, redacted in the same manner as the other spreadsheets produced by FOIA.   **Respondents agree to produce this information within five (5) business days of the entry of the Protective Order.**

2.   LTDP Final Spreadsheets – Bates labeled versions of final spreadsheets created by the LTDP working group for detained cases in ICE custody for more than 2 years, redacted in the same manner as the other spreadsheets produced by FOIA.   The parties also agree that Respondents may redact information protected from disclosure by statute or regulation (e.g., asylum-related information, VAWA-related information, "T" or "U" visa related information, and information pertaining to applications for legalization, special agricultural worker status, or temporary protected worker status) concerning individuals reviewed as part of the LTDP and who were not detained in the Central District of California at the time, redacted in the same manner as the other spreadsheets produced by FOIA.   **Respondents agree to produce this information within five (5) business days of the entry of the Protective Order.**

3.   LTDP Custody Review Worksheets – Bates labeled LTDP custody review worksheets ("CRWs") for those aliens who were detained in the Los Angeles Area of Responsibility.   **Respondents agree to produce this information within fifteen (15) business days of the entry of the Protective Order.**

4.   Parole Determination Worksheets – Parole determination worksheets identified in response to the Concordance database keyword search previously agreed to by the parties.   **Respondents agree to produce the responsive documents within two (2) business days of the entry of the Protective Order.**

5.   Form I-265s and Security Assessment Worksheets – Form I-265 or security risk/threat level assessment worksheets identified in response to the Concordance database keyword search previously agreed to by the parties.   **Respondents agree to complete production of responsive documents by June 15, 2012.**

6.   Electronic database information – Respondents agree to produce a copy of the Access electronic database containing information from the Executive Office for Immigration Review ("EOIR"), versions of which previously have been produced in this action.   Such production shall comply with the May 3 Order and this agreement.   **Respondents agree to produce the responsive database within two (2) business days of the entry of the Protective Order.**

7.   A-File Documents – The parties agree that Respondents need not conduct a page-by-page unredaction of non-VAWA-related or non-T or U visa related information (e.g., the unredaction of asylum-related information) of each of or a substantial number of A-Files previously produced in this case.   The parties also agree that Petitioners are not limited to a specific and pre-determined number of A-File documents Respondents may be required to unredact under the May 3 Order and this agreement.   Accordingly, the parties agree as follows:

a.    Petitioners represent that they have no intention to request that Respondents lift redactions with respect to a large number of documents from previously produced A-Files, and agree to limit their requests for the lifting of redactions on documents from the previously produced A-Files to a small number of individual documents, specifically identified by Petitioners by Bates number, for the purpose of conducting a sampling with respect to certain factual matters to support their claims or to discover information not available from the electronic databases produced by Respondents in this action.

b.    In exchange for Petitioners' agreement in paragraph IV(b)(7), Respondents agree not to take the deposition of any currently named class representative to this action, except that Petitioners represent that, to the best of their knowledge, Petitioner Perez Ruelas is not available for deposition, but if he becomes available for deposition, Petitioners will notify Respondents, who may then take his deposition.   The parties agree that Respondents' agreement to forego other class representative depositions shall not apply to any class representatives hereafter substituted by Petitioners in this action.   The parties further agree that, if there is a dispute as to whether Petitioners have violated their agreement under subparagraph IV(b)(7)(a) above, and if the parties cannot reasonably resolve the dispute through conference of counsel for the parties, then Respondents are not bound by their agreement in this subparagraph IV(b)(7)(b).   Should Respondents determine, after a conference of counsel for the parties, that Respondents are no longer bound by paragraph IV(b)(7)(b), then they shall inform Petitioners of that determination in writing, at which point Petitioners will no longer be bound by paragraph IV(b)(7)(a) in any respect, and will be free to request the unredaction of non-VAWA and non-T and U visa related information from the A-Files to the maximum extent permitted by the May 3 Order.

V.    Petitioners agree to provide Respondents on or before June 11, 2012, with a proposed scheduling order setting forth dates for the amendment of pleadings, close of fact discovery, dates for disclosure of experts and rebuttal experts, date for close of expert discovery, dates for filing and briefing dispositive motions, and any other scheduling matters.   The parties agree to negotiate and submit a joint scheduling order expeditiously thereafter for submission to the Court on or before June 15, 2012.

VI.    The parties agree not to take a litigation position in this action or in any appeal of this action that is contrary to their agreement.

By:  _/s/ Theodore W. Atkinson_____

Theodore W. Atkinson
Senior Litigation Counsel
United States Department of Justice
Office of Immigration Litigation
District Court Section

Counsel for Respondents

By:  _____

Ahilan T. Arulanantham
Deputy Legal Director
ACLU of Southern California

Counsel for Petitioners

# EXHIBIT B



**U.S. Department of Justice**

Civil Division
District Court Section
Office of Immigration Litigation

―――――――――――――――――――――――――――――――――

*Box 868, Ben Franklin Station*
*Washington, DC 20044*
*Tel: (202) 532-4135*
*Fax: (202) 305-7000*
*Email: theodore.atkinson@usdoj.gov*

March 23, 2012

**BY E-MAIL**

Ahilan Arulanantham
Michael Kaufman
American Civil Liberties Union of Southern California
1313 West Eighth Street
Los Angeles, California 90017

> RE:  *Rodriguez v. Robbins, et. al.*, No. 07-cv-3239 (C.D. Cal.)
> Response to February 9, 2012 Letter

Dear Michael:

I write to address an outstanding discovery issue set forth in your February 9, 2012 letter and in your March 14, 2012 e-mail.

**I.  Production of the I-265s, parole worksheets and security classification worksheets from class members' A-files**

You have requested that Respondents produce from the A-Files of the universe of approximately 1,000 aliens the following documents: (1) the Form I-265; (2) any parole determination worksheet; and (3) any security risk assessment worksheet.

As we have previously stated, Respondents are unwilling to conduct a file-by-file, page by page review to identify and produce these documents. As we have previously indicated, we believe that these documents were within your knowledge when you made your original request for A-File materials and later limited it last year. Specifically, based on the fact that you have an expert who is familiar with the contents of A-Files, there is no reasonable explanation for why these materials were not requested at that time.

We stated other objections, but we offered to conduct an electronic search of the documents through the Concordance database to determine if those form documents could be located and extracted with less burden than a page-by-page re-review of the files would require. The parties agreed to work together to conduct that search. Once the search was completed, we would then

-2-

inform you whether we would produce the documents you requested.  We address each of those form documents and the results of our search, in turn:

    1.    <u>Form I-265</u>

Each A-File in our Concordance database is imaged as a single document.  Running various test searches, we have been able to identify 687 original A-Files in which we received a hit on one of several search terms.  Those terms are:

```
BONDT'CUSTODY
BONDTECH/COUNTY
BONDT
BONDRCUSTODY
BONDO'CUSTODY
BONDLCUSTOOY
BONDLCUSTODY
BONDJCUSTODY
BONDJCIJSTODY
BONDIUSTODY
BONDICUSTOOY
BONDICUSTOIW
BOND/C
Bond adj3 cust*
Form adj2 "26.9"
Form adj3 "26.5"
Form adj3 265
Form adj3 2b5
F0rm adj3 "26.9"
F0rm adj3 "26.5"
F0rm adj3 265
Cvs* adj pr0*
F0rm adj3 2b5
Cus* adj pro*
Cvs* adj pro*
Cus* adj pr0*
```

These terms were selected for several reasons.  The I-265 form contains numerous terms that would result in hits on non I-265 documents if used (*e.g.*, "Notice," "Alien's name," etc.).  We therefore narrowed down the search terms to include those most likely to detect an I-265: searches for the terms (or variations of terms) Form I-265, Bond/Custody (which appears in the text of the form) and Custody within proximity of Processing (because the form title is a Notice to Appear, Bond, and *Custody Processing* Sheet).

-3-

Of course, the fact that we have 687 hits does not mean that the hits are on 687 Form I-265s. We
will begin reviewing the hits within each of the 687 documents to determine if they lead to a
Form I-265. If they do, we will produce it. But our intention at this time is not to look beyond
the search results from this effort. If that is unacceptable, please let us know immediately.

    2.    <u>Parole worksheets</u>

Running various test searches, we have been able to identify 68 original A-Files in which we
received a hit on one of several search terms. Those terms are:

determination/parole
four adj determin*
may adj militate
directive adj number

A spot review of the files with some of these hits shows that the OCR quality of the forms is
much higher than for the Form I-265s in the same or other files. It's unclear why the quality is
better, but it may have something to do with the size of the type and the lack of handwritten
comments. In any event, we are confident that these searches – based on typed text found in
different locations on the forms – have reasonably identified the parole determination worksheets
you seek. We will begin reviewing the hits within each of the 68 documents to determine if they
lead to a parole determination worksheet. If they do, we will produce it. But our intention at this
time is not to look beyond the search results from this effort. If that is unacceptable, please let us
know immediately.

    3.    <u>Security Risk Assessment Form</u>

Running various test searches, we have been able to identify 657 original A-Files in which we
received a hit on one of several search terms. Those terms are:

detainee adj classification
deta* adj class*
primary adj assessment
prim* adj ass*
moderate adj high
maximum adj custody
max* adj cust*

A spot review of the files with some of these hits shows that the OCR quality of the forms is
high. We are confident that these searches – based on typed text found in different locations on
the forms – have reasonably identified the security risk assessment worksheets you seek. We
will begin reviewing the hits within each of the 687 documents to determine if they lead to a
security assessment worksheet. If they do, we will produce it. But our intention at this time is

-4-

not to look beyond the search results from this effort.  If that is unacceptable, please let us know immediately.

Finally, as to timing.  We have several DOJ employees who will be taking the results of the Concordance database search and conducting a review of each file to determine if each hits corresponds with the requested worksheet.  If you are familiar with Concordance, then you will know that the hits track the OCR data.  Once located within that data, the DOJ reviewer will then go to the imaged file at the page where the hit is located, and print off any worksheet found there.  That process will begin on Monday of next week, and is expected to take two weeks.  We will produce on a rolling basis.

This is all contingent, of course, on your agreement that the search terms used are reasonably designed to identify the worksheets, and that the process above is sufficient to satisfy your request.  Please let me know if this is acceptable on Monday.

Regards,

*/s/ Theodore W. Atkinson*

Theodore W. Atkinson
Senior Litigation Counsel
Office of Immigration Litigation
District Court Section

# EXHIBIT C



# U.S. Department of Homeland Security Annual Performance Report

Fiscal Years 2011 – 2013



## Our Vision

*A homeland that is safe, secure, and resilient against terrorism and other hazards.*

## About this Report

The U.S. *Department of Homeland Security Annual Performance Report for Fiscal Years (FY) 2011 – 2013* presents the Department's performance measures and applicable results, associated performance targets for FY 2012 and FY 2013, and provides information on the Department's Priority Goals.

For FY 2011, the Department is using the alternative approach—as identified in the Office of Management and Budget's Circular A-136—to produce its Performance and Accountability Reports, which consists of the following three reports:

- *DHS Annual Financial Report*: Publication date – November 11, 2011.

- *DHS Annual Performance Report*: Publication date – February 13, 2012.  The *DHS Annual Performance Report* is submitted with the Department's Congressional Budget Justification.

- *DHS Summary of Performance and Financial Information*: Publication date – February 13, 2012.

When published, all three reports will be located on our public website at: http://www.dhs.gov/xabout/budget/editorial_0430.shtm.

For more information, contact:

Department of Homeland Security
Office of the Chief Financial Officer
Office of Program Analysis & Evaluation
245 Murray Lane, SW.
Mailstop 200
Washington, DC  20528

Information may also be requested by sending an email to par@dhs.gov or calling (202) 447-0333.


Homeland Security



# Table of Contents

Introduction ...................................................................................................................... 2
   Missions and Responsibilities for Homeland Security ................................................ 2

Performance Management Framework in DHS ................................................................ 4
   Performance Community ............................................................................................ 4
   Annual Process to Review and Improve Performance Measurement ........................ 4
   Verification and Validation Process .......................................................................... 4
   Quarterly Reporting and Reviews ............................................................................. 6
   PPBE and the Performance Budget .......................................................................... 6

Performance by Mission .................................................................................................. 8
   Mission 1:  Preventing Terrorism and Enhancing Security ....................................... 8
   Mission 2:  Securing and Managing Our Borders .................................................... 14
   Mission 3:  Enforcing and Administering Our Immigration Laws ............................ 19
   Mission 4:  Safeguarding and Securing Cyberspace ............................................... 24
   Mission 5:  Ensuring Resilience to Disasters .......................................................... 27
   Providing Essential Support to National and Economic Security ............................ 32
   Cross-Cutting Performance Measures ..................................................................... 35

Priority Goals ............................................................................................................... 36

DHS Workforce Strategy .............................................................................................. 49

GAO High-Risk Series – Summary of Progress ............................................................ 50

Low-Priority Program Activities ................................................................................... 56

Component Acronyms ................................................................................................... 57


Appendix A:  Measure Descriptions and Data Collection Methodologies
Appendix B:  Program Evaluations

**Department of Homeland Security**
**U.S. Immigration and Customs Enforcement**
**Salaries and Expenses**
**Justification of Program Changes**
(Dollars in Thousands)

| | |
|---|---|
| **Program Decrease 3:** | Reduction in Detention Beds to 32,800 |
| PPA: | ERO - Custody Operations |
| Program Decrease: | Positions 0,  FTE 0,  Dollars $(53,436) |

Funding Profile

| | FY 2011 Actual Obligations | | | FY 2012 Enacted Budget Authority | | | FY 2013 Requested Budget Authority | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos | FTE | Dollars ($000) | Pos | FTE | Dollars ($000) | Pos | FTE | Dollars ($000) |
| Current Services Level | | | | | | | - | - | 1,514,020 |
| Program Decrease | | | | | | | - | - | (53,436) |
| **Total Request** | - | - | **1,456,825** | - | - | **1,514,020** | - | - | **1,460,584** |

**Description of Item**

The Budget reduces ICE detention capacity to 32,800 detention beds.  ICE will prioritize the detention of criminal aliens and those who fall into other priority categories including repeat immigration law violators, recent border entrants and immigration fugitives in FY 2013. As ICE continues to focus on criminal and other priority cases, the agency also anticipates reducing the time removable aliens spend in detention custody.

While shifting some resources to Alternatives to Detention to ensure the most cost effective use of Federal resources, the Budget proposes flexibility to reallocate funding as needed to detain all high-risk aliens apprehended by ICE. Consistent with its stated enforcement priorities and recent policy guidance, ICE will continue to focus detention and removal resources on those individuals who have criminal convictions or fall under other priority categories. At the same time, ICE will enhance the effectiveness of Alternative to Detention for low risk individuals, monitoring them at a lower per day cost than detention.

The FY 2013 budget request reflects an average bed rate at a rate of $122.00 per day that has been held constant from FY 2012 due to ICE's concerted effort to make detention and removal practices more efficient.  ICE is planning on offsetting increases in detention contract and healthcare costs by maximizing the use of contracts with guaranteed minimums which provide reduced or free beds after occupying the minimum number of beds on the contract.

The FY 2013 bed rate does not include the potential impact of Department of Labor (DOL) service contract rate adjustments. Beginning in FY 2012, ICE may face increased annual costs due to a change

# EXHIBIT D



# CONTENTS

Management Letter.........................................................2

Executive Summary.........................................................4

ISAP II: An Alternative to Detention Program...........................10

About BI Incorporated.....................................................11

ISAP II Program Design...................................................12

Findings & Discussion....................................................15

ISAP II Year End Snapshot of Full-Service Supervision Participants........16

ISAP II Year End Snapshot of Technology-Only Participants.................22

ISAP II Lessons Learned..................................................24

ISAP II Recommendations..................................................26

Appendix.................................................................28

ICE-RPD-013730

*Within 60 days of beginning the ISAP II contract, BI opened 18 new offices, hired 85 additional personnel and transitioned more than 14,000 participants to ISAP II. The BI team completed this large expansion with no interruption in services.*

# MANAGEMENT LETTER

### DECEMBER 6, 2010

Teamwork was a unifying theme for BI Incorporated and our customer in implementing the new Intensive Supervision and Appearance Program II (ISAP II) beginning November 6, 2009. After operating ISAP for the Department of Homeland Security (DHS) for five-plus years, we are honored that the Alternatives to Detention (ATD) unit of Enforcement and Removal Operations (ERO) selected BI to manage ISAP II. BI is proud to have helped DHS and its supervisory units develop, manage and refine ISAP I, and now operate ISAP II.

Since program inception, we have focused on keeping participants engaged in the immigration court process so they adhere to ERO guidelines and final court orders. That focus supports ERO's mission to mitigate alien flight risk and promote immigration court compliance.

During the ISAP I contract, BI managed its duties with professionalism and a value orientation. For example, when BI embarked

on this partnership with DHS for ISAP I, there were pilot sites in eight U.S. cities. At the end of the ISAP I contract, there were 16 offices in 11 locations. There are now 35 ISAP II full-service supervision offices. In 2005, 2,128 participants were referred to ISAP I at an average daily cost of $2,200 per participant. During contract year 2010 (CY2010), ISAP II managed 19,996 participants in the ISAP II full-service supervision program at a cost of $7.00 per participant.

In addition, ISAP II includes technology-only services, a segment dedicated solely to electronic monitoring of aliens released to community supervision. In the first year of ISAP II, 5,782 participants were referred for technology-only services at an average daily cost of $0.51 per participant. The average daily cost for the 25,788 ISAP II participants served during CY2010 was $5.99 per participant.*

Within 60 days of beginning the ISAP II contract, BI opened 18 new full-service supervision offices, hired 85 additional personnel and transitioned more than 14,000 participants to ISAP II. One other office was opened during the year to bring the total to 35 by yearend. The BI team completed this large expansion with no interruption in services.

We are proud of how we managed our responsibilities with DHS for more than six years. We are also pleased to have supported our customer's growth and changing needs while generating significant program cost improvements. Every year, we have refined our systems in concert with DHS requirements and requests.

As the program has grown, we have grown our team of immigration-focused managers, office staff and training personnel dedicated to this important program. One of our strengths is our corporate-level understanding of this program. Most of our

executive team is the original team from 2004, which has contributed to consistent program delivery.

As always, BI remains focused on being fair, firm and consistent with program participants. This has been a cornerstone of our success and will continue to be our focus moving forward. As a result, trust and accountability are maintained and outcomes enhanced in immigration court appearances and compliance with final court orders – the primary goals of ISAP II's full-service supervision program.

On the following pages of this CY2010 report, you will find details about BI and our history of operating this program as well as detailed court appearance and outcomes data, lessons learned, recommendations, and Non-Governmental Organization collaboration for the first year of ISAP II. Please note, a majority of this report focuses on the full-service supervision component of ISAP II.

I would like to thank ATD for selecting BI, and for the opportunity to manage the ISAP II contract moving forward.

Sincerely,

*Bruce J. Thacker*

Bruce J. Thacker
President & Chief Executive Officer
BI Incorporated

* This overall rate includes administrative fees.

ICE-RPD-013731

# EXECUTIVE SUMMARY

The Department of Homeland Security's (DHS) paramount objective is the security of our nation. One facet of national security is the enforcement of United States immigration laws and cases in a fair and consistent manner. DHS issues a charging document to aliens that violate immigration laws and transfers jurisdiction of these cases to the Executive Office for Immigration Review (EOIR), which maintains 57 courts nationwide. DHS then decides to detain or release aliens to community supervision.

With limited bed space, DHS must reserve detention for aliens it considers highest risk. As a result, DHS supervises a large majority of individuals involved in the EOIR process within local communities.

The Intensive Supervision Appearance Program (ISAP) began as a DHS pilot in 2004. It was intended to serve as an alternative to detention focused on increasing immigration hearing appearance and compliance with final orders of removal. Today, at the close of the first year of ISAP II, the full-service supervision component is important in managing non-detained aliens as they progress through the immigration court process. The full-service supervision component has very clear objectives, including:

- Delivering a systematic approach to supervision and case management for non-detained aliens.

- Ensuring that program participants comply with release conditions as determined by EOIR.

- Focusing on guiding ISAP II participants to attend immigration court hearings.

- Maximizing compliance with immigration court orders, including orders of removal.

- Reducing absconder rates of the non-detained alien population.

- Providing accurate, reliable electronic supervision products and services.

## ISAP II INVOLVES TWO TRACKS

ISAP II involves two segments: full-service supervision and technology-only services. ERO refers participants to one of these options based on assessed risk and circumstance. BI supplies the electronic monitoring technology – including GPS tracking and telephonic reporting systems – and 24/7 monitoring support services for the technology-only portion of ISAP II. ERO manages all other facets of the technology-only program. In CY2010, ERO referred 5,782 participants to the technology-only program. By the end of the base year, ERO terminated 2,024 participants from this program.

A majority of BI's ISAP II effort involves the full-service supervision program. This program includes intensive case management, supervision, electronic monitoring and individual service plans. These service plans cover legal services, translation needs, transportation services, travel documents, departure plans and referrals to appropriate community services. By coordinating these services and plans, ISAP II helps mitigate flight risk and guide the participant through the immigration court process.

In CY2010, ERO referred 19,996 participants to ISAP II's full-service supervision. At the end of the base year, 13,429 were still active in the program. Of these active participants, 47% were monitored via telephonic reporting and 28% were monitored using GPS. The remaining 6,567 inactive participants exited the program because they had been granted relief or removed from the United States, absconded, removed for reasons other than absconscion, or are still in the process of being removed.

A total of 25,778 participants were referred to ISAP II in CY2010. Of those, 78% were full-service supervision participants and 22% were technology-only participants.

## FULL-SERVICE SUPERVISION PROGRAM OUTCOMES DEMONSTRATE POSITIVE RESULTS

Prior to ISAP II inception, EOIR court appearance rates were poor. In fact, in this report, we include a comparison of ISAP II full-service supervision data against two measures: a 2003 Office of Inspector General (OIG) study* and the 2003 and 2010 EOIR Statistical Year Book**. Both 2003 data sources pre-date ISAP II.

The 2003 OIG study found aliens who had not received an EOIR court order (Pre-Order) appeared at only one in three EOIR hearings of final decision. In addition, aliens complied with only 13% of final EOIR court orders in 2003. The 2003 EOIR Statistical Year Book found 59% of Pre-Order aliens attended final court hearings.

When we launched ISAP in 2004, we heard from Non-Governmental Organizations (NGO) and immigration experts that often aliens involved in EOIR either did not understand the immigration court system or, in some cases, they did not trust it due to negative experiences in their home nation. As a result, BI has always focused on treating participants with respect and dignity, but also making it clear that they are accountable for meeting EOIR requirements.

The participant-focused approach of full-service supervision has proven successful at building trust in the immigration court process and reducing barriers to court appearances. In turn, the program has produced positive results in guiding program participants to attend all immigration court hearings, including the all-important hearings involving final court decisions. In fact, for all EOIR hearings, full-service supervision program achieved a participant compliance rate of 99% for individuals considered active in the program. Of 15,794 court cases for ac-

ICE-RPD-013732

ICE-RPD-013732

## SUCCESS STORY

### ISAP II and ERO Cooperate on Successful Departure

ISAP II full-service supervision staff helped place a homeless participant at a housing shelter. The individual asked to depart voluntarily, but he did not have funding for a plane ticket. Cooperative efforts enabled the participant to remain in the community. He was provided with a stable living environment at the shelter (where home visits were completed), and he appeared at his scheduled court date. ERO supported funding for his ticket, and he has since departed for his home nation.

* The Immigration and Naturalization Service's Removal of Aliens Issued Orders, Report #I-2003-004

** Executive Office for Immigration Review, FY2010 Statistical Year Book

4

5

## SUCCESS STORY

### ISAP II Staff Assist Participant with Basic Life Needs

A participant reported to full-service supervision for a weekly scheduled visit and advised that until she was paid on Friday, she had nothing in the refrigerator to feed her family. The participant was very embarrassed and had great difficulty asking for help. Staff contacted several resources until one was found that could assist with providing food immediately. The participant was able to obtain a food basket for her family that day.

tive full-service supervision participants in CY2010, there were only 154 failures to appear for hearings, that involved final orders for active full-service supervision participants in CY2010, the program achieved a compliance rate of 94%, impressive rates when compared to data recorded prior to ISAP I development in 2004.

Many full-service supervision participants are still involved in the program after EOIR has issued a final court order. Their removal may be pending or they may be appealing the decision. In CY2010, 6,567 participants were terminated from the program. Of these inactive participants, 69% had final orders or were verified departures. At the end of CY2010, about half of these individuals had complied with final orders, only 7% had not. The remaining participants were still pending.

ERO developed a more broad approach to determining the success of full-service supervision. The agency developed 13 termination codes for inactive participants, with nine factors it considers "favorable" outcomes and four variables it considers "unfavorable" of the 6,567 full-service supervision participants

terminated from the program in CY2010, 87% were favorable outcomes; 13% had absconded or violated program guidelines and were removed from the program.

BI outcomes data found that of the 4,552 participants who had final EOIR orders or verified departures, 47% had complied with the orders. A large number of participants, 46%, were still in process while only 7% had not complied.

BI also looks at outcomes data for inactive participant compliance with final court orders compared to the OIG data from 2003, before ISAP I was implemented. The OIG study found only 13% of a comparable group, Pre-Order participants, complied with final orders. In contrast, 84% of Pre-Order full-service supervision participants complied with final EOIR orders.

### KEY COMPONENTS OF ISAP II FULL-SERVICE SUPERVISION

There are several core factors that contribute to the success of this program, including:

Collaboration: This program works because BI, Alternatives to Detention headquarters personnel, and local ERO are on the same page. Communication is regular and structured, yet each local ERO has the ability to reach out for immediate support.

Leadership: BI has developed a strong core team for full-service supervision. Many offices are led by BI program managers who have been involved since the inception of ISAP I. Other individuals are former case specialists trained and promoted to leadership roles. Others joined BI after years working in the immigration system. In addition, the BI executive management team is deeply involved in the program, and most executives have been involved since ISAP I was formed in 2004.

Case management: Direct case management and BI's case specialists remain critical to full-service supervision. Case specialists are the daily link to participants. They maintain frequent contact with participants throughout their involvement in the program. They help establish a bond of trust with the participant while also ensuring the individual is aware of requirements and consequences of non-compliant activity. Importantly, the case specialists reflect the diversity of the population served in each office.

Program flexibility: ISAP II full-service supervision is a valuable tool for ERO in managing the non-detained docket. BI assists ERO in refining the program by applying best practices and implementing what has been proven to work in the field. This flexibility has enabled ERO to manage larger caseloads and has primed the program for future growth.

Language: BI issues materials in multiple languages to help participants understand and navigate the immigration system. Each BI office includes staff members who are multi- or bilingual, with particular emphasis on languages prominent in that geographic location. During CY2010, 77% of the program case specialists were at least bi-lingual.

Training: Training is ongoing and involves continuous refreshers in electronic supervision technology for both BI and ERO staff. BI staff is regularly updated on immigration policies and procedures.

Program consistency: The ISAP II full-service supervision program, as shown in the program design segment of this report, is highly structured. Yet, it is flexible to meet the unique risks and needs of participants.







> *"ISAP II has provided the benefit of reducing detention costs while monitoring and encouraging ICE respondents to report to immigration court as required."*
> - ERO Field Office Director

ICE-RPD-013733

## SUCCESS STORY

### ISAP II Aids in Verified Departure

A participant was released from detention and enrolled in the program in order to care for her two young sons. Full-service supervision staff connected the participant with community resources and assisted her with plans for self-deportation. She sent her belongings to her home country and obtained travel documents for herself and her sons. The participant departed the U.S. within 30 days which was verified with the Automated Tracking System.

BI works closely with ERO to ensure program delivery remains consistent.

Participant treatment: As mentioned earlier, a core principle of the program is treating participants with respect and dignity while also holding them accountable. With such high expectations come outstanding results.

NGO relations: Each office maintains an online directory of local community service providers, including health, legal, transportation, and other services that stabilize the participant in the community. By stabilizing the life of an individual, the participant is more accepting of the immigration system and more likely to comply with program guidelines.

Community relations: BI program managers maintain a dialog with community officials to ensure the community is aware of the services provided.

Consistent reporting: BI program managers conduct ongoing meetings with ERO to provide reports developed from BI's proprietary case management system (BI AccuTrak®).

Quality control: BI compliance specialists audit full-service supervision offices to ensure compliance with contract guidelines.

Cultural diversity: Participants from 171 nations in were served CY2010. BI achieves this by hiring culturally diverse staff, providing materials in multiple languages, and connecting participants with supportive community services.

### SUPPORTING IMMIGRATION COURTS WITH EFFICIENCY

Immigration court intakes increased 12% from FY2006 and FY2010, according to the EOIR 2010 Statistical Year Book. With court intakes reaching almost 400,000 in FY2010, programs that drive efficiency are critical

In the base year of CY2010, ISAP II full-service supervision produced a 99% attendance rate at all EOIR hearings and a 94% attendance rate at hearings of final court decision. Through a well-coordinated approach to case management, the program has greatly reduced EOIR failures to appear at hearings, helping to streamline a very busy EOIR docket.

In addition, immigration judges must be satisfied that notice of hearing 'time and place' is provided to an alien or their representative prior to issuing a removal or in absentia decision. Judges know with confidence full-service supervision participants have received fair notice.

ISAP II full-service supervision also prepares participants for eventual departure as they proceed through the immigration court process. By gathering travel documents early in the supervision process and developing travel plans, participants may decide to depart voluntarily in advance of a final decision. This process plays an important role in ensuring participants have access to resources regarding various options and consequences, including voluntary departure.

### LESSONS LEARNED AND RECOMMENDATIONS

This CY2010 report includes several lessons learned and recommendations. Most importantly, we see from the data and heal feedback from ERO that ISAP II full-service supervision is working as intended. Participants are attending court hearings at a high rate and comply with final court orders at rates higher than those that pre-date the program.

We have also learned many key points that will help the program adapt and evolve. For example, ongoing communication with ERO and influential stakeholders such as NGOs is critical. In addition, we have learned that continuous innovation will fine tune the program. By ex-

---

## ISAP II CONTRACT YEAR 2010: BY THE NUMBERS

**19** new full-service supervision offices opened for a total of **35**

More than **14,000** participants transitioned during program implementation

**85** new employees trained during program start-up

More than **10,000** outbound calls made to transition telephonic reporting

**171** home nations represented by program participants

Referrals to more than **1,500** community partners and Non-Governmental Organizations

**16** languages spoken by ISAP II staff

**19,996** participants referred to full-service supervision

**5,782** participants referred to technology-only services

ploring pilot programs, such as expediting cases in EOIR or the use of bond fees, validated best practices can be expanded to other offices.

BI bases its recommendations on experience and lessons learned. Some of these recommendations are broad, such as the need to continually train staff and ERO. Others are tactical, such as the need for a formal legal presentation for participants at intake and orientation.

ISAP II is now poised to expand its supporting role for ERO. After a smooth and rapid expansion in November 2009, 35 offices are now in operation and more are planned for the future. BI stands ready to manage these non-detained aliens when they are referred to community supervision.

*"By providing an alternative means of supervision, the ISAP II program has allowed deportation officers to focus on other tasks. As a result more time is dedicated to actual case management and communication with foreign consulates. This in turn has led to an increased rate of removal."*

- Deputy Field Office Director

# ABOUT BI INCORPORATED

Established in 1978, BI Incorporated works with approximately 900 U.S. public agencies nationwide. In addition to managing the Intensive Supervision and Appearance Program II for the U.S. Department of Homeland Security, BI is a national leader in offender monitoring technology, supervision services, community-based treatment services, and reentry and day reporting center programs for adults and juveniles.

BI works closely with public officials to reduce recidivism, enhance public safety, and strengthen the communities it serves. To achieve success, BI assesses the risk and needs of individuals it supervises, matches services to address those risks and needs, and partners with supervising agency personnel to monitor compliance with conditions of release. Our approach and focus on objective outcomes have delivered verifiable and consistent results.

## BI INCORPORATED ISAP II LOCATIONS



• = BI Incorporated Supervision Offices
■ = Boulder, Colorado Headquarters
★ = Anderson, Indiana GuardCenter

**ISAP II Full-Service Supervision Offices:**

| | |
|---|---|
| Atlanta | Newark |
| Baltimore | New Orleans |
| Boston | New York City (4) |
| Buffalo | Orlando |
| Charlotte | Philadelphia |
| Chicago | Phoenix |
| Dallas | Portland |
| Delray Beach | Salt Lake City |
| Denver | San Antonio |
| Detroit | San Bernardino |
| El Paso | San Diego |
| Hartford | San Francisco |
| Houston | Santa Ana |
| Kansas City | St. Paul |
| Los Angeles | Seattle |
| Miami | Washington, D.C. |

### 2007-2009
The Enhanced Supervision and Reporting (ESR) program is operated as an Alternative to Detention program using electronic supervision and reporting

### 2008
**August:** Santa Ana, CA office opened bringing total ISAP II office count to 16

### 2009
**April** Request for Proposals released by ISAP II containing elements of ISAP with the ESR program

**July** BI awarded ISAP II contract for 19 additional offices in continuous three year term

**November:** BI transitions over 14,000 participants from ISAP I and ESR and begins operating ISAP II

### 2006
**October:** Delray Beach, FL site opened to support Miami office

### 2007
ISAP II expands to include six additional offices nationwide

### 2004
**July:** Request for Proposals released by Department of Homeland Security (DHS) for Intensive Supervision and Appearance Program (ISAP II) pilot

**March** BI Incorporated awarded ISAP II contract for eight pilot sites

June: Eight ISAP I pilot sites opened

### 2003
A second OIG report finds 13% compliance among non-detained aliens in court-final rulings removal

---

# ISAP II: AN ALTERNATIVE TO DETENTION PROGRAM

*"ISAP II allows my staff to concentrate on the most egregious cases and this ensure removal is imminent."*

Supervisory Detention & Deportation Officer

After two reports from the Office of Inspector General (OIG) in 1996 and 2003, the need for effective alternatives to detention became clear. Successfully removing non-detained aliens was identified as an area of weakness within the Immigration and Naturalization Service. Specifically, the two studies found alien removal rates were 11% and 13%, respectively, the 2003 OIG report made several recommendations for improvement, including expansion of a pilot program called the Appearance Assistance Program (AAP). The AAP pilot was administered by the Vera Institute of Justice from 1997 to 2000. It focused on supervising individuals in the community who were progressing through removal proceedings and aimed to increase hearing appearance rates and compliance with final orders of removal. The pilot showed promising results as a community supervision program for aliens moving through the immigration

court process (see Appendix for ISAP II comparison to Vera results).

The lessons learned from the AAP were applied in the launch of another pilot program – the Intensive Supervision and Appearance Program (ISAP). The original ISAP program, now referred to as ISAP I, began in 2004 and concluded in November 2009. BI Incorporated, along with government officials, had the privilege to operate ISAP I and grow the program from a pilot to a valued supervision program. After a competitive bidding process, DHS's Alternatives to Detention (ATD) unit of Enforcement and Removal Operations selected BI to manage a new program called ISAP II. This new program combined the best of intensive case management processes of ISAP I with another supervisory program called the Enhanced Supervision and Reporting program. BI began operating ISAP II for ATD on November 8, 2009.

### 1996
Office of Inspector General (OIG) report finds 11% compliance among non-detained aliens in court-final rulings on removal

### 1997-2000
Vera Institute of Justice Appearance Assistance Program (AAP) pilot focused on increasing hearing appearance rates and compliance with final orders shows promising results

ICE-RPD-013735



# ISAP II PROGRAM DESIGN

## SUCCESS STORY

### GPS Data Proves Timely in Absconsion Case

A known gang member in the ISAP II full-service supervision program who was under GPS supervision generated a tamper status alert. ERO was notified immediately by telephone while BI staff attempted to contact the participant. All attempts at contact failed and messages sent to the GPS device were not acknowledged.

ERO's response was immediate. A search team went to the participant's known address while additional personnel contacted other known associates and relatives. While the participant evaded attempts at contact, BI staff provided ERO with GPS information specific to the participant's location, direction, and speed of movements. This timely information assisted in the apprehension of the participant who was then remanded to custody.

ISAP assists Alternatives to Detention (ATD) and Enforcement and Removal Operations (ERO) with supervision of unauthorized immigrants involved in the U.S. immigration legal system. ISAP II offers alternatives to detention that allow immigration officials to reserve detention beds for certain higher risk aliens.

ISAP II is highly structured and is designed to facilitate effective services and promote clear communication, rapid response and efficient operations.

The program involves two segments: full-service supervision and technology-only services. ERO refers aliens to one of these options based on assessed risk and circumstances. ISAP II manages participants based on their status within the immigration court system, including:

- **Pre-Order:** These program participants have not received an order of removal from the immigration court.

- **Post-Order:** These participants have received a final order of removal from the court.

- **Appeal:** These participants have received a court decision, but they or the government are appealing the decision.

- **Post-Order Custody Review – Reasonable Foreseeable Removal:** These individuals have received a court order of removal, completed a custody review, and are likely to be removed in the near future.

