1    AHILAN T. ARULANANTHAM (SBN 237841)
     aarulanantham@aclu-sc.org
2    MICHAEL KAUFMAN (SBN 254575)
     mkaufman@aclu-sc.org
3    ACLU FOUNDATION OF SOUTHERN CALIFORNIA
     1313 West Eighth Street
4    Los Angeles, CA 90017
     Telephone:  (213) 977-9500
5    Facsimile:  (213) 977-5297

6    ***Attorneys for Petitioners***
     **(Additional Counsel listed on following page)**

7

         UNITED STATES DISTRICT COURT

8

      FOR THE CENTRAL DISTRICT OF CALIFORNIA

9

           WESTERN DIVISION

10

11 ALEJANDRO RODRIGUEZ,       )   Case No. CV-07-3239-TJH (RNBx)
    ABDIRIZAK ADEN FARAH,      )

12 YUSSUF ABDIKADIR, ABEL PEREZ  )
    RUELAS, JOSE FARIAS CORNEJO,   )  **DECLARATION OF SUSAN B.**
    ANGEL ARMANDO AYALA, for     )  **LONG**

13 themselves and on behalf of a class of  )
    similarly-situated individuals,      )  Honorable Terry J. Hatter

14                       )
           Petitioners,       )  Date:  May 6, 2013

15                       )  Time:  Under Submission
            v.           )

16                       )

17 ERIC HOLDER, United States Attorney  )
    General; JANET NAPOLITANO,     )

18 Secretary, Homeland Security;      )
    THOMAS G. SNOW, Acting Director,   )

19 Executive Office for Immigration    )
    Review; TIMOTHY ROBBINS, Field   )

20 Office Director, Los Angeles District   )
    Immigration and Customs Enforcement;  )

21 WESLEY LEE, Officer-in-Charge, Mira  )
    Loma Detention Center; et al.;      )

22 RODNEY PENNER, Captain, Mira    )
    Loma Detention Center; SANDRA    )

23 HUTCHENS, Sheriff of Orange County;  )
    OFFICER NGUYEN, Officer-in-     )

24 Charge, Theo Lacy Facility; CAPTAIN  )
    DAVIS NIGHSWONGER, Commander,  )

25 Theo Lacy Facility; CAPTAIN MIKE   )
    KREUGER, Operations Manager, James  )

26 A. Musick Facility; ARTHUR      )
    EDWARDS, Officer-in-Charge, Santa   )

27 Ana City Jail; RUSSELL DAVIS, Jail   )
    Administrator, Santa Ana City Jail,    )

28            Respondents.     )

---

**DECLARATION OF SUSAN B. LONG**

JUDY RABINOVITZ
JRabinovitz@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY  10004
Telephone: (212) 549-2618
Facsimile: (212) 549-2654

JAYASHRI SRIKANTIAH (SBN 189566)
STANFORD LAW SCHOOL
IMMIGRANTS' RIGHTS CLINIC
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA  94305-8610
Telephone: (650) 724-2442
Facsimile: (650) 723-4426

SEAN COMMONS (SBN 217603)
CODY JACOBS (SBN 272276)
JONATHAN FEINGOLD (SBN 286302)
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013-1010
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

*Attorneys for Petitioners*

2

DECLARATION OF SUSAN B. LONG

# DECLARATION OF SUSAN B. LONG

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

My name is Susan B. Long.  I am Associate Professor of Managerial Statistics at the Martin J. Whitman School of Management at Syracuse University. I have been retained by counsel for Petitioners as an expert in this matter.

Attached hereto as Exhibit A is a copy of my Expert Report. Appendix A to my Expert Report contains a summary of my educational and professional background, and qualifications to serve as an expert in this matter.

Attached hereto as Exhibit B is a copy my Rebuttal Expert Report.

Attached hereto as Exhibit C are screen shots taken from the website of the Transactional Records Access Clearinghouse (TRAC). TRAC is a data gathering, data research and data distribution center at Syracuse University. TRAC's data and reports cover information on a variety of federal government activities including the immigration detention and removal processes. As I document in Appendix A to my Expert Report, TRAC's data and reports on immigration detention and removal processes are regularly relied on by experts in the field of immigration law and policy, including by federal government agencies and Congressional committees.

Exhibit C contains screen shots taken from the "Immigration Court Processing Time by Outcome" application available on TRAC's website. The "Immigration Court Processing Time by Outcome" application allows a user to select a particular case outcome (for example, "relief granted") and to select a particular hearing location (for example, "Adelanto"), which will then yield the average court processing time for that particular type of case outcome at that particular hearing location. All the information available through the "Immigration Court Time by Outcome" application is derived from data provided to TRAC by federal government agencies through

Freedom of Information Act requests, including the Executive Office for Immigration Review.

The screen shots contained in Exhibit C show the immigration court processing times for cases in three hearing locations located in the Central District of California: Adelanto Detention Facility East, Orange County Detained, and Mira Loma Detention Facility.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.  Executed this 8th day of February, 2013 in Syracuse, New York.

Susan B. Long

2

# Exhibit A

# Expert Report of Professor Susan B. Long

*Rodriguez v. Hayes*, No. 07-3239 (C.D. Cal.)

Submitted Pursuant to Federal Rule
of Civil Procedure 26(a)(2)

## Introduction

I submit this report as an expert, and at the request of Petitioners in *Rodriguez v. Hayes*. I am an Associate Professor of Managerial Statistics at the Martin J. Whitman School of Management at Syracuse University and the Co-Director of the Transactional Records Access Clearinghouse ("TRAC"). TRAC is a data research center at Syracuse University that gathers electronic data from internal government data systems, analyzes the data, and then distributes the information along with TRAC's research findings. A more detailed account of my qualifications is attached as Appendix A to this report. I was compensated at a rate of $ 250 per hour for my services.

## Organization of Report

This report provides my research findings on the following questions I was asked to address:

1. **Detention Length.** How long has each class member been detained by Immigration and Customs Enforcement (ICE), and how have detention times varied among class members?

2. **Custody Status.** What – as of April 2012 – was the custody status of each class member: No longer in ICE custody? Still in ICE custody?

3. **Court Involvement.** What court proceedings – before the Immigration Court, the Board of Immigration Appeals, and the Ninth Circuit Court of Appeals – were decided following the individual's detention by ICE? How was this related to the detention times observed?

4. **Relief Applications.** What relief applications were filed with the Immigration Court? How was this related to detention times observed?

5. **Outcome.** What was the eventual outcome of each class member's court proceeding(s)? Did they ultimately win or lose their case? How was success or failure related to detention times observed?

6. **Comparing Outcomes in Other Removal Cases.** How did outcomes for class members compare to typical outcomes in other removal proceedings? Were they more or less successful?

7. **Aggregate Detention Days.** How does average detention time relate to aggregate detention space needed?

## Research Methodology

The methodology I used was as follows.  First, I compiled information for each
class member covering the period from entry into ICE custody through April
2012.  This information included each individual's ICE custody history, the details
of any court proceedings following the individual's entry into ICE custody, the
outcome of these court proceedings (or whether they were still pending), and
whether deportation of the individual had occurred.

Next, for each class member I ordered these actions by calendar dates so I could
examine in more detail the chronology of events that had taken place.  Using this
date chronology I identified what the nature of the final court outcome had been
(or whether proceedings were still pending), how long the individual had been
detained (or remained in custody), and whether the individual had ultimately won
their court case or had been ordered removed.

Finally, I prepared a series of tables that summarized the findings of my analysis,
and prepared this report describing these findings.

## Data Sources Used

The following data sources were obtained and used in my analysis:

**Detention and Deportation.**  The official records on detention and
deportation on each class member were furnished by the Immigration and
Customs Enforcement (ICE).  This data, obtained as part of this litigation and
furnished to me, was provided as a spreadsheet data table.  Each of the columns
of the table contained various items of information about each class member.
The data also identified which class member each piece of information was
associated with by the individual's alien number and name.[1]  Among the fields of
information recorded on each class member were the following items:

- date individual entered ICE custody
- date(s) individual had been released or left ICE custody
- for those individuals who had been deported, the departure date when he
  or she had left the United States

The data indicated that some individuals remained in ICE custody.  Also,
some individuals had more than one record.  This occurred if that individual had
entered and been released from ICE custody and was subsequently taken back
into ICE custody – for example, when processed for final deportation.

---

[1] I received three versions of this file.  Two versions ["ICE-EDI-001" and "ICE-EDI-002"] were
identical, except names had been originally redacted on the first.  These indicate that the data file
had been prepared on April 20, 2011 (using a data extract from ICE's "EID" database prepared
on April 18, 2011).  The remaining file ["ICE-EDI-009"] was prepared a year later, according to
source information provided with the file, and contained additional updated information from a
data extract from ICE's  "EID" database prepared on April 28, 2012.

**Court Proceedings Involving Class Members.** Official records were also obtained for any court proceedings that took place after individuals were placed in ICE custody. These included records from the Immigration Court, the Board of Immigration Appeals (BIA) and the Ninth Circuit Court of Appeals.

These court records were obtained as follows. (1) The Executive Office for Immigration Review (EOIR) furnished official extracts of case-by-case data on Immigration Court and BIA proceedings involving each class member. These files were produced as part of court proceedings in this case and furnished to me. These files contained each individual's alien number and name along with specific details on each Immigration Court and BIA proceeding related to that person.[2] (2) Data on Ninth Circuit appeals were obtained directly by me from the Ninth Circuit using that court's Public Access to Court Electronic Records (PACER) system. Additional information was provided to me by Petitioners' attorneys compiled from the court records on the specific Ninth Circuit appeals I identified as involving class members.[3]

---

[2] Similar to the ICE extracts, EOIR prepared multiple versions of the extract from its CASE database. I used the final version ["EOIR-EDI-006"] which contained the most complete set of records current through April 2012. This version contained additional details on applications for relief that had been originally redacted from earlier versions. In cross-checking the chronology of court proceedings I also used an extract EOIR had prepared for the Transactional Records Access Clearinghouse (TRAC) at Syracuse University where I serve as the co-director. The extract EOIR prepared for TRAC contained – in addition to the date fields provided in this case – one additional date field recording when the case began. This was the date the NTA was filed. I used this additional date as a cross-check when confirming the correctness of the date chronology I prepared. Apart from this, the added date field played no role in my analysis.

[3] Using PACER, on September 4, 2012 I downloaded a list of all appeals from BIA court cases received by the Ninth Circuit since December 1, 2007. This data file contained both the Ninth Circuit docket number and the specific BIA docket number recorded on each case, along with the case title, the date the appeal was filed and the last docket entry date for that case. To identify which of these appeals involved class members, I matched the EOIR records on BIA cases against the Ninth Circuit's records to identify each relevant case as follows. Both sets of records contained fields recording the BIA docket number for each case as well as the associated Ninth Circuit docket number. (The BIA uses the individual's alien number as its docket number.) Using the BIA docket number from each Ninth Circuit case, I matched it with the BIA docket number – that is, the alien number – recorded for each BIA case in the EOIR files to identify the relevant Ninth Circuit appeals that concerned class members. In addition, I also used the Court of Appeals docket numbers that were recorded in the EOIR files on BIA cases and matched these numbers against the Ninth Circuit docket numbers recorded in the listing of cases I had downloaded using PACER from the Ninth Circuit. This resulted in a list of Ninth Circuit appeals that matched the EOIR files covering class members. On each of these matched cases, I provided the information I downloaded from PACER to Petitioners' attorneys. After reading the court files on each of these cases, they added an entry to this listing indicating whether the Ninth Circuit case had concluded (yes or no), and if it had concluded, the date the mandate had issued. I then added these two additional fields of information to the original data I had downloaded. I then compared the filing and closure dates to the date the class member entered ICE custody. This identified 197 class members that had one or more Ninth Circuit appeals handled subsequent to their entry into ICE custody.

3

Among the fields of information recorded on each class member from these court records were the following:

### Immigration Court Proceedings:
- the date the Immigration Court case ("proceeding") began
- the type of proceeding involved – removal, deportation, etc.[4]
- the date the Immigration Court case ("proceeding") was completed
- the location of the court assigned the case and the hearing location
- the date each application for relief was filed with the Immigration Court
- the type of relief applied for
- the date each relief application was decided by the court
- the Immigration Court judge's decision on each relief application
- the Immigration Court judge's decision on the case

### Board of Immigration Appeals Proceedings:
- the type of appeal (for example, case appeal, motion to reopen case, remand from court of appeals, etc.)
- the party that filed the appeal
- the date the appeal was filed
- the date the BIA decided the case
- the BIA decision on the appeal

### Ninth Circuit Court of Appeal Proceedings:
- the date the appeal was filed
- whether the appeal was closed or was still pending
- when closed, the date the mandate was issued

This information, after it had been combined, allowed me to trace the chronology of court proceedings that had taken place involving each class member.

