**AHILAN T. ARULANANTHAM (SBN 237841)**
aarulanantham@aclu-sc.org
**MICHAEL KAUFMAN (SBN 254575)**
mkaufman@aclu-sc.org
**ACLU FOUNDATION OF SOUTHERN CALIFORNIA**
**1313 West Eighth Street**
**Los Angeles, CA 90017**
**Telephone:  (213) 977-9500**
**Facsimile:  (213) 977-5297**

*Attorneys for Petitioners*
**(Additional Counsel listed on following page)**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ALEJANDRO RODRIGUEZ, ABDIRIZAK ADEN FARAH, YUSSUF ABDIKADIR, ABEL PEREZ RUELAS, JOSE FARIAS CORNEJO, ANGEL ARMANDO AYALA, for themselves and on behalf of a class of similarly-situated individuals, <br><br> Petitioners, <br><br> v. <br><br> ERIC HOLDER, United States Attorney General; JANET NAPOLITANO, Secretary, Homeland Security; THOMAS G. SNOW, Acting Director, Executive Office for Immigration Review; TIMOTHY ROBBINS, Field Office Director, Los Angeles District Immigration and Customs Enforcement; WESLEY LEE, Officer-in-Charge, Mira Loma Detention Center; et al.; RODNEY PENNER, Captain, Mira Loma Detention Center; SANDRA HUTCHENS, Sheriff of Orange County; OFFICER NGUYEN, Officer-in-Charge, Theo Lacy Facility; CAPTAIN DAVIS NIGHSWONGER, Commander, Theo Lacy Facility; CAPTAIN MIKE KREUGER, Operations Manager, James A. Musick Facility; ARTHUR EDWARDS, Officer-in-Charge, Santa Ana City Jail; RUSSELL DAVIS, Jail Administrator, Santa Ana City Jail, <br><br> Respondents. | Case No. CV-07-3239-TJH (RNBx) <br><br> **DECLARATION OF MICHAEL TAN** <br><br> Honorable Terry J. Hatter <br><br> Date:  May  6, 2013 <br> Time:  Under Submission |

JUDY RABINOVITZ
JRabinovitz@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY  10004
Telephone: (212) 549-2618
Facsimile: (212) 549-2654

MICHAEL TAN (SBN 284869)
mtan@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm St.
San Francisco, CA  94111
Telephone:  (415) 343-0779
Facsimile:  (415) 395-0950

JAYASHRI SRIKANTIAH (SBN 189566)
jsrikantiah@law.stanford.edu
STANFORD LAW SCHOOL
IMMIGRANTS' RIGHTS CLINIC
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA  94305-8610
Telephone: (650) 724-2442
Facsimile: (650) 723-4426

SEAN COMMONS (SBN 217603)
scommons@sidley.com
CODY JACOBS (SBN 272276)
cjacobs@sidley.com
JONATHAN FEINGOLD (SBN 286302)
jfeingold@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013-1010
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

*Attorneys for Petitioners*

# DECLARATION OF MICHAEL TAN
## OF FEBRUARY 8, 2013

I, Michael Tan, hereby declare:

1.      I am a staff attorney of the ACLU Immigrants' Rights Project, and counsel of record for Petitioners in *Rodriguez v. Holder*, CV 07-3239-TJH (RNBx) ("*Rodriguez*").  This declaration is offered in support of Petitioners' Motion for Summary Judgment or, in the Alternative, Summary Adjudication and in opposition to any Cross-Motion filed by Respondents.  I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

## Excerpts of Depositions

2.      On August 9, 2012, my co-counsel Judy Rabinovitz took the deposition of Assistant Field Office Director Conrad Agagan.  I subsequently received a certified transcript of that deposition.  A copy of relevant portions of his deposition is attached as Exhibit A to this declaration.

3.      On November 28, 2012, my co-counsel Ahilan Arulanantham defended the deposition of Petitioners' expert Dr. Susan Long.  On December 21, 2012, my co-counsel Michael Kaufman defended another deposition of Dr. Long.  I subsequently received certified transcripts of those depositions.  Copies of relevant portions of those depositions are attached as Exhibits B and C to this declaration.

4.      On November 27, 2012, my co-counsel Ahilan Arulanantham took the deposition of Respondents' expert Dr. Chester Palmer.  On December 21, 2012, my co-counsel Michael Kaufman took another deposition of Dr. Palmer.  I subsequently received certified transcripts of those depositions.  Copies of relevant portions of those depositions are attached as Exhibits D and E to this declaration.

5.      On January 13, 2012, my co-counsel Michael Kaufman took the deposition of Eric Saldana, Assistant Field Office Director.  I subsequently received a

1  certified transcript of that deposition.  A copy of relevant portions of his deposition is

2  attached as Exhibit F to this declaration.

3      6.      On December 13, 2011, I took the deposition of Assistant Chief

4  Immigration Judge Jack Weil.  I subsequently received a certified transcript of that

5  deposition.  A copy of relevant portions of his deposition is attached as Exhibit G to

6  this declaration.

### Summary of Family Ties Information from A Files

7      7.      During discovery, Respondents produced documents from the alien files

8  ("A files") of 1,026 persons detained between April 21, 2010 and April 21, 2011.

9  Respondents represented that these A files accounted for nearly all of the class

10  members that Respondents could identify as having been present within the Central

11  District of California during that period.  I refer to these individuals as the "studied

12  class members."

13      8.      Because of the sheer volume of the A files, some of which total in excess

14  of 1,000 pages, it is impracticable to submit copies of the 1,026 A files for inspection

15  by the Court or even to extract relevant pages from all 1,026 A files for the Court's

16  inspection.  As a result, pursuant to Federal Rule of Evidence 1006, this declaration

17  contains a summary of the contents of those A files as they relate to the family ties of

18  the studied class members.

19      9.      In order to prepare this summary, I oversaw review of the A files by a

20  team of attorneys and legal support personnel, in addition to personally reviewing a

21  sample of the A files to ensure the accuracy of the summary.

22      10.     Reviewers looked for information contained in the A files concerning

23  family ties.  Reviewers would read entire A files to identify any such information and

24  contemporaneously record the existence of information bearing on family ties for later

25  tabulation.

26

27

28

DECLARATION OF MICHAEL TAN

11.    The summary excludes information from the A files of people who most likely were not, in fact, class members for the reasons set forth separately in the concurrently-filed Declaration of Michael Kaufman ¶¶ 22-25.

12.    The summary also excludes information from the A files of people whose 180th day of detention did not occur between April 21, 2010 and April 21, 2011.  I refer to individuals whose 180th day of detention did occur in this time period as the "in-period" population.  Based on the Expert Report and deposition testimony of Respondents' expert Dr. Chester Palmer, I understand that Dr. Palmer regards the "in-period" population as a proper sample from which to draw certain conclusions about class members.  Although Petitioners contend that reliance on the "in-period" population as a sample for measuring certain variables (such as average detention lengths) can produce biased and inaccurate results that underestimate harm to the class, for purposes of this summary, we looked only at the "in-period" population.

13.    In light of this, the summary below pertains to a universe of 610 A files.

14.    In addition, this summary likely understates the figures for the family ties of the class members for several reasons:

a.    Information may not have been submitted as part of the written record and, thus, not appear in the A-files.  For example, information may exist only in audio recording of proceedings, which Respondents did not produce with the A files.  In addition, in some cases, class members successfully terminated proceedings without ever having to file an application for relief, which typically would contain information on family ties.

b.    The A files produced by Respondents were incomplete and contained redactions, including because Respondents objected to disclosing certain information within the A files documents—although some appear to have been incomplete due to poor file keeping.

**Summary of A Files for Class Members**

**Not Including the 1225(b) Subclass**

15.　　We first analyzed the A files of class members without including the A files of members of the 1225(b) Subclass.  A files were determined to be associated with a person in the 1225(b) Subclass using the methodology described in the concurrently-filed Declaration of Michael Kaufman ¶¶ 7-11.

16.　　Based on our review of A files associated with persons in the 1225(b) Subclass, such persons were detained upon their arrival to the United States at a port of entry, almost always after making a request for asylum or expressing fear about returning to their country of origin review.  As a result, these files are far less likely to contain information about family ties.

17.　　Not including members of the 1225(b) Subclass, the A files of in period class members contained the following information:

　　　　a.　　412 A files contained information indicating whether the class member had a child or children in the United States.  Of these, 251 class members had a child or children who resided in the United States.

　　　　b.　　407 A files contained information indicating whether the class member had a child or children with U.S. citizenship.  Of these, 238 class members had a child or children with U.S. Citizenship.

　　　　c.　　445 A files contained information indicating whether the class member had a spouse who resided in the United States.  Of these, 147 class members had a spouse who resided in the United States.

**Summary of A Files for Class Members**

**Inclusive of the 1225 Subclass**

18.　　For the purposes of completeness, we also analyzed the A files of all 610 class members.  These A files contained the following information:

     a.    463 A files contained information indicating whether the class member had a child or children who resided in the United States.  Of these, 254 class members had a child or children who resided in the United States.

     b.    455 A files contained information indicating whether the class member had a child or children with U.S. citizenship.  Of these, 240 class members had a child or children with U.S. Citizenship.

     c.    498 A files contained information indicating whether the class member had a spouse who resided in the United States.  Of these, 150 class members had a spouse who resided in the United States.

## Summary of A Files for Class Members

## Within the 1226(c) Subclass

19.    We also separately analyzed the A files of those persons within the 1226(c) Subclass.  A files were determined to be associated with a person within the 1226(c) Subclass using the methodology described in the concurrently-filed Declaration of Michael Kaufman ¶¶ 12-18.

20.    The A files contained the following information:

     a.    211 A files contained information indicating whether the class member had a child or children who resided in the United States.  Of these, 138 class members had a child or children who resided in the United States.

     b.    210 A files contained information indicating whether the class member had a child or children with U.S. citizenship.  Of these, 130 class members had a child or children with U.S. Citizenship.

     c.    215 A files contained information indicating whether the class member had a spouse who resided in the United States.  Of these, 77 class members had a spouse who resided in the United States.

**Summary of Database Information Regarding Length of Residence**

**Prior to Detention and Age at the Time of Entry to the Country**

21.     Representatives of Respondents testified at deposition that information in the government databases produced to Petitioners is reliable and relied upon by Respondents in the course of their regularly conducted activities.  *See* Deposition of Sean Stephens at 21:24-22:14 (attached as Ex. I to the Declaration of Cody Jacobs); Deposition of Jennifer Sherriff at 14:14-15:1 (Jacobs Decl. Ex. H); Deposition of Benjamin McDowell at 152:17-153:5 (Jacobs Decl. Ex. G).

22.     On October 11, 2012, Respondents produced a Microsoft Excel spreadsheet entitled "ICE-EDI-010."  ICE-EDI-010 provides a range of information on the studied class members, including fields entitled "Birth Date," "Entry Date," and "Book In Date (Of Latest Detention of Removal Case)."  "Birth Date" provides the class member's date of birth.  "Entry Date" refers to the date of the class member's known entry into the United States.  "Book In Date (Of Latest Detention of Removal Case)" refers to the date the class member was taken into immigration custody for the most recent period of detention related to their removal case.

23.     Because of the size of ICE-EDI-010, it is impracticable to submit a copy of the entire spreadsheet for inspection by the Court.  As a result, pursuant to Federal Rule of Evidence 1006, this declaration contains a summary of the contents of ICE-EDI-010 as they relate to class members' length of residence in the country prior to detention and their age at the time of entry into the country.

24.     In order to prepare this summary, I supervised legal support personnel to calculate the period of time between "Entry Date" and "Book In Date (Of Latest Detention of Removal Case)" for each class member in order to determine the length of their residence in the United States prior to detention.  I also checked the calculations for a sample of class members to ensure their accuracy.

25.     In many cases, ICE-EDI-010 contains multiple entry dates for an individual class member—apparently because the class member left and reentered the

6

country on multiple occasions.  In these cases, we relied on the latest entry date to calculate length of residence prior to detention.

26.     As with the summaries regarding family ties, we excluded individuals who were likely not class members and individuals who were not "in-period."  Thus, the following summaries pertain to a universe of 610 class members.

27.     This summary is incomplete for several reasons.

a.     For 269 class members, ICE-EDI-010 did not contain either an Entry Date or their Book In Date.  For these class members, it was therefore impossible to calculate their length of residence prior to detention.

b.     For 27 class members, the Entry Date post-dated the Book In Date, apparently due to errors.  For these class members, it was therefore impossible to calculate their length of residence prior to detention.

## Length of Residence for Class Members
## Not Including the 1225 Subclass

28.     Using the methods referenced above, we first analyzed length of residence for the class members who did not fall within the 1225 Subclass.  As explained above, members of the 1225 Subclass are detained upon their arrival to the United States at a port of entry, almost always after making a request for asylum or expressing fear about returning to their country of origin review.  As a result, their A files are far less likely to contain information about length of residence in the United States prior to detention.

29.     ICE-EDI-010 contained sufficient information for us to calculate the length of residence for 254 class members who did not fall within the 1225 Subclass.  ICE-EDI-010 contained information stating that:

a.     190 had resided in the United States for at least 5 years prior to detention;

b.     139 had resided in the United States for at least 10 years prior to detention; and

c.    66 had resided in the United States for 20 years or more prior to detention.

### **Length of Residence for All Class Members**

30.    For purposes of completeness, we also analyzed length of residence for all class members, inclusive of the Section 1225 subclass.  ICE-EDI-010 contained sufficient information for us to calculate the length of residence for 314 class members.  ICE-EDI-010 contained information stating that:

a.    192 had resided in the United States for at least 5 years prior to detention;

b.    141 had resided in the United States for at least 10 years prior to detention; and

c.    66 had resided in the United States for 20 years or more prior to detention.

### **Length of Residence for Members of the 236(c) Subclass**

31.    Using the methods referenced above, we also analyzed length of residence for members of the Section 1226(c) subclass.  ICE-EDI-010 contained sufficient information for us to calculate the length of residence for 107 class members.  ICE-EDI-010 contained information stating that:

a.    88 had resided in the United States for at least 5 years prior to detention;

b.    67 had resided in the United States for at least 10 years prior to detention; and

c.    37 had resided in the United States for 20 years or more prior to detention.

### **Age of Class Members At the Time of Entry Into the United States**

32.    I also supervised legal support staff to calculate class members' age at the time of the date provided in "Entry Date" field using the information provided in the

"Birth Date" field.  I checked the calculations for a sample of class members in order to ensure their accuracy.

33.     Where there were multiple "Entry Dates" for the same class member, we used the earliest date of entry into the country.  In many cases, there was no information in the "Entry Date" field.  In these cases, we therefore could not determine the class member's age at the time of entry into the country.

34.     As with the summaries provided above, we excluded individuals who were likely not class members.  Due to technical difficulties, we were unable to isolate the class members who were "in-period" or the class members within the Section 1225 and Section 1226(c) Subclasses.  Thus, we could not provide data summaries regarding age along the same lines as the data summaries provided above.  We will submit a supplemental declaration with those summaries once those technical difficulties are resolved.

35.     ICE-EDI-010 contains sufficient information to determine the age at the time of entry for 642 individuals included in the spreadsheet.  Of those individuals:

        a.     325 were 21 years old or younger on the date of entry.

        b.     294 were 20 years old or younger on the date of entry.

        c.     224 were 19 years old or younger on the date of entry.

        d.     191 were 18 years old or younger on the date of entry.

DECLARATION OF MICHAEL TAN

1    I declare under penalty of perjury of the laws of the State of California and the

2    United States that the foregoing is true and correct to the best of my knowledge and

3    belief.  Executed this 8th day of February, 2013 in San Francisco, California.

4

5

6    /s/ Michael Tan
     MICHAEL TAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    - - - - - - - - - - - - - - -

5    ALEJANDRO RODRIGUEZ, et al.,    )

6                                    )

7              Petitioners,          )

8         vs.                        )   Case No.

9    TIMOTHY ROBBINS, et al.,        )   CV 07-3239-TJH(RNBx)

10             Respondents.          )

11   - - - - - - - - - - - - - - -

12

13

14        Deposition of CONRAD AGAGAN 30(b)(6),

15        taken at 1501 K Street, N.W., Washington,

16        D.C., commencig at 12:07 p.m., Thursday,

17        August 9, 2012, before SUSAN L. CIMINELLI,

18        CRR, RPR, a Notary Public.

19

20

21

22

23   Job No. 782585

24

25   PAGES 1 - 209

                                        Page 1

BY MS. RABINOVITZ:

    Q.    What were you instructed to review the
cases for?

    A.    To review the cases case-by-case to see
and to ensure that proper case management was
occurring on those cases.

    Q.    So the person was to evaluate whether
proper case management, I'm just repeating to make
sure I understand, that you were instructed to review
cases to make sure that proper case management was
happening with these cases?

    A.    To review the case.  Yes.

    Q.    And then you were -- you said you were
supposed to brief management, is that correct?

    A.    That's correct.

    Q.    And what were you supposed to brief
management about?

    A.    On each -- each of the cases.

    Q.    On each of the cases?

    A.    Yes.  Go over the cases, brief them on the
particulars, discuss the merits, discuss the -- all
the factors in those cases.

    Q.    And when you say management, do you mean
management within ERO that you were going to brief or
do you mean -- who are you referring to when you say

                                        Page 24

```
 1   briefing management?

 2              MR. ATKINSON:  Object to the form.  You

 3   may answer.

 4              THE WITNESS:  The briefings, and as we go

 5   on with the discussion and the process, the briefings

 6   weren't just after one group of people reviews the

 7   documents, it went directly to one individual.  It

 8   was many layers of reviews that occurred in

 9   briefings.

10   BY MS. RABINOVITZ:

11       Q.    Right.

12       A.    So --

13       Q.    Can you describe those levels of review?

14       A.    Okay.  The -- how this went -- came about,

15   at least the official project, the tasking was sent

16   to the field offices for them to -- both for ERO and

17   the office of chief counsel, for them to review the

18   cases that were identified and provide headquarters

19   with a case review worksheet.

20              That case review worksheet, upon arrival

21   in headquarters, would be processed by the staff that

22   were involved in the project, a group of them

23   responsible for recording the arrival of the

24   document, making sure that we have everything that --

25   every one accounted for.  And then it would go to
```

Page 25

1    individuals that -- both representatives from ERO and
2    OPLA to review the cases. And then after they
3    reviewed the case and obtained information they need,
4    if any additional information was needed, they would
5    solicit it from the field offices. So there is a lot
6    of discussions.
7            Once they discussed the case and decided
8    on what was going to happen, what they would
9    recommend to move forward with this case --
10       Q.    I'm sorry.
11       A.    What they would recommend as far as if
12   there was anything different that they would
13   recommend or course of action, then they would then
14   brief it up to the next level, which is the managers
15   that we brought in from the field offices to help
16   manage this.
17           And then once those individuals were
18   briefed and they were confident with information that
19   they have that was available, then they would brief
20   up to the next level, which was my level, and all
21   this occurred collaboratively between OPLA and ERO.
22           So when I would get briefed, my
23   counterpart in OPLA would be there and we would
24   listen to the case just similar to what happened at
25   the lower level. We'll ask questions. We'll ask for

                                          Page 26

```
 1   additional documentation.  If we felt we were ready,

 2   we would then brief up senior level management in ERO

 3   and OPLA.  And the same process occurs.  They get

 4   briefed.  Additional questions might be asked, and

 5   then once everybody is confident with everything and

 6   all the information is ready, then we brief senior

 7   ICE management.

 8        Q.    Were you a part of the briefing of senior

 9   ICE management?

10        A.    There were several briefings, obviously.

11   It wasn't just one briefing.  I can't say that I was

12   in all of them, but I did brief on many of those

13   occasions.

14        Q.    But there were people within ERO who were

15   directly -- that you were reporting to before you

16   were reporting to -- you weren't reporting directly

17   to ICE.  There was somebody at ERO who was above you

18   who was at the next level, is that correct?

19             MR. ATKINSON:  Object to the form.  You

20   may answer.

21             THE WITNESS:  That's correct.

22   BY MS. RABINOVITZ:

23        Q.    And who were those people?

24        A.    You're talking about who, as far as the

25   structure and chain of command.
```

Page 27

 1   that individual was out, sometimes it would be the

 2   lower level.

 3        Q.    All that I want to know is generally who

 4   within the project did you report to?  For the

 5   purposes of this project, not for the purposes of

 6   your general functions, but for the purposes of this

 7   project, who did you report to?

 8        A.    I briefed the senior management for both

 9   ERO and OPLA.

10        Q.    And what were the names of those people?

11             MR. ATKINSON:  Object.  We invoke

12   privilege, and I instruct the witness not to answer.

13             MS. RABINOVITZ:  And I would just ask what

14   the privilege -- what is the privilege?

15             MR. ATKINSON:  Deliberative process

16   privilege.  We are pretty confident that there is

17   case law that says that a deliberative process -- the

18   names of individuals who participated in that process

19   is subject to the deliberative process privilege.

20             MS. RABINOVITZ:  Just to be clear, I'm

21   just trying to understand whether there is somebody

22   else who is more knowledgeable about the issues that

23   we designated in this deposition, so I want to make

24   sure that in terms of who he was reporting to, I

25   assumed he was reporting to ICE leadership and that

                                        Page 31

```
 1        A.    That --

 2        Q.    What were some of the other things?

 3        A.    Well, it's hard to identify every single

 4  item that was -- would be the outcome of the review,

 5  but certainly you look at the case, like I mentioned

 6  before, to see if it's -- it's moving efficiently to

 7  the removal process, or if it's an individual with an

 8  order, how close are we towards effecting their

 9  removal.  And like you said, detention, custody

10  determination.  All those factors we're looking into.

11        Q.    Is there anything other than what you just

12  described, which is, one, making sure the case is

13  moving efficiently, and two, detention and custody

14  issues?

15             MR. ATKINSON:  Object to the form.  He

16  didn't say there were two factors.

17  BY MS. RABINOVITZ:

18        Q.    He said there were more.  Let me rephrase

19  it differently.  You've identified two things now,

20  but you said there were others.  And I just want to

21  know what the others were?

22        A.    It's really -- I can't enumerate all of

23  them.

24        Q.    Just enumerate one.

25        A.    I gave you examples already.
```

Page 35

```
 1                MS. RABINOVITZ:  Yes.

 2                MR. ATKINSON:  You may answer the

 3     question.

 4                THE WITNESS:  No.

 5     BY MS. RABINOVITZ:

 6         Q.    Okay.  In terms of the recommendations in

 7     individual cases, you said there was a variety of

 8     recommendations.  Can you give me an example of one

 9     kind of recommendation that might have been given?

10         A.    Could be approach the embassy from

11     headquarters to try and solicit for a travel

12     document.

13         Q.    Can you give me another example?

14         A.    There are so many different on many

15     different cases.

16         Q.    Were there ever recommendations pertaining

17     to continued detention or release?

18         A.    Yes.

19         Q.    Were any of these recommendations

20     implemented?

21                MR. ATKINSON:  Object to the form.  You

22     may answer.

23                THE WITNESS:  Yes.

24     BY MS. RABINOVITZ:

25         Q.    In general, can you estimate, can you say
```

Page 73

```
 1        A.    Because soon after the creation of this
 2    document, and analysis of what has been found, it was
 3    determined that reviewing the additional cases have
 4    been leading to the same sort of trends that we are
 5    already seeing.  And also in line that all of the
 6    decisions that were coming from the field appeared to
 7    be in line and there was no issues found.  It was
 8    proved to be unnecessary.
 9        Q.    It proved to be unnecessary to have the
10    briefings?
11        A.    No.  To proceed with reviewing them.
12        Q.    So those cases were not reviewed?
13            MR. ATKINSON:  Object to the form.  You
14    may answer again.
15    BY MS. RABINOVITZ:
16        Q.    But we have spreadsheets for all of those
17    cases.
18            MR. ATKINSON:  Hold on.  Are you
19    withdrawing your previous question that I just
20    objected to?  Because there was a pending question
21    that he may answer.
22            MS. RABINOVITZ:  Can you repeat that?
23            MR. ATKINSON:  Are you withdrawing the
24    previous question or --
25            MS. RABINOVITZ:  No.  I'm not withdrawing
```

Page 76

```
 1   seeing.  What were the trends that you had been
 2   seeing?
 3        A.   Okay.  What we found is that individuals'
 4   process, removal process were delayed by a few
 5   factors.  Some of those factors that we found were
 6   difficulty obtaining a travel document from the
 7   embassy, individuals failing to comply with the
 8   removal order and actively hindering their removal,
 9   and delays due to continuances in court, PFRs and one
10   second -- can I refer to --
11        Q.   Sure.
12        A.   Can you repeat what I mentioned already?
13             THE REPORTER:  "Answer:  What we found is
14   that individuals' process, removal process were
15   delayed by a few factors.  Some of those factors that
16   we found were difficulty obtaining a travel document
17   from the embassy, individuals failing to comply with
18   the removal order and actively hindering their
19   removal, and delays due to continuances in court,
20   PFRs and one second -- can I refer to --"
21             THE WITNESS:  And adjudication of
22   applications with CIS.
23   BY MS. RABINOVITZ:
24        Q.   Okay.  I'm going to move on to some other
25   aspects that are in here.  We've talked about the
```

Page 80

1   enough, how decisions were made as to somebody

2   qualified for release, and mainly that.

