STUART F. DELERY
Principal Deputy Assistant Attorney General
Civil Division
DAVID J. KLINE
Director, Office of Immigration Litigation
District Court Section
THEODORE W. ATKINSON
United States Department of Justice
Office of Immigration Litigation
    P.O. Box 868, Ben Franklin Station
    Washington, DC 20044
    Phone: (202) 532-4135
    theodore.atkinson@usdoj.gov
SARAH S. WILSON
Trial Attorney

Attorneys for Respondents

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| ALEJANDRO RODRIGUEZ, *et al.*, | Case No. CV 07-3239-TJH (RNBx) |
| Petitioners, | **RESPONDENTS'** |
| vs. | **(1) NOTICE OF CROSS-MOTION AND MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS;** |
| TIMOTHY S. ROBBINS, *in his capacity as U.S. Immigration and Customs Enforcement, Los Angeles District Field Office Director, et al.,* | |
| Respondents. | **(2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONDENTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PETITIONERS' MOTION FOR SUMMARY JUDGMENT; AND** |
| | **(3) SUPPORTING DECLARATIONS AND EXHIBITS** |
| | Hon. Terry J. Hatter, Jr. |
| | Hearing Date:  May 6, 2013 |
| | Hearing Time:  UNDER SUBMISSION |

0

## NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT

TO PETITIONERS AND THEIR ATTORNEYS OF RECORD:

NOTICE IS GIVEN that Respondents hereby move for an order under Rule 56 of the Federal Rules of Civil Procedure granting summary judgment to Respondents and against Petitioners on all claims for relief asserted in Petitioners' Third Amended Complaint [ECF No. 111].

Respondents are entitled to summary judgment because the practices, policies, and procedures (prior to this Court's preliminary injunction motion) regarding the detention of aliens for longer than six months under each of the four challenged statutes – 8 U.S.C. §§ 1226(a), 1226(c), 1225(b), and 1231(a)(6) – comport with the Due Process Clause of the Fifth Amendment, and are statutorily authorized. Specifically:

(1)    Detention without bond for aliens seeking admission to the United States under section 1225(b) during the pendency of their removal proceedings is both statutorily authorized and constitutional because, as the Supreme Court and the Ninth Circuit have recognized, Congress's authority to detain arriving aliens pending a determination of their admission or removal, even for prolonged periods, is a legitimate exercise of Congress's fundamental constitutional authority to determine who may and may not be admitted to the United States.

(2)    Detention without bond for criminal aliens under section 1226(c) during the pendency of their removal proceedings, including beyond six months, is both statutorily authorized and constitutional because, as the Supreme Court has recognized, Congress may, in the exercise of its broad constitutional authority over matters of immigration, mandate the detention of such aliens on a categorical basis and without an individualized showing of flight risk or danger.

(3)    In any event, this Court may not grant Petitioners any relief by reading into any of the four challenged statutes a requirement of bond hearings for detained aliens after 180 days of detention under the enhanced bond hearing requirements Petitioners seek, including shifting the burden of proof to the government under a

1

heightened standard of proof. Contrary to Petitioners' claims, the canon of constitutional avoidance – a tool of statutory construction to construe *ambiguous* statutory provisions – cannot be used to construe unambiguous statutory provisions such as those at issue with the section 1225(b) and 1226(c) subclasses, nor can it be used to read into statutes bond hearing requirements neither required by due process nor intended by Congress.

(4)    In no event does due process require a bright-line rule that all aliens, regardless of the facts and circumstances of their individual case, be given a bond hearing after 180 days of detention. Petitioners' argument that detention without a bond hearing raises constitutional concerns at six months, in *every* case, regardless of any other facts or circumstances of an alien's case, is fundamentally at odds with due process, which turns on the facts and circumstances of each case in an as-applied challenge such as this.

(5)    Petitioners' request for enhancements to immigration bond hearings are not constitutionally grounded and amount to little more than an attempt to legislate statutory and regulatory changes to the immigration detention system that are reserved by the Constitution to the political branches. Even if this Court were to conclude that bond hearings are required for aliens detained under sections 1226(c) and 1225(b) –a conclusion it cannot reach for the reasons stated above – Petitioners provide no support for their conclusion that such hearings must meet the requirements for hearings in accordance with *Casas-Castrillon v. DHS*, 535 F.3d 942 (9th Cir. 2008), let alone that such hearings must also meet the newly advanced requirements they propose here.

This motion is based on (1) the accompanying memorandum of points and authorities;[1] (2) Respondents' Local Rule 56-1 Statement of Uncontroverted Facts and Conclusions of Law; (3) Respondents' Opposition to Petitioners' Statement of

---

[1] By agreement of counsel and under this Court's order, Respondents submit both their memorandum in support of their motion for summary judgment and their opposition to Petitioners' motion for summary judgment as one memorandum.

Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment or, in the Alternative, Summary Adjudication ("RSOF")[2]; (4) the accompanying declarations and other exhibits; (5) the pleadings and papers filed in this action; and (6) any further material or oral argument that may be presented to the Court on this motion.

This motion is made following the conference of counsel under Local Rule 7-3, which occurred which took place telephonically on several occasions, including Thursday, January 10, 2013 and Monday, January 14, 2013.  Petitioners oppose this motion.

Dated:  March 15, 2013                    Respectfully submitted,

                                          STUART F. DELERY
                                          Principal Deputy Assistant Attorney General
                                          Civil Division
                                          DAVID J. KLINE
                                          Director, Office of Immigration Litigation
                                          District Court Section

                              By:    /s/ Theodore William Atkinson
                                          THEODORE W. ATKINSON
                                          United States Department of Justice
                                          Office of Immigration Litigation,
                                          P.O. Box 868, Ben Franklin Station
                                          Washington, DC 20044
                                          Phone: (202) 532-4135
                                          theodore.atkinson@usdoj.gov
                                          SARAH S. WILSON
                                          Trial Attorney

---

[2] Respondents submit, in accordance with Local Rule 56-1, a separate statement of uncontroverted facts in support of this motion.  Petitioners presented a statement of uncontroverted facts, in accordance with Local Rule 56-1.  However, throughout their memorandum in support of their motion for summary judgment, Petitioners also included references to facts contained in declarations Petitioners separately filed, but which were not contained in their Local Rule 56-1 statement of facts.  Petitioners state that these facts are not material to their motion for summary judgment, but instead provide "context and background" for their motion.  Petitioners' Memorandum in Support of Their Motion for Summary Judgment ("Pet. Memo") at 3.  Because Petitioners nevertheless rely on these facts, and for the convenience of the Court, Respondents also contemporaneously file their statement of facts in opposition to Petitioners' Local Rule 56-1 statement, and in opposition to the factual allegations made throughout their brief through the RSOF.

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................. 3

I.      Overview of the Various Subclasses and the Laws Governing their
        Detention ........................................................................................... 3

        A.      The constitutionally distinct treatment of arriving aliens is
                reflected in the section 1225(b) immigration detention
                provisions applicable to those aliens. ..................................... 3

        B.      8 U.S.C. § 1226(a) provides the general, discretionary
                authority to detain or release non-arriving aliens during
                removal proceedings. ............................................................... 5

        C.      Congress established an exception to discretionary detention
                authority during removal proceedings by mandating the
                detention of   aliens who have committed certain criminal
                offenses ................................................................................... 7

        D.      Aliens ordered removed and detained under 8 U.S.C. § 1231
                are already afforded bond hearings under Ninth Circuit
                precedent. ................................................................................. 9

II.     Overview of the Custody Determination Process ............................. 11

        A.      ICE's Initial Custody Determination ..................................... 11

        B.      The Parole Determination Process ......................................... 12

        C.      Determining Custody Under Section 1226 .............................. 13

        D.      *Casas* and *Diouf* Custody Determinations ............................... 14

ARGUMENT ................................................................................................ 15

I.      Overview of Due Process Analysis in the Immigration Detention
        Context ............................................................................................. 15

II.     THERE IS NO STATUTORY OR CONSTITUTIONAL
        REQUIREMENT  THAT ALL ALIENS RECEIVE *CASAS*
        HEARINGS ....................................................................................... 19

        A.      Congress's authority to detain arriving aliens without bond
                hearings under section 1225(b) is constitutional. ................... 19

        B.      Congress's authority to detain certain criminal aliens
                without a bond hearing under section 1226(c) during the
                pendency of their removal proceedings is constitutional. ....... 22

i

C.    This Court may not use constitutional avoidance to read
bond hearing requirements into the unambiguous mandatory
detention provisions of sections 1225(b) and 1226(c). ................25

D.    Due process does not require heightened bond hearings for
aliens already entitled to bond hearings under section
1226(a). ...................................................................................28

III.    THE UNIFORM CLASS-WIDE RELIEF PETITIONERS SEEK –
BOND HEARINGS FOR ALL ALIENS DETAINED FOR SIX
MONTHS  – IS NOT REQUIRED BY TRADITIONAL
NOTIONS OF  DUE  PROCESS ........................................................31

A.    Due process is a flexible concept that turns on the facts and
circumstances of an individual case, and rejects the kind of
bright-line rule Petitioners seek. ....................................................31

B.    *Diouf* does not compel the result in this case. ..............................32

C.    A six-month, bright-line rule ignores practical
considerations and individual factual circumstances. ...................36

IV.    THERE IS NO LEGAL BASIS FOR PETITIONERS'
REQUESTED  MODIFICATIONS TO *CASAS* HEARINGS ...............39

A.    Due process does not require immigration judges to consider
an    alien's ultimate removability under the standard set
forth in *Zadvydas* during removal proceedings, and it would
be practically impossible for immigration judges to properly
consider that factor as a threshold matter ......................................41

B.    Due process does not require immigration judges to consider
length of detention at bond hearings..............................................46

C.    Due process does not require immigration judges to consider
alternatives to detention...................................................................47

D.    Aliens eligible for bond hearings – either under section
1226(a) generally or under *Casas* and *Diouf* – already
receive notice of their eligibility to seek bond hearings
before immigration judges...............................................................50

E.    The Court should reject Petitioners' request for periodic
*Casas* hearings as untimely and not supported by due
process..............................................................................................53

CONCLUSION..............................................................................................55

CERTIFICATE OF SERVICE .......................................................................56

ii

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Aguilera-Montero v. Mukasey,*
    548 F.3d 1248 (9th Cir. 2008).......................................................................4

4

*Agyeman v. I.N.S. Assistant District Director Coachman,*
    74 F. App'x 691(9th Cir. 2003) .................................................................23

5

*Ahmed v. Holder,*
    569 F.3d 1009 (9th Cir. 2009)..................................................................36

6

7

*Alli v. Decker,*
    644 F. Supp. 2d. 535, 542-43 (M.D. Pa. 2010)........................................32

8

*Almendarez–Torres v. United States,*
    523 U.S. 224 (1998)..................................................................................26

9

10

*Alvarez-Garcia v. Ashcroft,*
    378 F.3d 1094 (9th Cir. 2004).........................................................4, 20, 21

11

*Andrus v. Glover Constr. Co.,*
    446 U.S. 608 (1980)....................................................................................8

12

13

*Apache Survival Coalition v.*
    *United States,* 21 F.3d 895 (9th Cir. 1994) ...........................................42, 54

14

*Arizona v. United States,*
    132 S.Ct. 2492 (2012) ...................................................................17, 39, 40

15

16

*Barrera-Echavarria v. Rison,*
    44 F.3d 1441 (9th Cir. 1995)...............................................................20, 21

17

*Cafeteria Workers v. McElroy,*
    367 U.S. 886 (1961) .............................................................................16, 31

18

19

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) .................................................................................18

20

*Carcieri v. Salazar,*
    129 S. Ct. 1058 (2009) .............................................................................26

21

22

*Casas-Castrillon v. DHS,*
    535 F.3d 942 (9th Cir. 2008)..............................................................passim

23

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984) .................................................................................30

24

25

*Clark v. Martinez,*
    543 U.S. 371(2005) ............................................................................26, 28

26

*Crowell v. Benson,*
    285 U.S. 22 (1932) ...................................................................................25

27

28

*Davis v. Mich. Dep't of Treasury,*
    489 U.S. 803 (1989) ............................................................................26

*Demore v. Kim,*
    538 U.S. 510 (2003) ..................................................................... passim

*Diaz–Zaldierna v. Fasano,*
    43 F. Supp. 2d 1114 (S.D. Cal. 1999) ................................................24

*Diop v. ICE/Homeland Security,*
    656 F.3d 221 (3d Cir. 2012) ..............................................................32

*Diouf v. Holder*, No. CV 06-7452 TJH (FMOx),
    2009 WL 6331130 (C.D. Cal. Sept. 9, 2009) .....................................27

*Diouf v. Napolitano,*
    634 F.3d 1081 (9th Cir. 2011) ..................................................... passim

*Doe v. Gallinot,*
    657 F.2d 1017 (9th Cir. 1981) ............................................................51

*Eminence Capital, LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003) .....................................................42, 54

*F.C.C. v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................................26

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ............................................................................17

*Flores-Powell v. Chadbourne,*
    677 F. Supp. 2d 455 (D. Mass. 2010) ...............................................32

*Galvan v. Press,*
    347 U.S. 522 (1954) ............................................................................40

*Gilbert v. Homar,*
    520 U.S. 942 (1997 ............................................................................31

*Goldberg v. Kelly,*
    397 U.S. 254 (1970) ............................................................................18

*Gonzalez-Galindo,*
    No. 10CV1875, 2010 WL 4977023 (S.D. Cal. Dec. 1, 2010) ...........36

*Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,*
    442 U.S. 1 (1979) ...............................................................................16

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) ............................................................................40

*Holder v. Humanitarian Law Project,*
    130 S. Ct. 2705 (2010) .......................................................................26

*Ileto v. Glock, Inc.,*
    565 F.3d 1126 (9th Cir. 2009) ...........................................................26

iv

*I.N.S. v. Cardoza-Fonseca,*
    480 U.S. 421 (1987) ........................................................................... 8, 28

*I.N.S. v. St. Cyr,*
    533 U.S. 289 (2001) .................................................................................. 25

*Jean v. Nelson,*
    472 U.S. 846 (1985) .................................................................................. 27

*Kaplan v. Tod,*
    267 U.S. 228 (1925) .................................................................................. 19

*Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) .................................................................................. 20

*Landon v. Plasencia,*
    459 U.S. 21 (1982) .................................................................................... 20

*Leng May Ma v. Barber,*
    357 U.S. 185 (1958) ............................................................................. 17,19

*Ly v. Hansen,*
    351 F.3d 263 (6th Cir. 2003) ................................................................... 32

*Masnauskas v. Gonzales,*
    432 F.3d 1067 (9th Cir. 2005) ................................................................. 17

*Mathews v. Diaz,*
    426 U.S. 67 (1976) .................................................................................... 17

*Memphis Light, Gas and Water Division v. Craft,*
    436 U.S. 1 (1978) ...................................................................................... 18

*Morrissey v. Brewer,*
    408 U.S. 471 (1972) ............................................................................. 16, 31

*Orloff v. Cleland,*
    708 F.2d 372 (9th Cir. 1983) ................................................................... 31

*Ousmane v. Clark,*
    No. C09-1167-JLR, 2010 WL 97816
    (W.D. Wash. Jan. 11, 2010) ..................................................................... 44

*Owino v. Napolitano,*
    575 F.3d 972 (9th Cir. 2009) ........................................................ 42, 43, 44

*Pedro v. Oregon Parole Bd.,*
    825 F.2d 1396 (9th Cir. 1987) ................................................................. 16

*Prieto-Romero v. Clark,*
    534 F.3d 1053 (9th Cir. 2008) ...................................................... 29, 47, 54

*Salinas v. United States,*
    522 U.S. 52 (1997) .................................................................................... 25

