STUART F. DELERY
Principal Deputy Assistant Attorney General
Civil Division
DAVID J. KLINE
Director, Office of Immigration Litigation
District Court Section
THEODORE W. ATKINSON
United States Department of Justice
Office of Immigration Litigation
    P.O. Box 868, Ben Franklin Station
    Washington, DC 20044
    Phone: (202) 532-4135
    theodore.atkinson@usdoj.gov
SARAH S. WILSON
Trial Attorney

Attorneys for Respondents

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| ALEJANDRO RODRIGUEZ, *et al.*, | Case No. CV 07-3239-TJH (RNBx) |
| Petitioners, | |
| vs. | **RESPONDENTS' OPPOSITION TO PETITIONERS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION ("RSOF")** |
| TIMOTHY S. ROBBINS, *in his capacity as U.S. Immigration and Customs Enforcement, Los Angeles District Field Office Director, et al.*, | |
| Respondents. | |
| | Hon. Terry J. Hatter, Jr. |
| | Hearing Date: May 6, 2013 |
| | Hearing Time: UNDER SUBMISSION |

0

Pursuant to Local Rule 56-2, Respondents submit the following statement of genuine issues of material fact in response to Petitioners' Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment or, in the Alternative, for Summary Adjudication [ECF No. 282].

Respondents (1) address Petitioners' Factual Assertions, and whether they are disputed, then (2) provide a response to Petitioners' other factual assertions contained in their memoranda of support, and on which Petitioners rely, beginning on page 5.

### Responses to Petitioners' Statement of Uncontroverted Facts

| Petitioners' Factual Assertion | Respondents' Position |
|---|---|
| Class members are being detained in the Central District of California pursuant to 8 U.S.C § 1226(c). | Not Disputed. |
| But for the preliminary injunction entered by this Court on September 13, 2012, Respondents would not have a policy or practice of providing and would not provide *Casas* hearings to persons in the 1226(c) Subclass. | Respondents do not dispute that but for the preliminary injunction, Respondents would not have a policy or practice of providing bond hearings to aliens detained under section 1226(c), but dispute that such aliens are entitled to *Casas* hearings as a matter of law. |
| Prior to the preliminary injunction entered by this Court on September 13, 2012, persons in the 1226(c) Subclass were being detained for six months or longer without a bond hearing. | Respondents do not dispute that some aliens detained under section 1226(c) are detained for more than six months, but deny any suggestion that *all* aliens detained under section 1226(c) are detained for six months or longer. |
| Class members are being detained in the Central District of California pursuant to 8 U.S.C. § 1225(b). | Not Disputed. |
| But for the preliminary injunction entered by this Court on September 13, 2012, Respondents would not have a policy or practice of providing and would not provide *Casas* hearings to persons in the 1225(b) Subclass. | Respondents do not dispute that but for the preliminary injunction, Respondents would not have a policy or practice of providing bond hearings to aliens detained under section 1225(b), but dispute that such aliens are entitled to *Casas* hearings |

| | as a matter of law. |
|---|---|
| But for the preliminary injunction entered by this Court on September 13, 2012, persons in the 1225(b) Subclass would be detained for six months or longer without a bond hearing. | Respondents do not dispute that some aliens detained under section 1225(b) are detained for more than six months, but deny any suggestion that all aliens detained under section 1225(b) are detained for six months or longer. |
| Class members are being detained in the Central District of California pursuant to 8 U.S.C. § 1226(a). | Not Disputed. |
| Respondents do not have a policy or practice of providing and would not provide a *Casas* hearing to persons in the 1226(a) Subclass who have been detained more than six months. | Disputed.  ICE informs aliens who have filed a petition for review and whose removal has been stayed with a hearing to which they are entitled under *Casas*.  Once an alien files a petition for review and requests a stay and becomes eligible for a *Casas* hearing, the ICE Los Angeles Field Office prepares a letter to the alien informing the alien that he or she is eligible to request a *Casas* hearing. Exh. A[1], Lee Dep.[2] 49:7-49:19. *See also*, Exh. L (*Casas/Diouf* Notice Letter).  This notice is provided regardless of whether an alien is seeking review of a final order (the situation addressed in *Casas*), or review of the denial of a motion to reopen (the situation in *Diouf*).  Lee Dep. 93:9-93:25. |
| Class members are being detained in the Central District of California pursuant to 8 U.S.C. § 1231(a). | Not Disputed. |
| Prior to recent Ninth Circuit precedent, Respondents did not have a policy or | Respondents do not dispute that aliens now eligible for a bond hearing |

[1] All exhibits labeled "Exh. __" are exhibits to the contemporaneously filed Declaration of Theodore W. Atkinson.

[2] "Lee Dep." refers to designated pages from the Deposition of Assistant Field Office Director Wesley J. Lee, attached as Exh. A to the Atkinson Declaration.

| | |
|---|---|
| practice of providing and would not provide a *Casas* hearing to persons in the Section 1231(a) Subclass. | under *Diouf* did not receive such a hearing prior to *Diouf*, but dispute that practices now outdated by intervening case law are material to this action, which challenges current policies, practices, and procedures. |
| Prior to recent Ninth Circuit precedent, persons in the Section 1231(a) Subclass were being detained for six months or longer without a bond hearing. | Respondents (1) do not dispute that aliens now eligible for a bond hearing under *Diouf* were detained without an opportunity for a bond hearing for longer than six months, (2) dispute that *all* such aliens were detained for six months or longer, and (3) dispute that practices now outdated by intervening case law are material to this action, which challenges current policies, practices, and procedures |
| Before and after the preliminary injunction entered by this Court on September 13, 2012, Respondents have not had and do not have a consistent policy or practice of considering, at class members' bond hearings, the likelihood that persons in the class will ultimately be deported. | Not Disputed. |
| Respondents do not have a policy or practice of providing and would not provide periodic bond hearings to persons in the Class who are either denied bond at their first bond hearing after six months or unable to pay the bond set at that first bond hearing. | Respondents do not dispute that there is no practice, policy or procedure to provide aliens detained under Sections 1225(b), 1236(c) and 1231(a) with "periodic" bond hearings.<br><br>Respondents dispute that they "would not" provide additional bond hearings to aliens requesting a hearing and eligible to request a hearing under section 1226(a). |
| The administrative burden on Respondents to provide a bond hearing at least once every six months is low, especially when compared to the costs of detention. | Respondents have stipulated that the monetary costs of providing a bond hearing to an alien is less than the monetary cost of detaining an alien. Respondents dispute that the |

