1  AHILAN T. ARULANANTHAM (SBN 237841)
   aarulanantham@aclu-sc.org
2  MICHAEL KAUFMAN (SBN 254575)
   mkaufman@aclu-sc.org
3  ACLU FOUNDATION OF SOUTHERN CALIFORNIA
   1313 West Eighth Street
4  Los Angeles, CA 90017
   Telephone: (213) 977-9500
5  Facsimile: (213) 977-5297

6  *Attorneys for Petitioners*
   (Additional Counsel listed on following page)

7

8              UNITED STATES DISTRICT COURT

9        FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                  WESTERN DIVISION

11  ALEJANDRO RODRIGUEZ,                ) Case No. 02:07-CV-3239-TJH
    ABDIRIZAK ADEN FARAH, YUSSUF        ) (RNBx)
12  ABDIKADIR, ABEL PEREZ RUELAS,       )
    JOSE FARIAS CORNEJO, ANGEL          ) **PETITIONERS' REPLY TO**
13  ARMANDO AYALA, for themselves and   ) **RESPONDENTS' OPPOSITION**
    on behalf of a class of similarly-situated ) **TO STATEMENT OF**
14  individuals,                        ) **UNCONTROVERTED FACTS**
                                        ) **AND CONCLUSIONS OF LAW**
15              Petitioners,            )
                                        ) Honorable Terry J. Hatter
16          v.                          )
                                        ) Date: May 6, 2013
17  ERIC HOLDER, United States Attorney ) Time: Under Submission
    General; JANET NAPOLITANO,          )
18  Secretary, Homeland Security; THOMAS )
    G. SNOW, Acting Director, Executive )
19  Office for Immigration Review; TIMOTHY )
    ROBBINS, Field Office Director, Los )
20  Angeles District Immigration and Customs )
    Enforcement; WESLEY LEE, Officer-in- )
21  Charge, Mira Loma Detention Center; et al.; )
    RODNEY PENNER, Captain, Mira Loma   )
22  Detention Center; SANDRA HUTCHENS,  )
    Sheriff of Orange County; OFFICER   )
23  NGUYEN, Officer-in-Charge, Theo Lacy )
    Facility; CAPTAIN DAVIS             )
24  NIGHSWONGER, Commander, Theo Lacy   )
    Facility; CAPTAIN MIKE KREUGER,     )
25  Operations Manager, James A. Musick )
    Facility; ARTHUR EDWARDS, Officer-in- )
26  Charge, Santa Ana City Jail; RUSSELL )
    DAVIS, Jail Administrator, Santa Ana City )
27  Jail,                               )
                                        )
28              Respondents.            )
    _____    )

1   JUDY RABINOVITZ
    JRabinovitz@aclu.org
2   AMERICAN CIVIL LIBERTIES FOUNDATION
    IMMIGRANTS' RIGHTS PROJECT
3   125 Broad Street, 18th Floor
    New York, NY  10004
4   Telephone:  (212) 549-2618
    Facsimile:  (212) 549-2654
5
    MICHAEL TAN (SBN 284869)
6   mtan@aclu.org
    AMERICAN CIVIL LIBERTIES FOUNDATION
7   IMMIGRANTS' RIGHTS PROJECT
    39 Drumm St.
8   San Francisco, CA  94111
    Telephone:   (415) 343-0779
9   Facsimile:   (415) 395-0950

10  JAYASHRI SRIKANTIAH (SBN 189566)
    jsrikantiah@law.stanford.edu
11  STANFORD LAW SCHOOL
    IMMIGRANTS' RIGHTS CLINIC
12  Crown Quadrangle
    559 Nathan Abbott Way
13  Stanford, CA  94305-8610
    Telephone:  (650) 724-2442
14  Facsimile:  (650) 723-4426

15  SEAN COMMONS (SBN 217603)
    scommons@sidley.com
16  CODY JACOBS (SBN 272276)
    cjacobs@sidley.com
17  JONATHAN FEINGOLD (SBN 286302)
    jfeingold@sidley.com
18  SIDLEY AUSTIN LLP
    555 West Fifth Street, Suite 4000
19  Los Angeles, CA  90013-1010
    Telephone:  (213) 896-6000
20  Facsimile:  (213) 896-6600

21  *Attorneys for Petitioners*

22

23

24

25

26

27

28

Petitioners respectfully submit this reply to Respondents' Opposition to Petitioners' Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment or, in the Alternative, Summary Adjudication (Dkt. 299-3). For the Court's convenience, Petitioners have organized this reply in the same manner as their original statement of undisputed facts (Dkt. 282), namely by identifying the facts relevant to the seven specific issues raised by Petitioners' motion for summary judgment or adjudication, followed by the background facts not necessary to resolve those issues, but submitted to provide context for Petitioners' claims in this litigation. In addition, Petitioners have organized the assertions, objections, and responses into three columns as follows: (1) the first and left-most column contains the uncontroverted facts advanced by Petitioners, along with the supporting evidence; (2) the middle column contains Respondents' objections, responses, and evidence (if any); and (3) where applicable, the third and right-most column contains Petitioners' rejoinder.

**Issue 1: Members Of The 1226(c) Subclass Are Entitled To *Casas* Hearings[1]**

| Uncontroverted Fact | Respondents' Position | Petitioners' Reply |
|---|---|---|
| Class members are being detained in the Central District of California pursuant to 8 U.S.C. § 1226(c). Petitioners' Motion for Class Certification, Declaration of Jennifer Stark ¶¶ 3, 15 (Dkt. 101-2); | Not Disputed. | This fact is established. |

[1] A "*Casas* hearing" is a bond hearing where the government bears the burden of proof by clear and convincing evidence to show that a detainee presents a danger or flight risk sufficient to justify his or her detention. *See V. Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011); *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 951 (9th Cir. 2008). In addition, a *Casas* bond hearing must be recorded for transcription. *V. Singh*, 638 F.3d at 1208-10.

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Fact | Respondents' Position | Petitioners' Reply |
|---|---|---|
| Respondents' Notice of Non-Opposition to Petitioners' Motion for Class Certification at 2-3 (Dkt. 122) | | |
| But for the preliminary injunction entered by this Court on September 13, 2012, Respondents would not have a policy or practice of providing and would not provide *Casas* hearings to persons in the 1226(c) Subclass.<br><br>Responses of the Department of Justice to Petitioners' First Set of Requests for Admission No. 1 (Kaufman Dec. Ex. K); Deposition of Assistant Chief Immigration Judge Thomas Fong (hereinafter "Fong Depo") at 88:16-18; 88:25-89:5 (attached as Exhibit E to the Declaration of Cody Jacobs (hereinafter "Jacobs Dec.")) | Respondents do not dispute that but for the preliminary injunction, Respondents would not have a policy or practice of providing bond hearings to aliens detained under section 1226(c), but dispute that such aliens are entitled to *Casas* hearings as a matter of law. | Respondents admit the material fact and merely dispute the legal conclusion that follows from the undisputed material fact. As a result, this fact is established. |
| Prior to the preliminary injunction entered by this Court on September 13, 2012, persons in the 1226(c) Subclass were being detained for six months or longer without a bond hearing.<br><br>Fong Depo. at 88:16-18; 88:25-89:5 (Jacobs Dec. Ex. E); Responses of the | Respondents do not dispute that some aliens detained under section 1226(c) are detained for more than six months, but deny any suggestion that *all* aliens detained under section 1226(c) are detained for six months or longer. | Respondents admit the material fact and merely dispute a hypothetical misreading of the material fact because the Subclass, by definition, is limited to persons detained at least six months. As a result, this fact is established. |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Fact | Respondents' Position | Petitioners' Reply |
|---|---|---|
| Department of Justice to Petitioners' First Set of Requests for Admission No. 1 (Kaufman Dec. Ex. K); Petitioners' Motion for Class Certification, Declaration of Jennifer Stark ¶¶ 3, 15 (Dkt. 101-2) | | |

### Petitioners' Conclusion of Law

Persons detained pursuant to 8 U.S.C. § 1226(c) are entitled to a *Casas* hearing no later than six (6) months after being detained. *See Diouf v. Napolitano* (*Diouf II*), 634 F.3d 1081, 1086 (9th Cir. 2011) (holding that detention becomes prolonged at six months, and therefore that 8 U.S.C. § 1231(a) should be read to require *Casas* bond hearings for individuals detained more than six months under that statute); *Casas-Castrillon v. DHS*, 535 F.3d 942, 950 (9th Cir. 2008) (holding that prolonged detention without a bond hearing raises serious constitutional concerns and construing Section 1226(c) to authorize only brief detention without a bond hearing); *cf. Demore v. Kim*, 538 U.S. 510, 523, 526, 530-31 (2003) (upholding constitutionality of "brief" mandatory detentions under Section 1226(c)).

### Respondents' Conclusions of Law

Respondents did not set forth objections to Petitioners' conclusions of law within their opposition to Petitioners' separate statement. *See* Dkt. 299-3.

### Issue 2:  Members Of The 1225(b) Subclass Are Entitled To Bond Hearings

| Uncontroverted Fact | Respondents' Position | Petitioners' Reply |
|---|---|---|
| Class members are being detained in the Central District of California pursuant to 8 U.S.C. | Not Disputed. | This fact is established. |

| | | |
|---|---|---|
| § 1225(b).<br><br>Petitioners' Motion for Class Certification, Declaration of Jennifer Stark ¶¶ 3, 15 (Dkt. 101-2); Respondents' Notice of Non-Opposition to Petitioners' Motion for Class Certification at 2-3 (Dkt. 122) | | |
| But for the preliminary injunction entered by this Court on September 13, 2012, Respondents would not have a policy or practice of providing and would not provide *Casas* hearings to persons in the 1225(b) Subclass.<br><br>Deposition of Assistant Field Office Director Wesley Lee (hereinafter "Lee Depo.") at 17:8-10 (Dec. Ex. F) | Respondents do not dispute that but for the preliminary injunction, Respondents would not have a policy or practice of providing bond hearings to aliens detained under section 1225(b), but dispute that such aliens are entitled to *Casas* hearings as a matter of law. | Respondents admit the material fact and merely dispute the legal conclusion that follows from the undisputed material fact. As a result, this fact is established. |
| But for the preliminary injunction entered by this Court on September 13, 2012, persons in the 1225(b) Subclass would be detained for six months or longer without a bond hearing.<br><br>Lee Depo. at 44:18 – 45:9 (Jacobs Dec. Ex. F); Petitioners' Motion for Class Certification, Declaration of Jennifer Stark ¶¶ 3, 15 (Dkt. 101-2) | Respondents do not dispute that some aliens detained under section 1225(b) are detained for more than six months, but deny any suggestion that all aliens detained under section 1225(b) are detained for six months or longer. | Respondents admit the material fact and merely dispute a hypothetical misreading of the material fact because the Subclass, by definition, is limited to persons detained at least six months. As a result, this fact is established. |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

1

2

**Petitioners' Conclusions of Law**

Persons detained pursuant to 8 U.S.C. § 1225(b) are entitled to a bond hearing no later than six (6) months after being detained. *See Diouf II*, 634 F.3d at 1086 (holding that detention becomes prolonged at six months, and that 8 U.S.C. § 1231(a) should be read to require *Casas* bond hearings for individuals detained more than six months); *Casas-Castrillon*, 535 F.3d at 950 (holding that prolonged detention without a bond hearing raises serious constitutional concerns, and construing Section 1226(c) to authorize only brief detention without a bond hearing); *cf. Demore v. Kim*, 538 U.S. 510, 523, 526, 530-31 (2003).

8 U.S.C. § 1225(b) applies to non-citizens "seeking admission" to the United States, including certain lawful permanent residents returning from trips abroad, and the statute must be construed in light of its application to such lawfully admitted non-citizens. *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1077 (9th Cir. 2006) (recognizing that lawfully-admitted non-citizens are detained under Section 1225(b), and construing that statute to permit only a "brief and reasonable" detention period of presumptively six months); *see also Clark*, 543 U.S. at 378 (construing Section 1225 to avoid constitutional problems arising from its applicability to lawfully-admitted noncitizens).

**Respondents' Conclusions of Law**

Respondents did not set forth objections to Petitioners' conclusions of law within their opposition to Petitioners' separate statement. *See* Dkt. 299-3.

