AHILAN T. ARULANANTHAM (SBN 237841)
aarulanantham@aclu-sc.org
MICHAEL KAUFMAN (SBN 254575)
mkaufman@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone:  (213) 977-9500
Facsimile:  (213) 977-5297

*Attorneys for Petitioners*
(Additional Counsel listed on following page)

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ALEJANDRO RODRIGUEZ, ABDIRIZAK ADEN FARAH, YUSSUF ABDIKADIR, ABEL PEREZ RUELAS, JOSE FARIAS CORNEJO, ANGEL ARMANDO AYALA, for themselves and on behalf of a class of similarly-situated individuals, <br><br> Petitioners, <br><br> v. <br><br> ERIC HOLDER, United States Attorney General; JANET NAPOLITANO, Secretary, Homeland Security; THOMAS G. SNOW, Acting Director, Executive Office for Immigration Review; TIMOTHY ROBBINS, Field Office Director, Los Angeles District Immigration and Customs Enforcement; WESLEY LEE, Officer-in-Charge, Mira Loma Detention Center; et al.; RODNEY PENNER, Captain, Mira Loma Detention Center; SANDRA HUTCHENS, Sheriff of Orange County; OFFICER NGUYEN, Officer-in-Charge, Theo Lacy Facility; CAPTAIN DAVIS NIGHSWONGER, Commander, Theo Lacy Facility; CAPTAIN MIKE KREUGER, Operations Manager, James A. Musick Facility; ARTHUR EDWARDS, Officer-in-Charge, Santa Ana City Jail; RUSSELL DAVIS, Jail Administrator, Santa Ana City Jail, <br><br> Respondents. | Case No. 02:07-cv-03239-TJH (RNBx) <br><br> **PETITIONERS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION AND OPPOSITION TO RESPONDENTS' CROSS-MOTION FOR SUMMARY JUDGMENT** <br><br> Honorable Terry J. Hatter <br><br> Hearing Date:  May 6, 2013 <br><br> Time:  UNDER SUBMISSION |

JUDY RABINOVITZ
jrabinovitz@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY  10004
Telephone:  (212) 549-2618
Facsimile:  (212) 549-2654

MICHAEL TAN (SBN 284869)
mtan@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA  94111
Telephone:   (415) 343-0779
Facsimile:   (415) 395-0950

JAYASHRI SRIKANTIAH (SBN 189566)
jsrikantiah@law.stanford.edu
STANFORD LAW SCHOOL
IMMIGRANTS' RIGHTS CLINIC
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA  94305-8610
Telephone:  (650) 724-2442
Facsimile:  (650) 723-4426

SEAN COMMONS (SBN 217603)
scommons@sidley.com
CODY JACOBS (SBN 272276)
cjacobs@sidley.com
JONATHAN FEINGOLD (SBN 286302)
jfeingold@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013-1010
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600


*Attorneys for Petitioners*

1

**TABLE OF CONTENTS**

2

3    INTRODUCTION ................................................................ 1

4    ARGUMENT ..................................................................... 5

5    I.    THE IMMIGRATION STATUTES AND DUE PROCESS CLAUSE REQUIRE *CASAS* HEARINGS FOR ALL CLASS MEMBERS.................. 5

6
7         A.    Prolonged Detention Without *Casas* Bond Hearings Presents Serious Constitutional Problems for All Class Members...................... 7

8         B.    Each of the Detention Statutes at Issue in this Case May be Read to Authorize Adequate Bond Hearings.................................... 10

9
10              1.    Section 1225(b) Must Be Construed to Permit Adequate Bond Hearings When Detention is Prolonged. ......................... 10

11              2.    Section 1226(c) Must Be Construed as Not Authorizing Prolonged Mandatory Detention. .............................. 15

12
13              3.    Section 1226(a) Must Be Construed to Authorize the Adequate Bond Hearings Petitioners Seek. ...................... 19

14
15              4.    Section 1231(a) Must Be Construed to Require Adequate Bond Hearings for for All Class Members Detained Under its Authority.................................. 24

16    II.   BECAUSE DETENTION BECOMES "PROLONGED" AT SIX MONTHS, THIS COURT SHOULD CONSTRUE THE IMMIGRATION STATUTES TO REQUIRE *CASAS* HEARINGS AT THAT TIME................................................... 27

17
18
19         A.    A Case-by-Case Approach Is Inconsistent with Ninth Circuit Precedent. ................................................ 28

20         B.    The Use of a Six Month Rule Comports with Due Process. ............... 30

21         C.    The Availability of Continuances Does Not Counsel Against Adoption of a Six Month Rule. .......................... 31

22    III.  THE COURT SHOULD CONSTRUE THE IMMIGRATION STATUTES TO REQUIRE ADEQUATE SUBSTANTIVE AND PROCEDURAL SAFEGUARDS, CONSISTENT WITH DUE PROCESS........................................ 38

23
24
25         A.    All of the Relief that Petitioners Seek to Render Hearings Adequate is Properly Before the Court.............................. 38

26         B.    Due Process and the INA Require that the Immigration Judge Consider Whether the Detainee Will Ever Be Removed. .................. 40
27

28

C.    Due Process Requires Immigration Judges to Consider Length of Detention in Prolonged Detention Bond Hearings.............................. 43

D.    Due Process Requires Immigration Judges to Consider Conditions Short of Incarceration. ..................................................................... 43

E.    The Government Must Provide Automatic Notice of Hearings in Language Clear Enough to Satisfy the Requirements of Due Process.................................................................................................. 46

CONCLUSION ................................................................................................. 50

# **TABLE OF AUTHORITIES**

**CASES**

*Aguilar-Ramos v. Holder*,
   594 F.3d 701 (9th Cir. 2010)..........................................................................20

*Ahmed v. Holder*,
   569 F.3d 1009 (9th Cir. 2009)........................................................................33

*Apache Survival Coalition v. United States*,
   21 F.3d 895 (9th Cir. 1994)............................................................................39

*Boumediene v. Bush*,
   553 U.S. 723 (2008)........................................................................................31

*Casas-Castrillon v. DHS*,
   535 F.3d 942 (9th Cir. 2008)...................................................................*passim*

*Cheff v. Schnackenberg*,
   384 U.S. 373 (1966).........................................................................................31

*Clark v. Martinez*,
   543 U.S. 371 (2005)..........................................................................12, 23, 30

*County of Riverside v. McLaughlin*,
   500 U.S. 44 (1991)...........................................................................................30

*Crull v. Gem Ins. Co.*,
   58 F.3d 1386 (9th Cir. 1995)..........................................................................38

*Demore v. Kim*,
   538 U.S. 510 (2003).................................................................................*passim*

*Diop v. ICE/Homeland Security*,
   656 F.3d 221 (3d Cir. 2011)...........................................................................28

*Diouf v. Mukasey* (*Diouf I*),
   542 F.3d 1222 (9th Cir. 2008).......................................................................25

*Diouf v. Napolitano*,
   684 F.3d 1081 (9th Cir. 2011) (*Diouf II*)...............................................*passim*

*Doe v. Gallinot*,
657 F.2d 1017 (9th Cir. 1981).......................................................... 31, 41, 48

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003)................................................................... 39

*Fanucchi & Limi Farms v. United Agri Prods.*,
414 F.3d 1075 (9th Cir. 2005)................................................................... 38

*Farnan v. Capistrano Unified School Dist.*,
654 F.3d 975 (9th Cir. 2011).................................................................... 39

*Jones v. Blanas*,
393 F.3d 918 (9th Cir. 2004).................................................................... 44

*Kwai Fun Wong v. United States*,
373 F.3d 952 (9th Cir. 2004).................................................................... 11

*Kwong Hai Chew v. Colding*,
344 U.S. 590 (1953)................................................................................. 12

*Landon v. Plasencia*,
459 U.S. 21 (1982).................................................................................. 12

*Ly v. Hansen*,
351 F.3d 263 (6th Cir. 2003)............................................................... 27, 28

*Mattertinez de Borjorquez v. Ashcroft*,
365 F.3d 800 ( 9th Cir. 2009)................................................................... 49

*Matter of A-W-*,
25 I&N Dec. 45 (BIA 2009) .................................................................... 23

*Matter of Joseph*,
22 I&N Dec. 799 (BIA 1999).................................................................... 15

*Matter of X-K-*,
23 I&N Dec. 731 (BIA 2005)............................................................... 14, 15

*Matter of Yauri*,
25 I&N Dec. 103 (BIA 2095)............................................................... 14, 15

*Nadarajah v. Gonzales*,
443 F.3d 1069 (9th Cir. 2006) .......................................................*passim*

iv

*Nehad v. Mukasey*,
    535 F.3d 962 (9th Cir. 2008)..............................................................35

*Ngo v. INS*,
    192 F.3d 390 (3d Cir. 1999)..............................................................11

*Ortiz-Alfaro v. Holder*,
    694 F. 3d 955 (9th Cir. 2012)............................................................22

*Owino v. Napolitano*,
    575 F.3d 952 (9th Cir. 2009).......................................... 4, 40, 41, 42

*Padilla-Agustin v. INS*,
    21 F.3d 970 (9th Cir. 1994)...............................................................46

*Prieto-Romero v. Clark*,
    534 F.3d 1053 (9th Cir. 2008)..................................................*passim*

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2009).......................................... 9, 15, 29

*Rosales-Garcia v. Holland*,
    322 F.3d 386 (6th Cir. 2003)..............................................................11

*Shatzer v. Maryland*,
    130 S. Ct. 1213 (2010)........................................................................31

*Tijani v. Willis*,
    430 F.3d 1241 (9th Cir. 2005)..................................................*passim*

*United States v. Briggs*,
    697 F.3d 98 (2d Cir. 2012).................................................................29

*United States v. Salerno*,
    481 U.S. 739 (1987).................................................................44, 45

*V. Singh v. Holder*,
    638 F.3d 1196 (9th Cir. 2011)..................................................*passim*

*Zadvydas v. Davis*,
    533 U.S. 678 (2001).................................................................*passim*

*Z Channel Ltd. P'ship v. Home Box Office, Inc.*,
    931 F.2d 1338 (9th Cir. 1991)............................................................38

v

1

*Zivkovic v. S. Cal. Edison Co.*,
    302 F.3d 1080 (9th Cir. 2002)................................................................38, 39

2

3

4

## STATUTES

5

6       8 U.S.C. § 1182(a)(2)(A)(i)...........................................................................18

7       8 U.S.C. § 1187(c)(2)(E)...............................................................................23

8       8 U.S.C. § 1225............................................................................................14

9       8 U.S.C. § 1225(a).......................................................................................14

10      8 U.S.C. § 1225(a)(1)...................................................................................14

11      8 U.S.C. § 1225(b).................................................................................*passim*

12      8 U.S.C. § 1225(b)(1)..................................................................................14

13      8 U.S.C. § 1226(c)(1)(A-C) .........................................................................18

14      8 U.S.C. § 1226a..........................................................................................15

15      8 U.S.C. § 1227(a)(2)(B) .............................................................................18

16      8 U.S.C. §§ 1531-1537 ................................................................................15

17

18

19

## REGULATIONS

20

21      8 C.F.R. § 8..................................................................................................21

22      8 C.F.R. § 236.1(c)(8)..................................................................................19

23      8 C.F.R. § 236.1(d)(1)..................................................................................45

24      8 C.F.R. § 241.13........................................................................................41

25      8 C.F.R. § 241.4(k)(1)-(k)(2) ......................................................................21

26      8 C.F.R. § 1003.23(b)(1)(v) ........................................................................25

27

28

**OTHER AUTHORITIES**

Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810,
    Article 9 (3d sess. 1948)................................................................. 15

International Covenant on Civil and Political Rights ("ICCPR") art. 9(1),
    999 U.N.T.S. 171 ......................................................................... 15

Statement of Gary Mead, Exec. Assoc. Dir. of Enforcement and Removal
    Operations, ICE, regarding a Hearing on "H.R. 1932, The Keep Our
    Communities Safe Act" Before the U.S. House of Representatives
    Judiciary Comm., Subcomm. on Immigration Policy and Enforcement,
    http://www.ice.gov/doclib/news/library/speeches/110524mead.pdf ................ 42

Executive Office of Immigration Review FY 2012 Statistical Yearbook
    F1, http://www.justice.gov/eoir/statspub/fy12syb.pdf ........................................47

## <u>INTRODUCTION</u>

Despite the volume of materials under submission, the Court can resolve the cross-motions by applying settled precedent to a handful of undisputed material facts. The Court is faced with questions of law – most of which it has resolved in Petitioners' favor on multiple occasions, including when it denied Respondents' Rule 12(c) Motion and when it granted Petitioners' Preliminary Injunction Motion. Four basic propositions dictate the outcome of this Motion.

*1. The Court has already ruled that Section 1225(b) and Section 1226(c) detainees must receive Casas hearings when their detention becomes prolonged*. Dkt. 255. Nonetheless, Respondents maintain that they must detain persons held under Sections 1225(b) and 1226(c) for months or years without bond hearings. Dkt. 299 at 1, 22-23. The Ninth Circuit unambiguously rejected Respondents' interpretation of those statutes in *Casas-Castrillon v. DHS*, 535 F.3d 942, 949 (9th Cir. 2008), *Tijani v. Willis*, 430 F.3d 1241 (9th Cir. 2005), and *Nadarajah v. Gonzales,* 443 F.3d 1069 (9th Cir. 2006). This is so regardless of whether, as Respondents argue, the Section 1226(c) Subclass members are "criminal aliens," Dkt. 299 at 1, 25, 28, because the Ninth Circuit ordered bond hearings for detainees allegedly convicted of aggravated felonies in *Casas*, *Tijani*, and *V. Singh v. Holder*, 638 F.3d 1196, 1203, 1209 (9th Cir. 2011). *See infra* Sections I.A, I.B.2.

