1   **AHILAN T. ARULANANTHAM (SBN 237841)**
    aarulanantham@aclu-sc.org
2   **MICHAEL KAUFMAN (SBN 254575)**
    mkaufman@aclu-sc.org
3   **ACLU FOUNDATION OF SOUTHERN CALIFORNIA**
    **1313 West Eighth Street**
4   **Los Angeles, CA 90017**
    **Telephone:  (213) 977-9500**
5   **Facsimile:  (213) 977-5297**

6   *Attorneys for Petitioners*
    **(Additional Counsel listed on following page)**
7

8                  UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                        WESTERN DIVISION

11  ALEJANDRO RODRIGUEZ,                ) Case No. 2:07-CV-3239-TJH (RNBx)
    ABDIRIZAK ADEN FARAH, YUSSUF        )
12  ABDIKADIR, ABEL PEREZ RUELAS,       )
    JOSE FARIAS CORNEJO, ANGEL          ) **DECLARATION OF MICHAEL**
13  ARMANDO AYALA, for themselves and   ) **TAN**
    on behalf of a class of similarly-situated )
14  individuals,                        ) Honorable Terry J. Hatter
                                        )
15              Petitioners,            ) Date:  May 6, 2013
                                        ) Time:  Under Submission
16         v.                           )
                                        )
17  ERIC HOLDER, United States Attorney )
    General; JANET NAPOLITANO,          )
18  Secretary, Homeland Security; THOMAS)
    G. SNOW, Acting Director, Executive )
19  Office for Immigration Review;      )
    TIMOTHY ROBBINS, Field Office       )
20  Director, Los Angeles District Immigration )
    and Customs Enforcement; WESLEY LEE,)
21  Officer-in-Charge, Mira Loma Detention )
    Center; et al.; RODNEY PENNER,      )
22  Captain, Mira Loma Detention Center;)
    SANDRA HUTCHENS, Sheriff of Orange  )
23  County; OFFICER NGUYEN, Officer-in- )
    Charge, Theo Lacy Facility; CAPTAIN )
24  DAVIS NIGHSWONGER, Commander,       )
    Theo Lacy Facility; CAPTAIN MIKE    )
25  KREUGER, Operations Manager, James A.)
    Musick Facility; ARTHUR EDWARDS,    )
26  Officer-in-Charge, Santa Ana City Jail;)
    RUSSELL DAVIS, Jail Administrator,   )
27  Santa Ana City Jail,                )
                                        )
28              Respondents.            )

---

1    JUDY RABINOVITZ
     JRabinovitz@aclu.org
2    AMERICAN CIVIL LIBERTIES FOUNDATION
     IMMIGRANTS' RIGHTS PROJECT
3    125 Broad Street, 18th Floor
     New York, NY  10004
4    Telephone: (212) 549-2618
     Facsimile: (212) 549-2654
5
6    MICHAEL TAN (SBN 284869)
     mtan@aclu.org
7    AMERICAN CIVIL LIBERTIES FOUNDATION
     IMMIGRANTS' RIGHTS PROJECT
     39 Drumm St.
8    San Francisco, CA  94111
     Telephone:  (415) 343-0779
9    Facsimile:  (415) 395-0950

10    JAYASHRI SRIKANTIAH (SBN 189566)
     jsrikantiah@law.stanford.edu
11    STANFORD LAW SCHOOL
     IMMIGRANTS' RIGHTS CLINIC
12    Crown Quadrangle
     559 Nathan Abbott Way
13    Stanford, CA  94305-8610
     Telephone: (650) 724-2442
14    Facsimile: (650) 723-4426

15    SEAN COMMONS (SBN 217603)
     scommons@sidley.com
16    CODY JACOBS (SBN 272276)
     cjacobs@sidley.com
17    JONATHAN FEINGOLD (SBN 286302)
     jfeingold@sidley.com
18    SIDLEY AUSTIN LLP
     555 West Fifth Street, Suite 4000
19    Los Angeles, CA  90013-1010
     Telephone: (213) 896-6000
20    Facsimile: (213) 896-6600

21    *Attorneys for Petitioners*

22

23

24

25

26

27

28

1

2

<u>**DECLARATION OF MICHAEL TAN**</u>
<u>**OF APRIL 5, 2013**</u>

3        I, Michael Tan, hereby declare:

4        1.        I am a staff attorney of the ACLU Immigrants' Rights Project, and

5    counsel of record for Petitioners in *Rodriguez v. Holder*, CV 07-3239-TJH (RNBx)

6    ("*Rodriguez*"). This declaration is offered in support of Petitioners' Motion for

7    Summary Judgment or, in the Alternative, Summary Adjudication and in opposition to

8    any Cross-Motion filed by Respondents and is to replace my prior declaration filed on

9    February 11, 2013 (Dkt. #283), which included certain incorrect figures not identified

10   until after the filing.[1] I make this declaration based on my own personal knowledge

11   and if called to testify I could and would do so competently as follows:

12                        <u>**Excerpts of Depositions**</u>

13       2.        On August 9, 2012, my co-counsel Judy Rabinovitz took the deposition

14   of Assistant Field Office Director Conrad Agagan. I subsequently received a certified

15   transcript of that deposition. A copy of relevant portions of his deposition is attached

16   as Exhibit A to this declaration.

17       3.        On November 28, 2012, my co-counsel Ahilan Arulanantham defended

18   the deposition of Petitioners' expert Dr. Susan Long. On December 21, 2012, my co-

19   counsel Michael Kaufman defended another deposition of Dr. Long. I subsequently

20   received certified transcripts of those depositions. Copies of relevant portions of those

21   depositions are attached as Exhibits B and C to this declaration.

22

23

24   [1] The incorrect figures occurred when matching the information from the A-file summary prepared by Petitioners with
     data produced by Respondents relating to "in-period" class members. In light of this, the data matching was performed
25   again and separately verified to ensure accuracy. Revised figures regarding family ties were provided to Respondents on
     March 1, 2013, along with the lists of A numbers corresponding to each summary, so that Respondents could
26   independently assess the accuracy of the revised summaries. In addition, as stated in my original declaration, due to
     similar difficulties performing matching, Petitioners were not previously able to submit summaries relating to age at time
27   of entry for certain class members. *See* Dkt. #283 ¶ 34. The data used to create these summaries is being provided to
     Respondents concurrently with this filing.

28

4.      On November 27, 2012, my co-counsel Ahilan Arulanantham took the deposition of Respondents' expert Dr. Chester Palmer.  On December 21, 2012, my co-counsel Michael Kaufman took another deposition of Dr. Palmer.  I subsequently received certified transcripts of those depositions.  Copies of relevant portions of those depositions are attached as Exhibits D and E to this declaration.

5.      On January 13, 2012, my co-counsel Michael Kaufman took the deposition of Eric Saldana, Assistant Field Office Director.  I subsequently received a certified transcript of that deposition.  A copy of relevant portions of his deposition is attached as Exhibit F to this declaration.

6.      On December 13, 2011, I took the deposition of Assistant Chief Immigration Judge Jack Weil.  I subsequently received a certified transcript of that deposition.  A copy of relevant portions of his deposition is attached as Exhibit G to this declaration.

<u>Summary of Family Ties Information from A Files</u>

7.      During discovery, Respondents produced documents from the alien files ("A files") of 1,026 persons detained between April 21, 2010 and April 21, 2011.  Respondents represented that these A files accounted for nearly all of the class members that Respondents could identify as having been present within the Central District of California during that period.  I refer to these individuals as the "studied class members."

8.      Because of the sheer volume of the A files, some of which total in excess of 1,000 pages, it is impracticable to submit copies of the 1,026 A files for inspection by the Court or even to extract relevant pages from all 1,026 A files for the Court's inspection.  As a result, pursuant to Federal Rule of Evidence 1006, this declaration contains a summary of the contents of those A files as they relate to the family ties of the studied class members.

9.      In order to prepare this summary, I oversaw review of the A files by a team of attorneys and legal support personnel, in addition to personally reviewing a sample of the A files to ensure the accuracy of the summary.

10.     Reviewers looked for information contained in the A files concerning family ties.  Reviewers would read entire A files to identify any such information and contemporaneously record the existence of information bearing on family ties for later tabulation.

11.     The summary excludes information from the A files of people who most likely were not, in fact, class members for the reasons set forth separately in the Declaration of Michael Kaufman ¶¶ 22-25 (Dkt. #281-3).

12.     The summary also excludes information from the A files of people whose 180th day of detention did not occur between April 21, 2010 and April 21, 2011.  I refer to individuals whose 180th day of detention did occur in this time period as the "in-period" population.  Based on the Expert Report and deposition testimony of Respondents' expert Dr. Chester Palmer, I understand that Dr. Palmer regards the "in-period" population as a proper sample from which to draw certain conclusions about class members.  Although Petitioners contend that reliance on the "in-period" population as a sample for measuring certain variables (such as average detention lengths) can produce biased and inaccurate results that underestimate harm to the class, for purposes of this summary, we looked only at the "in-period" population.

13.     Our analysis identified 595 "in-period" class members.  However, we were able to locate A files for only 582 of the "in-period" class members among the A files produced by Respondents.  In light of this, the summary below pertains to A files for a universe of 582 class members.

14.     The summary of A files likely understates the extent of the family ties of class members for several reasons:

a.      Information may not have been submitted as part of the written record and, thus, not appear in the A-files.  For example, information may exist only in audio recording of proceedings, which Respondents did not produce with the A files.  In addition, in some cases, class members successfully terminated proceedings without ever having to file an application for relief, which typically would contain information on family ties.

b.      The A files produced by Respondents were incomplete and contained redactions, including because Respondents objected to disclosing certain information within the A files documents—although some appear to have been incomplete due to poor file keeping.

### Summary of A Files for Class Members

### Not Including the 1225(b) Subclass

15.    We first analyzed the A files of class members, excluding the members of the 1225(b) Subclass.  A files were determined to be associated with a person in the 1225(b) Subclass using the methodology described in the Declaration of Michael Kaufman ¶¶ 7-11 (Dkt. #281-3).  Out of the universe of 582 class members for whom we located A files within Respondents' production, we identified 527 class members who were not part of the 1225(b) Subclass.

16.    Based on our review of A files associated with persons in the 1225(b) Subclass, such persons were detained upon their arrival to the United States at a port of entry, almost always after making a request for asylum or expressing fear about returning to their country of origin review.  As a result, these files are far less likely to contain information about family ties.

17.    Not including members of the 1225(b) Subclass, the A files of "in-period" class members contained the following information:

a.      405 A files contained information indicating whether the class member had a child or children in the United States.  Of these, 244 class members had a child or children who resided in the United States.

b.      401 A files contained information indicating whether the class member had a child or children with U.S. citizenship.  Of these, 234 class members had a child or children with U.S. Citizenship.

c.      429 A files contained information indicating whether the class member had a spouse who resided in the United States.  Of these, 140 class members had a spouse who resided in the United States.

### Summary of A Files for Class Members
### Inclusive of the 1225 Subclass

18.     For the purposes of completeness, we also analyzed the A files of all 582 "in-period" class members for whom we located an A file within the documents produced by Respondents.  The A files contained the following information:

a.      452 A files contained information indicating whether the class member had a child or children who resided in the United States.  Of these, 246 class members had a child or children who resided in the United States.

b.      445 A files contained information indicating whether the class member had a child or children with U.S. citizenship.  Of these, 236 class members had a child or children with U.S. Citizenship.

c.      477 A files contained information indicating whether the class member had a spouse who resided in the United States.  Of these, 143 class members had a spouse who resided in the United States.

### Summary of A Files for Class Members
### Within the 1226(c) Subclass

19.     We also separately analyzed the A files of those persons within the 1226(c) Subclass.  A files were determined to be associated with a person within the

5

1226(c) Subclass using the methodology described in the Declaration of Michael Kaufman ¶¶ 12-18 (Dkt. #281-3).  Out of the universe of 582 class members for whom we located A files with Respondents' production, we identified 249 individuals as within the 1226(c) Subclass.

20.    The A files for the 1226(c) Subclass contained the following information:

a.    209 A files contained information indicating whether the class member had a child or children who resided in the United States.  Of these, 131 class members had a child or children who resided in the United States.

b.    208 A files contained information indicating whether the class member had a child or children with U.S. citizenship.  Of these, 126 class members had a child or children with U.S. Citizenship.

c.    214 A files contained information indicating whether the class member had a spouse who resided in the United States.  Of these, 72 class members had a spouse who resided in the United States.

## Summary of Database Information Regarding Length of Residence Prior to Detention and Age at the Time of Entry to the Country

21.    Representatives of Respondents testified at deposition that information in the government databases produced to Petitioners is reliable and relied upon by Respondents in the course of their regularly conducted activities.  *See* Deposition of Sean Stephens at 21:24-22:14 (attached as Ex. I to the Declaration of Cody Jacobs (Dkt. #291)); Deposition of Jennifer Sherriff at 14:14-15:1 (Jacobs Decl. Ex. H (Dkt. #291)); Deposition of Benjamin McDowell at 152:17-153:5 (Jacobs Decl. Ex. G (Dkt. #291)).

22.    On October 11, 2012, Respondents produced a Microsoft Excel spreadsheet entitled "ICE-EDI-010."  ICE-EDI-010 contains a range of information on the in"-period" class members, including fields entitled "Birth Date," "Entry Date," and "Book In Date (Of Latest Detention of Removal Case)."  "Birth Date" provides

the class member's date of birth.  "Entry Date" refers to the date of the class member's known entry into the United States.  "Book In Date (Of Latest Detention of Removal Case)" refers to the date the class member was taken into immigration custody for the most recent period of detention related to their removal case.

23.    Because of the size of ICE-EDI-010, and because it contains records about individuals who are not class members, it is impracticable to submit a copy of the entire spreadsheet for inspection by the Court.  As a result, pursuant to Federal Rule of Evidence 1006, this declaration contains a summary of the contents of ICE-EDI-010 as they relate to "in-period" class members' length of residence in the country prior to detention and their age at the time of entry into the country.

24.    In order to prepare this summary, I supervised legal support personnel to calculate the period of time between "Entry Date" and "Book In Date (Of Latest Detention of Removal Case)" for each class member in order to determine the length of their residence in the United States prior to detention.  I also checked the calculations to ensure their accuracy.

25.    As with the summaries regarding family ties, we started with the 595 "in-period" class members and determined that there were 687 records relating to 593 "in-period" class members within ICE-EDI-010.  We then took the following approach to identify records that could be used for this summary:

a.    If an "in-period" class member had multiple records within ICE-EDI-010 where the Book in Date, Birth Date, and Entry Date were all identical, the duplicate entries were removed to avoid double counting.

b.    If an "in-period" class member had one or more records within ICE-EDI-010 where the Entry Date post-dated the Book In Date, we excluded the record from the summary because a person who has been detained for at least six months as of the Book in Date must have entered the U.S. before that date.

c.      If an "in-period" class member had multiple records within ICE-EDI-010, and more than one Entry Date that pre-dated the Book in Date, we used the most recent Entry Date to calculate the length of residence prior to detention.

d.      If an "in-period" class member had multiple records within ICE-EDI-010, and more than one Entry date that pre-dated the Book in Date, we used the oldest Entry Date to calculate the age at first entry.

26.     The summaries of length of residence prior to detention and age at time of entry are incomplete for several reasons.

a.      For 279 class members, ICE-EDI-010 did not contain an Entry Date.  For these class members, it was therefore impossible to calculate their length of residence prior to detention or age at first entry.

b.      For eleven (11) class members, all Entry Dates post-dated the Book In Date.  For these class members, it was therefore impossible to calculate their length of residence prior to detention, and we did not include them in our summary.

27.     As a result of the steps described immediately above, the summaries below relate to 303 "in-period" class members.

**Length of Residence for Class Members**

**Not Including the 1225 Subclass**

28.     Using the methods referenced above, we first analyzed length of residence for the class members who did not fall within the 1225 Subclass.  As explained above, members of the 1225 Subclass are detained upon their arrival to the United States at a port of entry, almost always after making a request for asylum or expressing fear about returning to their country of origin review.  As a result, they are far less likely to have significant periods of residence in the United States prior to detention.

DECLARATION OF MICHAEL TAN

29.    ICE-EDI-010 contained sufficient information for us to calculate the length of residence for 249 class members who did not fall within the 1225 Subclass. ICE-EDI-010 contained information stating that:

    a.    183 had resided in the United States for at least 5 years prior to detention;

    b.    140 had resided in the United States for at least 10 years prior to detention; and

    c.    67 had resided in the United States for 20 years or more prior to detention.

### Length of Residence for All Class Members

30.    For purposes of completeness, we also analyzed length of residence for all class members, inclusive of the Section 1225 subclass.  ICE-EDI-010 contained sufficient information for us to calculate the length of residence for 303 class members.  ICE-EDI-010 contained information stating that:

    a.    183 had resided in the United States for at least 5 years prior to detention;

    b.    140 had resided in the United States for at least 10 years prior to detention; and

    c.    67 had resided in the United States for 20 years or more prior to detention.

### Length of Residence for Members of the 236(c) Subclass

31.    Using the methods referenced above, we also analyzed length of residence for members of the Section 1226(c) subclass.  ICE-EDI-010 contained sufficient information for us to calculate the length of residence for 107 class members.  ICE-EDI-010 contained information stating that:

    a.    90 had resided in the United States for at least 5 years prior to detention;

**DECLARATION OF MICHAEL TAN**

b.     72 had resided in the United States for at least 10 years prior to detention; and

c.     34 had resided in the United States for 20 years or more prior to detention.

### Age of Class Members At the Time of Earliest Known Entry
### Into the United States

32.     I supervised legal support staff to calculate class members' age at the time of the date provided in "Entry Date" field using the information provided in the "Birth Date" field.  I also checked the calculations in order to ensure their accuracy.

33.     As noted above, where ICE-EDI-010 contained multiple "Entry Dates" for the same class member, we used the earliest date of entry into the country to calculate age at the time of entry.

34.     As with the summary relating to length of residence, this summary relates to 303 individuals.

### Age At the Time of Earliest Known Entry
### Into the United States for Class Members
### Not Including the 1225 Subclass

35.     Using the methods referenced above, we first analyzed age at the time of the earliest known entry into the United States for the class members who did not fall within the 1225 Subclass.

36.     ICE-EDI-010 contained sufficient information for us to calculate the age at the time of the earliest known entry for 249 class members who did not fall within the 1225 Subclass.  ICE-EDI-010 contained information stating that:

a.     114 were 21 years old or younger on the date of entry.

b.     96 were 20 years old or younger on the date of entry.

c.     89 were 19 years old or younger on the date of entry.

d.    75 were 18 years old or younger on the date of entry.

## Age At the Time of Earliest Known Entry
## Into the United States for All Class Members

37.    For purposes of completeness, we also analyzed length of residence for all class members, inclusive of the Section 1225 subclass.  ICE-EDI-010 contained sufficient information for us to calculate the age at the time of earliest known entry for 303 class members.  ICE-EDI-010 contained information stating that:

a.    125 were 21 years old or younger on the date of entry.

b.    102 were 20 years old or younger on the date of entry.

c.    91 were 19 years old or younger on the date of entry.

d.    76 were 18 years old or younger on the date of entry.

## Age At the Time of Earliest Known Entry
## Into the United States for Members of the 236(c) Subclass

38.    Using the methods referenced above, we also analyzed age at the time of earliest known entry for members of the Section 1226(c) subclass.  ICE-EDI-010 contained sufficient information for us to calculate the age at the time of earliest known entry for 107 class members.  ICE-EDI-010 contained information stating that:

a.    58 were 21 years old or younger on the date of entry.

b.    49 were 20 years old or younger on the date of entry.

c.    47 were 19 years old or younger on the date of entry.

d.    41 were 18 years old or younger on the date of entry.

DECLARATION OF MICHAEL TAN

1

2     I declare under penalty of perjury of the laws of the State of California and the

3     United States that the foregoing is true and correct to the best of my knowledge and

4     belief.  Executed this 8th day of February, 2013 in San Francisco, California.

5

6

7     _____/s/ Michael Tan_____
      MICHAEL TAN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3

4  - - - - - - - - - - - - - -

5  ALEJANDRO RODRIGUEZ, et al.,  )

6                     )

7        Petitioners,    )

8    vs.              )  Case No.

9  TIMOTHY ROBBINS, et al.,   )  CV 07-3239-TJH(RNBx)

10       Respondents.    )

11  - - - - - - - - - - - - - -

12

13

14     Deposition of CONRAD AGAGAN 30(b)(6),

15     taken at 1501 K Street, N.W., Washington,

16     D.C., commencig at 12:07 p.m., Thursday,

17     August 9, 2012, before SUSAN L. CIMINELLI,

18     CRR, RPR, a Notary Public.

19

20

21

22

23  Job No. 782585

24

25  PAGES 1 - 209

                                       Page 1

BY MS. RABINOVITZ:

    Q.    What were you instructed to review the cases for?

    A.    To review the cases case-by-case to see and to ensure that proper case management was occurring on those cases.

    Q.    So the person was to evaluate whether proper case management, I'm just repeating to make sure I understand, that you were instructed to review cases to make sure that proper case management was happening with these cases?

    A.    To review the case. Yes.

    Q.    And then you were -- you said you were supposed to brief management, is that correct?

    A.    That's correct.

    Q.    And what were you supposed to brief management about?

    A.    On each -- each of the cases.

    Q.    On each of the cases?

    A.    Yes. Go over the cases, brief them on the particulars, discuss the merits, discuss the -- all the factors in those cases.

    Q.    And when you say management, do you mean management within ERO that you were going to brief or do you mean -- who are you referring to when you say

```
 1   briefing management?

 2            MR. ATKINSON:  Object to the form.  You

 3   may answer.

 4            THE WITNESS:  The briefings, and as we go

 5   on with the discussion and the process, the briefings

 6   weren't just after one group of people reviews the

 7   documents, it went directly to one individual.  It

 8   was many layers of reviews that occurred in

 9   briefings.

10   BY MS. RABINOVITZ:

11        Q.   Right.

12        A.   So --

13        Q.   Can you describe those levels of review?

14        A.   Okay.  The -- how this went -- came about,

15   at least the official project, the tasking was sent

16   to the field offices for them to -- both for ERO and

17   the office of chief counsel, for them to review the

18   cases that were identified and provide headquarters

19   with a case review worksheet.

20            That case review worksheet, upon arrival

21   in headquarters, would be processed by the staff that

22   were involved in the project, a group of them

23   responsible for recording the arrival of the

24   document, making sure that we have everything that --

25   every one accounted for.  And then it would go to
```

Page 25

1   individuals that -- both representatives from ERO and

2   OPLA to review the cases.  And then after they

3   reviewed the case and obtained information they need,

4   if any additional information was needed, they would

5   solicit it from the field offices.  So there is a lot

6   of discussions.

7          Once they discussed the case and decided

8   on what was going to happen, what they would

9   recommend to move forward with this case --

10      Q.    I'm sorry.

11      A.    What they would recommend as far as if

12  there was anything different that they would

13  recommend or course of action, then they would then

14  brief it up to the next level, which is the managers

15  that we brought in from the field offices to help

16  manage this.

17         And then once those individuals were

18  briefed and they were confident with information that

19  they have that was available, then they would brief

20  up to the next level, which was my level, and all

21  this occurred collaboratively between OPLA and ERO.

22         So when I would get briefed, my

23  counterpart in OPLA would be there and we would

24  listen to the case just similar to what happened at

25  the lower level.  We'll ask questions.  We'll ask for

Page 26

1 additional documentation.  If we felt we were ready,

2 we would then brief up senior level management in ERO

3 and OPLA.  And the same process occurs.  They get

4 briefed.  Additional questions might be asked, and

5 then once everybody is confident with everything and

6 all the information is ready, then we brief senior

7 ICE management.

8     Q.   Were you a part of the briefing of senior

9 ICE management?

10     A.   There were several briefings, obviously.

11 It wasn't just one briefing.  I can't say that I was

12 in all of them, but I did brief on many of those

13 occasions.

14     Q.   But there were people within ERO who were

15 directly -- that you were reporting to before you

16 were reporting to -- you weren't reporting directly

17 to ICE.  There was somebody at ERO who was above you

18 who was at the next level, is that correct?

19     MR. ATKINSON:  Object to the form.  You

20 may answer.

21     THE WITNESS:  That's correct.

22 BY MS. RABINOVITZ:

23     Q.   And who were those people?

24     A.   You're talking about who, as far as the

25 structure and chain of command.

