1  **AHILAN T. ARULANANTHAM (SBN 237841)**
   aarulanantham@aclu-sc.org
2  **MICHAEL KAUFMAN (SBN 254575)**
   mkaufman@aclu-sc.org
3  **ACLU FOUNDATION OF SOUTHERN CALIFORNIA**
   **1313 West Eighth Street**
4  **Los Angeles, CA 90017**
   **Telephone:  (213) 977-9500**
5  **Facsimile:  (213) 977-5297**

6  *Attorneys for Petitioners*
   **(Additional Counsel listed on following page)**

7

8               UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                    WESTERN DIVISION

11  ALEJANDRO RODRIGUEZ,                    ) Case No. 02:07-cv-03239-TJH (RNBx)
    ABDIRIZAK ADEN FARAH, YUSSUF            )
12  ABDIKADIR, ABEL PEREZ RUELAS,           )
    JOSE FARIAS CORNEJO, ANGEL              )
13  ARMANDO AYALA, for themselves and       ) **DECLARATION OF MICHAEL**
    on behalf of a class of similarly-situated ) **KAUFMAN OF APRIL 5, 2013**
14  individuals,                            )
                                            ) Honorable Terry J. Hatter
15             Petitioners,                 )
                                            ) Date:  May 6, 2013
16         v.                               ) Time:  Under Submission
                                            )
17  ERIC HOLDER, United States Attorney     )
    General; JANET NAPOLITANO,              )
18  Secretary, Homeland Security; THOMAS    )
    G. SNOW, Acting Director, Executive     )
19  Office for Immigration Review;          )
    TIMOTHY ROBBINS, Field Office           )
20  Director, Los Angeles District Immigration )
    and Customs Enforcement; WESLEY LEE,    )
21  Officer-in-Charge, Mira Loma Detention  )
    Center; et al.; RODNEY PENNER,          )
22  Captain, Mira Loma Detention Center;    )
    SANDRA HUTCHENS, Sheriff of Orange      )
23  County; OFFICER NGUYEN, Officer-in-     )
    Charge, Theo Lacy Facility; CAPTAIN     )
24  DAVIS NIGHSWONGER, Commander,           )
    Theo Lacy Facility; CAPTAIN MIKE        )
25  KREUGER, Operations Manager, James A.   )
    Musick Facility; ARTHUR EDWARDS,        )
26  Officer-in-Charge, Santa Ana City Jail; )
    RUSSELL DAVIS, Jail Administrator,      )
27  Santa Ana City Jail,                    )
                                            )
28             Respondents.                 )
    _____

                    **DECLARATION OF MICHAEL KAUFMAN**

JUDY RABINOVITZ
JRabinovitz@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY  10004
Telephone: (212) 549-2618
Facsimile: (212) 549-2654

MICHAEL TAN (SBN 284869)
mtan@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm St.
San Francisco, CA  94111
Telephone:  (415) 343-0779
Facsimile:  (415) 395-0950

JAYASHRI SRIKANTIAH (SBN 189566)
jsrikantiah@law.stanford.edu
STANFORD LAW SCHOOL
IMMIGRANTS' RIGHTS CLINIC
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA  94305-8610
Telephone: (650) 724-2442
Facsimile: (650) 723-4426

SEAN COMMONS (SBN 217603)
scommons@sidley.com
CODY JACOBS (SBN 272276)
cjacobs@sidley.com
JONATHAN FEINGOLD (SBN 286302)
jfeingold@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013-1010
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

*Attorneys for Petitioners*

---

**DECLARATION OF MICHAEL KAUFMAN**

## <u>DECLARATION OF MICHAEL KAUFMAN OF APRIL 5, 2013</u>

I, Michael Kaufman, hereby declare:

1.      I am a staff attorney at the American Civil Liberties Union of Southern California and counsel of record for Petitioners in the above-entitled certified class action ("*Rodriguez*"). I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      A true and correct copy of a letter dated October 11, 2012, from Department of Justice attorney Theodore Atkinson to my co-counsel Sean Commons is attached as Exhibit A.

3.      A true and correct copy of excerpts of the "Immigration Court Practice Manual" by the Office of Chief Immigration Judge, Department of Justice is attached as Exhibit B.

4.      True and correct copies of immigration judge decisions in bond hearings conducted under this Court's preliminary injunction order, *see* Dkt. 255, are attached as Exhibit C.  *See* Fed. R. Evid. 803(8); *see also United States v. Estrella-Yuan*, 437 Fed.Appx. 555, 556-57 (9th Cir. 2011) (holding warrant of deportation issued in immigration proceeding admissible under Rule 803(8)); *United States v. Loma-Torres*, 406 Fed.Appx. 223, 224 (9th Cir. 2010) (holding documents from "A-file" admissible under the public records exception to the rule against hearsay); *United States v. Diaz-Lopez*, 403 Fed.Appx. 199, 201-202 (9th Cir. 2010) (order of immigration judgment admissible under public record exception); *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1217-18 (9th Cir. 2001) (affirming admission of A-file under public records exception); *United States v. Contreras*, 63 F.3d 852, 857 (9th Cir. 1995) (holding, in context of A file documents, that "documents that fall under the public records exception 'are presumed trustworthy, placing 'the burden of establishing untrustworthiness on the opponent of the evidence'").

5.      A true and correct copy of the report "Management of Immigration Cases and Appeal by the Executive Office for Immigration Review" by the Office of

Inspector General, Department of Justice is attached as Exhibit D.  *See* Fed. R. Evid. 801(d)(2), 803(8), 901(b)(7).

6.      On November 27, 2012, my co-counsel Ahilan Arulanantham took the deposition of Respondents' expert Dr. Chester Palmer.  On December 21, 2012, I took another deposition of Dr. Palmer.  I subsequently received certified transcripts of those depositions.  Copies of relevant portions of those depositions are attached as Exhibits E and F to this declaration.

7.      On November 28, 2012, my co-counsel Ahilan Arulanantham defended the deposition of Petitioners' expert Dr. Susan Long.  On December 21, 2012, I defended the deposition of Petitioners' expert Dr. Susan Long.  I subsequently received certified transcripts of the depositions.  Copies of relevant portions of the depositions are attached as Exhibits G and K to this declaration.

8.      Saldana, Assistant Field Office Director. I subsequently received a certified transcript of that deposition. A copy of relevant portions of his deposition is attached as Exhibit H to this declaration.

9.      A true and correct copy of the 2012 "Compliance Inspection" report for the Adelanto Correctional Facility by the Office of Detention Oversight, Department of Homeland Security is attached as Exhibit I.  *See* Fed. R. Evid. 801(d)(2), 803(8), 901(b)(7).

10.      I first learned that Byron Merida was a class member on October 16, 2012, after the close of fact discovery in this case, when I went to the Adelanto Detention Center to meet with detainees who were, according to the Government, eligible for hearings under the preliminary injunction order.  I spoke with Mr. Merida briefly in order to prepare him for his hearing, and at that time learned a little about his experience in immigration detention.  Several weeks later, my colleague, Carmen Iguina, and I represented Mr. Merida at his bond hearing.  In the course of preparing for that bond hearing, we learned details about Mr. Merida's experiences in detention and about his case history.

**DECLARATION OF MICHAEL KAUFMAN**

11.     On approximately November 8, 2013, after the close of fact discovery in this case, I first communicated with Mercedes Castillo regarding the practices of immigration judges at the Los Angeles Immigration Court with respect to case scheduling and continuances.

12.     My colleague Ahilan Arulanantham sent correspondence to Respondents' counsel Mr. Atkinson on January 15, 2013 in which he listed all of the forms of relief that Petitioners would seek with respect to the "adequacy" of bond hearings.  He had also provided such a list orally during a prior telephonic meet and confer conversations between the parties in which I participated.  A true and correct copy of that correspondence is attached to this Declaration as Exhibit J.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief.  Executed this 5th day of April, 2013 in Los Angeles, California.

*/s/ Michael Kaufman*
Michael Kaufman

# EXHIBIT A



**U.S. Department of Justice**

Civil Division
Office of Immigration Litigation
District Court Section

_____

*Box 868, Ben Franklin Station*
*Washington, DC 20044*
*Tel: (202) 532-4135*
*Fax: (202) 305-7000*
*Email: theodore.atkinson@usdoj.gov*

October 11, 2012

Sean A. Commons
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013

      RE:    *Rodriguez v. Robbins*
              No. CV 07-3239-TJH (RNBx) (C.D. Cal.)

Dear Sean:

      I am enclosing with this letter a copy of ICE-EDI-010 and EOIR-EDI-007.

      Please contact me if you have any questions or comments.

                      Regards,

                      */s/ Theodore W. Atkinson*

                      Theodore W. Atkinson
                      Senior Litigation Counsel
                      Office of Immigration Litigation
                      District Court Section

cc:    Ahilan T. Arulanantham (w/o enclosures)
      Michael Kaufman (w/o enclosures)

# EXHIBIT B

# Chapter 3
## Table of Contents

**Chapter 3**        **Filing with the Immigration Court**
    3.1    Delivery and Receipt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31
    3.2    Service on the Opposing Party  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39
    3.3    Documents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41
    3.4    Filing Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

# 3  Filing with the Immigration Court

## 3.1    Delivery and Receipt

*(a) Filing.* — Documents are filed either with the Immigration Judge during a hearing or with the Immigration Court outside of a hearing. For documents filed outside of a hearing, the filing location is usually the same as the hearing location. However, for some hearing locations, documents are filed at a separate "Administrative Control Court." See subsection (i), below, 8 C.F.R. §§ 1003.31, 1003.13.

*(i) Administrative Control Courts.* — "Administrative Control Courts" maintain the Records of Proceeding for hearings that take place at certain remote hearing locations. A list of these locations, and of the Administrative Control Courts responsible for these locations, is available on the Executive Office for Immigration Review website at www.usdoj.gov/eoir.

*(ii) Shared administrative control.* — In some instances, two or more Immigration Courts share administrative control of cases. Typically, these courts are located close to one another, and one of the courts is in a prison or other detention facility. Where courts share administrative control of cases, documents are filed at the hearing location. Cases are sometimes transferred between the courts without a motion to change venue. However, if a party wishes for a case to be transferred between the courts, a motion to change venue is required. See Chapter 5.10(c) (Motion to change venue). A list of courts with shared administrative control is available on the Executive Office for Immigration Review website at www.usdoj.gov/eoir.

*(iii) Receipt rule.* — An application or document is not deemed "filed" until it is received by the Immigration Court. All submissions received by the Immigration Court are date-stamped on the date of receipt. Chapter 3.1(c) (Must be "timely"). The Immigration Court does not observe the "mailbox rule." Accordingly, a document is not considered filed merely because it has been received by the U.S. Postal Service, commercial courier, detention facility, or other outside entity.

*(iv) Postage problems.* — All required postage or shipping fees must be paid by the sender before an item will be accepted by the Immigration Court. When using a courier or similar service, the sender must properly complete the packing slip, including the label and billing information. The Immigration Court does not pay postage due or accept mailings without sufficient postage. Further, the Immigration Court does not accept items shipped by courier without correct label and billing information.

*(v) Filings.* — Filings sent through the U.S. Postal Service or by courier should be sent to the Immigration Court's street address. Hand-delivered filings should be brought to the Immigration Court's public window during that court's filing hours. Street addresses and hours of operation for the Immigration Courts are available in on the Executive Office for Immigration Review website at www.usdoj.gov/eoir. Addresses are also available in Appendix A (Immigration Court Addresses).

Given the importance of timely filing, parties are encouraged to use courier or overnight delivery services, whenever appropriate, to ensure timely filing. However, the failure of any service to deliver a filing in a timely manner does not excuse an untimely filing. See Chapter 3.1(c)(iii) (Delays in delivery).

*(vi) Separate envelopes.* — Filings pertaining to unrelated matters should not be enclosed in the same envelope. Rather, filings pertaining to unrelated matters should be sent separately or in separate envelopes within a package.

*(vii) Faxes and e-mail.* — The Immigration Court does not accept faxes or other electronic submissions unless the transmission has been specifically requested by the Immigration Court staff or the Immigration Judge. Unauthorized transmissions are not made part of the record and are discarded without consideration of the document or notice to the sender.

*(viii) E-filing.* — The Immigration Court does not have electronic filing, or "e-filing," at this time. Although certain forms can be completed on-line, forms must be printed and submitted as hard copies to the Immigration Court. See Chapter 11(Forms).

*(b) Timing of submissions.* — Filing deadlines depend on the stage of proceedings and whether the alien is detained. Deadlines for filings submitted while proceedings are pending before the Immigration Court (for example, applications, motions, responses to motions, briefs, pre-trial statements, exhibits, and witness lists) are as specified in subsections (i), (ii), and (iii), below, unless otherwise specified by the Immigration Judge. Deadlines for filings submitted after proceedings before the Immigration Court have been completed are as specified in subsections (iv) and (v), below.

Deadlines for filings submitted while proceedings are pending before the Immigration Court depend on whether the next hearing is a master calendar or an individual calendar hearing.

Untimely filings are treated as described in subsection (d)(ii), below. Failure to timely respond to a motion may result in the motion being deemed unopposed. See

Chapter 5.13 (Response to Motion).  "Day" is constructed as described in subsection (c), below.

### (i) Master calendar hearings. —

*(A) Non-detained aliens.* — For master calendar hearings involving non-detained aliens, filings must be submitted at least fifteen (15) days in advance of the hearing if requesting a ruling at or prior to the hearing. Otherwise, filings may be made either in advance of the hearing or in open court during the hearing.

When a filing is submitted at least fifteen days prior to a master calendar hearing, the response must be submitted within ten (10) days after the original filing with the Immigration Court. If a filing is submitted less than fifteen days prior to a master calendar hearing, the response may be presented at the master calendar hearing, either orally or in writing.

*(B) Detained aliens.* — For master calendar hearings involving detained aliens, filing deadlines are as specified by the Immigration Court.

### (ii) Individual calendar hearings. —

*(A) Non-detained aliens.* — For individual calendar hearings involving non-detained aliens, filings must be submitted at least fifteen (15) days in advance of the hearing.  This provision does not apply to exhibits or witnesses offered solely to rebut and/or impeach. Responses to filings that were submitted in advance of an individual calendar hearing must be filed within ten (10) days after the original filing with the Immigration Court. Objections to evidence may be made at any time, including at the hearing.

*(B) Detained aliens.* — For individual calendar hearings involving detained aliens, filing deadlines are as specified by the Immigration Court.

*(iii) Asylum applications.* — Asylum applications are categorized as either "defensive" or "affirmative."  A defensive asylum application is filed with the Immigration Court by an alien already in proceedings.  An affirmative asylum application is filed with the Department of Homeland Security (DHS) Asylum Office by an alien not in removal proceedings.  If the DHS Asylum Office declines to grant an affirmative asylum application, removal proceedings may be initiated.  In that case, the asylum application is referred to an Immigration Judge, who may grant or deny the application.  See 8 C.F.R. § 1208.4.

An alien filing an application for asylum should be mindful that the application must be filed within one year after the date of the alien's arrival in the United States, unless certain exceptions apply.  INA § 208(a)(2)(B), 8 C.F.R. § 1208.4(a)(2).

**(A) Defensive applications.** — Defensive asylum applications are filed in open court at a master calendar hearing.

**(B) Affirmative applications.** — Affirmative asylum applications referred to an Immigration Court by the DHS Asylum Office are contained in the Record of Proceedings.  Therefore, there is no need for the alien to re-file the application with the Immigration Court.  After being placed in Immigration Court proceedings, the alien may amend his or her asylum application.  For example, the alien may submit amended pages of the application, as long as all changes are clearly reflected.  Such amendments must be filed by the usual filing deadlines, provided in subsections (b)(i) and (b)(ii), above.  The amendment should be accompanied by a cover page with an appropriate caption, such as "AMENDMENT TO PREVIOUSLY FILED ASYLUM APPLICATION." See Appendix F (Sample Cover Page).

**(iv) Reopening and reconsideration.** — Deadlines for filing motions to reopen and motions to reconsider with the Immigration Court are governed by statute and regulation.  See Chapter 5 (Motions).  Responses to such motions are due within fifteen (15) days after the motion was received by the Immigration Court, unless otherwise specified by the Immigration Judge.

**(v) Appeals.** — Appeals must be received by the Board of Immigration Appeals no later than 30 calendar days after the Immigration Judge renders an oral decision or mails a written decision.  See 8 C.F.R. § 1003.38, Chapter 6 (Appeals of Immigration Judge Decisions).

**(vi) Specific deadlines.** — The deadlines for specific types of filings are listed in Appendix D (Deadlines).

**(c) Must be "timely."** — The Immigration Court places a date stamp on all documents it receives.  Absent persuasive evidence to the contrary, the Immigration Court's date stamp is controlling in determining whether a filing is "timely."  Because filings are date-stamped upon arrival at the Immigration Court, parties should file documents as far in advance of deadlines as possible.

**(i) Construction of "day."** — All filing deadlines are calculated in calendar days.  Thus, unless otherwise indicated, all references to "days" in this manual refer to calendar days rather than business days.

**(ii) Computation of time.** — Parties should use the following guidelines to calculate deadlines.

**(A) Deadlines on specific dates.** — A filing may be due by a specific date. For example, an Immigration Judge may require a party to file a brief by June 21, 2008. If such a deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(B) Deadlines prior to hearings.** — A filing may be due a specific period of time *prior to* a hearing. For example, if a filing is due 15 days prior to a hearing, the day of the hearing counts as "day 0" and the day before the hearing counts as "day 1." Because deadlines are calculated using calendar days, Saturdays, Sundays, and legal holidays are counted. If, however, such a deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(C) Deadlines following hearings.** — A filing may be due within a specific period of time *following* a hearing. For example, if a filing is due 15 days after a master calendar hearing, the day of the hearing counts as "day 0" and the day following the hearing counts as "day 1." In such cases, the day of the hearing counts as "day 0" and the day following the hearing counts as "day 1." Because deadlines are calculated using calendar days, Saturdays, Sundays, and legal holidays are counted. If, however, such a deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(D) Deadlines following Immigration Judges' decisions.** — Pursuant to statute or regulation, a filing may be due within a specific period of time following an Immigration Judge's decision. For example, appeals, motions to reopen, and motions to reconsider must be filed within such deadlines. See 8 C.F.R. §§ 1003.38(b), 1003.23. In such cases, the day the Immigration Judge renders an oral decision or mails a written decision counts as "day 0." The following day counts as "day 1." Statutory and regulatory deadlines are calculated using calendar days. Therefore, Saturdays, Sundays, and legal holidays are counted. If, however, a statutory or regulatory deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(E) Deadlines for responses.** — A response to a filing may be due within a specific period of time following the original filing. For example, if a response to a motion is due within 10 days after the motion was filed with the Immigration Court, the day the original filing is received by the Immigration

Court counts as "day 0." The following day counts as "day 1." Because deadlines are calculated using calendar days, Saturdays, Sundays, and legal holidays are counted. If, however, such a deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(iii) Delays in delivery.** — Postal or delivery delays do not affect existing deadlines. Parties should anticipate all postal or delivery delays, whether a filing is made by first class mail, priority mail, or overnight or guaranteed delivery service. The Immigration Court does not excuse untimeliness due to postal or delivery delays, except in rare circumstances. See Chapter 3.1(a)(iii) (Receipt rule).

**(iv) Motions for extensions of filing deadlines.** — Immigration Judges have the authority to grant motions for extensions of filing deadlines that are not set by regulation. A deadline is only extended upon the *granting* of a motion for an extension. Therefore, the mere filing of a motion for an extension does not excuse a party's failure to meet a deadline. Unopposed motions for extensions are not automatically granted.

**(A) Policy.** — Motions for extensions are not favored. In general, conscientious parties should be able to meet filing deadlines. In addition, every party has an ethical obligation to avoid delay.

**(B) Deadline.** — A motion for an extension should be filed as early as possible, and must be received by the original filing deadline.

**(C) Contents.** — A motion for an extension should be filed with a cover page labeled "MOTION FOR EXTENSION" and comply with the requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). A motion for an extension should clearly state:

- when the filing is due

- the reason(s) for requesting an extension

- that the party has exercised due diligence to meet the current filing deadline

- that the party will meet a revised deadline

       ○    if the parties have communicated, whether the other party consents to the extension

**(d) Defective filings.** — Filings may be deemed defective due to improper filing, untimely filing, or both.

**(i) Improper filings.** — If an application, motion, brief, exhibit, or other submission is not properly filed, it is rejected by the Immigration Court with an explanation for the rejection. Parties are expected to exercise due diligence. Parties wishing to correct the defect and refile after a rejection must do so promptly. See Chapters 3.1(b) (Timing of submissions), 3.1(c) (Must be "timely"). See also subsection (ii), below. The term "rejected" means that the filing is returned to the filing party because it is defective and therefore will not be considered by the Immigration Judge. It is not an adjudication of the filing or a decision regarding its content. Examples of improper submissions include:

       ○    if a fee is required, failure to submit a fee receipt or fee waiver request

       ○    failure to include a proof of service upon the opposing party

       ○    failure to comply with the language, signature, and format requirements

       ○    illegibility of the filing

If a document is improperly filed but not rejected, the Immigration Judge retains the authority to take appropriate action.

**(ii) Untimely filings.** — The untimely submission of a filing may have serious consequences. The Immigration Judge retains the authority to determine how to treat an untimely filing. Accordingly, parties should be mindful of the requirements regarding timely filings. See Chapters 3.1(b) (Timing of submissions), 3.1(c) (Must be "timely").

Untimely filings, if otherwise properly filed, are not rejected by Immigration Court staff. However, parties should note that the consequences of untimely filing are sometimes as follows:

       ○    if an application for relief is untimely, the alien's interest in that relief is deemed waived or abandoned

    ○    if a motion is untimely, it is denied

    ○    if a brief or pre-trial statement is untimely, the issues in question are deemed waived or conceded

    ○    if an exhibit is untimely, it is not entered into evidence or it is given less weight

    ○    if a witness list is untimely, the witnesses on the list are barred from testifying

    ○    if a response to a motion is untimely, the motion is deemed unopposed

*(iii) Motions to accept untimely filings.* — If a party wishes the Immigration Judge to consider a filing despite its untimeliness, the party must make an oral or written motion to accept the untimely filing. A motion to accept an untimely filing must explain the reasons for the late filing and show good cause for acceptance of the filing. In addition, parties are strongly encouraged to support the motion with documentary evidence, such as affidavits and declarations under the penalty of perjury. The Immigration Judge retains the authority to determine how to treat an untimely filing.

*(iv) Natural or manmade disasters.* — Natural or manmade disasters may occur that create unavoidable filing delays. Parties wishing to file untimely documents after a disaster must comply with the requirements of subsection (iii), above.

*(e) Filing receipts.* — The Immigration Court does not issue receipts for filings. Parties are encouraged, however, to obtain and retain corroborative documentation of delivery, such as mail delivery receipts or courier tracking information. As a precaution, parties should keep copies of all items sent to the Immigration Court.

*(f) Conformed copies.* — A time-and-date stamp is placed on each filing received by the Immigration Court. If the filing party desires a "conformed copy" (i.e., a copy of the filing bearing the Immigration Court's time-and-date stamp), the original must be accompanied by an accurate copy of the filing, prominently marked "CONFORMED COPY; RETURN TO SENDER." If the filing is voluminous, only a copy of the cover page and table of contents needs to be submitted for confirmation. The filing must also contain a self-addressed stamped envelope or comparable return delivery packaging. The Immigration Court does not return conformed copies without a prepaid return envelope or packaging.

## 3.2    Service on the Opposing Party

*(a) Service requirements.* — For all filings before the Immigration Court, a party must:

- o    provide, or "serve," an identical copy on the opposing party (or, if the party is represented, the party's representative), and

- o    except for filings served during a hearing or jointly-filed motions agreed upon by all parties, declare in writing that a copy has been served

The written declaration is called a "Proof of Service," also referred to as a "Certificate of Service." See subsection (e), below, Appendix G (Sample Proof of Service). See also 8 C.F.R. §§ 1003.17(a), 1003.23(b)(1)(ii), 1003.32(a).

*(b) Whom to serve.* — For all filings before the Immigration Court, the opposing party must be served. For an alien in proceedings, the opposing party is the Department of Homeland Security (DHS). In most instances, a DHS Chief Counsel or a specific DHS Assistant Chief Counsel is the designated officer to receive service. Parties may contact the Immigration Court for the DHS address. The opposing party is never the Immigration Judge or Immigration Court.

*(c) Method of service.* — Service on the opposing party may be accomplished by hand-delivery, by U.S. Postal Service, or by commercial courier. Where service on the opposing party is accomplished by hand-delivery, service is complete when the filing is hand-delivered to a responsible person at the address of the individual being served.

Where service on the opposing party is accomplished by U.S. Postal Service or commercial courier, service is complete when the filing is deposited with the U.S. Postal Service or the commercial courier. Note that this rule differs from the rule for filings–filings with the Immigration Court are deemed complete when documents are received by the court, not when documents are mailed. See Chapter 3.1(a)(iii) (Receipt Rule).

*(d) Timing of service.* — The Proof of Service must bear the actual date of transmission and accurately reflect the means of transmission (e.g., hand delivery, regular mail, overnight mail, commercial courier, etc.). Service must be calculated to allow the other party sufficient opportunity to act upon or respond to served material.

*(e) Proof of Service.* — A Proof of Service is required for all filings, except filings served on the opposing party during a hearing or jointly-filed motions agreed upon by all parties. See 8 C.F.R. § 1003.17(a), 1003.23(b)(1)(ii), 1003.32(a). See also Appendix G

(Sample Proof of Service).  When documents are submitted as a package, the Proof of Service should be placed at the bottom of the package.

**(i) Contents of Proof of Service.** — A Proof of Service must state:

- ○ the name or title of the party served

- ○ the precise and complete address of the party served

- ○ the date of service

- ○ the means of service (e.g., hand delivery, regular mail, overnight mail, commercial courier, etc.)

- ○ the document or documents being served

A Proof of Service must contain the name and signature of the person serving the document.  A Proof of Service may be signed by an individual designated by the filing party, unlike the document(s) being served, which must be signed by the filing party.

**(ii) Certificates of Service on applications.** — Certain forms, such as the Application for Cancellation of Removal for Certain Permanent Residents (Form EOIR-42A), contain a Certificate of Service, which functions as a Proof of Service.  Such a Certificate of Service only functions as a Proof of Service for the form on which it appears, not for any supporting documents filed with the form.  If supporting documents are filed with an application containing a Certificate of Service, a separate Proof of Service for the entire submission must be included.

**(f) Representatives and service.** —

**(i) Service on a representative.** — Service on a representative constitutes service on the person or entity represented.  If an alien is represented by an attorney, the Department of Homeland Security must serve the alien's attorney but need not serve the alien.  See 8 C.F.R. § 1292.5(a), Chapter 2 (Appearances before the Immigration Court).

**(ii) Service by a represented alien.** — Whenever a party is represented, the party should submit all filings and communications to the Immigration Court through the representative.  See 8 C.F.R. § 1292.5(a), Chapter 2.1 (Representation Generally).

*(g) Proof of Service and Notice of Appearance.* — All filings with the Immigration Court must include a Proof of Service that identifies the item being filed, unless served during a hearing. Thus, a completed Proof of Service on a Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28) does not constitute Proof of Service of documents accompanying the Form EOIR-28.

## 3.3    Documents

*(a) Language and certified translations.* — All documents filed with the Immigration Court must be in the English language or accompanied by a certified English translation. See 8 C.F.R. §§ 1003.33, 1003.23(b)(1)(I). An affidavit or declaration in English by a person who does not understand English must include a certificate of interpretation stating that the affidavit or declaration has been read to the person in a language that the person understands and that he or she understood it before signing.

A certification of translation of a foreign-language document or declaration must be typed, signed by the translator, and attached to the foreign-language document. A certification must include a statement that the translator is competent to translate the language of the document and that the translation is true and accurate to the best of the translator's abilities. If the certification is used for multiple documents, the certification must specify the documents. The translator's address and telephone number must be included. See Appendix H (Sample Certificate of Translation).

*(b) Signatures.* — No forms, motions, briefs, or other submissions are properly filed without an original signature from either the alien, the alien's representative, or a representative of the Department of Homeland Security. A Proof of Service also requires a signature but may be filed by someone designated by the filing party. See Chapter 3.2(e) (Proof of Service).

A signature represents a certification by the signer that: he or she has read the document; to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is grounded in fact; the document is submitted in good faith; and the document has not been filed for any improper purpose. See 8 C.F.R. § 1003.102(j)(1). A signature represents the signer's authorization, attestation, and accountability. Every signature must be accompanied by the typed or printed name.

*(i) Simulated signatures.* — Signature stamps and computer-generated signatures are not acceptable on documents filed with the Immigration Court. These signatures do not convey the signer's personal authorization, attestation, and accountability for the filing. See also Chapters 3.1(a) (Filing), 3.3(d) (Originals and reproductions).

**(ii) Law firms.** — Except as provided in Chapter 2.3(j) (Appearances "on behalf of"), only an attorney of record–not a law firm, law office, or other attorney–may sign a submission to the Immigration Court. See Chapters 2.3(c) (Appearances), 2.3(e) (Multiple representatives), 2.3(f) (Law firms).

**(iii) Accredited representatives.** — Accredited representatives must sign their own submissions. See Chapter 2.4(f) (Signatures).

**(iv) Paralegals and other staff.** — Paralegals and other staff are not authorized to practice before the Immigration Court and may not sign a submission to the Immigration Court. See Chapter 2.6 (Paralegals). However, a paralegal may sign a Proof of Service when authorized by the filing party. See Chapter 3.2(e) (Proof of Service).

**(v) Other representatives.** — Only those individuals who have been authorized by the Immigration Court to represent a party and have submitted a Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28) may sign submissions to the Immigration Court. See Chapters 2.5 (Law students and Law Graduates), 2.9 (Others).

**(vi) Family members.** — A family member may sign submissions on behalf of a party only under certain circumstances. See Chapter 2.8 (Family Members).

**(c) Format.** — The Immigration Court prefers all filings and supporting documents to be typed, but will accept handwritten filings that are legible. Illegible filings will be rejected or excluded from evidence. See Chapter 3.1(d) (Defective filings). All filings must be signed by the filing party. See Chapter 3.3(b) (Signatures).

**(i) Order of documents.** — Filings should be assembled as follows. All forms should be filled out completely. If a Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28) is required, it should be submitted at the front of the package. See Chapter 2.1(b) (Entering an appearance).

**(A) Applications for relief.** — An application package should comply with the instructions on the application. The application package should contain (in order):

(1)    Form EOIR-28 (if required)
(2)    cover page
(3)    if applicable, fee receipt (stapled to the application) or motion for a fee waiver

(4)     application
(5)     proposed exhibits (if any) with table of contents)
(6)     Proof of Service

See Chapters 2.1(b) (Entering an appearance), 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption), 3.3(e)(ii) (Publications as evidence), 3.4 (Filing Fees).

**(B) Proposed exhibits.** — If proposed exhibits are not included as part of an application package, the proposed exhibit package should contain (in order):

(1)     Form EOIR-28 (if required)
(2)     cover page
(3)     table of contents
(4)     proposed exhibits
(5)     Proof of Service

See Chapters 2.1(b) (Entering an appearance), Chapters 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption), 3.3(e)(ii) (Publications as evidence), 3.4 (Filing Fees).

**(C) Witness list.** — A witness list package should contain (in order):

(1)     Form EOIR-28 (if required)
(2)     cover page
(3)     witness list (in compliance with the requirements of Chapter 3.3(g) (Witness lists))
(4)     Proof of Service

See Chapters 2.1(b) (Entering an appearance), 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption).

**(D) Motions to reopen.** — A motion package for a motion to reopen should contain (in order):

(1)     Form EOIR-28
(2)     cover page
(3)     if applicable, fee receipt (stapled to the motion or application) or motion for a fee waiver
(4)     motion to reopen
(5)     a copy of the Immigration Judge's decision

> (6)    if applicable, a motion brief
> (7)    if applicable, a copy of the application for relief
> (8)    supporting documentation (if any) with table of contents
> (9)    Alien's Change of Address Form (Form EOIR-33/IC) (recommended even if the alien's address has not changed)
> (10)    a proposed order for the Immigration Judge's signature
> (11)    Proof of Service

See Chapters 2.1(b) (Entering an appearance), 2.2(c)(iii) (Motions), 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption), 3.3(e)(ii) (Publications as evidence), 3.4 (Filing Fees), 5 (Motions before the Immigration Court).

**(E) Motions to reconsider.** — A motion package for a motion to reconsider should contain (in order):

> (1)    Form EOIR-28
> (2)    cover page
> (3)    if applicable, fee receipt (stapled to the motion or application) or motion for a fee waiver
> (4)    motion to reconsider
> (5)    a copy of the Immigration Judge's decision
> (6)    if applicable, a motion brief
> (7)    if applicable, a copy of the application for relief
> (8)    supporting documentation (if any) with table of contents
> (9)    Alien's Change of Address Form (Form EOIR-33/IC) (recommended even if the alien's address has not changed)
> (10)    a proposed order for the Immigration Judge's signature
> (11)    Proof of Service

See Chapters 2.1(b) (Entering an appearance), 2.2(c)(iii) (Motions), 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption), 3.3(e)(ii) (Publications as evidence), 3.4 (Filing Fees), 5 (Motions before the Immigration Court).

**(F) Other filings.** — Other filing packages, including pre-decision motions and briefs, should contain (in order):

> (1)    Form EOIR-28 (if required)
> (2)    cover page
> (3)    if applicable, fee receipt (stapled to the filing) or motion for a fee waiver
> (4)    the filing
> (5)    supporting documentation (if any) with table of contents

     (6)     if a motion, a proposed order for the Immigration Judge's signature

     (7)     Proof of Service

See Chapters 2.1(b) (Entering an appearance), 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption), 3.3(e)(ii) (Publications as evidence), 3.4 (Filing Fees).

**(ii) Number of copies.** — Except as provided in subsection (A) and (B), below, only the original of each application or other submission must be filed with the Immigration Court. For all filings, a copy must be served on the opposing party. See Chapter 3.2 (Service on the Opposing Party). Multiple copies of a filing (e.g., a brief, motion, proposed exhibit, or other supporting documentation) should not be filed unless otherwise instructed by the Immigration Judge.

**(A) Defensive asylum applications.** — For defensive asylum applications, parties must submit to the Immigration Court the original application and one copy. The copy submitted to the court is sent to the Department of State for review, in accordance with 8 C.F.R. § 1208.11. See Chapter 3.1(b)(ii)(A) (Defensive applications). In addition, a copy must be served on the opposing party. See Chapter 3.2 (Service on the Opposing Party).

**(B) Consolidated cases.** — In consolidated cases, parties should submit a separate copy of each submission for placement in each individual Record of Proceedings. However, a "master exhibit" may be filed in the lead individual's file for exhibits and supporting documentation applicable to more than one individual, with the approval of the Immigration Judge.

**(iii) Pagination and table of contents.** — All documents, including briefs, motions, and exhibits, should always be paginated by consecutive numbers placed at the bottom center or bottom right hand corner of each page.

Whenever proposed exhibits or supporting documents are submitted, the filing party should include a table of contents with page numbers identified. See Appendix P (Sample Table of Contents).

Where a party is filing more than one application, the party is encouraged to submit a separate evidence package, with a separate table of contents, for each application.

*(iv) Tabs.* — Parties should use alphabetic tabs, commencing with the letter "A." The tabs should be affixed to the right side of the pages. In addition, parties should carefully follow the pagination and table of contents guidelines in subsection (iii), above.

*(v) Paper size and document quality.* — All documents should be submitted on standard 8½" x 11" paper, in order to fit into the Record of Proceedings. See 8 C.F.R. § 1003.32(b). The use of paper of other sizes, including legal-size paper (8½" x 14"), is discouraged. If a document is smaller than 8½" x 11", the document should be affixed to an 8½" x 11" sheet of paper or enlarged to 8½" x 11". If a document is larger than 8½" x 11", the document should be reduced in size by photocopying or other appropriate means, as authorized by the Immigration Judge. This provision does not apply to documents whose size cannot be altered without altering their authenticity. All documents must be legible. Copies that are so poor in quality as to be illegible may be rejected or excluded from evidence. See Chapter 3.1(d) (Defective filings).

Paper should be of standard stock — white, opaque, and unglazed. Given its fragility and tendency to fade, photo-sensitive facsimile paper should never be used.

Ink should be dark, preferably black.

Briefs, motions, and supporting documentation should be single-sided.

*(vi) Cover page and caption.* — All filings should include a cover page. The cover page should include a caption and contain the following information:

- ○    the name of the filing party

- ○    the address of the filing party

- ○    the title of the filing (such as "RESPONDENT'S APPLICATION FOR CANCELLATION OF REMOVAL," "DHS WITNESS LIST," "RESPONDENT'S MOTION TO REOPEN")

- ○    the full name for each alien covered by the filing (as it appears on the charging document)

- ○    the alien registration number ("A number") for each alien covered by the filing (if an alien has more than one A number,

all the A numbers should appear on the cover page with a clear notation that the alien has multiple A numbers)

o   the type of proceeding involved (such as removal, deportation, exclusion, or bond)

o   the date and time of the hearing

See Appendix F (Sample Cover Page). If the filing involves special circumstances, that information should appear prominently on the cover page, preferably in the top right corner and highlighted (e.g., "DETAINED," "JOINT MOTION," "EMERGENCY MOTION").

*(vii) Fonts and spacing.* — Font and type size must be easily readable. "Times Roman 12 point" font is preferred. Double-spaced text and single-spaced footnotes are also preferred. Both proportionally spaced and monospaced fonts are acceptable.

*(viii) Binding.* — The Immigration Court and the Board of Immigration Appeals use a two-hole punch system to maintain files. All forms, motions, briefs, and other submissions should always be pre-punched with holes along the top (centered and 2 ¾" apart). Submissions may be stapled in the top left corner. If stapling is impracticable, the use of removable binder clips is encouraged. Submissions should neither be bound on the side nor commercially bound, as such items must be disassembled to fit into the record of proceedings and might be damaged in the process. The use of ACCO-type fasteners and paper clips is discouraged.

*(ix) Forms.* — Forms should be completed in full and must comply with certain requirements. See Chapter 11 (Forms). See also Appendix E (Forms).

*(d) Originals and reproductions.* —

*(i) Briefs and motions.* — The original of a brief or motion must always bear an original signature. See Chapter 3.3(b) (Signatures).

*(ii) Forms.* — The original of a form must always bear an original signature. See Chapters 3.3(b) (Signatures), 11.3 (Submitting completed forms). In certain instances, forms must be signed in the presence of the Immigration Judge.

Case 2:07-cv-03239-TJH-KES    Document 319    Filed 04/06/13    Page 27 of 228    Page ID #:7131

**(iii) Supporting documents.** — Photocopies of supporting documents, rather than the originals, should be filed with the Immigration Court and served on the Department of Homeland Security (DHS). Examples of supporting documents include identity documents, photographs, and newspaper articles.

