STUART F. DELERY
Acting Assistant Attorney General
Civil Division
DAVID J. KLINE
Director, Office of Immigration Litigation
District Court Section
THEODORE W. ATKINSON
United States Department of Justice
Office of Immigration Litigation
    P.O. Box 868, Ben Franklin Station
    Washington, DC 20044
    Phone: (202) 532-4135
    theodore.atkinson@usdoj.gov
SARAH S. WILSON
Trial Attorney

Attorneys for Respondents

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| ALEJANDRO RODRIGUEZ, *et al.*, | Case No. CV 07-3239-TJH (RNBx) |
| Petitioners, | **RESPONDENTS' REPLY TO PETITIONERS' OPPOSITION TO RESPONDENTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF RESPONDENTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| TIMOTHY S. ROBBINS, *in his capacity as U.S. Immigration and Customs Enforcement, Los Angeles District Field Office Director, et al.*, | |
| Respondents. | Hon. Terry J. Hatter, Jr. |
| | Hearing Date: May 6, 2013 |
| | Hearing Time: UNDER SUBMISSION |

      Respondents submit the following statement replying to Petitioners' opposition statement to Respondents' statement of uncontroverted material facts and conclusions of law, filed on April 7, 2013, as ECF No. 313. This statement combines (1) Respondents' statement of uncontroverted facts and conclusions of law, (2) Petitioners' opposition statements [ECF No. 313], and provides Respondents' reply.

1

**Issue No. 1:**     **The detention of arriving aliens without bond during the pendency of their removal proceedings is statutorily authorized and does not violate due process**

| Material Fact | Petitioners' Response | Respondents' Reply |
|---|---|---|
| During the relevant period of this action, a number of arriving aliens[1] are or have been detained within the Central District of California for a continuous period of more than six months pending removal proceedings under the detention authority of 8 U.S.C. § 1225(b).<br><br>*See* Respondents' Notice of Non-Opposition to Petitioners' Motion for Class Certification at 2-3 [ECF No. 122] | Not disputed, except to the extent that Petitioners do not concede that Section 1225(b) actually authorizes the detention of such individuals without a bond hearing as sought in Petitioners' Motion for Summary Judgment. | This material fact is undisputed. Petitioners' response does not go to the statement of fact, but is instead an argument over the statutory construction of section 1225(b), which is a matter of law. |
| A large number of the studied class members representing a selection of detainees between April 2010 and April 2011 – 86.9% – requested at least one continuance, and over half of them requested three or more continuances during their removal proceedings. If the analysis is limited just | Disputed. The evidence on which Respondents rely is not sufficiently reliable to support this factual assertion, and it must be disregarded on this basis. *See* Dkt 281-6, Exh. B at 4-7; Declaration of Susan Long of April 5, 2013 ¶¶ 4-13. | There is no dispute over the facts. Petitioners' do not dispute the actual statistical analysis Dr. Palmer provided showing that large numbers of studied class members request continuances, including multiple continuances during the first six months of their detention, as stated in his |

---

[1] An "arriving alien" is defined as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport." 8 C.F.R. §§ 1.2, 1001.1(q).

to the first six months of the studied aliens' detention, the data shows that 84.7% of aliens request a continuance during the first six months of their custody, and nearly two-thirds of those aliens – 66.2% – requested two or more continuances within the first six months of their custody.

*See* Exhibits O to the Declaration of Theodore W. Atkinson (Chester I. Palmer Deposition Excerpts); Exhibit P to the Declaration of Theodore W. Atkinson (Palmer Expert Report at 2, 10-11); Declaration of Benjamin B. McDowell

Moreover, resolution of this disputed fact would not entitle Respondents to judgment (or justify denial of judgment for Petitioners) because the percentage of studied Class members who requested continuances is not "material" to Petitioners' statutory and constitutional claims to an adequate bond hearing. *See* Reply Br. Section II.C (concurrently filed).

If an immigration judge believes that a detainee is acting to unreasonably delay his or her proceedings through requests for continuances, the judge can address such concerns at the bond hearing.

report and in Respondents' statement of material facts. Petitioners' only attack on Dr. Palmer's analysis is to assert that the database information on which he relied is unreliable. This is incorrect. The "Schedule Data Table" on which Dr. Palmer relied is the best evidence of continuances sought by aliens, because immigration court personnel input data into that table showing (1) when a hearing has been "adjourned," or continued, and (2) the reasons for the adjournment, as represented by a code selected by court personnel.

Petitioners' contention that the "Schedule Data Table" is unreliable is based on their pointing to the "Actions Data Table," which they incorrectly assert must reflect every adjournment in the same manner as reflected in the "Schedule Data Table." Petitioners' argument is a red herring. As explained by Ben McDowell, the EOIR employee familiar with the EOIR database, the "Actions Data Table"

is an auditing table that reflects when information is inputted into the database, but it is not necessarily a mirror reflection of the same information contained in the "Schedule Data Table."

Petitioners also argue that the declaration of Ben McDowell must be disregarded because it is new information not obtained in discovery. This is incorrect. McDowell was deposed at length by Petitioners in 2011, he submitted declarations discussing the database reliability in support of Respondents' preliminary injunction opposition, and he supplied a declaration after the deposition of Dr. Palmer to show that Petitioners are simply incorrect that the "Schedule Data Table" is incorrect, and Petitioners were invited to depose McDowell on that declaration. Petitioners declined. *See* April 26, 2013 Declaration of Sarah S. Wilson, ¶¶ 6-8.

Petitioners' contention that the undisputed statistical analysis made

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

by Dr. Palmer is not material to the statutory and constitutional issues in this case is legal argument, but in any event, it is incorrect. Courts have repeatedly recognized that whether an alien has contributed to the length of prolonged detention is a fact that must be considered in determining whether the continued detention of a detainee, without a bond hearing, comports with due process. Thus, contrary to Petitioners' arguments, whether an alien has contributed to the length of his or her detention is a fact that materially weighs on a determination of whether the alien's continued detention without a bond hearing is constitutional.

Finally, Petitioners' argument that an immigration judge may consider the effect of continuances at a bond hearing is a *legal* argument that does not challenge the factual assertion at issue. In any event, Petitioners' argument is both an incorrect statement of the regulatory authority of immigration judges and a

| | | |
|---|---|---|
| | | misunderstanding of the role of federal courts in determining the core constitutional issue of whether an alien's detention without bond comports with due process. |
| An alien's request for multiple continuances has the effect of delaying proceedings significantly. In analyzing the length of delays caused by continuances in just the first six months of detention, Dr. Palmer determined that for aliens requesting at least one continuance during the first 180 days of their detention, the total resulting delay varied between 6 days to 269 days. For the 84.7% of aliens who sought at least one continuance during their first 180 days of detention, the average delay attributable to those continuances accounted for over half of the 180 days. *See* Exhibits O to the Declaration of Theodore W. Atkinson (Chester I. Palmer Deposition Excerpts); Exhibit P to the Declaration of Theodore W. Atkinson (Palmer Expert Report at 2, 11-13); Declaration of Benjamin | Disputed. Dr. Palmer's report did not examine the potential causes for the length of individual continuances. Dkt. 283 Exh. D at 72:24-75:24, 80:22-81:24. As result, as Dr. Palmer conceded, his analysis does not establish that the length of any particular delay is the "result" of a class member's request. *Id.* In addition, Dr. Palmer testified that his review of the continuance data suggests that immigration judges' schedules are primarily responsible for the length of continuances. Dkt. 283 Exh. D at 79:25-80:6. The evidence on which Respondents rely also is not sufficiently reliable to support this factual assertion, and it must be disregarded on this basis. *See* Dkt 281-6, Exh. B at 4-7; Long Decl. ¶¶ 4-13.<br><br>Moreover, resolution of this disputed fact would | There is no dispute over the facts. Petitioners' do not dispute the actual statistical analysis Dr. Palmer provided showing that for the 84.7% of aliens who sought at least one continuance during their first 180 days of detention, the average delay attributable to those continuances accounted for over half of the 180 days, as stated in his report and in Respondents' statement of material facts.<br><br>Petitioners assert that the length of time between a continued hearing date and the next hearing date is not the result of a detainee's request, but is tied solely to the judge's schedule. This assertion is unsupported by any evidence, but only supposition (*see* Petitioners' Response, citing Dr. Palmer's deposition, Dkt. 283 Exh. D at 79:25-80:6). Indeed, this assertion is directly |

| B. McDowell | not entitle Respondents to judgment (or justify denial of judgment to Plaintiffs) because the percentage of studied class members who requested continuances, and the length of any "delay" that "resulted" from such continuances, is not "material" to Petitioners' statutory and constitutional claims to a bond hearing.<br>*See* Reply Br. Section II.C.<br><br>If an immigration judge believes that a detainee is acting to unreasonably delay his or her proceedings through requests for continuances, the judge can address such concerns at the bond hearing. | contradicted by the testimony of Judge Thomas Y.K. Fong, who testified that immigration judges provide aliens in removal proceedings with the time that they request or need for the continuance (*e.g.*, to find counsel, to prepare for a merits hearing, etc.).  *See* Atkinson Decl.Exh. C thereto (Fong Deposition at 38:9-38:20).<br><br>Petitioners also attack Dr. Palmer's analysis is to assert that the database information on which he relied is unreliable.  This is incorrect.  The "Schedule Data Table" on which Dr. Palmer relied is the best evidence of continuances sought by aliens, because immigration court personnel input data into that table showing (1) when a hearing has been "adjourned," or continued, and (2) the reasons for the adjournment, as represented by a code selected by court personnel.<br><br>Petitioners' contention that the "Schedule Data Table" is unreliable is based on their pointing to |

the "Actions Data Table," which they incorrectly assert must reflect every adjournment in the same manner as reflected in the "Schedule Data Table." Petitioners' argument is a red herring.  As explained by Ben McDowell, the EOIR employee familiar with the EOIR database, the "Actions Data Table" is an auditing table that reflects when information is inputted into the database, but it is not necessarily a mirror reflection of the same information contained in the "Schedule Data Table."

Petitioners also argue that the declaration of Ben McDowell must be disregarded because it is new information not obtained in discovery. This is incorrect. McDowell was deposed at length by Petitioners in 2011, he submitted declarations discussing the database reliability in support of Respondents' preliminary injunction opposition, and he supplied a declaration after the deposition of Dr. Palmer to show that Petitioners are simply incorrect that the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Schedule Data Table" is incorrect, and Petitioners were invited to depose McDowell on that declaration. *See* April 26, 2013 Declaration of Sarah S. Wilson, ¶¶ 6-8.

Petitioners' contention that the undisputed statistical analysis made by Dr. Palmer is not material to the statutory and constitutional issues in this case is legal argument, but in any event, it is incorrect. Courts have repeatedly recognized that whether an alien has contributed to the length of prolonged detention is a fact that must be considered in determining whether the continued detention of a detainee, without a bond hearing, comports with due process. Thus, contrary to Petitioners' arguments, whether an alien has contributed to the length of his or her detention is a fact that materially weighs on a determination of whether the alien's continued detention without a bond hearing is constitutional.

