# Exhibit A

to

Declaration of Theodore W. Atkinson

Respondents' Motion for Summary Judgment and
Opposition to Petitioners' Motion for Summary Judgment

*Rodriguez v. Robbins, et al.*, No. 07-cv-3239-TJH (C.D. Cal.)

1                UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4     ALEJANDRO RODRIGUEZ, et al.,

5                    Petitioners,          No. CV 07-3239-TJH(RNBx)

6        vs.

7     TIMOTHY ROBBINS, et al.,

8                    Respondents.

**CERTIFIED TRANSCRIPT**

9

10

11

12     _____

13

14              DEPOSITION of WESLEY J. LEE

15                 Los Angeles, California

16              Thursday, January 12, 2012

17                      Volume I

18

19     Reported by:

20     IRMA C. HOGAN

21     CSR No. 4877

22     Job No. 130811

23

24     PAGES 1-141, 149-247

25     (PAGES 142-148 are Confidenital and bound separately)

                                              Page 1

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4    ALEJANDRO RODRIGUEZ, et al.,

 5              Petitioners,           No. CV 07-3239-TJH(RNBx)

 6      vs.

 7    TIMOTHY ROBBINS, et al.,

 8              Respondents.

 9

10

11

12    _____

13

14         Deposition of WESLEY J. LEE, Volume 1, taken

15    on behalf of Petitioners, at 1313 West Eighth Street,

16    Los Angeles, California, beginning at 9:44 A.M. and

17    ending at 4:30 P.M. on Thursday, January 12, 2012, before

18    IRMA C. HOGAN, Certified Shorthand Reporter No. 4877.

19

20

21

22

23

24

25
                                                    Page 2
```

```
 1    APPEARANCES:

 2    For Petitioners:

 3        ACLU FOUNDATION OF SOUTHERN CALIFORNIA

 4        BY:  AHILAN T. ARULANANTHAM, ESQ.

 5             MICHAEL KAUFMAN, ESQ.

 6        1313 West Eighth Street

 7        Los Angeles, California 90017

 8        (213) 977-5211

 9        aarulanantham@aclu-sc.org

10        mkaufman@aclu-sc.org

11

12    For Respondents:

13        UNITED STATES DEPARTMENT OF JUSTICE

14        OFFICE OF IMMIGRATION LITIGATION, DISTRICT COURT SECTION

15        BY:  THEODORE W. ATKINSON, SENIOR LITIGATION COUNSEL

16        Box 868, Ben Franklin Station

17        Washington, D.C., 20044

18        (202) 532-4135

19        theodore.atkinson@usdoj.gov

20

21    Also Present:

22        JOANNA B. HALL, U.S. Immigration and Customs Enforcement

23        JULIA CONTRERAS, U.S. Immigration and Customs Enforcement

24        GENEVA TIEN

25        PHAEDRA POLYCHRONIS
```

Page 3



```
1                          INDEX

2

3   WITNESS                                EXAMINATION

4   WESLEY J. LEE
    Volume I

5

6              BY Mr. Arulanantham              7
                                              243

7
               By Mr. Kaufman                 210

8

9              BY MR. Atkinson                238

10

11

12                 UNANSWERED QUESTIONS

13                 PAGE      LINE

14                  110       21

15                  112       15

16                  113        2

17

18

                        EXHIBITS

19                                             PAGE

20  Exhibit 1   Second Amended Notice of Deposition      9

21

22  Exhibit 2   Memorandum re Delegation of Authority    27

23              for Post-Order Custody Review Decisions,

24              February 22, 2006

25

                                            Page 4
```

```
 1                    INDEX (CONTINUED)

 2                    WESLEY J. LEE

 3

                         EXHIBITS

 4                                                     PAGE

 5    Exhibit 3   (Confidential, bound separately)       56

 6

 7    Exhibit 4   (Confidential, bound separately)       85

 8

 9    Exhibit 5   (Confidential, bound separately)      100

10

11    Exhibit 6   Document re Parole of Arriving        113

12                Aliens Found to Have a Credible

13                Fear of Persecution or Torture

14

15    Exhibit 7   (Confidential, bound separately)      125

16

17    Exhibit 8   (Confidential, bound separately)      139

18

19    Exhibit 9   (Confidential, bound separately)      168

20

21    Exhibit 10  ICE/DRO Detention Standard,           199

22                Classification system

23

24

25
```

Veritext National Deposition & Litigation Services
866 299-5127

1                      INDEX (CONTINUED)

2                      WESLEY J. LEE

3

                         EXHIBITS

4                                                    PAGE

5    Exhibit 11  Memorandum re Alternatives to        213

6                Detention Program Participant

7                Enrollment Guidance, February 2011

8

9    Exhibit 12  Memorandum re Orders of              214

10               Supervision, ICE 227-229

11

12   Exhibit 13  Alternatives to Detention,           223

13               ICE 480-504

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 6

1

2

3

4          I, the undersigned, a Certified Shorthand

5  Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken before

7  me at the time and place herein set forth; that any

8  witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14          I further certify that I am neither financially

15  interested in the action nor a relative or employee of

16  any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date subscribed

18  my name.

19

20  Dated: January 30, 2012

21

22          _Irma C. Hogan_
           IRMA C. HOGAN
           CSR No. 4877

23

24

25

                                                    Page 247

1        Los Angeles, California; Thursday, January 12, 2012

2                    9:44 A.M.

3

4                    WESLEY J. LEE,

5    having been administered an oath, was examined and

6    testified as follows:

7

8                    EXAMINATION

9    BY MR. ARULANANTHAM:

10       Q.    Please state your full name for the record.    9:44:32AM

11       A.    Westley Julian Lee.

12       Q.    I'll just give you a few instructions before

13   we get started into the substance of it.  And you were

14   telling me before we started that you have been

15   deposed before.  Is that correct?                        9:44:45AM

16       A.    Yes.

17       Q.    So in the deposition I will ask you

18   questions.  My questions and your answers will be

19   recorded by the court reporter.  Just a few logistical

20   things to make that easier.                              9:44:56AM

21           You and I shouldn't talk at the same time

22   because then it makes it hard for her to write that

23   down.  Does that make sense?

24       A.    It does.

25       Q.    You should give verbal responses out loud so   9:45:04AM

                                                              Page 7

```
1    that the responses can be recorded.  Does that make      9:45:07AM

2    sense?

3         A.   Yes.

4         Q.   If you don't understand a question of mine

5    for any reason at all, don't try to answer it.  Just      9:45:11AM

6    tell me that or ask me for clarification and I'll try

7    to rephrase the question so that we can move forward.

8    Does that make sense?

9         A.   I will.

10        Q.   If you have no idea what the answer is to a      9:45:27AM

11   question and you would just have to guess, the law

12   doesn't require you to do that.  But we are entitled

13   to your best estimates.  So even if you don't know the

14   precise answer, if you have an estimate, you do have

15   to give that as well.                                     9:45:44AM

16        The common example I think is helpful to

17   capture that is if I asked you how long it took you to

18   get here today, you probably don't know the exact

19   minutes, seconds, but you can make an estimate.  I

20   would be entitled to that.                                9:45:59AM

21        If I asked you how long it took me to get

22   here today, you have no idea whatsoever.  Does that

23   make sense?

24        A.   Yes.

25        Q.   If there's an objection -- hopefully there      9:46:09AM
```

Page 8

```
 1    won't be too many -- you have to -- the objection is     9:46:11AM

 2    recorded, but you have to answer the question unless

 3    your attorney instructs you not to answer, which is

 4    usually for issues related to privilege.

 5         Does that make sense?                               9:46:23AM

 6    A.   Yes.

 7    Q.   And breaks are fine.  Just ask and we'll take

 8    a break.  The only thing I'd ask is that if I have a

 9    question pending, answer the question and then take

10    the break.                                               9:46:32AM

11    A.   Fair enough.

12    Q.   Are you taking any medication or other drugs

13    that might make it difficult for you to participate

14    today in the deposition?

15    A.   No.                                                 9:46:41AM

16    Q.   Any reason why you wouldn't be able to give

17    truthful testimony during the deposition today?

18    A.   No.

19    Q.   And you understand it's just like a trial,

20    it's perjury to give a false statement in this           9:46:50AM

21    deposition.

22    A.   I understand.

23         MR. ATKINSON:  I would just ask, wait until

24    he gets -- just for the sake of the court reporter,

25    wait until he gets the full question out before you      9:46:58AM
```

Page 9

```
 1     start to answer.  Thank you.                          9:47:02AM

 2            MR. ARULANANTHAM:  I'm going to mark the

 3     Notice as the first exhibit.  We made copies for

 4     everyone here, so maybe I should just hand the folder

 5     around.                                                9:47:23AM

 6            MR. ATKINSON:  That makes sense.

 7            (Exhibit 1 was marked for identification.)

 8     BY MR. ARULANANTHAM:

 9        Q.  Have you seen this document before, Mr. Lee?

10        A.  I have seen it.                                 9:47:35AM

11        Q.  Did you discuss that document with anyone

12     prior to testifying today?

13        A.  Not in detail.

14        Q.  With whom did you discuss it?

15        A.  With -- discussed it with --                    9:47:50AM

16            MR. ATKINSON:  Mr. Atkinson.

17     BY MR. ARULANANTHAM:

18        Q.  Did you discuss it with anyone else besides

19     Mr. Atkinson?

20        A.  No.                                             9:48:06AM

21        Q.  Oh, going back for a moment, you said you had

22     testified before in a deposition.  What was the nature

23     of the case that you testified in before?

24        A.  It was EEO issues.

25        Q.  Employment discrimination issues?              9:48:24AM

                                                       Page 10
```

| | | |
|---|---|---|
| 1 | A.    Uh-huh. | 9:48:26AM |
| 2 | Q.    How many times did that happen? | |
| 3 | A.    Probably four in my career. | |
| 4 | Q.    Did you ever testify at trial? | |
| 5 | A.    No. | 9:48:34AM |
| 6 | Q.    Besides talking to Mr. Atkinson about that | |
| 7 | Deposition Notice, what else did you do to prepare for | |
| 8 | this deposition today? | |
| 9 | A.    I reread some of the policies to familiarize | |
| 10 | myself with it.  That's basically it. | 9:48:52AM |
| 11 | Q.    Do you remember which policies you reread? | |
| 12 | A.    I read the civil detention policy, our | |
| 13 | priorities policy, our Post-Order Custody Review | |
| 14 | policy. | |
| 15 | Q.    Any others you can think of? | 9:49:10AM |
| 16 | A.    I read some of the information that you guys | |
| 17 | sent over to us, like this, and there was actually a | |
| 18 | couple more I think I read.  Maybe the suit itself. | |
| 19 | Q.    You said the civil detention policy.  What | |
| 20 | are you referring to?  I'm not sure -- | 9:49:38AM |
| 21 | A.    Our priorities. | |
| 22 | Q.    Priorities? | |
| 23 | A.    Yeah. | |
| 24 | Q.    I think that I'm going to ask you about that | |
| 25 | later today, but I'll try to remember to come back | 9:49:49AM |

Page 11

```
 1    because I'm not a hundred percent sure what you're        9:49:53AM

 2    talking about.  But we'll figure it out.

 3              You're employed now by DHS; is that correct?

 4        A.   I sure am.

 5        Q.   How long have you been employed by DHS?        9:50:03AM

 6        A.   I was employed with INS when DHS became

 7    established in 2003.

 8        Q.   How long were you employed by INS?

 9        A.   Since 1988.

10        Q.   What is your current title?              9:50:12AM

11        A.   I am Assistant Field Office Director here in

12    L.A.

13        Q.   How long have you been the AFOD?

14        A.   I came here, I think, in April 2007.

15        Q.   What was your position before that?       9:50:36AM

16        A.   Before that I was the unit chief over the

17    Fugitive Operation Support Center in Burlington,

18    Vermont.

19        Q.   How long did you hold that?

20        A.   From two thousand -- probably 2006 until I    9:50:52AM

21    came here to Lancaster, April 2007.

