# Exhibit B

to

## Declaration of Theodore W. Atkinson

Respondents' Motion for Summary Judgment and
Opposition to Petitioners' Motion for Summary Judgment

*Rodriguez v. Robbins, et al.*, No. 07-cv-3239-TJH (C.D. Cal.)

1        UNITED STATES DISTRICT COURT

2      FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4   ALEJANDRO RODRIGUEZ, et al.,      **CERTIFIED**
                                      **TRANSCRIPT**
5              Petitioners,      No. CV 07-3239-TJH(RNBx)

6      vs.

7   TIMOTHY ROBBINS, et al.,

8              Respondents.

9

10   _____

11

12

13

14        DEPOSITION of ERIC G. SALDANA

15            Los Angeles, California

16          Friday, January 13, 2012

17                Volume I

18

19

20   Reported by:

21   IRMA C. HOGAN

22   CSR No. 4877

23   Job No. 130812

24

25   PAGES 1 - 167

                                          Page 1

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ALEJANDRO RODRIGUEZ, et al.,

 5              Petitioners,       No. CV 07-3239-TJH(RNBx)

 6      vs.

 7   TIMOTHY ROBBINS, et al.,

 8              Respondents.

 9

10   _____

11

12

13

14            Deposition of ERIC G. SALDANA, Volume 1, taken

15   on behalf of Petitioners, at 1313 West Eighth Street,

16   Los Angeles, California, beginning at 9:41 A.M. and

17   ending at 3:16 P.M. on Friday, January 13, 2012, before

18   IRMA C. HOGAN, Certified Shorthand Reporter No. 4877.

19

20

21

22

23

24

25

                                              Page 2
```

1    APPEARANCES OF COUNSEL:

2

3    For Petitioners:

4        ACLU FOUNDATION OF SOUTHERN CALIFORNIA

5        BY:   AHILAN T. ARULANANTHAM, ESQ.

6            MICHAEL KAUFMAN, ESQ.

7        1313 West Eighth Street

8        Los Angeles, California 90017

9        (213) 977-5211

10        aarulanantham@aclu-sc.org

11        mkaufman@aclu-sc.org

12

13    For Respondents:

14        UNITED STATES DEPARTMENT OF JUSTICE

15        OFFICE OF IMMIGRATION LITIGATION, DISTRICT COURT SECTION

16        BY:   THEODORE W. ATKINSON, SENIOR LITIGATION COUNSEL

17        Box 868, Ben Franklin Station

18        Washington, D.C., 20044

19        (202) 532-4135

20        theodore.atkinson@usdoj.gov

21

22    Also Present:

23        JOANNA B. HALL, U.S. Immigration and Customs Enforcement

24        JULIA CONTRERAS, U.S. Immigration and Customs Enforcement

25

Page 3

1         I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3         That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were placed under oath; that a verbatim

7    record of the proceedings was made by me using machine

8    shorthand which was thereafter transcribed under my

9    direction; further, that the foregoing is an accurate

10   transcription thereof.

11        I further certify that I am neither financially

12   interested in the action nor a relative or employee of any

13   attorney of any of the parties.

14        IN WITNESS WHEREOF, I have this date subscribed my

15   name.

16

17   Dated: February 8, 2012

18

19

20

21        _____
              IRMA C. HOGAN, CSR 4877

22

23

24

25

                                            Page 167

1    conversations that you had?

2        A.    The nature of the conversations were to

3    determine operating procedures at their local

4    offices -- the vast majority of those people work

5    outside of San Bernardino which is where I work -- to

6    discuss how their day-to-day operations are run.

7        Q.    And your conversation with the individual who

8    works for the ISAP program?

9        A.    Would be the same:  To talk about

10   specifically day-to-day operations.

11       Q.    Does that individual work here in the Los

12   Angeles area?

13       A.    She is assigned to the San Bernardino office

14   of the contractor.

15       Q.    So I want to start talking about the custody

16   determination process for people who are brought into

17   ICE custody.

18            I'd just like to start with a general

19   question, which is when someone is brought into ICE

20   custody, how does ICE determine whether they should be

21   detained or not?

22       A.    Once the determination is made that he's also

23   to be released from custody, there's a number factors

24   that go into that.  The number one factor would be the

25   criminal history.  We would look into other equities a

Page 20

1   person may have dealing with family, employment,

2   residence.  We may take into account previous

3   immigration history, meaning not only his removals,

4   previous interactions with Border Patrol and things

5   like that, but also types of benefits that may be

6   pending for that particular individual.

7       Q.   You mentioned that or alluded to a

8   determination that someone is eligible to be released

9   from custody.  What do you mean by that?

10      A.   Well, if they're not someone who is a

11  mandatory detention case covered under 236(c), then

12  that's the first chopping block that we make in a

13  group.

14      Q.   So if I understand you correctly, the first

15  decision you make is whether someone is subject to

16  mandatory detention?

17      A.   It's whether they're eligible to be released,

18  yes.

19      Q.   And how does -- sorry -- who is making that

20  determination?

21      A.   The determination of any custody issue lies

22  with the first line supervisor or the supervisor

23  detention and deportation officer.  That's who makes

24  the decision.  During the course of processing, the

25  processing officer is usually aware of what will allow

Page 21

1   a person to be released, you know, if they're not an

2   aggravated felon, and then he would continue doing the

3   worksheet as if he could get a bond.

4        Q.   So the individual who's making that first-cut

5   decision about whether someone is subject to mandatory