- **Post-Order Custody Review – Non-Foreseeable Removal:** These individuals have also received a court order of removal and completed a custody review, but it is estimated that they will not be removed in the near future.

## FULL-SERVICE SUPERVISION

The ISAP II full-service supervision program involves intensive case management, supervision, electronic monitoring, and individual service plans. These service plans include legal translation, and transportation services as well as plans for travel documents, departure and referrals to appropriate community services. These coordinated services help mitigate flight risk and guide the individual through the immigration court process.

In the ISAP II full-service supervision program, the participant reports to a designated ISAP II office within 24 hours of referral for intake, assessment and orientation. After the individual service plan is developed, the case management process begins. This involves a combination of office visits, residence verifications, random home visits, employment verifications,

and an update of the participant's schedule. The supervision of participants in the full-service program is supplemented with two forms of electronic monitoring – GPS tracking and telephonic reporting. GPS tracking at a more intensive supervision technology, but both of these options provide excellent details about the person's adherence to schedules and supervision plans.

A participant's stage of supervision reflects their stage in the immigration court process. The frequency of reporting to the ISAP II office, home visits, employment checks and use of electronic monitoring correspond to the specific stage of supervision. Additionally, the program is successful because of consistent case management services, including treating the participant with dignity and respect, providing community connections for unique participant needs, and holding the participant accountable.

The full-service supervision program offers structure and flexibility, an approach that produces the desired results: high appearance rates at preliminary immigration court hearings and enhanced compliance to final court orders, including departure if ordered.

### TECHNOLOGY-ONLY SERVICES

Participants involved in the technology-only component of ISAP II do not receive the full-service supervision provided from BI's 35 offices throughout the U.S. The technology-only portion of ISAP II provides ERO personnel nationwide with two tools for enhanced supervision: GPS tracking and telephonic reporting. The GPS tracking system, BI ExacuTrack® One, is a sophisticated anklewoven device that tracks a participant's movements and reports violations of specific parameters, called exclusion and inclusion zones. The telephonic reporting system, BI VoiceID®, helps officers monitor compliance by making random and

## PARTNERSHIP IN ACTION

Non-Governmental Organizations provide critical assistance to BI in operating the ISAP II program. These partnerships enhance the success of program participants. Working closely with community-based organizations, the full-service supervision component of ISAP II provides community referrals to participants on an ongoing basis. Services include locating providers for legal services, food and clothing, substance abuse treatment, mental health needs, medical and dental assistance, disaster recovery (e.g. Haitian earthquake relief), wellness health screenings, translation, homeless outreach and shelters, religious support, public transportation and consulate assistance.

In the base contract year alone, ISAP II worked with more than 1,500 community organizations throughout the ERO areas of responsibility it serves to promote participant success. A small sample of ISAP II community partners includes:

- Catholic Charities
- Centers for Victims of Torture
- Department of Homeless Services
- Food Pantry Community Missions
- Goodwill Industries
- Immigration Counseling Services
- Legal Services
- Public Health Department
- Public Transportation
- Salvation Army
- United Way
- Women, Infants & Children Program

ICE-RPD-013736

# FINDINGS & DISCUSSION

ISAP II provides outcomes to measure if the program is meeting objectives. The following pages review specific findings for ISAP II during CY2010. On page 16, the chart highlights the number of full-service supervision participants referred to ISAP II by Enforcement and Removal Operations (ERO) for the contract year. The total population is segmented into "active participants," or those individuals still being supervised by ISAP II, and "inactive participants," those individuals who exited the program. ISAP II was still supervising a majority of the full-service participants at the end of the contract year.

The charts also indicate the legal status of the ISAP II participant when the person entered the program. Participant classifications include Pre-Order, Post-Order, Appeal, Post-Order Custody Review – Reasonable Foreseeable Removal, and Post-Order Cus-

tody Review – Non-Foreseeable Removal. We combine these legal stages in the charts to more simply compare participants who have not received an order of removal (Pre-Order), participants who have received an initial decision (Post-Order and Appeal), and those who have received a final order of removal and completed a custody review (POCR-RFR and POCR-NFR).

On pages 16 and 17, please find data for ISAP II active participants in the full-service supervision program. On pages 18 through 21, data is presented for inactive ISAP II participants in the full-service program. The charts review attendance at all EOIR court appearances and attendance at hearings where final decisions are rendered. We also compare the data for CY2010 against a pre-ISAP benchmark. Finally, on pages 22 and 23, data is presented for the technology-only component of ISAP II.

"We are seeing significant, positive results. We are seeing increases in successful voluntary departures, removals, and obtaining travel documents while reducing in absentia cases. Essentially, very few cases end up being non-compliant."

- Supervisory Detention & Deportation Officer

ICE-RPD-013737



## PARTICIPANT PROGRESSION THROUGH ISAP II

scheduled telephone calls to participants. The system identifies participants through a biometric "voice print" and verifies that the individual is where he or she is supposed to be throughout the day.

These supervision services are used at the discretion of ERO. They can be used to reduce face-to-face visits with lower-risk participants or enhance supervision of higher-risk participants where full service supervision is not an option. For ERO offices within proximity of full-service ISAP II offices, BI staff members can assist with participant enrollment, equipment installation and removal and removal ERO officers

manage participant monitoring by logging into BI's secure web portal and responding to violations as needed. BI's technology-only program manager and the BI GuardCenter™ provide ERO officers with equipment training and 24-hour a day support.

Participant monitoring and progression through ISAP II continue to be refined by ATD Participants referred to ISAP II – no matter which of the two program options – are eventually terminated from the program when they comply with final court orders, voluntarily terminated from the program when they comply with final court orders, voluntarily depart to their home country, or are released by ERO.



## ISAP II YEAREND SNAPSHOT OF FULL-SERVICE SUPERVISION PARTICIPANTS

Enforcement and Removal Operations (ERO) referred 19,996 participants to ISAP II full-service supervision during CY2010. On the last day of the contract year, 13,429, or 67% of these referrals were still actively involved in the ISAP II program. Of active full-service participants, 47% were being monitored with telephonic, reporting and 28% were being monitored with GPS tracking. Another 6,567 participants, or 33%, of these referrals were considered inactive participants and had been terminated from

ISAP II full-service supervision for one of three reasons: 1) they were granted relief or removed from the United States, 2) they had absconded from the ISAP II program and could not be located, 3) they were being removed from ISAP II for reasons other than an absconsion or completion and are still in process. During CY2010, a number of compliant participants were removed from ISAP II by Immigration and Customs Enforcement in an effort to most effectively use Alternatives to Detention resources.

### BREAKDOWN OF FULL-SERVICE SUPERVISION PARTICIPANTS (as of November 5, 2010)



**100%** Total Participants Referred = 19,996

**67%** Active Participants in ISAP II Program = 13,429

Full-Service Participants on Electronic Monitoring

6,254 on Telephonic Reporting (47%)   3,723 on GPS Tracking (28%)

**33%** Inactive Participants in ISAP II Program = 6,567

*"ISAP II provides ERO with up-to-the-minute information on the whereabouts of potential absconders, assisting our enforcement efforts by greatly increasing our rapid response capabilities."*

- Supervisory Detention & Deportation Officer

## ACTIVE ISAP II FULL-SERVICE SUPERVISION PARTICIPANTS

### ATTENDANCE AT ALL EOIR HEARINGS WHILE ACTIVE

During CY2010, there were 15,794 immigration court appearances scheduled for ISAP II full-service supervision participants considered "active" in the program. Participants appeared at 99% of these hearings. Pre-Order participants, the largest participant population, appeared at 99% of all immigration court hearings while involved in the program. This high appearance rate reflects positively on the program's ability to keep participants engaged in the immigration court process, a critical step toward successful compliance with final court orders or verified departure.



### ATTENDANCE AT FINAL EOIR HEARINGS WHILE ACTIVE

It is important for participants to attend hearings where the immigration court will issue a final order. This is a critical function of ISAP II full-service supervision as it indicates that participants are engaged in the court process and are more likely to comply with the court decision. Of the 2,438 final hearings held for active ISAP II participants, they attended 2,284, a 94% compliance rate. The majority of these hearings involved Pre-Order participants. Of the 2,310 court hearings that involved final orders for Pre-Order participants, 2,157, or 93%, of these individuals attended.

### PRE-ORDER ATTENDANCE AT FINAL EOIR HEARINGS WHILE ACTIVE COMPARED TO BENCHMARKS

BI uses two pre-ISAP benchmarks to measure program success. We isolate the comparisons to the ISAP II Pre-Order population. The comparable data sources include a 2003 Office of Inspector General study* and EOIR Statistical Year Book** data from 2003 and 2010. The OIG study recorded a final court appearance rate of 34% for a comparable group. The 2003 EOIR data found a 59% attendance rate, and the 2010 EOIR data recorded a 78% attendance rate. In comparison, the ISAP II Pre-Order population attended final court hearings at a 93% rate.



\* Immigration and Naturalization Services: Removal of Aliens Issued Orders, Report # I-2003-004
\*\* Executive Office for Immigration Review, FY 2010 Statistical Year Book. Note: change in methodology - administrative closures are no longer included to calculate failure to appear rate. As of 2009 EOIR only uses in-absentia orders in obtaining

ICE-RPD-013738

## INACTIVE ISAP II FULL-SERVICE SUPERVISION PARTICIPANTS

### INACTIVE PARTICIPANTS WITH & WITHOUT FINAL EOIR ORDERS

There were 6,567 participants terminated from ISAP II full-service supervision during CY2010. Of these participants, 4,552, or 69%, had final orders of removal or were verified departures. A total of 2,015, or 31%, were participants without final orders of removal

**BREAKDOWN OF INACTIVE FULL-SERVICE SUPERVISION PARTICIPANTS (as of November 5, 2010)**

**100% Total Participants Terminated = 6,567**

**69%** Participants with Final Orders and/or Verified Departures = 4,552

**31%** Participants without Final Orders = 2,015

## INACTIVE ISAP II FULL-SERVICE SUPERVISION PARTICIPANTS

### ISAP II CASE TERMINATIONS WITH AND WITHOUT FINAL ORDERS

The following table was developed by Enforcement and Removal Operations (ERO) to examine the reasons for termination for the 6,567 inactive participants who exited the ISAP II full-service supervision program in CY2010. ERO developed 13 variables, nine of which it considers 'favorable outcomes' and four of which it considers 'unfavorable outcomes.' Favorable outcomes include termination types A, B, G, H, I, J, K, L, and M. These ISAP II participants had complied with program

requirements, departed the United States or were no longer required to participate by ERO, among other factors. During CY2010, ERO found 86.8% of inactive participants were compliant with program requirements. Unfavorable outcomes include termination types C, D, E and F, where participants absconded or violated program requirements. In CY2010, 13.2% of participants were not compliant with ISAP II requirements and were terminated from the program.

**FAVORABLE OUTCOMES**

| Type | Description | Total | Percent |
| --- | --- | --- | --- |
| A | Departure Verified (Final Order of Removal) | 999 | 15.2% |
| B | Relief/Benefit Granted | 601 | 9.2% |
| G | No Longer Required to Participate (Cancellation of Removal, Adjustment of Status, Asylum, or Admission) | 2,534 | 38.6% |
| H | No Longer Required to Participate As determined by ERO for various reasons | 83 | 1.3% |
| I | Arrested by ICE for Removal (Final Order - Active Participant) | 183 | 2.8% |
| J | Pending Departure Verification (Final Order of Removal or Voluntary Departure) | 515 | 7.9% |
| K | Arrested by other Law Enforcement Agency | 120 | 1.8% |
| L | Other (No longer required to report; medical or deceased) | 526 | 8.0% |
| M | Departure Verified (Voluntary Departure) | 142 | 2.2% |
| **ISAP II TOTALS** | | **5,703** | **86.8%** |

**UNFAVORABLE OUTCOMES**

| Type | Description | Total | Percent |
| --- | --- | --- | --- |
| C | Pre-Order Program Absconder (Terminated from ATD) | 432 | 6.6% |
| D | Post-Order Program Absconder (Terminated from ATD) | 325 | 4.9% |
| E | Pre-Order Program Violator | 61 | 0.9% |
| F | Post-Order Program Violator | 46 | 0.7% |
| **ISAP II TOTALS** | | **864** | **13.2%** |
| **Total ISAP II Full-Service Case Terminations** | | **6,567** | **100.0%** |





ICE-RPD-013739

## INACTIVE ISAP II FULL-SERVICE SUPERVISION PARTICIPANTS

The subsequent charts on this page take a closer look at the 4,552 inactive ISAP II participants in the full-service supervision program with final orders or verified departures. Charts are shown with and without ISAP II cases when relief was granted. A total of 601 ISAP II participants were granted relief during CY2010.

*Note: Additional calculations are provided to reflect a unique situation in CY2010, the January 2010 earthquake in Haiti. The figures below provide compliance rates with and without Haitian participants who were administratively removed from ISAP II while their eligibility for temporary protective status was determined. In both instances, compliance rates for the total population rise when this group is removed.*

### FINAL EOIR ORDER COMPLIANCE OR VERIFIED DEPARTURES (INCLUDES RELIEF GRANTED)

This chart reviews compliance with final EOIR orders or verified departures of ISAP II participants in the full-service supervision program. Of the 4,552 inactive ISAP II participant cases during CY2010, 47% of these participants were compliant or verified departures based on final EOIR decisions. Another 46% were still pending. Only 7% did not comply with final orders. Of the 4,552 inactive participants measured for final order compliance or verified departure, 1,620 were Pre-Order participants. Of these Pre-Order participants, 74% had complied with final court orders or were verified departures. These statistics include final order granted cases.



■ Compliant ■ Pending ■ Noncompliant

### FINAL EOIR ORDER COMPLIANCE OR VERIFIED DEPARTURES (EXCLUDES RELIEF GRANTED)

This chart reviews final EOIR order compliance or verified departures for ISAP II, but the statistics exclude relief granted cases. In CY2010, the compliance rate for all inactive ISAP II participants was 39%. Another 53% of ISAP II participants in this category were still pending. Among the 1,132 Pre-Order participants, 65% had complied with final orders or were verified departures.

■ Compliant ■ Pending ■ Noncompliant

## ISAP II COMPARED TO BENCHMARK

The chart below compares ISAP II full-service supervision to a pre-ISAP II benchmark, a 2003 report by the Office of Inspector General (OIG)? The OIG report was commissioned to determine whether the Immigration and Naturalization Service had improved its effectiveness at removing non-detained aliens with final orders. The report reviewed a random sample of the non-detained alien population from the EOIR database. It did not include cases in which relief was granted or individuals were allowed to stay in the U.S. We compare the OIG sample to ISAP II participants who were enrolled as Pre-Order and later received final orders. Specifically, we combine verified and voluntary departures that result from final orders (A

and L terminations) and compare this data against Post-Order participant absconders (D terminations). The total ISAP II terminated population from CY2010 is also included for reference.

The Pre-Order ISAP II population in full-service supervision achieved an 84% verified departure rate as compared to 13% recorded in the OIG study. This data highlights one of the primary objectives of ISAP II full-service supervision – ensuring participants with final orders of removal depart successfully. Of the 842 Pre-Order participants, 133, or 16%, absconded.

*The Immigration and Naturalization Service's Removal of Aliens Issued Final Orders. Report #I-2003-004.*



■ Departure Verified ■ Absconded

*"EOIR court appearance rates have significantly improved, thereby reducing the number of aliens who failed to appear at their court hearings. Based on constant interaction between the ISAP II team and the participant, travel document issuance has improved, thereby reducing the length of stay in ICE detention, should detention be necessary in cases where the alien has not voluntarily departed."*

- Assistant Field Office Director

ICE-RPD-013740

## ISAP II YEAR END SNAPSHOT OF TECHNOLOGY-ONLY PARTICIPANTS

Throughout CY2010, Enforcement and Removal Operations (ERO) referred 5,782 participants to the technology-only portion of ISAP II. At the close of CY2010, 3,758, or 65%, were still being supervised through the technology-only program. The remaining 2,024, or 35%, participants had been terminated by ERO throughout the year.

**BREAKDOWN OF TECHNOLOGY-ONLY PARTICIPANTS (as of November 5, 2010)**

**100% Total Participants Referred = 5,782**

**65%**
**Active Participants in
ISAP II Program = 3,758**

**35%**
**Inactive Participants in
ISAP II Program = 2,024**

## ACTIVE ISAP II TECHNOLOGY-ONLY PARTICIPANTS

Two supervision tools are available to Enforcement and Removal Operations (ERO) within the technology-only portion of ISAP II. BI ExacuTrack One GPS tracking and BI VoiceID telephonic reporting ExacuTrack One and VoiceID are both used at the discretion of ERO officers as tools to enhance supervision efforts and assist in managing caseloads. ERO officers determine how to best employ these tools and when to terminate participant supervision.

The breakdown of supervision technology used among active technology-only participants at the close of CY2010 is shown below.



**90%**
**Participants on Telephonic Reporting = 3,371**

**10%**
**Participants on GPS Tracking = 387**

## INACTIVE ISAP II TECHNOLOGY-ONLY PARTICIPANTS

The following table highlights the reasons for termination among technology-only participants during CY2010. Thirteen termination types, as developed by Enforcement and Removal Operations (ERO), are used for both GPS and telephonic reporting participants. Of the 2,024 terminations by ERO during CY2010, 1,672 participants were monitored using telephonic reporting and 352 were monitored using GPS tracking.

### FAVORABLE OUTCOMES

| Type | Description | TR | Percent | GPS | Percent | Total | Percent |
|---|---|---|---|---|---|---|---|
| A | Departure Verified (Final Order of Removal) | 34 | 2.0% | 88 | 25.0% | 122 | 6.0% |
| B | Relief/Benefit Granted (Cancellation of Removal, Adjustment of Status, Asylum, or Admission) | 83 | 5.0% | 17 | 4.8% | 100 | 4.9% |
| G | No Longer Required to Participate (As determined by ERO for various reasons) | 1,005 | 60.1% | 105 | 29.8% | 1,110 | 54.8% |
| H | Arrested by ICE for Removal (Final Order – Active Participant) | 35 | 2.1% | 30 | 8.5% | 65 | 3.2% |
| I | Pending Departure Verification (Final Order of Removal or Voluntary Departure) | 17 | 1.0% | 14 | 4.0% | 31 | 1.5% |
| J | Arrested by other Law Enforcement Agency | 45 | 2.7% | 16 | 4.5% | 61 | 3.0% |
| K | Other (No longer required to report: medical or deceased) | 52 | 3.1% | 32 | 9.1% | 84 | 4.2% |
| M | Departure Verified (Voluntary Departure) | 4 | 0.3% | 18 | 5.1% | 22 | 1.1% |
|  | Deported the United States while in proceedings | 0 | 0.0% | 1 | 0.3% | 1 | 0.0% |
| **ISAP II TOTALS** | | 1,275 | 76.3% | 321 | 91.2% | 1,596 | 78.9% |

### UNFAVORABLE OUTCOMES

| Type | Description | TR | Percent | GPS | Percent | Total | Percent |
|---|---|---|---|---|---|---|---|
| C | Pre-Order Program Absconder (Terminated from ATD) | 55 | 3.3% | 3 | 0.9% | 58 | 2.9% |
| D | Post-Order Program Absconder (Terminated from ATD) | 94 | 5.6% | 17 | 4.8% | 111 | 5.5% |
| E | Pre-Order Program Violator | 41 | 2.5% | 4 | 1.1% | 45 | 2.2% |
| F | Post-Order Program Violator | 206 | 12.3% | 7 | 2.0% | 213 | 10.5% |
| **ISAP II TOTALS** | | 397 | 23.7% | 31 | 8.8% | 428 | 21.1% |
| **Total ISAP II Technology-Only Case Terminations** | | 1,672 | 100% | 352 | 100% | 2,024 | 100% |

ICE-RPD-013741

# ISAP II LESSONS LEARNED

*"BI has been an asset to our program and is a major factor in our overall success."*

– Supervisory Detention & Deportation Officer

BI offers the following observations and lessons learned from the contract base year for ISAP II. We base these lessons on our experience operating this program as well as feedback collected from Enforcement and Removal Operations (ERO) personnel and ISAP II program managers.

1. ISAP II full-service supervision is an effective supervisory program for ERO, with 19,996 participants enrolled in the program this contract year. The program freed up valuable detention space and provided an additional supervision mechanism for individuals involved in the immigration court process.

2. The ISAP II full-service supervision methods, including direct case management and ongoing contact with program participants, achieve the desired goals of the program—attendance at court hearings and compliance with final Executive Office for Immigration Review (EOIR) hearing decisions.

3. BI managers and ERO officers report that in locations where participants pay bond fees, such as in Philadelphia and St. Paul, there is an additional incentive to comply with ISAP II full-service supervision guidelines.

4. We learned that having ISAP II full-service supervision participants report approximately two to four times monthly versus three times weekly (an ISAP I requirement), is an appropriate level of commitment and allows staff to better manage larger participant caseloads.

5. Effective communication is essential to ISAP II. This involves communication between all key ISAP II stakeholders including participants, BI staff, Non-Governmental Organizations (NGO), and ERO personnel. Both ERO and BI staff report a strong team effort in ISAP II, resulting in positive results and a willingness to adapt and evolve as program needs change.

6. We learned using GPS tracking of participants provides a higher level of supervision, particularly for individuals who may be a flight risk as a final court hearing approaches. In addition, BI managers report that participants on GPS tracking understand they are being monitored closely and behave accordingly.

7. We learned the "Fast Track Court" program, a pilot program in which EOIR expedites ISAP II full-service supervision participant cases, shows promise in both court compliance and participants returning to their home nation more quickly.

8. Accelerated hearings provide significant cost savings to the government. Of the 15,794 hearings this contract year, 11,797 were continuances. Each participant had an average of five continued hearings prior to a final hearing taking place.

9. We learned ISAP II full-service supervision expands effectively without compromising program integrity. Using proven policies and procedures learned in ISAP I, ISAP II full-service supervision expanded to 35 offices without interruption to participant supervision in the contract year.

10. We learned that by involving experienced BI staff members, who can either relocate to a new office or mentor new staff, new ISAP II full-service supervision offices can be added smoothly without interrupting current operations.

11. Consistent home visits, including home residence verifications, are essential to gain a snapshot of the participant's life and community ties. These visits also help build trust and rapport with participants, which help improve outcomes.

12. By providing a high level of supervision services, ISAP II full-service supervision allows deportation officers to focus on other tasks. As a result, ERO can dedicate more time to actual case management and communication with foreign consulates. This, in turn, has led to an increased rate of removal. In San Diego, ERO reported one officer was able to manage a larger caseload with ISAP II full-service supervision support.

13. We have heard from ERO that ISAP II participants are more inclined to surrender travel documents than aliens not involved in this program. In addition, ERO officers report that obtaining these travel documents increases "self-deports" and compliance with all court hearings and final court orders.

14. We have learned that community resources in each ISAP II full-service supervision office are an important element of the program. By developing relationships with NGOs and maintaining a comprehensive list of NGO community resources for housing, legal support, medical and more, participants are more stable in the community and more likely to comply with program and immigration court requirements.

ICE-RPD-013742

## SUCCESS STORY

**Community Resources Contribute to Participant Safety**

A participant reported marital issues to a BI case specialist in a full-service supervision office. The participant's situation escalated and she later reported her husband had become aggressive. She expressed a need to leave her home due to continued domestic violence. The case specialist advised the participant to seek assistance and provided referrals to local domestic violence shelters. The participant then moved to a temporary victim shelter, obtained a protection order against her husband, and sought counseling at the local shelter.

# ISAP II RECOMMENDATIONS

*"ISAP II (full-service supervision) has also increased the level of compliance with court orders, i.e. voluntary departures and final orders of removal."*

– Deputy Field Office Director

These recommendations are based on our experience operating ISAP II as well as feedback provided by Enforcement and Removal Operations (ERO) personnel and ISAP II program managers. We believe the following recommendations would enhance ISAP II moving forward.

1. ERO and BI should continue to collaborate and develop pilot programs, such as the strategic alignment pilots and "Fast Track" court program, to refine ISAP II full-service supervision and enhance outcomes. If cases were processed in less than one year, results could be enhanced and overall costs reduced.

2. We recommend more flexibility in reporting requirements. Holding participants accountable for their behavior and compliance to program rules is essential having the ability to add or remove sanctions based on participant compliance or non-compliance would enhance outcomes.

3. Because effective communication and continual improvement are so important in ISAP II, we recommend BI and ERO

continue to meet frequently throughout the year. This includes monthly meetings at ERO Headquarters and annual contract review meetings. Additionally, we recommend a partnership meeting be held annually to include ERO and ISAP II managers. Finally, regular meetings between ERO personnel and ISAP II program managers on the local level should continue as they promote consistent coordination of services in the field.

4. We recommend an ISAP II orientation and training be conducted with ERO field officers and headquarters personnel as they are assigned to the Alternatives to Detention (ATD) unit. This training would contribute to consistent understanding of ISAP II objectives, goals and program operation.

5. Because Non-Governmental Organizations (NGO) and community service providers have proven effective partners in stabilizing a participant's life, we recommend BI continue to meet frequently with NGOs – both nationally and in local communities – and maintain a comprehensive referral list of service providers.

6. Training should remain a priority for both ERO and BI. ERO needs to be informed of changes in supervision technology and program practices, and BI staff members need to continually advance their knowledge of immigration and court procedures.

7. We recommend home visits continue to be a prominent component of ISAP II full-service supervision. Though time-consuming, these visits provide rich detail into a participant's life and community ties, which support effective supervision and help determine flight risk.

8. ERO is currently creating a risk assessment tool and associated guidelines to be used in ISAP II. Upon completion, we recommend a thorough training of all ISAP II full-service supervision. ERO and ATD personnel to maximize consistent and effective use of these tools.

9. We recommend additional benchmarks be developed to help refine analysis of the ISAP II full-service supervision and technology-only service components.

10. Additional data relative to the technology-only portion of ISAP II would enable analysis of its success in achieving key ISAP II objectives. Specifically, hearing appearance rates and final order status, as tracked for full-service participants, would assist in determining the effectiveness of the technology-only program track.

## IT SECURITY: BI EARNS ACCREDITATION FROM ERO

As part of ISAP II contract requirements, BI was required to submit an information technology (IT) security plan and complete a Certification and Accreditation (C&A) process to meet government standards for unclassified information technology resources. BI provided extensive IT security and contingency plan documentation for the primary software applications used to operate the ISAP II contract.

The ERO and BI IT security teams worked in close coordination to complete the C&A process on schedule. In addition to the review of documentation, a Security Test & Evaluation Plan was administered by the DHS Information and Assurance Division to verify proper controls were in place by BI. On August 19, 2010, James Chaparro, Executive Associate Director for ERO, granted BI an Authority to Operate (ATO) representing that the necessary security requirements had been met successfully.

The work toward achieving the ATO required strong collaboration between ERO and BI and was a tremendous team effort. The guidance provided to BI by the Information Resource Management Division of ERO was invaluable.

ICE-RPD-013743

ICE-RPD-013744

# APPENDIX

## ISAP II Full-Service Supervision Component — Benchmark Comparison to the Vera Appearance Assistance and the Office of Inspector General (OIG) Study

The Intensive Supervision Appearance Program (ISAP) was funded by Congress in 2004, after a 2003 OIG study identified low compliance with final orders and appearance at immigration court hearings. The ISAP II full-service supervision model developed by the Department of Homeland Security (DHS), incorporated lessons learned from the Vera pilot (2000), called the Appearance Assistance Program (AAP), which operated from 1997-2000. This document compares the outcomes from the OIG study, Vera pilot and ISAP II full-service supervision program, and provides benchmark comparisons to track ISAP II full-service supervision success. The ISAP II outcomes are taken from the Contract Year 2010 Annual Report' and cover the base year of operations.

### PROGRAM/STUDY COMPONENTS

| | Vera Pilot Program Report (2000) | ISAP II Full-Service Supervision Component (2010) | OIG Study (2003) |
|---|---|---|---|
| **Program Objectives** | 'Increase appearance rates at court hearings and increase compliance with final orders of removal, including departure procedures and compliance with orders to carry alternatives such as bonds, parole and release on orders of recognizance' (Vera, 2000). | 'Increase appearance rates at court hearings and increase compliance with final orders of removal, including departure procedures' (BI Incorporated, 2010). | 'Determine whether the INS had improved its effectiveness at removing non-detained aliens with final orders; and whether the INS actually removed the aliens it agreed to... in a... 1996 report' (OIG, 2001, p.i.) |
| **Location** | New York City | 35 full-service supervision offices nationwide. | Random sample of the non-detained docket from the EOIR database |
| **Population / Sample** | Referred by INS: 534 Asylum seekers, criminal aliens, and undocumented workers 336 final orders at termination. 227 'low priority' 109 'low high priority' | Referred by EOIR. ISAP II Pre-Order Participants: 1,620 New York ISAP II Pre-Order Participants: 72. All individuals referred by EOIR were accepted and were not identified by criteria in less study (asylum seeker, criminal alien, undocumented worker). | 309. Random sample and not identified by specific criteria in this study (asylum seekers, criminal aliens, undocumented workers). |
| **Levels of Supervision** | Low priority and high priority. Low priority was defined as orientation and court reminders only. Vera outcomes are based on the high priority only. | Determined by legal stage: Pre-Order, Post-Order, Appeal, Post-Order Custody Review – Reasonable/Foreseeable Removal, Post-Order Custody Review- Non-Foreseeable Removal | N/A |
| **Program Components** | High priority included: - Orientation - Appeal. office visits - Telephonic reporting - Court reminders - Home visits - Community connections | Legal stage determines frequency of services: - Orientation - Face-to-face office visits - Random home visits - Electronic monitoring - Employment verification - Community connections - Service plans - Progress reports | N/A |

The Appearance Assistance Program paved the way for expansion of Alternatives to Detention Programs by developing communication channels between providers and Immigration and Naturalization Service (INS). The Vera study also tracked participants moving through the complete immigration court system for the first time. The outcomes recorded from the Vera study enabled DHS to take what worked from the Vera study and expand it to eight original ISAP I sites across the country. As ISAP I showed success, the program was expanded to several additional sites. In 2009, the program was again expanded to what is today ISAP II, with 35 full-service supervision sites nationwide. As we continue to measure success based on three simple factors, appearance at court hearings, appearance at final court hearings, and compliance with final orders, DHS can educate decision makers on the continued success of this cost-effective program.

Further discussion of the outcomes of alternative to detention programs, with detailed methodology, is included below.

### COMPLIANCE WITH FINAL ORDERS (OIG METHODOLOGY)

The OIG (2003) study offers a methodology from which benchmark comparisons can be made. The chart below compares all three outcomes (OIG, Vera, and ISAP II full-service supervision) using this methodology. The OIG study did not include cases where relief was granted or outcomes resulting in the individual being allowed to stay in the US.

To fairly compare Vera, ISAP II full-service supervision and OIG, the Vera numbers were adjusted as follows (ISAP II reports outcomes based on the OIG methodology, so no adjustments were needed):
- Of the 109 participants receiving final orders, 33 who were granted relief or allowed to stay in the US, were excluded.
- The Vera study included five departures that INS did not confirm, but are included here.



### COMPLIANCE WITH FINAL ORDERS (VERA METHODOLOGY)

In order to compare ISAP II full-service supervision to the methodology used in the Vera study, the following adjustments to ISAP II numbers were made (note that OIG is not included as the Vera methodology could not be replicated with the available OIG data):
- Participants with relief granted were added back into the ISAP II full-service supervision numbers.
- Participants with relief granted, and those allowed to stay in the U.S., were included in the Vera numbers.

## COMPLIANCE WITH FINAL ORDERS (NEW YORK COMPARISON)

The two charts below follow the same methodology described earlier and compare Vera's population, which was located in New York, to the ISAP II full-service supervision Pre-Order population specific to only the New York office.



## ATTENDANCE AT IMMIGRATION COURT HEARINGS

A second benchmark comparison is attendance at immigration court hearings. The chart below compares attendance at all hearings for Vera and ISAP II participants (OIG only reported attendance at hearings of final decision; therefore, a comparison for OIG could not be included). The second chart below compares ISAP II and Vera attendance at hearings of final decision against the OIG study and EOR benchmarks.



## SUMMARY

The outcomes from the Vera pilot and ISAP II full-service supervision are compelling and all programs should continue to be reviewed as the immigration system evolves in its ability and desire to measure program effectiveness throughout the immigration system.

- The outcomes reveal that both Vera and ISAP II full-service supervision had improved appearance rates and compliance when compared in the OIG study.

- When comparing Vera's AAP to ISAP II full-service supervision, ISAP II shows increased rates of compliance with final court decisions:
  - 90% compared to 69% with Vera methodology (All ISAP II full-service supervision)
  - 84% compared to 49% with OIG methodology (All ISAP II full-service supervision)
  - 85% compared to 69% with Vera methodology (New York ISAP II full-service supervision)
  - 57% compared to 49% with OIG methodology (New York ISAP II full-service supervision)

- When comparing Vera's AAP to ISAP II full-service supervision, ISAP II shows increased rates of appearance at immigration court hearings:
  - 99% compared to 91% for ALL hearings
  - 94% compared to 88% for hearings of final decision

- Both programs showed substantial improvement over unsupervised aliens, as indicated by the OIG numbers.

- Outcomes indicate Alternatives to Detention programs are an effective tool for increasing compliance with court attendance and compliance with final decision orders.

By increasing usage of alternative programs, ERO has the ability to measure success through programming that is effective, efficient and affordable.

[1] U.S. Department of Justice Office of Inspector General, Evaluation and Inspections Division (2003), Immigration and Naturalization Service's Removal of Aliens Issued Orders, Report #I-3001-004

[2] Vera Institute of Justice, Appearance Assistance Program (2000), Testing Community Supervision for the INS: An evaluation of the Appearance Assistance Program, Volume I: Final Report to the Immigration and Naturalization Service.

[3] Bi-Incorporated (2010), ISAP II Contract Year 2010 Annual Report

ICE-RPD-013745

© 2010 BI Incorporated

BI Incorporated produces the Intensive Supervision Appearance Program II Annual Report for and in collaboration with the Alternatives to Detention (ATD) unit of Enforcement and Removal Operations (ERO). ERO is part of Immigration and Customs Enforcement (ICE), a division of the Department of Homeland Security (DHS).

ICE-RPD-013746

# EXHIBIT E

# INTENSIVE SUPERVISION APPEARANCE PROGRAM II

**AN ALTERNATIVES TO DETENTION PROGRAM FOR THE U.S. DEPARTMENT OF HOMELAND SECURITY**



**CONTRACT YEAR 2011 ANNUAL REPORT**

ICE-RPD-013747



# CONTENTS

Management Letter . . . . . . . . . . . . . . . . . . . . . 3

Executive Summary . . . . . . . . . . . . . . . . . . . . 5

Program Design . . . . . . . . . . . . . . . . . . . . . 7

Community Connections . . . . . . . . . . . . . . . 11

Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Lessons Learned . . . . . . . . . . . . . . . . . . . . . . 19

Recommendations . . . . . . . . . . . . . . . . . . . . 20

About BI Incorporated . . . . . . . . . . . . . . . . . 21

ISAP Staff Spotlight . . . . . . . . . . . . . . . . . . . 22

Appendix: Supplemental Report . . . . . . . . . . 25

ICE-RPD-013748

# MANAGEMENT LETTER

NOVEMBER 6, 2011



BI Incorporated is pleased to prepare this annual report about the Intensive Supervision Appearance Program (ISAP), an alternative to detention program of the U.S. Immigration and Customs Enforcement's (ICE) Enforcement and Removal Operations (ERO). This report reviews program design and expectations, significant events, performance measures, lessons learned and recommendations for future operations. We are proud to report that ISAP continues to cost effectively support ERO to meet a critical need for community supervision of non-detained individuals when they are involved in the U.S. immigration legal system.

While policies adjust to meet the needs of evolving immigration issues, ISAP remains vital to ERO because it continues to focus on its core purpose since established in 2004: facilitate attendance at immigration court hearings and enhance compliance with final court rulings.

ISAP has always relied on a comprehensive case management process for participants – many unfamiliar with the U.S. immigration court system – to achieve positive outcomes. This case management system not only builds trust with ISAP participants but also delivers quick and appropriate sanctions when necessary. The system tailors service plans for each participant, and it links immigration officials, community-based partners and participants effectively.

BI still utilizes this case management process, but today we have greatly expanded the use of location monitoring systems to assist in compliance and community supervision efforts. We have also strengthened our strategic partnerships with community-based organizations and non-governmental organizations to support participants as they proceed through Executive Office for Immigration Review hearings. Please see our staff profiles and comments from our strategic partners, both of which illustrate our commitment to a comprehensive approach.