### Research Results

In the following sections, the results from my analysis are provided.  There were exactly 1,000 class members.[5]  The body of this report covers these 1,000 individuals.  I was also asked by Petitioners' attorneys to prepare a parallel set of

---

[4] Almost all proceedings for class members were removal proceedings.  In this report I use the term "removal" in a general sense to cover all proceedings, even though a few involved other types of proceedings.

[5] I received data concerning 1,026 individuals.  The information recorded in the files I received indicated that two of these individuals had been detained for less than 180 days and therefore did not qualify for inclusion in the class.  Petitioners' attorneys provided me a list of 24 additional individuals from the original list whom they instructed me to exclude because – based upon the attorneys' analysis of the data provided – those individuals also did not meet the qualifications required for class membership.  Those individuals had no active proceedings at the administrative or judicial levels during or immediately prior to their detentions, and therefore appeared to have been detained without any pending case.  After these two groups (2+24=26) of individuals were removed, this left the set of exactly 1,000 individuals on which my results are based.

tables containing key results that pertained to each of two subclasses: the section 236(c) and section 235 subclasses. The lists for each of those class members were provided to me by Petitioners' attorneys. These separate table sets are found in Appendix B and C to this report.

**Questions 1 and 2:  Detention Times and Status.  *How long have class members spent detained in ICE custody and how many were still detained?***

Using the data provided from ICE records I calculated the number of days that each class member had remained in ICE custody as of April 28, 2012. I also determined their custody status as of that date. Individuals were divided into two categories – those no longer in ICE custody, and those still in ICE custody.

The monitoring period covered by my research was only able to follow cases through April 28, 2012 because that was the latest date in the detention records ICE provided on class members. As shown in Table 1, this monitoring period – from entry into ICE custody through April 2012 – was sufficient to follow the entire detention period for ninety-five percent of the class members (946 individuals). For these individuals detention times ranged from 180 days – the minimum required to qualify as a class member – up through 1,310 days. See Table 2.

**Table 1**

**Number of Cases by Detention Category\***

| Detention Category | Number | Percent |
|---|---|---|
| No longer detained | 946 | 95% |
| Still detained | 54 | 5% |
| All cases | 1,000 | 100% |

\* As of April 28, 2012

For the remaining five percent (54 individuals) of the class members the monitoring period was insufficient to capture their entire detention period. This was because these individuals were still in ICE custody at the point the records available to me ended. The number of detention days listed for these individuals and used in my analyses *under-estimates* their eventual detention period since it only reflects the number of days they had been detained up to April 28, 2012. Even these under-estimated detention times as shown in Table 2 were still very long, ranging from 558 days to 1,585 days.

5

**Table 2**

**Average Days of Detention by Detention Category**

| Detention Category | Detention Days | | |
|---|---|---|---|
| | Average | Lowest | Highest |
| No longer detained | 381 | 180 | 1,310 |
| Still detained | 805 | 558 | 1,585 |
| All cases | 404 | 180 | 1,585 |

Overall, and recognizing that the detention figures presented throughout this report will for this reason underestimate actual detention times for this group of class members, the average number of days spent in ICE detention for all class members was 404 days.

To provide a more detailed picture of the experience of class members, Table 3 summarizes how many class members had been detained for varying periods of time.  For example, more than three out of four individuals (78%) were detained eight months or longer, and nearly half (47%) were detained 12 months or longer.  Over one in five (21%) were detained for 18 months or longer periods.

**Table 3**

**Cases by Detention Period**

| Detention Period* | Number | Percent |
|---|---|---|
| Detained 6 months or more | 1,000 | 100% |
| Detained 7 months or more | 885 | 89% |
| Detained 8 months or more | 781 | 78% |
| Detained 9 months or more | 686 | 69% |
| Detained 10 months or more | 591 | 59% |
| Detained 11 months or more | 527 | 53% |
| Detained 12 months or more. | 469 | 47% |
| Detained 13 months or more | 405 | 41% |
| Detained 14 months or more | 353 | 35% |
| Detained 15 months or more | 309 | 31% |
| Detained 16 months or more | 273 | 27% |
| Detained 17 months or more | 238 | 24% |
| Detained 18 months or more | 205 | 21% |
| Detained 24 months or more** | 86 | 9% |

* Month (30 days).

** This number is likely to be a significant under-estimate because it ignores detention days after April 28, 2012 of the class members who were still detained.

It was not possible to provide an accurate percentage for the proportion of class members detained 24 months or more.  This is because while we know the detention period up through at least 18 months for all class members, we do not know it for all class members beyond that point.  Monitoring periods varied by individual. As of April 2012 almost one out of every ten individuals (9%) had been detained for 24 months or longer.  However, this proportion is likely to rise when the detention length for each of the 54 individuals who were still detained last April is followed until their custody is at an end.

Table 4 presents the odds of continued detention for individuals already detained for seven months, eight months, nine months, and so forth.  These figures are calculated from the numbers shown in Table 3.  And as explained, the various odds of continued detention shown for 24 months are under-estimated since they are likely to rise once the complete detention length for all class members is at an end.

### Table 4

### Odds of Continued Detention

Those detained 7 months:

| | |
|---|---|
| *still detained at 12 months* | 53% |
| *still detained at 18 months* | 23% |
| *still detained at 24 months* | 10% |

Those detained 8 months:

| | |
|---|---|
| *still detained at 12 months* | 60% |
| *still detained at 18 months* | 26% |
| *still detained at 24 months* | 11% |

Those detained 9 months:

| | |
|---|---|
| *still detained at 12 months* | 68% |
| *still detained at 18 months* | 30% |
| *still detained at 24 months* | 13% |

Those detained 10 months:

| | |
|---|---|
| *still detained at 12 months* | 79% |
| *still detained at 18 months* | 35% |
| *still detained at 24 months* | 15% |

Those detained 11 months:

| | |
|---|---|
| *still detained at 12 months* | 89% |
| *still detained at 18 months* | 39% |
| *still detained at 24 months* | 16% |

Those detained 12 months:

| | |
|---|---|
| *still detained at 12 months* | 100% |
| *still detained at 18 months* | 44% |
| *still detained at 24 months* | 18% |

**Question 3:  Court Proceedings.  *What court proceedings occurred
following the individual's detention by ICE?  How was this related to the
detention times observed?***

Results from the official court records I compiled on court proceedings are
summarized in Table 5.  These records indicated that Immigration Court
proceedings were conducted after ICE placed the individual into custody in
almost every case (94%).

In over one out of three cases (36%) an appeal to the Board of Immigration
Appeals ("BIA") was filed.  (Some of these were filed by ICE appealing an
immigration judge's (IJ) decision.).  Finally, in one out of five cases (20%), an
appeal was taken to the Ninth Circuit Court of Appeals.  See Table 5.

**Table 5**

**Court Involvement in Case**

| Type of Proceedings Involved | Number | Percent |
|---|---|---|
| All cases | 1,000 | 100% |
| Immigration Court proceeding(s) | 943 | 94% |
| BIA Court proceeding(s) | 356 | 36% |
| 9th Circuit Court proceeding(s) | 197 | 20% |

Not unexpectedly, when a case was appealed individuals experienced longer
detention times.  As shown in Table 6, for cases simply involving Immigration
Court proceedings, the average detention time was 330 days.   However, the
average detention time increased by about a third – from 330 days to 448 days –
for cases appealed to the BIA.  For cases that were then appealed to the Ninth
Circuit, detention times more than doubled – increasing from 330 days on
average to 667 days.

**Table 6**

**Court Involvement and Detention Time**

| Type of Proceedings Involved | Average Days |
|---|---|
| Only Immigration Court (IJ) proceeding(s) | 330 |
| BIA and Immigration Court proceedings | 448 |
| 9th Circuit, BIA, and IJ proceedings | 667 |
| All cases | 404 |

**Question 4:  Relief Applications.  *What relief applications were filed with
the Immigration Court?  How was this related to detention times observed?***

There were 713 class members who filed application(s) for relief with the
Immigration Court.  This meant that in seven out of ten cases (71%) relief was

8

sought.  As shown in Table 7, relief was granted by the immigration judge in more than one out of three of these cases – 251 out of 713, or 35 percent.

The judge's decision to grant relief was contested in some of these 251 cases. However, as of April 2012, the grant of relief had become final for over nine out of ten (91%) of these cases – 229 out of 251.  Of the 22 remaining cases, the grants were reversed in ten cases and the appeals remain pending in 12 cases. This data would not include any individuals denied relief by the immigration judge who then obtain it on appeal at either the BIA or the Ninth Circuit.

### Table 7

### Applications for Relief

|  | Comparison Group | Filing for Relief | |
|---|---|---|---|
|  |  | Number | Percent |
| Number and percent who filed relief application(s) | 1,000 | 713 | 71% |
| Number and percent where relief granted by IJ | 713 | 251 | 35% |
| Number and percent where relief granted is final outcome* | 251 | 229 | 91% |

* The final outcome is still pending on 12 cases on which relief was granted initially by the Immigration Judge, and in 10 cases the initial decision was later overturned or the individual left the country for other reasons.

Table 8 presents an overview of relief applications by type.  Cancellation of removal under Section 240A(a) of the Immigration and Nationality Act ["Form EOIR-42A"] was a common form of relief sought by class members.  A total of 256 class members – one in four (26%) – filed applications for relief under this provision.  An additional 28 class members, or less than three percent, filed applications only for withholding of removal (WOR) or withholding under the Convention Against Torture (WCAT).  The remaining 429 of the class members who sought relief (43%) filed various other types of relief applications.

### Table 8

### Relief Applications Filed by Type

|  | Number | Percent |
|---|---|---|
| Number of cases | 1,000 | 100% |
| EOIR-42A applications filed | 256 | 26% |
| Only applying for WOR/WCAT | 28 | 3% |
| Other types of applications | 429 | 43% |
| Total filing relief applications | 713 | 71% |

Table 9 summarizes the IJ's decision on relief applications under 240A(a) for
cancellation of removal.  Exactly half of these applications – 128 out of 256 –
were granted this relief.  See Table 9.

**Table 9**

**Application for Cancellation of Removal under 240A(a)**

| | |
|---|---|
| Number of EOIR-42A applications filed | 256 |
| Number of these granted by IJ | 128 |
| Percent granted | 50% |

As we saw in Table 8 there were relatively few individuals who only sought relief
under WOR or WCAT.   Table 10 presents a picture of relief applications that
excludes those who sought, or were only awarded relief, under WOR or
WCAT.  Not surprisingly, given their relatively small numbers, the same general
picture emerges as we saw earlier when we discussed Table 7.  Now a total of
685 class members filed relief applications (excluding WOR/WCAT) or more than
two out of three (69%).  Of those filing applications roughly one third – 32 percent
– were granted.

**Table 10**

**Applications for Relief**
**(Excluding Withholding of Removal and WCAT)***

| | Comparison Group | Filing for Relief | |
|---|---|---|---|
| | | Number | Percent |
| Number and percent who filed relief application(s) | 1,000 | 685 | 69% |
| Number and percent where relief granted by IJ | 685 | 222 | 32% |
| Number and percent where relief granted is final outcome** | 222 | 216 | 97% |

* Counts exclude cases where the only application filed, or the only application granted, was for Withholding of
Removal or withholding under the Convention Against Torture.
** The final outcome is still pending on 4 cases on which relief was granted initially by the Immigration Judge, and in 2
cases the initial decision was later overturned.

When relief applications were involved, detention times increased.  Individuals
who did not request relief had detention times which averaged 360 days, while
those requesting relief were detained an average of 421 days, or 61 days longer.
See Table 11.

**Table 11**

**Average Detention Days**
**If Relief Application Filed**

| Relief Applications | Average Days |
|---|---|
| No application for relief filed | 360 |
| Application for relief filed | 421 |
| All cases | 404 |

Table 12 subdivides these relief comparisons by the combination of court proceedings involved. Not only were detention times higher for those requesting relief at the Immigration Court stage, but they were substantially higher at each subsequent court stage.

For example, in cases with only Immigration Court proceedings the individual spent on average 281 days in detention; when applications for relief were filed the average detention time increased to 346 days. For those cases that went on to the BIA, the differential grew to 112 days (from 361 days to 473 days).