3           MR. ATKINSON:  Okay.  10 minutes.

4           MS. RABINOVITZ:  Yes.

5           MR. ATKINSON:  Excellent.

6           (Recess.)

7   BY MS. RABINOVITZ:

8       Q.    What I want to focus on now is actually

9   the review process, you know, what reviewers were

10  instructed to do and that kind of stuff.  So

11  approximately how many reviewers were assigned to

12  conduct the reviews for the cases detained more than

13  one year.  Just let me be clear.  From now on we are

14  going to be focused on just the cases detained for

15  more than one year.  So about how many reviewers were

16  assigned to conduct the reviews of those cases which

17  I guess was about 1400 cases?

18      A.    Well, approximately, it would have to be

19  approximate, because it changed and it wasn't the

20  same group of people.

21      Q.    Right.

22      A.    We -- I would say on the ERO side, 10 to

23  12.

24      Q.    And --

25      A.    On the OPLA side, similar number of

                                            Page 98

```
 1    individuals.
 2            Q.    And did DOJ -- I mean, is OPLA part of
 3    DOJ?  I'm just confused about whether -- is OPLA part
 4    of DOJ?
 5            A.    OPLA is part of ICE.  Our principal legal
 6    advisor.
 7            Q.    So did DOJ have any involvement in this
 8    process?
 9            A.    They were not involved.
10            Q.    And when review is done both by ERO and
11    OPLA, was it reviewing the same cases?
12            A.    There were -- yes.
13            THE REPORTER:  "Question:  And when review
14    is done both by ERO and OPLA, was it reviewing the
15    same cases?"
16    BY MS. RABINOVITZ:
17            Q.    Thank you.  What did the case reviews
18    entail?  And let me explain my question.  Was this
19    principally a file review?  So the question is, I'm
20    going to go back to my first question.  What did the
21    case reviews entail?
22            A.    Okay.  The headquarters solicited
23    information from the field offices.  They were
24    provided a tasking that advised that here's the
25    timeline, and here is a list of cases that we would
```

Page 99

```
 1   like you to prepare case review worksheets,
 2   collaboratively ERO and the office of the chief
 3   counsel.
 4            Those documents at the local level would
 5   be reviewed by the officers working up the chain
 6   through their management, then to headquarters where
 7   the individuals assigned to the work group will then
 8   process it similar in fashion as in the field.  ERO
 9   or the OPLA representative would then review those
10   cases.  Brief it up through the manager assigned to
11   help oversee, and then at that -- at that point, if
12   there are obviously additional questions, they would
13   solicit additional questions, get it until it's ready
14   for briefing to the higher level which would then be
15   my level, and the individual representative from
16   OPLA.
17        Q.    You can continue.  I just feel like I got
18   the answer.
19            MR. ATKINSON:  I know.  You were signaling
20   the witness to stop testifying which I think is
21   inappropriate, but go ahead.
22   BY MS. RABINOVITZ:
23        Q.    I'm just -- in the interest of time, I
24   feel like I wanted to, you know -- you more than
25   answered my question.  And what I really want to go
```

Page 100

1   back is to understand about what the -- how the case

2   review worksheets, the first thing I'd like, I want

3   to basically break it down and I want to start now

4   with the case review worksheets and how those were

5   prepared.  How did -- how did the reviewers get

6   information for the case review worksheets?

7          MR. ATKINSON:  Is there a question

8   pending?

9   BY MS. RABINOVITZ:

10         Q.    Yes.  How did the reviewers get

11  information for the case review worksheets?

12         A.    The case review worksheets were actually

13  completed by the field.

14         Q.    And they were completed by the field based

15  on what?

16         A.    The tasking to the field was to obtain

17  this information and provide it to headquarters.

18  Generally speaking, they would utilize the A file,

19  the ICE systems, systems utilized by office of chief

20  counsel to include reaching out to the individual or

21  also their legal representative.  It's a variety of

22  locations that they use as the resource to fill out

23  the form.

24         Q.    So that's what I wanted to establish.

25  First of all, the case review worksheets were not

                                        Page 101

1    response.  I said and/or.  They were given a task to

2    complete this form and to use the resources they have

3    at the field level to get information.  They use a

4    variety of sources, not to indicate that they have to

5    do all those different -- approach those different

6    sources.

7        Q.    Okay.  So these were not necessarily

8    prepared with any input from a detainee?

9            MR. ATKINSON:  Object to the form.

10          THE WITNESS:  If the information was

11    available from other sources, that might be the case.

12    BY MS. RABINOVITZ:

13        Q.    There was no requirement -- was there a

14    requirement that they contact the detainee to get --

15    to see if the detainee wanted to supplement the

16    information?

17        A.    Not on the tasking that was sent to the

18    field office.

19        Q.    Okay.  And after then the case review

20    worksheet, there is then this form that says highly

21    confidential.  I'm looking at one that's -- just

22    follow the numbers.  I mean, it's the end of each but

23    this is ICE-RPD 013719 but you can look at any of

24    them that says something confidential.  Was this also

25    filled out by the field?

Page 103

1    this document?  I mean, it's --

2             MR. ATKINSON:  Let me see if I can clarify

3    it because it's not clear from the face the way we

4    produced it.  The confidential we placed at the top

5    was placed in the production, as was the Bates number

6    at the bottom, ICE-RPD 013174.  This was, however,

7    the form itself is a standard form.  I believe.

8             THE WITNESS:  The standard form generated

9    by the work group to assist in when they solicit

10   additional information from the field, they had to

11   have a way to annotate that because we weren't --

12   that was the approach decided instead of sending back

13   the CRWs, have it edited.  This is the document they

14   used to annotate those additional information.

15   BY MS. RABINOVITZ:

16       Q.    So can we for the purposes of this

17   discussion just refer to this as the reset form?

18            MR. ATKINSON:  No.  Because I believe

19   that's an Adobe PDF function.

20            MS. RABINOVITZ:  What do we want to refer

21   to this as?

22            MR. ATKINSON:  It's up to the witness.

23   BY MS. RABINOVITZ:

24       Q.    What would you describe this form as?

25   What name would you give to this form?

                                             Page 105

```
1    the intent.  Obviously data quality, some people may
2    have -- but that's the intent of it.
3         Q.   If we look at this form, that doesn't seem
4    quite accurate because if you look farther down, OPLA
5    says litigation status Ninth Circuit, PFR with stay.
6    So that means that -- final order doesn't mean that
7    the person's removal can be effectuated.
8         A.   Sorry.  Can you -- can you repeat that
9    again?  I'm sorry.
10        Q.   I'm trying to clarify whether final order
11   means an administrative final order or whether final
12   order means a final order that can actually be
13   executed?
14        A.   Administrative.
15        Q.   Okay.  So the final order is an
16   administrative order even if it can't be executed.
17        A.   Yes.
18        Q.   Thank you.  Then we have -- action needed.
19   This is where somebody from the working group would
20   have said if there was any recommendation, would have
21   said that we have a recommendation here.
22        A.   This form, it's a cover sheet so it would
23   have been utilized for many different reasons.  It
24   could also be notetaking that they would say this is
25   what we need still on this particular --
```

Page 107

```
 1        A.    This form wasn't utilized independently of
 2   all the other forms.  It's to complement the
 3   documents and provide additional information.  So
 4   even though it's not listed here, the expectation is
 5   not that this is the only thing that you would be
 6   looking at.  We would be looking at this, other
 7   supporting documents that have been attached as well.
 8        Q.    Okay.  It's just someone devised this
 9   form, the working group devised this form because
10   they thought it would be a good summary.  Is that
11   correct?
12             MR. ATKINSON:  Object to the form.
13             THE WITNESS:  No.
14   BY MS. RABINOVITZ:
15        Q.    No?
16        A.    Not summary per se.  It's a way to instead
17   of having notes all over and with no established way
18   to add information, this document was created so that
19   there is a standardized document that goes with the
20   CRW where you can make notes, add comments.
21        Q.    Okay.
22        A.    And in addition just to clarify, although
23   there is no specific section like you mentioned,
24   there is the comment section at the bottom.  They
25   would make notes on the side that don't necessarily
```

Page 109

1   it's noted here.

2      A.    What's noted here are things that are

3   factual happening with the case that felt -- to be

4   included for the record.

5      Q.    Right.  But I'm asking a second question

6   which is later on after you then took this to the

7   next level, prepared spreadsheets, reviewed,

8   evaluated, was there any attempt to collect

9   information on specific things like for example Casas

10   hearings?

11      A.    Long-term detention project, no.

12      Q.    So at least we know that -- I'm not going

13   to repeat myself.  So once the file review is done

14   and then you had the -- I forget, I'm sorry, what you

15   called this, the cover page that talked about

16   additional information, then what happened next?

17      A.    So after the review at the field level and

18   they forward the document, the CRW and then other

19   documents they felt needed to be forwarded by

20   headquarters, it was received by the working group

21   through a mailbox, annotated so we know what

22   information we've received for which individuals.

23   The working group would prepare --

24      Q.    The spreadsheet?

25      A.    The spreadsheet.  And in some instances,

Page 113

1    when they had time, they typed up this form attached

2    to it and have it ready for the reviewers.

3         Q.    Does the spreadsheet review whether it

4    includes any information -- what information it's

5    based on, other than the CRW?

6              MR. ATKINSON:  Object to the form of the

7    question.

8              THE WITNESS:  Are you asking me does it

9    annotate where the information was taken from?

10   BY MS. RABINOVITZ:

11        Q.    No.  I'm asking you whether it reflects

12   anywhere that the entry in the spreadsheet was based

13   on -- what information it was based on, not

14   specifically matching this to this or this to this,

15   but just --

16        A.    Which document are you looking at?

17        Q.    I'm looking at right now a spreadsheet for

18   one to two years.  It's the first one to two-year

19   spreadsheet, ICE-RPD 012884.  And I'm asking you this

20   question because when you said when the ICE, when

21   these -- when the project reviewers looked at these

22   cases they looked at the file, the CRW and then any

23   other documents that had been obtained.  Is that

24   correct?

25        A.    And additional information that was

                                        Page 114

```
 1        A.    Yes.
 2        Q.    And are you familiar with the fact that
 3   there is a notice that is sent to them advising them
 4   that they are going to have a custody review and
 5   giving them an opportunity to supplement the file?
 6        A.    Yes.
 7        Q.    Why was there not something similar here?
 8             MR. ATKINSON:  Object to the form of the
 9   question.
10   BY MS. RABINOVITZ:
11        Q.    Was there something similar here?
12             MR. ATKINSON:  Object to the form of the
13   question.  You can answer.
14             THE WITNESS:  Well, this process didn't
15   remove any other -- like you were referring, those
16   review processes that are already in place.  This was
17   a project, a separate and independent project.
18   BY MS. RABINOVITZ:
19        Q.    Okay.  But part of the -- am I correct
20   that in reviewing and doing case management, the
21   reviewers were instructed to make recommendations,
22   including about whether somebody should be released?
23             MR. ATKINSON:  Object to the form.
24   BY MS. RABINOVITZ:
25        Q.    Is that accurate?
```

                                                    Page 123

1          MR. ATKINSON:  Object to the form.

2          THE WITNESS:  That would be one of the

3    things that would be a probable recommendation.

4    BY MS. RABINOVITZ:

5          Q.    And so it could be helpful in that context

6    to have additional information from the detainee.

7    Would you agree?

8          MR. ATKINSON:  Him personally or him as

9    the department?

10   BY MS. RABINOVITZ:

11         Q.    The department.

12         MR. ATKINSON:  It's not within the topics

13   but he can answer.

14   BY MS. RABINOVITZ:

15         Q.    Would you say that --

16         MR. ATKINSON:  Did you answer?

17         THE WITNESS:  No.

18         MR. ATKINSON:  Are you withdrawing the

19   previous question?

20         MS. RABINOVITZ:  No.  I'm not withdrawing

21   it.

22         MR. ATKINSON:  Then let him answer before

23   you ask him a new one.

24         THE WITNESS:  When tasking went out and it

25   was clear we requested for this information on the

                                        Page 124

```
 1              MR. ATKINSON:  I am not yelling.  Would
 2    you please read back the last question that was asked
 3    of the witness.
 4              THE REPORTER:  "Question:  What would you
 5    say, what were the recommendations for case
 6    management?"
 7              THE WITNESS:  It varies.  You look at the
 8    case and there is many different aspects of that you
 9    look at, so it's not solely one particular
10    recommendation, yes or no on that one.  It depends on
11    the case.
12    BY MS. RABINOVITZ:
13         Q.   Okay.  What I'd like to do is turn now to
14    the documents referred to as executive summary.  And
15    those begin on ICE-RPD 013142.  It seems like one of
16    the main -- first of all, who developed this form for
17    executive summary?  I don't mean who was the person.
18    Was this form developed by the working group?
19         A.   Yes.
20         Q.   Thank you.  And why does it focus so much
21    on DOJ-EOIR delays and CIS delays?
22              MR. ATKINSON:  Object to the form of the
23    question.
24    BY MS. RABINOVITZ:
25         Q.   I'll withdraw the question.  Is it true --

                                      Page 129
```

1    statement I made that I didn't see -- you know I saw

2    some that they didn't have it.

3         Q.    Right.  So can you answer that question

4    that they all -- the question, can you answer it now?

5         A.    Can you repeat the original question?

6         Q.    Sorry.  Can you repeat the question that

7    you just repeated?

8              THE REPORTER:  "Question:  Is it true --

9    is it accurate that all of these executive summaries

10   look at the issue of cases involving issues with

11   DOJ-EOIR delays and cases involving issues with CIS

12   delays?"

13             THE WITNESS:  Is it true?  This document

14   that is in this exhibit indicates a section

15   identifying issues with DOJ-EOIR delays and CIS

16   delays.

17   BY MS. RABINOVITZ:

18        Q.    And all the executive summaries have that

19   on them?

20        A.    On what's before me.

21        Q.    So I want to focus on what that means.

22   What is meant by delay in this context.  How was --

23   what is meant by delay here?

24        A.    I think I covered that in the beginning

25   when I mentioned trends.  There were cases that were

                                        Page 131

```
 1    continuances, a number of continuances on each case,
 2    or a case that we are still waiting for decision from
 3    CIS on adjudicating a case.  So that's what -- that
 4    would refer to that.
 5         Q.    Okay.  And why the focus on delay?
 6              MR. ATKINSON:  Object to the form of the
 7    question.
 8              THE WITNESS:  As I mentioned, those were
 9    the trends that we were seeing.
10    BY MS. RABINOVITZ:
11         Q.    That there -- can you state that a little
12    clearly.  What trends were you seeing?
13         A.    Like I said before, the trend that the
14    cases, there were delays associated with CIS
15    adjudicating petitions, continuances in court, and
16    PFRs.
17         Q.    And am I correct it also included delays
18    with immigration judges not issuing decisions for a
19    long time?
20              MR. ATKINSON:  Object to the form.  I
21    don't believe the witness has testified to that.  You
22    can answer.
23              THE WITNESS:  I don't know.
24    BY MS. RABINOVITZ:
25         Q.    Can you find where that page is?
```

Page 132

```
 1   question.  Throwing percentages at the witness --
 2   you're giving him factual information.  I don't know
 3   where you're getting it from.  You can answer the
 4   question.  I've never seen a deposition like this.
 5   You can answer.
 6            THE WITNESS:  I don't know.  I don't know
 7   what you're basing your statistics on.
 8   BY MS. RABINOVITZ:
 9       Q.    Let's skip my statistics.  Let me rephrase
10   the question.  Can cases extend a long time without
11   there being ICE, EOIR delays?
12       A.    As a matter of course, cases take the
13   amount of time necessary for it to be processed.
14       Q.    Okay.  So some cases take a long time even
15   if there is no delay?
16            MR. ATKINSON:  Object to the form of the
17   question.  You can answer.
18            THE WITNESS:  Yes.
19   BY MS. RABINOVITZ:
20       Q.    Okay.  Let's just take a five-minute
21   break.
22            MR. ATKINSON:  That's fine.
23            (Recess.)
24   BY MS. RABINOVITZ:
25       Q.    So I want to first point to two of the
```

Page 135

1    executive summaries.  One is for the case ICE-RPD
2    013150.  And sorry.
3         A.    What was the number again?
4         Q.    RPD 013150.  Am I correctly reading this
5    that it looks like 33 cases out of the hundred
6    involved some form of DOJ-EOIR delay or CIS delay?
7         A.    Yes.
8         Q.    And do you know if when -- when the
9    reviewer was putting or whoever prepared the
10   executive summary was -- was calculating the number
11   of cases that involved delay, did they include within
12   that the cases of the people who were now no longer
13   an issue that had been removed or released or granted
14   relief?
15              MR. ATKINSON:  Objection to form.  You can
16   answer.
17              THE WITNESS:  No.  That would not have
18   included that.
19   BY MS. RABINOVITZ:
20        Q.    So that in fact there may have been more
21   than 33 cases out of these hundred that involved
22   delay, is that correct?
23        A.    Yes.
24        Q.    And turning to now the summary for numbers
25   901 to 1,000 that's ICE-RPD 013156.  Again, here if

                                        Page 136

```
 1    I'm reading this correctly, it would show that there
 2    were 34 cases out of a hundred that involved delay?
 3              MR. ATKINSON:  I'm sorry.  What page are
 4    you looking at?
 5    BY MS. RABINOVITZ:
 6         Q.    I'm looking at 013156.
 7              MR. ATKINSON:  34?
 8    BY MS. RABINOVITZ:
 9         Q.    Actually, there is 34 because when I
10    cross-referenced, some of them had been counted twice
11    so I -- so there were 34.  Do you want me to --
12              MR. ATKINSON:  Well, let him answer the
13    question.
14    BY MS. RABINOVITZ:
15         Q.    At least 34.  Let me rephrase the
16    question.  Looking at this document, does it indicate
17    that at least 34 cases out of a hundred involve
18    delay?
19         A.    The document -- no.
20         Q.    No?  Can you tell me how many did involve
21    delay?
22         A.    Without counting every single case number,
23    it says 22 cases involve issues with DOJ-EOIR delays.
24         Q.    But the next page?  The next page on the
25    top says 14 cases involve six weeks or more from
```

Page 137

```
 1    custody until first master calendar hearing.  Is that
 2    considered a delay?
 3         A.    I would have to -- no.
 4         Q.    No?
 5               MR. ATKINSON:  The answer I believe was
 6    no.
 7    BY MS. RABINOVITZ:
 8         Q.    I know.  And I'm just saying --
 9               MR. ATKINSON:  You said no, question mark.
10    The answer was no.
11    BY MS. RABINOVITZ:
12         Q.    So it's routine that master calendar
13    hearings could take more than six weeks?
14               MR. ATKINSON:  Object to the form of the
15    question.  Outside of the scope of the topics.
16    Assumes facts not in evidence.  You can answer.
17    BY MS. RABINOVITZ:
18         Q.    And then there are four cases that involve
19    issues with CIS delays.  Is that correct?
20         A.    That's what it -- yes.
21         Q.    So then to reframe it, then, it would be
22    at least 26 out of a hundred in this case involved
23    delay?
24         A.    Yes.
25         Q.    Okay.  And I say at least because we don't
```

Page 138

1    know out of the 41 cases that are no longer in ICE

2    custody how many of those may have involved delay as

3    well.

4         A.    Yes.

5         Q.    Okay.  So is this barely -- is this what

6    you refer to when you were saying there were trends

7    of -- trends in these cases of delay?

8         A.    Yes.

9         Q.    Okay.

10        A.    To clarify, though, the delays also

11   included PFRs and not just limited to those.

12        Q.    Right.  So there could be even more delays

13   other than these?

14        A.    More factors.  Yes.

15        Q.    Because these are just -- this is just

16   DOJ-EOIR delays.  This doesn't include the days from

17   PFRs so delays could be more than this if you

18   included PFRs.

19        A.    Yes.

20        Q.    So does the agency consider this a problem

21   that there are so many delays?

22             MR. ATKINSON:  Object to the form of the

23   question.

24             THE WITNESS:  It was trends that were

25   found and it was passed on to OPLA to look into it

                                        Page 139

 1   been.

 2       Q.    Right.  But I'm focusing now just to

 3   clarify specifically on the recommendation whether to

 4   detain or release, not generally, general questions

 5   about case management.  I understand that length of

 6   detention is going to be critical in determining and

 7   assessing case management issues.  My question is, is

 8   length of detention a factor that is considered when

 9   deciding whether somebody should be continued in

10   detention or released?

11           MR. ATKINSON:  Object to the form of the

12   question.  You can -- he has just answered that but

13   go ahead.

14           THE WITNESS:  You said should?

15   BY MS. RABINOVITZ:

16       Q.    Is length of detention a relevant factor

17   for determining whether an individual should continue

18   to be detained or released?

19           MR. ATKINSON:  Object to the form.

20           THE WITNESS:  I would have to say that

21   that's just one factor you're mentioning.  It can't

22   be the only consideration.

23   BY MS. RABINOVITZ:

24       Q.    I'm not suggesting it's the only

25   consideration.

                                        Page 152

1      A.     Yes.

2      Q.     I'm asking if someone has been detained

3  three years, are there stronger equities for their

4  release than if they were detained three months?

5            MR. ATKINSON:  Object to the form of the

6  question.

7            THE WITNESS:  You're being very

8  hypothetical.  It would have to be -- I would have to

9  look at the exact case because there is other factors

10  associated with why an individual would have been

11  detained for three years or two years that play into

12  the factor of ultimately what the recommendation is.

13  BY MS. RABINOVITZ:

14     Q.     I understand.  I'm not suggesting that

15  this is the sole factor.  You have a whole bunch of

16  factors you're looking at and all I'm asking is, is

17  length of the detention part of the equation?

18     A.     I believe I already mentioned that all

19  factors are considered, none more than the other.

20  They are all weighed and looked at and the case is

21  reviewed as a whole.

22     Q.     What about -- what about family ties?

23            MR. ATKINSON:  Object to the form.  You

24  can answer.

25  BY MS. RABINOVITZ:

Page 153

```
 1        Q.    Is family ties another factor that would

 2   be looked at in terms of as relevant towards whether

 3   the person should be detained or released?

 4             MR. ATKINSON:   In the context of this

 5   project?

 6   BY MS. RABINOVITZ:

 7        Q.    In the context of this project.

 8        A.    Yes.   That would be one of those factors

 9   as well.

10        Q.    Is the fact of whether the person poses

11   danger relevant towards whether they should be

12   detained or released?

13             MR. ATKINSON:   Object to the form.

14             THE WITNESS:   I go back to my earlier

15   comment.   It's not one factor by itself.   They are

16   all relevant.   All the factors that you'll mention

17   are all relevant.   Depends on the case.

18   BY MS. RABINOVITZ:

19        Q.    Okay.  And so that would also include then

20   if a person has a challenge to removal, that would

21   also be a relevant factor?

22        A.    Can you please clarify challenge?

23        Q.    That the person has a colorable challenge

24   to removal as opposed to the merits of their

25   challenge to removal.   Would that be a relevant
```

Page 154

```
 1   factor?

 2              MR. ATKINSON:  I'm going to object.  The

 3   terms colorable and I think you contrast it to the

 4   merits of their removal.  Those are legal terms and

 5   he is not --

 6   BY MS. RABINOVITZ:

 7       Q.    Let me strike the question and --

 8              MR. ATKINSON:  Sure.  I know where you're

 9   trying to go and I'm just trying to help you get that

10   clarified.

11   BY MS. RABINOVITZ:

12       Q.    Thank you.  Would another factor be

13   whether an individual has claims for relief from

14   removal?

15       A.    That's a factor.

16       Q.    So turning specifically to the danger

17   assessment, since you acknowledged that danger would

18   be one of the factors and it's reflected in these

19   worksheets, how were reviewers instructed to assess

20   danger to the public?

21              MR. ATKINSON:  Object to the form of the

22   question.

23   BY MS. RABINOVITZ:

24       Q.    Go ahead and answer.

25       A.    Can you repeat it?
```

Page 155

1    Q.    Would the recency of a conviction be

2  relevant to whether somebody is a danger?

3    A.    That's a factor.

4    Q.    And did the working group do anything to

5  make sure that the reviewers understood this when

6  they were making their assessments?

7         MR. ATKINSON:  Objection.  You can answer.

8         THE WITNESS:  Yes.  Just to clarify, it's

9  not one factor again going back an individual can

10  have a conviction that's 10 years old, however, while

11  they were in custody, they committed multiple acts of

12  violence while in detention.  Those are all factors

13  that you put together.

14  BY MS. RABINOVITZ:

15    Q.    I'm just asking whether -- whether the

16  reviewers, whether the working group did anything to

17  make sure that the reviewers understood how they had

18  to consider all these factors in deciding danger?

19         MR. ATKINSON:  Can I object?  Part of the

20  reason I'm objecting to the form is because the

21  working group were the reviewers.  That's -- that's

22  where I think the confusion is coming.

23         MS. RABINOVITZ:  The management of the

24  working group.

25         MR. ATKINSON:  You have yet to go through

                                    Page 158

1  case and prepare this document to go up.

2          When it went up, it went to the working

3  group and then level of management was involved to

4  review the documents as well and the case, and then

5  another level, my level, and then another level, and

6  then -- so there was substantial layers of review.