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953) ............................................................17, 19, 20, 21

*Sherman v. U.S. Parole Com'n*,
    502 F.3d 869 (9th Cir. 2007) ..................................................................25

*Soberanes v. Comfort*,
    388 F.3d 1305 (10th Cir. 2004) ..............................................................23

*Steinert v. Winn Group, Inc.*,
    440 F.3d 1214 (10th Cir. 2006) ..............................................................31

*Terrebonne v. Blackburn*,
    646 F.2d 997 (5th Cir. 1981) ..................................................................24

*Terrebonne v. Butler*,
    848 F.2d 500 (5th Cir. 1988) ..................................................................24

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ...................................................................................8

*United States v. Briggs*,
    697 F.3d 98 (2d Cir. 2012) ......................................................................31

*United States v. Broncheau*,
    645 F.3d 676 (4th Cir. 2011) ..................................................................26

*United States v. Flores-Lopez*,
    63 F.3d 1468 (9th Cir. 1995) ..................................................................17

*United States v. Flores–Montano*,
    541 U.S. 149 (2004) .................................................................................17

*United States v. Grajales–Montoya*,
    117 F.3d 356 (8th Cir.1997).....................................................................39

*United States v. Locke*,
    471 U.S. 84 (1985) .............................................................................27, 28

*V. Singh v. Holder*,
    638 F.3d 1196 (9th Cir. 2011) ................................................................10

*Wong v. INS*, 373 F.3d 952
    (9th Cir. 2004) .........................................................................................21

*Yamataya v. Fisher*,
    189 U.S. 86 (1903) .....................................................................................3

Zadvydas v. Davis,
    533 U.S. 678 (2001) ....................................................................... passim

*Zivkovic v. S. Cal. Edison Co.*,
    302 F.3d 1080 (9th Cir. 2002)..................................................................42

vi

1

## ADMINISTRATIVE DECISIONS

2

*Matter of Garcia-Garcia*,
   25 I. & N. Dec. 93 (BIA 2009)..........................................................6

3

*Matter of G-K-*,
   26 I. & N. Dec. 88 (BIA 2013)........................................................47

4

5

*Matter of Guerra*,
   24 I. & N. Dec. 37 (BIA 2006)........................................6, 29, 50

6

*Matter of Joseph*,
   22 I. & N. Dec. 799 (BIA 1999)........................................................9

7

8

*Matter of Quilantan*,
   25 I. & N. Dec. 285 (BIA 2010)........................................................4

9

*Matter of Werner*,
   25 I. & N. Dec. 45 (BIA 2009)........................................................10

10

11

*Matter of Wong*,
   13 I. & N. Dec. 701 (BIA 1971)......................................................48

12

*Matter of X-K-*,
   23 I. & N. Dec. 731 (BIA 2005)......................................................27

13

14

## STATUTES

15

8 U.S.C. § 1101(a)(13)........................................................................4

16

8 U.S.C. § 1182(d)(5)........................................................................5

17

8 U.S.C. § 1182(d)(5)(a)..........................................................5, 21, 27

18

8 U.S.C. § 1187................................................................................10

19

8 U.S.C. § 1187(c)(2)(E)..................................................................10

20

8 U.S.C. § 1225..................................................................................4

21

8 U.S.C. § 1225(a)..............................................................................2

22

8 U.S.C. § 1225(b)..................................................................... passim

23

8 U.S.C. § 1225(b)(1)........................................................................27

24

8 U.S.C. § 1225(b)(1)(A)(i)................................................................5

25

8 U.S.C. § 1225(b)(1)(B)(ii)....................................................4, 5, 27

26

8 U.S.C. § 1225(b)(1)(B)(iii)(IV)..............................................5, 27

27

8 U.S.C. § 1225(b)(2)(A)............................................................5, 27

28

8 U.S.C. § 1226(a) ................................................................... passim

vii

8 U.S.C. § 1226(a)(1)..................................................................................6

8 U.S.C. § 1226(a)(2)..............................................................................6, 48

8 U.S.C. § 1226(a)(3)................................................................................48

8 U.S.C. § 1226(c) ..............................................................................passim

8 U.S.C. § 1226(c)(1)(A)-(D) ......................................................................8

8 U.S.C. § 1226(c)(2)..................................................................................8

8 U.S.C. § 1229a........................................................................................11

8 U.S.C. § 1231 ..............................................................................9, 10, 35

8 U.S.C. § 1231(a)....................................................................................10

8 U.S.C. § 1231(a)(1)(A) ............................................................................9

8 U.S.C. § 1231(a)(1)(c) ............................................................................9

8 U.S.C. § 1231(a)(6)........................................................................passim

8 U.S.C. § 1231(b)(2)(D)............................................................................45

8 U.S.C. § 1252(a) ......................................................................................7

8 U.S.C. § 1255(a) ......................................................................................4

**Illegal Immigration Reform and Immigrant Responsibility Act of 1996**

Div. C of Pub. L. No. 104-208, § 301(a), 110 Stat. 3009-546, 3009-575................4

**Immigration Act of 1990**

Pub. L. No. 101-649, 104 Stat. 4978, sect. 504 (1990) ............................................7

**Immigration Technical Corrections Act of 1991**

Pub. L. No. 102-232, sect. 306 (1991)........................................................................7

**REGULATIONS**

8 C.F.R. § 208.31(e) ................................................................10

8 C.F.R. § 212.5(b) ....................................................................5

8 C.F.R. § 235.3(b)(2)(iii)..........................................................5

8 C.F.R. § 235.3(b)(4)(ii)............................................................5

viii

8 C.F.R. § 235.3(c) ................................................................................ 5

8 C.F.R. § 236.1 .............................................................................. 6, 29

8 C.F.R. § 236.1(b) ............................................................................ 48

8 C.F.R. § 236.1(c)(8) .................................................................... 6, 48

8 C.F.R. § 236.1(c)(10) ...................................................................... 9

8 C.F.R. § 236.1(d)(1) ................................................................ 6, 9, 48

8 C.F.R. § 236.1(d)(2) ........................................................................ 6

8 C.F.R. § 236.1(d)(3) ..................................................................... 6, 9

8 C.F.R. § 236.1(g) ............................................................................ 6

8 C.F.R. § 241.4 ................................................................................. 9

8 C.F.R. § 241.4(k)(1)(i) .................................................................... 9

8 C.F.R. § 241.4(k)(2)(ii) .................................................................. 9

8 C.F.R. § 241.4(k)(2)(iii) ................................................................. 9

8 C.F.R. § 241.13 ............................................................................ 30

8 C.F.R. § 287.5(e)(3) ...................................................................... 48

8 C.F.R. § 1003.1(h) ........................................................................ 47

8 C.F.R. § 1003.19 ........................................................................... 29

8 C.F.R. § 1003.19(a) ........................................................................ 9

8 C.F.R. § 1003.19(b) ........................................................................ 9

8 C.F.R. § 1003.19(e) ................................................................ 29, 55

8 C.F.R. § 1003.19(h)(2)(i) ................................................................ 8

8 C.F.R. § 1003.19(h)(2)(i)(B) .......................................................... 5

8 C.F.R. § 1003.19(h)(2)(ii) ............................................................... 9

8 C.F.R. § 1003.29 ........................................................................... 36

8 C.F.R. § 1208.4(a)(6) .................................................................... 45

8 C.F.R. § 1236.1 ...................................................................... 28, 47

8 C.F.R. § 1236.1(c)(8) .................................................................... 47

8 C.F.R. § 1236.1(d)(1) .................................................................... 47

ix

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **MISCELLANEOUS**

103d Cong., 1st Sess. 15, 26 (1993) ..................................................................7

H.R. Rep. No. 22, 104th Cong., 1st Sess. 12 (1995) ....................................7

H.R. Rep. No. 22, at 2......................................................................................7

H.R. Rep. No. 469, 104th Cong., 2d Sess., Pt. 1, at 123 (1996) ..............7

Fed. R. Evid. 1006 ........................................................................................39

# <u>INTRODUCTION</u>

Unsatisfied with the current immigration detention system established by Congress in the Immigration and Nationality Act and administered by the Executive Branch, Petitioners seek nothing less than a dramatic and wholesale revision of that constitutional system through court order.  Petitioners' efforts to dramatically alter the detention system through this class action must fail, however, because the changes they seek are not required by due process and are inconsistent with statutory construction.

With respect to aliens seeking admission to the United States who are detained under 8 U.S.C. § 1225(b), Petitioners' requested relief would substantially undermine the government's ability to control which arriving aliens may come into the United States, a vested constitutional power that lies at the heart of core principles of sovereignty, and which affects the United States' foreign relations with other nations.

Similarly, with respect to criminal aliens detained under 8 U.S.C. § 1226(c), Petitioners' requested relief would contravene Congress's constitutional authority to require that certain aliens be detained without bond during their removal proceedings, which have a definite termination point.  The Supreme Court has upheld precisely that authority when it previously found section 1226(c) constitutional and concluded that Congress may order the detention of criminal aliens as a category *without* individualized determinations of flight risk and danger to avoid the widespread problem that criminal aliens fail to appear for removal proceedings once released on bond.  Granting Petitioners' requested relief would thus conflict with Supreme Court precedent and would inject into the statute the exact discretionary authority to release criminal aliens on bond that Congress specifically eliminated with the passage of section 1226(c).  This Court should reject Petitioners' flawed due process claims.

This Court should also reject Petitioners' argument that this Court can simply apply the doctrine of constitutional avoidance to construe sections 1225(b) and 1226(c) as statutes that require bond hearings after an arbitrary point in time.  Both statutes unambiguously preclude release on bond for arriving and criminal aliens

1

pending their removal proceedings, and are therefore not open to a constitutional avoidance interpretation. Moreover, the result sought by Petitioners is in direct conflict with Congress's intent and thus not a result this Court may reach, either through the canon of constitutional avoidance or otherwise.

Petitioners also seek to impose a new bond hearing requirement with respect to all aliens detained under 8 U.S.C. § 1226(a), who are *already* entitled to seek a bond hearing before an immigration judge immediately after an initial determination by ICE, and who may later request additional bond hearings upon a showing of changed circumstances. Petitioners have not challenged the adequacy of those bond hearings. Instead, without citing any constitutional jurisprudence to support their claim, they simply assert that due process requires such aliens to receive additional bond hearings with a shifted burden before immigration judges. Petitioners provide no legal reason for imposing such a requirement, and this Court should reject their claim.

Finally, Petitioners propose a number of enhancements to the immigration detention process and to bond hearings in general, including: (1) a requirement that such hearings shift the burden of proof to the government under a heightened standard of proof; (2) the requirement that such hearings be afforded not only at six months, but every six months; and (3) the requirement that immigration judges consider factors, including alternatives to detention, apart from flight risk and danger to the community that they must currently consider in bond hearings. Petitioners provide no case law to support their argument that due process requires such enhancements, nor do they offer any other explanation for why these proposals should be implemented through a court order rather than through the political branches of government.

In consideration of the requirements of due process, and in exercise of the appropriate limits of judicial restraint when construing statutes and regulations, this Court should grant Respondents summary judgment as to each of Petitioners' claims set forth in their Third Amended Complaint, and deny their motion for summary judgment in its entirety.

## <u>BACKGROUND</u>

This action involves four different categories of aliens, each of which are subject to different detention regimes and subject to different policies, practices, and procedures governing their detention.

## I.    Overview of the Various Subclasses and the Laws Governing their Detention

The Immigration and Nationality Act ("INA") gives the federal government broad authority to detain aliens pending a determination of their admission and during removal proceedings.  The immigration detention system is not uniform in design or application.  Whether an alien is entitled to a bond hearing depends largely on whether an alien falls within certain specified statutory categories.  Generally, Congress has established different statutory detention regimes depending on whether an alien is (1) an arriving alien seeking admission to the United States, (2) an alien present in the United States who is subject to removal proceedings, (3) an alien present in the United States who is inadmissible or deportable by reason of having committed certain criminal offenses, or (4) an alien subject to a final order of removal.  Each is examined in turn.

### A.    The constitutionally distinct treatment of arriving aliens is reflected in the section 1225(b) immigration detention provisions applicable to those aliens.

For at least a century, the Supreme Court has held that aliens who have gained admission or entry into the United States are entitled to due process.  *See, e.g.*, *Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903).  But the status of aliens outside our borders and seeking to enter the country has been seen as starkly different.  The Supreme Court's discussion in *Zadvydas v. Davis* captures the long-established view:

> The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.  It is well-established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders.

533 U.S. 678, 693 (2001) (internal citations omitted).  Thus, while an alien arriving at a port of entry may be *physically* present in the United States, an alien not granted admission after arriving at a port of entry is *legally* considered outside the United States, having never lawfully admitted.[3]  This reflects what has become known as the "entry fiction doctrine" under immigration law.  *See Aguilera-Montero v. Mukasey*, 548 F.3d 1248, 1253 (9th Cir. 2008) (citing *Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094, 1097 (9th Cir. 2004) ("although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country.").  Such aliens do not have constitutional rights regarding their admission into the United States, and courts have long recognized that Congress may direct the detention of such aliens commensurate with the power to exclude them from entry or admission.[4]

        In light of the constitutionally distinct treatment of arriving aliens, Congress has established an immigration detention system applicable to such aliens that is wholly different from detention regimes applicable to aliens who have gained entry.

        8 U.S.C. §1225 mandates the detention of all inadmissible arriving aliens.[5]  Aliens subject to expedited removal are detained pending the removal process.  *See* 8

---

[3] In 1996, Congress amended 8 U.S.C. § 1101(a)(13) to define the terms "admitted" and "admission," rather than "entry."  See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Div. C of Pub. L. No. 104-208, § 301(a), 110 Stat. 3009-546, 3009-575.  But the amendment was not intended to alter the constitutionally distinct treatment between aliens who have made a lawful "entry" – now, those who have gained "admission" – to the United States and those who have not.  *Cf. Matter of Quilantan*, 25 I. & N. Dec. 285, 291 (BIA 2010) (finding no indication that Congress meant to supersede the longstanding administrative use of the term "admitted" in 8 U.S.C. § 1255(a)).

[4] The constitutionally distinct treatment of arriving aliens is discussed in greater detail below.  *See infra* at Section II.A.

[5] Similarly, section 1225(b)(1)(B)(ii) provides that an alien subject to expedited removal who is found to have a credible fear of persecution "*shall be detained* for

*(Footnote continued)*

U.S.C. §1225(b)(1)(A)(i).[6]  Arriving aliens who avoid the expedited removal process but are not admitted pending removal proceedings are nonetheless subject to detention.  "[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained*…"  8 U.S.C. § 1225(b)(2)(A).  This includes aliens who establish a credible fear of persecution if removed from the United States.  8 U.S.C. § 1225(b)(1)(B)(iii)(IV).  Immigration judges are specifically prohibited by regulation from holding bond hearings for arriving aliens.  8 C.F.R. § 1003.19(h)(2)(i)(B) ("[A]n immigration judge may not redetermine conditions of custody imposed by the Service with respect to … [a]rriving aliens in removal proceedings, including aliens paroled after arrival pursuant to section 212(d)(5) of the Act.").  Instead, in a separate statute, 8 U.S.C. § 1182(d)(5)(A), Congress provided that DHS may – in its discretion – parole arriving aliens into the United States if an applicant meets the standards for parole, which are set forth in related regulations.  8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. §§ 212.5(b), 235.3 (b)(4)(ii), 235.3(b)(2)(iii), 235.3(c).  Those regulations permit parole, subject to certain limitations, where DHS determines that an alien's case presents "urgent humanitarian reasons" or "significant public benefit" justifying parole.  8 C.F.R. § 212.5(b).