| | |
|---|---|
| | administrative burden is "low." |
| Respondents do not have a policy or practice of providing notice to allow the detainee or his or her counsel to receive notice at least 7 days in advance of bond hearings to Class members or their legal counsel. | Disputed. At the time of an initial custody determination, aliens detained under section 1226(a) who are denied release on bond or other conditions by ICE are informed in writing by ICE that they may request review of that custody determination by an immigration judge. Exh. D (Notice of Custody Determination); Lee Dep. 18:4-20:17. Aliens detained under sections 1226(a) or 1231 and who are entitled to a bond hearing under either *Casas* or *Diouf* receive written notice informing them of their eligibility for and right to request a custody redetermination hearing before an immigration judge. Lee Dep. 49:7-49:19; 93:9-93:25; Exh. L. |
| Approximately 70% of studied class members asserted claims for relief. | Respondents do not dispute the cited statistic with respect to the studied class, but deny that Petitioners have demonstrated that the results of the studied class are statistically representative of the class as a whole. |
| Approximately 30% of studied class members won their cases. | Respondents do not dispute the cited statistic with respect to the studied class (and with clarification of what "won" means contained in Dr. Long's expert report), but deny that Petitioners have demonstrated that the results of the studied class are statistically representative of the class as a whole. |
| The average detention length for class members was no less than approximately eleven months. | Respondents do not dispute the cited statistic with respect to the studied class, but deny that Petitioners have demonstrated that the results of the studied class are statistically representative of the class as a whole. |

| Adopting the relief that Petitioners seek would save government resources. | Respondents dispute that this is a knowable fact.  The relief Petitioners seek is sweeping and unprecedented.  Respondents do not dispute that the monetary cost of a bond hearing, if the individual is subsequently released on bond, is less than the monetary cost of detention.  However, no other facts have been offered by Petitioners to support their claim that the relief they seek would "save government resources." |

### Other Facts Relied on by Petitioners

| No. | Petitioners' Factual Assertion | Respondents' Position |
|---|---|---|
| 1 | ICE officers may classify detainees as subject to mandatory detention without even speaking with the detainees themselves.  Pet. Mem. at 3. | Disputed.  During the initial processing of an alien, the alien is typically interviewed by an arresting or other deportation officer assigned to the case.. Lee Dep. 208:12 – 210:3; Saldana Dep.[3] 23:6-23:23.  The interview first is a determination of information consistent with the Form I-286 to complete the record of the record of deportation, Form I-213.  Saldana Dep. 23:24-25:17.  Deportation officers are trained to conduct interviews to find pertinent information.  Saldana Dep. 25:18-25:25.  Most of the deportation officers in the district speak Spanish, a language commonly spoken by encountered aliens in the Los Angeles area of operations. Lee Dep. 76:23-77:14.  In cases where the ICE officer does not speak the language of the encountered alien, translation services are available through contracted services, which are typically |

[3] "Saldana Dep." refers to designated pages from the deposition of Assistant Field Office Director Eric G. Saldana, attached as Exh. B to the Atkinson Declaration.

| | | |
|---|---|---|
| | | provided through an interpreter by telephone.  Lee Dep. 76:23-78:5. |
| 2 | If an ICE officer (not an attorney) determined that a class member had been convicted of an offense triggering mandatory detention, the class member was classified as a "mandatory detainee" and deemed ineligible for release on bond, regardless of their individual circumstances.  Pet. Mem. at 3. | Disputed.  Although deportation officers identify cases that are subject to mandatory detention under section 1225(b) or 1226(c), they do not make the decision whether an alien is subject to mandatory detention.  Saldana Dep. 36:8-37:11.  Instead, once a deportation officer has met with an encountered alien and has prepared processing paperwork and the A-File materials, those materials are then forwarded to a Supervisory Detention and Deportation Officer ("SDDO"), who then makes the determination whether an alien's criminal offenses require the alien's mandatory detention.  Saldana Dep. 37:6-15.  If the alien is not subject to mandatory detention, the SDDO determines the conditions of release and any bond. Saldana Dep. 37:16-37:20.  In making the initial custody determination, the SDDO may speak with other SDDOs or with the SDDO's supervisor to determine if the alien is subject to mandatory detention or, if not, to determine the conditions for release.  Saldana Dep. 37:21-38:14.  In addition, it is the practice of the ICE Los Angeles Field Office to have an additional review of the custody determination conducted at the detention facility during the alien's placement.  Saldana Dep. 38:16-39:7. That review is conducted by a deportation officer, SDDO, or by an Assistant Field Office Director ("AFOD").  Saldana Dep. 39:8-39:12. The reviewing official at the facility may redetermine the alien's custody or alter the conditions for release.  Saldana Dep. 39:13-39:21. |

| 3 | ICE officers unsure about how to classify detainees based on criminal history rely on the opinions of the same ICE attorneys who prosecute immigration cases. Pet. Mem. at 3. | Disputed.  In determining whether an alien is subject to mandatory detention under section 1226(c), SDDOs and other immigration officials rely on their own experience in identifying offenses enumerated under section 1226(c)(1)(A) – (D), and they also rely on written guidance from ICE attorneys that identify the offenses that require mandatory detention under section 1226(c).  Saldana Dep. 40:22-42:13.  In addition, ICE officials may rely on policies, procedures, or other information outlined on ICE's online library.  Saldana 43:19-44:23.  ICE field officers  are also regularly updated about changes in the law that may make an alien subject to mandatory detention.  *Id.*  In addition, ICE officials often call upon the advice of ICE attorneys if a determining official is uncertain whether an alien's conviction requires that the alien be charged or detained under section 1226(c).  Saldana Dep. 44:16-45:25; 52:10-53:6.  These discussions may be held with any ICE trial attorney and may include supervisory attorneys, including Deputy Chief Counsels in the local ICE Office of Chief Counsel. Saldana Dep. 53:9-53:16. |
| 4 | Dr. Long's study concluded that more than 10% of the studied class members in the Section 1226(c) Subclass won their cases by obtaining terminations of the proceedings brought against them. Pet. Mem. at 5. | Disputed.  According to Petitioners' expert, only 4.3% of the 1226(c) studied class members "won" their cases by having their cases terminated.  *See* Long Report[4] at B-4 (20 of 460 cases were terminated). |
| 5 | About 1 in 3 won their cases by | Disputed.  According to Petitioners' |