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

1

2

3

4

5

6

### Issue 3:  Members Of The 1226(a) Subclass Are Entitled To Bond Hearings

| Uncontroverted Fact | Respondents' Position | Petitioners' Reply |
|---|---|---|
| Class members are being detained in the Central District of California pursuant to 8 U.S.C. § 1226(a).<br><br>Petitioners' Motion for Class Certification, Declaration of Jennifer Stark ¶¶ 3, 15 (Dkt. 101-2); Respondents' Notice of Non-Opposition to Petitioners' Motion for Class Certification at 2-3 (Dkt. 122) | Not Disputed. | This fact is established. |
| Respondents do not have a policy or practice of providing and would not provide a *Casas* hearing to persons in the 1226(a) Subclass who have been detained more than six months.<br><br>Fong Depo. at 45:12-46:24 (Jacobs Dec. Ex. E) | Disputed.  ICE informs aliens who have filed a petition for review and whose removal has been stayed with a hearing to which they are entitled under *Casas*.  Once an alien files a petition for review and requests a stay and becomes eligible for a *Casas* hearing, the ICE Los Angeles Field Office prepares a letter to the alien informing the alien that he | Respondents admit that they do not provide a *Casas* hearing to Section 1226(a) Class members after they are detained for six months. Respondents' purported opposition addresses a different factual issue – that some individuals are re-classified as Section 1226(a) Class members after they file a petition for review and request a |

27

28

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| 1 | or she is eligible to request a *Casas* hearing.  Exh. A[2], Lee Dep.[3] 49:7-49: 19. *See also*, Exh. L (*Casas/Diouf* Notice Letter).  This notice is provided regardless of whether an alien is seeking review of a final order (the situation addressed in *Casas*), or review of the denial of a motion to reopen (the situation in *Diouf*). Lee Dep. 93:9-93:25. | stay of removal, and at that point can request a *Casas* hearing.  That fact is not material to Petitioners' claims, as Petitioners seek a Casas hearing for all members of the Section 1226(a) Subclass.  Respondents' position is also in conflict with the position taken in their brief to the extent they intend to state here that all individuals who file a petition for review and request a stay of removal become eligible for *Casas* hearings, as they argue in their brief that *Casas* only applies where the individual has not previously had a bond hearing.  *See* Dkt. 299 at 28-30. Notwithstanding this apparent inconsistency, because Respondents do not oppose the uncontroverted material fact, which is that not all members of the Section 1226(a) Subclass receive *Casas* hearings under the present system, the fact is established. |

[2] All exhibits labeled "Exh. ___ " are exhibits to the contemporaneously filed Declaration of Theodore W. Atkinson.

[3] "Lee Dep." refers to designated pages from the Deposition of Assistant Field Office Director Wesley J. Lee, attached as Exh. A to the Atkinson Declaration.

7

## Petitioners' Conclusions of Law

Persons detained pursuant to 8 U.S.C. § 1226(a) are entitled to a *Casas* hearing no later than six (6) months after being detained.  *See Casas-Castrillon v. DHS*, 535 F.3d at 950; *Diouf II*, 634 F.3d at 1086 (holding that detention becomes prolonged at six months).

Class members detained pursuant to 8 U.S.C. § 1226(a) include people who have a reinstated prior order of removal and are detained pending a reasonable fear determination and withholding-only removal proceedings, people who entered the country through the Visa Waiver Program, and others in various procedural postures that are not explicitly exempt from the class definition.  *See Ortiz-Alfaro v. Holder*, 694 F.3d 955, 958 (9th Cir. 2012) (holding that reinstated removal orders are not "final" until completion of reasonable fear and withholding-only proceedings); *see generally* 8 U.S.C. § 1187 (Visa Waiver Program).

## Respondents' Conclusions of Law

Respondents did not set forth objections to Petitioners' conclusions of law within their opposition to Petitioners' separate statement.  *See* Dkt. 299-3.

## Issue 4:  Members Of The 1231(a) Subclass Are Entitled To Bond Hearings

| Uncontroverted Fact | Respondents' Position | Petitioners' Reply |
|---|---|---|
| Class members are being detained in the Central District of California pursuant to 8 U.S.C. § 1231(a).<br><br>Petitioners' Motion for Class Certification, Declaration of Jennifer Stark ¶¶ 3, 15 (Dkt. 101-2) Respondents' Notice of Non-Opposition to | Not Disputed. | This fact is established. |

| | | |
|---|---|---|
| Petitioners' Motion for Class Certification, at 2-3 (Dkt. 122) | | |
| Prior to recent Ninth Circuit precedent, Respondents did not have a policy or practice of providing and would not provide a *Casas* hearing to persons in the Section 1231(a) Subclass.<br><br>Arulanantham Dec. ¶¶ 104, 157-58 | Respondents do not dispute that aliens now eligible for a bond hearing under *Diouf* did not receive such a hearing prior to *Diouf*, but dispute that practices now outdated by intervening case law are material to this action, which challenges current policies, practices, and procedures. | Respondents admit the material fact and merely dispute the legal conclusion that follows from the undisputed material fact.  In addition, Respondents' Cross Motion suggests that they still do not provide *Casas* hearings to some Section 1231(a) Subclass members.  *See* Dkt. 299 at 15 (interpreting *Diouf II* to authorize *Casas* hearings for only a subset of individuals detained under Section 1231(a)).  As a result, this fact is established. |
| Prior to recent Ninth Circuit precedent, persons in the Section 1231(a) Subclass were being detained for six months or longer without a bond hearing.<br><br>Arulanantham Dec. ¶¶ 104, 157-58 | Respondents (1) do not dispute that aliens now eligible for a bond hearing under *Diouf* were detained without an opportunity for a bond hearing for longer than six months, (2) dispute that *all* such aliens were detained for six months or longer, and (3) dispute that practices now outdated by intervening case law are material to this action, which challenges current policies, practices, and procedures. | Respondents admit the material fact and merely dispute (a) a hypothetical misreading of the material fact because the Subclass, by definition, is limited to persons detained at least six months; and (b) the legal conclusion that follows from the undisputed material fact.  As a result, this fact is established. |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

**Petitioners' Conclusion of Law**

Persons detained pursuant to 8 U.S.C. § 1231(a) are entitled to a *Casas* hearing no later than six (6) months after being detained.  *See Diouf II*, 634 F.3d at 1086 (extending *Casas* to people detained for six months or more under Section 1231(a)(6)).

**Respondents' Conclusions of Law**

Respondents did not set forth objections to Petitioners' conclusions of law within their opposition to Petitioners' separate statement.  *See* Dkt. 299-3.

**Issue 6:  All Class Members Are Entitled To A Bond Hearing Before An Immigration Judge That Considers The Likelihood That A Detainee Will Ultimately Be Deported, The Length Of Past And Future Detention, And Alternatives To Detention**

| Uncontroverted Fact | Respondents' Position | Petitioners' Reply |
|---|---|---|
| Before and after the preliminary injunction entered by this Court on September 13, 2012, Respondents have not had and do not have a consistent policy or practice of considering, at class members' bond hearings, the likelihood that persons in the class will ultimately be deported.<br><br>Fong Depo. at 49:5-51:7; 53:21-54:25; 135:5-14 (Jacobs Dec. Ex. E); *In re Guerra*, 24 I.&N. Dec. 37 (BIA 2006) | Not Disputed. | This fact is established. |
| Before and after the preliminary injunction | Respondents provided no response.  Dkt. 299-3 at p. | This fact is established. |

| | | |
|---|---|---|
| entered by this Court on September 13, 2012, Respondents have not had and do not have a consistent policy or practice of considering, at class members' bond hearings, the length of past and future detention.<br><br>Fong Depo. at 46:3-9 (Jacobs Dec. Ex. E); *In re Guerra*, 24 I.&N. Dec. 37 (BIA 2006) | 3. | |
| Before and after the preliminary injunction entered by this Court on September 13, 2012, Respondents have not had and do not have a consistent policy or practice of considering alternatives to detention at bond hearings for class members.<br><br>Fong Depo. at 57:11-59:14 (Jacobs Dec. Ex. E); *In re Guerra*, 24 I. & N. Dec. 37 (BIA 2006) | Respondents provided no response.  Dkt. 299-3 at p. 3. | This fact is established. |

### Petitioners' Conclusions of Law

All Class members -- persons detained pursuant to 8 U.S.C. §§ 1225(b), 1226(a), 1226(c), 1231(a) without adequate bond hearings for six months or more -- are entitled to a bond hearing that considers the likelihood that a detainee will ultimately be deported.  *See Owino v. Napolitano*, 575 F.3d 952, 955 (9th Cir. 2009) (holding that when a noncitizen is "not significantly likely to be removed" upon conclusion of judicial and administrative review of his case, continued detention is

unreasonable "and no longer authorized by statute") (citations omitted); *Nadarajah v. Gonzales*, 443 F.3d 1069 (9th Cir. 2005) (finding that detention of individual who had won asylum and CAT relief was no longer authorized by statute despite pending government appeal to Attorney General).

All Class members are entitled to a bond hearing that considers the length of past and future detentions. *See Diouf II*, 634 F.3d at 1091 (recognizing that detainees' deprivation of liberty worsens as detention lengthens).

All Class members are entitled to a bond hearing that considers the use of alternatives to detention. *See United States v. Salerno*, 481 U.S. 739, 750-52 (1987) (upholding a federal bail statute permitting pretrial detention in part because the statute required strict procedural protections for detention, including prompt hearings before a judicial officer where the government bore the burden of proving dangerousness by clear and convincing evidence that no conditions short of detention would satisfy the government's interest in preventing flight and danger).

### Respondents' Conclusions of Law

Respondents did not set forth objections to Petitioners' conclusions of law within their opposition to Petitioners' separate statement. *See* Dkt. 299-3.

### Issue 7:  All Class Members Are Entitled To Automatic And Periodic Bond Hearings And Adequate Advanced Notice Prior To Bond Hearings

| Uncontroverted Fact | Respondents' Position | Petitioners' Reply |
|---|---|---|
| Respondents do not have a policy or practice of providing and would not provide periodic bond hearings to persons in the Class who are either denied bond at their first bond hearing after six months or unable to pay the bond set at | Respondents do not dispute that there is no practice, policy or procedure to provide aliens detained under Sections 1225(b), 1226(c) and 1231(a) with "periodic" bond hearings.  Respondents dispute that | Respondents admit the material fact as to persons in the Section 1225(b), Section 1226(c), and Section 1231(a) Subclasses, and fail to provide any admissible evidence to dispute it as to the |

| | | |
|---|---|---|
| that first bond hearing.<br><br>Fong Depo. at 46:3-9 (Jacobs Dec. Ex. E) | they "would not" provide additional bond hearings to aliens requesting a hearing and eligible to request a hearing under section 1226(a). | Section 1226(a) Subclass. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("summary judgment … cannot be defeated by relying solely on conclusory allegations unsupported by factual data"); Local Rule 7-6 (requiring submission of evidence to support factual assertions).  As a result, this fact is established. |
| The administrative burden on Respondents to provide a bond hearing at least once every six months is low, especially when compared to the costs of detention.<br><br>Dkt. 165 (stipulation regarding costs); Fong Depo. 17:2-4, 19:3-5, 96:2-97:6 (attached as Ex. 2 to Dkt. Entry 3-3 in *Rodriguez v. Robbins*, Case No. 12-56734 (9th Cir. 2012)) | Respondents have stipulated that the monetary costs of providing a bond hearing to an alien is less than the monetary cost of detaining an alien. Respondents dispute that the administrative burden is "low." | This fact is established because Respondents fail to provide any admissible evidence to dispute it. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| Respondents do not have a policy or practice of providing notice to allow the detainee or his or her counsel to receive notice at least 7 days in advance of bond hearings to Class members or their legal counsel.<br><br>Declaration of Stacy | Disputed.  At the time of an initial custody determination, aliens detained under section 1226(a) who are denied release on bond or other conditions by ICE are informed in writing by ICE that they may request review of that custody determination by an | None of Respondents' cited evidence establishes that Respondents have a policy or practice of providing detainees and their counsel with written notice at least *seven days* in advance of bond hearings for *Class members*.  The evidence |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Tolchin, ¶¶ 6-8 | immigration judge.  Exh. D (Notice of Custody Determination); Lee Dep. 18:4-20:17.  Aliens detained under sections 1226(a) or 1231 and who are entitled to a bond hearing under either *Casas* or *Diouf* receive written notice informing them of their eligibility for and right to request a custody redetermination hearing before an immigration judge.  Lee Dep. 49:7-49:19; 93:9-93:25; Exh. L. | Respondents cite says nothing about ensuring written notice at least seven days in advance of a bond hearing and does not refer to hearings specifically for Class members.  As a result, Respondents have failed to provide any admissible evidence to dispute this material fact, and it thus is established.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |

## Petitioners' Conclusions of Law

All Class members -- persons detained pursuant to 8 U.S.C. §§ 1225(b), 1226(a), 1226(c), 1231(a) without adequate bond hearings for six months or more -- are entitled to automatic bond hearings.  *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Doe v. Gallinot*, 657 F.2d 1017, 1022 (9th Cir. 1981) (holding that the protection of hearings that detainees must affirmatively request is "illusory" when detainees "cannot realistically be expected to set the proceedings into motion").