Respondents' argument that "arriving aliens" under Section 1225(b) have no due process rights, Dkt. 299 at 19-22, was rejected by this Court in its order denying Respondents' Rule 12(c) motion. Dkt. 155 at 2. Section 1225(b) indisputably applies to both lawful permanent residents returning to the country and individuals who are apprehended inside the country after entering without inspection (known as "EWIs"); it therefore indisputably governs the detention of individuals who have due process rights not adequately protected by the Government's current detention practices. *See Nadarajah*, 443 F.3d at 1077. Construing Section 1225(b) to require *Casas* hearings for prolonged detainees also accords with the Government's own

regulations, which provide bond hearings to EWIs "seeking admission."  Such individuals are also covered by the plain language of 8 U.S.C. § 1225(b) – the same statute used to detain "arriving aliens."  *See infra* Section I.B.1.

      **2.  *The logic of existing Ninth Circuit precedent requires that all Section 1226(a) and Section 1231(a) detainees receive Casas hearings when their detention becomes prolonged*.**  While this Court's preliminary injunction order did not address Petitioners' claim for *Casas* hearings with respect to the other two Subclasses, their entitlement to that relief flows logically from the Court's prior rulings and Ninth Circuit precedent.  Other than calling Petitioners' arguments "absurd," Dkt. 299 at 29, Respondents offer no coherent explanation for treating individuals subject to prolonged detention under Section 1226(a) worse than other class members.  Dkt. 299 at 28-30.  The Ninth Circuit has construed Section 1226(a) to require the kind of prolonged detention bond hearings sought here, and, contrary to what Respondents suggest, has already held that Respondents' regulations cannot justify prolonged detention without such hearings. *V. Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) (construing existing regulations as inapplicable to cases involving prolonged detention).  Respondents' only answer appears to rest on the fact that Section 1226(a) detainees may have already obtained bond hearings prior to their detention becoming prolonged.  But they cite nothing for the odd proposition that an earlier bond hearing under weaker standards obviates the need – either as a statutory or a constitutional matter – for a bond hearing under more rigorous standards when detention has become prolonged.  *See infra* Section I.B.3

      With respect to Section 1231(a), the parties' dispute is narrow.  Respondents purport to concede that Subclass's entitlement to *Casas* hearings, but then define the group so as to deny relief to some Subclass members.  As explained below, the Court should unambiguously grant judgment for all members of this Subclass so as to ensure that their rights are not arbitrarily restricted.  *See infra* Section I.B.4.

**3.  Under *Diouf II*, all class members are entitled to bond hearings when their detention exceeds six months.**  With respect to the question of *when* Class members are entitled to Casas hearings, as this Court already held when granting the motion for preliminary injunction, detention becomes prolonged at six months.  *See* Dkt. 255; *see also* Dkt. 281 at 25 (citing *Diouf v. Napolitano* (*Diouf II*), 634 F.3d 1081, 1091 (9th Cir. 2011)).  In attempting to cabin *Diouf II*, Respondents ignore that opinion's broad language and its reliance on cases and statutes addressing detention beyond six months in a variety of immigration contexts.  Most importantly, they never explain how *Diouf II*'s holding requiring a bond hearing at six months for Mr. Diouf does not require the same result here for individuals with liberty interests equal to or stronger than those Mr. Diouf possessed.  *See infra* Section II.

**4.  All class members are entitled to adequate prolonged detention bond hearings that satisfy due process.**  Respondents cite little authority in opposition to Petitioners' argument that due process requires prolonged detention hearings to consider, as a substantive matter, (1) whether a detainee will ever be removed, (2) the length of the detainee's past and likely future detention, and (3) the availability of alternatives to detention that would adequately address the Government's concerns; and that the hearings themselves be conducted, as a procedural matter, (1) with adequate notice in a manner that the detainee can understand, (2) automatically without requiring an affirmative request from the detainee, and (3) every six months, for those who remain incarcerated.  As a threshold matter, the Government's argument that two of these requirements (that an Immigration Judge consider whether a detainee will ever be removed and that the hearings be periodic) are not properly before the Court since they were not specifically pled in the complaint, Dkt. 299 at 41-42, 54, is wholly without merit.  The Ninth Circuit has repeatedly held that a party need only plead claims, not every form of relief.  Moreover, even if these could be considered "claims," rather than specific forms of relief, Petitioners more

1    than satisfied the notice pleading standard in their complaint by seeking "adequate

2    process."  *See infra* Section III.A.

3         The Government's other arguments against the imposition of basic due

4    process requirements are equally meritless.  For example, the Government

5    incorrectly interprets the Ninth Circuit's decision in *Owino v. Napolitano*, 575 F.3d

6    952, 955 (9th Cir. 2009) to mean that Immigration Judges cannot consider whether a

7    detainee will ever be removed because that is somehow the exclusive province of

8    federal district courts.  Dkt. 299 at 42.  Nothing in *Owino* suggests that the Ninth

9    Circuit intended to preclude this determination from being made by Immigration

10   Judges as part of bond hearings.  Likewise, the Government cites no authority in

11   response to the simple proposition—supported by substantial case law—that the

12   length of detention is a factor that judges should consider at bond hearings, nor do

13   they offer any authority to refute governing Ninth Circuit law in the civil detention

14   context requiring inquiry into whether less restrictive conditions of custody—such

15   as electronic monitoring or other forms of intensive supervision—could satisfy the

16   Government's interests before condemning class members to prolonged

17   incarceration.  Yet the Government again opposes this modest request, Dkt. 299 at 4,

18   while grossly misreading evidence from its own witness as to the efficacy of such

19   alternatives.  *See infra* Sections III. B - D.

20        Finally, the Government's opposition to meaningful notice and automatic and

21   periodic hearings is equally baseless.  Indeed, with respect to notice, the

22   Government does not dispute that its sole notice of *Casas* hearings is a sentence

23   stating that a detainee may request a hearing and a citation to a chapter in the

24   Immigration Court Practice Manual.  Class members cannot realistically be expected

25   to navigate the complex language of the Court Manual to affirmatively request bond

26   hearings when they typically do not speak or write English and often lack legal

27   representation.  Equally important, the Government does not contend—nor could

28   it—that providing constitutionally sufficient notice would be burdensome.  As for

1   periodic automatic hearings, the Government's opposition relies solely on its

2   mischaracterization of the Ninth Circuit's decision in *Prieto-Romero v. Clark*, 534

3   F.3d 1053 (9th Cir. 2008), Dkt. 299 at 53-54, which did not address the question

4   whether due process requires such hearings.  Beyond that, the Government offers no

5   explanation for why individuals detained far beyond six months – in some cases for

6   years – should not be afforded regular hearings at six month intervals to determine

7   whether their detention remains warranted.

8                                        **ARGUMENT**

9   **I.   THE IMMIGRATION STATUTES AND DUE PROCESS CLAUSE**

10  **REQUIRE *CASAS* HEARINGS FOR ALL CLASS MEMBERS.**

11          Reading the Government's brief, one could almost forget that Respondents

12  defend a draconian system that imprisons, *for years*, long-term lawful residents

13  convicted of minor crimes, individuals with extensive family and community ties,

14  and refugees who arrive at our shores fleeing persecution, all without allowing them

15  even to *ask* a judge to consider them for release.  Although Respondents quibble

16  with some evidentiary details, they cannot deny that many Class members are

17  imprisoned for far longer in the immigration detention system than they were in the

18  criminal system (if they even have a criminal history).  *See generally* Dkt. 291

19  (Jacobs Decl.) (analyzing Class member's criminal history data).  Nor can

20  Respondents deny that many Class members will win their cases, *see* Dkt. 281-6,

21  Ex. B at 12-14 (Rebuttal Report of Dr. Long, showing that approximately one third

22  will prevail using most updated data and correcting for bias); *see, e.g.*, Ex. Dkt. 292

23  (Arulanantham Decl.) at ¶¶ 20-71 (describing mandatory detention of several Class

24  members who won termination of their cases or relief from removal), *id.* at ¶¶ 72-99

25  (describing prolonged detention of asylum seekers with no criminal history, many of

26  whom won asylum).  Others will lose their cases, but nonetheless be released

27  because their countries, predictably, will not take them back.  *Id.* at ¶¶ 176-87.  Of

28  course, while these individuals languish in the immigration prisons, they will be

1    separated from their family members.  *See generally* Dkt. 283 (Tan Decl.).[1]

2    These Class members never receive the adequate hearing Petitioners seek.

3    Most of them never received bond hearings at all (prior to this Court's preliminary

4    injunction ruling), and the custody determinations they did receive were sometimes

5    extremely cursory, lacking in reasoned explanation, or inaccurate.  *See, e.g.*, Dkt.

6    292 at ¶¶ 102-115.  Perhaps most important, Petitioners do not seek the release of all

7    such individuals, they seek only the chance to *ask* a judge if their detention is

8    necessary, or instead if they are one of the many Class members who could be

9    released under conditions of supervision without compromising the enforcement

10   system.

11   Despite these undeniable facts, Respondents defend their draconian system,

12   arguing in essence that the Supreme Court's decision in *Demore v. Kim*, 538 U.S.

13   510 (2003), permits it, and that the Government's heightened power in immigration

14   cases permits it to adopt this brutal system that would obviously be unacceptable in

15   any other context.  But Respondents cannot avoid the fundamental problem with that

16   legal position:  the Ninth Circuit has repeatedly and unequivocally held, in five

17   published cases decided during the past seven years, that prolonged detention

18   without adequate process raises serious constitutional concerns, and that the four

19   statutes at issue in this case must be construed to require rigorous process once

20   detention becomes prolonged, so as to avoid those serious problems.[2]  This Court

21   _____

22   [1] Concurrent with this filing, Petitioners are submitting a revised Declaration of
     Michael Tan with updated and corrected information about Class members.  This
23   information was disclosed to Respondents on March 1, 2013, prior to the filing of
     their Cross-Motion for Summary Judgment, and should be relied on in lieu of Dkt.
24   281-8 and Dkt. 283.

25   [2] *See Tijani*, 430 F.3d at 1242 ("we interpret the authority conferred by § 1226(c) as
26   applying to expedited removal of criminal aliens"); *Nadarajah*, 443 F.3d at 1084
     (construing Section 1225(b) to authorize detention only for a "brief and reasonable"
27   period and ordering immediate release of "arriving alien"); *Casas*, 535 F.3d at 951
28   (holding "prolonged detention of an alien without an individualized determination of

6

1   should affirm its preliminary injunction ruling and, consistent with Ninth Circuit

2   precedent, rule that all class members are entitled to *Casas* hearings for prolonged

3   detentions.

4       **A.    Prolonged Detention Without *Casas* Bond Hearings Presents Serious Constitutional Problems for All Class Members.**

5

6       Virtually all of the Government's arguments against providing class members

7   with *Casas* bond hearings – where the Government bears the burden of proof by

8   clear and convincing evidence and the hearing is recorded for transcription – have

9   been considered and rejected by the Ninth Circuit and this Court.

10      The Government first misreads *Demore* and *Zadvydas* as authorizing "the

11  detention of criminal aliens during the course of removal proceedings [as]

12  constitutional" under Congress's broad immigration power, regardless of the length

13  of detention, because removal proceedings have a "definite termination point."  Dkt.

14  299 at 22-23.  But the Ninth Circuit has rejected this misreading of *Demore* and

15  *Zadvydas*, emphasizing that "[r]eferences to the brevity of mandatory detention

16  under § 1226(c) run throughout *Demore*."  *Casas*, 535 F.3d at 949.  The "general

17  detention statutes" authorize only "brief and reasonable" detentions – presumptively

18  no longer than six months – pending completion of removal proceedings.

19  *Nadarajah*, 443 F.3d at 1079-80 (relying on *Zadvydas*, *Clark*, *Demore*, and

20  Congress' express authorization of detention beyond six months for national

21  security).

22      Respondents try to distinguish these cases, but their arguments are no more

23

24  his dangerousness or flight risk would be 'constitutionally doubtful,'" and therefore
    construing Section 1226(a) "as requiring the Attorney General to provide the alien

25  with such a hearing"); *Diouf II*, 634 F.3d at 1086 (holding "prolonged detention

26  under § 1231(a)(6), without adequate procedural protections, would raise 'serious
    constitutional concerns,'" and therefore construing statute to require *Casas* hearings

27  at six months); *V. Singh*, 638 F.3d at 1203 (holding government must bear burden of

28  proof by clear and convincing evidence at *Casas* hearing).

persuasive now than they were before.  *First*, the Government argues that *Casas* and, implicitly, *Tijani*, *Diouf II*, and *V. Singh*, are distinguishable because they did not involve individuals with removal cases pending before the immigration courts.  Dkt. 299 at 18.  But the Ninth Circuit knew full well that, "[a]s of the time" it decided *Casas*, Mr. Casas had a removal case pending "before the BIA …."  *Casas*, 535 F.3d at 945.  Indeed, the Ninth Circuit specifically rejected the Government's position that Mr. Casas became subject to mandatory detention under Section 1226(c) once his case had returned to the immigration courts.  *See id*. at 949.  Thus, the Ninth Circuit already has held that an individual with a case pending before the immigration courts is entitled to a bond hearing when detention becomes prolonged, even if that individual is potentially removable due to an offense that would otherwise trigger mandatory detention under Section 1226(c).

*Second*, the Government's argument implicitly rests on the assumption that individuals detained pursuant to final administrative removal orders – such as the petitioners in *Tijani*, *Casas*, *V. Singh*, and *Diouf II* – have a greater due process interest in receiving bond hearings than class members who have not yet been ordered removed.  The Government has the scales backwards.  As recognized in *Diouf II*, detainees subject to final orders of removal, if anything, may "have a lesser liberty interest in freedom from detention" than individuals who have not received final orders.  634 F.3d at 1086-87.  Indeed, the Government took that position in *Diouf II*.  *See* Ans. Br. for Resp'ts-Appellees at 33, *Diouf II*, 2010 WL 1219031 at *33 (asserting post-final order detainees have a "decreased interest in remaining free in the United States").[3]  For this reason, the Section 1226(c) Subclass members have a (marginally) *stronger* claim for a bond hearing than did the petitioners in *Tijani*, *V. Singh*, and *Diouf II,* because, unlike the petitioners in those cases, they

---

[3] Now that they have lost *Diouf II*, Respondents claim the opposite -- that *Diouf II* and *Casas* involved "essentially the same groups of aliens."  Dkt. 299 at 33.

have not lost at the administrative level, and in many cases never will.  Thus, there is
no reason to deny them even the opportunity to seek release when the law already
affords that opportunity to people in a weaker position.