Page 27

1    that individual was out, sometimes it would be the
    2    lower level.
    3        Q.    All that I want to know is generally who
    4    within the project did you report to?  For the
    5    purposes of this project, not for the purposes of
    6    your general functions, but for the purposes of this
    7    project, who did you report to?
    8        A.    I briefed the senior management for both
    9    ERO and OPLA.
   10        Q.    And what were the names of those people?
   11              MR. ATKINSON:  Object.  We invoke
   12    privilege, and I instruct the witness not to answer.
   13              MS. RABINOVITZ:  And I would just ask what
   14    the privilege -- what is the privilege?
   15              MR. ATKINSON:  Deliberative process
   16    privilege.  We are pretty confident that there is
   17    case law that says that a deliberative process -- the
   18    names of individuals who participated in that process
   19    is subject to the deliberative process privilege.
   20              MS. RABINOVITZ:  Just to be clear, I'm
   21    just trying to understand whether there is somebody
   22    else who is more knowledgeable about the issues that
   23    we designated in this deposition, so I want to make
   24    sure that in terms of who he was reporting to, I
   25    assumed he was reporting to ICE leadership and that

                                                    Page 31

```
 1       A.    That --

 2       Q.    What were some of the other things?

 3       A.    Well, it's hard to identify every single

 4  item that was -- would be the outcome of the review,

 5  but certainly you look at the case, like I mentioned

 6  before, to see if it's -- it's moving efficiently to

 7  the removal process, or if it's an individual with an

 8  order, how close are we towards effecting their

 9  removal.  And like you said, detention, custody

10  determination.  All those factors we're looking into.

11       Q.    Is there anything other than what you just

12  described, which is, one, making sure the case is

13  moving efficiently, and two, detention and custody

14  issues?

15            MR. ATKINSON:  Object to the form.  He

16  didn't say there were two factors.

17  BY MS. RABINOVITZ:

18       Q.    He said there were more.  Let me rephrase

19  it differently.  You've identified two things now,

20  but you said there were others.  And I just want to

21  know what the others were?

22       A.    It's really -- I can't enumerate all of

23  them.

24       Q.    Just enumerate one.

25       A.    I gave you examples already.
```

Page 35

```
 1              MS. RABINOVITZ:  Yes.
 2              MR. ATKINSON:  You may answer the
 3    question.
 4              THE WITNESS:  No.
 5    BY MS. RABINOVITZ:
 6       Q.    Okay.  In terms of the recommendations in
 7    individual cases, you said there was a variety of
 8    recommendations.  Can you give me an example of one
 9    kind of recommendation that might have been given?
10       A.    Could be approach the embassy from
11    headquarters to try and solicit for a travel
12    document.
13       Q.    Can you give me another example?
14       A.    There are so many different on many
15    different cases.
16       Q.    Were there ever recommendations pertaining
17    to continued detention or release?
18       A.    Yes.
19       Q.    Were any of these recommendations
20    implemented?
21              MR. ATKINSON:  Object to the form.  You
22    may answer.
23              THE WITNESS:  Yes.
24    BY MS. RABINOVITZ:
25       Q.    In general, can you estimate, can you say
```

Page 73

1  A.   Because soon after the creation of this

2  document, and analysis of what has been found, it was

3  determined that reviewing the additional cases have

4  been leading to the same sort of trends that we are

5  already seeing.  And also in line that all of the

6  decisions that were coming from the field appeared to

7  be in line and there was no issues found.  It was

8  proved to be unnecessary.

9      Q.   It proved to be unnecessary to have the

10 briefings?

11     A.   No.  To proceed with reviewing them.

12     Q.   So those cases were not reviewed?

13          MR. ATKINSON:  Object to the form.  You

14 may answer again.

15 BY MS. RABINOVITZ:

16     Q.   But we have spreadsheets for all of those

17 cases.

18          MR. ATKINSON:  Hold on.  Are you

19 withdrawing your previous question that I just

20 objected to?  Because there was a pending question

21 that he may answer.

22          MS. RABINOVITZ:  Can you repeat that?

23          MR. ATKINSON:  Are you withdrawing the

24 previous question or --

25          MS. RABINOVITZ:  No.  I'm not withdrawing

Page 76

1    seeing.  What were the trends that you had been
2    seeing?
3         A.    Okay.  What we found is that individuals'
4    process, removal process were delayed by a few
5    factors.  Some of those factors that we found were
6    difficulty obtaining a travel document from the
7    embassy, individuals failing to comply with the
8    removal order and actively hindering their removal,
9    and delays due to continuances in court, PFRs and one
10   second -- can I refer to --
11        Q.    Sure.
12        A.    Can you repeat what I mentioned already?
13             THE REPORTER:  "Answer:  What we found is
14   that individuals' process, removal process were
15   delayed by a few factors.  Some of those factors that
16   we found were difficulty obtaining a travel document
17   from the embassy, individuals failing to comply with
18   the removal order and actively hindering their
19   removal, and delays due to continuances in court,
20   PFRs and one second -- can I refer to --"
21             THE WITNESS:  And adjudication of
22   applications with CIS.
23   BY MS. RABINOVITZ:
24        Q.    Okay.  I'm going to move on to some other
25   aspects that are in here.  We've talked about the

                                            Page 80

1   enough, how decisions were made as to somebody

2   qualified for release, and mainly that.

3              MR. ATKINSON:  Okay.  10 minutes.

4              MS. RABINOVITZ:  Yes.

5              MR. ATKINSON:  Excellent.

6              (Recess.)

7   BY MS. RABINOVITZ:

8        Q.    What I want to focus on now is actually

9   the review process, you know, what reviewers were

10  instructed to do and that kind of stuff.  So

11  approximately how many reviewers were assigned to

12  conduct the reviews for the cases detained more than

13  one year.  Just let me be clear.  From now on we are

14  going to be focused on just the cases detained for

15  more than one year.  So about how many reviewers were

16  assigned to conduct the reviews of those cases which

17  I guess was about 1400 cases?

18       A.    Well, approximately, it would have to be

19  approximate, because it changed and it wasn't the

20  same group of people.

21       Q.    Right.

22       A.    We -- I would say on the ERO side, 10 to

23  12.

24       Q.    And --

25       A.    On the OPLA side, similar number of

                                        Page 98

```
 1    individuals.

 2         Q.    And did DOJ -- I mean, is OPLA part of

 3    DOJ?  I'm just confused about whether -- is OPLA part

 4    of DOJ?

 5         A.    OPLA is part of ICE.  Our principal legal

 6    advisor.

 7         Q.    So did DOJ have any involvement in this

 8    process?

 9         A.    They were not involved.

10         Q.    And when review is done both by ERO and

11    OPLA, was it reviewing the same cases?

12         A.    There were -- yes.

13              THE REPORTER:  "Question:  And when review

14    is done both by ERO and OPLA, was it reviewing the

15    same cases?"

16    BY MS. RABINOVITZ:

17         Q.    Thank you.  What did the case reviews

18    entail?  And let me explain my question.  Was this

19    principally a file review?  So the question is, I'm

20    going to go back to my first question.  What did the

21    case reviews entail?

22         A.    Okay.  The headquarters solicited

23    information from the field offices.  They were

24    provided a tasking that advised that here's the

25    timeline, and here is a list of cases that we would
```

Page 99

1    like you to prepare case review worksheets,

2    collaboratively ERO and the office of the chief

3    counsel.

4              Those documents at the local level would

5    be reviewed by the officers working up the chain

6    through their management, then to headquarters where

7    the individuals assigned to the work group will then

8    process it similar in fashion as in the field.  ERO

9    or the OPLA representative would then review those

10   cases.  Brief it up through the manager assigned to

11   help oversee, and then at that -- at that point, if

12   there are obviously additional questions, they would

13   solicit additional questions, get it until it's ready

14   for briefing to the higher level which would then be

15   my level, and the individual representative from

16   OPLA.

17        Q.    You can continue.  I just feel like I got

18   the answer.

19              MR. ATKINSON:  I know.  You were signaling

20   the witness to stop testifying which I think is

21   inappropriate, but go ahead.

22   BY MS. RABINOVITZ:

23        Q.    I'm just -- in the interest of time, I

24   feel like I wanted to, you know -- you more than

25   answered my question.  And what I really want to go

Page 100

1   back is to understand about what the -- how the case
2   review worksheets, the first thing I'd like, I want
3   to basically break it down and I want to start now
4   with the case review worksheets and how those were
5   prepared.  How did -- how did the reviewers get
6   information for the case review worksheets?
7           MR. ATKINSON:  Is there a question
8   pending?
9   BY MS. RABINOVITZ:
10      Q.    Yes.  How did the reviewers get
11  information for the case review worksheets?
12      A.    The case review worksheets were actually
13  completed by the field.
14      Q.    And they were completed by the field based
15  on what?
16      A.    The tasking to the field was to obtain
17  this information and provide it to headquarters.
18  Generally speaking, they would utilize the A file,
19  the ICE systems, systems utilized by office of chief
20  counsel to include reaching out to the individual or
21  also their legal representative.  It's a variety of
22  locations that they use as the resource to fill out
23  the form.
24      Q.    So that's what I wanted to establish.
25  First of all, the case review worksheets were not

                                        Page 101

1    response.  I said and/or.  They were given a task to
2    complete this form and to use the resources they have
3    at the field level to get information.  They use a
4    variety of sources, not to indicate that they have to
5    do all those different -- approach those different
6    sources.
7        Q.    Okay.  So these were not necessarily
8    prepared with any input from a detainee?
9            MR. ATKINSON:  Object to the form.
10           THE WITNESS:  If the information was
11   available from other sources, that might be the case.
12   BY MS. RABINOVITZ:
13       Q.    There was no requirement -- was there a
14   requirement that they contact the detainee to get --
15   to see if the detainee wanted to supplement the
16   information?
17       A.    Not on the tasking that was sent to the
18   field office.
19       Q.    Okay.  And after then the case review
20   worksheet, there is then this form that says highly
21   confidential.  I'm looking at one that's -- just
22   follow the numbers.  I mean, it's the end of each but
23   this is ICE-RPD 013719 but you can look at any of
24   them that says something confidential.  Was this also
25   filled out by the field?

                                        Page 103

1    this document?  I mean, it's --

2              MR. ATKINSON:  Let me see if I can clarify

3    it because it's not clear from the face the way we

4    produced it.  The confidential we placed at the top

5    was placed in the production, as was the Bates number

6    at the bottom, ICE-RPD 013174.  This was, however,

7    the form itself is a standard form.  I believe.

8              THE WITNESS:  The standard form generated

9    by the work group to assist in when they solicit

10   additional information from the field, they had to

11   have a way to annotate that because we weren't --

12   that was the approach decided instead of sending back

13   the CRWs, have it edited.  This is the document they

14   used to annotate those additional information.

15   BY MS. RABINOVITZ:

16       Q.   So can we for the purposes of this

17   discussion just refer to this as the reset form?

18             MR. ATKINSON:  No.  Because I believe

19   that's an Adobe PDF function.

20             MS. RABINOVITZ:  What do we want to refer

21   to this as?

22             MR. ATKINSON:  It's up to the witness.

23   BY MS. RABINOVITZ:

24       Q.   What would you describe this form as?

25   What name would you give to this form?

                                        Page 105

1    the intent.  Obviously data quality, some people may

2    have -- but that's the intent of it.

3        Q.    If we look at this form, that doesn't seem

4    quite accurate because if you look farther down, OPLA

5    says litigation status Ninth Circuit, PFR with stay.

6    So that means that -- final order doesn't mean that

7    the person's removal can be effectuated.

8        A.    Sorry.  Can you -- can you repeat that

9    again?  I'm sorry.

10        Q.    I'm trying to clarify whether final order

11    means an administrative final order or whether final

12    order means a final order that can actually be

13    executed?

14        A.    Administrative.

15        Q.    Okay.  So the final order is an

16    administrative order even if it can't be executed.

17        A.    Yes.

18        Q.    Thank you.  Then we have -- action needed.

19    This is where somebody from the working group would

20    have said if there was any recommendation, would have

21    said that we have a recommendation here.

22        A.    This form, it's a cover sheet so it would

23    have been utilized for many different reasons.  It

24    could also be notetaking that they would say this is

25    what we need still on this particular --

Page 107

```
 1        A.    This form wasn't utilized independently of
 2   all the other forms.  It's to complement the
 3   documents and provide additional information.  So
 4   even though it's not listed here, the expectation is
 5   not that this is the only thing that you would be
 6   looking at.  We would be looking at this, other
 7   supporting documents that have been attached as well.
 8        Q.    Okay.  It's just someone devised this
 9   form, the working group devised this form because
10   they thought it would be a good summary.  Is that
11   correct?
12             MR. ATKINSON:  Object to the form.
13             THE WITNESS:  No.
14   BY MS. RABINOVITZ:
15        Q.    No?
16        A.    Not summary per se.  It's a way to instead
17   of having notes all over and with no established way
18   to add information, this document was created so that
19   there is a standardized document that goes with the
20   CRW where you can make notes, add comments.
21        Q.    Okay.
22        A.    And in addition just to clarify, although
23   there is no specific section like you mentioned,
24   there is the comment section at the bottom.  They
25   would make notes on the side that don't necessarily
```

Page 109

1  it's noted here.

2      A.    What's noted here are things that are

3  factual happening with the case that felt -- to be

4  included for the record.

5      Q.    Right.  But I'm asking a second question

6  which is later on after you then took this to the

7  next level, prepared spreadsheets, reviewed,

8  evaluated, was there any attempt to collect

9  information on specific things like for example Casas

10  hearings?

11      A.    Long-term detention project, no.

12      Q.    So at least we know that -- I'm not going

13  to repeat myself.  So once the file review is done

14  and then you had the -- I forget, I'm sorry, what you

15  called this, the cover page that talked about

16  additional information, then what happened next?

17      A.    So after the review at the field level and

18  they forward the document, the CRW and then other

19  documents they felt needed to be forwarded by

20  headquarters, it was received by the working group

21  through a mailbox, annotated so we know what

22  information we've received for which individuals.

23  The working group would prepare --

24      Q.    The spreadsheet?

25      A.    The spreadsheet.  And in some instances,

Page 113

1    when they had time, they typed up this form attached

2    to it and have it ready for the reviewers.

3         Q.    Does the spreadsheet review whether it

4    includes any information -- what information it's

5    based on, other than the CRW?

6              MR. ATKINSON:  Object to the form of the

7    question.

8              THE WITNESS:  Are you asking me does it

9    annotate where the information was taken from?

10   BY MS. RABINOVITZ:

11        Q.    No.  I'm asking you whether it reflects

12   anywhere that the entry in the spreadsheet was based

13   on -- what information it was based on, not

14   specifically matching this to this or this to this,

15   but just --

16        A.    Which document are you looking at?

17        Q.    I'm looking at right now a spreadsheet for

18   one to two years.  It's the first one to two-year

19   spreadsheet, ICE-RPD 012884.  And I'm asking you this

20   question because when you said when the ICE, when

21   these -- when the project reviewers looked at these

22   cases they looked at the file, the CRW and then any

23   other documents that had been obtained.  Is that

24   correct?

25        A.    And additional information that was

                                        Page 114

1        A.    Yes.

2        Q.    And are you familiar with the fact that

3   there is a notice that is sent to them advising them

4   that they are going to have a custody review and

5   giving them an opportunity to supplement the file?

6        A.    Yes.

7        Q.    Why was there not something similar here?

8             MR. ATKINSON:  Object to the form of the

9   question.

10  BY MS. RABINOVITZ:

11       Q.    Was there something similar here?

12            MR. ATKINSON:  Object to the form of the

13  question.  You can answer.

14            THE WITNESS:  Well, this process didn't

15  remove any other -- like you were referring, those

16  review processes that are already in place.  This was

17  a project, a separate and independent project.

18  BY MS. RABINOVITZ:

19       Q.    Okay.  But part of the -- am I correct

20  that in reviewing and doing case management, the

21  reviewers were instructed to make recommendations,

22  including about whether somebody should be released?

23            MR. ATKINSON:  Object to the form.

24  BY MS. RABINOVITZ:

25       Q.    Is that accurate?

```
1              MR. ATKINSON:  Object to the form.

2              THE WITNESS:  That would be one of the

3    things that would be a probable recommendation.

4    BY MS. RABINOVITZ:

5         Q.    And so it could be helpful in that context

6    to have additional information from the detainee.

7    Would you agree?

8              MR. ATKINSON:  Him personally or him as

9    the department?

10   BY MS. RABINOVITZ:

11        Q.    The department.

12             MR. ATKINSON:  It's not within the topics

13   but he can answer.

14   BY MS. RABINOVITZ:

15        Q.    Would you say that --

16             MR. ATKINSON:  Did you answer?

17             THE WITNESS:  No.

18             MR. ATKINSON:  Are you withdrawing the

19   previous question?

20             MS. RABINOVITZ:  No.  I'm not withdrawing

21   it.

22             MR. ATKINSON:  Then let him answer before

23   you ask him a new one.

24             THE WITNESS:  When tasking went out and it

25   was clear we requested for this information on the
```

                                                    Page 124

```
 1           MR. ATKINSON:  I am not yelling.  Would
 2    you please read back the last question that was asked
 3    of the witness.
 4           THE REPORTER:  "Question:  What would you
 5    say, what were the recommendations for case
 6    management?"
 7           THE WITNESS:  It varies.  You look at the
 8    case and there is many different aspects of that you
 9    look at, so it's not solely one particular
10    recommendation, yes or no on that one.  It depends on
11    the case.
12    BY MS. RABINOVITZ:
13      Q.    Okay.  What I'd like to do is turn now to
14    the documents referred to as executive summary.  And
15    those begin on ICE-RPD 013142.  It seems like one of
16    the main -- first of all, who developed this form for
17    executive summary?  I don't mean who was the person.
18    Was this form developed by the working group?
19      A.    Yes.
20      Q.    Thank you.  And why does it focus so much
21    on DOJ-EOIR delays and CIS delays?
22           MR. ATKINSON:  Object to the form of the
23    question.
24    BY MS. RABINOVITZ:
25      Q.    I'll withdraw the question.  Is it true --
```

Page 129

```
 1   statement I made that I didn't see -- you know I saw
 2   some that they didn't have it.
 3        Q.   Right.  So can you answer that question
 4   that they all -- the question, can you answer it now?
 5        A.   Can you repeat the original question?
 6        Q.   Sorry.  Can you repeat the question that
 7   you just repeated?
 8             THE REPORTER:  "Question:  Is it true --
 9   is it accurate that all of these executive summaries
10   look at the issue of cases involving issues with
11   DOJ-EOIR delays and cases involving issues with CIS
12   delays?"
13             THE WITNESS:  Is it true?  This document
14   that is in this exhibit indicates a section
15   identifying issues with DOJ-EOIR delays and CIS
16   delays.
17   BY MS. RABINOVITZ:
18        Q.   And all the executive summaries have that
19   on them?
20        A.   On what's before me.
21        Q.   So I want to focus on what that means.
22   What is meant by delay in this context.  How was --
23   what is meant by delay here?
24        A.   I think I covered that in the beginning
25   when I mentioned trends.  There were cases that were
```

Page 131

```
 1   continuances, a number of continuances on each case,
 2   or a case that we are still waiting for decision from
 3   CIS on adjudicating a case.  So that's what -- that
 4   would refer to that.
 5        Q.    Okay.  And why the focus on delay?
 6             MR. ATKINSON:  Object to the form of the
 7   question.
 8             THE WITNESS:  As I mentioned, those were
 9   the trends that we were seeing.
10   BY MS. RABINOVITZ:
11        Q.    That there -- can you state that a little
12   clearly.  What trends were you seeing?
13        A.    Like I said before, the trend that the
14   cases, there were delays associated with CIS
15   adjudicating petitions, continuances in court, and
16   PFRs.
17        Q.    And am I correct it also included delays
18   with immigration judges not issuing decisions for a
19   long time?
20             MR. ATKINSON:  Object to the form.  I
21   don't believe the witness has testified to that.  You
22   can answer.
23             THE WITNESS:  I don't know.
24   BY MS. RABINOVITZ:
25        Q.    Can you find where that page is?
```

Page 132

1  question.  Throwing percentages at the witness --
2  you're giving him factual information.  I don't know
3  where you're getting it from.  You can answer the
4  question.  I've never seen a deposition like this.
5  You can answer.
6          THE WITNESS:  I don't know.  I don't know
7  what you're basing your statistics on.
8  BY MS. RABINOVITZ:
9      Q.    Let's skip my statistics.  Let me rephrase
10  the question.  Can cases extend a long time without
11  there being ICE, EOIR delays?
12      A.    As a matter of course, cases take the
13  amount of time necessary for it to be processed.
14      Q.    Okay.  So some cases take a long time even
15  if there is no delay?
16          MR. ATKINSON:  Object to the form of the
17  question.  You can answer.
18          THE WITNESS:  Yes.
19  BY MS. RABINOVITZ:
20      Q.    Okay.  Let's just take a five-minute
21  break.
22          MR. ATKINSON:  That's fine.
23          (Recess.)
24  BY MS. RABINOVITZ:
25      Q.    So I want to first point to two of the

Page 135

1    executive summaries.  One is for the case ICE-RPD

2    013150.  And sorry.

3        A.    What was the number again?

4        Q.    RPD 013150.  Am I correctly reading this

5    that it looks like 33 cases out of the hundred

6    involved some form of DOJ-EOIR delay or CIS delay?

7        A.    Yes.

8        Q.    And do you know if when -- when the

9    reviewer was putting or whoever prepared the

10   executive summary was -- was calculating the number

11   of cases that involved delay, did they include within

12   that the cases of the people who were now no longer

13   an issue that had been removed or released or granted

14   relief?

15              MR. ATKINSON:  Objection to form.  You can

16   answer.

17              THE WITNESS:  No.  That would not have

18   included that.

19   BY MS. RABINOVITZ:

20       Q.    So that in fact there may have been more

21   than 33 cases out of these hundred that involved

22   delay, is that correct?

23       A.    Yes.

24       Q.    And turning to now the summary for numbers

25   901 to 1,000 that's ICE-RPD 013156.  Again, here if

                                            Page 136

1   I'm reading this correctly, it would show that there
2   were 34 cases out of a hundred that involved delay?
3          MR. ATKINSON:  I'm sorry.  What page are
4   you looking at?
5   BY MS. RABINOVITZ:
6      Q.   I'm looking at 013156.
7          MR. ATKINSON:  34?
8   BY MS. RABINOVITZ:
9      Q.   Actually, there is 34 because when I
10  cross-referenced, some of them had been counted twice
11  so I -- so there were 34.  Do you want me to --
12         MR. ATKINSON:  Well, let him answer the
13  question.
14  BY MS. RABINOVITZ:
15     Q.   At least 34.  Let me rephrase the
16  question.  Looking at this document, does it indicate
17  that at least 34 cases out of a hundred involve
18  delay?
19     A.   The document -- no.
20     Q.   No?  Can you tell me how many did involve
21  delay?
22     A.   Without counting every single case number,
23  it says 22 cases involve issues with DOJ-EOIR delays.
24     Q.   But the next page?  The next page on the
25  top says 14 cases involve six weeks or more from

                                        Page 137

```
 1   custody until first master calendar hearing.  Is that
 2   considered a delay?
 3        A.    I would have to -- no.
 4        Q.    No?
 5              MR. ATKINSON:  The answer I believe was
 6   no.
 7   BY MS. RABINOVITZ:
 8        Q.    I know.  And I'm just saying --
 9              MR. ATKINSON:  You said no, question mark.
10   The answer was no.
11   BY MS. RABINOVITZ:
12        Q.    So it's routine that master calendar
13   hearings could take more than six weeks?
14              MR. ATKINSON:  Object to the form of the
15   question.  Outside of the scope of the topics.
16   Assumes facts not in evidence.  You can answer.
17   BY MS. RABINOVITZ:
18        Q.    And then there are four cases that involve
19   issues with CIS delays.  Is that correct?
20        A.    That's what it -- yes.
21        Q.    So then to reframe it, then, it would be
22   at least 26 out of a hundred in this case involved
23   delay?
24        A.    Yes.
25        Q.    Okay.  And I say at least because we don't
```

Page 138

1  know out of the 41 cases that are no longer in ICE
2  custody how many of those may have involved delay as
3  well.
4       A.    Yes.
5       Q.    Okay.  So is this barely -- is this what
6  you refer to when you were saying there were trends
7  of -- trends in these cases of delay?
8       A.    Yes.
9       Q.    Okay.
10      A.    To clarify, though, the delays also
11  included PFRs and not just limited to those.
12      Q.    Right.  So there could be even more delays
13  other than these?
14      A.    More factors.  Yes.
15      Q.    Because these are just -- this is just
16  DOJ-EOIR delays.  This doesn't include the days from
17  PFRs so delays could be more than this if you
18  included PFRs.
19      A.    Yes.
20      Q.    So does the agency consider this a problem
21  that there are so many delays?
22           MR. ATKINSON:  Object to the form of the
23  question.
24           THE WITNESS:  It was trends that were
25  found and it was passed on to OPLA to look into it

Page 139

```
 1   been.
 2        Q.    Right.  But I'm focusing now just to
 3   clarify specifically on the recommendation whether to
 4   detain or release, not generally, general questions
 5   about case management.  I understand that length of
 6   detention is going to be critical in determining and
 7   assessing case management issues.  My question is, is
 8   length of detention a factor that is considered when
 9   deciding whether somebody should be continued in
10   detention or released?
11             MR. ATKINSON:  Object to the form of the
12   question.  You can -- he has just answered that but
13   go ahead.
14             THE WITNESS:  You said should?
15   BY MS. RABINOVITZ:
16        Q.    Is length of detention a relevant factor
17   for determining whether an individual should continue
18   to be detained or released?
19             MR. ATKINSON:  Object to the form.
20             THE WITNESS:  I would have to say that
21   that's just one factor you're mentioning.  It can't
22   be the only consideration.
23   BY MS. RABINOVITZ:
24        Q.    I'm not suggesting it's the only
25   consideration.
```

Veritext National Deposition & Litigation Services
866 299-5127

1      A.      Yes.

2      Q.      I'm asking if someone has been detained

3  three years, are there stronger equities for their

4  release than if they were detained three months?

5              MR. ATKINSON:  Object to the form of the

6  question.

7              THE WITNESS:  You're being very

8  hypothetical.  It would have to be -- I would have to

9  look at the exact case because there is other factors

10  associated with why an individual would have been

11  detained for three years or two years that play into

12  the factor of ultimately what the recommendation is.