If supporting documents are filed at a master calendar hearing, the alien must make the originals available to DHS at the master calendar hearing for possible forensics examination at the Forensics Documents Laboratory. In addition, the alien must bring the originals to all individual calendar hearings.

If supporting documents are filed after the master calendar hearing(s), the filing should note that originals are available for review. In addition, the alien must bring the originals to all individual calendar hearings.

The Immigration Judge has discretion to retain original documents in the Record of Proceedings. The Immigration Judge notes on the record when original documents are turned over to DHS or the Immigration Court.

**(iv) Photographs.** — If a party wishes to submit a photograph, the party should follow the guidelines in subsection (iii), above. In addition, prior to bringing the photograph to the Immigration Court, the party should print identifying information, including the party's name and alien registration number (A number), on the back of the original photograph.

**(e) Source materials.** — Source materials should be provided to the Immigration Court and highlighted as follows.

**(i) Source of law.** — When a party relies on a source of law in any filing (e.g., a brief, motion, or pre-trial statement) that is not readily available, that source of law should be reproduced and provided to the Immigration Court and the other party, along with the filing. Similarly, if a party relies on governmental memoranda, legal opinions, advisory opinions, communiques, or other ancillary legal authority or sources in any filing, copies of such items should be provided to the Immigration Court and the other party, along with the filing.

**(ii) Publications as evidence.** — When a party submits published material as evidence, that material must be clearly marked with identifying information, including the precise title, date, and page numbers. If the publication is difficult to locate, the submitting party should identify where the publication can be found and authenticated.

In all cases, the party should submit title pages containing identifying information for published material (e.g., author, year of publication). Where a title page is not available, identifying information should appear on the first page of the document. For example, when a newspaper article is submitted, the front page of the newspaper, including the name of the newspaper and date of publication, should be submitted where available, and the page on which the article appears should be identified. If the front page is not available, the name of the newspaper and the publication date should be identified on the first page of the submission.

Copies of State Department Country Reports on Human Rights Practices, as well as the State Department Annual Report on International Religious Freedom, must indicate the year of the particular report.

*(iii) Internet publications.* — When a party submits an internet publication as evidence, the party should follow the guidelines in subsection (ii), above, as well as provide the complete internet address for the material.

*(iv) Highlighting.* — When a party submits secondary source material ("background documents"), that party should highlight or otherwise indicate the pertinent portions of that secondary source material. Any specific reference to a party should always be highlighted.

*(f) Criminal conviction documents.* — Documents regarding criminal convictions must comport with the requirements of 8 C.F.R. § 1003.41. When submitting documents relating to a respondent's criminal arrests, prosecutions, or convictions, parties are encouraged to use a criminal history chart and attach all pertinent documentation, such as arrest and conviction records. The criminal history chart should contain the following information for each arrest:

- ○ arrest date

- ○ court docket number

- ○ charges

- ○ disposition

- ○ immigration consequences, if any

The documentation should be paginated, with the corresponding pages indicated on the criminal history chart. For a sample, see Appendix O (Sample Criminal History Chart). Under "Immigration Consequences," parties should simply state their "bottom-line" position

(for example: "not an aggravated felony").  Parties may supplement the criminal history chart with a pre-hearing brief.  See Chapter 4.19 (Pre-Hearing Briefs).

**(g) Witness lists.** — A witness list should include the following information for each witness, except the respondent:

- the name of the witness

- if applicable, the alien registration number ("A number")

- a written summary of the testimony

- the estimated length of the testimony

- the language in which the witness will testify

- a curriculum vitae or resume, if called as an expert

## 3.4    Filing Fees

**(a) Where paid.** — Fees for the filing of motions and applications for relief with the Immigration Court, when required, are paid to the Department of Homeland Security as set forth in 8 C.F.R. § 1103.7. The Immigration Court does not collect fees.  See 8 C.F.R. §§ 1003.24, 1103.7.

**(b) Filing fees for motions.** —

**(i) When required.** — The following motions require a filing fee:

- a motion to reopen (except a motion that is based exclusively on a claim for asylum)

- a motion to reconsider (except a motion that is based on an underlying claim for asylum)

8 C.F.R. §§ 1003.23(b)(1), 1003.24, 1103.7. For purposes of determining filing fee requirements, the term "asylum" here includes withholding of removal ("restriction on removal"), withholding of deportation, and claims under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.

Where a filing fee is required, the filing fee must be paid in advance to the Department of Homeland Security and the fee receipt must be submitted with the motion. If a filing party is unable to pay the fee, he or she should request that the fee be waived. See subsection (d), below.

*(ii) When not required.* — The following motions do not require a filing fee:

- a motion to reopen that is based exclusively on a claim for asylum

- a motion to reconsider that is based on an underlying a claim for asylum

- a motion filed while proceedings are pending before the Immigration Court

- a motion requesting only a stay of removal, deportation, or exclusion

- a motion to recalendar

- any motion filed by the Department of Homeland Security

- a motion that is agreed upon by all parties and is jointly filed ("joint motion")

- a motion to reopen a removal order entered in absentia if the motion is filed under INA § 240(b)(5)(C)(ii)

- a motion to reopen a deportation order entered in absentia if the motion is filed under INA § 242B(c)(3)(B), as it existed prior to April 1, 1997

- a motion filed under law, regulation, or directive that specifically does not require a filing fee

8 C.F.R. §§ 1003.23(b)(1), 1003.24, 1103.7. For purposes of determining filing fee requirements, the term "asylum" here includes withholding of removal ("restriction on removal"), withholding of deportation, and claims under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.

**(c) Application fees. —**

**(i) When required.** — When an application for relief that requires a fee is filed during the course of proceedings, the fee for that application must be paid in advance to the Department of Homeland Security (DHS). Instructions for paying application fees can be found in the DHS biometrics instructions, which are available on the Executive Office for Immigration Review website at www.usdoj.gov/eoir. A fee receipt must be submitted when the application is filed with the Immigration Court.

If a filing party is unable to pay the fee, the party should file a motion for a fee waiver. See subsection (d), below.

**(ii) When not required.** — When an application for relief that requires a fee is the underlying basis of a motion to reopen, the fee for the application need not be paid to the Department of Homeland Security (DHS) in advance of the motion to reopen. Rather, only the fee for the motion to reopen must be paid in advance. The fee receipt for the motion to reopen must be attached to that motion. See subsection (b)(i), above. If the motion to reopen is granted, the fee for the underlying application must then be paid to DHS and that fee receipt must be submitted to the Immigration Court. See Chapter 3.1(c) (Must be "timely").

**(d) When waived.** — When a fee to file an application or motion is required, the Immigration Judge has the discretion to waive the fee upon a showing that the filing party is unable to pay the fee. However, the Immigration Judge will not grant a fee waiver where the application for relief is a Department of Homeland Security (DHS) form and DHS regulations prohibit the waiving of such fee. See 8 C.F.R. §§ 103.7, 1103.7.

Fee waivers are not automatic. The request for a fee waiver must be accompanied by a properly executed affidavit or unsworn declaration made pursuant to 28 U.S.C. § 1746, substantiating the filing party's inability to pay the fee. If a filing is submitted without a required fee and the request for a fee waiver is denied, the filing will be deemed defectively filed and may be rejected or excluded from evidence. See Chapter 3.1(d) (Defective filings).

Fees are not reimbursed merely because the application or motion is granted.

**(e) Amount of payment. —**

**(i) Motions to reopen or reconsider.** — When a filing fee is required, the fee for motions to reopen or reconsider is $110. 8 C.F.R. § 1103.7(b)(2). The fee

is paid to the Department of Homeland Security in advance. The fee receipt and motion are then filed with the Immigration Court.

*(ii) Applications for relief.* — Application fees are found in the application instructions and in the federal regulations. See 8 C.F.R. §§ 103.7, 1103.7(b)(1). See also Chapter 11 (Forms), Appendix E (Forms).

*(iii) Background and security checks.* — The Department of Homeland Security (DHS) biometrics fee is found in the DHS biometrics instructions provided to the aliens in the Immigration Court. 8 C.F.R. § 1003.47(d). The Immigration Judge cannot waive the DHS biometrics fee.

*(f) Payments in consolidated proceedings.* —

*(i) Motions to reopen and reconsider.* — Only one motion fee should be paid in a consolidated proceeding. For example, if several aliens in a consolidated proceeding file simultaneous motions to reopen, only one motion fee should be paid.

*(ii) Applications for relief.* — To determine the amount of the fee to be paid for applications filed in consolidated proceedings, the parties should follow the instructions on the application. In some cases, a fee is required for each application. For example, if each alien in a consolidated proceeding wishes to apply for cancellation of removal, a fee is required for each application.

*(g) Form of payment.* — When a fee is required to file an application for relief or a motion to reopen or reconsider, the fee is paid to the Department of Homeland Security and the form of the payment is governed by federal regulations. See 8 C.F.R. § 103.7.

*(h) Defective or missing payment.* — If a fee is required to file an application for relief or motion but a fee receipt is not submitted to the Immigration Court (for example, because the fee was not paid in advance to the Department of Homeland Security), the filing is defective and may be rejected or excluded from evidence. If a fee is not paid in the correct amount or is uncollectible, the filing is defective and may be rejected or excluded from evidence. See Chapter 3.1(d) (Defective filings).

# Chapter 4
## Table of Contents

**Chapter 4      Hearings before Immigration Judges**

4.1   Types of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55
4.2   Commencement of Removal Proceedings . . . . . . . . . . . . . . . . . . .  55
4.3   References to Parties and the Immigration Judge . . . . . . . . . . . . .  56
4.4   Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57
4.5   Hearing and Filing Location . . . . . . . . . . . . . . . . . . . . . . . . . . .  58
4.6   Form of the Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58
4.7   Hearings by Video or Telephone Conference . . . . . . . . . . . . . . . .  58
4.8   Attendance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59
4.9   Public Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60
4.10  Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61
4.11  Interpreters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61
4.12  Courtroom Decorum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62
4.13  Electronic Devices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  63
4.14  Access to Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64
4.15  Master Calendar Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64
4.16  Individual Calendar Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . .  75
4.17  In Absentia Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  78
4.18  Pre-Hearing Conferences and Statements . . . . . . . . . . . . . . . . . .  78
4.19  Pre-Hearing Briefs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  79
4.20  Subpoenas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  82
4.21  Combining and Separating Cases . . . . . . . . . . . . . . . . . . . . . . . .  83
4.22  Juveniles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  84

# 4  Hearings before Immigration Judges

## 4.1    Types of Proceedings

Immigration Judges preside over courtroom proceedings in removal, deportation, exclusion, and other kinds of proceedings.  See Chapter 1.5(a) (Jurisdiction).  This chapter describes the procedures in removal proceedings.

Other kinds of proceedings conducted by Immigration Judges are discussed in the following chapters:

|  |  |
|---|---|
| Chapter 7 | Other Proceedings before Immigration Judges |
| Chapter 9 | Detention and Bond |
| Chapter 10 | Discipline of Practitioners |

**Note:** Prior to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), the two major types of courtroom proceedings conducted by Immigration Judges were deportation and exclusion proceedings.  In 1996, the IIRIRA replaced deportation proceedings and exclusion proceedings with removal proceedings.  The new removal provisions went into effect on April 1, 1997.  See INA § 240, as amended by IIRIRA § 309(a).  The regulations governing removal proceedings are found at 8 C.F.R. §§1003.12-1003.41,1240.1-1240.26.  For more information on deportation and exclusion proceedings, see Chapter 7 (Other Proceedings before Immigration Judges).

## 4.2    Commencement of Removal Proceedings

*(a) Notice to Appear.* — Removal proceedings begin when the Department of Homeland Security files a Notice to Appear (Form I-862) with the Immigration Court after it is served on the alien.  See 8 C.F.R. §§ 1003.13, 1003.14.  The Notice to Appear, or "NTA," is a written notice to the alien which includes the following information:

- ○    the nature of the proceedings

- ○    the legal authority under which the proceedings are conducted

- ○    the acts or conduct alleged to be in violation of the law

- ○    the charge(s) against the alien and the statutory provision(s) alleged to have been violated

    o    the opportunity to be represented by counsel at no expense to the government

    o    the consequences of failing to appear at scheduled hearings

    o    the requirement that the alien immediately provide the Attorney General with a written record of an address and telephone number

The Notice to Appear replaces the Order to Show Cause (Form I-221), which was the charging document used to commence deportation proceedings, and the Notice to Applicant for Admission Detained for Hearing before an Immigration Judge (Form I-122), which was the charging document used to commence exclusion proceedings. See 8 C.F.R. § 1003.13.

**(b) Failure to prosecute.** — On occasion, an initial hearing is scheduled before the Department of Homeland Security (DHS) has been able to file a Notice to Appear with the Immigration Court. For example, DHS may serve a Notice to Appear, which contains a hearing date, on an alien, but not file the Notice to Appear with the court until some time later. Where DHS has not filed the Notice to Appear with the court by the time of the first hearing, this is known as a "failure to prosecute." If there is a failure to prosecute, the respondent and counsel may be excused until DHS files the Notice to Appear with the court, at which time a hearing is scheduled. Alternatively, at the discretion of the Immigration Judge, the hearing may go forward if both parties are present in court and DHS files the Notice to Appear in court at the hearing.


## 4.3    References to Parties and the Immigration Judge

The parties in removal proceedings are the alien and the Department of Homeland Security (DHS). See Chapter 1.2(d) (Relationship to the Department of Homeland Security). To avoid confusion, the parties and the Immigration Judge should be referred to as follows:

    o    the alien should be referred to as "the respondent"

    o    the Department of Homeland Security should be referred to as "the Department of Homeland Security" or "DHS"

    o    the attorney for the Department of Homeland Security should be referred to as "the Assistant Chief Counsel," "the DHS attorney," or "the government attorney"

&#9675;     the respondent's attorney should be referred to as "the respondent's counsel"
or "the respondent's representative"

&#9675;     the respondent's representative, if not an attorney, should be referred to as
"the respondent's representative"

&#9675;     the Immigration Judge should be referred to as "the Immigration Judge" and
addressed as "Your Honor" or "Judge ___"

Care should be taken not to confuse the Department of Homeland Security with the
Immigration Court or the Immigration Judge. See Chapter 1.5(e) (Department of Homeland
Security).


## 4.4    Representation

*(a) Appearances*. — A respondent in removal proceedings may appear without
representation ("pro se") or with representation. See Chapter 2 (Appearances before the
Immigration Court). If a party wishes to be represented, he or she may be represented by
an individual authorized to provide representation under federal regulations. See 8 C.F.R.
§ 1292.1. See also Chapter 2 (Appearances before the Immigration Court). Whenever a
respondent is represented, the respondent should submit all filings, documents, and
communications to the Immigration Court through his or her representative. See Chapter
2.1(d) (Who may file).

*(b) Notice of Appearance.* — Representatives before the Immigration Court must
file a Notice of Entry of Appearance as Attorney or Representative Before the Immigration
Court (Form EOIR-28). See Chapter 2.1(b) (Entering an appearance). If at any time after
the commencement of proceedings there is a change in representation, the new
representative must file a new Form EOIR-28, as well as complying with the other
requirements for substitution of counsel, if applicable. See Chapters 2.1(b) (Entering an
appearance), 2.3(c) (Appearances), 2.3(i)(i) (Substitution of counsel).

*(c) Multiple representation.* — Parties are limited to one primary attorney (notice
attorney) or accredited representative. For guidance on the limited circumstances in which
parties may be represented by more than one representative, see Chapter 2 (Appearances
before the Immigration Court).

*(d) Motions to withdraw.* — Withdrawal of counsel can be requested by oral or
written motion. See Chapter 2.3(i)(ii) (Withdrawal of counsel). Substitution of counsel also
can be requested by oral or written motion. See Chapter 2.3(i)(i)(Substitution of counsel).

## 4.5    Hearing and Filing Location

There are more than 200 Immigration Judges in over 50 Immigration Courts nationwide.  The hearing location is identified on the Notice to Appear (Form I-862) or hearing notice. See Chapter 4.15(c) (Notification). Parties should note that documents are not necessarily filed at the location where the hearing is held.  For information on hearing and filing locations, see Chapter 3.1(a) (Filing).  If in doubt as to where to file documents, parties should contact the Immigration Court.

## 4.6    Form of the Proceedings

An Immigration Judge may conduct removal hearings:

- o    in person

- o    by video conference

- o    by telephone conference, except that evidentiary hearings on the merits may only be held by telephone if the respondent consents after being notified of the right to proceed in person or by video conference

See INA § 240(b)(2), 8 C.F.R. § 1003.25(c).  See also Chapter 4.7 (Hearings by Video or Telephone Conference).

Upon the request of the respondent or the respondent's representative, the Immigration Judge has the authority to waive the appearance of the respondent and/or the respondent's representative at specific hearings in removal proceedings.  See 8 C.F.R. § 1003.25(a).  See also Chapter 4.15(m) (Waivers of appearances).

## 4.7    Hearings by Video or Telephone Conference

*(a) In general.* — Immigration Judges are authorized by statute to hold hearings by video conference and telephone conference, except that evidentiary hearings on the merits may only be conducted by telephone conference if the respondent consents after being notified of the right to proceed in person or through video conference.  See INA § 240(b)(2), 8 C.F.R. § 1003.25(c).  See also Chapter 4.6 (Form of the Proceedings).

*(b) Location of parties.* — Where hearings are conducted by video or telephone conference, the Immigration Judge, the respondent, the DHS attorney, and the witnesses need not necessarily be present together in the same location.

*(c) Procedure*. — Hearings held by video or telephone conference are conducted under the same rules as hearings held in person.

*(d) Filing*. — For hearings conducted by video or telephone conference, documents are filed at the Immigration Court having administrative control over the Record of Proceedings. See Chapter 3.1(a) (Filing). The locations from which the parties participate may be different from the location of the Immigration Court where the documents are filed. If in doubt as to where to file documents, parties should contact the Immigration Court.

In hearings held by video or telephone conference, Immigration Judges often allow documents to be faxed between the parties and the Immigration Judge. Accordingly, all documents should be single-sided. Parties should not attach staples to documents that may need to be faxed during the hearing.

*(e) More information*. — Parties should contact the Immigration Court with any questions concerning an upcoming hearing by video or telephone conference.

## 4.8    Attendance

Immigration Court hearings proceed promptly on the date and time that the hearing is scheduled. Any delay in the respondent's appearance at a master calendar or individual calendar hearing may result in the hearing being held "in absentia" (in the respondent's absence). See 8 C.F.R. § 1003.26. See also Chapters 4.15 (Master Calendar Hearing), 4.16 (Individual Calendar Hearing), 4.17 (In Absentia Hearing).

Any delay in the appearance of either party's representative without satisfactory notice and explanation to the Immigration Court may, in the discretion of the Immigration Judge, result in the hearing being held in the representative's absence.

Respondents, representatives, and witnesses should be mindful that they may encounter delays in going through the mandatory security screening at the Immigration Court, and should plan accordingly. See 4.14 (Access to Court). Regardless of such delays, all individuals must pass through the security screening and be present *in the courtroom* at the time the hearing is scheduled.

For hearings at detention facilities, parties should be mindful of any additional security restrictions at the facility. See 4.14 (Access to Court). Individuals attending such a hearing must always be present at the time the hearing is scheduled, regardless of any such additional security restrictions.

**4.9    Public Access**

*(a) General public. —*

*(i) Hearings.* — Hearings in removal proceedings are generally open to the public.  However, special rules apply in the following instances:

      o    Evidentiary hearings involving an application for asylum or withholding of removal ("restriction on removal"), or a claim brought under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, are open to the public unless the respondent expressly requests that the hearing be closed.  In cases involving these applications or claims, the Immigration Judge inquires whether the respondent requests such closure.

      o    Hearings involving an abused alien child are closed to the public.  Hearings involving an abused alien spouse are closed to the public unless the abused spouse agrees that the hearing and the Record of Proceedings will be open to the public.

      o    Proceedings are closed to the public if information may be considered which is subject to a protective order and was filed under seal.

See 8 C.F.R. §§ 1003.27, 1003.31(d), 1003.46, 1208.6, 1240.10(b), 1240.11(c)(3)(i).  Only parties, their representatives, employees of the Department of Justice, and persons authorized by the Immigration Judge may attend a closed hearing.

*(ii) Immigration Judges authorized to close hearings.* — The Immigration Judge may limit attendance or close a hearing to protect parties, witnesses, or the public interest, even if the hearing would normally be open to the public.  See 8 C.F.R. § 1003.27(b).

*(iii) Motions to close hearing.* — For hearings not subject to the special rules in subsection (i), above, parties may make an oral or written motion asking that the Immigration Judge close the hearing.  See 8 C.F.R. § 1003.27(b).  The motion should set forth in detail the reason(s) for requesting that the hearing be closed.  If in writing, the motion should include a cover page labeled "MOTION FOR CLOSED HEARING" and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).

*(b) News media.* — Representatives of the news media may attend hearings that are open to the public. The news media are subject to the general prohibition on electronic devices in the courtroom. See Chapter 4.13 (Electronic Devices). The news media are strongly encouraged to notify the Office of Legislative and Public Affairs and the Court Administrator before attending a hearing. See Appendix B (EOIR Directory).

## 4.10    Record

*(a) Hearings recorded.* — Immigration hearings are recorded electronically by the Immigration Judge. See 8 C.F.R. § 1240.9. Parties may listen to recordings of hearings by prior arrangement with Immigration Court staff. See Chapters 1.6(c) (Records), 12.2 (Requests).

The entire hearing is recorded except for those occasions when the Immigration Judge authorizes an off-the-record discussion. On those occasions, the results of the off-the-record discussion are summarized by the Immigration Judge on the record. The Immigration Judge asks the parties if the summary is true and complete, and the parties are given the opportunity to add to or amend the summary, as appropriate. Parties should request such a summary from the Immigration Judge, if the Immigration Judge does not offer one.

*(b) Transcriptions.* — If an Immigration Judge's decision is appealed to the Board of Immigration Appeals, the hearing is transcribed in appropriate cases and a transcript is sent to both parties. For information on transcriptions, parties should consult the Board Practice Manual, which is available on the Executive Office for Immigration Review website at www.usdoj.gov/eoir/biainfo.htm.

*(c) Record of Proceedings.* — The official file containing the documents relating to an alien's case is the Record of Proceedings, which is created by the Immigration Court. The contents of the Record of Proceedings vary from case to case. However, at the conclusion of Immigration Court proceedings, the Record of Proceedings generally contains the Notice to Appear (Form I-862), hearing notice(s), the attorney's Notice of Appearance (Form EOIR-28), Alien's Change of Address Form(s) (Form EOIR-33/IC), application(s) for relief, exhibits, motion(s), brief(s), hearing tapes (if any), and all written orders and decisions of the Immigration Judge.

## 4.11    Interpreters

Interpreters are provided at government expense to individuals whose command of the English language is inadequate to fully understand and participate in removal

proceedings. In general, the Immigration Court endeavors to accommodate the language needs of all respondents and witnesses. The Immigration Court will arrange for an interpreter both during the individual calendar hearing and, if necessary, the master calendar hearing. See 8 C.F.R. § 1003.22, Chapter 4.15(o) (Other requests).

The Immigration Court uses staff interpreters employed by the Immigration Court, contract interpreters, and telephonic interpretation services. Staff interpreters take an oath to interpret and translate accurately at the time they are employed by the Department of Justice. Contract interpreters take an oath to interpret and translate accurately in court. See 8 C.F.R. § 1003.22.

## 4.12  Courtroom Decorum

*(a) Addressing the Immigration Judge.* — The Immigration Judge should be addressed as either "Your Honor" or "Judge ___." See Chapter 4.3 (References to Parties and the Immigration Judge). The parties should stand when the Immigration Judge enters and exits the courtroom.

*(b) Attire.* — All persons appearing in the Immigration Court should respect the decorum of the court. Representatives should appear in business attire. All others should appear in proper attire.

*(c) Conduct.* — All persons appearing in the Immigration Court should respect the dignity of the proceedings. No food or drink may be brought into the courtroom, except as specifically permitted by the Immigration Judge. Disruptive behavior in the courtroom or waiting area is not tolerated.

*(i) Communication between the parties.* — Except for questions directed at witnesses, parties should not converse, discuss, or debate with each other or another person during a hearing. All oral argument and statements made during a hearing must be directed to the Immigration Judge. Discussions that are not relevant to the proceedings should be conducted outside the courtroom.

*(ii) Representatives.* — Attorneys and other representatives should observe the professional conduct rules and regulations of their licensing authorities. Attorneys and representatives should present a professional demeanor at all times.

*(iii) Minors.* — Children in removal proceedings must attend all scheduled hearings unless their appearance has been waived by the Immigration Judge. Unless participating in a hearing, children should not be brought to the Immigration Court. If a child disrupts a hearing, the hearing may be postponed with the delay

attributed to the party who brought the child. Children are not allowed to stay in the waiting area without supervision.

For Immigration Courts in Department of Homeland Security detention facilities or federal, state, or local correctional facilities, the facility's rules regarding the admission of children, representatives, witnesses, and family members will apply in addition to this subsection. See 4.14 (Access to Court).

## 4.13  Electronic Devices

*(a) Recording devices.* — Removal proceedings may only be recorded with the equipment used by the Immigration Judge. No device of any kind, including cameras, video recorders, and cassette recorders, may be used by any person other than the Immigration Judge to record any part of a hearing. See 8 C.F.R. § 1003.28.

*(b) Possession of electronic devices during hearings.* — Subject to subsection (c), below, all persons, including parties and members of the press, may keep in their possession laptop computers, cellular telephones, electronic calendars, and other electronic devices commonly used to conduct business activities, including electronic devices which have collateral recording capability. Cellular telephones must be turned off during hearings. All other such devices must be turned off or made silent during hearings. No device may be used by any person other than the Immigration Judge to record any part of a hearing. See subsection (a), above.

*(c) Use of electronic devices during hearings.* — In any hearing before an Immigration Judge, all persons, including parties and members of the press, may use laptop computers, electronic calendars, and other electronic devices commonly used to conduct business activities. Such devices may only be used in silent mode. The use of such devices must not disrupt the hearing. Cellular telephones must be turned off during hearings. No device may be used by any person other than the Immigration Judge to record any part of a hearing. See subsection (a), above.

*(d) Courtrooms administered under agreement.* — In any Immigration Court or detention facility administered under agreement between the Executive Office for Immigration Review and federal, state, or local authorities, the facility's rules regarding the possession and use of electronic devices shall apply in addition to subsections (a) through (c), above. In some facilities, individuals, including attorneys, are not allowed to bring cellular telephones, laptop computers, and other electronic devices into the facility.

**4.14    Access to Court**

*(a) Security screening. —*

*(i) All Immigration Courts. —* All Immigration Courts require individuals attending a hearing to pass through security screening prior to entering the court. All individuals attending a hearing should be mindful that they may encounter delays in passing through the security screening.

*(ii) Detention facilities. —* For hearings held in Department of Homeland Security detention facilities or federal, state, or local correctional facilities, compliance with additional security restrictions may be required. For example, individuals may be required to obtain advance clearance to enter the facility. In addition, cellular telephones, laptop computers, and other electronic devices are not allowed at some of these facilities. All persons attending a hearing at such a facility should be aware of the security restrictions in advance. Such individuals should contact the Immigration Court or the detention facility in advance if they have specific questions related to these restrictions.

*(iii) Timeliness required. —* Respondents, representatives, and witnesses must always be present in the courtroom at the time the hearing is scheduled. This applies regardless of any delays encountered in complying with the mandatory security screening and, if the hearing is held at a detention facility, with any additional security restrictions. See Chapter 4.8 (Attendance).

*(b) No access to administrative offices. —* Access to each Immigration Court's administrative offices is limited to Immigration Court staff and other authorized personnel. Parties appearing in Immigration Court or conducting business with the Immigration Court are not allowed access to telephones, photocopying machines, or other equipment within the Immigration Court's administrative offices.

**4.15    Master Calendar Hearing**

*(a) Generally. —* A respondent's first appearance before an Immigration Judge in removal proceedings is at a master calendar hearing. Master calendar hearings are held for pleadings, scheduling, and other similar matters. See subsection (e), below.

*(b) Request for a prompt hearing. —* To allow the respondent an opportunity to obtain counsel and to prepare to respond, at least ten days must elapse between service of the Notice to Appear (Form I-862) on the respondent and the initial master calendar hearing. The respondent may waive this ten-day requirement by signing the "Request for

Prompt Hearing" contained in the Notice to Appear. The respondent may then be scheduled for a master calendar hearing within the ten-day period. See INA § 239(b)(1).

**(c) Notification.** — The Notice to Appear (Form I-862) served on the respondent may contain notice of the date, time, and location of the initial master calendar hearing. If so, the respondent must appear at that date, time, and location. If the Notice to Appear does not contain notice of the date, time, and location of the initial master calendar hearing, the respondent will be mailed a notice of hearing containing this information. If there are any changes to the date, time, or location of a master calendar hearing, the respondent will be notified by mail at the address on record with the Immigration Court. See Chapter 2.2(c) (Address obligations).

**(d) Arrival.** — Parties should arrive at the Immigration Court prior to the time set for the master calendar hearing. Attorneys and representatives should check in with the Immigration Court staff and sign in, if a sign-in sheet is available. Parties should be mindful that they may encounter delays in passing through mandatory security screening prior to entering the court. See Chapters 4.8 (Attendance), 4.14 (Access to Court).

**(e) Scope of the master calendar hearing.** — As a general matter, the purpose of the master calendar hearing is to:

- advise the respondent of the right to an attorney or other representative at no expense to the government

- advise the respondent of the availability of free and low-cost legal service providers and provide the respondent with a list of such providers in the area where the hearing is being conducted

- advise the respondent of the right to present evidence

- advise the respondent of the right to examine and object to evidence and to cross-examine any witnesses presented by the Department of Homeland Security

- explain the charges and factual allegations contained in the Notice to Appear (Form I-862) to the respondent in non-technical language

- take pleadings

- identify and narrow the factual and legal issues

     o     set deadlines for filing applications for relief, briefs, motions, pre-hearing statements, exhibits, witness lists, and other documents

     o     provide certain warnings related to background and security investigations

     o     schedule hearings to adjudicate contested matters and applications for relief

     o     advise the respondent of the consequences of failing to appear at subsequent hearings

     o     advise the respondent of the right to appeal to the Board of Immigration Appeals

See INA §§ 240(b)(4), 240(b)(5), 8 C.F.R. §§ 1240.10, 1240.15.

**(f) Opening of a master calendar hearing.** — The Immigration Judge turns on the recording equipment at the beginning of the master calendar hearing. The hearing is recorded except for off-the-record discussions. See Chapter 4.10 (Record). On the record, the Immigration Judge identifies the type of proceeding being conducted (e.g., a removal proceeding); the respondent's name and alien registration number ("A number"); the date, time, and place of the proceeding; and the presence of the parties. The Immigration Judge also verifies the respondent's name, address, and telephone number. If the respondent's address or telephone number have changed, the respondent must submit an Alien's Change of Address Form (Form EOIR-33/IC).

If necessary, an interpreter is provided to an alien whose command of the English language is inadequate to fully understand and participate in the hearing. See Chapter 4.11 (Interpreters), subsection (o), below. If necessary, the respondent is placed under oath.

**(g) Pro se respondent.** — If the respondent is unrepresented ("pro se") at a master calendar hearing, the Immigration Judge advises the respondent of his or her hearing rights and obligations, including the right to be represented at no expense to the government. In addition, the Immigration Judge ensures that the respondent has received a list of providers of free and low-cost legal services in the area where the hearing is being held. The respondent may waive the right to be represented and choose to proceed pro se. Alternatively, the respondent may request that the Immigration Judge continue the proceedings to another master calendar hearing to give the respondent an opportunity to obtain representation.

If the proceedings are continued but the respondent is not represented at the next master calendar hearing, the respondent will be expected to explain his or her efforts to obtain representation. The Immigration Judge may decide to proceed with pleadings at that hearing or to continue the matter again to allow the respondent to obtain representation. If the Immigration Judge decides to proceed with pleadings, he or she advises the respondent of any relief for which the respondent appears to be eligible. Even if the respondent is required to enter pleadings without representation, the respondent still has the right to obtain representation before the next hearing. See Chapter 4.4 (Representation).

**(h) Entry of appearance.** — If a respondent is represented, the representative should file any routinely submitted documents at the beginning of the master calendar hearing. The representative must also serve such documents on the opposing party. See Chapter 3.2 (Service on the Opposing Party). Routinely-submitted documents include the Notice of Appearance (Form EOIR-28) and the Alien's Change of Address Form (Form EOIR-33/IC).

**(i) Pleadings.** — At the master calendar hearing, the parties should be prepared to plead as follows.

**(i) Respondent.** — The respondent should be prepared:

- o  to concede or deny service of the Notice to Appear (Form I-862)

- o  to request or waive a formal reading of the Notice to Appear (Form I-862)

- o  to request or waive an explanation of the respondent's rights and obligations in removal proceedings

- o  to admit or deny the charges and factual allegations in the Notice to Appear (Form I-862)

- o  to designate or decline to designate a country of removal

- o  to state what applications(s) for relief from removal, if any, the respondent intends to file

- o  to identify and narrow the legal and factual issues

- to estimate (in hours) the amount of time needed to present the case at the individual calendar hearing

- to request a date on which to file the application(s) for relief, if any, with the Immigration Court

- to request an interpreter for the respondent and witnesses, if needed

A sample oral pleading is included in Appendix M (Sample Oral Pleading). To make the master calendar hearing process more expeditious and efficient, representatives are strongly encouraged to use this oral pleading format.

**(ii) Department of Homeland Security.** — The DHS attorney should be prepared:

- to state DHS's position on all legal and factual issues, including eligibility for relief

- to designate a country of removal

- to file with the Immigration Court and serve on the opposing party all documents that support the charges and factual allegations in the Notice to Appear (Form I-862)

- to serve on the respondent the DHS biometrics instructions, if appropriate

**(j) Written pleadings.** — In lieu of oral pleadings, the Immigration Judge may permit represented parties to file written pleadings, if the party concedes proper service of the Notice to Appear (Form I-862). See Appendix L (Sample Written Pleading). The written pleadings must be signed by the respondent and the respondent's representative.

The written pleading should contain the following:

- a concession that the Notice to Appear (Form I-862) was properly served on the respondent

- a representation that the hearing rights set forth in 8 C.F.R. § 1240.10 have been explained to the respondent

    o    a representation that the consequences of failing to appear in Immigration Court have been explained to the respondent

    o    an admission or denial of the factual allegations in the Notice to Appear (Form I-862)

    o    a concession or denial of the charge(s) in the Notice to Appear (Form I-862)

    o    a designation of, or refusal to designate, a country of removal

    o    an identification of the application(s) for relief from removal, if any, the respondent intends to file

    o    a representation that any application(s) for relief (other than asylum) will be filed no later than fifteen (15) days before the individual calendar hearing, unless otherwise directed by the Immigration Judge

    o    an estimate of the number of hours required for the individual calendar hearing

    o    a request for an interpreter, if needed, that follows the guidelines in subsection (n), below

    o    if background and security investigations are required, a representation that:

        •    the respondent has been provided Department of Homeland Security (DHS) biometrics instructions

        •    the DHS biometrics instructions have been explained to the respondent

        •    the respondent will timely comply with the DHS biometrics instructions prior to the individual calendar hearing

        •    the consequences of failing to comply with the DHS biometrics instructions have been explained to the respondent

○         a representation by the respondent that he or she:

•         understands the rights set forth in 8 C.F.R. § 1240.10 and waives a further explanation of those rights by the Immigration Judge

•         if applying for asylum, understands the consequences under INA § 208(d)(6) of knowingly filing or making a frivolous asylum application

•         understands the consequences of failing to appear in Immigration Court or for a scheduled departure

•         understands the consequences of failing to comply with the DHS biometrics instructions

•         knowingly and voluntarily waives the oral notice required by INA § 240(b)(7) regarding limitations on discretionary relief following an in absentia removal order, or authorizes his or her representative to waive such notice

•         understands the requirement in 8 C.F.R. § 1003.15(d) to file an Alien's Change of Address Form (Form EOIR-33/IC) with the Immigration Court within five (5) days of moving or changing a telephone number

Additional matters may be included in the written pleading when appropriate. For example, the party may need to provide more specific information in connection with a request for an interpreter. See subsection (p), below.

**(k) Background checks and security investigations.** — For certain applications for relief from removal, the Department of Homeland Security (DHS) is required to complete background and security investigations. See 8 C.F.R. § 1003.47. Questions regarding background checks and security investigations should be addressed to DHS.

**(i) Non-detained cases.** — If a non-detained respondent seeks relief requiring background and security investigations, the DHS attorney provides the respondent with the DHS biometrics instructions. The respondent is expected to promptly comply with the DHS biometrics instructions by the deadlines set by the Immigration Judge. Failure to timely comply with these instructions will result in the

application for relief not being considered unless the applicant demonstrates that such failure was the result of good cause.  8 C.F.R. § 1003.47(d).

In all cases in which the respondent is represented, the representative should ensure that the respondent understands the DHS biometrics instructions and the consequences of failing to timely comply with the instructions.

*(ii) Detained cases.* — If background and security investigations are required for detained respondents, DHS is responsible for timely fingerprinting the respondent and obtaining all necessary information. See 8 C.F.R. § 1003.47(d).

*(l) Asylum Clock.* — Certain asylum applicants are eligible to receive employment authorization from the Department of Homeland Security (DHS) 180 days after the application is filed, not including delays in the proceedings caused by the applicant.  The "asylum clock" tracks the number of days since the application was filed, not including any such delays.  See 8 C.F.R. § 1208.7.

Where a respondent has applied for asylum, the Immigration Judge asks during the master calendar hearing whether the respondent wishes for the asylum clock to run.  If so, the case is handled "expeditiously," meaning that it is scheduled for completion within 180 days of the filing.  If the respondent does not wish for the asylum clock to run, the case is scheduled as any other case.

*(m) Waivers of appearances.* — Respondents and representatives must appear at all master calendar hearings unless the Immigration Judge has granted a waiver of appearance for that hearing.  Waivers of appearances for master calendar hearings are described in subsections (i) and (ii), below.  Respondents and representatives requesting waivers of appearances should note the limitations on waivers of appearances described in subsection (iii), below.

Representatives should note that a motion for a waiver of a representative's appearance is distinct from a representative's motion for a *telephonic appearance*. Motions for telephonic appearances are described in subsection (n), below.

*(i) Waiver of representative's appearance.* — A representative's appearance at a master calendar hearing may be waived only by written motion filed in conjunction with written pleadings. See subsection (j), above. The written motion should be filed with a cover page labeled "MOTION TO WAIVE REPRESENTATIVE'S APPEARANCE" and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). The motion should state the date and time of the master calendar hearing and explain the reason(s) for requesting a waiver of the representative's appearance.