Finally, Petitioners' argument that an immigration judge may

| | | consider the effect of continuances at a bond hearing is a *legal* argument that does not challenge the factual assertion at issue. In any event, Petitioners' argument is both an incorrect statement of the regulatory authority of immigration judges and a misunderstanding of the role of federal courts in determining the core constitutional issue of whether an alien's detention without bond comports with due process. |
|---|---|---|

**Conclusions of law:**

The detention of arriving aliens pending their removal proceedings is mandated by the unambiguous statutory language of 8 U.S.C. § 1225(b). The only exception to this detention is through the discretionary parole authority established by Congress in 8 U.S.C. § 1182(d)(5)(A).

The Supreme Court has consistently recognized that "our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality. In the latter instance, the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'" *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) (quoting *Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206, 212 (1953)); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. It is well-established that certain constitutional protections available

10

to persons inside the United States are unavailable to aliens outside of our geographic borders."

Such aliens do not have constitutional rights regarding their admission into the United States, and courts have long recognized that Congress may direct the detention of such aliens commensurate with the power to exclude them from entry or admission. *Zadvydas*, 533 U.S. at 693 (an arriving alien "stands on a different footing: 'Whatever the procedure authorized by Congress is [regarding admission or exclusion], it is due process as far as an alien denied entry is concerned.'") (quoting *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)); *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application . . . [H]owever, once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly.").

The unique constitutional position of arriving aliens permits their detention without a bond hearing pending their removal proceedings, even if such detention lasts beyond six months. *See, e.g., Zadvydas*, 533 U.S. at 693; *Ma*, 357 U.S. 185, 187-88 (1958) (alien "paroled" into the United States pending admissibility had not effected an "entry"); *see also Zadvydas*, 533 U.S. at 693 (discussing line of Supreme Court decisions recognizing the entry fiction doctrine, which considers an alien in the United States, but not granted admission to the United States, as having been "stopped at the border," and refusing to undermine *Mezei* with respect to the constitutionality of the detention of such aliens for lengthy periods); *Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1445 (9th Cir. 1995) (en banc), *superseded by statute as stated in Wong v. INS*, 373 F.3d 952, 972 n. 26 (9th Cir. 2004).

Moreover, a large number of aliens seek continuances that significantly lengthen their removal proceedings, and thus their detention. Courts have consistently recognized that an inflexible one-size-fits-all rule that detention raises constitutional concerns at a predetermined temporal benchmark does not comport with due process,

11

which "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *Pedro v. Oregon Parole Bd.*, 825 F.2d 1396, 1398 (9th Cir. 1987) (citing *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1 (1979)) (same). *See also*, *Demore*, 538 U.S. at 530 n.14 ("Prior to the enactment of § 1226(c), when the vast majority of deportable criminal aliens were not detained during their deportation proceedings, many filed frivolous appeals in order to delay their deportation."); *Ly v. Hansen*, 351 F.3d 263, 271-73 (6th Cir. 2003) (rejecting a six-month rule, concluding that "[a]bright-line time limitation . . . would not be appropriate for the pre-removal period" because "an easily administrable bright-line rule cannot be based on time, given the inevitable elasticity of the pre-removal period"); *Diop v. ICE/Homeland Security*, 656 F.3d 221, 234 (3d Cir. 2012) (declining "to adopt such a one-size-fits-all approach" because the constitutionality of detention under section 1226(c) "is a fact-dependent inquiry requiring an assessment of all of the circumstances of any given case."); *Alli v. Decker*, 644 F. Supp. 2d 535, 542-43 (M.D. Pa. 2010), *reversed and remanded on other grounds*, 650 F.3d 1007 (3d Cir. 2011); *see also Flores-Powell v. Chadbourne*, 677 F. Supp. 2d 455 (D. Mass. 2010) (citing the Sixth Circuit's rejection of a bright-line rule based solely on length of detention). Thus, Petitioners' request for an order that aliens detained under section 1225(b) receive a bond hearing after 180 days of detention, without regard to the individual facts and circumstances of their cases, is not required by due process.

Consistent with the constitutional principles described above, the detention of arriving aliens for more than six months without a bond hearing before an immigration judge, during the pendency of removal proceedings, comports with due process and therefore does not raise constitutional concerns.

**Petitioners' Response:**

Respondents mis-state the law governing Section 1225(b) detention. Contrary to Respondents' assertion, Section 1225(b) does not "mandate" detention pending

removal proceedings because, as Respondents readily admit, the Government itself releases "arriving aliens" under the parole process.  Further, the statute does not preclude the relief Petitioners seek, as the statute is silent as to both the length of detention authorized and the procedures that should govern detention decisions.  Indeed, the BIA has already interpreted Section 1225(b) to allow bond hearings for noncitizens who were arrested and placed in removal proceedings after their entry, even when their detention is not prolonged. *See Matter of X-K-*, 23 I&N Dec. 731, 731-32, 734-35 (BIA 2005).  As such, Section 1225(b) can be construed to provide the relief Petitioners seek, either by construing Section 1225(b) to authorize bond hearings, or by construing Section 1225(b) not to apply to prolonged detention such that detention authority "shifts" to Section 1226(a), under which class members are indisputably eligible for bond hearings.  *See Casas-Castrillon v. DHS*, 535 F.3d 942, 951 (9th Cir. 2008) (holding that Section 1226(c) detention "shifts" to Section 1226(a) after the grant of a stay of removal in connection with a petition for review, due to serious constitutional concerns raised by prolonged detention in the absence of a bond hearing).

Moreover, contrary to Respondents' assertion, class members detained under Section 1225(b) have constitutional rights with respect to their detention. First, the Ninth Circuit has unambiguously held that Section 1225(b) applies to lawful permanent residents, and that Section 1225(b) must be construed with those individuals in mind—regardless of whether detention would raise constitutional problems with respect to "arriving aliens" who are first-time entrants. *See Nadarajah v. Gonzalez*, 443 F.3d 1069 (9th Cir. 2006). Second, even as applied to first-time entrants to the United States who are stopped at the border, the Due Process Clause does not permit their prolonged detention without meaningful process.  *See generally Kwai Fun Wong v. United States*, 373 F.3d 952, 974-75 (9th Cir. 2004) (holding that "excludable" aliens retain Fifth Amendment rights)). Respondents cite cases establishing the limited rights of arriving noncitizens with respect to the procedures governing their admission to the United States, but Petitioners do not seek to alter the

13

procedures for admission, but rather to vindicate Class members' fundamental rights with respect to their detention. *See Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094, 1098 (9th Cir. 2004) (acknowledging that "'the entry doctrine does not categorically exclude non-admitted aliens from all constitutional coverage, including coverage by equal protection guarantees,'" but rather "'appears determinative of the procedural rights of aliens with respect to their applications for admission.'") (quoting *Kwai Fun Wong*, 373 F.3d at 971-73).

Respondents' argument that due process does not permit bright-line rules in this context is obviously incorrect, as the Ninth Circuit in *Diouf II* adopted the six-month rule that Petitioners seek here with respect to certain class members detained under Section 1231(a).  *See Diouf v. Napolitano*, 634 F.3d 1081 (9th Cir. 2011). Further, in *Zadvydas*, the Supreme Court adopted a similar six-month rule in a closely-related context, expressly relying on a long line of Supreme Court cases establishing similar time-based rules on constitutional grounds. *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001) (collecting cases). Respondents' unsupported assertion that "a large number of aliens seek continuances that significantly lengthen their removal proceedings" is incorrect, insofar as many class members request continuances for legitimate reasons, including to comply with Respondents' own procedures for applying for relief in immigration court. In any event, individual factors that bear on fitness for release – such as whether a detainee has taken unnecessary continuances – can appropriately be considered by immigration judges at bond hearings, but do not defeat Petitioners' basic claim that class members are entitled to bond hearings at which all the relevant factors should be considered.

**Respondents' Reply:**

In their response, Petitioners contend that section 1225(b) may be construed as permitting bond hearings before immigration judges because arriving aliens enjoy constitutional protections under the Due Process Clause of the Fifth Amendment, and because section 1225(b) is not an unambiguously mandatory detention statute and

1  therefore can be construed as permitting bond hearings.  Petitioners are incorrect on

2  both counts.

3          The detention of arriving aliens under section 1225(b), with the possibility of

4  parole, during the pendency of their removal proceedings, does not raise constitutional

5  concerns.  For more than a century, the Supreme Court has repeatedly recognized the

6  power to exclude aliens as "inherent in sovereignty, necessary for maintaining normal

7  international relations and defending the country against foreign encroachments and

8  dangers-a power to be exercised exclusively by the political branches of government,"

9  *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972), and not "granted away or restrained

10 on behalf of any one."  *The Chinese Exclusion Case*, 130 U.S. 581, 609 (1889).  Ever

11 since the decision in the Chinese Exclusion Case, the Supreme Court has, without

12 exception, sustained the exclusive power of the political branches to decide which

13 aliens may, and which aliens may not, enter the United States, and on what terms.

14 *See, e.g.*, *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893); *Lem Moon Sing*

15 *v. United States*, 158 U.S. 538, 543, 547 (1895); *Wong Wing v. United States*, 163

16 U.S. 228, 237 (1896); *Fok Young Yo v. United States*, 185 U.S. 296, 302 (1902); *Tiaco*

17 *v. Forbes*, 228 U.S. 549, 556-57 (1913); *United States ex rel. Knauff v. Shaughnessy*,

18 338 U.S. 537, 542 (1950); *Galvan v. Press*, 347 U.S. 522, 530 (1954); *Graham v.*

19 *Richardson*, 403 U.S. 365, 377 (1971); *Kleindienst*, 408 U.S. at 765-66; *Mathews v.*

20 *Diaz*, 426 U.S. 67, 81 (1976); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *Reno v. Flores*,

21 507 U.S. 292, 305-06 (1993).  Justice Frankfurter summarized the law as it continues

22 to this day:  "Ever since national States have come into being, the right of the people

23 to enjoy the hospitality of a State of which they are not citizens has been a matter of

24 political determination by each State" – a matter "wholly outside the concern and

25 competence of the Judiciary."  *Harisiades v. Shaughnessy*, 342 U.S. 580, 596 (1952)

26 (concurring opinion).

27          Arriving aliens seeking admission to the United States have no constitutional

28 rights regarding their admission or exclusion, under the Due Process Clause o

   otherwise.  This is a bedrock principle of constitutional law.  Decisions of the

15

Supreme Court and of other courts hold that the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990); *Johnson v. Eisentrager*, 339 U.S. 763, 783-84 (1950). While it is true that *Zadvydas* addressed the due process rights of aliens, the Supreme Court was careful to restrict its statement to aliens who had already entered the United States.  533 U.S. at 693.  It was on that ground that the Court distinguished *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), a case in which the Court held that an alien who had previously entered the United States could be detained when seeking reentry, even for prolonged periods, because the alien was not deprived of any constitutional right.  *Id.* at 215.  The *Zadvydas* Court reiterated that the distinction between an alien who has gained entry and one who has not is one that "runs throughout immigration law." *Zadvydas*, 533 U.S. at , 533 U.S. at 693.  The Court stated: "It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Id.* (citing *Verdugo-Urquidez*, 494 U.S. at 269; *Eisentrager*, 339 U.S. at 784).