22        Q.   A little over a year?

23        A.   No.  I came here in 2009.  Did I say '7?

24        Q.   Yeah.  So you were about three years working

25    as the Fugitive Operations unit chief in Vermont.      9:51:14AM
```

                                                    Page 12

```
 1    Before that what did you do?                          9:51:20AM

 2        A.    Before that I was in D.C. as -- I had many

 3    titles when I was there.  I got in D.C. probably late

 4    2002, mid-2002.

 5        Q.    Can you describe the work that you were      9:51:42AM

 6    doing?

 7        A.    I did -- I initially went there and ran a

 8    unit for Post-Order Custody Review, and then I was --

 9    it was during the time we were moving into the

10    Department of Homeland Security, so there was a lot of  9:52:04AM

11    restructuring being done.  So I was placed in a

12    position that oversaw the Eastern regional offices,

13    the field.  Then I was the acting director and then

14    eventually the acting -- I was acting deputy director

15    and then acting director.                             9:52:28AM

16        Q.    Of?

17        A.    Of D-R-O.  Of Detention and Removal

18    Operations, which is now Enforcement and Removal

19    Operations.  A lot of changes.

20        Q.    The POCR, P-O-C-R, Post-Order Custody Review,  9:52:43AM

21    unit that you ran in mid-2002 -- was that the

22    headquarters detention Post-Order Custody Review unit?

23        A.    Yes, it was.

24        Q.    Did you run that for the whole nation?

25        A.    I did.                                      9:53:02AM
```

Page 13

1      Q.   And the Eastern Regional Office that you          9:53:08AM

2  oversaw -- was that for Post-Order Custody Review for

3  the Eastern Regional Office?

4      A.   No.  We divided up our -- the field

5  offices currently now -- basically there's the offices  9:53:20AM

6  that were within the Eastern Region.  I oversaw those

7  offices.  We got rid of our Eastern Regional Office.

8  So we had a direct line of authority to field offices.

9      Q.   So that wasn't for post-order custody

10  detention decisions?                                   9:53:41AM

11     A.   Uh-uh.  Operations.

12     Q.   Before going to Washington in -- strike that.

13         That means you ran -- how long did you run

14  the headquarters' POCR unit for, roughly?

15     A.   I would say roughly six to eight months        9:54:05AM

16  maybe.

17     Q.   Before that what did you do?

18     A.   Before that I was at Krome Service Processing

19  Center in Miami.

20     Q.   What did you do there?                          9:54:22AM

21     A.   I was the officer in charge.

22         MR. ATKINSON:  Could you spell Krome for the

23  sake of the court reporter.

24         THE WITNESS:  K-r-o-m-e.

25  ///                                                     9:54:30AM

Page 14

| | | |
|---|---|---|
| 1 | BY MR. ARULANANTHAM: | 9:54:30AM |
| 2 | Q.  How long were you at Krome? | |
| 3 | A.  2000.  I would say maybe mid-2000. | |
| 4 | Q.  So about two years? | |
| 5 | A.  Yes. | 9:54:46AM |
| 6 | Q.  I won't go back to 1988, but I guess my other | |
| 7 | question about this is, did you at any point make | |
| 8 | detention decisions not as an AFOD but as a lower | |
| 9 | level ICE official? | |
| 10 | A.  Never. | 9:55:12AM |
| 11 | Q.  So now as an AFOD what are your | |
| 12 | responsibilities? | |
| 13 | A.  Well, my current responsibilities are I run | |
| 14 | Mira Loma, so I have oversight management of that | |
| 15 | detention facility. | 9:55:37AM |
| 16 | Q.  Does that include authority over detention | |
| 17 | decisions in Mira Loma? | |
| 18 | A.  Well, ultimately they would come up to me, | |
| 19 | but most decisions are made at the supervisory level | |
| 20 | and never reach me. | 9:55:56AM |
| 21 | Q.  Who is the -- what is the supervisory level | |
| 22 | below you? | |
| 23 | A.  An SDDO.  Supervisor, Detention, and | |
| 24 | Deportation Officer. | |
| 25 | Q.  And just so I get the organizational | 9:56:08AM |

Page 15

```
 1    structure clear, who is below that?              9:56:10AM

 2        A.   The deportation officers.

 3        Q.   So just take, for example, a parole decision.

 4    Would that be made initially by a deportation officer?

 5        A.   The recommendation would be made by a      9:56:26AM

 6    deportation officer.

 7        Q.   And then who makes the final decision?

 8        A.   Right now I'd make the final -- or AFODs make

 9    the final decision.  I make my facility and there's

10    other facilities within L.A.                       9:56:40AM

11        Q.   But does the supervisory deportation officer,

12    the SDDO, make an initial decision as well?

13        A.   They make a recommendation.  There's three

14    sign-offs:  Deportation officer makes the

15    recommendation; supervisory deportation officer makes  9:56:54AM

16    one; and then the final is with the AFOD right now.

17             It used to be probably similar to -- those

18    that you see in there were made by the deputy.  It

19    used to be at the deputy level.  It was delegated

20    down.                                              9:57:08AM

21        Q.   That's Tim Robbins delegated it to?

22        A.   To the deputy field officer director.

23        Q.   Okay.  And then the deputy field officer

24    directors in turn delegated it to the AFODs?

25        A.   It was delegated to the deputy and now the  9:57:19AM
```

Page 16

```
1     field office director delegated it down to AFODs.      9:57:22AM
2        Q.   I see.  Does that mean that you also then
3     make the final decision with respect to POCR reviews
4     for people detained in Mira Loma?
5        A.   No.                                              9:57:36AM
6        Q.   Who makes that?
7        A.   Deputy field officer director.
8        Q.   So with parole, you are the final
9     decision-maker?
10       A.   Yes.                                             9:57:46AM
11       Q.   With POCR it goes one level above you?
12       A.   Right.  It's as far as it can be delegated
13    down to the deputy, according to our policy.
14       Q.   What about for Casas-Castrillon release
15    decisions?                                               9:58:02AM
16       A.   Casas decisions go to the deputy field office
17    director.
18       Q.   What about initial -- just while we're here,
19    since we're covering it -- initial detention
20    decisions?                                               9:58:17AM
21       A.   The initial recommendation is by the
22    arresting officer, whether it's an immigration
23    enforcement agent or a deportation officer.
24       Q.   And the final decision on whether to detain
25    at the initial arrest stage is made by who?             9:58:27AM

                                                        Page 17
```

```
 1        A.    Well, there's many levels of review, but a      9:58:32AM

 2   supervisor is the one that actually signs off on the

 3   recommendation.  But it's reviewed after that.

 4        Q.    Okay.  I guess in the other situations you've

 5   described, people below -- for example, on parole --      9:58:46AM

 6   people below you are making a recommendation, but

 7   you're making the final decision?

 8             MR. ATKINSON:  Object to the form of the

 9   question.

10             THE WITNESS:  I didn't understand.            9:59:00AM

11   BY MR. ARULANANTHAM:

12        Q.    With parole recommendations, with parole

13   decisions, as you have described it -- and tell me if

14   I'm wrong -- people below you make the recommendation,

15   but you make the final decision?                        9:59:10AM

16        A.    On paroles, yes.

17        Q.    So with respect to the initial detention

18   decision, who is analogous to you?

19        A.    Say that again.

20        Q.    Who is analogous to you?  Who makes the final  9:59:22AM

21   decision with respect to initial detention?

22        A.    Initial --

23             MR. ATKINSON:  I'm sorry.  Give me a second

24   to get my objection in.

25             Object to the form.                          9:59:31AM
```

Page 18

```
 1              You can answer.                    9:59:32AM

 2              THE WITNESS:  Initial decision -- the initial

 3       recommendation is with the arresting officer.  Like I

 4       say, it's with the Immigration Enforcement agent,

 5       could be with the deportation officer, Border Patrol    9:59:40AM

 6       agent, inspector.  And then a supervisor has to sign

 7       off on that recommendation.  So that's the initial.

 8       BY MR. ARULANANTHAM:

 9          Q.   So would it be fair to say that with respect

10       to the initial detention decision, the SDDO plays the   10:00:08AM

11       same role that you play with respect to parole

12       decisions?

13              MR. ATKINSON:  Object to the form.

14              You can answer.

15              THE WITNESS:  The supervisor definitely signs 10:00:21AM

16       off on the recommendation.

17       BY MR. ARULANANTHAM:

18          Q.   Again just while we're on it, the decision to

19       treat someone as ineligible for bond in the initial

20       detention decision -- that has the same              10:00:42AM

21       decision-making structure as other initial detention

22       decisions; is that correct?

23              MR. ATKINSON:  Object to the form.

24              THE WITNESS:  I'm not really sure what you

25       mean.                                                  10:00:54AM

                                                         Page 19
```

1    BY MR. ARULANANTHAM:                                    10:00:54AM

2        Q.   Well, the arresting officer could decide, you

3    said earlier --

4        A.   Recommend.

5        Q.   Sorry.  Could recommend to initially detain    10:01:02AM

6    someone when someone is arrested initially.

7             There's also sometimes an initial

8    determination that the person is subject to mandatory

9    detention; right?

10       A.   Yes.                                            10:01:38AM

11       Q.   Who makes that decision?

12            MR. ATKINSON:  Object to the form.

13            You can answer.

14            THE WITNESS:  It's the same.  The

15   recommendation will come from the arresting officer     10:01:46AM

16   and then the supervisor will make that custody

17   decision.

18   BY MR. ARULANANTHAM:

19       Q.   Who do you report to?

20       A.   I report to the deputy field office director,   10:01:59AM

21   one of them.

22       Q.   Which one?

23       A.   Dan Shickle.

24       Q.   How many people report to you?

25       A.   I have two first-line supervisors that report  10:02:15AM

Page 20

```
 1          Q.    How many detainees roughly in Mira Loma?     10:05:20AM

 2          A.    Six hundred.

 3          Q.    That number has gone down; right?

 4          A.    It has.

 5          Q.    Did your staff correspondingly drop when the   10:05:28AM

 6     number went down?

 7          A.    It has been dropping.

 8          Q.    You look really happy about that.

 9          A.    I am.

10          Q.    And what are the other detention centers in    10:05:48AM

11     the Central District that hold detainees?

12               MR. ATKINSON:  Object to the form.

13               THE WITNESS:  In the Los Angeles area of

14     responsibility we have Mira Loma, we have a facility

15     in Adelanto, we have a facility in Santa Ana, and then 10:06:10AM

16     two in Orange County.  Five.

17     BY MR. ARULANANTHAM:

18          Q.    Those would be Theo Lacy and James Musick; is

19     that correct?

20          A.    Yes.                                           10:06:35AM

21          Q.    Do you know the total capacity of detention

22     beds in those facilities?

23          A.    Total capacity or total detained?

24          Q.    Total capacity.

25          A.    Twenty-nine hundred.                           10:06:59AM
```

Page 24

1      MR. ARULANANTHAM:  That's impressive.  He's    10:07:05AM

2   doing the math.

3      Q.    But you said capacity versus detained.  Can

4   you explain that difference?

5      A.    Well, like Mira Loma is a dedicated ICE    10:07:14AM

6   facility.  The capacity is 1400, but we have 600 in

7   custody right now.

8      Q.    And is that something -- that gap between the

9   capacity and what's being used -- is that something

10   that you're aware of on a regular basis?    10:07:29AM

11      MR. ATKINSON:  Object to the form.

12      THE WITNESS:  I don't understand what you

13   mean.

14   BY MR. ARULANANTHAM:

15      Q.    How do you know that, that the capacity and    10:07:38AM

16   the current detained population are different?

17      A.    I'm -- that's -- Mira Loma is my

18   responsibility.  I know how many detainees are out

19   there every day of the week.  And then 1400 never

20   changes.    10:07:55AM

21      Q.    So it's your job to know the kind of bed

22   space availability?

23      A.    Dedicated ICE facilities, so they're all ICE

24   detainees and I'm responsible for them.

25      Q.    Bed space is viewed at the sort of policy    10:08:14AM

Page 25

```
 1    level as a resource to be allocated; right?          10:08:19AM

 2        A.   It is.

 3        Q.   And is that something that you take into

 4    account when you're reviewing the detention decisions?