6   detention -- do they make the decision on their own or

7   are other people involved in the decision?

8             MR. ATKINSON:   Object to the form of the

9   question.

10            THE WITNESS:   Are you -- when you say on

11  their own, which person are you talking about?   The

12  SDDO or the processing officer?

13  BY MR. KAUFMAN:

14       Q.   Who is the individual who makes that

15  determination?

16       A.   Custody determinations are made by the

17  supervisor, SDDO, which is the acronym for Supervisor

18  Detention Deportation Officer.

19       Q.   They're the person who is ultimately

20  responsible for the decision?

21       A.   Yes.

22            MR. ATKINSON:   Just to be clear, that's

23  S-D-D-O.

24  BY MR. KAUFMAN:

25       Q.   There are other people who are involved in

                                            Page 22

1   the decision-making process?

2       A.   The processing agent is the one that creates

3   the documents and does the initial interview that the

4   information is derived from to make -- to usually make

5   that decision.

6       Q.   So the processing agent interviews the

7   individual?

8       A.   Yes.

9       Q.   Does that happen'in every case?

10      A.   It happens in almost all cases, but I can

11  think of cases when they may not.

12      Q.   When would the interview not take place?

13      A.   The interview may not take place if the

14  individual refuses to answer questions.

15      Q.   But other than those circumstances, there

16  will always be an interview?

17      A.   Yes.   That's the normal route for us to

18  extract information from an individual.

19      Q.   Where does that interview take place?

20      A.   It can take place either at the jail -- well,

21  at the place where they were encountered, which could

22  be at the jail, could be in the street somewhere,

23  could be in our processing area.

24      Q.   What sorts of questions are asked at that

25  interview?

Page 23

1        A.    That interview first is a determination of

2   alienage to determine whether somebody could be

3   removable.  Once that determination is made by the

4   agent or officer, they move on to processing.

5        What normally takes place is the agent is

6   sitting in front of a computer terminal.  And we have

7   a system that we input information to that sorts that

8   information, puts it onto the Notice to Appear and all

9   the other processing documents.  So in most cases the

10  agent will talk to the alien while he's filling out

11  the form and follow that form:  What's your name,

12  what's your birth date, where were you born.  And

13  that's -- in most cases that is how the interview

14  takes place.

15       Q.    Besides their name, date of birth, and

16  alienage, what other sorts of questions are asked at

17  the interview?

18       A.    There's multiple questions.  I would say the

19  minimum amount of questions are the questions that are

20  contained or in the boxes in the I-213, which is a

21  record of a deportable alien.  The top boxes have a

22  variety of questions related to biographical

23  information, everything from the name, date of birth,

24  addresses, information from parents, and entry

25  information of when they came into the country.

Page 24

1   Outside of that, the questions could be just about

2   anything.  It just depends on the way the conversation

3   goes.

4       Q.   Besides the fields that are contained in the

5   I-213, is there ICE policy or practice to ask

6   particular types of questions?

7       A.   Our practice, and in the policies for

8   females, for example, is to ask if they're pregnant,

9   if there's any children involved, if they're single

10  parents.

11          There's a number of other questions that

12  we'll ask.  We'll ask about possible military service,

13  we'll ask about medical conditions.  It's -- there's

14  no set specific format or document that we fill out

15  that we answer those questions, but those are all

16  things that are important to us that we continually

17  ask.

18      Q.   And those things that you just mentioned --

19  how are the processing agents notified that those are

20  the types of questions that they should be asking?

21      A.   It's done through training.  If there's a

22  special question that may come up, for example,

23  military service, that may come down to the agents

24  through briefings, e-mails, or through other meetings

25  with their supervisor.

Page 25

1    officer will sit down and actually process them.

2       Q.  Does every person who comes into ICE custody

3    get vetted by a processing agent whether or not

4    they've seen a screening agent previously?

5       A.  There is some type of processing that happens

6    for every individual that comes in.  Processing may

7    have been done in advance at the jail, depending on

8    the resources that are available to the agent there.

9       But every person that comes into custody,

10    there's some type of process that happens, whether it

11    is to ask them about basic biographical information,

12    maybe to take prints, they may come in with a file

13    that has been processed but has not been -- the

14    determination for bond or anything else has not been

15    signed off, which is the norm.  And then at that time

16    it's reviewed and it's served on the alien.  So

17    there's some type of process that usually happens.

18       Q.  Earlier you mentioned that sometimes the

19    processing agent might review equity things like a

20    person's equities.  What sorts of information would

21    that include?

22       A.  The normal questions would relate to is

23    someone married, how long have they been married,

24    children that are in the country, are they minors, do

25    they have a job, how long have they been at the job,