The results are impressive. During the 2011 contract year, ISAP expanded to 40 locations (see map on page 21) and served participants from more countries than ever. In fact, during the 2011 contract year we helped ERO supervise a record-high 35,380 participants. Despite this rapid program growth, we remained vigilant to achieve high appearance rates for participants at all EOIR hearings and compliance with final court decisions. Success does not mean we have become complacent, though. Please reference the appendix for research we have completed with a respected researcher to better understand what influences positive results, including removals. We will work with ERO to use this valuable information to adapt and adjust, as needed.

I believe the success of ISAP hinges on several factors, including our partnership with ERO; a value orientation; staff teamwork, integrity and experience; and a flexible, integrated approach. I would like to thank ERO for trusting BI to manage ISAP. We look forward to adapting and evolving with ERO as immigration policies and challenges unfold.

Sincerely,

*Bruce J. Thacher*

Bruce J. Thacher
President, BI Incorporated

ICE-RPD-013749

ICE-RPD-013750

# EXECUTIVE SUMMARY

November 6, 2011



This annual report presents highlights and results of the Department of Homeland Security's (DHS) Intensive Supervision Appearance Program (ISAP) – from Nov. 6, 2010 through Nov. 5, 2011. Throughout this report, we refer to this period as Contract Year 2011 (CY 2011). The Alternatives to Detention (ATD) unit, a division of Immigration and Customs Enforcement's (ICE), Enforcement and Removal Operations (ERO), oversees ISAP.

ISAP is in its 7th year. BI Incorporated has managed ISAP since its inception in 2004. This program supports EOIR to enforce the nation's immigration laws in a fair and effective manner. ISAP employs a comprehensive case management system and location monitoring systems to facilitate attendance at all EOIR hearings and compliance with final court orders, including removal to a person's country of origin.

The ISAP design facilitates cost-effective services and promotes clear communication, rapid response and efficient operations. ISAP delivers two supervision options: a full-service option and a technology-only option. The full-service option involves intensive case management, supervision, location monitoring technology and individual service plans. These service plans include legal, translation, and transportation services and plans for travel documents, departure and referrals to appropriate community services. Program managers and case specialists at the full-service offices also connect participants with local non-governmental and community-based organizations to facilitate stability in participants' lives.

ERO initially intended the ISAP technology-only option for locations where a full-service option was not available. However, it has evolved into a de-escalation tool for ERO. Participants involved in the ISAP technology-only option do not receive the full-service supervision provided from BI's 40 ISAP locations (see map on page 21). The technology-only option provides ERO personnel nationwide with two tools for location monitoring: GPS tracking and telephonic reporting. During CY 2011, ERO use of the technology-only option almost doubled, from 5,752 to 11,333 participants.

During CY 2011, the agency began to implement co-location sites, referred to as Government or "G" sites. G sites offer full-service opportunities in more locations. The first G site opened in March in Providence, RI, within 30 days of site approval. By yearend, five G sites were open, including locations in Tampa, FL, Bakersfield, CA, Marlton, NJ, and Charleston, SC. All sites reached recommended supervision counts quickly. As anticipated, the formation of the G site model allowed ERO and BI case specialists to communicate frequently for a coordinated approach to participant services, including simplified referrals, resolution of participant issues, and other program efficiencies.

In CY 2011, ISAP supported ERO to supervise 35,380 program participants, compared to 25,778 in CY 2010. Of the 35,380 participants supervised during CY 2011, 23,112 were still actively involved in ISAP at the end of the contract year. Throughout this report, we refer to these individuals as "active" participants. We refer to the remaining 12,268 participants as "inactive," meaning they exited the program. Inactive participants exited the program because EOIR granted relief or ordered removal from the United States; they had absconded and could not be located; or ERO had removed them from the program for reasons other than absconscion or completion and are still in process. An important component of the CY 2011 data analysis focuses on the inactive participant population to review compliance to final EOIR orders.

ICE-RPD-013751

## Close observation leads to voluntary departure

By working closely with participants, ISAP case specialists are in tune with changes in their lives and their flight risk. For example, a participant, estranged from her husband, expressed problems with supporting her two children and meeting ISAP requirements. The case specialist connected the participant with community services, including food, rental assistance and counseling. When the participant continued with non-compliant behavior, ERO requested increased supervision with GPS tracking and more counseling on the EOIR process. Through this support, firm supervision and by arming the participant with a better understanding of the court system, ISAP was able to assist the individual to obtain voluntary departure to her home nation, with her two children, in time for a new school year there.

ISAP facilitated positive outcomes in CY 2011, including:

- A 37.2% increase in ISAP participants from the previous contract year
- Using an ERO-developed formula for removals, 84.0% of ISAP participants involved in the full-service supervision option and 46.7% in the technology-only option successfully departed the country (see page 15 for a full description)
- Using an OIG study benchmark for removals, 83.8% of ISAP participants involved in the full-service supervision option and 65.0% in the technology-only option complied with a final EOIR decision (see page 15 for a full description)
- Participants attended 99.4% of all EOIR hearings during the year
- Participants attended 96.0% of hearings when EOIR rendered a final decision
- The cost to administer ISAP has declined considerably due to refinements in the program model, operational efficiencies as the program expands, and advancements in technology

ISAP offers many benefits, including cost savings, high compliance outcomes, and conformity with due process and best practices internationally. On the following pages, please find a review of the program design, statistical data, lessons learned and recommendations for the future. Throughout this annual report, you will also find success stories, comments from ERO and NGOs we work closely with, and profiles of ISAP staff, many of whom have been with ISAP since ERO established the program.

# PROGRAM DESIGN



The Intensive Supervision Appearance Program (ISAP) is a highly structured program that supports Enforcement and Removal Operations (ERO) to monitor and manage individuals released to community supervision while they are involved with the U.S. immigration legal system. ISAP is an alternative to detention program that allows ERO to manage the non-detained population while also meeting international best practices for immigration.

ISAP manages participants based on their status within the immigration court system, including:

- **Pre-Order:** These program participants have not received an order of removal from the immigration court.
- **Post-Order:** These participants have received a final order of removal from the court. Voluntary departure decisions are also included.
- **Appeal:** These participants have received a decision from the Immigration Court and have filed a Notice of Appeal (NOA) with the Board of Immigration Appeals (BIA). The Appeal is pending.
- **Post-Order Custody Review-Reasonably Foreseeable Removal:** These individuals have received a court order of removal, completed a custody review, and will be removed in the near future.
- **Post-Order Custody Review-Non-Foreseeable Removal:** These individuals have also received a court order of removal, completed a custody review, but it is estimated that they will not be removed in the near future.

## PARTICIPANT PROGRESSION THROUGH ISAP II



## A focus on travel documents pays off

Obtaining travel documents from participants is a primary focus as they enter ISAP. By obtaining these materials, removals can be expedited if ordered. One participant, who had received a decision from EOIR, was enrolled in ISAP to support his removal to his nation of origin, India. The individual resisted providing his passport and visiting the Indian consulate, but the case specialist persisted. This persistence paid off when the individual surrendered his passport, visited the consulate in October, then was apprehended and removed (verified) in November.

ISAP delivers two supervision options: full-service and technology-only. ERO refers individuals to one of these options based on assessed risk, circumstance, and full-service availability. The ISAP design facilitates cost-effective services and promotes clear communication, rapid response and efficient operations.

## FULL-SERVICE SUPERVISION

The ISAP full-service option relies on a comprehensive case management process for participants – many unfamiliar with the U.S. immigration court system – to facilitate positive outcomes. This case management success builds trust with ISAP participants and their family members but also delivers quick and appropriate sanctions when necessary. The system tailors service plans for each participant, and it links immigration officials, community-based partners and participants effectively. It involves individual service plans, face-to-face visits at an ISAP office, home visits, and a focus on obtaining travel documents. During CY 2011, ISAP performed 353,964 office and 201,054 home visits with participants. Additionally, the staff secured 9,889 travel documents. By securing travel documents, ISAP staff prepares program participants for the possibility that EOIR may order removal from the country.

## TRAVEL DOCUMENTS



Obtaining travel documents is an important component of the ISAP process and eventual removal, if ordered. In CY 2011, ISAP case specialists collected 9,889 travel documents from 140 nations.

As part of full-service supervision, the participant reports to a designated ISAP office within 24 hours of referral by ERO for intake, assessment and orientation. After an individual service plan is developed, the case management process begins. This involves a schedule of office visits, residence verifications, random home visits, and updates to the participant's schedule. Supervision of participants in the full-service option is supplemented with two forms of electronic monitoring – GPS tracking or telephonic reporting. GPS tracking is a more intensive location monitoring technology, but both of these options provide excellent details about the person's adherence to schedules and supervision plans (See Technology-Only Supervision on page 9 for more details).

A participant's stage of supervision reflects their stage in the immigration court process. The frequency of reporting to the ISAP office, home visits, employment checks and use of electronic monitoring corresponds to the specific stage of supervision. Additionally, the program is successful because of consistent case management services, including treating the participant with dignity and respect, building trust in the immigration process, providing community connections for unique participant needs, and holding the participant accountable.

The full-service option offers structure and flexibility to adjust, an approach that produces the desired results: high appearance rates at preliminary immigration court hearings and enhanced compliance with final court orders, including departure if ordered.

**Government (G) Site Locations:** During Contract Year 2011, ERO and BI implemented a new model, called "G" site locations. G sites are an alternative to a stand-alone, full-service supervision office. G sites consist of an ISAP employee co-locating in an ERO office and performing the same services as at a full-service site. A G site employee conducts intake and orientations, office visits, home visits, assessments and individual service plans. ERO provides the necessary equipment, software, infrastructure and technical support services for these sites. During the contract year, BI opened five G sites. ISAP opened the first G site in Providence, RI. It opened in March 2011 within 30 days of site approval. This site grew quickly and provided the model for additional G sites in Tampa, FL, Bakersfield, CA, Marlton, NJ, and Charleston, SC. Each of these G sites met recommended supervision counts quickly. As anticipated, the formation of the G site model allowed ERO and BI case specialists to communicate frequently for a coordinated approach to participant services, including simplified referrals, resolution of participant issues, and other program efficiencies.

## TECHNOLOGY-ONLY SUPERVISION

ERO created the ISAP technology-only option to offer an alternative where full-service supervision was not available. It has evolved to provide a tool for ERO to escalate and de-escalate participants between the full-service and technology-only options. Participants involved in the ISAP technology-only option do not receive the full-service supervision provided at the 40 ISAP locations. The technology-only option provides ERO personnel nationwide with two tools for location monitoring: GPS tracking and telephonic reporting. The GPS tracking system, BI ExacuTrack® One, is a sophisticated ankle-worn device that tracks a participant's movements and has many reliable tamper features that deliver alerts, if warranted. The telephonic reporting system, BI VoiceID®, helps ERO monitor compliance by making random and scheduled telephone calls to participants. VoiceID identifies participants through a biometric "voice print" and verifies the participant is where he or she is supposed to be throughout the day.

ISAP staff members can assist with participant enrollment, equipment installation and removal when there is an office in the area. ERO officers manage participant monitoring by logging on to BI's secure web portal and responding to violations as needed. ISAP program managers and BI's Monitoring Center Operations provide ERO officers with equipment training and 24-hour support.

ERO terminates participants in the full-service or technology-only ISAP supervision options when they comply with final court orders, voluntarily depart for their home country, or when they are released by ERO.

## Monitoring technology supports departure verification

BI monitoring technology has many reliable tamper features that deliver alerts, if warranted. In one situation, ISAP staff received an alert from a GPS tracking device that the strap had been tampered with. In fact, by tracking the GPS data points, the device was located in a dumpster. Immediately, staff began reaching out to the participant's network of family and friends to locate the participant. ISAP staff, through a relative, was able to reach the individual in his home nation. ISAP staff then arranged a meeting between ERO and the participant. ERO was able to determine the individual had left the country, resulting in a verified departure versus an absconded case.

ICF-RPD-013755



CE-RFD-013756

# COMMUNITY CONNECTIONS



ISAP's success can, in part, be attributed to the support from our many community and non-governmental partners. These organizations provide invaluable services to ISAP participants and play a role in achieving positive outcomes. Though ISAP staff members are experienced, well educated and often well-versed in a variety of cultures, the program requires community assistance to achieve the greatest success.

ERO determines the supervision and services a participant will receive, but the ISAP case specialist is also able to make referrals to community-based organizations based upon an intake assessment. These assessments can identify a participant's basic life needs, which often need to be met before the participant can think about attending court hearings and complying with orders of supervision. Identifying these needs and referring participants to supportive agencies is an integral part of ISAP, and it would not be successful without the support of the many agencies who serve ISAP participants.

Each ISAP site has a community resource plan outlining the agencies able to serve participants. This includes agencies able to provide services for food, shelter, legal assistance, mental health, medical, transportation, and other basic life needs.

ISAP program managers reach out to community organizations to help them understand the program and how they might help. The responses have been phenomenal, and in the last year, participants have received an extensive list of meaningful services. A partial list of partner providers includes:

"I have worked with the ISAP Kansas City office from the first day of the program. They are courteous, professional and easy to work with. They realize the importance of having legal assistance and consultation in these cases."

**Suzanne Gladney,**
**Managing Attorney**
Legal Aid of Western Missouri
Kansas City, Missouri

## ASSISTANCE WITH STABLE HOUSING



ERO and the program manager met with a habitual violator to assess how to ensure program compliance and determined that she needed a housing referral. The participant had an unstable living situation and had been associating with drug users. The program manager called Healthcare for the Homeless who prepared a stable residence for her until she files a change of venue and moves in with her mother in Texas.

| | | |
|---|---|---|
| 24 Hour Crisis Stabilization | ESL Language Centers | New Options for Violent Actions (NOVA) |
| Affordable Housing | Family Health Services | Planned Parenthood |
| Alcohol Drug Action | Florida Immigrant Advocacy Center (FIAC) | Public Health Department |
| Alcoholics Anonymous | Food Bank of San Diego | Regional Transit Authority |
| American Friends Service Committee | Food Pantry Community Missions | Rocky Mountain Survivors Center |
| American Red Cross | God's Food Pantry | Salt Lake City Office of Diversity Affairs |
| Amtrak Rail Service | Good Neighbors Health Care | Salvation Army |
| Angel Food Ministry | Goodwill Industries | San Diego Coalition for the Homeless |
| Baptist Immigration Center | Greyhound Bus Lines | San Diego Rescue Mission |
| CASA (Colombian American Service Assoc.) | Healthcare for the Homeless, Inc. | Spanish Catholic Center Medical Clinic |
| Catholic Charities | Hispanic Migrant Ministry | Substance Abuse & Mental Health (SAMHSA) |
| Centers for Victims of Torture | Hope Clinic | The Neighborhood Center |
| Charlotte Housing Authority | Housing Authority | Traveler's Aide (Hope Atlanta) |
| Child & Family Reach Out Program | Housing Helpers | Turning Point |
| Child Protective Services | Housing & Urban Development | United Way |
| Coalition for Suicide Prevention | Immigration Counseling Services | VIA Public Transport |
| Dental Health Services | Interfaith Ministries | Volunteers of America |
| Denver Rescue Mission | Latin America Association | Women, Infants & Children (WIC) Program |
| Department of Homeless Services | Legal Aid of Western Missouri | World Relief |
| Department of Public Health | Medicare Advocacy Program | YMCA |
| Diocesan Migrant & Refugee Services, Inc. | Morris County Dept. of Human Services | YWCA |

ICE-RPD-013757



"ISAP has evolved from a project into a full-service (option) of actually increasing removals. That meets and benefits the basics of the ERO mission, certainly."

Assistant Field Office Director

# FINDINGS



The Intensive Supervision Appearance Program (ISAP) contract year was from Nov. 6, 2010 to Nov. 5, 2011. BI managed 40 locations for Enforcement and Removal Operations (ERO) during this contract year. The findings section reviews general statistics for the contract year, post-order removal data, and specific Executive Office for Immigration Review (EOIR) hearing data.

ISAP remains vigilant in facilitating participant attendance at all EOIR hearings, including hearings where final orders are rendered. By facilitating high attendance rates, ISAP builds trust in the court system and achieves favorable outcomes.

As part of the data review for Contract Year 2011 (CY 2011), ISAP outcomes are compared against benchmark data and results achieved in Contract Year 2010.

## GENERAL PROGRAM DATA

In Contract Year 2011, ISAP supervised 35,380 participants, a 37.2% increase from the previous year.

### STATISTICS FROM 11/6/2010 - 11/5/2011

|  | FULL-SERVICE (FS) | TECHNOLOGY-ONLY (TO) | TOTAL |
|---|---|---|---|
| **TOTAL SERVED** | 24,047 | 11,333 | 35,380 |
| **Active in Program as of 11/5/11** | 13,862 | 9,250 | 23,112 |
| **Terminated from Program between 11/6/10 and 11/5/11** | 10,185 | 2,083 | 12,268 |




ICE-RPD-013759

# PARTICIPANT TERMINATION DATA

ERO defines 13 possible termination outcomes for ISAP participants. The following table displays results by termination type for these participants.

## TERMINATION CODES

| TYPE | DESCRIPTION | FS | TO |
|------|-------------|-----|-----|
| **FAVORABLE OUTCOMES** | | | |
| A | **Departure Verified** (Final Order of Removal) | 1,126 | 203 |
| B | **Relief/Benefit Granted** (Cancellation of Removal, Adjustment of Status, Asylum, or Admission) | 603 | 168 |
| L | **Departure Verified** (Voluntary Departure) | 963 | 61 |
| M | **Departed the United States while in proceedings** | 121 | 5 |
| **NEUTRAL OUTCOMES** | | | |
| G | **No Longer Required to Participate** (As determined by ERO for various reasons) | 5,429 | 1,033 |
| H | **Arrested by ICE for Removal** (Final Order - Active Participant) | 99 | 63 |
| I | **Pending Departure Verification** (Final Order of Removal or Voluntary Departure) | 147 | 31 |
| J | **Arrested by other Law Enforcement Agency** | 640 | 89 |
| K | **Other** (No longer required to report: medical or deceased) | 133 | 27 |
| **UNFAVORABLE OUTCOMES** | | | |
| C | **Pre-Order Program Absconder** (Terminated from ATD) | 395 | 40 |
| D | **Post-Order Program Absconder** (Terminated from ATD) | 405 | 142 |
| E | **Pre-Order Program Violator** | 107 | 56 |
| F | **Post-Order Program Violator** | 17 | 165 |
| **TOTAL** | | 10,185 | 2,083 |

Findings Note: These results cover the ISAP II contract year and will differ from the Government Fiscal Year. In addition, the results do not include changes that may have occurred after a participant was terminated from ISAP. The Government's database will have these updates.

# REMOVAL OUTCOMES

ISAP has been successful in facilitating removal. Two sets of removal calculations – one based on an ERO formula and another based on removal calculations from previous ISAP years (to allow comparison against a 2003 Office of Inspector General benchmark study), produce consistent results.

## ERO FORMULA

Based on an analysis of 2,632 participants in the full-service supervision option who received a final order to depart the country/departure verified (Type A); departed voluntarily (Type L); departed while in proceedings (Type M); absconded (Type D); or program violator (Type F), ISAP achieved an 84.0% rate of compliance. Based on an analysis of 576 participants in the technology-only supervision option who received a final order to depart the country/departure verified (Type A); departed voluntarily (Type L); departed while in proceedings (Type M); absconded (Type D) or program violator (Type F), ISAP achieved a 46.7% rate of compliance. When combining participant termination counts for individuals in both the technology-only option and full-service option (3,208 individuals, types A, L, M, D, F), ISAP achieves a 77.3% compliance rate.



## OIG STUDY BENCHMARK

The OIG study benchmark allows for a comparison against pre-ISAP benchmark data. Of 2,494 participants in the full-service supervision option who received a final order to depart the country/departure verified (Type A); departed voluntarily (Type L); or absconded (Type D), ISAP achieved an 83.8% rate of compliance. Based on an analysis of 406 participants in the technology-only supervision option who received a final order to depart the country/departure verified (Type A); departed voluntarily (Type L); or absconded (Type D), ISAP achieved a 65.0% rate of compliance. When combining participant termination counts for individuals in both the technology-only option and full-service option (2,900 individuals, types A, L, D), ISAP achieves an 81.1% compliance rate, far exceeding an OIG study that found that individuals complied with only 13.0% of final EOIR court orders in 2003.



† Immigration and Naturalization Service's Removal of Aliens Issued Orders, Report #I-2003-004.

Findings Note: These results cover the ISAP II contract year and will differ from the Government Fiscal Year. In addition, the results do not include changes that may have occurred after a participant was terminated from ISAP. The Government's database will have these updates.

ICF-RPD-013761

# HEARING ATTENDANCE - FULL SERVICE PARTICIPANTS*



■ = Successful Attendance
■ = Failed to Appear

## FULL-SERVICE
## EOIR HEARING DATA - ALL HEARINGS

Since its inception, ISAP has focused on delivering firm, fair and consistent services for participants. This approach aligns with ERO's mission to deliver a flight-mitigation program that increases compliance with release conditions, facilitates participant compliance with court hearings and final orders of removal while allowing individuals to remain in the community.

As a result, ISAP focuses on facilitating attendance at all EOIR court hearings, including hearings where final decisions are rendered. ERO does not track hearing attendance for technology-only participants and this section covers ISAP full-service attendance only.

Consistent with previous contract years, in CY 2011 ISAP achieved an excellent 99.4% full-service participant attendance rate at all EOIR hearings. Of 18,994 hearings for participants during the year, participants attended all but 109.



■ = Successful Attendance ■ = Failed to Appear

† Immigration and Naturalization Service's Removal of Aliens Issued Orders, Report #I-2003-004.
‡ Executive Office for Immigration Review, FY 2010 Statistical Year Book. Note change in methodology - administrative closures are no longer included to calculate failure to appear rate. As of 2009 EOIR only uses IJ decisions and orders in absentia.

## FULL-SERVICE
## EOIR HEARING DATA  - FINAL HEARINGS

At hearings where final decisions were rendered, ISAP also achieved an excellent 96.0% compliance rate for full-service participants. Of 2,753 final order hearings during the year, participants attended all but 109 as well. These rates far exceed compliance rates before ISAP was implemented. For example, the 2003 OIG study, which included a population similar to participants involved in ISAP, found only 33.6% of individuals attended final hearings. Another report from 2003, the EOIR Statistical Year Book, which included a broader group of participants than the OIG study, found 59.4% of individuals attended final court hearings.

In 2010, there were 22,523 EOIR hearings. Of these hearings, individuals attended 17,870, a compliance rate of 79.3%.

Findings Note: These results cover the ISAP II contract year and will differ from the Government Fiscal Year. In addition, the results do not include changes that may have occurred after a participant was terminated from ISAP. The Government's database will have these updates.

* Hearing attendance data not available for Technology-Only.

## ISAP II AND ERO PARTNER TO IMPROVE HEARING ATTENDANCE



An ISAP task force was implemented to address offices below a 94% hearing attendance rate. The group identified the unique challenges faced in each location. They shared ideas on what had worked in other locations and ways to overcome barriers participants face in attending their court hearings.

Specifically, the San Bernardino office, in partnership with local ERO, was the lead office in re-developing the supervision protocol to achieve maximum EOIR attendance. An analysis was conducted on historical absentia orders, and the results identified the most common barriers to hearing attendance as: unreliable transportation and/or directions, last-minute emergencies, forgotten appointments, and fear of attending.

To counter these barriers, ISAP II staff increased their efforts to prepare participants for hearing attendance by demystifying the EOIR process, confirming hearing dates/times and reminding participants at each face to face visit, confirming three transportation plans in advance of the hearing, conducting one week and 24-hour court reminder calls and/or unannounced home visits, and tracking the participant's GPS points the day of scheduled hearings.

The implementation of these initiatives has produced quantifiable improvement in hearing attendance rates across the country.

## ISAP FULL-SERVICE COSTS DROP OVER TIME



As the number of participants in the full-service option has increased since ISAP was implemented in 2004, the cost to administer the program has dropped significantly. In 2004, the daily participant rate was $21.47. At the end of CY 2011, the daily cost per participant had dropped to $7.89 per day.

ICE-RPD-013763



# LESSONS LEARNED



BI offers the following observations and lessons learned for the Intensive Supervision Appearance Program (ISAP) Contract Year 2011. We base these on experience operating this program for Enforcement and Removal Operations (ERO) and feedback from ISAP program managers, ERO and non-governmental and community-based organizations.

- ISAP facilitates **excellent attendance rates** at Executive Office for Immigration Review (EOIR) hearings and compliance with removals, if ordered by the court.

- ISAP continues to be a **flexible option** for managing the non-detained population. A survey of ERO staff that work with ISAP unanimously stated the program is a valuable ERO program.

- ISAP has become a **trusted alternative** to detention for ERO, allowing ERO officers to manage large caseloads and specific cases that require immediate attention.

- Once ERO refers individuals to ISAP, focusing on **obtaining travel documents** as soon as possible helps facilitate timely compliance with removal orders.

- The ISAP full-service option generates higher **final order compliance** than the technology-only option.

- We learned that adding Government **"G" site locations**, where BI co-locates ISAP staff in ERO offices, can be done within 30 days of site approval. During the year, BI implemented five G sites. Feedback on these sites indicates these sites facilitate good communication, efficient operations, and effective participant services.

- **Ongoing communication** between ERO and ISAP facilitates coordinated and cost-effective outcomes. For example, ISAP offices provide a daily participant violation report to the local ERO office to respond quickly to non-compliant behavior.

- We have learned that **increasing the level of supervision and communication** with participants prior to final court hearings facilitates appearances at these important hearings. For example, a pre-final court hearing reminder has been an effective enhancement.

- **Home visits**, as performed in the ISAP full-service option, provide excellent details about a participant's life and a window into this individual's flight risk.

- Placing ISAP offices within **close proximity to ERO offices** facilitates easy enrollment and frequent communication.

- Educating EOIR judges on ISAP facilitates more **timely outcomes and saves money.** In locations where EOIR installs new judges, a drop in efficiency has been noted.

- Working with **local NGOs and community-based organizations** is an important and ongoing responsibility for ISAP sites. Establishing and maintaining open channels of communication with these organizations facilitates referrals for necessary participant services. By connecting participants with vital community services, such as shelter, food or health services, they stabilize in the community and better engage in the EOIR process.

- We have learned that **contract modifications** can be effective at adapting and evolving to immigration challenges. These modifications, such as adding phase flexibility and allowing the cellular option for individuals on telephonic reporting, keep the program relevant.

- Treating participants with **dignity and respect** enhances compliance to program guidelines and outcomes.

ICE-RPD-013765

# RECOMMENDATIONS



We believe the following recommendations would enhance the Intensive Supervision Appearance Program (ISAP). These are based on operational experience and feedback from staff, Enforcement and Removal Operations, and non-governmental organizations (NGOs).

- We recommend that **more Government, known as "G" sites, be added.** These sites are an alternative to stand-alone, full-service supervision locations, they can be implemented in just 30 days, and they allow more participants to be served in more geographic locations. By being co-located in an ERO office, G sites also facilitate effective communication between ISAP and ERO.

- We recommend **ERO attend future technology training forums,** such as the session hosted at the BI National Monitoring Operations center this year. Location monitoring technology is continuously updated; understanding these changes can be helpful as BI incorporates these enhanced systems into program operations.

- We recommend that **training programs for ISAP staff** continue to include information on the removals process and ongoing refreshers on immigration law. By continuing to understand and align with ERO's mission, ISAP staff can effectively support this partnership.

- We recommend ERO develop a **training program for new EOIR judges** that promotes moving ISAP cases through the docket efficiently, thereby saving money and enhancing outcomes.

- We recommend that ISAP staff conduct **open houses on a regular basis** for local NGOs and community-based organizations. By facilitating open communication and an understanding of each other's mission, ISAP can better connect participants with services.

- We recommend **additional benchmarks** be developed to refine analysis of the ISAP full-service and technology-only supervision options.

ICE-RPD-013766

# ABOUT BI INCORPORATED

Established in 1978, BI Incorporated works with approximately 900 U.S. governmental agencies. In addition to managing ISAP since 2004, BI provides a full continuum of location monitoring systems, monitoring services, and treatment and day reporting services for offenders in residential, non-residential or in-custody settings. BI works closely with community corrections and immigration officials to cost effectively reduce recidivism and promote public safety. BI is a wholly owned subsidiary of The GEO Group, a global leader in corrections.

## BI INCORPORATED ISAP II FULL-SERVICE (FS) & GOVERNMENT (G) SITES



**ISAP II Full-Service Supervision Offices:**

| | |
|---|---|
| Atlanta | Newark |
| Baltimore | New Orleans |
| Boston | New York City (4) |
| Buffalo | Orlando |
| Charlotte | Philadelphia |
| Chicago | Phoenix |
| Dallas | Portland |
| Delray Beach | Salt Lake City |
| Denver | San Antonio |
| Detroit | San Bernardino |
| El Paso | San Diego |
| Hartford | San Francisco |
| Houston | Santa Ana |
| Kansas City | St. Paul |
| Los Angeles | Seattle |
| Miami | Washington, D.C. |

**ISAP II Government Sites:**

| | |
|---|---|
| Bakersfield | Providence |
| Charleston | Tampa |
| Marlton | |

## BI INCORPORATED ISAP II TECHNOLOGY ONLY (TO) SITES



ICE-RPD-013767

21

# ISAP STAFF SPOTLIGHT







"I enjoy helping participants understand and navigate the immigration system. Based on my family's positive experience – complying with rules, filling out the forms, and seeing the system work – I aim to have participants comply too.  If I did it, they can too."

Jocelyne wanted to work in immigration since her family moved to Boston from the Democratic Republic of Congo a decade ago. While she was in high school, her family was selected in the U.S. Diversity Immigrant Visa Program lottery. She continued her education in Boston, earning a criminal justice degree from University of Massachusetts. She has counseled and administered case management services for juvenile delinquents, which prepared her for her ISAP role. Jocelyne speaks French, Spanish, English and Lingala.



"I aim to be helpful and treat participants with dignity and respect. We help in many ways, and the relationships we build help avoid problems, gain trust and get results. Recently an individual, though terminated from ISAP, wrote a letter saying he appreciated our treatment."

Vincenia joined ISAP in Charlotte as a case specialist and was soon promoted to program manager. Vincenia has worked with federal, state, criminal justice and child welfare services, including time as a probation officer and civilian personnel clerk for the Navy. She also tutored in the America Reads program for young students and linked juvenile clients with the U.S. Marine's mentoring program for at-risk children. She has a master's degree in Urban Studies and bachelor's in Criminal Justice from Old Dominion University.

"ISAP saves the government a lot of money. Many participants are ideal candidates for an alternative to detention. They can live in the community and support their families while we help them through the immigration process."

Diana is involved in daily office activities, like installing or answering questions about GPS tracking, giving directions to services, coordinating information between case specialists and participants, even making court reminder calls. Participants in Chicago are often of Eastern European and Hispanic descent, so she applies her five languages – Ukrainian, Polish, Spanish, Russian and English. A Ukraine native, Diana cares about helping others, and believes in alternatives to detention. She has a political science degree and has taken national security classes at DePaul University.





**"I use my educational training in ISAP, including counseling, working with referral organizations, and using the local network to stabilize participants in the community. I believe in treating people with dignity and respect, but I am also here to help them follow through and hold them accountable."**

Kiana tells her two young daughters to reach high, and she, too, sets high goals in her commitment to her community and work. During Hurricane Katrina, her family was displaced to Houston. There, she joined the Texas Department of Criminal Justice as a parole officer. Ten months later, she returned home and earned her master's in Social Work from Southern University, having previously earned her criminal justice degree. She completed internships at the U.S. Probation Office and the New Orleans Criminal Court Mental Health Program, prior to joining the ISAP team.





**"I keep learning about the challenging but interesting immigration process, and I like working with the participant population. We build rapport with them, help them understand the system, keep them from absconding and compliant with court orders. We make a positive impact."**

Raised in the border town of San Luis, Arizona, Alan uses his knowledge of the area and the participant population, helping participants connect with the Mexican consulate and obtain departure papers as needed. Bilingual in English and Spanish, Alan earned his sociology degree from Arizona State University. He was previously a security officer.



**"I like what I do because the work is always evolving and the challenges are different. Each participant has a unique background, different cultural influences or circumstance, requiring a new approach. In working with them, I keep this in mind."**

Eduardo joined the ISAP team seven years ago. He has worked in several offices, including Atlanta, San Bernardino, and Charlotte, and he helps ISAP expand. He also assisted Phoenix, Santa Ana, Baltimore, and other offices. Born in Peru, he emigrated to Florida in 1989. There, his multilingual abilities (he speaks English, Spanish, Portuguese, and basic French) to connect with the diverse ISAP population. Eduardo earned his bachelor's degree in Psychology, and master's in Social Work from Barry University in Florida.

## Staff reaches overseas to complete the job

Sometimes, ISAP staff go beyond our borders to complete the job. For example, a participant from the Philippines complied with his voluntary departure and returned to his home nation in June. The ISAP case specialist noticed a discrepancy in his itinerary and, as a result, his departure could not be verified using ERO software. By requesting the individual provide his email address prior to removal, the case specialist was able to follow up with the participant, learn that he had become sick upon return home, and request he submit verification to the American embassy as soon as possible. ERO informed ISAP his departure was verified the next day.

ICE-RPD-013769



"The ISAP Program is a very effective tool if utilized properly. I have seen the positive results in our office, in removals obtaining documents that are required for certain cases, and in the overall tracking of those subjects currently in proceedings."

Deportation Officer

# APPENDIX: SUPPLEMENTAL REPORT

There is a lack of research exploring the effective management of the non-detained, undocumented immigration population in the United States. BI Incorporated, with the expertise and oversight of Dr. Jeffrey Lin, assistant professor of sociology and criminology at the University of Denver, has completed a statistical study of the Intensive Supervision Appearance Program (ISAP). While educated assumptions about why ISAP has been successful are relevant, they have not yet been validated. The purpose of this study was to understand factors that have affected these outcomes. In this study, we examined (1) factors that predict removal and (2) flight risk (i.e. risk of absconding), using ISAP participants from the full-service component of the program, or those individuals receiving intensive case management services as they navigate the immigration court process. The study did not include ISAP participants from the technology-only component.

This study used data collected on ISAP participants who were terminated between November 8, 2009 and November 5, 2011, and were not terminated as Term Code G. The study identifies factors that predict (1) compliance with removal orders and (2) flight risk. Participants in this study were referred to ISAP by Enforcement and Removal Operations (ERO) officers. ERO is a division of Immigration and Customs Enforcement (ICE) and the Department of Homeland Security (DHS).

Multivariate statistical analyses were conducted on this data to identify factors that predicted compliance with removal orders and flight risk while in ISAP. The participants in this study were members of the larger non-detained, undocumented immigrant population in the United States managed by ERO. The non-detained population consists of approximately 1.6 million undocumented immigrants (Enforce Alien Removal Module, ICE's system of record, December 30, 2011). Participants were adults, and upon entering ISAP, received an intake, orientation, and assessment, followed by the development of his or her Individual Service Plan (ISP).

*While educated assumptions about why ISAP has been successful are relevant they have not yet been validated. The purpose of this study was to understand factors that have affected these outcomes.*

## FINDINGS RELATED TO REMOVALS

Key study findings related to removals include:

**Program factors were the most powerful and significant predictors of successful removal, especially the use of technology and status at intake. Status at intake was reflective of the participant's level of supervision while in ISAP.**

- Compared to participants without technology, those with GPS tracking systems installed had 7.4 times higher odds of removal. Those with Telephonic Reporting (TR) had a 3.4 times higher rate of successful removal.
- Status at intake—a participant's legal stage in the immigration court process—was also predictive of successful removal. Participants with post-order, appeal, or POCR-RFR status were more likely to be removed when compared to pre-order participants. The highest level of supervision was most predictive of successful removal. Possibly, the legal stage was the predictor; the level of supervision was the predictor; or both.

**Demographic characteristics were also powerful predictors of successful removal.**

- Age was the most predictive variable. Younger participants were more likely to depart. Compared to participants between 18 and 30 years old, those between 31 and 44 had 22.8% lower odds of removal and those 45 and older had 29.3% lower rate of removal.
- Women were more likely to successfully depart than men.
- Participants from Mexico were more likely to depart to their home nation when compared to participants from Central/South America, Africa, Europe, and Asia.

ICE-RPD-013771

Legal factors were also predictive of successful removal.

- Participants without a criminal history had 21.5% higher odds of departing than those with at least one criminal conviction.
- Participants referred from detention were more likely to depart than those referred from the criminal alien program.

While social characteristics were not as predictive as other variable categories, they did yield some interesting findings.

- Participants with motorized transportation were more likely to depart than those without motorized transportation.
- Compared to non-high school graduates, those with some college education were more likely to depart.
- Participants requiring an interpreter were more likely to be removed than participants proficient or fluent in English.
- Participants with fewer non-family contacts had a higher likelihood of departure than those with a higher number of non-family contacts.
- Unemployed participants were more likely to depart than employed participants.

# FINDINGS RELATED TO PARTICIPANTS WHO ABSCONDED

In contrast to the successful removal model, in which program factors provided the most explanatory power, social characteristics best predict when a participant would abscond. Variables that were associated with increased absconding provide insight for case specialists to decrease participant flight risk.