**Table 12**

**Detention Time by Proceedings and Relief**

| Type of Proceedings Involved | Average Detention Days | | |
|---|---|---|---|
| | Applied for Relief | | All Cases |
| | No | Yes | |
| Only Immigration Court (IJ) proceeding(s) | 281 | 346 | 330 |
| BIA and Immigration Court proceedings | 361 | 473 | 448 |
| 9th Circuit, BIA, and IJ proceedings* | 623 | 681 | 667 |
| All cases | 362 | 421 | 404 |

\* Because the majority of individuals are still detained in the large number of cases (72) that are still pending when all three court levels handled the case, these figures underestimate what detention times will eventually reach.

**Question 5: Outcome.** *What was the eventual outcome of each class member's court proceeding(s)? Did they ultimately win or lose their case? How was success or failure related to detention times observed?*

The outcome of cases that had been resolved as of April 2012 are shown in Table 13. One in six cases (16%) was still pending as of that date so their outcome was not known. A total of 263 class members – more than one out of every four (26%) -- had already won their case.

11

Less than half of the class members had been removed (44%), and an additional five percent were granted voluntary departures.  The remaining nine percent were awaiting deportation after a final removal order had been entered.

### Table 13

#### Outcome of Case*

| Outcome | Number | Percent |
|---|---|---|
| Won case | 263 | 26% |
| Case still pending | 160 | 16% |
| Deportation ordered (not departed) | 87 | 9% |
| Voluntary departure | 46 | 5% |
| Removal | 444 | 44% |
| All cases | 1,000 | 100% |

* As of April 28, 2012

Table 14 further subdivides those class members who won their case by the type of decision.  Most (87%) were granted relief, while in the remaining 13 percent of the cases the proceedings were terminated.

### Table 14

#### Basis for Winning Case

| | Number | Percent |
|---|---|---|
| Individual won case | 263 | 100% |
| Relief granted | 229 | 87% |
| Case terminated | 34 | 13% |

Detention times are shown by outcome in Table 15.  Class members who won spent on average 342 days in detention.  But detention times ranged as high as 848 days for this group.  The longest detention times were experienced for those whose cases were still pending.  They had spent, as of April 28, 2012, an average of 545 days in ICE detention, and detention times ranged as high as 1,585 days.  The voluntary departure group was detained on average 305 days – the shortest period of time among outcome categories.

12

**Table 15**

**Average Days of Detention by Outcome***

|  | Detention Days | |
| --- | --- | --- |
| Outcome | Average | Highest |
| Won case | 342 | 848 |
| Case still pending | 545 | 1,585 |
| Deportation ordered (not departed) | 410 | 1,310 |
| Voluntary departure | 305 | 561 |
| Removal | 398 | 1,133 |
| All cases | 404 | 1,585 |

\* As of April 28, 2012

Those who won their case spent longer periods of time detained where additional proceedings before the BIA or Ninth Circuit Court of Appeals were involved. For example, as shown in Table 16, individuals who won after only Immigration Court proceedings spent on average 320 days in detention. However, those who prevailed only after both BIA and Immigration Court proceedings spent about 60 percent longer on average in detention – 509 days as compared to 320 days.

**Table 16**

**Detention Time for Class Members Who Won Their Case
Level of Court Proceedings Reached**

| Type of Proceedings Involved | Average Days |
| --- | --- |
| Won case | 342 |
| Won with only Immigration Court (IJ) proceeding(s) | 320 |
| Won after BIA and Immigration Court proceedings | 509 |
| Won after 9th Circuit, BIA, and IJ proceedings | *428 |

\* Because of the large number of cases (72) still pending involving Ninth Circuit appeals relative to the number this figure is based upon, this figure is likely to significantly under-estimate what detention length will turn out to be for those who eventually win their appeal.

Early results from those who prevailed only after winning a Ninth Circuit appeal similarly show higher detention times, averaging 428 days. However, because of the large number of cases (72) still pending involving Ninth Circuit appeals relative to the number on which this figure is based, this number is likely to significantly under-estimate what the length of detention will turn out to be for those who eventually win their appeal, because the majority of these individuals are still detained. The average number of detention days as of April 28, 2012 for those still detained in these pending cases had already reached 851 days.

13

**Question 6:  Comparing Outcomes in Other Removal Cases.  *How did
outcomes for class members compare to typical outcomes in other
removal proceedings?   Were they more or less successful?***

I next compared class member outcomes with outcomes in removal proceedings
more generally.  For these comparisons I used figures for the FY 2010 – 2012
time period published by the Transactional Records Access Clearinghouse
(TRAC) at Syracuse University.  As noted earlier, I am very familiar with this data
as I am the co-director of the Center and direct the preparation of this statistical
series.[6]

Table 17 presents a side-by-side comparison of outcomes in these removal
proceedings.  For these comparisons, I focused on the outcomes for the 840
class members on which a decision had been reached, excluding those on which
the matter was still pending before the courts.  As noted earlier, 263 of these
class members had won their case.  This represents 31 percent of the cases
decided to date.  Of these 263 who had won, 229 class members had been
granted relief, or 27 percent of all decided cases.  See figures in column labeled
"Class Members" in Table 17.

---

[6] Each month, the Executive Office for Immigration Review (EOIR) provides TRAC with a copy of
its official court records in the form of an extract from its CASE database.  This is the same type
of case-by-case data EOIR furnished regarding class members in this litigation, which I used for
the other sections in this report.  The data provided to TRAC covers all Immigration Court
proceedings in the country and is furnished without any identifiers to preserve the privacy of the
individuals appearing in these removal proceedings.  TRAC uses this data to publish regular
reports on Immigration Court proceedings available on its website at:
http://trac.syr.edu/immigration.  TRAC also provides a web interface
(http://trac.syr.edu/immigration/tools) to allow the public to query the database TRAC has
compiled from these court records providing information on new proceedings filed, cases
completed, court outcomes, the court's backlog, and wait and completion times. Results reported
here are taken directly from this source using data current as of August 31, 2012 and covers all
removal orders, voluntary departure orders, termination decisions and decisions granting relief.

Table 17

**Comparing Outcomes in Removal Proceedings**

|  | United States (majority not detained)* | Mira Loma Detention Facility* | Class Members |
|---|---|---|---|
| Removal proceedings decided | 608,129 | 9,355 | 840 |
| Number won by individual** | 163,907 | 669 | 263 |
| Number relief granted | 90,865 | 514 | 229 |
| *Percent won by individual* | *27%* | *7%* | *31%* |
| *Percent granted relief* | *15%* | *5%* | *27%* |

\* Immigration Court records current as of August 31, 2012.for the period FY 2010 - 2012. According to the latest published EOIR figures, for the U.S. non-detained cases made up 58% (FY 2011) and 56% (FY 2010) of proceedings, while Mira Loma hearings are just for detainees.

\*\* Includes cases granting relief and terminated.

Nationally during this time period there were 608,129 removal proceedings decided by the Immigration Court. The majority of these proceedings involved non-detained cases. Individuals won just over one out of every four (27%) of these cases. Relief was granted in 15 percent of the cases, while proceedings were terminated in the remaining 12 percent. See column labeled "United States" in Table 17.

Comparing the results for the U.S. with those for our class members, we see that class members were more successful. While in the U.S. 27 percent won the decision in their case, for class members wins were higher – 31 percent. Relief in particular was granted at over twice the rate that occurred in removal proceedings nationally. Because, in general, Immigration Court statistics show that non-detained individuals have far higher success rates than individuals who are detained, the fact that the reverse is true here is noteworthy.

I next compared the outcomes for class members to those in Immigration Court removal hearings conducted at the Mira Loma Detention Facility. Unlike the hearings reflected in the national statistics, the hearings in Mira Loma all involved only individuals detained in ICE custody. This particular location was chosen because the majority of class members had their hearings at this specific location, and because it allows a comparison to a group of exclusively detained cases.

As shown in Table 17 there were 9,355 removal proceedings decided at the Mira Loma Detention Facility during this time period. Of these, 669 individuals won their case, including 514 individuals who were granted relief. This means that only 7 percent of Mira Loma detainees won their case. Five percent were granted relief, while the remaining 2 percent had their proceedings terminated. See column labeled "Mira Loma Detention Facility" in Table 17.

15

The comparison of Mira Loma detainees to the class members is stark.   Class
members were successful four times more often – 31% versus 7% – than Mira
Loma detainees were on the whole.  And class members were awarded relief five
times more often – 27% versus 5% – than Mira Loma detainees overall were.

**Question 7:  Aggregate Detention Days.** *How does average detention time
relate to aggregate detention space needed?*

Thus far we have examined detention from the perspective of the individual who
is being detained.  The same data, however, can be examined from the
perspective of the agency responsible for providing detention space and for
paying to house these individuals while they are detained.

How many detention beds in aggregate were needed to cover the detention
needs for one year for class members once individuals qualified as class
members – that is, those who had already been detained for 180 days?

The answer to this question is shown in Table 18.  The first row shows the
aggregate number of days class members spent for the initial 180 days.  The
second row shows the aggregate number of days class members remained
detained during the following one year period.

**Table 18**

**Aggregate Detention Days**

| Time Period | Class Members |
|---|---|
| First 180 days | 180,000 |
| Next year (365 days) | 184,067 |
| Subtotal | 364,067 |
| | |
| More than 18 months | (insufficient data)* |
| Total detention days | (insufficient data)* |

\* monitoring period varied by class member but was designed
to ensure information for 180 days plus one year (365 days) for
all individuals; because monitoring period then ended one
cannot derive valid numbers for subsequent time periods.  The
total aggregate days for class members as of April 2012 had
reached 403,660.

All individuals were, by virtue of being class members, detained for the entire
initial 180 days period.  As shown in Table 18, this meant that, in aggregate,
facilities with capacity to house individuals for 180,000 detention days were
needed to house them.  (This represents 1,000 class members x 180 days =
180,000 detention days.)

16

For the next year the facilities required to house class members totaled 184,067 detention days.  Because some class members were released from detention or deported during this year, the figure shown in Table 18 was calculated by examining the detention days each individual spent during that following 365 days period and then summed to derive the total aggregate days of 184,067.

This figure excludes the aggregate detention days needed for the first 180 days of their detention.  When this is added, the aggregate detention days for the first 18 months – 180 initial days plus the subsequent year – were 364,067.   See Table 18.

These figures, however only include detention through the first year (plus 180 days).  However, from earlier Table 3, we know that more than one in five persons (21%) were detained for periods of 18 months or more.  In fact, one individual was detained for 1,585 days (over four years.)

Unfortunately, the data available are insufficient to calculate what the aggregate detention days would be after one year.  While the monitoring period varied somewhat by class member, it was only designed to ensure information for 180 days plus one year (365 days) for all individuals – the period covered by the figures shown.  Thus the 364,067 days figure presented in Table 18 significantly under-estimates what the aggregate number of detention days will eventually total for class members since it omits all detention time after 18 months.

The total aggregate days for class members as of April 2012 had already reached 403,660 days but, for the reasons explained above, this figure does not fully capture what the total will become since it reflects the number of days class members had been detained only up to April 28, 2012.

**Subclass Data**

In addition to the class-wide research, I also analyzed data specific to two of the subclasses: the section 236(c) and section 235 subclasses.  Because I am not familiar with the operation of the detention statutes and subclasses in this case, I relied on Petitioners' attorneys to provide me with a list of individuals who qualified as subclass members, which I then used to compile the data specific to each subclass.

With respect to the section 236(c) subclass, I was provided with a list of 460 subclass members.  I cannot speak to the accuracy of this list.  Information about the 236(c) subclass is contained in Tables 19 – 26 in Appendix B.

With respect to the section 235 subclass, I was provided with a list of 68 subclass members.  I understand that Petitioners' attorneys believe that this list is a sample of the section 235 subclass drawn from those for whom Respondents produced parole worksheets.  According to Petitioners' attorneys, the overall subclass size may be larger, but the sample is representative of the subclass as a whole.  I cannot speak to the accuracy of those claims.  Information about the section 235 subclass is contained in Tables 27 – 31 in Appendix C.

17

## Appendix A

I am a statistician and an Associate Professor of Managerial Statistics at the
Martin J. Whitman School of Management at Syracuse University, where I have
taught undergraduate, graduate and Ph.D. seminars in statistics and research
methods. Following my bachelor's degree from the University of Washington, I
received a master's degree in Sociology from the University of Washington in
1972. I also have a doctorate in Sociology from the University of Washington,
with a dual major in Quantitative Methods and Criminology. After receiving my
doctorate in 1980, I completed postdoctoral studies in Statistics at Princeton
University in 1981. Early in my career, I was a Visiting Fellow at the National
Institute of Justice, U.S. Department of Justice, a Visiting Scholar at the Bureau
of Social Science Research, and a Visiting Scholar at the Center for Engineering
Information at City University of London in England.