7      Q.   So is it accurate that -- is it fair to

8  say that levels of review is important in ensuring

9  the accuracy of these -- these assessments?

10     A.   It was more in place to -- because of the

11 people that we brought in and the roles that

12 individuals were given.  For example, I had to review

13 it because of my role as facilitator for the project

14 so I had to do it.  Then I had to remind management

15 before it went higher.  It was just a process that

16 was put in place.

17     Q.   And did having levels of review make the

18 process more accurate?

19     A.   I -- yes.

20     Q.   Okay.  Continue.

21     A.   Yes.  Yes.

22     Q.   You can continue if you want.

23     A.   Not that there were -- not to indicate

24 that there was anything wrong with what was found at

25 the lower levels, but it was just another level of

                                   Page 162

```
 1   briefing.
 2        Q.    And in terms of considering flight risk,
 3   were reviewers made aware that they should consider
 4   the -- that they could consider the availability of
 5   alternatives to detention?
 6              MR. ATKINSON:  Object to the form.
 7              THE WITNESS:  There was no instruction
 8   provided that limited what they were supposed to
 9   entertain.
10   BY MS. RABINOVITZ:
11        Q.    So was your assumption that -- is your
12   assumption that reviewers should have been
13   considering the availability of alternatives to
14   detention?
15              MR. ATKINSON:  Object to the form.  You
16   may answer.
17              THE WITNESS:  They were instructed to
18   review the cases.  Consider all factors.
19   BY MS. RABINOVITZ:
20        Q.    And all factors, does all factors include
21   whether the person could be released on ankle
22   monitoring?
23        A.    Yes.
24        Q.    Do you know in how many cases that were
25   reviewed in the -- this long-term review process
```

Page 163

1          MR. ATKINSON:  Object to the form.  You

2    can answer.

3          THE WITNESS:  To -- no.

4    BY MS. RABINOVITZ:

5          Q.    No?

6          A.    No.

7          Q.    So what were they supposed to do, just

8    determine if -- so what were they supposed to do with

9    respect to mandatory detention cases, apart from your

10   general stuff but just with a respect to detention,

11   what were they supposed to do?

12         A.    It's a factor considered, not necessarily

13   whether this case is being considered for either

14   detention or release.  It was just one of the factors

15   that's included in the case when you look at it.

16         Q.    So could reviewers recommend release of a

17   mandatory detention case?

18         A.    They would have to look at -- yes.

19         Q.    Under what circumstances?

20         A.    You said could they look at it.  Yes.

21   However, whether it's feasible or not is another

22   matter.

23         Q.    But it's possible that a reviewer could

24   recommend release of somebody who was mandatorily

25   detained?

                                          Page 167

```
 1          Q.    I think I've already asked this.  Are
 2    there any ongoing reviews about long-term detention?
 3          A.    No.
 4          Q.    So just going back to -- just to clean
 5    this up, make sure there is no ambiguity, when we
 6    were talking about the factors that are considered
 7    that are relevant to detention or release, you said
 8    it's, you know, a whole lot of factors.  You're not
 9    suggesting that any factor is relevant, are you?  I
10    mean, you're not suggesting, for example, that
11    whether someone has brown hair is a relevant factor?
12               MR. ATKINSON:  Object to the form.  You
13    can answer.
14               THE WITNESS:  Correct.
15    BY MS. RABINOVITZ:
16          Q.    So there is a lot of factors, but that
17    doesn't mean that everything is relevant?
18          A.    Correct.
19          Q.    So were there any -- were there any
20    written documents that were produced setting forth
21    the conclusions of this, of the study other than the
22    ones that we've -- well, we don't have any.  Were
23    there any written documents produced setting forth
24    the conclusions?
25               MR. ATKINSON:  You mean produced by us.
```

Page 188

1    your answers, okay?

2         A.    Yes.

3         Q.    Early in the deposition, you were asked

4    whether if an alien was a veteran was that a special

5    concern considered by the working group.  Do you

6    remember that question?

7         A.    Yes, I do.

8         Q.    If an alien was a veteran and was in the

9    long-term detention project, was the fact that they

10   were a veteran a heightened factor?

11        A.    It was a factor considered just like any

12   other factor.

13        Q.    So it wasn't inherently a more important

14   factor than any one other factor?

15        A.    Correct.

16        Q.    There was also a series of questions that

17   asked you about instructions from the working group

18   to the reviewers.  Do you recall that series of

19   questions?

20        A.    Yes.

21        Q.    In fact, I objected quite a bit during

22   that time, didn't I?

23        A.    Yes.

24        Q.    Okay.  Was the working group comprised of

25   the reviewers?

                                              Page 196

```
 1          A.    Yes.
 2          Q.    So the people who were in the working
 3    group were the people reviewing the work not only of
 4    the field offices but also of other reviewers as it
 5    moved up the chain?
 6          A.    Correct.
 7          Q.    So there would not have been instructions
 8    from the working group to the reviewers because the
 9    working group was the reviewers.  Is that right?
10          A.    Correct.
11          Q.    And was it the expectation of the
12    Department of Homeland Security that the working
13    group which consisted of the reviewers understood
14    what it was that they were to be assessing in looking
15    at the factors in the case management of these cases?
16          A.    Yes.
17          Q.    Is there any reason to believe that the
18    reviewers did not understand what it is that they
19    were to be reviewing?
20          A.    No.
21          Q.    You didn't get an opportunity to ask about
22    this -- to be asked about this, but in describing the
23    multiple layers of review that occurred in the
24    working group, was it your experience as a higher
25    level reviewer that there were a lot of errors being
```

Page 197

1  made at the field office level in the long-term

2  detention project?

3       A.    Far from it.  What we found was the

4  decisions made at the field level were in line with

5  what we would have expected at headquarters.

6       Q.    And in fact, that's part of the reason

7  that that project ended when it ended?

8       A.    That's correct.

9       Q.    There were a series of questions about

10  whether certain things were factors that were

11  considered in the evaluation of these cases on an

12  individual basis.  Do you remember that?

13       A.    Yes.

14       Q.    One of the questions that opposing counsel

15  asked you was whether or not if an alien was properly

16  categorized in mandatory detention, was that a factor

17  that was considered by the working group.  Do you

18  remember that question?

19       A.    I remember.

20       Q.    Do you remember whether you said that was

21  or was not a factor?

22       A.    I believe I said it was not.

23       Q.    Why -- what did you understand her

24  question to mean and your response to mean?

25       A.    What I understood the question to mean was

Page 198

1     did we go line by line on every single individual we

2     were reviewing to see if mandatory -- if the review

3     confirmed the mandatory detention classification.

4          Q.     But --

5                 MS. RABINOVITZ:  Can you just repeat that

6     answer because I didn't hear it.

7                 MR. ATKINSON:  Can you read back my

8     question?

9                 (The record was read as requested.)

10    BY MR. ATKINSON:

11         Q.     Did you understand my previous question?

12         A.     Could you repeat it again?

13         Q.     Let me withdraw my previous question.  Let

14    me ask this.  What did you do understand her question

15    and your response to mean?  Could you elaborate

16    further on what you meant in your response?

17         A.     When the cases are being reviewed and you

18    see that individuals are classified, for example, as

19    mandatory detention but yet looking at the criminal

20    record, it would reflect that individual was not

21    properly classified and obviously action would be

22    taken.  I misunderstood the question to mean did you

23    go to every single alien and review every single one

24    as far as mandatory detention.

25         Q.     During that line of questioning, you

                                         Page 199

1    also -- do you also recall that Ms. Rabinovitz asked

2    you whether there was a recommendation ever made by

3    the working group to release somebody who was subject

4    to mandatory detention?

5         A.    I recall the question.

6         Q.    And do you recall your response?

7         A.    I recall my response.  Yes.

8         Q.    And can you explain or can you -- can you

9    explain further what you meant when you testified

10   that recommendations may have been made?  It is

11   possible that recommendations may have been made to

12   recommend the release of somebody who is subject to

13   mandatory detention?

14        A.    What I meant to say was that options were

15   entertained, however, in order for that to be

16   considered, that classification mandatory detention

17   would have to be addressed first.

18        Q.    So to make sure it's clear, the working

19   group wasn't simply recommending that people be

20   released even if they were subject to 236 C because

21   they thought that there were other factors that might

22   weigh in favor of a release recommendation, did they?

23        A.    Correct.

24        Q.    Okay.  What generally would have to happen

25   with that alien's proceedings before release could go

                                        Page 200

1    through?

2         A.    Terminated.

3         Q.    Meaning the proceedings would have to be

4    terminated or otherwise closed?

5         A.    Yes.

6         Q.    So it wasn't the working group's practice

7    to recommend that aliens subject to detention under

8    236 C be released?

9         A.    No.

10        Q.    Okay.  There were also -- I think this is

11   my last area.  There was also a series of questions

12   regarding delays classified as DOJ-EOIR delays.  Do

13   you recall that line of questioning?

14        A.    I recall it.

15        Q.    Ms. Rabinovitz asked you a series of

16   questions as to whether immigration judge delays or

17   other delays were part of those delays in that

18   document.  Do you recall that?

19        A.    I do.

20        Q.    Would DOJ EOIR delays also include delays

21   caused by continuances sought by the alien?

22        A.    Yes.

23        Q.    Would that also include delays from

24   continuances sought by the alien's representative?

25        A.    Yes.

                                        Page 201

```
 1          Q.    Would they also include delays sought by

 2     the alien seeking to file a claim for some benefit at

 3     some point in the removal proceedings?

 4          A.    Yes.

 5                MR. ATKINSON:   I think that's all we have.

 6                MS. RABINOVITZ:   I just want to have just

 7     two follow-up points to that.

 8                EXAMINATION BY COUNSEL FOR PETITIONERS

 9     BY MS. RABINOVITZ:

10          Q.    I thought that we had clarified afterwards

11     that we were not asking about whether reviewers gave

12     themselves instructions.   What we were asking is

13     whether, whether managerial reviewers like you had

14     given instructions to other reviewers.   So that's

15     what we were talking about.   And is it correct that

16     no written instructions were given by the top

17     managers of this project to the -- to the reviewers

18     who were doing this, you know, on the ground?

19          A.    Yes.

20          Q.    And how -- how did you determine that they

21     understood what they were supposed to be doing

22     because your answer to Mr. Atkinson was obviously,

23     though, they understood what they were supposed to be

24     doing.   So I'm asking how do you know that they

25     understood unless you communicated it to them?
```

Page 202

```
1    UNITED STATES OF AMERICA)
2                                    SS:
3    DISTRICT OF COLUMBIA        )
4
5        I, SUSAN L. CIMINELLI, the officer before whom
6    the foregoing deposition was taken, do hereby
7    certify that the witness whose testimony appears in
8    the foregoing deposition was duly sworn by me; that
9    the testimony of said witness was taken by me to the
10   best of my ability and thereafter reduced to
11   typewriting under my direction; that I am neither
12   counsel for, related to, nor employed by any of the
13   parties to the action in which this deposition was
14   taken, and further that I am not a relative or
15   employee of any attorney or counsel employed by the
16   parties thereto, nor financially or otherwise
17   interested in the outcome of the action.
18
19                         _Susan L. Ciminelli_
20                         Notary Public in and for the
21                         District of Columbia
22
23   My commission expires:   11/30/2016
24
25
```

Page 209

# EXHIBIT B

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

----------------------------------------x

ALEJANDRO RODRIGUEZ, et al.,

        Petitioners,

    -vs-

TIMOTHY S. ROBBINS, in his capacity
as U.S. Immigration and Customs
Enforcement Los Angeles Field Office
Director, et al.,

        Respondents.

----------------------------------------x

        DATE:  Wednesday, November 28, 2012

        TIME:  9:27 a.m.


        Examination Under Oath of SUSAN B.

    LONG, held at the offices of UNITED STATES

    ATTORNEYS OFFICE, 100 South Clinton Street,

    Syracuse, New York, on November 28, 2012,

    before  CYNTHIA A. SANDERS, Registered

    Professional Reporter and Notary Public in

    and for the State of New York.

91

1                           S. Long

2       A.    To deal with the problem when you don't have

3    information.

4       Q.    Right.  What do you do to fill out the rest

5    of that?

6       A.    However you approach it --

7       Q.    Okay.

8       A.    -- from a statistical matter.

9       Q.    And am I correct that there are different

10   things from a statistical perspective you can do to

11   address the issue raised of censored data?

12      A.    Well, you're always limited as to what you

13   know in a situation --

14      Q.    Right.

15      A.    -- and availability of data.  There may be

16   nothing that you can do.  It depends upon -- you know,

17   methods will depend upon that.

18      Q.    So in the case where you have the 54

19   individuals who are still detained as of April 28th,

20   2012, what statistical approach did you take with

21   respect to those individuals in light of the fact that

22   that data was censored?

23      A.    For my report?

24      Q.    Yes.

25      A.    In my report I was, you know, given the

92

1                              S. Long

2    universe of individuals and asked to look at it, and I

3    took the conservative approach of simply, for

4    calculations, ending their detention, you know,

5    effectively on the 28th, when the data ended.

6          Q.    Even though it was likely that their

7    detention was going to continue beyond that date?

8          A.    Yes.

9          Q.    And you note that in your report?

10         A.    Yes; um-hmm.

11         Q.    Did you talk about that issue with

12   Professor Velu?

13         A.    (No verbal response.)

14         Q.    Did you talk about your approach that you

15   took in the expert report with Dr. Velu?

16         A.    No.

17         Q.    Okay.  What specifically did you talk about

18   with Dr. Velu with respect to the issue of the 54?

19         A.    I didn't talk about the 54, I talked about

20   the statistical issue of censoring.

21         Q.    This may be --  That last question may have

22   been because I was misremembering your answer.

23               I had asked you what were the things that

24   had led to this conversation, and you said there were

25   two things, one of which -- two issues of censored

95

1                                     S. Long

2      either inaccurate or insufficient to answer the

3      questions that you were asked to answer?

4                    MR. ARULANANTHAM:  Object to the form

5             of the question.

6      A.    Apart from when you say -- apart from the

7      limitations, I certainly discussed limitations with

8      counsel.

9      Q.    Okay.  Did you --  When you got the data

10     that you relied on to conduct your analysis in this

11     case, was there anything about that data that gave you

12     concern that it was missing information or that the

13     information in the tables that you got was inaccurate?

14     A.    Yes.

15     Q.    In what way?

16     A.    Well, I enumerate the data that I relied

17     upon, which I didn't rely upon all of the data; there

18     was a lot of information there.  And so there were

19     some fields of information that I did not use.

20     Q.    You did not use it because you believe that

21     they were unreliable?

22     A.    Yes.

23     Q.    What fields were those that you considered

24     unreliable?

25     A.    Well, I didn't conduct a thorough

96

1                              S. Long

2   examination of all of the fields of information, but

3   with respect to these questions, for example, there

4   was information in the EOIR tables also about

5   detention.

6       Q.   Okay.  Anything else that you can remember

7   now without having that information in front of you?

8       A.   And so that --  So I didn't use that data, I

9   felt it unreliable as compared to the ICE information,

10  which is -- you know, they are the people that are in

11  charge of the detention and would be the first -- they

12  would know what events occurred rather than some

13  secondhand source.

14            I also expressed some concern to counsel

15  about the reasons given -- listed in the field as to

16  the ending of a detention period as to whether those

17  were always reliable.

18      Q.   Okay.  Any other fields that you can think

19  of right now?

20      A.   I did, in fact, look at the scheduling table

21  and the actions table that were the subject of the

22  discussions yesterday as to whether it would be

23  possible to derive an estimate of delay where delay is

24  used in the normative sense of time that would

25  reasonably, you know, be taken.

97

1                              S. Long

2       Q.    When did you look at the scheduling table

3   and the actions table to determine whether those could

4   be used to derive delay in the normative sense?

5       A.    Way last summer.  It was one of the

6   questions that I was asked by counsel, could I -- that

7   was not on the list, because I advised them that I did

8   not see how that could be done, given the data, which

9   included -- there were a series of reasons, one of

10  which was the lack of correspondence between the

11  information that was in the schedules table and the

12  information in the actions table in trying to match

13  them together to get some picture of what was going

14  on.

15              MR. ATKINSON:  Could you read back the

16              second half of that answer?

17              (Whereupon, the requested portion of

18              the record was read.)

19  BY MR. ATKINSON:

20      Q.    The phrase correspondence to me was because

21  I was thinking of letters back and forth.

22              You mean that there was a lack of --

23      A.    Agreement.

24      Q.    -- agreement?

25      A.    But agreement is more than -- is this event

101

1                         S. Long

2  at EOIR about the schedules table?

3      A.    That was with respect to judges' scheduling

4  and the time that they had.  So the focus of this was

5  looking -- was looking at the scheduling of judges;

6  how many cases were they handling, you know, how many

7  hours were they scheduled to be holding sessions

8  versus not.

9      Q.    Has TRAC ever done any analysis based upon

10 time between hearing dates?

11     A.    No, not in terms of times between hearing

12 dates.

13     Q.    How about has TRAC ever done any analysis as

14 to --  Let me strike that.

15          What analysis has TRAC done that has

16 specifically required an examination of the scheduling

17 table?

18     A.    It was with respect to workload of

19 immigration judges.  And so we were analyzing it with

20 respect to specific judges, all the judges' workload,

21 and we prepared -- got the dump of a month's full

22 schedule for every judge, and we prepared extracts, in

23 terms of Excel spreadsheets that we shared with the

24 judges and interviewed them on that basis.

25     Q.    When you say workload of immigration judges,

1                                    S. Long

2          Q.    What kind of things?

3          A.    You know, things that might be scheduled

4    that might not appear.  This is some time ago.

5               And so the focus at that time was on the

6    workload, you know, in a large sense.  So we ended up

7    not, in fact, relying on the scheduling table because

8    of those issues that were raised as to its -- you

9    know, its completeness, and for the purposes that we

10   were looking at it for.

11              So we did not use it, as I recall, to derive

12   any statistics.  It certainly gave us a sense that the

13   judges are scheduled for a lot of hours, but in a

14   quantitative sense, as to how many, et cetera, I'm

15   just trying to recall some of the conversations, and

16   put together, you know, what we used, what we didn't

17   use, and I haven't thought about that in some time.

18         Q.    Well, let me --

19         A.    And so basically, they gave lots of -- they

20   gave a number of kinds of examples of things that

21   wouldn't show up there, and so as a measure of

22   completeness, it, you know, raised concerns as to

23   whether we should rely on it for that purpose.

24         Q.    But you can't identify any of those

25   examples, as you sit here today, because as you said

106

1                          S. Long

2    changed since the time that you last looked at it in

3    approximately September 2009?

4         A.   I mean, we certainly have occasion --  I

5    mean, we do receive it, we don't rely on it for

6    anything.

7         Q.   Okay.  You said that the lack of

8    correspondence between the tables was one reason that

9    you decided not to use the schedules table field or

10   the actions table field.  Were there any other reasons

11   that gave you concern as to its reliability?

12        A.   Yes.

13        Q.   Okay.  What?

14        A.   The issue was whether or not you could

15   measure delay in a normal sense, foot dragging, taking

16   longer than would be normal.  And what is recorded in

17   that field and the reasons there and that process,

18   it's not -- did not appear in my professional judgment

19   to be data entry's design to answer that question.

20        Q.   So you said that field.  Which field?

21        A.   This is the field that gives the -- what's

22   been referred to as adjournment reasons.

23        Q.   So the adjournment code field associated

24   with a particular date in a schedules table; is that

25   what you're referring to when you say that field?

107

1                         S. Long

2      A.    Yes; um-hmm.

3      Q.    And what about your --  Do you have any

4  reason to believe that the reason that is put in by --

5  let's assume it's put in by immigration court staff.

6  Do you have any reason to believe that the code that

7  was used, the adjournment code, is unreliable as a

8  general matter?

9      A.    The issue was --  The issue was does it

10  measure normative delay, and because that was what I

11  looked at, and it didn't measure that, I didn't

12  address the issue of the entry being reliable, because

13  even if it's reliable measuring something then it does

14  not get to the issue of if, in fact, it measures that

15  then we should look at reliability.  So I didn't

16  actually examine it for that purpose.

17      Q.    So you don't know --  Well, let me rephrase

18  that.

19           Do you have any basis to believe that the

20  adjournment codes that are put in by the immigration

21  court staff are not -- are inputted in a manner that

22  is inconsistently or largely incorrect?

23                MR. ARULANANTHAM:   Object to the form

24           of the question.

25      A.    The --

114

1                                    S. Long

2    not familiar, existing in the schedules table.

3        Q.    I'm not talking about that field, my

4    question was limited to the schedules table.  And you

5    said that some hearings are recorded in the schedules

6    table.  What do you mean by some hearings were

7    recorded in the schedules table?

8        A.    That not all hearings are recorded in it.

9        Q.    How do you know that?

10       A.    From conversations with the judges.

11       Q.    All of the judges?

12       A.    There were several judges.

13       Q.    Did you have a judge --  Did you have any

14   conversations with judges in the Los Angeles area as

15   to whether all hearings were discussed in the

16   schedules table?

17       A.    I'm trying to remember which courts the

18   judges were in.

19              I do not believe there was a Los Angeles

20   judge that I had a conversation about that with.

21       Q.    Have you ever had --  Well, let me ask it

22   this way.  Are you familiar with the manner in which

23   the Los Angeles court records its hearings and

24   schedules table, specifically?

25       A.    As to whether there is any specific local

115

```
 1                        S. Long
 2   rules?
 3      Q.   No, I didn't ask about local rules.   I'm
 4   going to ask --  Let me ask it again.
 5          Are you specifically familiar in the way in
 6   which court personnel in Los Angeles record
 7   information in the schedules table?
 8      A.   I have no information regarding how specific
 9   individuals in the Los Angeles area courts record
10   information apart from the general information about
11   how information was recorded in the tables and its
12   coverage.
13      Q.   Let me ask it again, because your answer
14   didn't answer the question.   I didn't ask about
15   specific individuals.
16          Do you have any specific knowledge as to how
17   the Los Angeles court, the immigration courts there,
18   record the schedule -- the information in the
19   schedule --
20             MR. ARULANANTHAM:   Object to the form
21          of the question.
22      Q.   I haven't finished the question, and I'll
23   withdraw draw it and ask it again.
24          Do you have specific knowledge as to how the
25   schedules table information is recorded by court
```

119

S. Long

1

2      So do you know whether every hearing that is

3  scheduled is recorded in the actions table?

4      A.   I do not know.

5      Q.   Okay.

6      A.   I --

7      Q.   So the absence of a recorded hearing or the

8  absence of the recording of a hearing in the actions

9  table is not, in and of itself, a discrepancy if there

10  is something that is recorded -- if a hearing is

11  recorded otherwise in the scheduling table; is it?

12      A.   If I just saw a single discrepancy, you

13  know, it wouldn't concern me, if I saw a pattern of

14  differences that I didn't understand, some of which

15  appeared on the surface to not agree, I could not

16  judge without more information.

17      Q.   Did you seek to get more information with

18  respect to answering your concerns about whether these

19  tables were reliable?

20      A.   Well, the question would be what avenues,

21  how much time and effort and -- would be required to

22  do that.

23      Q.   No, my question was:  Did you do anything to

24  seek further information to address your concerns

25  about the reliability of either the schedules table or

126

1                           S. Long

2      A.    Yes.

3                 (Witness reviewed document.)

4      A.    In a general sense, in terms of --  Let's

5  see, so we're just talking about EOIR data?

6      Q.    Any information that you relied on from EOIR

7  or ICE, any information that you relied on is in the

8  scope of this question.

9      A.    Okay.  With respect to the EOIR data that I

10  relied on, apart from the expectation that any

11  database is not perfect.

12      Q.    Right.

13      A.    I did not find anything that raised

14  questions that raised to the level of the reliability

15  in my mind.

16      Q.    Okay.  Let's go back to the concern that you

17  talked about for the reasons listed in the field as

18  for the basis for -- I think it was either the

19  proceeding ending or --

20      A.    Not a proceeding, no, that was ICE data.

21      Q.    Okay.  So the field that you -- that listed

22  the reasons for the detention ending, was that --

23      A.    Well, it doesn't -- that particular period

24  at that detention facility ended.

25      Q.    Okay.

127

1                          S. Long

2              MR. ARULANANTHAM:  Can we go off the

3         record for a minute?

4              (Whereupon, a discussion was held off

5         the record.)

6  BY MR. ATKINSON:

7         Q.   Okay.  This is the reason for the release

8  field in the ICE data?

9         A.   Yes.

10        Q.   And what did you consider unreliable, other

11  than release may be -- may have multiple meanings?

12        A.   Well, you would find, for example, a release

13  reason that they were transferred to another facility,

14  and you would find a deportation date that was sort of

15  right next to the release, which suggested that they

16  hadn't been taken to another facility, but, in fact,

17  had been deported.

18        Q.   Is there --  I'm sorry.  Go ahead.

19        A.   But -- or it would say that they were

20  released under bond or supervision, or there is a

21  variety of categories, and you found the deportation

22  date there that was in that same -- that occurred

23  shortly there after that release.

24        Q.   Okay.

25        A.   Those kinds of things that made me concerned

136

1                          S. Long

2      A.    Yes.

3      Q.    Now, on page 3 of your report there is a

4 statement at the bottom of the first --  I'm sorry,

5 the second full paragraph that says:  Additional

6 information was provided to me by petitioners'

7 attorneys compiled from the court reports from the

8 specific Ninth Circuit appeals I identified as

9 involving class members.