**B.    8 U.S.C. § 1226(a) provides the general, discretionary authority to detain or release non-arriving aliens during removal proceedings.**

The general detention authority for aliens in removal proceedings is governed by 8 U.S.C. § 1226(a).  Critically, every alien detained under section 1226(a) already may request a bond hearing.  That statute provides that an alien "may be arrested and detained" pending the conclusion of the alien's removal proceedings, and authorizes

---

further consideration of the application for asylum."  8 U.S.C. § 1225(b)(1)(B)(ii) (emphasis added).

[6] Expedited removal provides for the removal of aliens inadmissible for lack of proper documentation or fraud or willful misrepresentation of facts, without a hearing before an immigration judge, unless the alien indicates either an intention to apply for asylum or a fear of persecution or torture.

5

DHS to "continue to detain the alien," 8 U.S.C. § 1226(a)(1), or "release the alien on a bond" or other conditions of release.  8 U.S.C. § 1226(a)(2).

Regulations detail the process for determining whether an alien subject to detention under section 1226(a) may be released.  8 C.F.R. § 236.1.  Once an alien has been apprehended, DHS makes an initial custody determination.  ICE may release an alien if ICE determines that the release of an alien would not pose a danger to property or persons, and that the alien is likely to appear for removal proceedings.  8 C.F.R. §§ 236.1(c)(8) and (g).  If ICE releases an alien, ICE has the discretion to set a bond and/or prescribe other conditions for release.  8 U.S.C. § 1226(a); *see also* 8 C.F.R. §§ 236.1(c)(8) and (d)(2).  An alien released by ICE may apply to an immigration judge for amelioration of the terms of release within seven (7) days of release.  8 C.F.R. § 236.1(d)(1).  *Matter of Garcia-Garcia*, 25 I. & N. Dec. 93 (BIA 2009).

If ICE determines not to release an alien, the alien may seek a bond redetermination by an immigration judge. 8 C.F.R. § 236.1(d)(1).  At the bond hearing, the alien bears the burden of showing that he is not a flight risk or danger, and the immigration judge must take into consideration a number of factors in determining a request for bond redetermination.  8 C.F.R. § 236.1(d)(1); *see Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006)).[7]  An alien may also appeal an immigration judge's decision to the Board of Immigration Appeals. 8 C.F.R. § 236.1(d)(3).

---

[7] Those factors "may include any or all of the following: (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States." *Matter of Guerra*, 24 I. & N. Dec. at 40.

**C.    Congress established an exception to discretionary detention authority during removal proceedings by mandating the detention of aliens who have committed certain criminal offenses.**

As Respondents have previously detailed to this Court, *see*, *e.g.*, ECF No. 250, criminal aliens have long posed a special congressional concern.  Over the course of the last 30 years, Congress has, at times, provided the Executive Branch with the discretion to release criminal aliens during removal proceedings.  *See* 8 U.S.C. § 1252(a) (1982); Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, sect. 504 (1990); Immigration Technical Corrections Act of 1991, Pub. L. No. 102-232, sect. 306 (1991) (restoring discretion to release certain criminal aliens on bond).

However, by 1996, Congress determined that provisions allowing the release of criminal aliens by immigration judges on bond seriously undermined the Executive's ability to remove criminal aliens or prevent them from committing additional crimes during removal proceedings.[8]  As the Supreme Court later recognized, in enacting the mandatory detention provisions of section 1226(c), Congress acted on substantial evidence that "one of the major causes of the [former Immigration and Naturalization Services'] failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings."  *Demore v. Kim*, 538 U.S. 510, 519 (2003).  At the time Congress acted, one study "showed that, after criminal

---

[8]  Congress concluded that the 1990 and 1991 amendments restoring the Attorney General's discretion to release some aliens on bond had "weakened substantially" the government's efforts to deport criminal aliens and to protect public safety.  Criminal Aliens in the United States: Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs ("1993 Senate Hearing"), 103d Cong., 1st Sess. 15, 26 (1993); *see* H.R. Rep. No. 22, 104th Cong., 1st Sess. 12 (1995).  The Senate Governmental Affairs Committee found that as a result of the 1990 and 1991 amendments, and because of a shortage of space in immigration detention facilities, "many [criminal aliens] who should be detained [during deportation proceedings] are released on bond."  H.R. Rep. No. 22, at 2.  The House Judiciary Committee agreed that the failure to detain aliens during their deportation proceedings was "[a] chief reason why many deportable aliens are not removed from the United States."  H.R. Rep. No. 469, 104th Cong., 2d Sess., Pt. 1, at 123 (1996).

aliens were identified as deportable, 77% were arrested at least once more and 45% – nearly half – were arrested multiple times before their deportation proceedings even began." *Id.* at 518.

To address these concerns, Congress removed the discretion of the Executive to release certain criminal aliens, except under narrow exceptions related to an alien providing material assistance in a criminal matter.  8 U.S.C. § 1226(c)(2).  The mandatory nature of section 1226(c) detention is clear not only from the language of the statute – which provides that the government "shall take into custody" aliens who committed certain enumerated offenses identified in sections 1226(c)(1)(A) through (D) – but also by contrasting it with the government's discretionary authority in section 1226(a), which provides that the government "may" detain and "may release" on bond.

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987).  Additionally, the specific inclusion of a provision for the release of a narrow class of aliens subject to detention under section 1226(c)(2) makes clear that other aliens falling within the scope of section 1226(c) may not be released.[9]  *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–617 (1980)) ("'Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'").  Regulations accordingly prohibit immigration judges from holding bond hearings for such aliens. 8 C.F.R. § 1003.19(h)(2)(i).

---

[9] Section 1226(c)(2) provides in pertinent part that "[t]he Attorney General may release an alien described in paragraph (1) *only if* the Attorney General decides . . . that release of the alien from custody is necessary to provide" protection to witnesses or those assisting in investigations and their family and associates. (Emphasis added).

Criminal aliens detained under section 1226(c) may, however, challenge whether they are properly included within the scope of section 1226(c) before DHS and in a subsequent hearing before an immigration judge, and then to the Board of Immigration Appeals ("BIA").  *See* 8 C.F.R. §§ 1003.19(a), (b), and (h)(2)(ii); 236.1(c)(10), (d)(1), and (d)(3); *see also Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999).[10]

## D.    Aliens ordered removed and detained under 8 U.S.C. § 1231 are already afforded bond hearings under Ninth Circuit precedent.

Custody after a final removal order is governed by 8 U.S.C. § 1231.  The statute requires that the government take custody of aliens who are subject to final orders within 90 days.  8 U.S.C. § 1231(a)(1)(A).  The removal period may be extended and the alien detained beyond the 90-day removal period "if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure..."  8 U.S.C. §1231(a)(1)(c).  In addition, DHS may, in its discretion, continue to detain aliens ordered removed beyond the removal period.  8 U.S.C. § 1231(a)(6).  Once the statutory removal period ends, ICE determines, based on indicia of flight risk or danger, whether to continue detention in accordance with regulations found at 8 C.F.R. § 241.4.[11]

---

[10] An alien detained under section 1226(c) may contest her or his inclusion in the categories of aliens subject to section 1226(c) mandatory detention in a *Joseph* hearting.  At the hearing, the detainee may avoid mandatory detention by demonstrating that he was not convicted of the predicate crime, or that DHS is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention.  *See* 8 C.F.R. § 1003.19(h)(2)(ii); *Matter of Joseph*, 22 I. & N. Dec. at 806. *See also Demore v. Kim*, 538 U.S. 510, 513 n.3 (2003) (describing *Joseph* hearing).

[11] Under the regulations, ICE conducts an initial custody review before the 90-day removal period expires if the individual's removal cannot be accomplished during the removal period.  8 C.F.R. § 241.4(k)(1)(i).  If the alien is not released or removed at the time of the 90-day review, ICE conducts a second review three months later.  8 C.F.R. § 241.4(k)(2)(ii).  If the alien is not released, another review will occur within approximately one year after the 180-day review.  8 C.F.R. § 241.4(k)(2)(iii).

Under Ninth Circuit precedent, after 180 days of detention, the section 1231 Subclass of aliens in this action are *already* entitled in this circuit to receive a bond hearing before an immigration judge, at which the government bears the burden of proving that the alien is a flight risk or a danger, under a clear and convincing evidence standard. *Diouf v. Napolitano*, 634 F.3d 1081 (9th Cir. 2011).[12]  *See also V. Singh v. Holder*, 638 F.3d 1196, 1202-09 (9th Cir. 2011) (setting forth standard for *Casas* hearing).[13]

---

[12] The class does not include aliens with a final order of removal and no stay of removal, such that the government has legal authority to remove them.  ECF No. 111 (Third Amended Complaint), ¶ 107.  Thus, the section 1231 subclass consists solely of those aliens under section 1231 who are already entitled to a bond hearing under *Diouf.*

[13] In footnote 9 of their brief, Petitioners ask this court to clarify the scope of the class to include *any* alien in administrative process or proceedings.  Petitioners' purpose in making that request is to broaden the class to include detained Visa Waiver Program (VWP) aliens and detained aliens who have judicially and administratively final orders of removal, and who have had those orders reinstated but are placed in withholding-only proceedings.  Neither group is within the class definition.  Detained VWP aliens are not detained under the detention statutes challenged by Petitioners in the Third Amended Complaint.  *See* ECF No. 111 at ¶ 108 (defining the four subclasses by detention statute: (1) 8 U.S.C. § 1225(b); (2) 8 U.S.C. § 1226(a); (3) 8 U.S.C. § 1226(c); and (4) 8 U.S.C. § 1231(a)).  In *Matter of A-W*, 25 I. & N. Dec. 45, 47-48 (BIA 2009), the Board concluded that the statutory authority for detaining an alien who has been ordered removed under the VWP is found at 8 U.S.C. § 1187(c)(2)(E).  The Board also determined that under the statute immigration judges lack authority to release VWP aliens on bond.  *See* 25 I. & N. Dec. at 48; 8 U.S.C. § 1187(c)(2)(E) ("Nothing in this subparagraph gives rise to any cause of action or claim under this paragraph or any other law against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.").  For these reasons, VWP aliens are outside the class definition.  Similarly, detainees in withholding-only proceedings fall outside of the class definition.  In this case, the court-certified class consists of alien detained for "longer than six months pursuant to one of the general immigration detention statutes pending completion of *removal proceedings.*"  *See* ECF 77 (emphasis added).  Withholding-only proceedings are a distinct type of immigration proceeding where the exclusive issue is that of the alien's eligibility for relief in the form of withholding of removal.  *See* 8 C.F.R. § 208.31(e).  An immigration judge has no authority to reopen or review

*(Footnote continued)*

## II.    Overview of the Custody Determination Process

In the Central District of California, ICE follows certain established policies and procedures to identify which detention regime applies to an alien, to determine initial custody, and to make parole determinations for arriving aliens. Immigration judges within the district also follow certain jurisdictional, legal and other requirements in making custody redeterminations.

### A.    ICE's Initial Custody Determination

ICE makes its initial custody determination when an alien is presented for processing after arrest. Exh. A, Lee Dep. 98:16-98:25; 18:4-20:17; 78:21-78:24; Exh. B, Saldana Dep. 21:7-22:21; 30:2-33:25.[14] During processing, the alien is – contrary to Petitioners' assertion – interviewed by a deportation officer, with the assistance of a translator, if necessary. RSOF ¶¶ 1-3, 10, 14-15.[15] As part of the interview, and in reviewing the file material, criminal records, and other materials available, the deportation officer determines whether the alien is an arriving alien or, if not, whether the alien is subject to detention under section 1226(a) or section 1226(c). RSOF ¶¶ 1-3.

---

the prior order of removal. *See* 8 U.S.C. § 1231(a)(5). Accordingly, immigration judges have concluded that withholding-only proceedings are not "removal proceedings" under 8 U.S.C. § 1229a.

[14] For convenience of the Court, Respondents have adopted the following abbreviations for citations to evidence: (1) All references to Respondents' Statement in Opposition to Petitioners' Uncontroverted and Other Facts are cited as "RSOF ¶ __." (2) All cited exhibits are attached to the declaration of Theodore W. Atkinson, and are cited as "Exh. __." (3) Where appropriate, citations to deposition testimony are to the deponent's name, and to the page and line number of the deposition transcript (e.g., "Lee Dep. 10:25-11:5").

[15] Petitioners repeatedly suggest to this court that first level deportation officers make custody determinations without guidance and without supervisory review. This suggestion is contradicted by the testimony of Assistant Field Office Directors Wesley Lee and Eric Saldana, who detail how each custody decision is subject to review by supervisory officers, and how each determination is guided by training, written guidance, consultation, and, when necessary, guidance from agency counsel. *Id.*

**B.     The Parole Determination Process**

Substantial numbers of arriving aliens processed in ICE's Los Angeles Field Office make a claim for asylum and have established a credible fear of persecution or torture by the time they are processed.  RSOF ¶ 8; Lee Dep. 3:1-17:10.  An arriving alien who has established a credible fear is provided with an advisal that the alien may seek parole and with a date for a parole interview – which usually occurs within 30 days – and is given a questionnaire requesting certain information.  RSOF ¶ 9; Exh. E (Parole Advisals); Exh. F. (Parole Questionnaire).  An arriving alien is informed that the alien may provide whatever material or information to support the alien's request for parole.  RSOF ¶¶ 9-10; Exh. E.

At the interview, a deportation officer interviews the alien – with the aid of a translator, if necessary – to establish whether the alien may be released on parole.  RSOF ¶¶ 10, 14-15.  DHS public guidelines issued on January 4, 2010, directly address parole determinations with regard to arriving aliens found to have a credible fear.  *See* Exh. I (2010 Parole Guidelines); RSOF ¶ 9.  Following a written worksheet, the deportation officer determines whether the alien meets eligibility requirements under the regulations and under the 2010 Parole Guidelines, which make an arriving alien eligible for parole if the alien can establish reasonably reliable identification, and can provide a sponsor who can provide the alien with temporary residence.  RSOF ¶¶ 8-9; Exh. G (Parole Determination Worksheets).  If the alien can establish those criteria, parole will generally be granted.  RSOF ¶ 9.  For example, between January 4, 2010, when the 2010 Parole Guidelines took effect, and October 2011, DHS paroled 1,404 out of 1,836 arriving aliens who had demonstrated a credible fear, approximately 76 percent of all cases under the 2010 Parole Guidelines nationwide. *See* Exh. J (March 19, 2012 Response to Petition for Rulemaking).

Once a parole recommendation is made by a deportation officer, it is reviewed by a supervisory immigration official.  RSOF ¶ 10.  A final parole determination is

made by an ICE Assistant Field Office Director.  *Id.*; Exh. G.[16]  If parole is denied, ICE provides the alien with a written notice of the denial.  RSOF ¶9; Exh. H (Parole Denial Decision).[17]  The written denial advises the arriving alien that he or she may seek redetermination of parole if the alien can present changed circumstances, and provides the alien with examples of changed circumstances (*e.g.*, presenting government-issued identification such as a passport, birth certificate, or identity card).  Exh. H.  An alien may request redetermination at any time.  RSOF ¶¶ 9-10.

## C.    Determining custody under section 1226

If an alien is not an arriving alien, the deportation officer determines if the alien is subject to detention under either section 1226(a) or 1226(c).  The deportation officer examines the alien's file, pulls criminal records, and interviews the alien.  RSOF ¶¶ 1-3.  If the alien is subject to detention under section 1226(c) – a determination following established guidelines and, if necessary, after consultation with DHS counsel – then the deportation officer recommends mandatory detention to a supervisory official, who makes the formal determination.  *Id.*  There is yet another level of review: the alien's custody determination is reviewed against file materials and any other available information by a second supervisory official at the detention facility.  RSOF ¶ 2.  If after multiple levels of review, the alien's criminal offense(s) place him within section 1226(c), the alien is provided written notice that the alien is required to be detained and may not seek redetermination by an immigration judge.  RSOF ¶¶ 1-3; Exh. D (Notices of Custody Determination).  However, if an alien requests a bond hearing – and an alien may do so directly on the Notice of Custody Determination by checking a box next to the words "I do … request a redetermination

---

[16] Petitioners' suggestion that available bed space drives a parole decision is unsupported and was flatly contradicted by Assistant Field Office Director Lee at his deposition.  RSOF ¶ 11.  Nor is there any support for Petitioners' bizarre claim that parole decisions are sometimes made solely based on national ethnicity.  RSOF ¶ 12.