[4] "Long Report" refers to the report offered by Dr. Susan Long, attached as Exhibit A to her declaration filed in support of Petitioners' motion for summary judgment. [ECF No. 282].

| | | | |
|---|---|---|---|
| | | obtaining relief from removal – relief which in many cases the government chose not to appeal. Pet. Mem. at 4. | expert, 28% "won" by obtaining relief from removal. *See* Long Report at B-4 (130 of 460 cases with relief granted). |
| | 6 | The form provided to immigrants simply does not disclose the right to request a *Joseph* hearing. Pet. Mem. at 6. | Disputed. Although there is no form provided to aliens by Respondents that informs them of their right to seek a Joseph hearing, whether an alien is properly categorized as a mandatory detainee is reviewed as a matter of practice and policy by immigration judges. In making a determination of whether an alien is subject to mandatory detention under section 1226(c), an immigration judge will normally first look to the Form I-286. Fong Dep.[5] 60:13-61:4. If it is unclear, an immigration judge will normally seek clarification at a master calendar hearing, and will advise the alien of a right to bond and, if not, why not. Fong Dep. 60:5-61:18. Apart from the detention classification indicated on the Form I-286, immigration judges take steps to ensure than an individual is informed of his or her rights and the rights for which the individual is eligible. Fong Dep. 61:20-62:17. If the government makes a custody determination that the immigration judge believes is incorrect, then it is the immigration judge's responsibility to make an independent determination of whether the government's detention classification is correct or incorrect. Fong Dep. 62:12-63:22. Indeed, Judge Fong testified that "it has always been one of the clearest |

[5] "Fong Dep." refers to designated pages from the deposition of Assistant Chief Immigration Judge Thomas Y.K. Fong, attached as Exh. C to the Atkinson Declaration.

| | | | |
|---|---|---|---|
| | | | instructions and authorities of immigration judges to inform an individual, regardless of their representation, of the rights they have for relief . . . ." Fong Dep. 64:2-64:6. |
| 7 | | Despite twenty years of service as an Immigration Judge, the Assistant Chief Immigration Judge for a large portion of the western United States could not recall ever having conducted a Joseph hearing or receiving a question from another judge about a Joseph hearing. Pet. Mem. at 6. | Disputed. Judge Fong does not hear cases full time, and only hears cases on the non-detained docket. Fong Dep. 12:1-12:7. Moreover, Judge Fong did not think it was unusual that he was not frequently asked by immigration judges he oversees about the case, because *Matter of Joseph* "is a case that has been around for 20 years," and, accordingly, he would expect that "[a]ll immigration judges should be familiar with it." Fong Dep. 71:11-71:16. |
| 8 | | The overwhelming majority of individuals in the Section 1225(b) Subclass have no criminal history. Pet. Mem. at 7. | Disputed. Petitioners ignore deposition testimony that there is typically no criminal history readily available from an arriving alien's home country (or no criminal history in the United States because the alien has never visited the United States), and thus the type of review conducted is different than for other custody determinations. Lee Dep. 36:6-36:15. Specifically, parole determinations include consideration of a variety of factors, but focus primarily on identification, flight risk, and danger to the community. Lee Dep. 33:20-34:6; 100:6-100:23. According to AFOD Lee, in the case of an arriving alien, typically there is no criminal record for that alien available to ICE officials in the United States, but that does not indicate that the alien has no criminal history. *Id.* |
| 9 | | Respondents interpret Section 1225(b) and 8 C.F.R. § | Disputed. Any alien being considered for parole by immigration officials at the Los |

9

| | |
|---|---|
| 1003.19(h)(2)(i)(B) as granting unfettered discretion to ICE officers about whether to detain or release class members, without any possibility for review by an Immigration Judge.  Pet. Mem. at 7. | Angeles Field Office is provided with a written notice that an interview will be held.  Lee Dep. 47:24; 101:1-103:11; Exh. E.  ICE also provides each alien with a questionnaire the alien is required to fill out in advance of the parole interview.  Lee Dep. 103:18-104:3; Exh. F.  Detainees are also interviewed by immigration officers as part of the parole determination process.  Lee Dep. 104:4-104:9.  There is a parole determination worksheet ICE immigration officers use in conducting the parole determination, Exh. G, but ICE officers also take extensive notes during the interview and after.  Lee Dep. 107:24-108:15.   ICE informs the alien of the decision within 7 days of the interview.  Lee Dep. 47:22-48:6.  In addition to an oral explanation typically provided to the alien of the decision, Lee Dep. 106:18-107:21.  After a parole decision is made, an alien may make a request for additional parole determinations, which they typically do when they have new or better evidence to establish they are not a flight risk.  Lee Dep. 47:11-47:21.  Parole determinations are also made in accordance with a 2011 Memorandum entitled Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture.  Lee Dep. 114:20115:5; Exh. I.  Under those guidelines, once an arriving alien has established a credible fear, then the alien will be released if the alien can show appropriate identification and a verifiable sponsor.  Lee Dep. 123:2-123:15; *see also* Exh. I.  The current policy (reflected in the Parole Determination Guidelines memorandum cited above), is favorable to an arriving alien because under the policy, if ICE has been presented with |