All Class members are entitled to at least one bond hearing every six months after their initial bond hearing.  *Diouf II*, 634 F.3d 1091 ("When the period of detention becomes prolonged, 'the private interest that will be affected by the official action' . . . is more substantial."); *id*. at 1089 (noting that regulations establishing Post Order Custody Reviews require them to occur at 180 days, 12 months, and 18 months).

All Class members are entitled to receive a notice that states in plain language what they must know to prepare arguments and evidence or obtain legal counsel for

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

the hearing. *See Padilla-Agustin v. INS*, 21 F.3d 970 (9th Cir. 1994), *overruled on other grounds by Stone v. INS*, 514 U.S. 386 (1995) (clarifying that "[p]articularly when the alien is representing himself and has language difficulties, as is so often the case . . . a high degree of clarity should be a part of the process accorded"); *Orantes-Hernandez v. Smith*, 541 F.Supp. 351, 384 (C.D. Cal. 1982) (acknowledging, in immigration detention context that "incarcerated persons, though most in need of an opportunity to be heard, are least able to learn about their rights."); *see also Martinez de Bojorquez v. Ashcroft*, 365 F.3d 800, 804 (9th Cir. 2004) (holding that EOIR failure to provide noncitizen notice of consequences of departures from United States violated procedural due process); *see also Walters*, 145 F.3d at 1043 (striking down INS procedures in part because "the alien never learns *how* to take advantage of the . . . procedures because the combined effect of all the [immigration] forms together is confusion").

## Respondents' Conclusions of Law

Respondents did not set forth objections to Petitioners' conclusions of law within their opposition to Petitioners' separate statement. *See* Dkt. 299-3.

\*      \*      \*

Respondents dispute other evidence Petitioners submitted to provide context for Petitioners' claims, but which are not essential to granting summary judgment or adjudication on the seven issues raised by Petitioners' motion. Nonetheless, to protect the record, Petitioners hereby respond to the objections raised by Respondents.

## Other Background Facts Cited Either In Petitioners' Statement of Undisputed Facts (Dkt. 282) or In Respondents' Opposition to Petitioners' Statement of Undisputed Facts (Dkt. 299-3).

| Uncontroverted Fact | Respondents' Position | Petitioners' Reply |
|---|---|---|
| Approximately 70% of studied class members asserted claims for relief.<br><br>Expert Report of Professor Susan B. Long at 8-9, Table 7 (attached as Exhibit A to Declaration of Susan B. Long) | Respondents do not dispute the cited statistic with respect to the studied class, but deny that Petitioners have demonstrated that the results of the studied class are statistically representative of the class as a whole. | Respondents admit the material fact and merely raise a hypothetical challenge to its weight without citing evidence. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. As a result, this fact is established. |
| Approximately 30% of studied class members won their cases.<br><br>Expert Rebuttal Report of Professor Susan B. Long at 12-14, Table 37 (Long Dec. Ex. B) | Respondents do not dispute the cited statistic with respect to the studied class (and with clarification of what "won" means contained in Dr. Long's expert report), but deny that Petitioners have demonstrated that the results of the studied class are statistically representative of the class as a whole. | Respondents admit the material fact and merely raise a hypothetical challenge to its weight without citing evidence. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. As a result, this fact is established. |
| The average detention length for class members was no less than approximately eleven months.<br><br>Rebuttal Expert Statistical Report of Dr. Chester I. Palmer at 6, Table L-2 (Kaufman Dec. Ex. M). | Respondents do not dispute the cited statistic with respect to the studied class, but deny that Petitioners have demonstrated that the results of the studied class are statistically representative of the class as a whole. | Respondents admit the material fact and merely raise a hypothetical challenge to its weight without citing evidence. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. As a result, this fact is established. |
| Adopting the relief that Petitioners seek would save government resources.<br><br>Kaufman Dec. ¶¶ 31-33; Dkt. 165 (stipulation | Respondents dispute that this is a knowable fact. The relief Petitioners seek is sweeping and unprecedented. Respondents do not dispute | Respondents admit the material fact by acknowledging that the costs of detention exceed the costs or providing bond hearings, and |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| regarding costs) | that the monetary cost of a bond hearing, if the individual is subsequently released on bond, is less than the monetary cost of detention.  However, no other facts have been offered by Petitioners to support their claim that the relief they seek would "save government resources." | merely speculate about hypothetical costs without citing any evidence.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6.  Moreover, Respondents stipulated that they would not argue that the cost of providing the relief that Petitioners seek would justify denial of that relief.  Dkt. 165.  As a result, this fact is established. |

## Other Facts Disputed by Respondents

| Uncontroverted Fact | Respondents' Position | Petitioners' Reply |
|---|---|---|
| ICE officers may classify detainees as subject to mandatory detention without even speaking with the detainees themselves.  Pet. Mem. at 4. | Disputed.  During the initial processing of an alien, the alien is typically interviewed by an arresting or other deportation officer assigned to the case.  Lee Dep. 208:12 – 210:3; Saldana Dep.[4] 23:6-23.23.  The interview first is a determination of information consistent with the Form I-286 to complete the record of the record of deportation, Form I-213.  Saldana Dep. 23:24-25:17.  Deportation officers are trained to conduct interviews to find pertinent | None of Respondents' cited evidence establishes that ICE officers may *not* classify detainees as subject to mandatory detention *without speaking with the detainees themselves*.  Respondents' cited evidence merely relates to the potential for interviews to occur and recognizes that interviews are *not* universal.  Lee Dep. 209:10-21; Saldana Dep. 23:6-11.  Because Respondents fail to |

---

[4] "Saldana Dep." refers to designated pages from the deposition of Assistant Field Office Director Eric G. Saldana, attached as Exh. B to the Atkinson Declaration.

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | information. Saldana Dep. 25:18-25:25. Most of the deportation officers in the district speak Spanish, a language commonly spoken by encountered aliens in the Los Angeles area of operations. Lee Dep. 76:23-77:14. In cases where the ICE officer does not speak the language of the encountered alien, translation services are available through contracted services, which are typically provided through an interpreter by telephone. Lee Dep. 76:23-78:5. | provide any admissible evidence to dispute this fact, the fact is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| If an ICE officer (not an attorney) determined that a class member had been convicted of an offense triggering mandatory detention, the class member was classified as a "mandatory detainee" and deemed ineligible for release on bond, regardless of their individual circumstances. Pet. Mem. at 3. | Disputed. Although deportation officers identify cases that are subject to mandatory detention under section 1225(b) or 1226(c), they do not make the decision whether an alien is subject to mandatory detention. Saldana Dep. 36:8-37:11. Instead, once a deportation officer has met with an encountered alien and has prepared processing paperwork and the A-File materials, those materials are then forwarded to a Supervisory Detention and Deportation Officer ("SDDO"), who then makes the determination whether an alien's criminal offenses require the alien's | None of Respondents' cited evidence establishes that when ICE officers (a term that on its face includes "supervisory detention and deportation officers," who are not attorneys) determine that Class members have been convicted of an offense triggering mandatory detention, the Class members were classified as "mandatory detainees" ineligible for release on bond, regardless of their individual circumstances. The cited evidence merely relates to (1) *which* ICE |

| | | |
|---|---|---|
| | mandatory detention. Saldana Dep. 37:6-15.  If the alien is not subject to mandatory detention, the SDDO determines the conditions of release and any bond.  Saldana Dep. 37:16-37:20.  In making the initial custody determination, the SDDO may speak with other SDDOs or with the SDDO's supervisor to determine if the alien is subject to mandatory detention or, if not, to determine the conditions for release.  Saldana Dep. 37:21-38:14.  In addition, it is the practice of the ICE Los Angeles Field Office to have an additional review of the custody determination conducted at the detention facility during the alien's placement. Saldana Dep. 38:16-39:7. That review is conducted by a deportation officer, SDDO, or by an Assistant Field Office Director ("AFOD").  Saldana Dep. 39:8-39:12.  The reviewing official at the facility may redetermine the alien's custody or alter the conditions for release. Saldana Dep. 39:13-39:21. | officers make such decisions; (2) what occurs if an alien is not subject to mandatory detention, (3) the potential layers of review, and (4) who else an officer may speak with when making a determination.  As a result, Respondents have failed to provide any admissible evidence to dispute this fact; it thus is established.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| ICE officers unsure about how to classify detainees based on criminal history | Disputed.  In determining whether an alien is subject to mandatory detention | None of Respondents' cited evidence establishes that ICE |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| rely on the opinions of the same ICE attorneys who prosecute immigration cases. Pet. Mem. at 3. | under section 1226(c), SDDOs and other immigration officials rely on their own experience in identifying offenses enumerated under section 1226(c)(1)(A) – (D), and they also rely on written guidance from ICE attorneys that identify the offenses that require mandatory detention under section 1226(c). Saldana Dep. 40:22-42:13. In addition, ICE officials may rely on policies, procedures, or other information outlined on ICE's online library. Saldana 43:19-44:23. ICE field officers are also regularly updated about changes in the law that may make an alien subject to mandatory detention. *Id.* In addition, ICE officials often call upon the advice of ICE attorneys if a determining official is uncertain whether an alien's conviction requires that the alien be charged or detained under section 1226(c). Saldana Dep. 44:16-45:25; 52:10-53:6. These discussions may be held with any ICE trial attorney and may include supervisory attorneys, including Deputy Chief Counsels in the local ICE Office of Chief | officers unsure about how to classify detainees *do not* rely on the opinions of the same ICE attorneys who prosecute immigration cases. Respondents actually admit that "immigration officials rely on . . . written guidance from ICE attorneys . . ."; that "ICE officials often call upon the advice of ICE attorneys if a determining official is uncertain whether an alien's conviction requires that the alien be charged or detained under section 1226(c)"; and that such "ICE attorneys" include "ICE trial attorney[s]". The remaining evidence merely relates to the various other sources that ICE officers may rely upon. Because Respondents fail to provide any admissible evidence to dispute this fact, it is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |

20

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | Counsel. Saldana Dep. 53:9-53:16. | |
|---|---|---|
| Dr. Long's study concluded that more than 10% of the studied class members in the Section 1226(c) Subclass won their cases by obtaining terminations of the proceedings brought against them. Pet. Mem. at 5. | Disputed. According to Petitioners' expert, only 4.3% of the 1226(c) studied class members "won" their cases by having their cases terminated. *See* Long Report[5] at B-4 (20 of 460 cases were terminated). | No dispute exists because Respondents are misreading Dr. Long's study. The study found that more than 10% of the Section 1226(c) Subclass *who won their cases* did so by obtaining terminations, not that 10% of the Subclass overall won their cases by termination. Respondents fail to provide any admissible evidence to dispute this fact (as clarified); it thus is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| About 1 in 3 won their cases by obtaining relief from removal – relief which in many cases the government chose not to appeal. Pet. Mem. at 4. | Disputed. According to Petitioners' expert, 28% "won" by obtaining relief from removal. *See* Long Report at B-4 (130 of 460 cases with relief granted). | No dispute exists because Respondents are misreading Dr. Long's study. The study found that 130 Subclass members "won" their cases by obtaining relief from removal, out of 409 completed cases (32%). Furthermore, the outcome statistics in Dr. Long's first report undercount Class member success because it includes individuals who were not Class |

[5] "Long Report" refers to the report offered by Dr. Susan Long, attached as Exhibit A to her declaration filed in support of Petitioners' motion for summary judgment. [ECF No. 282].

21

| | | members (despite Respondents having treated them as such), all of whom lost their cases. Dkt. 281-6, Ex. B (Rebuttal Report of Dr. Long) at 13 n.8. Moreover, even under Respondents' misreading, 28% is "about 1 in 3." Respondents fail to provide any admissible evidence to dispute this fact (as clarified); it thus is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| The form provided to immigrants simply does not disclose the right to request a *Joseph* hearing. Pet. Mem. at 6. | Disputed. Although there is no form provided to aliens by Respondents that informs them of their right to seek a Joseph hearing, whether an alien is properly categorized as a mandatory detainee is reviewed as a matter of practice and policy by immigration judges. In making a determination of whether an alien is subject to mandatory detention under section 1226(c), an immigration judge will normally first look to the Form I-286. Fong Dep.[6] 60:13-61:4. If it is unclear, | Notwithstanding Respondents' purported opposition to this background fact, Respondents admit that "there is no form provided to aliens by Respondents that informs them of their right to seek a *Joseph* hearing." Respondents' remaining evidence merely relates to other aspects of the custody determination and bond hearing processes. As a result, the fact is established. |

[6] Fong Dep." refers to designated pages from the deposition of Assistant Chief Immigration Judge Thomas Y.K. Fong, attached as Exh. C to the Atkinson Declaration.