*Third*, Respondents contend that *Casas* construed only Section 1226(a), and
therefore has no applicability to Section 1226(c).  Dkt. 299 at 26-27.  But *Casas*
"reject[ed] the government's suggestion that § 1226(c) mandates *Casas*' detention
for the duration of his now seven-year confinement . . . . § 1226(c)'s mandatory
detention provision applies only to 'expedited removal of criminal aliens.'"  535
F.3d at 947-48.  Moreover, when this case was last before the Ninth Circuit, it
reaffirmed that Section 1226(c) applies only to detention pursuant to "expeditious"
removal proceedings.  *Rodriguez v. Hayes*, 591 F.3d 1105, 1116 (9th Cir. 2009)
("We have subsequently clarified that, in order to avoid the serious constitutional
questions raised by indefinite mandatory detention, detention of an alien beyond an
expedited period ceases to be mandatory under Section 1226(c) and instead becomes
discretionary under Section 1226(a).") (citing *Casas* and *Tijani*).  Thus, contrary to
Respondents' claim, the Ninth Circuit has *already* decided that Section 1226(c)
applies only to expeditious proceedings, in order to avoid serious constitutional
problems identical to those at issue in this case.

Finally, Respondents dismiss as inapplicable the bedrock constitutional
principles on which *Tijani*, *Nadarajah*, *Casas*, *V. Singh*, and *Diouf II* rest on the
ground that the Government has some greater authority in the immigration context.
*See* Dkt. 299 at 17-18.  But the Supreme Court relied upon constitutional principles
drawn from cases outside the immigration context when deciding *Zadvydas*, 533
U.S. at 690 (citing five substantive due process civil detention cases), and the Ninth
Circuit consistently has done the same when construing immigration statutes to
require bond hearings.  *See, e.g.*, *Tijani*, 430 F.3d at 1242 (citing *Cooper v.
Oklahoma*, 517 U.S. 348 (1996)); *Casas*, 535 F.3d at 950 (citing substantive due
process analysis from *Zadvydas* and *Tijani*); *Diouf II*, 634 F.3d at 1090-91 (citing

1   *Mathews v. Eldridge*, 424 U.S. 319 (1976)); *V. Singh*, 638 F.3d at 1204 (citing,

2   *inter alia*, *Addington v. Texas*, 441 U.S. 418 (1979); *Foucha v. Louisiana*, 504

3   U.S. 71 (1992)).  These Courts understood that, if the Due Process Clause – which

4   by its plain words applies to all "persons," including immigrants – requires the

5   Government to provide hearings to protect monetary interests in utility subsidies and

6   Social Security payments, then surely it requires hearings to incarcerate immigrants

7   for months or years.[4]

8        **B.    Each of the Detention Statutes at Issue in this Case May be Read to**
9             **Authorize Adequate Bond Hearings.**

10       Respondents contend that none of the statutes at issue should be construed to

11  authorize *Casas* hearings after six months of detention, notwithstanding that the

12  Ninth Circuit has already construed each in light of the serious constitutional

13  problems that would be raised by prolonged detention without sufficient process.  In

14  each case they are incorrect.

15       **1.    *Section 1225(b) Must Be Construed to Permit Adequate Bond***
16             ***Hearings When Detention is Prolonged.***

17       Respondents do not dispute the key structural features of the parole system that

18  render it an insufficient substitute for bond hearings – it provides no *hearings* before

19  *Immigration Judges*, but instead, at most, only *interviews* with *deportation officers*,

20  whose decisions are reviewed only by *supervisory deportation officers*.  *See* Dkt. 281

21

22

23  ───────────────

24  [4] In a footnote, Respondents suggest *Demore* supports their position because the
    petitioner in that case was detained for six months.  Dkt. 299 at 35 n.28.  But in

25  *Demore,* the Supreme Court never reached the statutory interpretation arguments
    Petitioners raise here – and which the Ninth Circuit has endorsed under the

26  constitutional avoidance doctrine – because the petitioner in *Demore* conceded he

27  was subject to the mandatory detention statute, and did not argue that he was entitled
    to a bond hearing at six months.  *See Demore*, 538 U.S. at 513-14.

28

at 7-9, Dkt. 299 at 12-13.[5]  Respondents also do not dispute that detainees bear the burden of proof in parole proceedings, and that there is no appeal – they note only that these detainees, the vast majority of whom have come from foreign countries and spent very little time in the United States, have the (largely hollow) right to file habeas petitions to challenge their detention.  *See* Dkt. 299 at 12-13.[6]

Nonetheless, Respondents assert that the Due Process Clause permits detention under this system, and that Section 1225(b) "mandates" such detention for "arriving aliens," regardless of length.  Dkt. 299 at 20, 27.  That argument is meritless for several reasons.

Most important, this Court already rejected the exact same arguments when it denied the Government's Rule 12(c) motion.  Dkt. 155 at 2.  As this Court recognized, the Due Process Clause does not permit even first-time entrants stopped at the border to be subject to prolonged detention without adequate process.  *See generally Kwai Fun Wong v. United States*, 373 F.3d 952, 974-75 (9th Cir. 2004)

---

[5] Respondents note that the decisions of line deportation officers are approved by supervisory officers.  Dkt. 299 at 11 n.15.  Petitioners do not dispute that supervisory officers review parole decisions.  *Id.*  But the Ninth Circuit has already held that a review system that conditions an individual's liberty on the unreviewable decisions of ICE officers – whether supervisory or otherwise – does not adequately protect against the risk of unwarranted prolonged detention, and therefore does not satisfy minimal due process standards.  *See Casas*, 535 F.3d at 951-52; *Diouf II*, 634 F.3d at 1091.

[6] Respondents try to distance themselves from an admission by a supervisory deportation officer, who Respondents designated as their Rule 30(b)(6) witness, that "the custody decision" has always "really just been about how much bed space [ICE has]."  *See* Dkt. 291, Ex. F (Lee Tr. 40:17-19).  Given the structural defects in the parole process, the Court need not decide whether to credit Respondents' attempt to re-write this testimony.  Similarly, Respondents deny that ICE officers consider detainees' national origin when denying parole, even though an ICE officer wrote as much on a document denying parole to a class member.  Dkt. 281 at 8-9, Dkt. 299 at 13 n.16.  The relevant point is that the parole system lacks a hearing and appeal mechanism that could detect such improper decision-making should it occur.

PETITIONERS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION AND OPPOSITION TO RESPONDENTS' CROSS-MOTION FOR SUMMARY JUDGMENT

(holding "excludable" aliens retains Fifth Amendment rights); *Rosales-Garcia v. Holland*, 322 F.3d 386, 408 (6th Cir. 2003) (en banc) (finding serious constitutional problems with indefinite detention of excludable aliens); *cf. Ngo v. INS*, 192 F.3d 390, 398 (3d Cir. 1999) (requiring meaningful release procedures for excludable aliens who had lost their cases, prior to *Zadvydas*).  Respondents cite a long history of cases establishing the limited rights of arriving noncitizens with respect to procedures governing *admission* to the United States, Dkt. 299 at 19-21, but this Court already rejected that argument, Dkt. 155 at 2.  As the Court recognized, this case is not about the *admission* of non-citizens; it concerns only their right to a hearing to seek release on bond *pending* a determination on their admissibility.

Moreover, there is a separate fundamental error with the Government's argument.  The term "arriving aliens" encompasses returning lawful permanents, who are indisputably entitled to protection under the Due Process Clause. *Nadarajah*, 443 F.3d at 1077 n.3; *Landon v. Plasencia*, 459 U.S. 21, 32-33 (1982).[7] The Ninth Circuit has held that, under the canon of constitutional avoidance, Section 1225(b) must therefore be read in light of the serious constitutional problems that would be raised were it read to authorize the prolonged detention of lawful permanent residents without bond hearings.  *See Nadarajah*, 443 F.3d at 1077 n.3; *see also Clark v. Martinez*, 543 U.S. 371, 380 (2005) ("It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the

---

[7] To the extent regulations purport to preclude bond hearings for "arriving aliens," this Court should either (1) hold them *ultra vires* and therefore unenforceable, or (2) hold them inapplicable to cases involving prolonged detentions, just as in *V. Singh, Casas*, and *Diouf II*, where the Ninth circuit construed Section 1226(a) and 1231(a)(6) to require rigorous bond hearings for prolonged detentions, notwithstanding a regulation prohibiting bond hearings for individuals with administratively final removal orders.  *Diouf II*, 634 F.3d at 1090 ("We may not defer to DHS regulations . . . if they raise grave constitutional doubts."); *see also Kwong Hai Chew v. Colding*, 344 U.S. 590, 599 (1953) (construing regulation to avoid constitutional problems).

statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation. The lowest common denominator, as it were, must govern.").  Given that Section 1225(b) applies to at least some lawful permanent residents, and because the Ninth Circuit already has held that serious constitutional problems would be raised by the prolonged detention of LPRs without adequate bond hearings, *Casas*, 535 F.3d at 950; *Diouf II*, 634 F.3d at 1088-89, it follows that this Court should construe Section 1225(b) to authorize the same protections found necessary in *Casas* and *Diouf II*, so long as the statute can reasonably be construed in such a manner.

Contrary to Respondents' arguments, there is no question that Section 1225(b) can be construed in a manner that affords bond hearings for prolonged detainees. As set forth in Petitioners' opening brief, Dkt. 281 at 24, Section 1225(b) is silent as to both the length of detention authorized and the procedures that should govern detention decisions.  Thus, Petitioners have identified two reasonable ways to construe Section 1225(b) to provide for adequate bond hearings for individuals subject to prolonged detention.  Dkt. 281 at 24.  First, Section 1225(b) itself can be construed to authorize bond hearings whenever detention is prolonged – a result which is entirely consistent with the statute's plain language, the agency's regulations, and BIA case law.  Alternatively, the Court could find that Section 1225(b) does not authorize prolonged detention, and thus when detention pursuant to that statute becomes prolonged, the authority for detention "shifts" to Section 1226(a), which provides for bond hearings – an approach analogous to the one the Ninth Circuit took in *Casas*, when it found that detention authority shifted from 1226(c) to 1226(a) when it became prolonged.  535 F.3d at 947.

The Government resists both of these readings, while never addressing them head on.  Instead, it continues to rest on its position that Section 1225(b) *unambiguously* authorizes what it terms "mandatory" detention without limit.  Dkt. 299 at 4, 20, 27.  But this position cannot be reconciled with the fact that the

13

Government already releases "arriving aliens" under the parole process, rendering it not a "mandatory" detention statute within any reasonable understanding of that word. In addition, the Government ignores that, by its plain terms, Section 1225(b) is not limited to "arriving aliens," but rather applies to any noncitizen "seeking admission" – which includes individuals who have entered the United States without inspections (EWIs), who indisputably have due process rights, and to whom the Government already affords bond hearings, even when their detention is not prolonged.[8] *See* 8 U.S.C. § 1225(a)(1) (defining "applicants for admission" to include "[a]n alien present in the United States who has not been admitted"); *Matter of X-K-*, 23 I&N Dec. 731, 731-32, 734-35 (BIA 2005) (authorizing bond hearings even for those EWIs who are placed in expedited removal proceedings under 8 U.S.C. § 1225(b)(1)). The Government has no answer for why the *statute* can be construed to authorize bond hearings for EWIs, but not to other people to whom it applies.

Respondents disagree with Petitioners' reading of *X-K-*, citing its holding that the *regulations* prohibit bond hearings for "arriving aliens" detained under Section 1225(b). Dkt. at 27 (citing *X-K-* at 734 (citing 8 C.F.R. §§ 1003.19(h)(2)(i)(B), 1235.3(c))). But *X-K-* emphasized that the prohibition on bond hearings for "arriving aliens" stemmed solely from *regulations*, not the statute, and thus did not preclude bond hearings for other "applicants for admission," such as EWIs. Moreover, even with respect to the regulations prohibiting bond hearings

---

[8] The Government confuses this issue by repeatedly referring to 8 U.S.C. § 1225(b) as governing only the detention of inadmissible "arriving aliens." *See, e.g.,* Dkt. 299 at 4 ("8 U.S.C. § 1225 mandates the detention of all inadmissible arriving aliens."). But the language of the statute applies to all aliens "seeking admission," *see* 8 U.S.C. § 1225(b) ("Inspection of Applicants for Admission"), which includes people who entered without inspection (EWI's), not just "arriving aliens." *See* 8 U.S.C. § 1225(a) ("An alien present in the United States who has not been admitted. . . shall be deemed . . . an applicant for admission.).

1    for "arriving aliens," *X-K-* never considered whether those regulations would apply

2    to prolonged detentions.  *Cf. V. Singh*, 638 F.3d at 1203 (placing burden of proof on

3    Government by clear and convincing evidence in *Casas* hearings, notwithstanding

4    regulations that place burden on the non-citizen at the time of an initial bond

5    hearing, because existing regulations do not "specify[] the appropriate standard of

6    proof at a *Casas* bond hearing").  *X-K-* makes clear that Section 1225(b) itself in no

7    way forecloses bond hearings before an Immigration Judge.  23 I&N Dec. at 734.[9]

8    **2.    Section 1226(c) Must Be Construed as Not Authorizing Prolonged Mandatory Detention.**

9

10    Respondents also recycle their arguments as to why Section 1226(c)

11    unambiguously mandates the prolonged detention of Class members, even though

12    the Ninth Circuit has repeatedly read that statute to authorize only "brief" detention

13    during "expeditious" proceedings, including in this very case.  Dkt. 299 at 22-24;

14    *Rodriguez*, 591 F.3d at 1116 (citing *Tijani* and *Casas*).  Every argument

15    Respondents advance has been rejected by this Court, the Ninth Circuit, or both.[10]

16    Prior caselaw construing Section 1226(c) as limited to brief detention has

17    recognized that Section 1226(c) is silent with respect to the procedures required

18    when detention is prolonged.  This contrasts directly with the immigration detention

19    statutes involving national security, which specifically authorize detention for longer

20    than six months in a narrow set of cases.  *Compare* 8 U.S.C. § 1226a & 8 U.S.C.