13  BY MS. RABINOVITZ:

14      Q.      I understand.  I'm not suggesting that

15  this is the sole factor.  You have a whole bunch of

16  factors you're looking at and all I'm asking is, is

17  length of the detention part of the equation?

18      A.      I believe I already mentioned that all

19  factors are considered, none more than the other.

20  They are all weighed and looked at and the case is

21  reviewed as a whole.

22      Q.      What about -- what about family ties?

23              MR. ATKINSON:  Object to the form.  You

24  can answer.

25  BY MS. RABINOVITZ:

                                        Page 153

1      Q.    Is family ties another factor that would
2  be looked at in terms of as relevant towards whether
3  the person should be detained or released?
4            MR. ATKINSON:  In the context of this
5  project?
6  BY MS. RABINOVITZ:
7      Q.    In the context of this project.
8      A.    Yes.  That would be one of those factors
9  as well.
10     Q.    Is the fact of whether the person poses
11  danger relevant towards whether they should be
12  detained or released?
13           MR. ATKINSON:  Object to the form.
14           THE WITNESS:  I go back to my earlier
15  comment.  It's not one factor by itself.  They are
16  all relevant.  All the factors that you'll mention
17  are all relevant.  Depends on the case.
18  BY MS. RABINOVITZ:
19     Q.    Okay.  And so that would also include then
20  if a person has a challenge to removal, that would
21  also be a relevant factor?
22     A.    Can you please clarify challenge?
23     Q.    That the person has a colorable challenge
24  to removal as opposed to the merits of their
25  challenge to removal.  Would that be a relevant

                                        Page 154

```
1    factor?
2              MR. ATKINSON:  I'm going to object.  The
3    terms colorable and I think you contrast it to the
4    merits of their removal.  Those are legal terms and
5    he is not --
6    BY MS. RABINOVITZ:
7         Q.    Let me strike the question and --
8              MR. ATKINSON:  Sure.  I know where you're
9    trying to go and I'm just trying to help you get that
10   clarified.
11   BY MS. RABINOVITZ:
12        Q.    Thank you.  Would another factor be
13   whether an individual has claims for relief from
14   removal?
15        A.    That's a factor.
16        Q.    So turning specifically to the danger
17   assessment, since you acknowledged that danger would
18   be one of the factors and it's reflected in these
19   worksheets, how were reviewers instructed to assess
20   danger to the public?
21             MR. ATKINSON:  Object to the form of the
22   question.
23   BY MS. RABINOVITZ:
24        Q.    Go ahead and answer.
25        A.    Can you repeat it?
```

1       Q.     Would the recency of a conviction be

2  relevant to whether somebody is a danger?

3       A.     That's a factor.

4       Q.     And did the working group do anything to

5  make sure that the reviewers understood this when

6  they were making their assessments?

7              MR. ATKINSON:  Objection.  You can answer.

8              THE WITNESS:  Yes.  Just to clarify, it's

9  not one factor again going back an individual can

10  have a conviction that's 10 years old, however, while

11  they were in custody, they committed multiple acts of

12  violence while in detention.  Those are all factors

13  that you put together.

14  BY MS. RABINOVITZ:

15       Q.     I'm just asking whether -- whether the

16  reviewers, whether the working group did anything to

17  make sure that the reviewers understood how they had

18  to consider all these factors in deciding danger?

19              MR. ATKINSON:  Can I object?  Part of the

20  reason I'm objecting to the form is because the

21  working group were the reviewers.  That's -- that's

22  where I think the confusion is coming.

23              MS. RABINOVITZ:  The management of the

24  working group.

25              MR. ATKINSON:  You have yet to go through

Page 158

1    case and prepare this document to go up.

2              When it went up, it went to the working

3    group and then level of management was involved to

4    review the documents as well and the case, and then

5    another level, my level, and then another level, and

6    then -- so there was substantial layers of review.

7         Q.    So is it accurate that -- is it fair to

8    say that levels of review is important in ensuring

9    the accuracy of these -- these assessments?

10        A.    It was more in place to -- because of the

11   people that we brought in and the roles that

12   individuals were given.  For example, I had to review

13   it because of my role as facilitator for the project

14   so I had to do it.  Then I had to remind management

15   before it went higher.  It was just a process that

16   was put in place.

17        Q.    And did having levels of review make the

18   process more accurate?

19        A.    I -- yes.

20        Q.    Okay.  Continue.

21        A.    Yes.  Yes.

22        Q.    You can continue if you want.

23        A.    Not that there were -- not to indicate

24   that there was anything wrong with what was found at

25   the lower levels, but it was just another level of

                                             Page 162

1    briefing.

2        Q.    And in terms of considering flight risk,

3    were reviewers made aware that they should consider

4    the -- that they could consider the availability of

5    alternatives to detention?

6            MR. ATKINSON:  Object to the form.

7            THE WITNESS:  There was no instruction

8    provided that limited what they were supposed to

9    entertain.

10   BY MS. RABINOVITZ:

11       Q.    So was your assumption that -- is your

12   assumption that reviewers should have been

13   considering the availability of alternatives to

14   detention?

15           MR. ATKINSON:  Object to the form.  You

16   may answer.

17           THE WITNESS:  They were instructed to

18   review the cases.  Consider all factors.

19   BY MS. RABINOVITZ:

20       Q.    And all factors, does all factors include

21   whether the person could be released on ankle

22   monitoring?

23       A.    Yes.

24       Q.    Do you know in how many cases that were

25   reviewed in the -- this long-term review process

                                          Page 163

1          MR. ATKINSON:  Object to the form.  You

2     can answer.

3          THE WITNESS:  To -- no.

4     BY MS. RABINOVITZ:

5          Q.   No?

6          A.   No.

7          Q.   So what were they supposed to do, just

8     determine if -- so what were they supposed to do with

9     respect to mandatory detention cases, apart from your

10    general stuff but just with a respect to detention,

11    what were they supposed to do?

12         A.   It's a factor considered, not necessarily

13    whether this case is being considered for either

14    detention or release.  It was just one of the factors

15    that's included in the case when you look at it.

16         Q.   So could reviewers recommend release of a

17    mandatory detention case?

18         A.   They would have to look at -- yes.

19         Q.   Under what circumstances?

20         A.   You said could they look at it.  Yes.

21    However, whether it's feasible or not is another

22    matter.

23         Q.   But it's possible that a reviewer could

24    recommend release of somebody who was mandatorily

25    detained?

                                          Page 167

1      Q.    I think I've already asked this.  Are

2  there any ongoing reviews about long-term detention?

3      A.    No.

4      Q.    So just going back to -- just to clean

5  this up, make sure there is no ambiguity, when we

6  were talking about the factors that are considered

7  that are relevant to detention or release, you said

8  it's, you know, a whole lot of factors.  You're not

9  suggesting that any factor is relevant, are you?  I

10  mean, you're not suggesting, for example, that

11  whether someone has brown hair is a relevant factor?

12      MR. ATKINSON:  Object to the form.  You

13  can answer.

14      THE WITNESS:  Correct.

15  BY MS. RABINOVITZ:

16      Q.    So there is a lot of factors, but that

17  doesn't mean that everything is relevant?

18      A.    Correct.

19      Q.    So were there any -- were there any

20  written documents that were produced setting forth

21  the conclusions of this, of the study other than the

22  ones that we've -- well, we don't have any.  Were

23  there any written documents produced setting forth

24  the conclusions?

25      MR. ATKINSON:  You mean produced by us.

Page 188

1    your answers, okay?

2        A.    Yes.

3        Q.    Early in the deposition, you were asked

4    whether if an alien was a veteran was that a special

5    concern considered by the working group.  Do you

6    remember that question?

7        A.    Yes, I do.

8        Q.    If an alien was a veteran and was in the

9    long-term detention project, was the fact that they

10   were a veteran a heightened factor?

11       A.    It was a factor considered just like any

12   other factor.

13       Q.    So it wasn't inherently a more important

14   factor than any one other factor?

15       A.    Correct.

16       Q.    There was also a series of questions that

17   asked you about instructions from the working group

18   to the reviewers.  Do you recall that series of

19   questions?

20       A.    Yes.

21       Q.    In fact, I objected quite a bit during

22   that time, didn't I?

23       A.    Yes.

24       Q.    Okay.  Was the working group comprised of

25   the reviewers?

1      A.    Yes.

2      Q.    So the people who were in the working

3  group were the people reviewing the work not only of

4  the field offices but also of other reviewers as it

5  moved up the chain?

6      A.    Correct.

7      Q.    So there would not have been instructions

8  from the working group to the reviewers because the

9  working group was the reviewers.  Is that right?

10     A.    Correct.

11     Q.    And was it the expectation of the

12 Department of Homeland Security that the working

13 group which consisted of the reviewers understood

14 what it was that they were to be assessing in looking

15 at the factors in the case management of these cases?

16     A.    Yes.

17     Q.    Is there any reason to believe that the

18 reviewers did not understand what it is that they

19 were to be reviewing?

20     A.    No.

21     Q.    You didn't get an opportunity to ask about

22 this -- to be asked about this, but in describing the

23 multiple layers of review that occurred in the

24 working group, was it your experience as a higher

25 level reviewer that there were a lot of errors being

                                        Page 197

1 made at the field office level in the long-term

2 detention project?

3     A.    Far from it.  What we found was the

4 decisions made at the field level were in line with

5 what we would have expected at headquarters.

6     Q.    And in fact, that's part of the reason

7 that that project ended when it ended?

8     A.    That's correct.

9     Q.    There were a series of questions about

10 whether certain things were factors that were

11 considered in the evaluation of these cases on an

12 individual basis.  Do you remember that?

13     A.    Yes.

14     Q.    One of the questions that opposing counsel

15 asked you was whether or not if an alien was properly

16 categorized in mandatory detention, was that a factor

17 that was considered by the working group.  Do you

18 remember that question?

19     A.    I remember.

20     Q.    Do you remember whether you said that was

21 or was not a factor?

22     A.    I believe I said it was not.

23     Q.    Why -- what did you understand her

24 question to mean and your response to mean?

25     A.    What I understood the question to mean was

Page 198

```
1   did we go line by line on every single individual we
2   were reviewing to see if mandatory -- if the review
3   confirmed the mandatory detention classification.
4       Q.    But --
5           MS. RABINOVITZ:  Can you just repeat that
6   answer because I didn't hear it.
7           MR. ATKINSON:  Can you read back my
8   question?
9           (The record was read as requested.)
10  BY MR. ATKINSON:
11      Q.    Did you understand my previous question?
12      A.    Could you repeat it again?
13      Q.    Let me withdraw my previous question.  Let
14  me ask this.  What did you do understand her question
15  and your response to mean?  Could you elaborate
16  further on what you meant in your response?
17      A.    When the cases are being reviewed and you
18  see that individuals are classified, for example, as
19  mandatory detention but yet looking at the criminal
20  record, it would reflect that individual was not
21  properly classified and obviously action would be
22  taken.  I misunderstood the question to mean did you
23  go to every single alien and review every single one
24  as far as mandatory detention.
25      Q.    During that line of questioning, you
```

Page 199

1  also -- do you also recall that Ms. Rabinovitz asked
2  you whether there was a recommendation ever made by
3  the working group to release somebody who was subject
4  to mandatory detention?
5       A.    I recall the question.
6       Q.    And do you recall your response?
7       A.    I recall my response.  Yes.
8       Q.    And can you explain or can you -- can you
9  explain further what you meant when you testified
10 that recommendations may have been made?  It is
11 possible that recommendations may have been made to
12 recommend the release of somebody who is subject to
13 mandatory detention?
14      A.    What I meant to say was that options were
15 entertained, however, in order for that to be
16 considered, that classification mandatory detention
17 would have to be addressed first.
18      Q.    So to make sure it's clear, the working
19 group wasn't simply recommending that people be
20 released even if they were subject to 236 C because
21 they thought that there were other factors that might
22 weigh in favor of a release recommendation, did they?
23      A.    Correct.
24      Q.    Okay.  What generally would have to happen
25 with that alien's proceedings before release could go

                                        Page 200

```
 1   through?

 2         A.     Terminated.

 3         Q.     Meaning the proceedings would have to be

 4   terminated or otherwise closed?

 5         A.     Yes.

 6         Q.     So it wasn't the working group's practice

 7   to recommend that aliens subject to detention under

 8   236 C be released?

 9         A.     No.

10         Q.     Okay.  There were also -- I think this is

11   my last area.  There was also a series of questions

12   regarding delays classified as DOJ-EOIR delays.  Do

13   you recall that line of questioning?

14         A.     I recall it.

15         Q.     Ms. Rabinovitz asked you a series of

16   questions as to whether immigration judge delays or

17   other delays were part of those delays in that

18   document.  Do you recall that?

19         A.     I do.

20         Q.     Would DOJ EOIR delays also include delays

21   caused by continuances sought by the alien?

22         A.     Yes.

23         Q.     Would that also include delays from

24   continuances sought by the alien's representative?

25         A.     Yes.
```

Veritext National Deposition & Litigation Services
866 299-5127

1     Q.    Would they also include delays sought by

2 the alien seeking to file a claim for some benefit at

3 some point in the removal proceedings?

4     A.    Yes.

5     MR. ATKINSON:  I think that's all we have.

6     MS. RABINOVITZ:  I just want to have just

7 two follow-up points to that.

8     EXAMINATION BY COUNSEL FOR PETITIONERS

9 BY MS. RABINOVITZ:

10     Q.    I thought that we had clarified afterwards

11 that we were not asking about whether reviewers gave

12 themselves instructions.  What we were asking is

13 whether, whether managerial reviewers like you had

14 given instructions to other reviewers.  So that's

15 what we were talking about.  And is it correct that

16 no written instructions were given by the top

17 managers of this project to the -- to the reviewers

18 who were doing this, you know, on the ground?

19     A.    Yes.

20     Q.    And how -- how did you determine that they

21 understood what they were supposed to be doing

22 because your answer to Mr. Atkinson was obviously,

23 though, they understood what they were supposed to be

24 doing.  So I'm asking how do you know that they

25 understood unless you communicated it to them?

UNITED STATES OF AMERICA)

                              SS:

DISTRICT OF COLUMBIA     )


    I, SUSAN L. CIMINELLI, the officer before whom
the foregoing deposition was taken, do hereby
certify that the witness whose testimony appears in
the foregoing deposition was duly sworn by me; that
the testimony of said witness was taken by me to the
best of my ability and thereafter reduced to
typewriting under my direction; that I am neither
counsel for, related to, nor employed by any of the
parties to the action in which this deposition was
taken, and further that I am not a relative or
employee of any attorney or counsel employed by the
parties thereto, nor financially or otherwise
interested in the outcome of the action.


                    _Susan L. Ciminelli_
                    Notary Public in and for the
                    District of Columbia


My commission expires:   11/30/2016

Veritext National Deposition & Litigation Services
866 299-5127

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

----------------------------------------x

ALEJANDRO RODRIGUEZ, et al.,

        Petitioners,

    -vs-

TIMOTHY S. ROBBINS, in his capacity
as U.S. Immigration and Customs
Enforcement Los Angeles Field Office
Director, et al.,

        Respondents.

----------------------------------------x

        DATE:  Wednesday, November 28, 2012

        TIME:  9:27 a.m.

        Examination Under Oath of SUSAN B.

LONG, held at the offices of UNITED STATES

ATTORNEYS OFFICE, 100 South Clinton Street,

Syracuse, New York, on November 28, 2012,

before  CYNTHIA A. SANDERS, Registered

Professional Reporter and Notary Public in

and for the State of New York.

1                          S. Long

2      A.   To deal with the problem when you don't have

3 information.

4      Q.   Right.  What do you do to fill out the rest

5 of that?

6      A.   However you approach it --

7      Q.   Okay.

8      A.   -- from a statistical matter.

9      Q.   And am I correct that there are different

10 things from a statistical perspective you can do to

11 address the issue raised of censored data?

12     A.   Well, you're always limited as to what you

13 know in a situation --

14     Q.   Right.

15     A.   -- and availability of data.  There may be

16 nothing that you can do.  It depends upon -- you know,

17 methods will depend upon that.

18     Q.   So in the case where you have the 54

19 individuals who are still detained as of April 28th,

20 2012, what statistical approach did you take with

21 respect to those individuals in light of the fact that

22 that data was censored?

23     A.   For my report?

24     Q.   Yes.

25     A.   In my report I was, you know, given the

1              S. Long

2    universe of individuals and asked to look at it, and I

3    took the conservative approach of simply, for

4    calculations, ending their detention, you know,

5    effectively on the 28th, when the data ended.

6          Q.    Even though it was likely that their

7    detention was going to continue beyond that date?

8          A.    Yes.

9          Q.    And you note that in your report?

10         A.    Yes; um-hmm.

11         Q.    Did you talk about that issue with

12   Professor Velu?

13         A.    (No verbal response.)

14         Q.    Did you talk about your approach that you

15   took in the expert report with Dr. Velu?

16         A.    No.

17         Q.    Okay.  What specifically did you talk about

18   with Dr. Velu with respect to the issue of the 54?

19         A.    I didn't talk about the 54, I talked about

20   the statistical issue of censoring.

21         Q.    This may be --  That last question may have

22   been because I was misremembering your answer.

23              I had asked you what were the things that

24   had led to this conversation, and you said there were

25   two things, one of which -- two issues of censored

1                    S. Long

2    either inaccurate or insufficient to answer the

3    questions that you were asked to answer?

4             MR. ARULANANTHAM:  Object to the form

5             of the question.

6    A.    Apart from when you say -- apart from the

7    limitations, I certainly discussed limitations with

8    counsel.

9    Q.    Okay.  Did you -- When you got the data

10   that you relied on to conduct your analysis in this

11   case, was there anything about that data that gave you

12   concern that it was missing information or that the

13   information in the tables that you got was inaccurate?

14   A.    Yes.

15   Q.    In what way?

16   A.    Well, I enumerate the data that I relied

17   upon, which I didn't rely upon all of the data; there

18   was a lot of information there.  And so there were

19   some fields of information that I did not use.

20   Q.    You did not use it because you believe that

21   they were unreliable?

22   A.    Yes.

23   Q.    What fields were those that you considered

24   unreliable?

25   A.    Well, I didn't conduct a thorough

1                         S. Long

2  examination of all of the fields of information, but

3  with respect to these questions, for example, there

4  was information in the EOIR tables also about

5  detention.

6      Q.   Okay.  Anything else that you can remember

7  now without having that information in front of you?

8      A.   And so that --  So I didn't use that data, I

9  felt it unreliable as compared to the ICE information,

10  which is -- you know, they are the people that are in

11  charge of the detention and would be the first -- they

12  would know what events occurred rather than some

13  secondhand source.

14         I also expressed some concern to counsel

15  about the reasons given -- listed in the field as to

16  the ending of a detention period as to whether those

17  were always reliable.

18      Q.   Okay.  Any other fields that you can think

19  of right now?

20      A.   I did, in fact, look at the scheduling table

21  and the actions table that were the subject of the

22  discussions yesterday as to whether it would be

23  possible to derive an estimate of delay where delay is

24  used in the normative sense of time that would

25  reasonably, you know, be taken.

1                           S. Long

2       Q.   When did you look at the scheduling table

3   and the actions table to determine whether those could

4   be used to derive delay in the normative sense?

5       A.   Way last summer.  It was one of the

6   questions that I was asked by counsel, could I -- that

7   was not on the list, because I advised them that I did

8   not see how that could be done, given the data, which

9   included -- there were a series of reasons, one of

10  which was the lack of correspondence between the

11  information that was in the schedules table and the

12  information in the actions table in trying to match

13  them together to get some picture of what was going

14  on.

15              MR. ATKINSON:  Could you read back the

16              second half of that answer?

17              (Whereupon, the requested portion of

18              the record was read.)

19  BY MR. ATKINSON:

20      Q.   The phrase correspondence to me was because

21  I was thinking of letters back and forth.

22              You mean that there was a lack of --

23      A.   Agreement.

24      Q.   -- agreement?

25      A.   But agreement is more than -- is this event

1                              S. Long

2   at EOIR about the schedules table?

3       A.   That was with respect to judges' scheduling

4   and the time that they had.  So the focus of this was

5   looking -- was looking at the scheduling of judges;

6   how many cases were they handling, you know, how many

7   hours were they scheduled to be holding sessions

8   versus not.

9       Q.   Has TRAC ever done any analysis based upon

10  time between hearing dates?

11      A.   No, not in terms of times between hearing

12  dates.

13      Q.   How about has TRAC ever done any analysis as

14  to --  Let me strike that.

15           What analysis has TRAC done that has

16  specifically required an examination of the scheduling

17  table?

18      A.   It was with respect to workload of

19  immigration judges.  And so we were analyzing it with

20  respect to specific judges, all the judges' workload,

21  and we prepared -- got the dump of a month's full

22  schedule for every judge, and we prepared extracts, in

23  terms of Excel spreadsheets that we shared with the

24  judges and interviewed them on that basis.

25      Q.   When you say workload of immigration judges,

1                                S. Long

2        Q.    What kind of things?

3        A.    You know, things that might be scheduled

4    that might not appear.  This is some time ago.

5              And so the focus at that time was on the

6    workload, you know, in a large sense.  So we ended up

7    not, in fact, relying on the scheduling table because

8    of those issues that were raised as to its -- you

9    know, its completeness, and for the purposes that we

10   were looking at it for.

11             So we did not use it, as I recall, to derive

12   any statistics.  It certainly gave us a sense that the

13   judges are scheduled for a lot of hours, but in a

14   quantitative sense, as to how many, et cetera, I'm

15   just trying to recall some of the conversations, and

16   put together, you know, what we used, what we didn't

17   use, and I haven't thought about that in some time.

18       Q.    Well, let me --

19       A.    And so basically, they gave lots of -- they

20   gave a number of kinds of examples of things that

21   wouldn't show up there, and so as a measure of

22   completeness, it, you know, raised concerns as to

23   whether we should rely on it for that purpose.

24       Q.    But you can't identify any of those

25   examples, as you sit here today, because as you said

1                    S. Long

2 changed since the time that you last looked at it in

3 approximately September 2009?

4      A.   I mean, we certainly have occasion --  I

5 mean, we do receive it, we don't rely on it for

6 anything.

7      Q.   Okay.  You said that the lack of

8 correspondence between the tables was one reason that

9 you decided not to use the schedules table field or

10 the actions table field.  Were there any other reasons

11 that gave you concern as to its reliability?

12      A.   Yes.

13      Q.   Okay.  What?

14      A.   The issue was whether or not you could

15 measure delay in a normal sense, foot dragging, taking

16 longer than would be normal.  And what is recorded in

17 that field and the reasons there and that process,

18 it's not -- did not appear in my professional judgment

19 to be data entry's design to answer that question.

20      Q.   So you said that field.  Which field?

21      A.   This is the field that gives the -- what's

22 been referred to as adjournment reasons.

23      Q.   So the adjournment code field associated

24 with a particular date in a schedules table; is that

25 what you're referring to when you say that field?

1                              S. Long

2        A.    Yes; um-hmm.

3        Q.    And what about your --  Do you have any

4   reason to believe that the reason that is put in by --

5   let's assume it's put in by immigration court staff.

6   Do you have any reason to believe that the code that

7   was used, the adjournment code, is unreliable as a

8   general matter?

9        A.    The issue was --  The issue was does it

10  measure normative delay, and because that was what I

11  looked at, and it didn't measure that, I didn't

12  address the issue of the entry being reliable, because

13  even if it's reliable measuring something then it does

14  not get to the issue of if, in fact, it measures that

15  then we should look at reliability.  So I didn't

16  actually examine it for that purpose.

17       Q.    So you don't know --  Well, let me rephrase

18  that.

19             Do you have any basis to believe that the

20  adjournment codes that are put in by the immigration

21  court staff are not -- are inputted in a manner that

22  is inconsistently or largely incorrect?

23                  MR. ARULANANTHAM:   Object to the form

24             of the question.

25       A.    The --

1                              S. Long

2    not familiar, existing in the schedules table.

3        Q.    I'm not talking about that field, my

4    question was limited to the schedules table.  And you

5    said that some hearings are recorded in the schedules

6    table.  What do you mean by some hearings were

7    recorded in the schedules table?

8        A.    That not all hearings are recorded in it.

9        Q.    How do you know that?

10       A.    From conversations with the judges.

11       Q.    All of the judges?

12       A.    There were several judges.

13       Q.    Did you have a judge --  Did you have any

14   conversations with judges in the Los Angeles area as

15   to whether all hearings were discussed in the

16   schedules table?

17       A.    I'm trying to remember which courts the

18   judges were in.

19             I do not believe there was a Los Angeles

20   judge that I had a conversation about that with.

21       Q.    Have you ever had --  Well, let me ask it

22   this way.  Are you familiar with the manner in which

23   the Los Angeles court records its hearings and

24   schedules table, specifically?

25       A.    As to whether there is any specific local

1                          S. Long

2    rules?

3         Q.   No, I didn't ask about local rules.  I'm

4    going to ask --  Let me ask it again.

5              Are you specifically familiar in the way in

6    which court personnel in Los Angeles record

7    information in the schedules table?

8         A.   I have no information regarding how specific

9    individuals in the Los Angeles area courts record

10   information apart from the general information about

11   how information was recorded in the tables and its

12   coverage.

13        Q.   Let me ask it again, because your answer

14   didn't answer the question.  I didn't ask about

15   specific individuals.

16             Do you have any specific knowledge as to how

17   the Los Angeles court, the immigration courts there,

18   record the schedule -- the information in the

19   schedule --

20             MR. ARULANANTHAM:  Object to the form

21             of the question.