**(ii) Waiver of respondent's appearance.** — A respondent's appearance at a master calendar hearing may be waived by oral or written motion. See 8 C.F.R. § 1003.25(a). If in writing, the motion should be filed with a cover page labeled "MOTION TO WAIVE RESPONDENT'S APPEARANCE" and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). The motion should state the date and time of the master calendar hearing and explain the reason(s) for requesting a waiver of the respondent's appearance.

**(iii) Limitations on waivers of appearances.** —

**(A) Waivers granted separately.** — A waiver of a representative's appearance at a master calendar hearing does not constitute a waiver of the respondent's appearance. A waiver of a respondent's appearance at a master calendar hearing does not constitute a waiver of the representative's appearance.

**(B) Pending motion.** — The mere filing of a motion to waive the appearance of a representative or respondent at a master calendar hearing does not excuse the appearance of the representative or respondent at that hearing. Therefore, the representative or respondent must appear in person unless the motion has been granted.

**(C) Future hearings.** — A waiver of the appearance of a representative or respondent at a master calendar hearing does not constitute a waiver of the appearance of the representative or respondent at any future hearing.

**(n) Telephonic appearances.** — In certain instances, respondents and representatives may appear by telephone at some master calendar hearings, at the Immigration Judge's discretion. For more information, parties should contact the Immigration Court.

An appearance by telephone may be requested by written or oral motion. If in writing, the motion should be filed with a cover page labeled "MOTION TO PERMIT TELEPHONIC APPEARANCE" and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). The motion should state the date and time of the master calendar hearing and explain the

reason(s) for requesting a telephonic appearance.  In addition, the motion should state the telephone number of the representative or respondent.

Parties requesting an appearance by telephone should note the guidelines in subsections (i) through (v), below.

**(i) Representative's telephonic appearance is not a waiver of respondent's appearance.** — Permission for a *representative* to appear by telephone at a master calendar hearing does not constitute a waiver of the *respondent's* appearance at that hearing.  A request for a waiver of a respondent's appearance at a master calendar hearing must comply with the guidelines in subsection (m), above.

**(ii) Availability.** — A representative or respondent appearing by telephone must be available during the entire master calendar hearing.

**(iii) Cellular telephones.** — Unless expressly permitted by the Immigration Judge, cellular telephones should not be used for telephonic appearances.

**(iv) Pending motion.** — The mere filing of a motion to permit a representative or respondent to appear by telephone at a master calendar hearing does not excuse the appearance in person at that hearing by the representative or respondent.  Therefore, the representative or respondent must appear in person unless the motion has been granted.

**(v) Future hearings.** — Permission for a representative or respondent to appear by telephone at a master calendar hearing does not constitute permission for the representative or respondent to appear by telephone at any future hearing.

**(o) Other requests.** — In preparation for an upcoming individual calendar hearing, the following requests may be made at the master calendar hearing or afterwards, as described below.

**(i) Interpreters.** — If a party anticipates that an interpreter will be needed at the individual calendar hearing, the party should request an interpreter, either by oral motion at a master calendar hearing, by written motion, or in a written pleading.  Parties are strongly encouraged to submit requests for interpreters at the master calendar hearing rather than following the hearing.  A written motion to request an interpreter should be filed with a cover page labeled "MOTION TO REQUEST AN INTERPRETER," and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).

A request for an interpreter, whether made by oral motion, by written motion, or in a written pleading, should contain the following information:

- the name of the language requested, including any variations in spelling

- the specific dialect of the language, if applicable

- the geographical locations where such dialect is spoken, if applicable

- the identification of any other languages in which the respondent or witness is fluent

- any other appropriate information necessary for the selection of an interpreter

**(ii) Video testimony. —** In certain instances, witnesses may testify by video at the individual calendar hearing, at the Immigration Judge's discretion. Video testimony may be requested only by written motion. For more information, parties should contact the Immigration Court.

A motion to request video testimony should be filed with a cover page labeled "MOTION TO PRESENT VIDEO TESTIMONY," and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). A motion to present video testimony must include an explanation of why the witness cannot appear in person. In addition, parties wishing to present video testimony must comply with the requirements for witness lists. See Chapter 3.3(g) (Witness lists).

If video testimony is permitted, the Immigration Judge specifies the time and manner under which the testimony is taken.

**(iii) Telephonic testimony. —** In certain instances, witnesses may testify by telephone, at the Immigration Judge's discretion. If a party wishes to have witnesses testify by telephone at the individual calendar hearing, this may be requested by oral motion at the master calendar hearing or by written motion. If telephonic testimony is permitted, the court specifies the time and manner under which the testimony is taken. For more information, parties should contact the Immigration Court.

A written motion to request telephonic testimony should be filed with a cover page labeled "MOTION TO PRESENT TELEPHONIC TESTIMONY," and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). In addition, parties wishing to present telephonic testimony must comply with the requirements for witness lists. See Chapter 3.3(g) (Witness lists).

*(A) Contents.* — An oral or written motion to permit telephonic testimony must include:

○    an explanation of why the witness cannot appear in person

○    the witness's telephone number and the location from which the witness will testify

*(B) Availability.* — A witness appearing by telephone must be available to testify at any time during the course of the individual calendar hearing.

*(C) Cellular telephones.* — Unless permitted by the Immigration Judge, cellular telephones should not be used by witnesses testifying telephonically.

*(D) International calls.* — If international telephonic testimony is permitted, the requesting party should bring a pre-paid telephone card to the Immigration Court to pay for the call.

## 4.16    Individual Calendar Hearing

*(a) Generally.* — Evidentiary hearings on contested matters are referred to as individual calendar hearings or merits hearings. Contested matters include challenges to removability and applications for relief.

*(b) Filings.* — The following documents should be filed in preparation for the individual calendar hearing, as necessary. Parties should note that, since Records of Proceedings in removal proceedings are kept separate from Records of Proceeding in bond redetermination proceedings, documents already filed in bond redetermination proceedings must be re-filed for removal proceedings. See Chapter 9.3 (Bond Proceedings).

*(i) Applications, exhibits, motions.* — Parties should file all applications for relief, proposed exhibits, and motions, as appropriate. All submissions must comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court).

*(ii) Witness list.* — If presenting witnesses other than the respondent, parties must file a witness list that complies with the requirements of Chapter 3.3(g) (Witness lists). In addition, the witness list must comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court).

*(iii) Criminal history chart.* — When submitting documents relating to a respondent's criminal arrests, prosecutions, or convictions, parties are encouraged to use a criminal history chart and attach all pertinent documentation, such as arrest and conviction records. For guidance on submitting a criminal history chart, see Chapter 3.3(f) (Criminal conviction documents). For a sample, see Appendix O (Sample Criminal History Chart). Parties submitting a criminal history chart should comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court).

*(c) Opening the individual calendar hearing.* — The Immigration Judge turns on the recording equipment at the beginning of the individual calendar hearing. The hearing is recorded, except for off-the-record discussions. See Chapter 4.10 (Record).

On the record, the Immigration Judge identifies the type of proceeding being conducted (e.g., a removal proceeding); the respondent's name and alien registration number ("A number"); the date, time and place of the proceeding; and the presence of the parties. The Immigration Judge also verifies the respondent's name, address, and telephone number. If the respondent's address or telephone number have changed, the respondent must submit an Alien's Change of Address Form (Form EOIR-33/IC).

*(d) Conduct of hearing.* — While the Immigration Judge decides how each hearing is conducted, parties should be prepared to:

- o make an opening statement

- o raise any objections to the other party's evidence

- o present witnesses and evidence on all issues

- o cross-examine opposing witnesses and object to testimony

- o make a closing statement

*(e) Witnesses.* — All witnesses, including the respondent if he or she testifies, are placed under oath by the Immigration Judge before testifying. If necessary, an interpreter is provided. See Chapters 4.11 (Interpreters), 4.15(o) (Other requests). The Immigration Judge may ask questions of the respondent and all witnesses at any time during the hearing. See INA § 240(b)(1).

*(f) Pro se respondents.* — Unrepresented ("pro se") respondents have the same hearing rights and obligations as represented respondents. For example, pro se respondents may testify, present witnesses, cross-examine any witnesses presented by the Department of Homeland Security (DHS), and object to evidence presented by DHS. When a respondent appears pro se, the Immigration Judge generally participates in questioning the respondent and the respondent's witnesses. As in all removal proceedings, DHS may object to evidence presented by a pro se respondent and may cross-examine the respondent and the respondent's witnesses.

*(g) Decision.* — After the parties have presented their cases, the Immigration Judge renders a decision. The Immigration Judge may render an oral decision at the hearing's conclusion, or he or she may render an oral or written decision on a later date. See Chapter 1.5(c) (Immigration Judge decisions). If the decision is rendered orally, the parties are given a signed summary order from the court.

*(h) Appeal.* — The respondent and the Department of Homeland Security have the right to appeal the Immigration Judge's decision to the Board of Immigration Appeals. See Chapter 6 (Appeals of Immigration Judge Decisions). A party may waive the right to appeal. At the conclusion of Immigration Court proceedings, the Immigration Judge informs the parties of the deadline for filing an appeal with the Board, unless the right to appeal is waived. See Chapter 6.4 (Waiver of Appeal).

Parties should note that the Immigration Judge may ask the Board to review his or her decision. This is known as "certifying" a case to the Board. The certification of a case is separate from any appeal in the case. Therefore, a party wishing to appeal must file an appeal *even if* the Immigration Judge has certified the case to the Board. See Chapter 6.5 (Certification).

If an appeal is not filed, the Immigration Judge's decision becomes the final administrative decision in the matter, unless the case has been certified to the Board.

*(i) Relief granted.* — If a respondent's application for relief from removal is granted, the respondent is provided the Department of Homeland Security (DHS) post-order instructions. These instructions describe the steps the respondent should follow to obtain documentation of his or her immigration status from U.S. Citizenship and Immigration Services, a component of DHS.

More information about these post-order instructions is available on the Executive Office for Immigration Review website at www.usdoj.gov/eoir.

For respondents who are granted asylum, information on asylees' benefits and responsibilities is available at the Immigration Court.

## 4.17   In Absentia Hearing

*(a) In general.* — Any delay in the respondent's appearance at a master calendar or individual calendar hearing may result in the respondent being ordered removed "in absentia" (in the respondent's absence). See 8 C.F.R. § 1003.26(c). See also Chapter 4.8 (Attendance). There is no appeal from a removal order issued in absentia. However, parties may file a motion to reopen to rescind an in absentia removal order. See Chapter 5.9 (Motions to Reopen In Absentia Orders).

*(b) Deportation and exclusion proceedings.* — Parties should note that in absentia orders in deportation and exclusion proceedings are governed by different standards than in absentia orders in removal proceedings. For the provisions governing in absentia orders in deportation and exclusion proceedings, see 8 C.F.R. § 1003.26. See also Chapter 7 (Other Hearings before Immigration Judges).

## 4.18   Pre-Hearing Conferences and Statements

*(a) Pre-hearing conferences.* — Pre-hearing conferences are held between the parties and the Immigration Judge to narrow issues, obtain stipulations between the parties, exchange information voluntarily, and otherwise simplify and organize the proceeding. See 8 C.F.R. § 1003.21(a).

Pre-hearing conferences may be requested by a party or initiated by the Immigration Judge. A party's request for a pre-hearing conference may be made orally or by written motion. If in writing, the motion should be filed with a cover page labeled "MOTION FOR A PRE-HEARING CONFERENCE," and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).

Even if a pre-hearing conference is not held, the parties are strongly encouraged to confer prior to a hearing in order to narrow issues for litigation. Parties are further encouraged to file pre-hearing statements following such discussions. See subsection (b), below.

***(b) Pre-hearing statements.*** — An Immigration Judge may order the parties to file a pre-hearing statement. See 8 C.F.R. § 1003.21(b). Parties are encouraged to file a pre-hearing statement even if not ordered to do so by the Immigration Judge. Parties also are encouraged to file pre-hearing briefs addressing questions of law. See Chapter 4.19 (Pre-Hearing Briefs).

***(i) Filing.*** — A pre-hearing statement should be filed with a cover page with an appropriate label (e.g., "PARTIES' PRE-HEARING STATEMENT"), and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).

***(ii) Contents of a pre-hearing statement.*** — In general, the purpose of a pre-hearing statement is to narrow and reduce the factual and legal issues in advance of an individual calendar hearing. For example, a pre-hearing statement may include the following items:

- a statement of facts to which both parties have stipulated, together with a statement that the parties have communicated in good faith to stipulate to the fullest extent possible

- a list of proposed witnesses and what they will establish

- a list of exhibits, copies of exhibits to be introduced, and a statement of the reason for their introduction

- the estimated time required to present the case

- a statement of unresolved issues in the proceeding

See 8 C.F.R. § 1003.21(b).

## 4.19   Pre-Hearing Briefs

***(a) Generally.*** — An Immigration Judge may order the parties to file pre-hearing briefs. Parties are encouraged to file pre-hearing briefs even if not ordered to do so by the Immigration Judge. Parties are also encouraged to file pre-hearing statements to narrow and reduce the legal and factual issues in dispute. See Chapter 4.18(b) (Pre-hearing statements).

***(b) Guidelines.*** — Pre-hearing briefs advise the Immigration Judge of a party's positions and arguments on questions of law. A well-written pre-hearing brief is in the

party's best interest and is of great importance to the Immigration Judge. Pre-hearing briefs should be clear, concise, and well-organized. They should cite the record, as appropriate. Pre-hearing briefs should cite legal authorities fully, fairly, and accurately.

Pre-hearing briefs should always recite those facts that are appropriate and germane to the adjudication of the issue(s) at the individual calendar hearing. They should cite proper legal authority, where such authority is available. See subsection (f), below. Pre-hearing briefs should not belabor facts or law that are not in dispute. Parties are encouraged to expressly identify in their pre-hearing briefs those facts or law that are not in dispute.

There are no limits to the length of pre-hearing briefs. Parties are encouraged, however, to limit the body of their briefs to 25 pages, provided that the issues in question can be adequately addressed. Pre-hearing briefs should always be paginated.

**(c) Format. —**

**(i) Filing. —** Pre-hearing briefs should be filed with a cover page with an appropriate label (e.g., "RESPONDENT'S PRE-HEARING BRIEF"), and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). Pre-hearing briefs must be signed by the respondent, the respondent's primary attorney (notice attorney) or representative, or the representative of the Department of Homeland Security. See Chapter 3.3(b) (Signatures). See also Chapter 2 (Appearances before the Immigration Court).

**(ii) Contents. —** Unless otherwise directed by the Immigration Judge, the following items should be included in a pre-hearing brief:

- a concise statement of facts

- a statement of issues

- a statement of the burden of proof

- a summary of the argument

- the argument

- a short conclusion stating the precise relief or remedy sought

*(iii) Statement of facts.* — Statements of facts in pre-hearing briefs should be concise.  Facts should be set out clearly.  Points of contention and points of agreement should be expressly identified.

Facts, like case law, require citation.  Parties should support factual assertions by citing to any supporting documentation or exhibits, whether in the record or accompanying the brief.  See subsection (f), below.

Do not misstate or misrepresent the facts, or omit unfavorable facts that are relevant to the legal issue.  A brief's accuracy and integrity are paramount to the persuasiveness of the argument and the decision regarding the legal issue(s) addressed in the brief.

*(iv) Footnotes.* — Substantive arguments should be restricted to the text of pre-hearing briefs.  The excessive use of footnotes is discouraged.

*(v) Headings and other markers.* — Pre-hearing briefs should employ headings, sub-headings, and spacing to make the brief more readable.  Short paragraphs with topic sentences and proper headings facilitate the coherence and cohesiveness of arguments.

*(vi) Chronologies.* — Pre-hearing briefs should contain a chronology of the facts, especially where the facts are complicated or involve several events.  Charts or similar graphic representations that chronicle events are welcome.  See Appendix O (Sample Criminal History Chart).

*(d) Consolidated pre-hearing briefs.* — Where cases have been consolidated, one pre-hearing brief may be submitted on behalf of all respondents in the consolidated proceeding, provided that each respondent's full name and alien registration number ("A number") appear on the consolidated pre-hearing brief. See Chapter 4.21 (Combining and Separating Cases).

*(e) Responses to pre-hearing briefs.* — When a party files a pre-hearing brief, the other party may file a response brief.  A response brief should be filed with a cover page with an appropriate label (e.g., "DHS RESPONSE TO PRE-HEARING BRIEF"), and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).  Response briefs should comply with the guidelines for pre-hearing briefs set forth above.

*(f) Citation.* — Parties are expected to provide complete and clear citations to all factual and legal authorities.  Parties should comply with the citation guidelines in Appendix J (Citation Guidelines).

## 4.20    Subpoenas

**(a) Applying for a subpoena.** — A party may request that a subpoena be issued requiring that witnesses attend a hearing or that documents be produced.  See 8 C.F.R. §§ 1003.35, 1287.4(a)(2)(ii).  A request for a subpoena may be made by written motion or by oral motion.  If made in writing, the request should be filed with a cover page labeled "MOTION FOR SUBPOENA," and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).  Whether made orally or in writing, a motion for a subpoena must:

- provide the court with a proposed subpoena

- state what the party expects to prove by such witnesses or documentary evidence

- show affirmatively that the party has made diligent effort, without success, to produce the witnesses or documentary evidence

If requesting a subpoena for telephonic testimony, the party should also comply with Chapter 4.15(o)(iii) (Telephonic testimony).

**(b) Contents.** — A proposed subpoena should contain:

- the respondent's name and alien registration number ("A number")

- the type of proceeding

- the name and address of the person to whom the subpoena is directed

- a command that the recipient of the subpoena:

  - testify in court at a specified time,

  - testify by telephone at a specified time, or

  - produce specified books, papers, or other items

- a return on service of subpoena

See 8 C.F.R. § 1003.35(b)(3), Appendix N (Sample Subpoena).

*(c) Appearance of witness.* — If the witness whose testimony is required is more than 100 miles from the Immigration Court where the hearing is being conducted, the subpoena must provide for the witness's appearance at the Immigration Court nearest to the witness to respond to oral or written interrogatories, unless the party calling the witness has no objection to bringing the witness to the hearing. See 8 C.F.R. § 1003.35(b)(4).

*(d) Service.* — A subpoena issued under the above provisions may be served by any person over 18 years of age not a party to the case. See 8 C.F.R. § 1003.35(b)(5).

## 4.21  Combining and Separating Cases

*(a) Consolidated cases.* — Consolidation of cases is the administrative joining of separate cases into a single adjudication for all of the parties involved. Consolidation is generally limited to cases involving immediate family members. The Immigration Court may consolidate cases at its discretion or upon motion of one or both of the parties, where appropriate. For example, the Immigration Court may grant consolidation when spouses or siblings have separate but overlapping circumstances or claims for relief. Consolidation must be sought through the filing of a written motion that states the reasons for requesting consolidation. Such motion should include a cover page labeled "MOTION FOR CONSOLIDATION" and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). A copy of the motion should be filed for each case included in the request for consolidation. The motion should be filed as far in advance of any filing deadline as possible. See Chapter 3.1(b) (Timing of submissions).

*(b) Severance of cases.* — Severance of cases is the division of a consolidated case into separate cases, relative to each individual. The Immigration Court may sever cases in its discretion or upon request of one or both of the parties. Severance must be sought through the filing of a written motion that states the reasons for requesting severance. Such motion should include a cover page labeled "MOTION FOR SEVERANCE" and comply with the deadlines and requirements for filing. See Chapter 3 (Filing before the Immigration Court), Appendix F (Sample Cover Page). A copy of the motion should be filed for each case included in the request for severance. Parties are advised, however, that such motion should be filed as far in advance of any filing deadline as possible. See Chapter 3.1(b) (Timing of submissions).

**4.22    Juveniles**

*(a) Scheduling.* — Immigration Courts do their best to schedule cases involving unaccompanied juveniles on a separate docket or at a fixed time in the week or month, separate and apart from adult cases.

*(b) Representation.* — An Immigration Judge cannot appoint a legal representative or a guardian ad litem for unaccompanied juveniles. However, the Executive Office for Immigration Review encourages the use of pro bono legal resources for unaccompanied juveniles. For further information, see Chapter 2.2(b) (Legal service providers).

*(c) Courtroom orientation.* — Juveniles are encouraged, under the supervision of court personnel, to explore an empty courtroom, sit in all locations, and practice answering simple questions before the hearing. The Department of Health and Human Services, Office of Refugee Resettlement, provides orientation for most juveniles in their native languages, explaining Immigration Court proceedings.

*(d) Courtroom modifications.* — Immigration Judges make reasonable modifications for juveniles. These may include allowing juveniles to bring pillows, or toys, permitting juveniles to sit with an adult companion, and permitting juveniles to testify outside the witness stand next to a trusted adult or friend.

*(e) Detained juveniles.* — For additional provisions regarding detained juveniles, see Chapter 9.2 (Detained Juveniles).

# EXHIBIT C

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
LOS ANGELES, CA

FILE: A075-488-409

IN THE MATTER OF:

MIGUEL-CARLOS, EDGAR JOSHUA

RESPONDENT

IN REMOVAL PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE
WITH RESPECT TO CUSTODY

Request having been made for a change in the custody status of
respondent pursuant to 8 CFR 236.1(c), and full consideration
having been given to the representations of the Department of
Homeland Security and the respondent, it is hereby

_____   ORDERED that the request for a change in custody status be
denied.

__X__   ORDERED that the request be granted and that respondent be:

_____   released from custody on his own recognizance

__X__   released from custody under bond of $ 7500

__X__   OTHER _Rodriguez v. Robbins Preliminary Injunction_
_Respondent to participate in ISAP_

Copy of this decision has been served on the respondent and the
Department of Homeland Security.

APPEAL:  waived -- reserved -- by DHS

LOS ANGELES -- ORANGE COUNTY DETAINED

Date: _1-24-2013_

_Kevin W. Riley_
KEVIN W. RILEY
Immigration Judge

XS

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
LOS ANGELES, CA

FILE: A092-978-333

IN THE MATTER OF:

GUERRERO-ORTEGA, ANTONIO

RESPONDENT

IN REMOVAL PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE
WITH RESPECT TO CUSTODY

Request having been made for a change in the custody status of
respondent pursuant to 8 CFR 236.1(c), and full consideration
having been given to the representations of the Department of
Homeland Security and the respondent, it is hereby

_____ ORDERED that the request for a change in custody status be
denied.

___X___ ORDERED that the request be granted and that respondent be:

_____ released from custody on his own recognizance

_____ released from custody under bond of $ *3,000*

___X___ OTHER *HAS ONLY CONVICTIONS I OVERDUES*
*PK CANCELLATION (ASP - NULST WGA "ANKLE BRACET"*

Copy of this decision has been served on the respondent and the
Department of Homeland Security.

APPEAL:  waived -- reserved

LOS ANGELES -- ADELANTO DETENTION FACILITY EAST

Date: *10-22-2012*

_____
STEPHEN L. SHOLOMSON
Immigration Judge

XS

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
LOS ANGELES IMMIGRATION COURT
LOS ANGELES, CALIFORNIA

File No.:   A 075 600 690

In the Matter of:

Ricardo Cervantes Borroel

Applicant

IN BOND PROCEEDINGS

## DECISION AND ORDER OF THE IMMIGRATION JUDGE
## ON PRELIMINARY INJUNCTION IN RODRIGUEZ et al., v. ROBBINS et al.,

By Order dated September 13, 2012, in the United States District Court for the Central District of California case of ALEJANDRO RODRIGUEZ, *et al.*, v. TIMOTHY ROBBINS, *et al.*, (Case No. CV 07-03239-TJH (RNBx)), Senior United States District Court, Judge Terry J. Hatter, Jr., directed the government to conduct bond hearings in the cases of several identified class members.

Upon due consideration of the applicant's request for release from custody and under the standards set forth in the preliminary injunction issued, the Court finds the following:

☒ The applicant <u>does merit</u> discretionary release from custody on the condition of bond, because the U.S. Department of Homeland Security has not satisfied its burden of proving by clear and convincing evidence that the applicant is a flight risk or a danger to the community. *See Singh v. Holder*, 638 F.3d 1196, 1205-06 (9th Cir. 2011); *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 951 (9th Cir. 2008); *Matter of Guerra*, 24 I. & N. Dec. 37, 40-41 (B.I.A. 2006).

☐ The applicant <u>does not merit</u> discretionary release from custody on the condition of bond, because the U.S. Department of Homeland Security has satisfied its burden of proving by clear and convincing evidence that the applicant is a flight risk or a danger to the community. *See Singh v. Holder*, 638 F.3d 1196, 1205-06 (9th Cir. 2011); *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 951 (9th Cir. 2008); *Matter of Guerra*, 24 I. & N. Dec. 37, 40-41 (B.I.A. 2006).

  ○ The applicant poses a danger to the community in view of:

    ○ The severity of his/her prior criminal acts, i.e., _____
    _____.

    ○ The recency of his/her criminal record, i.e., _____
    _____.

o    The extensiveness of his/her criminal record, i.e., _____

_____.

o    Other: _____

O    The applicant poses a flight risk  in view of:

o    The low likelihood that he/she will qualify for relief from removal.

o    His/her immigration record, i.e., _____

_____.

o    His/her criminal record, i.e., _____

_____.

o    His/her history of deceitful behavior, i.e., _____

_____.

o    His/her lack of a fixed address in the United States.

o    His/her brief length of residence in the United States, i.e., _____

_____.

o    His/her minimal or nonexistent family ties in the United States, i.e., _____

_____.

o    His/her lack of stable employment history in the United States, i.e., _____

_____.

o    Other: _____

_____.

Accordingly, the Court will enter the following order:

## <u>ORDER</u>

**IT IS HEREBY ORDERED** that the applicant's request for release from custody be:

☐ **DENIED** on the merits; ☒ **GRANTED** on the merits.

2 of 3

The Court orders that the release of the Respondent be based upon the posting of the following bond and/or other reasonable conditions:

☒ The Court will set bond in the amount of: $10,000 .

☐ The Court orders Supervision

    ☐ Respondent is to Report to DHS

        ☐ Once a week

        ☐ Once a month

        ☐ Every 6 months

        ☐ Other: _____

☒ The Court orders electronic monitoring

    ☒ Respondent to pay costs of the monitoring

☐ Other: _____

DATE: 10-25-2012          _____

                              **Immigration Judge**

Appeal
Reserved by DHS

Appeal Due: 11-26-2012

# EXHIBIT D



**U.S. Department of Justice**
**Office of the Inspector General**
**Evaluation and Inspections Division**

# Management of Immigration Cases and Appeals by the Executive Office for Immigration Review

## October 2012

**I-2013-001**

## EXECUTIVE DIGEST

### INTRODUCTION

The Office of the Inspector General (OIG) conducted a review to examine the Department of Justice's (Department) Executive Office for Immigration Review (EOIR) processing and management of immigration cases and appeals involving foreign-born individuals (aliens) charged with violating immigration laws. Among other duties, EOIR courts are responsible for determining whether aliens charged by the Department of Homeland Security (DHS) with immigration violations should be ordered removed from the United States or be granted relief from removal, which would allow them to remain in this country.[1]

### RESULTS IN BRIEF

The OIG found that immigration court performance reports are incomplete and overstate the actual accomplishments of these courts. These flaws in EOIR's performance reporting preclude the Department from accurately assessing the courts' progress in processing immigration cases or identifying needed improvements.

For example, administrative events such as changes of venue and transfers are reported as completions even though the immigration courts have made no decisions on whether to remove aliens from the United States. As a result, a case may be "completed" multiple times. In our sample of 1,785 closed cases, 484 administrative events were counted as completions by EOIR. Reporting these administrative actions as completions overstates the accomplishments of the immigration courts.[2] Similarly, those same administrative events result in a case

---

[1] Removal is the expulsion of a person from the United States who is not a U.S. citizen and is more commonly referred to as "deportation." In formal proceedings, "deportation" was changed to "removal" by the *Illegal Immigration Reform and Immigrant Responsibility Act of 1996*. The Department of Homeland Security alleges an alien is removable when the alien does not have legal grounds to be in the United States because, for example, the alien stayed longer than the alien's visa allowed or committed a crime while in the United States.

[2] EOIR stated that it measures completions in this way so that it has a precise measurement of an individual court's work. While there may be legitimate management decisions for tracking the completion rates for each individual court, we believe that the way EOIR externally reports these actions is confusing because it appears to be reporting on the time it takes to substantively complete cases. Moreover, a court's decision to transfer a case to another court or another venue for handling does nothing

*(Cont.)*

being reported as a "receipt" when the case is opened at the receiving court.[3] As a result, the same case may be reported as a "receipt" multiple times, thereby overstating the total number of cases opened by the immigration courts during a particular period.[4]

Further, for those cases where EOIR has put in place a timeliness goal for handling a case, EOIR does not report the total time it takes to complete the case. Instead, EOIR tracks case processing time by court. As a result, a case with a timeliness goal of 60 days that spent 50 days at one court and was then transferred to another court, where it spent another 50 days, would be reported by EOIR as two cases that were each completed within the 60-day timeliness goal. In actuality, there was only one case, and that case took EOIR 100 days to reach a decision on whether the alien should be removed, thereby exceeding the 60-day goal. This practice makes it appear that more cases meet the completion goals than actually do.

Additionally, in January 2010, EOIR abandoned completion goals for cases involving non-detained aliens who do not file asylum applications, which make up about 46 percent of the courts' completions.[5] EOIR made this decision to prioritize and focus on the completion of detained cases, in which aliens are deprived of their liberty and housed at taxpayer expense. While the OIG recognizes the importance of the timely completion of cases involving detained aliens, EOIR also should have goals for the timely processing of non-detained cases.

---

to advance the case towards completion. Yet, EOIR's statistical system rewards the transferring court by giving it credit for closing the case, which we do not believe provides an accurate measure of "completion" rates. Further, we believe there is an important management need for EOIR to track the time it takes to complete a single case from start to finish.

[3] "Receipts" are defined by EOIR as the total number of proceedings, bond redeterminations, and motions to reopen or reconsider received by the immigration courts during a reporting period. Our review included only proceedings receipts.

[4] Because cases are often completed in a fiscal year different from the one in which they are "received," it is not possible to determine how the figures impact the fiscal year data produced by EOIR.

[5] This 46 percent is based on FY 2010 proceedings completion data from the EOIR Statistical Year Book. The balance of the courts' proceedings are detained proceedings, asylum proceedings, and credible fear determination hearings (hearings held to review DHS determinations that aliens' fears of persecution or torture if they are removed were not credible), which have goals.

---

U.S. Department of Justice                                                    ii
Office of the Inspector General
Evaluation and Inspections Division

Despite overstating case receipts and completions, EOIR's immigration court data still showed that it was not able to process the volume of work. From FY 2006 through FY 2010, the overall efficiency of the courts did not improve even though there was an increase in the number of judges. In 4 of those 5 years, the number of proceedings received was greater than the number of proceedings completed. As a result, the number of pending cases increased.

Our analysis of a sample of closed cases showed that cases involving non-detained aliens and those with applications for relief from removal can take long periods to complete. This results in crowded court calendars and delayed processing of new cases. For example, cases for non-detained aliens took on average 17½ months to adjudicate, with some cases taking more than 5 years to complete.

In addition to the volume of new cases, the number and length of continuances immigration judges granted was a significant contributing factor to case processing times. In the 1,785 closed cases we examined, 953 cases (53 percent) had one or more continuances. Each of these cases averaged four continuances. The average amount of time granted for each continuance was 92 days (about 3 months), which results in an average of 368 days for continuances per case.

In contrast, the EOIR's Board of Immigration Appeals (BIA) completed more appeals of immigration court decisions than it received from FY 2006 through FY 2010. Appeals involving non-detained aliens, however, still took long periods to complete. In our sample, the BIA averaged more than 16 months to render decisions on cases involving non-detained aliens, as compared to 3½ months for cases involving detained aliens. However, EOIR's performance reporting does not reflect the actual length of time to review and decide those appeals because EOIR does not count processing time for one- and three-member reviews from the date the appeal was filed. Rather, EOIR begins the counting process once certain work is completed by the BIA and/or its staff. As a result, EOIR's performance reporting data underreports actual processing time, which undermines EOIR's ability to identify appeal processing problems and take corrective actions.

## RECOMMENDATIONS

In this report, we make nine recommendations to help EOIR improve its case processing and provide accurate and complete information on case completions. They include for EOIR to collect immigration court data that distinguishes decisions on the removal of

U.S. Department of Justice                                                                iii
Office of the Inspector General
Evaluation and Inspections Division

aliens from other case activities, that reflects actual case length even when more than one court is involved, and that eliminates case exemptions from completion goals. In addition, EOIR should develop immigration court case completion goals for non-detained cases in which an asylum application has not been filed. To reduce lengthy delays, EOIR should analyze reasons for continuances and develop guidance that provides immigration judges with standards and guidelines for granting continuances. To better allocate its resources, EOIR should develop a process for tracking the time that immigration judges spend on different types of cases and work activities; collect and track data on its use of staffing details of judges; and develop an objective staffing model to assist in determining staffing requirements and the allocation of positions among immigration courts. Lastly, EOIR should seek additional resources, or reallocate existing resources, in order for BIA to more timely process appeals for non-detained aliens and improve the collection, tracking, and reporting of appeal statistics to accurately reflect actual appeal processing times.

U.S. Department of Justice                                                                iv
Office of the Inspector General
Evaluation and Inspections Division

# TABLE OF CONTENTS

Background ................................................................................ 1

Scope and Methodology of the OIG Review ...................................... 11

Results of the Review ................................................................ 13

    Section I.  The Immigration Courts ........................................... 13

    Section II.  The Board of Immigration Appeals ............................ 41

Conclusion and Recommendations................................................. 51

Appendix I:  Immigration Court Process ......................................... 54

Appendix II:  Board of Immigration Appeals Process ........................ 55

Appendix III:  OIG Sample of Closed Cases at the
    Immigration Courts................................................................ 56

Appendix IV:  Pending Caseload at the Immigration Courts ............. 59

Appendix V:  EOIR Response to Draft Report.................................. 60

Appendix VI:  OIG Analysis of EOIR Response ................................ 70

# BACKGROUND

The Office of the Inspector General (OIG) conducted a review to examine the Department of Justice's (Department) Executive Office for Immigration Review (EOIR) processing and management of immigration cases and appeals involving foreign-born individuals (aliens) charged with violating immigration laws.

EOIR, headed by a Director who reports directly to the Deputy Attorney General, has three primary adjudicating components:

- Office of the Chief Immigration Judge, which includes the immigration courts that conduct hearings in response to cases filed by the Department of Homeland Security (DHS) to determine whether aliens should be ordered removed from the United States or be granted relief from removal, which would allow them to remain in this country;

- Board of Immigration Appeals (BIA), which decides appeals of immigration court decisions, among other matters; and

- Office of the Chief Administrative Hearing Officer, which adjudicates cases involving employment of undocumented workers, verification of employment eligibility, immigration-related document fraud, and immigration-related employment discrimination.[6]

EOIR's fiscal year (FY) 2012 budget was $302.3 million, with an authorized staffing level of 1,582 positions.

## Office of the Chief Immigration Judge and the Immigration Courts

The Office of the Chief Immigration Judge establishes overall program direction, policies, procedures, and priorities for judges conducting hearings on alien removals and other matters in immigration courts.

The Office of the Chief Immigration Judge oversees 59 immigration courts with approximately 120 additional hearing locations, including

---

[6] Our review did not include the Office of the Chief Administrative Hearing Officer.

detention centers and correctional facilities.[7]  As of the beginning of FY 2011, the courts were staffed by 238 immigration judges (284 were authorized) and 553 support personnel (709 were authorized).[8]  Immigration judges are attorneys appointed by the Attorney General to serve as independent arbiters of immigration issues.[9]  The judges are responsible primarily for hearing cases to decide whether aliens should be removed from the United States.[10]

According to EOIR's data, in FY 2010, the courts received a total of 325,326 proceedings and completed a total of 287,207 proceedings.[11]  EOIR told the OIG that it anticipates that the courts' caseloads, and therefore their volume of proceedings, will continue to increase in the future as a result of expanded DHS enforcement actions.

Removal Proceedings

*Role of the Department of Homeland Security*

Through its law enforcement activities, the DHS locates aliens it determines are in the United States illegally and thus may be removable. The DHS serves the alien with a charging document (notice to appear), which orders the alien to appear before an immigration judge to show

---

[7]  EOIR may open or close an immigration court depending on the volume of the caseload in that particular area.

[8]  Beginning in January 2011, EOIR has been under a Department-wide hiring freeze, which has impeded the hiring of judges and staff to fill authorized positions.

[9]  All immigration judges are career Schedule A appointees and are compensated under the IJ pay system that varies by locality.  The 2011 base annual salary range was $108,850 to $143,060 without locality adjustments.  In 2011 annual pay was capped at $165,300.

[10]  In addition to hearing cases, immigration judges consider other matters such as bond redetermination (bond) hearings and motions.  Bond hearings are held when detained aliens ask to be released on their own recognizance or to have the amount of their bond reduced.  Motions can be filed by either party (the alien or the DHS), including, for example, to reopen a case previously heard by an immigration judge due to changed circumstances.  In FY 2010, the courts received a total of 52,660 bond redetermination requests and 14,902 motions.  During the same period, the courts completed a total of 51,141 bond redetermination requests and 14,899 motions.

[11]  A proceeding includes any action taken on a case at a particular immigration court.  When a case is processed at multiple courts, there are multiple proceedings associated with that case.  All of the proceedings together make up an alien's immigration case.

why the alien should not be removed, and includes the following information:

- the *Immigration and Nationality Act* provisions that subject the alien to removal;
- the alien's option to obtain representation at no expense to the government; and
- the date, time, and location of the initial hearing, if scheduled by the DHS.

The DHS serves the alien with the notice to appear in person or by mail if unable to do so in person. When the DHS serves the alien in person, it may provide oral notice in a language the alien understands of the hearing's time and place and the consequences if the alien does not appear. Along with the notice to appear, the DHS provides the alien with a list of organizations and attorneys that provide free legal services. Often the DHS does not schedule the initial hearing, and the notice to appear will not specify the date, time, and location of the initial hearing.

After the alien has been served, the DHS files a copy of the notice to appear with the immigration court (which is determined by the alien's location). Once the notice to appear is filed with the court, the immigration court is vested with jurisdiction to decide whether the alien violated immigration laws and whether to order the alien's removal from the United States. If the DHS has not scheduled the initial hearing, the immigration court schedules the hearing and notifies the parties of the hearing's time and place. DHS attorneys represent the DHS's position in cases before the immigration judges and in appeals before the BIA.

*The Immigration Court Process*

The immigration court removal process generally involves an initial master calendar hearing and subsequent master and individual merits hearings (described below). An alien found to be removable by an immigration judge may seek to remain in the United States by applying for one or more types of relief from removal. Immigration judges may conduct hearings in person at the immigration court or by telephone or videoconference.