Petitioners are incorrect that the Supreme Court has altered the principle that arriving aliens enjoy no constitutional rights regarding their admission or exclusion. While it is true that aliens seeking benefits under the immigration laws of the United States enjoy some due process rights regarding the administrative process established by Congress in conferring or denying those benefits, *see e.g., Kwai Fun Wong v. United States*, 373 F.3d 952, 974-75 (9th Cir. 2004) (holding that "excludable" aliens retain equal protection rights under the Fifth Amendment regarding racial bias in the admissions process), the cases cited by Petitioners do not stand for the proposition that arriving aliens enjoy the same due process protections as aliens who have gained admission, nor do they contradict the decades of jurisprudence firmly establishing that arriving aliens enjoy no due process right to be free from detention pending their removal proceedings.  For these reasons, the detention of arriving aliens denied parole

16

1    during the pendency of their removal proceedings does not raise constitutional

2    concerns.

3        Although this Court need not reach the issue of constitutional avoidance

4    because section 1225(b) does not raise the constitutional concerns in this action,

5    Petitioners are nevertheless incorrect that this Court may construe section 1225(b) as

6    permitting immigration bond hearings under the canon of constitutional avoidance.

7        The canon of constitutional avoidance is a tool of statutory construction that

8    may only be applied to construe "ambiguous statutory language … to avoid serious

9    constitutional doubts." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516

10   (2009). Moreover, the canon of constitutional avoidance may only be applied, even in

11   the face of an ambiguous statute, "so long as such a reading *is not plainly contrary to

12   the intent of Congress*," *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2742

13   (2010) (emphasis added), and consistent with the larger statutory scheme of which the

14   provision is part, *see, e.g., Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809

15   (1989).

16       This Court may not apply the canon of constitutional avoidance because section

17   1225(b) is unambiguous in requiring the detention of arriving aliens during the

18   pendency of their removal proceedings, and because construing section 1225(b) as

19   requiring immigration bond hearings for arriving aliens detained for longer than six

20   months would be contrary to Congress's intent as reflected in the overall statutory

21   scheme.

22       First, section 1225(b) is, on its face, unambiguously mandatory in nature. As a

23   matter of statutory construction, the Supreme Court has repeatedly recognized that

24   Congress's use of the term "shall" in a statutory directive leaves no room for

25   discretion. *See*, *United States v. Monsanto*, 491 U.S. 600, 607 (1989) (by using

26   "shall" in a civil forfeiture statute, "Congress could not have chosen stronger words to

27   express its intent that forfeiture be mandatory in cases where the statute applied.");

28   *Pierce v. Underwood*, 487 U.S. 552, 569–70 (1988) (Congress's use of "shall" in a

     housing subsidy statute constitutes "mandatory language"). On its face, section

1225(b) mandates the pre-order detention of arriving aliens by directing that such aliens "shall be detained" pending a determination of removability.  8 U.S.C. §§ 1225(b)(1)(B)(ii) ("If the officer. . . determines that the alien has a credible fear. . . the alien *shall be detained* for further consideration of the application for asylum.") (emphasis added); 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the [expedited removal] procedures under this clause *shall be detained* pending a final determination of credible fear…") (emphasis added); 1225(b)(2)(A) ("…if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding…") (emphasis added).  Thus, as a matter of traditional statutory construction, the statute is mandatory.

Second, there is no merit to Petitioners' argument that the existence of the discretionary parole authority in 8 U.S.C. § 1182(d)(5)(A) – which allows DHS to release arriving aliens on parole for urgent humanitarian or public benefit reasons – somehow makes section 1225(b) a non-mandatory detention statute.  Section 1182(d)(5)(A) is an exception to the mandatory language of section 1225(b).  The existence of a statutory exception to the otherwise mandatory application of a statute does not turn the statute itself into a discretionary directive.  See, *e.g.*, *Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F. Supp. 2d 20, 43 (D.D.C. 2002) (in examining the Freedom of Information Act, court reasoned that an "exception to the public disclosure rule does not, however, introduce discretion into the statutory mandate" that certain documents "shall be made available.").

Indeed, under the indisputable principles of statutory construction described above, the Board and federal courts – including the Ninth Circuit – have repeatedly recognized that section 1225(b) is a mandatory detention statute.  *See Sissoko v. Rocha*, 509 F.3d 947, 949 (9th Cir. 2007) (describing "the mandatory detention provision contained in 8 U.S.C. § 1225(b)(1)(B)(iii)(IV)"); *Banton v. Morton*, 477 Fed. Appx. 929, 2012 WL 1492265 (3d Cir. April 30, 2012) (concluding that because the petitioner "is an 'arriving alien' who has been 'paroled' into the United States, his

18

detention is mandatory under the INA."); *Chen v. Aitken*, --- F. Supp. 2d ----, 2013 WL 123618, *2 (N.D. Cal. Jan. 8, 2013) (describing "mandatory detention under section 1225(b)"); *Abdi v. Napolitano*, No. C10-1722RSL, 2011 WL 1584433, *2 (W.D. Wash. Apr. 26, 2011) ("petitioner is subject to mandatory detention pursuant to 8 U.S.C. § 1225(b) pending his application for asylum").  Because the statute unambiguously mandates the detention of arriving aliens during the pendency of their removal proceedings, there is no ambiguity in the statutory language that allows this Court to construe the statute as permitting bond hearings before immigration judges.

Third, Petitioners are incorrect that the Board of Immigration Appeals concluded in *Matter of X-K-*, 23 I. & N. Dec. 731 (BIA 2005), that section 1225(b) authorizes immigration bond hearings for arriving aliens before an immigration judge. Petitioners' characterization of *Matter of X-K-* is directly contrary to the decision itself, which reiterates that "arriving aliens" (as distinguished from certain specially-designated "other aliens") are _not_ entitled to bond hearings.  After describing statutory language in section 1225(b) as "mandatory," *id.* at 734, the Board explained that unlike specially-designated aliens under the expedited removal procedures, the regulations contain "a specific statement that 'arriving aliens' who are placed in section 240 removal proceedings 'shall be detained in accordance with section 235(b) of the Act' and may only be considered for parole under 8 C.F.R. § 1212.5(b)."  *Id.* at 735.

Accordingly, Petitioners are incorrect that section 1225(b) can be construed by this Court as permitting bond hearings before immigration judges at six months or at any time, both in light of the statutory language of section 1225(b), and the possibility for release only upon the exercise of discretionary parole under section 1182(d)(5)(A). Petitioners' argument that section 1225(b) is "silent" on whether section 1225(b) allows bond hearings cannot be reconciled with the plain language of the statute mandating detention and the overall discretionary parole regime established by Congress as the only avenue for release from section 1225(b) detention.

19

1    Petitioners are also incorrect that due process requires this Court to impose a

2    bright-line, six-month rule applicable to every detainee, regardless of the individual

3    circumstances of any alien's case.  "[D]ue process, unlike some legal rules, is not a

4    technical conception with a fixed content unrelated to time, place and circumstances,"

5    *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961), but is "flexible and calls for

6    such procedural protections as the particular situation demands," *Morrissey v. Brewer*,

7    408 U.S. 471, 481 (1972).

8    *Diouf II* did not adopt a six-month rule in all immigration detention contexts,

9    and *Zadvydas* did not adopt a bright-line rule identifying the constitutional limits of

10   immigration detention at all.  First, *Diouf II* held that "serious constitutional concerns"

11   arise when "detention crosses the six-month threshold and release or removal is not

12   imminent." 634 F. 3d at 1091-92.  By contrast, *Demore* recognized that removal

13   proceedings have a "definite termination point," a key distinction.  *Demore*, 538 U.S.

14   at 529; see also *Diouf II*, 634 F.3d at 1092 n.13 (detention "prolonged" only when "it

15   has lasted six months and is expected to continue more than minimally beyond six

16   months"); *id.* at 1091 (noting that in the case before it, a constitutional concern was

17   raised because review after six months would "authorize[] detention for an additional

18   year" – for a total of eighteen months – with no bond hearing or further agency

19   review).  Should there be a case where the "definite termination point" of detention is

20   delayed by the government, the constitutionality of such detention must be considered

21   on a case-by-case basis, and not under a global and unrebuttable six-month rule that

22   not even *Diouf II* envisioned.  *See id.* at 1092 n. 13 (if "removal is imminent," no

23   hearing required after six months); see also *Zadvydas* 533 U.S. at 691-92 (same).

24   *Zadvydas* does not establish a six-month constitutional limit on detention

25   without a bond hearing.  Instead, the Supreme Court in *Zadvydas*, "for the sake of

26   uniform administration in the federal courts," *id.* at 701, held that post-order detention

27   for a period up to six months was presumptively constitutional.  However, Petitioners

28   are incorrect that *Zadvydas* stands for the principle that any detention beyond six

months raises constitutional concerns.  *Zadvydas* states the opposite:  "This 6–month

20

presumption, of course, does not mean that every alien not removed must be released after six months.  To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*   Therefore, a six-month rule applicable to all aliens detained under section 1225(b) is incompatible with due process and is not supported by any authority.

**Issue No. 2:**      **The detention of serious criminal aliens without bond during the pendency of their removal proceedings is statutorily authorized and does not violate due process**

| Material Fact | Petitioners' Response | Respondents' Reply |
|---|---|---|
| During the relevant period of this action, a number of certain criminal aliens are or have been detained within the Central District of California for a continuous period of more than six months pending removal proceedings under the detention authority of 8 U.S.C. § 1226(c).<br><br>*See* Respondents' Notice of Non-Opposition to Petitioners' Motion for Class Certification at 2-3 [ECF No. 122] | Not disputed, except to the extent that Petitioners do not concede that Section 1226(c) actually authorizes the detention of such individuals without a bond hearing as sought in Petitioners' Motion for Summary Judgment. | This material fact is undisputed.  Petitioners' response does not go to the statement of fact, but is instead an argument over the statutory construction of section 1226(c), which is a matter of law. |
| A large number of the studied class members representing a selection of detainees between April 2010 and April 2011 – 86.9% – requested at least one continuance, and over | Disputed. The evidence on which Respondents rely is not sufficiently reliable to support this factual assertion, and it must be disregarded on this basis. *See* Dkt 281-6, Exh. B at 4-7; Long Decl. ¶¶ 4-13. Moreover, resolution of this | There is no dispute over the facts.  Petitioners' do not dispute the actual statistical analysis Dr. Palmer provided showing that large numbers of studied class members request continuances, |

half of them requested three or more continuances during their removal proceedings.  If the analysis is limited just to the first six months of the studied aliens' detention, the data shows that 84.7% of aliens request a continuance during the first six months of their custody, and nearly two-thirds of those aliens – 66.2% – requested two or more continuances within the first six months of their custody.