 5        A.   It is.                                        10:08:30AM

 6        Q.   In what way do you take it into account?

 7        A.   Well, our department is only funded "x"

 8    amount of dollars so you have to try to enforce the

 9    immigration laws with the money that you have.  So we

10    have our priorities.  We kind of set our priorities    10:08:46AM

11    and try to enforce, you know, either the highest level

12    of criminal or, you know, recent entry.  So we look at

13    that.

14        Q.   If someone makes -- someone you supervise

15    makes a recommendation to detain someone but there     10:09:09AM

16    isn't bed space to detain that person, how do you deal

17    with that problem as the supervisor?

18            MR. ATKINSON:  Object to the form.

19            THE WITNESS:  Personally I'm -- at my

20    facility we don't make that determination.  It's       10:09:27AM

21    already been made and we just accept the detainee.

22    BY MR. ARULANANTHAM:

23        Q.   Is that because Mira Loma is never full?

24        A.   No.  It's because we don't do the arrest at

25    Mira Loma.  We just detain.  So the arrests and        10:09:41AM
```

Page 26

```
 1   processing is done in L.A. or San Bernardino, Ventura,   10:09:44AM

 2   one of our suboffices.

 3       Q.   What about with respect to a parole decision

 4   that you would be making the final decision on?

 5            MR. ATKINSON:  Object to the form.              10:09:56AM

 6            THE WITNESS:  A parole decision really

 7   wouldn't have anything to do with bed space.  We just

 8   follow our policies and procedures.  If somebody is

 9   eligible for parole, whether we have beds or not have

10   beds, we would release them.  It wouldn't play a part.   10:10:09AM

11   BY MR. ARULANANTHAM:

12       Q.   And if you have to -- your decision is to

13   detain someone on parole, in other words, to deny

14   release on parole but you don't have bed space, then

15   what do you do?                                          10:10:25AM

16            MR. ATKINSON:  Object to the form.

17            THE WITNESS:  We would look at all of our

18   cases and see what would be the lowest priority; we

19   wouldn't just say this person is a parole denial,

20   we're going to release this parole denial.  Just go      10:10:38AM

21   through the priority lists and you would have to

22   release someone in a lower priority.

23   BY MR. ARULANANTHAM:

24       Q.   But that would be somebody who you had

25   earlier decided should be detained?                      10:10:48AM
```

Page 27

```
 1    reviewed and what their rights are.  And there is a      10:18:45AM

 2    paragraph where they describe the, maybe, criminal

 3    history and the flight risk.  And it ends up with that

 4    they can go to the Immigration Judge.

 5            So is it boilerplate?  It definitely has some 10:19:01AM

 6    language in it for every detainee because it's all the

 7    same language.

 8        Q.    Would you say it's less detailed than a POCR

 9    decision but more detailed than 236(a) decision?

10            MR. ATKINSON:  Object to the form.           10:19:21AM

11            THE WITNESS:  I would say it is less detailed

12    than a POCR decision, yes.

13    BY MR. ARULANANTHAM:

14        Q.    What about parole decisions, is there a

15    comparable policy that boilerplate write-ups are       10:19:28AM

16    unacceptable for parole decisions?

17        A.    I've never seen that in a policy.

18        Q.    What's your view about it?

19            MR. ATKINSON:  Object to the form.

20            THE WITNESS:  The parole determination is --  10:19:46AM

21    it's done on different type of individual.  It's

22    really done on asylum seekers who come in.  And 99,

23    probably, .9 percent of them have no criminal history

24    so we're really not looking at that type of stuff that

25    we would look at on a 236(c) or Post-Order Custody     10:20:05AM
```

Page 33

1    Review.  So the review is a little bit different.  You    10:20:11AM

2    know, you're just reviewing identity and flight risk.

3         Like I say, there is a section that we do --

4    we're supposed to review for criminal history, but you

5    have none.  These people haven't been here.  It's a    10:20:27AM

6    different review.

7    BY MR. ARULANANTHAM:

8         Q.    Would you say flight risk determinations are

9    easier to make than danger determinations based on

10   criminal history?    10:20:41AM

11        A.    Personally for me they are.

12        Q.    Why is that?

13        A.    Because I've been around for a long time and

14   I know that once you release somebody that has a final

15   order or they're supposed to show up for an    10:20:52AM

16   immigration hearing, biggest proportion of the time

17   they abscond, you never see them again.  They may go

18   through their hearing, but then they don't show up for

19   removal.

20        Q.    So your sense is most people are a flight    10:21:09AM

21   risk?

22        A.    I would say most people are a flight risk,

23   yes.

24        Q.    What about for an officer who doesn't have 30

25   years or your level of experience in the Immigration,    10:21:24AM

Page 34

```
 1    Customs Enforcement world, do you think as a general    10:21:30AM

 2    matter flight risk determinations are easier to make

 3    than danger determinations?

 4          MR. ATKINSON:  Object to form.

 5          THE WITNESS:  I couldn't speak for anybody    10:21:44AM

 6    but myself.  But if you've been around detention

 7    removal for very long, you know that once somebody is

 8    released you usually don't see them again.  A very

 9    high percentage.

10    BY MR. ARULANANTHAM:                                10:21:55AM

11       Q.   So I guess the reason I'm asking is

12    because -- is there a reason why it would be less

13    important to have detailed reasons in a decision that

14    involves flight risk than in a decision that involves

15    danger?                                             10:22:16AM

16          MR. ATKINSON:  Object to the form.

17          THE WITNESS:  Can you say that one more time?

18    BY MR. ARULANANTHAM:

19       Q.   Sure.  You're saying in parole decisions it's

20    less important to have detailed reasons than in POCR   10:22:24AM

21    decisions or Casas decisions.  And if I've understood

22    you correctly, you're saying that's because the parole

23    decisions are really more about flight risk because

24    the people don't have a criminal history.

25          So I guess what I'm asking is, is there      10:22:38AM
```

Page 35

```
 1    something sort of inherent in flight risk          10:22:40AM

 2    determinations that makes it less important to have it

 3    all written down?

 4            MR. ATKINSON:  Object to the form of the

 5    question.                                          10:22:47AM

 6            THE WITNESS:  What I said was I didn't -- I

 7    didn't say criminal history wasn't important.  I said

 8    that type usually don't have a criminal history or we

 9    don't know about it, so there's not much you can

10    review on criminal history on an asylum case because  10:22:58AM

11    they're just coming into the country and we have no

12    record of them.  So if we do, we're going to consider

13    it.  And sometimes we do.  There's some databases that

14    we have.  But it's not that it's not important, it's

15    just that we don't have the information.           10:23:15AM

16    BY MR. ARULANANTHAM:

17        Q.  So if you assume a person doesn't have a

18    criminal history and you're trying to make a

19    determination whether to detain them based primarily

20    on flight risk, is it less important to have the    10:23:25AM

21    reasons written down when the line officers are making

22    that decision than it is when they're making a

23    decision which does involve criminal history?

24            MR. ATKINSON:  Object to the form.

25            THE WITNESS:  I would say that our new parole 10:23:50AM
```

Page 36

| | | |
|---|---|---|
| 1 | policy now is very favorable to the asylum seeker now | 10:23:53AM |
| 2 | compared to what it used to be. So I think definitely | |
| 3 | the policy that we have doesn't require a whole lot of | |
| 4 | documentation on identity. That's probably why you | |
| 5 | wouldn't see a whole lot of documentation on that. | 10:24:18AM |
| 6 | Our policy goes to the point where if they | |
| 7 | don't have ID, identification, that just their | |
| 8 | statement alone as to who they are -- if we have no | |
| 9 | reason not to believe them, then we should believe | |
| 10 | them. So there's not a whole lot of documentation on | 10:24:36AM |
| 11 | identity whether they would be a flight risk concern. | |
| 12 | BY MR. ARULANANTHAM: | |
| 13 | Q. There were POCR decisions for people who had | |
| 14 | no criminal history sometimes too; right? | |
| 15 | A. Yes, there will be. | 10:25:01AM |
| 16 | Q. In those cases you do the same detailed POCR | |
| 17 | write-up that you do for other cases as well? | |
| 18 | A. If they're in custody up to the 90-day mark, | |
| 19 | then we do a POCR unless their removal out of the | |
| 20 | country is imminent. | 10:25:20AM |
| 21 | Q. I think just a few more general questions | |
| 22 | before we get into the processes more specifically. | |
| 23 | If an ICE officer makes a decision to release | |
| 24 | someone and that person then commits a crime, does | |
| 25 | that get back to the officer? Do they ever hear about | 10:25:41AM |

Page 37

```
 1        Q.    Right.  So two years?                    10:32:08AM

 2        A.    Yes.

 3              MR. ATKINSON:  2009, '10, '11 -- three years.

 4              MR. ARULANANTHAM:  Yeah.  Actually Casas is

 5   July 26, 2008.                                      10:32:24AM

 6        Q.    When deciding whether to detain someone, does

 7   the ICE officer consider how long the detainee's case

 8   is going to take?

 9              MR. ATKINSON:  Object to the form of the

10   question.                                           10:32:42AM

11              THE WITNESS:  I don't know of any ICE officer

12   that could predict how long a case would take.

13   BY MR. ARULANANTHAM:

14        Q.    So I take it the answer is no then?

15        A.    The answer would be no.                  10:32:52AM

16        Q.    Do they take into account how long a person

17   has already been in detention?  Is that relevant?

18              MR. ATKINSON:  Object to the form.

19              You can answer.

20              THE WITNESS:  In like a federal prison or  10:33:03AM

21   state prison or --

22   BY MR. ARULANANTHAM:

23        Q.    No, no.  I mean in immigration detention.

24        A.    If they're in immigration detention, they're

25   not making a custody decision; they're already in    10:33:09AM
```

Page 43

```
 1    detention.                                    10:33:13AM

 2        Q.    No.   But I mean with respect to like a Casas

 3    determination.

 4        A.    Oh, Casas determination.   No.   They're going

 5    to look at danger to the public and flight risk    10:33:19AM

 6    basically.

 7            MR. ATKINSON:   I just want to make sure we're

 8    getting into just sort of general custody

 9    determinations, because you weren't specifying

10    whether they --                               10:33:31AM

11            MR. ARULANANTHAM:   I know.   I'm about to

12    clear that up.

13            MR. ATKINSON:   I just want to make sure

14    because there are areas for Eric Saldana and there are

15    areas for --                                  10:33:37AM

16            MR. ARULANANTHAM:   Right.   I know.   And I

17    realize my prior question wasn't clear on that.