Page 30

1   possibly are they even a business owner, residency,
2   where do you live, how long have you lived there,
3   sometimes who do you live with.  Questions as to that
4   nature.
5       Q.   And is that information that's all solicited
6   through the interview?
7       A.   In most cases.  I can't think of anything
8   else, anyplace else they would get it other than the
9   actual alien.
10      Q.   So there's no sort of like documentary
11  evidence they might look to?
12      A.   There may be.  I can think of a situation
13  where someone may have encountered as part of fugitive
14  operation where it was very clear that they were
15  already married to somebody and had lived at a
16  particular location.  So it may be evident by the type
17  of arrest they have.
18      Q.   So once the processing agent has all this
19  information we've discussed -- the interview,
20  information about criminal history and immigration
21  history, equities -- what's the next step in the
22  process?
23      A.   Next -- well, it's all part of the
24  processing.  Processing -- I mean that's the time that
25  our agent or officer takes to fill out the necessary

Page 31

1        A.    It's identification.  I wouldn't say

2   determination.

3             MR. ATKINSON:  Can we take a break for just

4   two minutes, please?

5             MR. KAUFMAN:  Sure.

6             (Recess taken.)

7             MR. KAUFMAN:  Back on the record.

8        Q.    So I want to ask you some questions in detail

9   about how ICE makes the determination that someone is

10  subject to mandatory detention.  But before we go

11  there I want to make sure I understand the

12  decision-making process in general.

13            So I understand that the processing agent is

14  the person who does the interview and makes that

15  initial determination.  Is that correct?

16       A.    The processing agent doesn't make a

17  determination.  What they may do is they may do a

18  recommendation.  And this is for cases that are

19  initial cases coming into custody, not someone coming

20  back after they've already been through the

21  proceedings.

22            For initial cases what will happen is that we

23  do so many of them they -- the great majority of cases

24  are just run through in a normal process.  Officers,

25  as they get more experience, identify cases that would

                                                Page 36

1    or would not allow them to be released, and for the

2    most part they understand the thought process of the

3    person making that decision. And if there's something

4    outside the norm, they'll usually make that

5    recommendation, give that information to the

6    determining official.

7         The processing officer does just that,

8    processes the case, prepares the forms, prepares the

9    worksheets, puts the A-File together and gives that to

10   the supervisor, the SDDO, who then reviews everything

11   and then he's the one who does the determination.

12        Q.   So he would make a determination whether

13   someone was subject to mandatory detention, for

14   example?

15        A.   Yes.

16        Q.   Would he also be the person if someone, let's

17   say, released on bond that would make the

18   determination as to whether to release that person and

19   the amount of bond?

20        A.   Yes.

21        Q.   When the SDDO makes those initial

22   determinations, besides the processing agent are there

23   any other ICE officials involved in the

24   decision-making process?

25        A.   There may be discussions with other

Page 37

1   officials.  The supervisor may discuss the case with a

2   peer.  He may discuss that case with his supervisor.

3   He may discuss the case with our attorneys.

4       Q.   Is there a policy that the SDDO should

5   discuss cases with those individuals or that's just

6   unusual circumstances?

7            MR. ATKINSON:  Object to the form of the

8   question.

9            You can answer.

10           THE WITNESS:  There is no written policy that

11  requires them to discuss a particular case.  The

12  working policy is that if you have a question, you

13  don't understand something or something seems amiss,

14  then you look for additional information.

15  BY MR. KAUFMAN:

16      Q.   After the SDDO makes an initial custody

17  determination, is that determination reviewed by any

18  officials above the SDDO?

19      A.   Not at that time.  That's the initial

20  determination.  Based on that determination, for

21  example, if the decision is made to hold somebody in

22  custody, that person when they get to the detention

23  facility where they're going to stay there's a review

24  of the entire file in which that decision may be

25  looked at and reviewed.

Page 38

1    Q.   So does that happen in every case, that when

2   a person arrives at a detention facility their case is

3   re-reviewed?

4    A.   I believe that is the practice of the field

5   office.

6    Q.   L.A. field office?

7    A.   Yes.

8    Q.   And who conducts that re-review?

9    A.   That review can either be made by the

10  deportation officer or the supervisor that's on duty

11  there, depending on the location and the organization

12  that's set up at that particular facility.

13   Q.   So they have the authority to make that

14  decision to, say, release somebody after the initial

15  determination was made to detain them?

16       MR. ATKINSON:   Object to the form of the

17  question.

18       THE WITNESS:   If it is somebody who is

19  eligible for release, they may re-determine that

20  individual's bond or release, whether to hold that

21  person or not.

22  BY MR. KAUFMAN:

23   Q.   When you said a supervisor may make a

24  determination at a detention facility, are you

25  referring to a supervisory --

Page 39