Key study findings include:

Certain social characteristics were able to best predict absconding.

- Participants who were proficient or fluent in English had 15.9% and 34.3% lower odds, respectively, of absconding than participants requiring or having an interpreter recommended
- Participants had 1.4 times higher odds of absconding if they had received a higher number of program referrals.
- Participants with motorized transportation had 1.3 times lower odds of absconding than participants without access to their own motorized transportation, and participants renting their homes had 1.3 times higher odds of absconding than participants who owned their homes.
- Participants who reported a low number of family and non-family contacts were more likely to abscond. Employed participants were less likely to abscond than unemployed participants.

Demographic, program and legal characteristics had predictive effects on absconding as well.

- A male participant had 1.4 times higher odds of absconding than a female participant. Also, participants between the ages of 18 and 30 were more likely to abscond than participants older than 31.
- Participants in the Central and South American regions were more likely to abscond than those from Mexico (other countries showed no significant differences).
- Participants on GPS tracking were less likely to abscond than those not on GPS.
- Participants with a post-order status at intake were less likely to abscond than those with a pre-order status. Post-order status participants received a higher level of supervision than pre-order participants. Possibly, the legal stage was the predictor; the level of supervision was the predictor; or both.

- Being referred from the criminal alien program and not having an attorney were both powerful and significant predictors of absconding. Participants referred from the criminal alien program had 1.7 times higher odds of absconding than those referred from detention. Participants who did not have an attorney had 1.6 times higher odds of absconding than those who did have an attorney.

## STUDY RECOMMENDATIONS

This study provided insights for possible improvements to the ISAP model, including:

1. The study results indicated that several variables predicting successful removal are operating differently from those predicting flight-risk. Therefore, developing two validated assessment tools that predict (1) successful removal and (2) absconding is recommended.

2. Use the factors identified from these assessment tools to develop the participant's supervision plan.

3. Given the apparent effectiveness of the use of technology with the full-service supervision component on outcomes, additional research is suggested for participants in the technology-only component. The annual report outcomes clearly revealed the use of technology alone is not as successful in securing removals or mitigating absconding as the integration of the full-service case management model. Additional research comparing full-service and technology-only would provide a more purified measure of technology's effectiveness.

4. While this study looked specifically at successful removals and absconding, appearance at final hearings is another important milestone in overall program success. It is recommended that an analysis of final hearing attendance be considered as an addendum to this study.

5. Deeper understanding of the findings might be enhanced by integrating geographic indicators (such as ISAP office location) as independent variables.

© 2012, BI Incorporated

ICF-RPD-013773

# EXHIBIT F

ICE-RPD-000091



*Office of Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

**U.S. Immigration
and Customs
Enforcement**

FEB 28 2011

| | |
|---|---|
| MEMORANDUM FOR: | Field Office Directors |
| FROM: | Gary Mead<br>Executive Associate Director |
| SUBJECT: | Alternatives to Detention Program Participant Enrollment Guidance |

The Alternatives to Detention (ATD) program meets a critical need for community supervision of the non-detained alien population.  Congress established the program in 2002 as a mechanism to facilitate alien compliance with court hearings and final orders of removal while remaining in their communities.  The ATD program utilizes technology and case specialists to actively engage aliens as they progress through the removal process.

As a result of the ATD program's continued success as an effective flight risk mitigation tool, the demand for ATD participant slots has increased.  In order to optimize the use of ATD resources, field offices are requested to follow the below enrollment guidelines for all existing and potential ATD participants.

1.  *Prioritize the enrollment of aliens who pose a significant risk of flight and who are likely to be removed in the near future.*

    ATD is not recommended for aliens who pose minimal flight risk.  Therefore, non-detained, removable aliens who pose a significant risk of flight, are subject to a final order of removal, and are likely to be removed in the near future are the highest priority, followed by non-detained, pre-order aliens with limited community ties.

2.  *Aliens who are not likely to be removed in the reasonably foreseeable future should not be enrolled (or continued) in the ATD program.*

    When aliens are removed from the ATD program for this reason, field offices should use ▮▮▮▮▮▮▮▮▮  These aliens remain eligible for other monitoring methods, including release on bond.  Should these participants become removable in the future, they may be re-enrolled into the ATD program as needed.

www.ice.gov

ICE91

ICE-RPD-000092

Alternatives to Detention Participant Enrollment Guidance
Page 2

3. *Expand the use of technology-only (TO) reporting.*

Pre-order aliens who have ties to the community (e.g., family members, caregivers, property ownership) are most appropriate for enrollment in the TO program. TO participants cost significantly less than their full-service participant counterparts, and have similar compliance rates.

This guidance supersedes prior guidance noted in the following memos:

- Memo: March 8, 2005; *Reporting Requirements and Management of Alternatives to Detention Program Participants*

- Memo: May 11, 2005; *Eligibility Criteria for Enrollment into the Intensive Supervision Appearance Program (ISAP) and the Electronic Monitoring Device (EMD) Program*

- Memo: June 28, 2005; *Alternatives to Detention (ATD) Program Enrollment Guidance*

Appropriate enrollments in the ATD program will maximize its effectiveness as a flight risk mitigation tool and will allow for more flexibility in funding for field offices capitalizing on this valuable initiative.

Please contact ████████████████████████████████████████ ████████████ if you have any questions or concerns.

# EXHIBIT G

# Judicial Business
# of the United States Courts

2011 Annual Report of the Director
Honorable Thomas F. Hogan, Director

This report was produced by The Statistics Division
Office of Judges Programs
Administrative Office of the United States Courts
Thurgood Marshall Federal Judiciary Building
Washington, D.C. 20544
Telephone: (202) 502-1441
E-Mail: SDInformation@ao.uscourts.gov

**Acknowledgments:**

*2011 Annual Report of the Director: Judicial Business of the United States Courts* was prepared by staff in the Statistics Division under the direction of Steven Schlesinger, Chief; John Sporing, Jr., Assistant Chief for Data Management and Reports; and Catherine Whitaker, Assistant Chief for Research and Statistical Modernization.

Contributing staff members were Charlotte Wilson, Chief of the Data Management Branch; Catherine Messina, Chief of the Workload Information and Reports Section; Anita Richardson, Assistant Chief of the Data Management Branch; Sheila Barnes-Jones; Susan Byrne; Gwendolyn Coleman; Christopher Davis; Lester Davis; Maurice Galloway; Kristin Garri; John Golmant; Malini Lavappa; Brian McLaughlin; Jennifer Monahan-Estes; Pragati Patrick; Gina Peterson; Kevin Scott; Parul Shah; Janice Simms; Sandra Thomas; Marlene Tibbs; Stacey Williamson; Johnny Wiseman; James Woods; and Elaine Young.

Programming assistance was provided by Fay Cheung, Chief of Information Technology Support and Operations; Ducman Butcher; Gail Davidson; Karen McClain; Joyce Price; Yung Lin; Hattie Pritchett; Rani Rapaka; Brenda Sylvester; and Joy Tang.

**Suggested Citation:**

Administrative Office of the United States Courts. *2011 Annual Report of the Director: Judicial Business of the United States Courts.* Washington, D.C.: 2012.

# Table of Contents

Caseload Highlights ............................................................................................................ 9
Judicial Caseload Indicators ............................................................................................. 10
Judicial Business ................................................................................................................ 11
U.S. Courts of Appeals ...................................................................................................... 11
U.S. District Courts ........................................................................................................... 15
U.S. Magistrate Judges ...................................................................................................... 21
Judicial Panel on Multidistrict Litigation ...................................................................... 23
U.S. Bankruptcy Courts .................................................................................................... 23
Criminal Justice Act .......................................................................................................... 26
Post-Conviction Supervision ........................................................................................... 27
Pretrial Services ................................................................................................................. 29
Complaints Against Judges .............................................................................................. 31
Status of Article III Judgeships ........................................................................................ 32
Status of Bankruptcy Judgeships ..................................................................................... 33
Appointments of Magistrate Judges ............................................................................... 33
U.S. Court of International Trade ..................................................................................... 34
U.S. Court of Federal Claims ........................................................................................... 34

## Supplemental Tables

### U.S. Courts of Appeals

Table S-1.
Appeals Terminated on the Merits After Oral Hearings or Submission on Briefs ............... 36
Table S-2.
Total Case Participations in Cases Terminated on the Merits ............................................... 37
Table S-3.
Types of Opinions or Orders Filed in Cases Terminated on the Merits .............................. 38
Table S-4.
Sources of Pro Se Appeals 2010 and 2011 ......................................................................... 39
Table S-5.
Appeals Under Submission More Than Three Months, 2010 and 2011 ............................... 40
Table S-6.
Criminal Appeals Filed Under the Sentencing Guidelines, 2007 Through 2011 ................. 41

### Other

Table S-13.
Federal Probation System—Offenders Receiving Federally Funded Substance Abuse Treatment ............ 42
Table S-14.
Pretrial Services Defendants Receiving Federally Funded Substance Abuse Treatment ............... 43
Table S-15.
U.S. District Courts—National Petit Juror Service, 2007 Through 2011 .............................. 44
Table S-16.
U.S. District Courts—National Grand Juror Service, 2007 Through 2011 ........................... 45
Table S-17.
Matters Disposed of by U.S. Magistrate Judges, 2001 and 2007 Through 2011 .................. 46

THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

Table S-18.
Three-Judge District Court Hearings, by Nature of Suit, 2007 Through 2011 ............................................... 48
Table S-19.
Cases Transferred by Order of the Judicial Panel on Multidistrict Litigation,
1968 Through 2011 ............................................................................................................................ 49
Table S-20.
Cumulative Summary of Multidistrict Litigation, 2009 Through 2011 ........................................................ 52
Table S-21.
Representations by Federal Defender Organizations, 2007 Through 2011 ................................................. 53
Table S-22.
Report of Complaints Filed and Action Taken Under Authority of 28 U.S.C. § 351-364 ...................... 54

## Appendix: Detailed Statistical Tables

### U.S. Supreme Court
Table A-1.
Cases on Docket, Disposed of, and Remaining on Docket, 2006 Through 2010 .................................... 58

### U.S. Courts of Appeals
Table B.
Appeals Commenced, Terminated, and Pending, 2010 and 2011 ............................................................ 59
Table B-1.
Appeals Commenced, Terminated, and Pending, by Circuit ................................................................. 60
Table B-1A.
Appeals Commenced, Terminated, and Pending, by Nature of Suit or Offense ................................... 65
Table B-2.
Petitions for Review on Writ of Certiorari to the Supreme Court
Commenced, Terminated, and Pending ................................................................................................ 71
Table B-3.
Sources of Appeals and Original Proceedings Commenced, by Circuit, 2007 Through 2011 ............ 74
Table B-3A.
Sources of Appeals in Civil and Criminal Cases From U.S. District Courts ...................................... 80
Table B-4.
Median Time Intervals in Cases Terminated After Hearing or Submission, by Circuit ...................... 83
Table B-4A.
Median Time Intervals for Merit Terminations of Appeals Arising From U.S. District Courts ........ 84
Table B-4B.
Median Time Intervals for Merit Terminations of Bankruptcy Appeals ............................................. 86
Table B-4C.
Median Time Intervals for Merit Terminations of Administrative Agency Appeals ........................... 87
Table B-4D.
Median Time Intervals for Merit Terminations of Original Proceedings ............................................ 88
Table B-5.
Appeals Terminated on the Merits, by Circuit ..................................................................................... 89
Table B-5A.
Appeals Terminated by Procedural Judgments, by Circuit .................................................................. 94
Table B-6.
Appeals Filed, Terminated, and Pending, by Circuit ........................................................................... 99
Table B-7.
Nature of Suit or Offense in Cases Arising From the U.S. District Courts, by Circuit ...................... 104

Table B-8.
U.S. Court of Appeals for the Federal Circuit—Appeals Filed, Terminated, and Pending ................................... 109
Table B-9.
Pro Se Appeals Commenced and Terminated, by Circuit ............................................................................... 110

**U.S. Bankruptcy Appellate Panels**
Table B-10.
Appeals Commenced, Terminated, and Pending, 2010 and 2011 ................................................................... 114
Table B-11.
Appeals Commenced, Terminated, and Pending, by Circuit ........................................................................... 115

**U.S. District Courts—Civil**
Table C.
Cases Commenced, Terminated, and Pending, 2010 and 2011 ...................................................................... 119
Table C-1.
Cases Commenced, Terminated, and Pending .............................................................................................. 122
Table C-2.
Cases Commenced, by Basis of Jurisdiction and
Nature of Suit............................................................................................................................................... 125
Table C-2A.
Cases Commenced, by Nature of Suit, 2007 Through 2011 ......................................................................... 128
Table C-3.
Cases Commenced, by Nature of Suit and District ....................................................................................... 131
Table C-3A.
Cases Pending, by Nature of Suit and District .............................................................................................. 137
Table C-3B.
Cases Terminated, by Nature of Suit and District ......................................................................................... 143
Table C-4.
Cases Terminated, by Nature of Suit and Action Taken ................................................................................ 149
Table C-4A.
Cases Terminated, by District and Action Taken .......................................................................................... 153
Table C-5.
Median Time Intervals From Filing to Disposition of Cases Terminated, by District and
Method of Disposition .................................................................................................................................. 156
Table C-6.
Cases Pending, by District and Length of Time Pending............................................................................... 159
Table C-7.
Intellectual Property Cases, Securities/Commodities/Exchanges Cases, and
Bankruptcy Appeals Filed, Terminated, and Pending... ............................................................................... 162
Table C-8.
Civil Cases Filed, by Origin, 2007 Through 2011 ......................................................................................... 176
Table C-9.
Recovery of Overpayment and Enforcement of Judgment Cases Filed .......................................................... 177
Table C-10.
Social Security Cases Commenced ............................................................................................................... 180
Table C-11.
Product Liability Cases Commenced, by Nature of Suit, 2010 and 2011 ...................................................... 183
Table C-12.
Cases Pending Three Years or More, by Basis of Jurisdiction and Nature of Suit,
2010 and 2011............................................................................................................................................. 186

THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

Table C-13.
Civil Pro Se and Non-Pro Se Filings, by District ........................................................................ 189

## U.S. District Courts—Criminal
Table D. Cases
Cases Commenced, Terminated, and Pending, 2003 and 2011 ............................................... 192
Table D. Defendants
Defendants Commenced, Terminated, and Pending, 2003 and 2011 ..................................... 195
Table D-1. Cases
Cases Commenced, Terminated, and Pending .......................................................................... 198
Table D-1. Defendants
Defendants Commenced, Terminated, and Pending ................................................................ 204
Table D-2. Cases
Cases Commenced, by Offense, 2007 Through 2011 .............................................................. 210
Table D-2. Defendants
Defendants Commenced, by Offense, 2007 Through 2011 ..................................................... 214
Table D-3. Cases
Cases Commenced, by Offense and District ............................................................................ 218
Table D-3. Defendants
Defendants Commenced, by Offense and District ................................................................... 224
Table D-4.
Defendants Disposed of, by Type of Disposition and Offense ............................................... 230
Table D-5.
Defendants Sentenced After Conviction, by Offense .............................................................. 234
Table D-6.
Median Time Intervals From Filing to Disposition of Defendants Disposed of, by District ... 240
Table D-7.
Defendants Disposed of, by Type of Disposition and District ............................................... 243
Table D-8.
Defendants Pending, by Offense and District ......................................................................... 246
Table D-9.
Defendants Terminated, by Offense and District .................................................................... 252
Table D-10.
Median Time Intervals from Filing to Disposition of Defendants Disposed of, by Offense .... 258
Table D-12.
Median Time From Conviction to Sentencing for Defendants Convicted ............................. 262
Table D-13. Cases
Cases Commenced, by Type of Proceedings, 2007 Through 2011 ........................................ 265
Table D-13. Defendants
Defendants Commenced, by Type of Proceedings, 2007 Through 2011 ............................... 266

## U.S. District Courts—Federal Probation System
Table E-1.
Persons Received for and Removed From Post-Conviction Supervision ............................... 267
Table E-2.
Persons Under Post-Conviction Supervision ........................................................................... 273
Table E-3.
Persons Under Post-Conviction Supervision, by Offense ...................................................... 276
Table E-7A.
Post-Conviction Supervision Cases Closed With and Without Revocation, by Type ............ 279

**U.S. Bankruptcy Courts**
Table F.
Bankruptcy Cases Commenced, Terminated, and Pending, 2010 and 2011 ........................................ 280
Table F-2.
Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code ........................... 283
Table F-8.
Adversary Proceedings Commenced, Terminated, and Pending Under the Bankruptcy Code .............. 287

**U.S. Court of International Trade**
Table G-1.
Cases Filed, Terminated, and Pending, 2010 and 2011 ................................................................... 290

**U.S. Court of Federal Claims**
Table G-2A.
Cases Filed, Terminated, and Pending ............................................................................................ 291
Table G-2B.
Judgments and Appeals ................................................................................................................. 292

**U.S. District Courts—Pretrial Services**
Table H-1.
Cases Activated ............................................................................................................................ 293
Table H-2.
Interviews and Types of Pretrial Services Reports .......................................................................... 296
Table H-3.
Recommendations Made for Initial Pretrial Release ........................................................................ 299
Table H-3A.
Recommendations Made for Initial Pretrial Release, Excluding Immigration Cases .......................... 302
Table H-6.
Defendants Released on Bond ....................................................................................................... 305
Table H-7.
Defendants Received for and Under Supervision ............................................................................ 308
Table H-8.
Defendants With Conditions of Release .......................................................................................... 311
Table H-13.
Cases Closed, by Type of Disposition ............................................................................................ 314
Table H-14.
Release and Detention .................................................................................................................. 317
Table H-14A
Release and Detention, Excluding Immigration Cases ..................................................................... 320

**U.S. District Courts—Grand and Petit Jurors**
Table J-1.
Grand Juror Service ...................................................................................................................... 323
Table J-2
Petit Juror Service on Days Jurors Were Selected for Trial .............................................................. 326

Parameters.

**U.S. District Courts—Federal Defender Organizations**
Table K-1.
Summary of Representations, by District .......................................................................... 329

**U.S. District Courts—U.S. Magistrate Judges**
Table M-1.
Class A Misdemeanor Defendants Disposed of by U.S. Magistrate Judges, by Major Offense................ 343
Table M-1A.
Class A Misdemeanor Defendants Disposed of by U.S. Magistrate Judges, by Type of Disposition ........... 346
Table M-2.
Petty Offense Defendants Disposed of by U.S. Magistrate Judges, by Nature of Offense .................... 349
Table M-2A.
Petty Offense Defendants Disposed of by U.S. Magistrate Judges, by Type of Disposition ................ 352
Table M-3.
Felony Preliminary Proceedings Handled by U.S. Magistrate Judges Under 28 U.S.C. 636(a) ............... 355
Table M-3A.
Miscellaneous Matters Handled by U.S. Magistrate Judges ..................................................... 358
Table M-4.
Criminal Pretrial Matters Handled by U.S. Magistrate Judges Under 28 U.S.C. 636(b) ................... 361
Table M-4A.
Civil Pretrial Matters Handled by U.S. Magistrate Judges Under 28 U.S.C. 636(b)....................... 364
Table M-4B.
Reports and Recommendations Issued by U.S. Magistrate Judges Under 28 U.S.C. 636(b) ................ 367
Table M-4C.
Evidentiary Proceedings Conducted by U.S. Magistrate Judges Under 28 U.S.C. 636(b) ................ 370
Table M-5.
Civil Consent Cases Terminated by U.S. Magistrate Judges Under 28 U.S.C. 636(c) ................... 373

**U.S. District Courts—Trials**
Table T-1.
Civil and Criminal Trials Completed, by District ............................................................. 376
Table T-2.
Lengths of Civil and Criminal Trials Completed, by District ............................................. 379
Table T-3.
Median Time Intervals From Filing to Trial for Civil Cases in Which Trials Were Completed,
by District ......................................................................................................... 382
Table T-4.
Civil and Criminal Trials Resulting in Verdicts or Judgments, by District ............................ 385
Table T-5.
Lengths of Civil and Criminal Trials Resulting in Verdicts or Judgments, by District ............... 388

**Other**
Table V-1.
Services Provided to and Received From Other District Courts............................................ 391
Table V-2.
Services Provided by Visiting Judges in Appeals Terminated............................................... 401
Table X-1A.
Weighted and Unweighted Filings per Authorized Judgeship ............................................. 406

Table B-4C.
U.S. Courts of Appeals—Median Time Intervals in Months for Merit Terminations of Administrative Agency Appeals, by Circuit, During the 12-Month Period Ending September 30, 2011

| Circuit | Total Cases | From Filing in Appellate Court to Filing Last Brief | | From Filing Last Brief to Hearing or Submission | | From Hearing to Final Disposition | | From Submission to Final Disposition | | From Filing in Appellate Court to Final Disposition | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Cases | Interval | Cases | Interval | Cases | Interval | Cases | Interval | Cases | Interval |
| TOTAL | 4,700 | 4,045 | 8.3 | 4,045 | 7.1 | 714 | 1.8 | 3,986 | 0.6 | 4,700 | 16.3 |
| DISTRICT OF COLUMBIA | 92 | 84 | 6.6 | 84 | 3.0 | 73 | 2.3 | 19 | 0.9 | 92 | 12.1 |
| FIRST | 92 | 77 | 5.3 | 77 | 2.3 | 8 | 5.4 | 84 | 1.6 | 92 | 9.0 |
| SECOND | 812 | 631 | 7.8 | 631 | 4.0 | 43 | 0.6 | 769 | 1.7 | 812 | 14.0 |
| THIRD | 437 | 388 | 5.3 | 388 | 5.3 | 58 | 3.1 | 379 | 0.7 | 437 | 12.0 |
| FOURTH | 157 | 124 | 4.9 | 124 | 2.6 | 18 | 2.3 | 139 | 0.6 | 157 | 8.0 |
| FIFTH | 223 | 204 | 4.6 | 204 | 4.9 | 53 | 1.2 | 170 | 0.8 | 223 | 10.3 |
| SIXTH | 240 | 208 | 5.6 | 208 | 8.7 | 40 | 1.4 | 200 | 1.0 | 240 | 15.8 |
| SEVENTH | 83 | 71 | 5.6 | 71 | 2.0 | 54 | 3.3 | 29 | 0.5 | 83 | 9.8 |
| EIGHTH | 69 | 46 | 3.8 | 46 | 3.2 | 14 | 3.0 | 55 | 0.3 | 69 | 6.9 |
| NINTH | 2,178 | 1,930 | 10.5 | 1,930 | 18.3 | 325 | 1.1 | 1,853 | 0.4 | 2,178 | 29.2 |
| TENTH | 62 | 52 | 4.8 | 52 | 2.4 | 10 | 3.5 | 52 | 1.9 | 62 | 9.0 |
| ELEVENTH | 255 | 230 | 4.2 | 230 | 2.4 | 18 | 0.7 | 237 | 1.4 | 255 | 8.2 |

NOTE: This table does not include data for the U.S. Court of Appeals for the Federal Circuit.

87

# EXHIBIT H



**U.S. Department of Justice**
Executive Office for Immigration Review

# FY 2011
# Statistical Year Book

## Prepared by the Office of Planning, Analysis, & Technology
## February 2012

**_Contact Information_**
*Office of Legislative and Public Affairs*
*5107 Leesburg Pike, Suite 1902*
*Falls Church, VA 22041*
*(703) 305-0289*
*(703) 605-0365 (fax)*

**DISCLAIMER**

The Statistical Year Book has been prepared as a public service by the Executive Office for Immigration Review (EOIR) and is strictly informational in nature. In no way should any information in the Year Book, in whole or in part, be regarded as legal advice or authority, or be understood in any way to enlarge upon, or otherwise modify or interpret, any existing legal authority, including, but not limited to, the Immigration and Nationality Act and Title 8 of the Code of Federal Regulations.

The Statistical Year Book is updated annually. The legend at the bottom of each page reflects the last revision date for that page. Yearly updates are available electronically through the EOIR website at www.justice.gov/eoir.

# FY 2011 STATISTICAL YEAR BOOK
## TABLE OF CONTENTS

|  | Tab |
|---|---|
| **FY 2011 Highlights** | A |
| **Immigration Courts:** | |
| Total Matters Received and Completed | B |
| Proceedings Received and Completed by Type | C |
| Proceedings Completed by Disposition | D |
| Proceedings Completed by Nationality | E |
| Proceedings Completed by Language | F |
| Proceedings Completed by Representation Status | G |
| Failures to Appear | H |
| Asylum Cases Received and Completed | I |
| Asylum Grants by Nationality | J |
| Disposition of Asylum Cases | K |
| Expedited Asylum Cases | L |
| Convention Against Torture | M |
| Proceedings Completed with Applications for Relief | N |
| Proceedings Completed for Detained Cases | O |
| Institutional Hearing Program Case Processing | P |
| Immigration Judge Grants of Voluntary Departure | Q |
| Applications for Relief other than Asylum | R |
| **Board of Immigration Appeals:** | |
| Total Cases Received and Completed | S |
| Cases Received and Completed by Type | T |
| Immigration Judge Decision Appeals Completed by Nationality | U |
| Immigration Judge Decision Appeals Completed by Representation Status | V |
| Immigration Judge Decision Appeals Completed for Detained Cases | W |
| **Immigration Courts and Board of Immigration Appeals:** | |
| Immigration Judge Decisions (Proceedings) Appealed | X |
| Pending Caseload | Y |
| **Office of the Chief Administrative Hearing Officer:** | |
| Total Cases Received and Completed | Z |
| **Appendix:  Glossary of Terms** | |

# FY 2011 STATISTICAL YEAR BOOK
## LIST OF FIGURES AND TABLES

**Page**

**List of Figures:**

| | |
|---|---|
| Figure 1 - Total Immigration Court Matters Received and Completed | B2 |
| Figure 2 - Immigration Court Matters Received by Type | B7 |
| Figure 3 - Immigration Court Matters Completed by Type | B7 |
| Figure 4 - Immigration Judge Proceedings Completed by Completion Type | D1 |
| Figure 5 - Immigration Judge Decisions by Disposition | D2 |
| Figure 6 - Other Completions by Disposition | D3 |
| Figure 7 - FY 2011 Court Proceedings Completed by Nationality | E1 |
| Figure 8 - FY 2011 Court Proceedings Completed by Language | F1 |
| Figure 9 - Court Proceedings Completed: Percentage of Represented Cases | G1 |
| Figure 10 - Failure to Appear Rates | H1 |
| Figure 11 - Failure to Appear Rates for Never Detained Aliens | H2 |
| Figure 12 - Failure to Appear Rates for Released Aliens | H3 |
| Figure 13 - Failure to Appear Rates for Non-Detained Aliens | H4 |
| Figure 14 - Immigration Court Asylum Receipts: Affirmative and Defensive | I1 |
| Figure 15 - Asylum Cases: Receipts and Completions | I2 |
| Figure 16 - FY 2011 Asylum Grants by Nationality | J1 |
| Figure 17 - Immigration Courts: Asylum Grant Rate | K1 |
| Figure 18 - Immigration Courts: Affirmative Grant Rate | K2 |
| Figure 19 - Immigration Courts: Defensive Grant Rate | K2 |
| Figure 20 - Asylum Completions by Disposition | K3 |
| Figure 20A - Immigration Courts: Withholding of Removal Grant Rate | K4 |
| Figure 20B - Immigration Courts: Asylum or Withholding of Removal Grant Rate | K5 |
| Figure 21 - Expedited Asylum Receipts Compared to Total Asylum Receipts | L1 |
| Figure 22 - Expedited Asylum Receipts and Completions | L2 |
| Figure 23 - Immigration Court Proceedings: Percent Completions with Applications | N1 |
| Figure 24 - Immigration Court Proceedings Completed: Detained and Total | O1 |
| Figure 25 - IHP Cases Received and Completed | P1 |
| Figure 26 - Total BIA Cases Received and Completed | S1 |
| Figure 27 - BIA Receipts by Type of Appeal | S2 |
| Figure 28 - BIA Completions by Type of Appeal | S2 |
| Figure 29 - FY 2011 BIA Completions by Nationality | U1 |
| Figure 30 - IJ Appeal Decisions: Percentage of Represented Cases | V1 |
| Figure 31 - IJ Case Appeal Decisions: Detained and Total | W1 |
| Figure 32 - Immigration Judge Decisions (Proceedings) Appealed | X1 |
| Figure 33 - Immigration Court Pending Proceedings by Year Received | Y1 |
| Figure 34 - BIA Pending Cases by Year Filed | Y3 |
| Figure 35 - OCAHO Cases Received and Completed | Z1 |

ii

# FY 2011 STATISTICAL YEAR BOOK
## LIST OF FIGURES AND TABLES

| | Page |
|---|---|
| **List of Tables:** | |
| Table 1 - Total Immigration Court Matters Received by Court for FY 2010 and FY 2011 | B3 |
| Table 1A - Total Immigration Court Receipts by Court and Type of Matter for FY 2011 | B4 |
| Table 2 - Total Immigration Court Matters Completed by Court for FY 2010 and FY 2011 | B5 |
| Table 2A - Total Immigration Court Completions by Court and Type of Matter for FY 2011 | B6 |
| Table 3 - Immigration Court Proceedings Received by Case Type | C3 |
| Table 4 - Immigration Court Proceedings Completed by Case Type | C4 |
| Table 5 - Court Proceedings Completed by Nationality: Top 25 Nationalities for FY 2007 – FY 2011 | E2 |
| Table 6 - Court Proceedings Completed by Language: Top 25 Languages for FY 2007 – FY 2011 | F2 |
| Table 7 - Asylum Receipts and Completions by Court for FY 2011 | I3 |
| Table 8 - Asylum Grants By Nationality: Top 25 Nationalities for FY 2007 – FY 2011 | J2 |
| Table 9 - FY 2011 Asylum Grant Rate by Immigration Court | K6 |
| Table 10 - FY 2011 Convention Against Torture Cases by Disposition | M1 |
| Table 11 - FY 2011 Convention Against Torture Completions by Court | M2 |
| Table 12 - FY 2011 Immigration Court Completions (Proceedings) With Applications for Relief | N2 |
| Table 13 - FY 2011 Immigration Court Completions (Proceedings) for Detained Cases | O3 |
| Table 14 - IHP Completions by Disposition | P2 |
| Table 15 - IJ Removal Decisions Compared to Voluntary Departure Decisions | Q1 |
| Table 16 - Grants of Relief | R3 |
| Table 17 - BIA Receipts by Type | T2 |
| Table 18 - BIA Completions by Type | T2 |
| Table 19 - IJ Decision Appeals Completed by Nationality: Top 25 Nationalities for FY 2007 – FY 2011 | U2 |
| Table 20 - Breakdown of BIA Detained Completions | W2 |
| Table 21 - Immigration Court Pending Proceedings by Immigration Court | Y2 |

iii

## Immigration Courts:
## Proceedings Completed by Representation Status

The Immigration and Nationality Act states that individuals in removal proceedings before an immigration judge may be represented by counsel, but at no expense to the government.  Prior to representing an alien before the immigration court, a representative must file a Notice of Appearance with the court.

Many individuals in removal proceedings are indigent and cannot afford a private attorney.  Some seek free or *pro bono* representation, while others proceed without counsel on their own, or *pro se*.  In order to ensure that *pro se* individuals understand the nature of the proceedings, as well as their rights and responsibilities, immigration judges take extra care and spend additional time explaining this information.  An individual may ask for a continuance of a proceeding to obtain counsel.

As shown in Figure 9, FY 2011 is the only year that more than half of the aliens whose proceedings were completed during the period FY 2007 to FY 2011 were represented.  The percentage of represented aliens for FY 2007 to FY 2011 ranged from 45 percent to 51 percent.

As of FY 2011, representation rates are calculated with newly-available data that more accurately reflects the actual representation rate of aliens.

**Figure 9**



| Court Proceedings Completed Representation in Immigration Courts | | | |
|---|---|---|---|
| | Represented | Unrepresented | Total |
| FY 07 | 130,641 | 142,839 | 273,480 |
| FY 08 | 127,189 | 154,055 | 281,244 |
| FY 09 | 130,599 | 159,866 | 290,465 |
| FY 10 | 141,708 | 146,170 | 287,878 |
| FY 11 | 155,185 | 148,102 | 303,287 |

# EXHIBIT I

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*



## SPECIAL REPORT

NOVEMBER 2012                                                                      NCJ 239243

# Pretrial Release and Misconduct in Federal District Courts, 2008-2010

Thomas H. Cohen, Ph.D., *BJS Statistician*

During fiscal years 2008 through 2010, 36% of the 283,358 defendants in cases disposed in federal district courts were released prior to case adjudication. The percentages of pretrial release ranged from 12% for defendants brought into federal courts for immigration violations to 71% for defendants charged with property offenses (**figure 1**). Nineteen percent of released defendants committed some form of pretrial misconduct, and technical violations accounted for 90% of these pretrial violations.

Data for the Bureau of Justice Statistics' (BJS) Federal Justice Statistics Program (FJSP) were provided by the Administrative Office of the U.S. Courts' (AOUSC) Office of Probation and Pretrial Services Automated Case Tracking System (PACTS). The PACTS data cover various aspects of pretrial release in federal district courts, including the decision to release or detain a defendant, the different mechanisms of release or detention, and the behavior of defendants while on pretrial release. The PACTS data analyzed for this report include defendants whose cases were disposed by the federal courts for the combined fiscal years of 2008 to 2010.



**FIGURE 1**
**Defendants released pretrial for cases disposed in federal district courts, by offense type, FY 2008–2010**
Most serious offense

| Offense | Percent released |
|---------|------------------|
| All offenses | 36% |
| Property | 71% |
| Public-order | 65% |
| Drug | 38% |
| Weapons | 32% |
| Violent | 30% |
| Immigration | 12% |

Source: Administrative Office of the U.S. Courts, Office of Probation and Pretrial Services Automated Case Tracking System, 2008–2010.

## HIGHLIGHTS

- Thirty-six percent of defendants in cases disposed in federal courts from 2008 to 2010 were released pretrial.

- Federal courts released 10% of noncitizen defendants identified as illegal aliens, compared to 43% of legal aliens and 55% of U.S. citizens.

- Twenty-four percent of these defendants were released at the time of their initial appearance, while another 12% were detained and then released at subsequent court events, including detention or bond hearings.

- Nonfinancial methods, including release on personal recognizance or unsecured bond, accounted for 73% of pretrial releases in federal courts.

- Ninety-one percent of detained defendants were held on either court-ordered detention or because they could not meet certain conditions set by the court.

- Of defendants released pretrial, 79% were released with conditions, including travel restrictions, substance abuse treatment requirements, weapons restrictions, or promises to remain employed or seek employment.

- About half (51%) of defendants with no prior arrest history were released pretrial, compared to 34% of defendants with 2 to 4 prior arrests and 21% of defendants with more than 10 prior arrests.

- Nineteen percent of defendants released pretrial committed some form of pretrial misconduct.

- Technical violations were committed by 17% of defendants released prior to case disposition, while 1% of released defendants failed to make court appearances and 4% were rearrested for new offenses.



The PACTS data provide important information about pretrial release and misconduct in the nation's federal courts. These data do not cover pretrial release in state courts. In an effort to provide comprehensive information on pretrial release, this report compares several aspects of the pretrial process in federal and in state courts. While no statistical series have national level estimates of pretrial release and misconduct in state courts, BJS has sponsored the State Court Processing Statistics (SCPS) project, which examines pretrial release and misconduct for felony cases filed in the nation's 75 most populous counties. Therefore, the SCPS data are referenced in this report when comparing state and federal pretrial statistics. (See *Methodology* for more information about the SCPS.)

---

### Pretrial release and detention in the federal criminal justice system

Before 1966, the federal courts relied almost exclusively on financial bond. In a bond system, persons accused of *criminal conduct can remain free pending case disposition* by posting a bond, usually property or money, as a guarantee that they will make all court appearances. In most situations, defendants will post a percentage of the bond set with a bail bondsman or with the court through a deposit bond program. Congress enacted the Bail Reform Act of 1966 to reform federal pretrial practices and minimizing the use of financial bond. The act mandated that any defendant charged with noncapital offenses in federal courts be released on either their own recognizance or an unsecured appearance bond (see *Methodology*). In cases that required additional supervision, the court could impose other conditions necessary to assure that a defendant made all court appearances.

The Bail Reform Act of 1984 (18 U.S.C. Section 3141) further codified the pretrial release process. According to the act, when defendants first appear before a judicial officer they may be 1) released on personal recognizance or unsecured bond, 2) released subject to conditions imposed by the court, 3) temporarily detained to permit deportation, exclusion, or the revocation of previously granted conditional release, or 4) detained pending the outcome of a detention hearing. At a detention hearing, the government is required by the act to prove by clear and convincing evidence that no condition of release would reasonably ensure that the defendant would appear for trial and not pose a risk to the community. The Bail Reform Act of 1984 also expanded *the scope of factors* that federal courts could consider when making pretrial release decisions to include the degree of dangerousness a defendant poses to the community.