Since 1980 I have been a faculty member at Syracuse University. From 1984-
1992 I served as the Director of the Center for Tax Studies there. Since 1989, I
have been the Co-Director and co-founder of the Transactional Records Access
Clearinghouse (TRAC). TRAC is a data gathering, data research and data
distribution center at Syracuse University. TRAC gathers electronic data from
internal government data systems, assesses its accuracy and reliability,
transforms this data into usable forms, and then distributes the information along
with TRAC's research findings. Users of TRAC's information services include
scholars, journalists, attorneys, public interest groups, Congressional committees
and government agencies. I therefore have knowledge and expertise in both
statistical research methods and the use and analysis of government-created
electronic records.

Among my duties as Co-Director of TRAC, I manage data processing and
statistical analyses for all of our data and reports, which cover information on a
variety of federal government activities including the immigration detention and
removal processes. We regularly obtain data from both EOIR and ICE from their
database systems (CASE and EID, respectively) and I therefore have developed
extensive experience with using and analyzing data from each of these
respective systems, both in my supervisory capacity as well as hands-on
experience working directly with these data. TRAC's public website contains
numerous reports which are based on this work and utilize one or both of these
data sources on detention and removal proceedings
(http://trac.syr.edu/immigration/).

TRAC's work is highly regarded. Our research findings are constantly cited in
scholarly and legal journals, government reports, news media and other sources.
Just in the last six months, our work was cited by the Administrative Conference
of the United States (concerning recommendations for reform of the immigration
regulatory system), in testimony before the Social Security Subcommittee of the
House Ways and Means Committee (concerning the backlog in adjudication of
social security disability cases), in testimony before the Border and Maritime
Security Subcommittee of the Committee of Homeland Security (concerning the

number of Border Patrol personnel), and in remarks by the Honorable
Representative Lamar Smith before the House Judiciary Subcommittee
(concerning immigration issues).  Our data on the immigration detention and
removal system was cited even more frequently by policy advocacy groups
during that time period.  Our findings are cited by those typically considered "pro-
" and "anti-" immigration, as well as those who, like us, take no position on such
matters.  For example, in the last three months our data concerning the
immigration detention and removal system has been cited by, amongst others,
Judicial Watch, the National Immigration Justice Center, and 21st Century Border
(a project of the New Policy Institute).  For more examples of the uses of our
work, see http://trac.syr.edu/tracatwork/.

TRAC also has many users – including universities, government offices, news
media, public interest groups and others – who have chosen to receive (and
presumably read) our reports, as well as use our data and information services.
For example, offices within Immigration and Customs Enforcement and the
Department of Justice subscribe to on-line data services TRAC provides that
allow these agencies to directly run analyses on our computers at TRAC using
the data we have compiled on their own specific law enforcement activities.

I have been asked to testify at hearings before the United States Congress on a
number of occasions.  For example, I testified on TRAC's research concerning
the operation of the Immigration Courts before the U.S. House of
Representatives, Committee on the Judiciary, Subcommittee on Immigration,
Citizenship, Refugees, Border Security, and International Law, on September 23,
2008.

In the last four years, I have not testified as an expert at trial or by deposition.
However, I did submit declarations in connection with the following cases:

*Moore v. Washington State Department of Corrections*, No. 06-2-01040-7 (Wash.
Sup. Ct. Thurston County).

*Moore et al. v. Health Care Authority et al.*, No. 06-2-21115-4 SEA (Wash. Sup.
Ct. King County)

The following is a list of publications I have authored in the past ten years:

- Forthcoming (with David Burnham), Volume 25, October 2012 issue of
  Federal Sentencing Reporter, "Examining Current Federal Sentencing
  Practices: A National Study of Differences Among Judges."

- Forthcoming, Volume 25, October 2012 issue of Federal Sentencing
  Reporter, "Response to Federal Public Defenders."

- "Tracking Judges" (with David Burnham), <u>Federal Sentencing Reporter</u>,
  Volume 16, Number 1 (October 2003) pp. 26-30.

- "From TRAC IRS – National Profile and Enforcement Trends over Time"
  (with David Burnham), Journal of Tax Practice & Procedure, Volume 4,
  Number 3 (June-July 2002) pp. 35-40, 47-48. [Note: despite nominal date
  this was accepted and came out during 2003].

- Technology and the Changing Practice of Law: An Entrée to Previously
  Inaccessible Information via TRAC (with Linda Roberge, Patricia Hassett,
  and David Burnham), The Artificial Intelligence and Law Journal, Volume
  10, Number 4, pp. 261-282. [Nominal date 2002, but came out in 2003]

- Data Warehouses and Data Mining Tools for the Legal Profession: Using
  Information Technology to Raise the Standard of Practice, (with Linda
  Roberge and David Burnham),  Syracuse Law Review, Volume 52,
  Number 4, pp. 1281-1292. [nominal date 2002, but came out in 2003]

- Judging the Judges (with Linda Roberge, Patricia Hassett and David
  Burnham) Champion Magazine, Vol. XXVI, Number 10, December 2002

### Proceedings:

- "SAS-Based Warehouse and Mining Tools Keep Tabs on U.S.
  Government" (with Linda Roberge and Jeff Lamicela),  Proceedings of the
  28th Annual Meeting of the SAS Users Group International (SUGI 28),
  April 2, 2003, Seattle, Washington.

- "Balancing Data Quality Against Time and Money Constraints" (with Linda
  Roberge, Jeff Lamicela, Mummoorthy Murgesan, forthcoming in the
  Proceedings of the 29th Annual Meeting of the SAS Users Group
  International (SUGI 29), May 9, 2004, Montreal, Canada.

- "Extended Legal Education on the Web:  Looking Beyond Traditional
  Research Skills" (with Robert Wiener, Linda Roberge, and Patricia
  Hassett), 2004 CALI Conference for Law School Computing, June 18,
  2004, Seattle, Washington.

- "Are TRAC and Other Electronic Data Sources Re-Defining Best Practice
  Standards for Legal Research Instruction" (with Patricia Hassett and Linda
  Roberge), 2004 Sub-Tech Conference, June 2004, Seattle, Washington
  (web archive hosted by the Shidler Center for Law, Commerce &
  Technology at the University of Washington School of Law).

- "Technological Developments Being Used to Enhance Sentencing May
  Provide a Model for other Criminal Justice Improvements" (with Patricia
  Hassett, David Burnham, and Linda Roberge), International Conference
  on Sentencing and Society, June 27-29, 2002, Glasglow, Scotland.

- "Design and Delivery of Online Mining Tools: Turning Government Data
  Into Usable Information" (with Linda Roberge and David Burnham)
  Proceedings of the 3rd World Congress on the Management of Electronic
  Commerce, January 16, 2002. Hamilton, Ontario, Canada.

Most of my recent work has been in connection with my research at TRAC.  A
complete listing of my reports published through TRAC can be found online at:
http://trac.syr.edu/tracreports/recentreports.html

A-4

## Appendix B:  Results for Section 236(c) Subclass

There were a total of 460 individuals in the Section 236(c) subclass.  Table 19
shows that 5 percent of these individuals were still detained as of April 2012
when data coverage ended.

**Table 19**

**Number of Cases by Detention Category:
Section 236(c) Subclass***

| Detention Category | Number | Percent |
|---|---|---|
| No longer detained | 437 | 95% |
| Still detained | 23 | 5% |
| All cases | 460 | 100% |

* As of April 28, 2012

As of last April, Individuals had been detained on average for 427 days.
Detention times, however, ranged as high as 1,585 days.  See Table 20.

**Table 20**

**Average Days of Detention by Detention Category:
Section 236(c) Subclass***

| Detention Category | Detention Days | | |
|---|---|---|---|
| | Average | Lowest | Highest |
| No longer detained | 406 | 180 | 1,310 |
| Still detained | 827 | 558 | 1,585 |
| All cases | 427 | 180 | 1,585 |

* As of April 28, 2012

As shown in Table 21, about three out of four (73%) applied for relief, and more
than 40 percent of the individuals who applied were granted relief by the
immigration judge.

B-1

**Table 21**

**Applications for Relief:**
**Section 236(c) Subclass**

|  | Comparison Group | Filing for Relief | |
|---|---|---|---|
|  |  | Number | Percent |
| Number and percent who filed relief application(s) | 460 | 338 | 73% |
| Number and percent where relief granted by IJ | 338 | 137 | 41% |
| Number and percent where relief granted is final outcome | 137 | 130 | 95% |

Table 22 gives figures on the types of relief for which 236(c) class members
applied.  About half of class members (49%) filed an EOIR-42A application.  Just
a few (3%) applied only for WOR/WCAT.

**Table 22**

**Relief Applications Filed by Type:**
**Section 236(c) Subclass**

|  | Number | Percent |
|---|---|---|
| Number of cases | 460 | 100% |
| EOIR-42A applications filed | 225 | 49% |
| Only applying for WOR/WCAT | 14 | 3% |
| Other types of applications | 99 | 22% |
| Total filing relief applications | 338 | 73% |

An analysis was also conducted excluding individuals who had only applied for
relief, or had only been granted relief, under WOR/WCAT.  These results are
shown in Table 23.  Because so few individuals were affected by this exclusion,
results shown in Table 23 generally show a very similar pattern to what we saw
earlier in Table 21 covering all applications for relief.

**Table 23**

**Applications for Relief:  Section 236(c) Subclass
(Excluding Withholding of Removal and WCAT)\***

|  | Comparison Group | Filing for Relief | |
|---|---|---|---|
|  |  | Number | Percent |
| Number and percent who filed relief application(s) | 460 | 324 | 70% |
| Number and percent where relief granted by IJ | 324 | 126 | 39% |
| Number and percent where relief granted is final outcome | 126 | 124 | 98% |

\* Counts exclude cases where the only application filed, or the only application granted, was for Withholding of Removal or withholding under the Convention Against Torture..

Just as for the class as a whole, applying for relief increased the average detention time a person was held in ICE custody under 236(c).  The average detention days for class members who did and did not apply for relief are shown in Table 24.

**Table 24**

**Detention Days If Relief Application Filed:
Section 236(c) Subclass**

| Relief Applications | Average Days |
|---|---|
| No application for relief filed | 383 |
| Application for relief filed | 443 |
| All cases | 427 |

One in three subclass members (33%) won their case, while for an additional 11 percent the case was still pending at the end of April 2012.    See Table 25.

Table 25

Outcome of Case:
Section 236(c) Subclass*

| Outcome | Number | Percent |
|---|---|---|
| Won case | 150 | 33% |
| Case still pending | 51 | 11% |
| Deportation ordered (not departed) | 36 | 8% |
| Voluntary departure | 5 | 1% |
| Removal | 218 | 47% |
| All cases | 460 | 100% |

* As of April 28, 2012

Of the 150 subclass members who had won their case, 130 were granted relief while the proceeding(s) for the remaining 20 had been terminated.  See Table 26.

Table 26

Basis for Winning Case:
Section 236(c) Subclass

| | Number | Percent |
|---|---|---|
| Individual won case | 150 | 100% |
| Relief granted | 130 | 87% |
| Case terminated | 20 | 13% |

B-4

## Appendix C:  Tables for Section 235 Subclass

There were a total of 68 individuals identified by Petitioners' counsel for purposes of my analysis of the Section 235 subclass.  It is my understanding that this likely does not include all individuals in that class.  No subclass member was still in custody at the end of the monitoring period.  Table 27 shows that on average subclass members spent 346 days in detention, although detention time ranged as high as 831 days.

**Table 27**

**Detention Days:**
**Section 235 Subclass\***

|                        | Value |
|------------------------|-------|
| Number of cases        | 68    |
| Average detention days | 346   |
| Lowest detention days  | 180   |
| Highest detention days | 831   |

\* All are no longer detained (as of April 28, 2012).

Almost all (97%) of Section 235 subclass members filed applications for relief. The immigration judge granted them relief almost two-thirds of the time (64%). See Table 28.

**Table 28**

**Applications for Relief:**
**Section 235 Subclass**

|                                                             | Comparison Group | Filing for Relief | |
|-------------------------------------------------------------|------------------|--------|---------|
|                                                             |                  | Number | Percent |
| Number and percent who filed relief application(s)          | 68               | 66     | 97%     |
| Number and percent where relief granted by IJ              | 66               | 42     | 64%     |
| Number and percent where relief granted is final outcome   | 42               | 41     | 98%     |

The types of relief applied for are shown in Table 29.  Only a single individual applied for relief only under WOR/WCAT.