10           What is that additional information that

11 you're talking about?

12     A.    I think it's described more fully in

13 Footnote 3, but basically the information was whether

14 or not a particular case was closed or not; and if it

15 was closed, the date.

16     Q.    So as I understand it from Footnote 3, you

17 used the -- you used Pacer, which is an electronic

18 service for obtaining court documents from federal

19 courts and state courts, I guess, to determine whether

20 certain proceedings of class members had either made

21 it to a Court of Appeals or were ongoing in the Court

22 of Appeals or were concluded in the Court of Appeals;

23 is that right?

24     A.    Yes.  I used Pacer to identify those cases

25 in the court, just in the Ninth Circuit was all I

137

1                              S. Long

2    looked, for pleadings that were listed under Pacer for

3    those particular members, class members.

4         Q.    When you looked through the information that

5    you got through Pacer, did you do some sort of

6    assessment of what kind of conclusion had been reached

7    in those proceedings?  For example, did you make a

8    distinction as to whether an appeal had been affirmed

9    or denied or whether the case had been remanded back

10   to the Board?

11        A.    I didn't make any such judgment.

12        Q.    Elsewhere in your report you provided

13   statistical information based on outcomes in various

14   tribunals; correct?

15        A.    (Witness nodded head.)

16        Q.    Whether there was an outcome in front of the

17   immigration court, Board of Appeals -- the Board of

18   Immigration Appeals, abbreviated as the BIA in this

19   deposition, or in front of a Court of Appeals; is that

20   correct?

21        A.    I had outcomes.

22        Q.    Okay.

23        A.    Yes, from the composite of those.

24        Q.    Okay.  So when you say an outcome, do you

25   mean that the case ended at one of those particular

1                          S. Long

2   levels?

3       A.   Yes.

4       Q.   How would you know if a case ended at the

5   Ninth Circuit?

6       A.   I was given a list from counsel of those

7   cases that had closed at the Ninth Circuit and the

8   date of closure.  And I was instructed that the way

9   the legal -- the laws are, that if the case had -- was

10  decided against the class member, then there would be

11  no subsequent proceeding in lower court.  And

12  therefore, I then looked to the prior proceeding to

13  determine the outcome.

14          If there was a subsequent proceeding, in the

15  chronology, then I looked to that proceeding or

16  whatever was the final order to determine outcome.

17      Q.   All right.  Other than --  We may revisit

18  that, because I'm not sure that I totally understand

19  that.

20          But for right now, other than the database

21  that we have identified, the ICE-EDI-001, -002, -009

22  and EOIR-EDI-006, and the information described in

23  Footnote 3 of your report concerning the Pacer

24  documents, is there any other documents that you

25  relied on in reaching your conclusions in this case?

150

1                          S. Long

2       Q.   So you took that list of all of the BIA

3   appeals which would include all petitions for review;

4   correct?

5       A.   Correct.

6       Q.   And you compared --

7       A.   At least that came from Pacer, yes.

8       Q.   What did you do with that information then?

9       A.   I believe I described, at least in that

10  footnote, because the docket number of the proceeding

11  in the court below, which would be the BIA docket

12  number, they use the alien's number.  And I was able

13  to match therefore those particular appeals that were

14  the same as the alien numbers in the EOIR or in the

15  list -- I would say, you know, the list of class

16  members.

17      Q.   All right.  So then you had a list of cases

18  that matched up with class members.  And if I'm

19  reading your footnote correctly, you wrote, quote --

20  And this is Footnote 3 on page 3 of your expert

21  report, you wrote, quote:  On each of these matched

22  cases I provided the information that I downloaded

23  from Pacer to petitioners' attorneys; is that correct?

24      A.   Correct.

25      Q.   I take it then that they --  And this is

151

1                          S. Long

2  also in your footnote, they quote:  Added an entry to

3  this listing indicating whether the Ninth Circuit case

4  had concluded, yes or no; and if it had concluded, the

5  date the mandate was issued?

6       A.   Yes.

7       Q.   So the information, to be clear, you didn't

8  determine whether the case concluded on the Ninth

9  Circuit on your own, you relied on petitioners'

10  counsel to do that?

11            MR. ARULANANTHAM:   Object to the form.

12       A.   Yes.

13       Q.   And the information you got back was either

14  yes, concluded or no, concluded?

15       A.   Yes, there was a field -- there was two

16  fields.

17       Q.   And the first field was a yes/no field?

18       A.   Yes.

19       Q.   And then the second field was the date the

20  mandate issued?

21       A.   Right, for those that had closed.

22       Q.   If a case was indicated as concluded in the

23  Ninth Circuit, what did that mean to you?

24       A.   It meant that I would look for a proceeding

25  --  I knew that it wasn't at that stage, that wasn't

171

```
 1                        S. Long

 2         When does --  We know the data set ends on

 3   April 28th, 2012.  What's the start date for your --

 4   for this window of analysis?

 5         A.   It was provided in the data.

 6         Q.   Okay.

 7         A.   I was given this data that was the universe

 8   of class members, and I was told that of this universe

 9   there wasn't any sampling done, everything was

10   included.

11         Q.   Okay.

12         A.   And so given that, I -- and those questions

13   related to that universe, and so I analyzed it.

14         Q.   And if somebody --  Go ahead.

15         A.   No, no.

16         Q.   If somebody had been detained for, say,

17   three months at the start of the window of the data

18   set, the beginning --  Let me make sure that we're all

19   understanding the proper terms or at least that we're

20   all on the same page.

21         The identification of the class members is a

22   result of choosing a period of time in which those who

23   were detained are included in the data set; is that

24   your understanding?

25              MR. ARULANANTHAM:  Object to the form
```

172

1                          S. Long

2        of the question.

3    A.    No, I mean I was provided with this data and

4    I was told, you know, here's the ICE data, here's the

5    EOIR data, and it covers the universe of class members

6    and I was to analyze that universe.

7    Q.    Was it your understanding that that 1,026

8    figure was the list of every class member in the

9    universe, as the universe --

10   A.    Yes, in terms of the universe described to

11   me.

12   Q.    Okay.  So when you analyzed length of

13   detention in various contexts throughout your report,

14   you looked at the length of detention that went back

15   prior to -- you would look at their length of

16   detention in total, not just beginning on a set date

17   at the -- the date that that data was pulled to

18   identify class members?

19        MR. ARULANANTHAM:   Object to the form

20        of the question.

21   A.    Well, data was pulled at different dates, so

22   I used the field entry into ICE custody.

23   Q.    Okay.  Why don't you have a problem of

24   overrepresentation with regard to length of detention

25   in your sample?

173

1                              S. Long

2        A.    Well, I don't have a sample, I have the

3    universe.   From the perspective of the question that

4    was given me.

5              For example, in Dr. Palmer's example he had

6    a hospital example, I believe it had 26 patients.   So

7    we got all 26 in our universe.

8        Q.    Let me ask you this:  Does your

9    understanding that your report, your analysis, was

10   going to be used to sort of make representations with

11   respect to how long aliens are detained, how long

12   aliens are -- how long they're detained before they

13   get outcomes at different levels of their proceedings,

14   what their general rate of relief is, didn't you have

15   an understanding that that would be applied to a

16   universe broader than just the 1,026?

17       A.    There was no discussion of that.  I was

18   handed this, what I understand to be the universe.

19       Q.    So have you done any analysis whatsoever to

20   determine whether the percentages and the outcomes --

21   the results that we see with respect to these 1,026

22   individuals could be applied to a larger number of

23   aliens detained under the same circumstances?

24       A.    You're saying in a sampling context?

25       Q.    Sure.

174

1                              S. Long

2       A.    Then that broader group would need to be

3  defined.

4       Q.    Okay.  So if there were 30,000 individuals

5  who were detained in the same way that these

6  individuals are detained, under the same laws and

7  under the same sort of same general circumstances, you

8  can't say that your results here could be extrapolated

9  out to any universe larger than the 1,026 individuals

10  included in this?

11       A.    This report was specific to that universe.

12       Q.    Okay.

13       A.    Of all class members in that; and I

14  understand that to be the question.

15       Q.    Okay.  Let's look at Table 2 of your report,

16  which is on page 6.  This measures average days of

17  detention by detention category; is that correct?  Or

18  it shows the results of those measurements?

19       A.    Yes.

20       Q.    What is the median in statistical terms or

21  in mathematical terms?

22       A.    The median is the halfway point, and you

23  would be able to see that from Table 3.

24       Q.    Okay.  So the median is --  If I have 1,000

25  individuals, and I count from one end 500 and count

185

1                        S. Long

2       A.    Um-hmm.

3       Q.    How did you go about determining what were

4    relief applications?

5       A.    I first went to the court applications

6    table, my information was restricted to filings with

7    the immigration court.  I did not have any information

8    with respect, if there was some relief application,

9    that occurred in -- you know, in BIA that simply

10   wasn't that information.

11            So this refers to immigration court

12   proceedings.  There is a table that we discussed on

13   court applications.  And there is a field in it by the

14   type of application.  I prepared a frequency

15   distribution of all of the types, and I shared that

16   with counsel and I asked:  What are the relief

17   applications to be included?  So I did not want to

18   rely upon my --

19      Q.    Your own experience?

20      A.    I mean, that's a legal question.

21      Q.    Did you get information in response to your

22   query after you sent the distribution table?

23      A.    Yes.

24      Q.    What was that response?

25            MR. ARULANANTHAM:  Hold on a minute.

1                          S. Long

2              MR. ATKINSON:  She is a witness, she is

3         not a client.

4              MR. ARULANANTHAM:  You can answer to

5         the extent you relied on the information in

6         your report.

7              THE WITNESS:  Okay.

8    A.    I excluded two categories.

9    Q.    What categories did you exclude?

10   A.    One was request for voluntary departure.

11   The other category had to do with representation,

12   withdrawing or something like that.

13   Q.    Is that category -- I see voluntary

14   departure in here at places.  Is that other category

15   addressed anywhere in the report?

16   A.    That is --  The Court, itself, can order

17   voluntary departure, and so that was treated as an

18   outcome but not within Question 4, which were relief

19   applications.

20   Q.    Right.  But there was a second category that

21   you said you excluded that had to do with

22   representation?

23   A.    Withdrawal of --  I mean, if you had -- if

24   you had the look-up table there, I could identify it.

25   Q.    When you say the look-up table, which

187

1                                    S. Long

2    look-up table?

3        A.    For the codes for relief applications.

4        Q.    Okay.

5        A.    There is a corresponding description of

6    that.  As I recall, the code was W.D.L., but I'm not

7    positive.

8        Q.    But that information --  After you sent the

9    distribution to counsel, and you got a response, you

10   relied upon that response in reaching the conclusions

11   in your --

12       A.    In excluding those two categories and

13   including the others.

14       Q.    For the purposes of your report?

15       A.    For the purposes of my report.

16             MR. ARULANANTHAM:  Can we go off the

17             record for a minute?

18             MR. ATKINSON:  Sure.  I'm making a

19             request for that communication.

20             THE WITNESS:  It was oral.

21             MR. ARULANANTHAM:  Can we go off the

22             record for a minute?

23             MR. ATKINSON:  Yes, we will go off the

24             record.

25             (Whereupon, a discussion was held off

225

1                    REPORTER'S CERTIFICATE

2

3              I, CYNTHIA A. SANDERS, Court Reporter and

4        Notary Public, certify:

5              That the foregoing proceedings were taken

6        before me at the time and place therein set

7        forth, at which time the witness was put under

8        oath by me;

9              That the testimony of the witness and all

10       objections made at the time of the examination

11       were recorded stenographically by me and were

12       thereafter transcribed;

13             That the foregoing is a true and correct

14       transcript of my shorthand notes so taken;

15             I further certify that I am not a relative

16        or employee of any attorney or of any of the

17       parties nor financially interested in the

18       action.

19

20

21       _Cynthia Sanders_____

22       CYNTHIA A. SANDERS

23

24

25

# EXHIBIT C

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-----------------------------------------x
ALEJANDRO RODRIGUEZ, et al,

     Plaintiffs,

        Civil Action No.
  vs.
        CV 07-3239-TJH
          (RNBx)


TIMOTHY S. ROBBINS, in his capacity as
U.S. Immigration and Customs Enforcement,
Los Angeles District Field Office
Director, et al,

     Defendants
-----------------------------------------x



     DATE:  Friday, December 21, 2012

     TIME:  3:30 p.m.



  DEPOSITION of Professor SUSAN LONG, conducted

at TRAC Main Office, Syracuse University, 215

University Place  Suite 360, Newhouse II,

Syracuse, New York before, JOHN F. DRURY, CSR,

RPR, Notary Public in and for the State of New

York, on December 21, 2012.

1                           S. Long

2      A.      Well, this is an area that I have, you

3   know, knowledge of.  I mean it's a very common --

4   it's a very common problem that one encounters

5   regularly.

6      Q.      The methodology that you described as

7   the self-balance methodology, is that a particular

8   term that's used throughout the field of statistics?

9      A.      Probably you would not -- statisticians

10  love to call things by, you know, specialized

11  terminology, so -- and it varies.  So you would

12  not normally probably encounter something -- have

13  the label be self-balancing; the description of

14  the label however is self-balancing.

15     Q.      Well, is there any other label that

16  you're aware of for the self-balancing methodology

17  that you came up with?

18     A.      To use out-of-sample data.

19     Q.      So correct me if I'm getting this wrong,

20  but you're saying that it may be referred to as

21  using out-of-sample data?

22     A.      Generally for censoring it involves time.

23  You use data from prior periods of time in which

24  to correct for censoring.  And that out-of-period

25  data is therefore what Dr. Palmer was referring to

28

1                     S. Long

2   from a sampling perspective in a general sense as

3   selection bias.  And you're looking for data where

4   either the censoring is less or ideally where the

5   censoring does not exist at all.

6       Q.    Okay, I think I'm confused by your

7   response.  You have described throughout your

8   report this self-balance methodology?

9       A.    Right.

10      Q.    And if I'm recalling your testimony just

11  now correctly, you've also said that statisticians

12  like to use some times specific and self-creative

13  labels?

14      A.    Right.

15      Q.    What I'm trying to find out is for this

16  censoring data methodology that you employed that

17  you call the self-balance methodology, is that

18  known throughout the field of statistics by some

19  other common name?

20      A.    No, it's not, I mean it's just so

21  common.  I mean this is the standard approach for

22  example, that the Department of Justice uses.

23  This is the standard approach that the Internal

24  Revenue Service uses, you know, in developing its.

25  It's just sort of baseline.

69

1                           S. Long

2     described in your report at pages 20 and 21 to

3     deal with the detention length censoring data

4     issue were methods that you did not rely on in

5     dealing with the issue of censoring data.

6          Let me go back and just ask you what I think

7     was the last question or rephrase the last question

8     that I had asked.  Did you rely on the first or

9     second method for calculating detention length in

10    reaching any opinions regarding censoring data in

11    this case?

12               MR. KAUFMAN:  Object to the form of

13               the question.

14    A.     They informed me that -- I relied upon

15    them in the following sense.  I did not rely upon

16    them as to the exact result.  Instead I chose

17    method three, because it was the more conservative

18    method, it produced a shorter estimate of

19    detention length.

20    Q.     So let's talk for a second about the

21    first method for calculating detention length.

22    You concluded that you had doubts as to the

23    feasibility of obtaining reliable results using

24    this first method, is that correct?

25    A.     Yes, I had doubts.  I was not certain.

74

1                    S. Long

2    text book but you're pretty sure it's in some

3    papers.  Can you give us anymore information --

4        A.    Yes, I can give you --

5              MR. KAUFMAN:  Objection, misstates

6              testimony.

7              MR. ATKINSON:  I didn't actually get

8              my question out before she started, so

9              let me start over.

10       Q.    Is there any source other than yourself

11   that you can point to to identify this approach as

12   being an approach that is widely used in the field

13   of statistics?

14             MR. KAUFMAN:  Object as to form.

15       A.    Yes.  Let us take the example of the

16   Internal Revenue Service and their procedure,

17   since, I don't know, in the teens, when Congress

18   passed the law requiring the publication of annual

19   statistics on income, all sorts of statistics on

20   income reported on tax returns, taxes, etc.  And

21   you know, they have methodologies that produce

22   papers.  There are, you know, there are collections

23   of those papers talking about, and indeed when

24   they would publish any estimates you would

25   typically find the methodological section in which

78

1                          S. Long

2       A.      No, there is a bias involved because you

3    no longer have a proper sample.  It goes to

4    whether or not those prior individuals are

5    properly part of a random sample of the population

6    of interest; and they're not.  So that's a biassing

7    effect.  In the same way that we have it here,

8    where you have people who are similar but reflect

9    an earlier period being added into the appropriate

10   sample information in order to correct the

11   sampling -- the censoring bias.

12      Q.      But isn't it correct that the

13   individuals you added back in to conduct this

14   self-balancing method are individuals who were

15   detained for longer periods than the data set that

16   Dr. Palmer used, which calculates everybody as

17   having reached that 181st day of detention during

18   the one year period at issue?

19      A.      That's not quite what I understand the

20   situation is.

21      Q.      What do you understand the situation is?

22      A.      Well, you're assuming that everybody is

23   detained longer.  But that's not the case at all.

24   In the out-period people you have people that are

25   detained a very short period of time as well.

86

1                          S. Long

2    the data and I divided it by the month that the

3    individual entered in their 181st day.

4        Q.    Is that described anywhere in your report?

5        A.    I will be happy to -- I mean that's why

6    I utilized it.  No one would utilize this without

7    looking to see whether it would -- in this case I

8    was looking for a conservative estimate.  So I

9    wanted --

10       Q.    That's not my question.  Let's look at

11   page 21 of your report.  There is a statement

12   there that "if these two biases," and this is

13   under the description of Number 3, the Third

14   Method for Calculating Detention Length about

15   halfway down the first paragraph, let me he read

16   the sentence.  "If these two biases are

17   approximately the same magnitude, they cancel each

18   other out."  What did you do to determine whether

19   these biases were approximately the same

20   magnitude?

21       A.    Well, I looked at, to try to isolate the

22   biases, to see whether I could determine that.

23   And because the bias for selection bias was

24   related to time I could look at month by month for

25   the months in the in-period, for the months going

88

1                      S. Long

2    very, you know, very little difference between

3    that month and the next month.  And the average

4    immediately was higher than my estimate.  Which

5    suggested that my balance point in fact wasn't

6    really balancing the two forces out because my

7    censoring bias wasn't adequately being cancelled

8    out by the selection bias.  And if anything my

9    estimate that I had derived earlier was too low,

10   which of course that's what I found on the other

11   two methods that I used, Method 1 and Method 2,

12   again they were too low.

13       So on that basis I felt that given the

14   available data this was the best reliable

15   conservative estimate.  And by conservative I mean

16   an estimate, a sort of reasonable estimate that

17   would be on the short side of detention length.

18      Q.    This month by month method of

19   calculation and examination or analysis, is that

20   described anywhere in your report?

21      A.    No, but no statistician would use that,

22   would use self-balancing without taking a look.

23   This is called the bootstrapping method, it's a

24   very common statistical method of using it.  And

25   so I used it.

92

1                     S. Long

2    looking at all of the ways that I looked at the

3    data and the three methods, that what is described

4    in my report is the self-balancing method, if

5    anything it was a conservative estimate.  And by

6    conservative that means it's on the low side.  And

7    to be on the low side means that the estimation

8    bias, excuse me, the censoring bias is pushing it

9    down more strongly and is not totally cancelling,

10   being cancelled by the selection bias.  That's

11   what makes it a conservative estimate.

12       Q.    Dr. Long, let me ask you just to make

13   sure that we're clear on something.  It seems like

14   there are two different censoring issues that

15   we're talking about with regard to your opinions.

16   Am I correct that one censoring issue involves

17   that 105 open cases with respect to the success

18   rate?

19       A.    There are 104 cases that have not

20   concluded.

21       Q.    Okay, and then the censoring data issue

22   with regard to length of detention, that involves

23   I think 19 people who continue to be detained?

24       A.    Well, what I did in my report, it

25   certainly involves the 19.  In my report to be

93

1                    S. Long

2    conservative in my first Method 1 and Method 2, I

3    assumed that no one who was released got

4    re-detained for purpose of my estimation.  Because

5    that would obviously lead to a lower estimate.  I

6    do not -- I do not think however, that the

7    evidence suggests that no one will be re-detained.

8        Q.    Well, that's not really an answer to my

9    question, so let me try it again.  There are two

10   different issues of censoring data with respect to

11   the results that you're trying to show.  One is,

12   there is a censoring data issue with respect to

13   the success rates because there are still 104 open

14   cases.  Is that correct?

15       A.    Well, there is a series of things, and

16   so that is one of them.

17       Q.    And with respect to the length of

18   detention censoring data issues, that is because

19   there are a certain number of individuals who

20   continue to be detained.  Is that right?

21       A.    That's not a complete answer as to the

22   only issue.  However, when I applied my methods

23   described in my Rebuttal Report to be conservative

24   I assumed it was only those 19.

25       Q.    And so do you know what the magnitude of

94

1                           S. Long

2    the bias effect is with respect to those 19

3    individuals?

4         A.    If we knew that, you're asking me do I

5    know it with certitude?

6         Q.    Yes.

7         A.    Well to know it with certitude you would

8    need to wait until those detained individuals

9    were -- none of them were any longer detained.

10        Q.    Would you agree that if you have a

11   population that you are using for statistical

12   analysis and you have no censoring data issues

13   with respect to a million of them, and you have

14   censoring data issues with respect to one person

15   in that population.  That the magnitude with

16   regard to that one person, the magnitude of the

17   censoring data issue is small?

18              MR. KAUFMAN:  Object as to form.

19        A.    No, it would depend on what it was that

20   you were estimating and the degree of censoring.

21   It's not merely the amount of people it is the

22   amount of censoring for each person.

23        Q.    So what leads you to conclude that the

24   censoring data issue with regard to the length of

25   detention is large in this case?

1                    S. Long

2    biases were netting each other out.  And in this

3    case because one was interested in whether the

4    original one was too high, whether or not in fact

5    your censoring bias was too small of a force to

6    net out the force of the selection bias.  And so

7    for that, one looks at the data in a variety of

8    ways.  You try different methods to see if there

9    is any evidence that you can uncover that suggests

10   that this netting process resulted in too high of

11   an estimate.

12        So I used the first method, which is the very

13   standard method to see whether or not based just

14   on the in-period, that we are all agreed on does

15   away with the selection bias.  And then to

16   minimize, to be conservative I assumed that the

17   only censoring bias had occurred in the 19

18   individuals who were still detained.  And then

19   using the best available data, and I described

20   that in some length as to exactly how I came up

21   with that data.  I'd be happy to go into more

22   detail there if that would be helpful.  I used it

23   because it was exit data, to base on my estimate

24   from it of the length of custody appropriate for

25   these 19 individuals.  Applied that estimate and

112

1                          S. Long

2        Q.     What are the implications that that has?

3        A.     Well, an Audit Table, for purposes of

4    audit is a record of when information is put into

5    CASE.  And what information it records is

6    obviously specific to the database.  But it's

7    something that happens automatically typically.

8    That's the nature of an audit.  So it's an

9    official, it's like a chain of evidence kind of an

10   idea, it is the record of, at least this is my

11   understanding of an Audit Table.  You know, I

12   don't have that knowledge of CASE with respect to

13   the specifics of how data gets into the Audit

14   Table.  But that when records are added or updated

15   that the CASE has pre-defined as something that it

16   wishes to log, an entry is made into the Actions

17   Table indicating with a date stamp the user that

18   did this and information about the action itself.

19       Q.     Do you know whether, as an Audit Table

20   if you put in a date for a hearing or you put in

21   an adjournment code for an adjournment in the

22   Schedule Table, whether it automatically records

23   as an adjournment in the Actions Table?

24       A.     Do I personally know that?

25       Q.     Do you know it?

## REPORTER'S CERTIFICATE

I, JOHN F. DRURY, Court Reporter and Notary Public, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney or of any of the parties nor financially interested in the action.