[17] ICE typically informs the alien of the decision in writing within 7 days of the interview, Lee Dep. 47:22-48:6, in addition to an oral explanation typically provided to the alien of the decision, Lee Dep. 106:18-107:21.

of this custody decision by an immigration judge," *see* Exh. D – that request is typically presented to an immigration judge at the alien's first master calendar hearing.  As Assistant Chief Immigration Judge Fong of the Los Angeles immigration courts testified, even if such alien does not request a *Joseph* hearing to determine whether the alien was properly categorized as a section 1226(c) detainee, the immigration judge will make an independent determination of whether the alien's crimes subject the alien to detention without bond, a step taken by immigration judges both in fulfillment of regulations and their obligations as judges.  RSOF ¶ 6 (citing Deposition of Assistant Chief Immigration Judge Thomas Y.K. Fong. ("Fong Dep.") at 61:20-64:6.[18]

An alien subject to detention under section 1226(a) is interviewed and his or her file is reviewed to decide the appropriate bond or conditions of release, if any.  RSOF ¶¶ 1-3.  Immigration officers may at this point also consider enrolling the alien in an alternative to detention program, such as the Intensive Supervision Assistance program – or "ISAP II".  RSOF ¶ 47; Saldana Dep. 3:15-14:2; 106:9-107:18; 120:1-124:16 (testifying about ISAP II).  ISAP II is a detention alternative using telephone reporting, radio frequency and GPS tracking, in addition to curfew checks and unannounced home visits.  Saldana Dep. 107:8-107:18; 120:1-124.  ISAP II is used for aliens with relatively minor criminal offenses or who otherwise present relatively low risk of flight.  RSOF ¶ 47; *see also* Exh. K (ISAP II Participant's Handbook) (describing ISAP II program).

## D.    *Casas* and *Diouf* Custody Determinations

If an alien with an administratively final order of removal files a petition for review with the Ninth Circuit, and obtains a stay of removal pending final judgment on the petition for review, then the alien is entitled to a bond hearing in accordance with *Casas*.  535 F.3d at 951.  In that case, the Ninth Circuit concluded that such

---

[18] The deposition testimony of Judge Fong is attached as Exhibit C to the Declaration of Theodore W. Atkinson.

aliens are detained under section 1226(a) and are entitled to a bond hearing at which the Government must establish that the alien presents a flight risk or danger to the community. *Id.* Once an alien files a petition for review, ICE conducts a custody review to determine whether the alien poses a flight risk or danger to the community, similar to the initial custody determination. RSOF at 2; RSOF ¶ 47. If ICE does not release the alien, then a written notice of a continued detention determination is sent to the alien, informing the alien of eligibility for a bond hearing under *Casas* before an immigration judge, and notifying the alien of the right to request such a hearing. *Id.*; Exh. L (Sample *Casas/Diouf* Notice Letters).

Similarly, in accordance with *Diouf*, aliens detained under section 1231(a)(6), who are subject to an administratively final order of removal, have filed a petition for review of a collateral challenge to the order, and have been issued a stay of removal by the Ninth Circuit are entitled to a bond hearing once the alien has been detained for 180 days after the removal period begins. *Diouf*, 634 F.3d at 1087. ICE notifies such aliens of the right to request a hearing under *Diouf*. RSOF at 2; Exh. L.

## ARGUMENT

## I.    Overview of Due Process Analysis in the Immigration Detention Context

This class action presents a core constitutional challenge to immigration detention without a bond hearing for more than six months.[19] To succeed, Petitioners' claim would require this Court to find that *all* detention beyond 180 days without a bond hearing is unconstitutional regardless of any other fact or circumstance that may bear upon a detainee's detention. Accordingly, although this action purports to present an as-applied challenge, Petitioners' claims are quite similar to a facial

---

[19] Petitioners also assert that detention without a bond hearing beyond six months violates the four relevant statutes themselves. That statutory authorization claim derives, however, from their due process claims because they argue that construing the statutes to authorize detention without a bond hearing beyond six months would violate due process. Thus, despite their contention that the claims contain multiple challenges, this Court is being asked to render a decision on due process grounds.

challenge in which they suggest that each statute becomes unconstitutional on its face at the 180-day mark.  In short, Petitioners contend that this one criteria – the 180-day threshold – is the only fact dispositive of their argument that each of the four challenged statutes is unconstitutional.

Petitioners' argument is not, however, supported by due process jurisprudence, which makes clear that "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961).  "Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *Pedro v. Oregon Parole Bd.*, 825 F.2d 1396, 1398 (9th Cir. 1987) (citing *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1 (1979)) (same).  Contrary to Petitioners' contentions, therefore, due process cannot be so inflexible as to require this Court to ignore every other fact in determining Petitioners' claims and to conclude instead that detention without a bond hearing becomes *per se* unconstitutional at the 180-day mark.  This Court cannot ignore, for example, whether an alien has prolonged the removal process, and thus his detention, through multiple continuances that stretch detention out for months, including beyond six months.  Under Petitioners' analysis, the mere length of detention is enough to support the relief they request, and nothing else matters.  This is incorrect.

Indeed, before this Court can reach the question of *when* due process requires a hearing, the Court must confront the threshold issue of whether the Constitution requires a hearing for arriving aliens and certain criminal aliens detained pending their removal proceedings.[20]  In answering this question, this Court must look first at what

---

[20] As discussed below, this claim only touches individuals detained under sections 1225(b) and 1226(c), because aliens detained under section 1226(a) *already* have a right to a bond hearing (even before six months' detention has elapsed), and aliens detained for six months or longer within the class under section 1231 are entitled to a bond hearing after six months of detention under *Diouf*.

16

the Supreme Court has said concerning Congress's authority with respect to aliens, generally, and with respect to arriving aliens and criminal aliens specifically.

The Supreme Court and the Ninth Circuit have long recognized that Congress has broader authority in the immigration context than in other contexts. *See Arizona v. United States,* 132 S.Ct. 2492, 2498 (2012) ("[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (recognizing that "over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens) (internal citations omitted); *see also United States v. Flores-Lopez*, 63 F.3d 1468, 1473 (9th Cir. 1995) (citing *Mathews v. Diaz*, 426 U.S. 67, 84-85 (1976)) (discussing congressional authority over immigration matters generally); *Demore v. Kim*, 538 U.S. 510, 521(2003) (citing *Mathews v. Diaz*, 426 U.S. at 79-80) (discussing Congressional authority in the context of immigration detention specifically).

This authority is especially broad insofar as it relates to determinations about which aliens may and may not be admitted within our borders – an interest directly at stake with respect to Petitioners' section 1225(b) claims. *Fiallo*, 430 U.S. at 792; *see also Masnauskas v. Gonzales*, 432 F.3d 1067, 1070-71 (9th Cir. 2005) (citing *Fiallo*, 430 U.S. at 792). It is here that Congress's interests and authority are most closely aligned and at their zenith. *United States v. Flores–Montano*, 541 U.S. 149, 152–53 (2004) ("The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border. . . . It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity."). Similarly, the Supreme Court has also given substantial deference to congressional interests over aliens who are within this country. *Demore,* 538 U.S. at 521 (recognizing that certain rules constitutionally applied to aliens may be unconstitutional if applied to citizens); *see Zadvydas*, 533 U.S. at 693 (discussing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206,

17

213-15 (1953); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925); *Leng May Ma v. Barber*,
357 U.S. 185, 188–190 (1958).  .

Petitioners fail to address this underlying premise that Congress has substantial
authority of immigration matters, and this Court should view with skepticism and not
accept Petitioners' efforts to align the interests of aliens precisely with those of
citizens by directly equating their circumstances and interests to citizens in due
process decisions outside the immigration context.  *See, e.g.,* Pet. Memo at 23 (relying
on *Goldberg v. Kelly*, 397 U.S. 254, 268 (1970) (termination of welfare benefits);
*Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1, 16 (1978) (termination
of utility subsidies); *Califano v. Yamasaki*, 442 U.S. 682, 696 (1979) (recovery of
excess Social Security payments)).

Indeed, it is telling that Petitioners offer this Court no analytical framework
with which to approach their core due process claims regarding detention without
bond under sections 1225(b) and 1226(c) – the two subclasses to which their due
process arguments are most sharply addressed.  Instead, Petitioners appear to argue
primarily that this Court should simply extend the post-removal order holdings of
*Casas* and *Diouf*, to the section 1226(c) and 1225(b) subclasses.[21]  As discussed
below, Petitioners are incorrect that *Casas* and *Diouf* or other cases they cite speak to
the pre-order detention of the subclasses at issue.  Petitioners' mischaracterization of
the scope of *Casas* and *Diouf* arises from their incorrect core contention that the
interests of the various subclasses of aliens are equal, and that the government's
interest does not vary with reference to the statutory purposes for detention under the
challenged statutes.  But this Court cannot accept that assumption, and must instead
recognize that any due process analysis of the interests of aliens in the immigration
context must be viewed as uniquely weighted toward the government's constitutional

[21] Respondents reserve the right to challenge any application of Ninth Circuit
jurisprudence limiting custody authorities and to pursue any further review that may
be appropriate in the federal courts of appeals and the Supreme Court.

authority and interests.  Only with these principles in mind can this Court decide Petitioners' claims in the proper context.

## II.    THERE IS NO STATUTORY OR CONSTITUTIONAL REQUIREMENT THAT ALL ALIENS RECEIVE *CASAS* HEARINGS

At the core of Petitioners' broad challenge to the existing detention system is their argument that aliens across the class are entitled to heightened bond hearings by notions of procedural due process, and that due process requires that those bond hearings be automatically given after an alien has been in immigration detention for six months.  Petitioners advocate their proposed blanket six-month rule on one argument: that *all* detention beyond six months raises constitutional concerns, regardless of the facts and circumstances of an alien's case, and regardless of the statute under which he or she is detained.  However, nothing in the INA or the Constitution requires that this Court treat these disparate categories of aliens – each implicating different congressional concerns – the same under a single standard at a pre-determined moment in time.  This Court should deny Petitioners' request for judgment, and grant judgment to the government on these constitutional and statutory claims.

### A.    Congress's authority to detain arriving aliens without bond hearings under section 1225(b) is constitutional.

The Supreme Court has consistently recognized that "our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality.  In the latter instance, the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'"  *Ma*, 357 U.S. at 187 (quoting *Mezei*, 345 U.S. at 212).  In *Mezei*, addressing the detention of a returning long time legal resident alien, the Supreme Court noted that "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."  345 U.S. at 212; *see also Zadvydas*,

533 U.S. at 693 (citing *Kaplan v. Tod*, 267 U.S. 228, 230 (1925)); *Ma*, 357 U.S. at 188–190 (recognizing that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law," and that "[i]t is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders.").

An arriving alien, however, "stands on a different footing: 'Whatever the procedure authorized by Congress is [regarding admission or exclusion], it is due process as far as an alien denied entry is concerned.'" *Id.* (quoting *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)); *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application . . . [H]owever, once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly.").  The unique constitutional position of arriving aliens permits their detention without a bond hearing pending their removal proceedings, even if such detention lasts beyond six months.  *See, e.g., Zadvydas*, 533 U.S. at 693; *Ma*, 357 U.S. 185, 187-88 (1958) (alien "paroled" into the United States pending admissibility had not effected an "entry"); *see also Zadvydas*, 533 U.S. at 693 (discussing line of Supreme Court decisions recognizing the entry fiction doctrine, which considers an alien in the United States, but not granted admission to the United States, as having been "stopped at the border," and refusing to undermine *Mezei* with respect to the constitutionality of the detention of such aliens for lengthy periods).

Any doubts as to whether these views had vitality in a post-*Zadvydas* era were put to rest in *Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094, 1097 (9th Cir. 2004).  There the Ninth Circuit reiterated its view that "[u]nder controlling precedent, excludable aliens have no constitutional right to the same procedures afforded deportable aliens in the admission process," explaining that "our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission and

20

those who are within the United States after an entry, irrespective of its legality." *Id.* at 1097 (citing *Barrera-Echavarria*, 44 F.3d 1441, 1448) (9th Cir. 1995) (en banc), *superseded by statute as stated in Wong v. INS*, 373 F.3d 952, 972 n.26 (9th Cir. 2004)) . Citing *Zadvydas*, this Court noted what the Supreme Court described as a "fundamental distinction" running throughout immigration laws "between an alien who has effected an entry into the United States and one who has never entered." *Alvarez-Garcia*, 378 F.3d at 1097 (citing *Zadvydas*, 533 U.S. at 693). The Ninth Circuit further explained that the entry fiction doctrine "provides that although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Id.*

Following these longstanding principles, and consistent with Supreme Court decisions, the Ninth Circuit held that Congress's wide latitude in detaining arriving aliens permits the prolonged detention of such aliens, given their unique position. In *Barrera-Echavarria*, 44 F.3d at 1445, the Ninth Circuit considered an arriving alien's challenge to his lengthy detention, construing, in part, section 1225(b) and section 1182(d)(5)(A). The Court found it "significant that Congress has for at least four decades been aware of instances of long-term detention of excludable aliens by the executive branch," and concluded that, consistent with *Mezei*, the alien had "no right to be free from detention pending his deportation." *Id.* at 1448. The Court concluded that prolonged detention was constitutionally sound, noting that aliens like Barrera had an opportunity to be considered for parole. *Id.* at 1450-51. The same opportunity for parole is available to class members here, and, when requested, that parole determination occurs well before six months have passed.

Petitioners' six-month rule thus conflicts with the unambiguous language and Congressional intent expressed in section 1225(b), as well as the decisions of the Supreme Court and the Ninth Circuit finding the premise of that statute constitutional. In short, there is no precedent for the proposition that arriving aliens are entitled to

bond hearings, let alone that arriving aliens are entitled to bond hearings at a fixed 180-day mark. More than five decades of law is precisely to the contrary.

**B.    Congress's authority to detain certain criminal aliens without a bond hearing under section 1226(c) during the pendency of their removal proceedings is constitutional.**

The constitutionality of mandatory detention under section 1226(c) was settled by the Supreme Court in *Demore*. In *Demore*, detainees argued that mandatory detention for criminal aliens was unconstitutional "because it results in prolonged detention of a wide array of lawful permanent residents who pose no danger or flight risk, who are raising bona fide challenges to removal, and who often prevail in those challenges." *See* Brief of Respondents in *Demore*, 2002 WL 31455525, * 11 (emphasis added); *see also Demore*, 538 U.S. at 523.

The Supreme Court disagreed, concluding that "Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that persons such as respondent be detained for the brief period necessary for their removal proceedings." *Id.* at 512 (emphasis added). Congress's broad authority over immigration, combined with a definable and valid statutory purpose that addressed the specific problems of criminal aliens facing removal, makes the detention of criminal aliens during the course of removal proceedings constitutional. *Demore*, 538 U.S. at 524-25.