| | | | |
|---|---|---|---|
| | | | some information regarding an alien's identification, and ICE does not have a reason to believe that identification is false, then ICE will accept the identity information. Lee Dep. 36:25-37:11; 134:24-136:17. Parole decisions are subject to judicial review, and may be set aside if not made for a facially legitimate and bona fide reason. |
| | 10 | The officers determine if detainees are eligible for release on parole – a form of discretionary release under 8 U.S.C. § 1182(d)(5)(A), which requires a showing that release is necessary for an "urgent humanitarian reason" or to create a "significant public benefit" – using "worksheets" approved by supervisory officers who typically do not interview detainees. Pet. Mem. at 7-8. | Disputed. With respect to parole decisions, AFOD Lee makes the final determination, based on a recommendation from deportation officers and SDDOs he oversees. Lee Dep. 3-17:10. Thus, parole determinations undergo three levels of recommendation and review before the alien arrives at the detention facility: the deportation officer makes a recommendation, the SDDO reviews the recommendation, and the AFOD reviews the SDDO's recommendation and makes a determination.<br><br>Arriving aliens seeking parole are typically interviewed by immigration officials prior to a parole determination being made. Any alien being considered for parole by immigration officials at the Los Angeles Field Office is provided with a written notice that an interview will be held. Lee Dep. 47:24; 101:1-103:11; Exh. E. ICE also provides each alien with a questionnaire the alien is required to fill out in advance of the parole interview. Lee Dep. 103:18-104:3. Deportation officers are trained to conduct interviews to find pertinent information. Saldana Dep. 25:18-25:25. Detainees are interviewed by immigration officers as part of the parole determination process. Lee Dep. 104:4- |

| | | | 104:9.  Most of the deportation officers in the district speak Spanish, a language commonly spoken by encountered aliens in the Los Angeles area of operations. Lee Dep. 76:23-77:14.  In cases where the ICE officer does not speak the language of the encountered alien, translation services are available through contracted services, which are typically provided through an interpreter by telephone. Lee Dep. 76:23-78:5.<br><br>In addition to review at the Los Angeles Field Office, an additional custody review is conducted at the detention facility, including a review of the Notice to Appear, the A-File material, and an interview with the detainee.  Lee Dep. 98:24-98:25; 203:9-205:18.  If the circumstances warrant, the custody determination can be revised.  Lee Dep. 204:10-204:12. There is a parole determination worksheet ICE immigration officers use in conducting the parole determination, Exh. G, but ICE officers also take extensive notes during the interview and after.  Lee Dep. 107:24-108:15 |
| 11 | Some parole decisions are influenced by available bed space at detention facilities.  Pet. Mem. at 8. | Disputed.  The availability of bed space is a factor that Lee said is taken into account when reviewing detention decisions, because they are a resource to be allocated.  Lee Dep. 25:25-26:13.  However, bed space is only a factor when there is a shortage, Lee Dep. 242:12-242:17, and it is not a factor in the Los Angeles area because of the availability of bed space.  Lee Dep. 243:1-243:4.  In the Los Angeles area of responsibility, during the period of much of this action, there were five detention facilities:  one at Mira Loma; one at Adelanto; one at |

| | | | |
|---|---|---|---|
| 1 | | | Santa Ana; and two in Orange County, the Theo Lacy and James Musick detention facilities.  Lee Dep. 24:10-24:20.  These five detention facilities have bed space for approximately 2,900 detainees.  Lee Dep. 24:21-24:25.  In no event is bed space a primary factor in a custody determination.  Lee Dep. 242:23-242:243:4.  Instead, parole determinations include consideration of a variety of factors, but focus primarily on identification, flight risk, and danger to the community.  Lee Dep. 33:20-34:6; 100:6-100:23.  Lee testified that he has never made a determination based on bed space.  Lee Dep. 26:19-26:21.  Lee also testified that bed space is not a factor in any of the parole decisions he makes at Mira Loma.  Lee Dep. 27:3-27:10. |
| 14 | 12 | Some parole decisions are influenced by an officer's prior experience with other detainees allegedly of the same nationality.  Pet. Mem. at 8. | Disputed.  This allegation is not supported by the two examples cited by Petitioners.  In the first example, an Ethiopian native and citizen of Somali, was denied parole because he could not present sufficient identification of his identity.  The officer noted that as a result of the review, there was "an apparent correlation with all of the Somali detainees that present a paradigm of deceit and ambiguity of events and identity."  Arulanantham Decl. ¶ 88, and Exh. 74 thereto.  That decision was reached the same day as the decision reached by the same officer in the case cited by Arulanantham at ¶ 94 of his declaration – January 8, 2010 –of another alien of Somali origin who arrived at the United States at the same time as the first alien.  *See* Arulanantham Decl. at ¶ 94 (Arulanantham did not identify as an exhibit the parole decision forming the basis of his testimony).  That the officer |

13

|   |   |   |
|---|---|---|
|   |   | concluded that the stories of these detainees showed evidence of correlation such to suggest deceit and ambiguity of events and identity does not support the assertion that this or any other officer denies parole based on ethnic origin. |
| 13 | In ICE's internal review under *Casas*, or during parole determinations, ICE does not consider length of past or anticipated future detention, likelihood of relief. Pet. Mem. at 8. | Disputed.  Lee testified that in considering release on a *Casas* custody determination, immigration officers may consider whether the alien has prevailed in immigration proceedings and the nature of the removal proceedings.  Lee Dep. 55:13-56:4. |
| 14 | The procedures governing parole decisions are deficient because officers are not required to keep formal records of conversations with detainees.  Pet. Mem. at 8-9. | Disputed. Any alien being considered for parole by immigration officials at the Los Angeles Field Office is provided with a written notice that an interview will be held.  Lee Dep. 47:24; 101:1-103:11; Exh. E.  ICE also provides each alien with a questionnaire the alien is required to fill out in advance of the parole interview.  Lee Dep. 103:18-104:3.  Detainees are also interviewed by immigration officers as part of the parole determination process.  Lee Dep. 104:4-104:9.  There is a parole determination worksheet ICE immigration officers use in conducting the parole determination, Exh. G, but ICE officers also take extensive notes during the interview and after.  Lee Dep. 107:24-108:15. |
| 15 | There's no way to catch investigative errors by officers conducting parole interviews, who may interview non-native English speakers in English or without reliable translation services. Pet. Mem. at 8-9. | Disputed.  Lee testified that there is "no way" to review *an interview* for errors.  As for the availability of translation services, most of the deportation officers in the district speak Spanish, a language commonly spoken by encountered aliens in the Los Angeles area of operations.  Lee Dep. 76:23-77:14.  In cases where |