22

| | | |
|---|---|---|
| | an immigration judge will normally seek clarification at a master calendar hearing, and will advise the alien of a right to bond and, if not, why not.  Fong Dep. 60:5-61:18.  Apart from the detention classification indicated on the Form I-286, immigration judges take steps to ensure than an individual is informed of his or her rights and the rights for which the individual is eligible.  Fong Dep. 61:20-62:17.  If the government makes a custody determination that the immigration judge believes is incorrect, then it is the immigration judge's responsibility to make an independent determination of whether the government's detention classification is correct or incorrect.  Fong Dep. 62:12-63:22.  Indeed, Judge Fong testified that "it has always been one of the clearest instructions and authorities of immigration judges to inform an individual, regardless of their representation, of the rights they have for relief . . . ." Fong Dep. 64:2-64:6. | |
| Despite twenty years of service as an Immigration Judge, the Assistant Chief | Disputed.  Judge Fong does not hear cases full time, and only hears cases on the non- | Notwithstanding Respondents' purported opposition, |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| Immigration Judge for a large portion of the western United States could not recall ever having conducted a Joseph hearing or receiving a question from another judge about a Joseph hearing. Pet. Mem. at 6. | detained docket. Fong Dep. 12:1-12:7. Moreover, Judge Fong did not think it was unusual that he was not frequently asked by immigration judges he oversees about the case, because *Matter of Joseph* "is a case that has been around for 20 years," and, accordingly, he would expect that 101 immigration judges should be familiar with it." Fong Dep. 71:11-71:16. | Respondents' evidence does not establish that Judge Fong (who testified as Respondents' Rule 30(b)(6) witness) could recall ever having conducted a *Joseph* hearing or receiving a question from another judge about a *Joseph* hearing; rather, the cited evidence admits this fact and merely disputes its relevance. As a result, the fact is established. |
| The overwhelming majority of individuals in the Section 1225(b) Subclass have no criminal history. Pet. Mem. at 7. | Disputed. Petitioners ignore deposition testimony that there is typically no criminal history readily available from an arriving alien's home country (or no criminal history in the United States because the alien has never visited the United States), and thus the type of review conducted is different than for other custody determinations. Lee Dep. 36:6-36:15. Specifically, parole determinations include consideration of a variety of factors, but focus primarily on identification, flight risk, and danger to the community. Lee Dep. 33:20-34:6; 100:6-100:23. According to AFOD Lee, in the case of an arriving alien, typically there is no criminal record for that | Respondents do not dispute the fact that the overwhelming majority of 1225(b) Subclass members do not have a criminal history in the United States, and do not offer admissible evidence to support speculation about hypothetical criminal histories in other countries. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. As a result, this fact is established. |

24

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | alien available to ICE officials in the United States, but that does not indicate that the alien has no criminal history. *Id.* | |
| Respondents interpret Section 1225(b) and 8 C.F.R. § 1003.19(h)(2)(i)(B) as granting unfettered discretion to ICE officers about whether to detain or release class members, without any possibility for review by an Immigration Judge. Pet. Mem. at 7. | Disputed. Any alien being considered for parole by immigration officials at the Los Angeles Field Office is provided with a written notice that an interview will be held. Lee Dep. 47:24; 101:1-103:11; Exh. E. ICE also provides each alien with a questionnaire the alien is required to fill out in advance of the parole interview. Lee Dep. 103:18-104:3; Exh. F. Detainees are also interviewed by immigration officers as part of the parole determination process. Lee Dep. 104:4-104:9. There is a parole determination worksheet ICE immigration officers use in conducting the parole determination, Exh. G, but ICE officers also take extensive notes during the interview and after. Lee Dep. 107:24-108:15. ICE informs the alien of the decision within 7 days of the interview. Lee Dep. 47:22-48:6. In addition to an oral explanation typically provided to the alien of the decision, Lee Dep. 106:18-107:21. After a parole | Notwithstanding Respondents' purported opposition, none of Respondents' cited evidence establishes that Respondents do *not* interpret Section 1225(b) and 8 C.F.R. § 1003.19(h)(2)(i)(B) as granting unfettered discretion to ICE officers about whether to detain or release Class members, without any possibility for review by an Immigration Judge. Respondents' evidence either relates to other aspects of parole determination procedures or to judicial review by federal courts in habeas cases. As a result, the fact is established. |

| 1 | | decision is made, an alien | |
| 2 | | may make a request for | |
| 3 | | additional parole | |
| 4 | | determinations, which they | |
| 5 | | typically do when they have | |
| 6 | | new or better evidence to | |
| 7 | | establish they are not a | |
| 8 | | flight risk.  Lee Dep. 47:11- | |
| 9 | | 47:21.  Parole | |
| 10 | | determinations are also | |
| 11 | | made in accordance with a | |
| 12 | | 2011 Memorandum entitled | |
| 13 | | Parole of Arriving Aliens | |
| 14 | | Found to Have a Credible | |
| 15 | | Fear of Persecution or | |
| 16 | | Torture.  Lee Dep. | |
| 17 | | 114:20115:5; Exh. I.  Under | |
| 18 | | those guidelines, once an | |
| 19 | | arriving alien has | |
| 20 | | established a credible fear, | |
| 21 | | then the alien will be | |
| 22 | | released if the alien can | |
| 23 | | show appropriate | |
| 24 | | identification and a | |
| 25 | | verifiable sponsor.  Lee | |
| 26 | | Dep. 123:2-123:15; *see also* | |
| 27 | | Exh. I.  The current policy | |
| 28 | | (reflected in the Parole | |

decision is made, an alien
may make a request for
additional parole
determinations, which they
typically do when they have
new or better evidence to
establish they are not a
flight risk.  Lee Dep. 47:11-
47:21.  Parole
determinations are also
made in accordance with a
2011 Memorandum entitled
Parole of Arriving Aliens
Found to Have a Credible
Fear of Persecution or
Torture.  Lee Dep.
114:20115:5; Exh. I.  Under
those guidelines, once an
arriving alien has
established a credible fear,
then the alien will be
released if the alien can
show appropriate
identification and a
verifiable sponsor.  Lee
Dep. 123:2-123:15; *see also*
Exh. I.  The current policy
(reflected in the Parole
Determination Guidelines
memorandum cited above),
is favorable to an arriving
alien because under the
policy, if ICE has been
presented with some
information regarding an
alien's identification, and
ICE does not have a reason
to believe that identification
is false, then ICE will
accept the identity
information.  Lee Dep.

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | 36:25-37:11; 134:24-136:17.  Parole decisions are subject to judicial review, and may be set aside if not made for a facially legitimate and bona fide reason. | |
| The officers determine if detainees are eligible for release on parole – a form of discretionary release under 8 U.S.C. § 1182(d)(5)(A), which requires a showing that release is necessary for an "urgent humanitarian reason" or to create a "significant public benefit" – using "worksheets" approved by supervisory officers who typically do not interview detainees.  Pet. Mem. at 7-8. | Disputed.  With respect to parole decisions, AFOD Lee makes the final determination, based on a recommendation from deportation officers and SDDOs he oversees.  Lee Dep. 3-17:10.  Thus, parole determinations undergo three levels of recommendation and review before the alien arrives at the detention facility: the deportation officer makes a recommendation, the SDDO reviews the recommendation, and the AFOD reviews the SDDO's recommendation and makes a determination.

Arriving aliens seeking parole are typically interviewed by immigration officials prior to a parole determination being made.  Any alien being considered for parole by immigration officials at the Los Angeles Field Office is provided with a written notice that an interview will be held.  Lee Dep. 47:24; 101:1-103:11; | Notwithstanding Respondents' purported opposition, Respondents' cited evidence fails to establish that ICE officers do *not* determine if a detainee is eligible for release on parole based on "worksheets" approved by supervisory officers who typically do not interview detainees, given that an Assistant Field Officer Director is an "ICE officer."  The cited evidence instead relates to other aspects of the parole determination process.  Respondents further admit that ICE officers often utilize a "worksheet" when conducting a parole determination.  Because Respondents present no admissible evidence contesting the undisputed the fact, it is established.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

Exh. E.  ICE also provides each alien with a questionnaire the alien is required to fill out in advance of the parole interview.  Lee Dep. 103:18-104:3.  Deportation officers are trained to conduct interviews to find pertinent information.  Saldana Dep. 25:18-25:25.  Detainees are interviewed by immigration officers as part of the parole determination process.  Lee Dep. 104:4-104:9.  Most of the deportation officers in the district speak Spanish, a language commonly spoken by encountered aliens in the Los Angeles area of operations.  Lee Dep. 76:23-77:14.  In cases where the ICE officer does not speak the language of the encountered alien, translation services are available through contracted services, which are typically provided through an interpreter by telephone.  Lee Dep. 76:23-78:5.

In addition to review at the Los Angeles Field Office, an additional custody review is conducted at the detention facility, including a review of the Notice to Appear, the A-File material,

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | and an interview with the detainee. Lee Dep. 98:24-98:25; 203:9-205:18. If the circumstances warrant, the custody determination can be revised. Lee Dep. 204:10-204:12. There is a parole determination worksheet ICE immigration officers use in conducting the parole determination, Exh. G, but ICE officers also take extensive notes during the interview and after. Lee Dep. 107:24-108:15 | |
| Some parole decisions are influenced by available bed space at detention facilities. Pet. Mem. at 8. | Disputed. The availability of bed space is a factor that Lee said is taken into account when reviewing detention decisions, because they are a resource to be allocated. Lee Dep. 25:25-26:13. However, bed space is only a factor when there is a shortage, Lee Dep. 242:12-242:17, and it is not a factor in the Los Angeles area because of the availability of bed space. Lee Dep. 243:1-243:4. In the Los Angeles area of responsibility, during the period of much of this action, there were five detention facilities: one at at Mira Loma; one at Adelanto; one at Santa Ana; and two in Orange County, the Theo Lacy and James Musick detention facilities. | Notwithstanding Respondents' purported opposition to this fact, Respondents admit that in some instances, "the availability of bed space is a factor . . . when reviewing detention decisions." Moreover, Respondents do not dispute that Officer Lee stated that "I think the custody decision really has always been the same. It's just – it's really just been how much bed space you have", Dkt. 291 Ex. F at 40:17-23, and this admission is binding, as Respondents' designated him as their witness under Rule 30(b)(6) of the Federal Rules. Apart from admitting the fact, |

| | | |
|---|---|---|
| | Lee Dep. 24:10-24:20. These five detention facilities have bed space for approximately 2,900 detainees. Lee Dep. 24:21-24:25. In no event is bed space a primary factor in a custody determination. Lee Dep. 242:23-242:243:4. Instead, parole determinations include consideration of a variety of factors, but focus primarily on identification, flight risk, and danger to the community. Lee Dep. 33:20-34:6; 100:6-100:23. Lee testified that he has never made a determination based on bed space. Lee Dep. 26:19-26:21. Lee also testified that bed space is not a factor in any of the parole decisions he makes at Mira Loma. Lee Dep. 27:3-27:10. | Respondents' cited evidence relates merely to the extent to which bed space may be relevant, but fails to establish that bed space is *not* a factor in determining some parole decisions. As a result, the fact is established. |
| Some parole decisions are influenced by an officer's prior experience with other detainees allegedly of the same nationality. Pet. Mem. at 8. | Disputed. This allegation is not supported by the two examples cited by Petitioners. In the first example, an Ethiopian native and citizen of Somali, was denied parole because he could not present sufficient identification of his identity. The officer noted that as a result of the review, there was "an apparent correlation with all of the Somali detainees that present a paradigm of deceit | Respondents admit that an ICE officer stated in the course of making a parole determination that there was "an apparent correlation with all of the Somali detainees that present a paradigm of deceit and ambiguity of events and identity", but merely dispute the implications of that statement. Notwithstanding their purported opposition, |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | and ambiguity of events and identity." Arulanantham Decl. ¶ 88, and Exh. 74 thereto.  That decision was reached the same day as the decision reached by the same officer in the case cited by Arulanantham at ¶ 94 of his declaration – January 8, 2010 – of another alien of Somali origin who arrived at the United States at the same time as the first alien.  *See* Arulanantham Decl. at ¶ 94 (Arulanantham did not identify as an exhibit the parole decision forming the basis of his testimony).  That the officer concluded that the stories of these detainees showed evidence of correlation such to suggest deceit and ambiguity of events and identity does not support the assertion that this or any other officer denies parole based on ethnic origin. | Respondents do not contest that this officer relied on purported prior experience with other detainees allegedly of the same nationality in reaching a parole determination.  As a result, the fact is established. |
| In ICE's internal review under *Casas*, or during parole determinations, ICE does not consider length of past or anticipated future detention, likelihood of relief.  Pet. Mem. at 8. | Disputed.  Lee testified that in considering release on a *Casas* custody determination, immigration officers may consider whether the alien has prevailed in immigration proceedings and the nature of the removal proceedings. Lee Dep. 55:13-56:4. | Respondents' cited evidence fails to establish that, either during ICE's internal review under *Casas*, or during parole determinations, ICE considers *length of past or anticipated future detention*, or the *likelihood of relief*.  The cited evidence relates merely to whether, if a |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | | detainee prevails before an immigration judge, the decision triggers an automatic redetermination of a prior denial of release under *Casas* or the parole process; the evidence does not address the considerations that apply in such a redetermination. Because Respondents have provided no admissible evidence to dispute the fact that ICE does not consider length of past or anticipated future detention, or likelihood of relief, at a *Casas* hearing or in the parole process, the fact is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| The procedures governing parole decisions are deficient because officers are not required to keep formal records of conversations with detainees.  Pet. Mem. at 8-9. | Disputed.  Any alien being considered for parole by immigration officials at the Los Angeles Field Office is provided with a written notice that an interview will be held.  Lee Dep. 47:24; 101:1-103:11; Exh. E.  ICE also provides each alien with a questionnaire the alien is required to fill out in advance of the parole interview.  Lee Dep. 103:18-104:3.  Detainees are also interviewed by | None of Respondents' cited evidence establishes that officers *are required to keep formal records of conversations* with detainees.  The cited evidence relates either to notice given to a detainee prior to a parole determination, or procedures that are sometimes followed by ICE officers during parole determination |