21    §§ 1531-1537.  The Supreme Court has previously held that such silence is not a

22

23    [9] International law supports construing Section 1225(b) in this manner, as arbitrary

24    detention is expressly prohibited under international law.  *See* Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810, Article 9 (3d sess. 1948);

25    International Covenant on Civil and Political Rights ("ICCPR") art. 9(1), 999 U.N.T.S. 171.

26    [10] Respondents do not dispute that the release procedures created by *Matter of*

27    *Joseph*, 22 I&N Dec. 799 (BIA 1999) do not serve as adequate substitutes for bond hearings for a variety of reasons.  *Compare* Dkt. 281 at 6-7 *with* Dkt. 299 at 9 n.10.

28

1  basis for assuming that Congress intended to authorize unlimited detention.

2  *Zadvydas*, 533 U.S. at 698-99; *cf. Nadarajah*, 433 F.3d at 1076 ("Congress cannot

3  authorize indefinite detention in the absence of a clear statement").  That same

4  rationale requires a limiting construction of Section 1226(c) here.

5       Respondents also rely, again, on very old data concerning flight risk of

6  "criminal aliens," which they claim reflects Congress's intent to detain such

7  individuals.  Dkt. 299 at 23-24.  Petitioners have objected to the admissibility of that

8  evidence in a motion filed concurrently with this brief, Dtk. 311.  However, even if

9  the Court could rely on such data as admissible evidence in this case, that stale data

10 does not concern people similarly-situated to Class members – all of whom have

11 been incarcerated for a prolonged period and the vast majority of whom raise

12 substantial challenges to their removal.  *See* Dkt. 281-6, Ex. A at 9 (Table 7).  In

13 addition, that stale data does not reflect the dramatic changes that have occurred

14 since Congress' enactment of Section 1226(c) and the Supreme Court's decision.  In

15 particular, the data does not account for the new systems that ICE uses to identify,

16 detain, and track noncitizens convicted of crimes, as well as the advent of secure

17 alternatives to detention such as the Intensive Supervision Assistance Program

18 (ISAP II).

19      Respondents also attempt to cabin their own witness's testimony that ISAP II

20 ensures appearance rates at or near 100% in cases in the Central District, *see* Dkt.

21 299 at 14, but in so doing badly misread the testimony.  Their witness never

22 suggested that ISAP II is designed only for Section 1226(a) detainees, and the

23 Government has offered no other evidence that ISAP II cannot be used for those

24 Section 1226(c) subclass members whom its own Immigration Judges determine are

25 not sufficiently dangerous or a flight risk to warrant further detention.  *See* Dkt. 383

26 Ex. F at 118:21-119:8 (witness stated only that if people already released on ISAP

27

28

16

PETITIONERS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION AND OPPOSITION TO RESPONDENTS' CROSS-MOTION FOR SUMMARY JUDGMENT

re-offend, it tends to be by committing "lower-range crimes").[11]  In addition, the

Government ignores that it has given bond hearings to people with criminal

convictions that trigger mandatory detention *under Section 1226(a)* for the last five

years – since the Ninth Circuit decided *Casas*.  Such individuals are detained under

Section 1226(c) while their cases are in removal proceedings, but then given bond

hearings under Section 1226(a) once they file a petition for review and obtain a stay

of removal.  Since this Court granted the motion for preliminary injunction,

Immigration Judges have also ordered Section 1226(c) class members released on

alternatives to detention programs, further disproving Respondents' claim.  *See*

Declaration of Michael Kaufman Ex. C (Immigration Judge decisions ordering

release on alternatives to detention programs, including ISAP II) (filed concurrently)

(hereinafter, "Kaufman Decl.").

　　　　Respondents also claim that problems regarding appearance rates have not

"lessened with time," citing a 2006 report by the DHS Office of the Inspector

General that itself refers to "historical trends."  Dkt. 299 at 24.  Petitioners have

objected to the admissibility of that document in a motion filed concurrently

herewith, Dkt. 311.  But even assuming that the seven year old report (based on

undisclosed data older than that) is admissible, Respondents provide no proof that

the source is recent enough to account for significant changes that have markedly

---

[11] Respondents cite two pieces of evidence for this critical claim – that alternatives
to detention do not work for people with criminal histories that trigger mandatory
detention – but neither piece of evidence even remotely supports their claim.  Dkt.
299 at 49.  They first cite the ISAP Handbook, but an examination of that document
reveals that it is a handout given to detainees when they are placed on ISAP.  It says
nothing about which detainees best fit the program.  The other evidence they cite is
the testimony of their own witness, Mr. Saldana, but they quote him completely out
of context.  His statement refers to the minor crimes that people typically commit in
those rare instances in which they re-offend while on ISAP.  In other words,
Respondents have literally no evidence to support their claim that ISAP is
inappropriate for people presently detained under Section 1226(c).

increased appearance rates, including most importantly the rise of intensive supervision programs.

Likewise, Respondents' citation to yet more inadmissible evidence regarding "fugitive aliens" is unavailing because these statistics are not limited to "criminal aliens" or people detained six months, let alone to actual class members, and Respondents provide no information as to whether these individuals failed to appear before or after the recent significant changes in supervision practices.  Without providing evidence, Respondents ask the Court to "presume" that these statistics apply to Section 1226(c) subclass members on the assumption that they pose a greater flight risk because they are less likely to win relief from removal.  Dkt. 299 at 24.  However, uncontroverted evidence shows that 1226(c) subclass members apply for relief and win their cases at approximately the same rate as other Class members.  *Compare* Dkt. 281-6, Ex. A at 9, Table 7 (of 71% of class members eligible for relief, 35% granted relief) *with id.* at B-3, Table 23 (of 70% of 1226(c) Subclass members eligible, 39% granted relief); *see also* Dkt. 292 at ¶¶ 22-56 (Arulanantham Decl.) (summarizing files of several mandatory detainees who won relief).[12]

---

[12] Respondents also fault Petitioners for describing certain offenses included under Section 1226(c) as "minor."  Dkt. 299 at 24, n.22.  But there is no serious dispute that Section 1226(c) includes a wide range of offenses, including many nonviolent misdemeanors that result in little or no jail time.  *See, e.g.*, Dkt. 291 at ¶ 8 (Jacobs Decl.) (describing individuals detained for years without hearings because of convictions for, e.g., being under the influence of a controlled substance, with sentences of 30 or 90 days); *see generally* Richard A. Boswell, Essentials of Immigration Law 49 (2006).  Nor do Respondents cite any authority for their suggestion that Congress understood Section 1226(c) to apply to only "serious" offenses.  Respondents cite cases stating that drug trafficking is serious, but in fact conviction for *any possession* offense involving more than 30 grams of marijuana triggers mandatory detention, as does conviction for two petty thefts, conviction for certain misdemeanors, and many convictions that resulted in no actual incarceration as part of the sentence.  *See* 8 U.S.C. § 1226(c)(1)(A-C) (cross-referencing, *inter alia*, 8 U.S.C. § 1182(a)(2)(A)(i) (any "crime involving moral turpitude," which

1    Thus, even leaving aside that the Ninth Circuit already ordered rigorous bond

2    hearings for the petitioners in *Tijani*, *Casas*, and *V. Singh*, the evidence on which the

3    Government relies has no applicability to this case. [13]

4              3.    ***Section 1226(a) Must Be Construed to Authorize the Adequate
           Bond Hearings Petitioners Seek.***

5

6    It should be obvious that Class members detained pursuant to Section 1226(a)

7    whose removal proceedings have taken longer than six months should be entitled to

8    the same protections afforded to those Class members initially detained pursuant to

9    Section 1226(c) whose proceedings have also extended beyond six months.  The

10   only material difference between the two groups is that Class members detained

11   under Section 1226(a) do *not* have a criminal history that triggered their  mandatory

12   detention.  Yet Respondents argue that persons subject to prolonged detention under

13   Section 1226(a) pending administrative proceedings before Immigration Judges and

14   the BIA are not entitled to the same robust bond process afforded to Class members

15   initially detained pursuant to Section 1226(c), merely because they already received

16   an initial bond hearing under less rigorous procedures.  Dkt. 299 at 28-30. [14]

17   includes petty theft) *and* 8 U.S.C. § 1227(a)(2)(B) (virtually all controlled substance
18   offenses)).  Moreover, Congress itself recognized that certain crimes that subject
     individuals to mandatory detention are not so serious as render them eligible for
19   discretionary relief.  Dkt. 292 ¶¶ 22-56 (summarizing files of several class members
20   who were eligible for and won relief despite being subject to mandatory detention).

21   [13] Respondents nowhere address Petitioners' alternative argument that because most
22   Section 1226(c) Subclass members are pursuing substantial challenges to removal,
     even if this Court declined to construe Section 1226(c) to require a bond hearing at
23   six months in all cases, it should still grant relief from prolonged mandatory
24   detention to those subclass members who have substantial challenges to removal, by
     construing Section 1226(c) as requiring mandatory detention only where the
25   Government shows that a detainee lacks a substantial defense to removal.  *See* Dkt.
26   281 at 25 n.14.

27   [14] At initial bond hearings the detainee bears the burden of proof by a preponderance
     of the evidence, and there is no requirement that the hearing be recorded for
28   transcription.  8 C.F.R. § 236.1(c)(8), (d)(1) (placing burden on detainee to show no

The most serious problem with Respondents' position is that it cannot be reconciled with at least two Ninth Circuit cases construing Section 1226(a) to require hearings where the Government bears the burden of proof to justify prolonged detention.  *See Casas*, 535 F.3d at 951 (holding that "an alien is entitled to release on bond [under Section 1226(a)] unless the government establishes that he is a flight risk or will be a danger to the community") (citing *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996)); *Aguilar-Ramos v. Holder*, 594 F.3d 701, 704 n.3 (9th Cir. 2010) (holding Section 1226(a) detainee entitled to bond hearing where Government bore burden of proof).

Respondents argue that these cases are distinguishable because they purportedly involve individuals who did not previously receive any type of bond hearing, but this is both wrong and irrelevant.  *Aguilar-Ramos* makes no mention of whether or not the detainee there "had not previously been afforded a bond hearing," Dkt. 299 at 30, and Mr. Casas *had* received a bond hearing, 535 F.3d at 952.  Yet the Ninth Circuit nonetheless remanded for a bond hearing "that complies with the requirements of *Tijani*," – *i.e.*, a hearing where the Government bears the burden of proof.  *Id.*; *see also Tijani*, 430 F.3d at 1242 (requiring hearing where Government bears burden of proof).  In other words, *Casas* ordered precisely what Petitioners seek here – a new bond hearing that complies with the heightened procedural protections necessitated by prolonged detention.

Respondents cite only one case in support of their position that Section 1226(a) detainees cannot request adequate bond hearings after being provided inadequate ones.  Dkt. 299 at 29 (citing *Prieto-Romero v. Clark*, 534 F.3d 1053, 1066 (9th Cir. 2008)).  But *Prieto* declined to adopt the position Respondents

---

danger or flight risk, and permitting IJ review under the same standard); *V. Singh*, 638 F.3d at 1208-09 (describing BIA policy that "there is no right to a transcript of a bond redetermination hearing" and finding that policy unconstitutional in *Casas* hearings).

1  advocate – the panel held that it "need not resolve the issue [of whether the

2  petitioner was entitled to a new hearing where the government bore the burden of

3  proof] because *Prieto-Romero* cannot demonstrate prejudice." *Id.* at 1066. Thus,

4  the case provides no support for the claim that Section 1226(a) Subclass members

5  should not receive adequate bond hearings.

6       Respondents advance no other coherent arguments against the modest relief

7  that Petitioners seek. Dkt. 299 at 29. They claim that the "practical aspects" of the

8  relief Petitioners seek are "mind-boggling" because Section 1226(a) detainees

9  already get initial bond hearings under a weaker standard. But there is nothing

10 practically or conceptually difficult about applying one procedure to detainees when

11 they are initially detained and another, heightened procedure when their detention

12 becomes prolonged. The Government already does so under existing Ninth Circuit

13 law in several related contexts. For example, under *Diouf II*, Respondents must

14 provide post-order custody review determinations to Section 1231(a)(6) detainees

15 held for 90 days where they bear the burden of proof as to danger and flight risk, and

16 then at 180 days provide both another post-order custody review where the detainee

17 bears the burden and a bond hearing where the Government bears the burden by

18 clear and convincing evidence. The post-order custody reviews also consider factors

19 beyond those considered at bond hearings, yet the Ninth Circuit directed the

20 Government to provide the overlapping processes because greater procedural

21 protections must attach when detention becomes prolonged. *Compare* 8 C.F.R. § 8

22 C.F.R. § 241.4(k)(1)-(k)(2) *with Diouf II*, 634 F.3d at 1089-90.

23       Finally, Respondents argue for exclusion from the class of two sets of

24 individuals who are detained under Section 1226(a) – people who were previously

25 ordered removed who are detained pending litigation of their withholding of

26 removal claims ("reinstatement" detainees) and people detained after residing in this

27 country under the Visa Waiver Pilot Program ("VWP" detainees). Both sets of

28 individuals are Class members who should receive bond hearings just as other Class

1    members do, and the Court should reject Respondents attempt to re-litigate class

2    certification at this late stage in the case.

3           Respondents distort Petitioners' argument concerning this issue, Dkt. 10 n.13,

4    caricaturing Petitioners' argument as claiming that the Class includes "*any* alien in

5    administrative process or proceedings." *See id.* In fact, however, Petitioners claim

6    that the class includes only those immigration detainees the Complaint specifies – all

7    individuals detained under one of the general detention statutes "pending completion

8    of removal proceedings, including judicial review" unless (a) they are detained

9    under one of two specifically-enumerated national security detention statutes, (b) the

10   Government has present authority to remove them because no stay of removal –

11   whether administrative or judicial – is in effect, or (c) they are juveniles detained

12   under separate custody. *See* Dkt. 111 at ¶¶ 105-08. Because the parties have

13   litigated this issue at some length in parallel motion practice in this case, Dkt. 308 at

14   1-6, Petitioners address it only briefly here.