22        Q.   I haven't finished the question, and I'll

23   withdraw draw it and ask it again.

24             Do you have specific knowledge as to how the

25   schedules table information is recorded by court

S. Long

2        So do you know whether every hearing that is

3    scheduled is recorded in the actions table?

4        A.    I do not know.

5        Q.    Okay.

6        A.    I --

7        Q.    So the absence of a recorded hearing or the

8    absence of the recording of a hearing in the actions

9    table is not, in and of itself, a discrepancy if there

10   is something that is recorded -- if a hearing is

11   recorded otherwise in the scheduling table; is it?

12       A.    If I just saw a single discrepancy, you

13   know, it wouldn't concern me, if I saw a pattern of

14   differences that I didn't understand, some of which

15   appeared on the surface to not agree, I could not

16   judge without more information.

17       Q.    Did you seek to get more information with

18   respect to answering your concerns about whether these

19   tables were reliable?

20       A.    Well, the question would be what avenues,

21   how much time and effort and -- would be required to

22   do that.

23       Q.    No, my question was:  Did you do anything to

24   seek further information to address your concerns

25   about the reliability of either the schedules table or

1                          S. Long

2       A.    Yes.

3                  (Witness reviewed document.)

4       A.    In a general sense, in terms of --  Let's

5   see, so we're just talking about EOIR data?

6       Q.    Any information that you relied on from EOIR

7   or ICE, any information that you relied on is in the

8   scope of this question.

9       A.    Okay.  With respect to the EOIR data that I

10  relied on, apart from the expectation that any

11  database is not perfect.

12      Q.    Right.

13      A.    I did not find anything that raised

14  questions that raised to the level of the reliability

15  in my mind.

16      Q.    Okay.  Let's go back to the concern that you

17  talked about for the reasons listed in the field as

18  for the basis for -- I think it was either the

19  proceeding ending or --

20      A.    Not a proceeding, no, that was ICE data.

21      Q.    Okay.  So the field that you -- that listed

22  the reasons for the detention ending, was that --

23      A.    Well, it doesn't -- that particular period

24  at that detention facility ended.

25      Q.    Okay.

1           S. Long

2           MR. ARULANANTHAM:  Can we go off the

3           record for a minute?

4           (Whereupon, a discussion was held off

5           the record.)

6    BY MR. ATKINSON:

7       Q.   Okay.  This is the reason for the release

8    field in the ICE data?

9       A.   Yes.

10      Q.   And what did you consider unreliable, other

11   than release may be -- may have multiple meanings?

12      A.   Well, you would find, for example, a release

13   reason that they were transferred to another facility,

14   and you would find a deportation date that was sort of

15   right next to the release, which suggested that they

16   hadn't been taken to another facility, but, in fact,

17   had been deported.

18      Q.   Is there --  I'm sorry.  Go ahead.

19      A.   But -- or it would say that they were

20   released under bond or supervision, or there is a

21   variety of categories, and you found the deportation

22   date there that was in that same -- that occurred

23   shortly there after that release.

24      Q.   Okay.

25      A.   Those kinds of things that made me concerned

1                           S. Long

2      A.    Yes.

3      Q.    Now, on page 3 of your report there is a

4   statement at the bottom of the first --  I'm sorry,

5   the second full paragraph that says:  Additional

6   information was provided to me by petitioners'

7   attorneys compiled from the court reports from the

8   specific Ninth Circuit appeals I identified as

9   involving class members.

10           What is that additional information that

11  you're talking about?

12     A.    I think it's described more fully in

13  Footnote 3, but basically the information was whether

14  or not a particular case was closed or not; and if it

15  was closed, the date.

16     Q.    So as I understand it from Footnote 3, you

17  used the -- you used Pacer, which is an electronic

18  service for obtaining court documents from federal

19  courts and state courts, I guess, to determine whether

20  certain proceedings of class members had either made

21  it to a Court of Appeals or were ongoing in the Court

22  of Appeals or were concluded in the Court of Appeals;

23  is that right?

24     A.    Yes.  I used Pacer to identify those cases

25  in the court, just in the Ninth Circuit was all I

1          S. Long

2    looked, for pleadings that were listed under Pacer for

3    those particular members, class members.

4          Q.    When you looked through the information that

5    you got through Pacer, did you do some sort of

6    assessment of what kind of conclusion had been reached

7    in those proceedings?  For example, did you make a

8    distinction as to whether an appeal had been affirmed

9    or denied or whether the case had been remanded back

10   to the Board?

11         A.    I didn't make any such judgment.

12         Q.    Elsewhere in your report you provided

13   statistical information based on outcomes in various

14   tribunals; correct?

15         A.    (Witness nodded head.)

16         Q.    Whether there was an outcome in front of the

17   immigration court, Board of Appeals -- the Board of

18   Immigration Appeals, abbreviated as the BIA in this

19   deposition, or in front of a Court of Appeals; is that

20   correct?

21         A.    I had outcomes.

22         Q.    Okay.

23         A.    Yes, from the composite of those.

24         Q.    Okay.  So when you say an outcome, do you

25   mean that the case ended at one of those particular

1                          S. Long

2    levels?

3        A.    Yes.

4        Q.    How would you know if a case ended at the

5    Ninth Circuit?

6        A.    I was given a list from counsel of those

7    cases that had closed at the Ninth Circuit and the

8    date of closure.  And I was instructed that the way

9    the legal -- the laws are, that if the case had -- was

10   decided against the class member, then there would be

11   no subsequent proceeding in lower court.  And

12   therefore, I then looked to the prior proceeding to

13   determine the outcome.

14           If there was a subsequent proceeding, in the

15   chronology, then I looked to that proceeding or

16   whatever was the final order to determine outcome.

17       Q.    All right.  Other than --  We may revisit

18   that, because I'm not sure that I totally understand

19   that.

20           But for right now, other than the database

21   that we have identified, the ICE-EDI-001, -002, -009

22   and EOIR-EDI-006, and the information described in

23   Footnote 3 of your report concerning the Pacer

24   documents, is there any other documents that you

25   relied on in reaching your conclusions in this case?

1                              S. Long

2       Q.   So you took that list of all of the BIA

3  appeals which would include all petitions for review;

4  correct?

5       A.   Correct.

6       Q.   And you compared --

7       A.   At least that came from Pacer, yes.

8       Q.   What did you do with that information then?

9       A.   I believe I described, at least in that

10  footnote, because the docket number of the proceeding

11  in the court below, which would be the BIA docket

12  number, they use the alien's number.  And I was able

13  to match therefore those particular appeals that were

14  the same as the alien numbers in the EOIR or in the

15  list -- I would say, you know, the list of class

16  members.

17       Q.   All right.  So then you had a list of cases

18  that matched up with class members.  And if I'm

19  reading your footnote correctly, you wrote, quote --

20  And this is Footnote 3 on page 3 of your expert

21  report, you wrote, quote:  On each of these matched

22  cases I provided the information that I downloaded

23  from Pacer to petitioners' attorneys; is that correct?

24       A.   Correct.

25       Q.   I take it then that they --  And this is

151

S. Long

also in your footnote, they quote:  Added an entry to
this listing indicating whether the Ninth Circuit case
had concluded, yes or no; and if it had concluded, the
date the mandate was issued?

A.   Yes.

Q.   So the information, to be clear, you didn't
determine whether the case concluded on the Ninth
Circuit on your own, you relied on petitioners'
counsel to do that?

MR. ARULANANTHAM:  Object to the form.

A.   Yes.

Q.   And the information you got back was either
yes, concluded or no, concluded?

A.   Yes, there was a field -- there was two
fields.

Q.   And the first field was a yes/no field?

A.   Yes.

Q.   And then the second field was the date the
mandate issued?

A.   Right, for those that had closed.

Q.   If a case was indicated as concluded in the
Ninth Circuit, what did that mean to you?

A.   It meant that I would look for a proceeding
--  I knew that it wasn't at that stage, that wasn't

1               S. Long

2          When does -- We know the data set ends on

3     April 28th, 2012.  What's the start date for your --

4     for this window of analysis?

5          A.   It was provided in the data.

6          Q.   Okay.

7          A.   I was given this data that was the universe

8     of class members, and I was told that of this universe

9     there wasn't any sampling done, everything was

10    included.

11         Q.   Okay.

12         A.   And so given that, I -- and those questions

13    related to that universe, and so I analyzed it.

14         Q.   And if somebody -- Go ahead.

15         A.   No, no.

16         Q.   If somebody had been detained for, say,

17    three months at the start of the window of the data

18    set, the beginning --  Let me make sure that we're all

19    understanding the proper terms or at least that we're

20    all on the same page.

21              The identification of the class members is a

22    result of choosing a period of time in which those who

23    were detained are included in the data set; is that

24    your understanding?

25              MR. ARULANANTHAM:  Object to the form

1                                   S. Long

2          of the question.

3     A.    No, I mean I was provided with this data and

4    I was told, you know, here's the ICE data, here's the

5    EOIR data, and it covers the universe of class members

6    and I was to analyze that universe.

7     Q.    Was it your understanding that that 1,026

8    figure was the list of every class member in the

9    universe, as the universe --

10    A.    Yes, in terms of the universe described to

11   me.

12    Q.    Okay.  So when you analyzed length of

13   detention in various contexts throughout your report,

14   you looked at the length of detention that went back

15   prior to -- you would look at their length of

16   detention in total, not just beginning on a set date

17   at the -- the date that that data was pulled to

18   identify class members?

19               MR. ARULANANTHAM:  Object to the form

20          of the question.

21    A.    Well, data was pulled at different dates, so

22   I used the field entry into ICE custody.

23    Q.    Okay.  Why don't you have a problem of

24   overrepresentation with regard to length of detention

25   in your sample?

1               S. Long

2       A.   Well, I don't have a sample, I have the

3   universe.   From the perspective of the question that

4   was given me.

5            For example, in Dr. Palmer's example he had

6   a hospital example, I believe it had 26 patients.   So

7   we got all 26 in our universe.

8       Q.   Let me ask you this:   Does your

9   understanding that your report, your analysis, was

10  going to be used to sort of make representations with

11  respect to how long aliens are detained, how long

12  aliens are -- how long they're detained before they

13  get outcomes at different levels of their proceedings,

14  what their general rate of relief is, didn't you have

15  an understanding that that would be applied to a

16  universe broader than just the 1,026?

17      A.   There was no discussion of that.   I was

18  handed this, what I understand to be the universe.

19      Q.   So have you done any analysis whatsoever to

20  determine whether the percentages and the outcomes --

21  the results that we see with respect to these 1,026

22  individuals could be applied to a larger number of

23  aliens detained under the same circumstances?

24      A.   You're saying in a sampling context?

25      Q.   Sure.

1                           S. Long

2      A.    Then that broader group would need to be

3  defined.

4      Q.    Okay.  So if there were 30,000 individuals

5  who were detained in the same way that these

6  individuals are detained, under the same laws and

7  under the same sort of same general circumstances, you

8  can't say that your results here could be extrapolated

9  out to any universe larger than the 1,026 individuals

10 included in this?

11     A.    This report was specific to that universe.

12     Q.    Okay.

13     A.    Of all class members in that; and I

14 understand that to be the question.

15     Q.    Okay.  Let's look at Table 2 of your report,

16 which is on page 6.  This measures average days of

17 detention by detention category; is that correct?  Or

18 it shows the results of those measurements?

19     A.    Yes.

20     Q.    What is the median in statistical terms or

21 in mathematical terms?

22     A.    The median is the halfway point, and you

23 would be able to see that from Table 3.

24     Q.    Okay.  So the median is --  If I have 1,000

25 individuals, and I count from one end 500 and count

S. Long

2    A.    Um-hmm.

3    Q.    How did you go about determining what were

4    relief applications?

5    A.    I first went to the court applications

6    table, my information was restricted to filings with

7    the immigration court.  I did not have any information

8    with respect, if there was some relief application,

9    that occurred in -- you know, in BIA that simply

10   wasn't that information.

11         So this refers to immigration court

12   proceedings.  There is a table that we discussed on

13   court applications.  And there is a field in it by the

14   type of application.  I prepared a frequency

15   distribution of all of the types, and I shared that

16   with counsel and I asked:  What are the relief

17   applications to be included?  So I did not want to

18   rely upon my --

19   Q.    Your own experience?

20   A.    I mean, that's a legal question.

21   Q.    Did you get information in response to your

22   query after you sent the distribution table?

23   A.    Yes.

24   Q.    What was that response?

25         MR. ARULANANTHAM:  Hold on a minute.

1                        S. Long

2              MR. ATKINSON:  She is a witness, she is

3          not a client.

4              MR. ARULANANTHAM:  You can answer to

5          the extent you relied on the information in

6          your report.

7              THE WITNESS:  Okay.

8     A.    I excluded two categories.

9     Q.    What categories did you exclude?

10    A.    One was request for voluntary departure.

11   The other category had to do with representation,

12   withdrawing or something like that.

13    Q.    Is that category -- I see voluntary

14   departure in here at places.  Is that other category

15   addressed anywhere in the report?

16    A.    That is --  The Court, itself, can order

17   voluntary departure, and so that was treated as an

18   outcome but not within Question 4, which were relief

19   applications.

20    Q.    Right.  But there was a second category that

21   you said you excluded that had to do with

22   representation?

23    A.    Withdrawal of --  I mean, if you had -- if

24   you had the look-up table there, I could identify it.

25    Q.    When you say the look-up table, which

1                          S. Long

2    look-up table?

3        A.   For the codes for relief applications.

4        Q.   Okay.

5        A.   There is a corresponding description of

6    that.  As I recall, the code was W.D.L., but I'm not

7    positive.

8        Q.   But that information --  After you sent the

9    distribution to counsel, and you got a response, you

10   relied upon that response in reaching the conclusions

11   in your --

12       A.   In excluding those two categories and

13   including the others.

14       Q.   For the purposes of your report?

15       A.   For the purposes of my report.

16            MR. ARULANANTHAM:  Can we go off the

17            record for a minute?

18            MR. ATKINSON:  Sure.  I'm making a

19            request for that communication.

20            THE WITNESS:  It was oral.

21            MR. ARULANANTHAM:  Can we go off the

22            record for a minute?

23            MR. ATKINSON:  Yes, we will go off the

24            record.

25            (Whereupon, a discussion was held off

1           REPORTER'S CERTIFICATE

2

3           I, CYNTHIA A. SANDERS, Court Reporter and

4      Notary Public, certify:

5           That the foregoing proceedings were taken

6      before me at the time and place therein set

7      forth, at which time the witness was put under

8      oath by me;

9           That the testimony of the witness and all

10     objections made at the time of the examination

11     were recorded stenographically by me and were

12     thereafter transcribed;

13          That the foregoing is a true and correct

14     transcript of my shorthand notes so taken;

15          I further certify that I am not a relative

16      or employee of any attorney or of any of the

17     parties nor financially interested in the

18     action.

19

20

21     _Cynthia Sanders_____

22     CYNTHIA A. SANDERS

23

24

25

# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-----------------------------------------x
ALEJANDRO RODRIGUEZ, et al,

               Plaintiffs,

                       Civil Action No.
     vs.
                       CV 07-3239-TJH
                          (RNBx)


TIMOTHY S. ROBBINS, in his capacity as
U.S. Immigration and Customs Enforcement,
Los Angeles District Field Office
Director, et al,

               Defendants
-----------------------------------------x


               DATE:  Friday, December 21, 2012

               TIME:  3:30 p.m.


    DEPOSITION of Professor SUSAN LONG, conducted

at TRAC Main Office, Syracuse University, 215

University Place  Suite 360, Newhouse II,

Syracuse, New York before, JOHN F. DRURY, CSR,

RPR, Notary Public in and for the State of New

York, on December 21, 2012.

1               S. Long

2      A.     Well, this is an area that I have, you

3   know, knowledge of.  I mean it's a very common --

4   it's a very common problem that one encounters

5   regularly.

6      Q.     The methodology that you described as

7   the self-balance methodology, is that a particular

8   term that's used throughout the field of statistics?

9      A.     Probably you would not -- statisticians

10  love to call things by, you know, specialized

11  terminology, so -- and it varies.  So you would

12  not normally probably encounter something -- have

13  the label be self-balancing; the description of

14  the label however is self-balancing.

15     Q.     Well, is there any other label that

16  you're aware of for the self-balancing methodology

17  that you came up with?

18     A.     To use out-of-sample data.

19     Q.     So correct me if I'm getting this wrong,

20  but you're saying that it may be referred to as

21  using out-of-sample data?

22     A.     Generally for censoring it involves time.

23  You use data from prior periods of time in which

24  to correct for censoring.  And that out-of-period

25  data is therefore what Dr. Palmer was referring to

1                              S. Long

2    from a sampling perspective in a general sense as

3    selection bias.  And you're looking for data where

4    either the censoring is less or ideally where the

5    censoring does not exist at all.

6         Q.    Okay, I think I'm confused by your

7    response.  You have described throughout your

8    report this self-balance methodology?

9         A.    Right.

10        Q.    And if I'm recalling your testimony just

11   now correctly, you've also said that statisticians

12   like to use some times specific and self-creative

13   labels?

14        A.    Right.

15        Q.    What I'm trying to find out is for this

16   censoring data methodology that you employed that

17   you call the self-balance methodology, is that

18   known throughout the field of statistics by some

19   other common name?

20        A.    No, it's not, I mean it's just so

21   common.  I mean this is the standard approach for

22   example, that the Department of Justice uses.

23   This is the standard approach that the Internal

24   Revenue Service uses, you know, in developing its.

25   It's just sort of baseline.

1             S. Long

2    described in your report at pages 20 and 21 to

3    deal with the detention length censoring data

4    issue were methods that you did not rely on in

5    dealing with the issue of censoring data.

6        Let me go back and just ask you what I think

7    was the last question or rephrase the last question

8    that I had asked.  Did you rely on the first or

9    second method for calculating detention length in

10   reaching any opinions regarding censoring data in

11   this case?

12            MR. KAUFMAN:  Object to the form of

13            the question.

14       A.    They informed me that -- I relied upon

15   them in the following sense.  I did not rely upon

16   them as to the exact result.  Instead I chose

17   method three, because it was the more conservative

18   method, it produced a shorter estimate of

19   detention length.

20       Q.    So let's talk for a second about the

21   first method for calculating detention length.

22   You concluded that you had doubts as to the

23   feasibility of obtaining reliable results using

24   this first method, is that correct?

25       A.    Yes, I had doubts.  I was not certain.

1                              S. Long

2    text book but you're pretty sure it's in some

3    papers.  Can you give us anymore information --

4          A.     Yes, I can give you --

5                 MR. KAUFMAN:  Objection, misstates

6                 testimony.

7                 MR. ATKINSON:  I didn't actually get

8                 my question out before she started, so

9                 let me start over.

10         Q.     Is there any source other than yourself

11   that you can point to to identify this approach as

12   being an approach that is widely used in the field

13   of statistics?

14                MR. KAUFMAN:  Object as to form.

15         A.     Yes.  Let us take the example of the

16   Internal Revenue Service and their procedure,

17   since, I don't know, in the teens, when Congress

18   passed the law requiring the publication of annual

19   statistics on income, all sorts of statistics on

20   income reported on tax returns, taxes, etc.  And

21   you know, they have methodologies that produce

22   papers.  There are, you know, there are collections

23   of those papers talking about, and indeed when

24   they would publish any estimates you would

25   typically find the methodological section in which

1                           S. Long

2         A.     No, there is a bias involved because you

3    no longer have a proper sample.  It goes to

4    whether or not those prior individuals are

5    properly part of a random sample of the population

6    of interest; and they're not.  So that's a biassing

7    effect.  In the same way that we have it here,

8    where you have people who are similar but reflect

9    an earlier period being added into the appropriate

10   sample information in order to correct the

11   sampling -- the censoring bias.

12        Q.     But isn't it correct that the

13   individuals you added back in to conduct this

14   self-balancing method are individuals who were

15   detained for longer periods than the data set that

16   Dr. Palmer used, which calculates everybody as

17   having reached that 181st day of detention during

18   the one year period at issue?

19        A.     That's not quite what I understand the

20   situation is.

21        Q.     What do you understand the situation is?

22        A.     Well, you're assuming that everybody is

23   detained longer.  But that's not the case at all.

24   In the out-period people you have people that are

25   detained a very short period of time as well.

1          S. Long

2     the data and I divided it by the month that the

3     individual entered in their 181st day.

4          Q.     Is that described anywhere in your report?

5          A.     I will be happy to -- I mean that's why

6     I utilized it.  No one would utilize this without

7     looking to see whether it would -- in this case I

8     was looking for a conservative estimate.  So I

9     wanted --

10         Q.     That's not my question.  Let's look at

11    page 21 of your report.  There is a statement

12    there that "if these two biases," and this is

13    under the description of Number 3, the Third

14    Method for Calculating Detention Length about

15    halfway down the first paragraph, let me he read

16    the sentence.  "If these two biases are

17    approximately the same magnitude, they cancel each

18    other out."  What did you do to determine whether

19    these biases were approximately the same

20    magnitude?

21         A.     Well, I looked at, to try to isolate the

22    biases, to see whether I could determine that.

23    And because the bias for selection bias was

24    related to time I could look at month by month for

25    the months in the in-period, for the months going

1                    S. Long

2  very, you know, very little difference between

3  that month and the next month.  And the average

4  immediately was higher than my estimate.  Which

5  suggested that my balance point in fact wasn't

6  really balancing the two forces out because my

7  censoring bias wasn't adequately being cancelled

8  out by the selection bias.  And if anything my

9  estimate that I had derived earlier was too low,

10  which of course that's what I found on the other

11  two methods that I used, Method 1 and Method 2,

12  again they were too low.

13      So on that basis I felt that given the

14  available data this was the best reliable

15  conservative estimate.  And by conservative I mean

16  an estimate, a sort of reasonable estimate that

17  would be on the short side of detention length.

18      Q.    This month by month method of

19  calculation and examination or analysis, is that

20  described anywhere in your report?

21      A.    No, but no statistician would use that,

22  would use self-balancing without taking a look.

23  This is called the bootstrapping method, it's a

24  very common statistical method of using it.  And

25  so I used it.

1             S. Long

2   looking at all of the ways that I looked at the

3   data and the three methods, that what is described

4   in my report is the self-balancing method, if

5   anything it was a conservative estimate.  And by

6   conservative that means it's on the low side.  And

7   to be on the low side means that the estimation

8   bias, excuse me, the censoring bias is pushing it

9   down more strongly and is not totally cancelling,

10  being cancelled by the selection bias.  That's

11  what makes it a conservative estimate.

12       Q.    Dr. Long, let me ask you just to make

13  sure that we're clear on something.  It seems like

14  there are two different censoring issues that

15  we're talking about with regard to your opinions.

16  Am I correct that one censoring issue involves

17  that 105 open cases with respect to the success

18  rate?

19       A.    There are 104 cases that have not

20  concluded.

21       Q.    Okay, and then the censoring data issue

22  with regard to length of detention, that involves

23  I think 19 people who continue to be detained?

24       A.    Well, what I did in my report, it

25  certainly involves the 19.  In my report to be

1          S. Long

2    conservative in my first Method 1 and Method 2, I

3    assumed that no one who was released got

4    re-detained for purpose of my estimation.  Because

5    that would obviously lead to a lower estimate.  I

6    do not -- I do not think however, that the

7    evidence suggests that no one will be re-detained.

8        Q.    Well, that's not really an answer to my

9    question, so let me try it again.  There are two

10   different issues of censoring data with respect to

11   the results that you're trying to show.  One is,

12   there is a censoring data issue with respect to

13   the success rates because there are still 104 open

14   cases.  Is that correct?

15       A.    Well, there is a series of things, and

16   so that is one of them.

17       Q.    And with respect to the length of

18   detention censoring data issues, that is because

19   there are a certain number of individuals who

20   continue to be detained.  Is that right?

21       A.    That's not a complete answer as to the

22   only issue.  However, when I applied my methods

23   described in my Rebuttal Report to be conservative

24   I assumed it was only those 19.

25       Q.    And so do you know what the magnitude of

1                    S. Long

2  the bias effect is with respect to those 19

3  individuals?

4      A.    If we knew that, you're asking me do I

5  know it with certitude?

6      Q.    Yes.

7      A.    Well to know it with certitude you would

8  need to wait until those detained individuals

9  were -- none of them were any longer detained.

10     Q.    Would you agree that if you have a

11 population that you are using for statistical

12 analysis and you have no censoring data issues

13 with respect to a million of them, and you have

14 censoring data issues with respect to one person

15 in that population.  That the magnitude with

16 regard to that one person, the magnitude of the

17 censoring data issue is small?

18             MR. KAUFMAN:  Object as to form.

19     A.    No, it would depend on what it was that

20 you were estimating and the degree of censoring.

21 It's not merely the amount of people it is the

22 amount of censoring for each person.

23     Q.    So what leads you to conclude that the

24 censoring data issue with regard to the length of

25 detention is large in this case?

1                    S. Long

2  biases were netting each other out.  And in this

3  case because one was interested in whether the

4  original one was too high, whether or not in fact

5  your censoring bias was too small of a force to

6  net out the force of the selection bias.  And so

7  for that, one looks at the data in a variety of

8  ways.  You try different methods to see if there

9  is any evidence that you can uncover that suggests

10 that this netting process resulted in too high of

11 an estimate.