*Master Calendar Hearing.* An immigration judge conducts a master calendar hearing to advise the alien of the purpose of the removal proceeding and of the alien's rights, and ensure the alien understands the allegations and charges. The judge also provides information regarding reduced-fee or free (pro bono) representation from

non-government sources and informs the alien that the alien must respond to the charges and present any applications for relief from removal.[12]

If the case is not complex or the alien admits to being in the United States illegally and does not ask for relief from removal to remain in the country, and the alien is represented or waives the opportunity to seek representation, the immigration judge may make a final decision at the master calendar hearing about whether the alien will be removed. When that does not happen, the alien or the DHS attorney may request a continuance, and if the judge grants it, another master calendar hearing or an individual merits hearing is set.[13]  The judge may extend the scheduled hearing date several times before examining contested matters or applications for relief.

*Individual Merits Hearing.*  Individual merits hearings are evidentiary hearings to decide contested matters, that is, aliens' challenges to being removable and aliens' applications for relief. Generally, the DHS bears the burden of proving by clear and convincing evidence that an alien is removable, but the alien may challenge removability.  When the alien applies for relief from removal, the burden of proof rests with the alien.  During a single case, a judge may reconvene over time multiple merits hearings as a result of continuances and scheduling conflicts to review evidence and hear testimony.

After the evidence is presented, the judge renders a decision on the alien's removability.  If removability of the alien is not established, the immigration judge may order the proceedings terminated.  If the judge finds the alien to be removable and the alien applies for relief from removal, the judge must determine whether to grant relief that would allow the alien to remain in the United States.  The judge informs the alien of the right to appeal adverse determinations.

---

[12] Aliens in immigration court proceedings do not have a right to government-provided representation.  However, they are given the opportunity to obtain representation (such as attorneys, law students, family members, and representatives from recognized charitable organizations) at their own expense.  According to EOIR's FY 2010 data, aliens were represented in 122,465 (43 percent) proceedings of 287,207 total proceedings completed.

[13] An alien may request a continuance for a number of reasons, including time to obtain representation, time to gather evidence, or for a change of venue to a different immigration court.  The DHS attorney may request a continuance for reasons including preparation of evidence or completion of a DHS investigation.

See Appendix I for a flow chart that illustrates the immigration court process.

Types of Immigration Cases

Immigration courts process five principal types of cases:

1. *Detained Without Applications for Relief from Removal:* Cases involving aliens who are in DHS custody during the immigration court process. These aliens do not apply for relief if they are found removable. Aliens may be detained because of their involvement in criminal activities.[14]

2. *Detained With Applications for Relief from Removal:* Cases involving aliens in DHS custody who, if they are found removable, apply for relief (other than asylum) from the order of removal so that they may legally reside in the United States.

3. *Asylum:* Cases involving aliens who have applied for asylum because they fear, or have suffered, harm in their native countries. If judges deny their claims for asylum, the aliens are ordered to be returned to their home countries.[15]

4. *Non-Detained Without Applications for Relief from Removal:* Cases involving aliens who are not in DHS custody during the immigration court process and who do not request relief from removal.

5. *Non-Detained With Applications for Relief from Removal:* Cases involving aliens not in DHS custody who, if they are found removable, apply for relief (other than asylum) from the order of removal so that they may legally reside in the United States, or have removal deferred.

Aliens may be detained for all or part of the duration of their cases.

---

[14] Under the *Immigration and Nationality Act,* the government is required to detain certain aliens who pose a national security risk or commit crimes in the United States, including crimes involving moral turpitude, drug smuggling, murder, and other aggravated felonies.

[15] Aliens in the United States may make a claim for asylum because of persecution based on race, religion, nationality, membership in a particular social group, or political opinion. Generally, aliens must apply for asylum within 1 year of arriving in the United States.

Immigration Court Case Completion Goals

EOIR assesses its case processing performance based on how timely various types of cases are completed (see Table 1).[16]  EOIR does not have outcome measures for its cases, such as an increase in the number of final removal orders or grants of relief because, as an impartial body that decides immigration cases, it cannot have quotas to meet.  Each case is to be decided on its own merits.

Beginning in January 2010, EOIR abolished its case completion goals for cases involving non-detained aliens, except when the aliens seek asylum and therefore are counted under EOIR's completion goal for asylum cases.[17]  According to EOIR, it discontinued the goals to help the immigration courts focus more on the highest priorities – namely, cases involving aliens who are detained during their proceedings.  EOIR also reset the goals for detained cases by establishing one goal that does not distinguish between cases with and without relief applications.

---

[16]  We evaluated EOIR's adjudication of removal cases, except Institutional Hearing Program cases because these cases involve aliens serving sentences in prison for criminal convictions.  We did not examine bond or credible fear determination hearings because they are not removal hearings, although EOIR has established completion goals for these types of matters.

[17]  According to 8 U.S.C. § 1158(d)(5)(A)(iii) (2011) (corresponds to INA § 208(d)(5)(A)(iii)), in the absence of exceptional circumstances, the final adjudication of asylum applications must be completed within 180 days after the application is filed.

**Table 1:  EOIR's 2009 and 2010 Case Completion Goals for the Immigration Courts**

| Type of Case | 2009 Goals | | 2010 Goals | |
|---|---|---|---|---|
| | Time Goal | Percentage Goal | Time Goal | Percentage Goal |
| **Detained** | | | | |
| Without applications for relief from removal | 30 days | 90% | 60 days | 85% |
| With applications for relief from removal other than asylum | 120 days | 90% | | |
| **Asylum (detained or non-detained)** | 180 days | 90% | 180 days | 90% |
| **Non-Detained** | | | | |
| Without applications for relief from removal | 240 days | 90% | Abolished | |
| With applications for relief from removal other than asylum | 240 days | 60% | Abolished | |

Notes:  EOIR has established goals for other matters that are outside the scope of our review.  The goals in the table are for the five principal types of cases.

The percentage goals are the proportions of a particular type of case that are to meet the time goals for that type of case.

Source:  EOIR Reports on Case Completion Goals:  FY 2010 1st Quarter and 2nd Quarter.

EOIR monitors the performance of the immigration courts in meeting the case completion goals in internal quarterly reports.  The immigration courts' success in meeting the goal for detained cases has been identified as an adjudication priority and is published in the Department's annual Performance and Accountability Report and congressional budget submission.

**The Board of Immigration Appeals**

Once an immigration judge renders a decision, both the alien and the DHS have the right to appeal that decision to the BIA.  The majority of appeals received by the BIA involve orders of removal and applications for relief from removal.[18]  The BIA is directed by a Chairman and is

---

[18] The BIA also reviews cases involving petitions to classify the status of alien relatives for the issuance of preference immigrant visas, fines imposed upon

*(Cont.)*

staffed with board members who adjudicate appeals, staff attorneys who assist board members, and support staff at EOIR's headquarters in Falls Church, Virginia.[19]  In FY 2010, the BIA was authorized 175 attorney positions, including 15 board members, of which 166 were filled as of September 30, 2010.  The BIA also was authorized 131 support staff positions, of which 104 were filled as of September 30, 2010.  Overall, BIA's authorized staffing increased approximately 20 percent from FY 2006 to FY 2010.  In FY 2010, the BIA received 15,556 appeals of immigration judge case decisions, which is 23 percent less than it received in FY 2006.  Also in FY 2010, it completed 16,069 appeals of immigration judge case decisions, which is almost 32 percent less than it completed in FY 2006.

Generally, the BIA does not conduct courtroom proceedings – board members decide appeals by reviewing briefs submitted by the parties, along with the immigration court case files and transcripts.  On rare occasions, board members hear oral arguments.  A single board member decides the appeal unless it falls into one of six categories that require a decision by a panel of three board members.[20]  The BIA may, by majority vote or by direction of the BIA Chairman, assign a case for review by all of the board members (an en banc review).[21]

The BIA Process

The BIA appellate review process begins when an alien or the DHS appeals an immigration judge's decision.  The BIA's clerk's office receives the appeal or motion, assembles the materials for BIA review, and sets briefing schedules.  Paralegals and staff attorneys review the appeal.  The attorneys or paralegals prepare a draft decision order on the case's

---

transportation carriers for the violation of immigration laws, and motions for reopening and reconsidering decisions.

[19]  The BIA Chairman is a career Senior Executive Service position, with a salary range of $119,554 to $179,700.  The board member positions are career Schedule A positions, with a salary range of $119,554 to $165,300.

[20]  These categories are the need to:  (1) settle inconsistencies among the rulings of different immigration judges; (2) establish a precedent construing the meaning of laws, regulations, or procedures; (3) review a decision by an immigration judge that is not in conformity with the law or with applicable precedents; (4) resolve a case of major national import; (5) review a clearly erroneous factual determination by an immigration judge; or (6) reverse the decision of an immigration judge in a final order, other than nondiscretionary dispositions.

[21]  8 C.F.R. § 1003.1(a)(5).

merits and initially assess whether the case should be reviewed by a single board member, three-member panel, or, in rare cases, recommend en banc review. Board members review the draft decision orders and may accept them, direct that they be modified, or decline them.

The BIA may issue an affirmance of the immigration judge's decision with or without an opinion. An affirmance without opinion, which does not contain the BIA's explanation or reasoning for approving the decision, is required when the case meets the criteria of 8 C.F.R. § 1003.1(e)(4)(i). The BIA may also modify, reverse, or remand a case to the immigration court for further consideration.

See Appendix II for a flow chart that illustrates the appeal process.

If the BIA rules against an alien, the alien may appeal the case to the appropriate U.S. Court of Appeals (Court of Appeals). The Department's Office of Immigration Litigation represents the United States before the Court of Appeals, and the alien may obtain his or her own representation. The DHS cannot appeal the BIA's ruling to the Court of Appeals, but may seek the Attorney General's review. The Attorney General may vacate the decision of the BIA and issue his or her own decision. A BIA decision is the final administrative decision in the matter, unless it is stayed, modified, rescinded, or overruled by the BIA itself, the Attorney General, or a Court of Appeals.

BIA Completion Goals for Cases on Appeal

Like the immigration courts, EOIR has goals for the BIA to complete percentages of the appeals it reviews within specific timeframes. Two of the goals are derived from 8 C.F.R. § 1003.1(e)(8)(i): those pertaining to appeals (regardless of the aliens' detention status) undergoing review by one or three board members. An additional goal established by EOIR pertains to detained appeals. Appeals involving detained aliens are measured twice: once under either the one- or three-member review timeline and again under the detained alien case timeline. (See Table 2.)

**Table 2:  EOIR's 2010 Completion Goals
for the Board of Immigration Appeals**

| Type of Review | Time Goal | Percentage Goal |
|---|---|---|
| One-member decision | 90 days | 100% |
| Three-member decision | 180 days | 100% |
| Detained alien decision | 150 days | 90% |

Notes:  The percentage goals are the proportions of appeals that are to meet the time goals for that type of review.

In FY 2007, the EOIR goal for detained appeals was reduced from 180 days to 150 days.

Source:  EOIR Report on Case Completion Goals: FY 2010 2nd Quarter.

EOIR tracks the performance of the BIA in meeting the completion goals in internal quarterly reports.  The BIA's success in meeting the goal for detained appeals has been identified as an adjudication priority and is published in the Department's annual Performance and Accountability Report and congressional budget submission.

## SCOPE AND METHODOLOGY OF THE OIG REVIEW

Our review examined the processing and management of removal cases in the immigration courts and of appeals of immigration judge removal decisions at the Board of Immigration Appeals.  We limited our review to cases initiated by the Department of Homeland Security because these cases are the majority of EOIR's caseload at both the immigration courts and the BIA.  We did not review the processing of cases by EOIR's Office of the Chief Administrative Hearing Officer, which adjudicates a small number of cases primarily related to employer sanctions that are unrelated to the removal caseload.

We conducted field work at EOIR Headquarters, the BIA, and three immigration courts:  Arlington, Virginia; New York, New York; and Chicago, Illinois.

We reviewed applicable laws, regulations, policy, and written procedures related to EOIR.  We attended hearings at the immigration courts and the BIA and interviewed appropriate personnel at the locations visited.  We also examined EOIR files, operational and administrative reports, and databases, which included automated case information.

We reviewed EOIR's public and internal reporting regarding caseloads and goal accomplishments for both the immigration courts and the BIA.  We used a limited amount of this aggregated data to present overall trends, but we used individual cases and appeals to analyze case characteristics and processing times.[22]  We did not rely on EOIR's performance reports in our analyses of the courts' or the BIA's ability to efficiently process cases or appeals because we found the data to be inaccurate (as discussed in Section I of the Results of the Review).[23]  The

---

[22]  We used EOIR's publicly available Statistical Year Books and internal Director's Monthly Reports to analyze trends from FY 2006 through FY 2010 for the immigration courts' and the BIA's aggregated completed, received, and pending cases. These reports track data for the immigration courts by proceeding.  A proceeding is all legal action taken on a case at a particular immigration court, excluding bond redeterminations and motions.  All of the proceedings together make up an alien's immigration case.

[23]  EOIR established a working group in September 2011 to review the data it collects, assess its accuracy, analyze whether it clearly presents information, and determine whether more data should be collected and reported.  In July 2012, the head of the working group informed the OIG that the review was completed.  She advised the
*(Cont.)*

problems we identified in the aggregated data did not affect our analysis of individual cases and appeals.[24]

To determine case processing times, we obtained EOIR data elements for a random sample of 1,785 cases that were closed during calendar year 2009 at 10 immigration courts. We selected these 10 courts because they represented a diverse mix in terms of size (as measured by the number of immigration judges at each court), geographical diversity, and because they collectively handle a wide spectrum of case types. For further information on the sample of closed cases, see Appendix III.

To determine characteristics of the immigration courts' pending caseload, EOIR provided us with 252,925 cases that were pending on August 3, 2010. According to EOIR, these were all of the cases pending at the immigration courts on that date. For further information on the pending cases, see Appendix IV.

To analyze the BIA's case review process, we reviewed a sample of 23 appeals closed between January 2011 and May 2011. Each appeal involved a removal case in which an immigration judge had made a final decision. Sixteen of the appeals involved non-detained aliens (70 percent) and seven involved detained aliens (30 percent), and most of the decisions regarding the appeals, regardless of the aliens' custody status, were made by single board members. To obtain a sample of appeals that exemplified work performed by the BIA's staff attorneys, we selected cases reviewed by different staff attorneys prior to the BIA decision. To determine the types of pending appeals and how long they had been pending, we analyzed individual case information for all immigration judge case appeals pending on May 24, 2011 (17,987 appeals).

---

OIG that a report of the group's findings and recommendations is being compiled for the EOIR Director.

[24] We did not assess the validity and reliability of the data entered in EOIR's automated case system.

---

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

## RESULTS OF THE REVIEW

### SECTION I.  THE IMMIGRATION COURTS

**PERFORMANCE REPORTS**

> **EOIR's performance reports are incomplete and overstate the actual accomplishments of the immigration courts in adjudicating immigration cases. EOIR reports completions even when the immigration courts have made no decisions on whether to remove the aliens from the United States.  Further, EOIR does not report the total time it takes to complete each case and excludes a substantial portion of cases from the data used to track the timely completion of cases, approximately one-third of our case sample analysis.  In addition, EOIR abandoned completion goals for cases involving non-detained aliens that do not involve asylum, which make up about 46 percent of the courts' completions.  Some courts' caseloads consist primarily of non-detained cases, and therefore, these courts do not have measures to assess their performance in processing the majority of their cases.  While no performance report is perfect, we concluded that the flaws in EOIR's performance reporting precludes the Department from accurately assessing the courts' progress in processing immigration cases or identifying needed improvements.**

**EOIR reports completions even when no decisions have been made whether to remove the aliens from the United States.**

EOIR records completions when cases are closed at a particular court even if a decision has not yet been made as to whether to remove the alien from the United States or to grant relief from removal.  As explained below, actions that close a case in a particular court but that do not result in a decision regarding whether to remove the alien include transfers or changes of venue, administrative closures, and failures to prosecute:

- Changes of venue and transfers occur when a case is moved from one court to another.

- Administrative closures occur when both parties agree to temporarily remove a case from the court calendar until the DHS or the alien files a motion to recalendar the case.[25] For example, the DHS and the alien can file a joint motion to administratively close a case in which the alien has an application pending with the DHS for an immigration benefit that may result in relief from removal.[26]

- Failures to prosecute occur when the DHS does not file copies of the notices to appear with the courts prior to the initial hearing. In those instances, the DHS serves the alien with the notice to appear and puts the master calendar hearing on the court's calendar. Although the DHS and alien are present for the hearing, the immigration judge is not permitted to hear the case because the DHS has not filed a copy of the notice to appear with the court and thus the court lacks jurisdiction. When failures to prosecute occur, the aliens are generally excused and no further hearings are scheduled until the DHS files the copies of the notices to appear.

In all these actions, no decisions are made about whether the aliens may remain in the United States or be ordered removed, but EOIR counts the actions in its performance reports as completions. As a result, EOIR does not accurately report the actual number of cases that are completed.

In our analysis of a sample of 1,785 cases closed during calendar year 2009, we found that a single case may be "completed" multiple times before a judge makes a decision to remove the alien or grant relief from removal. In addition to the 1,785 final decisions in these cases, EOIR would have reported as completions 484 actions that were administrative events rather than final decisions that determined whether the aliens should be ordered removed from the United States or granted relief from removal.[27]

---

[25] Recent case law permits immigration judges to administratively close certain cases even without the consent of both parties. *Matter of Avetisyan*, 25 I&N Dec. 688 (BIA 2012).

[26] Immigration benefits include naturalization and permanent residency.

[27] Sixty-four percent of the 1,785 aliens in our sample were ordered removed. Approximately 77 percent of the aliens who received a decision in less than 1 year (1,295 aliens) were ordered removed.

**EOIR does not accurately count the total time to complete each case, exempts some cases when measuring whether cases are meeting completion goals, and has discontinued some goals.**

EOIR's performance reports do not fully represent how long or how many cases are in the immigration court system awaiting decisions by immigration judges.  Three EOIR practices contribute to incomplete and inaccurate performance reporting:  (1) dividing case time between courts, (2) exempting cases from completion goals based on certain case activities, and (3) discontinuing completion goals for entire categories of cases.  We explain each practice in more detail below.

Dividing Case Time Between Courts

   EOIR does not tally the time an alien's case spends at different courts to determine the actual total case length and whether that total time met completion goals.[28]  For example, a case for a detained alien has a timeliness goal of 60 days, but if the case were to spend 50 days at one court and 50 days at another court, EOIR would report two detained cases that were each completed in 50 days, both meeting the 60-day goal.  In actuality, the case took 100 days from the first court's receipt of the notice to appear until the second court's decision on whether the alien should be removed.  Thus, EOIR understates the time it takes to complete some cases and reports cases as having successfully met EOIR's goals when they have not.[29]  EOIR officials told us that they report case length in this manner because a case that is closed at a particular court is "complete," from the point of view of the particular court, and is no longer pending on that court's docket.  Although tracking cases in this manner can serve as a measure of a particular court's workload and may identify specific delays in EOIR's handling of a case, it is not an accurate measure of the

> ### Case Examples
>
>    A 2009 case involving a non-detained alien without an application for relief from removal had a change of venue 142 days after the court received the case.  The receiving court substantively decided the case after another 196 days.  According to EOIR's method of tracking completions, the case would be reported as having been completed twice, the first in 142 days, and then again in 196 days, both times being successfully within the case completion goal of 240 days.  In actuality, it took an immigration judge 338 days to render a substantive decision on the case.  Therefore, the case actually exceeded the completion goal by more than 3 months.
>
>    A 2009 case involving a detained alien with an application for relief from removal was transferred 20 days after the court received the case.  The transfer moved the case to a different hearing location serviced by the same court.  The case was decided substantively after another 131 days.  According to EOIR's method of tracking completions, the case would be reported as having been completed twice, the first in 20 days, well within the case completion goal of 120 days, and the second in 131 days, which is outside the 120 day completion goal.  In actuality, it took an immigration judge 151 days to render a substantive decision on the case, exceeding the completion goal by a month.

---

   [28]  EOIR's case completion goals vary by type of case and changed between 2009 and 2010.  Table 1 in the Background section shows the goals by case type and year.

   [29]  EOIR includes a footnote in its internal Report on Case Completion Goals that states the report measures the time from receipt to completion at each court, which is a proceeding.

total time taken by EOIR to render a decision on removability in each case.  The text box (previous page) describes two cases in our sample that show the effect of EOIR's practice on reported completion times.

As a result, the total number of cases resolved by the immigration courts each year is not readily apparent in EOIR's reports.  For example, in its FY 2010 Performance and Accountability Report, EOIR reported that it completed 89 percent of its detained cases within 60 days.  However, because these completions include actions where a proceeding was completed at a particular immigration court but then reopened in another immigration court, the statistics overstate EOIR's overall completion rate.  These facts are not disclosed in the Performance and Accountability Report.  Additionally, because EOIR counts multiple receipts for cases that change venue or are transferred, the actual number of new cases it receives each year also is overstated.[30]

Exempted Cases

EOIR excludes cases from being measured in the goals when the cases are delayed for reasons that EOIR considers to be outside the control of immigration judges.[31]  These delays primarily occur when the DHS adjudicates immigration benefits or conducts background investigations.  The immigration judges cannot proceed with the cases until the DHS decides whether the aliens are eligible for the benefit or the background investigations have been completed.[32]

---

[30] "Receipts" are defined by EOIR as the total number of proceedings, bond redeterminations, and motions to reopen or reconsider received by the immigration courts during a reporting period.  Our review included only proceedings receipts.

[31] EOIR also excludes cases that involve juvenile and unaccompanied juvenile aliens, incarcerated criminal aliens where the DHS has filed the notice to appear less than 120 days from the alien's earliest possible release date, and incarcerated criminal aliens whose cases have been remanded back to the immigration courts by the BIA.  In our sample of 1,785 closed cases, 47 cases (2.6 percent) were excluded from the goals for these reasons.

[32] We are told that the DHS has worked with EOIR to identify procedures that promote court docket efficiency.  As a result, over the last 2 years, the DHS implemented a project to expedite benefits applications pending at the DHS's U.S. Citizen and Immigration Services when the aliens are in immigration court proceedings.  This project is meant to ensure that applications for these aliens are adjudicated quickly to allow the immigration court proceedings to proceed.  Our review did not involve an assessment of this project.

Once EOIR exempts a case from its completion goal, the exemption applies throughout the duration of the case. EOIR does not restart its count of court processing days when the cases resume after the DHS rules on the aliens' benefits or completes the background investigations. However, EOIR counts any completions (such as transfers or changes of venue) that occurred before the case was exempted toward that case's completion goal.

In our sample of closed cases from 2009, the percentage of cases exempted from EOIR's goals varied by the alien's custody status and whether the alien submitted an application for relief from removal. Figure 1 below shows the percentage of exempted cases in our sample by case type.

**Figure 1: Percentage of Cases Exempted from Case Completion Goals by Case Type**



Notes: Mixed custody cases involved aliens who were detained for a portion of the life of the case. All of the asylum cases involved non-detained aliens.

"Applications" refer to applications for relief from removal, which allow aliens to legally remain in the United States or to have removal deferred.

Although goals for cases involving non-detained aliens were in effect in calendar year 2009, those goals were discontinued beginning in calendar year 2010, as discussed in the following section.

Source: Sample of cases closed in calendar year 2009 from EOIR.

U.S. Department of Justice                                             18
Office of the Inspector General
Evaluation and Inspections Division

Most significantly, our analysis shows that a majority of the asylum cases in our sample – 64 percent – were exempted by EOIR from the goals despite a statutory requirement that these cases be completed within 180 days.[33]  Because a large percentage of cases may not be counted toward their completion goals, the usefulness of the goals is questionable in helping EOIR ensure cases are completed in a timely manner.

Discontinued Completion Goals

Beginning in calendar year 2010, EOIR discontinued the completion goals it previously established for monitoring the timeliness of its non-detained cases, with the exception of asylum cases.  As a result, there are no standards against which to measure the courts' ability to process these non-detained cases within particular time frames. According to EOIR, it discontinued the goals to help the immigration courts focus more on the highest priorities – namely, cases involving aliens who are detained during their proceedings.

However, our analysis showed that the non-detained cases constitute a large number of the immigration courts' proceedings – about 46 percent.[34]  For 18 courts, including New York, non-detained cases constitute the majority of their case load.[35]  Table 1 in the Background section shows the case completion goals that existed for the immigration courts during calendar year 2009 and the new goals that became effective in calendar year 2010.[36]

---

[33]  According to 8 U.S.C. § 1158(d)(5)(A)(iii) (2011) (corresponds to INA § 208(d)(5)(A)(iii)), in the absence of exceptional circumstances, the final adjudication of asylum applications must be completed within 180 days after the application is filed.

[34]  The 46 percent is based on FY 2010 proceedings completion data from the EOIR Statistical Year Book.  The remaining 54 percent of the courts' proceedings, all of which have goals, are detained proceedings, asylum proceedings, and credible fear determination hearings (hearings held to review DHS determinations that aliens' fears of persecution or torture if they are removed were not credible).

[35]  These immigration courts still have goals against which to measure the processing of their asylum cases.  However, our analysis showed that the asylum cases accounted for less than half of the cases processed at each of these 18 courts during FY 2010.

[36]  The immigration courts did not meet completion goals for the non-detained cases from FY 2006 through FY 2009.  The completions for the non-detained cases without applications were occasionally close to the goals – 79 to 89 percent of the cases
*(Cont.)*

The OIG recognizes the importance of the timely completion of cases involving detained aliens, given that the aliens are deprived of their liberty and detained at taxpayer expense. However, we believe that EOIR should have goals for the non-detained cases as well so that EOIR can assess whether, after prioritizing the detained cases, it is still making adequate progress on the timely completion of the non-detained cases. Moreover, the OIG believes that EOIR should have separate goals to reduce the non-detained cases that have been pending for an excessive amount of time.[37] Our analysis of case data (described later in the report) showed that about 75 percent of pending cases are non-detained cases.

## Conclusion

EOIR's reporting on the immigration courts' completion of cases is flawed and makes it difficult to know how well the courts are performing. EOIR counts completions when case actions occur that do not result in decisions to order the removal of aliens from the United States or to grant relief from removal. By reporting these actions as completions, EOIR obscures the actual number of immigration cases it receives and completes each year. Further, EOIR's method for counting case length underreports actual case processing times. When cases are moved from one immigration court to another, each court's processing time is considered separately when assessing whether the case processing time met goals. The total time that such cases remain in the court system overall is not reported. Also, EOIR exempts many cases from case completion goals when an event occurs that EOIR believes is outside the control of the courts and prevents the immigration judge from proceeding with the action. EOIR still counts any case activities that it defines as a "completion" before the case became exempt, and does not restart its count of court processing days once the case resumes. Further, beginning in January 2010, EOIR made a decision to abolish its completion goals for non-detained cases. EOIR made this decision to

---

were completed within 240 days during the time period. The completions for the non-detained cases with applications were never closer than 10 percentage points from the goal. The goal was to complete 60 percent of these cases within 240 days, but only 38 to 50 percent of the cases were completed within 240 days.

[37] EOIR began a project in March 2008 to attempt to resolve non-detained cases pending over 5 years. The goals of the project are to identify these cases, schedule and complete the cases as soon as possible, and document the reasons for any cases that legitimately remain pending. According to EOIR, there were 6,836 cases over 5 years old as of January 2010. We discuss our analysis of the pending cases by type of case and age later in the report.

emphasize the processing of detained cases, which understandably are a priority.  All cases, however, regardless of whether the alien is detained or not detained, should have goals to enable EOIR to monitor its performance in resolving cases in a timely manner.

We have no evidence to suggest that EOIR intended for its reporting to be misleading.  Nevertheless, substantially complete and accurate data reporting is essential for EOIR to better administer the volume of immigration cases, and without an accurate and comprehensive picture of how the immigration courts are performing, EOIR will be limited in its ability to identify areas that need improvement.

**Recommendations**

To provide more accurate and complete information for managing cases in the immigration courts, we recommend that EOIR:

1. improve reporting of immigration court data to distinguish decisions on the removal of aliens from other case activities and reflect actual case length even when more than one court is involved,

2. eliminate case exemptions from completion goals to reflect actual case length, but identify case delays that EOIR considers outside the control of immigration judges, and

3. develop immigration court case completion goals for non-detained cases.

## CASE PROCESSING

**We found that the immigration court system overall did not keep pace with processing the volume of immigration cases received from FY 2006 through FY 2010. The rate of completions decreased despite a small increase in the number of judges. During the period, the number of pending cases increased significantly. Our analysis of a sample of closed cases showed that cases involving non-detained aliens and those with applications for relief from removal can take long periods to complete. This results in crowded court calendars and delayed processing of new cases. For example, cases in our sample for non-detained aliens took on average 17½ months to adjudicate, with some cases taking more than 5 years to complete. In addition to the volume of new cases, the number and length of case continuances granted by immigration judges were a significant factor in slowing case processing. As a result of slow case processing, aliens who ultimately were not found to have supportable claims for relief from removal remained in the United States longer, and EOIR and the DHS expended more resources to pursue the cases.**

## Immigration courts did not keep pace with processing cases, and pending cases increased significantly.

EOIR has a strategic goal to adjudicate all immigration cases in a timely manner, which is an important aspect of upholding immigration law.[38] According to EOIR's reports on the immigration courts' performance from FY 2006 through FY 2010, the courts were unable to complete as many proceedings as they received each year during that period. In addition, the number and age of the cases that the courts carried over from fiscal year to fiscal year increased. As discussed below, EOIR's performance reports (although needing improvement) showed a downward trend in the court system's productivity for processing immigration proceedings, which EOIR counts instead of individual cases.

According to EOIR's FY 2010 Statistical Year Book, from FY 2006 through FY 2010, the number of proceedings received outpaced the

---

[38] Executive Office for Immigration Review Strategic Plan, Fiscal Years 2008 – 2013.

number of proceedings the courts completed.[39]  In 4 of 5 years during this period, the number of proceedings received was greater than the number of proceedings completed (that is, the completion rate was less than 100 percent).  The number of proceedings received grew about 5 percent, from 308,652 in FY 2006, to 325,326 in FY 2010.  During this same period, the number of proceedings the immigration courts completed decreased about 11 percent, from 324,040 in FY 2006 to 287,207 in FY 2010.  Figure 2 illustrates the court system's case completion rate for each fiscal year.[40]

### Figure 2:  Immigration Courts' Completed Proceedings as a Percentage of Proceedings Received, FY 2006 – FY 2010



| | FY 2006 | FY 2007 | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|---|---|
| Receipts | 308,652 | 279,430 | 292,013 | 327,928 | 325,326 |
| Completions | 324,040 | 273,468 | 281,216 | 290,435 | 287,207 |

Notes:  The rate completed is the total number of completions as a percentage of the total number of receipts for the entire immigration court system for each fiscal year.  Completions include proceedings that resulted in decisions and other completions, such as administrative closures and transfers of cases to other courts.

Source:  EOIR FY 2010 Statistical Year Book.

---

[39]  EOIR's Statistical Year Book tracks data for the immigration courts by proceeding.  A proceeding is all legal action taken on a case at a particular immigration court, excluding bond redeterminations and motions.  These proceedings make up the alien's immigration case.

[40]  Notably, bond redetermination hearings, which are not included in this proceedings data, increased from 29,740 to 51,141 from FY 2006 through FY 2010.  Given the scope of our review, we were not able to assess the impact of the increase in bond redetermination hearings on the immigration courts' ability to complete the proceedings analyzed here.

During this same 5-year period that the completion rate was declining, the number of immigration judges was increasing. We determined that EOIR hired 75 immigration judges from FY 2006 through FY 2010, which after attrition increased the number of on-board judges by 27, from 211 to 238 (13 percent).[41] Despite the increase in judges, the overall efficiency of the courts did not improve.[42]

As the overall completion rate for proceedings decreased below 100 percent from FY 2006 through FY 2010, the number and age of proceedings pending at the conclusion of each year increased. As shown in Figure 3, based on EOIR's internally reported data, the number of pending proceedings increased from 164,051 in FY 2006 to 261,426 in FY 2010 – an increase of 59 percent. Also, the number of proceedings pending 1 year or more increased from 64,236 in FY 2006 to 118,966 in FY 2010 – an increase of 85 percent. The percentage increase of cases pending 1 year or more was actually greater, but EOIR's method of reporting does not always capture true case length. These numbers indicate that the court system overall is falling further behind and that more cases are experiencing processing delays.

---

[41] Seventeen of the 75 judges (23 percent) were hired during FY 2010. New judges undergo extensive training and may not have the performance level of more experienced judges. Beginning in January 2011, EOIR has been under a Department-wide hiring freeze, which impedes the hiring of judges and staff.

[42] EOIR noted that in FY 2011, there was an 11 percent increase in the number of judges and the number of matters completed. However, FY 2011 was outside the scope of our review and we have not verified those figures.

U.S. Department of Justice                                                   24
Office of the Inspector General
Evaluation and Inspections Division

**Figure 3:  Number and Age of Pending Proceedings at the Immigration Courts, FY 2006 – FY 2010**



Note:  Pending proceedings are as of the end of each fiscal year (September 30).

Source:  FY 2006 – FY 2010 EOIR Director's Monthly Reports for September.

We analyzed individual case information for all removal proceedings pending on a randomly selected day – August 3, 2010 (252,925 cases) – to determine the amount of time that aliens had been waiting for resolution on their cases.[43]  Our analysis measured the amount of time from the date the original court received the notice to appear until August 3, 2010.  Non-detained proceedings accounted for 75 percent (189,276), asylum proceedings accounted for 19 percent (48,940), and detained proceedings accounted for 6 percent (14,709) of all pending proceedings.  We determined from the individual case information that, as of that date, 118,794 proceedings (47 percent) had been pending less than 1 year.  We also determined that 57,068 proceedings (23 percent of all pending proceedings) had been pending 1 to 2 years, 29,244 proceedings (12 percent of all pending proceedings) had been pending 2 to 3 years, and 47,819 proceedings (19 percent of all pending proceedings) had been pending 3 years or more.[44]  (See Figure 4.)  Predominantly, the proceedings pending for over 3 years involved aliens who were not detained, and most of these proceedings

---

[43]  We randomly selected the date of August 3, 2010.  We had no indication that the pending cases on a particular day would be significantly different than any other day within a reasonable time frame.

[44]  We determined that 21,614 proceedings (8.5 percent of all pending proceedings) were pending 5 years or more.

U.S. Department of Justice                                                    25
Office of the Inspector General
Evaluation and Inspections Division

involved aliens who had filed applications for relief from removal.[45] There were 6,238 proceedings (2.5 percent of all pending proceedings) that were pending for 10 years or more.

We note, however, that our calculations of proceedings' lengths does not account for cases that were closed and later reopened, as happens, for example, when cases are on appeal with the BIA, or when cases are administratively closed.[46]

---

[45] Of the 47,819 proceedings pending over 3 years, 44,107 (92 percent) involved non-detained aliens.

[46] The individual case information for the 252,925 pending proceedings did not enable us to identify the number that were closed and later reopened, or the length of time those proceedings were closed. EOIR noted that some older proceedings may have been closed for periods of time that would skew the computations. We therefore considered the impact of these temporary closures on our analysis. We used our sample of 1,785 closed cases for a comparison and found that approximately 8 percent of those cases were closed and later reopened. We then excluded a similar proportion (approximately 10 percent) from just the oldest cases to gauge the effect of closures on our analysis and we found that 48 percent of the 252,925 proceedings would still have been pending over 1 year. Due to the limitations of the available data, we were not able to assess whether the effects of interim closures were greater or less with respect to other calculations, including those cases which had been pending for more than 10 years.

**Figure 4:  Age of Pending Proceedings**



Notes:  The figure displays data for all 252,925 removal proceedings that were pending at the immigration courts as of August 3, 2010.

Percentages do not add to 100 due to rounding.

Source:  EOIR.

## Cases, especially those for non-detained aliens, can take long periods to complete.

We examined a sample of closed cases and found that case processing times can be protracted.  The case lengths varied considerably depending on the alien's detention status and whether the alien applied for relief from removal.  Our analysis of the closed cases in our sample showed that processing times were affected significantly by case continuances granted by the immigration judges.  We also found weaknesses in EOIR's resource management capabilities that affect the allocation of judges and, thus, case processing.

Processing Times by Case Type

Our analysis of a sample of 1,785 individual cases closed by 10 courts in calendar year 2009 showed that the courts' average case processing time for non-detained aliens was significantly greater than that for detained aliens.[47]  In our sample of cases, the average time to

---

[47]  Case processing time is the total time from the date the court receives a copy of the notice to appear until the immigration judge renders a decision on whether the

*(Cont.)*

process detained cases was 1½ months.  Detained cases with applications for relief from removal took almost 5 times longer on average than detained cases without applications for relief from removal.  Cases involving non-detained aliens took, on average, 17½ months to adjudicate, with some cases taking more than 5 years to complete. Figure 5 shows the average case times for detained and non-detained cases.

### Figure 5:  Closed Cases Average Processing Time by Case Type



Notes:  The figure displays data for 1,470 cases in which the aliens had a consistent custody status throughout their cases.  All of the asylum cases involved non-detained aliens.  The time when cases were closed and later reopened was excluded, including, for example, time that elapsed when cases were on appeal at the BIA or administratively closed.

We also examined 315 cases in which the aliens were detained for a portion of the life of the case.  Because we were unable to determine the amount of time the aliens were in detention, we did not include these cases in the figure.

Applications refer to applications for relief from removal, which allow aliens to legally remain in the United States or to have removal deferred.

Source:  Case sample data from EOIR.

alien is to be removed from the United States.  We excluded the time when cases were outside the courts' control, such as when cases were on appeal at the BIA or administratively closed.

Excessive delay in immigration case processing can undermine the fair administration of justice if witnesses are no longer available to testify, U.S. citizen relatives die, or documentary evidence is lost. Moreover, the failure to promptly resolve cases results in aliens with unsupportable claims for relief from removal remaining in the United States longer, while those with legitimate claims for relief remaining in legal limbo for unwarranted lengths of time. In our sample, we had 27 cases that took from 5 to 9 years to complete.

Delays in case processing for detained cases also increase associated DHS detention costs. The Department of Justice's costs also rise as time spent processing cases increases, as do the costs for those representing the aliens.

<u>Frequent and Lengthy Continuances</u>

We found that frequent and lengthy continuances are a primary factor contributing to case processing times, especially in non-detained cases. In our sample of 1,785 closed cases, 953 cases (53 percent) had one or more continuances. These 953 cases had a total of 4,091 continuances amounting to 375,047 days in aggregate. Each case had, on average, four continuances, and the average amount of time granted for each continuance was 92 days (about 3 months), resulting in an average of 368 days per case.

As shown in Figure 6, of the 4,091 continuances, requests from the alien accounted for 2,521 continuances (62 percent), requests from DHS accounted for 754 continuances (18 percent), and joint requests by the alien and the DHS accounted for 12 continuances (0.3 percent). Court-initiated continuances accounted for the remaining 804 continuances (20 percent).