See Exhibits O to the Declaration of Theodore W. Atkinson (Chester I. Palmer Deposition Excerpts); Exhibit P to the Declaration of Theodore W. Atkinson (Palmer Expert Report at 2, 10-11); Declaration of Benjamin B. McDowell

disputed fact would not entitle Respondents to judgment (or justify denial of judgment to Petitioners) because the percentage of studied class members who requested continuances is not "material" to Petitioners' statutory and constitutional claims to a bond hearing. See Reply Br. Section II.C. If an immigration judge believes that a detainee is acting to unreasonably delay his or her proceedings through requests for continuances, the judge can address such concerns at the bond hearing.

including multiple continuances during the first six months of their detention, as stated in his report and in Respondents' statement of material facts. Petitioners' only attack on Dr. Palmer's analysis is to assert that the database information on which he relied is unreliable.  This is incorrect.  The "Schedule Data Table" on which Dr. Palmer relied is the best evidence of continuances sought by aliens, because immigration court personnel input data into that table showing (1) when a hearing has been "adjourned," or continued, and (2) the reasons for the adjournment, as represented by a code selected by court personnel.

Petitioners' contention that the "Schedule Data Table" is unreliable is based on their pointing to the "Actions Data Table," which they incorrectly assert must reflect every adjournment in the same manner as reflected in the "Schedule Data Table." Petitioners' argument is a red herring.  As explained

22

by Ben McDowell, the EOIR employee familiar with the EOIR database, the "Actions Data Table" is an auditing table that reflects when information is inputted into the database, but it is not necessarily a mirror reflection of the same information contained in the "Schedule Data Table."

Petitioners also argue that the declaration of Ben McDowell must be disregarded because it is new information not obtained in discovery. This is incorrect. McDowell was deposed at length by Petitioners in 2011, he submitted declarations discussing the database reliability in support of Respondents' preliminary injunction opposition, and he supplied a declaration after the deposition of Dr. Palmer to show thatPetitioners are simply incorrect that the "Schedule Data Table" is incorrect, and Petitioners were invited to depose McDowell on that declaration. Petitioners declined.

Petitioners' contention that the undisputed statistical analysis made by Dr. Palmer is not material to the statutory and constitutional issues in this case is legal argument, but in any event, it is incorrect. Courts have repeatedly recognized that whether an alien has contributed to the length of prolonged detention is a fact that must be considered in determining whether the continued detention of a detainee, without a bond hearing, comports with due process. Thus, contrary to Petitioners' arguments, whether an alien has contributed to the length of his or her detention is a fact that materially weighs on a determination of whether the alien's continued detention without a bond hearing is constitutional.

Finally, Petitioners' argument that an immigration judge may consider the effect of continuances at a bond hearing is a *legal* argument that does not challenge the factual assertion at issue. In any event, Petitioners' argument is both an

| | | incorrect statement of the regulatory authority of immigration judges and a misunderstanding of the role of federal courts in determining the core constitutional issue of whether an alien's detention without bond comports with due process. |
|---|---|---|
| An alien's request for multiple continuances has the effect of delaying proceedings significantly.  In analyzing the length of delays caused by continuances in just the first six months of detention, Dr. Palmer determined that for aliens requesting at least one continuance during the first 180 days of their detention, the total resulting delay varied between 6 days to 269 days.  For the 84.7% of aliens who sought at least one continuance during their first 180 days of detention, the average delay attributable to those continuances accounted for over half of the 180 days.

*See* Exhibits O to the Declaration of Theodore W. Atkinson | Disputed. Dr. Palmer's report did not examine the potential causes for the length of individual continuances. Dkt. 283 Exh. D at 72:24-75:24, 80:22-81:24. As result, as Dr. Palmer conceded, his analysis does not establish that the length of any particular delay is the "result" of a class member's request. *Id.* In addition, Dr. Palmer testified that his review of the continuance data suggests that immigration judges' schedules are primarily responsible for the length of continuances. Dkt. 283 Exh. D at 79:25-80:6. The evidence on which Respondents rely also is not sufficiently reliable to support this factual assertion, and it must be disregarded on this basis.  *See* Dkt 281-6, Exh. B at 4-7; Long Decl. ¶¶ 4-13. Moreover, resolution of this disputed fact would not | There is no dispute over the facts.  Petitioners' do not dispute the actual statistical analysis Dr. Palmer provided showing that for the 84.7% of aliens who sought at least one continuance during their first 180 days of detention, the average delay attributable to those continuances accounted for over half of the 180 days, as stated in his report and in Respondents' statement of material facts.

Petitioners assert that the length of time between a continued hearing date and the next hearing date is not the result of a detainee's request, but is tied solely to the judge's schedule.  This assertion is unsupported by any evidence, but only supposition (*see* Petitioners' Response, citing Dr. Palmer's |

| | | |
|---|---|---|
| (Chester I. Palmer Deposition Excerpts); Exhibit P to the Declaration of Theodore W. Atkinson (Palmer Expert Report at 2, 11-13); Declaration of Benjamin B. McDowell | entitle Respondents to judgment (or justify denial of judgment to Plaintiffs) because the percentage of studied class members who requested continuances, and the length of any "delay" that "resulted" from such continuances, is not "material" to Petitioners' statutory and constitutional claims to a bond hearing. *See* Reply Br. Section II.C. If an immigration judge believes that a detainee is acting to unreasonably delay his or her proceedings through requests for continuances, the judge can address such concerns at the bond hearing. | deposition, Dkt. 283 Exh. D at 79:25-80:6. Indeed, this assertion is directly contradicted by the testimony of Judge Thomas Y.K. Fong, who testified that immigration judges provide aliens in removal proceedings with the time that they request or need for the continuance (*e.g.*, to find counsel, to prepare for a merits hearing, etc.). *See* Atkinson Decl., Exh C thereto (Fong Deposition at 38:9-38:20).<br><br>Petitioners also attack Dr. Palmer's analysis is to assert that the database information on which he relied is unreliable. This is incorrect. The "Schedule Data Table" on which Dr. Palmer relied is the best evidence of continuances sought by aliens, because immigration court personnel input data into that table showing (1) when a hearing has been "adjourned," or continued, and (2) the reasons for the adjournment, as represented by a code selected by court personnel. |

Petitioners' contention that the "Schedule Data Table" is unreliableis based on their pointing to the "Actions Data Table," which they incorrectly assert must reflect every adjournment in the same manner as reflected in the "Schedule Data Table." Petitioners' argument is a red herring.  As explained by Ben McDowell, the EOIR employee familiar with the EOIR database, the "Actions Data Table" is an auditing table that reflects when information is inputted into the database, but it is not necessarily a mirror reflection of the same information contained in the "Schedule Data Table."

Petitioners also argue that the declaration of Ben McDowell must be disregarded because it is new information not obtained in discovery. This is incorrect. McDowell was deposed at length by Petitioners in 2011, he submitted declarations discussing the database reliability in support of Respondents' preliminary injunction opposition, and he supplied a declaration

after the deposition of Dr. Palmer to show that Petitioners are simply incorrect that the "Schedule Data Table" is incorrect, and Petitioners were invited to depose McDowell on that declaration. Petitioners declined. *See* April 26, 2013 Declaration of Sarah S. Wilson, ¶¶ 6-8.

Petitioners' contention that the undisputed statistical analysis made by Dr. Palmer is not material to the statutory and constitutional issues in this case is legal argument, but in any event, it is incorrect. Courts have repeatedly recognized that whether an alien has contributed to the length of prolonged detention is a fact that must be considered in determining whether the continued detention of a detainee, without a bond hearing, comports with due process. Thus, contrary to Petitioners' arguments, whether an alien has contributed to the length of his or her detention is a fact that materially weighs on a determination of whether the alien's continued detention without a bond

|  |  | hearing is constitutional.

Finally, Petitioners' argument that an immigration judge may consider the effect of continuances at a bond hearing is a *legal* argument that does not challenge the factual assertion at issue. In any event, Petitioners' argument is both an incorrect statement of the regulatory authority of immigration judges and a misunderstanding of the role of federal courts in determining the core constitutional issue of whether an alien's detention without bond comports with due process. |
|---|---|---|

**Conclusions of law:**

8 U.S.C. § 1226(c) mandates the detention of certain serious criminal aliens during the pendency of their removal proceedings. The Supreme Court in *Demore v. Kim*, 538 U.S. 510 (2003), upheld the constitutionality of detention without bond for certain criminal aliens detained under 8 U.S.C. § 1226(c). In holding the detention of such aliens constitutional, the Supreme Court reasoned that such detention was constitutional and comported with due process because it lasted only during the pendency of removal proceedings, which have a definite termination point, because such detention furthered the statutory purpose of addressing serious concerns on the part of Congress that such criminal aliens, in large numbers, failed to appear for removal proceedings when released on bond or, worse, committed additional crimes.

1    *Demore*, 538 U.S. at 524-25, 527-28.  For this reason, the Supreme Court concluded

2    that such aliens could be detained during the pendency of their removal proceedings,

3    on a class wide basis, and without individualized determinations of flight risk or

4    danger.  *Id.*

5        Moreover, a large number of aliens seek continuances that significantly

6    lengthen their removal proceedings, and thus their detention.  Courts have consistently

7    recognized that an inflexible one-size-fits-all rule that detention raises constitutional

8    concerns at a predetermined temporal benchmark does not comport with due process,

9    which "is flexible and calls for such procedural protections as the particular situation

10   demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *Pedro v. Oregon Parole*

11   *Bd.*, 825 F.2d 1396, 1398 (9th Cir. 1987) (citing *Greenholtz v. Inmates of Nebraska*

12   *Penal & Correctional Complex*, 442 U.S. 1 (1979)) (same).  *See also*, *Demore,* 538

13   U.S. at 530 n.14 ("Prior to the enactment of § 1226(c), when the vast majority of

14   deportable criminal aliens were not detained during their deportation proceedings,

15   many filed frivolous appeals in order to delay their deportation."); *Ly v. Hansen*, 351

16   F.3d 263, 271-73 (6th Cir. 2003) (rejecting a six-month rule, concluding that

17   "[a]bright-line time limitation . . . would not be appropriate for the pre-removal

18   period" because "an easily administrable bright-line rule cannot be based on time,

19   given the inevitable elasticity of the pre-removal period"); *Diop v. ICE/Homeland*

20   *Security*, 656 F.3d 221, 234 (3d Cir. 2012) (declining "to adopt such a one-size-fits-all

21   approach" because the constitutionality of detention under section 1226(c) "is a fact-

22   dependent inquiry requiring an assessment of all of the circumstances of any given

23   case."); *Alli v. Decker*, 644 F. Supp. 2d 535, 542-43 (M.D. Pa. 2010), *reversed and*

24   *remanded on other grounds*, 650 F.3d 1007 (3d Cir. 2011); *see also Flores-Powell v.*

25   *Chadbourne*, 677 F. Supp. 2d 455 (D. Mass. 2010) (citing the Sixth Circuit's rejection

26   of a bright-line rule based solely on length of detention).  Thus, Petitioners' request

27   for an order that aliens detained under section 1226(c) receive a bond hearing after

28

180 days of detention, without regard to the individual facts and circumstances of their cases, is not required by due process.

Accordingly, the detention of certain criminal aliens enumerated in section 1226(c)(1)(A) through (D) during the pendency of their removal proceedings, without a bond hearing before an immigration judge, is statutorily authorized and consistent with due process.