18        Q.    And I just realized it when you answered

19    those questions.   So whenever -- so I guess I'm

20    talking now about custody determinations that are made 10:33:45AM

21    after people have been detained for more than a few

22    days or weeks.   And I could think that could arise in

23    the context of a Casas decision, it could arise in the

24    context of a POCR decision, it could arise in the

25    context of a parole redetermination decision.    10:34:01AM
```

Page 44

```
 1              I guess I want to confirm what you said,    10:34:05AM
 2    which is for all of those how long the person has been
 3    detained already is not something that the ICE officer
 4    takes into account.  Is that correct?
 5        A.   Not specifically.                           10:34:19AM
 6        Q.   And similarly, how long their case is going
 7    to take from the date the decision is made is also
 8    something that's not taken into account?
 9        A.   I would say no.
10        Q.   And I realize that there's the 180-day and  10:34:31AM
11    90-day reviews with respect to POCR.  We'll talk about
12    those separately in a minute.  So --
13             MR. ATKINSON:  I'm sorry.  Can you just let
14    me know when get off your general topics before you
15    start getting into specifics because that might be a  10:34:48AM
16    good time for us to take a quick break.
17             MR. ARULANANTHAM:  I will.
18             MR. ATKINSON:  Thanks.
19    BY MR. ARULANANTHAM:
20        Q.   With respect to -- strike that.             10:34:56AM
21             Other than with respect to POCR
22    determinations -- so leave POCR determinations
23    aside -- but when thinking about parole decisions,
24    Casas decisions, when an ICE officer decides to detain
25    someone, do they take into consideration whether the  10:35:14AM
```

Page 45

```
 1    person actually could be removed?                    10:35:16AM

 2              MR. ATKINSON:  Object to the form.

 3              THE WITNESS:  I would say they probably do

 4    some, but I don't know if it would play a huge role.

 5    BY MR. ARULANANTHAM:                                  10:35:33AM

 6         Q.   Is it ICE policy to consider that?

 7         A.   On a parole or a Casas?

 8         Q.   Right.

 9         A.   At that point no.  I would say no.

10         Q.   So, for example, I noticed when I was        10:35:43AM

11    reviewing these documents there's a lot of Somalis

12    that are coming up for parole determinations.

13              It's not ICE policy to take into account at

14    the parole stage whether or not this person would be

15    removable to Somalia later on?                        10:35:59AM

16         A.   Absolutely not.

17         Q.   Are there targets for an optimal percentage

18    of people who should be released under these different

19    custody determination processes?

20         A.   No.                                          10:36:19AM

21         Q.   Are there even soft targets?

22         A.   No.  Not that I know.

23         Q.   POCR determinations have a periodic

24    redetermination.  I mean it starts at 90 days, then

25    180 days, and then one year; is that correct?         10:36:40AM
```

Page 46

```
 1        A.    That's correct.                        10:36:43AM

 2        Q.    Is there any other type of custody

 3    determination that has that time trigger?

 4            MR. ATKINSON:  Object to the form.

 5            THE WITNESS:  Well, on your parole decisions  10:36:52AM

 6    we have a time frame that they are noticed and they

 7    are reviewed and a decision is made.

 8    BY MR. ARULANANTHAM:

 9        Q.    For the initial decision; right?

10        A.    Yes.                                   10:37:03AM

11        Q.    What about after it's been made?

12        A.    After a decision is made they can -- any time

13    they want to request they have more information -- a

14    lot of the cases that I see it's because they can't

15    find a sponsor.  So we have to make a decision.  And  10:37:17AM

16    we'll fudge that because if they're trying to find a

17    sponsor, we'll give them time.  But ultimately we need

18    to make a decision because we have a deadline.  So

19    we'll make a decision.  And then any time that they

20    can find a sponsor they come back to the deportation  10:37:33AM

21    officer and we'll review it.

22        Q.    You said you have a deadline.  What's that

23    referring to?

24        A.    You have to give a decision, you have to give

25    a notice of an interview and then you're supposed to  10:37:42AM
```

Page 47

```
 1    give a decision within a time frame.  I think after    10:37:46AM
 2    the interview it's seven days.  And then we have to
 3    route it up to the field office.  Or we did.  But
 4    there's a time.  And we do go past that time because,
 5    like I say, a lot times we're trying to give them more 10:38:00AM
 6    time to get their information.
 7         Q.   Other than that, I understand that they can
 8    come back to you later for redetermination any time,
 9    but there's no automatic time trigger like there is
10    with POCR redeterminations?                            10:38:16AM
11              MR. ATKINSON:  Object to the form.
12              THE WITNESS:  That we have to --
13    BY MR. ARULANANTHAM:
14         Q.   Right.
15         A.   No.  They -- if -- they can come back with   10:38:23AM
16    like three months, within three months, but they have
17    to have something different.  If you have somebody
18    that hasn't gained any more information, he can come
19    back in three months and ask for that new information.
20    But -- if you've got no information, you can come back 10:38:39AM
21    again in another three months, but you can't come
22    every week if you don't have any more information.  So
23    there's kind of a timeline for them to come back and
24    ask.
25         Q.   And that three-month policy you're          10:38:50AM
```

Page 48

```
 1    describing -- is that a rule written down somewhere    10:38:51AM

 2    or is that --

 3            MR. ATKINSON:  Object to the form.

 4            THE WITNESS:  I'm pretty sure it's in our

 5    policy.                                               10:38:58AM

 6    BY MR. ARULANANTHAM:

 7        Q.    What about for Casas decisions?

 8        A.    On a Casas decision there's really no written

 9    guidelines yet on Casas, when, how long.  But in our

10    field office we have just, you know, a 30-day that --  10:39:15AM

11    you know, within 30 days after a PFR is filed in Ninth

12    Circuit.

13        Q.    That's the time frame in which you and your

14    field office are trying to get the Casas determination

15    done?                                                 10:39:38AM

16        A.    Yes, it is.  I think -- I hate to speak for

17    the other field offices, but as soon as we learn of

18    the Petition for Review, we start working on the Casas

19    letter.

20        Q.    But the good thing is you don't have to speak 10:39:52AM

21    for the other offices because the case is really about

22    L.A. and the Central District of California, I guess.

23        A.    That's the other detention facilities.  I

24    really don't know how they do theirs, but our internal

25    policy is within 30 days.  I assume they do that      10:40:08AM
```

                                                        Page 49

```
 1    within 30 days.                                    10:40:12AM

 2        Q.    Okay.

 3            I'll direct this to you.  The 30(b)(6)

 4    deposition is beyond Mira Loma.  It also covers the

 5    Central District of --                             10:40:24AM

 6            MR. ATKINSON:  I understand.  I think when we

 7    take a break I'll speak to the witness about that.

 8    But there has been sort of a slow migration from what

 9    happens at -- you know, what are your

10    responsibilities, what happens at Mira Loma, to     10:40:36AM

11    talking about policies.  So it may be helpful to make

12    it clear to the witness since he is speaking on behalf

13    of the department that when you're asking about

14    policy, make sure it's clear in the question that

15    you're asking as far as the policy outside of just   10:40:48AM

16    Mira Loma.

17            MR. ARULANANTHAM:  Okay.

18            MR. ATKINSON:  There's no intention of

19    evasion or anything like that.

20            MR. ARULANANTHAM:  Yeah, and we're not having 10:40:56AM

21    any, not even remotely.

22        Q.    So if I understood what you said earlier

23    correctly, the kind of field offices' policies, like

24    Tim Robbins level policy, is to get the Casas

25    determination done 30 days after the stay is granted.  10:41:08AM
```

Page 50

```
 1    Is that correct?                              10:41:11AM

 2        A.   Within 30 days, yes.

 3        Q.   And is there any kind of redetermination

 4    timeline for Casas decisions if there's an initial

 5    denial?                                       10:41:21AM

 6        A.   Like I said, there's been no policy really

 7    coming from headquarters yet.  So what we decided with

 8    counsel -- and we all sat down and met on this, and so

 9    we were going to do it like we do the POCR; so a year

10    later then they would get a review unless they    10:41:34AM

11    requested a review --

12            MR. ATKINSON:  Can we -- are we --

13            MR. ARULANANTHAM:  We're nearly done actually

14    with all the pre-questions.

15            MR. ATKINSON:  Okay.                   10:41:49AM

16    BY MR. ARULANANTHAM:

17        Q.   When did that meeting take place?

18        A.   Within the last --

19            MR. ARULANANTHAM:  Do you want to take a

20    break on a pending question?                   10:42:06AM

21            MR. ATKINSON:  Yeah.  I just have a concern

22    because there was a reference to counsel and I want to

23    make sure I understand what the nature of the meeting

24    was.

25            MR. ARULANANTHAM:  Also let's take a break  10:42:17AM

                                                 Page 51
```

1    review and we just added the Diouf on there and then    11:01:35AM

2    came up -- we discussed when we would serve that, and

3    it was decided to try to get it done within 30 days.

4    BY MR. ARULANANTHAM:

5        Q.    So with respect to any of these -- again,    11:01:54AM

6    either the POCR or parole or Casas decisions -- if a

7    person wins in front the Immigration Judge, does that

8    trigger any redetermination of the decision to detain?

9            MR. ATKINSON:    Object to the form.

10            THE WITNESS:    What do you mean "wins in front 11:02:21AM

11    of the Immigration Judge"?

12    BY MR. ARULANANTHAM:

13        Q.    Let's say you have a Casas decision and the

14    decision is to detain the person and then their case

15    is remanded to the immigration courts and the person    11:02:31AM

16    then wins in front of the Immigration Judge, say, they

17    win cancellation of removal or they win that they're

18    not removable but they remained detained because the

19    government is appealing.    Does that trigger any kind

20    of redetermination of their custody status?    11:02:50AM

21            MR. ATKINSON:    Object to form.

22            THE WITNESS:    It really depends on the case,

23    the type of case it was.    And -- but I would say that

24    it could.    Yes, it could.

25    ///    11:03:13AM

                                            Page 55

1    BY MR. ARULANANTHAM:                          11:03:14AM

2        Q.    When would that happen?  When could it?

3        A.    It's on a case-by-case basis, so it depends

4    on what the circumstances would be.

5        Q.    What about with respect to parole denials?   11:03:26AM

6    Because that must be fairly frequent, right, where a

7    person is denied parole but then they win some form of

8    relief in front of the Immigration Judge and the

9    government appeals that?

10            In those situations does that trigger a       11:03:43AM

11    redetermination of the parole decision?

12            MR. ATKINSON:  Object to the form.

13            THE WITNESS:  I don't agree with you in the

14    first part of your statement because most asylum

15    parole reviews are released, not detained.  So there   11:03:57AM

16    are some that are retained and most of them are

17    because of identity issues and addresses.  So what was

18    the question?

19    BY MR. ARULANANTHAM:

20        Q.    Assume that a person is denied parole.  And I 11:04:16AM

21    take your point, but assume that a person is denied

22    parole and then they win in front of the Immigration

23    Judge, win some form of relief.

24            Will their having won automatically trigger

25    any kind of redetermination of their custody status?   11:04:33AM

Page 56

```
 1    filed with the Ninth Circuit, that triggers the --      11:19:36AM

 2    that's what you're saying -- that's what triggers our

 3    Casas review.

 4    BY MR. ARULANANTHAM:

 5        Q.   And that's ICE's position about when Casas      11:19:42AM

 6    comes into play?

 7        A.   In the Ninth Circuit here, it is.

 8        Q.   Is a bond determination under Casas different

 9    from an ordinary bond determination that you would

10    make?                                                    11:19:58AM

11            MR. ATKINSON:  Object to the form.

12            THE WITNESS:  Like I say, we would do a

13    review of that case based on criminal -- you know,

14    danger to the public and flight risk.  And if it's

15    determined that it's somebody that we think could be     11:20:12AM

16    released, we would release them.

17    BY MR. ARULANANTHAM:

18        Q.   And that's your approach to initial detention

19    decisions also; right?

20        A.   It's similar.                                   11:20:21AM

21        Q.   Is there any difference?

22        A.   Well, there would probably be some difference

23    because the person is obviously still in our custody.

24    So decisions have been made all along that he would be

25    in custody.  So, yeah, definitely different than the     11:20:34AM
```

Page 69

```
1     determination made about whether they should be          11:21:48AM

2     detained, but would you still say that the fact that

3     they've been in custody makes it more likely that they

4     will stay detained?

5          MR. ATKINSON:  Object to the form of the           11:21:56AM

6     question.

7          THE WITNESS:  We're still going to look at

8     danger to the community and flight risk.  That's the

9     big things.