```
 1        A.    An SDDO.
 2        Q.    In your experience how often does that
 3   re-review at a detention facility lead to a different
 4   outcome than was initially made?
 5             MR. ATKINSON:  Object to the form of the
 6   question.
 7             THE WITNESS:  I do not know.  I've never
 8   worked at a facility like that before and that's not
 9   something that usually comes back to my attention if
10   that is done.
11   BY MR. KAUFMAN:
12        Q.    Do you know -- do you happen to know if it's
13   a common occurrence?
14             MR. ATKINSON:  Object to the form.
15             THE WITNESS:  I don't believe so.
16   BY MR. KAUFMAN:
17        Q.    At the re-determinations that are made at the
18   detention facility, is there a review by officials at
19   a higher level than an SDDO?
20        A.    I do not believe there is on a normal
21   occasion.
22        Q.    So let's turn back now to this initial
23   determination that's made as to whether someone is
24   subject to mandatory detention.  So just so I'm clear,
25   I assume this is the same as with the process that we
```

Page 40

1   just discussed, that it's ultimately going to be the
2   SDDO that makes that final determination.  Is that
3   correct?
4        A.   Yes.
5        Q.   Specific to that determination as to whether
6   someone is subject to mandatory detention, what sort
7   of evidence is reviewed?
8        A.   Initially it's the rap sheet, the criminal
9   history which I refer to as the rap sheet.
10       Q.   Do officials review any database information
11  in making that determination?
12            MR. ATKINSON:  Object to the form.
13            THE WITNESS:  They may.  They may look at
14  the rap sheet.  When I refer to that, I mean the
15  printed-out form of the criminal history.  They may
16  review that on their own.  That's a possibility.
17  BY MR. KAUFMAN:
18       Q.   But is it fair to say that the rap sheet is
19  the primary document they rely on in making mandatory
20  detention determinations?
21       A.   Yes, it is.
22       Q.   So what makes someone subject to mandatory
23  detention?
24       A.   If they have a conviction that is listed in
25  the cases under 236(c) which is shown to be an

Page 41

1    aggravated felony.

2        Q.   Does ICE maintain a list of all convictions

3    that make you subject to mandatory detention?

4        A.   There is a guide that is furnished to us by

5    our attorneys that list those cases.

6            MR. KAUFMAN:  Could you read back that

7    answer?

8            (Record read)

9    BY MR. KAUFMAN:

10       Q.   When you say cases, what are you referring

11   to?

12       A.   I'm sorry.  Those types of convictions.

13   Excuse me.

14       Q.   Does that guide list --

15           MR. ATKINSON:  Go ahead.  Well, I'm sorry.

16   Because we're talking about something provided by

17   counsel, I'd like to be able just to confer with the

18   Chief Counsel's office who is again in the room just

19   to make sure we're not getting into something

20   privileged.

21           MR. KAUFMAN:  Sure.  Want to take a moment?

22           MR. ATKINSON:  Just less than a minute.

23           MR. KAUFMAN:  Sure.

24           (Recess taken.)

25   ///

Page 42

1  BY MR. KAUFMAN:

2      Q.   So can you describe that guidance that's

3  provided concerning mandatory detention

4  determinations?

5          Let me rephrase the question.

6          MR. ATKINSON:   Thank you.

7  BY MR. KAUFMAN:

8      Q.   Can you describe the guidance that's provided

9  by ICE attorneys regarding mandatory detention

10 determinations?

11         MR. ATKINSON:   I'm going to have to assert

12 the privilege, attorney-client privilege, to the

13 extent it seeks the content of guidance provided by

14 counsel to ICE officials with respect to mandatory

15 detention.

16         I am instructing you not to answer the

17 question.

18 BY MR. KAUFMAN:

19     Q.   Besides that guide, are there any other

20 sources that ICE officials consult in determining

21 whether someone is subject to mandatory detention?

22     A.   There may be policies, procedures that are

23 outlined in our ICE web library that's available to

24 them and there may be additional information provided

25 to us from our counsel regarding updated law, cases

                                         Page 43

1   that have changed the law.  But I can't think of

2   anything specific other than that.

3        Q.   How would those updates be communicated to

4   the officials that are making the mandatory

5   determinations?

6        A.   Nowadays the majority of updates are

7   furnished by e-mail, e-mail message or broadcast

8   message.  And a broadcast message is something that

9   goes out to the whole field office.

10       Q.   So if there was a Ninth Circuit case decided

11  that there's a particular, say, California offense

12  that is no longer considered subject -- no longer

13  considered an aggravated felony, that's the type of

14  update the officials would receive?

15       A.   Yes, sir.

16       Q.   Just so I'm clear, besides that guidance and

17  those updates, are there any other sources that ICE

18  officials consult in making mandatory detention

19  determinations?

20       A.   Sources would also include calling of our

21  attorneys to discuss the case.  But I cannot think of

22  any at this time, any other normal sources that we go

23  to.

24       Q.   Are you familiar with the term, legal term,

25  "burden of proof"?

Page 44