**17% of federal defendants released prior to case disposition committed technical violations**

Technical violations (such as violations of pretrial conditions, including drug test failure or failure to maintain electronic reporting requirements) were committed by 17% of defendants released prior to case disposition from 2008 to 2010 (table 11). Defendants released on weapons (30%), drug (25%), and violent (24%) offenses had the highest rates of technical violations, while immigration defendants released pretrial had the lowest rates of violating their pretrial conditions (6%). The relatively low rate of technical violations for immigration defendants may be due to federal courts typically not attaching pretrial conditions to these defendants when released prior to disposition.

From 2008 to 2010, relatively few released defendants either failed to make court appearances (1%) or were rearrested for new offenses (4%). The percentage of defendants with missed court appearances did not exceed 2% across the major offense types. Rearrest percentages ranged from 1% for immigration defendants to 8% for weapons defendants.

Fifty-six percent of defendants who committed misconduct had their release revoked by the federal courts (not shown in table). Twenty-one percent of released weapons and more than 15% of violent (18%) and drug (16%) defendants had their release revoked, while less than 10% of release property (7%), public-order (6%), and immigration defendants (4%) had a pretrial release revocation.

In comparison, a third of released defendants in the nation's 75 most populous counties committed some form of pretrial misconduct during 2006. Half of pretrial misconduct events involved bench warrants that were issued due to missed court appearances, while a similar percentage of defendants with pretrial misconduct were rearrested for new offenses committed during the pretrial release period (not shown in table). In 2006, the percentage of defendants charged with pretrial misconduct was highest for drug defendants (37%) and lowest for those released after being charged with a violent offense (26%) (not shown in table).

**TABLE 11**
**Behavior of defendants released pretrial for cases disposed in federal district courts, by offense type, FY 2008–2010**

| Most serious offense charged | Number of released defendants | Percent of released defendants who had— | | | | |
|---|---|---|---|---|---|---|
| | | At least one violation | Failed to appear | Technical violations of bond conditions | A rearrest for new offense* | Release revoked |
| All defendants | 101,622 | 19% | 1% | 17% | 4% | 11% |
| Violent | 2,668 | 26% | 1% | 24% | 4% | 18% |
| Property | 31,332 | 15% | 1% | 13% | 3% | 7% |
| Fraudulent | 25,378 | 14 | 1 | 12 | 3 | 7 |
| Other | 5,954 | 16 | 1 | 14 | 3 | 9 |
| Drug | 31,887 | 28% | 2% | 25% | 5% | 16% |
| Trafficking | 26,683 | 29 | 2 | 26 | 6 | 17 |
| Other | 5,204 | 24 | 2 | 23 | 4 | 12 |
| Public-order | 15,058 | 12% | 1% | 11% | 2% | 6% |
| Regulatory | 2,818 | 10 | 1 | 9 | 2 | 5 |
| Other | 12,240 | 12 | 1 | 11 | 2 | 6 |
| Weapons | 7,127 | 33% | 2% | 30% | 8% | 21% |
| Immigration | 11,939 | 7% | 1% | 6% | 1% | 4% |

Note: Detail will not sum to total because a defendant could have more than one type of violation. Information on offense type available for 98.4% of released defendants.

*Includes felony and misdemeanor offenses.

Source: Administrative Office of the U.S. Courts, Office of Probation and Pretrial Services Automated Case Tracking System, 2008–2010.

# EXHIBIT J

# Immigration Court Practice Manual



The Practice Manual has been assembled as a public service to parties appearing before the Immigration Courts.  This manual is not intended, in any way, to substitute for a careful study of the pertinent laws and regulations.  Readers are advised to review Chapter 1.1 before consulting any information contained herein.

The Practice Manual is updated periodically.  The legend at the bottom of each page reflects the last revision date for that page.  Updates to the Practice Manual are available through the EOIR website at www.usdoj.gov/eoir.

### The Office of the Chief Immigration Judge

Brian M. O'Leary, Chief Immigration Judge
Michael C. McGoings, Deputy Chief Immigration Judge

| | |
|---|---|
| Sarah M. Burr | Jeffrey L. Romig |
| Larry R. Dean | Gary W. Smith |
| Jill H. Dufresne | Bette K. Stockton |
| Thomas Y.K. Fong | Elisa M. Sukkar |
| MaryBeth Keller | Jack H. Weil |

Assistant Chief Immigration Judges

The Office of the Chief Immigration Judge expresses its gratitude to the many Immigration Judges, Court Administrators, and other individuals who provided comments and suggestions during the preparation of the Immigration Court Practice Manual. The Office of the Chief Immigration Judge also expresses its appreciation to former Chief Immigration Judge David L. Neal for his leadership in creating the Practice Manual. In addition, the Office of the Chief Immigration Judge recognizes the members of the Practice Manual Committee for their dedication in creating and updating this publication on an ongoing basis:

| | |
|---|---|
| Judge John F. Gossart, Jr. | Scott M. Rosen, Chief Counsel, OCIJ |
| Judge Stephen S. Griswold | Gary M. Somerville, Court Administrator |
| Jean C. King, Senior Legal Advisor, BIA | Emmett D. Soper, Attorney Advisor, OCIJ |

*Brian M. O'Leary*

*Chief Immigration Judge*

Case 2:07-cv-03239-TJH-RNB   Document 281-3   Filed 02/08/13   Page 104 of 201   Page ID #:3823

# Chapter 9
## Table of Contents

**Chapter 9**    **Detention and Bond**

9.1    Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
9.2    Detained Juveniles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
9.3    Bond Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
9.4    Continued Detention Review . . . . . . . . . . . . . . . . . . . . . . . . . 127

# 9  Detention and Bond

## 9.1    Detention

*(a) In general.* — The Department of Homeland Security (DHS) bears the responsibility for the apprehension and detention of aliens. Immigrations Judges have jurisdiction over custody determinations under certain circumstances. See generally 8 C.F.R. § 1003.19. See also Chapter 9.3 (Bond Proceedings).

*(b) Place and conditions.* — Aliens may be detained in a Department of Homeland Security (DHS) Processing Facility, or in any public or private detention facility contracted by DHS to detain aliens. See 8 C.F.R. § 235.3(e). Immigration Judges have no jurisdiction over the location of detention and the conditions in the detention facility.

*(c) Appearance at hearings.* — The Department of Homeland Security is responsible for ensuring that detained aliens appear at all hearings.

*(d) Transfers and Release.* — The Department of Homeland Security (DHS) sometimes transfers detained aliens between detention facilities.

*(i) Notification.* — DHS is obligated to notify the Immigration Court when an alien is moved between detention locations. See 8 C.F.R. § 1003.19(g).

In addition, DHS is responsible for notifying the Immigration Court when an alien is released from custody. See 8 C.F.R. § 1003.19(g). Nonetheless, the alien should file an Alien's Change of Address Form (Form EOIR-33/IC) with the Immigration Court to ensure that Immigration Court records are up-to-date.

*(ii) Venue.* — If an alien has been transferred while proceedings are pending, the Immigration Judge with original jurisdiction over the case retains jurisdiction until that Immigration Judge grants a motion to change venue. Either DHS or the alien may file a motion to change venue. See Chapter 5 (Motions before the Immigration Court). If DHS brings the alien before an Immigration Judge in another Immigration Court and a motion to change venue has not been granted, the second Immigration Judge does not have jurisdiction over the case, except for bond redeterminations.

*(e) Conduct of hearing.* — Proceedings for detained aliens are expedited. Hearings are held either at the detention facility or at the Immigration Court, either by video

or telephone conference. For more information on hearings conducted by video or telephone conference, see Chapter 4.7 (Hearings by Video or Telephone Conference).

*(i) Special considerations for hearings in detention facilities.* — For hearings in detention facilities, parties must comply with the facility's security restrictions. See Chapter 4.14 (Access to Court).

*(ii) Orientation.* — In some detention facilities, detainees are provided with orientations or "rights presentations" by non-profit organizations. The Executive Office for Immigration Review also funds orientation programs at a number of detention facilities, which are administered by the EOIR Legal Orientation and Pro Bono Program. See Chapter 1.4(c) (Legal Orientation and Pro Bono Program).

## 9.2   Detained Juveniles

*(a) In general.* — There are special procedures for juveniles in federal custody, whether they are accompanied or unaccompanied. See generally 8 C.F.R. § 1236.3. For purposes of this chapter, a juvenile is defined as an alien under 18 years of age. An unaccompanied juvenile is defined as an alien under 18 years of age who does not have a parent or legal guardian in the United States to provide care and physical custody.

*(b) Place and conditions of detention.* — The Department of Homeland Security (DHS) bears the initial responsibility for apprehension and detention of juveniles. When DHS determines that a juvenile is accompanied by a parent or legal guardian, DHS retains responsibility for the juvenile's detention and removal. When DHS determines that a juvenile is unaccompanied and must be detained, he or she is transferred to the care of the Department of Health and Human Services, Office of Refugee Resettlement, which provides for the care and placement, where possible, of the unaccompanied juvenile. See 6 U.S.C. § 279.

*(c) Representation and conduct of hearing.* — For provisions regarding the representation of juveniles, and the conduct of hearings involving juveniles, see Chapter 4.22 (Juveniles).

*(d) Release.* — Unaccompanied juveniles who are released from custody are released to a parent, a legal guardian, an adult relative who is not in Department of Homeland Security detention, or, in limited circumstances, to an adult who is not a family member.

## 9.3 Bond Proceedings

*(a) In general.* — In certain circumstances, an alien detained by the Department of Homeland Security (DHS) can be released from custody upon the payment of bond. Initially, the bond is set by DHS.  Upon the alien's request, an Immigration Judge may conduct a "bond hearing," in which the Immigration Judge has the authority to redetermine the amount of bond set by DHS.

Bond proceedings are separate from removal proceedings.  See generally 8 C.F.R. §§ 1003.19, 1236.1.

*(b) Jurisdiction.* — Except as provided in subsections (i) through (iii), below, an Immigration Judge generally has jurisdiction to conduct a bond hearing if the alien is in Department of Homeland Security (DHS) custody.  The Immigration Judge also has jurisdiction to conduct a bond hearing if the alien is released from DHS custody upon payment of a bond and, within 7 days of release, files a request for a bond redetermination with the Immigration Court.

An Immigration Judge has jurisdiction over such cases even if a charging document has not been filed.  In addition, an Immigration Judge has jurisdiction to rule on whether he or she has jurisdiction to conduct a bond hearing.

*(i) No jurisdiction by regulation.* — By regulation, an Immigration Judge does not have jurisdiction to conduct bond hearings involving:

- aliens in exclusion proceedings

- arriving aliens in removal proceedings

- aliens ineligible for release on security or related grounds

- aliens ineligible for release on certain criminal grounds

8 C.F.R. § 1003.19(h)(2)(i).

*(ii) No jurisdiction by mootness.* — A bond becomes moot, and the Immigration Judge loses jurisdiction to conduct a bond hearing, when an alien:

- departs from the United States, whether voluntarily or involuntarily

○      is granted relief from removal by the Immigration Judge, and the Department of Homeland Security does not appeal

○      is granted relief from removal by the Board of Immigration Appeals

○      is denied relief from removal by the Immigration Judge, and the alien does not appeal

○      is denied relief from removal by the Board of Immigration Appeals

*(iii) Other.* — Immigration Judges do not have bond jurisdiction in certain limited proceedings.    See generally Chapter 7 (Other Proceedings before Immigration Judges).

*(c) Requesting a bond hearing.* — A request for a bond hearing may be made in writing.  In addition, except as provided in subsection (iii), below, a request for a bond hearing may be made orally in court or, at the discretion of the Immigration Judge, by telephone.  If available, a copy of the Notice to Appear (Form I-862) should be provided. The telephone number of each Immigration Court is listed on the Executive Office for Immigration Review website at www.usdoj.gov/eoir.

*(i) Contents.* — A request for a bond hearing should state:

○      the full name and alien registration number ("A number") of the alien

○      the bond amount set by the Department of Homeland Security

○      if the alien is detained, the location of the detention facility

*(ii) No fee.* — There is no filing fee to request a bond hearing.

*(iii) Where to request.* — A request for a bond hearing is made, in order of preference, to:

○      if the alien is detained, the Immigration Court having jurisdiction over the alien's place of detention;

○      the Immigration Court with administrative control over the case; or

> ○ the Office of the Chief Immigration Judge for designation of an appropriate Immigration Court

8 C.F.R. § 1003.19(c). See Chapter 3.1(a)(i) (Administrative Control Courts).

**(iv) Multiple requests.** — If an Immigration Judge or the Board of Immigration Appeals has previously ruled in bond proceedings involving an alien, a subsequent request for a bond hearing must be in writing, and the alien must show that his or her circumstances have changed materially since the last decision. In addition, the request must comply with the requirements listed in subsection (c)(i), above. 8 C.F.R. § 1003.19(e).

**(d) Scheduling a hearing.** — In general, after receiving a request for a bond hearing, the Immigration Court schedules the hearing for the earliest possible date and notifies the alien and the Department of Homeland Security.

In limited circumstances, an Immigration Judge may rule on a bond redetermination request without holding a hearing.

If an alien requests a bond hearing during another type of hearing (for example, during a master calendar hearing in removal proceedings), the Immigration Judge may:

> ○ stop the other hearing and conduct a bond hearing on that date

> ○ complete the other hearing and conduct a bond hearing on that date

> ○ complete the other hearing and schedule a bond hearing for a later date

> ○ stop the other hearing and schedule a bond hearing for a later date

**(e) Bond hearings.** — In a bond hearing, the Immigration Judge determines whether the alien is eligible for bond. If the alien is eligible for bond, the Immigration Judge considers whether the alien's release would pose a danger to property or persons, whether the alien is likely to appear for further immigration proceedings, and whether the alien is a threat to national security. In general, bond hearings are less formal than hearings in removal proceedings.

**(i) Location.** — Generally, a bond hearing is held at the Immigration Court where the request for bond redetermination is filed.

**(ii) Representation.** — In a bond hearing, the alien may be represented at no expense to the government.

**(iii) Generally not recorded.** — Bond hearings are generally not recorded.

**(iv) Record of Proceedings.** — The Immigration Judge creates a record, which is kept separate from the Records of Proceedings for other Immigration Court proceedings involving the alien.

**(v) Evidence.** — Documents for the Immigration Judge to consider are filed in open court or, if the request for a bond hearing was made in writing, together with the request. Since the Record of Proceedings in a bond proceeding is kept separate and apart from other Records of Proceedings, documents already filed in removal proceedings must be resubmitted if the filing party wishes them to be considered in the bond proceeding.

If documents are filed in advance of the hearing, the documents should be filed *together with* the request for a bond hearing. If a document is filed in advance of the hearing but separate from the request for a bond hearing, it should be filed with a cover page labeled "BOND PROCEEDINGS." See Appendix F (Sample Cover Page).

Unless otherwise directed by the Immigration Judge, the deadlines and requirements for filings in Chapter 3 (Filing with the Immigration Court) do not apply in bond proceedings.

**(vi) Conduct of hearing.** — While the Immigration Judge decides how each hearing is conducted, parties should submit relevant evidence and:

o   the Department of Homeland Security (DHS) should state whether a bond has been set and, if a bond has been set, the amount of the bond and the DHS justification for that amount

o   the alien or the alien's representative should make an oral statement (an "offer of proof" or "proffer") addressing whether the alien's release would pose a danger to property or persons, whether the alien is likely to appear for future immigration proceedings, and whether the alien poses a danger to national security

At the Immigration Judge's discretion, witnesses may be placed under oath and testimony taken.  However, parties should be mindful that bond hearings are generally briefer and less formal than hearings in removal proceedings.

*(vii) Decision.* — The Immigration Judge's decision is based on any information that is available to the Immigration Judge or that is presented by the parties.  See 8 C.F.R. § 1003.19(d).

Usually, the Immigration Judge's decision is rendered orally.  Because bond hearings are generally not recorded, the decision is not transcribed.  If either party appeals, the Immigration Judge prepares a written decision based on notes from the hearing.

*(f) Appeals.* — Either party may appeal the Immigration Judge's decision to the Board of Immigration Appeals.  If the alien appeals, the Immigration Judge's bond decision remains in effect while the appeal is pending.  If the Department of Homeland Security appeals, the Immigration Judge's bond decision remains in effect while the appeal is pending unless the Board issues an emergency stay or the decision is automatically stayed by regulation.  See 8 C.F.R. §§ 1003.6(c), 1003.19(i).

For detailed guidance on when Immigration Judges' decisions in bond proceedings are stayed, parties should consult the Board of Immigration Appeals Practice Manual, which is available on the Executive Office for Immigration Review website at www.usdoj.gov/eoir/biainfo.htm.

## 9.4    Continued Detention Review

*(a) In general.* — Generally, the Department of Homeland Security (DHS) must remove or release detained aliens within 90 days of a final order of removal.  However, DHS may continue to detain an alien whose removal from the United States is not "reasonably foreseeable," if the alien's release would pose a special danger to the public.  See INA § 241(a)(6), 8 C.F.R. § 1241.14(f).  Such a decision by DHS to continue to detain an alien is reviewed by an Immigration Judge in "continued detention review proceedings." The proceedings begin with a DHS determination that continued detention is required and are divided into two phases: (1) reasonable cause hearings and (2) continued detention review merits hearings.  See subsections (c), (d), below.

*(b) DHS determination.* — If an alien has been ordered removed but remains detained, he or she may request that the Department of Homeland Security (DHS) determine whether there is a significant likelihood of removal in the reasonably foreseeable

future.  See 8 C.F.R. § 1241.13.  If there is a significant likelihood of removal in the reasonably foreseeable future, DHS may continue to detain the alien.

If there is *not* a significant likelihood of removal in the reasonably foreseeable future, the alien is released unless DHS determines, based on a full medical and physical examination, that the alien should be subject to continued detention because the alien's release would pose a special danger to the public.  Following such a determination, the matter is referred to an Immigration Judge for a reasonable cause hearing.  See 8 C.F.R. § 1241.14(f).

*(c) Reasonable cause hearing.* — A reasonable cause hearing is a brief hearing to evaluate the evidence supporting the determination by the Department of Homeland Security (DHS) that the alien's release would pose a special danger to the public.  In the hearing, the Immigration Judge decides whether DHS's evidence is sufficient to establish reasonable cause to go forward with a continued detention review merits hearing, or whether the alien should be released.  See generally 8 C.F.R. § 1241.14.

*(i) Timing.* — The reasonable cause hearing begins no later than 10 business days after referral to the Immigration Court.

*(ii) Location.* — If possible, the reasonable cause hearing is conducted in person, but may be conducted by telephone conference or video conference, at the Immigration Judge's discretion.  See Chapter 4.7 (Hearings by Video or Telephone Conference).

*(iii) Representation.* — The alien is provided with a list of free or low-cost legal service providers and may be represented at no expense to the government.

*(iv) Conduct of hearing.* — DHS may offer any evidence that is material and relevant to the proceeding.  The alien has a reasonable opportunity to examine evidence against him or her, to present evidence and witnesses on his or her own behalf, and to cross-examine witnesses presented by DHS.

*(v) Record of Proceedings.* — The Immigration Judge creates a Record of Proceedings, and the hearing is recorded.  The Record of Proceedings is not combined with records of any other Immigration Court proceedings involving the same alien.

*(vi) Immigration Judge's decision.* — If the Immigration Judge finds that DHS has met its burden of showing reasonable cause to go forward with a continued detention review merits hearing, the alien is notified, and the merits hearing is scheduled.

Case 2:07-cv-03239-TJH-RNB   Document 281-3   Filed 02/08/13   Page 113 of 201   Page ID #:3832

If the Immigration Judge finds that DHS has *not* met its burden, the Immigration Judge dismisses the proceedings, and the alien is released under conditions determined by DHS.

**(vii) Appeals.** — If the Immigration Judge finds that DHS has not met its burden of showing reasonable cause to go forward with a continued detention review merits hearing, DHS may appeal to the Board of Immigration Appeals. The appeal must be filed within two business days after the Immigration Judge's order. The Immigration Judge's order dismissing the proceedings is stayed pending adjudication of an appeal, unless DHS waives the right to appeal.

If the Immigration Judge finds that DHS *has* met its burden, the decision is not appealable by the alien.

**(d) Continued detention review merits hearing.** — In the continued detention review merits hearing, the Department of Homeland Security (DHS) has the burden of proving by clear and convincing evidence that the alien should remain in custody because the alien's release would pose a special danger to the public. See generally 8 C.F.R. § 1241.14.

**(i) Timing.** — The continued detention review merits hearing is scheduled promptly. If the alien requests, the merits hearing is scheduled to commence within 30 days of the decision in the reasonable cause hearing.

**(ii) Representation.** — The alien is provided with a list of free and low-cost legal service providers and may be represented at no expense to the government.

**(iii) Conduct of hearing.** — The Immigration Judge may receive into evidence any oral or written statement that is material and relevant to the proceeding. The alien has a reasonable opportunity to examine evidence against him or her, to present evidence and witnesses on his or her own behalf, and to cross-examine witnesses presented by DHS. In addition, the alien has the right to cross-examine the author of any medical or mental health reports used as a basis for DHS's determination that the alien's release would pose a special danger to the public.

**(iv) Immigration Judge's decision.** — If the Immigration Judge determines that DHS has met its burden of showing that the alien should remain in custody as a special danger to the public, the Immigration Judge orders the continued detention of the alien.

If the Immigration Judge determines that DHS has *not* met its burden, the Immigration Judge dismisses the proceedings, and the alien is released under conditions determined by DHS.

**(v) Appeals.** — Either party may appeal the Immigration Judge's decision to the Board of Immigration Appeals. Appeals by DHS must be filed within 5 business days of the Immigration Judge's order. Appeals by aliens are subject to the same deadlines as appeals in removal proceedings. For detailed guidance on appeals, parties should consult the Board of Immigration Appeals Practice Manual, which is available on the Executive Office for Immigration Review website at www.usdoj.gov/doir/biainfo.htm.

If the Immigration Judge dismisses the proceedings and orders the alien released, the order is stayed pending adjudication of any DHS appeal, unless DHS waives the right to appeal.

**(e) Periodic review.** — Following proceedings in which the alien's continued detention has been ordered, the alien may periodically request that the Department of Homeland Security (DHS) review his or her continued detention. The alien must show that, due to a material change in circumstances, the alien's release would no longer pose a special danger to the public. Such requests may be made no earlier than 6 months after the most recent decision of the Immigration Judge or the Board of Immigration Appeals.

If DHS does not release the alien, the alien may file a motion with the Immigration Court to set aside its prior determination in the proceedings. The alien must show that, due to a material change in circumstances, the alien's release would no longer pose a special danger to the public. If the Immigration Judge grants the motion, a new continued detention review merits hearing is held. If the motion is denied, the alien may appeal to the Board.

# EXHIBIT K

TONY WEST
Assistant Attorney General
Civil Division
DAVID J. KLINE
Director, Office of Immigration Litigation
District Court Section
VICTOR M. LAWRENCE
Principal Assistant Director
THEODORE W. ATKINSON
Senior Litigation Counsel
United States Department of Justice
Office of Immigration Litigation,
District Court Section
    P.O. Box 868, Ben Franklin Station
    Washington, DC 20044
    Phone: (202) 532-4135
    theodore.atkinson@usdoj.gov

Attorneys for Federal Respondents

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| ALEJANDRO RODRIGUEZ, *et al.*, | Case No. CV 07-3239-TJH (RNBx) |
| Petitioners, | |
| vs. | **RESPONDENTS' ANSWERS TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION TO RESPONDENT DEPARTMENT OF JUSTICE (NOS. 1-13)** |
| TIMOTHY S. ROBBINS, *in his capacity as U.S. Immigration and Customs Enforcement, Los Angeles District Field Office Director;* JANET NAPOLITANO, *in her official capacity as Secretary of Homeland Security*; ERIC H. HOLDER, JR., *in his official capacity as United States Attorney General,* | |
| Respondents. | |

Pursuant to Federal Rule of Civil Procedure 36, Respondent the Department of Justice hereby answers Petitioner's first set of requests for admissions.

**REQUEST FOR ADMISSION NO. 1:**

Admit that Petitioners detained under 8 U.S.C. 1226(c) have not been provided with any bond hearing or other review of their detention, except for hearings pursuant to *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999).

**ANSWER:** Respondent admits that aliens detained under 8 U.S.C. § 1226(c) are not, under section 1226(c), entitled to a bond hearing before an immigration judge, and admits that aliens may request a hearing before an immigration judge to determine whether he or she is properly included in the specified classes of aliens over whom the immigration judge has no jurisdiction, pursuant to *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999). Respondent denies that there is "no other review of [the] detention" of aliens under section 1226(c), because the outcomes of *Joseph* hearings are subject to further review on an appeal to the Board of Immigration Appeals. Respondents do not have reasonable access to sufficient readily obtainable information to either admit or deny that class members detained under section 1226(c) have been provided with any bond hearing other than a *Joseph* hearing.

**REQUEST FOR ADMISSION NO. 2:**

Admit that Respondent has no policy or procedure requiring it to notify individuals detained under 8 U.S.C. 1226(c) that they are entitled to request a hearing under *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999).

**ANSWER:** Admit.

**REQUEST FOR ADMISSION NO. 3:**

Admit that Respondent has no policy or practice requiring the creation of transcripts of BOND HEARINGS and CASAS HEARINGS.

**ANSWER:** Admit.

**REQUEST FOR ADMISSION NO. 4:**

Admit that Respondent has no policy or practice of informing individuals who are eligible for a hearing under *Casas-Castrillon v. Dep't of Homeland Sec'y*, 535 F.3d 942 (9th Cir. 2008), that they are eligible for such a hearing.

**ANSWER:** Respondent admits that there is no policy or procedure of providing notice to individuals eligible for CASAS HEARINGS that they are eligible for a CASAS HEARING.

**REQUEST FOR ADMISSION NO. 5:**

Admit that some PROLONGED DETAINEES who are eligible for a CASAS HEARING under *Casas-Castrillon v. Dep't of Homeland Sec'y*, 535 F.3d 942 (9th Cir. 2008), do not receive such a hearing.

**ANSWER:** Respondent, through the Executive Office for Immigration Review, has made inquiries to determine whether, in cases where PROLONGED DETAINEES are eligible to receive CASAS HEARINGS, those PROLONGED DETAINEES have not been provided with a CASAS HEARING. Respondent does not have reasonable access to sufficient readily obtainable information to either admit or deny that some PROLONGED DETAINEES who are eligible for a CASAS HEARING do not receive such a hearing.

**REQUEST FOR ADMISSION NO. 6:**

Admit that some persons in the Central District of California who request BOND HEARINGS have waited longer than 3 months to receive such a hearing.

**ANSWER:** Respondent, through the Executive Office for Immigration Review, has made inquiries to determine whether, in cases where PROLONGED DETAINEES have requested BOND HEARINGS, those hearings have not been held until longer than three months after the PROLONGED DETAINEE requested the hearing. Respondent does not have reasonable access to sufficient readily obtainable information to either admit or deny that that some PROLONGED DETAINEES who

3

request BOND HEARINGS have waited longer than three months to receive such hearings.

**REQUEST FOR ADMISSION NO. 7:**

Admit that some PROLONGED DETAINEES who request CASAS HEARINGS have waited longer than 3 months to receive such hearings.

**ANSWER:** Respondent, through the Executive Office for Immigration Review, has made inquiries to determine whether, in cases where PROLONGED DETAINEES have requested CASAS HEARINGS, those hearings have not been held until longer than three months after the PROLONGED DETAINEE requested the hearing. Respondent does not have reasonable access to sufficient readily obtainable information to either admit or deny that that some PROLONGED DETAINEES who request CASAS HEARINGS have waited longer than three months to receive such hearings.

**REQUEST FOR ADMISSION NO. 8:**

Admit that in CASAS HEARINGS conducted in the Central District of California, transcripts are not routinely maintained or prepared.

**ANSWER:** Admit.

**REQUEST FOR ADMISSION NO. 9:**

Admit that in CASAS HEARINGS conducted in the Central District of California, PROLONGED DETAINEES do not receive counsel, paid for by the Government.

**ANSWER:** Admit.

**REQUEST FOR ADMISSION NO. 10:**

Admit that in some CASAS HEARINGS conducted in the Central District of California, the burden of proof is placed on the PROLONGED DETAINEE.

**ANSWER:** Respondent denies that there is any policy or procedure that the alien bear the burden of proof in a CASAS HEARING. Respondent, through the Executive Office for Immigration Review, has made inquiries to determine whether, in some CASAS HEARINGS, immigration judges have placed the burden of proof on

1  PROLONGED DETAINEES.  Respondent does not have reasonable access to

2  sufficient readily obtainable information to either admit or deny that in some CASAS

3  HEARINGS immigration judges have placed the burden of proof on a PROLONGED

4  DETAINEE.

5  **REQUEST FOR ADMISSION NO. 11:**

6  Admit that, other than through a petition for a writ of habeas corpus or other writ,

7  there is no judicial review of the outcome of CASAS HEARINGS.

8      **ANSWER:**  Respondent admits that a bond decision affirmed by the Board of

9  Immigration Appeals is subject to judicial review only on the basis of a petition for a

10  writ of habeas corpus or other writ, but denies any implication in the Request that an

11  immigration judge's bond redetermination at a CASAS HEARING is not subject to

12  further review, specifically by the Board of Immigration Appeals.

13  **REQUEST FOR ADMISSION NO. 12:**

14  Admit that in BOND HEARINGS conducted in the Central District of California,

15  transcripts are not routinely maintained or prepared.

16      **ANSWER:**  Admit.

17  **REQUEST FOR ADMISSION NO. 13:**

18  Admit that in BOND HEARINGS conducted in the Central District of California,

19  PROLONGED DETAINEES do not receive counsel, paid for by the Government.

20      **ANSWER:**  Admit.

21

22

23

24

25

26

27

28

Dated:  May 27, 2011

Respectfully submitted,

TONY WEST
Assistant Attorney General
Civil Division
DAVID J. KLINE
Director, Office of Immigration Litigation
District Court Section
VICTOR M. LAWRENCE
Principal Assistant Director

/s/ Theodore W. Atkinson
THEODORE W. ATKINSON
Senior Litigation Counsel
United States Department of Justice
Office of Immigration Litigation,
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Phone: (202) 532-4135
theodore.atkinson@usdoj.gov

Attorneys for Respondents

## **CERTIFICATE OF SERVICE**

I certify that on May 27, 2011, I served a copy of the foregoing by e-mail on the following counsel of record:

Ahilan T. Arulanantham
ACLU Foundation of Southern California
1616 Beverly Boulevard
Los Angeles, CA 90026
Email: aarulanantham@aclu-sc.org

Michael Kaufman
ACLU Foundation of Southern California
1616 Beverly Boulevard
Los Angeles, CA 90026
Email: mkaufman@aclu-sc.org


/s/ Theodore W. Atkinson
Theodore W. Atkinson
Senior Litigation Counsel
United States Department of Justice

# EXHIBIT L

Alejandro Rodriguez et. al. v. Timothy S. Robbins, et al.
Civil Action No. CV 07-3239-TJH (RNBx)
Central District of California, Western Division


Expert Statistical Report of Dr. Chester I. Palmer


October 12, 2012

Executive Summary

Statistical analyses were performed on data for aliens detained in the Central District of California for at least 180 days without an individualized bond hearing before an immigration judge as of some date in the period from April 21, 2010 through April 21, 2011. In order to provide an appropriate sample, the analyses were restricted to aliens who reached their 181st day of custody in that time period.

- Based on the reasons coded in the data, most adjournments requested by the aliens were for a relatively small number of different reasons. Five reasons (time for preparation, time to seek representation, time to file another application, time requested by the alien or the alien's representative, and time to file for asylum) accounted for about 84% of the adjournments requested by the aliens.

Analyses of adjournments requested by the aliens showed:

- 86.9% of the aliens requested at least one adjournment, and over half of them requested three or more. Only 13.1% of the aliens never requested an adjournment.

- For those aliens requesting at least one adjournment, the total resulting delay varied from 5 days to 562 days; the median was 121 days and the mean (average) was 136.3 days.

- In addition to the 13.1% of aliens who did not request an adjournment, another 5.6% requested adjournments that totaled 30 days or less; 22.7% requested adjournments totaling 181 days or more.

Analyses of adjournments requested by the aliens during just their first 180 days of custody showed:

- 84.7% of the aliens requested at least one adjournment, and 66.2% requested two or more Only 15.3% of the aliens did not request at least one adjournment during their first 180 days of custody.

- For those aliens requesting at least one adjournment during their first 180 days of custody, the total resulting delay varied from 6 days to 269 days; the median was 101 days and the mean (average) was 105.9 days.

- In addition to the 15.3% of aliens who did not request at least one adjournment during their first 180 days of custody, another 6.0% requested adjournments that totaled 30 days or less; 34.1% requested adjournments totaling 121 days or more.

Introduction

     This report presents statistical analyses of events during the periods of custody of aliens who had been detained by U.S. Immigration and Customs Enforcement without an individualized bond hearing before an immigration judge for at least 180 days or more as of some date in the period from April 21, 2010 through April 21, 2011 and, as of some date within that period, were being held in facilities in the Central District of California.  The report was prepared at the request of the attorneys for defendant in the litigation Alejandro Rodriguez et. al. v. Timothy S. Robbins, et al., Civil Action No. CV 07-3239-TJH (RNBx), filed in the Central District of California, Western Division.

     The information for the analyses in this report came was supplied by counsel for defendant.  More specifically, the report is based on the following information:

- An Excel spreadsheet named "AC Delays.xls" received on 09/27/2012.  This was an update of an earlier spreadsheet of the same name received on 09/25/2012 with a small number of additional rows.  These spreadsheets contained information on the dates that the aliens entered custody and left custody and the dates of hearings, with codes indicating whether each hearing was adjourned and, if so, whether the adjournment was requested by the alien.  This is the primary information used in the analyses in this report.

- An Excel spreadsheet named "dbo_tblAdjournmentCodes.xlsx" received on 09/25/2012 that was used only to obtain descriptive labels for the codes for adjournment reasons in the AC Delays" spreadsheets.

- An Excel spreadsheet named "Rodriguez Update 09-26-12.xlsx" received on 09/27/2012 that was used only to find end dates of custody for 27 individuals for whom those dates were missing from the "AC Delays" spreadsheets.

- An Excel spreadsheet named "Detention Stays in LOS AOR.XLSX" that was received on 10/02/2012 and that was used only to check that no aliens were inadvertently omitted from the "AC Delays" worksheet.  No information from this spreadsheet was used in the analyses described in this report.

- Four e-mails from Sarah Wilson: two dated 10/01/2012, one dated 10/03/2012, and one dated 10/10/2012.  These messages were used to provide start and/or end dates of custody for about 15 individuals and to identify a few individuals to be excluded from the analyses.

     I also had several discussions with attorneys for defendant and data custodians to ensure that I understood the various data sets, but those discussions did not supply any information used in the analyses.

This report was prepared by Dr. Chester Palmer, Senior Statistician, ERS Group.
Dr. Palmer joined ERS Group in 1998 after twenty-four years as a faculty member in the
Department of Mathematics at Auburn University, Montgomery, Alabama, where he taught a
variety of courses in mathematics and statistics.  Dr. Palmer has testified as an expert witness in
statistics at deposition and/or at hearing in 19 cases in various federal district courts, at one
arbitration, and at one administrative proceeding.  Dr. Palmer's vita, including a list of testimony,
forms Appendix A to this report.

I.      Issues in the Analyses

        A.      Determining a Proper Sample

        It is my understanding that aliens were included in the data set if they had been detained by U.S. Immigration and Customs Enforcement without an individualized bond hearing before an immigration judge for at least 180 days or more as of some date in the period from April 21, 2010 through April 21, 2011 and, as of some date within that period, were being held in facilities in the Central District of California.  This method of selection raises some statistical issues.

        To see why, consider a simpler example.  Consider a hospital that wants to draw a sample of patient stays.  Suppose that, for the time period of interest, 25 patients each spent 1 day in the hospital and 1 patient, Mr. Long, spent 30 days in the hospital.  There are several ways in which the hospital might draw a sample for analysis.

- Individual-Based: An individual-based sample might proceed from the fact that the hospital had 26 patients, and randomly sample among them.  Each patient has the same probability of inclusion in this sample.

- Day-Based: Alternatively, the hospital might select one day and sample those patients.  In this case, because Mr. Long spent 30 days in the hospital and each other patient spent only one day, Mr. Long is much more likely to be included in the sample than any of the other patients.

        A sample is called "biased" (a technical term in statistics) if not all cases of interest have the same probability of selection for the sample.  In the example above, the day-based sample is a biased sample of individuals because individuals with longer stays are more likely to be selected than other individuals.  In the statistical language, patients with long stays are overrepresented  If the hospital uses the day-based sample for a survey of patient satisfaction, there will likely be too many patients with long stays (and presumably more serious conditions) in the sample, and their opinions will count more than the opinions of patients with shorter stays.  If the typical level of satisfaction for patients with long stays is different from that of patients with shorter stays, the results of the analysis could be quite deceptive.