**Table 29**

**Relief Applications Filed by Type:**
**Section 235 Subclass**

|  | Number | Percent |
|---|---|---|
| Number of cases | 68 | 100% |
| EOIR-42A applications filed | 0 | 0% |
| Only applying for WOR/WCAT | 1 | 1% |
| Other types of applications | 65 | 96% |
| Total filing relief applications | 66 | 97% |

Table 30 presents results on relief applications after those who only sought or were only granted relief under WOR/WCAT are excluded.  Results shown in Table 30 below are virtually unchanged from what we saw earlier in Table 28.

**Table 30**

**Applications for Relief:  Section 235 Subclass**
**(Excluding Withholding of Removal and WCAT)***

|  | Comparison Group | Filing for Relief | |
|---|---|---|---|
|  |  | Number | Percent |
| Number and percent who filed relief application(s) | 68 | 65 | 96% |
| Number and percent where relief granted by IJ | 65 | 41 | 63% |
| Number and percent where relief granted is final outcome | 41 | 41 | 100% |

* Counts exclude cases where the only application filed, or the only application granted, was for Withholding of Removal or withholding under the Convention Against Torture.

C-2

Six out of ten individuals (60%) won their case.  Two cases were still pending at the end of April 2012.  Case outcomes are shown in Table 31.

**Table 31**

**Outcome of Case:**
**Section 235 Subclass\***

| Outcome | Number | Percent |
|---|---|---|
| Won case | 41 | 60% |
| Case still pending | 2 | 3% |
| Deportation ordered (not departed) | 18 | 26% |
| Voluntary departure | 0 | 0% |
| Removal | 7 | 10% |
| All cases | 68 | 100% |

\* As of April 28, 2012

C-3

# Exhibit B

# Rebuttal Expert Report of Professor Susan B. Long

*Rodriguez v. Hayes*, No. 07-3239 (C.D. Cal.)

Submitted Pursuant to Federal Rule
of Civil Procedure 26(a)(2)

## Introduction

I submit this rebuttal report as an expert, and at the request of Petitioners in *Rodriguez v. Hayes*. This report was prepared to respond to two issues raised in the government's Expert Statistical Report of October 12, 2012, authored by Dr. Chester I. Palmer. The two issues covered in this report are:

**Issue One**: Was the data on "adjournments" on which Dr. Palmer based his analyses reliable?

**Issue Two**: If I had used the in-period sampling approach suggested by Dr. Palmer in my original report, would the results reported in my original report have materially changed?

1

## Summary of Findings

❖ Issue One:  The data on adjournments on which Dr. Palmer based his analyses is not reliable.

I assessed the reliability of the adjournment data by examining the internal consistency between adjournments recorded in the "schedule" table and adjournments recorded in the "actions" table of the EOIR database.  There are over 900 adjournments recorded (almost 20% of the total) in the "actions" table that have no corresponding adjournment recorded in the "schedule" table within six days of the date on which the "action" allegedly occurred.  Conversely, there are well over 500 adjournments recorded in the "schedule" table with no matching adjournment in the "actions" table (over 10% of the total).  Upon examination, there was no discernible pattern indicating that this inconsistency affects only particular types of adjournments.  In fact, it affects many of the adjournments that Dr. Palmer's report classified as "alien-caused delays."  The extremely high rate of inconsistency in the adjournments data render it unreliable as an information source for the analysis that Dr. Palmer undertook.

These findings are consistent with my prior experience with the "schedule" table.  I attempted to rely on the "schedule" table for a study I conducted in 2009 and, based on my review of the data and conversations with immigration judges at that time, found that it was not reliable for the purpose for which I sought to use it.

❖ Issue Two:  Use of the in-period sampling approach suggested by Dr. Palmer does not materially change the results reported in my original report.

In his report, Dr. Palmer suggested that the population on which my analysis was based was subject to a "selection" bias insofar as some detainees held for longer periods of time have a greater chance of inclusion.  Dr. Palmer suggested that it would be more appropriate to use an in-period sample, although that sample would have to be adjusted for censoring bias because the outcome and detention length for some sample members was not known.  While my approach was appropriate given the questions I was asked to answer in my report and the available data, I nonetheless carried out the in-period sampling approach suggested by Dr. Palmer to determine if his approach would produce materially different results – that is, *lower* values for detainee success or detention length.  I conclude that it would not.

With respect to the outcomes of class members' cases, I found that using an in-period sample produced comparable, although somewhat higher, estimates of class members' success rates than the results from my original report.  In-period detainees are likely to have a successful outcome approximately 35% of the time.  Consistent with my prior results, an analysis of the in-period sample showed substantially higher success rates

2

for class members compared with results for the U.S. as a whole (where the majority of individuals were not detained), and stark differences as compared with success rates for all detainees at the Mira Loma Detention Facility.  Results concerning relief applications for the in-period sample also show that a slightly higher proportion of class members applied for relief, and that they were slightly more successful, than I reported in my original report.

With respect to the detention lengths of class members, it is far more challenging to develop reliable estimates for the in-period sample because a significant number of individuals in that sample were detained as of the time the data was obtained, making it impossible to know how long they will ultimately be detained.  To account for this "censoring" bias, I used two different methods to estimate detention length utilizing other available sources of data.  However, those methods produced detention time estimates substantially longer than those in my original report.  I concluded that because these approaches rely on additional data to correct for censoring bias, and because they lead to results showing substantially longer detention times than those reflected by my initial report (which analyzed only class members), they are likely not reliable.  In the absence of a reliable source of data from which to correct the censoring bias, I employed a "self-balancing" method utilizing the in-period and out-period data to estimate detention lengths.  This is the standard method used by statisticians in situations such as this, where two sources of bias operate in opposing directions.  This method, which I believe to be the more conservative approach, is equivalent to the analysis in my original report and produces the same results previously reported on detention length.  I believe those results are the most accurate available measures of detention length for purposes of determining class members' detention length given the available data.

I.     *Issue One:  Reliability of EOIR data on "adjournments"*

Dr. Palmer's report contained an analysis of the "adjournments" in class members'
cases based on data provided to him by the government.  However, the information on
which Dr. Palmer based his conclusions is not reliable because there is significant
internal inconsistency in the adjournment information in the data.  This conclusion is
consistent with my prior experience analyzing the source of the adjournment data.

I assessed the reliability of the adjournment data by examining its internal consistency.
Because there are multiple sources of information on adjournments in the EOIR Access
database that was provided in discovery in this case, one can use the sources to check
their consistency.  At least two tables within the EOIR Access database contain
information on adjournments: (1) the "schedule" table, on which Dr. Palmer relied for his
analysis[1]; and (2) the "actions" table, which contains information regarding "actions"
taken in a case, including adjournments.  However, the two tables do not contain
identical categories of information on adjournments.  The "actions" table lists only the
date and the fact that an adjournment was taken, and does not contain an "adjournment
code" that indicates the reason for the adjournment.

To assess the reliability of adjournment data, I compared the adjournments recorded in
the "schedule" and "actions" table for proceedings during the April 2010 – April 2012
period.[2]  A comparison of the adjournment information in the two tables reveals

---

[1] As Dr. Palmer explains in his report, he primarily relied on a spreadsheet entitled "AC
Delays.xls" that contained "information on the dates of hearings, with codes indicating
whether each hearing was adjourned and, if so, whether the adjournment was
requested by the alien."  It is my understanding that the information on dates of hearings
and adjournment codes was derived from the "schedule" table in the EOIR Access
database that was produced in discovery in this case.

[2] To provide as accurate gauge of the internal consistency of data in the requisite time
period, I focused only on hearings scheduled between April 2010 – April 2012 in the
"schedule" table, and adjournment entries in the "actions" table that occurred between
these two dates.  To help ensure that results were insensitive to assumptions
concerning how to perform the match, I re-ran my analysis several ways.  To look at
"match" rates, I began by consolidating records from the schedule table that had
multiple records for the same date into a single record.  I ran the analysis first on this
entire set, and then again on a set which, consistent with Dr. Palmer's analysis,
eliminated the entries in the "schedule" table with the adjournment code "99" (defined as
"data entry error") and also eliminated the entries in the "schedule" table where no
adjournment code was entered.  This was done because the lack of a reason given
could indicate that no adjournment in fact occurred.  With respect to the "99" and "blank"
adjournment codes, I found that their inclusion or exclusion did not materially affect the
"match" rate (in part because there were a small number of "matches" for those entries
in the "actions" table).  With respect to the records in the "actions" table, I also

4

significant inconsistencies in the data.  As an initial matter, there were materially different counts of adjournments entries reflected in the "schedule" (4,669) and "actions" tables (5,001).  In total, there were 332 (roughly 7%) more adjournments recorded in the "actions" table.  This represents a fairly high error rate, even if we assume that the remaining adjournments recorded were consistent (i.e., conducted on the same date) – which, as I explain below, they are not.

An analysis of the dates on which adjournments were recorded reveals even greater inconsistencies in the data.  For the 4,669 adjournments recorded in the "schedule" table, only 3,538 (76%) had a corresponding adjournment entered in the "actions" table with an identical date match.  However, this does not necessarily indicate error in the remaining adjournments because, for a variety of reasons, it is conceivable that an adjournment may be recorded in the "schedule" and "actions" tables on different dates, or recorded as entered on different dates (although this delay could undermine the reliability of the reasons attributed to the adjournments).  To account for this possibility, I compared how often the adjournments recorded in the "schedule" and "actions" tables fell within a six day range of each other (that is, plus/minus three days).  Although it might be appropriate to select a smaller range to assess error rate, I selected a broad enough range that would account for any reasonable delay in data entry.

**Table 32**

**Comparison of Adjournment Entries in Schedule and Actions Tables\***

|  | Number |
|---|---|
| Schedule Table:  hearings listed with an adjournment reason | 4,669 |
| Actions Table:  adjournment entries | 5,001 |
|  |  |
| Dates matched: |  |
|     Adjournment dates the same | 3,538 |
|     Dates loosely match (within six day range - plus/minus 3 days) | 555 |
| No matching date within six-day range of each other: |  |
|     Adjournment entry in Actions Table not in Schedules Table | 908 |
|     Adjournment entry in Schedule Table not in Actions Table | 576 |
|     Subtotal - not matched | 1,484 |

\* Exclude records where adjournment reason blank or code '99' and all actions where adjournment action was "Edited" rather than "Added"

consolidated any adjournment records on the same date for a given case into a single record when I ran the analysis.  Sometimes the adjournment records indicated they had been "Edited" rather than "Added."  So I re-ran the analysis again after screening out the "Edited" adjournment records.  The "match" rates were comparable under these different methods.  For simplicity, I report the "match" rates for my final analysis where I eliminated blank or '99' entries in the adjournment code field and also eliminated "Edited" adjournment entries from the actions table.

As the above table indicates, there were significant numbers of adjournments in the "schedule" and "actions" table that had no matching date within a six day range. 908 of the adjournment entries (18%) in the "actions" table did not have a match within six days in the "schedule" table. Conversely, 576 of the adjournment entries (12%) in the "schedule" table did not have a match within six days in the "actions" table. In total, there were 1,484 adjournment entries across the two tables where their dates were not within a six-day range. This is a very high number – especially compared to the total number of original entries in either table – 4,669 in the "schedule" table, and 5,001 in the "actions" table.

I next carried out further analyses to see whether there were particular adjournment codes where this "no match" problem occurred. I found that the inconsistencies in the dates for adjournments did not appear to be limited to any one type or class of adjournment. For this analysis, I located the adjournment reasons that had been entered for the case and date for each "no match" record in the "schedule" table. I then analyzed the number and percent of "no match" entries for the adjournment codes. I concluded that, while there was some variability in the "no match" rates, there were "no matches" for all adjournment codes except for a few codes that occurred very infrequently in the "schedule" table.[3]

In particular, I found no discernible pattern in the types of adjournment codes where "no matches" occurred. I looked especially at the adjournment codes that Dr. Palmer's report attributed as "alien requested" and found a significant "no match" rate for these as well.

These estimates likely underestimate the error rate in the data because my analysis considered only the presence or absence of an adjournment entry. There were other variables included in the "schedule" table – including the "reason" for an adjournment – that could also be sources of error but were not included in this analysis since there was no corresponding adjournment code recorded in the "actions" table with which it could be compared.

In light of the significant inconsistency with the "actions" table, it is my opinion that the adjournment information in the "schedule" table is not sufficiently reliable for the type of analysis that Dr. Palmer attempted to conduct. While there will always be errors in any large data source, when the errors or inconsistencies in a data set become severe,

---

[3] For this analysis I could not consider adjournments that were recorded in the "actions" table but where there was no matching entry in the "schedule" table since the actions table did not contain the adjournment reason code. That is I started with 576 unmatched records. Accordingly this part of my analysis had to ignore the substantially larger number of occasions – 908 – where the "actions" table contained an adjournment but no match was found in the "schedule" table.

those data fields cannot be relied upon to draw valid statistical conclusions. Although the exact rate of error at which a data field becomes unreliable depends in part on the purpose for which it is used – and even then reasonable minds may differ on the tipping point at which the data is no longer useful – in my judgment, the high rate of inconsistencies between the "schedule" table and the "actions" table renders the "schedule" table unreliable for the analysis undertaken in Dr. Palmer's report.