_John F. Drury_

JOHN F. DRURY, CSR, RPR

Notary Public

# EXHIBIT D

```
 1              UNITED STATES  DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                   WESTERN DIVISION

 4       -----------------------------------------------

 5       ALEJANDRO RODRIGUEZ, ET AL.,

 6                              Plaintiffs,

 7       vs.              Civil Action No.:  CV 07-3239-TJH

 8       TIMOTHY S. ROBBINS, in his capacity as        (RNBx)

 9       U.S. Immigration and Customs Enforcement,

10       Los Angeles District Field Office Director, et al.,

11                              Defendants.

12       -----------------------------------------------

13

14            Examination Before Trial of

15            CHESTER I. PALMER, held on November 27,

16            2012, at the U.S. Attorneys Office,

17            100 South Clinton Street, Syracuse,

18            New York, before Erin M. Hutter, Registered

19            Professional Reporter and Notary Public in

20            and for the State of New York.

21

22

23

24

25       PAGES 1 - 191
```

Page 1

```
 1   letter A, that was what I asked about.
 2        Q        And you were told it comes from the
 3   court?
 4        A        Yes.
 5        Q        Okay.  Do you know what criteria are
 6   applied by the courts in choosing to grant or deny
 7   requests for continuances?
 8        A        No.
 9        Q        And I take it, then, you don't know if
10   those could be reviewed on appeal or anything like
11   that either?
12        A        No, no, I do not know.
13        Q        And you wouldn't know, then, if the
14   reason that is given for the continuance would play
15   any role on whether it's going to be upheld on appeal
16   or not?
17        A        No, I do not know about the legal context
18   here.
19        Q        Okay.  You'll have to forgive me, because
20   it's sort of relevant for other things in the case, I
21   might ask you a lot of questions where that's the way
22   it's -- and you're going to look at me and think
23   surely you already know that I don't know the answer
24   to this.
25        A        Oh, no, I understand, and I'll keep
```

Page 37

```
 1    saying at all opportunities that I'm not an expert on
 2    Immigration law.
 3        Q        Okay.  Do you know what the adjournment
 4    codes are used for by the Immigration courts?
 5        A        No.
 6        Q        Do you know the reason they keep track of
 7    them?
 8        A        I mean, I certainly never asked that
 9    question.  One would assume that it's the kind of
10    thing that a court would keep track of, or I would
11    have assumed that, but I don't know that, no.
12        Q        But don't you think that the purpose for
13    which certain information is tracked can bear on its
14    reliability?
15        A        It can in some circumstances, yes.
16        Q        And can bear on its reliability for a
17    particular purpose as opposed to some other purpose;
18    right?
19        A        Yes.
20        Q        But then wouldn't you want to know that,
21    wouldn't it be relevant if they're kept for one reason
22    rather than another?
23        A        Well, I suppose in some abstract sense,
24    but, you know, the fact is that as statisticians we
25    all deal with many databases that we have to sort of
```

Page 38

```
1    court that is attributing delay either to the detainee
2    or to some other source?
3                 MR. ATKINSON:  Object to the form.
4         A       You know, we're really sort of getting
5    into the realm of real speculation here.  It is
6    possible under some circumstances if the pressure was
7    strong enough and was known to the people at the time,
8    because remember, this is a 2012 report and we're
9    talking about what happened well previous to it, so if
10   you want to make the assumption that there was some
11   sort of strong pressure previous to the report and
12   that it was a bad deal for the court to record it in
13   one way, yeah, I mean, conceivably that could have an
14   affect, I have no evidence that it did, but certainly
15   I can't absolutely swear it wouldn't.
16        Q       Okay.  Okay.
17        A       They do appear to have used whatever -- I
18   don't know where they got their categorization from
19   where the delay came from, but one might think it came
20   from the same place.
21        Q       So that was actually going to be my next
22   question.  If you look at page 31 in that figure, if
23   you combine the reasons given in the table and then
24   the description of other in the second line underneath
25   the table it appears that there are 14 reasons for
```

Page 48

```
 1       Q        So was there any other instruction or
 2   guidance you were given as to what the population of
 3   interest is here other than the class definition?
 4                   MR. ATKINSON:  Object to the form.
 5       A        Not that I can recall.
 6       Q        Okay.  So the only reason that you threw
 7   out the two that were less than 180 was because you
 8   read the class definition in the Complaint, these
 9   people can't be class members, and so --
10       A        Well, yeah.  I mean, I asked counsel, I
11   said I've got two people here less than 180 days, you
12   know, it appears that they should not be in the data
13   set, I intend to exclude them, does that seem
14   appropriate.
15       Q        And they said yes?
16       A        And received the answer yes.
17       Q        Were you instructed to throw out the
18   three people for whom there were confidentiality
19   issues?
20       A        Yes.
21       Q        What about code 99, the data entry error?
22       A        Okay.  This is an issue that arised when
23   I was looking at the codes, because if you look at the
24   codes, you know, most of them sort of look like -- I
25   mean, you can understand that they're saying something
```

Page 56

```
 1    you ran on it other than what's here?
 2         A        Well, I mean, obviously I had a computer
 3    program, but it implements the rules that are given
 4    here, these are all of the rules in the program,
 5    unless I made a mistake.
 6         Q        Okay.
 7         A        But I believe these to be all the rules
 8    in the program.
 9         Q        Okay.  You had the EOIR database as well
10    and you had said that earlier?
11         A        The access database?
12         Q        The access data.
13         A        Yes.
14         Q        Right.  You didn't check the schedule
15    table data that you had, the adjournments, against
16    other -- other -- I don't know what the word is, other
17    tables in the access table database; is that right?
18         A        No, I did not check it against the access
19    table data.
20         Q        Why?  Any particular reason you --
21         A        I'm sorry.  I didn't hear.
22         Q        Why not?  Was there any protocol that --
23         A        No.  I mean, I certainly could have done
24    so if I had chosen, but my assumption is that they'd
25    been extracted from the same source, so they ought to
```

Page 60

1    match, but I did not check them.

2         Q         Okay.  There was a spreadsheet you

3    received two days earlier, on September 25th, that was

4    slightly different and I couldn't tell from this what

5    the difference was between the September 25th and the

6    September 27th, this is on page 3 of your report.  Do

7    you remember?

8         A         Okay.  The difference primarily was there

9    was a -- I forget what the date was as of when the

10   original AC delays spreadsheet was harvested, but

11   there was a cutoff date, there was a last date.  Now,

12   it's a little actually difficult to determine that

13   because some of the hearings that are scheduled are

14   scheduled in the future, they don't have adjournment

15   codes yet, but there are future hearings with

16   scheduled dates with no adjournment code, but if you

17   looked at the ones that actually had adjournment

18   codes, you could see that there was sort of a last

19   date and I asked if there was more recent data

20   available because in calculating, for example, the

21   lengths of some of the delays it would have been

22   useful to know.

23              I mean, there were a few cases where I

24   didn't -- you know, I had a from date but not really a

25   to date, so I asked if it would be possible to update

Page 61

```
 1    performed any comprehensive analysis of it.
 2         Q        Do you know if there are differences
 3    between the underlying data, like, the people who
 4    we're talking about and the cutoff date and things
 5    like that between her data set and yours?
 6         A        I have not compared them.
 7         Q        How would you -- well, as it's used in
 8    your report, how do you define "delay"?
 9         A        Okay.  The delay is the time between an
10    adjournment and either the next record recording an
11    adjournment or a hearing or whatever, or if it comes
12    first, the departure from custody.
13         Q        Okay.  So it's not measured by reference
14    to any amount of time that would be sort of the normal
15    time required to do any particular -- to take any
16    particular steps in an Immigration proceeding; is that
17    right?
18                  MR. ATKINSON:  Object to the form.
19         A        I'm not sure.  How would I know what the
20    normal time was apart from what I have in the data?
21         Q        So is the answer to the question no?
22                  MR. ATKINSON:  Object to the form.
23         A        So far as I understand the question, the
24    answer is no.
25         Q        Well, I guess delay in some parlances has
```

                                        Page 64

1    a normative connotation, I take it that you don't mean

2    it to have a normative connotation?

3        A        No, no, I just mean the delay is the

4    length of time between A and B.

5        Q        Okay.  So then any adjournment after --

6    well, let me ask it this way:  Do you know if the time

7    period from when a detainee enters the court system

8    and there's the first court record you would see,

9    right, until the time when you have a scheduling

10   hearing, would you count that as -- would you treat

11   that as delay as well under your definition?

12       A        No, because I -- I mean, I suppose if I

13   were doing different analyses there would be an issue

14   there, but remember, I did only -- I only analyzed

15   those delays that were the length of time after an

16   adjournment that was considered at the request of the

17   alien, so since that would not -- I mean, the initial

18   processing would not be such an event, I would not

19   have included it.

20       Q        So you wouldn't make any claim, then, as

21   to whether or not any of the delays discussed in your

22   report are justified or warranted in any kind of

23   normative sense; is that correct?

24       A        No, I have no knowledge of that.

25       Q        Do you know if it's possible for a case

Page 65

1    is preparation time; is that correct?

2         A        Yes.

3         Q        And do you know what that refers to, what

4    they're preparing for?

5         A        You know, I know -- I do not know

6    anything beyond the descriptions given here, my

7    assumption would be in the ordinary sense that it was

8    to prepare some material to provide to the court, but

9    I don't know what that material would be.

10        Q        And do you know if the detainee has a

11   right to prepare evidence to introduce to the court?

12        A        You know, I don't know legally what the

13   situation, I don't know what the legal requirement is,

14   no.

15        Q        And -- but whether it was true or not

16   would not change your analysis because you're not

17   making a normative claim about whether it's

18   appropriate to take a continuance for preparation;

19   right?

20        A        That's correct.  I am describing what

21   happened, not whether it should have happened or not,

22   but what happened.

23        Q        Okay.  So you'll forgive me, I hope, I'm

24   going to ask you the same question with respect to

25   certain of these.  So the second most common is to

                                        Page 67

```
 1    well, let me first ask, the fourth one, other
 2    alien/alien's attorney/representative request, do you
 3    know what that refers to?
 4         A      All I know is the label.
 5         Q      Okay.  Do you know if either of those can
 6    be denied if there's lack of good cause?
 7         A      I don't know.
 8         Q      There's another one, do you know -- so --
 9    or did you try and figure out if alien to file for
10    asylum or any of the other ones where it's -- it's
11    seeking to apply for some form of relief, if those
12    were used exclusively with each other as opposed to
13    overlapping?  So, for example, presumably an alien's
14    attorney or representative might request time in order
15    to prepare an asylum application, right, and then at
16    the same time you've got this other code, alien to
17    file for asylum, did you check to see if those were
18    ever overlapping?
19                  MR. ATKINSON:  Object to the form.
20                  You can answer.
21         A      There are cases where there is more than
22    one reason given, that's discussed in the report.  If
23    more that one reason is given in table one, I
24    tabulated all of the reasons, so the same adjournment
25    may count more than once in table one.
```

Page 71

```
 1              In later tables, however, I treated it as
 2    a single adjournment, I only counted it as one, but
 3    for the purpose of listing the types I counted
 4    whatever types were present.  Now, there were not many
 5    cases like that, but there where some, I don't
 6    remember how many.
 7         Q        And what about the decision to then
 8    attribute -- in the later tables you're then
 9    attributing percentages of delay or time periods of
10    delay to particular adjournments; right?  And how do
11    you make that decision where you've got two
12    adjournments that are both coded on the same day, but
13    for different reasons?
14         A        Okay.  If there are two adjournments --
15    that's what I was just saying.  If there are two
16    adjournments coded on the same day for different
17    reasons, for the purpose of table one I counted both
18    of them and I take the delay and I -- when I do the
19    mean delay it counts toward both of them.
20         Q        Yes.
21         A        However, after table one, I count it as a
22    single adjournment, so I don't have that problem.
23         Q        Well, but the delay --
24         A        After table one it's just number of
25    adjournments and delays and it counts as one
```

Page 72

1    adjournment and I count the delay once.

2        Q        Okay.  I understand.

3                    MR. ATKINSON:  As you're looking at

4                your outline, can we go off the record

5                to talk about timing for break?

6                    MR. ARULANANTHAM:  Sure.

7        (Discussion off the record.)

8        EXAMINATION BY MR. ARULANANTHAM:

9        Q        So you're not claiming that these

10   adjournments are requested to frustrate the system or

11   for any nefarious purpose?

12       A        I have no -- I mean, all I know is what's

13   in the data sets, so, you know, they are -- why they

14   were requested to me is just I have this code and

15   that's all I used.

16       Q        Are you making the claim that detention

17   length is caused by adjournment requests?  And I mean

18   caused there in a strong sense, a causal sense.

19                    MR. ATKINSON:  Object to the form.

20       A        Yeah.  I guess I'm having trouble with

21   that.  I mean, I actually never talked about the total

22   length of detention in my report at all.  All I talked

23   about was this is the total of the delays, so I mean,

24   I didn't analyze lengths of detention.

25       Q        But if -- let's leave detention length

                                              Page 73

1    detention, but that's all I can say.

2         Q        All right.  But even with respect to the

3    amount of time that the person's case took, even

4    there, all right, it's possible that there is some

5    other variable that has a stronger explanatory power

6    as to explain that amount of time than does alien

7    requested continuances; is that right?

8         A        Oh, yes.  I mean, I didn't look at any

9    variables beyond these delays.

10        Q        Do you know for the delays that are not

11   classified in your report as requested by the alien,

12   okay, do you know if -- would it be fair to attribute

13   the other, you know, all the other delays to the

14   government?

15                 MR. ATKINSON:  Object to the form.

16        A        I don't know.  You know, I didn't look at

17   those.  I suppose that would really be a question for

18   the person who did the classification.

19        Q        All right.

20        A        All I can tell you is that these are the

21   ones that were attributed to the alien and I used

22   those.  I didn't look at a table and there were

23   some -- I remember there was one that was something

24   like joint request or something like that and I

25   remember that one was not attributed to the alien and

Page 75

```
 1   where you've got two requests, one is coded as alien
 2   caused delay and the other one is not, what's the
 3   rational for counting that in your report?
 4        A     Well, you know, I think that's as long as
 5   the alien has made a request it seems reasonable to
 6   count that.  I mean, I don't know what I can say about
 7   the rational beyond that.  It could have been treated
 8   differently, it's a fairly rare event, so it doesn't
 9   have very much affect really, but --
10        Q     If that delay would have happened any way
11   is that -- how does that figure into your analysis?
12        A     Well, it does not figure into my
13   analysis, as I said.
14        Q     Okay.
15        A     If there was more than one and if one of
16   them is more attributable to the alien, I did
17   attribute it to the alien.
18        Q     All right.  What about the length of the
19   delay, is it your understanding that when the detainee
20   requests a continuance that the detainee is requesting
21   continuance of a particular length?
22        A     I have no specific understanding of that.
23   I don't know.  There has been some discussion that --
24   I mean, I do know that in some cases obviously another
25   hearing date has been set because there were dates
```

Page 77

1  mean, presumably the alien could say well, in that
2  case, let's go ahead or I'll take the next date you
3  have available or whatever, it's not clear.
4        I have no sort of opinion on that issue,
5  all I can do is tell you how I counted it.
6    Q    And did you try to determine from the
7  data that were there whether that phenomenon was
8  playing a role in that -- I mean whether that was sort
9  of a significant phenomenon that you described?
10        MR. ATKINSON:  Object to the form.
11   A    Well, I have no way of knowing what the
12  alien wanted, so no.
13   Q    Well, like, for example, there's, I think
14  one code for -- where is it?  On page 9, and there's
15  one entry for illness of witness, that is number 40,
16  and the delay is 51 days, right, like, presumably
17  that -- the fact that the next hearing happened on the
18  fifty-first day wasn't because the person got better
19  on the fiftieth day, right, it must be a product of a
20  scheduling --
21   A    Well, I don't know for sure, but that
22  sounds plausible.
23   Q    And the same phenomenon could be true
24  with respect to many of the continuances?
25   A    Oh, yes, certainly.  I would presume, and

                                    Page 79

```
 1   again, this is a presumption, but I would presume that
 2   in many cases if you look at the uniformity here,
 3   there's a lot of uniformity up at the top which
 4   suggests that in many cases what's happening is it's
 5   the next available date and it's about 40 days away,
 6   at least in many cases.
 7        Q       Right.  I'm sorry.  I didn't catch the
 8   number, it's about how many days away?
 9        A       About 40 days away for most of these
10   common things at the top.  Now, that's an assumption,
11   but I didn't think that was interesting was that if
12   you look at table nine for the mean delays for the
13   common reasons they're pretty much the same, there's
14   some variability, of course, you would expect that no
15   matter how they're caused, but it's not like there's
16   one that's 5 days and one that's 60 days, so, you
17   know, my assumption would be, but I do not know that
18   for a fact, that that reflects some sort of scheduling
19   imperative as far as available hearing dates goes, but
20   as I said, that's an assumption, I don't know, all I
21   did was measure the time.
22        Q       I guess I still want to know, then, what
23   we make of, like, even say page 2 of the report,
24   there's just the very kind of summary conclusions.
25   You say in the second bullet point for those aliens
```

Page 80

```
1                      MR. ATKINSON:  Object to the form.
2        A         Yeah.  I'm sorry.  I don't understand
3    what you mean by the ambiguity.
4        Q         Well, you had said earlier at the very
5    beginning of the deposition that there's a difference
6    in accuracy, potentially, between a reason that's
7    entered in that moment when something happens and a
8    reason that's entered a few days later, and I think
9    you had said you had seen this in some work that you
10   had done on job duties litigation, so I guess in that
11   context I'm asking you:  Does it matter whether the
12   reason for the adjournment is being entered on the --
13   in that moment in which the continuance is actually
14   being granted as opposed to a few days later?
15                     MR. ATKINSON:  Object to the form.
16       A         Well, in the moment is best, but a day or
17   two later is -- depending on how many actions, you
18   know, how busy the court was and so on may not be bad.
19   The cases I'm talking about were cases where people
20   were trying to recollect things that had happened
21   weeks or months earlier.
22       Q         If there were dozens of cases that were
23   adjudicated over the, say, three days, would that make
24   a difference?
25       A         Yeah, I mean, that certainly would make
```

Page 104

1      it more of an issue as to whether the person would

2      correctly remember.  On the other hand, you know,

3      you'd have to inquire into the process.  It's also

4      possible that the person makes notes at the time and

5      enters them into a database later, it's just hard to

6      say.

7           Q      Like, if the person has, like, a

8      handwritten and then is going to the computer

9      afterwards but the handwritten is contemporaneous,

10     that's what you're saying?

11          A      Yes.  I would need to know more about the

12     process to know whether this is likely a difficulty or

13     not.

14          Q      There's another adjournment now back on

15     the left-hand side at the top on November 5th, do you

16     see that?

17          A      Yes.

18          Q      And my -- when I was reviewing this the

19     corresponding data on the actions table seemed to be

20     November 8th, I'm wondering if you -- do you agree

21     with that that -- well, there's no adjournment on

22     November 5th, but there is an adjournment on

23     November 8th in the actions table?

24          A      Yeah, your statement is correct.

25          Q      Okay.  Now, going back up to the top of

                                                Page 105

1    adjournments appearing in the actions table that are

2    not in the schedule table, would that cause you to

3    change how you have done your analysis?

4        A       Well, if what you're saying is if I had

5    investigated this and found that there were actions

6    missing from the table I was using, would I have

7    corrected it, yes, I would have.

8              On the other hand, there are a lot of

9    embedded assumptions there which may or may not be

10    correct, namely that, you know, the database table is

11    more accurate than the spreadsheet table, which, you

12    know, we've talked about that, I'm not sure whether

13    that's true or not.

14        Q       I'm sorry.  Could I just go back, if

15    you'd excuse me for interrupting you, when you say

16    database more accurate than spreadsheet, you mean the

17    actions table is more accurate than the schedule

18    table, is that what you mean?

19        A       Yeah, if those are the sources of these

20    two, remember, I'm used to thinking of the left-hand

21    one as AC delays.

22        Q       I understand.

23        A       That's where this came from; right?

24        Q       Yes, the one on the left came from AC

25    delays.

Page 113

```
 1        A        Yes.  So --
 2        Q        But let me phrase that correctly.  Now
 3   you're asking the questions and I'm answering them,
 4   but my understanding is that AC delays came from the
 5   schedule table and what we have here on the left is
 6   the schedule table.
 7        A        Well, all my answers assume what is on
 8   the left is what is, in fact, in AC delays.
 9        Q        Correct.
10        A        Well, you know, obviously one thing to do
11   is to go check that and see if that's, in fact,
12   correct.
13        Q        Did you check that?  Did you check the
14   source from which AC delays was derived?
15        A        No.
16        Q        Sorry.  Go ahead.
17        A        But making that assumption, you know, if
18   there were more adjournments in the other table than
19   were in the table that I was using, you know, there
20   are a couple of issues here.  There is sort of a less
21   serious and a more serious one depending on how you
22   look at it.
23                 One of them is it could affect the
24   counts.  That, in a sense, might be less serious
25   because one would assume that at least in many cases
```

Page 114

```
 1   they would not be chargeable to the alien any way,
 2   many of the delays aren't, so there's a pretty good
 3   chance that if you found something there it wouldn't
 4   have much effect, but it might, you know, I just don't
 5   know.
 6              On the other hand, they also terminate
 7   other delays, and so the next question is -- that is
 8   an adjournment terminates the delay from the previous
 9   adjournment, so therefore, they would also affect the
10   lengths of time, again, that may or may not matter
11   because the previous adjournment may or may not have
12   been for a reason chargeable to the alien.
13              If it was for a reason that was not
14   chargeable to the alien, it's not going to matter
15   because I didn't tabulate those things any way.  If it
16   does, it potentially would matter.  Then you run into
17   does it matter a lot.
18              I mean, one would like everything to be
19   exact, but on the other hand, these things that are
20   one day off are really not probably going to make very
21   much difference to the analysis, we'd rather be right,
22   but realistically, given that databases are not
23   perfect, being one day off is not as serious as many
24   errors would be.
25              On the other hand, you know, sure,
```

                                              Page 115

1    that happens this late in somebody's record is going

2    to matter any way.

3        Q        Right, right.  What was the other issue

4    that you found?

5        A        I just looked and saw that one of

6    these -- there's custody status that says released on

7    9/16.  If that is, in fact, correct, and if I'm

8    interpreting correctly as a person that's no longer in

9    custody, nothing after that date matters to my

10   analysis anymore, because I would have dropped them

11   all.

12       Q        Right.  But that's on the question

13   whether this particular record -- the potential error

14   in this particular record affects any of your numbers,

15   but on the question of whether it suggests that there

16   is inaccuracy in the schedule table you would agree

17   the problem still remains because there appear to be

18   adjournments in the actions table that are not in the

19   schedule table?

20       A        We talked about that earlier, we don't

21   know which one should be given precedence.

22       Q        Right.

23       A        But let's put it this way:  To the extent

24   that the table that I used is missing adjournments,

25   that is obviously potentially a problem for the

                                              Page 118

1   analysis, perhaps a big one, perhaps a little one,

2   depending on how many and when they occurred and how

3   they play into the various analyses.

4       Q      Right.  And whichever one is more

5   accurate, I don't have a view as to which one is more

6   accurate, but whichever one is more accurate if there

7   is an inconsistency you'd want to do some

8   investigation to figure out, you know, what the source

9   of the inaccuracy is and which one is more accurate?

10      A      Ideally one would like to know that, yes.

11  I mean, obviously we would like to use the -- we know

12  our data won't be perfect, but we would like to work

13  on data that is as close to that as possible.

14      Q      Okay.  And on September 23rd, 2010, there

15  is an adjournment -- actually, yes, there's an

16  adjournment, it's the one, two, three, fourth -- I'm

17  sorry.  One moment.  Strike that question.

18             Yes, that's right.  On September 23rd,

19  2010, there is an adjournment, one, two, three, fourth

20  one down, do you see that?

21      A      Yes.

22      Q      There's no corresponding adjournment in

23  the actions table; is that correct?

24      A      As far as I can see, that's correct.

25      Q      And would you -- is that your view or is

Page 119

1     make one finger print check to the detainee and the

2     other -- attribute one to the detainee and the other

3     one not?

4          A        You know, I have some recollection I may

5     have asked about this and the response I got was it

6     was coded at the time, so there must have been --

7     perhaps there was something different about it, but

8     no, I mean, I have no knowledge of the underlying

9     reason for why that might be treated differently.

10         Q        That particular delay, the 11/22/2011,

11    does it -- I think we -- does that have any

12    corresponding events of any kind with the actions

13    table?  There's an adjournment?

14         A        Well, there's an adjournment on that

15    date.

16         Q        So why did I ask you that question?

17    Okay.  I think that's the answer to that question.

18                   Let me show you one more 62 -- I'm sorry.

19                   This is an exhibit, we're at the number

20    to the top left says 6292159.  I'm handing that to the

21    court reporter, to Dr. Palmer, and to the others

22    seated with us.

23         (Whereupon Exhibit 7 was marked for

24           identification, 11/27/12, EMH.)

25                   MR. ATKINSON:  Thank you.

                                      Page 123

1    there's a delay attributed to the detainee, but

2    there's no corresponding action in the actions table

3    for that; right?

4        A        It is a concern.  Now, I would say in the

5    hierarchy of concerns, my concern actually may be a

6    little bit less about this than some of the others

7    because there's a general rule in dealing with data

8    that when you have presence and absence, you tend to

9    believe presence.

10             That is in most data sets that I've

11   reviewed and when I've been able to check things, if

12   you have a record in one data set, but not another,

13   the most likely reason is it got omitted from one of

14   them, it's less likely that it got made up and put in

15   one.  Now, that said, one would like to know the

16   reason.

17       Q        Right.  And what's the -- you earlier had

18   said it was your understanding of the process of how

19   these got entered that they're entered by court staff,

20   either the judge or a clerk; right?

21       A        That was what I said about the codes,

22   that was what I asked about the codes, but presumably

23   in order to enter the code, the record had to be

24   there.

25       Q        Right.

                                        Page 126

1    depends on how the databases were constructed by whom,

2    under what circumstances, and so on.

3            So, you know, I'm not saying that it

4    necessarily applies here, what I'm saying is that just

5    as a matter of principle, though, that seems to be a

6    little less concerning than the opposite situation

7    where I'm seeing adjournments in the database that I

8    don't see on the other side.