In upholding mandatory detention under section 1226(c), the Supreme Court also specifically distinguished between the pre-final order detention under section 1226(c) and the post-order, but potentially indefinite, detention under section 1231(a)(6) considered in *Zadvydas*. As the Court explained, the aliens in *Zadvydas* were "ones for whom removal was 'no longer practically attainable,'" and thus "detention there did not serve its purported immigration purpose." *Demore*, 538 U.S. at 527 (citing *Zadvydas*, 533 U.S. at 690). Aliens detained under section 1226(c), by contrast, are detained pending their removal proceedings, and thus their detention

"necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Demore*, 538 U.S. at 528. The Supreme Court further distinguished *Zadvydas* by explaining that while "post-removal-period detention, unlike detention pending a determination of removability, has no obvious termination point," pre-final order detention under section 1226(c) has "a definite termination point." *Id.* at 529.

Because the termination of removal proceedings is definite, as opposed to potentially indefinite, and because it continues to serve the statute's purpose, detention under section 1226(c) beyond six months raises no greater constitutional concern than post-final order detention where removal is foreseeable. *See also Soberanes v. Comfort*, 388 F.3d 1305, 1311 (10th Cir. 2004) (alien's detention "is clearly neither indefinite nor potentially permanent," but "has a definite and evidently impending termination point . . . akin to detention during the administrative review process"); *Agyeman v. I.N.S. Assistant District Director Coachman*, 74 F. App'x 691, 694 (9th Cir. 2003) ("Moreover, his detention has a definite termination point. Thus, his detention meets substantive due process requirements.") (unpublished).

*Demore* revisited a thread of reasoning running through the Supreme Court's immigration detention cases showing that due process must be examined in a way appropriately reflective of Congress's broad immigration authority under the Constitution. Because of that authority, *Demore* and cases preceding it gave great deference to Congress. The *Demore* Court rejected the argument Petitioners advanced below, ER 21, that due process requires individualized determinations, *i.e.*, individual bond hearings. *Demore*, 538 U.S. at 527-28. To the contrary, the Court explained that Congress could require the detention of aliens by reference to a statutory purpose in the exercise of Congress's immigration authority, even if that statutory purpose forecloses an individualized determination in any particular alien's case. *Id.*

Nor has one of the primary statutory purposes behind section 1226(c) lessened with time. In an April 2006 report, DHS's Office of the Inspector General found that

23

1   "historical trends indicate that 62 percent of the aliens released will eventually be

2   issued final orders of removal . . . and later fail to surrender for removal or abscond."

3   Exh. N (Report of DHS OIG, "Detention and Removal of Illegal Aliens," Report OIG-

4   06-33, April 2006).  More recently, in 2011 ICE arrested more than 40,000 fugitive

5   aliens who failed to leave the United States when ordered removed or failed to report

6   to ICE as required.  Exh. M (Report of ICE, "Fact Sheet: ICE Fugitive Operations

7   Program," Nov. 7, 2011).  However, nearly 480,000 fugitive alien cases remained

8   pending at the end of fiscal year 2011.  *Id.*  Although these figures are not limited to

9   criminal aliens, one can presume that criminal aliens released on bond pose an even

10  greater flight risk because, for example, they are less likely to be granted relief from

11  removal.  In short, these statistics show that a compelling problem Congress sought to

12  address in 1996 – flight by criminal aliens – remains a problem that *Demore*

13  recognized Congress had authority to address through mandatory detention.[22]

14  Granting the relief that Petitioners now seek would thus run exactly contrary to

15  Congress's intent in enacting section 1226(c).

16

17  _____

18  [22] Petitioners argue that bond hearings should also be afforded to section 1226(c)
    detainees because some of the crimes are not serious, citing, among other things, drug-

19  related offenses and short sentences.  *See* Pet. Memo at 18.  But Petitioners' argument
    amounts to no more than a qualitative judgment on the enumerated categories of

20  offenses established by Congress, constituting the types of crimes courts routinely
    regard as serious offenses.  *See Terrebonne v. Blackburn,* 646 F.2d 997, 1002 (5th

21  Cir. 1981) (characterizing drug dealing as a "grave offense of high rank"); *Terrebonne*

22  *v. Butler,* 848 F.2d 500, 504 (5th Cir. 1988) (*en banc*) (comparing the trafficking of
    heroin to murder); *Diaz–Zaldierna v. Fasano,* 43 F.Supp.2d 1114, 1119 (S.D. Cal.

23  1999) ("[I]t is not excessive for Congress to find that aliens convicted of controlled

24  substances offences can be presumed to be dangerous such that their release on bail,
    pending the outcome of their removal proceedings, is not warranted.").  The *Demore*

25  Court upheld detention without bond under section 1226(c), which included the same

26  categories of enumerated crimes in the statute today.  Petitioners' argument that this
    Court should second-guess either Congress or the *Demore* Court in this regard – based

27  on surveys of time served or any other standard – is meritless.

28

Neither the purpose nor effect of mandatory detention under section 1226(c) changes at six months.  Petitioners' proposed six-month rule fails to address the problems that animated the *Demore* Court.  To the contrary, that bright-line rule would mean that the problems Congress addressed in 1996 would increase as serious criminal aliens become eligible for release on bond, just as they were before IIRIRA was enacted.  See *supra* at 7-8 (describing failure of discretionary detention to prevent criminal aliens from absconding or committing additional crimes).

C.   **This Court may not use constitutional avoidance to read bond hearing requirements into the unambiguous mandatory detention provisions of sections 1225(b) and 1226(c).**

Throughout this litigation, Petitioners have taken the misguided position that this Court may construe sections 1225(b) and sections 1226(c) as requiring bond hearings at six months for all arriving aliens and criminal aliens detained under those statutory provisions.  *See* ECF No. 232; *see also* Pet. Memo at 13, 33.  However, this Court may not construe unambiguous statutory provisions, and may not construe any statute to avoid constitutional concerns where the resulting statutory construction is contrary to the expressed intent of Congress.

1.   **Constitutional avoidance is a tool for interpreting ambiguous statutes, and then only consistent with the intent of Congress.**

The canon of constitutional avoidance "is merely a tool of statutory interpretation, not a license for the judiciary to rewrite language enacted by the legislature for we cannot press statutory construction to the point of disingenuous evasion even to avoid a constitutional question."  *Sherman v. U.S. Parole Com'n*, 502 F.3d 869, 882 (9th Cir. 2007) (quoting *Salinas v. United States*, 522 U.S. 52, 59-60, (1997) (internal quotation marks and citations omitted)).  Instead, courts are "obligated to construe [a] statute to avoid [constitutional] problems" if it is "fairly possible" to do so.  *I.N.S. v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

There are, as the Supreme Court and the Ninth Circuit have recognized, limits to this principle. The canon of constitutional avoidance does not supplant traditional modes of statutory interpretation. *See Clark v. Martinez*, 543 U.S. 371, 385 (2005) ("The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them"); *Almendarez–Torres v. United States*, 523 U.S. 224, 238 (1998). The doctrine of constitutional avoidance may only be applied to construe "*ambiguous statutory language … to avoid serious constitutional doubts.*" *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (emphasis added). It is not intended to "limit the scope of authorized executive action." *Id.*

Moreover, under the canon of constitutional avoidance, a court may "read [a challenged] statute to eliminate" any constitutional doubt, but only "so long as such a reading *is not plainly contrary to the intent of Congress.*" *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2742 (2010) (emphasis added). Accordingly, a court is bound not only to choose a construction that is consistent with the plain text of the statute, *see, e.g., Carcieri v. Salazar*, 555 U.S. 379, 386-388 (2009), but also one that is consistent with the larger statutory scheme of which the provision is part, *see, e.g., Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *see also United States v. Broncheau*, 645 F.3d 676, 686 (4th Cir. 2011) ("[T]he district court erred by invoking the canon of constitutional avoidance to justify creation of its alternative commitment scheme. This canon has no application to the construction of a statute in a manner that is incompatible with its plain terms."); *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1142-43 (9th Cir. 2009) ("Th[e] doctrine does not apply where, as here, congressional intent is clear from the text and purpose of the statute.").

In the past, the Ninth Circuit has applied the canon of constitutional avoidance to find bond hearing requirements in discretionary immigration detention statutes. *Casas,* 535 F.3d at 950-52 (applying constitutional avoidance to conclude that a post-order alien detained under 1226(a) is entitled to a bond hearing with a shifted burden

26

because that statute already provides for bond hearings); *Diouf*, 634 F.3d at 1086, 1089 (applying the canon of constitutional avoidance and explaining that there is "no meaningful distinction" between section 1226(a) which expressly authorizes release on bond and section 1231(a)(6), which does not speak to the question).

However, unlike the discretionary detention provisions of sections 1226(a) and 1231(a)(6), which courts have found to be ambiguous with respect to bond hearing requirements, *see, e.g., Zadvydas*, 533 U.S. at 697 (noting that the "may" detain language of section 1231(a)(6) makes it ambiguous with respect to authorizing indefinite detention), and *Diouf v. Holder*, No. CV 06-7452 TJH (FMOx), 2009 WL 6331130, *1 (C.D. Cal. Sept. 9, 2009) (finding section 1226(a) ambiguous with respect to whether it authorizes prolonged detention), constitutional avoidance cannot be applied to read sections 1226(c) or 1225(b) as requiring bond hearings, because neither statute is ambiguous on that point.  Instead, section 1225(b) unambiguously requires detention while allowing for parole, not bond, under section 1182(d)(5)(a).[23] It is impossible to conclude in light of the parole statute that Congress intended section 1225(b) to be interpreted as permitting bond hearings, let alone bond hearings before immigration judges at six months.  "The fact that courts should not decide constitutional issues unnecessarily does not permit a court to press statutory construction 'to the point of disingenuous evasion' to avoid a constitutional question." *Jean v. Nelson*, 472 U.S. 846, 855 (1985) (quoting *United States v. Locke*, 471 U.S.

---

[23] 8 U.S.C. §§ 1225(b)(1)(B)(ii) ("If the officer. . . determines that the alien has a credible fear. . . the alien *shall be detained* for further consideration of the application for asylum.") (emphasis added); 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the [expedited removal] procedures under this clause *shall be detained* pending a final determination of credible fear…") (emphasis added); 1225(b)(2)(A) ("…if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding…") (emphasis added).  Indeed, the BIA has concluded that section 1225(b) mandates the detention of arriving aliens.  *Matter of X-K-*, 23 I. & N. Dec. 731, 734 (BIA 2005) (describing section 235(b)(1)(B)(iii)(IV) as providing for "the *mandatory detention* of aliens who are being processed under section [1225(b)(1)] proceedings…") (emphasis added).

27

84, 96 (1985)).  Similarly, section 1226(c) unambiguously precludes release on bond for certain criminal aliens.  *See Casas*, 535 F.3d at 951 (applying constitutional avoidance after noting that Section 1226(a) is "unlike" section 1226(c) because it provides authority for the Attorney General to conduct a bond hearing).  As explained above, in enacting section 1226(c), Congress explicitly intended to eliminate discretionary release to address the specific concern that criminal aliens, in large measure, fail to appear at removal proceedings and commit additional crimes when released on bond.  That intent is also evident from the fact that section 1226(a) explicitly does provide for release on bond.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").  To now read section 1226(c) as Petitioners suggest, such that it would allow the very bond hearings Congress plainly sought to foreclose contravenes the long-recognized limits of constitutional avoidance.  Constitutional avoidance is "a means of giving effect to congressional intent, not of subverting it."  *Martinez*, 543 U.S. at 382.

> **D.    Due process does not require heightened bond hearings for aliens already entitled to bond hearings under section 1226(a).**

There can be no dispute that aliens detained under the discretionary detention provisions of section 1226(a) are already entitled by statute and by regulation to bond hearings before immigration judges following an initial custody determination by ICE. See 8 U.S.C. § 1226(a); 8 C.F.R. § 1236.1 (providing for custody redetermination hearings before immigration judges).  Despite this fact, Petitioners claim that aliens already afforded an opportunity for bond hearings before immigration judges must receive a bond hearing at six months under a heightened standard and shifted burden to DHS, even if an immigration judge has already determined that the individual presents a flight risk or danger to the community.  Petitioners' argument makes no sense and is wholly ungrounded in any due process analysis.

The practical aspects of granting Petitioners the relief they seek are mind-boggling and inconsistent with the detention scheme established by Congress and implemented by DHS and the Executive Office for Immigration Review ("EOIR"). If an alien is detained by ICE at the initial custody determination stage, that alien is informed in writing that he may seek a bond hearing before an immigration judge. 8 C.F.R. § 236.1; *see also* RSOF ¶¶ 1-3 (describing initial custody process and identifying the Notice of Custody Determination the alien receives). At that hearing, the immigration judge may redetermine bond, if the alien can establish he is not a flight risk or danger. 8 C.F.R. § 236.1; 8 C.F.R. § 1003.19. The alien may then appeal that determination to the BIA. 8 C.F.R. § 236.1. And the alien may seek additional custody redeterminations before immigration judges under existing regulations. 8 C.F.R. § 236.1; 8 C.F.R. § 1003.19(e).

Petitioners ask that an alien already determined by an immigration judge to be a flight risk or danger would be given a second bond hearing – just a few months or even weeks after his or her first bond hearing, and possibly while the alien's appeal of the immigration judge's custody decision is on appeal to the BIA – at which the burden suddenly shifts to the government under the heightened standard of proof proposed by Petitioners.

Nothing in the Constitution requires this absurd result. Aliens detained under section 1226(a) receive individualized determinations of flight risk and danger, which comport with due process. *Prieto-Romero v. Clark*, 534 F.3d 1053, 1066 (9th Cir. 2008) (alien who received a bond hearing before an immigration judge who considered the factors of flight risk and danger under *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (2006), "has already received an individualized determination of the governmental interest in his continued detention by a neutral decisionmaker"). And such aliens may be granted subsequent bond hearings upon a showing that "circumstances have change materially since the prior bond redetermination." 8 C.F.R. § 1003.19(e). Moreover, Petitioners have made no effort to argue that the discretionary bond hearing in any way fails to comport with due process in

29

determining whether an alien is a flight risk or danger for the purposes of continuing detention *after* bond has been denied.  This Court must give substantial deference to the implementation of the discretionary authority conferred by Congress under section 1226(a).  *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).

Moreover, nothing in either *Casas* or *Diouf* compels this additional bond hearing for section 1226(a) detainees.  As discussed above, *Casas* was, as the Ninth Circuit itself noted, limited to the issue of whether aliens seeking judicial review of a final order were entitled to bond hearings when the alien had not previously been afforded a bond hearing.  535 F.3d at 950.  Similarly, *Diouf* addressed post-order detention and concluded that while aliens detained under section 1231(a)(6) who have a petition for review pending and a stay of removal could be detained for 180 days under that statute without a bond hearing, the alien in *Diouf* had not previously been given a bond hearing.  634 F.3d at 1084-85.  This Court cannot accept Petitioner's argument that *Casas* and *Diouf* may be stretched to require additional bond hearings for aliens already entitled to bond hearings – indeed, potentially multiple bond hearings – under section 1226(a).  Apart from relying on those inapposite decisions, Petitioners make no due process argument why section 1226(a) aliens are entitled to bond hearings above and beyond the bond hearings they are now entitled to under the law.[24]

---

[24] Petitioners also claim that the section 1231(a)(6) subclass – a class of aliens who come into existence only after a removal order becomes administratively final – are also entitled to bond hearings after six months detention under that statute.  They are already entitled to such hearings under *Diouf* if they have a petition for review pending and stay of removal in place or, if no stay of removal is in place, they are subject to the *Zadvydas* standards and 8 C.F.R. § 241.13 and not subject to this class action.  634 F.3d at 1084.  It is unclear how this Court could order bond hearings to which section 1231(a)(6) detainees are already entitled or for which another custody framework applies.