| | | |
|---|---|---|
| | | the ICE officer does not speak the language of the encountered alien, translation services are available through contracted services, which are typically provided through an interpreter by telephone. Lee Dep. 76:23-78:5.<br><br>In the first example cited by Petitioners, the parole decision was based on the alien's inability to show <u>any</u> sponsor or reliable identification, *see* Arulanantham Decl. ¶ 101, Exh. 87 thereto. Additionally, both aliens requested that they remain in custody until their hearing. *Id.* The decision was based on lack of reliable identification, lack of an affidavit from a sponsor, and lack of any information showing contacts in the United States. *Id.* The second example of "error" is that at one point on a parole determination worksheet, the officer referred to the arriving alien as "Mr. Mohamud," *see* Arulanantham Decl. ¶ 97. But a casual examination of the parole determination worksheet shows that the examining officer otherwise repeatedly refers to the alien by his correct name, "Mr. Yusef," including at the top of the form and throughout the form. *Id.* |
| 16 | Officers make final parole decisions simply by checking a box on a form that contains no specific explanation and reflects no individualized deliberation. Pet. Mem. at 9. | Disputed. Lee testified at length regarding the notice, examination, interview, and review process conducted with respect to parole determinations. Any alien being considered for parole by immigration officials at the Los Angeles Field Office is provided with a written notice that an interview will be held. Lee Dep. 47:24; 101:1-103:11; Exh. E. ICE also provides each alien with a questionnaire the alien is required to fill out in advance of the parole interview. |

| | | | |
|---|---|---|---|
| | | | Lee Dep. 103:18-104:3; Exh. F. Detainees are also interviewed by immigration officers as part of the parole determination process. Lee Dep. 104:4-104:9.  There is a parole determination worksheet ICE immigration officers use in conducting the parole determination, Exh. G, but ICE officers also take extensive notes during the interview and after.  Lee Dep. 107:24-108:15. |
| | 17 | No procedure exists for disclosing to detainees what evidence an officer considered or relied upon to reach a decision.  Pet. Mem. at 9. | Disputed.  This assertion ignores the fact that an alien seeking parole is provided with a written notice that an interview will be held.  Lee Dep. 47:24; 101:1-103:11.  ICE also provides each alien with a questionnaire the alien is required to fill out in advance of the parole interview.  Lee Dep. 103:18-104:3.  As for other custody determinations, the information is either generally public knowledge, or provided by the alien.  Immigration officers review a variety of materials in making custody determinations.  Primarily, in any custody determination, officers review the A-File – the administrative file containing information about the alien.  Lee Dep. 78:21-78:24.  Officers may also run a check of NCIC information – or "rap sheets" – to determine if there are any updates to an alien's criminal history apart from what is already contained in the A-File.  Lee Dep. 78:24-79:5. Officers may also review any information provided by the alien or otherwise to determine if there is a sponsor of the alien where the alien could be housed or contacted.  Lee Dep. 79:6-79:10. |
| | 18 | Class members cannot appeal these ICE parole decisions.  Pet. Mem. at | Disputed.  Aliens may seek judicial review to challenge the denial of parole |

| 9. | on the ground that the denial was not made for facially legitimate and bona fide reasons. Additionally, after a parole decision is made, an alien may make a request for additional parole determinations, which they typically do when they have new or better evidence to establish they are not a flight risk. Lee Dep. 47:11-47:21. |
|---|---|
| 19 | Based on the more than 1,000 records produced by Respondents concerning the studied class members, over 96% of the individuals in the 1225(b) Subclass applied for relief from removal, and over 60% won their cases. Pet. Mem. at 9. | This is technically accurate though misleading: Of the 1000 records, Dr. Long viewed only 68 of them as 1225(b) Subclass members. Long Rep. at C-1. Of those 68, only 41 obtained relief. *Id.* |
| 20 | For the class as a whole, more than 70% applied for relief, and approximately a third won their cases. Pet. Mem. at 9. | Disputed. Dr. Long concluded that of the 1000 total persons, 713 filed for relief. Long Rep. at 7. Of the 713, 251 "won" their cases, 25% overall, not a third. *Id.* |
| 21 | In contrast, less than half of the studied class members were actually removed during the time period from which data was drawn. Pet. Mem. at 9. | Disputed. Dr. Long acknowledges that she does not use the most updated ICE removal data to conduct her analysis. Long Rep. at 2 n.1. |
| 22 | Even in instances when individuals lost on the merits, many were released from detention because they could not be removed. Pet. Mem. at 9. | Disputed. This claim is not supported by the cite to Dr. Long's report in Petitioners' brief. Table 31 says that of the 1225(b) subclass, 18 were ordered removed, but only 7 had been removed by April 28, 2012. We know that the other 11 people were no longer in detention as of April 28, 2012, but we do not know whether they were released because they could not be removed or for another reason. |