| | | |
|---|---|---|
| | immigration officers as part of the parole determination process. Lee Dep. 104:4-104:9. There is a parole determination worksheet ICE immigration officers use in conducting the parole determination, Exh. G, but ICE officers also take extensive notes during the interview and after. Lee Dep. 107:24-108:15. | interviews. Because Respondents fail to provide admissible evidence to dispute the fact, the fact is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| There's no way to catch investigative errors by officers conducting parole interviews, who may interview non-native English speakers in English or without reliable translation services. Pet. Mem. at 8-9. | Disputed. Lee testified that there is "no way" to review *an interview* for errors. As for the availability of translation services, most of the deportation officers in the district speak Spanish, a language commonly spoken by encountered aliens in the Los Angeles area of operations. Lee Dep. 76:23-77:14. In cases where the ICE officer does not speak the language of the encountered alien, translation services are available through contracted services, which are typically provided through an interpreter by telephone. Lee Dep. 76:23-78:5.<br><br>In the first example cited by Petitioners, the parole decision was based on the alien's inability to show <u>any</u> sponsor or reliable identification, *see* | Notwithstanding Respondents' purported opposition to this fact, Respondents admit that there is "no way to review an interview for errors." The remainder of Respondents' cited evidence merely relates to (1) the availability of translation services; (2) possible options when an ICE officer does not speak the alien's language; and (3) an explanation of the fact. As a result, the fact is established. |

| | | |
|---|---|---|
| | Arulanantham Decl. ¶ 101, Exh. 87 thereto. Additionally, both aliens requested that they remain in custody until their hearing. *Id.* The decision was based on lack of reliable identification, lack of an affidavit from a sponsor, and lack of any information showing contacts in the United States. *Id.* The second example of "error" is that at one point on a parole determination worksheet, the officer referred to the arriving alien as "Mr. Mohamud," *see* Arulanantham Decl. ¶ 97. But a casual examination of the parole determination worksheet shows that the examining officer otherwise repeatedly refers to the alien by his correct name, "Mr. Yusef," including at the top of the form and throughout the form. *Id.* | |
| Officers make final parole decisions simply by checking a box on a form that contains no specific explanation and reflects no individualized deliberation. Pet. Mem. at 9. | Disputed. Lee testified at length regarding the notice, examination, interview, and review process conducted with respect to parole determinations. Any alien being considered for parole by immigration officials at the Los Angeles Field Office is provided with a written notice that an interview will be held. Lee | Respondents' cited evidence fails to establish that officers do *not make final parole decisions simply by checking a box* on a form that contains no specific explanation and reflects no individualized deliberation. The cited evidence relates to the parole process prior to |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | Dep. 47:24; 101:1-103:11; Exh. E. ICE also provides each alien with a questionnaire the alien is required to fill out in advance of the parole interview. Lee Dep. 103:18-104:3; Exh. F. Detainees are also interviewed by immigration officers as part of the parole determination process. Lee Dep. 104:4-104:9. There is a parole determination worksheet ICE immigration officers use in conducting the parole determination, Exh. G, but ICE officers also take extensive notes during the interview and after. Lee Dep. 107:24-108:15. | the final decision, specifically to (1) notice given to a detainee prior to a parole determination; (2) a questionnaire that detainees fill out prior to parole; or (3) procedures that are sometimes followed by ICE officers during parole determination interviews. Because Respondents fail to provide admissible evidence to dispute the fact, the fact is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| No procedure exists for disclosing to detainees what evidence an officer considered or relied upon to reach a decision. Pet. Mem. at 9. | Disputed. This assertion ignores the fact that an alien seeking parole is provided with a written notice that an interview will be held. Lee Dep. 47:24; 101:1-103:11. ICE also provides each alien with a questionnaire the alien is required to fill out in advance of the parole interview. Lee Dep. 103:18-104:3. As for other custody determinations, the information is either generally public knowledge, or provided by the alien. Immigration officers review a variety of materials in making custody | None of Respondents' cited evidence establishes that a *procedure exists* for disclosing to detainees what evidence an officer considered or relied upon to reach a decision. The cited evidence merely relates either to notice prior to a parole determination or the nature of information relevant to other forms of custody determinations. None of the cited evidence establishes that detainees are informed as to the |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | determinations. Primarily, in any custody determination, officers review the A-File – the administrative file containing information about the alien. Lee Dep. 78:21-78:24. Officers may also run a check of NCIC information – or "rap sheets" – to determine if there are any updates to an alien's criminal history apart from what is already contained in the A-File. Lee Dep. 78:24-79:5. Officers may also review any information provided by the alien or otherwise to determine if there is a sponsor of the alien where the alien could be housed or contacted. Lee Dep. 79:6-79:10. | actual basis for a parole determination, rather than the general considerations that apply to all parole decisions. Because Respondents fail to provide admissible evidence to dispute the fact, the fact is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| Class members cannot appeal these ICE parole decisions. Pet. Mem. at 9. | Disputed. Aliens may seek judicial review to challenge the denial of parole on the ground that the denial was not made for facially legitimate and bona fide reasons. Additionally, after a parole decision is made, an alien may make a request for additional parole determinations, which they typically do when they have new or better evidence to establish they are not a flight risk. Lee Dep. 47:11-47:21. | Respondents' cited evidence fails to establish that Class members can appeal ICE parole decisions. Rather, the cited evidence merely relates to a Class member's ability to request a new parole decision under certain limited circumstances, or to affirmatively file a habeas petition in order to obtain judicial review in the federal courts. Respondents do not dispute that neither of |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | | these options constitutes an "appeal." Because Respondents fail to provide admissible evidence to dispute the fact, the fact is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| Based on the more than 1,000 records produced by Respondents concerning the studied class members, over 96% of the individuals in the 1225(b) Subclass applied for relief from removal, and over 60% won their cases. Pet. Mem. at 9. | This is technically accurate though misleading: Of the 1000 records, Dr. Long viewed only 68 of them as 1225(b) Subclass members. Long Rep. at C-1. Of those 68, only 41 obtained relief. *Id.* | Respondents admit the fact, but contend the fact is "misleading" without providing any explanation or evidence for this assertion. Respondents have presented no evidence that Dr. Long's method of identifying Section 1225(b) Subclass members was defective in any manner. Because Respondents fail to provide any admissible evidence to dispute the material fact, the fact is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| For the class as a whole, more than 70% applied for relief, and approximately a third won their cases. Pet. Mem. at 9. | Disputed. Dr. Long concluded that of the 1000 total persons, 713 filed for relief. Long Rep. at 7. Of the 713, 251 "won" their cases, 25% overall, not a third. *Id.* | Respondents acknowledge the undisputed evidence that 70% of the Class applied for relief. Respondents, however, ignore that Petitioners cited not just Dr. Long's Expert Report in support of this |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | | statement, but also her Rebuttal Expert Report, which shows that 31% of Class members who applied for relief "won" their cases.  Dkt. 281-6, Ex. B at 17.  Furthermore, the outcome statistics  in Dr. Long's first report undercount Class member success because they include individuals who were not Class members (despite Respondents having treated them as such), all of whom lost their cases.  Dkt. 281-6, Ex. B (Rebuttal Report of Dr. Long) at 13 n.8.  As a result, this fact is established. |
| In contrast, less than half of the studied class members were actually removed during the time period from which data was drawn.  Pet. Mem. at 9. | Disputed.  Dr. Long acknowledges that she does not use the most updated ICE removal data to conduct her analysis.  Long Rep. at 2 n.l. | Respondents merely argue the weight of the evidence and present no admissible evidence to dispute it.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6.

Moreover, the data analyzed by Dr. Long in her Expert Report was based on the evidence that Respondents made available to Petitioners at the time Dr. Long conducted her analysis.  Respondents provided the final shipment of |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | data concerning studied Class members to Petitioners *the day before the expert reports were due*. *See* Kaufman Decl, Ex. A (database information produced on October 11, 2012); Dkt. 237 (expert reports due on October 12, 2012). Because Respondents evidently had provided the data to their own expert long before disclosing it to Petitioners, Dr. Palmer's initial report did incorporate that data. However, Dr. Long analyzed the most updated data in her rebuttal report, and concluded that utilization of the new data did not materially affect the outcome of any of Dr. Long's initial Expert Report findings, insofar as it had the effect only of increasing reported rates of success in Class members' cases. *See* Long Decl. of April 5, 2013 ¶14. |
|---|---|---|
| | | As a result, this fact is established. |
| Even in instances when individuals lost on the merits, many were released from detention because they | Disputed. This claim is not supported by the cite to Dr. Long's report in Petitioners' brief. Table 31 says that of | This fact is established because Respondents provide no alternative explanation for why they |

| | | |
|---|---|---|
| could not be removed.  Pet. Mem. at 9. | the 1225(b) subclass, 18 were ordered removed, but only 7 had been removed by April 28, 2012.  We know that the other 11 people were no longer in detention as of April 28, 2012, but we do not know whether they were released because they could not be removed or for another reason. | would release individuals who were ordered removed other than that they were unable to be removed. Respondents are under a legal obligation to remove individuals who receive final orders of removal.  *See* 8 U.S.C. 1231(a)(1). |
| Only 10% of the 1225(b) Subclass members in the studied class member group were ultimately deported during the time period during which the data was drawn, (b) yet members of the Subclass as a whole were detained on average for nearly one year.  Pet. Mem. at 9. | Disputed.  Dr. Long acknowledges that she does not use the most updated ICE removal data to conduct her analysis.  Long Rep.  at 2 n.l. | This fact is established because Respondents merely contest the fact's relevance and fail to provide any admissible evidence to dispute the fact.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6.  Moreover, the data analyzed by Dr. Long in her Expert Report was based on the evidence that Respondents made available to Petitioners at the time Dr. Long conducted her analysis. Respondents provided the final shipment of data concerning studied Class members to Petitioners *the day before the expert reports were due*.  *See* Kaufman Decl, Ex. A (database information produced on October 11, 2012); Dkt. 237 (expert reports due on October 12, 2012). |

| | | |
|---|---|---|
| | | Because Respondents evidently had provided the data to their own expert long before disclosing it to Petitioners, Dr. Palmer's initial report could incorporate that data. However, that data does not materially affect the outcome of any of Dr. Long's initial Expert Report findings, insofar as it had the effect only of increasing reported rates of success in Class members' cases. *See* Long Decl. of April 5, 2013 ¶14. |
| Even applying a method described by Respondents' expert that undoubtedly undercounts many individuals' detention length, the data concerning the studied class members shows that they have been detained on average for at least 334 days without being afforded adequate bond hearings. Pet. Mem. at 11. | Disputed. Dr. Palmer concludes that the most appropriate single statistics for describing the length of detention of the class as a whole is the median value from his sample, or 286 days. Exh. P (Dr. Palmer Rebuttal Rep.) at 7. | Respondents' cited evidence fails to establish a dispute. The cited evidence merely relates to an *alternative* analytical method. Because Respondents fail to provide any admissible evidence to dispute this fact -- which is based on statements contained in Respondents' own expert's report -- the fact is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| The average length of detention was far higher for roughly a third of the studied class members, who pursued appeals either to the | Disputed. Dr. Palmer using his method calculates the relevant numbers to be significantly lower: 354 days for those with BIA | Respondents' cited evidence fails to establish that the averages reported by Dr. Long are incorrect. |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| BIA – 448 days – or the Ninth Circuit – 667 days. Pet. Mem. at 12. | appeals, and 573 days for those with Ninth Circuit Appeals.  Exh. P at C-6, Table L-6 ("in period yes"). | Moreover, as explained immediately below, Respondents' own expert, Dr. Palmer, expressly did not advocate the method that Respondents' characterize as "his method," and he conceded that his method undercounts average lengths of detention.  Further, Dr. Palmer agrees that Dr. Long's approach was more appropriate than the method Respondents now attribute to Dr. Palmer.<br><br>Petitioners provide a fuller explanation for why this fact is established, and why any residual dispute is immaterial, immediately below. |

Respondents repeatedly refer to disagreement between the parties' experts concerning conclusions drawn from various data.  None of these disagreements raise genuine issues of material fact that could stand as an obstacle to granting Petitioners' motion.  Petitioners explain here the reasons for those disagreements, why none are material, and, should the Court consider it necessary, how the Court can resolve them.