15          Reinstatement detainees have returned after a prior removal and face

16   prolonged incarceration while they litigate their claims that they face persecution or

17   torture in their home countries. *See, e.g.*, Dkt. 308 at 4. Because such individuals

18   are detained pending a determination of whether they may remain in the United

19   States, their detention is governed by the plain language of Section 1226(a). *See*

20   *Ortiz-Alfaro v. Holder*, 694 F. 3d 955, 958 (9th Cir. 2012) (holding that such

21   individuals do not have a "final removal order" within the meaning of Section 1231).

22   The Government claims they are not class members because such individuals are in

23   "a distinct type of immigration proceeding" rather than "removal proceedings" as

24   the Government defines that term. But this claim rests on an implausibly-narrow

25   reading of the Class definition that cannot be reconciled with its context. "Removal

26   proceedings" in the class definition is meant to refer to all forms of immigration

27   proceedings that seek to remove individuals from the United States. Only that

28   reading of the term can explain the fact that the definition includes people detained

pending "judicial review" and individuals detained pending review of their motions to reopen. Dkt. 111 at ¶ 105. Indeed, the Government's interpretation cannot be reconciled with the fact that the Class already includes at least two classes of individuals who are not in "removal proceedings" as the Government narrowly defines that term. It includes people who are detained under Section 1226(a) pending litigation of their petitions for review, and it includes individuals who are detained under Section 1231(a) pending litigation of their motions to reopen. Indeed, no one detained under Section 1231(a) is in "removal proceedings" as the Government defines it, because all such individuals by definition have an administratively final removal order.

Respondents also seek to exclude certain Class members who came to the United States under the Visa Waiver Program and have been detained for more than six months while they seek asylum. Because such individuals are also detained pending a determination of whether they may remain in the United States, their detention is governed by the plain language of Section 1226(a). However, Respondents contend that such individuals are detained under a different statute – 8 U.S.C. § 1187(c)(2)(E) – and therefore not part of the class. Respondents' argument is meritless. Section 1187(c)(2)(E) provides no detention authority – it nowhere even contains the words "detention" or "custody." The only arguably-relevant reference is a statement that that subparagraph of the code creates no duty or right with respect to release. In an analogous context, however, the Supreme Court made clear that such references to other immigration detention authority cannot "affirmatively authorize[] detention, much less indefinite detention." *Clark v. Martinez*, 543 U.S. 371, 385 (2005) (rejecting argument that Section 1182(d)(5)(A) authorizes detention). The Government also cites a BIA decision, *Matter of A-W-*, 25 I&N Dec. 45 (BIA 2009) for support, but that decision relies on regulatory changes to hold that Immigration Judges lack authority to release such individuals on bond. *Id.* at 47-48. Whatever the merit of that claim as

to individuals detained for short periods of time, neither the decision nor the regulations on which it relies speak explicitly to cases of prolonged detention. Most important, Respondents never even hint at a rationale for why such individuals – who were permitted to enter the United States without a visa and are detained for prolonged periods of time while applying for asylum – should be denied the procedural rights that federal law provides to other Class members.

In any event, there is no rationale for arbitrarily restricting the Class definition beyond the explicitly stated exceptions set forth in the Class definition, all of which have a facially-obvious rationale.

### 4. *Section 1231(a) Must Be Construed to Require Adequate Bond Hearings for All Class Members Detained Under its Authority.*

Petitioners also seek summary judgment on their claim that all Section 1231(a) Class members are entitled to adequate hearings. Dkt. 281 at 10. Respondents at one point appear to concede that all such individuals are entitled to *Casas* hearings, stating that "[u]nder Ninth Circuit precedent, after 180 days of detention, the section 1231 Subclass of aliens . . . are already entitled to [bond hearings where the government bears the burden by clear and convincing evidence]." Dkt. 299 at 10; *see also id*. at 16 n.20 (stating that "aliens detained for six months or longer within the class under section 1231 are entitled to a bond hearing after six months of detention"). However, at other times Respondents describe their obligations in a way that unilaterally narrows them in contravention of the Ninth Circuit's rules, thereby highlighting the need for this Court to issue a judgment on this claim. Specifically, Respondents re-describe their obligations as limited to individuals "detained under Section 1231(a)(6)" (rather than all of Section 1231(a)), who "have filed a petition for review of a collateral challenge to [a removal] order," and "have been issued a stay of removal by the Ninth Circuit" (thus excluding individuals who have a pending motion to reopen before the immigration courts), and, crucially, have "been detained for 180 days *after the removal period*

1    *begins.*"  *Id.* at 15 (emphasis added).  Respondents also suggest at one point that

2    they should not have to provide hearings to Class members if they can show – to

3    whom is unclear – that removal is imminent.  *Id.* at 34 n.27.

4         None of these arbitrary limitations on their obligations to the Section 1231(a)

5    Subclass are consistent with governing law.  The Subclass consists of all individuals

6    detained under Section 1231(a), not just Section 1231(a)(6) – an important

7    distinction because Respondents detain some individuals under other subsections of

8    Section 1231(a).[15]  Similarly, *Diouf II*'s holding is not limited to those detainees

9    who "have filed a petition for review of a collateral challenge to [a removal] order,"

10   but rather extends to anyone detained under the statute.  *Diouf II*, 634 F.3d at 1086

11   ("We now extend *Casas-Castrillon* to aliens detained under Section 1231(a)(6).").

12   Class members may be subject to prolonged detention while the BIA or the

13   Immigration Judge considers their pending motions to reopen, and both the BIA and

14   the Immigration Judge have authority to issue stays of removal under such

15   circumstances, *see* 8 C.F.R. § 1003.23(b)(1)(v); *Matter of Yauri*, 25 I. & N. Dec. 103

16   (BIA 2009) (recognizing stay authority in connection with pending motions).  Such

17   individuals are also detained under Section 1231(a), and there is no basis for

18   excluding them from the benefits of Class membership.

19         Perhaps most important, there is no rationale for providing such individuals

20   bond hearings only after they have been detained for six months "after the removal

21   period begins."  Dkt. 299 at 15.  Under such an approach, Respondents would

22   essentially ignore all the time that an individual has spent incarcerated during

23   removal proceedings, even if detention during that period lasted nearly six months.

24   
25   [15] To the extent Respondents argue that people detained under Section 1231(a)(1)(C)
26   or other sections of Section 1231(a) are entitled to fewer procedural protections
     because they have a lesser liberty interest, that argument was rejected in *Diouf v.*
27   *Mukasey* (*Diouf I*), 542 F.3d 1222, 1231 n.4 (9th Cir. 2008) (citing *United States v.*
     *Salerno*, 481 U.S. 739, 755 (1987)).
28

This is not how the Ninth Circuit has counted detention lengths in any of its prior cases. *See, e.g.*, *Tijani*, 430 F.3d at 1242, 1246 (Tashima, J., concurring) (characterizing detention as having lasted for two years and eight months, even though 20 of those months were for detention during removal proceedings before Immigration Judge and BIA); *Casas*, 535 F.3d at 948 (characterizing detention as lasting nearly seven years while case passed through different phases of proceedings).  While it is true that *Diouf II* construed the statute in that case to require a hearing after the 180 day post-order custody review, it did so on the assumption that "[w]hen the 180-day review takes place, the alien has been detained for approximately six months."  *Diouf II*, 634 F.3d at 1091.  While that will be true in many cases, as it was in Mr. Diouf's case, because the Government often will not detain Section 1231(a) Subclass members until they have an administratively final order of removal, neither the rationale nor the holding of prior Ninth Circuit authority in this context allows the Government to detain Class members for longer than six months without affording them a bond hearing. [16]

Respondents also argue for an exception to deny bond hearings to individuals whose removal is "imminent."  Dkt. 299 at 34 n.27 (citing *Diouf II*).  While an exception for "imminent" removal made sense in *Diouf II*, because the rule established by *Diouf II* applies to all individuals detained under Section 1231(a)(6), whether or not their removal order has been stayed, it makes no sense in this case, where the class definition exempts individuals whom the Government has present authority to deport.  Every Class member either has no final removal order or has a stay in place – whether administrative or judicial.  Therefore, by definition, no Class

---

[16] Further evidence against the Government's reading comes from the fact that *Diouf II* urged the Government to "afford an alien a hearing before an Immigration Judge before the [six-month mark] if it is practical to do so and it has already become clear that the alien is facing [future] prolonged detention."  *Diouf II*, 634 F.3d at 1092 n.13 (emphasis added).

1    member faces imminent removal.  *See* Dkt. 111 at ¶¶ 105-08.[17]

2         For all of these reasons, the Court should order injunctive relief for all

3    members of the Section 1231(a) Subclass as well.

4
5    **II.    BECAUSE DETENTION BECOMES "PROLONGED" AT SIX MONTHS, THIS COURT SHOULD CONSTRUE THE IMMIGRATION STATUTES TO REQUIRE *CASAS* HEARINGS AT THAT TIME.**

6
7         The Ninth Circuit unambiguously held in *Diouf II* that detention becomes

8    "prolonged" at six months, and therefore ordered *Casas* hearings for all individuals

9    detained under Section 1231(a)(6).  That holding dictates the same result for all

10   Class members here.  Dkt. 281 at 25.

11        Respondents make many meritless arguments against the six month rule

12   prescribed by *Diouf II*, Dkt. 31-39, but two threshold issues merit particular

13   attention, as they infect all of Respondents' flawed analysis.  First, Respondents

14   repeatedly conflate the right to a *hearing* – which Petitioners advocate – with the

15   right to *release* – which Petitioners do not advocate.  *See, e.g.*, Dkt. 299 at 32

16   (characterizing *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003) as "rejecting a six-month

17   rule" when the decision rejected a six month rule for *release*), *id.* at 31

18   (characterizing Petitioners' argument as "all immigration detention beyond six

19   months . . . raises constitutional concerns" when Petitioners' argument is actually

20   that immigration detention beyond six months *without a bond hearing* raises

21   constitutional concerns); *id.* at 32 (same).  As a result, they repeatedly cite cases that

22   do not support the positions they advance (in particular *Zadvydas*, which concerned

23   a request for release, *see, e.g.*, 533 U.S. at 682, and the Sixth Circuit's decision in

24   *Ly*, which endorsed a case-by-case approach for determining when the Constitution

25   _____

26   [17] The Government never explains who would decide whether a Class member's
     removal is imminent, thereby robbing them of their right to a bond hearing, and
27   what standard that official would apply to individuals whose cases remain pending
     with a stay of removal – whether administrative or judicial – in place.
28

1  requires release.  *See Ly*, 351 F.3d at 273 (declining to address issues concerning

2  adequacy of release procedures, and instead simply ordering the detainee's

3  release).[18]

4        Second, Respondents' opposition to the *Diouf II* rule appears at times to argue

5  for a case-by-case system for determining when bond hearings are required to satisfy

6  the Constitution's demands, even though they also contend that neither the

7  immigration laws nor the Due Process Clause permit *any* bond hearings for Class

8  members detained under Section 1226(c) and Section 1225(b), regardless of the

9  length of detention.  *See* Dkt. 299 at 31-32 (citing, with apparent approval, decisions

10 from the Third and Sixth Circuits that reject the Government's position with respect

11 to whether Section 1226(c) Subclass members are entitled to bond hearings).  In any

12 event, such an approach is inconsistent with *Diouf II* as well as other Ninth Circuit

13 authority, including the class certification ruling in this case.

### A.    A Case-by-Case Approach Is Inconsistent with Ninth Circuit Precedent.

15        Respondents recognize that the Ninth Circuit adopted a six month rule in

16 *Diouf II*.  Nonetheless, they cite *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003) and

17 *Diop v. ICE/Homeland Security*, 656 F.3d 221 (3d Cir. 2011)) in opposition to *Diouf*

18 *II*'s six month rule.  Dkt. 299 at 31-32.  *Ly* and *Diop* both reject the Government's

19 primary argument here—that Section 1226(c) imposes no limit on the length of

20 mandatory detentions.  *See Ly*, 351 F.3d at 270 (finding no authority for detention

21 under Section 1226(c) beyond the period reasonably necessary to conclude removal

22 proceedings); *Diop*, 656 F.3d at 235 (requiring bond hearing when detention

23 exceeded reasonable period of time).  *Ly* concluded on that basis that the petitioner

---

[18] For example, Respondents argue that the relief Petitioners seek is inconsistent with *Zadvydas* because *Zadvydas* contemplated some detention beyond six months. Dkt. 299 at 34-36.  But Petitioners also contemplate some detention beyond six months, they simply seek a hearing to determine *which* individuals must be detained beyond that time period.

1   should be released; while there is some discussion concerning bond hearings in the
2   opinion, it nowhere rejects the provision of bond hearings (rather than release) at six
3   months.  *Ly*, 351 F.3d at 272-73.  Although *Diop* did decline to adopt a bright-line
4   six-month rule for bond hearings as a constitutional matter, *see Diop*, 656 F.3d at
5   234, it did not expressly preclude such a rule as a matter of statutory interpretation.
6   Rather, it merely held that, to avoid serious constitutional problems, Section 1226(c)
7   needed to be construed to authorize detention only for a "reasonable" period of time,
8   leaving open for future resolution what is "reasonable."  *See id.* at 235.[19]

9        There are serious problems with these case-by-case approaches.  Under the
10  Third Circuit's approach, no Government official makes an effort to assess whether
11  a given detention is reasonable, instead leaving that determination to be made by
12  district courts when detainees file individual habeas petitions.  The Ninth Circuit
13  ordered certification of the class in this case expressly to avoid that result, deciding
14  instead to "facilitate development of a uniform framework for analyzing detainee
15  claims to a bond hearing," *Rodriguez v. Hayes*, 591 F.3d 1105, 1123 (9th Cir. 2010).
16  *Zadvydas* itself cited practical considerations such as "uniform administration" as
17  support for establishing a six-month rule for release in the post-final-order detention
18  context.  533 U.S. at 701.