12      So I used the first method, which is the very

13 standard method to see whether or not based just

14 on the in-period, that we are all agreed on does

15 away with the selection bias.  And then to

16 minimize, to be conservative I assumed that the

17 only censoring bias had occurred in the 19

18 individuals who were still detained.  And then

19 using the best available data, and I described

20 that in some length as to exactly how I came up

21 with that data.  I'd be happy to go into more

22 detail there if that would be helpful.  I used it

23 because it was exit data, to base on my estimate

24 from it of the length of custody appropriate for

25 these 19 individuals.  Applied that estimate and

1                    S. Long

2      Q.    What are the implications that that has?

3      A.    Well, an Audit Table, for purposes of

4  audit is a record of when information is put into

5  CASE.  And what information it records is

6  obviously specific to the database.  But it's

7  something that happens automatically typically.

8  That's the nature of an audit.  So it's an

9  official, it's like a chain of evidence kind of an

10  idea, it is the record of, at least this is my

11  understanding of an Audit Table.  You know, I

12  don't have that knowledge of CASE with respect to

13  the specifics of how data gets into the Audit

14  Table.  But that when records are added or updated

15  that the CASE has pre-defined as something that it

16  wishes to log, an entry is made into the Actions

17  Table indicating with a date stamp the user that

18  did this and information about the action itself.

19      Q.    Do you know whether, as an Audit Table

20  if you put in a date for a hearing or you put in

21  an adjournment code for an adjournment in the

22  Schedule Table, whether it automatically records

23  as an adjournment in the Actions Table?

24      A.    Do I personally know that?

25      Q.    Do you know it?

# REPORTER'S CERTIFICATE

I, JOHN F. DRURY, Court Reporter and Notary Public, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney or of any of the parties nor financially interested in the action.

JOHN F. DRURY, CSR, RPR

Notary Public

# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-------------------------------------------------------

ALEJANDRO RODRIGUEZ, ET AL.,

                          Plaintiffs,

vs.                    Civil Action No.: CV 07-3239-TJH

TIMOTHY S. ROBBINS, in his capacity as           (RNBx)

U.S. Immigration and Customs Enforcement,

Los Angeles District Field Office Director, et al.,

                          Defendants.

-------------------------------------------------------



        Examination Before Trial of

        CHESTER I. PALMER, held on November 27,

        2012, at the U.S. Attorneys Office,

        100 South Clinton Street, Syracuse,

        New York, before Erin M. Hutter, Registered

        Professional Reporter and Notary Public in

        and for the State of New York.







PAGES 1 - 191

                                    Page 1

1  letter A, that was what I asked about.

2      Q        And you were told it comes from the

3  court?

4      A        Yes.

5      Q        Okay.  Do you know what criteria are

6  applied by the courts in choosing to grant or deny

7  requests for continuances?

8      A        No.

9      Q        And I take it, then, you don't know if

10  those could be reviewed on appeal or anything like

11  that either?

12      A        No, no, I do not know.

13      Q        And you wouldn't know, then, if the

14  reason that is given for the continuance would play

15  any role on whether it's going to be upheld on appeal

16  or not?

17      A        No, I do not know about the legal context

18  here.

19      Q        Okay.  You'll have to forgive me, because

20  it's sort of relevant for other things in the case, I

21  might ask you a lot of questions where that's the way

22  it's -- and you're going to look at me and think

23  surely you already know that I don't know the answer

24  to this.

25      A        Oh, no, I understand, and I'll keep

1   saying at all opportunities that I'm not an expert on

 2   Immigration law.

 3        Q        Okay.  Do you know what the adjournment

 4   codes are used for by the Immigration courts?

 5        A        No.

 6        Q        Do you know the reason they keep track of

 7   them?

 8        A        I mean, I certainly never asked that

 9   question.  One would assume that it's the kind of

10   thing that a court would keep track of, or I would

11   have assumed that, but I don't know that, no.

12        Q        But don't you think that the purpose for

13   which certain information is tracked can bear on its

14   reliability?

15        A        It can in some circumstances, yes.

16        Q        And can bear on its reliability for a

17   particular purpose as opposed to some other purpose;

18   right?

19        A        Yes.

20        Q        But then wouldn't you want to know that,

21   wouldn't it be relevant if they're kept for one reason

22   rather than another?

23        A        Well, I suppose in some abstract sense,

24   but, you know, the fact is that as statisticians we

25   all deal with many databases that we have to sort of

                                        Page 38

1    court that is attributing delay either to the detainee

2    or to some other source?

3              MR. ATKINSON:  Object to the form.

4         A         You know, we're really sort of getting

5    into the realm of real speculation here.  It is

6    possible under some circumstances if the pressure was

7    strong enough and was known to the people at the time,

8    because remember, this is a 2012 report and we're

9    talking about what happened well previous to it, so if

10   you want to make the assumption that there was some

11   sort of strong pressure previous to the report and

12   that it was a bad deal for the court to record it in

13   one way, yeah, I mean, conceivably that could have an

14   affect, I have no evidence that it did, but certainly

15   I can't absolutely swear it wouldn't.

16        Q         Okay.  Okay.

17        A         They do appear to have used whatever -- I

18   don't know where they got their categorization from

19   where the delay came from, but one might think it came

20   from the same place.

21        Q         So that was actually going to be my next

22   question.  If you look at page 31 in that figure, if

23   you combine the reasons given in the table and then

24   the description of other in the second line underneath

25   the table it appears that there are 14 reasons for

Page 48

```
 1      Q        So was there any other instruction or
 2  guidance you were given as to what the population of
 3  interest is here other than the class definition?
 4                  MR. ATKINSON:  Object to the form.
 5      A        Not that I can recall.
 6      Q        Okay.  So the only reason that you threw
 7  out the two that were less than 180 was because you
 8  read the class definition in the Complaint, these
 9  people can't be class members, and so --
10      A        Well, yeah.  I mean, I asked counsel, I
11  said I've got two people here less than 180 days, you
12  know, it appears that they should not be in the data
13  set, I intend to exclude them, does that seem
14  appropriate.
15      Q        And they said yes?
16      A        And received the answer yes.
17      Q        Were you instructed to throw out the
18  three people for whom there were confidentiality
19  issues?
20      A        Yes.
21      Q        What about code 99, the data entry error?
22      A        Okay.  This is an issue that arised when
23  I was looking at the codes, because if you look at the
24  codes, you know, most of them sort of look like -- I
25  mean, you can understand that they're saying something
```

Page 56

1  you ran on it other than what's here?

2      A       Well, I mean, obviously I had a computer

3  program, but it implements the rules that are given

4  here, these are all of the rules in the program,

5  unless I made a mistake.

6      Q       Okay.

7      A       But I believe these to be all the rules

8  in the program.

9      Q       Okay.  You had the EOIR database as well

10  and you had said that earlier?

11      A       The access database?

12      Q       The access data.

13      A       Yes.

14      Q       Right.  You didn't check the schedule

15  table data that you had, the adjournments, against

16  other -- other -- I don't know what the word is, other

17  tables in the access table database; is that right?

18      A       No, I did not check it against the access

19  table data.

20      Q       Why?  Any particular reason you --

21      A       I'm sorry.  I didn't hear.

22      Q       Why not?  Was there any protocol that --

23      A       No.  I mean, I certainly could have done

24  so if I had chosen, but my assumption is that they'd

25  been extracted from the same source, so they ought to

1    match, but I did not check them.

2         Q        Okay.  There was a spreadsheet you

3    received two days earlier, on September 25th, that was

4    slightly different and I couldn't tell from this what

5    the difference was between the September 25th and the

6    September 27th, this is on page 3 of your report.  Do

7    you remember?

8         A        Okay.  The difference primarily was there

9    was a -- I forget what the date was as of when the

10   original AC delays spreadsheet was harvested, but

11   there was a cutoff date, there was a last date.  Now,

12   it's a little actually difficult to determine that

13   because some of the hearings that are scheduled are

14   scheduled in the future, they don't have adjournment

15   codes yet, but there are future hearings with

16   scheduled dates with no adjournment code, but if you

17   looked at the ones that actually had adjournment

18   codes, you could see that there was sort of a last

19   date and I asked if there was more recent data

20   available because in calculating, for example, the

21   lengths of some of the delays it would have been

22   useful to know.

23              I mean, there were a few cases where I

24   didn't -- you know, I had a from date but not really a

25   to date, so I asked if it would be possible to update

Veritext National Deposition & Litigation Services
866 299-5127

1    performed any comprehensive analysis of it.

2        Q        Do you know if there are differences

3    between the underlying data, like, the people who

4    we're talking about and the cutoff date and things

5    like that between her data set and yours?

6        A        I have not compared them.

7        Q        How would you -- well, as it's used in

8    your report, how do you define "delay"?

9        A        Okay.  The delay is the time between an

10   adjournment and either the next record recording an

11   adjournment or a hearing or whatever, or if it comes

12   first, the departure from custody.

13       Q        Okay.  So it's not measured by reference

14   to any amount of time that would be sort of the normal

15   time required to do any particular -- to take any

16   particular steps in an Immigration proceeding; is that

17   right?

18                 MR. ATKINSON:  Object to the form.

19       A        I'm not sure.  How would I know what the

20   normal time was apart from what I have in the data?

21       Q        So is the answer to the question no?

22                 MR. ATKINSON:  Object to the form.

23       A        So far as I understand the question, the

24   answer is no.

25       Q        Well, I guess delay in some parlances has

                                          Page 64

1    a normative connotation, I take it that you don't mean
2    it to have a normative connotation?
3        A       No, no, I just mean the delay is the
4    length of time between A and B.
5        Q       Okay.  So then any adjournment after --
6    well, let me ask it this way:  Do you know if the time
7    period from when a detainee enters the court system
8    and there's the first court record you would see,
9    right, until the time when you have a scheduling
10   hearing, would you count that as -- would you treat
11   that as delay as well under your definition?
12       A       No, because I -- I mean, I suppose if I
13   were doing different analyses there would be an issue
14   there, but remember, I did only -- I only analyzed
15   those delays that were the length of time after an
16   adjournment that was considered at the request of the
17   alien, so since that would not -- I mean, the initial
18   processing would not be such an event, I would not
19   have included it.
20       Q       So you wouldn't make any claim, then, as
21   to whether or not any of the delays discussed in your
22   report are justified or warranted in any kind of
23   normative sense; is that correct?
24       A       No, I have no knowledge of that.
25       Q       Do you know if it's possible for a case

                                              Page 65

1    is preparation time; is that correct?

2         A         Yes.

3         Q         And do you know what that refers to, what

4    they're preparing for?

5         A         You know, I know -- I do not know

6    anything beyond the descriptions given here, my

7    assumption would be in the ordinary sense that it was

8    to prepare some material to provide to the court, but

9    I don't know what that material would be.

10        Q         And do you know if the detainee has a

11   right to prepare evidence to introduce to the court?

12        A         You know, I don't know legally what the

13   situation, I don't know what the legal requirement is,

14   no.

15        Q         And -- but whether it was true or not

16   would not change your analysis because you're not

17   making a normative claim about whether it's

18   appropriate to take a continuance for preparation;

19   right?

20        A         That's correct.  I am describing what

21   happened, not whether it should have happened or not,

22   but what happened.

23        Q         Okay.  So you'll forgive me, I hope, I'm

24   going to ask you the same question with respect to

25   certain of these.  So the second most common is to

Page 67

```
1    well, let me first ask, the fourth one, other
2    alien/alien's attorney/representative request, do you
3    know what that refers to?
4         A        All I know is the label.
5         Q        Okay.  Do you know if either of those can
6    be denied if there's lack of good cause?
7         A        I don't know.
8         Q        There's another one, do you know -- so --
9    or did you try and figure out if alien to file for
10   asylum or any of the other ones where it's -- it's
11   seeking to apply for some form of relief, if those
12   were used exclusively with each other as opposed to
13   overlapping?  So, for example, presumably an alien's
14   attorney or representative might request time in order
15   to prepare an asylum application, right, and then at
16   the same time you've got this other code, alien to
17   file for asylum, did you check to see if those were
18   ever overlapping?
19                  MR. ATKINSON:  Object to the form.
20                  You can answer.
21        A        There are cases where there is more than
22   one reason given, that's discussed in the report.  If
23   more that one reason is given in table one, I
24   tabulated all of the reasons, so the same adjournment
25   may count more than once in table one.

                                             Page 71
```

1          In later tables, however, I treated it as
2     a single adjournment, I only counted it as one, but
3     for the purpose of listing the types I counted
4     whatever types were present.  Now, there were not many
5     cases like that, but there where some, I don't
6     remember how many.
7          Q          And what about the decision to then
8     attribute -- in the later tables you're then
9     attributing percentages of delay or time periods of
10    delay to particular adjournments; right?  And how do
11    you make that decision where you've got two
12    adjournments that are both coded on the same day, but
13    for different reasons?
14         A          Okay.  If there are two adjournments --
15    that's what I was just saying.  If there are two
16    adjournments coded on the same day for different
17    reasons, for the purpose of table one I counted both
18    of them and I take the delay and I -- when I do the
19    mean delay it counts toward both of them.
20         Q          Yes.
21         A          However, after table one, I count it as a
22    single adjournment, so I don't have that problem.
23         Q          Well, but the delay --
24         A          After table one it's just number of
25    adjournments and delays and it counts as one

1  adjournment and I count the delay once.

2      Q       Okay.  I understand.

3              MR. ATKINSON:  As you're looking at

4              your outline, can we go off the record

5              to talk about timing for break?

6              MR. ARULANANTHAM:  Sure.

7      (Discussion off the record.)

8      EXAMINATION BY MR. ARULANANTHAM:

9      Q       So you're not claiming that these

10  adjournments are requested to frustrate the system or

11  for any nefarious purpose?

12     A       I have no -- I mean, all I know is what's

13  in the data sets, so, you know, they are -- why they

14  were requested to me is just I have this code and

15  that's all I used.

16     Q       Are you making the claim that detention

17  length is caused by adjournment requests?  And I mean

18  caused there in a strong sense, a causal sense.

19             MR. ATKINSON:  Object to the form.

20     A       Yeah.  I guess I'm having trouble with

21  that.  I mean, I actually never talked about the total

22  length of detention in my report at all.  All I talked

23  about was this is the total of the delays, so I mean,

24  I didn't analyze lengths of detention.

25     Q       But if -- let's leave detention length

                                        Page 73

1    detention, but that's all I can say.

2         Q       All right.  But even with respect to the

3    amount of time that the person's case took, even

4    there, all right, it's possible that there is some

5    other variable that has a stronger explanatory power

6    as to explain that amount of time than does alien

7    requested continuances; is that right?

8         A       Oh, yes.  I mean, I didn't look at any

9    variables beyond these delays.

10        Q       Do you know for the delays that are not

11   classified in your report as requested by the alien,

12   okay, do you know if -- would it be fair to attribute

13   the other, you know, all the other delays to the

14   government?

15                MR. ATKINSON:  Object to the form.

16        A       I don't know.  You know, I didn't look at

17   those.  I suppose that would really be a question for

18   the person who did the classification.

19        Q       All right.

20        A       All I can tell you is that these are the

21   ones that were attributed to the alien and I used

22   those.  I didn't look at a table and there were

23   some -- I remember there was one that was something

24   like joint request or something like that and I

25   remember that one was not attributed to the alien and

Page 75

1    where you've got two requests, one is coded as alien

2    caused delay and the other one is not, what's the

3    rational for counting that in your report?

4        A      Well, you know, I think that's as long as

5    the alien has made a request it seems reasonable to

6    count that. I mean, I don't know what I can say about

7    the rational beyond that. It could have been treated

8    differently, it's a fairly rare event, so it doesn't

9    have very much affect really, but --

10       Q      If that delay would have happened any way

11    is that -- how does that figure into your analysis?

12       A      Well, it does not figure into my

13    analysis, as I said.

14       Q      Okay.

15       A      If there was more than one and if one of

16    them is more attributable to the alien, I did

17    attribute it to the alien.

18       Q      All right. What about the length of the

19    delay, is it your understanding that when the detainee

20    requests a continuance that the detainee is requesting

21    continuance of a particular length?

22       A      I have no specific understanding of that.

23    I don't know. There has been some discussion that --

24    I mean, I do know that in some cases obviously another

25    hearing date has been set because there were dates

Page 77

mean, presumably the alien could say well, in that
case, let's go ahead or I'll take the next date you
have available or whatever, it's not clear.

I have no sort of opinion on that issue,
all I can do is tell you how I counted it.

Q        And did you try to determine from the
data that were there whether that phenomenon was
playing a role in that -- I mean whether that was sort
of a significant phenomenon that you described?

MR. ATKINSON:  Object to the form.

A        Well, I have no way of knowing what the
alien wanted, so no.

Q        Well, like, for example, there's, I think
one code for -- where is it?  On page 9, and there's
one entry for illness of witness, that is number 40,
and the delay is 51 days, right, like, presumably
that -- the fact that the next hearing happened on the
fifty-first day wasn't because the person got better
on the fiftieth day, right, it must be a product of a
scheduling --

A        Well, I don't know for sure, but that
sounds plausible.

Q        And the same phenomenon could be true
with respect to many of the continuances?

A        Oh, yes, certainly.  I would presume, and

Page 79

1  again, this is a presumption, but I would presume that
2  in many cases if you look at the uniformity here,
3  there's a lot of uniformity up at the top which
4  suggests that in many cases what's happening is it's
5  the next available date and it's about 40 days away,
6  at least in many cases.
7      Q       Right.  I'm sorry.  I didn't catch the
8  number, it's about how many days away?
9      A       About 40 days away for most of these
10 common things at the top.  Now, that's an assumption,
11 but I didn't think that was interesting was that if
12 you look at table nine for the mean delays for the
13 common reasons they're pretty much the same, there's
14 some variability, of course, you would expect that no
15 matter how they're caused, but it's not like there's
16 one that's 5 days and one that's 60 days, so, you
17 know, my assumption would be, but I do not know that
18 for a fact, that that reflects some sort of scheduling
19 imperative as far as available hearing dates goes, but
20 as I said, that's an assumption, I don't know, all I
21 did was measure the time.
22     Q       I guess I still want to know, then, what
23 we make of, like, even say page 2 of the report,
24 there's just the very kind of summary conclusions.
25 You say in the second bullet point for those aliens

Veritext National Deposition & Litigation Services
866 299-5127

1          MR. ATKINSON:  Object to the form.

2       A          Yeah.  I'm sorry.  I don't understand

3  what you mean by the ambiguity.

4       Q          Well, you had said earlier at the very

5  beginning of the deposition that there's a difference

6  in accuracy, potentially, between a reason that's

7  entered in that moment when something happens and a

8  reason that's entered a few days later, and I think

9  you had said you had seen this in some work that you

10 had done on job duties litigation, so I guess in that

11 context I'm asking you:  Does it matter whether the

12 reason for the adjournment is being entered on the --

13 in that moment in which the continuance is actually

14 being granted as opposed to a few days later?

15         MR. ATKINSON:  Object to the form.

16      A          Well, in the moment is best, but a day or

17 two later is -- depending on how many actions, you

18 know, how busy the court was and so on may not be bad.

19 The cases I'm talking about were cases where people

20 were trying to recollect things that had happened

21 weeks or months earlier.

22      Q          If there were dozens of cases that were

23 adjudicated over the, say, three days, would that make

24 a difference?

25      A          Yeah, I mean, that certainly would make

                                        Page 104

1    it more of an issue as to whether the person would
2    correctly remember.  On the other hand, you know,
3    you'd have to inquire into the process.  It's also
4    possible that the person makes notes at the time and
5    enters them into a database later, it's just hard to
6    say.
7         Q        Like, if the person has, like, a
8    handwritten and then is going to the computer
9    afterwards but the handwritten is contemporaneous,
10   that's what you're saying?
11        A        Yes.  I would need to know more about the
12   process to know whether this is likely a difficulty or
13   not.
14        Q        There's another adjournment now back on
15   the left-hand side at the top on November 5th, do you
16   see that?
17        A        Yes.
18        Q        And my -- when I was reviewing this the
19   corresponding data on the actions table seemed to be
20   November 8th, I'm wondering if you -- do you agree
21   with that that -- well, there's no adjournment on
22   November 5th, but there is an adjournment on
23   November 8th in the actions table?
24        A        Yeah, your statement is correct.
25        Q        Okay.  Now, going back up to the top of

Veritext National Deposition & Litigation Services
866 299-5127

1    adjournments appearing in the actions table that are
2    not in the schedule table, would that cause you to
3    change how you have done your analysis?
4        A    Well, if what you're saying is if I had
5    investigated this and found that there were actions
6    missing from the table I was using, would I have
7    corrected it, yes, I would have.
8             On the other hand, there are a lot of
9    embedded assumptions there which may or may not be
10   correct, namely that, you know, the database table is
11   more accurate than the spreadsheet table, which, you
12   know, we've talked about that, I'm not sure whether
13   that's true or not.
14       Q    I'm sorry.  Could I just go back, if
15   you'd excuse me for interrupting you, when you say
16   database more accurate than spreadsheet, you mean the
17   actions table is more accurate than the schedule
18   table, is that what you mean?
19       A    Yeah, if those are the sources of these
20   two, remember, I'm used to thinking of the left-hand
21   one as AC delays.
22       Q    I understand.
23       A    That's where this came from; right?
24       Q    Yes, the one on the left came from AC
25   delays.

Page 113

1      A      Yes. So --

2      Q      But let me phrase that correctly. Now

3  you're asking the questions and I'm answering them,

4  but my understanding is that AC delays came from the

5  schedule table and what we have here on the left is

6  the schedule table.

7      A      Well, all my answers assume what is on

8  the left is what is, in fact, in AC delays.

9      Q      Correct.

10     A      Well, you know, obviously one thing to do

11  is to go check that and see if that's, in fact,

12  correct.

13     Q      Did you check that? Did you check the

14  source from which AC delays was derived?

15     A      No.

16     Q      Sorry. Go ahead.

17     A      But making that assumption, you know, if

18  there were more adjournments in the other table than

19  were in the table that I was using, you know, there

20  are a couple of issues here. There is sort of a less

21  serious and a more serious one depending on how you

22  look at it.

23         One of them is it could affect the

24  counts. That, in a sense, might be less serious

25  because one would assume that at least in many cases

Veritext National Deposition & Litigation Services
866 299-5127

1    they would not be chargeable to the alien any way,
2    many of the delays aren't, so there's a pretty good
3    chance that if you found something there it wouldn't
4    have much effect, but it might, you know, I just don't
5    know.
6            On the other hand, they also terminate
7    other delays, and so the next question is -- that is
8    an adjournment terminates the delay from the previous
9    adjournment, so therefore, they would also affect the
10   lengths of time, again, that may or may not matter
11   because the previous adjournment may or may not have
12   been for a reason chargeable to the alien.
13           If it was for a reason that was not
14   chargeable to the alien, it's not going to matter
15   because I didn't tabulate those things any way.  If it
16   does, it potentially would matter.  Then you run into
17   does it matter a lot.
18           I mean, one would like everything to be
19   exact, but on the other hand, these things that are
20   one day off are really not probably going to make very
21   much difference to the analysis, we'd rather be right,
22   but realistically, given that databases are not
23   perfect, being one day off is not as serious as many
24   errors would be.
25           On the other hand, you know, sure,

                                              Page 115

1    that happens this late in somebody's record is going

2    to matter any way.

3         Q         Right, right.  What was the other issue

4    that you found?

5         A         I just looked and saw that one of

6    these -- there's custody status that says released on

7    9/16.  If that is, in fact, correct, and if I'm

8    interpreting correctly as a person that's no longer in

9    custody, nothing after that date matters to my

10   analysis anymore, because I would have dropped them

11   all.

12        Q         Right.  But that's on the question

13   whether this particular record -- the potential error

14   in this particular record affects any of your numbers,

15   but on the question of whether it suggests that there

16   is inaccuracy in the schedule table you would agree

17   the problem still remains because there appear to be

18   adjournments in the actions table that are not in the

19   schedule table?

20        A         We talked about that earlier, we don't

21   know which one should be given precedence.

22        Q         Right.

23        A         But let's put it this way:  To the extent

24   that the table that I used is missing adjournments,

25   that is obviously potentially a problem for the

                                            Page 118

```
1    analysis, perhaps a big one, perhaps a little one,

2    depending on how many and when they occurred and how

3    they play into the various analyses.

4         Q       Right.  And whichever one is more

5    accurate, I don't have a view as to which one is more

6    accurate, but whichever one is more accurate if there

7    is an inconsistency you'd want to do some

8    investigation to figure out, you know, what the source

9    of the inaccuracy is and which one is more accurate?

10        A       Ideally one would like to know that, yes.

11   I mean, obviously we would like to use the -- we know

12   our data won't be perfect, but we would like to work

13   on data that is as close to that as possible.

14        Q       Okay.  And on September 23rd, 2010, there

15   is an adjournment -- actually, yes, there's an

16   adjournment, it's the one, two, three, fourth -- I'm

17   sorry.  One moment.  Strike that question.

18                Yes, that's right.  On September 23rd,

19   2010, there is an adjournment, one, two, three, fourth

20   one down, do you see that?

21        A       Yes.

22        Q       There's no corresponding adjournment in

23   the actions table; is that correct?

24        A       As far as I can see, that's correct.

25        Q       And would you -- is that your view or is
```

Page 119

```
 1    make one finger print check to the detainee and the

 2    other -- attribute one to the detainee and the other

 3    one not?

 4         A        You know, I have some recollection I may

 5    have asked about this and the response I got was it

 6    was coded at the time, so there must have been --

 7    perhaps there was something different about it, but

 8    no, I mean, I have no knowledge of the underlying

 9    reason for why that might be treated differently.

10         Q        That particular delay, the 11/22/2011,

11    does it -- I think we -- does that have any

12    corresponding events of any kind with the actions

13    table?  There's an adjournment?

14         A        Well, there's an adjournment on that

15    date.

16         Q        So why did I ask you that question?

17    Okay.  I think that's the answer to that question.

18                  Let me show you one more 62 -- I'm sorry.

19                  This is an exhibit, we're at the number

20    to the top left says 6292159.  I'm handing that to the

21    court reporter, to Dr. Palmer, and to the others

22    seated with us.

23         (Whereupon Exhibit 7 was marked for

24            identification, 11/27/12, EMH.)

25                       MR. ATKINSON:  Thank you.

                                          Page 123
```

1    there's a delay attributed to the detainee, but
2    there's no corresponding action in the actions table
3    for that; right?
4         A        It is a concern.  Now, I would say in the
5    hierarchy of concerns, my concern actually may be a
6    little bit less about this than some of the others
7    because there's a general rule in dealing with data
8    that when you have presence and absence, you tend to
9    believe presence.
10             That is in most data sets that I've
11   reviewed and when I've been able to check things, if
12   you have a record in one data set, but not another,
13   the most likely reason is it got omitted from one of
14   them, it's less likely that it got made up and put in
15   one.  Now, that said, one would like to know the
16   reason.
17        Q        Right.  And what's the -- you earlier had
18   said it was your understanding of the process of how
19   these got entered that they're entered by court staff,
20   either the judge or a clerk; right?
21        A        That was what I said about the codes,
22   that was what I asked about the codes, but presumably
23   in order to enter the code, the record had to be
24   there.
25        Q        Right.