### Figure 6:  Sources of Continuances



Source:  Case sample data from EOIR.

*Alien Continuances*

Aliens request continuances for a variety reasons, but the most common reasons include seeking legal representation and preparing their cases.  Aliens in immigration court proceedings do not have a right to government-provided representation.  However, they are given the opportunity to obtain representation at their own expense.[48]  Of the 2,521 alien-requested continuances, 574 continuances (23 percent) were to allow the alien time to obtain representation and 522 (21 percent) were to allow the alien time to prepare the case.  Continuances for the alien to seek representation averaged 53 days, and continuances for the alien to prepare the case averaged 66 days.  Alien-requested continuances accounted for 227,939 days (61 percent) of the total 375,047 days granted for all continuances.  Figure 7 shows the reasons for continuances related to aliens from our sample of closed cases.

---

[48]  Aliens may be represented not only by attorneys and law students, but also by other persons, including accredited representatives from recognized charitable organizations and family members.

## Figure 7:  Reasons for Alien Continuances



Alien to seek representation: Time to seek legal representation.

Alien to prepare case:  Time to prepare the case, including time to file a relief application.

Alien request:  Time for other request or to accommodate alien's request for an alternative hearing date.

Alien to file or supplement application:  Time to file or amend an application for relief.

Alien-initiated DHS application:  Time for the DHS to adjudicate the alien's application for an immigration benefit.

Alien completes paperwork for DHS background investigation (BI):  Time to complete the required paperwork for a DHS background investigation.

Notes:  Percentages do not add to 100 due to rounding.

*Other* is a combination of 8 infrequently occurring reasons.

Source:  Case sample data from EOIR.

Of the 574 continuances granted to the aliens to obtain representation, 271 occurred at the initial hearing. The *Immigration and Nationality Act* (Act) affords aliens time prior to the initial master calendar hearing to secure representation. According to the Act, the initial master calendar hearing cannot be scheduled earlier than 10 days after the alien is served with the notice to appear. This minimum 10-day period before the initial master calendar hearing is provided for the alien to secure representation.[49] Among the cases in our sample, the average time from the aliens being served with the notices to appear until the initial master calendar hearings was 69 days (more than 2 months).[50] Nevertheless, 271 aliens requested continuances at their initial master calendar hearings for more time to seek representation.

The decision on whether to grant a continuance requested by an alien is a legal issue governed by precedent. We are informed by EOIR that there is a well-established body of case law regarding continuances and many cases deal with denial of a continuance as it

---

**Helping Aliens
Understand the Court Process**

EOIR has administered a Legal Orientation Program since 2003 to provide detained aliens with basic information about the immigration court proceedings. According to EOIR, during FY 2010, contract personnel provided information to about 62,000 detained aliens (50 percent of the detained population) at 25 of the DHS's more than 80 detention sites that may house aliens involved in removal proceedings. The program also is used for some non-detained aliens. For example, during 2010, EOIR launched a pilot program at the Miami immigration court to provide services to non-detained aliens who:

- were unable to secure representation, and

- the immigration judge believed did not understand the proceedings.

According to EOIR, the Legal Orientation Program improves the efficient processing of immigration cases because its participants have a better understanding of the process, are better prepared for their cases, and are more likely to identify forms of relief from removal for which they are eligible. The Department's FY 2012 budget request included an additional $4 million to expand the program to reach more detained aliens. Congress did not provide the additional funds.

---

[49] Section 239(b)(1) of the Act directs that for an alien to "be permitted the opportunity to secure counsel before the first hearing . . . the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear, unless the alien requests . . . an earlier hearing date." Section 239(b)(3) states that it should not be construed that the government is prevented from proceeding against an alien if the time period has elapsed and the alien has failed to secure representation.

[50] When the aliens are served with the notice to appear, the DHS informs them that they may secure legal representation and provides a list of attorneys or programs providing reduced-fee or free assistance.

---

impacts the right to counsel.[51]  According to EOIR, most unrepresented aliens are granted at least one continuance to obtain representation in order to meet the legal requirements of a fair hearing that affords due process.  EOIR advised us that a lack of representation can significantly delay proceedings because of the extra time needed to provide explanations to, and solicit information from, the aliens.

To help aliens understand the immigration court process, and thus improve the efficient processing of immigration cases, EOIR administers a legal orientation program primarily for detained aliens (see text box).

*DHS Continuances*

The most common DHS-requested continuance was to allow the DHS time to complete background investigations and security checks of aliens seeking relief from removal.  Of the 754 DHS-requested continuances, 294 continuances (39 percent) were granted for this purpose.  An immigration judge cannot grant an alien relief from removal from the United States until the DHS completes the appropriate background investigations and reports any relevant information to the judge.[52]  Thus, while judges have discretion whether or not to grant continuances, because the judge cannot grant an alien relief without the results of the DHS background investigation, continuances for this reason are unavoidable.  In our sample, we found that the background investigation continuances averaged 132 days.  Figure 8 shows the various reasons for DHS-requested continuances.

---

[51]  We did not undertake an analysis of these legal precedents as part of our review.

[52]  However, an immigration judge does not need to wait for the results of the DHS background investigation or security check to deny an alien relief from removal.

U.S. Department of Justice                                                                33
Office of the Inspector General
Evaluation and Inspections Division

## Figure 8:  Reasons for DHS Continuances



DHS background investigation:  Time to complete alien background investigations.

DHS preparation:  Time to prepare the case or to obtain the alien's case file.

Released from custody:  Case moved from a detained to non-detained court because alien was released from custody.

DHS investigation or forensic analysis:  Time to complete investigations or forensics examination of alien-filed documents.

Notes:  *Other* is a combination of 10 reasons.  Each reason is less than 10 percent of all DHS-requested continuances.

Source:  Case sample data from EOIR.

Overall, the number of DHS-requested continuances was less than one-third of alien-requested continuances, yet DHS continuances were longer on average than alien continuances.  In our sample, DHS continuances exceeded alien continuances on average by 12 days (102 days versus 90 days).  Overall, DHS-requested continuances accounted for 76,863 days (20 percent) of the total 375,047 days granted for all continuances.  Almost half of the total days attributable to DHS-requested continuances (38,734) were for the DHS to conduct background investigations.  The DHS depends in part on the Federal Bureau of Investigation (FBI) in completing its background investigations and security checks.  The FBI performs name checks in its databases and fingerprint identification.  We did not assess the timeliness of the FBI's name checks and fingerprint identification in this review.[53]

---

[53] A 2008 OIG audit, *The FBI's Security Check Procedures for Immigration Applications and Petitions* (Report Number 08-24), found that the FBI had significant delays in processing name checks, but efficiently processed fingerprint identification. All 21 recommendations in the report have been resolved and closed, including our
*(Cont.)*

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

*EOIR Guidance on Continuances*

According to 8 C.F.R. § 1003.29, immigration judges may grant continuances "for good cause shown." Immigration judges decide whether to grant a continuance request, and for how long, largely on the basis of past BIA and federal court decisions, and on the scheduling concerns of the court. Immigration judges have received limited guidance from EOIR, amounting to a single policy memorandum issued by the Chief Immigration Judge in 1994. The memorandum states that no more than two continuances should be granted for an alien to obtain representation unless the alien establishes a legitimate reason for additional continuances.[54] The guidance is silent on the amount of time that should be allowed to obtain representation and is silent on any other type of continuance.

In our sample of closed cases, 352 cases had 574 continuances to allow the alien time to find representation. In 295 (84 percent) of the 352 cases, the judges adhered to the policy to limit the number of continuances to two for finding representation. However, judges granted aliens more than two continuances for the purpose of obtaining representation in 57 cases (16 percent), which resulted in an additional 206 continuances.[55] The additional 206 continuances extended those 57 cases by 8,581 days, or an average of 151 days per case. One case we reviewed involved a detained alien who received 11 continuances to seek legal assistance, and the case took the immigration court 884 days to process. Even with all of those continuances, the alien never obtained representation and the alien was ordered removed.

Figure 9 shows the number of continuances to seek representation for the 352 cases.

---

recommendation that the FBI develop a formal, long-term business plan for improving the efficiency and accuracy of the name check process. The OIG has not conducted a follow-up review to determine whether the FBI's processing times have changed, but in January 2012, the FBI informed our office that it had improved the processing time of name checks, with 99 percent of the closure rates for FY 2011 averaging within 30 days. [Note: The original report released on November 1, 2012, incorrectly stated that 18 of the 21 recommendations had been resolved and closed.]

[54] Office of the Chief Immigration Judge, Operating Policies and Procedures Memorandum 94-6: Continuances, July 18, 1994.

[55] In 33 (58 percent) of the 57 cases where judges granted more than two continuances to seek representation, the aliens never obtained representation.

### Figure 9:  Number of Continuances per Case for Alien to Seek Representation



Source:  Case sample data from EOIR.

For the 352 cases, the average length of each continuance to seek representation was 53 days.  Figure 10 shows the range of days for the 352 cases.

### Figure 10:  Amount of Time per Case for Alien to Seek Representation



Source:  Case sample data from EOIR.

When asked about the feasibility of issuing additional guidance on continuances, EOIR officials indicated that determining whether the circumstances of an individual case warrant a continuance is too complex to be addressed with strict guidelines.  EOIR also stated that

immigration judges often set the length of continuances according to the next available hearing dates on their calendars, and therefore, guidance on the length of continuances is unlikely to have practical effect.

While we agree that such decisions are complex and fact-dependent, we also believe that immigration judges could better apply their judgment in individual cases if EOIR provided further direction on the use of continuances, particularly with regard to what qualifies as good cause for granting continuances, and to the extent possible, what is reasonable in terms of the number and length of continuances in frequently-encountered circumstances. Additionally, EOIR could require additional review and approval if the number of continuances exceeded a reasonable number, or if the total length of continuances exceeded a certain amount of days. Doing so could assist immigration judges in avoiding unnecessary delays, which would help the courts process cases expeditiously and could also help ease some of the crowding of court calendars that leads to more lengthy delays.

Weak Resource Management

In examining whether changes to EOIR staff allocations might improve case processing times, we found EOIR does not have the data or an objective staffing model to guide its resource planning and deployment of immigration judges. For example, EOIR does not track how the judges use their time on different types of cases or work activities. Case type affects the use of judges' time, with more time spent on complex cases such as asylum cases. Other work activities, such as responding to motions, conducting bond hearings, and performing administrative tasks, also compete for the judges' time. Further, although EOIR stated that it uses information on the frequency and length of judges' details to other courts to determine the allocation of judges, it was unable to provide us with data such as how frequently details occur, how long each lasted, or how many proceedings were conducted during the detail.[56] Without data on staffing details, EOIR does not know how much time judges spend helping other courts and

---

[56] We asked EOIR how it tracked information for both physical staffing details and details through videoconferencing. In response, EOIR stated that it does not centrally track detail travel information, but that it accounts for costs through the travel authorization, travel vouchering, and the budget processes. When we requested summary data on the number of immigration judges and hours they worked through staffing details in FY 2009 and FY 2010, EOIR did not provide any data because it stated that it does not track staffing detail information in the manner we requested. When we requested any analyses EOIR had conducted on its use of staffing details, EOIR responded that it had none.

cannot assess the effects on the detained and non-detained caseloads of the courts involved in the details.

EOIR is not using a quantitative model to determine staffing levels for immigration courts. EOIR officials told us that they consider the following types of information when making staffing decisions: Assistant Chief Immigration Judge assessments of court needs, DHS actions, frequency of staffing details and associated costs, availability of court space and agency resources, and legal requirements.[57] However, EOIR has not documented the staffing methodology it uses to assess that information or assigned relative weights to reflect the importance of each type of information. When we requested that EOIR provide any studies that project staffing levels or needs, EOIR responded that it had none.

Some models and guidance exist that EOIR can review and potentially adopt to assist its resource management decisions. Federal courts and many state courts use weighted caseload studies to assess workload and determine the number of judges needed, which could potentially help EOIR to develop a staffing model.[58] Weighted caseload is a method used to convert caseload into workload using time as a proxy for workload. It is based on the assumption that the more time it takes to process a case, the more work is involved. The Government Accountability Office also has identified best practices for strategic workforce planning. For example, staffing decisions, including needs assessments and allocation decisions should be based on comprehensive workload data that is valid and reliable.[59]

---

[57] According to EOIR, support staff are allocated in part on the basis of a ratio of immigration judges to support staff. EOIR also stated that staffing is based on the court size (i.e., one-judge, small, medium, and large immigration courts). The latter basis for staffing decisions was provided to the OIG after its field work was completed and therefore, was not confirmed.

[58] For example, the Judicial Conference, the federal judiciary's principal policymaking body, assesses the need for federal bankruptcy judges and federal district judges by using a weighted case methodology. The National Center for State Courts also recommends a weighted case methodology and has worked with several states to develop weighted caseload models, including California, Colorado, Iowa, Maryland, Minnesota, and New Hampshire.

[59] U.S. Government Accountability Office, *DHS Immigration Attorneys: Workload Analysis and Workforce Planning Efforts Lack Data and Documentation,* GAO-07-206 (April 17, 2007), 12-14.

---

**Conclusion**

Immigration court cases are frequently adjourned, resulting in longer processing times. Our analysis showed most continuances are attributed to the alien, and a significant percentage of the alien-requested continuances are granted to allow the alien time to seek representation and prepare the case. At initial hearings, for example, the majority of the continuances were requested by the aliens, and almost half of these continuances were to allow the aliens time to seek representation. In our sample of closed cases, we found aliens had, on average, 69 days (over 2 months) before their initial hearings to obtain representation.

EOIR has recognized that when aliens are better informed about the immigration court process, they are better prepared for their cases. To inform aliens about the court process, EOIR administers a Legal Orientation Program that in 2010 provided services to about 40 percent of detained aliens at 27 detention sites. In addition, EOIR launched a pilot program in 2010 to extend the program's services for the first time to some non-detained aliens at one immigration court. (For FY 2012, the Department requested additional funding to expand the program to more detention sites, but did not receive the funds.)

Though not as frequent as alien-requested continuances, DHS-requested continuances are longer on average than alien-requested continuances. Over one-third of the DHS continuances were caused by pending background investigations and security checks that the DHS must complete prior to an immigration judge granting an alien relief from removal from the United States. The DHS depends in part upon the FBI for assistance in completing background investigations and security checks. These continuances are unavoidable because the judges do not have the discretion to grant the aliens relief from removal until they receive the results of the DHS investigations.

We found that EOIR has provided limited guidance to immigration judges to supplement the past BIA and federal court decisions on whether to grant a continuance request and for how long to adjourn cases. EOIR's only guidance regarding continuances states that no more than two continuances should be granted for an alien to seek representation. For continuances for aliens seeking representation and preparing their cases, we found significant differences in the number of continuances granted and the total amount of time allowed for these continuances. While we agree that decisions on granting continuances are complex and fact-dependent, we also believe that immigration judges

could better apply their judgment in individual cases if EOIR provided further direction on the use of continuances, and to the extent possible, what is reasonable in terms of the number and length of continuances in frequently-encountered circumstances. Doing so could assist immigration judges in avoiding unnecessary delays, which would help the courts process cases expeditiously and could also help ease some of the crowding of court calendars that leads to more lengthy delays.

EOIR does not collect full information about how court personnel use their time and does not have a sound staffing model to determine staffing requirements and the allocation of positions among immigration courts. EOIR could develop a staffing model by reviewing methodologies used by federal and state courts in determining their personnel requirements.

## Recommendations

To improve case processing by the immigration courts, we recommend that EOIR:

4. analyze reasons for continuances and develop guidance that provides immigration judges with standards and guidelines for granting continuances to avoid unnecessary delays;

5. develop a process for tracking time that immigration judges spend on different types of cases and work activities;

6. collect and track data on its use of staffing details of judges; and

7. develop an objective staffing model to assist in determining staffing requirements and the allocation of positions among immigration courts.

## SECTION II.  THE BOARD OF IMMIGRATION APPEALS

**The BIA completed more appeals of immigration judge decisions than it received from FY 2006 through FY 2010 and reduced the number of pending appeals. Appeals involving non-detained aliens, however, still took long periods to complete.  In our sample, the BIA averaged more than 16 months to render decisions on cases involving non-detained aliens.  As a result, aliens whose appeals were ultimately denied remained in the United States longer than if the BIA had processed their cases more promptly, while those aliens whose appeals were ultimately granted faced prolonged uncertainty as to their legal status while the cases were being processed.  EOIR's performance reporting does not reflect appeal delays and underreports actual processing time, which undermines EOIR's ability to identify problems and take corrective actions.**

## The BIA completed more appeals of immigration judge decisions than it received.

Timely processing of appeals by the BIA, like timely processing of immigration cases by the courts, is part of EOIR's strategic plan.[60] Based on EOIR's publicly reported data of the BIA's past performance from FY 2006 through FY 2010, the BIA was able to complete more appeals of immigration judge case decisions than it received most years during that period.

<u>Completed Appeals of Immigration Judge Case Decisions</u>

From FY 2006 through FY 2010, the BIA's completion of appeals of immigration judge case decisions generally outpaced the number of newly filed appeals.  In 4 of the 5 years during this period, the number of these appeals completed by the BIA was greater than the number of appeals received (that is, the completion rate was more than 100 percent).  Overall, the number of appeals received declined 23 percent, from 20,282 in FY 2006 to 15,556 in FY 2010.  Figure 11 shows the BIA's completion rate of case decision appeals for each fiscal year.

---

[60] Executive Office for Immigration Review Strategic Plan, Fiscal Years 2008 – 2013.

### Figure 11:  The BIA's Completed Appeals of Immigration Judge Case Decisions as a Percentage of Appeals Received, FY 2006 – FY 2010



|  | FY 2006 | FY 2007 | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|---|---|
| **Receipts** | 20,282 | 18,343 | 17,759 | 16,644 | 15,556 |
| **Completions** | 23,544 | 17,802 | 21,928 | 17,885 | 16,069 |

Note:  The figure displays data only for appeals of immigration judge case decisions.

Source:  EOIR FY 2010 Statistical Year Book.

<u>Pending Appeals</u>

EOIR does not report the BIA's number of pending appeals of immigration judge case decisions separately from the number of other types of pending appeals.[61]  Therefore, we could not analyze the trend from FY 2006 through FY 2010 for the number of pending immigration judge case appeals.  However, because the total number of these appeals completed by the BIA was greater than the total number of these appeals received over the 5-year period, it is apparent that the BIA was able to reduce its pending caseload of immigration judge case appeals.[62]

---

[61]  The BIA reviews cases involving other immigration court judge decisions, such as bond eligibility and motions to reopen and reconsider.  The BIA also reviews cases involving DHS decisions, such as petitions to classify the status of alien relatives for the issuance of preference immigrant visas, and fines imposed on transportation carriers for the immigration law violations.

[62]  The BIA's completed appeals of immigration judge case decisions as a percentage of appeals received for all immigration judge case decision appeals was 110 percent for the 5-year period.

Additionally, we analyzed EOIR's internally reported data for all types of appeals and found that the number of all appeals pending decreased 5 percent, from 27,441 in FY 2006 to 26,116 in FY 2010.

To determine the types of pending appeals and how long they had been pending, we analyzed individual case information for all immigration judge case appeals pending on May 24, 2011 (17,987 appeals).[63]  Appeals involving non-detained aliens accounted for 92 percent (16,468), and those involving detained aliens accounted for 8 percent (1,519) of the immigration judge case appeals.  We determined that a majority of the appeals were pending for less than 1 year – 66 percent or 11,862 appeals.  Almost all of the appeals pending 1 or more years involved aliens who were not detained.  Of the 6,125 appeals that were pending 1 or more years, 6,112 (99.7 percent) involved non-detained aliens.

**Some appeals took long periods to complete due to BIA processing delays.**

In our sample of 23 appeals, appeals from non-detained aliens took the BIA almost 5 times longer on average to complete than appeals from detained aliens.  The average number of days to complete appeals (counting from the day the notice of appeal was filed to the day the BIA's decision was issued) for non-detained aliens was 485 days (16 months).  For detained aliens, it was 105 days (3½ months).  Because appeals from detained aliens are the BIA's priority, we expected that those appeals would have shorter processing times.  However, the difference in the number of processing days between non-detained and detained appeals in our sample is significant and attributable primarily to the volume of non-detained appeals waiting for review by the BIA's paralegal specialists.[64]

According to an EOIR official, a paralegal reviews the full case file to ensure that all critical documents are present, complete, in the correct order, and pertain to the case.  The paralegal also prepares an issue sheet for the case; tabs important documents; and does a jurisdictional review to determine whether the appeal was filed on a timely basis,

---

[63]  There were a total of 27,293 appeals pending on May 24, 2011, consisting of 17,987 appeals of immigration judge case decisions, 5,418 appeals of other immigration judge decisions, and 3,888 appeals of DHS decisions.

[64]  There were 16 paralegal specialists at BIA during the period of our review.

whether the parties have standing, and whether a motion to withdraw or a joint motion to remand has been filed.

The EOIR official informed us that the technical legal review by the paralegal usually takes only a few hours as long as the case file is complete and presents no legal analysis problems. This official said that the paralegals processed detained appeals immediately after receiving them from the clerk. However, the paralegals processed the non-detained appeals in turn from a large queue, an average of 6 to 8 months after the appeals became available for the paralegals' review.

We found in our sample that when an alien was detained, a paralegal reviewed the appeal within an average of 8 days. When the alien was not detained, a paralegal completed the review in an average of 294 days. Figure 12 shows that, of the three types of reviews conducted during the BIA process – by the clerk, by the paralegal, and by the staff attorney and board member – 76 percent of the total processing time for non-detained appeals in our sample was the time waiting for the paralegal review and then the actual review. EOIR attributes the delays to the overall volume of appeals, the fact that detained cases are the BIA's priority when allocating its resources, and inadequate staffing levels.

**Figure 12:  Average Time to Review Non-Detained Appeals in Sample**



Notes:  A flowchart of the BIA's process is in Appendix II.

The time from the date of the filing of the notice of appeal until the date of the filing of the last brief averaged 84 days in our sample.

Source:  Case Access System for EOIR (CASE) automated system.

### EOIR's completion statistics for appeals do not include the entire processing time.

EOIR's completion statistics for appeals do not include the entire processing time to review and decide appeals.  The interval EOIR counts varies for each of its goals.  According to 8 C.F.R. § 1003.1(e)(8)(i), the BIA is required to issue its decisions within established timelines based on the number of board members assigned to review the appeal (regardless of the detention status of the alien).  A single board member decides the appeal unless it falls into one of six categories that require a decision by a panel of three board members.[65]  The goal for one-member decisions is 90 days.  The goal for three-member decisions is 180 days. In addition to the timelines established in the Code of Federal Regulations (which are for all appeals), the BIA developed an additional

---

[65]  These categories are the need to:  (1) settle inconsistencies among the rulings of different immigration judges; (2) establish a precedent construing the meaning of laws, regulations, or procedures; (3) review a decision by an immigration judge that is not in conformity with the law or with applicable precedents; (4) resolve a case of major national import; (5) review a clearly erroneous factual determination by an immigration judge; and (6) reverse the decision of an immigration judge in a final order, other than nondiscretionary dispositions.

timeline for appeals involving detained aliens because those are priority appeals.[66]  Appeals involving detained aliens are measured twice:  once under either the one- or three-member review timeline and again under the detained alien case timeline, which sets the goal at 150 days for 90 percent of the detained cases.

EOIR's starting point for counting appeal processing days under each goal is described below:

- One-member reviews – The count begins when a staff attorney or paralegal is assigned to review the appeal and prepare the written decision (includes appeals from detained and non-detained aliens).[67]

- Three-member review – After a staff attorney reviews an appeal and determines that is it appropriate for a three-member review, EOIR begins the count on the date that the board agrees with the attorney's determination (includes appeals from detained and non-detained aliens).

- Detained alien cases – EOIR begins the count when the alien or DHS files a notice of appeal with the BIA, which is the beginning of the appellate process.

As a result of the starting points EOIR uses, its statistics for the one- and three-member review goals do not reflect the total number of elapsed days taken to review and decide appeals.  Figure 13 illustrates the basic BIA process.  (See Appendix II for a detailed flowchart of the BIA's process.)

---

[66] The Code of Federal Regulations does not provide a timeline to complete detained cases, but does state that decisions on the merits of the cases must be issued as soon as practicable with a priority for cases involving detained aliens.

[67] This review is separate from the technical legal review by the paralegal discussed previously.

### Figure 13:  Board of Immigration Appeals Process



Source:  EOIR documentation and interviews.

The BIA's goals for one- and three-member reviews count only part of the BIA's process for reviewing appeals, and the parts that are excluded represent a significant portion of the processing time.  For the 23 appeals in our sample, we calculated processing times for one- and three-member appeals starting from the day the appeal was filed until the BIA issued a decision, which is the actual time the appellants are waiting for decisions.  While EOIR's method of calculation showed an average of 54 days to process an appeal under the one-member goal and an average of 76 days under the three-member goal, the entire time to process the appeals averaged 372 and 361 days, respectively.  The differences in EOIR counts and actual total elapsed days are most noteworthy among the non-detained appeals.  EOIR's longest count for a non-detained appeal was 154 days.  In contrast, the shortest number of elapsed days for a non-detained appeal was 206 days.  Table 3 shows, for the 23 cases in our sample, the contrast between the number of days that EOIR uses to measure how long the BIA members take to decide appeals and the total processing time for appeals.

**Table 3:  Comparison of EOIR Count of Processing Days and Total Elapsed Days for 23 Appeals**

| Alien Custody Status | One-Member Review | Three-Member Review | Days in EOIR Count | Total Elapsed Days | Difference in Days |
|---|---|---|---|---|---|
| 1.  Detained | ✓ | | 10 | 62 | 52 |
| 2.  Detained | ✓ | | 16 | 76 | 60 |
| 3.  Detained | ✓ | | 23 | 121 | 98 |
| 4.  Detained | | ✓ | 31 | 136 | 105 |
| 5.  Detained | ✓ | | 43 | 114 | 71 |
| 6.  Detained | ✓ | | 50 | 110 | 60 |
| 7.  Detained | | ✓ | 72 | 119 | 47 |
| 8.  Non-Detained | ✓ | | 5 | 474 | 469 |
| 9.  Non-Detained | ✓ | | 7 | 250 | 243 |
| 10.  Non-Detained | ✓ | | 28 | 364 | 336 |
| 11.  Non-Detained | | ✓ | 34 | 670 | 636 |
| 12.  Non-Detained | ✓ | | 49 | 456 | 407 |
| 13.  Non-Detained | ✓ | | 54 | 206 | 152 |
| 14.  Non-Detained | ✓ | | 72 | 700 | 628 |
| 15.  Non-Detained | ✓ | | 73 | 651 | 578 |
| 16.  Non-Detained | ✓ | | 73 | 304 | 231 |
| 17.  Non-Detained | ✓ | | 78 | 671 | 593 |
| 18.  Non-Detained | ✓ | | 83 | 342 | 259 |
| 19.  Non-Detained | ✓ | | 83 | 634 | 551 |
| 20.  Non-Detained | ✓ | | 84 | 610 | 526 |
| 21.  Non-Detained | | ✓ | 90 | 387 | 297 |
| 22.  Non-Detained | ✓ | | 138 | 545 | 407 |
| 23.  Non-Detained | | ✓ | 154 | 493 | 339 |

Notes:  EOIR's count for the one-member review starts with the date that the staff attorney or paralegal is assigned to review the appeal to prepare the written decision until the date the BIA's decision is issued.

EOIR's count for the three-member review starts with the date that the appeal is accepted for review by three members until the date of the BIA's decision.

Total Elapsed Days starts with the date that the appeal is filed until the date of the BIA's decision.

See Appendix II for a flowchart of the BIA process.

Source:  Case Access System for EOIR (CASE) automated system.

**Conclusion**

EOIR personnel we interviewed stated that appeals for non-detained aliens have disproportionate processing delays due to the paralegal review, which takes months to initiate but only hours to complete.  EOIR also attributes the delays to the volume of appeals and too few staff members.  Further, EOIR's tracking method for the length of appeals does not include total processing times for appeals.  Depending on the type of review – one or three board members – EOIR counts the appeal processing time from different starting points.  These different starting points significantly skew the reported achievement of its completion goals for appeals and impede EOIR's effective management of the appeals process.  The total number of days taken to review and decide appeals, not EOIR's count of days, represents how long the aliens and the DHS wait for decisions on their appeals.

**Recommendations**

To provide accurate and complete information for managing appeals at the BIA, we recommend that EOIR:

8. consider seeking additional resources or reallocating resources to reduce delays in the processing of appeals for non-detained aliens; and

9. improve its collecting, tracking, and reporting of BIA appeal statistics to accurately reflect actual appeal processing times.

## CONCLUSION AND RECOMMENDATIONS

EOIR does not collect and report complete performance data about the immigration courts, which can conceal problems and overstate accomplishments.  For example, EOIR excludes nearly a third of immigration court cases from being measured in the performance reports that it uses to track the timely completion of cases.  Further, EOIR discontinued any timeliness goals for non-detained cases.  It now has timeliness goals only for detained cases and asylum cases even though some courts have few, if any, detained cases.  Although we agree that EOIR should prioritize the completion of detained cases, EOIR should have goals for the non-detained cases as well.  EOIR also reports cases as completed even when no decisions have been made on whether to remove the aliens from the United States.  After cases have been administratively closed, they may be later reopened and thus result in EOIR reporting multiple receipts for the same cases.

From FY 2006 through FY 2010, the volume of immigration cases received outpaced many immigration courts' capability to process the cases on a timely basis even though there was an increase in the number of judges.  Cases, especially those for non-detained aliens, can take long periods to complete, which crowds court calendars and delays processing of new cases.  Over the 5-year period, the number of cases pending one year or more increased by 85 percent.

Adding to the case processing times are the frequent continuances.  In our sample of 1,785 closed cases, 953 cases (53 percent) had one or more continuances.  Each of those cases had, on average, four continuances, and the average amount of time granted for each continuance was 92 days (about 3 months), resulting in an average of 368 days per case.

We found that EOIR has provided only limited guidance to immigration judges to supplement the past BIA and federal court decisions on whether to grant a continuance request and for how long to adjourn cases.  In our case sample, we found significant differences in the number of continuances granted and the total amount of time allowed for continuances.  Cases in which judges granted more than two continuances for aliens to seek representation resulted in an additional 206 continuances, which extended the 57 cases by a total of 8,581 days.

Staffing decisions can affect the court system's capability to process immigration cases.  We found that EOIR does not collect full

information about how court personnel use their time and does not have a sound staffing model to determine staffing requirements and the allocation of positions among immigration courts. EOIR could develop a staffing model by reviewing methodologies used by federal and state courts in determining their personnel requirements.

From FY 2006 through FY 2010, the BIA was able to complete more appeals of immigration judge case decisions than it received and thus reduced the appeals pending processing. In our sample of completed appeals, the BIA processed appeals involving non-detained aliens significantly slower than appeals involving detained aliens. Appeals for non-detained aliens have disproportionate processing delays due to the paralegal review, which EOIR attributes to the overall volume of appeals, the priority given to detained cases, and inadequate staffing levels. EOIR's completion statistics for appeals do not include the entire processing time to review and decide appeals. Therefore, significant delays in processing are not reflected in the statistics.

Below, we restate our overall recommendations for improving EOIR's management of the immigration courts and the BIA.

## Recommendations

To improve its case processing and provide accurate and complete information on case processing, we recommend that EOIR:

1. improve reporting of immigration court data to distinguish decisions on the removal of aliens from other case activities and reflect actual case length even when more than one court is involved;

2. eliminate case exemptions from completion goals to reflect actual case length, but identify case delays that EOIR considers outside the control of immigration judges;

3. develop immigration court case completion goals for non-detained cases;

4. analyze reasons for continuances and develop guidance that provides immigration judges with standards and guidelines for granting continuances to avoid unnecessary delays;

5. develop a process for tracking time that immigration judges spend on different types of cases and work activities;

6.  collect and track data on its use of staffing details of judges;

7.  develop an objective staffing model to assist in determining staffing requirements and the allocation of positions among immigration courts;

8.  consider seeking additional resources or reallocating resources to reduce delays in the processing of appeals for non-detained aliens; and

9.  improve its collecting, tracking, and reporting of BIA appeal statistics to accurately reflect actual appeal processing times.

## APPENDIX I:  IMMIGRATION COURT PROCESS



Source:  EOIR documentation and interviews.

## APPENDIX II: BOARD OF IMMIGRATION APPEALS PROCESS



Note: This flow chart does not include every step in the process. It excludes, for example, actions as a result of defective submissions or board members returning orders to staff attorneys to be revamped.

Source: EOIR documentation and interviews.

## APPENDIX III:  OIG SAMPLE OF CLOSED CASES
## AT THE IMMIGRATION COURTS

To examine case processing at the immigration courts, we requested that EOIR provide us with specific data elements for a random sample of individual removal cases that were closed during calendar year 2009 at the following 10 immigration courts:

1. Arlington, Virginia;
2. Chicago, Illinois;
3. New York City, New York;
4. Seattle, Washington;
5. Tacoma, Washington;
6. Tucson, Arizona;
7. Eloy, Arizona;
8. Harlingen, Texas;
9. Port Isabel, Texas; and
10. San Diego, California.

We selected these 10 courts because they represent a mix in terms of size (as measured by the number of immigration judges at each court), geographical diversity, and because they collectively handle a wide spectrum of case types.  We limited our request to removal cases because these cases account for the vast majority of cases that the immigration courts handle each year.[68]  However, we did not include Institutional Hearing Program removal cases in our request because these cases involve criminal aliens serving sentences in prison for criminal convictions.[69]

In response to our request, EOIR provided us with over 30 data elements for 2,500 cases.  After deleting some cases (for example, removing cases from the sample that did not have a final decision regarding whether or not an alien would be removed from the United States during calendar year 2009), the final sample was 1,785 cases.  We used this sample to represent generally how the immigration courts process the caseload.

---

[68]  According to EOIR's FY 2010 Statistical Year Book, removal cases accounted for 318,435 of the total of 325,326 cases received (98 percent) and 280,420 of the total of 287,207 cases completed (98 percent) at the immigration courts during FY 2010.

[69]  According to EOIR, Institutional Hearing Program cases constitute only 2 percent of total removal cases.

We classified the sample of closed cases into types based on EOIR's categories. EOIR categorizes a case based on its status when the case is completed. However, those categories may not have been consistent throughout the time the case was pending at the courts. We found that some of the non-detained cases in our sample included cases in which the alien was initially detained but subsequently released from custody. Consequently, because an alien's custody status can change during the life of the case, we created a case type that EOIR does not use – that is, mixed custody. Table 4 provides information on the seven case types we analyzed.

### Table 4:  Case Types in OIG Sample of Closed Cases

| No. | Case Type | Description | Number of Cases | % of Total |
|-----|-----------|-------------|-----------------|------------|
| 1 | Detained without applications for relief from removal | Alien was detained during the entire case and did not seek relief from removal by submitting an application | 691 | 39% |
| 2 | Detained with applications for relief from removal | Alien was detained during the entire case and sought relief from removal by submitting an application (other than asylum) | 264 | 15% |
| 3 | Non-detained with applications for relief from removal | Alien was never detained and sought relief from removal by submitting an application (other than asylum) | 223 | 12% |
| 4 | Non-detained without applications for relief from removal | Alien was never detained and did not seek relief from removal by submitting an application | 209 | 12% |
| 5 | Mixed custody with applications for relief from removal | Alien was detained during a portion of the case and sought relief from removal by submitting an application | 206 | 12% |
| 6 | Mixed custody without applications for relief from removal | Alien was detained during a portion of the case and did not seek relief from removal by submitting an application | 109 | 6% |
| 7 | Asylum | Alien was never detained and sought relief from removal by filing for asylum | 83 | 5% |
| **Total** | | | **1,785** | **100%** |

Note:  Percentages do not add to 100 due to rounding.

Source:  Case sample data from EOIR.

Our analysis of case processing times was based on the amount of time that elapsed from when the DHS served the court with a copy of the notice to appear until the immigration judge rendered a decision to order the alien removed from the United States, grant relief, or terminate the case. It does not include the time a case was closed and later reopened, such as cases that were on appeal at the BIA or administratively closed.

Of the 1,785 cases in our sample, 146 were closed and later reopened (8 percent). Of the 146 cases, 50 cases (3 percent of the cases in our sample) were appealed to the BIA and remanded to the immigration courts; 45 cases (3 percent of the cases in our sample) were administratively closed and later reopened; 43 cases (2 percent of the cases in our sample) were closed due to a judge's decision and later reopened; 6 cases (0.3 percent of the cases in our sample) were administratively closed, appealed to the BIA, and remanded to the immigration courts; 1 case (0.1 percent of the cases in our sample) was closed and later reopened because it had an administrative closure and a decision; and 1 case (0.1 percent of the cases in our sample) was closed and later reopened because it had a decision and the immigration judge granted the alien temporary protected status.[70]

To determine the reasons and sources for continuances, including the amount of time cases were delayed by continuances, we analyzed continuance code data that was included in our sample of closed cases. When a case is adjourned, the immigration judge is required to use a two-digit code that indicates the reason for the continuance. Each continuance code assigns responsibility for the delay to one of the parties (alien, court, or the DHS). A court support staff member enters this code along with the date when the immigration judge granted the continuance into EOIR's automated case tracking system. To identify common reasons for alien-requested and DHS-requested continuances, we grouped continuance codes with similar descriptions.[71] We determined the amount of time a case was delayed by a continuance by counting the number of days that elapsed after the continuance until the next continuance or completion.

---

[70] Temporary protected status is a temporary form of relief from removal that takes the case off the court calendar until the DHS files a motion to reopen the case. The Secretary of Homeland Security has the authority to designate a foreign country's nationals for temporary protected status if adverse conditions preclude those nationals from safely returning home.

[71] As of March 2009, there were a total of 62 continuance codes.

## APPENDIX IV:  PENDING CASELOAD AT
## THE IMMIGRATION COURTS

To determine the age and characteristics of the immigration courts' pending caseload, we requested that EOIR provide us with specific data elements for every removal case that was pending (except Institutional Hearing Program removal cases) on an agreed-upon date.  In response, EOIR provided us with 7 data elements (including case type and the date each case was originally received at the immigration court) for 252,925 cases in which a final decision regarding whether an alien would be removed from the United States had not yet been reached on August 3, 2010.  According to EOIR, these cases were all of the removal cases that were pending at the immigration courts on that date.  We limited our review to removal cases because these cases account for the vast majority of cases that the immigration courts handle each year.

We believe that the data characteristics on one day are sufficiently similar to any other day within a reasonable time frame.  Therefore, we are using these data to represent generally the condition of the immigration court's pending caseload at that time.

EOIR classifies its cases by type, and we used the same case types to categorize the pending caseload.  EOIR's classification of a case is determined by the status of the alien as of the case's last completion.[72] The case types are either that the alien is detained or not detained and either the alien has applied for relief from removal or not.  The case types may or may not be the type the cases started as or what they may end up to be when a final decision is rendered because aliens may be released from detention or submit or withdraw applications for relief from removal while the cases are pending.