**Petitioners' Response:**

Respondents ignore several binding Ninth Circuit cases regarding prolonged detention under Section 1226(c) and, in so doing, mis-state the law governing Section 1226(c) detention.  On three separate occasions in recent years, the Ninth Circuit has unambiguously held that Section 1226(c) must be construed in light of the serious constitutional concerns presented by prolonged detention in the absence of a constitutionally-adequate bond hearing. *See Tijani v. Willis*, 430 F.3d 1241, 1242 (9th Cir. 2005) ("we interpret the authority conferred by § 1226(c) as applying to expedited removal of criminal aliens"); *Casas-Castrillon v. DHS*, 535 F.3d 942, 951 (9th Cir. 2008) (holding that "prolonged detention [under Section 1226(c)] of an alien without an individualized determination of his dangerousness or flight risk would be 'constitutionally doubtful,'" and therefore construing detention statutes "as requiring the Attorney General to provide the alien with such a hearing"); *V. Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) (holding that Government must bear burden of proof by clear and convincing evidence at *Casas* hearing for individual formerly subject to Section 1226(c)).  In so holding, the Ninth Circuit has consistently rejected the Government's reading that *Demore* authorizes unlimited prolonged detention during removal proceedings. *See, e.g.*, *Casas*, 535 F.3d at 949 ("References to the brevity of mandatory detention under § 1226(c) run throughout *Demore*."); *Tijani*, 430 F.3d at 1242 (distinguishing *Demore* for detainee whose proceedings were not "expeditious" and who contested deportability). As such, as the Ninth Circuit and this Court have recognized, Section 1226(c) can – and must –

31

be construed in a manner that affords class members access to a constitutionally adequate bond hearing in light of their prolonged detentions.

Respondents' argument that due process does not permit bright-line rules in this context is obviously incorrect, as the Ninth Circuit in *Diouf II* adopted the precise six-month rule that Petitioners seek here with respect to certain class members detained under Section 1231(a). *Diouf II*, 634 F.3d at 1091. Further, in *Zadvydas*, Supreme Court adopted a similar six-month rule in a closely-related context, expressly relying on a long line of Supreme Court cases establishing similar time-based rules on constitutional grounds. *Zadvydas*, 533 U.S. at 701 (collecting cases). Respondents' unsupported assertion that "a large number of aliens seek continuances that significantly lengthen their removal proceedings" is incorrect, insofar as many class members request continuances for legitimate reasons, including to comply with Respondents' own procedures for applying for relief in immigration court. In any event, individual factors that bear on fitness for release – such as whether a detainee has taken unnecessary continuances – are appropriately addressed by immigration judges at bond hearings, but do not defeat Petitioners' basic claim that class members are entitled to bond hearings at which all the relevant factors should be considered.

**Respondents' Reply:**

Contrary to Petitioners' argument, the Ninth Circuit has not addressed the issue of whether section 1226(c) detention during the pendency of pre-order removal proceedings raises constitutional concerns after six months' detention. None of the cases cited by Petitioners in their response above stand for the proposition that all criminal aliens in pre-order removal proceedings are entitled to bond hearings once their detention exceeds a pre-determined length.

First, *Casas-Castrillon v. DHS*, 535 F.3d 942 (9th Cir. 2008), is limited to those aliens who seek judicial review of their removal orders, and is not applicable to the section 1226(c) subclass members not seeking judicial review. The Ninth Circuit emphasized that its holding in that case was limited to determining whether "legal

permanent residents like Casas, who have been subjected to prolonged detention *pending judicial review of their final order of removal or agency reconsideration on remand* may continue to be detained" without a bond hearing. *Casas-Castrillon*, 535 F.3d at 950 (emphasis added).

Ultimately, *Casas-Castrillon* construed a different statute – 8 U.S.C. § 1226(a) – to require bond hearings. Section 1226(a) is a discretionary statute that expressly provides for release on bond or other conditions, and therefore does not provide guidance in interpreting section 1226(c) mandatory detention "of deportable criminal aliens pending their removal proceedings." Demore v. Kim, 538 U.S. 510, 526 (2003) (emphasis in original). In *Casas-Castrillon*, the Ninth Circuit had greater flexibility in interpreting the discretionary section 1226(a) provisions in the post-order context of *Casas-Castrillon* than this Court has in interpreting Section 1226(c), which mandates detention in a pre-order context.

Although the Ninth Circuit rejected "the government's suggestion that section 1226(c) mandated Casas' detention for the duration of his now seven-year confinement . . . §1226(c) applies only to the 'expedited removal of criminal aliens,'" *Casas-Castrillon*, 535 F.3d at 947-48 (citing *Tijani v. Willis*, 430 F.3d 1241, 1242 (9th Cir. 2005)), concerns about a single individual's "seven-year confinement" – which is not before this court – cannot support the district court's class action ruling requiring a bond hearing for every individual after just six months. Petitioners ignore other language in the decision emphasizing the separate but related points that the *Demore* Court recognized that section 1226(c) governs detention of criminal aliens pending their removal proceedings.

The Ninth Circuit has reiterated the limited reach of *Casas-Castrillon* in later decisions. *See, e.g.*, *Diouf v. Mukasey*, 542 F.3d 1222, 1234 (9th Cir. 2009) (describing Casas-Castrillon as a "limited holding" applying to the question of "whether § 1226(a) . . . subject[s] lawful permanent residents to prolonged [mandatory] detention pending judicial review of a final order of removal") (emphasis added); *Diouf v. Napolitano* ("Diouf II"), 634 F.3d 1081, 1084 (describing *Casas-*

33

*Castrillon* as "address[ing] the prolonged detention of aliens under § 1226(a) while

seeking direct judicial review of their administratively final orders of removal"); *V.*

*Singh v. Holder*, 638 F.3d 1196, 1200 (9th Cir. 2011) (describing *Casas-Castrillon* as

holding that "aliens facing prolonged detention while their petitions for review of their

removal orders are pending are entitled to a bond hearing").

      Nor do *Tijani v. Willis*, 430 F.3d 1241 (9th Cir. 2005), or *V. Singh v. Holder*,

638 F.3d 1196 (9th Cir. 2011), address prolonged detention under section 1226(c) in a

pre-order context. Although *Tijani* purports to address prolonged section 1226(c)

detention, the alien in *Tijani* had received a final order of removal at the time of the

decision, and thus would be covered by *Casas-Castrillon* now. Thus, *Tijani* did not

consider the circumstances of the section 1226(c) subclass members in pre-order

proceedings. *V. Singh* is entirely inapposite because it considered the requirements of

*Casas* hearings, not the constitutionality of prolonged detention.

      Petitioners are also incorrect that due process requires this Court to impose a

bright-line, six-month rule applicable to every detainee, regardless of the individual

circumstances of any alien's case. "[D]ue process, unlike some legal rules, is not a

technical conception with a fixed content unrelated to time, place and circumstances,"

*Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961), but is "flexible and calls for

such procedural protections as the particular situation demands," *Morrissey v. Brewer*,

408 U.S. 471, 481 (1972).

      *Diouf II* did not adopt a six-month rule in all immigration detention contexts,

and *Zadvydas* did not adopt a bright-line rule identifying the constitutional limits of

immigration detention at all. First, *Diouf II* held that "serious constitutional concerns"

arise when "detention crosses the six-month threshold and release or removal is not

imminent." 634 F. 3d at 1091-92. By contrast, *Demore* recognized that removal

proceedings have a "definite termination point," a key distinction. *Demore*, 538 U.S.

at 529; see also *Diouf II*, 634 F.3d at 1092 n.13 (detention "prolonged" only when "it

has lasted six months and is expected to continue more than minimally beyond six

months"); *id.* at 1091 (noting that in the case before it, a constitutional concern was

34

1    raised because review after six months would "authorize[] detention for an additional

2    year" – for a total of eighteen months – with no bond hearing or further agency

3    review).  Should there be a case where the "definite termination point" of detention is

4    delayed by the government, the constitutionality of such detention must be considered

5    on a case-by-case basis, and not under a global and unrebuttable six-month rule that

6    not even *Diouf II* envisioned.  *See id*. at 1092 n. 13 (if "removal is imminent," no

7    hearing required after six months); see also *Zadvydas* 533 U.S. at 691-92 (same).

8        *Zadvydas* does not establish a six-month constitutional limit on detention

9    without a bond hearing.  Instead, the Supreme Court in *Zadvydas*, "for the sake of

10   uniform administration in the federal courts," *id*. at 701, held that post-order detention

11   for a period up to six months was presumptively constitutional.  However, Petitioners

12   are incorrect that *Zadvydas* stands for the principle that any detention beyond six

13   months raises constitutional concerns.  *Zadvydas* states the opposite:  "This 6–month

14   presumption, of course, does not mean that every alien not removed must be released

15   after six months.  To the contrary, an alien may be held in confinement until it has

16   been determined that there is no significant likelihood of removal in the reasonably

17   foreseeable future."  *Id.*  Therefore, a six-month rule applicable to all aliens detained

18   under section 1226(c) is incompatible with due process and is not supported by any

19   authority.

20   **Issue No. 3:          Due process does not require the modifications to *Casas***
                  **hearings sought by Petitioners**

21

| Material Fact | Petitioners' Response | Respondents' Reply |
|---|---|---|
| ISAP II is designed for aliens who are detained under section 1226(a), and who pose relatively low-level risks of flight or danger.  Unlike the types of serious offenses that place an alien within one of the section 1226(c) categories, ISAP II is used | Disputed. Respondents' cited evidence does not support the asserted fact. Mr. Saldana testified that, among the types of crimes that are committed by people *who are released on ISAP II*, "it's more common for us to see lower-range crimes." Dkt. | There remains a dispute over whether ISAP II is an alternative to detention designed and appropriate for (1) serious criminal aliens, and (2) arriving aliens without a sponsor, and thus without a residence. |

| | | |
|---|---|---|
| in cases where the types of offenses an alien has committed are, as Assistant Field Office Director Eric Saldana described them, "lower-range crimes," such as driving without a license, drunk in public, and other relatively non-serious offenses.<br><br>*See,* Exh. K to the Declaration of Theodore W. Atkinson (ISAP II Participant's Handbook); Exhibit B to the Declaration of Theodore W. Atkinson (Deposition of Eric G. Saldana), at 118:21-119:8 | 283 Exh. F at 118:21-119:8. The testimony cited by Respondents does not in any way suggest that ISAP II is designed for noncitizens detained under Section 1226(a), or with any particular type of criminal history. Likewise, the ISAP II Participant's Handbook does not anywhere suggest that the program is limited to people detained under Section 1226(a). The Handbook provides an introduction to the ISAP II program for participants, and does not discuss for whom the program was designed.<br><br>Contrary to Respondents' position, immigration judges have ordered certain individuals who had been subject to detention under Section 1226(c) released on ISAP II, including class members who received bond hearings under this Court's preliminary | In his testimony, Assistant Field Office Director Eric G. Saldana testified[2] that in his office's experience, the types of crimes committed by aliens placed on ISAP II were low-level crimes. But Petitioners overlook another, more basic fact: because ICE cannot place anyone subject to mandatory detention under section 1226(c) into ISAP II or provide such aliens with any conditions of release, ISAP II is inherently not intended to be used with aliens who have committed serious criminal offenses. Thus, to the extent Petitioners assert ISAP II is entirely appropriate as an alternative to detention for such aliens, that assertion is necessarily based on speculation.<br><br>Indeed, Petitioners provide no evidence that |

[2] Respondents inadvertently filed incorrect pages with the depositions of Wesley Lee, which was Exhibit A to the March 15, 2013 Declaration of Theodore W. Atkinson. Respondents also inadvertently filed incorrect pages with the deposition of Eric Saldana, which was Exhibit B to the March 15, 2013 Declaration of Theodore W. Atkinson. To correct these errors, Respondents contemporaneously file replacement, corrected copies of Exhibits A and B with the Supplemental Declaration of Theodore W. Atkinson.

injunction order. *See* Declaration of Michael Kaufman of April 5, 2015 Ex. C.