10    BY MR. ARULANANTHAM:                                    11:22:03AM

11        Q.   Is there anything different about the -- like

12    how much of a danger you have to be or how much of a

13    flight risk you have to be in order to be detained

14    under Casas as compared to other -- under other

15    detention decisions?                                    11:22:20AM

16         MR. ATKINSON:  Object to the form.

17         THE WITNESS:  I would say no.

18    BY MR. ARULANANTHAM:

19        Q.   So in your view the -- like the burden of

20    proof is not any different for a decision to detain    11:22:34AM

21    someone under Casas than it is under any other

22    decision?

23         MR. ATKINSON:  Object to the form.

24         THE WITNESS:  I would say danger to the

25    community would be the same no matter what your case   11:22:44AM
```

Page 71

1          MR. ATKINSON:  I'm sorry, before there's any    11:36:12AM

2    question, can I just consult with my client about

3    something?

4          (Recess taken.)

5    BY MR. ARULANANTHAM:                                   11:36:27AM

6       Q.   Is the detainee interviewed prior to a Casas

7    determination?

8          MR. ATKINSON:  Object to the form.

9          THE WITNESS:  Could be.

10   BY MR. ARULANANTHAM:                                   11:36:38AM

11      Q.   How often does that happen?

12      A.   I couldn't tell you.

13      Q.   Have there been any interviews?

14      A.   I'm sure there have.

15      Q.   How do you know that?                          11:36:47AM

16      A.   Because the deportation officers are there on

17   site so they're communicating with the detainee the

18   whole time they're out there.  So --

19      Q.   Do you know if there are any rules governing

20   when you would interview somebody for a Casas          11:37:07AM

21   determination or not?

22      A.   To my knowledge there's no rules.

23      Q.   For interviews, whether it be for a Casas

24   determination or for a parole or a POCR determination,

25   how does the language barrier work?                    11:37:23AM

                                                            Page 76

```
 1        A.   We have -- if there's nobody there that can    11:37:27AM

 2   translate, then we have an interpreter service.

 3        Q.   So if there is someone there who can

 4   translate, who would that person be?

 5        A.   Deportation officer.  A lot of them speak      11:37:43AM

 6   Spanish.

 7        Q.   So the deportation officers would serve as

 8   translators for like a Casas interview or POCR

 9   interview?

10        A.   They wouldn't need a translator if they speak 11:37:54AM

11   the language.

12        Q.   But if there's -- how many of the deportation

13   officers speak Spanish?

14        A.   Most of them.

15             MR. ATKINSON:  Object to the form.            11:38:02AM

16             THE WITNESS:  Most of them speak Spanish.

17   BY MR. ARULANANTHAM:

18        Q.   What about if it's some other language like

19   Somali or Chinese?

20             MR. ATKINSON:  Object to the form.            11:38:15AM

21             THE WITNESS:  If it's a language where we

22   can't communicate with them, we normally use an

23   interpreter.

24   BY MR. ARULANANTHAM:

25        Q.   Where does that interpreter come from?        11:38:22AM
```

Page 77

```
 1        A.    We have a contract with a service, an        11:38:24AM

 2   interpreter service.

 3        Q.    Is that person who comes on site or is it

 4   done by phone?

 5        A.    Phone.                                        11:38:32AM

 6        Q.    How long would an officer typically spend in

 7   conducting a Casas review, review of the documents and

 8   other things that they review, in order to make the

 9   decision?

10        MR. ATKINSON:  Object to the form.                 11:38:56AM

11        THE WITNESS:  I'm sure it's on an individual

12   basis.  I couldn't tell you how long they spend on

13   each one.

14   BY MR. ARULANANTHAM:

15        Q.    How long do you spend reviewing them?        11:39:04AM

16        A.    Depends on how big the file is.  So it can be

17   an hour.

18        Q.    Do you think the officers spend longer making

19   decisions than you do reviewing them?

20        A.    I'm pretty sure that they would, yes.        11:39:27AM

21        Q.    Do you know what documents they review in

22   making the determination?

23        A.    They review the information that's in the

24   A-File mostly.

25        Q.    Do they review other information that's not   11:39:39AM
```

Page 78

1     in the A-File?                                      11:39:42AM

2        A.   Well, they might rerun an NCIC to see if

3     anything has changed.  Some of those don't hit.  It

4     could have been something not in there a year from now

5     and now it is in there.  So --                      11:39:54AM

6        Q.   Anything else you can think of?

7        A.   They may try to reverify any kind of sponsor

8     information.  A lot of times when they provide

9     sponsors you can't get a hold of anybody and then

10    later on you might be able to.                       11:40:11AM

11       Q.   How would an officer get sponsor information

12    in a Casas determination?

13       A.   Like I say, we're on site out there so

14    detainees can provide information any day they want

15    to.  And they have a mail slot and they put a request  11:40:25AM

16    to speak to a deportation officer and they can submit

17    anything during the course of their stay out there.

18       Q.   Does that happen frequently that detainees

19    submit information to the officers prior to the Casas

20    review?                                              11:40:42AM

21       A.   It's not necessarily maybe prior to the Casas

22    review, but for the POCR.  So they've been detained

23    and now they're waiting.

24       Q.   So just for purposes of this set of questions

25    let's exclude -- leave POCR aside.  Imagine we're just  11:40:57AM

Page 79

1    talking about Casas reviews.                          11:41:01AM

2            Would an officer check sponsor information

3    for a Casas review?

4        A.   When they're reviewing the case if there's

5    some documentation in the file, they might, yes.    11:41:12AM

6        Q.   If a detainee -- is it common for a detainee

7    to submit information in advance of a Casas review?

8        A.   I would say no, because for one thing

9    probably most of the detainees don't know that they

10   have the right to a Casas review.                   11:41:34AM

11       Q.   Are there any rules about what evidence can

12   be considered when ICE is making a Casas determination

13   about a detainee?

14       A.   Say that again.

15       Q.   Are there any rules about what evidence can  11:41:54AM

16   be considered when ICE is making a decision about

17   whether to release someone under Casas?

18       A.   Not that I'm aware of.

19       Q.   Does JTTF ever submit evidence for Casas

20   determinations?                                     11:42:09AM

21            MR. ATKINSON:  Could you -- I'm sorry, just

22   for the record could you say what JTTF is.

23            MR. ARULANANTHAM:  Sorry.  Joint Terrorism

24   Task Force.

25            THE WITNESS:  Would they send it for a Casas  11:42:19AM

                                                          Page 80

 1        Q.    How often -- strike that.                    11:43:31AM

 2              And the initial recommendation is made by the

 3     SDDO or the deportation officer in a Casas case?

 4        A.    Deportation officer makes the initial.

 5        Q.    So there's three recommendations before it    11:43:46AM

 6     gets to the final decision-maker within ICE; is that

 7     correct?

 8        A.    The deportation officer makes the initial.

 9     Supervisor, deportation officer reviews it, and then I

10     review it, and then it goes up to the deputy director    11:43:57AM

11     for a decision.

12        Q.    How often is the initial recommendation not

13     what is ultimately decided by the deputy?

14              MR. ATKINSON:  Object to the form.

15              THE WITNESS:  I don't know because I don't    11:44:11AM

16     see what happens with the supervisor and the officer

17     because they make that decision.  So an officer might

18     make a recommendation and the supervisor may discuss

19     it with him and make a change, and I don't see that

20     change until it gets to me.                             11:44:26AM

21     BY MR. ARULANANTHAM:

22        Q.    Okay.  How often is -- well, how often is

23     there disagreement?

24        A.    I don't know.  I don't speak to my supervisor

25     about how often they disagree with --                   11:44:36AM

                                                            Page 82

```
1        Q.    With the deportation officer?           11:44:39AM

2        A.    Uh-huh.

3        Q.    How often do you disagree with the supervisor

4   on Casas determinations?

5        A.    I can't really think of when I might have    11:44:58AM

6   overturned their decision, their recommendation.

7        Q.    And can you think of a time when the deputy

8   overturned your decision?

9        A.    I cannot.

10       Q.    Do you know if it's different in other       11:45:14AM

11  detention centers?

12            MR. ATKINSON:  Object to the form.

13            THE WITNESS:  I would assume we're all fairly

14  consistent.  I mean -- yeah, it's an individual

15  review.  I mean they're going to -- deputy is going to 11:45:28AM

16  make his decision, but it's based on information

17  that's come up through three levels.  So --

18  BY MR. ARULANANTHAM:

19       Q.    Other than the meeting that you described

20  earlier, has there been any training of the officers   11:45:48AM

21  within the field office on Casas and Prieto and Diouf?

22       A.    Yes.

23       Q.    Can you describe it?

24       A.    The training was we just went through the

25  sections of law and what our requirement was to give   11:46:09AM
```

Page 83

```
 1   a -- really notify them of a review.  So we would do    11:46:14AM

 2   the Casas review and then notify them that they can

 3   take that to the Immigration Judge and that they have

 4   the right for -- to take that decision to the

 5   Immigration Judge.                                       11:46:57AM

 6        Q.   Were there any materials for that training or

 7   was it just oral?

 8        A.   I don't think there was any material for it.

 9        Q.   Do you remember when it happened?

10        A.   No.                                            11:47:20AM

11        Q.   Was it before or after that meeting you were

12   talking about earlier?

13        A.   It was -- we had training again there after

14   that meeting about six, eight months ago.  But before

15   that I wasn't there when Casas first started so I       11:47:34AM

16   can't really speak to what training they had during

17   that time.

18        Q.   So you don't know if there was training on

19   Casas prior to your arrival in 2009?

20        A.   I do not, but -- yeah, I do not know.          11:47:46AM

21        Q.   You were about to say you suspect that there

22   was or there wasn't?

23        A.   Well, I wouldn't think -- they wouldn't know

24   what to do unless they got some kind of training.  I

25   wasn't there.                                            11:48:02AM
```

```
 1        A.   No.                                      11:59:24AM

 2        Q.   You had said that when a person files a

 3   Petition for Review, that's what triggers whether or

 4   not ICE considers them for release under Casas; is

 5   that correct?                                      11:59:46AM

 6             MR. ATKINSON:  Object to the form.

 7             THE WITNESS:  Yes.

 8   BY MR. ARULANANTHAM:

 9        Q.   Does it make a difference what the procedural

10   posture is of the case that's going up to the Ninth   11:59:58AM

11   Circuit in whether or not the person gets a Casas

12   hearing or does everybody who is going to the Ninth

13   Circuit get a Casas determination from ICE?

14             MR. ATKINSON:  Object to the form.

15             THE WITNESS:  Everybody that files with the   12:00:14PM

16   Ninth Circuit is going to get a review.

17   BY MR. ARULANANTHAM:

18        Q.   So it doesn't matter if they filed a motion

19   to reopen and that's what's going up to the Ninth

20   Circuit or if it's the provisional removal order      12:00:22PM

21   that's going up, as long as they filed a Petition for

22   Review they're going to get a Casas determination; is

23   that correct?

24             MR. ATKINSON:  Object to the form.

25             THE WITNESS:  They should.              12:00:33PM
```

Page 93

1     asylum officer.  So it kind of triggers it for us.        12:05:48PM

2     BY MR. ARULANANTHAM:

3          Q.     If a person is coming over the land border in

4     San Diego, then they would have gone through that

5     process before they got to the L.A. field office;        12:05:56PM

6     right?

7          A.     True.

8          Q.     So how then when they get to the L.A. field

9     office do you know that they're parole eligible as

10    opposed to detainees who would be subject to 236(a) or 12:06:08PM

11    some other process?

12         A.     Their paperwork comes with them.

13         Q.     So someone reviews -- someone in the L.A.

14    field office reviews that paperwork after they arrive?

15         A.     Yes, they do.                                 12:06:25PM

16         Q.     Tell me about that.  How does that process

17    work?

18         A.     Most of the Los Angeles field office's

19    detainees come through staging at our office downtown.

20    So especially if they're coming from San Diego, they     12:06:41PM

21    would come downtown or if they're coming from LAX they

22    would come downtown.  And the officers there would

23    review the cases before they send them out to the

24    detention facilities.  And then they're reviewed again

25    once they get out to the detention facilities.           12:06:58PM

Page 98

```
1    BY MR. ARULANANTHAM:                          12:08:00PM

2        Q.   Right.  And obviously if someone's caught at

3    LAX, then the credible fear interview would typically

4    also happen in Los Angeles; right?