```
 1        A.    Yes.
 2        Q.    So what burden of proof is applied when
 3   determining whether someone is subject to mandatory
 4   detention?
 5              MR. ATKINSON:   Object to the form.
 6              THE WITNESS:   The burden of proof can vary.
 7   If this is a -- we're talking -- are we talking about
 8   in general or just mandatory detention?
 9   BY MR. KAUFMAN:
10        Q.    Just mandatory detention.
11        A.    In most cases we rely on the rap sheet, which
12   is actually the charging offense for removability in
13   which we have conviction documents.
14        Q.    And if there's some ambiguity in those
15   conviction documents or in the rap sheet, is there a
16   standard that the ICE officials apply in determining
17   whether those convictions may render them subject to
18   mandatory detention?
19              MR. ATKINSON:   Object to the form.
20              THE WITNESS:   I would not say there is a
21   standard.  But I would say there's always discussions
22   with our attorneys to determine whether the documents
23   that have been presented to us from the state or from
24   the county are adequate to go forward with the
25   charges, to support the charges.
```

Page 45

1   relief in making a determination?

2       A.   Yes.

3       Q.   In what circumstances would that be?

4       A.   That would be where somebody has long family

5   ties or long residency here in the country, the arrest

6   or crime is minor or an infraction, and that in

7   discussions with our attorneys they would recommend or

8   they would advise us that this person would more

9   likely be eligible.

10      Q.   So is it policy or practice for ICE officials

11  to consult with attorneys in determining whether

12  someone is eligible for relief prior to making a

13  custody determination?

14      A.   Not in all cases.  But it is practice to the

15  point where we have an attorney that is now embedded

16  in the field office to answer those types of

17  questions.

18      Q.   Would you say -- how often would you say that

19  occurs?

20      A.   Discussions with an attorney?

21      Q.   About eligibilities for relief in connection

22  with making a custody determination.

23      A.   I'm not sure if I could estimate that.  That

24  would depend on the caseload for the day.  Every day

25  is a little bit different.  If we have a number of

Page 52

1    cases coming from the county jail where there is a
2    relatively minor criminal history, then that would be
3    a higher day compared to somebody's coming out of
4    state prison which would be obviously a lower day.
5              So I don't know if I can give you that.  But
6    I would say it is not uncommon.
7         Q.   Would you say it happens more often than not?
8         A.   No.
9         Q.   When you mention that the official might
10   consult with an ICE attorney, what attorney -- what
11   sort of title of the attorney are you referring to?
12             Are you speaking of ICE trial attorneys?
13             MR. ATKINSON:  Object to the form.
14             THE WITNESS:  I believe it's ICE trial
15   attorney.  Depends on their network, their contacts.
16   May be all the way up to deputy chief counsel.
17   BY MR. KAUFMAN:
18        Q.   So I want to turn now your attention back to
19   this document that we're looking through.
20             MR. ATKINSON:  Exhibit 14.
21             MR. KAUFMAN:  Exhibit 14.
22        Q.   In Section B can you read the first question
23   that's listed there?
24        A.   Section B:  "Is a petition or application
25   pending for this alien or family member?  Explain."

                                              Page 53

1   criminal history.  If based on the supervisor's

2   perception of his danger to the community, his ability

3   to reoffend, his factors as far as how strong his

4   family equities are, work equities, residences, and he

5   decides to make that type of determination, that's one

6   of the first things that they'll look at as kind of a

7   step-down process.

8          First it will be a no-bond, then you go down

9   to a bond, then you would consider an ATD option, then

10  you would consider a lower bond, then you would

11  consider straight O/R.

12         So there's that kind of -- I guess I don't

13  call that a scale, but there's that kind of thought

14  process.

15     Q.   If I understand you correctly, an ICE

16  official doesn't first make a determination whether to

17  release or not and then only after that first decision

18  is made then consider alternatives to detention; it's

19  part of the same --

20     A.    It could be part of the same.  And it could

21  be in addition to.  We may have somebody who has a --

22  who the SDDO would consider a bond to and then -- but

23  with other factors may consider ATD may be an

24  appropriate issue.  For example, somebody comes in and

25  they have no family ties in the area, we may give them

                                               Page 105

1    that determination.

2         Q.   So at that initial custody review stage the

3    SDDO will make a determination to release on ATD, but

4    the ultimate program they're assigned to is determined

5    by the ATD official; is that correct?

6         A.   Once he makes a determination to send someone

7    to ATD, that's the program.  And then within the

8    programs there's variations of the program.

9         Q.   What happens if an ICE official determines to

10   release someone on ATD but there's no availability in

11   the ATD program?

12            MR. ATKINSON:  Object to the form.

13            THE WITNESS:  There has been that issue in

14   the past.  We have had guidance indicating that we

15   were to keep our ATD dockets kind of fluid, if you

16   will, not to have anybody sit in one particular area.

17            For example, in my particular office what

18   happens is somebody who comes on to the ATD program --

19   and this is in San Bernardino, and San Bernardino is a

20   little bit different than other places.  San

21   Bernardino people will initially be enrolled into a

22   GPS device which is an ankle bracelet, a device is

23   connected to their ankle and can spot the locations.

24   After approximately 30 days of compliance on that,

25   they are dropped down to the T/R and then the T/O and

Page 108

ID #:7897