        On the other hand, there are some purposes for which the day-based sample would be better.  If the hospital wants to analyze its daily workload, the day-based sample is appropriate because Mr. Long really did make up a higher proportion of the workload than did any of the other patients.

        To see the similar issue with the data set for this litigation, consider two hypothetical aliens, Mr. Short and Mr. Long, who entered custody on the same day, April 21, 2009.  Mr. Short was detained for 7 months prior to his hearing, then released immediately after his hearing in November 2009.  Thus, he is a class member, but he is not included in the data set because he

5

was not in custody during the time period for the data (April 21, 2010 through April 21, 2011). Mr. Long was detained for 13 months prior to his hearing, then released immediately after his hearing in May 2010. Thus, he is a class member and he is included in the data set because he was in custody during the time period for the data. In summary, the method of selection for the data set is biased in favor of including aliens with longer periods of custody rather than those with shorter ones.

This bias may or may not matter depending on the analyses to be performed. For example, if one analyzes what happened during the first 180 days each alien was in custody, the bias probably does not matter (unless there was some change in procedure over time). On the other hand, if one analyzes how long people were held in custody, or performs any other analysis that looks at lengths of time, the bias may have a substantial effect because aliens with longer periods of custody are overrepresented.

The simplest way to avoid such a bias and create an individual-based sample is to assign to each individual a single date and then use that date to determine whom to include. In the hospital example, one might sample based on the first day each person was in the hospital, or the last day; either would give Mr. Long the same probability of selection as the other patients. For this litigation, the most straightforward way to sample from the data set is to take those aliens in the data set for whom the 181st day of detention fell in the time period for the data (April 21, 2010 through April 21, 2011). That has the advantage that, if one believes that 181 days from the beginning of custody is an especially important date, one has everyone for whom that date falls in the time period for the sample. I have followed that practice, and in the body of this report I give results for only those aliens; I refer to them as "in-period". It would be reasonable for the reader to wonder how much of a difference that makes (in fact, not much for most of my analyses), so I have included parallel tables without that restriction in Appendix B.

B.      Details of the Analyses and Data Issues

Analyses were conducted based on alien number as provided in the data sets.

The following records were not used in the analyses:

- There are six alien numbers that are accompanied by names that make it appear that the records may not all pertain to the same individual: 022660128, 036901593, 076186391, 077052958, 077324537, and 095425585. These six alien numbers have been excluded from the analyses.

- There are two alien numbers for which the calculated stay in custody is less than 180 days: 090503375 and 093166641. These two alien numbers have been excluded from the analyses.

6

- There are three alien numbers for which there are confidentiality issues under the protective order in this case. These three alien numbers have been excluded from the analyses.

- For some aliens, the data sets contain information relating to events that occurred before or after the period of custody that resulted in the alien being included in the data set; for example, events relating to prior proceedings. Any records from before the beginning of the relevant period of custody (the variable name in the data set is "Entered Custody") or on or after the end of that period ("Book Out") are not used in the analyses.

- Records with adjournment reason '99', defined in the documentation as "Data Entry Error," are not used in the analyses. It is my understanding that no hearings actually occurred on those dates.

The following conventions were used in the analyses:

- The delay due to an adjournment is calculated as the number of days until the next hearing date or, if the alien leaves custody before the next hearing date, the number of days until the alien leaves custody.

- Records with no reason for the adjournment are treated as hearing dates but not considered as adjournments requested by the alien. Many of these records are for events before the time period of interest; about 70% are before 2008, including about 56% from before 2004. Others apparently represent hearings that, at the time the data were collected, were in the future; about 18% were in October 2012 or later.

- It is my understanding that adjournment code '8A', defined as 'IJ Completion prior to hearing', does not represent a hearing but is likely to represent some kind of change in the status of the alien. Those actions are also counted as hearing dates but are not considered as requested by the alien, so they do not affect counts of adjournments requested by the aliens. They do terminate delays of previous adjournments, so they may shorten, but not lengthen, those delays.

In some cases, there are multiple records in the data set for the same alien number and date. These situations were treated as follows:

- If there are multiple records with the same adjournment reason, they are treated as duplicates and all but one of them are deleted.

7

- In counts of adjournments, multiple adjournments on the same date are counted as a single adjournment, although there may be multiple reasons counted for that adjournment.

- If there are multiple reasons for adjournment on the same date, if any of the reasons indicates an adjournment at the request of the alien, that adjournment is counted as being at the request of the alien.

After my initial review of the data, I requested some additional information. To put the numbers here in context, the original data set contained 10,283 records (i.e., dates of adjournments) for 1,021 distinct alien numbers; 4,874 records showed delays requested by the alien. I received the following additional information as discussed in the Introduction above:

- An updated list of adjournments including 124 additional records, 59 of which were delays requested by the alien.

- There were 13 alien numbers in the original data for which the dates the alien entered custody and left custody were both missing. I received information on the dates all 13 entered custody and the dates on which 12 of them left custody. (The thirteenth was still in custody.)

- There was one alien number for which the original data showed the date for leaving custody as prior to the date for entering custody. I received a corrected date for leaving custody.

- A file that provided the dates when 27 aliens left custody when those dates had been missing in the original data.

The additional data had little effect on the results of the analyses. The additional information on adjournments added just over 1% to the original number. The dates for entering custody allowed 10 additional aliens to be included in the analyses. (Three of the 13 were not used for reasons discussed above.) The dates for leaving custody had little effect on the analyses as those dates play a very minor part in the analyses.

8

II.     Results of Analyses

    A.     Types of Adjournments at the Request of the Alien and Lengths of the Resulting Delays

Table 1 below gives information about the number of adjournments for each of the reasons labeled in the data base as requested by the in-period aliens and the average resulting delay in days.

| Table 1: Types of Requested Adjournments and Average Resulting Delays | | | |
|---|---|---|---|
| Code | Description | Number | Mean Delay |
| 02 | PREPARATION--ALIEN/ATTORNEY/REPRESENTATIVE | 504 | 37.4 |
| 01 | ALIEN TO SEEK REPRESENTATION | 383 | 42.6 |
| 06 | ALIEN TO FILE OTHER APPLICATION | 319 | 42.8 |
| 12 | OTHER ALIEN/ALIEN'S ATTY/REPRESENTATIVE REQUEST | 284 | 39.8 |
| 05 | ALIEN TO FILE FOR ASYLUM | 184 | 34.0 |
| 21 | SUPPLEMENT ASYLUM APPLICATION | 81 | 40.1 |
| 7C | I-130 PENDING | 74 | 41.0 |
| 11 | OTHER NO-SHOW BY ALIEN/ALIEN'S ATTORNEY OR REP. | 58 | 29.0 |
| 36 | RECORDS CHECK/FINGERPRINTS/OVERSEAS INVESTIGATION | 33 | 37.7 |
| 7A | ALIEN APPLICATION PROCESS | 19 | 51.6 |
| 22 | ALIEN OR REP. REJECTED EARLIEST POSSIBLE HEARING | 14 | 73.6 |
| 51 | CONTESTED CHARGES | 13 | 48.5 |
| 23 | ASYLUM APPLICATION WITHDRAWN/RESET FOR OTHER ISSUE | 5 | 53.0 |
| 54 | ALIEN CLAIM TO U.S. CITIZENSHIP | 4 | 17.3 |
| 39 | ILLNESS OF ATTY/REP | 2 | 35.5 |
| 38 | ILLNESS OF ALIEN | 1 | 7.0 |
| 40 | ILLNESS OF WITNESS | 1 | 51.0 |
| 7D | I-140 PENDING | 1 | 7.0 |
| 7E | I-730 PENDING | 1 | 53.0 |
| OT | ALIEN/ATTORNEY/REP. TO FILE OTHER APPLICATION | 1 | 42.0 |
| All | | 1,982 | 39.7 |

Table 1 indicates that most of the delays labeled in the data base as requested by the alien are for one or more of a relatively small number of reasons. The top five reasons account for about 84% of the delays and the top nine reasons account for about 97%. The average delay is about 40 days, and does not vary much among the most common reasons for the request.

Table B-1 in Appendix B contains similar information including out-of-period aliens.

B.      Counts of Requested Adjournments by Alien

Table 2 below shows the number of adjournments requested by in-period aliens.

| Table 2: Number of Adjournments Requested | | |
|---|---|---|
| Number of Requests | Number of Aliens | Pct of Aliens |
| None | 87 | 13.1 |
| 1 | 92 | 13.9 |
| 2 | 125 | 18.9 |
| 3 | 113 | 17.1 |
| 4 | 104 | 15.7 |
| 5 | 62 | 9.4 |
| 6 | 43 | 6.5 |
| 7 | 17 | 2.6 |
| 8 | 6 | 0.9 |
| 9 | 4 | 0.6 |
| 10 or more | 9 | 1.4 |
| Total | 662 | 100.0 |

Table 2 shows that only 13.1% of the in-period aliens never requested an adjournment. From an alternative point of view, 86.9% of them requested at least one adjournment, and over half of them requested three or more.

Table B-2 in Appendix B contains similar information including out-of-period aliens.

10

C.        Counts of Adjournments Requested in the First 180 Days of Custody

Table 3 below show the number of adjournments requested by in-period aliens where the count includes only those requested in the first 180 days of custody.

| Table 3: Number of Adjournments Requested in First 180 Days of Custody | | |
|---|---|---|
| Number of Requests | Number of Aliens | Pct of Aliens |
| None | 101 | 15.3 |
| 1 | 123 | 18.6 |
| 2 | 151 | 22.8 |
| 3 | 165 | 24.9 |
| 4 | 88 | 13.3 |
| 5 | 27 | 4.1 |
| 6 | 5 | 0.8 |
| 7 | 2 | 0.3 |
| Total | 662 | 100.0 |

Table 3 shows that only 15.3% of in-period aliens did not request at least one adjournment during their first 180 days of custody; 84.7% did request at least one, and 66.2% requested two or more. Recall that the average delay resulting from a requested adjournment was about 40 days. Few aliens requested more than 4 adjournments within their first 180 days of custody; in most cases, there probably was just not enough time to request more.

Table B-3 in Appendix B contains similar information including out-of-period aliens.

D.        Total Delays for Adjournments Requested by Aliens

Table 4 below provides summary information by alien on the total delays resulting from the adjournments requested by the in-period aliens. Note that this table does not include the 87 in-period aliens that did not request an adjournment. (See Table 2.)

11

| Table 4: Summary Statistics on Total Delays for Adjournments Requested by Aliens | |
|---|---|
| Number of aliens | 575 |
| Shortest delay | 5 days |
| Median delay | 121 days |
| Mean delay | 136.3 days |
| Longest delay | 562 days |

Table B-4 in Appendix B contains similar information including out-of-period aliens.

Table 5 below shows the distribution of the total length of the delays requested by in-period aliens.

| Table 5: Distribution of Total Delays for Adjournments Requested by Aliens | | |
|---|---|---|
| Length | Number of Aliens | Pct of Aliens |
| None | 87 | 13.1 |
| 1 to 30 days | 37 | 5.6 |
| 31 to 60 days | 78 | 11.8 |
| 61 to 90 days | 86 | 13.0 |
| 91 to 120 days | 80 | 12.1 |
| 121 to 150 days | 81 | 12.2 |
| 151 to 180 days | 63 | 9.5 |
| 181 days or more | 150 | 22.7 |
| Total | 662 | 100.0 |

The table shows that there was quite a bit of variation between different in-period aliens in the length of the delay resulting from adjournments that they requested.  In addition to the 87 aliens who did not request an adjournment, another 37 requested adjournments that totaled 30

12

days or less. At the other end of the scale, 150 requested adjournments totaling 181 days or more.

Table B-5 in Appendix B contains similar information including out-of-period aliens.

E.      Total Delays for Adjournments Requested by Aliens During the First 180 Days of Custody

This section contains the results of analyses parallel to those in Section D immediately above but only for those delays that in-period aliens requested during the first 180 days of custody. Note that it is possible for an adjournment requested during the first 180 days to continue beyond the 180-day mark, and the full length of the adjournment is included in the analyses.

Table 6 below provides summary information on the resulting delays. Note that this table does not include the 101 in-period aliens that did not request an adjournment. (See Table 3.)

| Table 6: Summary Statistics on Total Delays for Adjournments Requested by Aliens in Their First 180 Days of Custody | |
|---|---|
| Number of aliens | 561 |
| Shortest delay | 6 days |
| Median delay | 101 days |
| Mean delay | 105.9 days |
| Longest delay | 269 days |

Table B-6 in Appendix B contains similar information including out-of-period aliens.

Table 7 below shows the distribution of the total length of the delays requested by in-period aliens.

13

| Table 7: Distribution of Total Delays for Adjournments Requested by Aliens in First 180 Days of Custody | | |
|---|---|---|
| Length | Number of Aliens | Pct of Aliens |
| None | 101 | 15.3 |
| 1 to 30 days | 40 | 6.0 |
| 31 to 60 days | 91 | 13.7 |
| 61 to 90 days | 100 | 15.1 |
| 91 to 120 days | 104 | 15.7 |
| 121 to 150 days | 103 | 15.6 |
| 151 to 180 days | 76 | 11.5 |
| 181 days or more | 47 | 7.1 |
| Total | 662 | 100.0 |

Even after restricting to adjournments requested during the first 180 days of custody, there was quite a bit of variation between different in-period aliens in the length of the delay resulting from adjournments that they requested. In addition to the 101 aliens who did not request an adjournment, another 40 requested adjournments that totaled 30 days or less. At the other end of the scale, 226 (34.1%) requested adjournments totaling 121 days or more.

Table B-7 in Appendix B contains similar information including out-of-period aliens.

III.    Statement of Compensation and Signature

The author of this report is employed by ERS Group, which currently bills his time at $475 per hour.

_October 12, 2012_
Date

_Chester I. Palmer_
Chester I. Palmer

**Appendix A**

**Vita of Dr. Chester I. Palmer**

# CHESTER I. PALMER

4901 Tower Court • Tallahassee, FL  32303 • (850) 562-1211, Ext. 308
cpalmer@ersgroup.com

## PROFESSIONAL EXPERIENCE:

**ERS GROUP**
- Senior Statistician (1998 - present)

Design, perform, interpret, review and evaluate statistical studies.  Studies on employment data have involved salaries, hiring, promotions, discipline, performance appraisals, and testing; other studies have involved environmental concentrations of pollutants.  Provide expert testimony as needed.

**AUBURN UNIVERSITY**
- Professor, Department of Mathematics (1986-1998)

- Associate Professor, Department of Mathematics (1982-1986)

- Assistant Professor, Department of Mathematics (1979-1982)

- Instructor, Department of Mathematics (1974-1979)

- Acting Head of Department, Department of Mathematics (1998; 1981-1982)

Teach undergraduate and graduate courses in Mathematics and Statistics, including Elementary Statistics, Advanced Statistics, Engineering Statistics, and Mathematical Statistics; develop and administer the mathematics testing program; monitor performance of adjunct faculty; advise students; perform research and consulting.

**OTHER TEACHING EXPERIENCE:**
Teaching Fellow, graduate school, Cornell University and Yale University.

Three summers teaching high-school and elementary school mathematics.

Mathematics teacher, Dartmouth-Talladega Upward Bound Program (Summer 1968).

**OTHER CONSULTING EXPERIENCE NOT RELATED TO LITIGATION:**
U.S. Environmental Protection Agency: design of experiments and analysis of experimental data.

Psychological Services, Inc.: statistical analysis, the design and construction of tests, computer programming, preparation of instructional material on computing.

Center for Government and Public Affairs and Center for Business, Auburn University at Montgomery: statistical analysis and computer programming on many projects.

McCann Associates: scaling, equating, and statistical analysis of results of promotional procedures for the Pennsylvania State Police.

Alabama Board of Bar Examiners: test scoring, equating, and validation.  Chaired a committee that recommended changes in the scoring and equating rules which have since been adopted.

Professional Experience (Cont.)

**EDUCATION:**

A.B., Dartmouth College, Honors Mathematics, 1969

M.A., Cornell University, Mathematics, 1971

M.Phil., Yale University, Mathematics, 1973

Ed.D., Auburn University, Mathematics Education, 1979

**HONORS AND AWARDS:**

A.B. *summa cum laude*, with highest distinction in mathematics

Phi Beta Kappa

National Science Foundation Graduate Fellowship, 1969-1972

Woodrow Wilson Fellow

Faculty Service Award, Auburn University at Montgomery, 1985 "for outstanding service and superlative teaching contributions"

**SPECIALIZATION:**

Applied Statistics, Statistics in Legal Context, Tests and Testing.

## PUBLICATIONS AND RESESARCH PAPERS:

Review of the College-Level Examination Program General Examinations, Keyser, D.J. and Sweetland, R.C. (Eds.), Test Critiques, Vol. X, Austin, TX: Pro-Ed, 1994, pp. 128-135.

Review of the College-Level Examination Program Subject Examinations in Mathematics, Keyser, D.J. and Swettland, R.C. (Eds.), Test Critiques, Vol. X, Austin, TX: Pro-Ed, 1994, pp. 136-142.

Review of Linear Algebra with Applications, 2nd edition, by Gareth Williams.  Invited review in Journal of Undergraduate Mathematics and its Applications, Vol. 14, No. 1, Spring, 1993, pp. 89-90.

Costs of Accreditation: Leveraging Internal Resources, (with J.B. Hill), Amin, S.G. (Ed.), Contemporary Business Issues.  MD: Academy of Business Administration, 1992, pp. 281-286.

Validation of a Clerical Test Using Work Samples, (with W.R. Boyles, J.G. Veres, III, and J.B. Hill), Journal of Business and Psychology, Vol. 7, No. 2, Winter, 1992, pp. 239-257.

Review of College Basic Studies Examination, Keyser, D.J. and Sweetland, R.C. (Eds.), Test Critiques, Volume IX, Austin, TX: Pro-Ed, 1992, pp. 105-113.

"Acoustic Correlates of Pathologic Voice Types," (with V. Woolf and R. Cornell), Journal of Speech and Hearing Research, Vol. 34, No. 3, June, 1991, pp. 509-516.

"Problem Q755 With Solution," Mathematics Magazine, Vol. 62, No. 5, December, 1989, p. 344 and p. 349.

"Allen v. Board: Litigating Teacher Certification Testing," (with D. Boyd and J.G. Veres, III), invited paper in National Clearinghouse on Examination Information Newsletter, Vol. VII, No. 3, December, 1989, pp. 10-16.

"Learning from the 1987 Geometry and Algebra II Contests," Alabama Journal of Mathematics, Vol. 12, No. 1, Spring, 1988, pp. 38-40.

"Reflections on High-School Algebra," Alabama Journal of Mathematics, Vol. 9, No. 1, Spring, 1985, pp. 23-30.

"Statistics," invited contribution to Student Merit Awards: High School, National Council of Teachers of Mathematics, 1984, pp. 135-37.

"Statistics," invited contribution to Student Merit Awards: Middle School, National Council of Teachers of Mathematics, 1984, pp. 58-60.

"Problem Q690 With Solution," Mathematics Magazine, Vol. 57, No. 3, May, 1984, p. 176 and p. 181.

"Learning from the Statewide Contest Results," Alabama Journal of Mathematics, Vol. 8, No. 1, Spring, 1984, pp. 38-46.

"Using an Item Bank to Construct a Local College Mathematics Placement Test," Measurement and Evaluation in Guidance, Vol. 15, No. 4, January, 1983, pp. 259-66.

"Learning from the Statewide Contest Results," Alabama Journal of Mathematics, Vol. 5, No. 2, Fall, 1981, pp. 38-46.

"Measuring Effectiveness in Teaching," (with J.B. Hill) Alabama Journal of Mathematics, Vol. 5, No. 1, Spring, 1981, pp. 11-15.

"Beyond Remediation," Alabama Journal of Mathematics, Vol. 3, No. 2, Fall, 1979, pp. 41-44.

"Cubic Functions and Integral Triangles," Alabama Journal of Mathematics, Vol. 1, No. 2. Fall, 1977, pp. 1-3.

"Two Calculus Examples," Alabama Journal of Mathematics, Vol. 1, No. 1, Spring, 1977, p. 75.

Review of A First Course in Linear Algebra, by Raymond A. Beauregard and John B. Fraleigh in American Mathematical Monthly, Vol. 84, No. 2, February, 1977, pp. 145-46.

## SELECTED TECHNICAL REPORTS:

"Selection for Supervisory/Management Positions at the Montgomery General Mail Facility," (with John G. Veres, III), November 15, 1996.

"Analyses of Involuntary Terminations at Ceridian Corporation Between 1988 and 1993," (with John G. Veres, III), May 25, 1994.

"Setting a Minimum Passing Score on the 1993 Fundamentals of Engineering Examination," a technical report for the National Council of Examiners in Engineering and Surveying, (with W.R. Boyles, J.G. Veres III, and A. Prewitt), February, 1994.

"Access to and Effects of the Nuclear Competitive Levels During the 1990 Reduction in Force at Mare Island Naval Shipyard," (with Kevin Gilmartin), August 2, 1993.

"The Effects of the 1990 Reduction in Force at Mare Island Naval Shipyard on Employees in Grades WG-1 to WG-7," (with Barbara Bessey and Mary Anne Lahey), August 2, 1993.

"Setting a Minimum Passing Score on the 1990 Fundamentals of Engineering Examination, a technical report for the National Council of Examiners in Engineering and Surveying, (with W.R. Boyles and J.G. Veres, III), February 22, 1991; published by NCEES, 1991.

"Applying the Mantel-Haenszel Procedure to the 1990 Trooper-Cadet Examination," March 2, 1992.

"The Analysis of Selection Events," (with Don McLaughlin), March, 1990.

"The Analysis of Waiting Times," (with Don McLaughlin), March, 1990.

"Logistics Analyses of Selection Events," (with Don McLaughlin), March, 1990.

"Statistical Analyses of Jury Selection in Tuscaloosa County, Alabama, 1978-1985," January 4, 1989.

"Statistical Analyses of Merit Staffing at NARF Jacksonville: Potential Applicants," (with Mary Anne Lahey), March 30, 1988.

"Statistical Analysis of Merit Staffing for the Jacksonville Naval Air Rework Facility, 1973-82," (with Mary Anne Lahey and Margaret E. Giffin), May 15, 1987.

"Applicant Flow Databases for the Jacksonville Naval Air Rework Facility, 1973-1982," (with Mary Anne Lahey and Margaret E. Giffin), July 20, 1987.

"Final Report of Task Analysis – Licensed Surveyors, 1984," a technical report for the National Council of Engineering Examiners; published by NCEE, 1984.

"Projection of Alabama Prison Populations – 1986," a technical report for the Center for Government and Public Affairs, AUM, September, 1981; reprinted in Court News, Vol. 5, No. 11, November, 1981, pp. 10-11.

"Land Surveying Professional Activities Analysis," (with Wiley R. Boyles), a technical report for the National Council of Engineering Examiners, December, 1979; published by NCEE, 1981.

Content-Oriented Personnel Selections Procedures – A Training Manual, (with R. Elliott, W.R. Boyles, J.B. Hill, J.G. Veres, III, and P. Thomas),  Center for Government and Public Affairs, AUM, 1981

## PRESENTATIONS/PROFESSIONAL MEETINGS:

"Implications of Alternative Methods of Test Score Use in Personnel Selection: A Follow-up Study," (with J.G. Veres, III), presented at the annual meeting of the Society for Industrial and Organizational Psychology, Nashville, April, 1994.

"The Analysis of Differential Item Functioning (DIF) on Employment Tests," presented at the annual meeting of the Society for Industrial and Organizational Psychology, San Francisco, April, 1993.

"Costs of Accreditation: Leveraging Internal Resources," (with J.B. Hill), presented at the National Conference of the Academy of Business Administration, Las Vegas, February, 1992.

"Practical and Theoretical Applications of Item Bias Studies," (with W.R. Boyles), presented at the annual meeting of the International Personnel Management Association Assessment Council, New Orleans, June, 1985. In Proceedings.

"Trends in Content Validation," (with W.R. Boyles and J.G. Veres,III), topical discussion at the annual meeting of the Southeastern Psychological Association, Atlanta, March, 1981.

"Bias in Content Valid Tests," (with W.R. Boyles and J.G. Veres,III), invited paper presented at the annual conference of the International Personnel Management Association Assessment Council, Boston, July, 1980.  In Proceedings.

"A New Procedure for Constructing College Mathematics Placement Tests," one-hour talk at the regional meeting of the National Council of Teachers of Mathematics, Nashville, November, 1979.

Numerous presentations to local and statewide educational organizations.

## PROFESSIONAL ASSOCIATIONS AND MEMBERSHIPS:

American Statistical Association

Mathematical Association of America

National Council on Measurement in Education

# CHESTER I. PALMER

4901 Tower Court • Tallahassee, FL 32303 • (850) 562-1211 x308
cpalmer@ersgroup.com

## TESTIMONY

<u>Reeves v. City of Atlanta</u>, Nos. 18191 and 18227, U.S. District Court, Northern District of Georgia, Atlanta Division.

<u>U.S. v. Alabama</u>, No. 791 F.2d 1450, U.S. District Court, Northern District of Alabama.

<u>U.S. v. City of Atlanta</u> and <u>Hamer et. al v. City of Atlanta</u>, No. 872F.2d 1521, U.S. District Court, Northern District of Georgia, Atlanta Division.

<u>Jackson v. Thigpen</u>, No. 87-C-2046-W, U.S. District Court, Northern District of Alabama.

<u>Johnson v. Webb</u>, No. 73-702-CIV-J-12, U.S. District Court, Middle District of Florida, Jacksonville Division.

<u>Fields et al. v. Southern Company Services, Inc.</u>, No. CV89-P-594-S, U.S. District Court, Northern District of Alabama, Southern Division.

<u>McLester v. Thigpen et al.</u>, No. 87-T-0174-5, U.S. District Court, Middle District of Alabama.

<u>Wilbourn v. Davis et al.</u>, U.S. District Court, Northern District of Alabama.

<u>U.S. v. City of Montgomery</u>, and <u>Jordan et al. v. Wilson</u>, Civil Action Nos: 3739-N; 75-19-N. U.S. District Court, Middle District of Alabama, Northern Division.

<u>Paradise v. McHenry et. al.</u>, Civil Action No. 3561-N, U.S. District Court, Middle District of Alabama.

<u>Walton et al. v. Dalton</u>, No. 2 :94-CV-967, U.S. District Court, Eastern District of Virginia, Norfolk Division.

<u>Starks et al. v. Dorsey Trailers et al.</u>, U.S. District Court, Middle District of Alabama.

<u>Collins v. City of Atlanta</u>, No. 79-3782, U.S. District Court, Northern District of Georgia, Atlanta Division.

<u>American Federation of Government Employees Local 1156 and Laborers International Union Local 1170 v. Naval Inventory Control Point and Defense Logistics Agency</u>, PMCS No. 98-02249, Mechanicsburg, PA. (Navy Litigation).

<u>Arthur and Klepetar v. College of St. Benedict and Order of St. Benedict</u>, No. 98-CV-01959-JMR/FLN, U.S. District Court, District Court of Minnesota.

<u>Bull et al. v. AVX Corporation</u>, No. 3:98-3463-23-AJ, U.S. District Court, District of South Carolina, Florence Division.

<u>Inglis et al. v. Buena Vista University</u>, No. C 00-4150-MWB,  U.S. District Court, Northern District of Iowa, Western Division.

<u>Adam et al. v. Norton</u>, No. C98-02094-CW, U.S. District Court, Northern District of California, Oakland Division.

<u>Robinson et al. v. Winter</u>, No. 1:02-CV-2 (WLS), U.S. District Court, MD, GA, Albany Division.

<u>Starks and Foster v. Winter</u>, EEOC Appeal Number 0198147, New York District Office

<u>Zivali et al. v. AT&T Mobility</u>, No. 08 Civ. 10310 (JSR), U.S. District Court, Southern District of New York

**Appendix B**

**Tables Parallel to Those in the Text but Including Out-of-Period Aliens**

Table B-1: Types of Requested Adjournments and Average Resulting Delays

| | All | | in_period | | | |
| | | | No | | Yes | |
| | | wait | | wait | | wait |
| Code and Description | N | Mean | N | Mean | N | Mean |
|---|---|---|---|---|---|---|
| 01 ALIEN TO SEEK REPRESENTATION | 774 | 44.2 | 391 | 45.8 | 383 | 42.6 |
| 02 PREPARATION--ALIEN/ATTORNEY/REPRESENTATIVE | 862 | 39.9 | 358 | 43.4 | 504 | 37.4 |
| 05 ALIEN TO FILE FOR ASYLUM | 259 | 38.1 | 75 | 48.2 | 184 | 34.0 |
| 06 ALIEN TO FILE OTHER APPLICATION | 552 | 45.0 | 233 | 48.1 | 319 | 42.8 |
| 11 OTHER NO-SHOW BY ALIEN/ALIEN'S ATTORNEY OR REP. | 104 | 32.0 | 46 | 35.9 | 58 | 29.0 |
| 12 OTHER ALIEN/ALIEN'S ATTY/REPRESENTATIVE REQUEST | 591 | 42.7 | 307 | 45.4 | 284 | 39.8 |
| 21 SUPPLEMENT ASYLUM APPLICATION | 114 | 42.1 | 33 | 47.2 | 81 | 40.1 |
| 22 ALIEN OR REP. REJECTED EARLIEST POSSIBLE HEARING | 16 | 73.8 | 2 | 75.0 | 14 | 73.6 |
| 23 ASYLUM APPLICATION WITHDRAWN/RESET FOR OTHER ISSUE | 9 | 79.9 | 4 | 113.5 | 5 | 53.0 |
| 36 RECORDS CHECK/FINGERPRINTS/OVERSEAS INVESTIGATION | 68 | 50.4 | 35 | 62.4 | 33 | 37.7 |
| 38 ILLNESS OF ALIEN | 9 | 43.3 | 8 | 47.9 | 1 | 7.0 |
| 39 ILLNESS OF ATTY/REP | 7 | 58.3 | 5 | 67.4 | 2 | 35.5 |
| 40 ILLNESS OF WITNESS | 1 | 51.0 | 0 | 0 | 1 | 51.0 |
| 51 CONTESTED CHARGES | 21 | 48.8 | 8 | 49.4 | 13 | 48.5 |
| 52 JURISDICTION RESTS WITH THE BIA | 1 | 133.0 | 1 | 133.0 | 0 | 0 |
| 54 Alien Claim to U.S. Citizenship | 10 | 32.0 | 6 | 41.8 | 4 | 17.3 |
| 7A ALIEN APPLICATION PROCESS | 23 | 50.8 | 4 | 47.0 | 19 | 51.6 |
| 7C I-130 PENDING | 178 | 48.5 | 104 | 53.8 | 74 | 41.0 |
| 7D I-140 PENDING | 1 | 7.0 | 0 | 0 | 1 | 7.0 |
| 7E I-730 PENDING | 1 | 53.0 | 0 | 0 | 1 | 53.0 |
| 7H PENDING NATURALIZATION OF PETITIONING RELATIVE | 1 | 49.0 | 1 | 49.0 | 0 | 0 |
| OT ALIEN/ATTORNEY/REP. TO FILE OTHER APPLICATION | 1 | 42.0 | 0 | 0 | 1 | 42.0 |
| All | 3603 | 42.8 | 1621 | 46.6 | 1982 | 39.7 |

1

Table B-2: Number of Adjournments Requested

|  |  |  |  | in_period |  |  |
|---|---|---|---|---|---|---|
|  | All | | No | | Yes | |
|  | N | Pct | N | Pct | N | Pct |
| All | 1010 | 100.0 | 348 | 100.0 | 662 | 100.0 |
| Count |  |  |  |  |  |  |
| 0 | 113 | 11.2 | 26 | 7.5 | 87 | 13.1 |
| 1 | 119 | 11.8 | 27 | 7.8 | 92 | 13.9 |
| 2 | 156 | 15.4 | 31 | 8.9 | 125 | 18.9 |
| 3 | 166 | 16.4 | 53 | 15.2 | 113 | 17.1 |
| 4 | 142 | 14.1 | 38 | 10.9 | 104 | 15.7 |
| 5 | 115 | 11.4 | 53 | 15.2 | 62 | 9.4 |
| 6 | 83 | 8.2 | 40 | 11.5 | 43 | 6.5 |
| 7 | 55 | 5.4 | 38 | 10.9 | 17 | 2.6 |
| 8 | 18 | 1.8 | 12 | 3.4 | 6 | 0.9 |
| 9 | 13 | 1.3 | 9 | 2.6 | 4 | 0.6 |
| 10 | 9 | 0.9 | 5 | 1.4 | 4 | 0.6 |
| 11 | 9 | 0.9 | 6 | 1.7 | 3 | 0.5 |
| 12 | 4 | 0.4 | 3 | 0.9 | 1 | 0.2 |
| 13 | 1 | 0.1 | 1 | 0.3 | . | . |
| 14 | 3 | 0.3 | 3 | 0.9 | . | . |
| 15 | 1 | 0.1 | 1 | 0.3 | . | . |
| 19 | 1 | 0.1 | . | . | 1 | 0.2 |
| 22 | 1 | 0.1 | 1 | 0.3 | . | . |
| 23 | 1 | 0.1 | 1 | 0.3 | . | . |

Table B-3: Number of Adjournments Requested in First 180 Days of Custody

| | All | | in_period | | | |
| | | | No | | Yes | |
| | N | Pct | N | Pct | N | Pct |
|---|---|---|---|---|---|---|
| All | 1010 | 100.0 | 348 | 100.0 | 662 | 100.0 |
| Count | | | | | | |
| 0 | 140 | 13.9 | 39 | 11.2 | 101 | 15.3 |
| 1 | 158 | 15.6 | 35 | 10.1 | 123 | 18.6 |
| 2 | 223 | 22.1 | 72 | 20.7 | 151 | 22.8 |
| 3 | 274 | 27.1 | 109 | 31.3 | 165 | 24.9 |
| 4 | 161 | 15.9 | 73 | 21.0 | 88 | 13.3 |
| 5 | 42 | 4.2 | 15 | 4.3 | 27 | 4.1 |
| 6 | 9 | 0.9 | 4 | 1.1 | 5 | 0.8 |
| 7 | 3 | 0.3 | 1 | 0.3 | 2 | 0.3 |

Table B-4: Summary Statistics on Total Delays for Adjournments Requested by Aliens

|        |        |   All  |  in_period | |
|--------|--------|--------|------|------|
|        |        |        |  No  | Yes  |
| Total Delay | N | 897 | 322 | 575 |
|        | Min    |   5.0  |  6.0 |  5.0 |
|        | Median | 148.0  | 221.0 | 121.0 |
|        | Mean   | 171.2  | 233.7 | 136.3 |
|        | Max    | 956.0  | 956.0 | 562.0 |

Table B-5: Distribution of Total Delays for Adjournments Requested by Aliens

| | All | | in_period | | | |
| | | | No | | Yes | |
| | N | Pct | N | Pct | N | Pct |
|---|---|---|---|---|---|---|
| All | 1010 | 100.0 | 348 | 100.0 | 662 | 100.0 |
| Total Delay | | | | | | |
| None | 113 | 11.2 | 26 | 7.5 | 87 | 13.1 |
| 1 to 30 days | 49 | 4.9 | 12 | 3.4 | 37 | 5.6 |
| 31 to 60 days | 92 | 9.1 | 14 | 4.0 | 78 | 11.8 |
| 61 to 90 days | 99 | 9.8 | 13 | 3.7 | 86 | 13.0 |
| 91 to 120 days | 107 | 10.6 | 27 | 7.8 | 80 | 12.1 |
| 121 to 150 days | 113 | 11.2 | 32 | 9.2 | 81 | 12.2 |
| 151 to 180 days | 94 | 9.3 | 31 | 8.9 | 63 | 9.5 |
| 181 days or more | 343 | 34.0 | 193 | 55.5 | 150 | 22.7 |

Table B-6: Summary Statistics on Total Delays for Adjournments
Requested by Aliens During First 180 Days of Custody

|  |  | All | in_period |  |
|---|---|---|---|---|
|  |  |  | No | Yes |
| Total Delay | N | 870 | 309 | 561 |
|  | Min | 2.0 | 2.0 | 6.0 |
|  | Median | 119.0 | 145.0 | 101.0 |
|  | Mean | 116.3 | 135.3 | 105.9 |
|  | Max | 269.0 | 239.0 | 269.0 |

Table B-7: Distribution of Total Delays for Adjournments
Requested by Aliens During First 180 Days of Custody

| | All | | in_period | | | |
| | | | No | | Yes | |
| | N | Pct | N | Pct | N | Pct |
|---|---|---|---|---|---|---|
| All | 1010 | 100.0 | 348 | 100.0 | 662 | 100.0 |
| Total Delay | | | | | | |
| None | 140 | 13.9 | 39 | 11.2 | 101 | 15.3 |
| 1 to 30 days | 52 | 5.1 | 12 | 3.4 | 40 | 6.0 |
| 31 to 60 days | 115 | 11.4 | 24 | 6.9 | 91 | 13.7 |
| 61 to 90 days | 130 | 12.9 | 30 | 8.6 | 100 | 15.1 |
| 91 to 120 days | 146 | 14.5 | 42 | 12.1 | 104 | 15.7 |
| 121 to 150 days | 168 | 16.6 | 65 | 18.7 | 103 | 15.6 |
| 151 to 180 days | 143 | 14.2 | 67 | 19.3 | 76 | 11.5 |
| 181 days or more | 116 | 11.5 | 69 | 19.8 | 47 | 7.1 |

# EXHIBIT M

Alejandro Rodriguez et. al. v. Timothy S. Robbins, et al.
Civil Action No. CV 07-3239-TJH (RNBx)
Central District of California, Western Division


Rebuttal Expert Statistical Report of Dr. Chester I. Palmer


December 14, 2012

Introduction

This report presents statistical analyses of events during the periods of custody of aliens who had been detained by U.S. Immigration and Customs Enforcement without an individualized bond hearing before an immigration judge for at least 180 days or more as of some date in the period from April 21, 2010, through April 21, 2011, and, as of some date within that period, were being held in facilities in the Central District of California. The report was prepared at the request of the attorneys for respondents in the litigation Alejandro Rodriguez et. al. v. Timothy S. Robbins, et al., Civil Action No. CV 07-3239-TJH (RNBx), filed in the Central District of California, Western Division.