My conclusion is reinforced by my prior experience working with the "schedule" table data. In 2009, I conducted a study on the workload of immigration judges that relied in part on data provided by EOIR, including data from the case, proceedings, charge, court applications, and the "schedule" tables. My study also involved interviews of immigration judges. I had originally planned to base a good part of my results on the data in the "schedule" table. However, when I provided immigration judges with copies of the tables for their own schedules and that of their colleagues, the judges I interviewed pointed to numerous inaccuracies in them and advised me that they did not believe the "schedule" table accurately reflected what they knew had taken place. Given this advice, I discontinued my use of the schedule table and did not rely upon it in deriving my results. While it is possible that the data in the "schedule" table has improved since that time, my review of the "schedule" table in this case strongly suggests that numerous problems remain.

## II.   *Issue Two: Use of in-period detainees to measure outcomes and detention length*

In his report, Dr. Palmer suggested that it would be more appropriate to use an in-period sample for my analysis because the population on which my analysis was based was subject to a "selection" bias. While my approach was appropriate given the questions I addressed in my report and the available data, I nonetheless carried out the in-period sampling approach suggested by Dr. Palmer to determine if his approach would produce materially different results – that is, lower values. I conclude that it would not.

With respect to the outcome of class members' cases, I found that using an in-period sample produced somewhat higher estimates of class members' success rates than the results in my original report. Consistent with my prior results, an analysis of the in-period sample showed materially higher success rates for class members compared with results for the U.S. as a whole (where the majority of individuals were not detained) as well as stark differences with success rates for all detainees at the Mira Loma Detention Facility. Results concerning relief applications for the in-period sample show that a slightly higher proportion of class members applied for relief and that they were slightly more successful than I had reported in my original report.

It is far more challenging to develop reliable estimates of detention lengths for the in-period sample because a significant number of individuals in that sample remain detained.  To account for this "censoring" bias, I applied two additional standard methods coupled with other available data to estimate the likely detention lengths for those members of the in-period sample who remain detained.  Those standard methods produce detention lengths that are distinctively higher than in my initial report – that is, they show substantially longer average detention periods.  Because these estimates rely upon additional data to correct for censoring bias that may not be reliable, and because they produce results that are markedly different from (and longer than) those produced in my original report, I ultimately reject them.  I believe a more conservative approach is to use the self-balancing method that is commonly employed when both selection bias and censoring bias are present in the data.  The self-balancing method is equivalent to the analysis in my original report and produces the same results reported there on detention length.

### A.  Preliminary Considerations

#### 1.  *Using Data About the Universe vs. Only a Sample*

In my initial report, I was asked to provide information on the class members whose information I was given as though they constituted the universe of the relevant population.  In this case, an analysis that treats the class members whose information we have as the universe of cases may be preferable to an analysis limited to just a sample of cases selected from that universe, for a number of reasons.  First, because *more* individuals are included in the universe, results can usefully examine the outcome for smaller subgroups within the data. Second, the methodology of sampling inherently introduces additional imprecision into the results about the class as a whole. Statisticians refer to this imprecision as "sampling error."  Third, analysis based upon the universe of cases uses concrete data about actual class members.  Accordingly, unlike with sampling, results derived from analysis of that universe is based on what has actually occurred, rather than on what anyone assumes *might* occur.

However, there are occasions when a sampling approach may be preferred, such as when analysis of the universe of cases leads to bias.  Dr. Palmer suggests that the data from this particular universe – all class members detained for at least 180 days and in the Los Angeles area at any time during the period between April 2010 and April 2011 – may lead to biased results if all class members did not have the *exact same probability* of inclusion.  Statisticians refer to this phenomenon as "selection bias."  Dr. Palmer suggests that this selection bias might, under some circumstances, be expected to lead to over-estimation of detention length.  He then attempts to adjust for this selection bias by restricting his analysis to a sample of individuals drawn from the universe who were in custody during their 181st day during this period (the "in-period" sample).

8

However, Dr. Palmer's method leaves other sources of bias unaddressed. One of
these, which is present in this data, statisticians refer to as "censoring" bias. As I
mentioned in my earlier report, the data available were incomplete because individuals
were not followed long enough to know either the eventual outcome for every case or
the entire length of each detention period. This bias can be expected to lead to under-
estimating the eventual success of class members and their detention length.

As I noted in my earlier report, even when utilizing the data we have about all class
members, "censoring" bias is present to some degree because we only know the
ultimate outcome and detention length for individuals whose cases had *already*
concluded. When one uses just an in-period sample of those class members, the
"censoring" bias is magnified, because the percentage of individuals whose cases have
not yet concluded rises.

### 2. *Methodology for This Report*

To assess whether Dr. Palmer's suggested method would produce materially different
results from those provided in my original report, I re-analyzed the same data I used
before. This time I followed the in-period sampling approach suggested by Dr. Palmer.

This re-analysis involved the following steps. First, I defined the "population" of interest
to determine which individuals properly fell into the "in-period" sample for this
population. Second, I performed the same analysis I conducted earlier, but just on this
"in-period" sample. Where sources of bias were substantial, I used standard techniques
for estimation to counteract that bias.

### 3. *Defining the Proper In-Period Sample*

Before one can apply a sampling approach, one must have a clear definition of what
statisticians refer to as the *population of interest*. This is required if, as Dr. Palmer
states, one wants to ensure that "all cases of interest have the same probability of
selection for the sample" from this population. The implicit assumption inherent in such
a method is that the "population of interest" is not simply class members during the April
2010 – April 2011 period (the universe that my original report analyzed), but individuals
who will qualify as class members subsequent to April 2011 and continuing on into the
future.

It is worth noting at the outset that strictly speaking the in-period sampling methodology
suggested by Dr. Palmer does not ensure that everyone in the population of interest has
the same probability of selection. Indeed, individuals who only qualify as class
members subsequent to April 2011 have no chance of being selected in the sample
because we have no data concerning them. In addition, other factors that gave rise to
the outcomes of interest – including the various factors impacting who ICE detains and,

9

once detained, the class members' length of detention and ultimate success or failure –
may change in the future.  (For example, we already know that the length of time
immigration judges are taking to dispose of cases has been generally rising, which
presumably has an impact upon how long future class members may take to obtain a
final decision and therefore their length of detention.)

Nonetheless, I utilized Dr. Palmer's general method by treating class members detained
during the April 2010 – April 2011 period as a sample from which to draw conclusions
about class members who have been or will be detained after that time period.  I treated
all individuals who will qualify as class members subsequent to April 2011 and
continuing on into the future as encompassed within the population of interest.

During the course of preparing this analysis, and after consulting with Petitioners'
counsel, I also made further adjustments to exclude individuals who were not class
members but whose data were included in the initial information provided to me.

Out of the 1,026 records the government provided in the universe, there were a total of
83 individuals who Petitioners' attorneys instructed me were not properly part of the
population,[4] leaving a total of 943 class members (943 = 1,026 - 83) from which to
select the "in-period" sample.  Applying the same methodology Dr. Palmer
recommended – selecting class members who reached their 181st day of detention

---

[4] I excluded people from the original 1,026 data entries for the following reasons.  First,
there were two individuals that were not detained for 180 days.  Second, there were an
additional 24 individuals that had no ongoing administrative or judicial proceeding at any
time subsequent to their entry into ICE custody.  Prior to my completing my original
report, I notified Petitioners' counsel about the existence of those individuals and they
instructed me to exclude them from my analysis.  The exclusion of the first two groups is
discussed at page 4 and in footnote 5 of my original report.  Upon preparing the
analysis for this report, I discovered additional individuals for whom a final decision in
their case already had been reached by the time they reached 180 days of detention.
Thus, there was no ongoing administrative or judicial proceeding that prevented the
government from deporting such individuals.  After discussing the issue with Petitioners'
counsel, they instructed me to exclude 57 individuals from my analysis for this report
because they had concluded that these individuals were not class members.  To assist
the attorneys in their review to confirm that these individuals were not class members, I
was asked to provide the field "appeal_rsvd" from the proceedings table which had not
been included in the EOIR extract provided in this case, but was included in the extract
EOIR prepares on all proceedings for the Transactional Records Access Clearinghouse
(TRAC) at Syracuse University where I serve as the co-director. The availability of this
data was discussed at footnote 2 in my earlier report.

during the April 2010 – April 2011 period – resulted in an in-period sample of 595 class members.[5]

### 4. *Identifying the Presence of Censoring Bias*

Next I examined the data for the in-period sample to determine in how many cases the data had ended before the individual's court proceedings and detention history had reached their conclusions. As noted above, bias resulting from having incomplete information because cases are not followed long enough is referred to as "censoring bias."

Censoring bias was a significant problem in the in-period sample. As shown in Table 33, individuals had not been followed long enough for their cases to conclude in nearly one out of every five cases (18%). A total of 105 out of the 595 class members in the sample had data which was "censored" in this manner.

**Table 33**

**Cases with Censored Data in Sample**

|                  | Number | Percent |
|------------------|--------|---------|
| Censored cases   | 105    | 18%     |
| Remaining cases  | 490    | 82%     |
| All cases        | 595    | 100%    |

---

[5] Dr. Palmer's in-period sample contained 662 individuals. I directly compared the individuals Dr. Palmer used in his sample with those contained in my sample using a file which Dr. Palmer provided listing the alien numbers in his "in-period" sample. The main reason for the differences between my sample and his was that he failed to exclude 81 of the 83 individuals from the data the government provided who were not class members. There also were other minor differences, although they do not affect the analysis in a material way. For example, for some reason, Dr. Palmer did not report receiving a complete list of the 1,026 individuals that was originally provided to Petitioners' attorneys in the initial data release; Dr. Palmer reports (at page 8 of his report) only receiving a list of "1,021 distinct alien numbers." Further, as explained at page 6 of his report Dr. Palmer excluded six individuals because he was concerned about differences in the names on these records. I did not exclude any individual on this basis. (I examined the data on these six individuals and found that the possible name discrepancies that Dr. Palmer was apparently concerned about disappeared once records were restricted to the period of time beginning when these individuals entered ICE custody. Since the names were entirely consistent for the time period relied upon, whether or not these old records concerned the same or different individuals had no bearing on this analysis.)

In 104 out of these 105 cases the case was still pending and no final outcome had occurred. (In the remaining case, the individual was still detained even though the data available indicated that a removal order had been entered and no additional information on any subsequent proceeding was located. Therefore, I treated the case as closed).[6]

Given the prevalence of censoring in the data for this in-period sample of class members, sample estimates must include an adjustment for their potential biasing effects. Thus, I adjusted the sample estimates using standard methodologies to correct for censoring bias. Then I compared the resulting in-period sample estimates with my original findings to see whether they have materially changed. As noted above, they do not.

Because the potential effects of selection bias as well as censoring bias may vary depending upon the specific purposes for which the data are being used, I divide my discussion into three sections based upon the type of measures or questions being addressed. First, I discuss findings related to outcome – whether the class members win or lose their cases. Next, I discuss results concerning the process in class members' cases – the types of proceedings involved, and types of relief requested. Finally, I discuss findings concerning detention length.[7]

## B. Class Member Outcomes

### 1. *Success Rates*

The results initially reported on case outcomes are not materially affected by use of an in-period sampling approach. As Table 34 shows, a total of 176 individuals among the 595 class members in our sample had already won their case (30%). This number is higher than that found in my original report (26%). But there were an additional 104

---

[6] Using the ICE information on detention current as of September 27, 2012 from ICE-EDI-010, which I received after my original report was prepared, I was able to determine that, as of that date, 19 sample members remained in detention. However, as long as proceedings continue and a final outcome has not been reached, this number can change either up or down. Even if a class member had been released from detention, the data show he or she can be placed back into ICE custody. For example, one class member was placed back into ICE custody on the day following an adverse decision by the BIA and remained detained during the class member's Ninth Circuit appeal. While he was counted as not detained in my earlier report, he is counted as detained here.

[7] The analysis in Table 18 of my original report on aggregate detention days is not repeated here because Dr. Palmer and I are in agreement that selection bias should not be an issue when answering this question. See page 5 of Dr. Palmer's report discussing sampling approaches for measuring workload.

individuals for whom their final outcome was unknown because their cases were still pending.