9        Q        Okay.  Understood.  Is there any -- well,

10   let me ask it this way:  If there were enough

11   inconsistency, dates not matching, entries not

12   matching, between this date -- the schedule database

13   and the actions table database, it might cause you to

14   say data is not reliable, cannot rely on it

15   altogether; right?

16       A        Probably it might cause me to say I have

17   to fix it.  I mean, that's a different issue.  That is

18   it might cause me to say, you know, I have to somehow

19   reconcile these two, I have to find someway to figure

20   out what's most likely to have happened.

21           You know, again, when you're dealing with

22   historical databases particularly, perfection is not

23   to be attained, but if there -- you know, and frankly

24   while, again, I want all my data to be as accurate as

25   it can be, I'm not terrifically disturbed when there's

Page 128

```
1    the analysis from the two different databases and see

2    if they tell me the same thing.  I mean --

3         Q        I see, I see.

4         A        -- you know, if I get the result and one

5    way the average is 39 days and the other way it's 41

6    days, I'd like to know the exact answer, but

7    realistically for purposes of this litigation, it

8    probably doesn't matter.

9             On the other hand, you know, if one of

10   them tells me 39 days and the other one tells me 98

11   days, I'm going to worry.  So I don't really have a

12   quantitative, you know, it's -- you know, I hate to

13   say this, but it's really a matter of judgment.

14        Q        But you said, you know, 1 to 2 percent is

15   very common in databases where people nonetheless use

16   the databases for analyses, you gave me an outer

17   spectrum, I don't know if there's anything more you

18   can say about it.

19            What if we said -- and I haven't done the

20   analysis, so I don't know, but what if we said

21   10 percent of the records of the adjournments in one

22   table are not in the other or in this table and not in

23   this one?

24        A        I would be concerned with 10 percent.

25   Now, as I said earlier, might or might not matter.  I
```

                                        Page 131

1  might proceeded to check it and discover it made no

2  difference, but if I became aware it was 10 percent, I

3  would feel the need to check it to make sure it made

4  no difference.

5  　　　　　　　　MR. ARULANANTHAM:  Can we take a

6  　　　　　　　break for just a minute?

7  　　　　　　　　MR. ATKINSON:  Sure.

8  　　(Whereupon, a brief recess was taken.)

9  　　EXAMINATION BY MR. ARULANANTHAM:

10  　　Q　　　　I'm going to pick up where we left off

11  before the break.  I was asking about numbers of

12  percentages of inconsistency that might make -- give

13  rise to concern.  What about kinds of inconsistency?

14  You had said, okay, if it's a date where it's, like, a

15  couple days off or something, that's not necessarily

16  going to be a concern.  Can you say more about that?

17  What kinds of consistency -- or inconsistency would

18  give you pause?

19  　　A　　　　Well, there are several issues here,

20  first of all, as far as I can see from the database

21  here you -- in many cases, you can't tell the reason,

22  in some cases you can.

23  　　　　　　　So the reason would be one thing,

24  although, the only thing that's really important -- I

25  mean, I suppose the reason is important for my table

　　　　　　　　　　　　　　　　　　　　Page 132

```
 1    one as to what lines you get in, but on the other

 2    hand, one can argue that table one is not all that

 3    important in the larger scheme of things of what I

 4    did, that's up to other people than me, but for the

 5    later ones what's important about the reason is

 6    whether it is attributable to the alien or not.  So

 7    anything that affected whether it was attributable to

 8    the alien or not would be important.

 9         Q         Okay.  And does that mean, then, that if

10    you could -- if something in the actions table would

11    give you cause to question whether the description of

12    the reason for the adjournment arose, then that's

13    another kind of problem?

14         A         Yes.  Again, assuming particularly the

15    most important change would be one that caused --

16    would affect whether it was attributable to the alien,

17    you know.

18              An example might be if the one said, you

19    know, alien to submit asylum application and I didn't

20    have anything attributable to the alien in the

21    spreadsheet then I would be a little bit concerned,

22    and, of course, it would be the other way as well; if

23    there was something that made it clear, you know, that

24    the government asked for time for some reason and for

25    come reason the spreadsheet made it look like it was
```

Page 133

```
 1    the alien, I'd kind of want to know why.
 2              For six of the seven tables I did those
 3    two things and the dates are really all I used,
 4    because all I did was count things and measure delays,
 5    so -- and for those counts all that was important was
 6    it was attributable to the alien, it wasn't
 7    attributable to the alien, so those are the things
 8    that would be of the most concern.
 9         Q    Omissions, we talked about, in some of
10    the examples I showed you, if there were omissions in
11    either table that would be a cause for concern; is
12    that right?
13         A    Well, omissions in the database table
14    don't -- I mean, as long as the thing actually
15    happened don't -- aren't a problem.  I mean, remember
16    my analysis used the spreadsheet, so if something's in
17    the spreadsheet but not the database table, as long as
18    we're convinced that it really happened, the fact that
19    the database table isn't right isn't a problem because
20    I didn't use it.
21         Q    Right.  But if there were enough
22    omissions that might cause you to question whether the
23    events actually happened; right?
24         A    Yeah, I suppose.  I would want some kind
25    of assurance -- I would want to some database
```

Page 134

1    custodian to explain to me why this was happening and
2    give me some assurance that what I was looking at was
3    right.
4         Q       Even with the small delays that you have
5    seen, I mean, the small date discrepancies, like the
6    one, two day date discrepancies that we talked about,
7    does that give you a desire to learn more about the
8    process for how adjournments get coded?
9         A       Yes.
10        Q       In some respects you did a very vigorous
11   check for the consistency of the database like checked
12   all the names, cross-checked these dates, things like
13   that, but then you didn't check against the actions
14   table, you know, other things that we walked about
15   that you didn't do, is there a method, like, why do
16   you do some kind of consistency checks and not others?
17        A       Well, I think it's automatic for most
18   statisticians to do internal consistency checks on any
19   data they receive.  You know, you always worry
20   about -- I mean, some things even the statistical
21   program will spit up if you get a date of
22   February 30th, so you worry about that, you worry
23   about those kinds of things.
24               Comparing with sort of other data sets is
25   important if you have reason to believe that the other

                                              Page 135

```
 1              Now I've given you a little bit of reason
 2   to believe, perhaps, that there might be adjournments
 3   missing because there are some adjournments in the
 4   actions table that are not in the schedule table, but
 5   my question is:  Is that analogous to you, do you
 6   think now there's a reason to go back and look and see
 7   if there are adjournments that did not get classified?
 8              MR. ATKINSON:  Object to the form.
 9       A      I think that there's a reason for me to
10   check with those who understand the databases better
11   than I do about how these databases relate and whether
12   the database I used is really correct.  Now, that's
13   sort of the best I can tell you there, you know.
14       Q      Okay.  That makes sense.
15              One last line of questioning on this
16   subject which is:  You had said that if there's
17   10 percent of them missing the -- you know, that's a
18   serious problem, you know, 1 to 2 percent is really
19   common, I mean, is there some -- what's the line in
20   between there?
21       A      You know, there's a famous saying in
22   mathematics, you know, someone who has five hairs
23   counts as bald, someone who has 100,000 doesn't,
24   somewhere there must be a dividing line, but it isn't
25   really clear where it is.
```

Page 139

```
 1    you know, in my discussion of this, there are some
 2    kind of studies where that may be perfectly reasonable
 3    where you want some people to count more heavily than
 4    other people, and that's fine, but if -- you know, in
 5    a case where what you're doing is doing data over
 6    individuals the usual assumption is that every
 7    individual should count the same unless there's some
 8    reason not to and that every kind of individual should
 9    count the same.
10         Q       When might be an example where you do
11    want to capture -- you know, capture people in a way
12    that isn't random?
13         A       Well, I gave an example in here, at the
14    hospital, where the hospital wants -- if the hospital
15    wants to know with their workload, the person who's
16    there for a long time really does represent the higher
17    proportion of their workload than the people who come
18    through for one day, so if they want to know about
19    their workload, they should be counting that person
20    more, because it's more of the workload.
21         Q       All right.  Could you give me other
22    examples of that.  When else might you care about
23    that?
24         A       Well, a facetious example is would be if
25    some people got to vote more than once, but let's hope
```

Page 157

1    that doesn't happen.  I'm trying to think of sort of

2    similar situations.

3        Q        What about the Census?

4        A        I'm sorry.  I didn't hear you?

5        Q        The Census, the Census, you know, the

6    Census?

7        A        Oh, yes, the Census.  That's a good

8    example.  The Census makes an effort to contact

9    everyone but they have a problem that there are

10   certain kinds of people, those with no fixed residence

11   and so on, that are very hard to contact, and so they

12   attempt to identify those people in a variety of ways,

13   but, in fact, they're probably undercounted and that

14   probably introduced some bias into the Census.

15       Q        But do they try harder -- am I right that

16   they try harder to contact those people than they do

17   other people so at the sort of threshold level

18   methodologically it's -- you'd assume that every

19   attempt to contact people sort of would lead -- you

20   know, is equally good, then you would expect that they

21   would be overcounting those populations?

22       A        Well, I would be very surprised if they

23   were overcounting them because they're very hard to

24   find.

25       Q        Right, they're not overcounting them, but

                                        Page 158

```
1    my point is they don't try equally hard to contact all
2    groups of the population, they try harder to contact
3    some than others; right?
4         A       Yes, but they're trying to do that to
5    restore what they consider the proper balance in terms
6    of actually contacting people.
7         Q       That's because there's a sort of separate
8    form of inaccuracy?
9         A       No, I'm saying that that's what they do.
10   Actually, there's been a lot of political dispute
11   about it and I'm not sure what the current status of
12   it is, but there was a time, I believe, where they did
13   that and I think then there was some political
14   activity and I don't know what the current situation
15   is.
16            I know that the census actually wanted to
17   adjust its head count for these things and I believe
18   it was not allowed to do so by law.
19        Q       Right.  Right.  Leave aside the -- I also
20   don't know what happened and what they're actually
21   doing now, but I think the next question I was going
22   to ask was there is -- if you just tried equally hard
23   to count everyone, then the fear is that that would
24   produce some form of inaccuracy; is that right?
25        A       Yeah, it produces inaccuracy particularly
```

Page 159

1       at the group level.  That is, one could assume for

2       demographics, an obvious one is income, one can assume

3       that people with no fixed abode probably have on the

4       average lower income than people who are easier to

5       contact and, therefore, that would tend to bias your

6       income statistics, because you would -- people would

7       tend to look richer than they should because you're

8       missing some of the people who are down toward the

9       lower end.

10              Q       What if you were interested in analyzing

11      tax returns and you've got a small number of people

12      who make lots and lots of money, is that -- can you

13      imagine that's another situation where you might be

14      interested in introducing a selection system which

15      tried harder to get those people than to get other

16      people?

17              A       Sure.  In fact, the technical term would

18      be over sampling.  In that case one might deliberately

19      over sample.  It's fairly common actually in a lot of

20      situations.

21              I had a case that involved once what was

22      happening at drugstores and what they really wanted to

23      know is was what happening sort of chain wide but some

24      stores were much bigger than others, so we recommended

25      they draw a higher proportion of stores for a sample

                                                Page 160

1    from the larger stores than they did from the smaller

2    stores because an error in the average of what was

3    going on in the larger stores was more serious because

4    they were seeing more people, so that would be a

5    problem.

6              So, now, understand that once we got the

7    results, we put them back correctly taking into

8    account the fact that we didn't just average them out

9    because we had more one type than another, we had to

10   put them back correctly by re-weighting them correctly

11   in order to get them right.

12        Q        So you try harder to find them, but after

13   once having found, them you weight them in a way that

14   tries to achieve what?

15        A        Try to make it representative of the

16   population as a whole.

17        Q        Are you familiar with censoring, that

18   content?

19        A        Yes.

20        Q        And how would you define it?

21        A        Ordinarily one says that data are

22   censored when one cannot observe extreme values.  We

23   normally think in terms of high values, but

24   occasionally it's low values also.

25              An example would be if you're doing a

Page 161

1    complicated answer to that.

2         Q         Go right ahead.

3         A         If you're going to tell me you want me to

4    do the best I can to estimate detention lengths, the

5    answer is I would limit the sample to the in period

6    ones, yes, because the out of period ones bias it,

7    they're all long.

8                   On the other hand, if I'm actually making

9    my best estimate and if I can make the assumption that

10   things have not changed over time, then I can use the

11   out of period cases to get some idea of how quickly

12   people might fall out of formation from the in period

13   group in later time periods.

14                  So I wouldn't use them directly, but I

15   might use that information directly to see, you know,

16   what kind of assumption should I make about this

17   person who has -- I see they're already waiting for 14

18   months and that's all I know, can I go back and see

19   what happened to people -- as many people who were

20   there for at least 14 months, how much longer they

21   stayed.

22        Q         You would use that method if you

23   believed -- or in order to use that method, wouldn't

24   you have to believe that people who are detained for

25   some very long periods of time could be -- I'm sorry.

                                              Page 164

we think this is, we'd have to assume that the
percentage of people who have been detained for some
much longer period of time is representative of the
percentage who are going to be detained for that
period with respect to the in period?

　　　　A　　　　Not really.  Let me explain what I'd have
to assume and see if -- the first thing is that I have
to make sure that I have for my estimation, you know,
it depends on how far back you go.  I might have a
problem with people who have only been detained for 14
months because I need to know what has happened in the
past to people who have been detained for at least 14
months and I need to have an unbiased sample of that,
I can't just have the people who were not only there
for 14 months, but were there for three years or I'm
not going to be able to tell how fast they fell out of
formation after 14 months, so what I would have to
assume is if you look at the present -- assuming I had
a good sample of that, I would have to assume that if
you looked at the present number of people, let's say
18 months because it's convenient, if you look at the
present number of people who have been in detention
for 18 months that the distribution of how long they
would remain in detention would be the same as that
for a group of people who had been in that situation

Page 166

1    in the past.  That is people who in the past, if I

2    have a good sample of all of those from some period

3    who had been detained at least 18 months.

4              That's why I said that you have to be

5    willing to make the assumption that conditions haven't

6    changed over time.  If conditions have changed so that

7    things are faster or slower, then the assumption isn't

8    going to be very good.

9       Q        Okay.  Let me go back and ask you some

10   questions, again, recognizing you didn't measure

11   detention length; right?

12             You would agree that if you only limited

13   the sample to in period detainees and you made no

14   other adjustments, you just took the detention lengths

15   for inpatient detainees, that would also not be an

16   accurate account, that way of measuring the detention

17   length for this population; right?

18      A        I assume what you want to do is manage

19   your average detention length.  I mean, there are

20   things you could measure about detention length

21   because there are only a certain number of them that

22   are still in process, for many of them we know the

23   detention lengths, so if you wanted to know the median

24   or the 75th percentile or whatever, you might very

25   well be able to do that.

Page 167

1          Now, if what you want to do is know the

2     mean, that's harder, because for that you need to know

3     the total and the total is hard to get, you have to

4     estimate that, so --

5          Q     Right.  Let me just -- just to make sure

6     this is clear, the reason why you can't rely on just

7     the in-period detainees to get the mean, right, is

8     because it is right censored, it fails to capture

9     people detained for long periods of time; correct?

10         A     Yes.  Some of them are still in detention

11    and therefore you do not know for sure how long their

12    detention will last.

13         Q     And if you only took inpatient detainees

14    and measured it on that, am I right that you couldn't

15    get a detention length longer than something like 30

16    months, because you've got 180 days and then you've

17    got a roughly, you know, two-year period after that;

18    is that right?

19         A     There would be some maximum, I'm not sure

20    exactly what it is, but there would be some maximum of

21    something like that, I'd have to look it up and see

22    how exactly how late the data go.

23         Q     Okay.  And you'd also be cutting off

24    people, I mean, that's the maximum that you would get

25    if a person sort of just got in because their 180th

                                        Page 168

1     A      It would certainly have an effect, but,

2    you know, understand that the group size is really

3    important here.  I mean, if only 1 percent of people

4    were still going and even if you lost three years for

5    them, three years for 1 percent of the population is

6    .03 years, so it's about ten days.

7          Now, whether that's important or not is

8    not really for me to say, but compared to the mean

9    length that's probably a fairly small amount, so one

10   would like to have it exact, but at some point the

11   number becomes so small that, again, unless the

12   detention is going to be unbelievably long, it's not

13   going to matter very much.

14     Q      But if you were particularly concerned

15   about the due process problems arising from detaining

16   somebody for that substantial length of time, much

17   longer than 30 months, then analogous to the Census

18   concept, right, you might want to make sure to capture

19   those people even though they're a small percentage of

20   the total; is that right?

21     A      Yes.  I mean, for some purposes it might

22   be important to have information specifically about

23   those people, I take that to be your question.

24          Now, your purpose is a legal purpose, and

25   I can't say what's appropriate for a legal purpose,

Page 170

1   but there -- I certainly agree that there are purposes

2   for which that 1 percent could conceivably be

3   important, or at least there may be.

4        Q       All right.  Oh, leaving detention length

5   just for one moment, when you were calculating the

6   lengths of adjournments, there were some people who,

7   you know, there wasn't a final action for those

8   people, too; right?  In other words, sort of analogous

9   problem, there are people for whom you have a cutoff

10  date and the adjournment is extend beyond that cutoff

11  date; right?

12       A       Okay.  There are a couple of issues, but

13  no, I don't -- now, I would have to look, but I

14  remember checking for that and I don't believe it

15  happened, because remember, future hearing dates are

16  present, there are no --

17       Q       Right.

18       A       -- there are no adjournment reasons for

19  those dates, but future hearing dates are in the file,

20  so I think that between future hearing dates and the

21  dates people left detention I was actually able to

22  find a closing date for all of them.  Now --

23       Q       Okay.

24       A       -- there was a point at which I was

25  missing a few, but I think I ultimately found them for

                                            Page 171

## REPORTER'S CERTIFICATE

I, ERIN M. HUTTER, Registered Professional Reporter and Notary Public, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney or of any of the parties nor financially interested in the action.

*Erin M. Hutter*

ERIN M. HUTTER, RPR

Page 191

# EXHIBIT E

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3                   WESTERN DIVISION
 4

    ALEJANDRO RODRIGUEZ, et al.,
 5              Petitioners,
 6    vs.                    CASE NO. CV 07-3239-TJH
 7    TIMOTHY S. ROBBINS, in his
 8    capacity as U.S. Immigration
 9    and Customs Enforcement, Los
      Angeles District Field Office
10    Director; JANET NAPOLITANO, in
11    her capacity as Secretary of
12    Homeland Security; and ERIC H.
13    HOLDER, JR., in his capacity
14    as Attorney General of the
15    United States,
16              Respondents.

      _____
17

18        DEPOSITION OF CHESTER PALMER, Ph.D.
19    taken on December 21, 2012 commenced
20    at 11:38 a.m., taken at 4901 Tower Court,
21    Tallahassee, Florida, before SANDRA L. NARGIZ
22    Certified Realtime Reporter, Certificate of
23    Merit Holder
24
25    PAGES 1 - 116
```

Page 1

```
1     APPEARANCES: (ALL COUNSEL BY TELEPHONE)

2

      REPRESENTING PETITIONERS:

3              AHILAN ARULANANTHAM, ESQUIRE

4              aarulanantham@aclu-sc.org

5              MICHAEL KAUFMAN, ESQUIRE

6              mkaufman@aclu-sc.org

7              Michael Kaufman

8              ACLU of Southern California

9              1313 West 8th Street

10             Los Angeles CA 90017

11

      REPRESENTING RESPONDENTS:

12             SARAH S. WILSON, ESQUIRE

13             sarah.s.wilson@usdoj.gov

14             THEODORE ATKINSON, ESQUIRE

15             theodore.atkinson@usdoj.gov

16             Theodore W. Atkinson

17             U.S. Department of Justice

18             Office of Immigration Litigation

19             District Court Section

20             450 5th Street, NW

21             Washington, DC 20004

22             (202) 532-4135

23

      ALSO PRESENT:

24             Michael Sheen

25             Susan B. Long

                                   Page 2
```

```
1                            INDEX

2    WITNESS                                    PAGE

3    CHESTER PALMER, Ph.D.                        4

4       Direct Examination by Mr. Kaufman        4

5                    INDEX OF EXHIBITS

6                 (Exhibits are attached.)

7    NO.   Description                          PAGE

8    Exhibit 13  Rebuttal Expert Statistical Report of 12

9                Dr. Chester I. Palmer

10   Exhibit 14  Rebuttal Expert Report of Professor   31

11               Susan B. Long

12   Exhibit 15  Declaration of Benjamin B.          64

13               McDowell 12-14-12

14   Exhibit 16  CONFIDENTIAL-Deposition transcript   89

15               of Benjamin McDowell

16   Exhibit 17  Series of printouts                  90

17

18

19

20

21

22

23

24

25

                                         Page 3
```

```
 1                    STIPULATIONS
 2          The following telephonic deposition of CHESTER
 3   PALMER, Ph.D. was taken on oral examination, pursuant
 4   to notice, for purposes of discovery, and for use as
 5   evidence, and for other uses and purposes as may be
 6   permitted by the applicable and governing rules.
 7   Reading and signing is not waived.
 8                          *  *  *
 9

10          THE COURT REPORTER:  Would you raise your
11       right hand, please?  Do you swear or affirm that
12       the testimony you are about to give will be the
13       truth, the whole truth, and nothing but the truth?
14          THE WITNESS:  I do.
15          THE COURT REPORTER:  Thank you.
16   Thereupon,
17                    CHESTER PALMER, Ph.D.
18   was called as a witness, having been first duly sworn,
19   was examined and testified as follows:
20                    DIRECT EXAMINATION
21   BY MR. KAUFMAN:
22       Q    Could you state your full name for the record,
23   please.
24       A    Chester I. Palmer, Jr.
25       Q    Dr. Palmer, I understand that you have been
```

Page 4

```
 1    fairly clear that people would see as material, the some
 2    effect falls somewhere in between those two extremes,
 3    correct?
 4         A    Yes.
 5         Q    With respect to the court proceedings
 6    statistics, did you find that the effects that you noted
 7    in choice of population, those effects moved in one
 8    direction or the other, that is to say that the choice
 9    of population led to either more people being counted as
10    having BIA and Ninth Circuit proceedings or less BIA and
11    Ninth Circuit proceedings?
12         A    Yes.  As my report says, continuing in the
13    paragraph you were just reading, out-of-period aliens
14    had more.  So therefore using the full dataset tends to
15    produce higher percentages than using just the in-period
16    people.
17         Q    And is it your view today that the estimates
18    for the in-period population are best estimates for
19    determining the statistics on court proceedings?
20         A    Generally, yes.  There is an issue that it is,
21    I suppose, possible that there would be cases where
22    people who have not yet gone to the Ninth Circuit might
23    choose to do so.  I suppose that's also true at the BIA,
24    but I would guess that to be less likely since that
25    seems to come earlier in the proceedings in most cases.
```

Page 15