30

III.  **THE UNIFORM CLASS-WIDE RELIEF PETITIONERS SEEK –
BOND HEARINGS FOR ALL ALIENS DETAINED FOR SIX MONTHS
– IS NOT REQUIRED BY TRADITIONAL NOTIONS OF DUE
PROCESS**

A.  **Due process is a flexible concept that turns on the facts and
circumstances of an individual case, and rejects the kind of bright-
line rule Petitioners seek.**

It is a bedrock legal principle that due process does not lend itself to fixed
bright-line rules that apply regardless of the facts and circumstances of an individual
case.  It is now firmly established that "'due process,' unlike some legal rules, is not a
technical conception with a fixed content unrelated to time, place and circumstances."
*Gilbert v. Homar*, 520 U.S. 942, 930 (1997); *Orloff v. Cleland*, 708 F.2d 372, 378 (9th
Cir. 1983) (same).  "The precise procedural protections of due process vary,
depending upon the circumstances, because due process is a flexible concept
unrestricted by any bright-line rules."  *Steinert v. Winn Group, Inc.*, 440 F.3d 1214,
1222 (10th Cir. 2006).  In determining what process is due, the court must take into
account the particular facts and circumstances, as the need for procedural safeguards
varies with the situation.  *See, e.g.,Cafeteria Workers*, 367 U.S. at 895 ("Nature of due
process negates any concept of inflexible procedures…"); *Morrisey*, 408 U.S. at 481.

In cases where an individual challenges the length of confinement, courts
regularly eschew bright-line rules demarking the constitutionality of continued
detention based solely on a temporal standard:  "[D]ue process places no bright-line
limit on the length of pretrial detention.  While length of detention is obviously a
central focus of our inquiry, the due process limit on the duration of preventive
detention requires assessment on a case-by-case basis."  *United States v. Briggs*, 697
F.3d 98, 101 (2d Cir. 2012).

This is also true in cases involving immigration detention.  As Respondents
have previously noted to this Court, two circuits presented with the same position
Petitioners' take here – that *all* detention beyond six months, regardless of individual
facts and circumstances, raises constitutional concerns – have concluded that the

31

constitutionality of detention under section 1226(c) cannot be measured solely by reference to a temporal standard in any individual case. Instead, those courts have concluded that due process requires an examination of the individual facts and circumstances attendant to any individual case of detention. *See Ly v. Hansen*, 351 F.3d 263, 271-73 (6th Cir. 2003) (rejecting a six-month rule, concluding that "[a]bright-line time limitation . . . would not be appropriate for the pre-removal period" because "an easily administrable bright-line rule cannot be based on time, given the inevitable elasticity of the pre-removal period"); *Diop v. ICE/Homeland Security*, 656 F.3d 221, 234 (3d Cir. 2012) (declining "to adopt such a one-size-fits-all approach" because the constitutionality of detention under section 1226(c) "is a fact-dependent inquiry requiring an assessment of all of the circumstances of any given case.").[25]

**B.    *Diouf* does not compel the result in this case.**

As they have throughout this case, Petitioners rely heavily on the Ninth Circuit's decision in *Diouf* as the linchpin for their argument that *all* immigration detention beyond six months, regardless of the facts and circumstances, raises constitutional concerns.[26] But the holding in *Diouf* cannot be stretched to every

---

[25] Even before the Third Circuit issued its decision in *Diop*, district courts also rejected the restricted view that the constitutionality of detention under section 1226(c) is determined solely by the length of detention. "[T]here is no expression of Congress's doubts as to the constitutionality of detention of deportable criminal aliens for more than six months," and "[a] bright-line rule, and likely even a rule based solely on whether detention is 'prolonged,' run the risk of ignoring …consideration[]" of "relevant factors beyond the length of detention …" *Alli v. Decker*, 644 F. Supp. 2d. 535, 542-43 (M.D. Pa. 2010), *reversed and remanded on other grounds*, 650 F.3d 1007 (3d Cir. 2011); *see also Flores-Powell v. Chadbourne*, 677 F. Supp. 2d 455 (D. Mass. 2010) (citing the Sixth Circuit's rejection of a bright-line rule based solely on length of detention).

[26] Undermining Petitioners' argument that *Diouf* is a case of constitutional interpretation is the fact that at the oral argument on the appeal from this Court's preliminary injunction, Petitioners took the position that *Diouf* was a case of statutory

*(Footnote continued)*

circumstance in which an alien has been detained for 180 days. The Ninth Circuit's conclusion in *Diouf* that detention under section 1231(a)(6) beyond 180 days raises constitutional concerns has to be understood in the facts and circumstances in that case. *Diouf* considered the detention of aliens ordered removed and detained under the discretionary detention authority of section 1231(a)(6), but whose removal was stayed pending a determination of a petition for review by the Ninth Circuit. 634 F.3d at 1083-86. Indeed, the fact that the statute in *Diouf* applies to aliens in discretionary detention was critical to the Ninth Circuit's decision in that case because the court applied constitutional avoidance to read a bond hearing requirement into the discretionary statute. *Diouf*, 634 F.3d at 1086. Because section 1231(a)(6) is a discretionary detention statute, the Ninth Circuit examined and compared the due process interests of section 1231(a)(6) detainees with those of section 1226(a) detainees also seeking judicial review after a final order, the situation addressed in *Casas*, and found "no basis for withholding from aliens detained under section 1231(a)(6) the same procedural safeguards afforded to aliens detained under section 1226(a)." *Diouf*, 634 F.3d at 1086. At the same time, the Ninth Circuit in *Diouf* was not faced with a congressional interest in mandatory detention to weigh in the due process calculus, as the Supreme Court did in *Demore*. Moreover, both *Casas* and *Diouf* involved and cabined their decisions to essentially the same groups of aliens: aliens seeking judicial review with a concomitant stay of removal after the administrative process had been completed.

By contrast, aliens detained under sections 1225(b) and 1226(c) fall into two decidedly different categories of aliens in removal proceedings, and each category has received different constitutional consideration based on either their immigration status as arriving aliens or as criminal aliens posing substantial concerns of flight risk and danger. While the discretionary detention statutes at issue in *Casas* and *Diouf* are in

---

interpretation, not constitutional interpretation. *See* Oral Argument, available at http://www.ca9.uscourts.gov/media/view.php?pk_id=0000010460.

many ways similar to each other, they are decidedly dissimilar from the mandatory detention sections 1226(c) or 1225(b), which were designed to serve specific statutory purposes with respect to concerns posed by two specific classes of aliens – pre-order criminal and arriving aliens – which also stand in a procedurally dissimilar position from the aliens in *Casas* and *Diouf*.  Petitioners' broad assertion that the due process analysis applicable to one group of aliens standing outside the administrative process under similar circumstances (the *Casas* and *Diouf* aliens) must be applied whole cloth to two other different groups of aliens (arriving aliens and criminal aliens) detained on a pre-final order basis, in starkly different procedural positions, under different statutes, ignores the command that due process must be dependent upon the facts and circumstances of an individual case.

Apart from the differences between the aliens and the constitutional treatment they have been given, neither *Casas* nor *Diouf* supports a six-month bright-line rule under either section 1225(b) or 1226(c).  The *Diouf* Court cited *Zadvydas*, *Casas*, and, to a lesser extent, *Demore*, in concluding that detention becomes prolonged at six months under section 1231(a)(6).  634 F.3d at 1091.[27]  But those cases do not support the adoption of a six-month rule in the context of mandatory pre-order detention, regardless of the governmental interests at stake, and regardless of the facts of an alien's case.

*Zadvydas* does not support a six-month rule in a pre-order context, particularly when the *Zadvydas* Court stated that detention beyond six months does not raise constitutional concerns unless and until removal is no longer reasonably foreseeable.  533 U.S. at 701.  Although *Zadvydas* declared post-order detention to be presumptively constitutional up to six months, and constitutional beyond that presumptive period so long as removal remained reasonably foreseeable, *Zadvydas*

---

[27] Even then, the Ninth Circuit's 180-day rule in *Diouf* is rebuttable on a showing that the alien's removal is "imminent."  *Diouf*, 634 F.3d at 1091-92.  Petitioners' proposed order gives no leeway for the government to show any facts or circumstances why continued detention is, in fact, constitutional.

34

considered indefinite detention and in no way suggested that pre-order detention

beyond six months raises any constitutional concerns.  There the question concerned

whether continued detention would facilitate removal, the purpose of 8 U.S.C. § 1231

under which the alien was detained, when there was no judicial impediment to

removal.  The Supreme Court concluded that in determining when to continue

detention, it was "practically necessary to recognize some presumptively reasonable

period of detention," specifically six months.  533 U.S. at 701.  The Supreme Court

determined that "[a]fter this 6-month period, once the alien provides good reason to

believe that there is no significant likelihood of removal in the reasonably foreseeable

future, the government must respond with evidence sufficient to rebut that showing."

*Id.*  Thus, *Zadvydas* raised the possibility that detention beyond six months with a

final order of removal *could* raise constitutional concerns, but it expressly rejected the

notion that detention of 181 days or longer *per* se raised constitutional concerns.

Instead, the constitutionality of detention was tied to the factors of an alien's

individual case, and constitutional concerns are raised only when the facts of a case

show that the alien's removal is not reasonably likely in the foreseeable future.[28]

Thus, *Zadvydas* directly contradicts the argument that the constitutionality of

_____

[28] Nor does *Demore* provide a basis for adopting a six-month rule.  In *Demore*, the
Supreme Court upheld the mandatory detention of the alien challenging his detention
pursuant to section 1226(c), even though he had been detained *longer than six months*.
*Demore*, 538 U.S. at 530-31.  Even if this Court could conclude from *Demore* that the
Court understood "prolonged" detention to raise constitutional concerns *Demore* does
not stand for the proposition that at a specific, predetermined time detention becomes
irrefutably unconstitutional.  *Demore* did not suggest that the length of removal
proceedings is in and of itself a touchstone of constitutionality.  The *Demore* Court's
reference to a five-month "average" length of detention was cited by the *Demore*
Court to show that detention during removal proceedings, unlike the post-order
detention at issue in *Zadvydas*, is not potentially indefinite.  *Demore*, 538 U.S. at 529.
Moreover, by referring to the "average" length of detention the Court tacitly
acknowledged that some removal proceedings would last longer than five months, and
yet *Demore* does not separately or differently address the constitutionality of detention
that lasts longer than the "average."

detention for all aliens regardless of individual facts turns on a particular point in detention.

### C.    A six-month, bright-line rule ignores practical considerations and individual factual circumstances.

 Courts rejecting a temporal benchmark as the *sole* criterion for the determination of the constitutionality of detention without a bond hearing have concluded that such a standard ignores the practical considerations in any given case. As the Sixth Circuit observed, "hearing schedules and other proceedings must have leeway for expansion or contraction as the necessities of the case . . . warrant." *Ly*, 351 F.3d at 271; *see also, e.g.*, *Gonzalez-Galindo*, No. 10CV1875, 2010 WL 4977023 at *3 (S.D. Cal. Dec. 1, 2010) (holding 12-month detention reasonable where alien "sought a change of venue early in the proceedings and has challenged his removal by filing an application for cancellation of removal").

 A six-month rule ignores the possibility that aliens can prolong their removal proceedings and consequently their detention regardless of agency diligence – a fact noted in *Demore*. 538 U.S. at 530 n.14 ("Prior to the enactment of § 1226(c), when the vast majority of deportable criminal aliens were not detained during their deportation proceedings, many filed frivolous appeals in order to delay their deportation."). Indeed, in this Circuit, immigration judges generally must grant a continuance at the alien's request for good cause. *See Ahmed v. Holder*, 569 F.3d 1009, 1014-15 (9th Cir. 2009); 8 C.F.R. § 1003.29. Consequently, aliens may easily circumvent detention pursuant to section 1226(c) by filing continuances until the six-month threshold is reached.

 Evidence adduced in this action bears this out. In the course of discovery, Respondents produced over 1,000 administrative files – or A-Files – of aliens detained within the Central District during a one-year period from April 2010 to April 2011. Atkinson Decl. ¶ 2. Also produced with respect to these aliens were electronic database records maintained by ICE and by EOIR, which oversees the immigration courts, including the Los Angeles immigration courts. *Id.*

Dr. Chester I. Palmer, an expert in statistical analysis retained by Respondents, reviewed an EOIR database table that identifies the dates of scheduled hearings and, if the hearing was continued, the reason for the continuance or "adjournment." Exh. O (identifying portions of Dr. Palmer's deposition in which he identifies his expert report), and Exh. P (Dr. Palmer's Expert Report ("Palmer Report")).[29] Dr. Palmer's report shows that aliens within the studied group, in high numbers, request one or more continuances within the first six months of their removal proceedings.

Specifically, Dr. Palmer's analysis shows that of the studied aliens, 86.9% requested at least one continuance, and over half of them requested three or more continuances during their removal proceedings. Palmer Rep. at 2, 10. If the analysis is limited just to the first six months of the studied aliens' detention, the data shows that 84.7% of aliens request a continuance during the first six months of their custody, and nearly two-thirds of those aliens – 66.2% – requested two or more continuances within the first six months of their custody. Palmer Rep. at 2, 11.

An alien's request for multiple continuances has the effect of delaying proceedings significantly. In analyzing the length of delays caused by continuances in just the first six months of detention, Dr. Palmer determined that for aliens requesting at least one continuance during the first 180 days of their detention, the total resulting delay varied between 6 days to 269 days. Palmer Rep. at 2, 13. For the 84.7% of aliens who sought at least one continuance during their first 180 days of detention, the average delay attributable to those continuances accounted for over half of the 180 days. *Id.* (reporting that the average number of days added to the length of

_____

[29] Adjournments are recorded in the EOIR database according to a particular code available to court personnel. That reasons for continuance associated with each code was also produced in discovery. *See* Declaration of Benjamin McDowell, and Exhibit B thereto, at ¶ 3.

proceedings as a result of alien-requested continuances was 105.9 days, with a median delay of 101 days).[30]

What Dr. Palmer reported is what courts in *Ly*, *Diop*, *Alli*, and other cases – and what the Supreme Court in *Demore*, 538 U.S. at 530 n.14 – recognized:  that aliens may take steps that serve to lengthen their removal proceedings, and commensurately, their detention.  A six-month rule ignores this fact, and assumes that detention beyond six months raises constitutional concerns, even when an alien's multiple requests for continuances – to obtain counsel, to obtain new counsel, to file an application for relief, to raise new defenses well into proceedings, or for other reasons – result in the length of removal proceedings beyond six months irrespective of any cause for delay attributable to the government.

Moreover, in hand-selecting anecdotal cases from among the hundreds of A-Files produced in this action,[31] Petitioners have chosen to ignore cases where the

---

[30] Dr. Palmer also questions in his reports the method by which Dr. Long reached some of her calculations, and Respondents note that some of Dr. Long's calculations reported in Petitioners' memorandum are also inconsistent from what she reports in her expert report.  *See* RSOF ¶¶ 4-5; 19-32.  *See* also Exhs. O through R.

[31] Much of the declaration of Ahilan Arulanantham, lead counsel for Petitioners, contains what Petitioners purport to be "summaries" of A-File materials produced in this action.  Respondents are separately filing objections to much of that evidence, but it is instructive to note in this brief that of the hundreds of files produced, Mr. Arulanantham reviewed 210 of them, and only fully reviewed 25 of them.  ECF No. 281, Arulanantham Decl. ¶ 16.  From those 25 A-Files, Petitioners selected only certain materials to provide "color and background" for their arguments.  Moreover, the Arulanantham declaration summaries are not the kind of summaries contemplated by Fed. R. Evid. 1006, but rather are narrative descriptions that characterize, or more accurately, mischaracterize, many of the facts in those materials.  *See* Objections (contemporaneously filed) at 21-26.  The notion of lead litigation counsel offering narrative descriptions of the contents of A-Files as evidence raises inherent questions of credibility and admissibility.  Fed. R. Evid. 1006 suggests that a summary admitted under that rule "will have been prepared by a witness available for cross-examination, not by the lawyers trying the case."  *United States v. Grajales–Montoya*, 117 F.3d 356, 361 (8th Cir.1997) (reasoning that Fed.R.Evid. 1006 does not allow for the admission of a summary prepared by a lawyer trying the case that restates and distills

38

*(Footnote continued)*

individual facts and circumstances weigh against a finding that a particular alien's detention beyond six months violates due process. For example, Petitioners have highlighted anecdotal evidence where an alien has obtained relief from removal, but do not point out that their own expert concluded that approximately two-thirds of aliens in the class did not receive relief from removal. *See* ECF 281-6, Long Decl., Exh. A thereto, at 8 (reporting that 35% of immigration judges granted relief from removal in the studied cases).