| | | |
|---|---|---|
| 23 | Only 10% of the 1225(b) Subclass members in the studied class member group were ultimately deported during the time period during which the data was drawn, (b) yet members of the Subclass as a whole were detained on average for nearly one year.  Pet. Mem. at 9. | Disputed.  Dr. Long acknowledges that she does not use the most updated ICE removal data to conduct her analysis. Long Rep. at 2 n.1. |
| 24 | Even applying a method described by Respondents' expert that undoubtedly undercounts many individuals' detention length, the data concerning the studied class members shows that they have been detained on average for at least 334 days without being afforded adequate bond hearings. Pet. Mem. at 11. | Disputed.  Dr. Palmer concludes that the most appropriate single statistics for describing the length of detention of the class as a whole is the median value from his sample, or 286 days.  Exh. P (Dr. Palmer Rebuttal Rep.) at 7. |
| 25 | The average length of detention was far higher for roughly a third of the studied class members, who pursued appeals either to the BIA – 448 days – or the Ninth Circuit – 667 days. Pet. Mem. at 12. | Disputed.  Dr. Palmer using his method calculates the relevant numbers to be significantly lower: 354 days for those with BIA appeals, and 573 days for those with Ninth Circuit Appeals.  Exh. P at C-6, Table L-6 ("in period yes"). |
| 26 | Over 20% of the studied class members were detained for at least 18 months, while close to 10% were detained for more than two years. Pet. Mem. at 12. | Disputed.  Dr. Palmer finds that only 13% of class members continue to be detained at 18 months, and less than 3% continue to be detained at 24 months. Exh. P, Table L-4 ("in period yes"). |
| 27 | Dr. Long's analysis of studied class members' cases reveals that 53% of class members detained for 7 months are still detained at 12 months; 23% of them are still detained at 18 months, and 10% are still detained at 24 months.  Pet. Mem. at 32. | Disputed.  Dr. Long acknowledges that she does not use the most updated ICE removal data to conduct her analysis. Long Rep. at 2 n.1.   Dr. Palmer (using his sampling method and the most up to date data) concluded that of the class members detained 7 months, only 40% are still detained at 12 months, only 13% continue to be detained at 18 months, and only 3% continue to be detained at 24 |

| | | months.  Exh. P, Table L-4 ("in period yes"). |
|---|---|---|
| 28 | Dr. Long estimates that 47% of the studied class members were detained for 12 months or more, and 9% were detained for 24 months or more.  Pet. Mem. at 32. | Disputed. Dr. Palmer calculates that only 33% of the class was detained for 12 months or longer and 2.5% were detained for 24 months or more. Exh. Q (Dr. Palmer Rebuttal Rep.) at C3, Table L-3. |
| 29 | These numbers (cited above) likely undercount the length of detention because some class members continued to be detained even past the window of Dr. Long's data set.  Pet. Mem. at 31 n.17. | Disputed.  Dr. Long admits that the undercounting issue only comes into play for means, not for distribution data. *See* Long Report. |
| 30 | The average period of incarceration for studied class members was 404 days, well in excess of six months.  Pet. Mem. at 31. | Disputed.  First, this is misleading because the average period of incarceration of the studied class members necessarily must be "well in excess of six months" because to qualify for the studied group, the alien had to have been detained for at least 6 months. Additionally, Dr. Palmer concludes that the most appropriate single statistics for describing the length of detention of the class as a whole is the median value from his sample, or 286 days.  Exh. P at 7. |
| 31 | Dr. Long reported that the average length of detention increased as studied class members' cases were appealed to the BIA and the Ninth Circuit.  Pet. Mem. at 31. | Disputed.  Dr. Palmer using his method calculates the numbers to be significantly lower: 260 days median detention time for class members with only immigration court proceedings, 354 days for those with BIA appeals, and 573 days for those with Ninth Circuit Appeals.  Exh. Q at C-6, Table L-6 ("in period yes"). |
| 32 | The data concerning the studied class members also revealed that a remarkably large number of them win their cases.  By one measure, more than 30% of the studied class were ultimately found to have a right to remain in this country.  Pet. | Disputed.  The only individuals "found to have a right to remain in this country" are those against whom proceedings were terminated based on DHS's inability to establish the charge of removability.  All those granted relief or protection were not found to have a right to remain in this |

19

| | | Mem. at 12. | country, but were instead granted purely discretionary relief from removal. Using that standard and Dr. Long's numbers, the percentage with a "right to remain in the country" is less than 4%. *See* Dr. Long Rep. at 15 (34 proceedings terminated of 840 removal proceedings ended). |
|---|---|---|---|
| | 33 | Discovery revealed an example where a class member finally obtained release in a *Casas* hearing over a year after he became eligible for the hearing, after suffering 796 days of detention. Pet. Mem. at 41. | Disputed. The Im case identified as an example of lengthy detention in the Arulanantham Declaration is misleading. The materials cited by Arulanatham indicates that the alien was given a *Casas* review by ICE less than 11 days after he became eligible for the hearing, *see* Arulanantham Decl. at ¶ 150, but was denied release because he failed to apply for a travel document. However, Petitioners can point to no evidence that the alien requested a bond hearing following that review. |
| | 34 | Detainees have limited access to libraries, which have sparse resources. Pet. Mem. at 12. | Disputed. *See* Exh. V, 2008 National Detention Standards governing law libraries and legal materials; Exh. W, 2011 National Detention Standards governing law libraries and legal materials. |
| | 35 | Class members generally are permitted only limited contact with their children and other family and friends – they talk by phone through a see-through window for, at most, a few hours per week. Direct, in-person contact with family and friends generally is not permitted. Pet. Mem. at13. | Disputed. *See* Exh. T, 2008 National Detention Standards governing visitation ; Exh. U, 2011 National Detention Standards governing visitation. |
| | 36 | The legal process for requesting hearings requires an understanding of the highly technical text of the | Disputed.

The Immigration Court Manual is hardly |

| | | |
|---|---|---|
| | Court Manual.  Pet. Mem. at 41. | "highly technical."  The manual has a table of contents with a topic listed as "Detention and Bond."  *See* Immigration Court Manual at www.justice.gov/eoir/vll/OCIJPracManual/Chap%209.pdf. |

Turning to that section, there is a section labeled "9.3 Bond Hearings," which states:

"(c) Requesting a bond hearing. — A request for a bond hearing may be made in writing. In addition, except as provided in subsection (iii), below, a request for a bond hearing may be made orally in court or, at the discretion of the Immigration Judge, by telephone. If available, a copy of the Notice to Appear (Form I-862) should be provided. The telephone number of each Immigration Court is listed on the Executive Office for Immigration Review website at www.usdoj.gov/eoir."