In discovery, Respondents produced database information for approximately 1,000 individuals who had been detained in the Central District from approximately April 2010-April 2011.  Respondents produced data about these individuals over a period of time from August 12, 2011 to October 11, 2012.  This group constitutes the "studied class members".  Respondents initially claimed they were all Class members, although in fact approximately 83 of them were not.

The parties' experts agree that the data for the "studied class members" is

subject to two different statistical "biases" for purposes of making more general claims about detention of Class members.  First, the data undercounts detention length because some "studied class members" remained in detention even after the last date on which the data were drawn, while others were released from detention but could be re-detained in the future because their cases remained pending.  *See* Dkt. 281-6, Ex. B. at 11-12 (Long Expert Report); Kaufman Decl. Ex. E at 168:1012 (Dr. Palmer: "Some of them are still in detention and therefore you do not know how long their detention will last.") (filed concurrently herewith); Kaufman Decl. Ex. F at 29:22-30:2, 32:19-33:6, 38:1-39:7 (filed concurrently herewith).  This is known as "censoring" bias.

Second, by selecting all individuals who had been detained for a total of at least six months during the course of a given calendar year, individuals detained for longer periods of time have a greater probability of being included in the sample than individuals detained for shorter periods.  In this way, the manner in which the "studied class members" were selected is over-inclusive of cases with longer detention lengths, and therefore overcounts certain statistics related to detention length.  This effect is known as "selection" bias.  *See* Dkt. 281-3, Ex. L at 5-6; Dkt. 281-6, Ex. B at 9-11.  These two factors operate in opposing directions – the censoring bias makes the average detention time appear to be shorter than it actually is, while the selection bias makes it appear to be longer than it actually is.

Both parties' experts agree that the dataset is subject to both "censoring" and "selection" biases.  Further, both parties' experts agree that statistical methods must be applied to account for these factors, and both agree on the basic framework for accounting for these factors.  *See* Kaufman Decl. Ex. E at 164:3-21, 166:6-167:8 (filed concurrently herewith); Kaufman Decl. Ex. F at 19:2-9; *id.* at 40:7-41:21, 55:1-16 (filed concurrently herewith); Dkt. 281-6, Ex. B at 17-22.

First, to correct for "selection" bias, the population under review should be limited to people whose 180th day in detention fell during the year from April 2010-April 2011.  This method of selection eliminates the risk that individuals detained for longer periods of detention will be over-represented in the sample.  The group of 595 individuals whose 180th day in detention fell during that year are known as the "in period" population.  *See* Dkt. 281-6, Ex. B at 10-11; Dkt. 281-3, Ex. L at 5-8; B-2,; Dkt. 281-3 Ex. M at B-1.[7]

---

[7] Dr. Palmer reported that there are 662 people in the "in-period" sample.  However, his calculations included people whom Petitioners determined were not class-members, and Respondents have not disputed these determinations.  *See* Dkt. 281-6, Ex. B n.5.

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

Second, to correct for "censoring" bias, the detention length for the "in period" population must be increased through an adjustment process to account for the fact that some individuals remain detained even after the data concerning their detention length has been drawn. *See* Kaufman Decl. Ex. E at 164:3-21, 166:6-167:8 (filed concurrently herewith); Kaufman Decl. Ex. F at 19:2-9 (Dr. Palmer: "But if you really wanted to make your best estimate, the best to do it would be to take the in-period group and try to make some kind of an adjustment for what is likely to happen in the future based on patterns in the past.") (filed concurrently herewith); Dkt. 281-3, Ex. M at 17-22.

Finally, the parties' experts agreed that only certain analyses of the data need to account for these "selection" and "censoring" biases. For example, both parties' experts agree that statistics on the percentage (rather than raw number) of Class members who apply for relief, or who "win" their cases, are not subject to the biases. *See* Dkt. 281-3, Ex. M at 9; Kaufman Decl. Ex. F at 20:23-21:12, 21:20-22:4 (filed concurrently herewith); Dkt. 281-6, Ex. B at 12-17. As a result, both parties' experts agree that the statistics drawn from the "studied class member" population are statistically representative of the class as a whole with respect to applications for relief and case outcomes. *Id.*

The area of the experts' disagreements is therefore very narrow: the experts disagree only as to the appropriate correction for the "censoring" bias for statistics related to the average length of detention and, to a lesser extent, the statistics related to court proceedings. *See* Dkt. 281-3, Ex. M at 5-10; Kaufman Decl. Ex. F at 15:17-25 (filed concurrently herewith); Dkt. 281-6, Ex. B at 12-17.

Petitioners' expert, Dr. Long, evaluated several statistical methods for correcting "censoring" bias, and ultimately concluded that, with respect to the statistics on detention lengths, the two biases are of approximately equal magnitude and their effects cancel each other out. *See* Dkt. 281-6, Ex. B at 12-17. Dr. Long has provided a detailed defense of her methodology as well as an explanation for why alternative methods that she considered were not likely to produce more accurate results. *Id.*; *see also* Dkt. 283 Ex. C at 86:21-88:25.

Dr. Palmer did not employ a different methodology than Dr. Long for correcting for "censoring" bias. Instead, Dr. Palmer reported statistics for the "in period" population without attempting to account for "censoring" bias using statistical methodologies. *See* Dkt. 281-3, Ex. M at 5-10, B1-B3, C1-C18; *see also* Kaufman Decl. Ex. F at 19:2-9 (filed concurrently herewith) (explaining how to derive "best estimate" by adjusting in-period statistics, but observing "I have not attempted to do this, I have not studied this issue"); *id.* at 45:2-48:19 (acknowledging that numerous detention length statistics in his rebuttal expert report undercount detention lengths

due to censoring bias).  Dr. Palmer never advocated for the use of his findings to measure detention lengths.  *See* Kaufman Decl. Ex. F at 43:12-44:24 (filed concurrently herewith).  Rather, he admitted that he did not conduct the adjustments necessary to correct for the bias because he believed he did not have access to sufficient information to account for the biases in the data, and because "[t]o me correcting the mean is not a terribly important thing to do" because, in his view, it is a "minor" statistic.  *See id.* at 41:22-44:24.[8]  Although Dr. Palmer took issue with the particular conclusions Dr. Long reached with respect to detention lengths, he "endors[ed]" Dr. Long's "general approach" to accounting for biases in the data.  *See id.* at 19:16-17.  Further, he candidly acknowledged that Dr. Long would be in a better position to conduct such calculations because she knows far more about the immigration enforcement system than he does.  *See id.* at 48:6-49:1.

In their objections to Petitioners' Statement of Undisputed Facts, Respondents cite Dr. Palmer's uncorrected detention length statistics.  However, as explained above, not even Dr. Palmer advocated relying on such numbers as a reliable measure of detention lengths, and Dr. Long has described in detail the flaws in those conclusions.  Dr. Palmer himself admitted that the statistics reported in his Rebuttal Expert Report undercount detention lengths and are in that sense inaccurate.  Kaufman Decl. Ex. F at 45:2-48:19 (filed concurrently herewith).  Respondents cite and rely on these statistics in their Motion for Summary Judgment without acknowledging that their own expert believes them to be inaccurate.  *See, e.g.*, Dkt. 299-3 at 18-19.

In any event, the disagreements described above are not material because, under any measure, the average and median detention lengths far exceed those at issue in *Demore v. Kim*, 538 U.S. 510, 529 (2003).  However, should the Court find it necessary to resolve the disagreement, it should credit the detention lengths described in Dr. Long's rebuttal report, as Respondents have presented no evidence that anyone, including their own expert, advocates the use of the detention length statistics on which they rely.

Two other disagreements concerning the experts' evidence also arise in the parties' briefing, although neither gives rise to disputed issues of material fact.  First, because Respondents provided the final shipment of data concerning studied Class members to Petitioners the day before the expert reports were due, Dr. Long's initial Expert Report could not rely on that data.  *See* Kaufman Decl. Ex. A (database

---

[8] Dr. Palmer also acknowledged that some of the data he reported on continuance lengths is also "censored" and may over-count statistics related to the time attributable to "alien-caused" continuances, but he took no steps to correct for such censoring.  Kaufman Decl. Ex. F at 102:16-107:14 (filed concurrently herewith).

1  information produced on October 11, 2012); Dkt. 237 (expert reports due on October
2  12, 2012). Because Respondents evidently had provided the data to their own expert
3  before disclosing it to Petitioners, Dr. Palmer's initial report did incorporate that data.
   However, Dr. Long subsequently analyzed that data and concluded that it does not
4  materially affect the outcome of any of her initial Expert Report findings, insofar as it
   serves only to make her conclusions more favorable to Petitioners. *See* Long Decl. of
5  April 5, 2013 ¶14. In any event, Dr. Long's Rebuttal Expert Report relies on the final
6  shipment of data. *Id.*

7       Second, as noted above, the 1,000 "studied class members" on whom
8  Respondents provided data included a number of individuals who were not Class
   members. These individuals had been detained for more than six months, but had lost
9  their cases prior to their 180th day in detention. Dr. Long excluded these individuals
10 from her analysis in her Rebuttal Report. Removing the individuals erroneously
   identified by Respondents as Class members resulted in data that reinforced the
11 original conclusions in Dr. Long's report. *See* Dkt. 281-3, Ex. M at 13 n.5; *see also*
12 Kaufman Decl. Ex. F at 63:1-25, 99:15-24 (filed concurrently herewith)
   (acknowledging that inclusion of non-Class members lowers detention lengths, if non-
13 Class members do not have active cases that are likely to lead to lengthy detentions).
14 Respondents have not disputed that the individuals excluded from Dr. Long's
   Rebuttal Report were not in fact Class members.
15

| | | |
|---|---|---|
| 16 Over 20% of the studied class members were detained for at least 18 months, while close to 10% were detained for more than two years. Pet. Mem. at 12. | Disputed. Dr. Palmer finds that only 13% of class members continue to be detained at 18 months, and less than 3% continue to be detained at 24 months. Ex. P, Table L-4 ("in period yes"). | Respondents' cited evidence fails to establish that the averages reported by Dr. Long are incorrect. As set forth above, Respondents' own expert, Dr. Palmer, expressly did not advocate the method that Respondents' characterize as "his method," and he conceded that his method undercounts average lengths of detention. Further, Dr. Palmer agrees that Dr. Long's approach was |