19       Respondents' other arguments against *Diouf II* are also meritless.  They ask
20  this Court to limit *Diouf II* to its particular facts, but the decision relied heavily on
21  the time periods described in *Demore* and cited in *Casas*, both of which involved
22  other statutes.  *Id.* at 1091 (noting that *Demore* "upheld a six month detention with
23  the specific understanding that § 1226(c) authorized mandatory detention only for

---

24
25  [19] Respondents also cite the Second Circuit's decision in *United States v. Briggs*,
26  697 F.3d 98 (2d Cir. 2012), which declined to impose a bright-line limit to criminal
    pretrial detention.  *See* Dkt. 299 at 31.  However, the defendant in *Briggs* sought
27  *release* from pretrial custody—not a bond hearing—and had already been provided a
28  bond hearing under the Bail Reform Act.

the 'limited period of [the detainee's] removal proceedings,' which the Court estimated 'lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal' his removal order to the BIA.") (citing *Casas*).  Moreover, even prior to *Diouf II*, the Ninth Circuit in *Nadarajah* had relied on *Demore* and *Zadvydas* to construe all the "general detention statutes"—those that do not involve national security detainees and do not specifically mention detention beyond six months—to authorize detention only for a "brief and reasonable" period of, presumptively, six months for an "arriving alien." *Nadarajah*, 443 F.3d at 1079-80.

Respondents also argue that *Diouf II* does not apply to the Section 1225 and 1226(c) Subclasses because their prolonged detention raises no constitutional concerns.  *See* Dkt. 299 at 33-34.  However, as set forth above, *see supra* Section I.A, this assertion ignores both Ninth Circuit precedent and the prior decisions of this Court.

**B.    The Use of a Six Month Rule Comports with Due Process.**

Respondents also assert that due process does not permit the use of bright-line rules such as the six month rule Petitioners advocate.  But, as Petitioners have repeatedly stated, their primary argument for this rule rests on statutory construction under the constitutional avoidance doctrine, and in that respect it is no different than the six month rule already adopted by the Supreme Court in *Zadvydas*, 533 U.S. at 701, and the Ninth Circuit in *Diouf II*, 634 F.3d at 1091 (and before that in *Nadarajah*, 443 F.3d at 1079-80).[20]  In any event, Respondents are wrong to the

---

[20] As the Supreme Court explained in *Clark*, the canon of constitutional avoidance "is not a method of adjudicating constitutional questions" but rather one of statutory interpretation—"a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005).  Thus, contrary to Respondents' claim, Dkt. 299 at 15 n.19, Petitioners' primary argument does not require the Court to adjudicate the underlying Due Process issue, but only to recognize it as serious.

extent that they argue that courts have not recognized bright line rules in the constitutional context. *See, e.g.*, *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-58 (1991) (adopting requirement that probable cause hearings, incorporated against the States under the Due Process Clause of the Fourteenth Amendment, must occur within 48 hours of arrest); *Shatzer v. Maryland*, 130 S. Ct. 1213, 1222 (2010) (holding that a suspect who asserts his Miranda rights cannot be re-interrogated following a break in custody for 14 days); *Cheff v. Schnackenberg*, 384 U.S. 373, 379-80 (1966) (plurality opinion) (right to jury trial extends to all cases in which sentence of six months or greater is imposed).

Respondents are also wrong to suggest that due process permits the Government to wait for detainees to file habeas petitions in order to ensure that their detention is authorized. Such an approach runs counter to the basic rule that "[t]he bare existence of optional habeas corpus review does not, of itself, alleviate due process concerns." *Doe v. Gallinot*, 657 F.2d 1017, 1023 (9th Cir. 1981); *cf. Boumediene v. Bush*, 553 U.S. 723, 785 (2008) (holding that the Due Process Clause and the Suspension Clause impose distinct procedural requirements). Because "it is the state, after all, which must ultimately justify depriving a person of a protected liberty interest by determining that good cause exists for the deprivation," *Gallinot*, 657 F.2d at 1023, the Government must designate some agent (other than a habeas court) whose function it is to determine that detention remains reasonable, and some time period by which that agent must act. As this Court has previously recognized, under Ninth Circuit precedents, that individual should be an Immigration Judge, and that determination should take place at six months.

## C.    The Availability of Continuances Does Not Counsel Against Adoption of a Six Month Rule.

Respondents also assert that a six-month rule will encourage dilatory conduct by detainees to secure bond hearings, citing to its expert report's conclusion that class members have requested continuances during the course of their removal

proceedings. *See* Dkt. 299 at 36-39. However, the Government's expert's report in fact proves exactly the opposite—*i.e.*, that individuals seek continuances for reasons other than to obtain a bond hearing. The individuals the Government cites were barred from obtaining a bond hearing under the system in place at the time the data was drawn, yet they sought continuances.

Putting aside this obvious error in the Government's argument, the Court should reject the Government's attempt to blame class members for their lengthy detentions for several additional reasons. *First*, and most significantly, the analysis of the Government's expert, Dr. Palmer, does not account for whether class members sought continuances *for legitimate reasons*. Indeed, Dr. Palmer expressly disclaimed any knowledge of whether the studied continuances were justified or warranted – he readily admitted that he had no specialized knowledge about immigration law and that Petitioners' expert, Dr. Long, knew much more about immigration law than he did. *See* Dkt. 281-8 Ex. D at 65:20-24; Kaufman Decl. Ex. F at 48:6-49:1. Dr. Palmer's report therefore does not draw any normative distinction between justified and unjustified continuances. Dr. Long attempted such a task, but had concluded that it was impossible given available data produced by Respondents. *See* Kaufman Decl. Ex. K at 96:20-97:14, 165:11-166:11.

*Second*, it was Respondents (or their counsel) who categorized continuances as "alien-caused," and their categorization includes continuances that are plainly legitimate, including where they are due to the Government's own bureaucratic delays,[21] where the detainee or his attorney is sick, or where, as explained in more

---

[21] For example, detainees may be eligible to adjust their immigration status in removal proceedings, if a qualifying family member has filed an I-130, "Petition for Alien Relative," petition on the detainee's behalf. It often takes United States Citizenship and Immigration Services ("USCIS") months, if not longer, to process I-130 petitions. *See* Dkt. 111 ¶¶ 72-76 (named Plaintiff Perez-Ruelas waited in detention for over a year while his I-130 petition was processed and granted). *See also* Arulanantham Decl. Ex. A (testimony of "person most knowledgeable" about the Long-Term Detention Review Project, a government project undertaken to study

detail below, the continuances are necessary for the detainee to litigate his removal
case.  *See* Dkt. 281-3, Ex. L at 9 (list of continuances deemed "alien-caused").  In
immigration court, "a continuance may be granted only 'for good cause shown.'"
*Ahmed v. Holder*, 569 F.3d 1009, 1014 (9th Cir. 2009) (quoting 8 C.F.R. § 1003.29)
("Both the language of the regulation itself and our precedent require an IJ to make
some inquiry into whether good cause exists in a given individual case.").
Accordingly, Respondents' own regulations required that an Immigration Judge
determine that each of the continuances analyzed by Dr. Palmer was supported by
"good cause."  In light of this fact, Respondents cannot seriously contend that
Dr. Palmer's report even suggests that Class members frivolously sought
continuances to extend their cases.

    *Third*, the Government's account ignores the way in which Respondents have
structured the immigration court scheduling practices, which *requires* that detainees
who file applications for relief or otherwise contest their removal take at least one,
and often several, continuances.  Under Respondents' immigration court system, the
first hearing scheduled is a "master calendar" hearing, akin to a criminal
arraignment.  *See* Kaufman Decl. Ex. B (Immigration Court Manual § 4.15(a)).  At
the hearing, if the detainee is pro se – which is the case for the vast majority of
detainees at this stage in their case – the Immigration Judge provides "a list of
providers of free and low-cost legal services in the area where the hearing is being
held" and asks the detainee whether he would like to take a continuance to seek legal
assistance.  *See* Kaufman Decl. Ex. B § 4.15(g)); Dkt. 281-4 ¶ 3; Dkt. 281-7 ¶¶ 19-
20.  In the Central District, Immigration Judges frequently encourage *pro se*
detainees to take a continuance if the judge believes that the detainee may be eligible
for relief from removal.  *See* Dkt. 281-4 ¶ 5.

---

cases of prolonged immigration detention) (observing that "delays by CIS" are a
frequent cause of prolonged detention).  Nonetheless, Respondents have categorized
an adjournment entitled "I-130 Pending" as "alien-caused."  Dkt. 281-3, Ex. L at 9.

33

Critically, under no circumstances can an immigration case be resolved at the initial "master calendar" hearing if the detainee seeks relief from removal, as decisions on applications for relief are reserved for a separate type of hearing – an "individual" merits hearing – that must be scheduled after the initial "master calendar" hearing. *See* Kaufman Decl. Ex. B § 4.16; Dkt. 281-7 ¶ 22.[22] Moreover, because Respondents' policies require that certain applications for relief be submitted at a "master calendar" hearing, cases in which relief is sought are typically continued for a second "master calendar" hearing before the case can reach a merits determination. *See* Kaufman Decl. Ex. B § 3.1(b)(3)(A) (providing that asylum applications must be filed at a "master calendar" hearing); Dkt. 281-7 ¶ 22. At an "individual" hearing (unlike at a master calendar hearing), the detainee and Government counsel have the opportunity to offer arguments, present evidence and examine witnesses. *See* Kaufman Decl. Ex. B § 4.16. In some cases, the Immigration Judge's schedule will not permit sufficient time to hear a case in its entirety, and the case will be continued for another "individual" merits hearing. Dkt. 281-7 ¶ 23. In complex cases, it is not uncommon that multiple "individual" merits hearings are necessary to resolve a case. *Id.*

It is therefore unsurprising that Dr. Palmer found that many cases involve multiple "alien-caused" continuances. An ordinary case in which a detainee seeks relief from removal *requires* that the Immigration Judge order multiple continuances, which the Government then categorizes as "alien-caused." *See* Dkt. 281-3, Ex. L at 9 (categories of "alien-caused" continuances include "Alien to seek

---

[22] A case can resolve at the initial master calendar hearing if the court terminates proceedings – for example, if the court determines that the Government cannot sustain its charges – or if the detainee voluntarily accepts deportation. *See* Dkt. 281-1 ¶ 17. However, these outcomes are unlikely for Class members in this action who, by definition, are detained for periods typically well beyond the time period for the initial "master calendar" hearings, and because the overwhelmingly percentage of class members seek relief from removal. *See* Dkt. 281-6, Ex. A at 10.

representation"; "Alien to file for asylum"; "Alien to file other application"; "Preparation—Alien/Attorney/Representative"; "I-130 Pending"). Indeed, the Chief Judge for the Los Angeles Immigration Court testified that, in his experience, multiple continuances are necessary in cases in which the detainee is granted relief. *See* Dkt. 291 (Jacobs Decl.), Ex. E at 130:18-24 (stating that it is not "surprising" that cases where the detainee is granted relief take longer "because by definition, someone who has been granted relief has to apply for some relief or release, which means *there are additional hearings that have to be held*, additional continuances to prepare evidence, to present witnesses and the like") (emphasis added); *see also* Dkt. 281-6, Ex. C (statistical data from facilities within the Central District showing that cases where the detainee won and cases involving applications for relief consistently took longer than others). Respondents' suggestion that Class members engage in dilatory tactics finds no support in their evidence, which shows only that Class members engage in entirely legitimate – and constitutionally protected – efforts to litigate their removal cases.[23]

      *Fourth*, the Government's own statistics belie any suggestion that detainees

---

[23] To the extent that Respondents argue that there is something improper about *pro se* detainees seeking legal assistance, that suggestion must be rejected. *See* Dkt. 281-3, Ex. L at 9 (reporting that some detainees request multiple continuances to find an attorney). Class members are usually unfamiliar with immigration law and procedure; substantial numbers do not understand English or are illiterate; and many are detained in facilities located in remote locations with extremely limited access to legal assistance and law libraries. *See* Dkt. 281-7 ¶¶ 10-14, 19; Dkt. 281-1 ¶ 12. In light of these facts, class members cannot be faulted for seeking an opportunity to find some help with their complex cases. Indeed, the Ninth Circuit has recognized "[r]epresentation by competent counsel is particularly important in removal proceedings because '[t]he proliferation of immigration laws and regulations has aptly been called a labyrinth that only a lawyer could navigate.'" *Nehad v. Mukasey*, 535 F.3d 962, 967 (9th Cir. 2008). It is presumably for the same reason that Immigration Judges in the Central District actively encourage pro se detainees to find an attorney where the judge believes the person is eligible for relief. *See* Dkt. 281-4 ¶ 5.

1    bear central responsibility for the length of proceedings.  A review of publicly-
2    available information on case processing times for the detention centers in the
3    Central District reveals that there are significant fluctuations in the length of
4    proceedings for detainees at different detention centers, and for different years
5    within the same detention center.  *See* Dkt. 281-6 at 61 (average case processing in
6    which Mira Loma Detention Center detainees were granted relief fluctuated from 74
7    days in 2001 to 228 days in 2011); *id*. at 61, 62 (average cases processing time in
8    which detainee was granted relief in 2011 was 228 days at Mira Loma Detention
9    Center and 150 days at Orange County detention centers).  Respondents cannot
10   seriously contend that detainees at some detention centers take more continuances
11   than detainees at other facilities in the Central District, or that the number of
12   continuances taken by detainees at a single facility rapidly fluctuates from year to
13   year.  As such, it is clear that the length of Class members' proceedings is driven by
14   factors beyond Class members' requests for continuances – likely the extent of the
15   backlog in the immigration courts.