Veritext National Deposition & Litigation Services
866 299-5127

1   depends on how the databases were constructed by whom,

2   under what circumstances, and so on.

3           So, you know, I'm not saying that it

4   necessarily applies here, what I'm saying is that just

5   as a matter of principle, though, that seems to be a

6   little less concerning than the opposite situation

7   where I'm seeing adjournments in the database that I

8   don't see on the other side.

9       Q       Okay.   Understood.   Is there any -- well,

10  let me ask it this way:   If there were enough

11  inconsistency, dates not matching, entries not

12  matching, between this date -- the schedule database

13  and the actions table database, it might cause you to

14  say data is not reliable, cannot rely on it

15  altogether; right?

16      A       Probably it might cause me to say I have

17  to fix it.   I mean, that's a different issue.   That is

18  it might cause me to say, you know, I have to somehow

19  reconcile these two, I have to find someway to figure

20  out what's most likely to have happened.

21          You know, again, when you're dealing with

22  historical databases particularly, perfection is not

23  to be attained, but if there -- you know, and frankly

24  while, again, I want all my data to be as accurate as

25  it can be, I'm not terrifically disturbed when there's

```
1    the analysis from the two different databases and see

2    if they tell me the same thing.  I mean --

3        Q        I see, I see.

4        A        -- you know, if I get the result and one

5    way the average is 39 days and the other way it's 41

6    days, I'd like to know the exact answer, but

7    realistically for purposes of this litigation, it

8    probably doesn't matter.

9              On the other hand, you know, if one of

10   them tells me 39 days and the other one tells me 98

11   days, I'm going to worry.  So I don't really have a

12   quantitative, you know, it's -- you know, I hate to

13   say this, but it's really a matter of judgment.

14       Q        But you said, you know, 1 to 2 percent is

15   very common in databases where people nonetheless use

16   the databases for analyses, you gave me an outer

17   spectrum, I don't know if there's anything more you

18   can say about it.

19              What if we said -- and I haven't done the

20   analysis, so I don't know, but what if we said

21   10 percent of the records of the adjournments in one

22   table are not in the other or in this table and not in

23   this one?

24       A        I would be concerned with 10 percent.

25   Now, as I said earlier, might or might not matter.  I
```

1    might proceeded to check it and discover it made no

2    difference, but if I became aware it was 10 percent, I

3    would feel the need to check it to make sure it made

4    no difference.

5                    MR. ARULANANTHAM:  Can we take a

6                    break for just a minute?

7                    MR. ATKINSON:  Sure.

8    (Whereupon, a brief recess was taken.)

9    EXAMINATION BY MR. ARULANANTHAM:

10       Q        I'm going to pick up where we left off

11   before the break.  I was asking about numbers of

12   percentages of inconsistency that might make -- give

13   rise to concern.  What about kinds of inconsistency?

14   You had said, okay, if it's a date where it's, like, a

15   couple days off or something, that's not necessarily

16   going to be a concern.  Can you say more about that?

17   What kinds of consistency -- or inconsistency would

18   give you pause?

19       A        Well, there are several issues here,

20   first of all, as far as I can see from the database

21   here you -- in many cases, you can't tell the reason,

22   in some cases you can.

23                    So the reason would be one thing,

24   although, the only thing that's really important -- I

25   mean, I suppose the reason is important for my table

                                              Page 132

1    one as to what lines you get in, but on the other

2    hand, one can argue that table one is not all that

3    important in the larger scheme of things of what I

4    did, that's up to other people than me, but for the

5    later ones what's important about the reason is

6    whether it is attributable to the alien or not.  So

7    anything that affected whether it was attributable to

8    the alien or not would be important.

9         Q        Okay.  And does that mean, then, that if

10   you could -- if something in the actions table would

11   give you cause to question whether the description of

12   the reason for the adjournment arose, then that's

13   another kind of problem?

14        A        Yes.  Again, assuming particularly the

15   most important change would be one that caused --

16   would affect whether it was attributable to the alien,

17   you know.

18             An example might be if the one said, you

19   know, alien to submit asylum application and I didn't

20   have anything attributable to the alien in the

21   spreadsheet then I would be a little bit concerned,

22   and, of course, it would be the other way as well; if

23   there was something that made it clear, you know, that

24   the government asked for time for some reason and for

25   come reason the spreadsheet made it look like it was

1   the alien, I'd kind of want to know why.

2           For six of the seven tables I did those

3   two things and the dates are really all I used,

4   because all I did was count things and measure delays,

5   so -- and for those counts all that was important was

6   it was attributable to the alien, it wasn't

7   attributable to the alien, so those are the things

8   that would be of the most concern.

9       Q       Omissions, we talked about, in some of

10  the examples I showed you, if there were omissions in

11  either table that would be a cause for concern; is

12  that right?

13      A       Well, omissions in the database table

14  don't -- I mean, as long as the thing actually

15  happened don't -- aren't a problem.  I mean, remember

16  my analysis used the spreadsheet, so if something's in

17  the spreadsheet but not the database table, as long as

18  we're convinced that it really happened, the fact that

19  the database table isn't right isn't a problem because

20  I didn't use it.

21      Q       Right.  But if there were enough

22  omissions that might cause you to question whether the

23  events actually happened; right?

24      A       Yeah, I suppose.  I would want some kind

25  of assurance -- I would want to some database

                                        Page 134

1    custodian to explain to me why this was happening and
2    give me some assurance that what I was looking at was
3    right.
4         Q       Even with the small delays that you have
5    seen, I mean, the small date discrepancies, like the
6    one, two day date discrepancies that we talked about,
7    does that give you a desire to learn more about the
8    process for how adjournments get coded?
9         A       Yes.
10        Q       In some respects you did a very vigorous
11   check for the consistency of the database like checked
12   all the names, cross-checked these dates, things like
13   that, but then you didn't check against the actions
14   table, you know, other things that we walked about
15   that you didn't do, is there a method, like, why do
16   you do some kind of consistency checks and not others?
17        A       Well, I think it's automatic for most
18   statisticians to do internal consistency checks on any
19   data they receive.  You know, you always worry
20   about -- I mean, some things even the statistical
21   program will spit up if you get a date of
22   February 30th, so you worry about that, you worry
23   about those kinds of things.
24              Comparing with sort of other data sets is
25   important if you have reason to believe that the other

                                            Page 135

```
1              Now I've given you a little bit of reason
2    to believe, perhaps, that there might be adjournments
3    missing because there are some adjournments in the
4    actions table that are not in the schedule table, but
5    my question is:  Is that analogous to you, do you
6    think now there's a reason to go back and look and see
7    if there are adjournments that did not get classified?
8              MR. ATKINSON:  Object to the form.
9        A     I think that there's a reason for me to
10   check with those who understand the databases better
11   than I do about how these databases relate and whether
12   the database I used is really correct.  Now, that's
13   sort of the best I can tell you there, you know.
14       Q     Okay.  That makes sense.
15             One last line of questioning on this
16   subject which is:  You had said that if there's
17   10 percent of them missing the -- you know, that's a
18   serious problem, you know, 1 to 2 percent is really
19   common, I mean, is there some -- what's the line in
20   between there?
21       A     You know, there's a famous saying in
22   mathematics, you know, someone who has five hairs
23   counts as bald, someone who has 100,000 doesn't,
24   somewhere there must be a dividing line, but it isn't
25   really clear where it is.
```

Veritext National Deposition & Litigation Services
866 299-5127

1   you know, in my discussion of this, there are some

2   kind of studies where that may be perfectly reasonable

3   where you want some people to count more heavily than

4   other people, and that's fine, but if -- you know, in

5   a case where what you're doing is doing data over

6   individuals the usual assumption is that every

7   individual should count the same unless there's some

8   reason not to and that every kind of individual should

9   count the same.

10        Q        When might be an example where you do

11  want to capture -- you know, capture people in a way

12  that isn't random?

13        A        Well, I gave an example in here, at the

14  hospital, where the hospital wants -- if the hospital

15  wants to know with their workload, the person who's

16  there for a long time really does represent the higher

17  proportion of their workload than the people who come

18  through for one day, so if they want to know about

19  their workload, they should be counting that person

20  more, because it's more of the workload.

21        Q        All right.  Could you give me other

22  examples of that.  When else might you care about

23  that?

24        A        Well, a facetious example is would be if

25  some people got to vote more than once, but let's hope

Page 157

1    that doesn't happen.  I'm trying to think of sort of
2    similar situations.
3          Q        What about the Census?
4          A        I'm sorry.  I didn't hear you?
5          Q        The Census, the Census, you know, the
6    Census?
7          A        Oh, yes, the Census.  That's a good
8    example.  The Census makes an effort to contact
9    everyone but they have a problem that there are
10   certain kinds of people, those with no fixed residence
11   and so on, that are very hard to contact, and so they
12   attempt to identify those people in a variety of ways,
13   but, in fact, they're probably undercounted and that
14   probably introduced some bias into the Census.
15         Q        But do they try harder -- am I right that
16   they try harder to contact those people than they do
17   other people so at the sort of threshold level
18   methodologically it's -- you'd assume that every
19   attempt to contact people sort of would lead -- you
20   know, is equally good, then you would expect that they
21   would be overcounting those populations?
22         A        Well, I would be very surprised if they
23   were overcounting them because they're very hard to
24   find.
25         Q        Right, they're not overcounting them, but

                                           Page 158

1    my point is they don't try equally hard to contact all

2    groups of the population, they try harder to contact

3    some than others; right?

4         A       Yes, but they're trying to do that to

5    restore what they consider the proper balance in terms

6    of actually contacting people.

7         Q       That's because there's a sort of separate

8    form of inaccuracy?

9         A       No, I'm saying that that's what they do.

10   Actually, there's been a lot of political dispute

11   about it and I'm not sure what the current status of

12   it is, but there was a time, I believe, where they did

13   that and I think then there was some political

14   activity and I don't know what the current situation

15   is.

16          I know that the census actually wanted to

17   adjust its head count for these things and I believe

18   it was not allowed to do so by law.

19         Q       Right.  Right.  Leave aside the -- I also

20   don't know what happened and what they're actually

21   doing now, but I think the next question I was going

22   to ask was there is -- if you just tried equally hard

23   to count everyone, then the fear is that that would

24   produce some form of inaccuracy; is that right?

25         A       Yeah, it produces inaccuracy particularly

Page 159

1    at the group level.  That is, one could assume for

2    demographics, an obvious one is income, one can assume

3    that people with no fixed abode probably have on the

4    average lower income than people who are easier to

5    contact and, therefore, that would tend to bias your

6    income statistics, because you would -- people would

7    tend to look richer than they should because you're

8    missing some of the people who are down toward the

9    lower end.

10        Q       What if you were interested in analyzing

11   tax returns and you've got a small number of people

12   who make lots and lots of money, is that -- can you

13   imagine that's another situation where you might be

14   interested in introducing a selection system which

15   tried harder to get those people than to get other

16   people?

17        A       Sure.  In fact, the technical term would

18   be over sampling.  In that case one might deliberately

19   over sample.  It's fairly common actually in a lot of

20   situations.

21             I had a case that involved once what was

22   happening at drugstores and what they really wanted to

23   know is was what happening sort of chain wide but some

24   stores were much bigger than others, so we recommended

25   they draw a higher proportion of stores for a sample

1   from the larger stores than they did from the smaller

2   stores because an error in the average of what was

3   going on in the larger stores was more serious because

4   they were seeing more people, so that would be a

5   problem.

6          So, now, understand that once we got the

7   results, we put them back correctly taking into

8   account the fact that we didn't just average them out

9   because we had more one type than another, we had to

10  put them back correctly by re-weighting them correctly

11  in order to get them right.

12      Q      So you try harder to find them, but after

13  once having found, them you weight them in a way that

14  tries to achieve what?

15      A      Try to make it representative of the

16  population as a whole.

17      Q      Are you familiar with censoring, that

18  content?

19      A      Yes.

20      Q      And how would you define it?

21      A      Ordinarily one says that data are

22  censored when one cannot observe extreme values.  We

23  normally think in terms of high values, but

24  occasionally it's low values also.

25          An example would be if you're doing a

                                        Page 161

1    complicated answer to that.

2         Q        Go right ahead.

3         A        If you're going to tell me you want me to

4    do the best I can to estimate detention lengths, the

5    answer is I would limit the sample to the in period

6    ones, yes, because the out of period ones bias it,

7    they're all long.

8              On the other hand, if I'm actually making

9    my best estimate and if I can make the assumption that

10   things have not changed over time, then I can use the

11   out of period cases to get some idea of how quickly

12   people might fall out of formation from the in period

13   group in later time periods.

14             So I wouldn't use them directly, but I

15   might use that information directly to see, you know,

16   what kind of assumption should I make about this

17   person who has -- I see they're already waiting for 14

18   months and that's all I know, can I go back and see

19   what happened to people -- as many people who were

20   there for at least 14 months, how much longer they

21   stayed.

22        Q        You would use that method if you

23   believed -- or in order to use that method, wouldn't

24   you have to believe that people who are detained for

25   some very long periods of time could be -- I'm sorry.

                                        Page 164

1   we think this is, we'd have to assume that the
2   percentage of people who have been detained for some
3   much longer period of time is representative of the
4   percentage who are going to be detained for that
5   period with respect to the in period?
6       A       Not really.  Let me explain what I'd have
7   to assume and see if -- the first thing is that I have
8   to make sure that I have for my estimation, you know,
9   it depends on how far back you go.  I might have a
10  problem with people who have only been detained for 14
11  months because I need to know what has happened in the
12  past to people who have been detained for at least 14
13  months and I need to have an unbiased sample of that,
14  I can't just have the people who were not only there
15  for 14 months, but were there for three years or I'm
16  not going to be able to tell how fast they fell out of
17  formation after 14 months, so what I would have to
18  assume is if you look at the present -- assuming I had
19  a good sample of that, I would have to assume that if
20  you looked at the present number of people, let's say
21  18 months because it's convenient, if you look at the
22  present number of people who have been in detention
23  for 18 months that the distribution of how long they
24  would remain in detention would be the same as that
25  for a group of people who had been in that situation

                                        Page 166

1    in the past.  That is people who in the past, if I
2    have a good sample of all of those from some period
3    who had been detained at least 18 months.
4              That's why I said that you have to be
5    willing to make the assumption that conditions haven't
6    changed over time.  If conditions have changed so that
7    things are faster or slower, then the assumption isn't
8    going to be very good.
9         Q       Okay.  Let me go back and ask you some
10   questions, again, recognizing you didn't measure
11   detention length; right?
12             You would agree that if you only limited
13   the sample to in period detainees and you made no
14   other adjustments, you just took the detention lengths
15   for inpatient detainees, that would also not be an
16   accurate account, that way of measuring the detention
17   length for this population; right?
18        A       I assume what you want to do is manage
19   your average detention length.  I mean, there are
20   things you could measure about detention length
21   because there are only a certain number of them that
22   are still in process, for many of them we know the
23   detention lengths, so if you wanted to know the median
24   or the 75th percentile or whatever, you might very
25   well be able to do that.

1          Now, if what you want to do is know the

2     mean, that's harder, because for that you need to know

3     the total and the total is hard to get, you have to

4     estimate that, so --

5          Q     Right.  Let me just -- just to make sure

6     this is clear, the reason why you can't rely on just

7     the in-period detainees to get the mean, right, is

8     because it is right censored, it fails to capture

9     people detained for long periods of time; correct?

10         A     Yes.  Some of them are still in detention

11    and therefore you do not know for sure how long their

12    detention will last.

13         Q     And if you only took inpatient detainees

14    and measured it on that, am I right that you couldn't

15    get a detention length longer than something like 30

16    months, because you've got 180 days and then you've

17    got a roughly, you know, two-year period after that;

18    is that right?

19         A     There would be some maximum, I'm not sure

20    exactly what it is, but there would be some maximum of

21    something like that, I'd have to look it up and see

22    how exactly how late the data go.

23         Q     Okay.  And you'd also be cutting off

24    people, I mean, that's the maximum that you would get

25    if a person sort of just got in because their 180th

                                              Page 168

1      A      It would certainly have an effect, but,
2 you know, understand that the group size is really
3 important here.  I mean, if only 1 percent of people
4 were still going and even if you lost three years for
5 them, three years for 1 percent of the population is
6 .03 years, so it's about ten days.
7           Now, whether that's important or not is
8 not really for me to say, but compared to the mean
9 length that's probably a fairly small amount, so one
10 would like to have it exact, but at some point the
11 number becomes so small that, again, unless the
12 detention is going to be unbelievably long, it's not
13 going to matter very much.
14      Q      But if you were particularly concerned
15 about the due process problems arising from detaining
16 somebody for that substantial length of time, much
17 longer than 30 months, then analogous to the Census
18 concept, right, you might want to make sure to capture
19 those people even though they're a small percentage of
20 the total; is that right?
21      A      Yes.  I mean, for some purposes it might
22 be important to have information specifically about
23 those people, I take that to be your question.
24           Now, your purpose is a legal purpose, and
25 I can't say what's appropriate for a legal purpose,

Veritext National Deposition & Litigation Services
866 299-5127

1    but there -- I certainly agree that there are purposes

2    for which that 1 percent could conceivably be

3    important, or at least there may be.

4         Q       All right.  Oh, leaving detention length

5    just for one moment, when you were calculating the

6    lengths of adjournments, there were some people who,

7    you know, there wasn't a final action for those

8    people, too; right?  In other words, sort of analogous

9    problem, there are people for whom you have a cutoff

10   date and the adjournment is extend beyond that cutoff

11   date; right?

12        A       Okay.  There are a couple of issues, but

13   no, I don't -- now, I would have to look, but I

14   remember checking for that and I don't believe it

15   happened, because remember, future hearing dates are

16   present, there are no --

17        Q       Right.

18        A       -- there are no adjournment reasons for

19   those dates, but future hearing dates are in the file,

20   so I think that between future hearing dates and the

21   dates people left detention I was actually able to

22   find a closing date for all of them.  Now --

23        Q       Okay.

24        A       -- there was a point at which I was

25   missing a few, but I think I ultimately found them for

Page 171

## REPORTER'S CERTIFICATE

I, ERIN M. HUTTER, Registered Professional Reporter and Notary Public, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney or of any of the parties nor financially interested in the action.

_Erin M. Hutter_
ERIN M. HUTTER, RPR

Veritext National Deposition & Litigation Services
866 299-5127

# EXHIBIT E

4

ALEJANDRO RODRIGUEZ, et al.,

5         Petitioners,

6    vs.                    CASE NO. CV 07-3239-TJH

7    TIMOTHY S. ROBBINS, in his

8    capacity as U.S. Immigration

9    and Customs Enforcement, Los

     Angeles District Field Office

10   Director; JANET NAPOLITANO, in

11   her capacity as Secretary of

12   Homeland Security; and ERIC H.

13   HOLDER, JR., in his capacity

14   as Attorney General of the

15   United States,

16         Respondents.

     _____

17

18       DEPOSITION OF CHESTER PALMER, Ph.D.

19   taken on December 21, 2012 commenced

20   at 11:38 a.m., taken at 4901 Tower Court,

21   Tallahassee, Florida, before SANDRA L. NARGIZ

22   Certified Realtime Reporter, Certificate of

23   Merit Holder

24

25   PAGES 1 - 116

                                   Page 1

```
 1   APPEARANCES: (ALL COUNSEL BY TELEPHONE)

 2

     REPRESENTING PETITIONERS:

 3           AHILAN ARULANANTHAM, ESQUIRE

 4           aarulanantham@aclu-sc.org

 5           MICHAEL KAUFMAN, ESQUIRE

 6           mkaufman@aclu-sc.org

 7           Michael Kaufman

 8           ACLU of Southern California

 9           1313 West 8th Street

10           Los Angeles CA 90017

11

     REPRESENTING RESPONDENTS:

12           SARAH S. WILSON, ESQUIRE

13           sarah.s.wilson@usdoj.gov

14           THEODORE ATKINSON, ESQUIRE

15           theodore.atkinson@usdoj.gov

16           Theodore W. Atkinson

17           U.S. Department of Justice

18           Office of Immigration Litigation

19           District Court Section

20           450 5th Street, NW

21           Washington, DC 20004

22           (202) 532-4135

23

      ALSO PRESENT:

24           Michael Sheen

25           Susan B. Long
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

```
1                        INDEX

2    WITNESS                                    PAGE

3    CHESTER PALMER, Ph.D.                        4

4       Direct Examination by Mr. Kaufman        4

5                    INDEX OF EXHIBITS

6                 (Exhibits are attached.)

7    NO.   Description                          PAGE

8    Exhibit 13  Rebuttal Expert Statistical Report of 12

9                Dr. Chester I. Palmer

10   Exhibit 14  Rebuttal Expert Report of Professor   31

11               Susan B. Long

12   Exhibit 15  Declaration of Benjamin B.           64

13               McDowell 12-14-12

14   Exhibit 16  CONFIDENTIAL-Deposition transcript   89

15               of Benjamin McDowell

16   Exhibit 17  Series of printouts                  90
```

17

18

19

20

21

22

23

24

25

```
1                        STIPULATIONS

2          The following telephonic deposition of CHESTER

3   PALMER, Ph.D. was taken on oral examination, pursuant

4   to notice, for purposes of discovery, and for use as

5   evidence, and for other uses and purposes as may be

6   permitted by the applicable and governing rules.

7   Reading and signing is not waived.

8                          * * *

9

10          THE COURT REPORTER:  Would you raise your

11       right hand, please?  Do you swear or affirm that

12       the testimony you are about to give will be the

13       truth, the whole truth, and nothing but the truth?

14          THE WITNESS:  I do.

15          THE COURT REPORTER:  Thank you.

16   Thereupon,

17                   CHESTER PALMER, Ph.D.

18   was called as a witness, having been first duly sworn,

19   was examined and testified as follows:

20                   DIRECT EXAMINATION

21   BY MR. KAUFMAN:

22       Q   Could you state your full name for the record,

23   please.

24       A   Chester I. Palmer, Jr.

25       Q   Dr. Palmer, I understand that you have been
```

1  fairly clear that people would see as material, the some

2  effect falls somewhere in between those two extremes,

3  correct?

4      A    Yes.

5      Q    With respect to the court proceedings

6  statistics, did you find that the effects that you noted

7  in choice of population, those effects moved in one

8  direction or the other, that is to say that the choice

9  of population led to either more people being counted as

10 having BIA and Ninth Circuit proceedings or less BIA and

11 Ninth Circuit proceedings?

12     A    Yes.  As my report says, continuing in the

13 paragraph you were just reading, out-of-period aliens

14 had more.  So therefore using the full dataset tends to

15 produce higher percentages than using just the in-period

16 people.

17     Q    And is it your view today that the estimates

18 for the in-period population are best estimates for

19 determining the statistics on court proceedings?

20     A    Generally, yes.  There is an issue that it is,

21 I suppose, possible that there would be cases where

22 people who have not yet gone to the Ninth Circuit might

23 choose to do so.  I suppose that's also true at the BIA,

24 but I would guess that to be less likely since that

25 seems to come earlier in the proceedings in most cases.

Page 15

```
 1        appropriate.

 2              If you really wanted to make your best

 3        estimate -- and I have not attempted to do this, I

 4        have not studied this issue.  But if you really

 5        wanted to make your best estimate, the best way to

 6        do it would be to take the in-period group and try

 7        to make some kind of an adjustment for what is

 8        likely to happen in the future based on patterns in

 9        the past.

10  BY MR. KAUFMAN:

11        Q    If I understand correctly, isn't that what

12  Dr. Long attempted to do in her rebuttal report?

13        A    Yes.

14        Q    So you would endorse that as a correct

15  approach to studying the court proceedings statistics?

16        A    I am endorsing the general approach, not

17  necessarily the way she implemented it.