To determine the amount of time a case was pending, we counted the number of days that elapsed from when the DHS served the court with a copy of the notice to appear until August 3, 2010.  Consequently, our analysis of the age of the pending caseload on that date includes the time that elapsed for those cases that were outside the control of the courts; that is, for cases appealed to the BIA and remanded back to the courts or cases administratively closed and later reopened.  However, we believe that these cases represent a small percentage of all cases and therefore would not have a significant impact on the overall age of the pending caseload.

---

[72] We asked EOIR to provide us with the case types as of August 3, 2010, even though the cases were still pending.

## APPENDIX V:  EOIR RESPONSE TO DRAFT REPORT



**U.S. Department of Justice**

Executive Office for Immigration Review

*Office of the Director*

Director

*5107 Leesburg Pike, Suite 2600*
*Falls Church, Virginia 22041*

September 14, 2012

MEMORANDUM

TO:      Jason R. Higley
         Acting Assistant Inspector General for
         Evaluation and Inspections
         Office of the Inspector General

FROM:    Juan P. Osuna
         Director
         Executive Office for Immigration Review

SUBJECT: EOIR's Response to the OIG's Report: *Management of Immigration
         Cases and Appeals by the Executive Office for Immigration Review*

         The Executive Office for Immigration Review (EOIR) has examined the
Department of Justice (DOJ), Office of Inspector General's (OIG) Draft Audit Report,
entitled: *Management of Immigration Cases and Appeals by the Executive Office for
Immigration Review* (Report).  EOIR recognizes the OIG's effort to ensure that the public
is aware of EOIR's caseload and its efficient processing of cases.  EOIR's mission
remains focused on adjudicating immigration cases by fairly, expeditiously, and
uniformly interpreting and administering the Nation's immigration laws.

**General Response**

         The main focus of the Report is a criticism of the manner in which EOIR analyzes
and reports its data both for internal performance measurement and external performance
reporting. The report's conclusion that EOIR's external reporting could be clearer is well
taken and the agency intends to report the additional information recommended by the
Report.  As noted below, the agency last year came to the same conclusion and is
working to enhance its data reporting.  However, the Report also concludes that these
reports are necessary in order for the agency to identify performance areas that require
improvement, without any specific information on how those reports could be used to
identify areas for improvement or assist management in the efficient processing of cases,
and this is where EOIR disagrees with many of the Report's conclusions.

Memorandum for Jason R. Higley                                           Page 2
Subject: EOIR's Response to the OIG's Report: *Management of Immigration
        Cases and Appeals by the Executive Office for Immigration Review*

The Report conflates the distinction between the external clarity of EOIR reports
and their internal usefulness. The Report concludes that EOIR's performance reports are
"incomplete" and "overstate accomplishments." However, the OIG misunderstands the
purpose of the management reports. As an initial matter, case completion reports are
intended to measure court workload so that the agency can more effectively balance
resources among the immigration courts to accomplish its mission. These reports were
never intended to promote the agency's accomplishments to the public but instead were
developed as internal tools to provide the courts and EOIR management with critical
information about the processing of cases.

The OIG report claims that the agency overstates the number of matters opened
by the immigration court and the number of cases completed by the agency. EOIR does
not overstate the number of matters and receipts received by the courts. The agency's
Statistical Yearbook, published annually on the agency's website, defines all terms and
explains each of its statistical conclusions. The term "matter" and the term "receipt" are
clearly defined in the agency's reporting statistics and are intended to communicate the
amount of work received by the courts from the actions that define those terms. EOIR
Statistical Yearbook 2011 at B1. By disagreeing with the agency's clear and public
definition of a "completion," the report confuses what EOIR statistics actually measure
with what the OIG believes EOIR should measure.

The Report also characterizes EOIR performance reports as "inaccurate" but
never specifically states where the data is inaccurate. In actuality, the report's concern
about EOIR data is not with its accuracy but with its usefulness. There were no specific
findings of statistical flaws in EOIR's data or in its reports, just a suggestion about what
additional information the OIG believes would be useful to the public and additional
ways in which the agency's data can be reported. To the extent that the OIG believes that
the agency's public reporting could be made clearer, the agency is willing to publically
report information as suggested in the Report. However, EOIR strongly disagrees with
statements that the agency's internal management reports are "inaccurate."

**Specific Inaccuracies**

- On p. 29, the Report states that "[t]he Department of Justice's costs also rise as
  time spent processing cases increases, as do the costs for those representing the
  aliens." The Report does not provide any factual support for this statement.
  EOIR believes that it would be helpful if the OIG would be willing to share the
  analysis that led to this conclusion as we have not necessarily reached the same
  conclusion.

- Also on p. 29, the Reports states: "Delays in case processing for detained cases
  also increase associated DHS detention costs." This appears to suggest that there
  are delays in detained case processing, yet the OIG did not analyze or comment

Memorandum for Jason R. Higley                                    Page 3
Subject: EOIR's Response to the OIG's Report: *Management of Immigration*
*Cases and Appeals by the Executive Office for Immigration Review*

upon delays in detained case processing.  Indeed it would be hard pressed to do so as detained cases are resolved with exceptional speed through the system, as the OIG's own chart shows.  *See* Report, p. 28, Figure 5.

- The Report contains flowcharts intended to illustrate the agency's case processing (Figure 13; Appendix I; Appendix II).  These flowcharts indicate that their source is EOIR.  EOIR did not create these flowcharts for the OIG.  Instead, the agency provided technical information and subsequent corrections to the charts that were created by the OIG.

**The Report's Recommendations**

*Recommendation 1: Improve reporting of immigration court data to distinguish decisions on the removal of aliens from other case activities and reflect actual case length even when more than one court is involved.*

**EOIR concurs in this recommendation.**

The Report reaches specific conclusions regarding EOIR's definition of a "completion" and the effect that definition has on both internal performance measurement and external performance reporting.  The Report first criticizes EOIR's determination to report "cases as completed even when no decisions have been made whether to remove the aliens from the United States" and that EOIR does not count the total time it takes to complete each case from the date the Notice to Appear is filed in court to the date of a final order of removal.

The hearing or hearings conducted at the immigration court that receives the Notice to Appear, including any motions, require administrative work, research, and a decision by the judge.  For example, with regard to a motion to change venue, the judge reviews the history of the case, listens to previous hearings, examines reasons cited by counsel or the respondent, balances competing factors (e.g., administrative convenience, expeditious treatment of the case, location of witnesses, cost of transporting witnesses and evidence, and locations of the respondent and counsel), and determines if there is "good cause" to change venue based on regulations and case law, such as *Matter of Rahman*, 20 I&N Dec. 480 (BIA 1992).  While the decision on a motion to change venue is not a final decision on the alien's removability, it is important to take into account these types of decisions in measuring employee and court performance because the above actions use judge and support staff time.  In other words, not every decision made by an Immigration Judge in a given case is a decision on whether to order the alien removed.  Yet these other types of decisions, including changes of venue, motions, bonds, and others, require substantial judge and staff time, and thus are relevant to assessments about the efficiency of particular courts.

Memorandum for Jason R. Higley                                                        Page 4
Subject: EOIR's Response to the OIG's Report: *Management of Immigration
          Cases and Appeals by the Executive Office for Immigration Review*

In addition, EOIR focuses on decisions at each court location because each case is separately managed at the local court level throughout the country. If a case begins anew at a second court, for example through change of venue or transfer, the judge must review all of the actions taken previously, listen to prior hearings, and the staff must update all data entry. It is, for all practical purposes, a new case at the receiving court. By using completion data for each court, as opposed to the total time to complete each case, EOIR can pinpoint the efficiencies at each location. A single measurement that measures the date the Notice to Appear is filed to the date there is a final adjudication on the case would mask whether there was an unreasonable delay in the case's progress as it moved from one court location to another.

EOIR recognizes that the data collected in its CASE system and analyzed for internal performance measurement is now being used to communicate information to the public regarding the agency's case processing and performance. As a result of EOIR's own recognition of the limitations of the performance reporting it provides and an understanding that we may need to communicate our performance to the public differently, in September 2011 the Director created the EOIR Data Working Group to address these issues. As mentioned in the Report, the Data Working Group met from October 2011 to June 2012 and anticipates producing a report for the Director with recommendations on external reporting measurements in the fall of 2012.

To the extent that the Report concludes that the agency report specific case information along with court specific information, EOIR concurs in this recommendation and will begin reporting immigration court data to distinguish decisions on the removal of aliens from other case activities and reflect case length by the end of FY 2013.

**Recommendation 2: *Eliminate case exemptions from completion goals to reflect actual case length, but identify case delays that EOIR considers outside the control of immigration judges.***

**EOIR concurs in this recommendation.**

The Report criticizes the usefulness of the agency's completion goals in ensuring that cases are completed in a timely manner because a percentage of our cases are exempted from our goals. We first note the ultimate validity of this criticism is based on how "timeliness" is defined. EOIR determined that in order for completion goals to constitute a valid internal performance measure of timeliness, we should exclude the time periods when cases are delayed for reasons outside of an Immigration Judge's control. Therefore, as an internal performance measure, our completion goals, with exemptions, accurately measure the Immigration Judges' and courts' performance in this area.

Memorandum for Jason R. Higley                                            Page 5
Subject: EOIR's Response to the OIG's Report: *Management of Immigration*
         *Cases and Appeals by the Executive Office for Immigration Review*

In the cases studied by the Report, OIG found that 39 percent of the Department of Homeland Security's (DHS) requests for continuances were granted to complete mandatory background investigations and security checks of aliens seeking relief from removal. The Report also states that these continuances averaged 132 days. The Report does not say how measuring length of what amounts to a mandatory continuance in an overall performance measure of an Immigration Judge's ability to process a case would assist agency management in analyzing efficient case processing or whether an Immigration Judge is completing a case in a timely manner. An Immigration Judge cannot grant relief without completed background checks and has no control over how long these checks may take at DHS.

However, if it is the Report's conclusion that completion goals are also meant to inform the public as to how many cases the agency can complete in a set amount of time, without taking into consideration any of the delays outside of the control of the Immigration Judge, we accept that this information may be useful and the agency will begin to engage in this reporting by the end of FY 2013.

**Recommendation 3: Develop immigration court case completion goals for non-detained cases.**

**EOIR partially concurs in this recommendation.**

The Report states that EOIR abandoned all goals for non-detained cases, with the exception of asylum cases, and consequently has no measures for assessing performance of courts processing primarily non-detained cases. That conclusion is incorrect for various reasons. First, it minimizes the impact of asylum cases on our caseload. While asylum cases may account for less than half of the caseload at some of our courts that primarily process non-detained cases, asylum cases are very time intensive and generally take more processing time and immigration court resources than other non-detained cases.

Second, the change in case completion goals was made to clearly communicate the agency's priorities, and as the Report acknowledges, EOIR's emphasis on detained cases is proper. It appears that the OIG believes that our completion goals, as a whole, should be set to serve as a measure of our performance as opposed to a communication of the agency's priorities. However, we note that the Report does not provide any analysis of how this information can be used internally to assist the agency in efficient overall processing of cases. EOIR believes that some examination of how this information can be used to assist management in analyzing efficient case processing must be done before committing to establishing additional goals. Therefore, EOIR will examine whether establishing additional goals would assist in measuring agency performance and serve as a useful management tool for identifying the need for efficiencies in certain areas. EOIR will complete this assessment by the end of FY 2013.

Memorandum for Jason R. Higley                                    Page 6
Subject: EOIR's Response to the OIG's Report: *Management of Immigration*
         *Cases and Appeals by the Executive Office for Immigration Review*

*Recommendation 4: Analyze reasons for continuances and develop guidance that*
*provides immigration judges with standards and guidelines for granting continuances*
*to avoid unnecessary delays.*

**EOIR partially concurs in this recommendation.**

        In response to the January 2012 working draft report's inference that the agency
could place clear and definite limits on continuances across all cases, EOIR responded by
advising the OIG that controlling caselaw regarding a showing of "good cause" for a
continuance found due process concerns implicated by any approach that placed greater
emphasis on case management concerns than fairness. While acknowledging that EOIR
informed the OIG of the well-established body of law regarding continuances, the Report
did not analyze those precedents before continuing to assert the belief that EOIR should
provide further direction on the use of continuances. In particular the OIG continues to
suggest that EOIR provide guidance with regard to what qualifies as good cause for
granting continuances, and to the extent possible, identify what is reasonable in terms of
the number and length of continuances in frequently-encountered circumstances. A
reading of even some of the relevant federal caselaw establishes that the recommendation
in the Report is legally problematic.

        In *Hashmi v. Attorney General of United States*, 531 F.3d 256 (3rd Cir. 2008),
after multiple adjournments, an Immigration Judge denied a continuance request finding
that he had an obligation to complete cases in a reasonable amount of time and the goal
for completion of the type of case before him had already been exceeded by almost a
year. The United States Court of Appeals for the Third Circuit held that reaching a
decision about whether to grant or deny a motion for a continuance based solely on case-
completion goals, with no regard for the circumstances of the case itself, is impermissibly
arbitrary.

        In *Baires v. INS*, 856 F.2d 89 (9th Cir. 1988), an Immigration Judge denied a
request for a continuance finding that the timing of the request would result in
administrative inefficiency if granted. The United States Court of Appeals for the Ninth
Circuit found that the Immigration Judge's inflexibility deprived the alien of a fair
opportunity to present his case.

        In *Cui v. Mukasey*, 538 F.3d 1289 (9th Cir. 2008), an Immigration Judge denied a
request for a short continuance for the alien to comply with fingerprinting requirements
where the case had been continued seven times over the course of 2 ½ years and the
Immigration Judge had specifically informed the alien's attorney at a prior hearing that
the fingerprinting requirements had to be met prior to the next hearing. The Ninth Circuit
found no inconvenience to the Immigration Court in granting the continuance and found
that the denial of another continuance entirely deprived the alien of an opportunity to

Memorandum for Jason R. Higley                                          Page 7
Subject: EOIR's Response to the OIG's Report: *Management of Immigration*
        *Cases and Appeals by the Executive Office for Immigration Review*

present her case. The Ninth Circuit stated that, "As frustrating as delays may be, an immigrant's right to have her case heard should not be sacrificed because of the IJ's heavy caseload." *See id.* at 1295.

In *Varpetyan v. Holder*, 406 Fed. Appx. 236 (9th Cir. 2010), an Immigration Judge denied a continuance requested at the hearing by substitute counsel who asserted he needed time to familiarize himself with the case. The Ninth Circuit disregarded the import of the three continuances previously sought by the alien that had been granted and found no inconvenience to the government in granting another continuance. The Ninth Circuit noted that the interest in administrative efficiency cannot justify the pretermission of alien's claims where other factors militate strongly in the alien's favor.

In *Freire v. Holder*, 647 F.3d 67 (2nd Cir. 2011), the agency denied the alien's motion to reopen for reasons grounded in an inefficient use of court resources, finding that it would be injudicious to grant a continuance to await a decision on a matter over which it had no control. The Court found that the facts of record relevant to the motion for continuance had not been adequately considered.

Finally, in *Matter of Hashmi*, 24 I&N Dec. 785 (BIA 2009), the Board of Immigration Appeals, in responding to the Third Circuit decision set forth above, identified a multitude of factors to be considered by Immigration Judges in assessing whether good cause for a continuance to pursue an adjustment of status application has been established. The Board expressly stated that compliance with an Immigration Judge's case completion goals is not an appropriate factor in deciding a continuance request. Moreover, the Board cautioned that the number and length of prior continuances were not alone determinative and had to be considered under the totality of the circumstances.

As an administrative tribunal, subject to the controlling authority of the federal circuit courts of appeal, EOIR is bound to follow the guidance of federal courts concerning the facts to be considered in every case in assessing whether good cause for a continuance has been established. Similarly, Immigration Judges are also bound to follow the guidance of the Board in addressing motions for continuance. In this regard, EOIR has provided guidance to Immigration Judges through decisions of the Board that set forth specific factual scenarios that do or do not constitute good cause for a continuance, such as *Matter of Sibrun*, 18 I&N Dec. 354 (BIA 1983), *Matter of Silva-Rodriguez*, 20 I&N Dec. 448 (BIA 1992), *Matter of Hashmi, supra*, and *Matter of C-B-*, 25 I&N Dec. 888 (BIA 2012).

Consistent with the above review of federal and administrative caselaw, any policy guidance by EOIR that seeks to limit the granting of continuances generally by pre-determining the reasonableness of a continuance request based upon the number and length of previous continuances, and a desire to meet case completion goals, is an

Memorandum for Jason R. Higley                                    Page 8
Subject: EOIR's Response to the OIG's Report: *Management of Immigration*
    *Cases and Appeals by the Executive Office for Immigration Review*

approach doomed to failure upon judicial review. The federal courts and the Board have stressed that such considerations cannot override the specific facts underlying each individual request for a continuance without impinging upon the fundamental fairness of the removal proceedings.

Thus, while setting forth a mechanized policy consistent with the approach urged by the Report would unquestionably have the effect of reducing the number of continuance requests granted by Immigration Judges, the end result would not be the more efficient disposition of cases before the Immigration Judge envisioned by the Report. Rather, by providing aliens who might otherwise have no factual or legal basis for disputing the Immigration Judge's decision in their removal proceedings with a legitimate basis for appeal grounded in administrative and federal circuit precedent, the policy directive envisioned by the Report would likely increase both the total number of appeals and the number of successful appeals from Immigration Judge decisions based solely on the denial of continuance requests, unnecessarily keeping otherwise meritless cases pending through the appeals and remand process for years past the date those cases would ordinarily have been concluded.

However, EOIR will develop specific training to be presented to the Immigration Judges in 2013 that will provide them with an update on the case law related to continuances. Such training will include written materials that the Immigration Judges can then refer to when adjudicating cases. This training will be implemented in FY 2013.

*Recommendation 5: Develop a process for tracking time that immigration judges spend on different types of cases and work activities.*

*Recommendation 6: Collect and track data on its use of staffing details of judges.*

*Recommendation 7: Develop an objective staffing model to assist in determining staffing requirements and the allocation of positions among immigration courts.*

**EOIR concurs with recommendations 5, 6, and 7.**

EOIR recognizes that as the agency grows along with its caseload, there is a need to constantly evaluate staffing models and work activities. The agency has discussed with other court systems for many years the usefulness of a study on weighted case methodology and the associated costs with commissioning a study and implementing its recommendations. Under the current Departmental budget, and the agency's limited resources and personnel, we have not allocated the substantial financial resources required for such a study, prioritizing other agency needs. However, the agency will engage in a study to examine weighted case methodology, to include a process for tracking time that immigration judges spend on different types of cases and work activities, as well as objective staffing models for the determination of staffing

Memorandum for Jason R. Higley                                                    Page 9
Subject: EOIR's Response to the OIG's Report: *Management of Immigration Cases and Appeals by the Executive Office for Immigration Review*

requirements and the allocation of positions among immigration courts.   The agency will begin a caseload study during FY 2013.

*Recommendation 8: Consider seeking additional resources or reallocating resources to reduce delays in the processing of appeals for non-detained aliens.*

**EOIR partially concurs in this recommendation.**

While the Report acknowledges that the Board of Immigration Appeals completed more appeals of Immigration Judge decisions than it received, it also found that appeals involving non-detained aliens took long periods to complete and concludes that the difference between detained and non-detained processing times for appeals of Immigration Judge decisions is due to delays in paralegal review of non-detained cases. EOIR believes that the Report does not provide a complete picture and oversimplifies the resource implications of the Board's varied caseload.

While the Report notes that the Board gives priority to processing detained cases, the Report's narrow focus on non-detained Immigration Judge case appeals does not recognize the extent to which detained cases drive the workload of the Board and draw resources away from non-detained cases.  Detained cases are labor intensive because they are urgent and fluctuate in volume according to DHS enforcement priorities and initiatives.

In addition, the Report only partially captures the Board's actual caseload because its analysis focuses solely on Immigration Judge case appeals.  In addition to Immigration Judge case appeals, the Board reviews the bond decisions of Immigration Judges, appeals from DHS immigrant visa petition decisions and other DHS decisions, motions to reopen and motions to reconsider Board decisions, attorney discipline decisions, recognition and accreditation decisions, and interlocutory appeals. These other matters comprise over half of the Board's workload.  *See* EOIR FY 2011 Statistical Year Book, at T2.

A good example of the workload implications of the Board's varied caseload is appeals from DHS decisions.  These cases involve the same resource commitment as Immigration Judge case appeals, and they have risen both dramatically and erratically in the past decade.  In fiscal year 2011, the Board received over 8,700 visa petition appeals, which constituted almost 25% of the Board's overall case receipts for FY 2011. *See* EOIR FY 2011 Statistical Year Book, at T2. Incorporating these appeals into the Board's overall workload significantly impacts the pace of the Board's adjudication of non-detained Immigration Judge case appeals since, given the priority that the agency gives detained cases, the Board necessarily draws from resources allocated to non-detained appeals.  Furthermore, it is difficult to put permanent workload management measures in place to address the DHS appeals due to the fact that the volume of these appeals is difficult to predict.  For example, during the five-year period studied, the Board

Memorandum for Jason R. Higley                                    Page 10
Subject: EOIR's Response to the OIG's Report: *Management of Immigration Cases and Appeals by the Executive Office for Immigration Review*

experienced dramatic fluctuations in the numbers of receipts of visa petition appeals (FY 2006 – 5,918; FY 2007 – 3,980; FY 2008 – 2,851; FY 2009 – 3,986; FY 2010 - 8,584; FY 2011- 8,705). *See* EOIR FY 2010 and 2011 Statistical Year Books, at T2.

The Board strives to process as many cases as it can, within the confines of fairness, agency priorities and existing resources. To that end, the Board has found through experience that its attorneys and Board Members can sustain a processing workload of roughly 4,500 assigned cases at any one time. Thus, as the Board completes cases, it assigns additional cases to its attorneys and Board Members – thereby maintaining a peak production that can balance volume and due process.

Thus, the Report should not conclude that adding paralegals is what is needed to improve non-detained case processing time. More paralegals processing more cases will not result in faster case completion rates. Additional paralegal resources are of limited value without a corresponding increase in other personnel – legal staff to draft orders, Board Members to sign orders, and administrative personnel to staff the process. Therefore, EOIR does not believe that a reallocation of resources would assist the Board in processing cases quicker. Instead, in order for Board cases to be processed in a shorter amount of time, additional paralegals, legal staff, and other personnel are required. EOIR will continue to ask for additional resources in its next budgetary request, as it has for many years.

**Recommendation 9: Improve its collecting, tracking, and reporting of BIA appeal statistics to accurately reflect actual appeal processing times.**

**EOIR concurs with this recommendation.**

EOIR believes that in order for the Board to increase its performance, it must continue its current success in processing more cases than it receives, resulting in a reduction of the pending caseload. Such reduction in the pending caseload will result in fewer numbers of cases awaiting assignment to attorneys and Board Members, allowing cases to be assigned more quickly. For that reason the monthly tracking of the pending caseload number is one of the main performance measures Board managers utilize. However, to the extent it is the Report's conclusion that it would also be useful to the public to report total appeal processing time, the agency is willing to report this information by the end of FY 2013.

## APPENDIX VI:  OIG ANALYSIS OF EOIR RESPONSE

The Office of the Inspector General provided a draft of this report to the Executive Office for Immigration Review (EOIR) for its comment. EOIR's response is included in Appendix V to this report.  The OIG's analysis of EOIR's response and the actions necessary to close the recommendations are discussed below.

### GENERAL COMMENTS

In its response, EOIR states that our conclusion that its external reporting could be clearer is well taken and EOIR intends to report the additional information recommended by the report.  EOIR, however, disagrees with our conclusion that EOIR's public reports "overstate" the actual accomplishments of the immigration courts.  EOIR states that since the terms "matter," "receipt" and "completion" are clearly defined in its Statistical Year Book, the amount of work received and completed by the courts is not overstated.

As we found in our review, EOIR counts completions when case actions occur that do not result in decisions to order the removal of aliens from the United States or to grant them relief from removal.  We concluded that by reporting these actions as completions, EOIR obscures the actual number of immigration cases it receives and completes each year.  Further, EOIR's method for counting case length underreports actual case processing times and results in EOIR counting certain cases as meeting its completion goals when, in fact, they did not.  When cases are moved from one immigration court to another, each court's processing time is considered separately when assessing whether the case processing time met goals.

We recognize that there may be legitimate management reasons for tracking the number of proceedings completed within a particular timeframe at individual courts.[73]  However, contrary to EOIR's claim in its response that these "reports were never intended to promote the agency's accomplishments," we found that EOIR used the results of its case completion goal reports in the Department's annual Performance and

---

[73] EOIR's contention in its response that case completions as currently measured are helpful to EOIR in measuring individual court workload and performance is itself questionable given the way EOIR counts the data.  For example, an immigration court that transfers a case to another venue within the case completion goal time period receives equal credit for meeting EOIR's performance goals as a court that substantively resolves the case within the same case completion goal time period.

Accountability Report and congressional budget submission. Further, we found it did so without adequate explanation of what the reports were measuring.[74] We concluded that the use of the information in this manner overstated EOIR's accomplishments. Moreover, we found that by tracking cases in this manner, EOIR itself does not have an accurate measure of the total time taken to render a decision on removability in each case.

EOIR also questioned our conclusion that as time spent processing cases increases, the Department of Justice's costs rise, along with the costs for those representing the aliens. Because there are direct and indirect costs associated with adjudicating each immigration case, we believe it is self-evident and reasonable to conclude that as the amount of time the court takes to adjudicate a case rises, the associated costs also rise. Similarly, we believe it is self-evident and reasonable to conclude that delays in detained case processing increase associated DHS detention costs.

Below we provide the summary of actions necessary to close this report.

**Recommendation 1:** EOIR improve reporting of immigration court data to distinguish decisions on the removal of aliens from other case activities and reflect actual case length even when more than one court is involved.

**Status:** Resolved.

**EOIR Response:** EOIR concurred with this recommendation and stated it will begin reporting immigration court data to distinguish decisions on the removal of aliens from other case activities and reflect case length by the end of FY 2013.

**OIG Analysis:** EOIR's planned actions are responsive to our recommendation. Please provide documentation on the status of this effort by March 29, 2013.

---

[74] For example, the definitions of the terms "completion" and "proceeding" are fundamental to how EOIR measures accomplishments, but they are not explained in the Performance and Accountability Report or congressional budget submission. The term "completion" is explained in the Statistical Year Book, but does not appear until the fourth chapter, well after numerous completion statistics have been presented. The term "proceeding" is defined in the Statistical Year Book's glossary as "the legal process conducted before the immigration court and Board of Immigration Appeals." We found this definition to be lacking in clarity and easily subject to being misinterpreted as including the entire proceeding from EOIR's initial receipt of the case until EOIR rendered its final decision.

**Recommendation 2:**  EOIR eliminate case exemptions from completion goals to reflect actual case length, but identify case delays that EOIR considers outside the control of immigration judges.

    **Status:**  Resolved.

    **EOIR Response:**  EOIR concurred with this recommendation and stated it will begin reporting this information publicly by the end of FY 2013.

    **OIG Analysis:**  EOIR's planned actions are responsive to our recommendation.  Please provide documentation on the status of this effort by March 29, 2013.

**Recommendation 3:**  EOIR develop immigration court case completion goals for non-detained cases.

    **Status:**  Resolved.

    **EOIR Response:**  EOIR partially concurred with the recommendation.  EOIR states that it must examine how the information can be used to assist management before committing to establishing these goals.  As a result, EOIR proposes an alternative in which it will examine whether establishing these goals would assist in measuring agency performance and will serve as a useful management tool for identifying the need for efficiencies in certain areas.  EOIR will complete this assessment by the end of FY 2013.

    **OIG Analysis:**  We believe that having completion goals for all cases, regardless of whether the alien is detained, would assist EOIR in monitoring its performance in resolving cases in a timely manner.  However, we believe it is reasonable that EOIR first examine how it would use the goals before developing case completion goals for non-detained cases.  We therefore have determined that EOIR's planned actions are responsive to our recommendation.  Please provide documentation on the status of this effort by March 29, 2013.

**Recommendation 4:**  EOIR analyze reasons for continuances and develop guidance that provides immigration judges with standards and guidelines for granting continuances to avoid unnecessary delays.

    **Status:**  Unresolved.

    **EOIR Response:**  EOIR partially concurred with this recommendation.  EOIR stated that the OIG inferred that EOIR could

place clear and definite limits on continuances across all cases. As an alternative to the recommendation, EOIR suggested that it develop training for immigration judges that provides them with an update on case law related to continuances.

    **OIG Analysis:** EOIR's planned actions are partially responsive to our recommendation. We believe EOIR's plan to develop training for immigration judges that provides them with an update on case law related to continuances would have some benefit. However, we do not agree with EOIR's claim in its response that the report recommends that EOIR issue a "mechanized policy" on continuances or guidelines for immigration judges that "pre-determine" the reasonableness of a continuance. To the contrary, our report recognizes that continuance decisions are complex and fact-dependent. Rather, as indicated in the report, we believe that even if immigration judges are appropriately following case law in ruling on continuances, providing guidance on the use of continuances and what is reasonable in terms of the number and length of continuances also would be beneficial for immigration judges. Thus, EOIR should examine the reasons for continuances and develop related guidance to further assist immigration judges in making decisions on granting continuances. Please provide a response on EOIR's planned actions to resolve this recommendation by January 18, 2013.

**Recommendations 5, 6, and 7:** EOIR develop a process for tracking time that immigration judges spend on different types of cases and work activities.

EOIR collect and track data on its use of staffing details of judges.

EOIR develop an objective staffing model to assist in determining staffing requirements and the allocation of positions among immigration courts.

    **Status:** Resolved.

    **EOIR Response:** EOIR concurred with these recommendations. EOIR stated that it will institute a study on weighted case methodology, which will include a process for tracking time that immigration judges spend on different types of cases and work activities, as well as objective staffing models for the determination of staffing requirements and the allocation of positions among immigration courts. The agency will begin a caseload study during FY 2013.

    **OIG Analysis:** EOIR's planned actions are responsive to our recommendation. Please provide documentation on the status of this effort by March 29, 2013.

U.S. Department of Justice                            73
Office of the Inspector General
Evaluation and Inspections Division

**Recommendation 8:**  EOIR consider seeking additional resources or reallocating resources to reduce delays in the processing of appeals for non-detained aliens.

>    **Status:**  Unresolved.

>    **EOIR Response:**  EOIR partially concurred with this recommendation.  EOIR stated that it does not believe a reallocation of resources would assist in processing cases quicker.  Instead, it believes additional paralegals, legal staff, and other personnel are required.  It proposes asking for additional resources in its next budgetary request.

>    **OIG Analysis:**  EOIR's planned actions are not fully responsive to our recommendation.  In EOIR's response, it states that the OIG should not have concluded that adding paralegals is what is needed to improve the appeal processing time for non-detained aliens.  However, our report does not make that conclusion.  Although we found that the paralegal review process for detained aliens averaged only 8 days compared to the 294 days for non-detained aliens, we recommended that EOIR re-examine its process and all of its resource allocations (not just for paralegals) in non-detained cases to determine the appropriate number of personnel that are needed to process those cases more quickly.  While we understand that EOIR intends to seek additional resources, we also believe that EOIR should take all possible steps to maximize the use of the resources it has received.  Please provide documentation on the status of this effort by January 18, 2013.

**Recommendation 9:**  EOIR improve its collecting, tracking, and reporting of BIA appeal statistics to accurately reflect actual appeal processing times.

>    **Status:**  Resolved.

>    **EOIR Response:**  EOIR concurred with this recommendation.  EOIR stated if the OIG concluded that it would also be useful to the public to report total appeal processing time, the agency is willing to report it and will do so by the end of FY 2013.

>    **OIG Analysis:**  EOIR's planned actions are responsive to our recommendation.  Please provide documentation on the status of this effort by March 29, 2013.

# EXHIBIT E

Page 1

```
 1              UNITED STATES  DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                  WESTERN DIVISION

 4   ----------------------------------------------

 5   ALEJANDRO RODRIGUEZ, ET AL.,

 6                            Plaintiffs,

 7   vs.             Civil Action No.:  CV 07-3239-TJH

 8   TIMOTHY S. ROBBINS, in his capacity as      (RNBx)

 9   U.S. Immigration and Customs Enforcement,

10   Los Angeles District Field Office Director, et al.,

11                           Defendants.

12   ----------------------------------------------

13

14         Examination Before Trial of

15         CHESTER I. PALMER, held on November 27,

16         2012, at the U.S. Attorneys Office,

17         100 South Clinton Street, Syracuse,

18         New York, before Erin M. Hutter, Registered

19         Professional Reporter and Notary Public in

20         and for the State of New York.

21

22

23

24

25   PAGES 1 - 191
```

Page 164

1    complicated answer to that.

2        Q        Go right ahead.

3        A        If you're going to tell me you want me to

4    do the best I can to estimate detention lengths, the

5    answer is I would limit the sample to the in period

6    ones, yes, because the out of period ones bias it,

7    they're all long.

8            On the other hand, if I'm actually making

9    my best estimate and if I can make the assumption that

10   things have not changed over time, then I can use the

11   out of period cases to get some idea of how quickly

12   people might fall out of formation from the in period

13   group in later time periods.

14           So I wouldn't use them directly, but I

15   might use that information directly to see, you know,

16   what kind of assumption should I make about this

17   person who has -- I see they're already waiting for 14

18   months and that's all I know, can I go back and see

19   what happened to people -- as many people who were

20   there for at least 14 months, how much longer they

21   stayed.

22       Q        You would use that method if you

23   believed -- or in order to use that method, wouldn't

24   you have to believe that people who are detained for

25   some very long periods of time could be -- I'm sorry.

Page 166

1    we think this is, we'd have to assume that the

2    percentage of people who have been detained for some

3    much longer period of time is representative of the

4    percentage who are going to be detained for that

5    period with respect to the in period?

6         A         Not really.  Let me explain what I'd have

7    to assume and see if -- the first thing is that I have

8    to make sure that I have for my estimation, you know,

9    it depends on how far back you go.  I might have a

10   problem with people who have only been detained for 14

11   months because I need to know what has happened in the

12   past to people who have been detained for at least 14

13   months and I need to have an unbiased sample of that,

14   I can't just have the people who were not only there

15   for 14 months, but were there for three years or I'm

16   not going to be able to tell how fast they fell out of

17   formation after 14 months, so what I would have to

18   assume is if you look at the present -- assuming I had

19   a good sample of that, I would have to assume that if

20   you looked at the present number of people, let's say

21   18 months because it's convenient, if you look at the

22   present number of people who have been in detention

23   for 18 months that the distribution of how long they

24   would remain in detention would be the same as that

25   for a group of people who had been in that situation

Page 167

1    in the past.  That is people who in the past, if I

2    have a good sample of all of those from some period

3    who had been detained at least 18 months.

4              That's why I said that you have to be

5    willing to make the assumption that conditions haven't

6    changed over time.  If conditions have changed so that

7    things are faster or slower, then the assumption isn't

8    going to be very good.

9         Q         Okay.  Let me go back and ask you some

10   questions, again, recognizing you didn't measure

11   detention length; right?

12             You would agree that if you only limited

13   the sample to in period detainees and you made no

14   other adjustments, you just took the detention lengths

15   for inpatient detainees, that would also not be an

16   accurate account, that way of measuring the detention

17   length for this population; right?

18        A         I assume what you want to do is manage

19   your average detention length.  I mean, there are

20   things you could measure about detention length

21   because there are only a certain number of them that

22   are still in process, for many of them we know the

23   detention lengths, so if you wanted to know the median

24   or the 75th percentile or whatever, you might very

25   well be able to do that.

Page 168

1        Now, if what you want to do is know the
2    mean, that's harder, because for that you need to know
3    the total and the total is hard to get, you have to
4    estimate that, so --
5        Q        Right.  Let me just -- just to make sure
6    this is clear, the reason why you can't rely on just
7    the in-period detainees to get the mean, right, is
8    because it is right censored, it fails to capture
9    people detained for long periods of time; correct?
10       A        Yes.  Some of them are still in detention
11   and therefore you do not know for sure how long their
12   detention will last.
13       Q        And if you only took inpatient detainees
14   and measured it on that, am I right that you couldn't
15   get a detention length longer than something like 30
16   months, because you've got 180 days and then you've
17   got a roughly, you know, two-year period after that;
18   is that right?
19       A        There would be some maximum, I'm not sure
20   exactly what it is, but there would be some maximum of
21   something like that, I'd have to look it up and see
22   how exactly how late the data go.
23       Q        Okay.  And you'd also be cutting off
24   people, I mean, that's the maximum that you would get
25   if a person sort of just got in because their 180th

REPORTER'S CERTIFICATE

I, ERIN M. HUTTER, Registered Professional Reporter and Notary Public, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney or of any of the parties nor financially interested in the action.

ERIN M. HUTTER, RPR

Page 191

# EXHIBIT F

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION

4

ALEJANDRO RODRIGUEZ, et al.,

5              Petitioners,

6    vs.                    CASE NO. CV 07-3239-TJH

7    TIMOTHY S. ROBBINS, in his

8    capacity as U.S. Immigration

9    and Customs Enforcement, Los

     Angeles District Field Office

10   Director; JANET NAPOLITANO, in

11   her capacity as Secretary of

12   Homeland Security; and ERIC H.

13   HOLDER, JR., in his capacity

14   as Attorney General of the

15   United States,

16              Respondents.

     _____

17

18        DEPOSITION OF CHESTER PALMER, Ph.D.

19   taken on December 21, 2012 commenced

20   at 11:38 a.m., taken at 4901 Tower Court,

21   Tallahassee, Florida, before SANDRA L. NARGIZ

22   Certified Realtime Reporter, Certificate of

23   Merit Holder

24

25   PAGES 1 - 116

Page 15

1    fairly clear that people would see as material, the some

2    effect falls somewhere in between those two extremes,

3    correct?

4         A    Yes.

5         Q    With respect to the court proceedings

6    statistics, did you find that the effects that you noted

7    in choice of population, those effects moved in one

8    direction or the other, that is to say that the choice

9    of population led to either more people being counted as

10   having BIA and Ninth Circuit proceedings or less BIA and

11   Ninth Circuit proceedings?

12        A    Yes.  As my report says, continuing in the

13   paragraph you were just reading, out-of-period aliens

14   had more.  So therefore using the full dataset tends to

15   produce higher percentages than using just the in-period

16   people.

17        Q    And is it your view today that the estimates

18   for the in-period population are best estimates for

19   determining the statistics on court proceedings?

20        A    Generally, yes.  There is an issue that it is,

21   I suppose, possible that there would be cases where

22   people who have not yet gone to the Ninth Circuit might

23   choose to do so.  I suppose that's also true at the BIA,

24   but I would guess that to be less likely since that

25   seems to come earlier in the proceedings in most cases.