In addition, individuals detained under Section 1226(c) during removal proceedings have been treated as detained under Section 1226(a) – and therefore eligible for release on ISAP – since the *Casas* decision in 2008. *Casas-Castrillon v. DHS*, 535 F.3d 942, 951 (9th Cir. 2008).

Moreover, resolution of this disputed fact would not entitle Respondents to judgment because whether ISAP II was designed for people with certain criminal history levels is not "material" to Petitioners' statutory and constitutional claims to an adequate bond hearing where judges can *consider* whether to release class members on ISAP. First, many class members do not have criminal histories more serious than people detained under Section 1226(a) -- including but not limited to members of the Section 1226(a) Subclass -- and Respondents have provided no evidence that

prior to the entry of the preliminary injunction, any alien treated as a section 1226(a) detainee at a *Casas* hearing has been placed into ISAP II by an immigration judge. Until the preliminary injunction in this action, immigration judges did not order ISAP II as an alternative to detention. Although immigration judges are delegated authority to review and "ameliorate" conditions set by DHS, they are not delegated the authority to "impose" conditions in the first instance, including alternatives to detention. Compare 8 C.F.R. § 236.1(c)(8) (officers who can issue warrants of arrest can impose conditions under section 1226(a)(2) and (3), see also 8 C.F.R. § 236.1(b), 287.5(e)(3)) with 8 C.F.R. § 236.1(d)(1) (immigration judges can detain, release, determine bond, and ameliorate the conditions set initially by DHS if the request is made within 7 days).

Thus, there is no evidence to support Petitioners' assertion that immigration judges have

37

| | ISAP II is inappropriate for these individuals. Second, immigration judges can assess any concerns about an individual's fitness for release on ISAP II at a bond hearing. | authority apart from the preliminary injunction in this action, which is currently on appeal, to order detainees into ISAP II, nor do they have any evidence to refute the fact that, apart from the few instances under this Court's injunction, ISAP II is not used for serious criminal aliens. |
|---|---|---|
| ISAP II is not designed to work with aliens who have no place of residence or reliable identification, which is the reason most arriving aliens are denied parole.<br><br>*See*, Exh. K to the Declaration of Theodore W. Atkinson (ISAP II Participant's Handbook); Exhibit A to the Declaration of Theodore W. Atkinson (Deposition of Wesley J. Lee), at 36:25-37:11; 123:2-123:15; 134:24-136:17; Exhibit B to the Declaration of Theodore W. Atkinson (Deposition of Eric G. Saldana), at 107:8-107:18; 120-1-124:16 | Disputed. Respondents' cited evidence does not support that "the reason most arriving aliens are denied parole" is lack of residence or reliable identification.<br><br>Mr. Lee's testimony concerns the current parole process and standards for release. Mr. Saldana's testimony generally describes the ISAP II program. Neither deponents' testimony discusses residence or identification requirements for the ISAP II program. Moreover, resolution of this disputed fact would not entitle Respondents to judgment because whether certain "arriving aliens" are denied release based on lack of identification or residence is not "material" to Petitioners' statutory and constitutional claims to an adequate bond | This fact remains in dispute. Petitioners do not dispute that ISAP II uses unscheduled home visits as part of its program, at all levels of ISAP II. *See* Exh. K to the Declaration of Theodore W. Atkinson (ISAP II Participant's Handbook).<br><br>The testimony of Assistant Field Office DirectorWesley J. Lee and the Participant's Handbook cited by Respondents show (1) that ISAP II uses unscheduled home visits at each stage of the ISAP II program, *see* ISAP II Participant's Handbook, and (2) that arriving aliens denied parole are often denied parole because they lack a sponsor, and thus they lack a residence at which such unannounced home |

| | | |
|---|---|---|
| | hearing.<br><br>Immigration judges can assess any concerns about an individual's fitness for release on ISAP II at a bond hearing. | visits could occur, *see* Atkinson Decl., Exh. A Lee Dep. 36:25-37:11; 123:2-123:15; 134:24-136:17 (cited at ECF No. 299 p. 48), and (2).<br><br>For the same reasons cited above, Petitioners are incorrect that an immigration judge has the authority to "assess any concerns about an individual's fitness for release on ISAP II at a bond hearing." Although immigration judges are delegated authority to review and "ameliorate" conditions set by DHS, they are not delegated the authority to "impose" conditions in the first instance, including alternatives to detention. Compare 8 C.F.R. § 236.1(c)(8) (officers who can issue warrants of arrest can impose conditions under section 1226(a)(2) and (3), see also 8 C.F.R. § 236.1(b), 287.5(e)(3)) with 8 C.F.R. § 236.1(d)(1) (immigration judges can detain, release, determine bond, and ameliorate the conditions set initially by DHS if the request is made within 7 days). |
| Once ICE determines that an alien is subject to | Disputed. Respondents' cited evidence does not | This fact is not in dispute. |

discretionary detention under section 1226(a), the alien receives a written Notice of Custody Determination indicating that the alien is entitled to seek a custody redetermination before an immigration judge.  This document provides straightforward notice, in plain language, that the alien is entitled to a bond hearing before an immigration judge ("You may request a review of this determination by an immigration judge").

See, Exh. D to the Declaration of Theodore W. Atkinson (Notices of Custody Determination)

establish the asserted fact. Respondents have simply attached a notice of custody determination, which does not establish whether, when, or how consistently this notice is provided to detainees in the class.

Moreover, the text of the notice demonstrates that it is not straightforward and may be confusing for many class members. The notice does not explain the term "review" or how to "request" such review by an individual judge, and nowhere uses the words "bond" or "bail." Substantial numbers of class members do not read or understand English, and are unfamiliar with legal proceedings and immigration law. Dkt. 281-7 ¶¶ 10-14, 19; Dkt. 281-1 ¶12. For such individuals, the notice of custody determination does not provide sufficiently clear and straightforward notice of a detainee's right to request a bond hearing. Moreover, resolution of this disputed fact would not entitle Respondents to judgment because the notice provided to Section 1226(a) Subclass members at the outset of their

Petitioners respond by contending that the sample Notice of Custody determination does not show whether, when, or how consistently this notice is provided to section 1226(a) detainees. Notably, Petitioners do not *dispute* the assertion of fact, but note that it is "unsupported."

However, Petitioners know from a review of the A-Files of the studied class members that the established practice is to provide this written Notice to the alien at the time of the initial custody determination.  Indeed, the Petitioners have taken the position throughout this case that the Notice provided to aliens informing them of the initial custody determination –the form Respondents provided a sample of as Exhibit D – does not inform aliens that they are entitled to a *Joseph* hearing.  [*See* ECF No. 283].  Thus, Petitioners cannot credibly dispute that such notices are, as a matter of practice, provided to aliens at the time the initial custody determination is made.

| | | |
|---|---|---|
| | detention is not "material" to Petitioners' statutory and constitutional claims to an adequate bond hearing after six months of detention. | Petitioners concede that the Notice provided to section 1226(a) and section 1226(c) aliens, if detained, at the time of the initial custody determination, contains the language cited.<br><br>Petitioners' characterization on the understandability of the undisputed language is based on two declarations, the Declarations of Bryan Merida and Stacey Tolchin.  Respondents have objected to and moved to strike those declarations (1) because they were not timely disclosed until after the close of discovery[3]; (2) those declarations rely on inadmissible hearsay. Moreover, the Merida Declaration fails to establish in any way Merida's ability to evaluate the legal comprehension levels of other detainees at his detention facility. |

---

[3] Petitioners' counsel now concedes that they were aware of Merida on October 16, 2012, more than two months before close of discovery.  Kaufman Declaration, ECF No. 319 ¶ 10.  Despite that, they did not disclose him until February 1, 2013 – almost two months after the close of discovery.  ECF No. 306, Exh. A at 4.

| | | |
|---|---|---|
| Once an alien becomes eligible for a *Casas* or *Diouf* hearing, and if ICE does not release the alien once the alien becomes eligible, ICE provides the detainee with a written notice that they are entitled to seek a bond hearing before an immigration judge.  This document provides straightforward notice, in plain language, that the alien is entitled to a bond hearing before an immigration judge ("Pursuant to the above-named Ninth Circuit decisions, you may request a review of this determination from an immigration judge")<br><br>*See*, Exh. L to the Declaration of Theodore W. Atkinson (sample *Casas/Diouf* Letters provided by ICE). | Disputed. Respondents' cited evidence does not establish the asserted fact. Respondents have simply attached the text of the letters they send to individuals whose detention is governed by *Casas* or *Diouf II*. These letters in fact demonstrate that they are not straightforward and may be confusing for many class members. The notice does not explain the term "review" or how to "request" such review by an immigration judge. The letter does not use the word "bail" or "bond." Further, the letter provides a citation to the Immigration Court Manual, but the Manual itself is written in highly technical legalese and is only available in the detention center libraries, to which detainees have extremely limited access. Dkt. 281-1 ¶¶13-21. Substantial numbers of class members do not read or understand English, and are unfamiliar with legal proceedings and immigration law. Dkt. 281-7 ¶¶ 10-14, 19; Dkt. 281-1 ¶12. For such individuals, the letter does not provide sufficiently | |

42

| | clear and straightforward notice of a detainee's right to request a *Casas/Diouf* bond hearing. | |
| --- | --- | --- |

**Conclusions of law:**

Petitioners claim two categories of modifications must be made to *Casas* hearings to make them constitutionally adequate: (1) immigration judges must be required to consider the alien's ultimate removability, the length of an alien's past and future detention, and alternatives to detention; and (2) Respondents should be required to provide constitutionally adequate notice of hearings, or provide automatic immigration hearings, under a heightened standard, every six months.

First, Petitioners' claim that immigration judges must consider an alien's ultimate removability is an untimely amendment to the Complaint. In any event, such a requirement is not compelled by due process. Such a requirement would create a conflict in the standards of burden between *Casas* hearings and that established in *Zadvydas*. Such a requirement would also pose enormous practical problems that cannot be overcome, because it would require judges to make determinations on ultimate removability that cannot be determined until an alien has been ordered removed and travel documents are sought. It would also require immigration judges, at a relatively early stage of removal proceedings, to predetermine whether an alien is ultimately removable, a determination that cannot be made until ICE has begun efforts to remove the alien after a final order is entered.