5        A.   I would say yes.                      12:08:08PM

6        Q.   The standard for release on parole -- does it

7    also include danger and flight risk?  Is that right?

8            MR. ATKINSON:  Object to the form.

9            You can answer.

10           THE WITNESS:  Yes.  It's identity.  It's your 12:08:24PM

11   identity and flight risk and it does have danger to

12   the community, yes.

13   BY MR. ARULANANTHAM:

14       Q.   Are there other factors involved in the

15   parole detention decision which are different from the 12:08:38PM

16   236(a) detention decision?

17           You said identity, danger, flight risk.  Is

18   there anything else?

19       A.   There's actually a lot of factors that go

20   into that decision.  But, yeah, that's kind of pretty 12:08:57PM

21   much what we look at:  Danger, the criminal history

22   or -- well, both of them can include national security

23   concerns.

24       Q.   I'm going to hand you what we will mark as

25   Exhibit 5.                                     12:09:26PM
```

Page 100

```
 1              (Exhibit 5 was marked for identification    12:09:28PM

 2         and is bound separately.)

 3         MR. ARULANANTHAM:  This is another -- well,

 4    it's a set of documents that have a "Confidential"

 5    designation, so just the same rules that we discussed  12:09:35PM

 6    earlier concerning the possible designation of these

 7    documents as confidential.

 8         MR. ATKINSON:  I think we have to make that

 9    designation, so -- just under the protective order.

10    So the defendants will be designating Exhibit 5 as    12:09:54PM

11    confidential under the protective order in this case.

12    And any questions that may elicit personal identifying

13    information we would also deem as confidential with

14    respect to Exhibit 5.

15         MR. ARULANANTHAM:  And this is also           12:10:21PM

16    information that was produced as part of discovery in

17    this case and has the ICE Bates number on the bottom.

18    Q.   Can you tell me what the -- it's actually, I

19    think, three documents all very closely related to

20    each other.  Can you tell me what the first document  12:10:38PM

21    is?

22    A.   The third one?

23    Q.   The first.

24         MR. ATKINSON:  You mean the first page of

25    Exhibit 5?                                         12:10:47PM

                                                    Page 101
```

```
 1           MR. ARULANANTHAM:  Yeah, the first page.        12:10:48PM

 2           THE WITNESS:  The first page appears to be

 3      the parole decision.

 4           MR. ATKINSON:  I'm sorry, just for

 5      clarification, Page 1 and 2 appear to be the same     12:10:56PM

 6      document.  Or I just want to make it clear that Page 1

 7      doesn't look like it's separate from Page 2.  So if

 8      you're identifying Page 1, I want to make it clear for

 9      the record that that's not a separate document.

10      BY MR. ARULANANTHAM:                                  12:11:18PM

11           Q.   What is the parole decision?

12           A.   The parole decision was that they would stay

13      in custody.

14           Q.   Because?

15           A.   Well, here it's marked that:                12:11:31PM

16                "You have not established to ICE's

17                satisfaction that you will appear as

18                required for immigration hearings,

19                enforcement appointments, or other

20                matters if you are paroled from             12:11:41PM

21                detention."

22                And then another reason:

23                "That you have established as to ICE's

24                satisfaction you would not pose a danger

25                to the community or U.S. security if you    12:11:48PM
```

Page 102

```
 1              "are paroled from detention."          12:11:52PM

 2       Q.    Go to the third page.  Can you describe what

 3    that page is generally?

 4       A.    This is a notice that they are going to be

 5    reviewed for parole.                             12:12:12PM

 6       Q.    It's also a questionnaire, isn't it?

 7              Oh, sorry, you're on the second page.

 8              MR. ATKINSON:  It's the third page.

 9              MR. ARULANANTHAM:  You're right.  I see.  Got

10    it.                                              12:12:22PM

11       Q.    So this third page -- is that provided to

12    every person who is parole eligible?

13       A.    It should be, yes.

14       Q.    And it's provided in advance of the parole

15    decision?                                        12:12:37PM

16       A.    Yes.  It's provided in advance of the parole

17    recommendation.

18       Q.    The fourth page -- tell me what that is.

19       A.    Was there a question?

20       Q.    Tell me what this is.                    12:13:05PM

21       A.    This is a questionnaire that we give to every

22    person that's considered for parole for them to fill

23    out.

24       Q.    And obviously that's filled out in advance of

25    the parole determination?                        12:13:20PM

                                                  Page 103
```

1       A.    Yes.                                            12:13:22PM

2       Q.    And in advance of the recommendation as well?

3       A.    It's really done in advance of the interview.

4       Q.    Is every detainee interviewed for parole?

5       A.    I would say that almost all, yeah.             12:13:32PM

6       Q.    Is that pursuant to policy, guidance?

7       A.    I don't recall if you have to interview.

8       Q.    But in practice you do?

9       A.    In practice the officers interview, yeah.

10      Q.    This particular individual listed an address   12:13:50PM

11  at the top of the form.  Do you see that?

12      A.    I do.

13      Q.    And the person says they have no criminal

14  history.  Second-to-last question of the form.  Do you

15  see that?                                                12:14:12PM

16      A.    Yes, I see that.

17      Q.    So why do you think the person was found a

18  flight risk?

19          MR. ATKINSON:  Objection to the form of the

20  question.                                                12:14:23PM

21          THE WITNESS:  I don't have that A-File here

22  so I don't really -- I don't see what happened.  But

23  it could be because this sponsor that he gave -- this

24  wasn't a good address or name; or when they called

25  him, they said they didn't know them.  Could be that.    12:14:42PM

                                                    Page 104

```
 1    BY MR. ARULANANTHAM:                              12:14:45PM

 2        Q.   What do you think about danger?  Why do you

 3    think the person would have been denied danger?

 4            MR. ATKINSON:  Object to the form of the

 5    question.                                         12:14:52PM

 6            THE WITNESS:  Again I don't have the A-File

 7    to see, but it could have been that there was a --

 8    some information that we have on this individual.

 9    BY MR. ARULANANTHAM:

10        Q.   What other source of information would there  12:15:02PM

11    be besides criminal history?

12            MR. ATKINSON:  Object to the form of the

13    question.

14            THE WITNESS:  There could have been some

15    Department of Defense information.  There could have  12:15:17PM

16    been some FBI information.

17    BY MR. ARULANANTHAM:

18        Q.   That's information that would come through

19    the JTTF, would it?

20        A.   It would, most of it.                    12:15:28PM

21        Q.   If, for example, the address didn't check

22    out --

23            MR. ATKINSON:  I'm sorry, before you get your

24    question out, I just want to -- there may be a

25    question of privilege here.                       12:15:41PM
```

Page 105

```
 1              (Recess taken.)                      12:15:45PM

 2          MR. ATKINSON:  Okay.  Sorry.

 3   BY MR. ARULANANTHAM:

 4       Q.   If, for example, the address didn't check

 5   out, that's not something that the officer would write 12:15:54PM

 6   in the parole denial; right?

 7       A.   In the --

 8       Q.   That's not something that the officer would

 9   write down in the parole denial typically?

10          MR. ATKINSON:  Object to the form of the      12:16:07PM

11   question.

12          THE WITNESS:  This decision letter has

13   changed.  It's a little bit more detailed now, so

14   there are more checked boxes.  So there may be a

15   checked box on there that says they haven't provided  12:16:23PM

16   an address in the U.S.

17   BY MR. ARULANANTHAM:

18       Q.   But other than what the checked boxes

19   provide, the officers don't write other explanations

20   for the denial, for parole denials; is that true?     12:16:38PM

21          MR. ATKINSON:  Object to the form of the

22   question.

23          THE WITNESS:  The decision that the detainee

24   gets is just the decision letter.  Like I say, the

25   decision letter has been changed.  Once policies come  12:16:53PM
```

Page 106

```
 1    out, things change when you see that they need to be      12:16:57PM

 2    changed.

 3           So now it -- the decision letter is still a

 4    checked box, but it definitely has a little bit

 5    more -- it's broken down in more details so it gives      12:17:06PM

 6    them an opportunity.  But they're interviewing these

 7    people so the decision letter might not go into

 8    detail.  But definitely the detainee knows what the

 9    issues are unless they're of a national security

10    concern.                                                  12:17:24PM

11    BY MR. ARULANANTHAM:

12       Q.   So the detainee might orally hear more about

13    why they're being denied parole.  But I'm only asking

14    again because I don't think you actually answered my

15    question kind of precisely, although I understood what   12:17:39PM

16    you said, that any explanation other than the checking

17    of the boxes would not appear in the decision letter;

18    is that correct?

19       A.   There's another decision letter besides this

20    one --                                                    12:17:56PM

21       Q.   Right.

22       A.   -- but the checked boxes that are on there is

23    all we're doing right now.  That's our procedure.

24       Q.   There's no other document that is in the file

25    that explains the decision beyond the decision letter;   12:18:17PM
```

Page 107

```
 1    is that correct?                                    12:18:20PM

 2              MR. ATKINSON:  Object to the form.

 3              THE WITNESS:  There will be officer notes,

 4    yeah.

 5    BY MR. ARULANANTHAM:                                 12:18:28PM

 6        Q.   But those are -- that's not something that a

 7    detainee would see or that anybody outside of ICE

 8    would see; is that right?

 9        A.   It's not.

10        Q.   That's going to look funny on the record.   12:18:44PM

11             When you say it's not, you mean it isn't

12    anything -- no one else will see that; is that

13    correct?

14        A.   It's law enforcement privileged.  I don't

15    think anybody will see it.                           12:18:55PM

16        Q.   Is the danger standard used -- actually,

17    strike that question.

18             You had said earlier that information might

19    come to you about a detainee through the JTTF?

20        A.   Yes.                                        12:19:18PM

21        Q.   How often does that happen in a parole

22    decision?

23        A.   Early on for certain nationalities it's

24    pretty often until they're cleared.

25        Q.   What does "early on" mean?                  12:19:36PM
```

Page 108

```
 1   BY MR. ARULANANTHAM:                           12:25:50PM

 2       Q.   How often do you -- in your review of parole

 3   decisions, how often are there national security

 4   concerns that arise in the cases?

 5            You waived it.  He answered a very similar   12:26:12PM

 6   question earlier.

 7            MR. ATKINSON:  I'm not sure what question

 8   you're talking about so I can't determine whether he

 9   waived it or not.  But I'm going to say that to the

10   extent you're asking him to answer whether there's a   12:26:23PM

11   percentage of frequency of national security cases

12   that come through his office, we're going to instruct

13   him not to answer on the grounds of law enforcement

14   sensitivity and national security interests.

15            MR. ARULANANTHAM:  I disagree.              12:26:44PM

16            MR. ATKINSON:  I'm sorry, Counsel, did you

17   have something to say on the record?

18            MR. ARULANANTHAM:  Sure.  I disagree with the

19   decision of privilege.

20            MR. ATKINSON:  Okay.  That's why we have a   12:26:48PM

21   magistrate judge in this case.

22   BY MR. ARULANANTHAM:

23       Q.   Are alternatives to detention considered at

24   the time that you decide whether or not to detain

25   someone who's eligible for parole?                   12:27:09PM
```

Page 113

```
 1              MR. ATKINSON:  Object to the form of the      12:27:11PM

 2    question.

 3              THE WITNESS:  It could be.  It could be

 4    considered.