```
 1   so forth.  So in doing that there are a limited number
 2   of spots available for that program.  But as those
 3   people drop down, those numbers become available.
 4   BY MR. KAUFMAN:
 5       Q.   Does it ever happen though that someone is
 6   recommended for an ATD program but there isn't space
 7   at that time?
 8       A.   Not now.  I think -- I think there may have
 9   been in the past.
10       Q.   In the past when that occurred, would the
11   person end up being detained until a spot opened up?
12       A.   Probably not.  They would probably be given
13   some type of bond.  Or, excuse me, it could have gone
14   either way.  They could have been detained, they could
15   have taken another look at their case and determined
16   that they are eligible to just be released straight
17   O/R.
18           So it's kind of hard to say.  It depends on
19   how the deciding official -- which way the deciding
20   official was leaning.  Was he leaning more towards
21   release or was he leaning more towards someone he had
22   to detain.
23       Q.   But it would be possible then for someone to
24   be ordered detained until there was an available ATD?
25       A.   Yes.
```

Page 109

866 299-5127

```
1        Q.    How long has it been the case that you
2    haven't had an issue with ATD availability?
3                MR. ATKINSON:  Object to the form.
4                You can answer.
5                THE WITNESS:  I believe it was when ISAP-2
6    came on.  During the progression of ATD since -- for
7    at least maybe the last four or five years the program
8    has developed to where it's a very, very useful tool
9    for us to use.  And with that, guidance has been
10   created or have been established in different field
11   offices to ensure that that program is available to a
12   larger number of people, which includes a number of
13   slots that have been opened up.
14               At one time in the Los Angeles field office,
15   I believe we only had 200 slots available to us, and
16   now the number is probably closer to 3,000.  And
17   there's different requirements on each one of those
18   steps.
19               For example, that approximate 3,000 number
20   only deals with people who are on full service, and a
21   full-service program is a program in which ISAP has a
22   contractor that monitors those cases specifically and
23   provides us with information.
24               And then there's the other, third lowest, the
25   T/O portion that is a system that we use that is
```

Page 110

1   some type of bond; but that same person comes in and

2   we learn information that maybe there's an issue with

3   a family member, maybe a medical issue with a family

4   member, child is sick, single parent.  That's

5   something we want to really push to get them back to

6   his family, so we would consider the ATD option.  And

7   ATD, I mean Alternatives to Detention.  That's what we

8   would call it.

9       Q.   When ICE officials make that initial custody

10  determination, do they sometimes -- is the

11  determination release on a particular ATD program?

12      A.   Based on the documents that I reviewed for

13  this case, there was a lot of mention of multiple ATD

14  programs.  Since, I believe it was, November of 2009,

15  the contractors that we use for those programs -- I

16  don't think they consolidated, but we chose one.

17  There was multiple contractors that we used previous

18  to that.

19           That contractor has created something called

20  ISAP-2, so that is the form of Alternatives to

21  Detention that we use.  And in reading through some of

22  this material that was submitted to you, I saw that

23  there was mentioned an EMD, electronic monitoring

24  device, and other programs that were part of G4S

25  Corporation that no longer holds the contract with us.

Page 106

1          So if a supervisor decides to do Alternatives

2     to Detention, it's with ISAP program or the B.I.

3     Corporation.  So it's -- there's not as many types

4     available to the supervisor to choose from.

5          Q.   So if I understand, there's only one type

6     available now in the L.A. field office, the ISAP-2

7     program?

8          A.   There's one provider.  There's the ISAP-2

9     program, and in that program there's various levels of

10    supervision that take place.  There's three common

11    ones or the three of them are GPS or technology, which

12    is what they sometimes refer to as full service;

13    there's a telephonic T/O, which is -- in which the

14    alien is monitored by the contractor and still -- and

15    has to do a telephonic call-in system; and there's

16    T/R, which is a system made available that we've

17    contracted with B.I. for but ICE maintains the

18    supervision over and the management of.

19         Q.   Are the SDDOs aware of all these programs,

20    these options?

21         A.   They may not have specific knowledge of each,

22    but every program works a little bit differently.  And

23    at the time that SDDO determines to turn someone over

24    to ATD, they don't necessarily choose ATD this or

25    that; it will usually go to an ATD officer who makes

Page 107

1          You can answer.

2          THE WITNESS:  I can tell you that we are

3    aware of when they re-offend because ISAP notifies us

4    and we take some type of action.  I am not sure and do