I prepared an earlier report in this case dated October 12, 2012. My vita forms Appendix A to that report. The case list in that vita is still correct except that I have also testified by deposition in this matter. My earlier report lists on page 3 the data sources I used in my analyses. The analyses in this report use the same data sources plus a data file supplied by in discovery by Dr. Susan Long, petitioners' expert.

This report has three main purposes:

• As I discussed in my original report, the data sets produced by respondents for use in this litigation overrepresent class members with longer periods of detention. For my original report, I analyzed a subset of the data (what I called the "in-period" aliens) that corrected for this overrepresentation. As I commented then, correcting the overrepresentation generally had little effect on my results because of the types of analyses I performed. Dr. Long's report often analyzed lengths of detention, so correcting the overrepresentation has a substantial effect on many of those results, and it also has some effect on some of her other results. Thus, one purpose of this report is to show that extent of those effects and provide parallel values based on only the in-period aliens.

• Most of Dr. Long's analyses of lengths of detention tabulate only the mean number of days in detention for various groups. I think it is desirable to present additional information regarding the distribution of the lengths of detention, and I have done so in this report.

• I have also provided some information that puts the information on lengths of detention in the context of the results in my original report regarding delays requested by the aliens.

1

I.      Selecting an Appropriate Sample for Analysis

In my previous report, I discussed at some length the choice of an appropriate sample for analysis in this litigation.  I will include a brief summary of that discussion below, together with some additional considerations; but I have also included my earlier discussion as Appendix A to this report.

According to the Third Amended Complaint:

105.    Petitioners represent a class of all people within the Central District of California who 1) are or will be detained for longer than six months pursuant to the general immigration detention statutes pending completion of removal proceedings, including judicial review, 2) are not detained pursuant to one of the national security detention statutes at 8 U.S.C. 1226a and 8 U.S.C. 1531-37 and 3) have not been afforded a hearing to determine whether their prolonged detention is justified.

106.    The class includes people who were present in an ICE detention facility in the Central District on or after the date on which the original complaint was filed ...

The original complaint was filed on May 16, 2007, so the class time period extends from that date onward.  On the other hand, it is my understanding that aliens were included in the data set produced in discovery and used in Dr. Long's expert report if they had been detained by U.S. Immigration and Customs Enforcement without an individualized bond hearing before an immigration judge for at least 180 days or more as of some date in the period from April 21, 2010 through April 21, 2011 and, as of some date within that period, were being held in facilities in the Central District of California.  Thus, only a small proportion of the class is included in the data set[1] and the data set itself is already a sample of the potentially relevant data.  Unfortunately, the data set is not a representative sample of the class because it was selected in a way that makes inclusion of class members with long detention periods more likely than the inclusion of otherwise similar class members with shorter detention periods.  To see that, note that aliens whose detention began early in the time period, say in 2007, are included in the sample only if they were still in detention on April 21, 2010; the data set does not include otherwise similar aliens who began their detention at the same time and were detained for at least six months, making them class members, but who were detained for less than two years and so were no longer in detention on April 12, 2010.  For this reason, my earlier report emphasized analyses on those class members for whom the 181st day of detention fell in the time period for the data (April 21, 2010 through April 21, 2011).  I refer to these class members as "in-period

---

[1] The period of one year represented in the data is only about 18% of the period from May 16, 2007 to the date of this report; and because the class includes future detainees, that proportion decreases daily.

aliens."[2]  Note that another way of describing this is to say that these aliens entered custody within the time period from October 23, 2009 (180 days before April 21, 2010) through October 23, 2010 (180 days before April 21, 2011).  Because the set of in-period aliens contains all class members whose detention began during a specified period of time, it does not have the problem of overrepresenting aliens with longer detention periods.  For a more detailed discussion, see Appendix A.

---

[2] My earlier report also contains an appendix with tables for out-of-period aliens and for all aliens in the data set, in-period and out-of-period combined, so the reader can see the extent to which the choice of in-period aliens for analysis affects the results of the analyses.

3

II.    Comparing Analysis Results with Those in Dr. Long's Report

    A.    General Considerations

As discussed in the Introduction, one major purpose of this report is to provide results parallel to those provided in Dr. Long's report but that correct for the overrepresentation of class member with longer periods of detention as discussed in Section I above. In order to do so, I reproduce Tables 1 to 16 in her report using the data set that she supplied in discovery; I number those tables prefix "L-" to indicate that I used Dr. Long's data.[3]  One major difference is that because of my opinion that it is more appropriate to perform analyses on the in-period aliens, as defined above, I provide information for each table separately for in-period aliens, for out-of-period aliens, and for all aliens in the data set. Dr. Long performed her analyses only for all aliens.[4]

The second general difference between the tables in this report and those in Dr. Long's report applies only to those tables that show lengths of detention: Tables 2, 6, 11, 12, 15, and 16. She does not always supply the same information in such tables. In Table 2, she provides averages, lowest values, and highest values. In Tables 6, 11, 12 and 16, she supplies only the averages; in Table 15, she supplies the averages and the highest values. Her Table 3 supplies additional information about the distribution of detention times in Table 2, but the report does not supply such information for her other tables of lengths of detention. As discussed in the Introduction, I believe that it is desirable to present additional information regarding the distribution of the lengths of detention rather than just the mean, or mean, minimum, and maximum. Thus, all my tables of detention length supply the same information:

| | |
|---|---|
| N | the number of cases in the row |
| Pct | the percentage of total cases in the table that are in this row |
| Mean | the mean (average) length of detention for cases in this row |
| Min | the shortest length of detention for cases in this row |
| P10 | the 10th percentile length of detention for cases in this row (i.e., 10% were below this value, 90% were above it) |
| P25 | the 25th percentile length of detention for cases in this row |
| Median | the central value, also called the 50h percentile; half of the lengths for cases in this row were below this value, half were above it. |
| P75 | the 75th percentile length of detention for cases in this row |
| P90 | the 90th percentile length of detention for cases in this row |
| Max | the highest length of detention for cases in this row |

---

[3] Although Dr. Long and I performed our analyses on different data sets, the differences between the two data sets make little difference to the results. See Appendix B for additional information on this point, and also for a discussion of the reliability of the data set used in my analyses.

[4] With the exception of one trivial typographical error, I am able to verify the numbers in her report. In her Table 12, under "All cases" and "Applied for Relief" equal to "No," the number should be 360, not 362. Compare with her Table 11 above it.

4

B.      An Example Comparing the Two Types of Tables

On the next page, I have reproduced Table 2 from Dr. Long's report and Table L-2 from
Appendix C of this report for comparison. In this section, I compare and contrast the two sets of
results and discuss the differences in interpretation.

Note that my table L-2 has three sections, one for "in_period No" (the out-of-period
aliens), one for "in_period  Yes" (the in-period aliens), and one for "All" (the complete data set).
Many of my tables use this format, although some simpler tables place the three sets of results
side by side.

As discussed above, the results in Dr. Long's Table 2 correspond to the "All" section of
my table L-2. Thus, Dr. Long's average detention times of 381, 805, and 404 (days) appear in
my table in the Mean column for the "All" section at the bottom. Similarly, her "Lowest" values
appear in my Min column and her "Highest" values appear in my Max column. Thus, as noted
earlier, when we calculate the same statistics, we get the same answer. Looking at the bottom
section of my printout, the mean overall is 404 days (bottom row) and the median is 342 days.
There is nothing wrong with giving the mean, but it would be an easy mistake for the reader to
believe that half the values were below the mean of 404 days and half above it. In fact, the
dividing line between the bottom half and the upper half is at the median of 342 days, about two
months less than the mean; there are more values below the mean of 404 days than there are
above it. The difference between the median and the mean is quite substantial; from 342 days to
404 days is an 18% increase. This difference is caused by the shape of the distribution of the
lengths of detention. With a mean of 404 but values running from 180 to 1585, it is clear that the
data are quite asymmetric (in the statistical language, they are skewed to the right, meaning that
there is a short fat tail to the left and a long skinny tail to the right). In such cases, it is better to
give the median along with, or in place of, the mean. As an example, consider yearly income,
where a small number of people have incomes of many millions of dollars, but the mean is much
less than half of that and incomes cannot go below zero. The Census Bureau generally tabulates
median incomes, not mean incomes.[5] In this case, much of the information on the distribution of
detention lengths can be approximated from Dr. Long's Table 3, but she does not give tables
parallel to Table 3 for her other tables of detention lengths.

Next, recall that the "All cases" values are biased in favor of longer detention lengths.
First, note that of the 1,000 class members in Dr. Long's analysis, 352 (35.2%) were out-of-
period and 648 (64.8%) were in-period. Thus, the out-of-period aliens responsible for the bias
form a substantial part of the data set she analyzed. To see the effect of that bias, compare the
three parts of my table; for simplicity, I will only consider the bottom row (still detained equal to
"All") of each part. I consider the most appropriate values those for the in-period aliens in the

---

[5] For example, on the first page of Highlights in <u>Income, Poverty, and Health Insurance Coverage in the United
States: 2010</u>, the word "median" occurs 18 times; neither "mean" nor "average" occurs at all. The report is at
http://www.census.gov/hhes/www/income/data/incpovhlth/2010/index.html (visited December 12, 2012); click on
Report, and go to page 5 for the "Highlights" section.

### Table 2 from Dr. Long's Report
### Average Days of Detention by Detention Category

| Detention Category | Detention Days | | |
|---|---|---|---|
| | Average | Lowest | Highest |
| No longer detained | 381 | 180 | 1,310 |
| Still detained | 805 | 558 | 1,585 |
| All cases | 404 | 180 | 1,585 |

Table L-2
Days of Detention by Detention Category

in_period No

| | | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| Still Detained | | | | | | | | | | |
| No | 333 | 94.6 | 503 | 187 | 280 | 336 | 453 | 608 | 827 | 1310 |
| Yes | 19 | 5.4 | 1026 | 562 | 571 | 933 | 1026 | 1171 | 1304 | 1585 |
| All | 352 | 100.0 | 531 | 187 | 282 | 346 | 469 | 651 | 911 | 1585 |

in_period Yes

| | | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| Still Detained | | | | | | | | | | |
| No | 613 | 94.6 | 314 | 180 | 196 | 222 | 278 | 375 | 490 | 839 |
| Yes | 35 | 5.4 | 685 | 558 | 568 | 586 | 661 | 767 | 856 | 887 |
| All | 648 | 100.0 | 334 | 180 | 197 | 224 | 286 | 408 | 558 | 887 |

All

| | | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| Still Detained | | | | | | | | | | |
| No | 946 | 94.6 | 381 | 180 | 204 | 246 | 330 | 463 | 617 | 1310 |
| Yes | 54 | 5.4 | 805 | 558 | 571 | 604 | 724 | 934 | 1118 | 1585 |
| All | 1000 | 100.0 | 404 | 180 | 205 | 249 | 342 | 499 | 673 | 1585 |

middle of the table. There the median is 286 days and the mean is 334 days. Dr. Long's values (those in the bottom part of the table for the "All" group") have median 342 days and mean 404 days. Those last values are higher than those for the in-period aliens because the values for the out-of-period aliens are higher still, with median 469 days and mean 531 days. These differences are not surprising because, as discussed above, the "All" group overrepresents aliens with long detentions. The differences between the in-period group and the "All" groups are quite substantial, both in the means (from 334 days to 404 days is a 21% increase) and in the medians (from 286 days to 342 days is a 20% increase).

The selection of the "right" number for a "typical" length of detention depends on the use to be made of the statistic. Note, though, that in this case the range of possible values is large; it goes from 286 days (the median for the in-period aliens) to 404 days (the mean for the complete data set), and from 286 days to 404 days is a 41% increase. The user of these statistics should give careful consideration to which measure is most appropriate for a particular purpose. In my opinion, if the purpose is solely to provide a number to serve as a "typical" value in an asymmetric distribution, the median is a better choice than the mean. Also, in my opinion, the values for the in-period aliens come from a more appropriate sample in terms of generalizing to the broader population of all class members. Note, by the way, that all these values (and all other values throughout both Dr. Long's report and my report) describe detention lengths only for class members; that is, for aliens detained at least 180 days. Aliens detained for shorter periods are not included in the data at all.

Finally, consider a point that Dr. Long makes in her report: Because some of the class members were still in detention, the means that she calculated are underestimates of the means that she would obtain if she had complete information on the lengths of detention. The statement is correct, but it is interesting to note that in this table the problem has no effect on the medians and very little effect on many of the other statistics. To see why, consider the middle section (the in-period aliens) of Table L-2. The row for "Still Detained" shows a minimum detention length of 558 days, so additional information could increase only those values that are already 558 days or more. Comparing that with the "All" row shows that additional information could only affect the mean, the 90th percentile, and the highest value because 558 days is already beyond all the other percentiles in the row; the median does not change. Also, in this particular table, the additional length of detention would need to be quite extreme to have a large effect even on the mean because only 5.4% of the detentions are ongoing. For example, if on the average those detentions lasted an additional year, the mean would increase by .054 years, or about 20 days. Of course, still longer stays would affect the mean by more; and there are other tables where the proportion of those still in detention is higher and therefore the additional lengths of detention might have larger effects on the mean.

C.      Differences in Interpretation for Other Tables

In this section, I will review the tables in Dr. Long's report and the interpretation of her results as it is affected by the results in Appendix C of this report. Although I will briefly mention each table, I obviously cannot discuss every number; so I will concentrate on those

situations where I believe the new tables have the most important effects on the interpretation of the results.

Looking overall, I would summarize these differences as follows: The two issues (in-period versus all and median versus mean) have substantial effects on the results of analyses of detention length. For other tables, the in-period versus all issue matters, but the median versus mean distinction does not because the tables involve only counts and percentages. For those other tables, the in-period versus all has some effect on the percentages for types of court proceedings (out-of-period aliens have more), but not much effect on other percentages such as the percentages of those applying for or receiving relief.

Dr. Long's Table 1 shows counts and percentages for how many of the class members are still detained. The proportion is almost exactly the same for in-period aliens and out-of-period aliens, and thus also for all aliens in the data.

I have discussed Dr. Long's Table 2 in detail above. Her Tables 3 and 4 provide additional detail on the distribution of lengths of detention. Because they tabulate probabilities, the mean vs. median issue does not apply to them. But it does make a difference whether the table includes all those in the data set or just the in-period aliens because the full data set includes the out-of-period aliens, who generally have longer detention periods. For example, only 33% of the in-period aliens were detained 12 months or more (i.e., 360 days or more), as compared with 47% of all aliens in the data set, the figure in Dr. Long's Table 3.

Dr. Long's Table 5 give counts and percentages for how many class members have cases involving various courts. Unsurprisingly, the out-of-period aliens, who are included in the data set only if they have long periods of detention, tend to involve more courts. For example, 30% of the in-period aliens have cases involving BIA court proceedings, compared with 46% of the out-of-period aliens and 36% of the aliens in the full data set. So, if one agrees that the results for the in-period aliens are most appropriate, Dr. Long's table, which uses the full data set, somewhat overstates the proportion of class members with BIA court proceedings and Ninth Circuit Proceedings.

Dr. Long's Table 6 shows detention length by type of court proceedings. One oddity of this table is that it does not show the 60 cases that do not follow any of the three patterns of court involvement in her tables, even though they are included in her "All cases" line. For this table, there are the same kind of differences between in-period aliens and the full data set, and between means and medians, as I discussed above for Table 6. Thus, for class members with immigration court proceedings only, Dr. Long shows a mean length of detention of 330 days; the median for this group is 294 days. For the in-period aliens in this group, the mean is 292 days and the median is 260 days. The difference between the median of the in-period group and the mean of the all group is substantial, although a bit smaller than in Table 2; from 260 days to 330 days is a 27% increase. For the in-period aliens, the 25th percentile of this group is 217 days, so 25% of them had detention lengths from 180 days to 217 days. There are similar differences for the

other groups in the table, although the pattern remains that those with more proceedings do, as expected, have longer periods of detention.

Dr. Long's Tables 7-10 show percentages for applications for relief and cases where relief was granted. There is little difference between the percentages for in-period and out-of-period aliens.

Dr. Long's Table 11 shows detention length by whether the class member filed an application for relief. Here again, there are substantial differences between in-period aliens and the full data set, and between means and medians. Thus, for those not filing any application for relief, her table shows a mean of 360 days; for in-period aliens only, the mean was 288 days and the median was 253 days. From 253 days to 360 days is a 42% increase. For those who did file applications for relief, her table shows a mean of 421 days; for in-period aliens only, the mean was 352 days and the median was 303 days. From 303 days to 421 days is a 39% increase. Thus, the combined effects on the sample and the choice of mean and median are very similar in both cases to the 41% increase in Table 2.

Dr. Long's Table 12 shows detention length by types of proceedings and whether the class member applied for relief. Note that, because of the number of combinations shown in the table, Table L-12 in Appendix C extends over three pages (although some of the numbers duplicate those in Table 6 and Table 11). Because of the complexity here, I am not going to summarize the situation except to note that there are the same kind of between in-period aliens and the full data set, and between means and medians, as in the previous tables, although the size of the effect varies from one group to another.

Dr. Long's Table 13 shows counts and percentages for case outcomes and her Table 14 shows the basis on which class members won their cases. In general, there are few dramatic differences between in-period aliens and out-of-period aliens in these tables.

Dr. Long's Table 15 shows lengths of detention by outcome. Again, there are the usual differences between in-period aliens and the full data set, and between means and medians. For simplicity, I will discuss only one in detail. For aliens who won their cases, Dr. Long's table shows a mean length of detention of 342 days. For in-period aliens who won their cases, the mean length of detention was 286 days and the median was 257 days. As usual, the overall difference is substantial; from 257 days to 342 days is a 33% increase.

Finally, Dr. Long's Table 16 shows the lengths of detention by type of proceedings for just those aliens who won their cases. Again, there are substantial differences between in-period aliens and the full data set, and between means and medians. It is also worth noting that some of these averages should be viewed with caution because they are based on very small numbers of individuals; there were 227 aliens who won their cases overall, but only 28 who won after BIA and immigration proceedings and only 6 who won after Ninth Circuit, BIA, and Immigration Court proceedings, and the counts are even smaller for just in-period aliens in these groups.

Averages (or medians, for that matter) based on such small samples may not be reliable estimates of the values that would be obtained for the entire class.

III.     More on the Lengths of Delays Attributable to Adjournments Requested by the Aliens

In this section, I provide information on lengths of detention in the context of the results in my original report regarding delays attributable to requests by the aliens.[6]  Table 4 and 5 of my first report gave information on the lengths of the delays attributable to adjournments requested by the in-period aliens, and Tables B-4 and B-5 gave similar information for out-of-period aliens and for all aliens in the data set.

The table below gives information on the proportion of the total detention time for each alien attributable to requests by the alien, where total time in detention is calculated as described in Section 2 of Appendix B.  Thus, for half of the in-period aliens, 34.2% or more of their detention time was spent in delays attributable to the alien.  That proportion was 50% or more for 28.7% of the in-period aliens, although that number cannot be read from the table below.

```
|           | Percentage of Detention Time Attributable to Alien-Requested Delays |
|           | N    | Pct   | Mean | Min | P10  | P25  | Median | P75  | P90  | Max  |
| in_period |      |       |      |     |      |      |        |      |      |      |
| No        | 348  | 34.5  | 43.5 | 0.0 | 3.4  | 21.9 | 44.6   | 64.2 | 78.6 | 95.0 |
| Yes       | 662  | 65.5  | 35.9 | 0.0 | 0.0  | 15.1 | 34.2   | 53.9 | 72.6 | 93.9 |
| All       | 1010 | 100.0 | 38.5 | 0.0 | 0.0  | 17.5 | 37.0   | 59.1 | 74.7 | 95.0 |
```

The length of time in detention that was NOT attributable to alien-requested delays may also be of some interest.  The table below gives information on the distribution of those lengths of time. For in-period aliens, the 25th percentile was 121 days and the median was 192 days.  Thus, EXCLUDING time attributable to alien-requested delays, 25% of the in-period aliens spent 121 days or less in detention and half of the in-period aliens spent 192 days or less in detention.  The total detention time EXCLUDING time attributable to alien-requested delays was under 180 days for 45.9% of the in-period aliens, although that number cannot be read from the table below.

```
|           | Days in Detention Not Including Periods Attributable to Alien-Requested Delays |
|           | N    | Pct   | Mean | Min | P10 | P25 | Median | P75 | P90 | Max  |
| in_period |      |       |      |     |     |     |        |     |     |      |
| No        | 348  | 34.5  | 331  | 20  | 81  | 146 | 237    | 462 | 703 | 1520 |
| Yes       | 662  | 65.5  | 228  | 14  | 73  | 121 | 192    | 288 | 432 | 972  |
| All       | 1010 | 100.0 | 264  | 14  | 75  | 128 | 204    | 336 | 544 | 1520 |
```

---

[6] In this section, I use the phrase "delays attributable to requests by the alien" to mean the delay between the date of a hearing that was adjourned at the request of the alien to the next hearing date for the same alien.  For more detail on the conventions I used in calculating the lengths of the delays, see pages 7 and 8 of my earlier report.

11

IV.   Statement of Compensation and Signature

The author of this report is employed by ERS Group, which currently bills his time at $475 per hour.

| December 14, 2012 | | Chester I. Palmer |
| --- | --- | --- |
| Date | | Chester I. Palmer |

Appendix A

Discussion of Appropriate Sample from my Original Report

It is my understanding that aliens were included in the data set if they had been detained by U.S. Immigration and Customs Enforcement without an individualized bond hearing before an immigration judge for at least 180 days or more as of some date in the period from April 21, 2010 through April 21, 2011 and, as of some date within that period, were being held in facilities in the Central District of California. This method of selection raises some statistical issues.

To see why, consider a simpler example. Consider a hospital that wants to draw a sample of patient stays. Suppose that, for the time period of interest, 25 patients each spent 1 day in the hospital and 1 patient, Mr. Long, spent 30 days in the hospital. There are several ways in which the hospital might draw a sample for analysis.

- <u>Individual-Based</u>: An individual-based sample might proceed from the fact that the hospital had 26 patients, and randomly sample among them. Each patient has the same probability of inclusion in this sample.

- <u>Day-Based</u>: Alternatively, the hospital might select one day and sample those patients. In this case, because Mr. Long spent 30 days in the hospital and each other patient spent only one day, Mr. Long is much more likely to be included in the sample than any of the other patients.

A sample is called "biased" (a technical term in statistics) if not all cases of interest have the same probability of selection for the sample. In the example above, the day-based sample is a biased sample of individuals because individuals with longer stays are more likely to be selected than other individuals. In the statistical language, patients with long stays are overrepresented. If the hospital uses the day-based sample for a survey of patient satisfaction, there will likely be too many patients with long stays (and presumably more serious conditions) in the sample, and their opinions will count more than the opinions of patients with shorter stays. If the typical level of satisfaction for patients with long stays is different from that of patients with shorter stays, the results of the analysis could be quite deceptive.

On the other hand, there are some purposes for which the day-based sample would be better. If the hospital wants to analyze its daily workload, the day-based sample is appropriate because Mr. Long really did make up a higher proportion of the workload than did any of the other patients.

To see the similar issue with the data set for this litigation, consider two hypothetical aliens, Mr. Short and Mr. Long, who entered custody on the same day, April 21, 2009. Mr. Short was detained for 7 months prior to his hearing, then released immediately after his hearing in November 2009. Thus, he is a class member, but he is not included in the data set because he was not in custody during the time period for the data (April 21, 2010 through April 21, 2011). Mr. Long was detained for 13 months prior to his hearing, then released immediately after his hearing in May 2010. Thus, he is a class member and he is included in the data set because he was in custody during the time period for the data. In summary, the method of selection for the data set is biased in favor of including aliens with longer periods of custody rather than those

A-1

with shorter ones.

This bias may or may not matter depending on the analyses to be performed.  For example, if one analyzes what happened during the first 180 days each alien was in custody, the bias probably does not matter (unless there was some change in procedure over time).  On the other hand, if one analyzes how long people were held in custody, or performs any other analysis that looks at lengths of time, the bias may have a substantial effect because aliens with longer periods of custody are overrepresented.

The simplest way to avoid such a bias and create an individual-based sample is to assign to each individual a single date and then use that date to determine whom to include.  In the hospital example, one might sample based on the first day each person was in the hospital, or the last day; either would give Mr. Long the same probability of selection as the other patients.  For this litigation, the most straightforward way to sample from the data set is to take those aliens in the data set for whom the 181st day of detention fell in the time period for the data (April 21, 2010 through April 21, 2011).  That has the advantage that, if one believes that 181 days from the beginning of custody is an especially important date, one has everyone for whom that date falls in the time period for the sample.  I have followed that practice, and in the body of this report I give results for only those aliens; I refer to them as "in-period".  It would be reasonable for the reader to wonder how much of a difference that makes (in fact, not much for most of my analyses), so I have included parallel tables without that restriction in Appendix B.

A-2

Appendix B

Information about the Analysis Data Sets

1.      The Accuracy of My Analysis Data Set

At my deposition in this matter, I was asked a number of questions about situations in which there appeared to be disagreements between the entries in the spreadsheet AC_Delays, which formed the principal basis for my analysis data set, and the entries in the Action Table of an EOIR Microsoft Access database also provided by respondents in discovery.  At the deposition, I pointed out that the apparent discrepancies were only a problem for my analyses if, in fact, the data I used were incorrect.

I have reviewed the declaration of Benjamin B. McDowell dated December 14, 2012. Mr. McDowell is an employee of the Executive Office of Immigration Review who routinely uses the EOIR CASE database and who used it to prepare the two data sets discussed above. McDowell Dec. ¶¶1-3.  He states that the information in my analysis database on the dates of delays and the reasons for those delays comes from the Schedule Table, the database table that is used to record and analyze that information.  Id. at ¶¶4-6.  He further states that the Action table is maintained for the purpose of auditing the addition of information to the CASE database and is designed in such a way that there is no easy way to match the information in that table with the information in the Schedule Table; therefore, the fact that the records do not match does not cause him to doubt the reliability of the information in the Schedule Table from which my analysis database is derived.  Id. at ¶7.  Thus, the apparent disagreements provide no reason for me to doubt the reliability of results based on my analysis database, either the results in my previous report or those presented in this report.

2.      Disagreements between Dr. Long's and My Analysis Data Sets

In our initial reports, Dr. Long and I both explained that we excluded certain observations from our analyses.  Dr. Long's analysis data set included 1,000 aliens; mine included 1,010. Dr. Long's data set contained 11 aliens that mine did not; mine contained 21 aliens that hers did not; and there were 989 aliens in both data sets.  So the two data sets had about 98-99% of the same individuals.  Also, I had more recent information on a small number of aliens, and I filled in some missing dates and made a few corrections in the dates.  It would be reasonable to want to know how much the differences between data sets might have affected the results.

My earlier report provided counts and percentages involving the numbers of adjournments requested by the aliens.  Dr. Long's report did not address those issues.  Dr. Long's report provided information on the lengths of detention and on the types and outcomes of relief applications and court proceedings.  My report did not address those issues.  To investigate the effects of the differences between the data sets, it is necessary to perform the same analyses on both data sets to see the extent to which they agree.  Because my report presented only counts and percentages, and because 98% of the aliens in my data set were also in Dr. Long's data set (where they formed 99% of her data), the results of my analyses would have changed little if I had run them on the aliens in her data set.  The same is true of the percentages in her report.  On the other hand, it is possible that the means might be somewhat different because a mean can be affected substantially by a few very large observations.  (This fact is one reason for preferring

the median in many situations.)  So I reran my equivalent of Dr. Long's Table 2 on my data.  The most recent date that an alien left custody in my data set was September 25, 2012.  So I treated that as the last day of detention for aliens still in custody, in parallel to the way that Dr. Long treated April 28, 2012 as the last day of detention for aliens still in custody in her data set.

The parts of the two tables for in-period aliens and for all cases are on the next page.[7] Note that because some aliens have moved from still detained in Dr. Long's analyses to not still detained in my analyses, we should not expect the "Yes" and "No" rows to be comparable.  For the "All" row for in-period aliens, Dr. Long's data set gives a mean of 334 days and a median of 286 days; my data gives a mean of 347 days and a median of 294 days.  For all aliens in the data set, Dr. Long's data gives a mean of 404 days and a median of 342 days; my data set gives a mean of 416 days and a median of 343 days.  So the differences in the means between the two data sets are small compared to the differences between the mean and median or between the difference between in-period aliens and all aliens; as expected from the fact that my data set extends later in time, the values from my data set are slightly larger than those from Dr. Long's data set.  The medians are closer still.  In fact, for the overall data set, the values at the 10th percentile, 25th percentile, and median all differ by two days or less, and the difference at the 75th percentile is only 8 days.  Except for the largest values (the 90th percentile and maximum), which are affected by the additional time added for those still in custody, the differences are small.  In general, it seems unlikely that the difference in data sets is of any practical importance in the interpretation of the results.

---

[7] The part of the table for out-of-period aliens is of little independent interest, so I have omitted it for simplicity.

B-2

## Results from Dr. Long's Data

in_period Yes

| | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| Still Detained | | | | | | | | | | |
| No | 613 | 94.6 | 314 | 180 | 196 | 222 | 278 | 375 | 490 | 839 |
| Yes | 35 | 5.4 | 685 | 558 | 568 | 586 | 661 | 767 | 856 | 887 |
| All | 648 | 100.0 | 334 | 180 | 197 | 224 | 286 | 408 | 558 | 887 |

All

| | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| Still Detained | | | | | | | | | | |
| No | 946 | 94.6 | 381 | 180 | 204 | 246 | 330 | 463 | 617 | 1310 |
| Yes | 54 | 5.4 | 805 | 558 | 571 | 604 | 724 | 934 | 1118 | 1585 |
| All | 1000 | 100.0 | 404 | 180 | 205 | 249 | 342 | 499 | 673 | 1585 |

## Results from My Data

in_period Yes

| | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| Still Detained | | | | | | | | | | |
| No | 643 | 97.1 | 332 | 180 | 197 | 223 | 287 | 401 | 530 | 954 |
| Yes | 19 | 2.9 | 854 | 713 | 733 | 754 | 827 | 943 | 1021 | 1037 |
| All | 662 | 100.0 | 347 | 180 | 197 | 224 | 294 | 415 | 567 | 1037 |

All

| | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| Still Detained | | | | | | | | | | |
| No | 983 | 97.3 | 401 | 180 | 204 | 247 | 336 | 492 | 680 | 1685 |
| Yes | 27 | 2.7 | 952 | 713 | 736 | 802 | 917 | 1084 | 1232 | 1366 |
| All | 1010 | 100.0 | 416 | 180 | 205 | 251 | 343 | 507 | 735 | 1685 |

B-3

Appendix C

Tables Using Dr. Long's Data Parallel to Tables 1 to 16 in Her Report

Table L-1
Cases by Detention Category as of April 28, 2012

| Detention Category | in_period | | | | All | |
| | No | | Yes | | | |
| | Count | Pct | Count | Pct | Count | Pct |
| No longer detained | 333 | 94.6 | 613 | 94.6 | 946 | 94.6 |
| Still detained | 19 | 5.4 | 35 | 5.4 | 54 | 5.4 |
| All | 352 | 100.0 | 648 | 100.0 | 1000 | 100.0 |

C-1

Table L-2
Days of Detention by Detention Category

in_period No

| | | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| Still Detained | | | | | | | | | | |
| No | 333 | 94.6 | 503 | 187 | 280 | 336 | 453 | 608 | 827 | 1310 |
| Yes | 19 | 5.4 | 1026 | 562 | 571 | 933 | 1026 | 1171 | 1304 | 1585 |
| All | 352 | 100.0 | 531 | 187 | 282 | 346 | 469 | 651 | 911 | 1585 |

in_period Yes

| | | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| Still Detained | | | | | | | | | | |
| No | 613 | 94.6 | 314 | 180 | 196 | 222 | 278 | 375 | 490 | 839 |
| Yes | 35 | 5.4 | 685 | 558 | 568 | 586 | 661 | 767 | 856 | 887 |
| All | 648 | 100.0 | 334 | 180 | 197 | 224 | 286 | 408 | 558 | 887 |

All

| | | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| Still Detained | | | | | | | | | | |
| No | 946 | 94.6 | 381 | 180 | 204 | 246 | 330 | 463 | 617 | 1310 |
| Yes | 54 | 5.4 | 805 | 558 | 571 | 604 | 724 | 934 | 1118 | 1585 |
| All | 1000 | 100.0 | 404 | 180 | 205 | 249 | 342 | 499 | 673 | 1585 |

C-2

Table L-3
Cases by Detention Period

| Detention Period | in_period | | | | | | | | All | | | |
| | No | | | | Yes | | | | | | | |
| | Detention That Long? | | | | Detention That Long? | | | | Detention That Long? | | | |
| | No | | Yes | | No | | Yes | | No | | Yes | |
| | N | Pct | N | Pct | N | Pct | N | Pct | N | Pct | N | Pct |
| 06 months or more | 0 | 0 | 352 | 100.0 | 0 | 0 | 648 | 100.0 | 0 | 0 | 1000 | 100.0 |
| 07 months or more | 3 | 0.9 | 349 | 99.1 | 112 | 17.3 | 536 | 82.7 | 115 | 11.5 | 885 | 88.5 |
| 08 months or more | 12 | 3.4 | 340 | 96.6 | 207 | 31.9 | 441 | 68.1 | 219 | 21.9 | 781 | 78.1 |
| 09 months or more | 27 | 7.7 | 325 | 92.3 | 287 | 44.3 | 361 | 55.7 | 314 | 31.4 | 686 | 68.6 |
| 10 months or more | 52 | 14.8 | 300 | 85.2 | 357 | 55.1 | 291 | 44.9 | 409 | 40.9 | 591 | 59.1 |
| 11 months or more | 77 | 21.9 | 275 | 78.1 | 396 | 61.1 | 252 | 38.9 | 473 | 47.3 | 527 | 52.7 |
| 12 months or more | 97 | 27.6 | 255 | 72.4 | 434 | 67.0 | 214 | 33.0 | 531 | 53.1 | 469 | 46.9 |
| 13 months or more | 125 | 35.5 | 227 | 64.5 | 470 | 72.5 | 178 | 27.5 | 595 | 59.5 | 405 | 40.5 |
| 14 months or more | 149 | 42.3 | 203 | 57.7 | 498 | 76.9 | 150 | 23.1 | 647 | 64.7 | 353 | 35.3 |
| 15 months or more | 162 | 46.0 | 190 | 54.0 | 529 | 81.6 | 119 | 18.4 | 691 | 69.1 | 309 | 30.9 |
| 16 months or more | 182 | 51.7 | 170 | 48.3 | 545 | 84.1 | 103 | 15.9 | 727 | 72.7 | 273 | 27.3 |
| 17 months or more | 197 | 56.0 | 155 | 44.0 | 565 | 87.2 | 83 | 12.8 | 762 | 76.2 | 238 | 23.8 |
| 18 months or more | 218 | 61.9 | 134 | 38.1 | 577 | 89.0 | 71 | 11.0 | 795 | 79.5 | 205 | 20.5 |
| 24 months or more | 282 | 80.1 | 70 | 19.9 | 632 | 97.5 | 16 | 2.5 | 914 | 91.4 | 86 | 8.6 |

Notes:  A "month" is defined as a 30-day period.
        Some class members were still detained at the end of the analysis period, so the counts for 24 months
            may be underestimates.