Given the already high "win" rate, it would not be reasonable to assume that in every one of the 104 pending matters the class member will eventually lose. Thus, some censoring bias clearly exists with respect to case outcomes. Perhaps the most common way to correct for this obvious bias is to use information from prior time periods for the adjustment. For example, if we can determine from prior periods what proportion of cases will eventually be won we can use this information to adjust the proportion of cases in the sample that are likely to be successful. The only data available, however, are the 348 class members in the population who were not in the in-period sample. Although these individuals were followed for somewhat longer periods, 16 percent of these cases also were still pending at the time the data was obtained. Thus, the degree of censoring bias from this data with respect to outcome is only marginally lower than the degree for our in-period sample.

We are therefore left with having to make some further assumption for this adjustment. Without more data, the most straightforward approach is to assume the success rate for outstanding cases in the sample is similar to the success rate for cases that have already been concluded. This was the approach I used.

Table 34 presents these results, and compares them to those I reported earlier in Table 17 of my original report. In my original report, 26% had won their case. For the in-period sample, a higher percentage – 30% – had won their case even before applying an adjustment for censoring bias.[8] Assuming that the success rate for outstanding cases will be the same as for cases that have already concluded, the success rate for the sample is 35%; that is, 35% of class members will eventually win their cases.

---

[8] The reason that the sample had won a somewhat higher proportion of their cases than the universe – 30% versus 26% -- does not appear to be a result of selection bias. Success rates for the in-period and out-period individuals were essentially the same prior to the exclusion of the additional 57 individuals who were not class members but were unknowingly included in the universe I analyzed in my original report. Every one of the 57 individuals had lost their case and most of these individuals would have otherwise qualified to be in the in-period sample.

Table 34

**Outcome of Case:  Methods Compared**

|  | Total | Won Case* Number | Percent |
|---|---|---|---|
| Original report | 1,000 | 263 | 26% |
| Sample results: | | | |
| Initial (subject to censoring bias) | 595 | 176 | 30% |
| Final (after corrections for censoring bias) | 595 | 207 | 35% |

* Numbers for "won" do not include those who obtained orders for voluntary departure (VD).  Results in my original report indicated that an additional 46 individuals (5%) received VD orders.  Sample results found an additional 28 individuals received VD orders (5%) without correction and 33 (6%) after correction for censoring bias.

My original report (at Table 17) also compared the success rate for class members against two other groups.  Table 35 repeats this comparison but uses the sample results.  The numbers reported in the first two columns concerning outcomes in removal proceedings for the United States as a whole, and in all removal proceedings at the Mira Loma Detention Facility are taken directly from my original report.  Those in column three report sample results after correcting for censoring bias.

Table 35

**Comparing Outcomes in Removal Proceedings**

|  | United States (majority not detained)* | Mira Loma Detention Facility* | Class Members |
|---|---|---|---|
| Removal proceedings decided | 608,129 | 9,355 | 595 |
| Number won by individual** | 163,907 | 669 | 207 |
| Number relief granted | 90,865 | 514 | 184 |
| *Percent won by individual* | *27%* | *7%* | *35%* |
| *Percent granted relief* | *15%* | *5%* | *31%* |

* Immigration Court records current as of August 31, 2012.for the period FY 2010 - 2012.  According to the latest published EOIR figures, for the U.S. non-detained cases made up 58% (FY 2011) and 56% (FY 2010) of proceedings, while Mira Loma hearings are just for detainees.

** Includes cases granting relief and terminated.

14

The general thrust of these results is not materially altered from my original report, except that class members based upon sample results are somewhat more successful. Comparing the results for the U.S. as a whole (where the majority of individuals were not detained) with those for our class members, we see that class members were more successful – 35% for class members as compared with 27% for all proceedings nationally.  Indeed, class members were over twice as successful – 31% versus 15% -- in being awarded relief.

And again, the success rate for class members as compared with all detainees at the Mira Loma Detention Facility was stark.  Class members' success rate was five times higher – 35% versus 7% -- and the percent awarded relief was now more than six times higher – 31% versus 5%.

## 2.  *Types of Proceedings*

Use of the in-period sampling method also results in no material change to the results originally reported concerning the types of proceedings.  Records available on the in-period sample showed that – as before -- Immigration Court proceedings were conducted in almost every case (96%).  In slightly less than one out of three cases (32%) an appeal to the Board of Immigration Appeals ("BIA") was filed.  Finally, in one out of six cases (16%), an appeal was taken to the Ninth Circuit Court of Appeals.

**Table 36**

**Court Involvement in Case:  Methods Compared**

|  | | Case Appealed to: | | | |
|  | | BIA | | 9th Circuit | |
|  | Total | Number | Percent | Number | Percent |
|---|---|---|---|---|---|
| Original report | 1,000 | 356 | 36% | 197 | 20% |
| Sample results: | | | | | |
|    Initial (subject to censoring bias) | 595 | 190 | 32% | 97 | 16% |
|    Final (after corrections for censoring bias) | 595 | 221 | 37% | 121 | 20% |

Again, however, some censoring bias is likely present in our sample because some future appeals (by either the government or the class members) are not yet reflected in the data because cases have not been followed long enough.  Given the sizable number of appeals to the BIA and the Ninth Circuit that are already recorded in the data and given the large number of censored cases, it is not reasonable to assume that *no* further BIA or Ninth Circuit Appeals will occur. Indeed, over a third (36%) of pending cases are still waiting for the immigration judge to issue an initial decision in their case. Thus some estimate to correct for censoring bias is needed.

15

Unlike the situation when we estimated sample members' success rates, it is *not* reasonable to assume that sample members whose cases have reached a conclusion are similar to those whose cases are still pending. Cases that progress more quickly through the system and thus have already reached a final outcome may not be representative of those that progress more slowly for purposes of what we are trying to estimate here – the number of cases that will be appealed.

A standard way of attempting to correct for censoring bias under these circumstances is to add in cases from prior periods which were not part of the original sample to those from the sample and calculate an overall average or proportion from this combined set. This approach, which we later explain in more detail, is sometimes referred to as the "self-balancing" method. The "self-balancing" method is appropriate under circumstances where cases originating in prior periods are subject to substantially less censoring bias, usually because they have been followed for much longer. Statisticians recognize that this approach is an approximation, but it has been found to work quite well as a practical matter in many circumstances and hence is widely used.

Using this technique, we combine information on the 348 class members not selected for the in-period sample with the 595 individuals in the sample and use this combined set to derive an overall proportion of cases that record a BIA appeal and a Ninth Circuit appeal. Not surprisingly, these results are almost identical to those in my original report, which were reported at Table 5 of that report.

### 3. *Relief Applications*

Use of the in-period sampling method also results in no material change to the results originally reported concerning relief applications. Results concerning relief applications for the in-period sample show that 75% of class members filed relief applications, and 29% of class members had been granted relief thus far by an immigration judge. As shown in Table 37 these percentages are similar – although slightly higher – than those from my original report.

**Table 37**

**Applications for Relief:  Methods Compared**

| | | Relief Application: | | | |
| | | Filed | | Granted | |
| | Total | Number | Percent | Number | Percent |
|---|---|---|---|---|---|
| Original report | 1,000 | 713 | 71% | 251 | 25% |
| Sample results: | | | | | |
|    Initial (subject to censoring bias) | 595 | 444 | 75% | 171 | 29% |
|    Final (after corrections for censoring bias) | 595 | 444 | *75% | 184 | 31% |

\* No correction for censoring bias needed.

Unlike with respect to outcomes and types of proceedings, the problem of censoring bias is less likely to occur in the data on relief applications because such applications tend to be filed earlier in proceedings and are thus more likely to have been recorded in the data for cases where proceedings have not yet concluded.  Thus, no correction for censoring bias is made.

Censoring bias for the reasons previously discussed, however, is likely to have materially affected our estimate of the proportion of class members who are granted relief.   We have already estimated the proportion of class members who won relief (31%).  This figure was reported in Table 35.  We have therefore used this estimate for the proportion of class members who eventually are granted relief as shown in Table 37.

Sample results were also not materially changed for my findings on the type of relief applications filed, as well as for their grant rates.  If anything, consistent with the larger proportion found to have filed relief applications and to have been granted relief when the sample method was used, these statistics also rose slightly. With respect to WOR/WCAT, only 19 sample members or just 3% only applied for these types of relief.   This was the exact same percentage I initially reported.  And again, given their relatively small numbers, the same general picture emerged if those who only sought, or were only awarded relief, under WOR or WCAT were excluded rather than included.

## C. Detention Length

Among all the questions examined in my original report, the use of the in-period sampling method to measure detention length is the most impacted by bias.  As Dr. Palmer noted, some sampling bias is present in the original analysis of detention

17

lengths, because individuals detained for longer periods of time are more likely to be selected from the universe of class members detained from April 2010 to April 2011. However, censoring bias – which leads to an under-estimation of detention lengths – is also present in the original report, and is magnified when we use the in-period sampling method to analyze detention lengths. This is because in-period detainees have been followed for a shorter period of time and a higher percentage of cases have not yet concluded, leaving their detention length unknown. Data that has been publicly released by ICE as well as by the Immigration Courts to TRAC and to others indicates that some individuals remain in ICE custody for many years while waiting for a final decision in their case. Yet the data on class members on which my original report was based stopped following some class members after only 18 months.

For a measure such as detention length where the custody time can be lengthy, to obtain an uncensored data set we would have to follow all of the individuals in the sample for an extensive period of time, until they were all released from detention. Because this is often not possible, there are three approaches commonly used to correct for censoring bias in situations such as this. The first method starts with the in-period sample, but then uses an external source of data to estimate how long all members of that group will eventually be detained. The second method starts with all class members on whom we have data, but then uses a weighting method to correct for selection bias to bring the under-represented segment in the out-period group into parity with the proportion found within the in-period group. An external source of data is similarly required with the second method. However, because the out-period group was followed longer, less correction is needed. The third method is the "self-balancing" approach described above. It takes the universe of individuals observed in the time period available, and where two sources of bias are acting in opposite directions, assumes that these two sources of potential bias – selection bias and censoring bias -- cancel each other out. Unlike the other two approaches, the self-balancing method does not require any outside information or assumptions about the eventual distribution of detention length for class members. As I explain below, I ultimately concluded that the third method was the most conservative and most accurate method to measure detention lengths in this case.

Both of the first two methods require use of reliable additional data about the entire distribution of detention times that describes our population of interest. This information is then used to correct the censored data values so that the detention length used in our analysis more closely corresponds to what the actual detention times will ultimately be for those individuals who are still detained. These first two methods can be used only if

18

reliable data describing the distribution of detention times for our population of interest exists.[9]

The first step was to locate additional data on the distribution of detention times for the population of interest so that the first two methods could be applied.  Because we know that this class includes people who are detained for very lengthy periods, we must utilize an accurate source of externally-available data to approximate what the distribution of detention times looks like for class members that would include those with particularly lengthy times in custody.  However, this presents a serious problem.  Although I have actively gathered data available on ICE detentions as well as on immigration proceedings for a number of years through my work with TRAC, I know of no other data of comparable completeness and specificity to the data that was ordered disclosed through discovery in this case and that was used in my original report.  To correct for the censoring bias present here, however, what is needed is comparable data for an extremely long period of time.

In an attempt to find such data I utilized detailed records on all immigration court proceedings covering the past twenty years that TRAC obtained from EOIR.  I first identified all proceedings of detained individuals held at detention facilities in Los Angeles County over the last twenty years.  I then eliminated from consideration any removal or deportation case where at any point custody for the individual was recorded as other than detained.  From these I selected those where a decision concluding the case – that is a decision recorded as removal, voluntary departure, grant of relief, or a decision terminating the case allowing the individual to remain in the country – was recorded.

Following a method similar to the one Dr. Palmer used to avoid any selection bias, I then narrowed the set of cases to those where the decision concluding the case occurred in the same twelve month window used to compile the data used in the prior reports – April 2010 to April 2011. (I will refer to this as the "exit" data since it uses the data on when individuals' cases conclude.)  Using these cases I computed the number of days between ICE's initial filing of the action in immigration court and the date of the court's final decision in order to approximate the length of custody.  Selecting only those cases where this period was at least 180 days, I then used this information in order to derive alternative estimates for the average number of days that class members remain in custody.

_____

[9] In his deposition, Dr. Palmer suggested that the censoring problem could be addressed by using the out-period detainees to develop estimates for the length of future detention for class members in the in-period sample that remained detained. However, the out-period data suffers from the same basic censoring problem – a significant number of out-period detainees remained detained – that would bias the data and result in an under-estimate of detention length.