```
 1       appropriate.
 2              If you really wanted to make your best
 3       estimate -- and I have not attempted to do this, I
 4       have not studied this issue.  But if you really
 5       wanted to make your best estimate, the best way to
 6       do it would be to take the in-period group and try
 7       to make some kind of an adjustment for what is
 8       likely to happen in the future based on patterns in
 9       the past.
10  BY MR. KAUFMAN:
11       Q    If I understand correctly, isn't that what
12  Dr. Long attempted to do in her rebuttal report?
13       A    Yes.
14       Q    So you would endorse that as a correct
15  approach to studying the court proceedings statistics?
16       A    I am endorsing the general approach, not
17  necessarily the way she implemented it.
18       Q    Yes, I understand that.  Thank you.
19              Dr. Palmer, I would like to now turn to
20  statistics on outcomes of class members cases.  And I
21  will refer you to again page 8 of your rebuttal expert
22  report.  In the same paragraph that we were discussing
23  earlier, you state that, quote, not much affect upon
24  other percentages, such as the percentages of those
25  applying for relief, is affected by the choice of
```

Page 19

1    doesn't seem like a very good descriptive statistic.  It

2    seems like you need to know more.

3           Now Dr. Long did give more on one of her sets

4    of data in her first report.  But only on one.  And she

5    gave a much more complete distribution than it's really

6    practical to give for all of the numbers.  So I settled

7    for this sort of intermediate strategy, but I readily

8    agree that other strategies also would be acceptable.

9    But it just doesn't seem to me that just giving the mean

10   is a very good thing to do.  Done.

11          Q    I thank you, Dr. Palmer.  That was very clear.

12   And I just want to follow up on one thing you mentioned

13   and that is the inappropriateness of using a single

14   statistic to represent a complex dataset like that like

15   we have here; does that concern apply equally to the

16   median as it does to the means?

17          A    Well, the median is a better representative

18   than the mean, but I don't think it's enough by itself,

19   if that's the nature of the question.

20          Yes, I agree that I began by saying I don't

21   think any one number is a good number here.  There are

22   datasets that can be accurately described by one number,

23   but this is not one of them.

24          Q    Thank you.  Now, Dr. Palmer, is one of the

25   reasons why you think the median is a more appropriate

                                           Page 26

1    would like to refer you to Exhibit 14 we just

2    introduced, page 12 of that document, if you could take

3    a look at footnote 6.  And I will refer you to the last

4    two sentences of that footnote beginning, for example,

5    "One class was placed back into custody on the day

6    following an adverse decision by the BIA and remained

7    detained during the class members Ninth Circuit appeal.

8    While he was counted as not detained in my earlier

9    report, he is counted as detained here."

10          Dr. Palmer, does this indicate to you that

11   there is, in fact, a case of re-detention in the

12   dataset?

13        A    Yes, there certainly appears to be.  I mean, I

14   am assuming the accuracy of the statement, of course.

15   But yes.

16        Q    Do you have any reason to doubt the accuracy

17   of that statement?

18        A    No.

19        Q    So Dr. Palmer, if we assume that there is a

20   possibility which has been demonstrated in the dataset

21   of re-detention, could the median be affected by

22   re-detention?

23        A    The median could be affected by re-detention.

24   It would not likely be affected very much unless there

25   was quite a lot of re-detention going on.  But it

                                            Page 32

1    certainly could be affected, yes.

2        Q    That would mean that the medians that you

3    report in your report underestimate the median length of

4    detention, correct?

5        A    Yes.  Again, presumably by a not very large

6    amount.  But, yes, that would be the direction.  Done.

7        Q    Now, Dr. Palmer, I would like to return back

8    to the general topic we were discussing earlier about

9    whether the median is a better choice than a mean as a

10   single value to describe this dataset.  And I believe

11   you indicated that the censoring issue is a minor reason

12   why you preferred the median as a single value, but

13   there were more, I guess, substantial reasons you

14   preferred; is that correct?

15       A    Well, minor might be too strong, but it's not

16   the principal reason.

17       Q    And what is the principal reason?

18       A    The principal reason is that in a dataset that

19   is skewed as this one is, this dataset has a substantial

20   skew -- that's a technical term in statistics, s-k-e-w.

21   That means that it's asymmetric around the middle.  It

22   means you would see sort of a big short hump to the left

23   and a long skinny stretched-out tail to the right.

24            You can see that most readily by looking at

25   one of my tables.  May I refer to one of my tables here?

Page 33

1    didn't think any one number was good.

2         Q    And the median, I guess, is not good because

3    it doesn't tell you anything about the asymmetry of the

4    dataset that -- the values on either side of the median,

5    correct?

6         A    It doesn't give you a picture of the extreme

7    values.  It tells you where the middle comes, but it

8    doesn't give you a picture of what statisticians called

9    the tales of the distribution, the left and the right

10   end.  And that's why in my little table I gave 10th,

11   90th percentile, and also shortest, longest.

12        Q    Now, in your report you stated the median

13   better captures the, quote, typical detainee, correct?

14        A    Yes.

15        Q    And in your view, is this case about typical

16   detention cases?

17        A    You know, I cannot tell you what the case is

18   about.  But that really is not the question.  The

19   question is what is the purpose of this particular

20   statistic?

21             If the purpose of this particular statistic is

22   to give an idea of how long class members are being

23   detained, it would seem that one would want to know what

24   was typical for class members.  That admittedly is not

25   the same as what's typical for everyone, but that's a

                                              Page 36

1    separate issue.  Done.

2         Q    Thank you.  Just to summarize, Dr. Palmer, you

3    would agree that there is some value in knowing the mean

4    detention time for class members, correct?

5              MS. WILSON:  Object to the form.

6              THE WITNESS:  Well, I mean I supplied it as

7         one of my descriptive statistics, so I suppose I

8         have to say yes.  But -- and I think anybody would.

9         I think the value was limited but, yeah, it's

10        there.  And it certainly has value in certain

11        calculations.  As I said, one of Dr. Long's

12        calculations requires it.  So there are

13        circumstances for which you need it.  So by

14        definition I guess that makes it valuable.  Done.

15   BY MR. KAUFMAN:

16        Q    Thank you.  But Dr. Palmer, I want to return

17   now, I guess, to the topic of censoring which is

18   something I know you discussed at length during your

19   prior deposition.  And just to make sure that you and

20   are on the same page, can you again give me a definition

21   of what censoring is.

22        A    Okay.  Perhaps I will give a less elaborate

23   one than I did before and may I discuss what censoring

24   is in the context of this particular dataset?

25        Q    Yes, please.  Thank you.

                                        Page 37

1    500 and counting now, you could -- and do similar things

2    for each censored observation, you could get an exactly

3    correct answer.

4            Now that, of course, is unrealistic.  And I

5    guess in a sense it's not exactly correct anyway because

6    these people right now may not be average compared to

7    people in the past.  But you would get an optimal

8    answer.

9            Now saying it that way makes it sound easier

10   than it is.  There are a lot of problems with gathering

11   the data and doing the calculation and trying to make

12   sure that it's right.  But that's the general approach I

13   think that most people would take, most statisticians

14   would take in this situation.

15           The other approach I think I also mentioned,

16   but I think it's unlikely to work here, if you had

17   enough people you could try to sort of form a

18   distribution of detention lengths; and if you could

19   somehow get some mathematical form for that, you could

20   use that to answer the question also.  But that's an

21   even harder problem than the first one.  Done.

22       Q    Thank you, Dr. Palmer, that's very clear.

23           Did you try either of these methods for

24   correcting for censoring with the in-period population?

25       A    No, I didn't really have a sensible sample to

                                        Page 41

```
 1    mean, correct?  Sorry, let me rephrase that.
 2            Of the statistics you report in your rebuttal
 3    report, censoring affects more than the means, right?
 4        A    Yes, it affects the upper percentiles, the
 5    90th percentile particularly, and, in fact, it's likely
 6    to affect that much more than it does the mean.
 7        Q    And are there other statistics in your report
 8    that are affected by censoring?
 9        A    The highest value and in some cases the
10    75th percentile.  That seems to vary, if I remember
11    correctly, from one table to the next.  Sometimes
12    75 percent of the lengths are in without considering the
13    lengths of the people who are still detained; sometimes
14    they are not.
15        Q    For the statistics that are affected by
16    censoring, that would be the mean, the 75th percentile,
17    the 90th percentile, and the highest detention lengths,
18    all of those underestimate detention lengths as a result
19    of censoring, correct?
20            MS. WILSON:  Object to the form.
21            THE WITNESS:  Yes.  By definition, if you
22        don't take censoring into account essentially
23        anything is an underestimate.
24            I am sorry, I should say that -- I need to
25        correct that.  Obviously the median isn't if you
```

Page 45

```
 1        have over 50 percent of it.  But anything that is
 2        still undetermined is an underestimate.
 3   BY MR. KAUFMAN:
 4        Q    And do you have a sense of how great those
 5   statistics underestimate detention length as a result of
 6   censoring?
 7             MS. WILSON:  Object to the form.
 8             THE WITNESS:  I don't understand the question.
 9   BY MR. KAUFMAN:
10        Q    You just testified that those statistics we
11   discussed are affected by censoring, correct?
12        A    Yes.
13        Q    And that they underestimate detention lengths,
14   correct?
15        A    Yes.
16        Q    By how much do they underestimate detention
17   lengths?
18        A    Without doing some fairly elaborate work, it's
19   very difficult to tell.  Some of them obviously more
20   than others.  The one most affected is the maximum
21   length.
22        Q    You don't know how greatly the statistics on
23   mean, 75th percentile and 90th percentile and greatest
24   detention length, are underestimated as a result of
25   censoring?
```

Page 46

1        MS. WILSON:  Object to the form of the

2     question.

3        THE WITNESS:  I don't know exactly.  I am able

4     to make some kind of range estimates which I do in

5     the report.

6  BY MR. KAUFMAN:

7     Q    What are those range estimates?

8     A    Let me find them.  Okay?  (Examining

9  documents.)

10        It's fair to say, by the way, that although I

11  don't know exactly, no one else knows exactly either;

12  only the future will tell us exactly.  None of these

13  estimation methods will tell us exactly.

14        All right.  It's on page 7.  If you look down

15  just before subheading C, go up about halfway in that

16  paragraph, you see a sentence, a third of the way in

17  that paragraph, a sentence that begins with also.  "Also

18  in this particular table."

19     Q    Yes, I see that.

20     A    And what it does is point out that 5.4 percent

21  of the detentions are ongoing.  So what that means is if

22  you assume that they are all going to last another year,

23  then the mean would increase by .054 years.  And if you

24  work out what that is, it's about 20 days.

25        So if you assume that they are all going to be

                                          Page 47

1    there on the average another year, the means is going up

2    20 days.  If you assume that they are going to be there

3    another three years, it's going up 60 days.  If you

4    assume they are going to be there another 10 years, it's

5    going up 200 days.

6              Now, that at least gives you some idea of

7    what's rational here.  It's probably not rational to

8    assume that the average detention in that group is going

9    to be another 10 years, at least for many of the numbers

10   that I have seen.

11             Dr. Long would have a better idea of whether

12   it's a rational value for this than I do.  But that

13   gives you some idea of roughly how large the effect

14   would be on the mean.

15             It's much more difficult to estimate the

16   effect on some of the other numbers, again particularly

17   for the maximum, because the maximum is affected by the

18   one case out of these hundreds that goes the longest.

19   Done.

20        Q    And I am sorry, Dr. Palmer, but why would

21   Dr. Long be the person to make the best rational guess

22   as to the likelihood of future detentions?

23        A    She knows a lot more about the underlying

24   subject of detention and lengths of detention and things

25   like that than I do.  My knowledge is limited to this

                                            Page 48

```
 1   dataset.

 2       Q    I see.  Thank you.  I want to return to that

 3   example you offered in that paragraph, that if we assume

 4   people are detained in the future for another year.  I

 5   am curious about why you selected one year as the value

 6   for anticipated future length of detention.  Did you

 7   have some basis for assuming one year?

 8       A    No, it was a value of convenience.  Obviously

 9   you can scale it.  If it's two years, it's twice as

10   much, and so on.

11       Q    Are you aware that people routinely get

12   detained for years at a time in immigration detention?

13           MS. WILSON:  Objection.

14           THE WITNESS:  I am aware that some detention

15       periods are long.  One can see that in the

16       out-of-period data.

17   BY MR. KAUFMAN:

18       Q    So you are not confident that one year is an

19   accurate representation of future length of detention

20   for those still detained population, correct?

21           MS. WILSON:  Objection.

22           THE WITNESS:  No, that's correct.  I believe

23       the report makes that clear.

24   BY MR. KAUFMAN:

25       Q    Dr. Palmer, I wanted to return to another
```

Page 49

```
 1   point that you make in that same sentence, that is that
 2   if we assume a year, it would increase the mean by
 3   20 days, correct?
 4        A    Yes.
 5        Q    In your view, is 20 days not a statistically
 6   significant amount?
 7        A    Okay.  We need to back away a little bit here
 8   and I think I missed this the first time.
 9             Statistically significant is a term of art,
10   and this isn't what it means.  So I got around that by
11   saying substantial.  So may I modify the question
12   accordingly?
13        Q    Yes, please, go ahead.
14        A    I think 20 days may be on the verge of
15   substantial.  I would think that 40 days is substantial,
16   clearly.
17        Q    So if we assume that this future length of
18   detention was something north of a year, let's say it
19   was two years for the still detained population and that
20   would get us to the arena of substantially significant,
21   the differences in the mean, correct?
22        A    I am sorry --
23             MS. WILSON:  Object to the form.
24             THE WITNESS:  The problem is the word
25        "significant," not the word "substantial" -- not
```

Page 50

```
 1          the word "statistical."
 2               But, yeah, I mean, I have indicated that I
 3          think that differences of sizes of 30 days, and so
 4          on, I think most people might think that a month
 5          was a meaningful difference here.
 6               Now, whether that's meaningful in terms of the
 7          legal issues in this lawsuit, I cannot say.  But
 8          certainly it's large enough that I think one
 9          probably should pay some attention to it.
10               So basically, yes.  Now remember that's the
11          average for the group as a whole.
12               We actually have some information on this, by
13          the way, if you are interested in it.
14    BY MR. KAUFMAN:
15          Q    Please go ahead.
16          A    If you look at page B3, this shows results
17    from Dr. Long's data and from my data, and I am going to
18    use them for somewhat different purposes here, but I've
19    already concluded up above -- and I noticed that
20    Dr. Long says in her rebuttal report -- that really the
21    issues of who we included or excluded in our original
22    report have very little effect on the results.  So let's
23    just take those as comparable for the moment.
24               If you look at her original data, if you look
25    at the in-period aliens, we see there were 35 percent of
```

Page 51

1      Q    Would you agree that if you wanted to come up

2  with the best estimate for the number of class members

3  who take appeals, that you would use the in-period

4  sample and apply some adjustment for censoring?

5      A    Yes.

6      Q    Would you agree that if you wanted to come up

7  with the best estimate for the average detention length

8  for class members, that you would use the in-period

9  sample and apply some method to adjust for censoring?

10     A    Yes.

11     Q    So the in-period sample by itself is not the

12  best way to make estimates about detention lengths?

13        MS. WILSON:  Object to the form.

14  BY MR. KAUFMAN:

15     Q    Correct?

16     A    Not if you wish to estimate the mean.

17        MR. KAUFMAN:  Why don't we take a break?

18        (A recess took place from  12:56 p.m. to

19     1:02 p.m.)

20  BY MR. KAUFMAN:

21     Q    Dr. Palmer, before we move on to an entirely

22  different topic, I just want to circle back on one issue

23  we were discussing previously.  We were discussing the

24  statistics related to court proceedings, and I believe

25  you mentioned that you endorsed the approach that

Page 55

1    that's the issue.

2        Q    And as you stand today, you have no reason to

3    doubt those numbers; you just haven't had a chance to

4    review it, correct?

5        A    I have not had a chance to review it

6    thoroughly.  On the other hand, her adjustment is like

7    from 30 percent to 35 percent.  On the face of it that

8    does not seem unreasonable.

9        Q    Thank you, Dr. Palmer.  So let's switch gears

10   a little bit, and I want to just talk in general about

11   some of the differences between the people that were

12   included in your in-period sample and Dr. Long's

13   in-period sample.  And I just want to start with the

14   basic question which is, did you independently verify

15   whether people in the dataset qualified as class

16   members?

17       A    Well, you are going to have to define qualify

18   as class members.  Let me tell you what I did.

19            I verified that the people had a detention

20   length of at least 180 days.  That's what I did.  There

21   were two people I rejected on that basis.  There were

22   also two people Dr. Long rejected.  I don't have her

23   labels, but I would assume they were the same people.

24       Q    Is it your understanding that the only

25   qualification for class membership is that the person is

                                            Page 57

```
 1   person has 180-day detention, are you aware that in
 2   order to qualify for class membership the person must
 3   have a pending immigration case?
 4        A    I am still trying to understand pending as of
 5   when?
 6        Q    After the 180th day of detention.
 7        A    Okay.  So at the end of the 181st day or
 8   180th day or whatever?
 9        Q    Sure.  Let's assume that the person qualified
10   by detention length, they have hit 180 days of
11   detention, they are on the 181st day.  Separate from
12   that requirement, are you aware there is the additional
13   requirement that that person has been detained for
14   180 days also has a pending immigration case?
15        A    I do not believe I was aware of that until I
16   read Dr. Long's rebuttal report which so stated.
17        Q    Dr. Palmer, can I refer you to page 2 of your
18   rebuttal report which we have marked as Exhibit 13.
19        A    Yes.  I see the point.  Yes.  It's in the
20   complaint which I have read.  So I should have noted it,
21   but I didn't.
22        Q    Okay.  So is it your understanding from the
23   complaint and our discussion that a person must have a
24   pending immigration case in order to qualify as a class
25   member?
```

Page 59

```
 1        A    Yes, I had actually focused on number 3.  I
 2   was aware that they had not been afforded a hearing.  I
 3   had not focused on the completion of proceedings.
 4        Q    Now, Dr. Palmer, I know you only had a chance
 5   to review Dr. Long's report yesterday and you were under
 6   the weather, so forgive me if I am asking too many
 7   detailed questions about it.  But are you aware that
 8   Dr. Long removed approximately 57 people from her
 9   in-period sample because those people did not have
10   pending immigration cases?
11        A    What I am aware of, what she said in the
12   report was -- let me see if I can find it -- what she
13   says is she was instructed to exclude these
14   57 individuals from her analysis because the attorneys
15   had concluded that these individuals were not class
16   members.  I was aware of that.
17        Q    Yes, that's actually perhaps a more accurate
18   description.  Thank you for that clarification.
19             And I believe the report states also that we
20   instructed her that these people were not class members
21   because they did not have pending cases at their
22   180th day of detention.
23             Assuming that that's correct, that these 57
24   people did not have pending cases at their 180th day of
25   detention, do you agree it was appropriate to remove
```

Page 60

1                THE WITNESS:  In general, yes.  Certainly

2         underestimates -- accepting all this as given,

3         which I have not checked, it certainly means that

4         if you -- if they are not class members, as I've

5         said, one should probably exclude them and if one

6         excludes them, and if they tend to be shorter than

7         average, the average will go up.

8    BY MR. KAUFMAN:

9         Q    And that would mean that Dr. Long, that

10   detention lengths reported in Dr. Long's rebuttal report

11   for the in-period sample would be more accurate,

12   correct?

13        A    Would be more accurate than what?

14        Q    Than the detention lengths reported in your

15   expert report for the in-period sample, correct?

16               MS. WILSON:  Object to the form.

17               THE WITNESS:  Well, the detention lengths

18        reported in my rebuttal report, because I didn't

19        report any in my original report, so we are talking

20        about my rebuttal report, are the same ones that

21        Dr. Long reported in her initial report.  So if it

22        is correct that these people should be excluded,

23        then the means without them are better estimates

24        than the means with them, that is correct.

25

                                        Page 63

```
1    schedule table to count adjournments, to count

2    adjournments requested by aliens or attributable to

3    aliens, I think is the language that I used in my more

4    recent report; and that involved the reasons for the

5    adjournments.  And Mr. McDowell says that it is not a

6    problem that those two tables don't agree, he would not

7    expect them to agree, and that the schedule table is the

8    proper source of information for the kind of analyses

9    that I performed.  So that is what I relied on.

10        Q    So is it fair to say that Mr. McDowell's

11   declaration gave you confidence in the reliability of

12   the AC delay spreadsheet and schedule table on which it

13   was based?

14             MS. WILSON:  Object to the form.

15             THE WITNESS:  Yes, that seems fair to me.

16   BY MR. KAUFMAN:

17        Q    And apart from this declaration, were there

18   any other documents you consulted to assess the

19   reliability of the AC delays spreadsheet or the schedule

20   table?

21        A    No.

22        Q    Dr. Palmer, I want to refer you to page 3 of

23   the declaration.  Towards the bottom of that page,

24   paragraph 6, starts at line 21, the first sentence

25   reads, "The most reliable way to calculate the amount of
```

Page 67

```
 1    support that.  And so I used it.  If it is, in fact,
 2    correct that the schedule table has many large scale
 3    errors, then my analyses are in error.  That is simply
 4    true.
 5         Q    Dr. Palmer, can you show me where in the
 6    declaration it says that the schedule table is accurate?
 7         A    I am presuming that the operational purpose of
 8    this table is to allow the kind of calculations that I
 9    do.  I am presuming that the agency desires accurate
10    data.  If that is not true, if the agency does not care
11    about the accuracy of its data, then I think we are all
12    in trouble, all the calculations based on it.
13         Q    I'm still not seeing where in the declaration
14    it says that the information in the schedule table is
15    accurate or reliable.  I see it says that it's the most
16    reliable way.  I don't see where it says that it is
17    reliable or it is accurate.
18              Can you show me where in the declaration it
19    states that the data in this schedule table is reliable
20    or is accurate?
21              MS. WILSON:  Object to the form.
22              THE WITNESS:  It does not use those words.  It
23         does say the most appropriate way to calculate the
24         length of delays is to use that table which is what
25         I did.  My assumption is that when someone says the
```

Page 69

1          most appropriate way, that means he has taken

2          reliability into account and that he believes that

3          the reliability is adequate.

4   BY MR. KAUFMAN:

5          Q    And do you have some basis for that assumption

6   through your conversations with Mr. McDowell?

7          A    We certainly had some discussion in which he

8   expressed confidence in the table.  I've got to say I do

9   not remember the details of it at this point, but I did

10  inquire about some such things.

11         But, you know, it sort of comes back to

12  something you said earlier.  The only reason I have to

13  doubt it, is this fact that it has been pointed out to

14  me that some of the entries in the schedule table do not

15  agree with results in the action table.  Mr. McDowell

16  says that is not an appropriate comparison to make so,

17  you know, I don't really have any reason to doubt it

18  either.  One assumes that official government data is

19  generally reliable.

20         Q    Is that an assumption you make for all

21  government data, that it's reliable?

22         A    Well, you know, I do some internal consistency

23  checks, but when you receive data from any kind of an

24  organization, as a statistician I don't live in the

25  organization.  I don't see from day to day what goes

                                             Page 70

```
 1    determine the length.
 2         Q    I asked you to determine the length of a
 3    particular continuance request.
 4         A    Well, yeah, but I mean, if I have the date of
 5    a hearing and the date of the next hearing, we've all
 6    been using as a shorthand that the time between a
 7    hearing and the next hearing is what was due to the
 8    continuance.  Now, I will agree that I can't tell
 9    whether it's attributable to the alien, if that's what
10    you are getting at, but that's a separate question.
11         Q    Okay.  Dr. Palmer, I would like to refer you
12    to the next page of Mr. McDowell's declaration and the
13    paragraph 7 there.
14         A    Yes.
15         Q    And there's a sentence that begins on line 7,
16    it reads, "The action table is an auditing table that
17    holds information about actions added to a record in the
18    case."
19              Do you see that?
20         A    Yes.
21         Q    Can you tell me what that sentence means?
22         A    Well, I can tell you how I interpret it.
23         Q    Please.
24         A    In many databases -- and I am not an expert on
25    the case system, so I am responding in terms of the fact
```

                                          Page 76

```
 1    that I have experience with a number of databases.  And
 2    in most databases, when you go in and make a change
 3    anywhere in the database, there is a table that says on
 4    such-and-such a day, such-and-such a person changed
 5    such-and-such a data element.
 6              That's what is called an auditing table.  And,
 7    therefore, my assumption is that he is describing, or my
 8    interpretation is that he is describing a similar table.
 9        Q    That is the actions table, is an auditing
10    table in the way you describe it, correct?
11        A    Yes, that is my interpretation, realizing
12    again that I am not an expert in case.
13        Q    If a table is used for auditing as you
14    understand that term, would you expect that table to be
15    accurate?
16        A    I would expect it to be accurate for the
17    purpose of auditing.  But that purpose is not
18    necessarily the kind of purpose that might permit it for
19    analysis for other purposes.  For example, let's suppose
20    there is some problem with a Social Security number in a
21    record.  So one person goes in and changes it and there
22    is a record that says person A entered Social Security
23    number such-and-such on such-and-such a date.  And then
24    three weeks later somebody decides that's wrong and
25    there is a record that says somebody else entered Social
```

Page 77

```
 1    should be consistent.
 2              If the information in the two tables turned
 3    out to be inconsistent, would that cause you to doubt
 4    the reliability of information in the schedule table?
 5              MS. WILSON:  Object to the form.
 6              THE WITNESS:  It would make me want to know
 7         which table was more reliable for the purpose for
 8         which I was using it.  So in that sense, I suppose
 9         the answer is yes.
10              I mean, obviously one would like an
11         explanation and one would like to know that one is
12         using the most available -- most reliable available
13         information.  I guess I don't know what more I can
14         say.  Done.
15    BY MR. KAUFMAN:
16         Q    Let's assume that the inconsistency goes both
17    directions, that is that there is data in the actions
18    table that's not reflected in the schedule table and
19    there is data in the schedule table that's not reflected
20    in the actions table.  Assuming that's the case, would
21    that cause you to doubt the reliability of information
22    in both tables?
23         A    If I am answering under the assumption that
24    they are supposed to match --
25         Q    Yes.
```

Page 85

```
 1        Q    Do you see the table at the bottom of that
 2   page?
 3        A    Yes.
 4        Q    Do you see that the table states that there
 5   were 908 adjournments reflected in the actions table
 6   that were not recorded in the schedule table data within
 7   a six-day buffer?
 8        A    Yes, I see that.
 9        Q    And that's well over 10 percent of the total
10   number of adjournments in the actions table, correct?
11        A    Yes.
12        Q    And that inconsistency doesn't cause you to
13   doubt the reliability of the schedule table because of
14   what Mr. McDowell states in his declaration, correct?
15        A    Mr. McDowell, who is --
16             MS. WILSON:  Hold on one second, Chet.  I
17        object to the form of the question.
18             Chet, you can go ahead.
19             THE WITNESS:  Mr. McDowell tells me that the
20        tables aren't supposed to match, so how often they
21        don't match doesn't really matter.  So why should
22        this be a problem?
23             MR. KAUFMAN:  Let's go off the record for one
24        minute.
25             (A recess took place from  1:53 p.m. to
```

                                        Page 87

```
 1   database?
 2       Q    No, I am sorry.  I am just representing that
 3   the screen shot you are looking at right here on page 11
 4   is a screen shot of the actions table.
 5       A    Okay.  That much I understood.
 6       Q    Okay.  I didn't mean to say anything more than
 7   that.
 8       A    Okay.
 9       Q    Okay.  So returning now to the deposition
10   transcript on page 147, you seeing they are talking
11   about the actions table at this point.  Now I want to
12   refer you to page 148 and you will see beginning at
13   line 7 there is a question that reads, "And how would it
14   be reflected under action items?"  The answer reads, "On
15   the action items tab, all adjournments, all hearings
16   that are -- or all adjournments that are entered for
17   hearings will show up on this action items tab, it would
18   be entered there."
19            Do you see that, Dr. Palmer?
20       A    I do.
21       Q    Okay.  And that was the testimony of
22   Mr. McDowell.  Does that indicate to you that all
23   adjournments should be reflected on the actions table?
24            MS. WILSON:  Object to the form.
25            THE WITNESS:  It certainly appears to say
```

Page 92

1     that.  Now understand that I am responding
2     obviously without full knowledge of the context
3     here.
4  BY MR. KAUFMAN:
5        Q    Understood.  Understood.  I am just asking you
6  to evaluate that sentence, though.
7        A    But that's certainly what it appears to say.
8  Now, as you know, people often respond in terms of the
9  current situation rather than thinking more generally.
10 But that is certainly what it does appear to say.
11       Q    Does that appear consistent with what you
12 understood Mr. McDowell's declaration to state?
13       A    It certainly could be consistent.  You know,
14 we are once again running into the issue of, for
15 example, what date is going to appear with it because
16 it's going to be impossible to match it up if the date
17 is the date of entry rather than the date of the
18 adjournment itself.  That is the date in the actions
19 table, is the date of entry rather than the date of the
20 adjournment itself, then it's going to be very -- still
21 be very difficult to match them up.
22       Q    If I understand you correctly, they may not
23 match in those circumstances because the date which is
24 entered in the actions table may be a different date
25 than entered into the schedule table?

                                              Page 93

```
 1    bottom or are we just using the page numbers from the

 2    transcript itself?