The six-month rule Petitioners seek runs directly counter to the flexibility and case-by-case considerations fundamental to any due process analysis. Nothing in the principles of due process or the jurisprudence examining due process require a broad, one-size-fits-all rule. This Court cannot grant Petitioners the relief they seek and should grant summary judgment to Respondents on Petitioner's statutory and constitutional claims.

## IV.    THERE IS NO LEGAL BASIS FOR PETITIONERS' REQUESTED MODIFICATIONS TO *CASAS* HEARINGS

In addition to seeking bond hearings for class members at the 180-day mark, Petitioners seek an extensive list of changes to *Casas* hearings and bond hearing procedures without providing any legal basis for those requested changes. Instead, Petitioners appear to assert an opinion that these changes should be incorporated out of a basic sense of fairness. Pet. Mem. at 15. Petitioners may appropriately convey that view to the political branches of government, not the judiciary. *See, e.g.*, *Arizona*, 132 S.Ct. at 2498 (noting that "[t]he federal power to determine immigration policy is well settled."); *Fiallo*, 430 U.S. at 792 ("it is important to underscore the limited scope of judicial inquiry into immigration legislation"); *Galvan v. Press*, 347 U.S. 522, 531 (1954) (explaining that the formulation of "[p]olicies pertaining to the entry of aliens and their right to remain here … is entrusted exclusively to Congress.");

other properly admitted exhibits). Accordingly, the Arulanantham Declaration and related A-File exemplars, while voluminous, must be given no weight by this Court.

*Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.").

One group of Petitioners' proposed modifications would require immigration judges to consider factors far beyond flight risk and danger by requiring them to assess, relatively early in the removal process: (1) whether the alien is ultimately removable under *Zadvydas* – a claim not raised in Petitioners' Third Amended Complaint, but improperly raised for the first time on summary judgment – a constitutional issue left to federal courts in their habeas jurisdiction and a factor that cannot be adequately assessed until the government begins to take steps to remove the alien; (2) the length of an alien's past and future detention, a wholly superfluous factor under Petitioners' own constitutional theory (if the length of detention compels a heightened hearing on flight risk and danger, then why must length of detention be of any further consideration at a bond hearing on flight risk and danger?), and one that requires immigration judges to speculate as to the likelihood of the alien's success and the course of proceedings; and (3) the availability of alternatives to detention, which would require immigration judges to order release on terms well outside their statutory and regulatory jurisdiction, and would largely transfer programmatic decision-making from the authority of ICE and its officers and into the hands of immigration judges. This Court should deny Petitioners' motion for summary judgment, and grant summary judgment to Respondents on each of these claims.

The Court should also reject Petitioners' request that the Court order Respondents to provide notice of eligibility for *Casas* hearings in "plain language," and also order Respondents to provide *Casas* hearings every six months. Aliens eligible for bond hearings already receive written notice, and Petitioners' evidence

that "many" aliens do not understand the plain language of those notices is both
unpersuasive and contradicted by other evidence. Petitioners' claim that due process
requires Respondents to provide a *Casas* hearing *every six months* must be denied
because it is not a part of Petitioners' claims in this action, and was only raised for the
first time on summary judgment. Moreover, there is no due process basis to conclude
that aliens are entitled to multiple bond hearings once an immigration judge has
concluded that an alien poses a flight risk or danger substantial enough to deny bond.
In any event, aliens may, under existing regulations and policies, request additional
bond hearings without this Court's intervention. This Court should grant summary
judgment to Respondents on each of these claims.

> **A.   Due process does not require immigration judges to consider an
> alien's ultimate removability under the standard set forth in
> *Zadvydas* during removal proceedings, and it would be
> practically impossible for immigration judges to properly
> consider that factor as a threshold matter.**

Petitioners seek an order requiring immigration judges to consider whether an
alien is significantly likely to be removed to his home country in the reasonably
foreseeable future after being ordered removed – a standard set forth in *Zadvydas* in
assessing the legality of indefinite *post-order* detention. Petitioners' claim that the
Constitution requires judges to consider ultimate likelihood of removal is a claim
raised for the first time on summary judgment and should be rejected. However, even
if the Court does not reject Petitioners' untimely amendment, the Court should grant
summary judgment to Respondents on this claim. Requiring immigration judges to
consider ultimate removability is not compelled by due process, takes a habeas issue
out of the hands of federal courts and puts it in the hands of immigration judges,
creates a conflict of burden within the bond hearing process itself, and raises practical
obstacles that cannot be overcome.

First, Petitioners did not claim that due process requires immigration judges to
consider ultimate removability until they filed their motion for summary judgment.
That claim is not found in their Third Amended Complaint. *See* ECF No. 111 ¶¶ 120-

41

27.  Despite having more than four years to amend their Complaint to make this claim, Petitioners did not raise this claim until after the close of discovery, and only then for the first time on summary judgment.   As a result, Respondents have not had ample opportunity to investigate that claim.  When issues are raised in opposition to a motion for summary judgment that are outside the scope of the complaint, the court construes the matter raised as a request pursuant to Rule 15 of the Federal Rules of Civil Procedure to amend the pleadings out of time.  *See Apache Survival Coalition v. United States,* 21 F.3d 895, 910 (9th Cir. 1994).  The court should deny the amendment where, as here, the amendment is prejudicial to the opposing party, expands the scope of the complaint, or materially affects court-imposed deadlines. *See Zivkovic v. S. Cal. Edison Co.,* 302 F.3d 1080, 1087 (9th Cir. 2002); *see also Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1051 (9th Cir. 2003) ("[T]he consideration of prejudice to the opposing party . . . carries the greatest weight."). Accordingly, this Court should reject Petitioners' untimely effort to amend its Complaint.

Second, requiring immigration judges to consider an alien's ultimate removability is not compelled by due process.  Petitioners argue that the Ninth Circuit has already determined that an alien may challenge whether he is subject to potentially indefinite detention under the *Zadvydas* standard, citing *Owino v. Napolitano*, 575 F.3d 972 (9th Cir. 2009).  However, *Owino* does not support Petitioners' claim, for several reasons.  As a matter of timing, the question of ultimate removability did not arise early in removal proceedings, but after the administrative process had been completed and after judicial review was sought.  *Owino*, 575 F.3d at 955 (the alien's case had been through removal proceedings, but was remanded by the Ninth Circuit for a determination of whether he was entitled to relief under the Convention Against Torture).  Nor did the Ninth Circuit come close to suggesting that the issue before it must be decided by an immigration judge on remand to the immigration courts. Instead, the Ninth Circuit remanded the issue of whether Owino was ultimately removable to the district court – not to an immigration judge – in accordance with

42

*Zadvydas*, 533 U.S. at 699 (instructing that a habeas challenge to indefinite detention rests with the district court under a habeas proceeding). *Owino* instructs that the constitutional question of whether an alien faces a significant likelihood of removal in reasonably foreseeable future – the standard set forth by *Zadvydas*, 533 U.S. at 701 – is a question for a district court in a habeas proceeding, as contemplated by *Zadvydas*, and not an issue for an immigration judge. Thus, *Owino* dramatically undercuts Petitioners' argument.

Third, requiring immigration judges to consider ultimate removability would create a conflict in the standards of burden between *Casas* hearings and that established in *Zadvydas*. After establishing a presumptively constitutional period of detention as the government pursues removal, *Zadvydas* held that an alien could be detained beyond six months as long as there was a significant likelihood of removal in the reasonably foreseeable future. 533 U.S. at 701. Under *Zadvydas*, the Supreme Court placed the burden of showing that the alien faced indefinite detention (*i.e.*, that the alien was not significantly likely to be removed in the reasonably foreseeable future ) squarely on the alien, not the government. *Id.* ("*once the alien* provides good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future…") (emphasis added). However, under Petitioners' proposed order, the burden of proof at the type of bond hearing they seek would be placed on the government, not the alien. This directly conflicts with *Zadvydas*.

Fourth, requiring immigration judges to consider the ultimate likelihood of removal at a bond hearing relatively early in removal proceedings poses enormous practical problems that cannot be overcome. As the Supreme Court noted in *Zadvydas*, and as other courts recognize, whether an alien is likely to be removed will turn on whether there is a legal impediment to removal, and that question often turns on whether DHS can obtain travel documents and related papers for the alien's removal. *Zadvydas*, 533 U.S. at 700 (noting that courts "must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS

43

efforts to" remove aliens ordered removed); *see also, e.g., Owino*, 386 F. App'x at 639 ("Kenya's refusal to provide travel documents without Owino's consent while immigration proceedings remain pending is not evidence that Kenya will prove intransigent should Owino fail to establish entitlement to CAT relief and become subject to a final order of removal.").  However, that process cannot be started until the alien has been ordered removed and there are no judicial impediments to removal. Obtaining a travel document typically requires an alien to submit to a consular interview with consular officials from the country of removal, and requires ICE to present the government of the country of removal with a final order.  *See, e.g., Owino*, 386 F. App'x at 639; *Ousmane v. Clark*, No. C09-1167-JLR, 2010 WL 97816, *1-2 (W.D. Wash. Jan. 11, 2010) (describing typical process involved in obtaining travel documents).  Thus, the government's ability to remove an alien involves a series of steps requiring interaction with foreign governments, a process that cannot begin until a final order is in hand.  For this reason, immigration judges would be unable to accurately assess whether an alien is significantly likely to be removed because until a final order is obtained, immigration judges necessarily lack the travel document and other information required to weigh ultimate removability as a factor in a pre-order setting.

Petitioners do not even address these practical obstacles.  Instead, Petitioners assert that some aliens are natives and citizens of countries to which they cannot be returned.  Pet. Memo at 16.  Petitioners cite Vietnam, Cambodia, and Somalia as countries to which aliens from those countries cannot be returned.  That assertion is plainly incorrect.  As the most recently available public records show, ICE has removed hundreds of aliens to these countries.  *See* Exh. S, 2011 Yearbook of Immigration Statistics, office of Immigration Statistics, Department of Homeland Security, at 103-105 (showing that there were 64 removals to Cambodia between 2009 to 2011; 59 removals to Somalia during that same period; and 2,080 removals to Vietnam during that same period).

While it is true that *some* individuals may ultimately not be removed to the country of origin, it is not true of all aliens – nor of all Vietnamese aliens, or all Cambodian aliens, or all Somali aliens. As the Supreme Court recognized in *Zadvydas*, governmental efforts to repatriate aliens takes time and involves sometimes delicate negotiations with foreign governments. It is for this reason that *Zadvydas* created a presumptively constitutional period of post-order detention for six months – a presumption that Petitioners' proposed order would sweep away. Moreover, even if certain countries present difficulties regarding return, statutory and regulatory provisions permit immigration judges to designate a different country for removal under certain circumstances. *See* 8 U.S.C. § 1231(b)(2)(D); 8 C.F.R. 1208.4(a)(6). This is why Judge Fong, testifying in this action, stated that consideration of ultimate removability at bond hearing "would be premature." Exh. C, Fong Dep. 50:2-50:14. At the bond hearing stage, the proceedings are still pending, and an immigration judge has not yet found removability, let alone relief. Fong Dep. 50:17:-50:18. As Judge Fong testified, for an immigration judge to assume, at a bond hearing stage, "that the government may or may not be able to [re]move the individual would be … presumptuous." Fong Dep. 50:19-50:22.

For these reasons, this Court should not require immigration judges to determine, "as a threshold matter," Pet. Memo at 29, that an alien ultimately is removable or not based on facts that will not be – and cannot be – before the immigration judge at that hearing, under a standard different from that established in *Zadvydas*, and at a procedural stage where such a determination would amount to guesswork.

**B.    Due process does not require immigration judges to consider length of detention at bond hearings.**

Due process does not require that immigration judges consider length of detention at *Casas* hearings, nor does Petitioners' claim that length of detention must be considered make any sense.

45

As noted above, immigration judges are required by statute, regulation, and BIA precedents to consider factors related to flight risk and danger, and federal courts have not second-guessed the scope of that inquiry. Significantly, Petitioners do not contend that the length of detention – past or future—has any bearing at all on factors of flight risk or danger. Instead, Petitioners insist that past and future length of detention must be considered because of the "importance of the length of detention *in the due process analysis*." Pet. Memo at 33.

Even if the length of detention is a factor in a *due process analysis*, that only means that length of detention is a factor in determining, under due process, whether bond hearings are required *in the first instance*, and is not a factor that must be considered at the bond hearings themselves. *See* cases cited at Pet. Memo at 33. Petitioners' own case citations on this point underline the distinction. In no case cited by Petitioners has any court found that the length of detention is a factor *at* a bond hearing on flight risk and danger (as opposed to a factor in determining *whether* there must be a bond hearing on flight risk and danger). There is no due process requirement that immigration judges consider anything other than flight risk and danger at a bond hearing, and Petitioners cite nothing to the contrary.

Tellingly, Petitioners make no effort to explain why length of detention would be relevant at a bond hearing. Nor would it be. If an immigration judge, properly applying the *Guerra* factors, determines that the alien is a flight risk or danger based on the evidence presented, then the only way length of detention would have any bearing on the bond decision is if it served as a factor mitigating an otherwise valid determination that an alien is a flight risk or a danger. Due process does not require immigration judges to give less weight to findings of flight risk and danger based on an alien's unrelated detention length. And Petitioners cannot point to a single case to the contrary.

**C.    Due process does not require immigration judges to consider alternatives to detention.**

This Court should also reject Petitioners' request for an order requiring judges to consider the least restrictive alternatives to detention.  Courts have long recognized that the range of bond remedies provided under 8 U.S.C. § 1226(a) – release on bond or release on recognizance or other conditions – is constitutionally adequate, and subject to limited judicial review.  *See, e.g., Prieto-Romero*, 534 F.3d 1043, 1067 (9th Cir. 2008) (finding that there is no basis to challenge an immigration judge's bond or custody determination, properly made, in a habeas proceeding).  Indeed, Petitioners cite to no decision in which any court in this circuit or elsewhere has concluded – or even questioned – whether the bond authority wielded by immigration judges is insufficient.

The regulations make clear that an immigration judge's authority occurs after the initial custody determination by DHS.  8 C.F.R. § 1236.1(d)(1).  The provision of 8 C.F.R. §§ 1236.1 is quite specific in setting forth the respective authorities of the Attorney General and DHS.  While 8 C.F.R. § 1236.1(c)(8) provides that an officer authorized to issue a warrant of arrest may release an alien not subject to mandatory detention under section 1226(a)(2) and (3), 8 C.F.R. §1236.1(d) provides that an immigration judge may ameliorate the conditions of release set by DHS.  Nowhere do the regulations governing custody determinations provide for the immigration judge to set initial conditions of release as opposed to reviewing or modifying conditions already set by DHS.   "[T]he jurisdiction of the Board and the Immigration Judge is limited by statute and regulation to that which has been delegated by the Attorney General."  *Matter of G-K-,* 26 I. & N. Dec. 88, 93 (BIA 2013) (citing cases).  Both the immigration judge and the BIA exercise limited authority that is dependent upon the Attorney General's delegation.  *See* 8 C.F.R. § 1003.1(h).  Section 1226(a) merely gives an immigration judge the authority to grant bond after concluding, in the exercise of broad discretion, that the alien's release on bond is warranted.  An immigration judge is not an enforcement officer and does not possess an arsenal of

47

enforcement tools unless specifically authorized by statute or regulation.  *See Matter of Wong*, 13 I. & N. Dec. 701 (BIA 1971).  Thus, although immigration judges are delegated authority to review and "ameliorate" conditions set by DHS, they are not delegated the authority to "impose" conditions in the first instance, including alternatives to detention.  *Compare* 8 C.F.R. § 236.1(c)(8) (officers who can issue warrants of arrest can impose conditions under section 1226(a)(2) and (3), *see also* 8 C.F.R. § 236.1(b), 287.5(e)(3)) *with* 8 C.F.R. § 236.1(d)(1) (immigration judges can detain, release, determine bond, and ameliorate the conditions set initially by DHS if the request is made within 7 days).