Additionally, immigration judges take steps to ensure than an individual is informed of his or her rights and the rights for which the individual is eligible. Fong Dep. 61:20-62:17.  If the government makes a custody determination that the immigration judge believes is incorrect, then it is the immigration judge's responsibility to make an independent determination of whether the government's detention classification is correct or incorrect. Fong Dep. 62:12-63:22.  Indeed, Judge Fong testified that "it has always been one of the clearest instructions and authorities of immigration judges to inform an individual, regardless of their

| | | |
|---|---|---|
| | | representation, of the rights they have for relief … " Fong Dep. 64:2-64:6. |
| 37 | Respondents' failure to provide an automatic hearing and sufficient notice has resulted in continued incarcerations despite the fact that class members were eligible for a *Casas* hearing upon obtaining a stay of removal from the Ninth Circuit pending consideration of petitions for review. Pet. Mem. at 41. | Disputed. The referenced declaration paragraph states that the facts of the particular procedural circumstances surrounding the alien's case are "unclear," *see* Arulanantham Dec. ¶ 124. It appears, however, that ICE provided the alien with a custody review and denied the alien release based on a finding of danger to the community for his controlled substance conviction. Arulanantham Dec. ¶ 125-126. Thereafter, the alien received a *Casas* hearing before an immigration judge, at which he was released on a significant bond in the amount of $5,000. Arulanantham Dec. ¶ 127. |
| 38 | With *Casas* detainees and the parole process, ICE does not appear to review any individual's custody on a periodic basis. Indeed, ICE policy is not to automatically review parole determinations even when a detainee prevails before the Immigration Judge but ICE chooses to appeal to the BIA. Pet. Mem. at 45. | Disputed. With respect to parole determinations, after a parole decision is made, an alien may make a request for additional parole determinations, which they typically do when they have new or better evidence to establish they are not a flight risk. Lee Dep. 47:11-47:21. With respect to *Casas*, under the policy followed by ICE ERO in Los Angeles, a second *Casas* determination will be conducted within the following year, if the alien is denied release. Lee Dep. 51:3-51:11. |
| 39 | An example of the consequences of ICE's failure to provide periodic hearings from the parole context involves a class member who was a refugee from Somalia. ICE initially denied release based on its assessment that he did not have a sponsor if he was released. Two | Disputed. The cited A-File materials show that while ICE concluded that there was credible evidence of identity, there was no sponsor willing to provide the alien with a place of temporary residence. Arulanantham Dec. ¶ 82, Exh. 69 thereto. The examining officer reached one potential sponsor identified by the alien |

| | | |
|---|---|---|
| | months later, in his asylum application, he submitted a declaration from "an American citizen (and family friend) who pledged to allow him to remain at her residence, expressing that she was 'unconditionally willing to assist [him] once he is out.'" But because ICE does not conduct periodic custody reviews under its parole procedures, he was subjected to 512 days of incarceration, approximately one year of which was after he submitted documentation of sponsorship. He only obtained release after he prevailed on his asylum claim before the Immigration Judge. Pet. Mem. at 41. | by telephone, but that individual affirmatively declined to sponsor the alien. *Id.* The worksheet also indicates that the examining officer attempted to contact two other potential sponsors by telephone, again listing their telephone numbers, but states that neither potential sponsor could be reached at the numbers provided. *Id.* Arulanantham complains that ICE did not act on an affidavit of sponsorship submitted by the alien's attorney two months later, but Arulanantham fails to note in the brief that the alien's attorney did not submit that information *to ICE*, but rather to the immigration court as part of the alien's asylum application. *See* Arulanantham ¶ 83, and Exh. 70 thereto. Nor does Arulanantham explain why this information was not submitted to ICE by the alien's representative, nor does he indicate whether the alien or his attorney availed themselves of the opportunity to make a second parole determination request – which any alien may request, and which is often made where, as here, the alien has updated information to provide, such as an affidavit of sponsorship, *see* Lee Dep. 47:11-47:21. |
| 40 | The Immigration Judge's calendar results in a continuance longer than the detainee otherwise would want or need. Pet. Mem. at 14. | Disputed. Fong testified that in granting continuances, the Los Angeles immigration courts engage in oversight to determine that the length of the continuance is based on good cause. Fong Dep. 97:7-97:19. However, immigration judges also must ensure that the alien or the alien's representative gets the amount of time needed for the continuance and for a fair opportunity to present their case. Fong Dep. 97:24-98:16. If an immigration judge believes that the requested continuance is too |

| | | | |
|---|---|---|---|
| | | | long, the immigration judge may shorten the period in his or her discretion. Fong Dep. 97:24-98:14. |
| 41 | The *Guerra* factors do not require Immigration Judges to consider whether individuals seeking release are likely to ever be removed, either because they are from countries that will not likely take them back or because they will win their cases and therefore retain the right to reside in the United States. Pet. Mem. at 16. | | Partially Disputed. While there is no requirement that immigration judges consider the alien's ultimate removability at a bond hearing, during custody redetermination hearings, immigration judges look primarily to issues of flight risk and danger, but will consider any information either side presents. Fong Dep. 44:5-45:2. Judge Fong also testified that it is the Government that has the authority and responsibility to determine a place of removal of an alien. Fong Dep. 48:5-48:24. Indeed, Judge Fong could not recall an instance where that was an issue at a bond hearing, because the Government had either released the alien or was still in the process of attempting to obtain travel documents for the alien. Fong Dep. 49:5-49:24. To make such a finding at a bond hearing, according to Judge Fong, "would be premature." Fong Dep. 50:2-50:14. At the bond hearing stage, the proceedings are still pending, and an immigration judge has not yet found removability, let alone relief. Fong Dep. 50:17:-50:18. As Judge Fong testified, for an immigration judge to assume, at a bond hearing stage, "that the government may or may not be able to [re]move the individual would be … presumptuous." Fong Dep. 50:19-50:22. |
| 42 | As a result, class members from certain countries with which the United States lacks a repatriation agreement – or otherwise refuse to accept back their nationals – have | | Disputed. ICE has removed hundreds of aliens to these countries, a significant number of returns to these countries of aliens found inadmissible at the border from those nations. *See* Exh. S, 2011 |