| | | more appropriate than the method Respondents now attribute to Dr. Palmer. *See supra.* |
|---|---|---|
| Dr. Long's analysis of studied class members' cases reveals that 53% of class members detained for 7 months are still detained at 12 months; 23% of them are still detained at 18 months, and 10% are still detained at 24 months.  Pet. Mem. at 32. | Disputed.  Dr. Long acknowledges that she does not use the most updated ICE removal data to conduct her analysis.  Long Rep. at 2 n.l.  Dr. Palmer (using his sampling method and the most up to date data) concluded that of the class members detained 7 months, only 40% are still detained at 12 months, only 13% continue to be detained at 18 months, and only 3% continue to be detained at 24 months.  Exh. P, Table L-4 ("in period yes"). | Respondents' cited evidence fails to establish that the averages reported by Dr. Long are incorrect. Respondents' own expert, Dr. Palmer, expressly did not advocate the method that Respondents' characterize as "his sampling method," and he conceded that his method undercounts average lengths of detention.  Further, Dr. Palmer agrees that Dr. Long's approach was more appropriate than the method Respondents now attribute to Dr. Palmer. *See supra.* |
| Dr. Long estimates that 47% of the studied class members were detained for 12 months or more, and 9% were detained for 24 months or more.  Pet. Mem. at 32. | Disputed.  Dr. Palmer calculates that only 33% of the class was detained for 12 months or longer and 2.5% were detained for 24 months or more.  Exh. Q (Dr. Palmer Rebuttal Rep.) at C3, Table L-3. | Respondents' cited evidence fails to establish that the averages reported by Dr. Long are incorrect. Respondents' own expert, Dr. Palmer, expressly did not advocate the method that Respondents characterize as "his method," and he conceded that his method undercounts |

| | | |
|---|---|---|
| | | average lengths of detention.  Further, Dr. Palmer agrees that Dr. Long's approach was more appropriate than the method Respondents now attribute to Dr. Palmer.  *See supra.* |
| These numbers (cited above) likely undercount the length of detention because some class members continued to be detained even past the window of Dr. Long's data set.  Pet. Mem. at 31 n.17. | Disputed.  Dr. Long admits that the undercounting issue only comes into play for means, not for distribution data.  *See* Long Report. | Respondents admit the fact.  The term "length of detention" refers to the average length of detention, which includes distribution data.  Respondents' expert, Dr. Palmer, expressly conceded that his distribution data undercounts distribution data on detention lengths.  *See* Kaufman Decl. Ex. F at 45:2-48:19.  As a result, this fact is established. |
| The average period of incarceration for studied class members was 404 days, well in excess of six months.  Pet. Mem. at 31. | Disputed.  First, this is misleading because the average period of incarceration of the studied class members necessarily must be "well in excess of six months" because to qualify for the studied group, the alien had to have been detained for at least 6 months.  Additionally, Dr. Palmer concludes that the most appropriate single statistics for describing the length of detention of the class as a whole is the median value from his | Respondents admit the fact, and merely dispute the fact's relevance.  Respondents' only cited evidence relates to an *alternative* analytical method, but does not dispute Petitioners' fact.  In addition, Dr. Palmer testified that he did not believe any single statistic, including the median, was appropriate to describe the data in this case.  Kaufman Decl. Ex. F 26:17-23.  Because Respondents |

| | | |
|---|---|---|
| | sample, or 286 days. Exh. P at 7. | fail to provide any admissible evidence to dispute the fact, it is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| Dr. Long reported that the average length of detention increased as studied class members' cases were appealed to the BIA and the Ninth Circuit. Pet. Mem. at 31. | Disputed. Dr. Palmer using his method calculates the numbers to be significantly lower: 260 days median detention time for class members with only immigration court proceedings, 354 days for those with BIA appeals, and 573 days for those with Ninth Circuit Appeals. Exh. Q at C-6, Table L-6 ("in period yes"). | Although Respondents purport to dispute the fact, their statement does not dispute either that Dr. Long reported that the average length of detention increased as studied Class members' cases were appealed or that Dr. Palmer did not find that the average length of detention increased as studied Class members' cases were appealed. Thus, this fact is established. In addition, Respondents' cited evidence fails to establish that the averages reported by Dr. Long are incorrect. Respondents' own expert, Dr. Palmer, expressly did not advocate the method that Respondents characterize as "his method," and he conceded that his method undercounts average lengths of detention. Further, Dr. Palmer agrees that Dr. Long's approach was |

| | | |
|---|---|---|
| | | more appropriate than the method Respondents now attribute to Dr. Palmer. *See supra*. |
| The data concerning the studied class members also revealed that a remarkably large number of them win their cases. By one measure, more than 30% of the studied class were ultimately found to have a right to remain in this country. Mem. at 12. | Disputed. The only individuals "found to have a right to remain in this country" are those against whom proceedings were terminated based on DHS's inability to establish the charge of removability. All those granted relief or protection were not found to have a right to remain in this country, but were instead granted purely discretionary relief from removal. Using that standard and Dr. Long's numbers, the percentage with a "right to remain in the country" is less than 4%. *See* Dr. Long Rep. at 15 (34 proceedings terminated of 840 removal proceedings ended). | Although Respondents purport to dispute the fact, they rely only on a legal assertion regarding the effect of a grant of discretionary relief. Respondents do not dispute that more than 30% of the studied class ultimately won their cases. Because Respondents fail to dispute the background fact with admissible evidence, the fact is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. In addition, Respondents' legal assertion is incorrect. *See, e.g.*, 8 C.F.R. 1212.3(d) (providing that once awarded discretionary relief (under that section), the award is "valid indefinitely"). |
| Discovery revealed an example where a class member finally obtained release in a *Casas* hearing over a year after he became eligible for the hearing, after suffering 796 days of detention. Pet. Mem. at 41. | Disputed. The Im case identified as an example of lengthy detention in the Arulanantham Declaration is misleading. The materials cited by Arulananatham indicates that the alien was given a *Casas* review by ICE less than 11 days after he | Respondents' cited evidence fails to establish that the Class member in this example *did not* obtain release in a *Casas* hearing over a year after becoming eligible and after 796 days in detention. Respondents' evidence |

| | | |
|---|---|---|
| | became eligible for the hearing, *see* Arulanantham Decl. at ¶ 150, but was denied release because he failed to apply for a travel document.  However, Petitioners can point to no evidence that the alien requested a bond hearing following that review. | merely (1) establishes that he received a review conducted only by ICE officers after he became eligible for a *Casas* hearing and (2) speculates that he did not request a hearing before an Immigration Judge.  Although Respondents note the purported omission of evidence concerning whether the individual requested a *Casas* bond hearing, such requests would be unnecessary under the relief that Petitioners seek. As a result, the fact is established. |
| Detainees have limited access to libraries, which have sparse resources.  Pet. Mem. at 12. | Disputed.  *See* Exh. V, 2008 National Detention Standards governing law libraries and legal materials; Exh. W, 2011 National Detention Standards governing law libraries and legal materials. | Respondents' cited evidence fails to establish that detainees *do not* have *limited* access to libraries, which have sparse resources. Respondents' citation to national standards, even if they are admissible (which Petitioners dispute), does not constitute evidence of Respondents' actual practices in detention centers in the Central District.  Because Respondents fail to cite admissible evidence to dispute the background fact, the fact is established.  *See Taylor*, |

| | | 880 F.2d at 1045; Local Rule 7-6. |
|---|---|---|
| Class members generally are permitted only limited contact with their children and other family and friends – they talk by phone through a see-through window for, at most, a few hours per week. Direct, in-person contact with family and friends generally is not permitted. Pet. Mem. at 13. | Disputed. *See* Exh. T, 2008 National Detention Standards governing visitation ; Exh. U, 2011 National Detention Standards governing visitation. | Respondents' cited evidence fails to establish that detainees *are not* generally permitted only limited contact with their children and other family and friends; the standards they cite do not require contact visits and expressly contemplate limits on the number, duration, and method of visits.  In addition, Respondents' citation to national standards, even if admissible (which Petitioners dispute), is not evidence of Respondents' actual practices in the detention centers in the Central District.  Because Respondents fail to cite admissible evidence to dispute the background fact, the fact is established.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| The legal process for requesting hearings requires an understanding of the highly technical text of the Court Manual.  Pet. Mem. at 41. | Disputed.  The Immigration Court Manual is hardly "highly technical."  The manual has a table of contents with a topic listed as "Detention and Bond."  *See* | Respondents' cited evidence fails to establish that the legal process for requesting hearings *does not* require an *understanding of the highly technical* text of the Court manual.  The |

Immigration Court Manual at www.justice.gov/ eoir/ v11/OCIJPracManual/Chap %209.pdf.

Turning to that section, there is a section labeled "9.3 Bond Hearings," which states:

"(c) Requesting a bond hearing. — A request for a bond hearing may be made in writing. In addition, except as provided in subsection (iii), below, a request for a bond hearing may be made orally in court or, at the discretion of the Immigration Judge, by telephone. If available, a copy of the Notice to Appear (Form I-862) should be provided. The telephone number of each Immigration Court is listed on the Executive Office for Immigration Review website at www.usdoj.gov/eoir."

Additionally, immigration judges take steps to ensure than an individual is informed of his or her rights and the rights for which the individual is eligible. Fong Dep. 61:20-62:17. If the government makes a custody determination that the immigration judge

cited evidence merely provides an excerpted portion of the Court Manual, which is insufficient to dispute the fact and the evidence Petitioners submitted supporting that fact. The remainder of Respondents' cited evidence merely relates to the particular judges' practice of informing detainees about whether they are subject to mandatory detention as an initial matter and their rights to seek substantive immigration relief, but does not establish that immigration judges inform detainees of their right to seek a *Casas* bond hearing. As a result, the fact is established.

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | believes is incorrect, then it is the immigration judge's responsibility to make an independent determination of whether the government's detention classification is correct or incorrect. Fong Dep. 62:12-63:22. Indeed, Judge Fong testified that "it has always been one of the clearest instructions and authorities of immigration judges to inform an individual, regardless of their representation, of the rights they have for relief . . . " Fong Dep. 64:2-64:6. | |
| Respondents' failure to provide an automatic hearing and sufficient notice has resulted in continued incarcerations despite the fact that class members were eligible for a *Casas* hearing upon obtaining a stay of removal from the Ninth Circuit pending consideration of petitions for review. Pet. Mem. at 41. | Disputed. The referenced declaration paragraph states that the facts of the particular procedural circumstances surrounding the alien's case are "unclear," *see* Arulanantham Dec. ¶ 124. It appears, however, that ICE provided the alien with a custody review and denied the alien release based on a finding of danger to the community for his controlled substance conviction. Arulanantham Dec. ¶ 125-126. Thereafter, the alien received a *Casas* hearing before an immigration judge, at which he was released on a significant bond in the amount of $5,000. | Respondents' cited evidence does not establish that the referenced alien would *not* have suffered continued incarceration had Respondents provided an *automatic hearing and notice*. Respondents' cited evidence actually supports this fact because it reveals that the referenced detainee would have been released long before receiving his *Casas* hearing had Respondent provided automatic hearings with notice. Respondents fail to cite additional admissible evidence that disputes |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | Arulanantham Dec. ¶ 127. | this fact. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. As a result, the fact is established. |
|---|---|---|
| With *Casas* detainees and the parole process, ICE does not appear to review any individual's custody on a periodic basis. Indeed, ICE policy is not to automatically review parole determinations even when a detainee prevails before the Immigration Judge but ICE chooses to appeal to the BIA. Pet. Mem. at 45. | Disputed. With respect to parole determinations, after a parole decision is made, an alien may make a request for additional parole determinations, which they typically do when they have new or better evidence to establish they are not a flight risk. Lee Dep. 47:11-47:21. With respect to *Casas*, under the policy followed by ICE ERO in Los Angeles, a second *Casas* determination will be conducted within the following year, if the alien is denied release. Lee Dep. 51:3-51:11. | Respondents' cited evidence fails to establish that ICE has a policy to review parole decisions on a periodic basis, but rather relates to a detainee's right to request additional parole determinations. As a result this fact is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6.<br><br>With respect to *Casas*, Respondents' cited evidence does not establish that Respondents provide periodic bond hearings every six months in cases of prolonged detention, but rather, relates to periodic review by ICE officials. As such, the dispute is immaterial to Petitioners' claim for periodic bond hearings. |
| An example of the consequences of ICE's failure to provide periodic hearings from the parole context involves a class member who was a refugee from Somalia. ICE initially denied release based on its | Disputed. The cited A-File materials show that while ICE concluded that there was credible evidence of identity, there was no sponsor willing to provide the alien with a place of temporary residence. | Respondents admit that the referenced detainee was initially denied release because of the assessment that he did not have a sponsor. In addition, as established in Mr. Arulanantham's |

assessment that he did not have a sponsor if he was released. Two months later, in his asylum application, he submitted a declaration from "an American citizen (and family friend) who pledged to allow him to remain at her residence, expressing that she was 'unconditionally willing to assist [him] once he is out.'" But because ICE does not conduct periodic custody reviews under its parole procedures, he was subjected to 512 days of incarceration, approximately one year of which was after he submitted documentation of sponsorship. He only obtained release after he prevailed on his asylum claim before the Immigration Judge. Pet. Mem. at 41.