16          *Fifth*, Dr. Palmer's analysis does not account for whether the length of any
17   given continuance is attributable to the detainee – a flaw he readily acknowledged.
18   *See* Kaufman Decl. Ex. E at 79:25-80:6 (acknowledging that pattern of
19   approximately forty day continuances suggests that length of continuance is dictated
20   by court scheduling imperatives); *see also* Dkt. 283, Ex. D at 103:19-25 (deposition
21   of Judge Fong) (admitting that immigration court does not record information
22   regarding whether detainee sought shorter continuance than Immigration Judge
23   granted).  For example, if a detainee sought a several day continuance to fix a
24   clerical error in an application for relief, but the immigration court's schedule did
25   not permit rescheduling for weeks or months, Respondents attribute the *entire length*
26   of the continuance as "alien-caused."  Lengthy continuances frequently occur
27   because of the Los Angeles Immigration Court's busy docket.  *See* Dkt. 242-1 ¶ 6
28   (reporting that lengthy continuances "occur with some frequency"); *id*. at ¶ 4

1  (documenting case in which Immigration Judge continued a detained asylum

2  seeker's case for four months, and denied motion to shorten continuance).

3      *Finally*, the data Dr. Palmer analyzed is not sufficiently reliable to support his

4  conclusions.  In Petitioners' expert rebuttal report, Dr. Susan Long identified

5  significant inconsistencies between the data that was provided to Dr. Palmer, and the

6  data that was produced to Petitioners in discovery.  *See* Dkt. 281-6, Ex. B at 4-7.

7  Based on Respondents' failure to provide any explanation for these inconsistencies,

8  as well as her own prior experience with the data from that source, Dr. Long

9  concluded in her expert opinion that the data on which Dr. Palmer relied was not

10 sufficiently reliable and should be disregarded.  *Id.*  In its motion for summary

11 judgment, Respondents provided a declaration of Benjamin McDowell that purports

12 to explain the inconsistencies in Respondents' data, Dkt. 299-1, but that declaration

13 raises even more questions about the reliability of the data.  Most troubling,

14 Mr. McDowell included in his declaration a new source of data drawn from

15 Respondents' databases that was not provided to Petitioners in discovery, nor to

16 Dr. Palmer.  *See* Declaration of Dr. Susan Long ¶¶ 4-13 (filed concurrently).  Based

17 on Mr. McDowell's explanation of this new data, it is clear that that one of the key

18 assumptions on which Dr. Palmer based his analysis – that the "adjournment date"

19 reflects the date on which an adjournment was requested and granted – is

20 demonstrably false.  *Id.* at ¶¶ 5-10.  As Petitioners argue separately in their

21 objections to Respondents' evidence, given that Respondents now seek to explain

22 the inconsistencies in their data through the introduction of another declaration from

23 Mr. McDowell that provides an additional and incomplete source of information not

24 previously disclosed to Petitioners in discovery, the Court must disregard the

25 evidence regarding continuances, Dkt. 311.  While Respondents have not disclosed

26 sufficient information to determine the degree to which the erroneous assumption

27 affects Dr. Palmer's analysis, at a minimum, it demonstrates that his calculations

28 regarding the length of "delay" due to detainee-requested continuances are incorrect

1    and must be disregarded.  Long Decl. at ¶¶ 4-13.

2    **III.    THE COURT SHOULD CONSTRUE THE IMMIGRATION STATUTES TO REQUIRE ADEQUATE SUBSTANTIVE AND PROCEDURAL SAFEGUARDS, CONSISTENT WITH DUE PROCESS.**

3

4         Respondents cite little authority in opposition to Petitioners' statutory and due

5    process arguments seeking to establish certain minimal safeguards at prolonged

6    detention bond hearings in order to render them "adequate" to protect against such a

7    serious deprivation of liberty.  Dkt. 281 at 26-47.  The Court should order the

8    minimal additional protections that Petitioners seek.

9         **A.    All of the Relief that Petitioners Seek to Render Hearings Adequate is Properly Before the Court.**

10

11        As a threshold matter, Respondents contend that the Court must treat

12   Petitioners as having sought leave to constructively amend their complaint in order

13   to assert two of their requests for relief – that the Immigration Judge must consider

14   the likelihood of removal and that prolonged detention bond hearings should recur

15   every six months for those individuals who are not released.  Dkt. 299 at 41-42, 54.

16   That argument is incorrect for four reasons.

17        *First*, neither one is a *claim*; they are forms of equitable relief required by the

18   federal immigration statutes and Due Process Clause.  The Ninth Circuit has held –

19   repeatedly – that a party need only plead claims, not every form of relief.  *See*

20   *Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075, 1082 (9th Cir. 2005)

21   (holding party not required to allege novation under breach of contract claim to

22   pursue novation as form of relief at summary judgment); *Z Channel Ltd. P'ship v.*

23   *Home Box Office, Inc.*, 931 F.2d 1338, 1341 (9th Cir. 1991) (holding plaintiff

24   entitled to raise damages for first time on appeal, even though not requested in

25   complaint or summary judgment briefing); *see also Crull v. Gem Ins. Co.*, 58 F.3d

26   1386, 1391 (9th Cir. 1995) (reversing summary judgment for defendant because

27   "pleadings need not identify any particular legal theory under which recovery is

28

1  sought"). Here, Petitioners have pled claims for relief under the immigration

2  statutes and Due Process Clause, seeking adequate hearings as a form of relief. This

3  alone renders inapposite the case Respondents cite where a plaintiff sought to add

4  new *claims* less than three months before trial. *See Zivkovic v. S. Cal. Edison Co.*,

5  302 F.3d 1080, 1087 (9th Cir. 2002).

6       *Second*, even if these were new claims, Petitioners would have more than

7  satisfied the notice pleading standard. The complaint makes plain that Petitioners

8  seek to ensure "adequate process" for immigrants subjected to prolonged detentions.

9  Dkt. 111 ¶¶ 1, 13, 103, 116, 118, 125, 127. It lists certain additional safeguards

10  needed to ensure such process, but makes clear that the list set forth only

11  "minimum" conditions. Dkt. 111 ¶ 9 n.3. Among other things, it identifies as

12  examples of injured Class members persons held despite the unlikelihood of removal

13  due to a credible asylum claim (*id.* ¶¶ 45-52) and held for years after an initial bond

14  hearing (*id.* ¶¶ 17, 36 & n.6, 42, 73-75) – harms that would be remedied through the

15  forms of relief sought here. Nothing more is required.

16       *Third*, even if the Court had to construe the summary judgment motion as a

17  constructive motion for leave to amend, it should grant leave because Respondents

18  have not satisfied their burden of demonstrating prejudice. *See Eminence Cap., LLC*

19  *v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (reversing denial of motion to

20  amend in light of "extreme liberality" with which amendment is permitted). The

21  propriety of affording Petitioners these two forms of relief both raise questions of

22  law; no additional discovery is necessary. *Farnan v. Capistrano Unified School*

23  *Dist.*, 654 F.3d 975, 984-85 (9th Cir. 2011) (permitting amendment after scheduling

24  order deadline because issue was "a question of law" and could be decided "based

25  on the factual record already developed").

26       *Finally*, Petitioners did not raise these issues "in opposition to a motion for

27  summary judgment . . . ." Dkt. 299 at 42, 54. Petitioners disclosed them during the

28  pre-filing meet and confer process. *See* Kaufman Decl. ¶12. For this and other

reasons, Respondents' reliance on *Apache Survival Coalition v. United States*, 21 F.3d 895 (9th Cir. 1994) is misplaced – Respondents had ample notice that Petitioners would seek these forms of relief.  The Court should reject this attempt to bar the Court from ruling on these two important issues.

### B.    Due Process and the INA Require that the Immigration Judge Consider Whether the Detainee Will Ever Be Removed.

On the merits, Respondents vehemently oppose Petitioners' argument that Immigration Judges should consider whether the detainee will ever be removed, despite the fact that this standard would likely make a difference only in a few cases, and then would serve only to protect against entirely pointless detention.  Dkt. 299 at 41.  Respondents have no answer not only to the basic common sense rationale for the rule Petitioners seek, but also to the fact that both *Nadarajah* and *Owino* required the Government to release noncitizens *even while their cases are pending*, so long as their removal would not be significantly likely upon the conclusion of their removal case.  Respondents offer no rationale for preventing Immigration Judges from enforcing that rule.  *See* Dkt. 281 at 29.

Respondents do not even address Plaintiffs' argument that removal is not "significantly likely" where the noncitizen has prevailed in an asylum, withholding, or Convention Against Torture (CAT) claim before the Immigration Judge, and is significantly likely to prevail in a case upon administrative or judicial review.  *See* Dkt. 281 at 30 (citing *Nadarajah v. Gonzales*, 443 F.3d 1069, 1080 (9th Cir. 2006)).  The Ninth Circuit ordered Mr. Nadarajah's release even though his removal proceedings remained pending (before the Attorney General, to whom the BIA had referred his case) at the time of the Court's decision.  *See id.* at 1075.  Individuals who, like Mr. Nadarajah, have won their cases and remain detained only pending the Government's appeal should be released once their detention exceeds six months.

Although Respondents say nothing about the individuals entitled to release

1    under *Nadarajah*, they seek to distinguish *Owino v. Napolitano*, 575 F.3d 952, 955

2    (9th Cir. 2009) on a number of grounds, all of which are meritless.

3    *First*, Respondents suggest that the standard set forth in *Owino* applies only to

4    post-order detention under Section 1231.  *See* Dkt. 299 at 41.  However, as

5    Respondents concede, *see id*. at 42, the petitioner in *Owino* had prevailed on his

6    petition for review and had his case remanded for further administrative proceedings

7    on his CAT claim.  *Owino*, 575 F.3d at 953.  He was detained, pursuant to *Casas*,

8    under the pre-order detention statute, Section 1226(a).  *Id.* at 955.

9    *Second*, Respondents assert that *Owino* requires the district court, rather than

10   the Immigration Judge, to determine whether removal is significantly likely.  *See*

11   Dkt. 299 at 42.  But nothing in *Owino* precludes Immigration Judges from making

12   that judgment in the first instance, particularly given that Immigration Judges are

13   under an independent obligation to ensure that detention remains lawful.  *Cf. Doe v.*

14   *Gallinot*, 657 F.2d 1017, 1023 (9th Cir. 1981) (noting that "[t]he bare existence of

15   optional habeas corpus review does not, of itself, alleviate due process concerns").

16   Indeed, all *Casas* hearings are subject to review for constitutional and legal error in

17   district courts via habeas petitions, yet this does not obviate the need for

18   Immigration Judge hearings in the first instance.  *See V. Singh*, 638 F.3d at 1202.[24]

19   *Third*, Respondents assert that the rule Petitioners seek creates a conflict

20   between the burden standards set forth in *Casas* and those set forth in *Zadvydas*.

21   Dkt. 299 at 43.  This too is incorrect.  Petitioners acknowledge that the detainee

22   would have to first present evidence, just as in *Zadvydas* cases, that removal is

23   unlikely for some reason (typically, the fact that the detainee is from a country to

24

25   [24] Nor does *Zadvydas* require that the habeas court determine whether removal is

26   significantly likely, as the Government asserts.  *See* Dkt. 299 at 43.  Indeed, ICE has

27   promulgated post-order custody review regulations implementing Section 1231(a)(6), under which the agency determines whether removal is significantly

28   likely and continued detention still justified.  *See* 8 C.F.R. § 241.13.

1    which repatriation is unlikely).  Thus, Immigration Judges need not apply a test

2    different from that at issue in *Zadvydas*: "once the alien provides good reason to

3    believe that there is no significant likelihood of removal in the reasonably

4    foreseeable future, the Government must respond with evidence sufficient to rebut

5    that showing."  *Zadvydas*, 533 U.S. at 701.

6        *Fourth*, Respondents assert that it is impractical for Immigration Judges to

7    consider the likelihood of removal before the conclusion of the removal case.  *See*

8    Dkt. 299 at 43-45.  But the same problem arises under *Owino*, which requires district

9    courts (and, presumably, ICE officials) to consider whether removal will ultimately

10   be accomplished at the time that a detainee files a habeas petition, even if the

11   Government does not yet have authority to remove the individual at that time.  And

12   while such cases may be rare, there are undoubtedly at least some cases—for

13   example, where the individual is stateless or from Cuba or Vietnam (for individuals

14   who entered the United States prior to July 1995) – where an Immigration Judge can

15   determine that removal is not significantly likely.  *See Zadvydas*, 533 U.S. at 684-

16   86, 701.[25]

17       *Finally*, Respondents point to a number of removals to particular countries

18   with repatriation problems.  Dkt. 299 at 45.  Of course, Respondents do not say how

19   many people they *tried* to remove to these countries, nor do they dispute Petitioners'

20   examples of class members subject to needless detention.  *See* Dkt. 292 ¶¶ 176-87

21   (Arulanantham Decl.).  In any event, none of Respondents' arguments undermine

22   Petitioners' claim that Immigration Judges have to *consider* whether removal is

23   significantly likely to occur, as existing Ninth Circuit and Supreme Court law

24   _____

25   [25] *See also* Statement of Gary Mead, Exec. Assoc. Dir. of Enforcement and Removal
     Operations, ICE, regarding a Hearing on "H.R. 1932, The Keep Our Communities

26   Safe Act" Before the U.S. House of Representatives Judiciary Comm., Subcomm.
     on Immigration Policy and Enforcement, at 8,

27   http://www.ice.gov/doclib/news/library/speeches/110524mead.pdf (discussing
     inability to repatriate to Cuba and Vietnam).

28

1  plainly require.

2  ### C. Due Process Requires Immigration Judges to Consider Length of Detention in Prolonged Detention Bond Hearings.

3  Respondents cite no authority in response to the substantial caselaw that

4  Petitioners advance in favor of the simple proposition that the length of detention is

5  a factor that judges should consider at bond hearings. *See* Dkt. 281 at 33 (citing

6  cases from immigration and criminal detention context). Nor does the Government

7  dispute the factual contention underlying Petitioners' claim – *i.e.*, that some Class

8  members have been detained for far longer than six months, and that a substantial

9  proportion of individuals detained for six months are likely to face another six

10  months or more of detention.

11  Instead, Respondents concede that due process case law requires

12  consideration of the length of detention in deciding *whether* a detainee is entitled to

13  a bond hearing, Dkt. 299 at 46, but argue that it should not be a factor at the bond

14  hearing itself. *Id.* (claiming that "no case" supports Petitioner's position). But

15  Respondents ignore several cases Petitioners cite from the pre-trial context, all of

16  which require that district judges consider the length of past and likely future

17  detention when determining whether to release individuals prior to trial – precisely

18  the relief that Petitioners seek here for Class members with hearings before

19  Immigration Judges. *See* Dkt. 281 at 33 (citing cases).

20  Because the nature of the deprivation is more severe where past and future

21  detention length are greater, due process requires consideration of that length of

22  detention.

23  ### D. Due Process Requires Immigration Judges to Consider Conditions Short of Incarceration.

24  

25  Due Process also requires Immigration Judges to consider whether less

26  restrictive conditions of custody – such as electronic monitoring or other forms of

27  intensive supervision – could satisfy the Government's interests before condemning

28  Class members to prolonged incarceration. Dkt. 281 at 35. Respondents

1  vehemently oppose this modest request, Dkt. 299 at 47, but their arguments once

2  again ignore the controlling authority.

3          Respondents first assert that no court has even "questioned" the adequacy of

4  the bond authority that Immigration Judges exercise, but the Ninth Circuit has

5  repeatedly altered the standards for bond hearings in cases involving prolonged

6  detention, most recently in *V. Singh*, 638 F.3d at 1203-04 (requiring judges,

7  *inter alia*, to apply clear and convincing standard of proof).  As in *V. Singh*,

8  Petitioners seek modifications to the standards applicable in prolonged detention

9  bond hearings to bring them into conformity with due process requirements.

10  Petitioners also grossly mis-cite *Prieto-Romero v. Clark*, 534 F.3d 1053 (9th Cir.

11  2008), to support their claim.  *See* Dkt. 299 at 47.  *Prieto* declined to decide whether

12  a detainee could challenge the result of a bond hearing on the ground that it was

13  "conducted arbitrarily or otherwise in violation of law," *id.* at 1067 n.11, because the

14  detainee could not show prejudice.  Nothing in *Prieto* suggested that courts lacked

15  authority to entertain challenges to the rules governing bond hearings themselves.

16  Indeed, the Ninth Circuit later held in *V. Singh* that legal and constitutional error in

17  bond hearings was cognizable on habeas.  *See V. Singh*, 638 F.3d at 1202.

18          With respect to the requirement that Immigration Judges consider less

19  restrictive alternatives to detention, Respondents ignore Petitioners' citation to *Jones*

20  *v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (Dkt. 281 at 36), in which the Ninth

21  Circuit required consideration of whether the Government's objectives can be

22  "accomplished in . . . alternative and less harsh methods" in cases of prolonged civil

23  detention.  *Id.* at 932.  That is precisely what Petitioners seek here.  Respondents

24  object to other authority on which Petitioners rely – cases from the pre-trial

25  detention context – on the ground that those cases arise under the Bail Reform Act

26  (BRA), and therefore say nothing about what the Constitution demands.  Dkt. 299 at

27  48.  But the Supreme Court upheld the limited pre-trial detention in the BRA

28  because it contained stringent procedural protections, including that "[i]n a full-

44

1    blown adversary hearing, the Government must convince a neutral decisionmaker by

2    clear and convincing evidence that *no conditions of release can reasonably assure*

3    *the safety of the community* or any person." *United States v. Salerno*, 481 U.S. 739,

4    750 (1987) (emphasis added).  Again, Petitioners seek nothing more here.

5           Respondents also cite various regulations that they claim foreclose the relief

6    Petitioners seek, Dkt. 299 at 47-48, but *V. Singh* made clear that those regulations do

7    not address prolonged detention.  *Id.* at 1203.  In any event, Petitioners do not

8    contend that ICE officers may not consider the utility of alternatives to detention in

9    the first instance – they certainly may, just as they do under current regulations.

10   Petitioners contend only that Immigration Judges must review that determination,

11   just as they do under existing regulations for initial detentions under

12   Section 1226(a).  *See* 8 C.F.R. § 236.1(d)(1) (permitting Immigration Judges to

13   "ameliorat[e]" conditions of release).

14          Respondents also raise certain pragmatic objections to this aspect of the relief

15   Petitioners seek, but the most serious problem with those claims is that Immigration

16   Judges are *already* ordering detainees released on alternatives to detention, albeit not

17   on a consistent basis.  *See* Kaufman Decl. Ex. C.  Petitioners assert only that judges

18   should be required to *consider* whether such release is appropriate in every case

19   where detention is prolonged.

20          Respondents also challenge Petitioners' use of evidence from the

21   Government's 30(b)(6) witness concerning the remarkably high success rates of the

22   intensive supervision programs that ICE now employs, but, as described *supra*, they

23   misunderstand their own witness's evidence.  Dkt. 299 at 48-49.  No record evidence

24   suggests that ISAP cannot be utilized as an alternative to detention for people held

25   under Section 1226(c), and in fact it has been used for years for people with

26   comparable criminal histories who get bond hearings under *Casas*, and more

27   recently for others as well, pursuant to the preliminary injunction order, which is

28   unsurprising given that many people subject to mandatory detention do not have

1    serious criminal histories.  *See* Kaufman Decl. Ex. C.

2          Finally, Respondents advance a distinct argument that alternatives would be

3    inappropriate for some Section 1225(b) Subclass members who are denied parole

4    because they have no residence, but Petitioners do not advocate that all Class

5    members be released on alternatives, only that judges be required to *consider* their

6    utility in each case, just as they do in criminal cases.  If a given alternative is

7    inappropriate for any particular detainee, the judge need not order its use.

8          **E.    The Government Must Provide Automatic Notice of Hearings in
              Language Clear Enough to Satisfy the Requirements of Due Process.**

9

10         Respondents cite no authority in response to Petitioners' extremely modest

11   requests for notice –notice in plain language of hearings that would be provided

12   automatically every six months.  Dkt. 281 at 39.

13         As to Petitioners' first contention, Respondents do not dispute that its sole

14   notice of *Casas* hearings is a sentence stating that a detainee may request a hearing

15   and a citation to a chapter in the Immigration Court Practice Manual.  The key

16   deficiency in the notice is that it does not sufficiently inform detainees *how* to obtain

17   a hearing, beyond citation to the highly technical text of the Court Manual.[26]

18   Notwithstanding Government counsel's blithe statements that the manual is clear,

19   examination of its language reveals that it falls far short of the "high degree of

20   clarity" that the Ninth Circuit has required for notice in the immigration context,

21   where many detainees are unfamiliar with both the English language and our legal

22   system.  *See Padilla-Agustin v. INS*, 21 F.3d 970, 976 (9th Cir. 1994), *overruled on*

23   *other grounds by Stone v. INS*, 514 U.S. 386 (1995); Dkt. 281 at 41.  Among other

24   deficiencies, the manual requires detainees to decipher terms such as "jurisdiction"

25   ───────────────

26   [26] The Government incorrectly states that limited access to law libraries "says
     nothing about the plain language of the notice provided."  Dkt. 299 at 52.  The plain
27   language of the notice instructs detainees to consult the Court Manual, which is only
     available in the detention facility law libraries, to which access is limited.
28

and "administrative control," and nowhere informs detainees of the address for the Los Angeles Immigration Court (to which they must send their requests for hearings).  *See* Dkt. 281-3, Ex. J.[27]

The Government also does not dispute that the challenges with navigating the Court Manual to obtain a bond hearing are undoubtedly greater for class members who do not have counsel or speak English.  They do not dispute—nor can they—that their own statistics reveal that almost half of noncitizens in removal proceedings nationwide lack counsel, and that number is almost certainly greater for detained noncitizens.  *See* Dkt. 281 at 42 (citing EOIR statistical yearbook).  Rather, even though approximately 82.5% of noncitizens in proceedings speak a language other than English,[28] the Government's nonsensical contention appears to be that these individuals should somehow be able to understand the English-language notice provided them by ICE because it is (according to the Government) "plain" English.[29] Dkt. 299 at 52.  The Government also points to the 2008 ICE National Detention Standards to suggest that class members have sufficient access to computer terminals containing Court Manuals, even though those standards are not binding on

---

[27] Petitioners do not need to demonstrate that the language of the Court Manual "confound[s]" individuals who have not been detained for more than six months, and are not class members.  *See* Dkt. 299 at 53.  Rather, the Court must determine whether the notice is sufficient for prolonged detainees, given the substantial liberty interest at stake in their cases.

[28] Executive Office of Immigration Review FY 2012 Statistical Yearbook F1, available at http://www.justice.gov/eoir/statspub/fy12syb.pdf.

[29] The Government's reference to the ICE National Detention Standards as requiring that illiterate or non-English-speaking detainees must be provided with "more than access" to English language materials, Dkt. 299 at 52 n.36, reflects the disconnect between aspiration and reality.  In the Adelanto facility, for example, non-English and illiterate speaking detainees must rely on other detainees to assist them when possible; they receive no assistance from the facility.  *See* Dkt. 281-1 at ¶¶ 12, 22.  It is also inadmissible if, as here, it is offered to prove that the standard is actually followed, as Petitioners argue in separately-filed objections.

facilities, and inadmissible to prove what actually occurs on the ground, Dkt. 311. That evidence cannot create a genuine dispute of fact when Petitioners have submitted evidence about the *actual, current conditions* at, for instance, the Adelanto facility, demonstrating that detainees have very limited access to computer terminals containing the Court Manual.[30] *Id.* In any event, ICE's own audits reveal that its facilities fall short of its nonbinding standards, and reports by other agencies criticize ICE for its failure to comply with the standards. Kaufman Decl. Ex. I.

The Government's responses as to Petitioners' second contention—that hearings should be automatically provided—also miss the mark. Respondents seek to limit *Doe v. Gallinot*, 657 F.2d 1017 (9th Cir. 1981) to its factual context, but the Court hinged its holding requiring automatic hearings on two broader considerations: whether detainees "can[] realistically be expected to set the proceedings into motion in the first place," *id.* at 1023, and the Government's obligation to "ultimately justify depriving a person of a protected liberty interest by determining that good cause exists for the deprivation." *Id.* As in *Gallinot*, class members cannot realistically be expected to affirmatively request bond hearings when they may not speak English (or are illiterate), often lack legal representation, and have restricted access to family visits; and, as in *Gallinot*, the Government bears the ultimate responsibility to ensure that each Class members' detention is authorized by the immigration statutes and consistent with Due Process.[31]

---

[30] Petitioners' response to Respondents' objections to the admissibility of this and other evidence is filed concurrently herewith.

[31] Far from being "outrageously wrong," Dkt. 299 at 52, Petitioners' contentions regarding detainees' limited access to lawyers and visitation by family members is supported by the undisputed evidence. According to the Government's own reports, approximately half of all noncitizens in removal proceedings – detained and non-detained -- lack lawyers. *See* Dkt. 281 at 42. As to visitation, the Government's brief cites to the ICE website for visiting hours, which only contain hours for one of the five detention facilities in question. *See* Dkt. 299 at 52 n.35 (citing www.ice.gov/detentionfacilities). Even as to that facility, hours are limited to three

1    Most important with respect to notice, the Government does not contend—nor

2 could it—that providing constitutionally sufficient notice would be burdensome.  As

3 the Ninth Circuit has clarified, the cost of providing written notice is "minimal."

4 *Martinez de Bojorquez v. Ashcroft*, 365 F.3d at 805.  This is particularly true here,

5 where the Government already provides a letter and would only need to add a clear,

6 plain language explanation of how a detainee should go about requesting a bond

7 hearing to that letter.  Given that concession, the Court should order the notice that

8 Petitioners seek.

9    Finally, Respondents object to Petitioners' common-sense argument for

10 periodic hearings.  Dkt. 299 at 53-54.  In support, they again mis-cite *Prieto-*

11 *Romero*, 534 F.3d at 1065-66, which, as noted above, did not address the question

12 whether the petitioner there was entitled to another bond hearing under appropriate

13 standards, because it found no prejudice.  *Id.* at 1066.  Beyond that, Respondents

14 have no explanation for why individuals detained far beyond six months – in some

15 cases for years – should not be afforded regular hearings at six month intervals to

16 determine whether their detention remains warranted, particularly when doing so

17 would allow some detainees subject to particularly long detentions to receive

18 hearings they would not otherwise know to request.  Dkt. 281 at 45 (citing example

19 of studied class member who would have won release if automatically given a

20 periodic hearing).  Respondents object to the example Petitioners offer on the

21 ground that it concerned a parole request rather than a bond hearing and that the

22 detainee could have requested a redetermination of parole, Dkt. 299 at 54, but these

23 objections prove the need for periodic hearings.  Placing the burden of requesting a

24 redetermination in the hands of Class members unfamiliar with our legal system

25 (such as detained Somali asylum seekers) makes it far more likely that individuals

26

27 days per week, and more to the point, detainees can be housed far from family and

28 thus lack access to critical assistance regardless of visiting hours.

1   will remain detained for no reason at all – as was the case with that individual, who

2   was detained on the ground that he lacked a sponsor even though in fact he had one

3   who had submitted a declaration to the Immigration Judge. *See* Dkt. 292

4   (Arulanantham Decl. at ¶¶ 81-84). Providing an automatic periodic hearing before

5   an Immigration Judge would ensure that such miscarriages of justice do not take

6   place. Given the minimal burden of providing such hearings and the massive

7   deprivation of liberty (as well as wasteful expenditure of resources) that they may

8   prevent, the Due Process Clause requires that minimal procedural protection.[32]

### CONCLUSION

10          For all of these reasons, the Court should grant Petitioners' motion for

11  summary judgment, deny Respondents' cross-motion, and enter judgment in

12  Petitioners' favor as set forth in the proposed findings of fact and conclusions of

13  law. *See* Dkt. 281-9.

                                          Respectfully submitted,

15  Dated:    April 5, 2013              ACLU OF SOUTHERN CALIFORNIA

17                                       /s/   Ahilan T.  Arulanantham
18                                       AHILAN T.  ARULANANTHAM
                                         Counsel for Petitioners

---

[32] Respondents do not oppose Petitioners' claim that, in light of Respondents' failure to provide sufficient advanced notice for hearings scheduled under this Court's preliminary injunction order, the Court should order that the notice for prolonged detention bond hearings must be received by class members at least seven days prior to the scheduled hearing. *See* Dkt. 281 at 41 n.24. As such, the Court should grant this relief.