18        Q    Yes, I understand that.  Thank you.

19              Dr. Palmer, I would like to now turn to

20  statistics on outcomes of class members cases.  And I

21  will refer you to again page 8 of your rebuttal expert

22  report.  In the same paragraph that we were discussing

23  earlier, you state that, quote, not much affect upon

24  other percentages, such as the percentages of those

25  applying for relief, is affected by the choice of
```

1   doesn't seem like a very good descriptive statistic.  It
2   seems like you need to know more.

3         Now Dr. Long did give more on one of her sets
4   of data in her first report.  But only on one.  And she
5   gave a much more complete distribution than it's really
6   practical to give for all of the numbers.  So I settled
7   for this sort of intermediate strategy, but I readily
8   agree that other strategies also would be acceptable.
9   But it just doesn't seem to me that just giving the mean
10  is a very good thing to do.  Done.

11        Q   I thank you, Dr. Palmer.  That was very clear.
12  And I just want to follow up on one thing you mentioned
13  and that is the inappropriateness of using a single
14  statistic to represent a complex dataset like that like
15  we have here; does that concern apply equally to the
16  median as it does to the means?

17        A   Well, the median is a better representative
18  than the mean, but I don't think it's enough by itself,
19  if that's the nature of the question.

20        Yes, I agree that I began by saying I don't
21  think any one number is a good number here.  There are
22  datasets that can be accurately described by one number,
23  but this is not one of them.

24        Q   Thank you.  Now, Dr. Palmer, is one of the
25  reasons why you think the median is a more appropriate

                                                  Page 26

```
 1   would like to refer you to Exhibit 14 we just
 2   introduced, page 12 of that document, if you could take
 3   a look at footnote 6.  And I will refer you to the last
 4   two sentences of that footnote beginning, for example,
 5   "One class was placed back into custody on the day
 6   following an adverse decision by the BIA and remained
 7   detained during the class members Ninth Circuit appeal.
 8   While he was counted as not detained in my earlier
 9   report, he is counted as detained here."
10           Dr. Palmer, does this indicate to you that
11   there is, in fact, a case of re-detention in the
12   dataset?
13       A    Yes, there certainly appears to be.  I mean, I
14   am assuming the accuracy of the statement, of course.
15   But yes.
16       Q    Do you have any reason to doubt the accuracy
17   of that statement?
18       A    No.
19       Q    So Dr. Palmer, if we assume that there is a
20   possibility which has been demonstrated in the dataset
21   of re-detention, could the median be affected by
22   re-detention?
23       A    The median could be affected by re-detention.
24   It would not likely be affected very much unless there
25   was quite a lot of re-detention going on.  But it
```

Page 32

1  certainly could be affected, yes.

2      Q    That would mean that the medians that you

3  report in your report underestimate the median length of

4  detention, correct?

5      A    Yes.  Again, presumably by a not very large

6  amount.  But, yes, that would be the direction.  Done.

7      Q    Now, Dr. Palmer, I would like to return back

8  to the general topic we were discussing earlier about

9  whether the median is a better choice than a mean as a

10  single value to describe this dataset.  And I believe

11  you indicated that the censoring issue is a minor reason

12  why you preferred the median as a single value, but

13  there were more, I guess, substantial reasons you

14  preferred; is that correct?

15      A    Well, minor might be too strong, but it's not

16  the principal reason.

17      Q    And what is the principal reason?

18      A    The principal reason is that in a dataset that

19  is skewed as this one is, this dataset has a substantial

20  skew -- that's a technical term in statistics, s-k-e-w.

21  That means that it's asymmetric around the middle.  It

22  means you would see sort of a big short hump to the left

23  and a long skinny stretched-out tail to the right.

24          You can see that most readily by looking at

25  one of my tables.  May I refer to one of my tables here?

Sarnoff, A VERITEXT COMPANY
877-955-3855

1    didn't think any one number was good.

2         Q    And the median, I guess, is not good because

3    it doesn't tell you anything about the asymmetry of the

4    dataset that -- the values on either side of the median,

5    correct?

6         A    It doesn't give you a picture of the extreme

7    values.  It tells you where the middle comes, but it

8    doesn't give you a picture of what statisticians called

9    the tales of the distribution, the left and the right

10   end.  And that's why in my little table I gave 10th,

11   90th percentile, and also shortest, longest.

12        Q    Now, in your report you stated the median

13   better captures the, quote, typical detainee, correct?

14        A    Yes.

15        Q    And in your view, is this case about typical

16   detention cases?

17        A    You know, I cannot tell you what the case is

18   about.  But that really is not the question.  The

19   question is what is the purpose of this particular

20   statistic?

21             If the purpose of this particular statistic is

22   to give an idea of how long class members are being

23   detained, it would seem that one would want to know what

24   was typical for class members.  That admittedly is not

25   the same as what's typical for everyone, but that's a

                                              Page 36

1    separate issue.  Done.

2         Q    Thank you.  Just to summarize, Dr. Palmer, you

3    would agree that there is some value in knowing the mean

4    detention time for class members, correct?

5              MS. WILSON:  Object to the form.

6              THE WITNESS:  Well, I mean I supplied it as

7         one of my descriptive statistics, so I suppose I

8         have to say yes.  But -- and I think anybody would.

9         I think the value was limited but, yeah, it's

10        there.  And it certainly has value in certain

11        calculations.  As I said, one of Dr. Long's

12        calculations requires it.  So there are

13        circumstances for which you need it.  So by

14        definition I guess that makes it valuable.  Done.

15   BY MR. KAUFMAN:

16        Q    Thank you.  But Dr. Palmer, I want to return

17   now, I guess, to the topic of censoring which is

18   something I know you discussed at length during your

19   prior deposition.  And just to make sure that you and

20   are on the same page, can you again give me a definition

21   of what censoring is.

22        A    Okay.  Perhaps I will give a less elaborate

23   one than I did before and may I discuss what censoring

24   is in the context of this particular dataset?

25        Q    Yes, please.  Thank you.

Sarnoff, A VERITEXT COMPANY
877-955-3855

1 500 and counting now, you could -- and do similar things

2 for each censored observation, you could get an exactly

3 correct answer.

4         Now that, of course, is unrealistic. And I

5 guess in a sense it's not exactly correct anyway because

6 these people right now may not be average compared to

7 people in the past. But you would get an optimal

8 answer.

9         Now saying it that way makes it sound easier

10 than it is. There are a lot of problems with gathering

11 the data and doing the calculation and trying to make

12 sure that it's right. But that's the general approach I

13 think that most people would take, most statisticians

14 would take in this situation.

15         The other approach I think I also mentioned,

16 but I think it's unlikely to work here, if you had

17 enough people you could try to sort of form a

18 distribution of detention lengths; and if you could

19 somehow get some mathematical form for that, you could

20 use that to answer the question also. But that's an

21 even harder problem than the first one. Done.

22     Q    Thank you, Dr. Palmer, that's very clear.

23         Did you try either of these methods for

24 correcting for censoring with the in-period population?

25     A    No, I didn't really have a sensible sample to

                                              Page 41

1  mean, correct?  Sorry, let me rephrase that.

2        Of the statistics you report in your rebuttal

3  report, censoring affects more than the means, right?

4        A    Yes, it affects the upper percentiles, the

5  90th percentile particularly, and, in fact, it's likely

6  to affect that much more than it does the mean.

7        Q    And are there other statistics in your report

8  that are affected by censoring?

9        A    The highest value and in some cases the

10  75th percentile.  That seems to vary, if I remember

11  correctly, from one table to the next.  Sometimes

12  75 percent of the lengths are in without considering the

13  lengths of the people who are still detained; sometimes

14  they are not.

15       Q    For the statistics that are affected by

16  censoring, that would be the mean, the 75th percentile,

17  the 90th percentile, and the highest detention lengths,

18  all of those underestimate detention lengths as a result

19  of censoring, correct?

20            MS. WILSON:  Object to the form.

21            THE WITNESS:  Yes.  By definition, if you

22        don't take censoring into account essentially

23        anything is an underestimate.

24            I am sorry, I should say that -- I need to

25        correct that.  Obviously the median isn't if you

                                        Page 45

```
 1          have over 50 percent of it.  But anything that is
 2          still undetermined is an underestimate.
 3   BY MR. KAUFMAN:
 4          Q    And do you have a sense of how great those
 5   statistics underestimate detention length as a result of
 6   censoring?
 7               MS. WILSON:  Object to the form.
 8               THE WITNESS:  I don't understand the question.
 9   BY MR. KAUFMAN:
10          Q    You just testified that those statistics we
11   discussed are affected by censoring, correct?
12          A    Yes.
13          Q    And that they underestimate detention lengths,
14   correct?
15          A    Yes.
16          Q    By how much do they underestimate detention
17   lengths?
18          A    Without doing some fairly elaborate work, it's
19   very difficult to tell.  Some of them obviously more
20   than others.  The one most affected is the maximum
21   length.
22          Q    You don't know how greatly the statistics on
23   mean, 75th percentile and 90th percentile and greatest
24   detention length, are underestimated as a result of
25   censoring?
```

MS. WILSON:  Object to the form of the

     question.

         THE WITNESS:  I don't know exactly.  I am able

     to make some kind of range estimates which I do in

     the report.

BY MR. KAUFMAN:

     Q    What are those range estimates?

     A    Let me find them.  Okay?  (Examining

documents.)

         It's fair to say, by the way, that although I

don't know exactly, no one else knows exactly either;

only the future will tell us exactly.  None of these

estimation methods will tell us exactly.

         All right.  It's on page 7.  If you look down

just before subheading C, go up about halfway in that

paragraph, you see a sentence, a third of the way in

that paragraph, a sentence that begins with also.  "Also

in this particular table."

     Q    Yes, I see that.

     A    And what it does is point out that 5.4 percent

of the detentions are ongoing.  So what that means is if

you assume that they are all going to last another year,

then the mean would increase by .054 years.  And if you

work out what that is, it's about 20 days.

         So if you assume that they are all going to be

                                            Page 47

there on the average another year, the means is going up

20 days.  If you assume that they are going to be there

another three years, it's going up 60 days.  If you

assume they are going to be there another 10 years, it's

going up 200 days.

Now, that at least gives you some idea of

what's rational here.  It's probably not rational to

assume that the average detention in that group is going

to be another 10 years, at least for many of the numbers

that I have seen.

Dr. Long would have a better idea of whether

it's a rational value for this than I do.  But that

gives you some idea of roughly how large the effect

would be on the mean.

It's much more difficult to estimate the

effect on some of the other numbers, again particularly

for the maximum, because the maximum is affected by the

one case out of these hundreds that goes the longest.

Done.

Q    And I am sorry, Dr. Palmer, but why would

Dr. Long be the person to make the best rational guess

as to the likelihood of future detentions?

A    She knows a lot more about the underlying

subject of detention and lengths of detention and things

like that than I do.  My knowledge is limited to this

Page 48

1    dataset.

2         Q    I see.  Thank you.  I want to return to that

3    example you offered in that paragraph, that if we assume

4    people are detained in the future for another year.  I

5    am curious about why you selected one year as the value

6    for anticipated future length of detention.  Did you

7    have some basis for assuming one year?

8         A    No, it was a value of convenience.  Obviously

9    you can scale it.  If it's two years, it's twice as

10   much, and so on.

11        Q    Are you aware that people routinely get

12   detained for years at a time in immigration detention?

13             MS. WILSON:  Objection.

14             THE WITNESS:  I am aware that some detention

15        periods are long.  One can see that in the

16        out-of-period data.

17   BY MR. KAUFMAN:

18        Q    So you are not confident that one year is an

19   accurate representation of future length of detention

20   for those still detained population, correct?

21             MS. WILSON:  Objection.

22             THE WITNESS:  No, that's correct.  I believe

23        the report makes that clear.

24   BY MR. KAUFMAN:

25        Q    Dr. Palmer, I wanted to return to another

                                                    Page 49

1   point that you make in that same sentence, that is that

2   if we assume a year, it would increase the mean by

3   20 days, correct?

4       A   Yes.

5       Q   In your view, is 20 days not a statistically

6   significant amount?

7       A   Okay.  We need to back away a little bit here

8   and I think I missed this the first time.

9          Statistically significant is a term of art,

10   and this isn't what it means.  So I got around that by

11   saying substantial.  So may I modify the question

12   accordingly?

13       Q   Yes, please, go ahead.

14       A   I think 20 days may be on the verge of

15   substantial.  I would think that 40 days is substantial,

16   clearly.

17       Q   So if we assume that this future length of

18   detention was something north of a year, let's say it

19   was two years for the still detained population and that

20   would get us to the arena of substantially significant,

21   the differences in the mean, correct?

22       A   I am sorry --

23       MS. WILSON:  Object to the form.

24       THE WITNESS:  The problem is the word

25   "significant," not the word "substantial" -- not

Sarnoff, A VERITEXT COMPANY
877-955-3855

```
1        the word "statistical."

2             But, yeah, I mean, I have indicated that I

3        think that differences of sizes of 30 days, and so

4        on, I think most people might think that a month

5        was a meaningful difference here.

6             Now, whether that's meaningful in terms of the

7        legal issues in this lawsuit, I cannot say.  But

8        certainly it's large enough that I think one

9        probably should pay some attention to it.

10            So basically, yes.  Now remember that's the

11       average for the group as a whole.

12            We actually have some information on this, by

13       the way, if you are interested in it.

14  BY MR. KAUFMAN:

15       Q    Please go ahead.

16       A    If you look at page B3, this shows results

17  from Dr. Long's data and from my data, and I am going to

18  use them for somewhat different purposes here, but I've

19  already concluded up above -- and I noticed that

20  Dr. Long says in her rebuttal report -- that really the

21  issues of who we included or excluded in our original

22  report have very little effect on the results.  So let's

23  just take those as comparable for the moment.

24            If you look at her original data, if you look

25  at the in-period aliens, we see there were 35 percent of
```

Page 51

1  Q Would you agree that if you wanted to come up

2 with the best estimate for the number of class members

3 who take appeals, that you would use the in-period

4 sample and apply some adjustment for censoring?

5  A Yes.

6  Q Would you agree that if you wanted to come up

7 with the best estimate for the average detention length

8 for class members, that you would use the in-period

9 sample and apply some method to adjust for censoring?

10  A Yes.

11  Q So the in-period sample by itself is not the

12 best way to make estimates about detention lengths?

13  MS. WILSON:  Object to the form.

14 BY MR. KAUFMAN:

15  Q Correct?

16  A Not if you wish to estimate the mean.

17  MR. KAUFMAN:  Why don't we take a break?

18  (A recess took place from  12:56 p.m. to

19 1:02 p.m.)

20 BY MR. KAUFMAN:

21  Q Dr. Palmer, before we move on to an entirely

22 different topic, I just want to circle back on one issue

23 we were discussing previously.  We were discussing the

24 statistics related to court proceedings, and I believe

25 you mentioned that you endorsed the approach that

Page 55

that's the issue.

     Q    And as you stand today, you have no reason to doubt those numbers; you just haven't had a chance to review it, correct?

     A    I have not had a chance to review it thoroughly.  On the other hand, her adjustment is like from 30 percent to 35 percent.  On the face of it that does not seem unreasonable.

     Q    Thank you, Dr. Palmer.  So let's switch gears a little bit, and I want to just talk in general about some of the differences between the people that were included in your in-period sample and Dr. Long's in-period sample.  And I just want to start with the basic question which is, did you independently verify whether people in the dataset qualified as class members?

     A    Well, you are going to have to define qualify as class members.  Let me tell you what I did.

     I verified that the people had a detention length of at least 180 days.  That's what I did.  There were two people I rejected on that basis.  There were also two people Dr. Long rejected.  I don't have her labels, but I would assume they were the same people.

     Q    Is it your understanding that the only qualification for class membership is that the person is

Page 57

1  person has 180-day detention, are you aware that in

2  order to qualify for class membership the person must

3  have a pending immigration case?

4       A    I am still trying to understand pending as of

5  when?

6       Q    After the 180th day of detention.

7       A    Okay.  So at the end of the 181st day or

8  180th day or whatever?

9       Q    Sure.  Let's assume that the person qualified

10  by detention length, they have hit 180 days of

11  detention, they are on the 181st day.  Separate from

12  that requirement, are you aware there is the additional

13  requirement that that person has been detained for

14  180 days also has a pending immigration case?

15       A    I do not believe I was aware of that until I

16  read Dr. Long's rebuttal report which so stated.

17       Q    Dr. Palmer, can I refer you to page 2 of your

18  rebuttal report which we have marked as Exhibit 13.

19       A    Yes.  I see the point.  Yes.  It's in the

20  complaint which I have read.  So I should have noted it,

21  but I didn't.

22       Q    Okay.  So is it your understanding from the

23  complaint and our discussion that a person must have a

24  pending immigration case in order to qualify as a class

25  member?

Sarnoff, A VERITEXT COMPANY
877-955-3855

1      A    Yes, I had actually focused on number 3.    I

2    was aware that they had not been afforded a hearing.    I

3    had not focused on the completion of proceedings.

4      Q    Now, Dr. Palmer, I know you only had a chance

5    to review Dr. Long's report yesterday and you were under

6    the weather, so forgive me if I am asking too many

7    detailed questions about it.    But are you aware that

8    Dr. Long removed approximately 57 people from her

9    in-period sample because those people did not have

10   pending immigration cases?

11     A    What I am aware of, what she said in the

12   report was -- let me see if I can find it -- what she

13   says is she was instructed to exclude these

14   57 individuals from her analysis because the attorneys

15   had concluded that these individuals were not class

16   members.    I was aware of that.

17     Q    Yes, that's actually perhaps a more accurate

18   description.    Thank you for that clarification.

19          And I believe the report states also that we

20   instructed her that these people were not class members

21   because they did not have pending cases at their

22   180th day of detention.

23          Assuming that that's correct, that these 57

24   people did not have pending cases at their 180th day of

25   detention, do you agree it was appropriate to remove

Page 60

```
 1          THE WITNESS:  In general, yes.  Certainly
 2      underestimates -- accepting all this as given,
 3      which I have not checked, it certainly means that
 4      if you -- if they are not class members, as I've
 5      said, one should probably exclude them and if one
 6      excludes them, and if they tend to be shorter than
 7      average, the average will go up.
 8  BY MR. KAUFMAN:
 9      Q    And that would mean that Dr. Long, that
10  detention lengths reported in Dr. Long's rebuttal report
11  for the in-period sample would be more accurate,
12  correct?
13      A    Would be more accurate than what?
14      Q    Than the detention lengths reported in your
15  expert report for the in-period sample, correct?
16          MS. WILSON:  Object to the form.
17          THE WITNESS:  Well, the detention lengths
18      reported in my rebuttal report, because I didn't
19      report any in my original report, so we are talking
20      about my rebuttal report, are the same ones that
21      Dr. Long reported in her initial report.  So if it
22      is correct that these people should be excluded,
23      then the means without them are better estimates
24      than the means with them, that is correct.
25
```

Page 63

```
 1   schedule table to count adjournments, to count
 2   adjournments requested by aliens or attributable to
 3   aliens, I think is the language that I used in my more
 4   recent report; and that involved the reasons for the
 5   adjournments.  And Mr. McDowell says that it is not a
 6   problem that those two tables don't agree, he would not
 7   expect them to agree, and that the schedule table is the
 8   proper source of information for the kind of analyses
 9   that I performed.  So that is what I relied on.
10        Q    So is it fair to say that Mr. McDowell's
11   declaration gave you confidence in the reliability of
12   the AC delay spreadsheet and schedule table on which it
13   was based?
14             MS. WILSON:  Object to the form.
15             THE WITNESS:  Yes, that seems fair to me.
16   BY MR. KAUFMAN:
17        Q    And apart from this declaration, were there
18   any other documents you consulted to assess the
19   reliability of the AC delays spreadsheet or the schedule
20   table?
21        A    No.
22        Q    Dr. Palmer, I want to refer you to page 3 of
23   the declaration.  Towards the bottom of that page,
24   paragraph 6, starts at line 21, the first sentence
25   reads, "The most reliable way to calculate the amount of
```

Page 67

1   support that.  And so I used it.  If it is, in fact,
2   correct that the schedule table has many large scale
3   errors, then my analyses are in error.  That is simply
4   true.
5        Q    Dr. Palmer, can you show me where in the
6   declaration it says that the schedule table is accurate?
7        A    I am presuming that the operational purpose of
8   this table is to allow the kind of calculations that I
9   do.  I am presuming that the agency desires accurate
10  data.  If that is not true, if the agency does not care
11  about the accuracy of its data, then I think we are all
12  in trouble, all the calculations based on it.
13       Q    I'm still not seeing where in the declaration
14  it says that the information in the schedule table is
15  accurate or reliable.  I see it says that it's the most
16  reliable way.  I don't see where it says that it is
17  reliable or it is accurate.
18            Can you show me where in the declaration it
19  states that the data in this schedule table is reliable
20  or is accurate?
21            MS. WILSON:  Object to the form.
22            THE WITNESS:  It does not use those words.  It
23       does say the most appropriate way to calculate the
24       length of delays is to use that table which is what
25       I did.  My assumption is that when someone says the

Page 69

```
 1              most appropriate way, that means he has taken
 2              reliability into account and that he believes that
 3              the reliability is adequate.
 4   BY MR. KAUFMAN:
 5        Q    And do you have some basis for that assumption
 6   through your conversations with Mr. McDowell?
 7        A    We certainly had some discussion in which he
 8   expressed confidence in the table.  I've got to say I do
 9   not remember the details of it at this point, but I did
10   inquire about some such things.
11              But, you know, it sort of comes back to
12   something you said earlier.  The only reason I have to
13   doubt it, is this fact that it has been pointed out to
14   me that some of the entries in the schedule table do not
15   agree with results in the action table.  Mr. McDowell
16   says that is not an appropriate comparison to make so,
17   you know, I don't really have any reason to doubt it
18   either.  One assumes that official government data is
19   generally reliable.
20        Q    Is that an assumption you make for all
21   government data, that it's reliable?
22        A    Well, you know, I do some internal consistency
23   checks, but when you receive data from any kind of an
24   organization, as a statistician I don't live in the
25   organization.  I don't see from day to day what goes
```

Page 70

1     determine the length.

2         Q    I asked you to determine the length of a

3     particular continuance request.

4         A    Well, yeah, but I mean, if I have the date of

5     a hearing and the date of the next hearing, we've all

6     been using as a shorthand that the time between a

7     hearing and the next hearing is what was due to the

8     continuance.  Now, I will agree that I can't tell

9     whether it's attributable to the alien, if that's what

10    you are getting at, but that's a separate question.

11        Q    Okay.  Dr. Palmer, I would like to refer you

12    to the next page of Mr. McDowell's declaration and the

13    paragraph 7 there.

14        A    Yes.

15        Q    And there's a sentence that begins on line 7,

16    it reads, "The action table is an auditing table that

17    holds information about actions added to a record in the

18    case."

19             Do you see that?

20        A    Yes.

21        Q    Can you tell me what that sentence means?

22        A    Well, I can tell you how I interpret it.

23        Q    Please.

24        A    In many databases -- and I am not an expert on

25    the case system, so I am responding in terms of the fact

                                                  Page 76

1    that I have experience with a number of databases.  And

2    in most databases, when you go in and make a change

3    anywhere in the database, there is a table that says on

4    such-and-such a day, such-and-such a person changed

5    such-and-such a data element.

6           That's what is called an auditing table.  And,

7    therefore, my assumption is that he is describing, or my

8    interpretation is that he is describing a similar table.

9      Q     That is the actions table, is an auditing

10   table in the way you describe it, correct?

11     A     Yes, that is my interpretation, realizing

12   again that I am not an expert in case.

13     Q     If a table is used for auditing as you

14   understand that term, would you expect that table to be

15   accurate?

16     A     I would expect it to be accurate for the

17   purpose of auditing.  But that purpose is not

18   necessarily the kind of purpose that might permit it for

19   analysis for other purposes.  For example, let's suppose

20   there is some problem with a Social Security number in a

21   record.  So one person goes in and changes it and there

22   is a record that says person A entered Social Security

23   number such-and-such on such-and-such a date.  And then

24   three weeks later somebody decides that's wrong and

25   there is a record that says somebody else entered Social

```
1     should be consistent.

2             If the information in the two tables turned

3     out to be inconsistent, would that cause you to doubt

4     the reliability of information in the schedule table?

5             MS. WILSON:  Object to the form.

6             THE WITNESS:  It would make me want to know

7         which table was more reliable for the purpose for

8         which I was using it.  So in that sense, I suppose

9         the answer is yes.

10            I mean, obviously one would like an

11        explanation and one would like to know that one is

12        using the most available -- most reliable available

13        information.  I guess I don't know what more I can

14        say.  Done.

15    BY MR. KAUFMAN:

16        Q    Let's assume that the inconsistency goes both

17    directions, that is that there is data in the actions

18    table that's not reflected in the schedule table and

19    there is data in the schedule table that's not reflected

20    in the actions table.  Assuming that's the case, would

21    that cause you to doubt the reliability of information

22    in both tables?

23        A    If I am answering under the assumption that

24    they are supposed to match --

25        Q    Yes.

                                              Page 85
```

1    Q    Do you see the table at the bottom of that
2  page?

3    A    Yes.

4    Q    Do you see that the table states that there
5  were 908 adjournments reflected in the actions table
6  that were not recorded in the schedule table data within
7  a six-day buffer?

8    A    Yes, I see that.

9    Q    And that's well over 10 percent of the total
10 number of adjournments in the actions table, correct?

11   A    Yes.

12   Q    And that inconsistency doesn't cause you to
13 doubt the reliability of the schedule table because of
14 what Mr. McDowell states in his declaration, correct?

15   A    Mr. McDowell, who is --

16        MS. WILSON:  Hold on one second, Chet.  I
17        object to the form of the question.

18        Chet, you can go ahead.

19        THE WITNESS:  Mr. McDowell tells me that the
20        tables aren't supposed to match, so how often they
21        don't match doesn't really matter.  So why should
22        this be a problem?

23        MR. KAUFMAN:  Let's go off the record for one
24        minute.

25        (A recess took place from  1:53 p.m. to

                                        Page 87

1  database?

2       Q     No, I am sorry.  I am just representing that

3  the screen shot you are looking at right here on page 11

4  is a screen shot of the actions table.

5       A     Okay.  That much I understood.

6       Q     Okay.  I didn't mean to say anything more than

7  that.

8       A     Okay.

9       Q     Okay.  So returning now to the deposition

10  transcript on page 147, you seeing they are talking

11  about the actions table at this point.  Now I want to

12  refer you to page 148 and you will see beginning at

13  line 7 there is a question that reads, "And how would it

14  be reflected under action items?"  The answer reads, "On

15  the action items tab, all adjournments, all hearings

16  that are -- or all adjournments that are entered for

17  hearings will show up on this action items tab, it would

18  be entered there."

19          Do you see that, Dr. Palmer?

20       A     I do.

21       Q     Okay.  And that was the testimony of

22  Mr. McDowell.  Does that indicate to you that all

23  adjournments should be reflected on the actions table?

24          MS. WILSON:  Object to the form.

25          THE WITNESS:  It certainly appears to say

                                              Page 92

1      that. Now understand that I am responding

2      obviously without full knowledge of the context

3      here.

4  BY MR. KAUFMAN:

5      Q    Understood. Understood. I am just asking you

6  to evaluate that sentence, though.

7      A    But that's certainly what it appears to say.

8  Now, as you know, people often respond in terms of the

9  current situation rather than thinking more generally.

10 But that is certainly what it does appear to say.

11     Q    Does that appear consistent with what you

12 understood Mr. McDowell's declaration to state?

13     A    It certainly could be consistent. You know,

14 we are once again running into the issue of, for

15 example, what date is going to appear with it because

16 it's going to be impossible to match it up if the date

17 is the date of entry rather than the date of the

18 adjournment itself. That is the date in the actions

19 table, is the date of entry rather than the date of the

20 adjournment itself, then it's going to be very -- still

21 be very difficult to match them up.

22     Q    If I understand you correctly, they may not

23 match in those circumstances because the date which is

24 entered in the actions table may be a different date

25 than entered into the schedule table?

```
 1   bottom or are we just using the page numbers from the
 2   transcript itself?
 3        Q    The transcript itself.
 4        A    Okay.
 5        Q    It's page 11 in the big numbers at the bottom.
 6        A    Okay.  I have it.
 7        Q    Now, I want to begin with line -- at the
 8   bottom of the page, line 24, there is a question that
 9   states, "If anyone adds information to case enters
10   information into a field, will that be recorded under
11   the action items table?"
12             Answer -- now this is page 42, the answer,
13   quote, yes.
14             The following question is:  "And if anyone
15   modifies a record in case, that will be reflected in the
16   action items table?"
17             "Answer:  Yes."
18             Do you see that passage?
19        A    Yes.
20        Q    Does that indicate to you that all changes in
21   tables within that case database system should be
22   reflected in the actions table?
23        A    Yes, it appears to.
24        Q    Earlier we were discussing the possibility
25   about why there might be some actions in -- excuse me,
```

Page 98

1    some records in the adjournment -- strike that.

2        There might be some record in the schedule

3    table that are not reflected in the actions table.

4    Having now reviewed that deposition transcript, are you

5    still of the view that it's likely that there should be

6    actions reflected in the schedule table that are not in

7    the actions table?

8      A    No, it would appear from the transcript that

9    they should all be reflected, but again, with this

10    caveat that the records may not have matching dates.

11        MR. KAUFMAN: Let's go ahead and take a break.

12        (A recess took place from 2:16 p.m. to

13      2:19 p.m.)

14    BY MR. KAUFMAN:

15      Q    Dr. Palmer, I just wanted to briefly follow up

16    on one topic we were discussing earlier regarding the

17    exclusion of the 57 people in Dr. Long's rebuttal

18    report. And I just want to confirm or confirm your

19    view. Is it the case that if we excluded those 57

20    people, it could potentially affect the median as well

21    as the means?

22      A    Yes, assuming that they tend to be on the

23    short end, the median would rise, although the median

24    may very well not rise nearly as much as the mean does.

25      Q    Understood. Thank you. I just have a couple

```
1   something like that.  So I took that.  And I don't think
2   I needed to make any correction to the end of that as I
3   recall because for all of those people who were still
4   active, I had a future hearing date, I believe, so I
5   knew how long the past was.
6           So I added up all of those dates, those days,
7   and I divided that number of days by the total number of
8   days.  So for example, if a person was in custody for a
9   total of 600 days and 100 of them were attributable to
10  alien requests, then the number in this table would be
11  100 over 600 as a percentage, which is 16.7.  Done.
12      Q    Thank you.  That was very helpful.  I just
13  want to confirm, you did include detainees whose cases
14  had not yet completed, correct?
15      A    Yes.
16      Q    So isn't the data you included censored in the
17  way we had discussed earlier?
18      A    It is censored, but notice that this is
19  censored in a rather odd way.  It is true -- first of
20  all, remember that the number is down.  We looked at
21  this table earlier, but the number I have censored was
22  lower than the number Dr. Long had censored because I
23  had a longer time period.  I think it's 29 of them, if I
24  remember earlier.
25          So, first of all, we are talking about less
```

                                              Page 102

1    than 3 percent.  So there's censored data, but there is
2    less and less of it as time runs on.
3            The second thing to remember is that future
4    delays might also be attributable to the alien.  So in
5    this case, it isn't clear that the censoring drives
6    these numbers in one direction rather than the other.
7        Q    Dr. Palmer, isn't it the case that detainees
8    whose cases go on a long time are detainees who are
9    taking appeals?
10       A    In many cases, yes.  I don't know if it's true
11   in all cases.
12       Q    I should say they are more likely to be taking
13   appeals than the general population, correct?
14       A    Yes.
15       Q    Okay.  And are appeal times attributed to
16   alien continuances?
17       A    No, I don't have information on appeal times.
18       Q    For the purposes of your calculations, when
19   you were calculating delays due to detainee
20   continuances, did you include appeals time as detainee
21   caused continuances?
22       A    No, I do not have information on that.
23       Q    So if we know that people whose cases go on a
24   long time are more likely to be on appeal, isn't it
25   likely that the future time that they are in detention

                                              Page 103

1   is not going to be time attributable to the alien --
2   delays to attributable to the alien?

3       A    That seems right, provided -- and here's a
4   legal issue that I don't know about -- there aren't any
5   remands.  I don't know if the case ever comes back from
6   the Court of Appeals with the court having directed, for
7   example, some immigration judge or board of immigration
8   appeals to do something that would restart proceedings
9   at a lower level.  I don't know enough about the system
10  to know.

11          But do remember that we are talking about
12  something that only affects 3 percent of the people.  I
13  don't want to belabor this point too much, but once
14  again, if you think of medians instead of means -- and
15  by the way, this time they are not very different --
16  it's going to make very little difference.

17      Q    Right.  But here I am just talking about the
18  percentage, we are talking about the percentage of the
19  time that's attributable, if a person's detention is
20  attributable to delays due to alien caused continuances.
21  The date of the censoring could have some effect, could
22  it not?

23      A    It could have some effect for 3 percent of the
24  people.

25      Q    Just to confirm, you didn't take any steps to

                                              Page 104

```
1    adjust for that censoring, correct?

2         A    That's correct.

3         Q    I want to look at that next paragraph on that

4    same page, and there you provide some information on

5    times not attributable to detainee continuances,

6    correct?

7         A    Yes.

8         Q    Similar to the discussion we were just having,

9    isn't that data similarly subject to censoring?

10        A    Yes.

11        Q    Go ahead.

12        A    This one conceivably probably more seriously

13   because of its nature as a count table, because it's

14   tabulating detention.

15        Q    I am sorry, could you explain that a little

16   more?

17        A    If someone has already been in detention

18   for -- I am sorry, strike that.  That may not be right.

19   I am sorry, I am sort of trying to answer on the fly and

20   this isn't something I've considered, so I should

21   withdraw that answer.  I haven't considered it

22   adequately.

23        Q    Similar to the data reported, I take it you

24   did not take any steps to adjust for the censoring in

25   the data?
```

Page 105

```
1        A     That is correct.  Once again, it affects about

2    3 percent of the people.

3        Q     But it is the case that the data you report

4    likely underestimates the amount of time due to -- that

5    is not due to alien-caused continuances?

6        A     The mean, yes; probably this time only the

7    mean and the max.  The others, something like the

8    median, more than half the people are done in 192 days.

9    The censored observations are all beyond 192 days, I

10   would bet.  I doubt it would have any effect on the

11   median or even the 75th or possibly even the 90th

12   percentile because we know those people have been around

13   for at least 500 days.

14       Q     In calculating the percentages that you report

15   in those charts, did you rely on the means?  It appears

16   the percentages are also subject to the censoring.

17       A     We are going back to the previous table?

18       Q     No, the table at the bottom of the page there.

19       A     So you are talking about the 45.9 percent?

20       Q     Exactly, yes.

21       A     I am sorry, I am just trying to understand

22   what the number is you are looking at.

23             Censoring would affect that only if there is

24   someone -- I can't swear it wouldn't.  Okay?  But let's

25   think about how big it could be.
```

probably 20 or 40 or 60 days off and just keep that in mind.

Q    So if I understand you correctly, Dr. Palmer, it may be the case that self-balancing does result in an accurate estimate of detention rates, correct?

MS. WILSON:  Object to the form.

THE WITNESS:  Yeah, I mean it's possible, but I don't see any basis for believing that.

BY MR. KAUFMAN:

Q    Right.  So your problem with the method is that you don't see any way of confirming whether the two opposite biases are equally balanced; is that correct?

A    Right.  I mean, we are trying to correct for one bias.  Are we undercorrecting or overcorrecting?  I have no idea.

Q    If there was a way to consult other database sources that might help to confirm that, in fact, the results you get from self-balancing are in line with other forms of estimates, would that help to confirm the accuracy of the self-balancing approach?

MS. WILSON:  Object to the form.

THE WITNESS:  You know, with the usual caveats of checking the other results, yes, certainly.  Let me see -- her original result was to bring her back to the -- bring us back to the total number she had

Page 111

```
1        before, right?  Let's look at the mean.
2               That brings us from 334 to 404, if I am
3        correct.
4               So that's up 70 days.  No, let me see.  Let me
5        grab my calculator for a minute.
6               If my quick calculation is correct, that is
7        equivalent to assuming that the 35 in-period aliens
8        who were still detained will, on the average, be in
9        detention for another three and a half years.
10              That's what it would take, if my quick
11       calculation is correct, to move the mean from 334
12       to 404 based on 5.4 percent of the data.
13   BY MR. KAUFMAN:
14       Q     And Dr. Palmer, you already testified that you
15   don't have any knowledge about how likely it is that the
16   still detained population will be detained for a period
17   such as three and a half years, correct?
18       A     That's correct.  I find it a high -- it seems
19   a high estimate to me, just because if you remember the
20   other table we looked at, 40 percent of them were no
21   longer still detained in like four months.  There had
22   been quite a lot of motion.  Now that doesn't make it
23   wrong.  It could be there's going to be some people out
24   there who are going to be detained for seven years.  I
25   don't know.  But all I can say is I don't know.
```

Page 112

# REPORTER'S CERTIFICATE

I, ERIN M. HUTTER, Registered Professional Reporter and Notary Public, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney or of any of the parties nor financially interested in the action.

*Erin M. Hutter*

ERIN M. HUTTER, RPR

Page 191

# EXHIBIT F

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

ALEJANDRO RODRIGUEZ, et al.,

          Petitioners,     No. CV 07-3239-TJH(RNBx)

  vs.

TIMOTHY ROBBINS, et al.,

          Respondents.

_____

DEPOSITION of ERIC G. SALDANA

Los Angeles, California

Friday, January 13, 2012

Volume I

Reported by:

IRMA C. HOGAN

CSR No. 4877

Job No. 130812

PAGES 1 - 167

Veritext National Deposition & Litigation Services
866 299-5127

```
 1       A.   Yes.
 2       Q.   Do you see at the bottom of the page topic
 3  number four?
 4       A.   Yes.
 5       Q.   Are you the person most knowledgeable about
 6  this topic at the Department of Homeland Security?
 7            MR. ATKINSON:  I'm sorry, could he just take
 8  a moment to read the topic?
 9            MR. KAUFMAN:  Sure.
10            THE WITNESS:  I've read it and I'm able to
11  speak to this.
12  BY MR. KAUFMAN:
13       Q.   You are the person most knowledgeable at the
14  Department of Homeland Security on this topic?
15       A.   Yes.
16       Q.   Could you turn to the next page and take a
17  moment to read over what is listed as topic number
18  seven.
19       A.   Yes.
20       Q.   Are you the person most knowledgeable at the
21  Department of Homeland Security on this topic?
22       A.   Yes.
23            MR. ATKINSON:  Just -- when we earlier
24  designated Mr. Saldana, it was with regard to topic
25  number seven with respect to the notification provided
```

Veritext National Deposition & Litigation Services
866 299-5127

1    to persons eligible for such hearings, not with

2    respect to how hearings are conducted, which was the

3    topic, I believe, we designated Judge Wyle for for the

4    Department of Justice.

5    BY MR. KAUFMAN:

6        Q.   Mr. Saldana, could you please turn what is

7    marked as Page 10 in this document and take a moment

8    to read over topic number ten at the bottom of the

9    page.

10       A.   Yes.

11       Q.   Are you the person most knowledgeable at the

12    Department of Homeland Security on topic number ten?

13       A.   Yes.

14       Q.   Now, finally, please turn to the next page

15    and take a moment to look over topic number eleven.

16            Are you the person most knowledgeable at the

17    Department of Homeland Security on topic number

18    eleven?

19       A.   Yes.

20       Q.   Great.  So, Mr. Saldana, what did you do to

21    prepare for this deposition?

22       A.   In addition to my experience in working with

23    these different aspects that you pointed out earlier,

24    I have prepared with the attorneys that you see

25    present with me today.

1  or would not allow them to be released, and for the
2  most part they understand the thought process of the
3  person making that decision.  And if there's something
4  outside the norm, they'll usually make that
5  recommendation, give that information to the
6  determining official.
7       The processing officer does just that,
8  processes the case, prepares the forms, prepares the
9  worksheets, puts the A-File together and gives that to
10 the supervisor, the SDDO, who then reviews everything
11 and then he's the one who does the determination.
12      Q.   So he would make a determination whether
13 someone was subject to mandatory detention, for
14 example?
15      A.   Yes.
16      Q.   Would he also be the person if someone, let's
17 say, released on bond that would make the
18 determination as to whether to release that person and
19 the amount of bond?
20      A.   Yes.
21      Q.   When the SDDO makes those initial
22 determinations, besides the processing agent are there
23 any other ICE officials involved in the
24 decision-making process?
25      A.   There may be discussions with other

1   some type of bond; but that same person comes in and
2   we learn information that maybe there's an issue with
3   a family member, maybe a medical issue with a family
4   member, child is sick, single parent.  That's
5   something we want to really push to get them back to
6   his family, so we would consider the ATD option.  And
7   ATD, I mean Alternatives to Detention.  That's what we
8   would call it.
9       Q.   When ICE officials make that initial custody
10  determination, do they sometimes -- is the
11  determination release on a particular ATD program?
12      A.   Based on the documents that I reviewed for
13  this case, there was a lot of mention of multiple ATD
14  programs.  Since, I believe it was, November of 2009,
15  the contractors that we use for those programs -- I
16  don't think they consolidated, but we chose one.
17  There was multiple contractors that we used previous
18  to that.
19          That contractor has created something called
20  ISAP-2, so that is the form of Alternatives to
21  Detention that we use.  And in reading through some of
22  this material that was submitted to you, I saw that
23  there was mentioned an EMD, electronic monitoring
24  device, and other programs that were part of G4S
25  Corporation that no longer holds the contract with us.

Page 106

1    So if a supervisor decides to do Alternatives

2    to Detention, it's with ISAP program or the B.I.

3    Corporation.  So it's -- there's not as many types

4    available to the supervisor to choose from.

5         Q.   So if I understand, there's only one type

6    available now in the L.A. field office, the ISAP-2

7    program?

8         A.   There's one provider.  There's the ISAP-2

9    program, and in that program there's various levels of

10   supervision that take place.  There's three common

11   ones or the three of them are GPS or technology, which

12   is what they sometimes refer to as full service;

13   there's a telephonic T/O, which is -- in which the

14   alien is monitored by the contractor and still -- and

15   has to do a telephonic call-in system; and there's

16   T/R, which is a system made available that we've

17   contracted with B.I. for but ICE maintains the

18   supervision over and the management of.

19        Q.   Are the SDDOs aware of all these programs,

20   these options?

21        A.   They may not have specific knowledge of each,

22   but every program works a little bit differently.  And

23   at the time that SDDO determines to turn someone over

24   to ATD, they don't necessarily choose ATD this or

25   that; it will usually go to an ATD officer who makes

Page 107

1    ISAP's, but it's an ICE agent or officer actually

2    doing the review of the cases.

3    BY MR. KAUFMAN:

4        Q.   In your experience has the use of ATDs in the

5    L.A. field office changed the way that officials go

6    about assessing flight risk in that initial

7    determination?

8        A.   I think I could say yes to that.

9        Q.   In what way?

10       A.   It's another option.  The concern for anybody

11   who has to set bond or decide whether somebody is

12   going to stay in custody or not is am I making the

13   correct decision, is this person that will be released

14   on his own recognizance, whether it's under a bond or

15   something else, will they come back and re-offend,

16   one; will they come back for their hearing.

17        I think, although it isn't the case every

18   time, ATD has shown to be more of a positive influence

19   for those individuals taking part in the program.  We

20   see a good success rate on that.  So therefore I think

21   it makes the supervisors more comfortable to use that

22   program.  But then again there are issues that come up

23   where people take advantage of the system, which also

24   puts them back.

25       Q.   When you say success rate, what do you mean

Page 111

1    by that?

2        A.    Success rate traditionally has been tracked

3    with what they call a compliance rate.  And a

4    compliance rate for B.I. -- they manage a number of

5    different performances that they consider compliance,

6    whether it has to do with people showing up for

7    interviews, home visits, or whether the alien goes to

8    their court hearing.

9             It's -- I think it's been successful in terms

10   of compliance to get people to their court

11   proceedings.  It's a very impressive system.

12            Earlier this year my specific office in San

13   Bernardino -- we had a compliance rate of about

14   60 percent for people going to their immigration

15   hearing.  We had a brainstorming session and thought

16   about existing protocols in the program and how we

17   could use them to better increase that particular

18   number.  And by making some changes we are at, if not

19   close to, 100 percent compliance rate for people to go

20   to their immigration court hearing pre-order.

21       Q.    Is that in the San Bernardino area or --

22       A.    That's in the San Bernardino area.  And

23   throughout Los Angeles it's probably in the 90th

24   percentile, I would estimate.

25            MR. ATKINSON:  I'm sorry, I'm trying to jump

Page 112

BY MR. KAUFMAN:

Q. I see. But your best understanding is it's increased substantially in the last five years?

MR. ATKINSON: Object to the form. Object, outside the scope.

THE WITNESS: I see no reason not to agree with that.

BY MR. KAUFMAN:

Q. When was the most recent increase in availability of placements in the ISAP program?

A. I could not answer that specifically, the numbers that we have. It may vary, but I'm talking, you know, within 20 or 30. And it may be a case where the -- my particular office, for example, the cap of available positions in San Bernardino is just over 1100. There may be a case where Los Angeles may need some of those slots and we may in between us move them.

So it's -- to my knowledge, the cap across the field office is about 3,000, of which about 1100, maybe 1150, are in San Bernardino. About the same in Los Angeles. And about seven and some change down in Santa Ana. And at any time, because of the amount of personnel, it could change.

So it would be hard for me to -- I don't run

1  paragraph below number one on Page 1 of the document.

2  The first sentence states, "ATD is not recommended for

3  aliens who pose a minimal flight risk."

4       From ICE's perspective what constitutes,

5  quote-unquote, a minimal flight risk?

6       A.   It would be somebody who has major ties to

7  the community who may have a question as to

8  removability possibly -- and these are the extremes --

9  somebody who is awaiting a benefit.  Cases such as

10  that.  I think it would also be cases in which we

11  would determine upon initial determination that they

12  would be released O/R, Order of Recognizance.

13       Q.   If someone is released O/R, are there no

14  conditions placed on their release?

15       A.   Usually there's a condition that they have to

16  report back in the office and they have to, of course,

17  go to their court hearings.

18       Q.   Is eligibility for relief a consideration in

19  determining whether someone is a flight risk?

20       MR. ATKINSON:  Object to the form of the

21  question.

22       THE WITNESS:  As I stated before, it's not

23  necessarily -- not always a part of it, not

24  necessarily a major part of the decision, for the

25  custody decision which this is part of.  But it can --

Page 139

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 8, 2012

_____
IRMA C. HOGAN, CSR 4877

Veritext National Deposition & Litigation Services
866 299-5127

# EXHIBIT G

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4    ALEJANDRO RODRIGUEZ, et al.

5              Petitioners              Case No.

6    vs.                        CV 07-3239-TJH (RNBx)

7    TIMOTHY S. ROBBINS, in his

8    capacity as U.S. Immigration

9    and Customs Enforcement, Los

10   Angeles District Field Office

11   Director; JANET NAPOLITANO,

12   in her capacity as Secretary

13   of Homeland Security; and ERIC

14   H. HOLDER, JR., in his

15   capacity as Attorney General

16   of the United States

17              Respondents

18   _____/

19          The Telephonic Deposition of HONORABLE

20   JACK H. WEIL was held on Tuesday, December 13, 2011,

21   commencing at 9:15 a.m., at the law offices of Sidley

22   Austin, LLP, 1501 K Street, N.W., Washington, D.C.

23   20005, before George W. Tudor, Notary Public.

24   TSG Job # 44694

25   REPORTED BY:  George W. Tudor

1    Central District of California?

2          A.     Yes.

3          Q.     Great.  You started to explain how bond

4    hearings -- how someone requests a bond hearing or

5    doesn't and how the scheduling of a bond hearing

6    happens.  Can you just give me a description of that

7    process, how someone asks for a bond hearing and then

8    how it comes to be scheduled?

9          A.     Yes.  The Department of Homeland Security

10   will make a custody determination.  The jurisdiction

11   vests with the immigration court over the removal

12   procedure via the filing of the notice to appear.

13              The notice to appear will include the

14   initial custody determination from the Department of

15   Homeland Security and the indication whether the

16   respondent is or is not requesting redetermination of

17   that.

18              When that is filed with the Court, the Court

19   clerk will then schedule the hearing based upon what the

20   respondent has indicated, either they do or do not the

21   request a hearing.  There is a little bit of variance

22   among the judges in -- for efficiency purposes, but it

23   doesn't affect the substantive, as to whether the matter

24   is put onto a separate bond calendar or just an initial

25   hearing that includes both bond and non-bond matters.

1   what the alternative possibilities are.  So until you --

2   I'm sure you can craft an alternative, but I don't know

3   what those alternatives are.  I don't know what is

4   possible, what's legally appropriate, what -- so I --

5        Q.        And so when judges conduct bond hearings, is

6   the availability for an alternative to detention program

7   one of the factors to keep in mind when you make the

8   bond decision?

9        A.        When we talk about a bond decision, the

10  judge -- DHS makes the initial custody determination.

11  So the immigration judge does not have the authority to

12  order somebody into an ICE-run program.

13       Q.        Is the Immigration Judge's authority limited

14  to ordering release on bond at a bond hearing?

15       A.        No.

16       Q.        Okay.  If an Immigration Judge is going to

17  order release, is their authority limited to ordering

18  release on bond?

19       A.        There's a dispute among judges as to whether

20  you can release somebody on their own recognizance, but

21  the statute says a minimum amount of bond is $1500.

22       Q.        Can you maybe describe that dispute in a

23  little more detail?  What is that controversy?

24            MR. LAWRENCE:  I object to this as being

25  outside of the scope of the deposition.

1                CERTIFICATE OF DEPONENT

2

3          I hereby certify that I have read and

4   examined the foregoing transcript, and the same is a

5   true and accurate record of the testimony given by me.

6

7          Any additions or corrections that I feel

8   are necessary, I will attach on a separate sheet of

9   paper to the original transcript.

10

11

12                    _____

13                    HONORABLE JACK H. WEIL

14

15

16

17

18

19

20

21

22

23

24

25

1    District of Columbia,

2    At Large, to wit:

3

4              I, George W. Tudor, a Notary Public of

5    the District of Columbia, do hereby certify that the

6    within-named witness, personally appeared before me

7    at the time and place herein set out, and after having

8    been duly sworn by me, according to law, was examined

9    by counsel.

10             I further certify that the examination was

11   recorded stenographically by me and this transcript

12   is a true record of the proceedings.

13             I further certify that I am not of counsel

14   to any of the parties, nor in any way interested in

15   the outcome of this action.

16             As witness my hand and notarial seal this

17   23rd day of December, 2011.

18

19

20                        _____

21                            George W. Tudor

22                             Notary Public

23

24   My Commission Expires:

25   January 1, 2016