1       appropriate.

2               If you really wanted to make your best

3       estimate -- and I have not attempted to do this, I

4       have not studied this issue.  But if you really

5       wanted to make your best estimate, the best way to

6       do it would be to take the in-period group and try

7       to make some kind of an adjustment for what is

8       likely to happen in the future based on patterns in

9       the past.

10  BY MR. KAUFMAN:

11          Q    If I understand correctly, isn't that what

12  Dr. Long attempted to do in her rebuttal report?

13          A    Yes.

14          Q    So you would endorse that as a correct

15  approach to studying the court proceedings statistics?

16          A    I am endorsing the general approach, not

17  necessarily the way she implemented it.

18          Q    Yes, I understand that.  Thank you.

19              Dr. Palmer, I would like to now turn to

20  statistics on outcomes of class members cases.  And I

21  will refer you to again page 8 of your rebuttal expert

22  report.  In the same paragraph that we were discussing

23  earlier, you state that, quote, not much affect upon

24  other percentages, such as the percentages of those

25  applying for relief, is affected by the choice of

1    population; is that correct?

2         A    Yes.

3         Q    Okay.  Now, what about the rates at which

4    class members win their cases?

5              MS. WILSON:  Object to the form.

6              THE WITNESS:  Well, if you want detail in any

7         of these things, I supplied elaborate tables that

8         you can look at.  There are lots and lots of those

9         tables.

10             But once again, if you look at, let's see,

11        page C10 is one example.  Page C15 is another.

12        Now, these are -- again, these tables in appendix C

13        are all done using Dr. Long's data.  But if you

14        look, for example, at page C15, you see the

15        category 1 case.  And you can see that it's

16        24.7 percent of the out-of-period aliens,

17        27.2 percent of the in-period aliens, 26.3 percent

18        overall.  Doesn't seem like a very meaningful

19        difference, particularly if you look at the

20        in-period and overall, they differ by essentially

21        1 percent.

22   BY MR. KAUFMAN:

23        Q    I see.  Thank you.  That's helpful.  I

24   apologize my question wasn't very clear.  I was just

25   hoping to understand from you, you had given sort of a

1    general statement overview on the effect of population

2    on the applications for relief, and I was hoping you

3    could give a similar summary for the outcome data, that

4    is the percentage of class members who win their cases.

5    And based on the answer you just gave, I understand you

6    correctly there is not a substantial effect on the rate

7    at which class members win based on the population

8    choice; is that correct?

9            MS. WILSON:  Object to the form.

10           THE WITNESS:  It is, and the report says that.

11       It says the percentages of those applying for or

12       receiving relief.

13   BY MR. KAUFMAN:

14       Q    Is there a difference in your view between

15   receiving relief and winning a case?

16       A    I had intended that the general phrase

17   receiving relief included winning cases.  That's one

18   kind of relief I assume.  I evidently didn't make that

19   clear.

20       Q    I will just represent to you that when we use

21   the term win, or Dr. Long uses the term win in her

22   report, it includes both people who win by receiving

23   relief and win through other routes of winning their

24   cases.

25           So if we just look at the data that Dr. Long

Page 22

1    reported as winning cases, in your view is it the case

2    that the choice of population does not substantially

3    affect the rate at which class members win?

4         A    Yes.

5         Q    Thank you.  Now, the last sort of set of

6    statistics that are reported by Dr. Long in the report

7    and you review in your rebuttal report are statistics

8    that include information about detention lengths.

9              Dr. Palmer, in your review, these statistics

10   as a general matter are substantially affected by the

11   choice of population; is that correct?

12        A    Yes.

13        Q    Another issue that you examine in your report,

14   Dr. Palmer, is the use of means and medians, correct?

15        A    Yes.

16        Q    And in your view, is it true that the median

17   is a more appropriate value for studying detention

18   lengths of this population?

19        A    Well, it depends on why you want to do it.  I

20   mean, I am sorry, statisticians always seem to give that

21   answer.  But there is one table in Dr. Long's report,

22   her table 18, which requires the use of means because

23   she is trying to count the total number of days, and it

24   is the mean that is connected to the total in a

25   population; not the median or any of the other

Page 29

1   that?

2       Q    No, that's okay.  Dr. Palmer, would you agree

3   with Dr. Long that there are a significant number of

4   class members whose cases have not yet concluded in the

5   in-period dataset?

6       A    I think we are in danger of confusing two

7   things here, so let me make sure as I understand the

8   question.

9           Detention length, being done for detention

10  length purposes is not the same as having your case

11  closed.  Dr. Long gets higher counts for people who have

12  cases open substantially higher than she does for people

13  who are still detained.  So those are really somewhat

14  different populations.

15          And so which one are you talking about?

16      Q    I am talking about the people with open cases,

17  not the people that are still detained.

18      A    Okay.  There are more people with open cases.

19  I am sorry, at this point I lost the question.  Could

20  you ask it again?

21      Q    Sure.  Let me try to rephrase it actually.

22          So you've reviewed the data.  In your view,

23  are there some people whose cases remain open but they

24  are no longer detained?

25      A    I believe the counts indicate that that must

Page 30

1    be the case.  And I believe Dr. Long may have said that

2    at her first deposition, although I am not sure.

3        Q    And in your view, are there a substantial

4    number of people who fall in that category?

5        A    There are enough to affect percentages by more

6    than 1 or 2 percent, yes.

7        Q    And are you aware that people who are in

8    active proceedings and not in detention can be

9    re-detained?

10       A    I was not specifically aware of it.  I am not

11   surprised.

12       Q    Now, wouldn't the possibility of re-detention

13   potentially affect the median?

14       A    Both Dr. Long and I calculated the period --

15   or at least I did, and I believe she did -- of the

16   detention as the continuous period between entrance and

17   release.  I don't believe either of us have considered

18   the possibility of re-detention; at least I certainly

19   did not.  I have --

20       Q    Go ahead, I am sorry, I didn't mean to

21   interrupt.

22       A    I have measured detention as the single

23   length, the length from intake to the date that is

24   called book out.  I don't recall a case of someone

25   showing re-detained records.  There were people who

Page 32

1    would like to refer you to Exhibit 14 we just

2    introduced, page 12 of that document, if you could take

3    a look at footnote 6.  And I will refer you to the last

4    two sentences of that footnote beginning, for example,

5    "One class was placed back into custody on the day

6    following an adverse decision by the BIA and remained

7    detained during the class members Ninth Circuit appeal.

8    While he was counted as not detained in my earlier

9    report, he is counted as detained here."

10          Dr. Palmer, does this indicate to you that

11   there is, in fact, a case of re-detention in the

12   dataset?

13       A    Yes, there certainly appears to be.  I mean, I

14   am assuming the accuracy of the statement, of course.

15   But yes.

16       Q    Do you have any reason to doubt the accuracy

17   of that statement?

18       A    No.

19       Q    So Dr. Palmer, if we assume that there is a

20   possibility which has been demonstrated in the dataset

21   of re-detention, could the median be affected by

22   re-detention?

23       A    The median could be affected by re-detention.

24   It would not likely be affected very much unless there

25   was quite a lot of re-detention going on.  But it

Page 33

1    certainly could be affected, yes.

2        Q    That would mean that the medians that you

3    report in your report underestimate the median length of

4    detention, correct?

5        A    Yes.  Again, presumably by a not very large

6    amount.  But, yes, that would be the direction.  Done.

7        Q    Now, Dr. Palmer, I would like to return back

8    to the general topic we were discussing earlier about

9    whether the median is a better choice than a mean as a

10   single value to describe this dataset.  And I believe

11   you indicated that the censoring issue is a minor reason

12   why you preferred the median as a single value, but

13   there were more, I guess, substantial reasons you

14   preferred; is that correct?

15       A    Well, minor might be too strong, but it's not

16   the principal reason.

17       Q    And what is the principal reason?

18       A    The principal reason is that in a dataset that

19   is skewed as this one is, this dataset has a substantial

20   skew -- that's a technical term in statistics, s-k-e-w.

21   That means that it's asymmetric around the middle.  It

22   means you would see sort of a big short hump to the left

23   and a long skinny stretched-out tail to the right.

24           You can see that most readily by looking at

25   one of my tables.  May I refer to one of my tables here?

Page 38

1        A     In this particular dataset, censoring means

2     there are people we know that they have been in

3     detention for a certain number of days but the detention

4     has not ended.   So therefore, we know that their

5     detention is say 600 days or more, but since the period

6     extended into the future as of the date of the

7     calculation, we do not know how much longer that more

8     may be.

9        Q     With respect to detention length, there is

10     censoring because some people are still detained,

11     correct?

12        A     Yes.

13        Q     And there may also be censoring by virtue of

14     the fact that some people who are out of detention may

15     be re-detained in the future, correct?

16        A     If that should count.   I would have to give

17     some thought to, you know, the logic of whether that

18     really should be included.   But if you're representing

19     legally it should be, then yes, that's correct.

20        Q     And then separate from detention lengths there

21     is also a censoring issue with respect to outcome data,

22     correct?

23        A     Yes.

24        Q     Can you describe the censoring with respect to

25     outcomes?

Page 39

1          A     Well, people whose proceedings are still in

2     process, we obviously don't know if they are going to

3     win or lose.   Done.

4          Q     With respect to the outcome data, it is

5     censored and likely underestimates the number of winners

6     in the in-period sample, correct?

7          A     Yes.

8          Q     Now, Dr. Palmer, you may recall during your

9     prior deposition that you discussed at length the issue

10    of censoring, correct?

11         A     Yes.

12         Q     And my colleague, Mr. Arulanantham, asked you

13    how you would measure detention lengths for the censored

14    population, correct?

15         A     Yes.

16         Q     Do you recall what method you suggested for

17    correcting for censoring for this population?

18         A     I recall I said -- I said what I would try --

19    you know, until you try something, you don't kind of

20    know whether you have the right data or whether it's

21    going to work out sensibly or not.   So with that in

22    mind, I will repeat what I said before as the kind of

23    approach I would want to take, which is that ideally --

24    first of all, I am sorry, let me go back.

25               Pretty much all of this discussion is premised

Page 40

1     on the fact that you have an urgent need for an estimate

2     of the mean, not of anything else, just the mean.  Now I

3     am going to accept that as a given for the purpose of

4     this discussion, but you already know how I feel about

5     that.  Okay?

6          Q    Understood.

7          A    But assuming that that's what you want to do,

8     the standard way to do it, if you have someone who has

9     been detained say 500 days and counting, let me say it

10    that way to mean that it's ongoing, okay?  So instead of

11    describing a measurement as just 500, I will say 500 and

12    counting.

13         Then you go and you find everybody who is

14    comparable, that is everybody who was 500 and counting

15    that you can round up and you try to do it in some

16    systematic way because you can get a bias in your sample

17    here also; but you try to find all the people who have

18    detention lengths of 500 days or more, all of those

19    people with 500 days and counting at some point.

20         So they give you some idea, if you know their

21    current -- if you know their complete detention length,

22    they give you some idea of how long that person who is

23    500 and counting is likely to go.  Ideally, if you could

24    calculate the mean for all those people who are 500 or

25    more in the past and fill it in for this person who is

Page 41

1    500 and counting now, you could -- and do similar things

2    for each censored observation, you could get an exactly

3    correct answer.

4              Now that, of course, is unrealistic.  And I

5    guess in a sense it's not exactly correct anyway because

6    these people right now may not be average compared to

7    people in the past.  But you would get an optimal

8    answer.

9              Now saying it that way makes it sound easier

10   than it is.  There are a lot of problems with gathering

11   the data and doing the calculation and trying to make

12   sure that it's right.  But that's the general approach I

13   think that most people would take, most statisticians

14   would take in this situation.

15             The other approach I think I also mentioned,

16   but I think it's unlikely to work here, if you had

17   enough people you could try to sort of form a

18   distribution of detention lengths; and if you could

19   somehow get some mathematical form for that, you could

20   use that to answer the question also.  But that's an

21   even harder problem than the first one.  Done.

22        Q    Thank you, Dr. Palmer, that's very clear.

23             Did you try either of these methods for

24   correcting for censoring with the in-period population?

25        A    No, I didn't really have a sensible sample to

Page 42

1  do it in.  The out-of-period aliens again are not a very

2  good group to use because although there are certainly

3  people there who are 500 and more, 500 days and more,

4  that's not a random sample either.  That sample already

5  has problems with being biased for longer samples.  And

6  that would be true even among the people who had

7  500 days or more.  It would be a difficult calculation.

8  I think one would have to use a different data source.

9       I had not worked all this out at the time

10  because I was asked on the fly.

11       Q    Dr. Palmer, I am not sure I understand that.

12  If you are looking for a dataset that has people with

13  really long detention lengths, isn't the out-of-period

14  sample that has a disproportionate number of lengthy

15  detention lengths, wouldn't that be exactly the type of

16  population you are looking for?

17       A    They are perfectly good observations in one

18  sense, but you see, you want ideally all of the people

19  who had 500 days or more.

20       Now you are probably not going to get that,

21  but you probably want to try to do it in some way that

22  doesn't overselect the ones that are longest among

23  those.  That is, the out-of-period group is more likely

24  to include people with 700 days than people with 502

25  days because of the way it was selected.  So that's not

Page 43

1    entirely satisfactory.  Whether it might be useable or

2    not, I would have to examine in some detail to try to

3    figure out.  Done.

4         Q    So I take it that's why you didn't try the

5    first method that you described for adjusting for

6    censoring; is that correct?

7         A    Well, one reason I didn't try it is that

8    personally I don't feel any burning need to calculate

9    all these means.

10        Q    But you did report means in your rebuttal

11   report, did you not?

12        A    I reported the mean as part of a descriptive

13   statistic, yes, but I also reported a lot of other data

14   from which one can get a much better idea.  To me the

15   mean is a minor part of that table.

16        Q    Okay.  And the second method you suggested

17   using the distribution and mathematical approach to

18   predict future detention lengths, I assume you did not

19   attempt that method either; is that correct?

20        A    No, I think that would be very difficult.

21   That's typically done in populations where you have some

22   reason to know in advance what that distribution is

23   going to look like.  The classic example would be

24   failure of electronic components or something like that

25   where there is a lot of data to show you what the shape

Page 44

1      of that curve is likely to be.  Done.

2          Q    So the reason why you didn't attempt that

3      approach here is because it would have been really

4      complicated?

5          A    Well, I didn't attempt the approach because I

6      didn't attempt to do it at all.

7              MS. WILSON:  Objection.

8      BY MR. KAUFMAN:

9          Q    I guess I am trying to understand why you

10     didn't do it at all.

11         A    Because to me, correcting the mean is not a

12     terribly important thing to do.  Now I'm perfectly

13     willing to offer opinions on what the best way is to do

14     it if that's what you want to do.  But one can -- I did

15     make a rough estimate; you can say, for example, if the

16     average person who is still in detention remains

17     detained another year, it will affect the mean by so

18     many days.  I did that at one point in my report.  If

19     the average person is still in detention, is detained

20     for two years, it would obviously affect it by twice as

21     much, and so on.  That gives you a rough idea how much

22     we are talking about here.

23             And I am not sure you are going to get a much

24     better answer by using $50 methods.

25         Q    Dr. Palmer, censoring affects more than the

Page 45

1    mean, correct?  Sorry, let me rephrase that.

2              Of the statistics you report in your rebuttal

3    report, censoring affects more than the means, right?

4         A    Yes, it affects the upper percentiles, the

5    90th percentile particularly, and, in fact, it's likely

6    to affect that much more than it does the mean.

7         Q    And are there other statistics in your report

8    that are affected by censoring?

9         A    The highest value and in some cases the

10   75th percentile.  That seems to vary, if I remember

11   correctly, from one table to the next.  Sometimes

12   75 percent of the lengths are in without considering the

13   lengths of the people who are still detained; sometimes

14   they are not.

15        Q    For the statistics that are affected by

16   censoring, that would be the mean, the 75th percentile,

17   the 90th percentile, and the highest detention lengths,

18   all of those underestimate detention lengths as a result

19   of censoring, correct?

20             MS. WILSON:  Object to the form.

21             THE WITNESS:  Yes.  By definition, if you

22        don't take censoring into account essentially

23        anything is an underestimate.

24             I am sorry, I should say that -- I need to

25        correct that.  Obviously the median isn't if you

Page 46

1          have over 50 percent of it.  But anything that is

2          still undetermined is an underestimate.

3      BY MR. KAUFMAN:

4          Q    And do you have a sense of how great those

5      statistics underestimate detention length as a result of

6      censoring?

7                MS. WILSON:  Object to the form.

8                THE WITNESS:  I don't understand the question.

9      BY MR. KAUFMAN:

10         Q    You just testified that those statistics we

11     discussed are affected by censoring, correct?

12         A    Yes.

13         Q    And that they underestimate detention lengths,

14     correct?

15         A    Yes.

16         Q    By how much do they underestimate detention

17     lengths?

18         A    Without doing some fairly elaborate work, it's

19     very difficult to tell.  Some of them obviously more

20     than others.  The one most affected is the maximum

21     length.

22         Q    You don't know how greatly the statistics on

23     mean, 75th percentile and 90th percentile and greatest

24     detention length, are underestimated as a result of

25     censoring?

Page 47

1          MS. WILSON:  Object to the form of the

2      question.

3          THE WITNESS:  I don't know exactly.  I am able

4      to make some kind of range estimates which I do in

5      the report.

6  BY MR. KAUFMAN:

7      Q     What are those range estimates?

8      A     Let me find them.  Okay?  (Examining

9  documents.)

10          It's fair to say, by the way, that although I

11  don't know exactly, no one else knows exactly either;

12  only the future will tell us exactly.  None of these

13  estimation methods will tell us exactly.

14          All right.  It's on page 7.  If you look down

15  just before subheading C, go up about halfway in that

16  paragraph, you see a sentence, a third of the way in

17  that paragraph, a sentence that begins with also.  "Also

18  in this particular table."

19      Q     Yes, I see that.

20      A     And what it does is point out that 5.4 percent

21  of the detentions are ongoing.  So what that means is if

22  you assume that they are all going to last another year,

23  then the mean would increase by .054 years.  And if you

24  work out what that is, it's about 20 days.

25          So if you assume that they are all going to be

Page 48

1    there on the average another year, the means is going up

2    20 days.  If you assume that they are going to be there

3    another three years, it's going up 60 days.  If you

4    assume they are going to be there another 10 years, it's

5    going up 200 days.

6         Now, that at least gives you some idea of

7    what's rational here.  It's probably not rational to

8    assume that the average detention in that group is going

9    to be another 10 years, at least for many of the numbers

10   that I have seen.

11        Dr. Long would have a better idea of whether

12   it's a rational value for this than I do.  But that

13   gives you some idea of roughly how large the effect

14   would be on the mean.

15        It's much more difficult to estimate the

16   effect on some of the other numbers, again particularly

17   for the maximum, because the maximum is affected by the

18   one case out of these hundreds that goes the longest.

19   Done.

20        Q    And I am sorry, Dr. Palmer, but why would

21   Dr. Long be the person to make the best rational guess

22   as to the likelihood of future detentions?

23        A    She knows a lot more about the underlying

24   subject of detention and lengths of detention and things

25   like that than I do.  My knowledge is limited to this

1    dataset.

2         Q    I see.  Thank you.  I want to return to that

3    example you offered in that paragraph, that if we assume

4    people are detained in the future for another year.  I

5    am curious about why you selected one year as the value

6    for anticipated future length of detention.  Did you

7    have some basis for assuming one year?

8         A    No, it was a value of convenience.  Obviously

9    you can scale it.  If it's two years, it's twice as

10   much, and so on.

11        Q    Are you aware that people routinely get

12   detained for years at a time in immigration detention?

13             MS. WILSON:  Objection.

14             THE WITNESS:  I am aware that some detention

15        periods are long.  One can see that in the

16        out-of-period data.

17   BY MR. KAUFMAN:

18        Q    So you are not confident that one year is an

19   accurate representation of future length of detention

20   for those still detained population, correct?

21             MS. WILSON:  Objection.

22             THE WITNESS:  No, that's correct.  I believe

23        the report makes that clear.

24   BY MR. KAUFMAN:

25        Q    Dr. Palmer, I wanted to return to another

Page 55

1    Q    Would you agree that if you wanted to come up

2    with the best estimate for the number of class members

3    who take appeals, that you would use the in-period

4    sample and apply some adjustment for censoring?

5    A    Yes.

6    Q    Would you agree that if you wanted to come up

7    with the best estimate for the average detention length

8    for class members, that you would use the in-period

9    sample and apply some method to adjust for censoring?

10    A    Yes.

11    Q    So the in-period sample by itself is not the

12    best way to make estimates about detention lengths?

13        MS. WILSON:    Object to the form.

14    BY MR. KAUFMAN:

15    Q    Correct?

16    A    Not if you wish to estimate the mean.

17        MR. KAUFMAN:    Why don't we take a break?

18        (A recess took place from  12:56 p.m. to

19    1:02 p.m.)

20    BY MR. KAUFMAN:

21    Q    Dr. Palmer, before we move on to an entirely

22    different topic, I just want to circle back on one issue

23    we were discussing previously.  We were discussing the

24    statistics related to court proceedings, and I believe

25    you mentioned that you endorsed the approach that

Page 63

1              THE WITNESS:  In general, yes.  Certainly
2         underestimates -- accepting all this as given,
3         which I have not checked, it certainly means that
4         if you -- if they are not class members, as I've
5         said, one should probably exclude them and if one
6         excludes them, and if they tend to be shorter than
7         average, the average will go up.
8    BY MR. KAUFMAN:
9         Q    And that would mean that Dr. Long, that
10   detention lengths reported in Dr. Long's rebuttal report
11   for the in-period sample would be more accurate,
12   correct?
13        A    Would be more accurate than what?
14        Q    Than the detention lengths reported in your
15   expert report for the in-period sample, correct?
16             MS. WILSON:  Object to the form.
17             THE WITNESS:  Well, the detention lengths
18        reported in my rebuttal report, because I didn't
19        report any in my original report, so we are talking
20        about my rebuttal report, are the same ones that
21        Dr. Long reported in her initial report.  So if it
22        is correct that these people should be excluded,
23        then the means without them are better estimates
24        than the means with them, that is correct.
25

Page 99

1      some records in the adjournment -- strike that.

2             There might be some record in the schedule

3      table that are not reflected in the actions table.

4      Having now reviewed that deposition transcript, are you

5      still of the view that it's likely that there should be

6      actions reflected in the schedule table that are not in

7      the actions table?

8          A    No, it would appear from the transcript that

9      they should all be reflected, but again, with this

10     caveat that the records may not have matching dates.

11            MR. KAUFMAN:  Let's go ahead and take a break.

12            (A recess took place from  2:16 p.m. to

13         2:19 p.m.)

14     BY MR. KAUFMAN:

15         Q    Dr. Palmer, I just wanted to briefly follow up

16     on one topic we were discussing earlier regarding the

17     exclusion of the 57 people in Dr. Long's rebuttal

18     report.  And I just want to confirm or confirm your

19     view.  Is it the case that if we excluded those 57

20     people, it could potentially affect the median as well

21     as the means?

22         A    Yes, assuming that they tend to be on the

23     short end, the median would rise, although the median

24     may very well not rise nearly as much as the mean does.

25         Q    Understood.  Thank you.  I just have a couple

Page 102

1    something like that.  So I took that.  And I don't think

2    I needed to make any correction to the end of that as I

3    recall because for all of those people who were still

4    active, I had a future hearing date, I believe, so I

5    knew how long the past was.

6              So I added up all of those dates, those days,

7    and I divided that number of days by the total number of

8    days.  So for example, if a person was in custody for a

9    total of 600 days and 100 of them were attributable to

10   alien requests, then the number in this table would be

11   100 over 600 as a percentage, which is 16.7.  Done.

12        Q    Thank you.  That was very helpful.  I just

13   want to confirm, you did include detainees whose cases

14   had not yet completed, correct?

15        A    Yes.

16        Q    So isn't the data you included censored in the

17   way we had discussed earlier?

18        A    It is censored, but notice that this is

19   censored in a rather odd way.  It is true -- first of

20   all, remember that the number is down.  We looked at

21   this table earlier, but the number I have censored was

22   lower than the number Dr. Long had censored because I

23   had a longer time period.  I think it's 29 of them, if I

24   remember earlier.

25              So, first of all, we are talking about less

Page 103

1    than 3 percent.  So there's censored data, but there is

2    less and less of it as time runs on.

3             The second thing to remember is that future

4    delays might also be attributable to the alien.  So in

5    this case, it isn't clear that the censoring drives

6    these numbers in one direction rather than the other.

7        Q    Dr. Palmer, isn't it the case that detainees

8    whose cases go on a long time are detainees who are

9    taking appeals?

10       A    In many cases, yes.  I don't know if it's true

11   in all cases.

12       Q    I should say they are more likely to be taking

13   appeals than the general population, correct?

14       A    Yes.

15       Q    Okay.  And are appeal times attributed to

16   alien continuances?

17       A    No, I don't have information on appeal times.

18       Q    For the purposes of your calculations, when

19   you were calculating delays due to detainee

20   continuances, did you include appeals time as detainee

21   caused continuances?

22       A    No, I do not have information on that.

23       Q    So if we know that people whose cases go on a

24   long time are more likely to be on appeal, isn't it

25   likely that the future time that they are in detention

1    A    That is correct.  Once again, it affects about

2    3 percent of the people.

3    Q    But it is the case that the data you report

4    likely underestimates the amount of time due to -- that

5    is not due to alien-caused continuances?

6    A    The mean, yes; probably this time only the

7    mean and the max.  The others, something like the

8    median, more than half the people are done in 192 days.

9    The censored observations are all beyond 192 days, I

10   would bet.  I doubt it would have any effect on the

11   median or even the 75th or possibly even the 90th

12   percentile because we know those people have been around

13   for at least 500 days.

14   Q    In calculating the percentages that you report

15   in those charts, did you rely on the means?  It appears

16   the percentages are also subject to the censoring.

17   A    We are going back to the previous table?

18   Q    No, the table at the bottom of the page there.

19   A    So you are talking about the 45.9 percent?

20   Q    Exactly, yes.

21   A    I am sorry, I am just trying to understand

22   what the number is you are looking at.

23        Censoring would affect that only if there is

24   someone -- I can't swear it wouldn't.  Okay?  But let's

25   think about how big it could be.

1          First of all, there are only 3 percent of the

2    people who are censored, so the most it can change it by

3    3 percent.

4          Secondly, it can only change it at all if

5    there is somebody whose total now is under 180 days and

6    as a result of future actions it becomes greater than

7    180 days.  My recollection earlier is that the total

8    detention of these people is all over 500 days.  I

9    suppose it's possible that there is some people in that

10   group that have under 180 days not attributable to alien

11   continuances.  I wouldn't bet on it being very many.

12         So I guess what I am saying is the upper limit

13   of that effect is 3 percent, and I would expect it to be

14   substantially less.

15   Q    Thank you, Dr. Palmer.  The last set of

16   questions I have for you are about Dr. Long's rebuttal

17   report and that part of her report that deal with how

18   she attempted to adjust the in-period sample for the

19   various censoring issues.

20         Have you had a chance to review those portions

21   of her report?

22   A    I have read the report.  As I said before, I

23   have not had a chance to review it all in as much detail

24   as I would have liked.  But I have certainly read it,

25   yes.

116

CERTIFICATE OF REPORTER

STATE OF FLORIDA        )

COUNTY OF LEON          )

I, SANDRA L. NARGIZ, Registered Professional Reporter, certify that the foregoing proceedings were taken before me at the time and place therein designated; that my shorthand notes were thereafter translated under my supervision; and the foregoing pages numbered 1 through 117 are a true and correct record of the aforesaid proceedings.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 30th day of December, 2012.

s//Sandra L. Nargiz

SANDRA L. NARGIZ, RMR, CRR
Notary Public
1-800-934-9090
850-878-2221
snargiz@comcast.net

# EXHIBIT G

Capital Reporting Company

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-----------------------------------------x
ALEJANDRO RODRIGUEZ, et al,

     Plaintiffs,

         Civil Action No.
  vs.
         CV 07-3239-TJH
           (RNBx)


TIMOTHY S. ROBBINS, in his capacity as
U.S. Immigration and Customs Enforcement,
Los Angeles District Field Office
Director, et al,

     Defendants
-----------------------------------------x



    DATE:  Friday, December 21, 2012

    TIME:  3:30 p.m.


  DEPOSITION of Professor SUSAN LONG, conducted

at TRAC Main Office, Syracuse University, 215

University Place  Suite 360, Newhouse II,

Syracuse, New York before, JOHN F. DRURY, CSR,

RPR, Notary Public in and for the State of New

York, on December 21, 2012.

Capital Reporting Company

86

```
 1                    S. Long

 2   the data and I divided it by the month that the

 3   individual entered in their 181st day.

 4       Q.    Is that described anywhere in your report?

 5       A.    I will be happy to -- I mean that's why

 6   I utilized it.  No one would utilize this without

 7   looking to see whether it would -- in this case I

 8   was looking for a conservative estimate.  So I

 9   wanted --

10       Q.    That's not my question.  Let's look at

11   page 21 of your report.  There is a statement

12   there that "if these two biases," and this is

13   under the description of Number 3, the Third

14   Method for Calculating Detention Length about

15   halfway down the first paragraph, let me he read

16   the sentence.  "If these two biases are

17   approximately the same magnitude, they cancel each

18   other out."  What did you do to determine whether

19   these biases were approximately the same

20   magnitude?

21       A.    Well, I looked at, to try to isolate the

22   biases, to see whether I could determine that.

23   And because the bias for selection bias was

24   related to time I could look at month by month for

25   the months in the in-period, for the months going
```

Capital Reporting Company

87

1                          S. Long

2    out of the in-period just on the margin, I could

3    look and see, well, how did the statistics for

4    detention length behave?  In those period of time

5    what we have is one kind in the in-period time.

6    What we have is one kind of bias only, censoring

7    bias.  So we would expect those estimates to be

8    too low, because we just have the bias operating

9    in one direction.

10       And when I looked month by month I saw that in

11   fact there was some variability in that average.

12   And indeed in some months you in fact had an

13   average despite there being censoring bias that

14   was approximately what I had reported in my first

15   report in terms of the average number of days. And

16   when there was no presence at all of selection

17   bias.

18       When I went and looked at those individuals

19   that weren't in the in-period sample, because they

20   had just missed it by thirty days, so it was in

21   that immediate month before that they had reached

22   their 181st day after entry into ICE detention.

23   And in this case again, we're going to have very

24   strong censoring bias.  But the selection bias

25   will be very small relatively speaking.  Because

Capital Reporting Company

88

1                         S. Long

2    very, you know, very little difference between

3    that month and the next month.  And the average

4    immediately was higher than my estimate.  Which

5    suggested that my balance point in fact wasn't

6    really balancing the two forces out because my

7    censoring bias wasn't adequately being cancelled

8    out by the selection bias.  And if anything my

9    estimate that I had derived earlier was too low,

10   which of course that's what I found on the other

11   two methods that I used, Method 1 and Method 2,

12   again they were too low.

13       So on that basis I felt that given the

14   available data this was the best reliable

15   conservative estimate.  And by conservative I mean

16   an estimate, a sort of reasonable estimate that

17   would be on the short side of detention length.

18       Q.    This month by month method of

19   calculation and examination or analysis, is that

20   described anywhere in your report?

21       A.    No, but no statistician would use that,

22   would use self-balancing without taking a look.

23   This is called the bootstrapping method, it's a

24   very common statistical method of using it.  And

25   so I used it.

REPORTER'S CERTIFICATE


I, JOHN F. DRURY, Court Reporter and Notary Public, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

I further certify that I am not a relative or employee of any attorney or of any of the parties nor financially interested in the action.


*John F. Drury*

JOHN F. DRURY, CSR, RPR

Notary Public

# EXHIBIT H

1              UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    ALEJANDRO RODRIGUEZ, et al.,

5              Petitioners,      No. CV 07-3239-TJH(RNBx)

6       vs.

7    TIMOTHY ROBBINS, et al.,

8              Respondents.

9

10   _____

11

12

13

14           DEPOSITION of ERIC G. SALDANA

15           Los Angeles, California

16           Friday, January 13, 2012

17                  Volume I

18

19

20   Reported by:

21   IRMA C. HOGAN

22   CSR No. 4877

23   Job No. 130812

24

25   PAGES 1 - 167

                                          Page 1

1          You can answer.

2          THE WITNESS:   I can tell you that we are

3    aware of when they re-offend because ISAP notifies us

4    and we take some type of action.   I am not sure and do

5    not know the matrix or how they are kept to track

6    that.

7    BY MR. KAUFMAN:

8          Q.   Do you have any sense of what -- how often

9    that's occurring?

10         A.   It varies.   I can give you an example.

11   Before, this morning, I was dealing with somebody who

12   re-offended out of my office.   And it happens on a --

13   I would say probably at least a weekly basis in my

14   particular office.

15         Q.   Do you find that ISAP is effective in

16   minimizing recidivism rates?

17         MR. ATKINSON:   Object to the form.

18         THE WITNESS:   I don't know if I can answer

19   that.

20   BY MR. KAUFMAN:

21         Q.   In terms of the types of crimes that you see

22   committed by people who re-offend, are there

23   particular types more likely -- that you are more

24   likely to see?

25         MR. ATKINSON:   Object to the form.

                                        Page 118

```
 1              THE WITNESS:  Actually, we have the whole
 2     range.  I think it's more common for us to see
 3     lower-range crimes, crimes involving driving without a
 4     license, drunk in public.  I can -- I know of one case
 5     in which somebody committed murder.  The case this
 6     morning involved a man they contemplated rape charges
 7     for.  So it's all over the board.  But I would say it
 8     was more common that it would be lower-ended offenses.
 9     BY MR. KAUFMAN:
10          Q.   Is drug possession a common type of crime you
11     see for re-offenders?
12          A.   We see that.
13          Q.   I want to take a step back and talk a little
14     bit more about the process for assessing people for
15     Alternatives to Detention programs and some programs
16     more generally.  So I'm going to start very basic.
17          A.   Okay.
18          Q.   What does the term "Alternatives to
19     Detention" mean for ICE?
20          A.   It means having the availability of a program
21     that allows somebody to be in the community and not in
22     custody.
23          Q.   So is it anything besides custody count as an
24     alternative to detention?
25          A.   I can't think of any.
```

Page 119

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 8, 2012

_____
IRMA C. HOGAN, CSR 4877

Page 167

# EXHIBIT I



**U.S. Department of Homeland Security**
Immigration and Customs Enforcement
Office of Professional Responsibility
Management Inspections and Detention Oversight
Washington, DC 20536-5501

# Office of Detention Oversight
## Compliance Inspection

# Enforcement and Removal Operations
## Los Angeles Field Office
## Adelanto Correctional Facility
## Adelanto, California

# September 18 - 20, 2012

# COMPLIANCE INSPECTION
# ADELANTO CORRECTIONAL FACILITY
# LOS ANGELES FIELD OFFICE

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................1

INSPECTION PROCESS
    Report Organization..................................................................6
    Inspection Team Members..........................................................6

OPERATIONAL ENVIRONMENT
    Internal Relations .....................................................................7
    Detainee Relations ...................................................................7

ICE PERFORMANCE BASED NATIONAL DETENTION STANDARDS
    Detention Standards Reviewed ..................................................8
    Detainee Handbook...................................................................9
    Food Service ..........................................................................10
    Funds and Personal Property ...................................................12
    Grievance System ..................................................................13
    Law Libraries and Legal Material.............................................14
    Medical Care..........................................................................16

# EXECUTIVE SUMMARY

The Office of Professional Responsibility (OPR), Office of Detention Oversight (ODO) conducted a Compliance Inspection (CI) of the Adelanto Correctional Facility (ACF) in Adelanto, California, from September 18 to 20, 2012. ACF is owned and operated by the GEO Group, Inc. (GEO) under contract with the City of Adelanto. ACF has two facilities, both of which are adjacent to each other: the East facility, which opened in August 2011, and the West facility, which opened in August 2012; ODO inspected both during this CI. Both serve as major facilities with whom ICE contracts in the Southern California area. Since ACF opened, U.S. Immigration and Customs Enforcement (ICE), Office of Enforcement and Removal Operations (ERO) has housed male detainees of all classification levels (Level I – lowest threat, Level II – medium threat, Level III – highest threat) at ACF for periods in excess of 72 hours pursuant to an intergovernmental service agreement (IGSA) with the City of Adelanto. The average length of stay at ACF is 30 days. ICE does not detain females at ACF; all 1,300 beds are reserved exclusively for male ICE detainees. GEO provides both the food service and medical care at ACF. Commissary services are provided under contract by Keefe Group. ACF does not hold any accreditations.

The average daily population (ADP) at ACF in September 2012 was 909, a significant increase from the August 2012 ADP of 683 and the July 2012 ADP of 605. The ADP is increasing as ERO moves detainees out of Mira Loma and relocates them to ACF and other alternate detention facilities within the area of responsibility of the ERO Field Office Director, Los Angeles, California (FOD Los Angeles). ACF will absorb a large number of detainees from Mira Loma. According to GEO officials, ACF is expected to reach its full capacity of 1,300 beds by November 2012. At the time of this inspection, ACF housed a total of 922 detainees (245 Level I, 538 Level II, and 139 Level III).

The FOD Los Angeles is responsible for ensuring facility compliance with ICE policies and the Performance Based National Detention Standards (PBNDS). An Assistant Field Office Director (AFOD) stationed at ACF is the highest-ranking ERO official at the facility. In addition to the AFOD, ERO staff at ACF is comprised of (b)(7)e Supervisory Detention and Deportation Officers (SDDO) (b)(7)e Deportation Officers (DO) (b)(7)e Immigration Enforcement Agents (IEA), and (b)(7)e Enforcement and Removal Assistants (ERA). The AFOD stated that ACF will absorb ERO personnel assigned to Mira Loma once ICE terminates that contract. ACF has a full-time ACF Compliance Manager and an ERO compliance team is permanently stationed at ACF to oversee compliance with the PBNDS. These teams engage in active self-inspections of the facility similar to the ODO method, which involves fully inspecting all components of the PBNDS using the text of each standard as a guide. An ERO Detention Service Manager (DSM) currently assigned to Mira Loma will be re-assigned to ACF to monitor facility compliance with the PBNDS.

ODO observed communication and esprit de corps need to be improved between ACF and ERO staff. ODO observed morale levels of ICE and ACF personnel assigned at the East and West facilities are different. The personnel at the East facility reported enthusiasm about their jobs, while personnel assigned to the West facility (where the ICE and ACF administrators are physically located) expressed a lack of motivation. ODO shared this concern with both the ACF and ERO staff during the closeout briefing conducted on September 18, 2012.

The Warden is the highest ranking official at ACF and is responsible for oversight of daily operations. The total number of ACF staff employed at the facility is ▮▮▮ In addition to the Warden, ACF supervisory staff consists of an Assistant Warden, a deputy administrator, ▮▮▮ managers, ▮▮▮ captain, a chief of security, ▮▮ lieutenants, ▮▮ sergeants, ▮▮▮ detention officers, ▮▮▮ medical staff, and ▮▮ administrative and maintenance staff.

In March 2012, an ICE detainee who had been housed at ACF died of alcoholic liver disease, sepsis, multi-organ failure, and bronchopneumonia after being transported to the Victor Valley Community Hospital in Victorville, California. This was the first ICE detainee death to ever occur at ACF. Following the death, ODO conducted a Detainee Death Review (DDR) to determine compliance with the PBNDS and established policies and procedures. Based on the findings of the DDR, ODO concluded ACF medical staff failed to provide adequate health care to the detainee, and failed to comply with the requirements of the ICE PBNDS. The investigation disclosed several egregious errors committed by ACF medical staff, including failure to perform proper physical examinations in response to symptoms and complaints, failure to pursue any records critical to continuity of care, and failure to facilitate timely and appropriate access to off-site treatments. ODO concluded the detainee's death could have been prevented and that the detainee received an unacceptable level of medical care while detained at ACF.

In November 2011, ERO Detention Standards Compliance Unit contractor, MGT of America, Inc., conducted an annual review of the PBNDS at the ACF East facility. ACF received an overall rating of "Does Not Meet Standards," yet was found compliant with 39 of 40 standards reviewed. The inspection concluded medical officials were not conducting detainee health appraisals within 14 days of arrival, and registered nurses were performing health assessments without training or certification from the Clinical Director.

In July 2012, ERO Detention Standards Compliance Unit contractor, The Nakamoto Group, Inc., conducted a pre-occupancy inspection of the ACF West facility. At that time, there were no ICE detainees housed at the West facility. ACF did not receive any rating since the review was only a pre-occupancy review.

During this CI, ODO reviewed 17 PBNDS at both the ACF East and West facilities. Eleven standards were determined to be fully compliant. Ten deficiencies were identified in the following six standards: Detainee Handbook (1 deficiency), Food Service (2), Funds and Personal Property (1), Grievance System (1), Law Libraries and Legal Material (2), and Medical Care (3).

This report details all deficiencies identified by ODO and refers to the specific, relevant sections of the PBNDS. ERO will be provided a copy of this report to assist in developing corrective actions to resolve all identified deficiencies. These deficiencies were discussed with ACF and ERO staff on-site during the inspection, as well as during the closeout briefing conducted on September 18, 2012. Of particular concern, lavatories for kitchen workers in the West facility did not have appropriate supplies for hand-washing before handling or preparing food. Further, ODO's review of 30 medical records of newly-arrived detainees indicated ten were not reviewed by a physician within 24 hours, as required by the PBNDS. Furthermore, 12 of 25 sick call requests reviewed by ODO were not triaged within 48 hours as required. ODO also found ▮▮▮

of ▆▆ medical staff did not have current cardiopulmonary resuscitation (CPR) or emergency first aid training.

Detainees receive the ICE National Detainee Handbook and an ACF detainee handbook upon admission. The handbooks are available in both English and Spanish. Translation services are available for those detainees speaking languages other than English and Spanish. The ACF detainee handbook is missing information about how to file medical grievances but otherwise includes all required information. Detainees are required to sign for the handbooks, and a receipt is generated and placed in detainees' detention files. Furthermore, detainees are provided adequate hygiene supplies and clothing as required by the PBNDS.

The food service operation is managed by GEO staff and supported by a crew of detainee workers. ODO verified all food service staff and workers received medical clearances. ODO verified the temperature of selected food items served in the dining rooms and on carts met the PBNDS requirements. Review of the master cycle menu confirmed it was reviewed and certified as nutritionally adequate by a registered dietician. ODO verified religious and medical diets are provided in accordance with the standard. As noted earlier, hand-washing facilities in the West facility did not meet the PBNDS requirements.

ACF maintains an electronic grievance log to document and track all formal and informal grievances submitted by detainees. ODO verified grievance forms are placed in the detention file of each detainee submitting a grievance. ACF staff tries to resolve most complaints informally during daily interactions with detainees. ACF provides detainees an opportunity to file both formal and informal grievances, and grievance forms are readily available. ODO's review of grievances showed they were answered in a timely manner as required by the PBNDS.

There are three libraries in the facility: one in the West facility, one in the East facility, and one inside the Special Management Units (SMU). The libraries in the East and West facilities are used by the respective general populations. The libraries have adequate seating and workspaces. All libraries are well-lit and reasonably isolated from noisy areas. ODO verified the Lexis-Nexis legal resource software was installed and updated on September 5, 2012. However, the law libraries do not have all the reference materials required by the PBNDS either in hard-copy format or electronically in the law libraries' computers. In addition, the required rules and procedures provided in the local detainee handbook are not posted in all three libraries.

Medical services at ACF are provided by the GEO Care Division. The primary intake area and medical unit are in the West facility. The Health Services Administrator (HSA) provides administrative oversight of medical services, and a full-time physician serves as the Clinical Director (CD). The current HSA and CD were hired as replacements following the March 2012 detainee death, but the former HSA currently holds the position of Assistant HSA. In addition to the HSA, CD, and Assistant HSA, full-time clinical staffing consists of a psychologist, a dentist, a dental assistant, ▆▆ nurse practitioners ▆▆ registered nurses (RN), ▆▆ licensed vocational nurses ▆▆ medical records clerks, and ▆▆ medical data entry clerk. ACF informed ODO a significant portion of the nursing staff is new to ACF, and efforts are on-going to monitor and enhance performance, including improving interaction with custody staff. Part-time staff includes an additional psychiatrist, an X-ray technician, and a lab technician. ODO finds staffing sufficient to meet the health care needs of the detainee population at its current level of

922 detainees. ACF notified ODO that contingencies are in place to address the increase in population from Mira Loma. According to the HSA and GEO's Director of Correctional Health, a proposal has been submitted to increase medical staffing by ▮▮ positions to support the impending population increase.

ACF has a comprehensive intake packet, which assures all necessary forms are initiated for the medical record, and detainees receive information on accessing medical care and health issues. Included in the packet is a Health Services Notice, which provides information on sick call procedures and reporting medical emergencies; and Intake Education Information, which acknowledges that during the intake process, the detainee has been provided with information on medical services, nutrition, personal hygiene, oral care and hygiene, HIV/AIDS, hepatitis, TB testing and prevention, boils and skin lesions, substance abuse, and sexual assault prevention. ODO cites the intake packet as best practice because it assures necessary forms and documents supporting delivery of health care are initiated and included in the medical record, and detainees receive important information on health issues and care.

There have been no suicides or attempted suicides since ACF opened in August 2011. ACF informed ODO that 29 ICE detainees have been on suicide watch in the past year. Review of medical records for ten of the ICE detainees on suicide watch confirmed compliance with the PBNDS and local policy. ODO verified screening for suicide potential occurs as part of intake screening, and detainees at risk for suicide are referred to medical staff. ODO inspected the two observation rooms used for suicide watch and verified they are free of fixtures that could be used to facilitate a suicide attempt. Inspection of ▮▮ detention and ▮▮ medical staff training records confirmed all completed the required initial and annual suicide prevention training.

ACF has a designated Sexual Abuse and Assault Prevention and Intervention (SAAPI) Coordinator. ACF informs detainees of the SAAPI program in the detainee handbook, during orientation, and by postings in the intake area and housing units. The information is in both English and Spanish, and includes toll-free telephone numbers. Detainees are screened during the intake process for sexual abuse victimization history, as well as predatory history to determine potential sexual aggressors. ACF separates detainees with a history of predatory or abusive sexual behavior from detainees with a history of victimization. Staff is required to attend pre-service, quarterly, and annual training on the SAAPI program. ODO verified completion of the required training upon review of ▮▮ training records. The training curriculum is comprehensive and includes all required elements. In interviews staff knew the SAAPI program and how to handle any information received concerning possible sexual abuse or assault. ODO verified ACF has the SAAPI-related program, policy, training, reporting procedures, reviews, and investigations protocols.

The SAAPI coordinator informed ODO there were two incidents of reported sexual abuse and assault from the opening of ACF in August 2011 to present. ODO reviewed each case file and found both were complete and included documentation of notification to ICE, local law enforcement, and other required agencies and individuals. One case was initiated as a grievance and subsequently withdrawn by the detainee; however, ERO management determined the allegation was unsubstantiated. The second case was investigated by ACF and referred to the Adelanto Sheriff's Department. Documentation indicates the alleged victim informed the investigating deputy that he wanted no contact with law enforcement or reference to him as a

victim of sexual battery, and did not want the alleged perpetrator prosecuted.  The Sheriff's Department closed the matter as an informational report without substantiating the allegation. ERO personnel assigned to ACF were kept informed during each step of the investigation process in both cases.  ODO confirmed ACF followed its local facility policy and the PBNDS, including completion of the required medical examination by facility health care personnel. OPR was not notified regarding either incident, and there were no related entries in JICMS.  As of May 2012, ERO is obligated to report any sexual assault incidents to OPR.

Detainee requests are logged and responded to within 72 hours of ERO receipt.  ERO has placed small red lockboxes for detainee requests in or near each of the ICE detainee housing units. These lockboxes are only accessible to ERO personnel, who retain the keys.  ERO personnel pick up the detainee requests on a daily basis.  The field office has a local policy and procedure to ensure and document that ICE IEAs and SDDOs conduct weekly announced and unannounced visits to housing units to address detainee concerns and inquiries, as required by the Model Protocol on Staff-Detainee Communication.  The ERO schedules are conspicuously posted in each housing unit.  Scheduled visits are documented on the Facility Liaison Visit Checklist as required by the Model Protocol.  Weekly telephone maintenance is also conducted and recorded on a log.

The SMU at ACF has 32 double-occupancy cells.  At the time of the inspection, there were 14 ICE detainees in the SMU: six in disciplinary segregation and eight in administrative segregation.  ODO observed the SMU at ACF to be well-lit, temperature appropriate, and sanitary.  ODO reviewed the Facility Liaison Visit Checklists and confirmed ERO staff regularly visit the SMU to interact with detainees and to closely monitor the living conditions in the SMU.

# INSPECTION PROCESS

ODO primarily focuses on areas of noncompliance with the ICE National Detention Standards or the ICE PBNDS, as applicable. The PBNDS apply to ACF. In addition, ODO may focus its inspection based on detention management information provided by the ERO Headquarters (HQ) and ERO field offices, and on issues of high priority or interest to ICE executive management. Inspection objectives are to evaluate the welfare, safety, and living conditions of detainees, and to determine compliance with applicable laws, policies, regulations, and procedures.

ODO reviewed the processes employed at ACF to determine compliance with current policies and detention standards. Prior to and during the inspection, ODO collected and analyzed relevant allegations and detainee information from multiple ICE databases, including the Joint Integrity Case Management System (JICMS), the ENFORCE Alien Booking Module (EABM), and ENFORCE Alien Removal Module (EARM). ODO also gathered facility facts and inspection-related information from ERO HQ staff to best prepare for the site visit at ACF.

## REPORT ORGANIZATION

This report documents inspection results, serves as an official record, and is intended to provide ICE and detention facility management with a comprehensive evaluation of compliance with policies and detention standards. It summarizes those PBNDS that ODO found deficient in at least one aspect of the standard. ODO reports convey information to best enable prompt corrective actions and to assist in the on-going process of incorporating best practices in nationwide detention facility operations.

OPR defines a deficiency as a violation of written policy that can be specifically linked to the PBNDS, ICE policy, or operational procedure. When possible, the report includes contextual and quantitative information relevant to the cited standard. Deficiencies are highlighted in bold throughout the report and are encoded sequentially according to a detention standard designator.

Comments and questions regarding the report findings should be forwarded to the Deputy Division Director, OPR ODO.

## INSPECTION TEAM MEMBERS



| | |
|---|---|
| Special Agent (Team Leader) | ODO, Phoenix |
| Special Agent | ODO, Phoenix |
| Detention and Deportation Officer | ODO, Phoenix |
| Contract Inspector | Creative Corrections |
| Contract Inspector | Creative Corrections |
| Contract Inspector | Creative Corrections |

# OPERATIONAL ENVIRONMENT

## INTERNAL RELATIONS

ODO interviewed supervisory ICE and ACF staff, including the ACF Warden, chief of security, compliance manager, and the ERO AFOD. ACF staff stated ERO personnel conduct weekly scheduled and unscheduled visits to detainee housing units at the facility. During the interviews, ICE and ACF personnel stated the working relationship between the two agencies is positive and morale is high; however, ODO observed morale levels of ICE and ACF personnel assigned at the East and West facilities are different. The personnel at the East facility state their enthusiasm about their jobs, while personnel assigned to the West facility where the ICE and ACF administrators are physically located, express a lack of motivation. ODO shared this concern with both the ACF and ERO staff during the closeout briefing conducted on September 18, 2012.

ERO staff expressed concerns relating to the timeliness in response to sick call submissions and replenishing of hygiene supplies daily. During the inspection, ODO verified the hygiene supplies at two randomly-selected housing units were fully stocked. The AFOD indicated ERO constantly receives complaints about medical care from detainees. For example, detainees are not seen within 48 hours of the sick call slip submission, as required by the PBNDS. This information is cited as a deficiency under the Medical Care PBNDS portion of this report.

## DETAINEE RELATIONS

ODO interviewed 45 randomly-selected male detainees to assess the overall living and detention conditions at ACF. None of the detainees complained about recreation, food service, hygiene supplies, telephone access, religious services, visitation, or the law library. All detainees knew who their DO was. An ICE visitation schedule is posted in the housing unit dayrooms. Twenty-eight of 45 detainees complained about the timeliness of responses to sick-call requests; detainees are seen three to five days after their sick call request submission. ODO's review of 25 sick call requests found that 12 of the requests were not triaged by ACF medical staff within 48 hours of receipt, as required by the PBNDS.

# ICE PERFORMANCE BASED
# NATIONAL DETENTION STANDARDS

ODO reviewed a total of 17 PBNDS and found ACF fully compliant with the following 11 standards:

      Admission and Release
      Correspondence and Other Mail
      Disciplinary System
      Personal Hygiene
      Sexual Abuse and Assault Prevention and Intervention
      Special Management Units
      Staff-Detainee Communication
      Suicide Prevention and Intervention
      Telephone Access
      Terminal Illness, Advance Directives, and Death
      Use of Force and Restraints

As these standards were compliant at the time of the review, a synopsis for these standards was not prepared for this report.

ODO found deficiencies in the following six standards:

      Detainee Handbook
      Food Service
      Funds and Personal Property
      Grievance System
      Law Libraries and Legal Material
      Medical Care

ODO findings for each of these standards are presented in the remainder of this report.

Office of Detention Oversight                     8                    Adelanto Correctional Facility
September 2012                                             ERO Los Angeles
OPR 201207738

## DETAINEE HANDBOOK (DH)

ODO reviewed the Detainee Handbook standard at ACF to determine if the facility provides each detainee with a handbook, written in English and any other languages spoken by a significant number of detainees housed at the facility, describing the facility's rules and sanctions, disciplinary system, mail and visiting procedures, grievance system, services, programs, and medical care, in accordance with the ICE PBNDS. ODO interviewed staff and detainees, and reviewed the facility detainee handbook and facility policies.

ACF staff informed ODO detainees are provided verbal and video orientations that include references to the handbook. Detainees receive the ICE National Detainee Handbook and an ACF detainee handbook upon admission. The handbooks are available in both English and Spanish. Translation services are available for those detainees speaking languages other than English and Spanish. Detainees are required to sign for the handbooks, and receipts are generated and placed in detainees' detention files. ODO randomly selected and reviewed 15 active detention files, and verified all detainees signed an intake property form acknowledging receipt of both handbooks.

The ACF handbook informs detainees about the programs and services ACF offers, and provides information concerning access to medical care, contraband, prohibited acts, sanctions resulting from misconduct, correspondence and mail, grievances, telephone access, recreation, and visitation; however, the ACF handbook does not describe how to file a medical grievance **(Deficiency DH-1)**. The omission of medical grievance information from the detainee handbook is also reported as **Deficiency GS-1**.

## STANDARD/POLICY REQUIREMENTS FOR DEFICIENT FINDINGS

### DEFICIENCY DH-1
In accordance with the ICE PBNDS, Detainee Handbook, section (V)(2), the FOD must ensure, while all applicable topics from the ICE National Detainee Handbook must be addressed, it is particularly important that each local supplement notify each detainee of [among others]:

- The detainee Grievance System, including medical grievances.

# FOOD SERVICE (FS)

ODO reviewed the Food Service standard at ACF to determine if detainees are provided with a nutritious and balanced diet, in a sanitary manner, in accordance with the ICE PBNDS. ODO interviewed staff and detainees, observed meal preparation and service, reviewed documentation, and inspected food and chemical storage areas, and food preparation areas.

The food service operation is managed by GEO staff and supported by a crew of detainee workers. ODO verified all food service staff and workers received medical clearances. There are two kitchen areas, one in the West facility and the other in the East facility. Meals prepared in the West facility kitchen are served in two dining rooms; meals prepared in the East facility are delivered to the housing units on carts. ODO verified the temperature of selected food items served in the dining rooms and on carts met the PBNDS requirements.

Review of the master cycle menu confirmed it was reviewed and certified as nutritionally adequate by a registered dietician. Food items from the breakfast and lunch meals prepared in both kitchens were sampled and found to be appetizing and appropriately portioned. ODO verified religious and medical diets are provided in accordance with the standard.

The Food Service Administrator (FSA) or cook supervisors conduct daily and weekly kitchen inspections to identify sanitation and safety concerns. The San Bernardino County Health Department inspects the facility annually. Documentation supports the facility was found in compliance with health and safety regulations during its last Health Department inspection on May 30, 2012. Equipment and water temperature checks are conducted and recorded as required. Pest control services are provided under contract on a monthly basis, verified by inspection of statements for the past ten months.

During the inspection of the five detainee lavatories in the West facility kitchen, ODO noted soap and paper towels were not available, and there was no readily-available hot water in one of the five lavatories. In addition, three hand-washing stations in the kitchen did not have soap and paper towels. Alternative hand-drying devices were not available in the lavatory or at any hand-washing sink **(Deficiency FS-1)**. ODO found one hand-washing station with hot water, soap, and paper towels, and observed it being used by detainee workers exiting the lavatory. Prior to completion of the review, ODO confirmed soap dispensers were installed and filled, and paper towels were supplied in all the five lavatories. Workers repaired the hot water line in the relevant lavatory. Because hand-washing by food service workers is critical to assuring food safety, ODO recommends the FSA ensure water temperatures are tested, and soap and paper towel supplies are confirmed during daily and weekly inspections of the food service areas. ODO notes this deficiency was not found in the East facility kitchen.

ODO verified food service staff monitors detainee workers for health and cleanliness. Workers are issued clean uniforms and appropriate attire to ensure personal and food safety. During the inspection, ODO observed four workers being escorted from the kitchen area after changing from food service uniforms and safety shoes following their shift. Before arriving at the housing unit, they were called to the loading dock area to unload a delivery of food items on wood pallets. The detainees remained in their canvas shoes and were not required to put on their safety shoes **(Deficiency FS-2)**. The loading dock is an FSA-designated food hazard area. When

alerted to this by ODO, food service staff immediately required detainees to wear safety shoes as required by the PBNDS.

During observation of the issuance of medical and religious diet trays in housing units, ODO noted that officers followed inconsistent procedures.  Some officers called detainees to the front of the unit to be issued a tray; other officers waited for detainees on special diets to approach them to claim a tray.  ODO recommends implementation of consistent, formalized procedures to support proper issuance of medical and religious diet trays to detainees.

## STANDARD/POLICY REQUIREMENTS FOR DEFICIENT FINDINGS

**DEFICIENCY FS-1**
In accordance with the ICE PBNDS, Food Service, section (V)(J)(9),  the FOD must ensure adequate and conveniently located toilet facilities shall be provided for all food service staff and detainee workers.

- Lavatories shall have readily available hot and cold water.
- Soap or detergent and paper towels or a hand-drying device providing heated air shall be available at all times in each lavatory.

**DEFICIENCY FS-2**
In accordance with the ICE PBNDS, Food Service, section (V)(J)(12)(c), the FOD must ensure machines shall be guarded in compliance with OSHA standards:

- Safety shoes shall be worn in FSA-designated foot hazard areas.

## FUNDS AND PERSONAL PROPERTY (F&PP)

ODO reviewed the Funds and Personal Property standard at ACF to determine if controls are in place to inventory, receipt, store, and safeguard detainees' personal property, in accordance with the ICE PBNDS. ODO toured the facility, reviewed local policies, interviewed staff, and inspected property storage areas.

The property storage room at ACF is located in the West facility behind one solid locked door. ACF uses the room to secure property bins containing clothing and other personal items, such as legal papers and books. Within the room is a secured locker for the purposes of holding large valuables. The storage area is secured when not attended by assigned staff. The control room staff monitors the secured locker 24 hours a day. ODO found all detainee property bins are clearly marked with tags documenting the name and booking number of each detainee. Property is stored and organized using a numerical system.

ODO interviewed a lieutenant and (b)(7)e correctional officers responsible for ensuring the accountability, storage, and security of detainee property. During the interviews, ODO determined ACF's policy allows non-supervisory correctional officers access to the secured storage locker, which holds large valuables. Access is not strictly limited to a lieutenant or a shift-supervisor, as required by the PBNDS **(Deficiency F&PP-1)**. ACF corrected this deficiency on-site by limiting access to the secured locker to only the lieutenant.

## STANDARD/POLICY REQUIREMENTS FOR DEFICIENT FINDINGS

### DEFICIENCY F&PP-1
In accordance with the ICE PBNDS, Funds and Personal Property, section (V)(A), the FOD must ensure all facilities, at a minimum shall provide:

- A secured locker for holding large valuables, that can be accessed only by designated supervisor(s); and
- A baggage and property storage area that is secured when not attended by assigned admissions processing staff.

Both the safe and the large-valuables locker should be kept in either the shift supervisor's office or otherwise secured in an area accessible only by the shift supervisor.

## GRIEVANCE SYSTEM (GS)

ODO reviewed the Grievance System standard at ACF to determine if a process to submit formal or emergency grievances exists, and responses are provided in a timely manner, without fear of reprisal. In addition, the review was conducted to determine if detainees have an opportunity to appeal responses, and if accurate records are maintained, in accordance with the ICE PBNDS. ODO interviewed staff and detainees, and reviewed local policies and procedures, the detainee handbook, detention files, and grievance logs.

Detainees are encouraged to resolve grievances informally, but may pursue formal grievances at any time. Detainees can file both informal and formal grievances. Grievance forms are readily available inside the housing units. Detainees are able to appeal a grievance decision. ACF staff tries to resolve most complaints informally during daily interactions with detainees.

ODO noted the ACF grievance coordinator maintains an electronic grievance log to document and track all formal and informal grievances submitted by detainees. ODO verified grievance forms are placed in the detention file of each detainee submitting a grievance. The grievance log reflects ACF received and processed 331 grievances between January 2012 and September 2012. Of the 331 grievances, 51 pertained to medical care; 79 pertained to facility staff; seven pertained to food service; 66 pertained to quality of life such as television viewing, microwave access and other similar requests; and 128 pertained to miscellaneous complaints. According to the grievance coordinator, GEO management requires documentation regardless of the topic. There were no grievances related to staff misconduct. The ACF detainee handbook did not contain any information on the detainee's right to file a medical grievance (**Deficiency GS-1**); however, as noted, 51 of the grievances related to medical care.

## STANDARD/POLICY REQUIREMENTS FOR DEFICIENT FINDINGS

### DEFICIENCY GS-1
In accordance with the ICE PBNDS, Grievance System, section (V)(B), the FOD must ensure the facility shall provide each detainee, upon admittance, a copy of the Detainee Handbook / local supplement, in which the grievance section provides notice of [among others]:

- The right to file a grievance, including medical grievances, both informal and formal.

## LAW LIBRARIES AND LEGAL MATERIAL (LL&LM)

ODO reviewed the Law Libraries and Legal Material standard at ACF to determine if detainees have access to a law library, legal materials, courts, counsel, and document copying equipment to facilitate the preparation of legal documents, in accordance with the ICE PBNDS. ODO interviewed detainees and staff, reviewed policies and the facility detainee handbook, and toured and observed the law library.

There are three libraries in the facility, one in the West facility, one in the East facility, and one inside the SMU. Both the West and East facility libraries are used by the respective general populations. The libraries have adequate seating and workspaces. All libraries are well-lit and reasonably isolated from noisy areas.

ODO verified the Lexis-Nexis legal resource software was installed and updated on September 5, 2012. All libraries are equipped with either typewriters or computers and printers, or both. ODO noted there were adequate supplies and writing materials available to detainees. All libraries are under constant supervision by ACF staff.

All law libraries are open Monday through Friday (except holidays) from 7:50 am to 4:00 pm. A schedule is posted in each housing unit indicating designated times for each housing unit, including the SMU. A detainee can request additional time in the law library beyond the five-hour minimum time limit by submitting a request through the housing unit manager.

A notary public, certified mail, and other such services to pursue legal matters are available to detainees. ODO's review of the detainee handbook found the rules and procedures governing law library and legal materials in the facility are addressed in the handbook. Although all the required rules and procedures are provided in the local detainee handbook, these procedures are not posted in the three libraries **(Deficiency LL&LM-1)**.

The legal reference materials in each of the three law libraries did not include *Immigration Law and Crimes, Guide for Immigration Advocates, Human Rights Watch, UNCHR Handbook on Procedures and Criteria for Determining Refugee Status, Affirmative Asylum Procedures Manual, and AILA's Asylum Primer, 4th Edition* in hard-copy format or electronically **(Deficiency LL&LM-2)**.

## STANDARD/POLICY REQUIREMENTS FOR DEFICIENT FINDINGS

### DEFICIENCY LL&LM-1
In accordance with the ICE PBNDS, Law Libraries and Legal Material, section (V)(O), the FOD must ensure the Detainee Handbook or supplement shall provide detainees with the rules and procedures governing access to legal materials, including the following information:

1. That a law library is available for detainee use;
2. The scheduled hours of access to the law library;
3. The procedure for requesting access to the law library;
4. The procedure for requesting additional time in the law library (beyond the 5-hours-per-week minimum);

5.  The procedure for requesting legal reference materials not maintained in the law library; and
6.  The procedure for notifying a designated employee that library material is missing or damaged.
7.  Required access to computers, printers, and other supplies.
8.  If applicable, that Lexis/Nexis is being used at the facility and that instructions for its use are available.

These policies and procedures shall also be posted in the law library along with a list of the law library's holdings.

**DEFICIENCY LL&LM-2**
In accordance with the ICE PBNDS, Law Libraries and Legal Material, section (V)(E)(2)(b)(2), the FOD must ensure, as an alternative to obtaining and maintaining the paper-based publications in *Attachment A*, a facility may substitute the Lexis/Nexis publications on CD ROM.  Any materials listed in Attachment A which are not loaded onto the Lexis/Nexis CDROM must be maintained in paper form.

## MEDICAL CARE (MC)

ODO reviewed the Medical Care standard at ACF to determine if detainees have access to healthcare and emergency services to meet health needs in a timely manner, in accordance with the ICE PBNDS. ODO toured the medical clinic, reviewed policies and procedures, examined 30 medical records, verified medical staff credentials, and observed the intake process and medication distribution. In addition, ODO interviewed the HSA, Assistant HSA, CD, psychiatrist, and the Director of Correctional Health Services for GEO's Western Regional Office.

Medical services at ACF are provided by the GEO Care Division. The primary intake area and medical unit are in the West facility. ACF does not hold any accreditations; however, ACF policies and procedures mirror the American Correctional Association and the National Commission on Correctional Health Care standards. The facility is scheduled for an American Correctional Association review in March 2013.

Administrative oversight of medical services is provided by the HSA, and a full-time physician serves as the CD. The current HSA and CD were hired following the March 2012 detainee death, replacing the former staff. The former HSA currently holds the position of Assistant HSA. In addition to the HSA, CD, and Assistant HSA, full-time clinic staffing consists of a psychologist, a dentist, a dental assistant, ▓▓ nurse practitioners, ▓▓ RNs, ▓▓ licensed vocational nurses, ▓▓ medical records clerks, and ▓▓ medical data entry clerk. ACF medical staff informed ODO a significant portion of the nursing staff is new to ACF, and efforts are on-going to monitor and enhance performance, including improving interaction with custody staff. Part-time staff includes an additional psychiatrist, X-ray technician, and lab technician. ODO finds staffing sufficient to meet the health care needs of the detainee population at its current level of 922 detainees. ODO was informed, however, that the detainee population will increase to 1,300 detainees. ACF notified ODO that contingencies are in place to address the increase in population from Mira Loma. According to the HSA and the GEO Director of Correctional Health, a proposal has been submitted to increase medical staffing by ▓▓ positions to support the impending population increase.

Medical and mental health intake screenings of detainees are conducted by nursing staff at arrival. ODO observed the screening is comprehensive, and includes taking and documenting a complete set of vital signs. Translation during intake and all subsequent medical encounters is provided by Spanish-speaking staff, or a telephone language interpretation service for those speaking languages other than English or Spanish. Intake screening includes testing for tuberculosis (TB) by way of chest X-ray (CXR), read immediately by a tele-radiology service. ODO confirmed screening and CXRs were completed as required in all 30 records reviewed; however, ten of 30 screenings were not reviewed by a physician within 24 hours as required by the PBNDS (**Deficiency MC-1**). ODO notes the facility policy requires physician reviews of intake screenings.

ACF has a comprehensive intake packet, which assures all necessary forms are initiated for the medical record, and detainees receive information on accessing medical care and health issues. Included in the packet is the Consent to Medical, Dental and Mental Health Services, and Authorization for Release of Information, both of which are signed by the detainee. Obtaining

authorization to release information assures that medical history and treatment information may be obtained from other sources as necessary. In addition, the packet includes a Health Services Notice, which provides information on sick call procedures and reporting medical emergencies; and Intake Education Information, which acknowledges that during the intake process, the detainee has been provided with information on medical services, nutrition, personal hygiene, oral care and hygiene, HIV/AIDS, hepatitis, TB testing and prevention, boils and skin lesions, substance abuse, and sexual assault prevention. ODO cites the intake packet as a best practice because it ensures necessary forms and documents supporting delivery of health care are initiated and included in the medical record, and detainees receive important information on health issues and care.

Detainees with medical conditions or chronic diseases identified at intake receive physical examinations (PEs) conducted by the CD. Appropriately trained RNs conduct PEs on detainees with no known medical issues. Of the 30 records reviewed, ODO found 20 PEs were conducted by the CD and ten were conducted by RNs. All PEs were completed well within the 14 days required by the standard. The CD completed the PEs within 24 hours of referral, and the average timeframe across all 30 PEs was three days. ODO verified all PEs were hands-on, and the physician reviewed the PEs conducted by the RNs.

Review of ACF's chronic care program verified procedures are in place to ensure detainees receive treatment, monitoring, and routine follow-up. A color-coded file system is in place to distinguish chronic care patients from healthy detainees, and a computer system is used to support the efficient scheduling of follow-up appointments. Review of chronic care records confirmed the CD thoroughly documented examinations and reviews of lab results and consult reports. Although not a deficiency, ODO notes nurses did not consistently record detainees' weights as part of chronic care evaluations. The HSA stated she would address this matter with the nursing staff.

Detainees are referred to community providers for services beyond the scope of care provided by the facility. ODO was informed the facility has improved its partnership with the local hospital to facilitate mutual exchange of medical information, including patient history, emergency room and hospital admissions, and lab, X-ray, and consultation reports. ODO confirmed the presence of such documentation in detainees' medical records, and verified the presence of signed authorizations to release information. Review of 30 Medication Administration Records confirmed physician's orders were accurately reflected, and detainees received medications in the dosage and frequency ordered.

ODO's observation of medication distribution found detainees are identified prior to receiving medications, and officers ensured the line of detainees awaiting their medications was organized and controlled by correctional officers.

Detainees access care by completing written medical requests available in English and Spanish, and placing them in secure medical lockboxes in each housing unit. ACF medical personnel collect the sick call requests daily. Although local policy mirrors the PBNDS requirement that sick call requests be triaged within 48 hours, review of 25 sick call requests found 12 were triaged three to five days following submission **(Deficiency MC-2)**. Review by ODO confirmed that these 12 sick call requests did not document medical concerns of a significant nature;

nonetheless, ODO recommends the facility takes steps to ensure triage is conducted and documented in the medical record on a timely basis.

Review of ▇▇ randomly-selected correctional and ICE staff training records verified current CPR, automated external defibrillator (AED), and emergency first aid training.  Out of ▇▇ medical staff credentials and certifications reviewed, ODO found ▇▇ RNs and ▇▇ licensed vocational nurses did not have current CPR, AED, or first aid certifications **(Deficiency MC-3)**.  The HSA informed ODO the RNs and licensed vocational nurses would complete the necessary training to obtain certifications on Friday, September 21, 2012.

## STANDARD/POLICY REQUIREMENTS FOR DEFICIENT FINDINGS

**DEFICIENCY MC-1**
In accordance with the ICE PBNDS, Medical Care, section (V)(I)(1), the FOD must ensure the clinical medical authority shall be responsible for review of all health screening forms within 24 hours or next business day to assess the priority for treatment (for example, Urgent, Today, or Routine).

**DEFICIENCY MC-2**
In accordance with the ICE PBNDS, Medical Care, section (V)(N), the FOD must ensure each facility shall have a sick call procedure that allows detainees the unrestricted opportunity to freely request health care services (including mental health and dental services) provided by a physician or other qualified medical staff in a clinical setting.  This procedure shall include [among others]:

- All facilities must have an established procedure in place to ensure that all sick call requests are received and triaged by appropriate medical personnel within 48 hours after the detainee submits the request.  In an urgent situation, the housing unit officer shall notify medical personnel immediately.

**DEFICIENCY MC-3**
In accordance with the ICE PBNDS, Medical Care, section (V)(O), the FOD must ensure a plan shall be prepared in consultation with the facility's clinical medical authority or the administrative health authority.  The plan will include the following [among others]:

- All detention staff shall receive cardio pulmonary resuscitation (CPR, AED), and emergency first aid training annually.

EXHIBIT J

**Michael Kaufman**

| | |
|---|---|
| **From:** | Ahilan Arulanantham |
| **Sent:** | Tuesday, January 15, 2013 4:39 PM |
| **To:** | 'Atkinson, Theodore (CIV)'; Wilson, Sarah S. (CIV) |
| **Cc:** | Michael Kaufman |
| **Subject:** | Rodriguez - meet and confer regarding MSJ |

Dear Ted,

This email memorializes, at your request, the issues on which we intend to move for summary judgment in Rodriguez. We will argue that all detainees held for six months whose cases remain pending are entitled to rigorous bond hearings unless a) they are detained under one of the national security statutes – 1226a or 1537 –, or b) the government has present authority to remove them notwithstanding that their case is pending (this category is defined in more detail in the third amended complaint).

We will argue that "rigorous" bond hearings entail:

1. Adequate advance notice of
2. A Hearing before an IJ
3. With the Burden on the Govt
4. By clear and convincing evidence
5. That is transcribed
6. And occurs periodically every six months (if the detainee loses).
7. To authorize further detention, the judge must find that no conditions short of detention (such as alternatives to detention) will satisfy the government's interest in preventing danger and flight. That argument will mirror the standard set forth in the complaint. (We will also preserve for review the argument that the danger must be particularly serious, which we lost in Singh).
8. The judge must also consider the likelihood of deportation (which encompasses both the likelihood of success and the possibility of repatriation), and
9. The judge must also consider length of detention.

Take care,
ahilan

Ahilan T. Arulanantham
Deputy Legal Director
ACLU of Southern California
213.977.9500 xt. 211

website || facebook || twitter || blog

**The ACLU: Because Freedom Can't Protect Itself**

1

# EXHIBIT K

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

----------------------------------------x

ALEJANDRO RODRIGUEZ, et al.,

          Petitioners,

    -vs-

TIMOTHY S. ROBBINS, in his capacity
as U.S. Immigration and Customs
Enforcement Los Angeles Field Office
Director, et al.,

          Respondents.

----------------------------------------x

          DATE:  Wednesday, November 28, 2012

          TIME:  9:27 a.m.

      Examination Under Oath of SUSAN B.

LONG, held at the offices of UNITED STATES

ATTORNEYS OFFICE, 100 South Clinton Street,

Syracuse, New York, on November 28, 2012,

before  CYNTHIA A. SANDERS, Registered

Professional Reporter and Notary Public in

and for the State of New York.

1                              S. Long

2      in your view?

3           A.    Yes, there was no measure --

4           Q.    Okay.

5           A.    -- of reasons that occurred in a general

6      sense, you know, that would allow you to do that.

7           Q.    But there were the adjournment codes --

8           A.    Yes.

9           Q.    -- that told you why the hearing was

10     adjourned?

11          A.    There were adjournment codes, but they

12     didn't -- they weren't specifically designed to

13     attribute fault in the normative sense as a general

14     matter.

15          Q.    Well, there is a practical difference

16     between a signing fault and a normative sense and

17     simply indicating who requested a continuance?

18               MR. ARULANANTHAM:   Object to the form

19               of the question.

20          A.    Well, it's my understanding that if a class

21     member had defenses to the government's N.T.A. seeking

22     removal order that, to raise those defenses, is --

23     subsequent proceedings would be required as a general

24     rule.

25          Q.    I don't mean this to sound flip, but so

1                              S. Long

2    what?  So subsequent proceedings would be required?

3    How would that affect your ability as a statistician

4    to analyze, in a raw and dispassionate way, the time

5    from one proceeding to the next attributable to a

6    continuance identified by an adjournment?

7                    MR. ARULANANTHAM:  Object to the form

8            of the question.

9        A.    But if we're speaking of his fault, this is

10   just due process that you get to raise your defense,

11   and normal proceedings would take some time.

12       Q.    But that strikes me as you laying on top of

13   a strictly objective statistical analysis.  Your view

14   that because this is qualitatively an assignment of

15   fault, it simply cannot be reliable statistically

16   analyzed?

17                   MR. ARULANANTHAM:  Object to the form

18           of the question.

19       A.    No, I don't think that's what I was saying.

20       Q.    Well, is it true that you could measure in a

21   statistical form the time between -- as a general

22   matter, the time between one hearing date and the

23   next, assuming you have reliable information in the

24   database that says:  Here is one date, here is the

25   next date, and it provides you with a sufficiently

265521fa-0d5b-4bc0-a208-16c8ccec61d2

225

REPORTER'S CERTIFICATE

    I, CYNTHIA A. SANDERS, Court Reporter and Notary Public, certify:

    That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

    That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

    That the foregoing is a true and correct transcript of my shorthand notes so taken;

    I further certify that I am not a relative or employee of any attorney or of any of the parties nor financially interested in the action.


_____
CYNTHIA A. SANDERS