Second, if the length of past and future detention has any bearing, it only has a bearing on whether continued detention comports with due process, not flight risk and danger, which is the proper area of inquiry at an immigration bond hearing. 8 C.F.R. § 236.1(d)(1); *see Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006).

Third, due process does not require immigration judges to consider alternatives to detention at a bond hearing. The available alternative to detention, ISAP II, is not a practical alternative to detention for arriving aliens or serious criminal aliens because

43

ISAP II was designed for low-risk offenders and for individuals with an established residence.  Moreover, immigration judges have limited jurisdiction that precludes ordering an alternative to detention.  An immigration judge's authority occurs after the initial custody determination by DHS.  8 C.F.R. § 1236.1(d)(1).  While 8 C.F.R. § 1236.1(c)(8) provides that an officer authorized to issue a warrant of arrest may release an alien not subject to mandatory detention under section 1226(a)(2) and (3), 8 C.F.R. §1236.1(d) provides that an immigration judge may ameliorate the conditions of release set by DHS.  Nowhere do the regulations governing custody determinations provide for the immigration judge to set initial conditions of release as opposed to reviewing or modifying conditions already set by DHS.   "[T]he jurisdiction of the Board and the Immigration Judge is limited by statute and regulation to that which has been delegated by the Attorney General."  *Matter of G-K-,* 26 I. & N. Dec. 88, 93 (BIA 2013) (citing cases).

Due process also does not compel a modified notice of the right to request hearings or automatic, periodic bond hearings every six months.  First, the notice provided by ICE to aliens informing them of their right to seek a bond hearing before an immigration judge is constitutionally adequate because it informs aliens, in plain language, that they may request a bond hearing before an immigration judge.  Second, Petitioners' claim for periodic bond hearings every six months constitutes an untimely amendment to the Complaint.  *See Apache Survival Coalition v. United States,* 21 F.3d 895, 910 (9th Cir. 1994).  In any event, periodic hearings are not required by due process.  If an alien is provided with the opportunity to seek a bond hearing, or has a bond hearing, then due process has been satisfied with respect to a determination of flight risk and danger.  Nothing in due process requires Respondents to provide additional bond hearings after a bond hearing was available or provided, but bond was denied.  *Prieto-Romero*, 534 F.3d 534 F.3d 1053, 1065-66 (9th Cir. 2008).

**Petitioners' Response:**

Respondents mis-state the law regarding the procedures that should govern at prolonged detention bond hearings. As an initial matter, Respondents erroneously contend that certain of the relief Petitioners seek constitutes an untimely amendment to the complaint. The procedures sought are forms of equitable relief, not freestanding claims, and the Ninth Circuit has repeatedly held that a party need only plead claims, not every form of relief. *See, e.g.*, *Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075, 1082 (9th Cir. 2005). But if these were new claims, Petitioners would have more than satisfied the notice pleading standard because the complaint makes plain that Petitioners seek to ensure "adequate process" for immigrants subjected to prolonged detentions, and identifies as examples of injured class members persons held despite the unlikelihood of removal due to a credible asylum claim, or held for years after an initial bond hearing. Dkt. 111 ¶¶ 1, 13, 17, 36, 42, 45-52, 73-75, 103, 116, 118, 125, 127. Regardless, Respondents have not satisfied their burden of demonstrating prejudice. These issues raise questions of law; no additional discovery is necessary. *Farnan v. Capistrano Unified School Dist.*, 654 F.3d 975, 984-85 (9th Cir. 2011) (permitting amendment after scheduling order deadline because issue was "a question of law" and could be decided "based on the factual record already developed") (quoting district court decision with approval).

With respect to the consideration of removability, the Ninth Circuit has held that the Government is required to release noncitizens *while their cases are pending*, so long as their removal would not be significantly likely upon the conclusion of their removal case. *See Owino v. Napolitano*, 575 F.3d 952, 955 (9th Cir. 2009). Respondents offer no rationale for preventing Immigration Judges from enforcing that rule, who are equally – if not better – positioned than district courts sitting in habeas to address the purported "practical concerns" raised by Respondents.

With respect to consideration of the length of past and future detention, the Ninth Circuit has acknowledged that, as past or anticipated future detention length increases, so does the extent of the deprivation of a noncitizen's liberty. *See Diouf II*,

634 F.3d 1091 ("When the period of detention becomes prolonged, 'the private interest that will be affected by the official action' . . . is more substantial.") (quoting and citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). To avoid the due process problem that would otherwise be presented, the Government should be required to provide a more substantial justification for detention—a showing of greater flight risk or danger—as the length of past or anticipated future detention increases. Courts routinely apply this common-sense rule in other prolonged detention contexts. *See, e.g.*, *United States v. Hare*, 873 F.2d 796, 801 (5th Cir. 1989) ("In determining whether due process has been violated, a court must consider not only factors relevant in the initial detention decision, . . . but also additional factors such as the length of the detention that has in fact occurred or may occur in the future [and] . . . the nonspeculative nature of future detention."); *United States v. Ailemen*, 165 F.R.D. 571, 589 (N.D. Cal. 1996) (collecting cases).

        With respect to the consideration of alternatives to detention, due process requires an Immigration Judge to determine, in any adequate prolonged detention hearing, that no alternatives to detention would address the Government's justifications for detention. In analogous contexts, the Supreme Court and Ninth Circuit have recognized the importance of the consideration of alternatives to detention when it comes to prolonged civil detention. *See United States v. Salerno*, 481 U.S. 749, 750 (1987) (upholding the constitutionality of preventive detention, but only while recognizing the Bail Reform Act's requirement that a federal judge must first determine that no conditions of release will "reasonably assure the appearance of such person as required and the safety of any other person and the community") (citing 18 U.S.C. § 3142(e)); *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (recognizing, in striking down measures to incarcerate civil detainees, due process requires that the Government's objectives could not be "accomplished in . . . alternative and less harsh methods") (citations and quotations omitted). Respondents argue that the regulations do not permit immigration judges to set "initial conditions" of release, but Petitioners do not seek to divest ICE officers of authority to set "initial

46

conditions" – rather, they simply seek an order requiring immigration judges to use their existing authority to "ameliorat[e]" the conditions set by ICE officers by ordering release on alternatives to detention. *See* 8 C.F.R. 236.1(d)(1) (permitting Immigration Judges to "ameliorat[e]" conditions of release).

With respect to the need for automatic hearings, Respondents have provided no authority or support for their bald assertion that "the notice provided by ICE . . . is constitutionally adequate." The Government's procedures ignore the Government's independent obligation to ensure that detention is justified, whether or not a detainee requests a hearing. *See generally Doe v. Gallinot*, 657 F.2d 1017, 1023 (9th Cir. 1981). Further, the notice provided falls far short of clarity, particularly for the substantial number of detainees who lack counsel and do not speak English or are illiterate. *See Padilla-Agustin v. INS*, 21 F.3d 970, 976 (9th Cir. 1994) ("Particularly when the alien is representing himself and has language difficulties, as is so often the case . . . a high degree of clarity should be a part of the process accorded."), *overruled on other grounds by Stone v. INS*, 514 U.S. 386 (1995).

With respect to the need for periodic bond hearings, Respondents have no explanation for why individuals detained far beyond six months – in some cases for years – should not be afforded regular hearings at six month intervals to determine whether their detentions remain warranted. Respondents cite *Prieto-Romero v. Clark*, 534 F.3d 1053, 1065-66 (9th Cir. 2008), but *Prieto* did not address whether that petitioner was entitled to another bond hearing under appropriate standards, because it found no prejudice. *Id.* Respondents conduct periodic reviews for detainees under the Post-Order Custody Review Process and for detainees who have had a *Casas* hearing but remain detained. Respondents have provided no reason why they should not also be required to conduct similar periodic reviews for class members who may face months or years of detention after an initial bond hearing.

**Respondents' Reply:**

Petitioners assert two claims which are not contained in their Third Amended Complaint ("TAC"), and which are untimely: (1) that immigration judges must

47

consider an alien's ultimate removability, and (2) that due process requires periodic bond hearings every six months. Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary, but the statement must "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). But notice pleading, while liberal in nature, does not allow a party to assert a new ground or claim that certain governmental conduct is unconstitutional after discovery has closed and without proper amendment to the pleadings. *See, e.g., Christopher v. Harbury*, 536 U.S. 403, 419 n. 17 (2002) ("Whatever latitude is allowed by federal notice pleading, no one says [plaintiff] should be allowed to construe 'adequate legal redress' to mean causes of action that were not even mentioned in her complaint."). Federal procedure relies on notice pleading rather than fact pleading, but at a minimum, as explained by the Advisory Committee on Civil Rules in October, 1955, the pleader is required "to disclose adequate information as the basis of his claim for relief". 2A J. Moore, Federal Practice ¶ 8.01(3) (2d ed. 1974). Conley, 355 U.S. at 47. The grounds sought to be added by a plaintiff should be rejected if it seeks strategic advantage, is prejudicial to the opposing party, expands the scope of the complaint, or materially affects court-imposed deadlines. *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002); *see also Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) ("[T]he consideration of prejudice to the opposing party . . . carries the greatest weight."); *U.S. v. $11,500.00 in U.S. Currency*, --- F.3d ---, 2013 WL 1174382, *4 (9th Cir. 2013).

Here, Petitioners assert not only new specific additional forms of relief not sought in the TAC – consideration of an additional factor by immigration judges at bond hearings and a requirement that the government provide bond hearings every six months – but also assert constitutional inadequacies not otherwise detailed in the TAC. Petitioners did not include these grounds among the specific bond hearing

48

inadequacies they list in the TAC, *see* ECF No. 111, ¶¶ 121-123, which are otherwise detailed and which specifically allege what "the government must at a minimum provide" for "a hearing to be adequate…" ECF No. 111, ¶ 121. Petitioners did not include these constitutional claims in their Complaint, despite the fact that Petitioners have had more than four years to amend their Complaint, which they have done three times. This evidences a decision to assert these claims either as a strategic advantage, but at the very least expands the scope of the TAC in significant ways, weighing against amendment. Moreover, the newly asserted constitutional grounds prejudice Respondents. Although couched as "questions of law" by Petitioners, Respondents have been denied an opportunity to explore through discovery the basis for Petitioners' claim that additional bond hearings are required to properly weigh evidence of flight risk and danger of a detainee after a determination of flight risk and danger has already been determined by an immigration judge. For example, Respondents have been denied an opportunity to determine if there is any evidence, among the studied class members or otherwise, supporting Petitioners' claim that there is any factual basis for concluding that circumstances have changed such that the bond hearing has become "stale" as to evidence submitted showing a flight risk or danger. By that same token, Petitioners' assertion that the consideration of ultimate removability is purely "a question of law" is belied by the fact that Petitioners themselves cite factual information to support their claim, *see e.g.* ECF No. 281 at 16, pertaining to repatriation likelihood and studied class members. Respondents did not have an opportunity to take discovery regarding these factual assertions or of the newly-asserted constitutional deficiencies alleged, and thus are prejudiced by Petitioners' late-made arguments regarding those deficiencies on summary judgment.

With respect to Petitioners claim that immigration judges must consider ultimate removability at bond hearings, Respondents are entitled to summary judgment on that claim. Petitioners' assertion that Respondents "offer no rationale" why immigration judges should not consider this factor is simply incorrect. As Respondents persuasively explained in their memorandum, there is not authority for

Petitioners' claim that immigration judges must consider ultimate removability. The one case cited by Petitioners, *Owino v. Napolitano*, 575 F.3d 952, 955 (9th Cir. 2009), does not stand for the proposition that immigration judges must consider ultimate removability at an early bond hearing to satisfy due process. Instead, *Owino* considered an alien's claim of potentially indefinite detention when removal proceedings were at a close, and even then the Ninth Circuit concluded that the issue was to be decided by a federal district court empowered to consider constitutional claims. The Ninth Circuit did not hold that a challenge to indefinite detention was properly a matter for an immigration judge. Moreover, Respondents persuasively explained through the testimony of Assistant Chief Immigration Judge Thomas Y.K. Fong why determining ultimate removability was not a factor that could be properly considered before an alien is ordered removed and travel documents are sought by ICE. In the absence of a final removal order or efforts to begin repatriation, it would be speculative for an immigration judge to determine whether the alien ultimately may be removed.

     With respect to Petitioners' claim that due process requires immigration judges to consider the length of future, as well as past detention, Respondents are entitled to summary judgment on this claim. The Ninth Circuit has rejected Petitioners' argument that the list of factors considered by immigration judges under *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006), is constitutionally insufficient in *Casas* hearings. *V. Singh v. Holder*, 638 F.3d 1196, 1206-07 (9th Cir. 2011). The Guerra factors does not require an immigration judge to consider factors unrelated to flight risk and danger, and nothing in Petitioners' arguments stands against the Ninth Circuit's decision. At the same time, the Ninth Circuit rejected the argument – again advanced by Petitioners here – that due process requires a showing of special dangerousness when challenging prolonged detention. *Id.* The Court correctly explained that the dangerousness of an alien must only be weighed on a special basis only where the alien faces indefinite detention under *Zadvydas*. *Id.* at 1207. Moreover, the Ninth Circuit correctly noted that the issue of indefinite detention arises

in a post-order context, and thus special dangerousness is not a burden or factor that must be considered either in a pre-order context, or where indefinite detention is not alleged.  Respondents are entitled to judgment as a matter of law on this claim.

Petitioners cite no authority contravening the Ninth Circuit's reasoning of the appropriateness of the *Guerra* factors in an immigration context.  Neither *United States v. Hare*, 873 F.2d 796, 801 (5th Cir. 1989), nor *United States v. Ailemen*, 165 F.R.D. 571, 589 (N.D. Cal. 1996), support Petitioners' argument.  Those cases involved U.S. citizens challenging the length of their pre-trial detention in a criminal context under the provisions of the Speedy Trial Act and the Bail Reform Act.  The Supreme Court has long held that "[i]n exercise of its broad power over naturalization and immigration, Congress may make rules as to aliens that would be unacceptable if applied to citizens."  *Demore v. Kim*, 538 U.S. 510, 521 (2003) (citing *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976)) (upholding mandatory detention without opportunity for bond hearing).  Moreover, *Hare* noted that whether due process requires consideration of certain factors must be made on a case-by-case basis by a *district court* considering a due process challenge to criminal pre-trial detention.  873 F.2d at 801-802.  Thus, not only are these cases inapposite because they arise in a criminal context in cases brought by U.S. citizens, but it undercuts Petitioners' argument by indicating that the length of future detention is an appropriate factor for consideration by a federal district court on a case-by-case constitutional challenge.  That is a materially different setting and situation than what Petitioners seek in this case: consideration of length of detention as part of an administrative bond hearing at which the flight risk and danger of a non-citizen is considered.  The Ninth Circuit's decision in *V. Singh* speaks to these issues far more directly than *Hare* or *Ailemen*.  Respondents are entitled to judgment as a matter of law on this claim.

With respect to Petitioners' claim that due process requires that immigration judges consider alternatives to detention in rendering bond hearing decisions, Respondents are entitled to summary judgment on this claim.  Due process does not require immigration judges to consider the least restrictive means to ensure that an

alien will not flee or commit further crimes if released.  As the Ninth Circuit indicated in reviewing *casas* hearings in *V. Singh*, the factors considered by immigration judges under *Guerra* are constitutionally adequate to meet the statutory purpose and interest underlying immigration detention in a pre-order context.  *See, e.g., V. Singh*, 638 F.3d at 1206-07.

The cases cited by Petitioners, *United States v. Salerno*, 481 U.S. 749, 750 (1987), and *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004), do not support Petitioners' arguments.  First, both cases involved claims by U.S. citizens.  As noted above, the Supreme Court has long held that "[i]n exercise of its broad power over naturalization and immigration, Congress may make rules as to aliens that would be unacceptable if applied to citizens."  *Demore*, 538 U.S. 510, 521 (2003).  Second, *Salerno* does not stand for the proposition that due process requires the government to determine that "no conditions of release" will "reasonably assure the appearance of such person as required and the safety of any other person and the community," *see* Petitioners' Response.  That language, as Petitioners note, is a *statutory* requirement – not a constitutional one.  *Id.* citing 18 U.S.C. § 3142(e).  Moreover, *Salerno* did not conclude that a court considering detention must consider alternatives to detention. After weighing the strong governmental interests over the deprivation of personal liberty, the Court concluded that detention was constitutionally and statutorily sound. 481 U.S. at 750-51.  Third, *Jones* does not support Petitioners' argument because that case involved a Fourteenth Amendment due process challenge to conditions of confinement, which the Ninth Circuit characterized as "punitive."  393 F.3d at 934. However, the Fourteenth Amendment due process analysis in *Jones* considered a different constitutional standard than a due process analysis under the Fifth Amendment.  It also followed a different constitutional test to determine if the conditions of confinement were unduly punitive.  *Bell v. Wolfish*, 441 U.S. 520, 537, (1979) (In determining whether confinement is punitive in nature, a "court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose ... [a]bsent a showing

of an intent to punish ... that determination generally will turn on 'whether an
alternative purpose to which [the restriction] may rationally be connected is assignable
for it, and whether it appears excessive in relation to the alternative purpose assigned
[to it].'").  The case says nothing about whether detention in an immigration context is
inherently punitive unless "alternative and less harsh means" are employed as
alternatives to detention.  Indeed, the Supreme Court in *Zadvydas* stated that civil
detention in immigration proceedings is "nonpunitive in purpose and effect" because
aliens are being detained pursuant to legitimate non-punitive reasons, to facilitate their
removal from the United States and to alleviate DHS's concerns that aliens are a threat
to the community and a flight risk.  533 U.S. at 690.  Accordingly, there is no merit to
Petitioners claim that due process requires that immigration judges must consider
alternatives to detention as part of their flight risk and danger analysis.  Respondents
are entitled to judgment as a matter of law on this claim.

       With respect to Petitioners' challenging the adequacy of notices provided to
aliens at the time of their initial custody determination -- informing section 1226(a)
detainees of their right to a bond hearing or advising section 1225(b) detainees of their
right to request a parole determination – Respondents are entitled to judgment as a
matter of law on this claim.  Petitioners conceded that the Government advises these
aliens in writing of their right to request a bond hearing or parole determination.
Petitioners argue that regardless of notices, the government is required to schedule
hearings even in the absence of a request for a hearing, citing *Doe v. Gallinot*, 657
F.2d 1017, 1023 (9th Cir. 1981).  That case, however, considered whether requiring
mentally disabled individuals to file complex habeas challenges was sufficient in the
absence of an automatic hearing.  *Id*.  This case presents an altogether different
situation, in which an alien need only make a request for a bond hearing with the
immigration court or request for a parole determination with their deportation officer.
Petitioners do not show how this fails to meet due process.  Nor is there merit to
Petitioners' argument that the notice provided "falls far short of clarity."  The
language of the written notices states that an alien may request review of a custody

determination, or informs the alien of the right to request a parole interview.   The notices provide clarity in simple English.   The notices are constitutionally sufficient. Respondents are entitled to judgment as a matter of law on this claim.

Finally, with respect to Petitioners' claim that due process requires a bond hearing every six months, Respondents are entitled to summary judgment on that claim.  First, the claim is an untimely amendment to the TAC, as discussed above. Second, Petitioners' response above merely argues that the government has not shown why it should *not* have to provide a bond hearing every six months.  Petitioners misstate the burden.  They must show why periodic bond hearings are *required* by due process.  They have not done so.  As discussed above, once an alien has received a bond hearing before an immigration judge to determine flight risk and danger, an alien ordered detained has no claim that his due process has been violated because he did not receive an additional bond hearing at some later time. *See Prieto-Romero*, 534 F.3d at 1065-66.  Due process simply does not require periodic bond hearings, and Petitioners can cite to no authority anywhere for the proposition that it does. Respondents are entitled to judgment as a matter of law on this claim.

* * *

For the reasons above, this Court should conclude there is no genuine dispute over any material fact necessary to summary judgment for Respondents, and enter judgment for Respondents as a matter of law as to all counts in the TAC.

Date:  April 26, 2013                    Respectfully submitted,

                                         STUART F. DELERY
                                         Acting Assistant Attorney General
                                         Civil Division
                                         DAVID J. KLINE
                                         Director, Office of Immigration Litigation
                                         District Court Section
                                         */s/ Theodore W. Atkinson*
                                         THEODORE W. ATKINSON
                                         United States Department of Justice
                                         Office of Immigration Litigation,
                                         P.O. Box 878, Ben Franklin Station
                                         Washington, DC 20044
                                         Phone: (202) 532-4135
                                         theodore.atkinson@usdoj.gov
                                         SARAH S. WILSON
                                         Trial Attorney

                                         Attorneys for Respondents

## CERTIFICATE OF SERVICE

I certify that on April 26, 2012, I served a copy of the foregoing through the Court's CM/ECF system on the following counsel of record:

Ahilan T. Arulanantham
ACLU Foundation of Southern
California
1616 Beverly Boulevard
Los Angeles, CA 90026
213-977-5211
Fax: 213-977-5297
Email: aarulanantham@aclu-sc.org

Jayashri Srikantiah
Stanford Law School
Immigrants' Rights Clinic,
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
650-724-2442
Fax: 650-723-4426
Email: jsrikantiah@law.stanford.edu

Sean Commons
Sidley Austin
555 West Fifth Street Suite 4000
Los Angeles, CA 90013-1010
213-816-6000
Fax: 213-896-6600
Email: scommons@sidley.com

Judy Rabinovitz
ACLU Immigrants' Rights Project
125 Broad Street 18th Floor
New York, NY 10004
212-549-2618
Fax: 212-549-2654
Email: jrabinovitz@aclu.org

Cody Jacobs
Sidley Austin LLP
555 West Fifth Street Suite 4000
Los Angeles, CA 90013-1010
213-896-6000
Fax: 213-896-6600
Email: cjacobs@sidley.com

*/s/  Theodore W. Atkinson*
Theodore W. Atkinson
United States Department of Justice