 5    BY MR. ARULANANTHAM:                                   12:27:24PM

 6        Q.   Is it something that's considered regularly?

 7              MR. ATKINSON:  Object to the form.

 8              THE WITNESS:  I would say that most asylum

 9    cases that we release on parole are done without any

10    kind of alternative detention.                        12:27:41PM

11              MR. ATKINSON:  And I just want to make it

12    clear on the record that Mr. Saldana has also been

13    designated for discussion of the topic of alternatives

14    to detention.  So --

15    BY MR. ARULANANTHAM:                                   12:27:54PM

16        Q.   I'm going to show you what we'll mark as

17    Exhibit No. -- what number are we?

18              MR. ATKINSON:  Six, I believe.

19              MR. ARULANANTHAM:  Six.

20              (Exhibit 6 was marked for identification.)   12:28:23PM

21    BY MR. ARULANANTHAM:

22        Q.   If you look at page -- the third page of

23    this -- well, sorry.  Tell me what this document is.

24        A.   It's a policy on parole of aliens -- of

25    arriving aliens found to have a credible fear of       12:29:00PM
```

Page 114

```
 1    persecution or torture.                          12:29:02PM

 2        Q.   This is one of the documents that you

 3    reviewed prior to this deposition; right?

 4        A.   I definitely read this document.

 5        Q.   I mean to get ready for this deposition, is   12:29:25PM

 6    this one of the documents you reviewed?

 7        A.   I haven't reviewed this in a while.

 8        Q.   On Page 3, which is also labeled ICE23 at the

 9    bottom, at the bottom paragraph, 6.3 it's numbered, it

10    says, "DRO shall maintain national and local        12:29:48PM

11    statistics on parole determinations and have a quality

12    assurance process in place to monitor parole

13    decision-making."

14           Do you know if those statistics are kept?

15        A.   Yes, they are kept.                      12:30:06PM

16        Q.   What are those statistics on?

17        A.   I'm not sure what you're saying.

18        Q.   What are they measuring?  What are they

19    keeping track of?

20           MR. ATKINSON:  Object to form.             12:30:18PM

21           THE WITNESS:  I'm not really sure what

22    headquarters is tracking for, but the field offices

23    are required to forward them to headquarters.

24    BY MR. ARULANANTHAM:

25        Q.   What are you forwarding to them?          12:30:27PM
```

Page 115

```
 1              THE WITNESS:  I would assume that if they    12:33:25PM

 2    discovered something that needed to be changed, they

 3    would notify the field to make that change.  That's

 4    probably why they made the one change on the decision

 5    letter.                                                 12:33:36PM

 6    BY MR. ARULANANTHAM:

 7       Q.   If everything else were fine, you would know

 8    that too?

 9              MR. ATKINSON:  Object to the form.

10              THE WITNESS:  I would only know what they    12:33:44PM

11    tell me.

12    BY MR. ARULANANTHAM:

13       Q.   How are officers trained in making parole

14    determinations?

15       A.   I would say it starts at the academy, and     12:34:06PM

16    then as you go through your career you'll get updated

17    training throughout, depending on what office you're

18    in and what unit you're in as the frequency of that

19    training.

20              When this new policy came out, there was     12:34:24PM

21    training with this new policy.  It changed our parole

22    a little bit.

23       Q.   Right.  You said earlier that each parole

24    packet, set of documents, gets sent to headquarters.

25    That's not for the purpose of headquarters deciding to 12:34:43PM
```

Page 118

```
 1    change that decision; is that right?                 12:34:47PM

 2        A.   That's correct, it's not.  It's for the

 3    analysis.

 4        Q.   So is it -- or have you ever seen a decision

 5    that was made at the field office level get changed by 12:35:00PM

 6    people at headquarters with respect to parole?

 7        A.   I have not.

 8        Q.   Do you know if that ever happens?

 9        A.   I haven't seen it.

10            MR. ARULANANTHAM:  We can stop for lunch.     12:35:13PM

11            MR. ATKINSON:  That's a good idea.

12            MR. ARULANANTHAM:  I'm not quite done with

13    parole stuff, but why don't we stop.

14               (The luncheon recess was taken at

15               1:02 P.M.)                                  1:02:25PM

16

17

18

19

20

21

22

23

24

25

                                                            Page 119
```

```
 1    agreement.                                          1:13:38PM

 2        Q.   Is the flight risk standard that you apply in

 3    parole decisions different than the flight risk

 4    standard that you apply with respect to other custody

 5    determination processes?                            1:13:55PM

 6            MR. ATKINSON:  Object to the form.

 7            You can answer.

 8            THE WITNESS:  Only on the parole?  I would

 9    say yes.

10    BY MR. ARULANANTHAM:                                1:14:01PM

11        Q.   How is it different?

12        A.   Our parole policy is very liberal now.  So

13    if -- pretty much if the -- after a determination of

14    credible fear they can provide a sponsor, an address

15    to go to, that's going to satisfy the flight risk.   1:14:15PM

16        Q.   Whereas more would be required for 236(a)

17    determination?

18        A.   It would.

19        Q.   Is the danger standard that you apply in

20    parole cases different than the danger standard that  1:14:29PM

21    you apply in other cases, in other custody

22    determination processes?

23            MR. ATKINSON:  Object to the form.

24            You can answer.

25            THE WITNESS:  I would say it is just because  1:14:40PM

                                                          Page 123
```

```
 1    we don't have a lot of information on criminal history    1:14:42PM

 2    on somebody that's arriving where it's the first time

 3    they've been in the U.S., so we don't really know

 4    whether they're a danger or not because we don't have

 5    any information on them basically.  So it is    1:14:54PM

 6    different.

 7    BY MR. ARULANANTHAM:

 8        Q.    Please forgive me if I've asked these

 9    questions before, I just couldn't remember from my

10    notes.    1:15:04PM

11        The length of detention, both past and

12    future, the past detention and the likely future

13    detention -- are those factors you consider in parole

14    decisions?

15        MR. ATKINSON:  Object to form.    1:15:17PM

16        THE WITNESS:  They would not be.

17    BY MR. ARULANANTHAM:

18        Q.    I would imagine once in a while there are

19    people who are -- have some immigration status who are

20    returning and then get subject to the parole custody    1:15:33PM

21    determination process.  Is that true?

22        MR. ATKINSON:  Object to the form.

23        THE WITNESS:  Say that again.

24    BY MR. ARULANANTHAM:

25        Q.    You had earlier said that most of the people    1:15:44PM
```

Page 124

```
 1   who are coming through the parole determination        1:15:45PM

 2   process have never had any contact with the United

 3   States before; is that correct?

 4           MR. ATKINSON:  Object to form.

 5           THE WITNESS:  The ones that I see, that's      1:15:54PM

 6   correct.

 7   BY MR. ARULANANTHAM:

 8      Q.   But once in a while there are other people

 9   who do have some prior contact with the U.S. who you

10   also consider through the parole determination         1:16:01PM

11   process; right?

12           MR. ATKINSON:  Object to the form.

13           THE WITNESS:  I would assume.

14   BY MR. ARULANANTHAM:

15      Q.   Have you ever had a lawful permanent resident  1:16:07PM

16   who traveled and came back and then was stopped upon

17   entry and got subject to the parole determination

18   process?

19      A.   I can't recall one, but I'm sure there has

20   been.                                                  1:16:23PM

21      Q.   When that happens, does their immigration

22   status factor into the parole decision?

23      A.   Say that again.

24      Q.   When that happens, does their immigration

25   status factor into the parole decision?               1:16:41PM
```

Page 125

| | | |
|---|---|---|
| 1 | A.   I would say not necessarily.  Basically if -- | 1:16:45PM |
| 2 | you know, they're going to look at the same thing: | |
| 3 | Flight risk, you know, criminal history. | |
| 4 | Q.   I'm going to show you another set of | |
| 5 | documents pertaining to a detainee that we'll mark as | 1:17:10PM |
| 6 | Exhibit 7. | |
| 7 | And like the other sets of documents | |
| 8 | concerning detainees, this is confidential, Ted? | |
| 9 | MR. ATKINSON:  Yes.  We will designate | |
| 10 | Exhibit 7 as confidential.  And any questions that | 1:17:25PM |
| 11 | elicit personal identifying information with respect | |
| 12 | to Exhibit 7 will also be designated as confidential. | |
| 13 | (Exhibit 7 was marked for identification | |
| 14 | and is bound separately.) | |
| 15 | BY MR. ARULANANTHAM: | 1:17:37PM |
| 16 | Q.   Tell me what you see on the first page of | |
| 17 | this document. | |
| 18 | A.   It's a release notification. | |
| 19 | Q.   Is this a notification that the person is | |
| 20 | being released pursuant to the POCR process? | 1:17:45PM |
| 21 | A.   It is. | |
| 22 | Q.   Then in between there are several pages which | |
| 23 | are the POCR worksheet; is that correct? | |
| 24 | A.   Yes. | |
| 25 | Q.   If you go -- what happened? | 1:18:01PM |

Page 126

```
1              MR. ATKINSON:  Object to the form.        1:28:13PM

2         You can answer.

3              THE WITNESS:  Deportation officer, in my

4    opinion, would be a reviewer and a recommender.

5    BY MR. ARULANANTHAM:                                1:28:23PM

6         Q.   I meant the supervisory review, the levels

7    above that.

8              MR. ATKINSON:  Object to the form.

9              THE WITNESS:  They could.

10   BY MR. ARULANANTHAM:                                1:28:32PM

11        Q.   Does it happen?

12             MR. ATKINSON:  Object to the form.

13             THE WITNESS:  I don't know.  I don't know if

14   every reviewer has not interviewed somebody.

15   BY MR. ARULANANTHAM:                                1:28:51PM

16        Q.   Is it the practice of the ICE agents who are

17   doing the reviews, not the initial -- the initial

18   recommender but the reviewer -- is it the practice of

19   them to interview the detainees?

20        A.   It's not practice.                        1:29:07PM

21        Q.   Have you ever seen it?

22        A.   Some of the supervisors might have

23   interviewed the detainee.  I couldn't tell you really.

24        Q.   So the -- staying on the policy for a minute,

25   let's look at Exhibit 6, Page ICE23, Paragraph 6.2.   1:29:50PM
```

Page 134

```
 1                Looking at the line it says -- starts in the    1:30:10PM

 2   second line:  When an arriving alien found to have a

 3   credible fear establishes to the satisfaction of DRO

 4   his or her identity and that he or she presents

 5   neither a flight risk or danger to the community, DRO    1:30:25PM

 6   should, absent additional factors described in

 7   Paragraph 8.3 parole the alien.

 8        A.   Yes.

 9        Q.   What is your understanding of the phrase "to

10   the satisfaction of"?  Is that a like legal standard?    1:30:39PM

11   Or what does that phrase mean to you?

12            MR. ATKINSON:  Object to the form.

13            THE WITNESS:  What does the phrase mean to

14   me?  It means that if they can show their identity and

15   it's reasonable and they have a sponsor that make them    1:31:03PM

16   not a flight risk, they have no criminal history that

17   we know of to make them ineligible for release or

18   danger to the community, they would be released.

19   BY MR. ARULANANTHAM:

20        Q.   Is it -- go back a second.  Have you been --    1:31:18PM

21   have you been trained at any point on the difference

22   between preponderance of the evidence or clear and

23   convincing evidence or burdens of proof?  Is that

24   something that ever came up in your training on

25   custody determinations at any point?                      1:31:38PM
```

Page 135

1        A.    On custody determinations I would say no.      1:31:41PM

2        Q.    Did it come up in any training?

3        A.    In just law, immigration law?  Sure.

4        Q.    Do you understand "to the satisfaction of" to

5    be like a standard like that or no?                      1:31:53PM

6              MR. ATKINSON:  Object to the form.

7              THE WITNESS:  This parole policy is very

8    liberal to the arriving alien.

9    BY MR. ARULANANTHAM:

10       Q.    Right, you said that.                           1:32:05PM

11       A.    So it is -- if they can show that they're not

12   lying -- if we can't demonstrate why we think they're

13   lying or if they have a sponsor where they're going to

14   go when they're going to be released so they don't

15   become a flight risk, if we don't have any information  1:32:25PM

16   on their criminal history, they are going to be

17   released.  Very liberal policy.

18       Q.    Are there databases that ICE uses at the

19   field office level to record statistics on parole?

20             MR. ATKINSON:  Object to the form of the        1:32:51PM

21   question, outside the scope of the 30(b)(6) topics.

22             You can answer.

23             THE WITNESS:  We do have a database, ICE

24   does, and information is put in that database.  I do

25   not think there is any way to pull a statistic out of    1:33:08PM

Page 136

1    that they were in that classification level they will

2    not know.

3              MR. ARULANANTHAM:  I'd like the record to

4    reflect that -- actually can we go off the record for

5    a minute?

6              MR. ATKINSON:  Fine with me.

7              (Discussion held off the record.)

8    BY MR. ARULANANTHAM:

9        Q.    We were having an off-the-record conversation

10   with government counsel here, and I want to ask you

11   some questions about a decision-making process of

12   which I was not previously aware which concerns a

13   decision that's made about detention when a detainee

14   arrives at the detention center.

15             Can you explain that process to me?

16       A.    The initial custody determination is made

17   at -- with the arresting officer.  So that could be

18   Border Patrol, Investigations, and that decision, that

19   custody decision would be signed off by their

20   supervisors.  And then those detainees will come to --

21   if they're detain decisions or bond decisions will

22   come to ICE's custody.

23             Some of those come into the sub-offices first

24   and then they are -- most of them are funneled into

25   the Los Angeles field office at 300 North Los Angeles.

Page 203

```
 1              And at that point if that decision has
 2   already been made, the officer there won't review
 3   those custody decisions coming from other agencies.
 4   So they just place them in a detention facility.
 5              So every detainee that comes into a detention
 6   facility is -- they are interviewed, the detainee is
 7   interviewed again and they go through their NTA or
 8   their charging document, why they're there, whatever
 9   reason they're there.
10              At that time when the case is reviewed, if
11   the custody decision -- it will be reviewed there, it
12   could be changed.  So --
13       Q.    In the situation you're describing, typically
14   how long has the person been detained before they come
15   to the detention center within L.A. field office that
16   we're talking about?
17       A.    From --
18       Q.    From the time of arrest to the time of
19   that --
20       A.    They're -- normally it's -- I mean it's the
21   same day.  It's the same day within our field office.
22   We're pretty --
23       Q.    You make this determination regardless of how
24   the person ends up at your facility; is that correct?
25       A.    We review every case when they come into --
```

Page 204

1    all of our detention facilities review the cases.

2        Q.    So in theory if somebody had been detained

3    for one year at the Bakersfield Detention Center and

4    then they came to Mira Loma or Theo Lacy, after that

5    one year there would be a determination about whether

6    or not to detain the person done by the L.A. field

7    office staff at that time?

8        A.    After the alien was at the facility, the

9    deportation officer would review that case, yes.

10       Q.    The deportation officer would review it?

11       A.    Yes.

12       Q.    How often does it happen that people who have

13   been detained for more than six months at some other

14   facility, not the L.A. field office, and then they're

15   brought to one of the detention centers in the L.A.

16   field office?

17       A.    I would say that doesn't happen very often.

18   Initial cases, yes.  But not long-term cases.

19           MR. ARULANANTHAM:  I'd like the record to

20   reflect that we, government counsel and petitioners'

21   counsel, are planning to discuss detention under

22   236(a) and the decision whether to classify someone as

23   a 236(a) detainee as opposed to a mandatory detainee

24   tomorrow.

25           MR. ATKINSON:  That's correct.  We believe

                                            Page 205

1        A.    Yes.

2        Q.    And to prepare for this deposition you

3    familiarized yourself with the positions of -- the

4    positions of and the information available to

5    Immigrations and Customs Enforcement and Department of

6    Homeland Security in order to be able to testify about

7    those topics; is that correct?

8        A.    I would say, yes, I did familiarize myself.

9            MR. ATKINSON:  We just want to make one

10    notation on the record:  That we had originally

11    designated Mr. Lee with respect to eight and nine just

12    to speak for the department with respect to

13    notification provided to persons eligible for such

14    hearings, but we understand the scope went beyond that

15    and -- which is fine.

16            MR. ARULANANTHAM:  Then to that end actually,

17    let me just clean this up and ask that one question

18    then.

19        Q.    Once a detainee has been determined to be

20    subject to mandatory detention under 236(c), are they

21    given notice of that?

22        A.    Yes.

23        Q.    How?

24        A.    It's on the custody determination.

25        Q.    On the sheet it says what?

Page 207

1      A.    It's a checked box that says you've been

2    determined to be mandatory detention.  I don't think

3    it specifically says 236(c), but --

4      Q.    Is the detainee informed of any ability to

5    seek redetermination of that determination?

6      A.    On 236(c)?  No.

7          MR. ARULANANTHAM:  Can we go off the record

8    for one second?

9          MR. ATKINSON:  Sure.

10          (Discussion held off the record.)

11   BY MR. ARULANANTHAM:

12     Q.    Does the detainee have the opportunity to

13   argue to ICE that he's not subject to mandatory

14   detention?

15     A.    Does he have the opportunity to?

16     Q.    Yes.

17     A.    He can argue that to the officer that's

18   writing him up.  I don't know -- on the custody

19   determination if we're going to place them in 236(c)

20   mandatory detention because we believe the crime

21   places them there, there's a check box on there that

22   says they're mandatory detention.  And there are

23   little check boxes on the form if you guys have a copy

24   of one.  And if they're not 236(c), it has on there

25   that you have a right to, you know, an immigration

Page 208

1    hearing with an IJ, Department of Homeland Security.

2        On that particular one if we determine

3    they're 236(c), it says they cannot have a bond

4    hearing.

5        Q.    You said the detainee can argue with the

6    officer who's writing him up?

7        A.    Yeah.

8        Q.    Is there an interview?  Or how does that

9    happen?

10        A.    There's an interview done between the

11    detainee and the arresting officer, even if it's at a

12    detention facility, and we have 287(g) there, and

13    there's discussion about, you know, what are your

14    crimes; and then they'll be verified and they'll

15    discuss their -- why they're being charged and then

16    they'll sign their notice to appear and their custody

17    determination.

18        So definitely you're talking to the detainee

19    in a large majority of the cases.  There are instances

20    where you may not.  An NTA may be written up without

21    talking to the detainee.

22        Q.    This is the same decision -- the process that

23    you're talking about now when the officer is talking

24    to the detainee -- that's the same time when the

25    officer is deciding whether the person is going to be

1    detained under 236(a) or whether the person is even

2    chargeable and unlawfully present at all; right?

3         A.    And that's at the processing, yeah.

4              MR. ARULANANTHAM:  So let's switch.

5              MR. ATKINSON:  Okay.  Can we go off the

6    record?

7              MR. ARULANANTHAM:  Yeah.

8              (Recess taken.)

9

10                      EXAMINATION

11   BY MR. KAUFMAN:

12        Q.    So I want to ask you some questions about the

13   different conditions of release for people who are

14   released under the various custody review procedures

15   that we've been discussing.  And that's Casas --

16              MR. ATKINSON:  I'm sorry.  Before you

17   actually ask a pending question, we have by agreement

18   of counsel switched the deposing counsel just because

19   of the topics that are being discussed and what

20   Mr. Lee is available for.  So this is by agreement

21   without objection of the defendants.

22   BY MR. KAUFMAN:

23        Q.    So I'd like to walk through each of the

24   custody review processes we've been discussing today:

25   The casas review, the POCR process, and parole.  So

                                        Page 210

1      A.    Yes.

2      Q.    Why would they do that?

3      A.    Because they're individual officers.

4      Q.    So that's not coming from any sort of

5    instruction or guidance?

6      A.    No, not that I'm aware of.

7      Q.    When an official is making a determination as

8    to whether someone is a danger or flight risk in that

9    POCR determination process, they are not considering

10   whether there are alternatives to detention that might

11   mitigate that flight risk or danger, if I understood

12   correctly?

13          MR. ATKINSON:  Object to form.

14          THE WITNESS:  The Alternate to Detention

15   program was initially for -- to make sure somebody

16   shows up for their immigration hearing for removal,

17   not for somebody placed on a hold or supervision for

18   post-order custody that you don't think you're going

19   to remove.

20          So can they be?  Yes.  Sometimes after the

21   180 days headquarters will place somebody on that

22   that, you know, they may get a document on, like a

23   travel document, so they may want to put them in

24   Alternate to Detention until they get their travel

25   document.  If that's done, normally it's a short time

Page 213

1    frame.   If a travel document can't be obtained, then

2    they would be taken off Alternatives to Detention.

3    BY MR. KAUFMAN:

4         Q.   But just so I'm understanding things

5    correctly -- forgive me if I keep hitting the same

6    topic again -- but it's not ICE policy that officers

7    should consider the conditions of release that a

8    person can be placed under in determining whether they

9    are a danger or flight risk?

10        A.   On a post-order custody?

11        Q.   Under the POCR process.

12        A.   Alternative detention?  Alternative detention

13   is not something that we consider at the field office

14   level for Post-Order Custody Review cases.

15             MR. KAUFMAN:  I'd like to mark as an

16   exhibit -- I'm not sure of the number we're up to.

17             MR. ATKINSON:  We are now up to No. 11.

18             MR. KAUFMAN:  As Exhibit 11 a two-page

19   document Bates labeled ICE91, 92.

20                  (Exhibit 11 was marked for identification.)

21             MR. KAUFMAN:  I'm sorry, I have the wrong

22   document.

23             MR. ATKINSON:  That's okay.

24             MR. ARULANANTHAM:  Why don't you just keep it

25   marked.

                                              Page 214

1    they have been determined to be 236(c)?

2              MR. ARULANANTHAM:  Object as to form.

3              MR. ATKINSON:  I didn't finish my question.

4         Could you read my question back, please.

5          (Record read)

6              MR. ARULANANTHAM:  And I said object as to

7    form.

8              THE WITNESS:  Definitely it's possible for an

9    Immigration Judge to set a hearing if they said that

10   they didn't want a hearing.

11   BY MR. ATKINSON:

12        Q.   Finally, with regard to the considerations

13   that are made as to whether or not an alien should be

14   subject to custody, I believe you testified earlier

15   that bed space was a consideration.  Is that correct?

16        A.   Bed space could be a consideration if you

17   don't have any bed space.

18        Q.   Is there a policy or procedure by the

19   Department of Homeland Security or ICE that bed space

20   be considered as a consideration in whether to detain

21   an alien?

22        A.   No, not that I'm aware of.

23        Q.   Is bed space a primary factor in determining

24   whether to detain an alien?

25        A.   No.

Page 242

1        Q.    In fact, at Mira Loma you have approximately

2    800 beds that are not currently filled; is that

3    correct?

4        A.    That's correct.

5            MR. ARULANANTHAM:  Objection to form.

6            MR. ATKINSON:  Did you get his answer?

7            THE REPORTER:  Yes.

8            MR. ATKINSON:  Okay.

9            No further questions.

10           MR. ARULANANTHAM:  I have one question.  Do

11   you have any?

12           MR. KAUFMAN:  No.

13

14                EXAMINATION (CONTINUING)

15   BY MR. ARULANANTHAM:

16       Q.    Earlier when we spoke about a notice for

17   detainees subject to mandatory detention, you said

18   that the Notice of Custody Determination form says on

19   it that you cannot get a review by an Immigration

20   Judge if you're subject to mandatory detention; is

21   that correct?

22       A.    Yes.

23           MR. ARULANANTHAM:  Nothing else.

24           MR. ATKINSON:  We're going to read and sign

25   the deposition.

Page 243