5    not know the matrix or how they are kept to track

6    that.

7    BY MR. KAUFMAN:

8       Q.  Do you have any sense of what -- how often

9    that's occurring?

10      A.  It varies.  I can give you an example.

11   Before, this morning, I was dealing with somebody who

12   re-offended out of my office.  And it happens on a --

13   I would say probably at least a weekly basis in my

14   particular office.

15      Q.  Do you find that ISAP is effective in

16   minimizing recidivism rates?

17          MR. ATKINSON:  Object to the form.

18          THE WITNESS:  I don't know if I can answer

19   that.

20   BY MR. KAUFMAN:

21      Q.  In terms of the types of crimes that you see

22   committed by people who re-offend, are there

23   particular types more likely -- that you are more

24   likely to see?

25          MR. ATKINSON:  Object to the form.

Page 118

1           THE WITNESS:  Actually, we have the whole

2     range.  I think it's more common for us to see

3     lower-range crimes, crimes involving driving without a

4     license, drunk in public.  I can -- I know of one case

5     in which somebody committed murder.  The case this

6     morning involved a man they contemplated rape charges

7     for.  So it's all over the board.  But I would say it

8     was more common that it would be lower-ended offenses.

9     BY MR. KAUFMAN:

10         Q.   Is drug possession a common type of crime you

11    see for re-offenders?

12         A.   We see that.

13         Q.   I want to take a step back and talk a little

14    bit more about the process for assessing people for

15    Alternatives to Detention programs and some programs

16    more generally.  So I'm going to start very basic.

17         A.   Okay.

18         Q.   What does the term "Alternatives to

19    Detention" mean for ICE?

20         A.   It means having the availability of a program

21    that allows somebody to be in the community and not in

22    custody.

23         Q.   So is it anything besides custody count as an

24    alternative to detention?

25         A.   I can't think of any.

                                        Page 119

1      Q.    So if someone's released on bond, you
2    consider that an alternative to detention?
3      A.    In -- no.  We say they're on bond.  And when
4    they're on Alternatives to Detention, we mean they're
5    on ISAP.
6      Q.    So in the L.A. field office ATD and ISAP are
7    interchangeable?
8      A.    Yes.
9      Q.    And we've been discussing the ISAP-2 program.
10   When did that program come on line?
11     A.    I believe it was in November of 2009.
12     Q.    How does ISAP-2 differ from the prior ISAP
13   program?
14     A.    Well, I do not know exactly every single
15   change, but the major component is there's a lot more
16   standardization in the way that people were -- or the
17   type of supervision a person was placed in.
18         Beforehand, ISAP-1, somebody could have been
19   placed straight to a T/O or T/R docket or somewhere in
20   between in all the levels of supervision they have.
21   In the new program the standard is they go on to a GPS
22   device for some time until they show compliance with
23   that particular area and then they're stepped down.
24         Also, too, the reporting requirements are a
25   little bit more outlined depending on where that

Page 120

1    person is in their immigration proceedings from one
2    visit or interview maybe every two weeks to at the
3    maximum one every eight weeks depending on pre-order,
4    post-order, things like that.
5        Q.   So could you talk a little bit more about the
6    differences depending on what stage their case is at?
7        A.   The actual device that tracks that person
8    which is a GPS or telephonic reporting systems -- and
9    I'll mention that's kind of interchangeable, T/R and
10   T/O, it's basically the same system but, like I said,
11   one is monitored by the contractor, one is monitored
12   by us.
13       As somebody will come on to the program, they
14   will be started naturally at a higher level of device
15   and also more rigid interview or home visit schedule.
16   As those persons show compliance in those particular
17   elements, the elements get relaxed, so, you know, go
18   from an ankle bracelet on to a telephonic type of
19   reporting system.
20       When somebody gets on to the program, there's
21   usually a home visit that occurs within, I believe,
22   two business days of them being put on to the program.
23   And I believe there is a home visit that happens, I
24   believe, once every two weeks or so for the initial.
25   As someone is on the program longer, I know that that

Page 121

1    can be stretched out to once every eight weeks.  And
2    there's a similar type of schedule for in-office
3    visits in which the alien is required to come into the
4    ISAP office to report in.
5        Q.    How are those schedules determined?
6        A.    The schedules are determined by ISAP.  What
7    happens is during the initial intake and interview by
8    ISAP to the alien, they talk about their day, what
9    type of work do you do, do you work 8:00 to 5:00, are
10   you usually home on Tuesdays and Thursdays, what days
11   are you home, what days are you not available.  The
12   older systems had curfews in place where somebody had
13   to be home by a certain hour.  The newer systems don't
14   have a curfew, but based on information that's
15   provided from the alien to ISAP, they determine a time
16   frame in which they're usually home.  Are they usually
17   home Thursdays and Saturdays between 10:00 and 12:00,
18   are they home, you know, Fridays and Mondays from
19   these particular hours based on that person's
20   schedule.  And that could vary because of the person's
21   work or anything else.  Then during those particular
22   time periods ISAP will make a random visit to their
23   home.
24       Q.    When you refer to ISAP, are you referring to
25   ICE officials or to the contractor?

Page 122

1       A.    When I refer to ISAP, I'm referring to the
2    contractor.
3       Q.    So it's the contractor who determines the
4    schedules for people to report?
5            MR. ATKINSON:  Object to the form.
6            THE WITNESS:  It's -- I'm not sure if it's
7    laid out in the contract.  It's not necessarily the --
8    there's a requirement for them to -- for example, a
9    pre-order case I believe it's one visit every two
10   weeks.  So that type of requirement is out there.  And
11   I believe, but I'm not sure, that may be part of the
12   contract.  But it's the case officer to determine one
13   in that particular area that they may go to.
14   BY MR. KAUFMAN:
15      Q.    Earlier you mentioned that in San Bernardino
16   typically the progression is that after you've had the
17   ankle bracelet you're moved to a lower form of
18   supervisor; is that correct?
19      A.    Yes.
20      Q.    Is that progression from ankle bracelet to
21   off-ankle bracelet -- is that something that's
22   dictated by ICE or by the contractor?
23      A.    It's dictated by ICE.
24      Q.    What is the source of -- how does ICE
25   communicate that to the contractor?

Page 123

1          MR. ATKINSON:  Object to the form.

2          THE WITNESS:  ICE officer assigned -- we have

3    a unit that's assigned to that particular ATD unit and

4    they work very closely with ATD and they monitor the

5    cases that are on there.  They have a lot of

6    communication with the contractor.  So as people are

7    better suited to be lowered in their supervision

8    level, that information is floated to the officers or

9    the supervisor and then continue on with that

10   decision.

11         Then there are some changes that may occur,

12   too.  It's not just de-escalation, it's re-escalation.

13   In San Bernardino also when people are about 30 to 60

14   days out of their next court hearing, our officer

15   requires them to be placed back onto a GPS device and

16   then work it back off after the hearing.

17         Q.   That schedule in terms of when the ankle

18   bracelet is on or off, the one that San Bernardino is

19   currently employing -- when was that policy adopted?

20         A.   Approximately eight months ago.  That's when

21   we determined that we had an issue with our compliance

22   rate being around 60 percent.

23         Q.   And is that a similar policy that the L.A.

24   field office -- all the offices in L.A. field office

25   follow?

                                              Page 124

1       A.    No.

2       Q.    How do other offices differ?

3       A.    The other offices have a very similar program

4    to the de-escalation.  Most offices, most cases do not

5    have the re-escalation prior or before the next

6    hearing.

7       Q.    What ICE official is responsible for making

8    the determination as to what sort of schedule to

9    follow in these ISAP cases?

10      A.    That is usually the deportation officer with

11   concurrence of the supervisor.

12      Q.    Just -- I think I may not have understood you

13   totally correctly.  When did the ISAP-2 program begin?

14      A.    I think it was November of 2009.

15      Q.    And you had also mentioned that currently the

16   contractor in the L.A. field office is B.I.; is that

17   correct?

18      A.    Yes.

19      Q.    When did they become the sole contractor?

20            MR. ATKINSON:  Object to the form.

21            THE WITNESS:  I believe it was right in that

22   time frame.

23   BY MR. KAUFMAN:

24      Q.    Prior to that time frame were there other

25   contractors that were used?

Page 125

```
 1        A.    Yes.   There was a contractor that we refer to
 2   G4S.
 3        Q.    Why did ICE decide to go with B.I.?
 4        A.    I don't know.
 5        Q.    At what stage in the immigration process is
 6   an individual considered for placement on ATD?
 7             MR. ATKINSON:   Object to the form.
 8             You can answer.
 9             THE WITNESS:   Can you -- I'm not sure if I
10   understand your question.
11   BY MR. KAUFMAN:
12        Q.    I want to know at what stages in the
13   immigration process a person can be considered for
14   placement on ATD.  So I presume it's at the initial
15   custody determination?
16        A.    The vast majority of time it's done at the
17   initial determination, as we spoke of earlier, while
18   they're in proceedings and not in custody.  Although
19   it could happen, I don't think I'm aware of any cases
20   that were placed on ISAP.
21        Q.    And there's no mechanism in place to
22   automatically review people while their cases are
23   pending for placement in an ISAP program I take it?
24        A.    No.   Not unless maybe they're arrested again
25   and came back into custody.
```

Page 126