C-3

Table L-4
Probability of Continued Detention

in_period No

| | Still detained at 12 months | | | | Still detained at 18 months | | | | Still detained at 24 months | | | |
| | No | | Yes | | No | | Yes | | No | | Yes | |
| | N | Pct | N | Pct | N | Pct | N | Pct | N | Pct | N | Pct |
| start_per | | | | | | | | | | | | |
| Those detained 07 months | 94 | 26.9 | 255 | 73.1 | 215 | 61.6 | 134 | 38.4 | 279 | 79.9 | 70 | 20.1 |
| Those detained 08 months | 85 | 25.0 | 255 | 75.0 | 206 | 60.6 | 134 | 39.4 | 270 | 79.4 | 70 | 20.6 |
| Those detained 09 months | 70 | 21.5 | 255 | 78.5 | 191 | 58.8 | 134 | 41.2 | 255 | 78.5 | 70 | 21.5 |
| Those detained 10 months | 45 | 15.0 | 255 | 85.0 | 166 | 55.3 | 134 | 44.7 | 230 | 76.7 | 70 | 23.3 |
| Those detained 11 months | 20 | 7.3 | 255 | 92.7 | 141 | 51.3 | 134 | 48.7 | 205 | 74.5 | 70 | 25.5 |
| Those detained 12 months | 0 | 0 | 255 | 100.0 | 121 | 47.5 | 134 | 52.5 | 185 | 72.5 | 70 | 27.5 |

in_period Yes

| | Still detained at 12 months | | | | Still detained at 18 months | | | | Still detained at 24 months | | | |
| | No | | Yes | | No | | Yes | | No | | Yes | |
| | N | Pct | N | Pct | N | Pct | N | Pct | N | Pct | N | Pct |
| start_per | | | | | | | | | | | | |
| Those detained 07 months | 322 | 60.1 | 214 | 39.9 | 465 | 86.8 | 71 | 13.2 | 520 | 97.0 | 16 | 3.0 |
| Those detained 08 months | 227 | 51.5 | 214 | 48.5 | 370 | 83.9 | 71 | 16.1 | 425 | 96.4 | 16 | 3.6 |
| Those detained 09 months | 147 | 40.7 | 214 | 59.3 | 290 | 80.3 | 71 | 19.7 | 345 | 95.6 | 16 | 4.4 |
| Those detained 10 months | 77 | 26.5 | 214 | 73.5 | 220 | 75.6 | 71 | 24.4 | 275 | 94.5 | 16 | 5.5 |
| Those detained 11 months | 38 | 15.1 | 214 | 84.9 | 181 | 71.8 | 71 | 28.2 | 236 | 93.7 | 16 | 6.3 |
| Those detained 12 months | 0 | 0 | 214 | 100.0 | 143 | 66.8 | 71 | 33.2 | 198 | 92.5 | 16 | 7.5 |

All

| | Still detained at 12 months | | | | Still detained at 18 months | | | | Still detained at 24 months | | | |
| | No | | Yes | | No | | Yes | | No | | Yes | |
| | N | Pct | N | Pct | N | Pct | N | Pct | N | Pct | N | Pct |
| start_per | | | | | | | | | | | | |
| Those detained 07 months | 416 | 47.0 | 469 | 53.0 | 680 | 76.8 | 205 | 23.2 | 799 | 90.3 | 86 | 9.7 |
| Those detained 08 months | 312 | 39.9 | 469 | 60.1 | 576 | 73.8 | 205 | 26.2 | 695 | 89.0 | 86 | 11.0 |
| Those detained 09 months | 217 | 31.6 | 469 | 68.4 | 481 | 70.1 | 205 | 29.9 | 600 | 87.5 | 86 | 12.5 |
| Those detained 10 months | 122 | 20.6 | 469 | 79.4 | 386 | 65.3 | 205 | 34.7 | 505 | 85.4 | 86 | 14.6 |
| Those detained 11 months | 58 | 11.0 | 469 | 89.0 | 322 | 61.1 | 205 | 38.9 | 441 | 83.7 | 86 | 16.3 |
| Those detained 12 months | 0 | 0 | 469 | 100.0 | 264 | 56.3 | 205 | 43.7 | 383 | 81.7 | 86 | 18.3 |

Note: A "month" is defined as a 30-day period.

C-4

Table L-5
Court Involvement in Cases

| | in_period | | | | All | |
| | No | | Yes | | | |
| | N | Pct | N | Pct | N | Pct |
|---|---|---|---|---|---|---|
| All | 352 | 100.0 | 648 | 100.0 | 1000 | 100.0 |
| Immigration Court Proceeding(s) | | | | | | |
| No | 23 | 6.5 | 34 | 5.2 | 57 | 5.7 |
| Yes | 329 | 93.5 | 614 | 94.8 | 943 | 94.3 |
| BIA Court Proceeding(s) | | | | | | |
| No | 189 | 53.7 | 455 | 70.2 | 644 | 64.4 |
| Yes | 163 | 46.3 | 193 | 29.8 | 356 | 35.6 |
| 9th Circuit Court Proceeding(s) | | | | | | |
| No | 257 | 73.0 | 546 | 84.3 | 803 | 80.3 |
| Yes | 95 | 27.0 | 102 | 15.7 | 197 | 19.7 |

C-5

Table L-6
Days of Detention by Court Involvement

in_period No

| | Length of Detention (days) | | | | | | | | |
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
|---|---|---|---|---|---|---|---|---|---|---|
| Proceedings | | | | | | | | | | |
| 1: Immigration Court Only | 184 | 52.3 | 422 | 187 | 266 | 304 | 388 | 491 | 648 | 1092 |
| 2: BIA and Immigration | 68 | 19.3 | 532 | 216 | 280 | 394 | 519 | 646 | 759 | 1104 |
| 3: 9th Cir, BIA, and Imm | 77 | 21.9 | 776 | 281 | 457 | 579 | 726 | 970 | 1133 | 1585 |
| Other | 23 | 6.5 | 580 | 329 | 335 | 359 | 468 | 833 | 973 | 1082 |
| All | 352 | 100.0 | 531 | 187 | 282 | 346 | 469 | 651 | 911 | 1585 |

in_period Yes

| | Length of Detention (days) | | | | | | | | |
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
|---|---|---|---|---|---|---|---|---|---|---|
| Proceedings | | | | | | | | | | |
| 1: Immigration Court Only | 447 | 69.0 | 292 | 180 | 195 | 217 | 260 | 340 | 435 | 831 |
| 2: BIA and Immigration | 88 | 13.6 | 383 | 180 | 227 | 276 | 354 | 477 | 563 | 800 |
| 3: 9th Cir, BIA, and Imm | 76 | 11.7 | 556 | 188 | 308 | 419 | 573 | 661 | 796 | 887 |
| Other | 37 | 5.7 | 278 | 180 | 188 | 199 | 239 | 335 | 423 | 591 |
| All | 648 | 100.0 | 334 | 180 | 197 | 224 | 286 | 408 | 558 | 887 |

All

| | Length of Detention (days) | | | | | | | | |
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
|---|---|---|---|---|---|---|---|---|---|---|
| Proceedings | | | | | | | | | | |
| 1: Immigration Court Only | 631 | 63.1 | 330 | 180 | 201 | 231 | 294 | 395 | 499 | 1092 |
| 2: BIA and Immigration | 156 | 15.6 | 448 | 180 | 252 | 296 | 421 | 547 | 697 | 1104 |
| 3: 9th Cir, BIA, and Imm | 153 | 15.3 | 667 | 188 | 377 | 504 | 621 | 824 | 1009 | 1585 |
| Other | 60 | 6.0 | 393 | 180 | 194 | 217 | 335 | 454 | 752 | 1082 |
| All | 1000 | 100.0 | 404 | 180 | 205 | 249 | 342 | 499 | 673 | 1585 |

Table L-7A
Whether Filed Relief Application

|  | in_period | | | | All | |
|  | No | | Yes | | | |
| Applied for Relief | N | Pct | N | Pct | N | Pct |
|---|---|---|---|---|---|---|
| No | 105 | 29.8 | 182 | 28.1 | 287 | 28.7 |
| Yes | 247 | 70.2 | 466 | 71.9 | 713 | 71.3 |
| All | 352 | 100.0 | 648 | 100.0 | 1000 | 100.0 |

Table L-7B
Whether Relief Granted by IJ

|  | in_period | | | | All | |
|  | No | | Yes | | | |
| Granted Relief | N | Pct | N | Pct | N | Pct |
|---|---|---|---|---|---|---|
| No | 167 | 67.6 | 295 | 63.3 | 462 | 64.8 |
| Yes | 80 | 32.4 | 171 | 36.7 | 251 | 35.2 |
| All | 247 | 100.0 | 466 | 100.0 | 713 | 100.0 |

Table L-7C
Whether Relief Granted is Final Outcome

|  | in_period | | | | All | |
|  | No | | Yes | | | |
| Granted Final Relief | N | Pct | N | Pct | N | Pct |
|---|---|---|---|---|---|---|
| No | 7 | 8.8 | 15 | 8.8 | 22 | 8.8 |
| Yes | 73 | 91.3 | 156 | 91.2 | 229 | 91.2 |
| All | 80 | 100.0 | 171 | 100.0 | 251 | 100.0 |

Notes:  Final outcome still pending on 12 cases granted relef by IJ.
        In 10 cases, initial decision was overturned or alien left country for other reasons.

C-7

Table L-8
Relief Applications Filed by Type

| | in_period | | | | | |
|---|---|---|---|---|---|---|
| | No | | Yes | | All | |
| | N | Pct | N | Pct | N | Pct |
| Did not File for Relief | | | | | | |
|    None | 105 | 29.8 | 182 | 28.1 | 287 | 28.7 |
|    All | 105 | 29.8 | 182 | 28.1 | 287 | 28.7 |
| Filed for Relief | | | | | | |
|    Only applying for WOR/WCAT | 8 | 2.3 | 20 | 3.1 | 28 | 2.8 |
|    Other types of applications | 141 | 40.1 | 288 | 44.4 | 429 | 42.9 |
|    EOIR-42A applications filed | 98 | 27.8 | 158 | 24.4 | 256 | 25.6 |
|    All | 247 | 70.2 | 466 | 71.9 | 713 | 71.3 |
| All | 352 | 100.0 | 648 | 100.0 | 1000 | 100.0 |

Table L-9
Results of Applications for Cancellation of Removal under 240A(a)

|  | in_period | | | | All | |
|---|---|---|---|---|---|---|
|  | No | | Yes | | | |
|  | N | Pct | N | Pct | N | Pct |
| Granted Relief by IJ | | | | | | |
| No | 52 | 53.1 | 76 | 48.1 | 128 | 50.0 |
| Yes | 46 | 46.9 | 82 | 51.9 | 128 | 50.0 |
| All | 98 | 100.0 | 158 | 100.0 | 256 | 100.0 |

C-9

Table L-10A
Whether Filed for Relief (Excluding Those Filing Only for Withholding of Removal and/or WCAT)

|  | in_period | | | | | |
|  | No | | Yes | | All | |
|  | N | Pct | N | Pct | N | Pct |
| Filed for Relief | | | | | | |
| No | 113 | 32.1 | 202 | 31.2 | 315 | 31.5 |
| Yes | 239 | 67.9 | 446 | 68.8 | 685 | 68.5 |
| All | 352 | 100.0 | 648 | 100.0 | 1000 | 100.0 |

Table L-10B
Whether Relief Granted by IJ
Among Those Who Filed for Relief (Excluding Those Filing Only for Withholding of Removal and/or WCAT)

|  | in_period | | | | | |
|  | No | | Yes | | All | |
|  | N | Pct | N | Pct | N | Pct |
| grt_relief2 | | | | | | |
| No | 169 | 70.7 | 294 | 65.9 | 463 | 67.6 |
| Yes | 70 | 29.3 | 152 | 34.1 | 222 | 32.4 |
| All | 239 | 100.0 | 446 | 100.0 | 685 | 100.0 |

Table L-10C
Whether Relief Granted is Final Outcome Among Those Granted Relief by IJ
Among Those Who Filed for Relief (Excluding Those Filing Only for Withholding of Removal and/or WCAT)

|  | in_period | | | | | |
|  | No | | Yes | | All | |
|  | N | Pct | N | Pct | N | Pct |
| won_relief2 | | | | | | |
| No | 3 | 4.3 | 3 | 2.0 | 6 | 2.7 |
| Yes | 67 | 95.7 | 149 | 98.0 | 216 | 97.3 |
| All | 70 | 100.0 | 152 | 100.0 | 222 | 100.0 |

C-10

Table L-11
Detention Times by Whether Application for Relief Filed

in_period No

| Filed For Relief | N | Pct | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| No | 105 | 29.8 | 484 | 187 | 257 | 310 | 388 | 531 | 960 | 1304 |
| Yes | 247 | 70.2 | 551 | 217 | 294 | 377 | 506 | 672 | 901 | 1585 |
| All | 352 | 100.0 | 531 | 187 | 282 | 346 | 469 | 651 | 911 | 1585 |

in_period Yes

| Filed For Relief | N | Pct | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| No | 182 | 28.1 | 288 | 180 | 192 | 210 | 253 | 336 | 420 | 759 |
| Yes | 466 | 71.9 | 352 | 180 | 199 | 232 | 303 | 433 | 568 | 887 |
| All | 648 | 100.0 | 334 | 180 | 197 | 224 | 286 | 408 | 558 | 887 |

All

| Filed For Relief | N | Pct | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| No | 287 | 28.7 | 360 | 180 | 198 | 227 | 289 | 409 | 591 | 1304 |
| Yes | 713 | 71.3 | 421 | 180 | 213 | 262 | 367 | 529 | 706 | 1585 |
| All | 1000 | 100.0 | 404 | 180 | 205 | 249 | 342 | 499 | 673 | 1585 |

Table L-12
Detention Times by Type of Proceedings and Whether Filed for Relief

in_period No

| | | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| **1: Immigration Court Only** | | | | | | | | | | |
| Did not File for Relief | 46 | 13.1 | 337 | 187 | 226 | 268 | 315 | 388 | 455 | 928 |
| Filed for Relief | 138 | 39.2 | 451 | 217 | 282 | 321 | 413 | 538 | 671 | 1092 |
| All | 184 | 52.3 | 422 | 187 | 266 | 304 | 388 | 491 | 648 | 1092 |
| **2: BIA and Immigration** | | | | | | | | | | |
| Did not File for Relief | 13 | 3.7 | 453 | 216 | 254 | 310 | 387 | 516 | 562 | 1104 |
| Filed for Relief | 55 | 15.6 | 551 | 230 | 295 | 452 | 534 | 687 | 759 | 922 |
| All | 68 | 19.3 | 532 | 216 | 280 | 394 | 519 | 646 | 759 | 1104 |
| **3: 9th Cir, BIA, and Imm** | | | | | | | | | | |
| Did not File for Relief | 24 | 6.8 | 688 | 285 | 377 | 483 | 565 | 981 | 1118 | 1304 |
| Filed for Relief | 53 | 15.1 | 815 | 281 | 576 | 625 | 799 | 970 | 1133 | 1585 |
| All | 77 | 21.9 | 776 | 281 | 457 | 579 | 726 | 970 | 1133 | 1585 |
| **Other** | | | | | | | | | | |
| Did not File for Relief | 22 | 6.3 | 589 | 329 | 335 | 359 | 485 | 833 | 973 | 1082 |
| Filed for Relief | 1 | 0.3 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 |
| All | 23 | 6.5 | 580 | 329 | 335 | 359 | 468 | 833 | 973 | 1082 |
| **All** | | | | | | | | | | |
| Did not File for Relief | 105 | 29.8 | 484 | 187 | 257 | 310 | 388 | 531 | 960 | 1304 |
| Filed for Relief | 247 | 70.2 | 551 | 217 | 294 | 377 | 506 | 672 | 901 | 1585 |
| All | 352 | 100.0 | 531 | 187 | 282 | 346 | 469 | 651 | 911 | 1585 |

<Table continues on next page>

Table L-12 (continued)
Detention Times by Type of Proceedings and Whether Filed for Relief

in_period Yes

|  | | Length of Detention (days) | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| 1: Immigration Court Only | | | | | | | | | | |
| Did not File for Relief | 112 | 17.3 | 258 | 180 | 190 | 205 | 236 | 287 | 350 | 621 |
| Filed for Relief | 335 | 51.7 | 303 | 180 | 196 | 222 | 272 | 361 | 449 | 831 |
| All | 447 | 69.0 | 292 | 180 | 195 | 217 | 260 | 340 | 435 | 831 |
| 2: BIA and Immigration | | | | | | | | | | |
| Did not File for Relief | 22 | 3.4 | 307 | 182 | 227 | 265 | 293 | 350 | 414 | 430 |
| Filed for Relief | 66 | 10.2 | 409 | 180 | 238 | 278 | 387 | 500 | 642 | 800 |
| All | 88 | 13.6 | 383 | 180 | 227 | 276 | 354 | 477 | 563 | 800 |
| 3: 9th Cir, BIA, and Imm | | | | | | | | | | |
| Did not File for Relief | 14 | 2.2 | 512 | 188 | 293 | 415 | 549 | 603 | 661 | 759 |
| Filed for Relief | 62 | 9.6 | 566 | 193 | 336 | 422 | 582 | 668 | 824 | 887 |
| All | 76 | 11.7 | 556 | 188 | 308 | 419 | 573 | 661 | 796 | 887 |
| Other | | | | | | | | | | |
| Did not File for Relief | 34 | 5.2 | 285 | 181 | 192 | 209 | 261 | 336 | 423 | 591 |
| Filed for Relief | 3 | 0.5 | 189 | 180 | 180 | 180 | 188 | 199 | 199 | 199 |
| All | 37 | 5.7 | 278 | 180 | 188 | 199 | 239 | 335 | 423 | 591 |
| All | | | | | | | | | | |
| Did not File for Relief | 182 | 28.1 | 288 | 180 | 192 | 210 | 253 | 336 | 420 | 759 |
| Filed for Relief | 466 | 71.9 | 352 | 180 | 199 | 232 | 303 | 433 | 568 | 887 |
| All | 648 | 100.0 | 334 | 180 | 197 | 224 | 286 | 408 | 558 | 887 |

<Table continues on next page>

C-13

Table L-12 (continued)
Detention Times by Type of Proceedings and Whether Filed for Relief

in_period All

| | | | Length of Detention (days) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| **1: Immigration Court Only** | | | | | | | | | | |
| Did not File for Relief | 158 | 15.8 | 281 | 180 | 195 | 211 | 257 | 322 | 404 | 928 |
| Filed for Relief | 473 | 47.3 | 346 | 180 | 203 | 240 | 307 | 422 | 531 | 1092 |
| All | 631 | 63.1 | 330 | 180 | 201 | 231 | 294 | 395 | 499 | 1092 |
| **2: BIA and Immigration** | | | | | | | | | | |
| Did not File for Relief | 35 | 3.5 | 361 | 182 | 227 | 265 | 315 | 414 | 516 | 1104 |
| Filed for Relief | 121 | 12.1 | 473 | 180 | 259 | 335 | 471 | 587 | 713 | 922 |
| All | 156 | 15.6 | 448 | 180 | 252 | 296 | 421 | 547 | 697 | 1104 |
| **3: 9th Cir, BIA, and Imm** | | | | | | | | | | |
| Did not File for Relief | 38 | 3.8 | 623 | 188 | 359 | 457 | 562 | 715 | 1039 | 1304 |
| Filed for Relief | 115 | 11.5 | 681 | 193 | 381 | 540 | 652 | 846 | 982 | 1585 |
| All | 153 | 15.3 | 667 | 188 | 377 | 504 | 621 | 824 | 1009 | 1585 |
| **Other** | | | | | | | | | | |
| Did not File for Relief | 56 | 5.6 | 405 | 181 | 197 | 231 | 336 | 481 | 833 | 1082 |
| Filed for Relief | 4 | 0.4 | 234 | 180 | 180 | 184 | 194 | 285 | 370 | 370 |
| All | 60 | 6.0 | 393 | 180 | 194 | 217 | 335 | 454 | 752 | 1082 |
| **All** | | | | | | | | | | |
| Did not File for Relief | 287 | 28.7 | 360 | 180 | 198 | 227 | 289 | 409 | 591 | 1304 |
| Filed for Relief | 713 | 71.3 | 421 | 180 | 213 | 262 | 367 | 529 | 706 | 1585 |
| All | 1000 | 100.0 | 404 | 180 | 205 | 249 | 342 | 499 | 673 | 1585 |

Table L-13
Outcomes of Cases as of April 28, 2012

|  | in_period | | | | All | |
|  | No | | Yes | | | |
| | N | Pct | N | Pct | N | Pct |
| outcome | | | | | | |
| Won case | 87 | 24.7 | 176 | 27.2 | 263 | 26.3 |
| Case still pending | 58 | 16.5 | 102 | 15.7 | 160 | 16.0 |
| Deportation ordered (not departed) | 19 | 5.4 | 68 | 10.5 | 87 | 8.7 |
| Voluntary departure | 12 | 3.4 | 34 | 5.2 | 46 | 4.6 |
| Removal | 176 | 50.0 | 268 | 41.4 | 444 | 44.4 |
| All | 352 | 100.0 | 648 | 100.0 | 1000 | 100.0 |

C-15

Table L-14
Basis for Winning Case

| Basis | in_period | | | | All | |
| | No | | Yes | | | |
| | N | Pct | N | Pct | N | Pct |
|---|---|---|---|---|---|---|
| Case terminated | 14 | 16.1 | 20 | 11.4 | 34 | 12.9 |
| Individual won case | 73 | 83.9 | 156 | 88.6 | 229 | 87.1 |
| All | 87 | 100.0 | 176 | 100.0 | 263 | 100.0 |

C-16

Table L-15
Detention Times by Outcome

in_period No

| | N | Pct | Length of Detention (days) | | | | | | | |
| | | | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
|---|---|---|---|---|---|---|---|---|---|---|
| Won case | 87 | 24.7 | 456 | 216 | 300 | 336 | 429 | 561 | 659 | 848 |
| Case still pending | 58 | 16.5 | 696 | 187 | 285 | 388 | 642 | 970 | 1133 | 1585 |
| Deportation ordered (not departed) | 19 | 5.4 | 590 | 260 | 300 | 329 | 560 | 828 | 1104 | 1310 |
| Voluntary departure | 12 | 3.4 | 371 | 261 | 266 | 285 | 389 | 437 | 455 | 531 |
| Removal | 176 | 50.0 | 519 | 206 | 272 | 344 | 483 | 654 | 877 | 1133 |
| All | 352 | 100.0 | 531 | 187 | 282 | 346 | 469 | 651 | 911 | 1585 |

in_period Yes

| | N | Pct | Length of Detention (days) | | | | | | | |
| | | | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
|---|---|---|---|---|---|---|---|---|---|---|
| Won case | 176 | 27.2 | 286 | 180 | 188 | 214 | 257 | 336 | 421 | 706 |
| Case still pending | 102 | 15.7 | 459 | 181 | 201 | 248 | 436 | 636 | 759 | 887 |
| Deportation ordered (not departed) | 68 | 10.5 | 360 | 180 | 203 | 249 | 303 | 467 | 563 | 763 |
| Voluntary departure | 34 | 5.2 | 281 | 180 | 183 | 202 | 236 | 359 | 440 | 561 |
| Removal | 268 | 41.4 | 319 | 180 | 201 | 229 | 287 | 370 | 496 | 831 |
| All | 648 | 100.0 | 334 | 180 | 197 | 224 | 286 | 408 | 558 | 887 |

All

| | N | Pct | Length of Detention (days) | | | | | | | |
| | | | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
|---|---|---|---|---|---|---|---|---|---|---|
| Won case | 263 | 26.3 | 342 | 180 | 197 | 224 | 308 | 413 | 548 | 848 |
| Case still pending | 160 | 16.0 | 545 | 181 | 217 | 293 | 500 | 715 | 938 | 1585 |
| Deportation ordered (not departed) | 87 | 8.7 | 410 | 180 | 229 | 262 | 355 | 498 | 604 | 1310 |
| Voluntary departure | 46 | 4.6 | 305 | 180 | 188 | 224 | 270 | 383 | 452 | 561 |
| Removal | 444 | 44.4 | 398 | 180 | 209 | 260 | 339 | 495 | 661 | 1133 |
| All | 1000 | 100.0 | 404 | 180 | 205 | 249 | 342 | 499 | 673 | 1585 |

C-17

Table L-16
Detention Times for Class Members who Won Case by Type of Proceedings

in_period No

| | | | Length of Detention (days) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| 1: Immigration Court Only | 68 | 78.2 | 430 | 246 | 288 | 332 | 407 | 506 | 600 | 764 |
| 2: BIA and Immigration | 16 | 18.4 | 578 | 216 | 310 | 473 | 598 | 720 | 805 | 848 |
| 3: 9th Cir, BIA, and Imm | 2 | 2.3 | 415 | 387 | 387 | 387 | 415 | 442 | 442 | 442 |
| Other | 1 | 1.1 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 |
| All | 87 | 100.0 | 456 | 216 | 300 | 336 | 429 | 561 | 659 | 848 |

in_period Yes

| | | | Length of Detention (days) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| 1: Immigration Court Only | 159 | 90.3 | 273 | 180 | 188 | 213 | 252 | 319 | 407 | 567 |
| 2: BIA and Immigration | 12 | 6.8 | 416 | 180 | 202 | 312 | 396 | 524 | 646 | 706 |
| 3: 9th Cir, BIA, and Imm | 4 | 2.3 | 435 | 343 | 343 | 362 | 429 | 508 | 540 | 540 |
| Other | 1 | 0.6 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 |
| All | 176 | 100.0 | 286 | 180 | 188 | 214 | 257 | 336 | 421 | 706 |

All

| | | | Length of Detention (days) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | N | Pct | Mean | Min | P10 | P25 | Median | P75 | P90 | Max |
| 1: Immigration Court Only | 227 | 86.3 | 320 | 180 | 195 | 222 | 293 | 393 | 490 | 764 |
| 2: BIA and Immigration | 28 | 10.6 | 509 | 180 | 216 | 356 | 512 | 673 | 752 | 848 |
| 3: 9th Cir, BIA, and Imm | 6 | 2.3 | 428 | 343 | 343 | 380 | 415 | 476 | 540 | 540 |
| Other | 2 | 0.8 | 262 | 188 | 188 | 188 | 262 | 335 | 335 | 335 |
| All | 263 | 100.0 | 342 | 180 | 197 | 224 | 308 | 413 | 548 | 848 |

# EXHIBIT N

ICE-RPD-000058        **U.S. Department of Homeland Security**
Detention and Removal Operations



**U.S. Immigration
and Customs
Enforcement**

May 10, 2011

Name, A number
Address
Address

Re:  Custody Status Review

Name:

This letter is to inform you that your custody status has been reviewed under section 236(a) of
the Immigration and Nationality Act, as amended (INA), pursuant to the decisions of the
United States Court of Appeals for the Ninth Circuit in *Prieto-Romero v. Clark*, 534 F.3d 1053
(9th Cir. Jul. 25, 2008), and/or *Casas-Castrillon v. DHS*, 535 F.3d 942 (9th Cir. Jul. 25, 2008).
This custody decision has been made based on a review of your file and consideration of any
information you previously submitted to U.S. Immigration and Customs Enforcement's (ICE)
reviewing officials.  For the following reasons, ICE has reviewed your custody status and has
determined that you will [not be released from custody] *or* [be released from custody on
$_____ bond] at this time.

[A review of your criminal record reveals (list criminal convictions)].  [Articulate any basis for
flight risk and/or danger to the community.]

On [date], an Immigration Judge found you removable based on [your aggravated felony
conviction] and ordered you removed to _____.  The Board of Immigration Appeals
(Board) affirmed that finding on [date].  At the time of the Board's decision, your removal
order became administratively final.  You then timely filed a Petition for Review (PFR) of that
decision on [date], along with a request to stay your removal.  That PFR is still pending before
the Ninth Circuit Court of Appeals [or, your case has been remanded to the Board on _____].

[Based on your criminal history and the resulting convictions, you have failed to establish that
you are not a danger to the community/in light of _____ history, you are considered a flight
risk/etc.]  In addition, if your PFR is ultimately unsuccessful, your removal is reasonably
foreseeable in that ICE is able to effectuate removals to _____, and there are no known
impediments to removal at this time.  Thus, in light of the above, I have determined, in my
discretion, that you will [not be released from the custody of ICE] *or* [be released from custody
on $_____ bond] at this time.

Pursuant to the above-named Ninth Circuit decisions, you may request a review of this custody
determination from an Immigration Judge. *See* 8 C.F.R. § 1003.19; Chapter 9 of the
Immigration Court Practice Manual; www.usdoj.gov/eoir.

ICE58

Name, A number

Page 2 of 3

ICE-RPD-000059

_____

Name
Title

ICE59

# EXHIBIT O

**Michael Kaufman**

| | |
|---|---|
| **From:** | Lawrence, Victor (CIV) [Victor.Lawrence@usdoj.gov] |
| **Sent:** | Tuesday, September 11, 2012 8:51 PM |
| **To:** | Ahilan Arulanantham |
| **Cc:** | STEINBERGM@sullcrom.com; LichaaS@sullcrom.com; Marisol Orihuela; Go, Samuel (CIV); Ihsanullah, Neelam (CIV) |
| **Subject:** | Re: Franco -- Sampling Compromise & Other Discovery Issues |

Ahilan,

I write regarding several discovery issues in advance of our discovery hearing with Judge Bristow tomorrow.

First, I'm disappointed that Plaintiffs receded on what I had thought was a tentative agreement on some issues related to the random sample. When we left on Friday, I thought we had general agreement that we would have two random samples of approximately 100 files each -- one with the file sample you preferred, and one with the sample Defendants preferred. Then, I received your "compromise" proposal which was entirely different than what we discussed.

In any event, you asked for a response. Defendants do not really view your proposed sample as "random." It's essentially a revised discovery request seeking 200 files from various sets. Defendants continue to view the request for 200 files as unnecessarily large and burdensome.

However, if Plaintiffs can substantially reduce the number of files and simultaneously not object to a production schedule that will allow Defendants appropriate flexibility to make a rolling production over a reasonable period of time, we might be able to come to an agreement on the pools of files Plaintiffs seek.

If so, Defendants would need agreement on several issues:

1. Defendants would make no waiver to the argument that Plaintiffs' overall batch of files is not representative of the entire batch as a whole. (We could potentially agree to waive arguments that files chosen randomly from various pools are not representative of other files in the pool.)

2. In addition to the files Plaintiffs seek, Defendants would randomly choose a batch of files from the Notice Group and use those files to make any necessary arguments about the effectiveness of Defendants' procedures. Of course, we retain the right to make any and all arguments of effectiveness/adequacy of procedures based on Plaintiffs' batch as well. Similarly, Plaintiffs can make similar arguments about Defendants' batch, but we would have a reciprocal agreement concerning Plaintiffs' waiver of arguments about Defendants' random sample and whether it is representative of the pool from the Notice group.

3. Assuming agreement on the number of files, Defendants would agree to make a rolling production as follows: one-third after 60 days, the second third 60 days after that, the final third 60 days after that. Obviously, depending on the final number of files, these timeframes may need to be adjusted.

4. We are exploring the redaction issue and the possibility of a super-enhanced protective order to allow for disclosure of asylum info -- a significant concern of my clients. This is very premature, but I may know more about what we can offer on this point (if anything) by tomorrow. I just wanted to mention it because, depending on what my clients and the Parties are able to do with respect to a revised PO, such events MAY also allow for slightly shorter timelines that are expressed in # 3 above.

Rather than rejecting this out of hand, I'd appreciate the opportunity to confer with you about it more before (or during) tomorrow's hearing.

On other matters:

1. At our meeting on Friday, you and Mike expressed significant concern about not getting an interrogatory response to one particular interrogatory requesting information on facilities in CA, AZ, and WA. I think this is quite overblown since we have related similar info to you before in prior communications. Nevertheless, to resolve this issue, I offer the following information:

A. The Northwest Detention Center is the only facility in Washington that holds ICE detainees. It is an IHSC staffed facility and has an Average Daily (ICE) Population (ADP) in FY 2012 of 1,320 ICE detainees.

B. Arizona has the following facilities that holds ICE detainees. I note in parenthesis whether IHSC staff are on site at each facility: Eloy Federal Contract Facility (IHSC, FY12 ADP = 1,493); Pinal County Jail (IHSC, FY12 = 445); CCA, Florence Correctional Center (non-IHSC, FY12 = 205); Florence Service Processing Center (IHSC, FY12 = 386); CCA Central Arizona Detention Center (non-IHSC, FY12 ADP = 73).

C. California has the following facilities that holds ICE detainees: Mira Loma Detention Center (non-IHSC, FY12 ADP = 747); San Diego Contract Detention Facility (IHSC, FY12 ADP = 664); Adelanto Correctional Facility (non-IHSC, FY12 ADP = 550); Theo Lacy Facility (non-IHSC, FY12 ADP = 448); James Musick Facility (non-IHSC, FY12 ADP = 285); Yuba County Jail (non-IHSC, FY12 ADP = 225); Santa Ana City Jail (non-IHSC, FY12 ADP = 190); Sacramento County Jail (non-IHSC, FY12 ADP = 127); California City Correctional Center (non-IHSC, FY12 ADP = 121); Contra Costa County Jail West (non-IHSC, FY12 ADP = 119); El Centro SPC (IHSC, FY12 ADP = 392).

2. You also expressed concern generally about our statements to you that you would have our interrogatory responses by November 16. I reviewed this issue with my clients today, and here is what is in the works:

A. ICE plans to create a "Process Description" that will explain the entire process for ICE detainees from the point they come into custody to the time of their immigration proceedings and how issues related to mental health are captured and communicated along the way. I anticipate that this document will be very helpful and also be responsive to all outstanding interrogatories.

B. ICE aspires to complete this in two stages. The first stage will be the Macro description of the process. It will still take some time to draft and get clearance from five chief counsel's office and ICE Headquarters, but ICE aspires to complete this so it is ready for production by September 30. Two to three weeks after that, ICE aspires to complete the second stage of this which will give the Micro statistics on the particular information sought in interrogatory responses, in the form of an Excel chart (showing, inter alia, info on IJ competency determinations after consideration of competency issues raised by ICE or noted by the IJ).

Anyway, that is all I have for now. I may have more for you prior to the hearing.

Regards,

Victor

---

**From**: Ahilan Arulanantham [mailto:aarulanantham@ACLU-SC.ORG]
**Sent**: Monday, September 10, 2012 09:26 PM
**To**: Lawrence, Victor (CIV)
**Cc**: Steinberg, Michael H. <STEINBERGM@sullcrom.com>; 'Lichaa, Shawn J.' <LichaaS@sullcrom.com>; Marisol Orihuela <morihuela@ACLU-SC.ORG>

2

**Subject**: Franco -- Sampling Compromise

Dear Victor,

I write to summarize Plaintiffs' compromise proposal on sampling discussed last Friday.  If Defendants cannot agree to this proposal, we will seek from the Court an order that Defendants produce the number of files and distribution as detailed in the Joint Stipulation (Dkt. 406), and as slightly modified in the Supplemental Brief filed today.

As a compromise, Plaintiffs propose that Defendants produce a total of approximately 200 files, broken up as follows:

First, as we discussed, Defendants must agree to produce information (A files, medical files, ROC's, database information) for all Subclass One members identified by the Government pursuant to the Court's notice order, as well as information for a small number of individuals identified on a case by case basis when Plaintiffs request it (as in, for example, the email requests that Talia Inlender sent recently).  Defendants must agree that they will not resist such disclosure on the basis of any alleged privacy interest, so long as Plaintiffs agree to be bound by the protective order with respect to the information Defendants produce.  Relatedly, if Defendants rely on their own files (outside of the random sampling detailed below), they must not argue that those files are representative (as opposed to just using them as illustrative examples, as Plaintiffs intend to do with their case-by-case requests).

Second, Plaintiffs propose that Defendants produce 150 files from three different groups, with the breakdown as follows: (1) 50 files from the group identified during discovery conducted for purposes of numerosity ("Numerosity Group"); (2) 50 files of individuals who, since May 23, 2011, have had one of the following occur: been hospitalized for a mental health reason, received a mental health evaluation (in any form, including mental health reviews), received a hearing to determine competency pursuant to *Matter of M-A-M*, or had their cases continued or adjourned under Code 53 ("Post May 23, 2011 Sampling Group"); and (3) 50 files from the group identified through the Court ordered notice procedure ("Notice Group").  Defendants would have to produce a list of detainees in each group (lists already exist for the first and third, but Defendants would have to produce one for the second), after which the parties would use a random number generator to select 50 files

from each group.  If a file was in multiple groups, it would only be counted once, so that the total number from this portion of the production is no less than 150.

Defendants would agree to produce the selected files on a rolling basis, with all production (A-files, medical files, ROCs, database information) completed within 60 days.  Finally, because the number of files sought in this compromise is smaller than the number of files that Plaintiffs are seeking through litigation, Defendants must agree to waive any argument that the selected files are not representative of the pools from which they are drawn.

Please let us know by COB Tuesday, September 11th whether Defendants agree to this proposal.

Take care,

ahilan