From the outset I had reservations as to the suitability of this exit data for the purposes needed. Because the data TRAC receives does not contain alien numbers or detainee names, I had no way to match detainee records in EOIR's data with those from ICE's data and therefore could only approximate actual time in ICE custody for each detainee. And for the same reason, it was not possible to match up detainee records through all levels of appeal. This left some uncertainty that these data accurately captured the population of interest – that is, all individuals who qualified as class members -- or that I in fact was observing the *final* outcome in each case. However, I pressed forward as I determined that it was preferable to at least apply the first two methods using this exit data, given that it is the best available external data source, in order to see what the result would be using the in-period detainee data.

## 1. *The First Method for Calculating Detention Length*

I then applied the first method for calculating detention lengths using our in-period sample. I did this by taking the recorded times for the individuals who were still detained with pending cases, comparing them with the times I computed for the identical proportion of individuals from the exit data, and then correcting the recorded times to reflect how long the exit data indicated we should expect them to remain detained. I then computed the average detention length for detainees in the in-period sample. This resulted in an estimate for the average detention period for class members of 474 days. Since this result was substantially larger than the value I had derived in my original report (404 days), this increased my doubts as to the feasibility of obtaining reliable results using the first method.

## 2. *The Second Method for Calculating Detention Length*

I then applied the second method of calculating detention lengths. The second method utilizes a different approach for correcting for selection bias. It uses the entire population of 943 class members, rather than only those selected for the in-period sample, and then uses a weighting method to correct for selection bias to bring the under-represented segment in the out-period group into parity with the proportion found within the in-period group. This "weighted sample" thus corrects for selection bias, but does not require throwing away data on any class members.

Under many circumstances this *weighted sample* method gives better precision and hence is often preferred by statisticians over the first method, particularly because it does not require disregarding data on any class members (as the first method does). Because those not selected for the in-period sample had been followed longer, censoring bias on detention time also was significantly less. Thus, relatively speaking, the weighted combined sample needed less correction for censoring bias.

20

I then computed the average detention length using the second method, by correcting
censored times in the weighted sample to reflect how long the exit data indicated we
should expect those still detained to remain detained.  This resulted in an estimate for
the average detention period for class members of 478 days.  This result again was
much larger than the value of 404 days I had derived as the average detention days for
class members in my original report, and further undermined my confidence in the use
of any method that required an external source of data.

Based upon these results, I concluded that it was infeasible to derive reliable estimates
for detention lengths for class members using either of the first two methods.  These
methods required more reliable information about population detention times than was
provided by available data.

### 3.   *The Third Method for Calculating Detention Length*

The third method I used was the self-balancing approach to correct for both selection
and censoring bias.  I started with the same data on detention time for the 1,000
detainees I had used in my original report.  As we have discussed, there are two
primary sources of known bias.[10]  The effect of censoring bias is to make estimates of
detention times too short, while selection bias leads to the opposite effect – making
estimates of detention times too long.  If these two biases are approximately the same
magnitude, they cancel each other out, and resulting estimates of detention time would
be correct.  This method turns out to be the equivalent of what I employed when I was
simply analyzing the universe of detainees in my original report, using all of the data
available and making no predictive assumptions about how long people would be
detained for in the future.  Thus, the estimates that result from the self-balancing
approach are identical to the ones that were reported there.

While we cannot know in advance if the result retains some "net" bias in one direction or
the other, use of the self-balancing method allows us to avoid making further
assumptions about the nature of the sample and imposing adjustments to correct for

---

[10] There is also a third source – the inclusion of 57 detainees who were not class
members.  Because their cases completed before the 180 detention days were
reached, their detention times were also shorter than average.  Thus, their inclusion
depressed the average detention time for the class.  It often happens in studies that the
determination of membership in the population of interest inadvertently includes some
individuals who should have been excluded, or excludes some individuals that should
have been included because of imperfect information.  The self-balancing approach
treats these imperfections as simply other potential sources of bias that the method
balances out.  In contrast, the in-period and weighted sampling methods assume that
we can identify the population of interest precisely.

resulting biases.  In this sense it has the advantage of being based on what we know has occurred, rather than on what *might* occur.

Self-balancing is the standard method used by statisticians to correct for censoring bias in the absence of adequate data to estimate and correct for it.  Adding in cases from prior periods which were not part of the original sample and calculating an overall average from this combined set will generally result in better estimates than selecting a perfectly random sample where there is censoring bias.  This approach works because cases originating in prior periods usually have been followed longer and thus either have no censoring bias or (as in this case) are subject to less censoring bias. Thus, we know that it generally will lead to better estimates to use this self-balancing approach than to use a sample that is chosen to avoid selection bias but fails to account for censoring bias.

Of course statisticians recognize that this approach is an approximation, but it has been found to work quite well as a practical matter in many circumstances and hence is widely used.   In my professional judgment, given the state of available data, the estimates produces by this method are the most reliable we have.  This method, which is described as a self-balancing estimation technique when conducting sampling, is exactly equivalent to the analysis in my original report.  Hence the results I reported there are the most reliable we have on the average detention length for all individuals who qualify or will qualify as class members in the future -- our population of interest.

22

## Appendix: Sample Results for Section 236(c) and Section 235 Subclasses

Using the same in-period sampling approach for subclasses resulted in a total of 252
individuals in the Section 236(c) Subclass sample, and 55 in the Section 235 Subclass
sample.  Table 38 compares how many won their cases, and estimates – both prior to
correction and after corrections for censoring bias – their win rates.  As we saw for the
population as a whole, the in-period sampling method resulted in somewhat higher
success rates than originally reported.

**Table 38**

**Outcome of Case:  Methods Compared for Subclasses**

|  | Total | Won Case* Number | Percent |
|---|---|---|---|
| *Section 236(c) Subclass* | | | |
| Original report | 460 | 150 | 33% |
| Sample results: | | | |
| Initial (subject to censoring bias) | 252 | 88 | 35% |
| Final (after corrections for censoring bias) | 252 | 97 | 38% |
| *Section 235 Subclass* | | | |
| Original report | 68 | 41 | 60% |
| Sample results: | | | |
| Initial (subject to censoring bias) | 55 | 35 | 64% |
| Final (after corrections for censoring bias) | 55 | 36 | 65% |

* Numbers for "won" do not include those who obtained orders for
voluntary departure (VD).  For the Section 236 Subclass an additional
1% of individuals won VD orders under either method.  There were
no VD orders in the Section 235a Subclass.

23

# Exhibit C



**TRACImmigration**



## Immigration Court Processing Time by Outcome
### by Removals, Voluntary Departures, Terminations, Relief, Administrative Closures

**About the Data**
*through October 31st, 2012*

**What to tabulate:**
- Completed Cases
- ● Average Days

**Starting with:**
- ● States
- Nationalities

**Outcome Type:**
- All
- Removals
- Voluntary Departures
- No Grounds For Removal (Terminations)
- ● Relief Granted
- Administrative/Other Closure

**Graph As:**
- ● Time series
- Top 10



**Fiscal Year 2013**
*click on column headings to sort*

| State | Avg. Days To Relief |
| --- | --- |
| Entire US | 891 |
| Georgia | 1,055 |
| Nebraska | 1,050 |
| Oregon | 1,045 |
| Utah | 1,037 |
| California | 1,035 |
| Illinois | 1,030 |
| Arizona | 1,020 |
| Massachusetts | 1,003 |
| Minnesota | 968 |
| Virginia | 942 |
| Colorado | 940 |
| Maryland | 906 |
| New Jersey | 878 |
| Tennessee | 870 |

**State = California**
*click on column headings to sort*

| Court Location | Avg. Days To Relief |
| --- | --- |
| All Courts | 1,035 |
| Los Angeles | 1,200 |
| San Francisco | 838 |
| San Diego | 637 |
| Imperial | 124 |
| Lancaster | 93 |

| Hearing Location | Avg. Days To Relief |
| --- | --- |
| Los Angeles, California | 1,221 |
| San Francisco Annex | 971 |
| San Francisco, California | 853 |
| San Diego, California | 718 |
| Adelanto Detention Facility East | 648 |
| Orange County Detained | 306 |
| Los Angeles 3 | 297 |

**State = California, Hearing Location = Mira Loma Detention Facility**
*click on column headings to sort*

| Nationality | Avg. Days To Relief |
| --- | --- |
| All Nationalities | 93 |
| Mexico | 149 |
| Philippines | 110 |
| Ethiopia | 54 |
| Somalia | 54 |
| Venezuela | 50 |

TRAC
Copyright 2013, TRAC Reports, Inc.



EXHIBIT
8
PENGAD 800-631-6989
11-27-12



**TRAC Immigration**

## Immigration Court Processing Time by Outcome
### by Removals, Voluntary Departures, Terminations, Relief, Administrative Closures

**About the Data**
*through October 31st, 2012*

**What to tabulate:**
- Completed Cases
- ✓ Average Days

**Starting with:**
- ○ States
- Nationalities

**Outcome Type:**
- All
- Removals
- Voluntary Departures
- No Grounds For Removal (Terminations)
- ✓ Relief Granted
- Administrative/Other Closure

**Graph As:**
- ● Time series
- ○ Top 10



| Fiscal Year 2013 | |
|---|---|
| *click on column headings to sort* | |
| State | Avg. Days To Relief |
| Entire US | 891 |
| Georgia | 1,055 |
| Nebraska | 1,050 |
| Oregon | 1,045 |
| Utah | 1,037 |
| California | 1,035 |
| Illinois | 1,030 |
| Arizona | 1,020 |
| Massachusetts | 1,003 |
| Minnesota | 968 |
| Virginia | 942 |
| Colorado | 940 |
| Maryland | 906 |
| New Jersey | 878 |
| Tennessee | 870 |

| State = California | |
|---|---|
| *click on column headings to sort* | |
| Court Location | Avg. Days To Relief |
| All Courts | 1,035 |
| Los Angeles | 1,200 |
| San Francisco | 838 |
| San Diego | 637 |
| Imperial | 124 |
| Lancaster | 93 |
| Hearing Location | Avg. Days To Relief |
| Los Angeles, California | 1,221 |
| San Francisco Annex | 971 |
| San Francisco, California | 853 |
| San Diego, California | 718 |
| Adelanto Detention Facility East | 648 |
| Orange County Detained | 306 |
| Los Angeles 3 | 297 |

| State = California, Hearing Location = Orange County Detained | |
|---|---|
| *click on column headings to sort* | |
| Nationality | Avg. Days To Relief |
| All Nationalities | 306 |
| Mexico | 383 |
| El Salvador | 362 |
| Philippines | 57 |
| Canada | 36 |

**TRAC**
Copyright 2013, TRAC Reports, Inc.



EXHIBIT
9
11-27-12 EMH



**TRACImmigration**



# Immigration Court Processing Time by Outcome
### by Removals, Voluntary Departures, Terminations, Relief, Administrative Closures

**About the Data**
*through October 31st, 2012*

**What to tabulate:**
- Completed Cases
- ✓ Average Days

**Starting with:**
- ✓ States
- Nationalities

**Outcome Type:**
- All
- Removals
- Voluntary Departures
- No Grounds For Removal (Terminations)
- ✓ Relief Granted
- Administrative/Other Closure

**Graph As:**
- ✓ Time series
- Top 10



| **Fiscal Year 2013** *click on column headings to sort* | |
|---|---|
| State | Avg. Days To Relief |
| Entire US | 891 |
| Georgia | 1,055 |
| Nebraska | 1,050 |
| Oregon | 1,045 |
| Utah | 1,037 |
| California | 1,035 |
| Illinois | 1,030 |
| Arizona | 1,020 |
| Massachusetts | 1,003 |
| Minnesota | 968 |
| Virginia | 942 |
| Colorado | 940 |
| Maryland | 906 |
| New Jersey | 878 |
| Tennessee | 870 |

| **State = California** *click on column headings to sort* | |
|---|---|
| Court Location | Avg. Days To Relief |
| All Courts | 1,035 |
| Los Angeles | 1,200 |
| San Francisco | 838 |
| San Diego | 637 |
| Imperial | 124 |
| Lancaster | 93 |

| Hearing Location | Avg. Days To Relief |
|---|---|
| Los Angeles, California | 1,221 |
| San Francisco Annex | 971 |
| San Francisco, California | 853 |
| San Diego, California | 718 |
| Adelanto Detention Facility East | 648 |
| Orange County Detained | 306 |
| Los Angeles 3 | 297 |

| **State = California, Hearing Location = Adelanto Detention Facility East** *click on column headings to sort* | |
|---|---|
| Nationality | Avg. Days To Relief |
| All Nationalities | 648 |
| El Salvador | 2,534 |
| Mexico | 200 |
| Switzerland | 106 |

**TRAC**
Copyright 2013, TRAC Reports, Inc.