 3         Q    The transcript itself.

 4         A    Okay.

 5         Q    It's page 11 in the big numbers at the bottom.

 6         A    Okay.  I have it.

 7         Q    Now, I want to begin with line -- at the

 8    bottom of the page, line 24, there is a question that

 9    states, "If anyone adds information to case enters

10    information into a field, will that be recorded under

11    the action items table?"

12              Answer -- now this is page 42, the answer,

13    quote, yes.

14              The following question is:  "And if anyone

15    modifies a record in case, that will be reflected in the

16    action items table?"

17              "Answer:  Yes."

18              Do you see that passage?

19         A    Yes.

20         Q    Does that indicate to you that all changes in

21    tables within that case database system should be

22    reflected in the actions table?

23         A    Yes, it appears to.

24         Q    Earlier we were discussing the possibility

25    about why there might be some actions in -- excuse me,
```

                                                  Page 98

1    some records in the adjournment -- strike that.

2          There might be some record in the schedule

3    table that are not reflected in the actions table.

4    Having now reviewed that deposition transcript, are you

5    still of the view that it's likely that there should be

6    actions reflected in the schedule table that are not in

7    the actions table?

8          A    No, it would appear from the transcript that

9    they should all be reflected, but again, with this

10   caveat that the records may not have matching dates.

11         MR. KAUFMAN:  Let's go ahead and take a break.

12         (A recess took place from  2:16 p.m. to

13         2:19 p.m.)

14   BY MR. KAUFMAN:

15         Q    Dr. Palmer, I just wanted to briefly follow up

16   on one topic we were discussing earlier regarding the

17   exclusion of the 57 people in Dr. Long's rebuttal

18   report.  And I just want to confirm or confirm your

19   view.  Is it the case that if we excluded those 57

20   people, it could potentially affect the median as well

21   as the means?

22         A    Yes, assuming that they tend to be on the

23   short end, the median would rise, although the median

24   may very well not rise nearly as much as the mean does.

25         Q    Understood.  Thank you.  I just have a couple

                                              Page 99

1    something like that.  So I took that.  And I don't think

2    I needed to make any correction to the end of that as I

3    recall because for all of those people who were still

4    active, I had a future hearing date, I believe, so I

5    knew how long the past was.

6              So I added up all of those dates, those days,

7    and I divided that number of days by the total number of

8    days.  So for example, if a person was in custody for a

9    total of 600 days and 100 of them were attributable to

10   alien requests, then the number in this table would be

11   100 over 600 as a percentage, which is 16.7.  Done.

12        Q    Thank you.  That was very helpful.  I just

13   want to confirm, you did include detainees whose cases

14   had not yet completed, correct?

15        A    Yes.

16        Q    So isn't the data you included censored in the

17   way we had discussed earlier?

18        A    It is censored, but notice that this is

19   censored in a rather odd way.  It is true -- first of

20   all, remember that the number is down.  We looked at

21   this table earlier, but the number I have censored was

22   lower than the number Dr. Long had censored because I

23   had a longer time period.  I think it's 29 of them, if I

24   remember earlier.

25              So, first of all, we are talking about less

                                              Page 102

1   than 3 percent.  So there's censored data, but there is

2   less and less of it as time runs on.

3           The second thing to remember is that future

4   delays might also be attributable to the alien.  So in

5   this case, it isn't clear that the censoring drives

6   these numbers in one direction rather than the other.

7       Q    Dr. Palmer, isn't it the case that detainees

8   whose cases go on a long time are detainees who are

9   taking appeals?

10      A    In many cases, yes.  I don't know if it's true

11  in all cases.

12      Q    I should say they are more likely to be taking

13  appeals than the general population, correct?

14      A    Yes.

15      Q    Okay.  And are appeal times attributed to

16  alien continuances?

17      A    No, I don't have information on appeal times.

18      Q    For the purposes of your calculations, when

19  you were calculating delays due to detainee

20  continuances, did you include appeals time as detainee

21  caused continuances?

22      A    No, I do not have information on that.

23      Q    So if we know that people whose cases go on a

24  long time are more likely to be on appeal, isn't it

25  likely that the future time that they are in detention

                                              Page 103

```
 1    is not going to be time attributable to the alien --
 2    delays to attributable to the alien?
 3         A    That seems right, provided -- and here's a
 4    legal issue that I don't know about -- there aren't any
 5    remands.  I don't know if the case ever comes back from
 6    the Court of Appeals with the court having directed, for
 7    example, some immigration judge or board of immigration
 8    appeals to do something that would restart proceedings
 9    at a lower level.  I don't know enough about the system
10    to know.
11              But do remember that we are talking about
12    something that only affects 3 percent of the people.  I
13    don't want to belabor this point too much, but once
14    again, if you think of medians instead of means -- and
15    by the way, this time they are not very different --
16    it's going to make very little difference.
17         Q    Right.  But here I am just talking about the
18    percentage, we are talking about the percentage of the
19    time that's attributable, if a person's detention is
20    attributable to delays due to alien caused continuances.
21    The date of the censoring could have some effect, could
22    it not?
23         A    It could have some effect for 3 percent of the
24    people.
25         Q    Just to confirm, you didn't take any steps to
```

Page 104

1    adjust for that censoring, correct?

2        A    That's correct.

3        Q    I want to look at that next paragraph on that

4    same page, and there you provide some information on

5    times not attributable to detainee continuances,

6    correct?

7        A    Yes.

8        Q    Similar to the discussion we were just having,

9    isn't that data similarly subject to censoring?

10       A    Yes.

11       Q    Go ahead.

12       A    This one conceivably probably more seriously

13    because of its nature as a count table, because it's

14    tabulating detention.

15       Q    I am sorry, could you explain that a little

16    more?

17       A    If someone has already been in detention

18    for -- I am sorry, strike that.  That may not be right.

19    I am sorry, I am sort of trying to answer on the fly and

20    this isn't something I've considered, so I should

21    withdraw that answer.  I haven't considered it

22    adequately.

23       Q    Similar to the data reported, I take it you

24    did not take any steps to adjust for the censoring in

25    the data?

Page 105

```
 1        A     That is correct.  Once again, it affects about
 2    3 percent of the people.
 3        Q     But it is the case that the data you report
 4    likely underestimates the amount of time due to -- that
 5    is not due to alien-caused continuances?
 6        A     The mean, yes; probably this time only the
 7    mean and the max.  The others, something like the
 8    median, more than half the people are done in 192 days.
 9    The censored observations are all beyond 192 days, I
10    would bet.  I doubt it would have any effect on the
11    median or even the 75th or possibly even the 90th
12    percentile because we know those people have been around
13    for at least 500 days.
14        Q     In calculating the percentages that you report
15    in those charts, did you rely on the means?  It appears
16    the percentages are also subject to the censoring.
17        A     We are going back to the previous table?
18        Q     No, the table at the bottom of the page there.
19        A     So you are talking about the 45.9 percent?
20        Q     Exactly, yes.
21        A     I am sorry, I am just trying to understand
22    what the number is you are looking at.
23              Censoring would affect that only if there is
24    someone -- I can't swear it wouldn't.  Okay?  But let's
25    think about how big it could be.
```

Page 106

1    probably 20 or 40 or 60 days off and just keep that in

2    mind.

3        Q    So if I understand you correctly, Dr. Palmer,

4    it may be the case that self-balancing does result in an

5    accurate estimate of detention rates, correct?

6            MS. WILSON:  Object to the form.

7            THE WITNESS:  Yeah, I mean it's possible, but

8        I don't see any basis for believing that.

9    BY MR. KAUFMAN:

10       Q    Right.  So your problem with the method is

11   that you don't see any way of confirming whether the two

12   opposite biases are equally balanced; is that correct?

13       A    Right.  I mean, we are trying to correct for

14   one bias.  Are we undercorrecting or overcorrecting?  I

15   have no idea.

16       Q    If there was a way to consult other database

17   sources that might help to confirm that, in fact, the

18   results you get from self-balancing are in line with

19   other forms of estimates, would that help to confirm the

20   accuracy of the self-balancing approach?

21           MS. WILSON:  Object to the form.

22           THE WITNESS:  You know, with the usual caveats

23       of checking the other results, yes, certainly.  Let

24       me see -- her original result was to bring her back

25       to the -- bring us back to the total number she had

                                              Page 111

```
 1        before, right?  Let's look at the mean.

 2               That brings us from 334 to 404, if I am

 3        correct.

 4               So that's up 70 days.  No, let me see.  Let me

 5        grab my calculator for a minute.

 6               If my quick calculation is correct, that is

 7        equivalent to assuming that the 35 in-period aliens

 8        who were still detained will, on the average, be in

 9        detention for another three and a half years.

10               That's what it would take, if my quick

11        calculation is correct, to move the mean from 334

12        to 404 based on 5.4 percent of the data.

13   BY MR. KAUFMAN:

14        Q    And Dr. Palmer, you already testified that you

15   don't have any knowledge about how likely it is that the

16   still detained population will be detained for a period

17   such as three and a half years, correct?

18        A    That's correct.  I find it a high -- it seems

19   a high estimate to me, just because if you remember the

20   other table we looked at, 40 percent of them were no

21   longer still detained in like four months.  There had

22   been quite a lot of motion.  Now that doesn't make it

23   wrong.  It could be there's going to be some people out

24   there who are going to be detained for seven years.  I

25   don't know.  But all I can say is I don't know.
```

Page 112

## REPORTER'S CERTIFICATE

I, ERIN M. HUTTER, Registered Professional Reporter and Notary Public, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney or of any of the parties nor financially interested in the action.

*Erin M. Hutter*

ERIN M. HUTTER, RPR

Page 191

# EXHIBIT F

```
 1            UNITED STATES DISTRICT COURT

 2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ALEJANDRO RODRIGUEZ, et al.,

 5            Petitioners,        No. CV 07-3239-TJH(RNBx)

 6     vs.

 7   TIMOTHY ROBBINS, et al.,

 8            Respondents.

 9

10   _____

11

12

13

14           DEPOSITION of ERIC G. SALDANA

15            Los Angeles, California

16           Friday, January 13, 2012

17                Volume I

18

19

20   Reported by:

21   IRMA C. HOGAN

22   CSR No. 4877

23   Job No. 130812

24

25   PAGES 1 - 167
```

Page 1

```
 1        A.   Yes.

 2        Q.   Do you see at the bottom of the page topic

 3   number four?

 4        A.   Yes.

 5        Q.   Are you the person most knowledgeable about

 6   this topic at the Department of Homeland Security?

 7             MR. ATKINSON:   I'm sorry, could he just take

 8   a moment to read the topic?

 9             MR. KAUFMAN:   Sure.

10             THE WITNESS:   I've read it and I'm able to

11   speak to this.

12   BY MR. KAUFMAN:

13        Q.   You are the person most knowledgeable at the

14   Department of Homeland Security on this topic?

15        A.   Yes.

16        Q.   Could you turn to the next page and take a

17   moment to read over what is listed as topic number

18   seven.

19        A.   Yes.

20        Q.   Are you the person most knowledgeable at the

21   Department of Homeland Security on this topic?

22        A.   Yes.

23             MR. ATKINSON:   Just -- when we earlier

24   designated Mr. Saldana, it was with regard to topic

25   number seven with respect to the notification provided
```

Page 9

```
 1    to persons eligible for such hearings, not with
 2    respect to how hearings are conducted, which was the
 3    topic, I believe, we designated Judge Wyle for for the
 4    Department of Justice.
 5    BY MR. KAUFMAN:
 6        Q.   Mr. Saldana, could you please turn what is
 7    marked as Page 10 in this document and take a moment
 8    to read over topic number ten at the bottom of the
 9    page.
10        A.   Yes.
11        Q.   Are you the person most knowledgeable at the
12    Department of Homeland Security on topic number ten?
13        A.   Yes.
14        Q.   Now, finally, please turn to the next page
15    and take a moment to look over topic number eleven.
16            Are you the person most knowledgeable at the
17    Department of Homeland Security on topic number
18    eleven?
19        A.   Yes.
20        Q.   Great.  So, Mr. Saldana, what did you do to
21    prepare for this deposition?
22        A.   In addition to my experience in working with
23    these different aspects that you pointed out earlier,
24    I have prepared with the attorneys that you see
25    present with me today.
```

Page 10

1 or would not allow them to be released, and for the

2 most part they understand the thought process of the

3 person making that decision.  And if there's something

4 outside the norm, they'll usually make that

5 recommendation, give that information to the

6 determining official.

7      The processing officer does just that,

8 processes the case, prepares the forms, prepares the

9 worksheets, puts the A-File together and gives that to

10 the supervisor, the SDDO, who then reviews everything

11 and then he's the one who does the determination.

12     Q.  So he would make a determination whether

13 someone was subject to mandatory detention, for

14 example?

15     A.  Yes.

16     Q.  Would he also be the person if someone, let's

17 say, released on bond that would make the

18 determination as to whether to release that person and

19 the amount of bond?

20     A.  Yes.

21     Q.  When the SDDO makes those initial

22 determinations, besides the processing agent are there

23 any other ICE officials involved in the

24 decision-making process?

25     A.  There may be discussions with other

                                     Page 37

1    some type of bond; but that same person comes in and

2    we learn information that maybe there's an issue with

3    a family member, maybe a medical issue with a family

4    member, child is sick, single parent.  That's

5    something we want to really push to get them back to

6    his family, so we would consider the ATD option.  And

7    ATD, I mean Alternatives to Detention.  That's what we

8    would call it.

9        Q.   When ICE officials make that initial custody

10   determination, do they sometimes -- is the

11   determination release on a particular ATD program?

12       A.   Based on the documents that I reviewed for

13   this case, there was a lot of mention of multiple ATD

14   programs.  Since, I believe it was, November of 2009,

15   the contractors that we use for those programs -- I

16   don't think they consolidated, but we chose one.

17   There was multiple contractors that we used previous

18   to that.

19           That contractor has created something called

20   ISAP-2, so that is the form of Alternatives to

21   Detention that we use.  And in reading through some of

22   this material that was submitted to you, I saw that

23   there was mentioned an EMD, electronic monitoring

24   device, and other programs that were part of G4S

25   Corporation that no longer holds the contract with us.

                                            Page 106

```
 1           So if a supervisor decides to do Alternatives
 2   to Detention, it's with ISAP program or the B.I.
 3   Corporation.  So it's -- there's not as many types
 4   available to the supervisor to choose from.
 5       Q.   So if I understand, there's only one type
 6   available now in the L.A. field office, the ISAP-2
 7   program?
 8       A.   There's one provider.  There's the ISAP-2
 9   program, and in that program there's various levels of
10   supervision that take place.  There's three common
11   ones or the three of them are GPS or technology, which
12   is what they sometimes refer to as full service;
13   there's a telephonic T/O, which is -- in which the
14   alien is monitored by the contractor and still -- and
15   has to do a telephonic call-in system; and there's
16   T/R, which is a system made available that we've
17   contracted with B.I. for but ICE maintains the
18   supervision over and the management of.
19       Q.   Are the SDDOs aware of all these programs,
20   these options?
21       A.   They may not have specific knowledge of each,
22   but every program works a little bit differently.  And
23   at the time that SDDO determines to turn someone over
24   to ATD, they don't necessarily choose ATD this or
25   that; it will usually go to an ATD officer who makes
```

Page 107

```
 1   ISAP's, but it's an ICE agent or officer actually
 2   doing the review of the cases.
 3   BY MR. KAUFMAN:
 4       Q.   In your experience has the use of ATDs in the
 5   L.A. field office changed the way that officials go
 6   about assessing flight risk in that initial
 7   determination?
 8       A.   I think I could say yes to that.
 9       Q.   In what way?
10       A.   It's another option.  The concern for anybody
11   who has to set bond or decide whether somebody is
12   going to stay in custody or not is am I making the
13   correct decision, is this person that will be released
14   on his own recognizance, whether it's under a bond or
15   something else, will they come back and re-offend,
16   one; will they come back for their hearing.
17           I think, although it isn't the case every
18   time, ATD has shown to be more of a positive influence
19   for those individuals taking part in the program.  We
20   see a good success rate on that.  So therefore I think
21   it makes the supervisors more comfortable to use that
22   program.  But then again there are issues that come up
23   where people take advantage of the system, which also
24   puts them back.
25       Q.   When you say success rate, what do you mean
```

Page 111

by that?

    A.   Success rate traditionally has been tracked with what they call a compliance rate. And a compliance rate for B.I. -- they manage a number of different performances that they consider compliance, whether it has to do with people showing up for interviews, home visits, or whether the alien goes to their court hearing.

        It's -- I think it's been successful in terms of compliance to get people to their court proceedings. It's a very impressive system.

        Earlier this year my specific office in San Bernardino -- we had a compliance rate of about 60 percent for people going to their immigration hearing. We had a brainstorming session and thought about existing protocols in the program and how we could use them to better increase that particular number. And by making some changes we are at, if not close to, 100 percent compliance rate for people to go to their immigration court hearing pre-order.

    Q.   Is that in the San Bernardino area or --

    A.   That's in the San Bernardino area. And throughout Los Angeles it's probably in the 90th percentile, I would estimate.

        MR. ATKINSON:  I'm sorry, I'm trying to jump

Page 112

BY MR. KAUFMAN:

    Q.  I see.  But your best understanding is it's increased substantially in the last five years?

        MR. ATKINSON:  Object to the form.  Object, outside the scope.

        THE WITNESS:  I see no reason not to agree with that.

BY MR. KAUFMAN:

    Q.  When was the most recent increase in availability of placements in the ISAP program?

    A.  I could not answer that specifically, the numbers that we have.  It may vary, but I'm talking, you know, within 20 or 30.  And it may be a case where the -- my particular office, for example, the cap of available positions in San Bernardino is just over 1100.  There may be a case where Los Angeles may need some of those slots and we may in between us move them.

        So it's -- to my knowledge, the cap across the field office is about 3,000, of which about 1100, maybe 1150, are in San Bernardino.  About the same in Los Angeles.  And about seven and some change down in Santa Ana.  And at any time, because of the amount of personnel, it could change.

        So it would be hard for me to -- I don't run

                         Page 134

```
 1    paragraph below number one on Page 1 of the document.
 2    The first sentence states, "ATD is not recommended for
 3    aliens who pose a minimal flight risk."
 4              From ICE's perspective what constitutes,
 5    quote-unquote, a minimal flight risk?
 6         A.   It would be somebody who has major ties to
 7    the community who may have a question as to
 8    removability possibly -- and these are the extremes --
 9    somebody who is awaiting a benefit.  Cases such as
10    that.  I think it would also be cases in which we
11    would determine upon initial determination that they
12    would be released O/R, Order of Recognizance.
13         Q.   If someone is released O/R, are there no
14    conditions placed on their release?
15         A.   Usually there's a condition that they have to
16    report back in the office and they have to, of course,
17    go to their court hearings.
18         Q.   Is eligibility for relief a consideration in
19    determining whether someone is a flight risk?
20              MR. ATKINSON:  Object to the form of the
21    question.
22              THE WITNESS:  As I stated before, it's not
23    necessarily -- not always a part of it, not
24    necessarily a major part of the decision, for the
25    custody decision which this is part of.  But it can --
```

Page 139

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 8, 2012

_Irma C. Hogan_
IRMA C. HOGAN, CSR 4877

Page 167

# EXHIBIT G

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4   ALEJANDRO RODRIGUEZ, et al.

 5            Petitioners              Case No.

 6   vs.                       CV 07-3239-TJH (RNBx)

 7   TIMOTHY S. ROBBINS, in his

 8   capacity as U.S. Immigration

 9   and Customs Enforcement, Los

10   Angeles District Field Office

11   Director; JANET NAPOLITANO,

12   in her capacity as Secretary

13   of Homeland Security; and ERIC

14   H. HOLDER, JR., in his

15   capacity as Attorney General

16   of the United States

17            Respondents

18   _____/

19            The Telephonic Deposition of HONORABLE

20   JACK H. WEIL was held on Tuesday, December 13, 2011,

21   commencing at 9:15 a.m., at the law offices of Sidley

22   Austin, LLP, 1501 K Street, N.W., Washington, D.C.

23   20005, before George W. Tudor, Notary Public.

24   TSG Job # 44694

25   REPORTED BY:  George W. Tudor
```

1    Central District of California?

2        A.    Yes.

3        Q.    Great.  You started to explain how bond

4    hearings -- how someone requests a bond hearing or

5    doesn't and how the scheduling of a bond hearing

6    happens.  Can you just give me a description of that

7    process, how someone asks for a bond hearing and then

8    how it comes to be scheduled?

9        A.    Yes.  The Department of Homeland Security

10   will make a custody determination.  The jurisdiction

11   vests with the immigration court over the removal

12   procedure via the filing of the notice to appear.

13           The notice to appear will include the

14   initial custody determination from the Department of

15   Homeland Security and the indication whether the

16   respondent is or is not requesting redetermination of

17   that.

18           When that is filed with the Court, the Court

19   clerk will then schedule the hearing based upon what the

20   respondent has indicated, either they do or do not the

21   request a hearing.  There is a little bit of variance

22   among the judges in -- for efficiency purposes, but it

23   doesn't affect the substantive, as to whether the matter

24   is put onto a separate bond calendar or just an initial

25   hearing that includes both bond and non-bond matters.

1   what the alternative possibilities are.  So until you --

2   I'm sure you can craft an alternative, but I don't know

3   what those alternatives are.  I don't know what is

4   possible, what's legally appropriate, what -- so I --

5       Q.      And so when judges conduct bond hearings, is

6   the availability for an alternative to detention program

7   one of the factors to keep in mind when you make the

8   bond decision?

9       A.      When we talk about a bond decision, the

10  judge -- DHS makes the initial custody determination.

11  So the immigration judge does not have the authority to

12  order somebody into an ICE-run program.

13      Q.      Is the Immigration Judge's authority limited

14  to ordering release on bond at a bond hearing?

15      A.      No.

16      Q.      Okay.  If an Immigration Judge is going to

17  order release, is their authority limited to ordering

18  release on bond?

19      A.      There's a dispute among judges as to whether

20  you can release somebody on their own recognizance, but

21  the statute says a minimum amount of bond is $1500.

22      Q.      Can you maybe describe that dispute in a

23  little more detail?  What is that controversy?

24              MR. LAWRENCE:  I object to this as being

25  outside of the scope of the deposition.

1              CERTIFICATE OF DEPONENT

2

3              I hereby certify that I have read and

4    examined the foregoing transcript, and the same is a

5    true and accurate record of the testimony given by me.

6

7              Any additions or corrections that I feel

8    are necessary, I will attach on a separate sheet of

9    paper to the original transcript.

10

11

12                              _____

13                              HONORABLE JACK H. WEIL

14

15

16

17

18

19

20

21

22

23

24

25

1    District of Columbia,

2    At Large, to wit:

3

4            I, George W. Tudor, a Notary Public of

5    the District of Columbia, do hereby certify that the

6    within-named witness, personally appeared before me

7    at the time and place herein set out, and after having

8    been duly sworn by me, according to law, was examined

9    by counsel.

10           I further certify that the examination was

11   recorded stenographically by me and this transcript

12   is a true record of the proceedings.

13           I further certify that I am not of counsel

14   to any of the parties, nor in any way interested in

15   the outcome of this action.

16           As witness my hand and notarial seal this

17   23rd day of December, 2011.

18

19

20                           _____

21                           George W. Tudor

22                           Notary Public

23

24   My Commission Expires:

25   January 1, 2016