The prime driver behind Petitioners' argument for the consideration of alternatives to detention is a discussion of the Bail Reform Act.  Pet. Memo. at 35-36.  But the Bail Reform Act's requirements of federal judges making pre-trial bail determinations in a criminal context derive from statute, not from a due process analysis.  What is required by statute is not necessarily required by due process.  To the extent Petitioners make a due process argument, it is that preventative detention is only constitutional where there are no conditions of release that will reasonably ensure against flight risk or danger if the individual is released.  That does not mean that due process requires immigration judges to consider the least restrictive means to protect against flight or danger.  Again, Petitioners cite no authority for their view that bond determinations are unconstitutional unless the immigration judge has considered existing alternatives to detention.

Petitioners' flawed due process analysis is not advanced by their citation of the success rate of ISAP II, because ISAP II was not designed for, and is not used on, criminal offenders subject to mandatory detention or arriving aliens.  Petitioners' citation of Eric Saldana's deposition testimony discussing the ISAP II success rate is conveniently unaccompanied by his later testimony that Petitioners cannot apply that

success rate to criminal offenders subject to mandatory detention or arriving aliens.[32]

Petitioners overlook some basic limitations on the use of ISAP II with arriving aliens

and serious criminal aliens, as discussed by DHS officials at deposition in this case.

First, as explained in public documents describing the program, ISAP II is

designed for aliens who are detained under section 1226(a), and who pose relatively

low-level risks of flight or danger.  *See* Exh. K (ISAP II Participant's Handbook).

Unlike the types of serious offenses that place an alien within one of the section

1226(c) categories, ISAP II is used in cases where the types of offenses an alien has

committed are, as Assistant Field Office Director Eric Saldana described them,

"lower-range crimes," such as driving without a license, drunk in public, and other

relatively non-serious offenses.  Exh. B, Saldana Dep. 118:21-119:8.  Petitioners' bald

assertion that ISAP II will have similar success rates with serious criminal offenders

who face removal (and who Congress has already determined flee at high rates) is

conjecture.

Second, ISAP II is not designed to work with aliens who have no place of

residence or reliable identification, which is the reason most arriving aliens are denied

parole.  *See* Exh. K; Exh. A, Lee Dep. 36:25-37:11; 123:2-123:15; 134:24-136:17; *see

also* RSOF ¶ 9 (describing lack of reliable identification and lack of willing sponsor

for basis for most parole denials for arriving aliens who have expressed a credible

fear).  As described in public documents and in the deposition of Assistant Field

Office Director Saldana, ISAP II uses a combination of electronic monitoring and

unannounced home visitations, among other strategies.  *See* Saldana Dep. 107:8-

107:18; 120-1-124:16; *see also* Exh. K 3-4 (describing use of electronic monitoring by

ISAP and use of unscheduled home visits as part of each ISAP II program stage).  If

an arriving alien lacks a place of residence, unannounced home visits become

---

[32] And Petitioners' description of success rates of unidentified "alternatives to detention" in a pre-trial criminal context and from two State programs in San Francisco and Texas is hardly persuasive evidence that ISAP II would be effective if applied to serious criminal offenders in an immigration setting.  *See* Pet. Memo at

impossible, as does fitting an alien for an electronic monitoring device.  Petitioners'

arguments fail to address these practical problems, and fail to identify any basis for

this Court to conclude that due process requires immigration judges to consider

alternatives to detention apart from the factors in *Matter of Guerra*, which courts

recognize adequately addresses flight risk and danger.  This Court should grant

summary judgment to Respondents on this claim.[33]

> ### D.  Aliens eligible for bond hearings – either under section 1226(a) generally or under *Casas* and *Diouf* – already receive notice of their eligibility to seek bond hearings before immigration judges.

The written notices aliens receive informing them of their eligibility for a bond

hearing before an immigration judge are constitutionally adequate, and this Court

should reject Petitioners' arguments to the contrary.

It is undisputed that when ICE determines that an alien is subject to

discretionary detention under section 1226(a), the alien receives a written Notice of

Custody Determination indicating that the alien is entitled to seek a custody

redetermination before an immigration judge.  *See* Exh. D (Notices of Custody

Determination); RSOF ¶¶ 1-3.  It is also undisputed that when an alien becomes

eligible for a *Casas* or *Diouf* hearing, and if ICE does not release the alien once the

alien becomes eligible, ICE provides the detainee with a written notice that they are

---

[33] The Court should also reject Petitioners' contention that bond hearings for aliens in a pre-order context should be subject to the same standards as *Casas* or *Diouf* hearings in a post-order context.  As discussed above, those cases address detention once the case is brought before a circuit court for judicial review, and after the alien has been detained for a longer period than in a pre-order context.  Under Petitioners' proposed order, arriving aliens and criminal aliens detained for six months under sections 1225 and 1226(c) – unlike aliens detained under section 1231(a)(6), who likely have been in detention for significantly longer periods – would receive a bond hearing under a heightened standard in which the burden to show flight risk and danger to the community would shift to the Government.  Notably, this standard would be different from the burden used in section 1226(a) bond hearings where the alien bears the burden of proof.  Petitioners cite no case law requiring such a shift in burden and evidentiary standard.

entitled to seek a bond hearing before an immigration judge.  *See* Exh. L (sample *Casas/Diouf* Letters provided by ICE).

These documents provide straightforward notice, in plain language, that the alien is entitled to a bond hearing before an immigration judge.  *See* Exh. D ("You may request a review of this determination by an immigration judge"); Exh. L ("Pursuant to the above-named Ninth Circuit decisions, you may request a review of this determination from an immigration judge").  Although Petitioners complain that these notices are not constitutionally sufficient, Petitioners make no effort to identify why this language results, as they assert, in a "high risk of erroneous deprivation," Pet. Memo at 40, nor do they present persuasive information to support that assertion.

Petitioners cite one case, *Doe v. Gallinot*, 657 F.2d 1017, 1023 (9th Cir. 1981), to argue that the opportunity aliens currently have for bond hearings becomes "illusory" when "detainees cannot realistically be expected to set the proceedings into motion in the first place."  Pet. Memo at 41 (citing *id.*).  *Doe*, however, is completely inapposite.  In that case, the Ninth Circuit rejected the State of California's argument that mentally disabled individuals who wanted to challenge their civil commitment under the specific provisions of a challenged commitment statute could avail themselves of a habeas proceeding in the appropriate court.  657 F.2d at 1019-20.  The Ninth Circuit rejected the State's argument because the individuals who would need to initiate habeas proceedings were "gravely disabled" (defined as "a condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter …"), *id.* at 1019 n.3, and thus could not be expected to have the capacity to initiate habeas proceedings.  *Id.* at 1021-22.  Of course, nowhere do Petitioners provide any evidence that large numbers of aliens eligible for bond hearings and who receive notice of those hearings suffer from "grave disability" that prevents them from being able to provide themselves with basic personal needs.

In an effort to equate section 1226(a) detainees with the "gravely disabled" aliens in *Doe*, Petitioners offer unpersuasive evidence that "ICE's procedures make it

51

very likely that at least *some* individuals who would win release will never have a
meaningful opportunity to seek it."  Pet. Memo at 41 (emphasis added).  They cite two
declarations from immigration attorneys representing detained aliens to show that
"many" aliens are "not proficient in English" or are "illiterate."  Pet. Memo at 41.
Apart from the fact that those declarations may not be considered because they are
from witnesses identified for the first time on summary judgment, long after the close
of discovery,[34] the fact that "some" aliens cannot understand English does not support
the bald conclusion that it is "very likely" that "some" individuals will not understand
the plain notice indisputably provided to them by ICE.  Petitioners also strain to find
constitutional deprivation in the sufficiency of the notices provided on the ground
aliens are detained "often without access" to attorneys or family – a fact that is
undeniably and outrageously wrong[35]  – or because detainees only have "limited
access" to detention facility law libraries – a fact which says nothing about the plain
language of the notices provided.[36]

---

[34] Respondents have contemporaneously filed objections on these and other grounds
to the admissibility of the declaration from Talia Inlender and Byron Merida.

[35] Every detention facility in the Central District has set visiting hours when attorneys
or family may visit with detainees.  Visiting hours are publicly available at
http://www.ice.gov/detention-facilities/.   These visitation hours comply with ICE's
National Detention Standards, which require detention facilities to allow visitation
from family members under flexible conditions, and according to posted visitation
hours.  *See* Exh. T (2008 National Detention Standards, "Visitation,").  Visitation by
attorneys and other legal representatives is subject to an even broader schedule:  Each
facility shall permit legal visitation seven days a week, including holidays, for a
minimum of eight hours per day on regular business days (Monday through Friday),
and a minimum of four hours per day on weekends and holidays.  *Id.*

[36] In any event, detainees have access to law library materials at detention facilities, in
accordance with Exh. V (2008 National Detention Standards, "Law Libraries and
Legal Material".  These standards provide that each detainee shall be permitted to use
the law library for a minimum of five hours per week, and requests for additional time
shall be accommodated to the extent possible, with priority given to detainees facing a
court deadline.  *Id.*  Unrepresented illiterate or non-English speaking detainees who
indicate difficulty with the legal materials must be provided with more than access to
a set of English-language law books.  *Id.*  Detainees may obtain assistance in using the

*(Footnote continued)*

Petitioners also go to great lengths to describe the steps aliens need to take to request a bond hearing, and to understand the procedures for a bond hearing set forth in the Immigration Court Manual – which they concede detainees have access to – as "highly technical language" they must "wade" through. Pet. Memo at 43. However, the language is not "highly technical," *see* RSOF ¶ 36 (quoting immigration court manual). Moreover, this is the same process that any alien requesting an initial custody determination must make, and Petitioners do not suggest that aliens seeking a bond hearing at an initial stage in proceedings are incapable of doing so, and they point to no evidence that substantial numbers of aliens eligible for initial bond hearings under section 1226(a) do not receive them. If this process is adequate for those aliens, then it is difficult to comprehend Petitioners' argument that the same process is "very likely" to confound aliens at a later time, requiring automatic bond hearings in lieu of the current notice aliens receive of their entitlement to request a bond hearing.

Petitioners' request that this Court order automatic bond hearings due to alleged insufficiencies in the plain language of the notices ICE provides aliens stands on shaky due process grounds, and even shakier evidentiary support. The Court should reject Petitioners' arguments and grant summary judgment on this claim to Respondents.

### E. The Court should reject Petitioners' request for periodic *Casas* hearings as untimely and not supported by due process.

Finally, this Court should reject Petitioners' request for an order requiring Respondents to provide *Casas* hearings not just at six months, but every six months of an alien's detention. The Court should grant summary judgment to Respondents on this claim for two reasons.

First, Petitioners did not claim that due process requires periodic *Casas* hearings until they filed their motion for summary judgment. That claim is not found

---

law library and in contacting pro bono legal-assistance organizations from the ICE-provided list. *Id.*

in their Third Amended Complaint.  See ECF No. 111 ¶¶ 120-27.  Despite having more than four years to amend their Complaint to make this claim, Petitioners did not raise this claim until after the close of discovery, and only then for the first time on summary judgment.   As a result, Respondents have not had ample opportunity to investigate that claim.  When issues are raised in opposition to a motion for summary judgment that are outside the scope of the complaint, the court construes the matter raised as a request pursuant to Rule 15 of the Federal Rules of Civil Procedure to amend the pleadings out of time.  *See Apache Survival Coalition*, 21 F.3d at 910.  The court should deny the amendment where, as here, the amendment is prejudicial to the opposing party, expands the scope of the complaint, or materially affects court-imposed deadlines.  *See Zivkovic*, 302 F.3d at 1087; *see also Eminence Capital, LLC*, 316 F.3d at 1051.

Second, in any event, Petitioners' claim is wholly unsupported by any due process analysis or supporting authority.  As discussed above, once an alien has received a bond hearing before an immigration judge to determine flight risk and danger under section 1226(a), an alien ordered detained has no claim that his due process has been violated because he did not receive an additional bond hearing at some later time.  *See Prieto-Romero*, 534 F.3d at 1065-66.  Petitioners cite no authority to support their position.  Instead, they rely on one single incident – which is inaccurately described[37] – in which an alien did not receive a later *parole* determination after being denied the first.  But as Assistant Field Office Director Lee testified, aliens may seek additional parole determinations at any time to present evidence supporting their parole.  Similarly, existing regulations allow aliens detained

---

[37]  Respondents have objected to the Declaration of Ahilan Arulanantham on a number of grounds, including that the declaration is inadmissible as summary evidence under Fed. R. Evid. 1006, that it contains argument and characterization of selected facts, that it contains inadmissible hearsay, and other grounds.  Those objections are being filed contemporaneously with this motion.

54

under section 1226(a) to seek additional bond hearings when their circumstances have changed.  8 C.F.R. § 1003.19(e).

Because Petitioners' "periodicity" claim is untimely, and because due process does not require that aliens receive multiple bond hearings on their flight risk and danger, this Court should grant Respondents summary judgment on this claim.

## <u>CONCLUSION</u>

For the reasons set forth above, this Court should deny Petitioners' motion for summary judgment and enter the accompanying proposed order granting Respondents summary judgment on each claim set forth in the Third Amended Complaint.

Date: March 15, 2013          STUART F. DELERY
Acting Assistant Attorney General
Civil Division
DAVID J. KLINE
Director, Office of Immigration Litigation
District Court Section
*/s/ Theodore W. Atkinson*
THEODORE W. ATKINSON
United States Department of Justice
Office of Immigration Litigation,
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Phone: (202) 532-4135
theodore.atkinson@usdoj.gov
SARAH S. WILSON
Trial Attorney

Attorneys for Respondents

## CERTIFICATE OF SERVICE

I certify that on March 15, 2013, I served a copy of the foregoing through the Court's CM/ECF system on the following counsel of record:

Ahilan T. Arulanantham
ACLU Foundation of Southern
California
1616 Beverly Boulevard
Los Angeles, CA 90026
213-977-5211
Fax: 213-977-5297
Email: aarulanantham@aclu-sc.org

Jayashri Srikantiah
Stanford Law School
Immigrants' Rights Clinic,
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
650-724-2442
Fax: 650-723-4426
Email: jsrikantiah@law.stanford.edu

Sean Commons
Sidley Austin
555 West Fifth Street Suite 4000
Los Angeles, CA 90013-1010
213-816-6000
Fax: 213-896-6600
Email: scommons@sidley.com

Judy Rabinovitz
ACLU Immigrants' Rights Project
125 Broad Street 18th Floor
New York, NY 10004
212-549-2618
Fax: 212-549-2654
Email: jrabinovitz@aclu.org

Cody Jacobs
Sidley Austin LLP
555 West Fifth Street Suite 4000
Los Angeles, CA 90013-1010
213-896-6000
Fax: 213-896-6600
Email: cjacobs@sidley.com

*/s/  Theodore W. Atkinson*
Theodore W. Atkinson
United States Department of Justice