| | | | |
|---|---|---|---|
| | | spent years in detention litigating removal cases, only to be released after receiving removal orders – because there is no way to return them to their home countries. The studied class members include numerous such individuals from countries such as Vietnam, Cambodia, and Somalia.  Pet. Mem. at 16. | Yearbook of Immigration Statistics, Office of Immigration Statistics, Department of Homeland Security, at 103-105 (64 removals to Cambodia between 2009 to 2011; 59 removals to Somalia during that same period; 2,080 removals to Vietnam during that same period). |
| | 43 | The average detention length also increased for those individuals who filed applications for relief from removal.  Long Rep. at 10 (509 vs. 320 days).  Pet. Mem. at 16-17. | Disputed.  The numbers in the parenthetical are not the same as the cited page of the report, where Longsays the average detention length for persons who filed a request for relief is 421 days (not 509) and the average for those who did not is 360 days (not 320).  Thus, the real difference between the length of time for proceedings based on applying for relief is only 60 days as opposed to the nearly 200 day difference suggested in the parenthetical.  Second, Dr. Palmer says the more accuratestatistic would be 250 days for a class member who did not file for relief to 303 for a class member who did file for relief.  Exh. Q at 9. |
| | 44 | The *Guerra* factors also do not require Immigration Judges to consider alternatives to detention that would be sufficient to alleviate danger to the community or flight risk, even though numerous such alternatives exist.  Pet. Mem. at 36. | Respondents do not dispute that *Guerra* does not require immigration judges to consider alternatives to detention, but dispute that immigration judges have regulatory authority to do so. Immigration judges do not consider alternatives to detention because immigration judges do not have authority to determine the conditions of the alien's release apart from the amount of bond, if any.  Fong Dep. 57:11-58:3. Immigration judges do not have the authority to release an alien on an ankle bracelet or to order its removal.  Fong |

| | | |
|---|---|---|
| | | Dep. 58:5-59:14. Again, the only proper consideration for an immigration judge is whether the alien is a flight risk or danger to the community. Fong Dep. 58:24-59:25. |
| 45 | ICE also does not consider alternatives to detention in POCR reviews. Pet. Mem. at 36. | Disputed. Lee testified that under certain circumstances, ICE may make a determination that an alien should be placed in an alternative to detention program pending removal. Lee Dep. 213:7-214:2. However, there is no policy that alternatives to detention must be considered as part of the POCR process at the field level. Lee Dep. 214:4-214:14. |
| 46 | Respondents produced no evidence of criminal history for many class members subject to prolonged detentions. As to the remainder, over half of the records produced by Respondents for class members in the sample did not disclose convictions for crimes serious enough to warrant sentences of over six months – the minimum length of their immigration detention. | Disputed. The Jacobs declaration does not distinguish between those aliens who have minor offenses and who were section 1226(a), 1225(b), or section 1226(c). Nor did Petitioners make any effort to match the summary data to any section 1226(c) subclass member. Thus, it is incompatible to say that a substantial number of criminal aliens detained under section 1226(c) are somehow categorized under section 1226(c) for "minor offenses."<br><br>Second, the Jacobs declaration identifies the longest conviction by the alien, and measures that alone. It does not determine the number of convictions, the recency of convictions, or other information provided in a "rap sheet" that may go to flight risk or danger. For example, in the first hand-selected case chosen by counsel for Petitioners as an "exemplary sample," Jacobs identifies one conviction for DUI of a controlled substance. Jacobs Dec. ¶ 8(a). However, |

| | | |
|---|---|---|
| | | the Jacobs declaration fails to also point out that the alien was convicted for burglary and obstruction or resisting an officer, receiving probation, and had bench warrants issued against him. Jacobs Decl. ¶ 8(a), and Exh. B thereto. An alien's criminal history cannot be summed up by a single reference to the longest time served for a single conviction, and citing that statistic, in the absence of everything else, is not meaningful. |
| 47 | Respondents' own 30(b)(6) witness testified that individuals released under a program available to certain immigrants in this district as an alternative to detention have appeared when required at future hearings "at, if not close to, 100%" of the time. Pet. Mem. at 36. | Disputed.  Unlike the types of serious offenses that place an alien within one of the section 1226(c) categories, ISAP II is used in cases where the types of offenses an alien has committed are, as AFOD Saldana described them, "lower-range crimes," such as driving without a license, drunk in public, and other relatively non-serious offenses.  Saldana Dep. 118:21-119:8. |
| 48 | As in the immigration context, alternatives to detention in the pretrial detention setting have been proven to be effective in preventing danger to the community and flight pending proceedings. Pet. Mem. at 38. | Disputed.  These statistics are not addressed to immigration detention, but to criminal detention outside the Central District of California, and do not consider the alternatives to detention used by ICE for certain low-level offenders. |

Dated:  March 15, 2013

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General
Civil Division
DAVID J. KLINE
Director, Office of Immigration Litigation
District Court Section

By:    */s/ Theodore William Atkinson*
THEODORE W. ATKINSON
United States Department of Justice
Office of Immigration Litigation,
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Phone: (202) 532-4135
theodore.atkinson@usdoj.gov
SARAH S. WILSON
Trial Attorney

## **CERTIFICATE OF SERVICE**

I certify that on March 15, 2013, I served a copy of the foregoing through the Court's CM/ECF system on the following counsel of record:

Ahilan T. Arulanantham
ACLU Foundation of Southern
California
1616 Beverly Boulevard
Los Angeles, CA 90026
213-977-5211
Fax: 213-977-5297
Email: aarulanantham@aclu-sc.org

Jayashri Srikantiah
Stanford Law School
Immigrants' Rights Clinic,
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
650-724-2442
Fax: 650-723-4426
Email: jsrikantiah@law.stanford.edu

Sean Commons
Sidley Austin
555 West Fifth Street Suite 4000
Los Angeles, CA 90013-1010
213-816-6000
Fax: 213-896-6600
Email: scommons@sidley.com

Judy Rabinovitz
ACLU Immigrants' Rights Project
125 Broad Street 18th Floor
New York, NY 10004
212-549-2618
Fax: 212-549-2654
Email: jrabinovitz@aclu.org

Cody Jacobs
Sidley Austin LLP
555 West Fifth Street Suite 4000
Los Angeles, CA 90013-1010
213-896-6000
Fax: 213-896-6600
Email: cjacobs@sidley.com

*/s/  Theodore W. Atkinson*
Theodore W. Atkinson
United States Department of Justice

1