Arulanantham Dec. ¶ 82, Exh. 69 thereto. The examining officer reached one potential sponsor identified by the alien by telephone, but that individual affirmatively declined to sponsor the alien. *Id.* The worksheet also indicates that the examining officer attempted to contact two other potential sponsors by telephone, again listing their telephone numbers, but states that neither potential sponsor could be reached at the numbers provided. *Id.* Arulanantham complains that ICE did not act on an affidavit of sponsorship submitted by the alien's attorney two months later, but Arulanantham fails to note in the brief that the alien's attorney did not submit that information *to ICE*, but rather to the immigration court as part of the alien's asylum application. *See* Arulanantham ¶ 83, and Exh. 70 thereto. Nor does Arulanantham explain why this information was not submitted to ICE by the alien's representative, nor does he indicate whether the alien or his attorney availed themselves of the opportunity to make a

supplemental declaration filed concurrently herewith, the detainee did provide a copy of the sponsor information to ICE at the time it was submitted to the Immigration Judge. (Arulanantham Decl. of April 5, 2013, Ex. C) (filed concurrently herewith). In any event, Respondents fail to establish that this instance is *not* an example of ICE's *failure to provide periodic hearings* from the parole context because the remainder of Respondents' cited evidence merely relates to the original parole determination and actions taken by the detainee's representative, and speculates about the representative's decisionmaking. Whether the failure at issue - presenting to ICE the same evidence of a sponsor that had been presented to the IJ - was the fault of ICE, the detainee, or the detainee's representative, is immaterial to the fact that Petitioners seek to

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | second parole determination request – which any alien may request, and which is often made where, as here, the alien has updated information to provide, such as an affidavit of sponsorship, *see* Lee Dep. 47:11-47:21. | establish, namely that an automatic periodic hearing would have resulted in the detainee's release approximately ten months before he won his case. |
| The Immigration Judge's calendar results in a continuance longer than the detainee otherwise would want or need.  Pet. Mem. at 14. | Disputed.  Fong testified that in granting continuances, the Los Angeles immigration courts engage in oversight to determine that the length of the continuance is based on good cause.  Fong Dep. 97:7-97:19.  However, immigration judges also must ensure that the alien or the alien's representative gets the amount of time needed for the continuance and for a fair opportunity to present their case.  Fong Dep. 97:24-98:16.  If an immigration judge believes that the requested continuance is too long, the immigration judge may shorten the period in his or her discretion.  Fong Dep. 97:24-98:14. | Respondents do not dispute Petitioners' cited evidence that the *immigration judge's calendar results in a longer continuance* than a detainee would otherwise need or want.  Rather, Respondents' cited evidence relates to factors that guide the continuance determination.  Because Respondents fail to cite admissible evidence that disputes this fact, it is established.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |
| The *Guerra* factors do not require Immigration Judges to consider whether individuals seeking release are likely to ever be removed, either because they are from countries that will not likely take them | Partially Disputed.  While there is no requirement that immigration judges consider the alien's ultimate removability at a bond hearing, during custody redetermination hearings, immigration judges look | Respondents admit that the *Guerra* factors do not require immigration judges to consider "*the alien's ultimate removability at a bond hearing.*"  The remainder of |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| back or because they will win their cases and therefore retain the right to reside in the United States.  Pet. Mem. at 16. | primarily to issues of flight risk and danger, but will consider any information either side presents.  Fong Dep. 44:5-45:2.  Judge Fong also testified that it is the Government that has the authority and responsibility to determine a place of removal of an alien.  Fong Dep. 48:5-48:24.  Indeed, Judge Fong could not recall an instance where that was an issue at a bond hearing, because the Government had either released the alien or was still in the process of attempting to obtain travel documents for the alien. Fong Dep. 49:5-49:24.  To make such a finding at a bond hearing, according to Judge Fong, "would be premature." Fong Dep. 50:2-50:14.  At the bond hearing stage, the proceedings are still pending, and an immigration judge has not yet found removability, let alone relief.  Fong Dep. 50:17:-50:18.  As Judge Fong testified, for an immigration judge to assume, at a bond hearing stage, "that the government may or may not be able to [re]move the individual would be ... presumptuous." Fong Dep. 50:19-50:22. | Respondents' cited evidence merely relates to an argument concerning the weight of the fact and judges' discretion to consider other facts and the Government's role in determining to where a detainee shall be removed.  Respondents fail to cite additional admissible evidence that disputes this fact.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. As a result, the fact is established. |
| As a result, class members | Disputed.  ICE has removed | Respondents do not |

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| from certain countries with which the United States lacks a repatriation agreement – or otherwise refuse to accept back their nationals – have spent years in detention litigating removal cases, only to be released after receiving removal orders – because there is no way to return them to their home countries.  The studied class members include numerous such individuals from countries such as Vietnam, Cambodia, and Somalia.  Pet. Mem. at 16. | hundreds of aliens to these countries, a significant number of returns to these countries of aliens found inadmissible at the border from those nations.  See Exh. S, 2011 Yearbook of Immigration Statistics, Office of Immigration Statistics, Department of Homeland Security, at 103-105 (64 removals to Cambodia between 2009 to 2011; 59 removals to Somalia during that same period; 2,080 removals to Vietnam during that same period). | dispute the fact, because their objection is predicated on a misreading of Petitioners' brief.  Petitioners stated only that *some Class members from certain countries, after litigating their removal cases for years, are released upon receiving a removal order because there is no way to return them to their home country*.  Respondents' cited evidence merely relates to nationwide statistics that some noncitizens have been returned to these countries.  Apart from the fact that Respondents fail to provide evidence of how many noncitizens from these countries are *not removed* despite having final removal orders, Respondents fail to cite additional admissible evidence that disputes the actual fact asserted by Petitioners.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6.  As a result, the fact is established. |
| The average detention length also increased for those individuals who filed applications for relief from | Disputed.  The numbers in the parenthetical are not the same as the cited page of the report, where Long says the | Respondents are correct that Dr. Long in fact reported that the average detention length for |

| | | |
|---|---|---|
| removal.  Long Rep. at 10 (509 vs. 320 days).  Pet. Mem. at 16-17. | average detention length for persons who filed a request for relief is 421 days (not 509) and the average for those who did not is 360 days (not 320).  Thus, the real difference between the length of time for proceedings based on applying for relief is only 60 days as opposed to the nearly 200 day difference suggested in the parenthetical.  Second, Dr. Palmer says the more accurate statistic would be 250 days for a class member who did not file for relief to 303 for a class member who did file for relief.  Exh. Q at 9. | persons who filed a request for relief is 421 days, and the average for those who did not is 360 days.  Nonetheless, even with this correction, there is no material dispute, as the detention length at issue is still far longer than that upheld in *Demore v. Kim*.  As such, the fact is undisputed.<br><br>In addition, Respondents' cited evidence fails to establish that the averages reported by Dr. Long are incorrect.  Respondents' own expert, Dr. Palmer, expressly did not advocate the method that Respondents characterize as "his method," and he conceded that his method undercounts average lengths of detention.  Further, Dr. Palmer agrees that Dr. Long's approach was more appropriate than the method Respondents now attribute to Dr. Palmer.  *See supra.* |
| The *Guerra* factors also do not require Immigration Judges to consider alternatives to detention that would be sufficient to | Respondents do not dispute that *Guerra* does not require immigration judges to consider alternatives to detention, but dispute that | Respondents admit that the *Guerra factors do not require judges to consider alternatives to detention*, and |

60

| | | |
|---|---|---|
| alleviate danger to the community or flight risk, even though numerous such alternatives exist.  Pet. Mem. at 36. | immigration judges have regulatory authority to do so.  Immigration judges do not consider alternatives to detention because immigration judges do not have authority to determine the conditions of the alien's release apart from the amount of bond, if any.  Fong Dep. 57:11-58:3.  Immigration judges do not have the authority to release an alien on an ankle bracelet or to order its removal.  Fong Dep. 58:5-59:14.  Again, the only proper consideration for an immigration judge is whether the alien is a flight risk or danger to the community.  Fong Dep. 58:24-59:25. | Respondents' cited evidence merely relates to the weight of the fact.  Respondents fail to cite additional admissible evidence that disputes this fact.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6.  As a result, the fact is established. |
| ICE also does not consider alternatives to detention in POCR reviews.  Pet. Mem. at 36. | Disputed.  Lee testified that under certain circumstances, ICE may make a determination that an alien should be placed in an alternative to detention program pending removal.  Lee Dep. 213:7-214:2.  However, there is no policy that alternatives to detention must be considered as part of the POCR process at the field level.  Lee Dep. 214:4-214:14. | Respondents' cited evidence does not establish that ICE considers *alternatives to detention in the POCR review process*. The cited testimony concerns the parole process, not POCR.  In fact, Respondents admit that "Alternative detention is not something that we consider at the field office level for [POCR] cases."  Lee Dep. 214:4-14.  As such, the fact is established. |
| Respondents produced no | Disputed.  The Jacobs | Respondents' cited |

evidence of criminal history for many class members subject to prolonged detentions. As to the remainder, over half of the records produced by Respondents for class members in the sample did not disclose convictions for crimes serious enough to warrant sentences of over six months – the minimum length of their immigration detention.

declaration does not distinguish between those aliens who have minor offenses and who were section 1226(a), 1225(b), or section 1226(c). Nor did Petitioners make any effort to match the summary data to any section 1226(c) subclass member. Thus, it is incompatible to say that a substantial number of criminal aliens detained under section 1226(c) are somehow categorized under section 1226(c) for "minor offenses."

Second, the Jacobs declaration identifies the longest conviction by the alien, and measures that alone. It does not determine the number of convictions, the recency of convictions, or other information provided in a "rap sheet" that may go to flight risk or danger. For example, in the first hand-selected case chosen by counsel for Petitioners as an "exemplary sample," Jacobs identifies one conviction for DUI of a controlled substance. Jacobs Dec. ¶ 8(a). However, the Jacobs declaration fails to also point out that the alien was convicted for burglary and obstruction or resisting an

evidence fails to dispute that Respondents produced no evidence of criminal history for many Class members subject to prolonged detention, and that for the remainder, over half the records in the sample do not disclose convictions for crimes serious enough to warrant sentences of over six months. Respondents' cited evidence merely relates to the weight of that fact, and to other evidence that Petitioners did not provide (and that Respondents also did not provide, although they had access to the same information). Because Respondents have failed to provide any admissible evidence to dispute the fact, it is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6.

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | officer, receiving probation, and had bench warrants issued against him. Jacobs Decl. ¶ 8(a), and Exh. B thereto.  An alien's criminal history cannot be summed up by a single reference to the longest time served for a single conviction, and citing that statistic, in the absence of everything else, is not meaningful. | |
| Respondents' own 30(b)(6) witness testified that individuals released under a program available to certain immigrants in this district as an alternative to detention have appeared when required at future hearings "at, if not close to, 100%" of the time.  Pet. Mem. at 36. | Disputed.  Unlike the types of serious offenses that place an alien within one of the section 1226(c) categories, ISAP II is used in cases where the types of offenses an alien has committed are, as AFOD Saldana described them, "lower-range crimes," such as driving without a license, drunk in public, and other relatively non-serious offenses.  Saldana Dep. 118:21-119:8. | Respondents do not dispute this fact but rather argue relevance.  Because Respondents fail to cite additional admissible evidence that disputes this fact, it is established.  *See Taylor*, 880 F.2d at 1045; Local Rule 7-6.  Moreover, Respondents' cited evidence does not support their assertions. Mr. Saldana testified that, among the types of crimes that are committed by people *who are released on ISAP II*, "it's more common for us to see lower-range crimes." Declaration of Michael Kaufman of April 5, 2013 Ex. H at 118:21-119:8.  The testimony cited by Respondents does not in any way suggest that ISAP II is |

| | | designed for noncitizens detained under Section 1226(a), or with any particular type of criminal history. |
|---|---|---|
| As in the immigration context, alternatives to detention in the pretrial detention setting have been proven to be effective in preventing danger to the community and flight pending proceedings. Pet. Mem. at 38. | Disputed. These statistics are not addressed to immigration detention, but to criminal detention outside the Central District of California, and do not consider the alternatives to detention used by ICE for certain low-level offenders. | Respondents do not dispute the fact that alternatives to detention have proven effective in the pretrial setting, but rather argue relevance. Because Respondents fail to cite additional admissible evidence that disputes this fact, it is established. *See Taylor*, 880 F.2d at 1045; Local Rule 7-6. |

Respectfully submitted,

Dated:    April 5, 2013                SIDLEY AUSTIN LLP

/s/   Sean A. Commons
SEAN A. COMMONS
Counsel for Petitioners

PETITIONERS' REPLY TO RESPONDENTS' OPPOSITION TO STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW