1  STUART F. DELERY
   Acting Assistant Attorney General
2  Civil Division
   DAVID J. KLINE
3  Director, Office of Immigration Litigation
   District Court Section
4  THEODORE W. ATKINSON
   United States Department of Justice
5  Office of Immigration Litigation
        P.O. Box 868, Ben Franklin Station
6       Washington, DC 20044
        Phone: (202) 532-4135
7       theodore.atkinson@usdoj.gov
   SARAH S. WILSON
8  Trial Attorney

9  Attorneys for Respondents

10

11              UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
12                 WESTERN DIVISION

13  ALEJANDRO RODRIGUEZ, *et al.*,       ) Case No. CV 07-3239-TJH (RNBx)
                                         )
14            Petitioners,               )
                                         ) **(1) RESPONDENTS' OPPOSITION TO**
15        vs.                            ) **PETITIONERS' OBJECTIONS TO**
                                         ) **EVIDENCE RELIED UPON BY**
16  TIMOTHY S. ROBBINS, *in his*         ) **RESPONDENTS IN SUPPORT OF**
    *capacity as U.S. Immigration and*   ) **CROSS MOTION FOR SUMMARY**
17  *Customs Enforcement, Los Angeles*   ) **JUDGMENT AND IN OPPOSITION TO**
    *District Field Office Director, et al.,* ) **PETITIONERS' MOTION FOR**
18                                       ) **SUMMARY JUDGMENT**
                                         )
19            Respondents.               )
                                         ) **(2) DECLARATION OF SARAH**
20                                       ) **WILSON WITH EXHIBITS A-E**
                                         )
21                                       )
                                         )
22                                       ) Hon. Terry J. Hatter, Jr.
                                         )
23                                       )
                                         ) Hearing Date:  May 6, 2013
24                                       ) Hearing Time:  UNDER SUBMISSION
                                         )
25  _____ )

26

27

28

Respondents respectfully submit this opposition to Petitioners' Objections to Evidence Relied upon by Respondents' in Support of Cross Motion for Summary Judgment and in Opposition to Petitioners' Motion for Summary Judgment, ECF No. 311.  For the Court's convenience, Respondents have reproduced the text of Petitioners' objections and then set forth Respondents' position on the objections.

**Objection No. 1:**

**Objectionable Assertion**:

"DHS's Office of Inspector General found that historical trends indicate that '62 percent of the aliens released will eventually be issued final orders of removal . . . and later fail to surrender for removal or abscond.'"  Dkt. 299 at 23-24.

**Petitioners' Objections**:

Respondents cite the DHS Report to argue that "historical trends indicate that 62 percent of the aliens released will eventually be issued final orders of removal . . . and later fail to surrender for removal or abscond."  Dkt. 299 at 23-24.  This appears to be a quote from the Report's "Executive Summary," which in turn summarizes information contained on page 17 of the Report.  Dkt. 307 Ex. N at 1, 17.  The Court should exclude this statement – and thus the Report – because it is prohibited hearsay not within any exception. *See* Fed. R. Evid. 801, 802.

*First*, the statement Respondents quote from the 2006 Report does not describe a historical fact.  Rather, it purports to predict future events. The public records hearsay exception in Fed. R. Evid. 803(8) does not extend to predictions about the future. *See United States v. Am. Tel. & Tel. Co.*, 498 F. Supp. 353, 360-61, 363 (D.D.C. 1980) (predictions of future behavior do not constitute "factual findings" as contemplated by Rule 803(8)).

*Second*, the Report fails to satisfy Fed. R. Evid. 803(8)'s high bar for trustworthiness because the underlying data lacks sufficient foundation. *See Bright v. Firestone Tire & Rubber Co.*, 756 F.2d 19, 22 (6th Cir. 1984) ("Rule 803(8)(C) also requires that the report not be subject to circumstances indicating a lack of

1

1    trustworthiness."); *see also Barry v. Trustees*, 467 F. Supp. 2d 91, 102 (D.D.C. 2006)

2    (House Report was "insufficiently trustworthy for admission").  The Report does not

3    disclose the source of the data, other than to note that it was provided by the U.S.

4    Department of Justice.  Dkt. 307 Ex. N at 16.  In addition, the Report's preface admits

5    that it is based upon "interviews with employees and officials of relevant agencies and

6    institutions, direct observations, and a review of applicable documents."  *Id*. at

7    Preface.  "The unverified nature of the evidence relied on … is sufficient reason" to

8    treat the Report's prediction about the future as "not trustworthy enough to be

9    admissible."  *See Bright*, 756 F.2d at 22-23.  And all but "direct observations" create

10   double, and potentially triple hearsay concerns; none of which is admissible absent an

11   independent hearsay exception.  *See Barry*, 467 F. Supp. 2d at 102 (explaining that

12   even if a Senate report is not wholly inadmissible, out-of-court statements within the

13   report are admissible only if within a hearsay exception).

14       *Third*, the prediction in the Report was made in 2006 and was based on

15   nationwide data for the period of 2001 to 2004, whereas this case concerns (a) aliens

16   in the Central District (b) currently being detained for six months or longer (c) under

17   four specific statutes (d) and subject to current practices governing supervision of

18   aliens on release in this district.  Respondents have not offered any evidence – through

19   expert testimony or otherwise – that this stale evidence ever was, or could continue to

20   be, representative of Class members.  *See Allstates Air Cargo, Inc. v. United States*,

21   42 Fed. Cl. 118, 123 (1998) (excluding as inadmissible hearsay survey offered by

22   Government, which had not met its burden to establish that "sample population was

23   properly chosen and defined"); *Reinsdorf v. Skechers U.S.A.*, --- F.Supp.2d ----, 2013

24   WL 454828, at *9-10 (C.D. Cal. 2013) (excluding survey evidence at summary

25   judgment where there was "no indication that the survey population had any

26   relationship to the relevant population"); *Thurston v. Schwarzenegger*, No. 1:08–cv–

27   00342–AWI–GBC (PC), 2011 WL 703553, at *14 (E.D. Cal. Feb. 18, 2011)

28   (excluding statistical study of general prison population as inadmissible and irrelevant

1   to summary judgment motion due to defendant's failure to demonstrate how it could

2   support drawing conclusions about a subpopulation of prisoners).

3          Because Respondents do not cite any other portion of the Report in their brief,

4   the entire Report should be stricken.

5   **Respondents' Position:**

6          The portion of the report cited by Respondents falls squarely within the

7   category of admissible evidence covered by Rule 803(8)'s public records exception to

8   the hearsay rule for "factual findings from a legally authorized investigation."  *See*

9   Fed. R. Evid. 803(8)(A)(iii).  Reports that meet the above criteria are *presumed*

10  *admissible* absent the opposing party demonstrating that the circumstances indicate a

11  lack of trustworthiness.  *See* Fed. R. 803(8)(B); *Jordan v. Binns,* --- F.3d ----, 2013

12  WL 1338049, *7 (7th Cir. 2013).

13         The report – entitled "Detention and Removal of Illegal Aliens" – was prepared

14  by the Department of Homeland Security's Office of the Inspector General as one of a

15  "series of audit, inspection, and special reports prepared as part of the [Inspector

16  General's] oversight responsibilities to promote economy, efficiency, and

17  effectiveness within the department."  ECF No. 307, Ex. N at 1.  The Office of the

18  Inspector General derives authority to conduct audits from the Homeland Security Act

19  of 2002, Pub. L. 1007-296, and the Inspector General Act of 1978.  *Id*. at 1, 38.  The

20  audit was conducted in compliance with federal law and according to generally

21  accepted governmental auditing standards.  *Id*. at 1, 37-38.

22         Contrary to Petitioner's assertions, the OIG report provides a detailed

23  description of its methodology and the documents relied upon in making its findings.

24  The audit was designed to determine, *inter alia*, whether Immigration and Customs

25  Enforcement ("ICE") "is removing all illegal aliens with final orders of removal" and,

26  if not, whether "[e]xternal factors . . . are impacting its ability to perform its detention

27  and removal mission."  *Id*. at 37.  The report "is based on interviews with employees

28  and officials of relevant agencies and institutions, direct observations, and a review of

                                            3

applicable documents." *Id.* Specifically, the audit's methodology included interviews with Detention and Removal Operations ("DRO"), Border Patrol, Customs and Border Protection ("CBP") officials, and ICE investigations at numerous field offices selected based on number of apprehensions, CBP and ICE suggestion, and audit coverage of air, land, and sea operational environments. *Id.*

Petitioners first assert that Rule 803(8)(A)(iii) applies only to "historical facts" and not statements that attempt to "predict future events." Petitioners' argument is premised on distinguishable authority from the D.C. District Court that predates the Supreme Court's expansion of the scope of Rule 803(8) in *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1989). In *Beech Aircraft*, the Supreme Court rejected Petitioners' narrow interpretation of Rule 803(8)(A)(iii) as applying exclusively to factual findings. *Id.* at 170. Instead, the Court applied a broader interpretation of the rule as extending to conclusions contained in Rule 803(8) investigatory reports if the conclusion is based on the factual investigation. *Id.* Here, the referenced statement – that based on historical trends, 62 percent of released aliens will be issued a final order of removal and later fail to surrender for removal – is lifted directly from the report's factual finding that historically 62.3 percent of released aliens were issued final orders of removal and failed to surrender for removal. ECF No. 307, Ex. N at 17 (75% of released aliens are ordered removed; 85% of those aliens will abscond). Thus, the statement is simply a restatement of a properly made factual finding about historical data paired with a second properly made factual finding that, if the rate follows historical trends, it will remain constant in the future. *Id.* Accordingly, it is well within the bounds of conclusions admissible under Rule 803(8)(A)(iii).

Petitioners' second objection – that the cited portion of the report is excludable under Rule 803(8)(B) based on "circumstances indicating a lack of trustworthiness" – is equally unavailing. Petitioners incorrectly cast Rule 803(8)(B) as establishing a "high bar" to trustworthiness. In reality, Rule 803(8)(A)(iii) materials are "*presumptively admissible*" under Rule 803(8)(B) and are subject to exclusion only "if

4

the party opposing admission establishes that the circumstances indicate a lack of trustworthiness." *Binns,* --- F.3d ----, 2013 WL 1338049 at *7.

The OIG report contains no such indicia of unreliability, and, even so, Petitioners' objection falls well short of overcoming the presumption of reliability. *See Beech Aircraft*, 488 U.S. at 167 ("The rule assumes admissibility in the first instance." (alterations omitted)). According to the report, the cited historical statistic is from information tracked by DRO (and not from an unknown DOJ component as alleged by Petitioners). ECF No. 307, Ex. N at 17. OIG's investigation and the report's methodology provide a sufficient basis for proper reliance on the information obtained during the course of the investigation and adopted as fact by the OIG. *Id*. at 1, 16-18, 37-38. Unlike the cases cited by Petitioners, where the reports contained affirmative indicators of unreliability, the OIG report contains no such methodological issues. *See Bright*, 756 F.2d at 22 (report on safety of Firestone Tires stated that the report was not based on "evidence or testimony on . . . problems with [the tires]"); *Barry*, 467 F. Supp. 2d at 102 (House Report was the product of a highly partisan investigation that excluded minority committee members).

Additionally, Petitioners incorrectly assert that the report is excludable under Rule 803(8)(B) based on its reliance on hearsay. However, a governmental report's reliance on hearsay does not render the report inadmissible under Rule 803(8)(B). Indeed, "government reports . . . have to rely on hearsay evidence, and the reports are not generally excluded for this reason." *Moss v. Ole S. Real Estate, Inc.,* 933 F.2d 1300, 1309-10 (5th Cir. 1991). Even so, the information collected by DRO falls within a second hearsay exception found in found in Rule 803(8)(A)(ii). DRO collects removal statistics as the law enforcement component tasked with the execution of final orders of removal. As such, the record of removal statistics falls within a second hearsay exception as public record of "a matter observed while under a legal duty to report." *See* Fed. R. Evid. 803(8)(A)(ii).

Petitions' final objection unsuccessfully attempts to repackage a weak Rule 401 relevancy objection into a Rule 803(8) reliability objection.  *See* Fed. R. Evid. 401(a). Petitioners apparently contend that Rule 803(8)(A)(iii) reports are only admissible where the report studies the very same population as the population as issue in the litigation.  None of the cases cited by Petitioners support this argument.  In those cases, the court excluded reports where there were clear sampling errors present in the surveys underlying the reports.  *See, e.g, Allstates Air Cargo*, 42 Fed. Cl. at 122 (finding survey failed to meet the 803(8)(B) reliability standard because "the survey was not conducted according to generally accepted survey standards").  The issue in those cases was not, as the Petitioners suggest, whether the sample population aligned with the population that is the topic of the litigation, but whether the sample was collected in a manner that aligned with the conclusions drawn *by the report*.  There are no such issues here.  The OIG report is a report of an *audit*, not a *survey*, and expressly states that the audit was conducted in compliance with governmental auditing standards.  ECF No. 307, Ex. N at 1, 37-38.  The report does not rely on sampling and, therefore, there is no sampling incongruence present in the report.

Petitioners' argument appears to be one about the strength of the evidence – specially, that information about removal rates are not applicable because Petitioners' class is not a nationwide class.   This argument flatly ignores Rule 401's directive that "[e]vidence is relevant if . . . it has *any tendency* to make a fact more or less probable than it would be without the evidence."  *See* Fed. R. Evid. 401(a) (emphasis added). Even if accepted as an argument about the weight of the evidence, rather than its admissibility, Petitioners' argument fails.  The report is cited in support of Respondents' argument about the broader purpose of 8 U.S.C. § 1226(c).  *See* ECF No. 299 at 23-24.  There is no doubt that Respondents' use of the report for this purpose meets Rule 401's liberal relevancy standard.  *See* 299 at 23-24 (report cited in support of argument that 1226(c) continued to serve primary statutory purpose).

____ Sustained

____ Overruled

## Objection No. 2:

**Objectionable Assertion:**

"More recently, in 2011 ICE arrested more than 40,000 fugitive aliens who
failed to leave the United States when ordered removed or failed to report to ICE as
required.  Exh. M (Report of ICE, "Fact Sheet: ICE Fugitive Operations Program,"
Nov. 7, 2011).  However, nearly 480,000 fugitive alien cases remained pending at the
end of fiscal year 2011.  *Id.*  Although these figures are not limited to criminal aliens,
one can presume that criminal aliens released on bond pose an even greater flight risk
because, for example, they are less likely to be granted relief from removal." Dkt. 299
at 24.

**Petitioners' Objection:**

*First,* Petitioners object to the third sentence because it is an unsupported and
inadmissible factual assumption, even assuming the first two sentences are admissible
(and, as explained below, they are not).

*Second*, the first two sentences come from a "Fact Sheet" (Dkt. 307 Ex. M),
which fails to satisfy Fed. R. Evid. 803(8)'s high bar for trustworthiness. *See Bright*,
756 F.2d at 22 ("Rule 803(8)(C) also requires that the report not be subject to
circumstances indicating a lack of trustworthiness."); *see also Barry*, 467 F. Supp. 2d
at 102 (House Report was "insufficiently trustworthy for admission").  Aside from a
generic reference to "ICE's databases," the Fact Sheet does not disclose the basis for
the factual assertions.  Dkt. 307 Ex. M. "The unverified nature of the evidence relied
on … is sufficient reason" to treat the Fact Sheet's assertions as "not trustworthy
enough to be admissible."  *See Bright*, 756 F.2d at 22-23.

*Third*, the Fact Sheet was based on nationwide data, whereas this case concerns
(a) aliens in the Central District (b) currently being detained for six months or longer

7

(c) under four specific statutes (d) and subject to current practices governing supervision of aliens on release in this district. Respondents have offered no evidence – through expert testimony or otherwise – that the information in the Fact Sheet is representative of Class members. *See Allstates Air Cargo, Inc.*, 42 Fed. Cl. at 123 (excluding as inadmissible hearsay survey offered by Government, which had not met its burden to establish that "sample population was properly chosen and defined"); *Reinsdorf*, 2013 WL 454828, at *9-10 (excluding survey evidence at summary judgment where there was "no indication that the survey population had any relationship to the relevant population"); *Thurston*, 2011 WL 703553, at *14 (excluding statistical study of general prison population as inadmissible and irrelevant to summary judgment motion due to defendant's failure to demonstrate how it could support drawing conclusions about a subpopulation of prisoners).

**Respondents' Position:**

Petitioners' first argument is not a proper evidentiary objection because it is directed at an argument made by counsel and not the underlying evidence.  To the extent that Petitioners disagree with Respondents' argument, Petitioners' argument may be properly raised in the opposition brief, not as an evidentiary objection.

Petitioners' second and third arguments are based entirely on case law limiting the admissibility of evaluation reports, one of the three categories of public records covered by Rule 803(8).  *See* Rule 803(A)(i)-(iii).  The cases cited by Petitioners are not applicable because the Fact Sheet is admissible under the two other categories of public records covered by Rule 803(8).  *See Jordan v. Binns*, --- F.3d ---, 2013 WL 1338049 (7th Cir. 2013) (noting public records often fall into more than one of the three categories).  The Fact Sheet is admissible under Rule 803(8)(A)(i) as a public record setting out the activities of the ICE Fugitive Operations Team.  *See* ECF No. 307, Ex. M.  It is also admissible under Rule 803(8)(A)(ii) as a record setting out "a matter observed while under a legal duty to report."  The record at issue is generated by the governmental agency tasked with "locat[ing], arrest[ing], and remov[ing]

8

fugitive aliens from the United States" sets out the number of fugitive alien cases. *See* ECF No. 307, Ex. M. These types of Rule 803(8) reports do not raise the unique admissibility and reliability concerns presented by evaluative reports. *See Colvin v. United States*, 479 F.2d 998, 1001 n.3 (9th Cir. 1973). Like evaluative reports, other 803(8) reports are presumptively admissible and may be excluded only where the party opposing admission establishes that the circumstances indicate a lack of trustworthiness. *Binns,* --- F.3d ----, 2013 WL 1338049 at *7. Petitioners have not made a showing capable of overcoming the presumption of admissibility.

For the same reasons discussed in response to Petitioners' first objection, Petitioners' class-based arguments are meritless. Petitions attempts to cast a weak Rule 401 relevancy objection as a Rule 803(8) reliability objection, without providing any basis for finding the report unreliable. *See* Fed. R. Evid. 401(a). The cases cited by Petitioners exclusively deal with sampling errors in surveys. *See, e.g, Allstates Air Cargo*, 42 Fed. Cl. at 122 (finding survey failed to meet the 803(8)(B) reliability standard because "the survey was not conducted according to generally accepted survey standards"). Because the Fact Sheet provides a total number of fugitive cases and *does not rely on sampling*, these cases are not applicable. *Id.* The Fact Sheet is admissible as relevant evidence under Rule 401's liberal admissibility standard for its cited purpose, which was to provide background information on fugitive alien cases nationwide. *See* Fed. R. Evid. 401.

_____ Sustained

_____ Overruled

**Objection No. 3:**

**Objectionable Assertion:**

"[B]y 1996, Congress determined that provisions allowing the release of criminal aliens by immigration judges on bond seriously undermined the Executive's ability to remove criminal aliens or prevent them from committing additional crimes

9

during removal proceedings . . . , Congress concluded that the 1990 and 1991 amendments restoring the Attorney General's discretion to release some aliens on bond had 'weakened substantially' the government's efforts to deport criminal aliens and to protect public safety."  Dkt. 299 at 7 & n.8 (citing "1993 Senate Hearing"), 103d Cong., 1st Sess. 15, 26 (1993)).

**Petitioners' Objections:**

The Court should exclude this assertion – and thus the hearing record in its entirety – because it is prohibited hearsay not within any exception (Fed. R. Evid. 801, 802), and Respondents do not cite any other portion of this hearing record in their brief.

*First*, the portions of the hearing record that Respondents rely upon for this assertion include (1) a Staff Statement prepared by a minority group within a Senate Subcommittee, and (2) a witness's oral testimony. *See* Dkt. 299 at 7 n.8 (citing 1993 Senate Hearing, 103d Cong., 1st Sess. 15, 26 (1993)). Neither is equivalent to factual findings by Congress, as required to be potentially admissible under the public records exception. *See* Fed. R. Evid. 803(8); *Bright,* 756 F.2d at 22 (excluding subcommittee report that was comprised predominately of comments, criticism, and argument); *Pearce v. E.F. Hutton Group, Inc.*, 653 F. Supp. 810, 813 (D.D.C. 1987) (excluding subcommittee report that lacked any "attempt . . . to formulate or set forth separate factual findings"); *Anderson v. City of New York,* 657 F.Supp. 1571, 1577–79 (S.D.N.Y. 1987) (declaring a subcommittee report to be unreliable and hence inadmissible in part because committee engaged in grandstanding and heard testimony from interested parties, not objective experts) (citation omitted).

*Second,* even were the hearing record admissible, the cited portions could not come in because no independent hearsay exceptions apply. *See* Fed. R. Evid. 801, 802; *Barry*, 467 F. Supp. 2d at 102 (explaining that even if a Senate report is not wholly inadmissible, the presence of out-of-court statements within the report are inadmissible unless each part satisfies a hearsay exception).

10

**Respondents' Position:**

Petitioners' objection is frivolous given the Supreme Court's express reliance on this very report in *Demore v. Kim*, to make the very same point about Congressional intent in enacting 8 U.S.C. 1226(c).  *See Demore*, 538 U.S. 510, 517-18 (2003) ("Congress adopted this provision against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens.  *See*, *e.g.,* Criminal Aliens in the United States: Hearings before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 103d Cong., 1st Sess. (1993) S.Rep. No. 104-48, p. 1 (1995) (hereinafter S. Rep. 104-48).").   Thus, the same argument may be properly made by citation to *Demore*.  *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) (summary judgment evidence admissible if can be reduced to admissible form for trial).

Petitioners incorrectly assert that the report is inadmissible under Rule 803(8) because it was "prepared by a minority group" and includes "a witness's oral testimony."  First, while the investigation was directed by Senator William V. Roth, the Ranking Minority Member, the report was submitted by the entire Permanent Subcommittee on Investigation.  S. Rep. No. 104-48.  It obtained bipartisan support from Senator Roth and Senator Nunn, the Subcommittee Chairman.  *Id*.  Secondly, the portion of the report cited by Respondents does not include oral testimony, but represents the subcommittee's conclusion about the effect of earlier amendments to the Attorney General's authority to release criminal aliens.  *Id*. Thus, there is no basis for Petitioners' assertion that the cited portions require an independent hearsay exception.  *See* Fed. R. Evid. 803(8) (establishing exception to hearsay for public records).

_____ Sustained

_____ Overruled

**Objection No. 4:**

**Objectionable Assertion:**

"The House Judiciary Committee agreed that the failure to detain aliens during their deportation proceedings was '[a] chief reason why many deportable aliens are not removed from the United States.'"  Dkt. 299 at 7 n.8 (citing H.R. Rep. No. 469, 104th Cong., 2d Sess., Pt. 1, at 123 (1996)).

**Petitioners' Objection:**

The Court should exclude this statement – and thus the House Report – because it is prohibited hearsay not within any exception (Fed. R. Evid. 801, 802), and Respondents do not cite any other portion of this Report in their brief. The Report is not admissible for the proffered purpose under the public records exception because it contains dissenting views. S*ee* H.R. Rep. 469, Dissenting Views ("Although, we support legislation which would more effectively prevent illegal immigration, we strongly oppose the bill's historically shortsighted and dramatic reductions . . ."); *Pearce v. E.F. Hutton Group, Inc.,* 653 F.Supp. 810, 813–15 (D.D.C. 1987) (excluding House committee report that was prepared as part of the committee's oversight responsibilities, from which the minority members dissented, and that failed "to isolate or distinguish any factual findings from its subjective criticisms and conclusions") (citation omitted).

**Respondents' Position:**

Petitioners' objection is frivolous given the Supreme Court's express reliance on this very report in *Demore v. Kim*, to make the very same point about Congressional intent in enacting 8 U.S.C. 1226(c).  *See Demore*, 538 U.S. 510, 517-18 (2003) ("Congress also had before it evidence that one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings.  *See* Department of Justice, Office of the Inspector General, Immigration and Naturalization Service, Deportation of Aliens After Final Orders Have Been Issued, Rep. No. I-96-03 (Mar.1996), App. 46

12

(hereinafter Inspection Report) ("Detention is key to effective deportation"); see also H.R.Rep. No. 104-469, p. 123 (1995)).") .  Thus, the same argument may be properly made by citation to *Demore*.  *See Fraser*, 342 F.3d at 1037 (summary judgment evidence admissible if can be reduced to admissible form for trial).

Petitioners assert that the report should be excluded because it contains a dissent.  The dissent referenced by Petitioners, however, is not related to the cited finding.  The only case cited by Petitioners in support predates the Supreme Court's expansion of the scope of Rule 803(8) in *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1989).   Under the modern view of Rule 803(8), the report is admissible absent Petitioners' demonstrating that the cited conclusion is unreliable.  *Id*. at at 167 ("The rule assumes admissibility in the first instance." (alterations omitted)).

_____ Sustained

_____ Overruled


**Objection No. 5:**

**Objectionable Assertion:**

"Petitioners also strain to find constitutional deprivation in the sufficiency of the notices provided on the ground aliens are detained 'often without access' to attorneys or family – a fact that is undeniably and outrageously wrong ….", purportedly because visitation hours at "**[e]very detention facility**" "**comply with ICE's National Detention Standards** …." (emphasis added). Dkt. 299 at 52 & n.35 (citing http://www.ice.gov/detention-facilities/ ("ICE Website"); 2008 National Detention Visitation Standards); *see also* Dkt. 299-3 at 20 (citing 2008 and 2011 National Detention Visitation Standards to dispute background fact number 35).

**Petitioners' Objections:**

Petitioners do not dispute that ICE detention facilities maintain websites listing visitation hours and that those published visiting hours may conform to published national visitation standards. Rather, Petitioners object to this assertion because a

published policy is not competent evidence of actual practice, particularly where, as here, Petitioners have submitted direct evidence regarding actual practices in this jurisdiction. *See Shockey v. Huhtamaki, Inc.*, 730 F. Supp. 2d 1298, 1304 (D. Kan. 2010) ("Defendant relies on its Employee Handbook and collective bargaining agreements, which state that employees are to be paid for all time worked and for overtime as required by state and federal law. However, the presence of a written policy is not evidence that the policy was enforced, and certainly does not negate the possibility of an unwritten policy or general practice to the contrary."). For example, contrary to the published policies, one detention center in the Central District has limited visits to "no more than half an hour, and only during certain designated periods on three designated days a week," while another facility prohibits direct contact with anyone but retained counsel; other visits are limited to phone conversations across a see-through barrier or "video chats." Dkt. 281-7 ¶¶ 8-9 (Inlender Decl.). In addition, the Department of Homeland Security's own audits have reported failures to comply with the Detention Standards, including at facilities in the Central District. *See* Kaufman Declaration of April 5, 2013, Exh. I (filed concurrently).

Because Respondents rely upon this evidence solely to prove actual practice, and the evidence is not competent for that purpose, it should be stricken.

**Respondents' Position:**

Petitioners' objection is not a proper evidentiary objection as it does not contest the admissibility of the evidence cited. The sole case cited by Petitioners discusses the weight of policy evidence, not its admissibility. Petitioners have cited no authority that would support striking the relevant policy evidence as inadmissible. *See* Fed. R. Evid. 401 (establishing broad definition of relevant evidence).

_____ Sustained

_____ Overruled

14

**Objection No. 6:**

    **Objectionable Assertion:**

    "In any event, detainees have access to law library materials at detention facilities, in accordance with Exh. V (2008 National Detention Standards, "Law Libraries and Legal Material)." Dkt. 299 at 52 n.36; *see also* Dkt. 299-3 at p. 20 (citing 2008 and 2011 Law Libraries and Legal Material Standards to dispute background fact number 34).

    **Petitioners' Objections:**

    Petitioners do not dispute that Respondents have published national detention standards or that such standards "provide that each detainee shall be permitted to use the law library." Dkt. 299 at 52 n.36. Rather, Petitioners object to this assertion because a published policy is not competent evidence of actual practice, particularly where, as here, Petitioners have submitted direct evidence regarding actual practices in this jurisdiction. *See Shockey*, 730 F. Supp. 2d at 1304 ("Defendant relies on its Employee Handbook and collective bargaining agreements, which state that employees are to be paid for all time worked and for overtime as required by state and federal law. However, the presence of a written policy is not evidence that the policy was enforced, and certainly does not negate the possibility of an unwritten policy or general practice to the contrary."). For example, Class members detained in the Central District have reported limited access to law libraries (*e.g.*, a maximum of roughly 30 minutes per day at certain locations) and to legal resources (*e.g.*, because a detention facility failed to maintain Internet access and its LEXIS subscription). *See* Dkt. 281-1 ¶¶ 13-18 (Merida Decl.); *see also* Dkt. 281-7 ¶ 11 (Inlender Decl.). In addition, the Department of Homeland Security's own audits have reported failures to comply with the Detention Standards, including at facilities in the Central District. *See* Kaufman Declaration of April 5, 2013, Exh. I (filed concurrently).

    Because Respondents rely upon this evidence solely to prove actual practice, and the evidence is not competent for that purpose, it should be stricken.

**Respondents' Position:**

Petitioners' objection is not a proper evidentiary objection as it does not contest the admissibility of the evidence cited. The sole case cited by Petitioners discusses the weight of policy evidence, not its admissibility. Petitioners have cited no authority that would support striking the relevant policy evidence as inadmissible. *See* Fed. R. Evid. 401 (establishing broad definition of relevant evidence).

_____ Sustained

_____ Overruled

**Objection No. 7:**

**Objectionable Declaration & Reports:**

The declaration of Benjamin B. McDowell (Dkt. 299-1) should be excluded in its entirety, and the original and rebuttal reports of Dr. Chester Palmer (Dkt. 307 Exs. P, Q) should be excluded with respect to conclusions and opinions regarding delays associated with continuances.

**Petitioners' Objections:**

The third declaration submitted by Benjamin B. McDowell in this case contains two troubling revelations. *First*, Respondents have withheld information that Mr. McDowell makes clear one would need to determine the actual dates when hearings occurred and, thus, the length of continuances. Dkt. 299-1 at 7-8 ¶¶ 12-13 (disclosing, for the first time, an "UPDATE_DATE" value in the Schedule Table). Mr. McDowell admits that Respondents created a database for purposes of this litigation that incorporated the "Schedule Table" (Dkt. 299-1 at 2 ¶ 2), but Respondents withheld a pertinent field in the Schedule Table from Petitioners and Petitioners' expert. In fact, Respondents still have not disclosed this readily-available electronic data field, except for the seven records summarized in Mr. McDowell's declaration, which relate to *one* class member. Dkt. 299-1 ¶ 13.

*Second*, to make matters worse, Mr. McDowell originally swore that the "most appropriate way to calculate the length of delays" would be by using the "Schedule Table" alone – indeed, that it would "not be appropriate" to look at "data entry or data correction contained in the Actions Table" – and, further, that the "Actions Table is not set up in a way that allows the user to link particular entries in the Actions Table to particular changes in the Schedule Table …." Dkt. 299-1 Ex. B ¶¶ 6-7 (McDowell declaration dated Dec. 14, 2012). However, if Mr. McDowell's newly submitted declaration is to be believed, the only reliable way to calculate delay due to a continuance would be to compare the Schedule Table to the Actions Table, because the Actions Table contains data entry and data correction information not available in the Schedule Table. Dkt. 299-1 ¶¶ 12-13; *see* Declaration of Susan B. Long of April 5, 2013 ¶¶ 5-6 (filed concurrently) ("Long Decl."). In short, Mr. McDowell has not only changed his testimony, but he has done so based on undisclosed information that should have been produced during discovery.

The Court should strike the declaration of Mr. McDowell in its entirety, and also strike the declaration of Dr. Chester Palmer with respect to the portions of his analysis that concern adjournments (because it relies on data from the Schedule Table and Actions Table) because of the manifest and significant prejudice caused to Petitioners by these revelations:

- Respondents have challenged the conclusions and analysis of Petitioners' expert as incomplete, but Petitioners' expert could not have considered data that, to this day, Respondents have withheld despite its purported relevance to determining when hearings occurred and, thus, the length of continuances. *See* Long Decl. ¶¶ 10-11.

- Petitioners could not have known until now that Respondents were withholding this information because Mr. McDowell represented that one can determine "when a hearing was adjourned" by looking at a particular field ("ADJ_DATE"),[1] and that one should measure delay solely by

17

looking at the Schedule Table, whereas he now asserts that one must compare a field in the Schedule Table that was never previously disclosed to information in the Actions Table to ascertain whether the "ADJ_DATE" truly is the date when a hearing was adjourned.

- This newly disclosed information reveals additional defects in the methodology employed by Respondents' expert, Dr. Palmer, that Petitioners did not have an opportunity to explore during Dr. Palmer's depositions or to address in Dr. Long's original or rebuttal expert reports, which Petitioners expended thousands of dollars to prepare. *See* Long Decl. ¶¶ 6, 8-10.

- In addition, Mr. McDowell's recent declaration raises a host of questions about the accuracy and reliability of the data provided by Respondents regarding continuances. *See* Long Decl. ¶ 12. Mr. McDowell's purported explanation about how to determine the actual date of a hearing by comparing the Schedule Table and Actions Table does not work even for the handful of records in his declaration, which relate to only one of the more than 1,000 class members in the data set analyzed by the parties' experts.

One of Respondents' principal arguments in their brief is that immigrants request continuances, and that such requests materially contribute to the length of detention. Dkt. 299 at 36-39. Respondents rely heavily upon their expert's work to support this argument. Petitioners have set forth why, as a legal matter, these arguments do not defeat the right of Class members to adequate bond hearings. But Petitioners were entitled to the underlying data, which they repeatedly requested in discovery, so that Petitioners and Dr. Long could independently assess and rebut Respondents' claims about continuances, including those made by Respondents' expert Dr. Palmer. Given the late stage of these proceedings, that the parties have completed fact and expert discovery, and that this information was readily available to

18

Respondents in electronic databases before the close of fact and expert discovery, the only way to cure the prejudice caused by Respondents' conduct is to strike the declaration of Mr. McDowell and the portions of Dr. Palmer's reports relating to continuances. In the alternative, and at a minimum, Mr. McDowell's declaration should be stricken because a witness cannot change sworn testimony in response to a motion for summary judgment. *Reinsdorf v. Skechers U.S.A.*, --- F.Supp.2d ----, 2013 WL 454828, at *6-7 (C.D. Cal. 2013) (striking evidence under "sham affidavit" rule in connection with summary judgment ruling); *Fredianelli v. Jenkins*, --- F.Supp.2d ----, 2013 WL 1087653, at *1-3 (N.D. Cal. 2013) (same).

**Response by Respondents:**

Petitioners' objection to Mr. McDowell's declaration and Dr. Palmer's expert reports should be summarily overruled. Petitioners' objection is premised on two unsupported assertions: (1) Mr. McDowell has changed his testimony and (2) Respondents had an obligation to produce "Update_Date" information from the CASE database server. Both assertions are demonstrably false.

Mr. McDowell has consistently testified that the most reliable and appropriate way to calculate the length of delays is by using two pieces of information in the Schedule Table: the "ADJ_Date," which represents the dates of scheduled hearings in a particular immigration proceeding, and the "ADJ_RSN," which represents the reason that a scheduled hearing was either rescheduled or concluded. *See* ECF No. 299-1 at ¶¶ 3-4; Exhibit A; Exhibit B ¶¶ 3-6. Mr. McDowell has described and demonstrated the process for calculating delays based on these two pieces of information in his declarations. *See* ECF No. 299-1 at ¶¶ 3-4; 7-11; Exhibit A; Exhibit B ¶¶ 3-6. In his declarations dated July 18, 2012, and December 12, 2012, he explained the relationship between the "ADJ_Date" and the corresponding "ADJ_RSN" and testified that they provide the most reliable way to calculate the amount of time a proceeding was delayed as a result of continuance requests. Mr. McDowell further explained that the most appropriate way to run this calculation

would be to count the number of days between the date of the originally scheduled hearing and date of the next scheduled hearing. *See* ECF No. 299-1 at Exhibit A; Exhibit B ¶¶ 3-6. Calculating delays in this manner is consistent with the operational purpose of the Schedule Table, which is used to monitor the asylum clock and track case completion times. *See* McDowell Dep. at Exhibit 20. Those calculations rely on the Scheduling Table for information about particular delays that are subtracted from the total case processing time. *Id*. Those delays are calculated in the same way Dr. Palmer calculated the delays in his report. *Id*.

Mr. McDowell has also consistently testified that the information in the Actions Table cannot be used to verify the reliability of the information in the Schedule Table. *See* ECF No. 299-1 at Exhibit A ¶¶ 5, 12; Exhibit B ¶¶ 5-7. Mr. McDowell has never suggested that information in the Actions Table would be in any way useful in calculating delays. *See generally* McDowell Dec. and Exhibits. Rather, Mr. McDowell has repeatedly provided examples and explanations of the most reliable process for calculating delays without referencing any information in the Actions Table. *Id*. The reason the Actions Table is not useful for this purpose is explained by Mr. McDowell's prior testimony that the operational purpose of the Actions Table is to track metadata associated with changes to records in the CASE system. *Id*. at Exhibit B ¶ 7. Therefore, it is not possible to use this data to determine, for example, dates of scheduled hearings or adjournments, because the Actions Table collects only data-entry data. *Id*. Hearing dates are exclusively stored in the Schedule Table, specifically in the ADJ_Date field, making the information in the Schedule Table the most reliable way, and the only way using the CASE database, to calculate the time between hearings that are adjourned due to an alien's request for additional time. *Id*. at Exhibit B ¶ 6.

Ignoring Mr. McDowell's consistent position that the Schedule Table alone represents the most reliable means of calculating continuance delays, Petitioners manipulate Mr. McDowell's declaration to assert that he has changed his testimony to

say "the only reliable way to calculate delay due to a continuance would be to compare the Schedule Table to the Actions Table, because the Actions Table contains data entry and data correction information not available in the Schedule Table." This is patently false. The sole reason for Mr. McDowell's reference to the Actions Table data in his March 15, 2013, is to address *Petitioners' claim* that the Action Table data contradicts data in the Schedule Table. *See* ECF No. 299-1, McDowell Dec. at ¶¶ 7-13. Mr. McDowell does not use the Actions Table data for any purpose other than to demonstrate that Petitioners' understanding of the Actions Table is incorrect. *Id*. Mr. McDowell never suggests that the Actions Table has any value in calculating delays in proceedings. He has remained steadfast in his testimony that continuance delays are most reliably calculated based exclusively on two pieces of information in the Schedule Table: ADJ_Date and ADJ_RSN. *See* ECF No. 299-1 at ¶¶ 3-4; Exhibit A; Exhibit B ¶¶ 3-6. Petitioners have not specifically pointed to a single change in testimony, much less a change in testimony that rises to the level of a sham affidavit. *See Reinsdorf v. Skechers U.S.A.*, --- F.Supp.2d ----, 2013WL 454828, at *6-7 (C.D. Cal. 2013).

Petitioners' second assertion is equally unfounded. Respondents were under no obligation to *sua sponte* produce the "Update_Date" information. Respondents have not pointed to any discovery request to which this information would have been responsive. Indeed, it was not responsive to any of Petitioners requests for database information. *See* Wilson Decl. at ¶¶ 3-5 & Exhibits B-D. Petitioners did not request the entirety of the information stored by the CASE database and server, but instead limited their request to fields that would provide specific information: criminal history, country of origin, detention information, nature and outcomes of custody reviews and removal proceedings, and whether the detainee was represented. *Id*. at Exhibit C, pp. 2-3. The information in the Update_Date field is not responsive to any category of Petitioners' database requests. *See id*. at Exhibit B, RFP 4 (preserving objections to broader reading of request). Petitioners have not asserted that the data is

21

subject to any voluntary disclosure requirements.  *See* Fed. R. Civ. P. 26.  As even Dr. Long admits, Respondents' expert did not use this information in conducting his analysis.  ECF No. 318 at ¶ 10 ("The Update_Date field was not included in the . . . files released to . . . Dr. Palmer[.].").  Respondents have produced the only Update_Date data on which they have relied through Mr. McDowell's declaration. There is no free-standing obligation to produce anything more than has already been produced to Petitioners in this case.

Petitioners have not cited any authority to support the extraordinary relief they request, which includes (1) striking an entire expert report prepared by a qualified and properly disclosed expert witness, (2) striking an entire declaration of a properly disclosed fact witness, and (3) striking a large portion of a timely rebuttal expert report.  To support Petitioners' claim to this unprecedented relief, they assert that Mr. McDowell's declaration caused them "manifest and significant prejudice."  However, any prejudice suffered by Petitioners is the result of Petitioners' own failure to fully investigate their own theory before pursuing it in a rebuttal expert report.

Petitioners' prejudice claim is substantially undermined by Petitioners' decision not to depose Mr. McDowell on issues related to the CASE database raised by Petitioners' during the deposition of Dr. Palmer.  Shortly after the close of expert discovery, Respondents agreed to make Mr. McDowell available for a second deposition to address questions posed by Petitioners to Dr. Palmer about the database. Wilson Decl. at ¶ 6.  After Dr. Palmer's deposition, Respondents informed Petitioners of their intention to file a supplemental declaration by Mr. McDowell in support of Respondents' cross motion for summary judgment.  *Id*. at 7.  The anticipated purpose of the declaration was to have Mr. McDowell address questions about the database that Respondents believed Petitioners inappropriately directed to Dr. Palmer, who repeatedly indicated that he was unable to answer Petitioners' questions due to his lack of familiarity with the database.  *Id*.  Petitioners declined to take Mr. McDowell's deposition.  *Id*. at ¶ 6.

Any alleged prejudice is a result of Petitioners' failure to seek discovery to confirm their understanding of the Actions Table and identify any additional information that would be relevant to the theory set forth in Petitioners' rebuttal expert report.  Respondents were under no obligation to forecast the position that Petitioners would take in their rebuttal expert report and voluntarily produce information in anticipation of Petitioners' perceiving a need for it.  Respondents could not have known what additional database information Petitioner might perceive as useful – this would be an especially difficult task given that Respondents believe Petitioners' view relies on a fundamental misunderstanding of the database information.  It is for precisely this reason that the responsibility lies with Petitioners to craft discovery requests geared towards identifying and obtaining information to support their legal theories.   Respondents went above and beyond their discovery obligations by agreeing to make Mr. McDowell available for a second deposition.  After having their offer rejected by Petitioners, Respondents were under no obligation to voluntarily produce information to Petitioners.  Any prejudice incurred by Petitioners from their failure to obtain that information is not the fault of Respondents and provides no basis for Petitioners' objection.

_____ Sustained

_____ Overruled

**Objection No. 8:**

**Objectionable Assertions:**

Benjamin B. McDowell (Dkt. 299-1) asserts that various "adjournments" reflected in electronic database records are "alien caused delays," in the course of purporting to summarize records relating to five aliens.  Dkt. 299-1 ¶¶ 7-11.

**Petitioners' Objections**:

To the extent Mr. McDowell's declaration is not stricken in its entirety due to inconsistencies, and because pertinent information now relied upon by Respondents

23

was withheld, Petitioners object to repeated assertions in his declaration that the

records for five aliens reflect "alien caused delays" on the grounds of lack of

foundation. Fed. R. Evid. 602. As Petitioners have demonstrated, aliens may request

or receive continuances at the direction and advisement of an immigration court, and

Mr. McDowell does not claim otherwise. *See* Dkt. 281-4 ¶ 5 (Castillo Decl.). The

records purportedly summarized by Mr. McDowell do not capture whether a

continuance or adjournment occurred at the direction and advisement of an

immigration court (Long Decl. ¶¶ 4-9 (filed concurrently)), and Mr. McDowell, as a

non-lawyer information technology employee, has no personal knowledge of the

proceedings in the underlying actions. In light of this, Petitioners object to Mr.

McDowell's speculation that these continuances were "alien caused delays" and

Respondents' arguments based on that speculation.

**<u>Respondents' Position:</u>**

Mr. McDowell's declarations and deposition testimony establish a proper

foundation for his testimony labeling particular delays as "alien caused." Fed. R.

Evid. 602. Petitioners established Mr. McDowell's knowledge of Operating Policies

and Procedures Memorandum 05-07 ("OPPM 05-07"), Definitions and Use of

Adjournment, Call-up and Case Identification Codes, during his deposition. Wilson

Decl., Ex. A ("McDowell Dep.") at Exhibit 20; 131:8-25. OPPM 05-07 provides a

definition for the adjournment codes and, for each adjournment code, identifies

whether the adjournment is caused by the alien, is caused by the Department of

Homeland Security, is caused by the immigration judge, or is operational in nature.

*Id.* at Exhibit 20 to McDowell Dep. Mr. McDowell has also testified to creating the

excel spreadsheet, "AC_Delays," used by Dr. Palmer in conducting his data analysis.

*See* ECF No. 299-1at Exhibit B, ¶ 3. He further testified that in preparing the

AC_Delays spreadsheet he included a column labeled "Alien Caused," which

indicates whether particular adjournments and the resulting delays resulted from an

alien's request for a continuance. *Id.* He testified that the information in the "Alien

24

1    Caused" field was taken from information in EOIR's database that tracks whether a

2    particular adjournment was "registered by" the alien. *Id.* According to Mr.

3    McDowell, by using this information, it is possible to calculate the amount of time a

4    proceeding was delayed due to a particular continuance. *Id.* at ¶ 6. Thus, Mr.

5    McDowell's prior testimony establishes a foundation for labeling continuances

6    resulting from adjournments coded as registered by the alien as "alien caused delays."

7    Fed. R. Evid. 602.

8    _____ Sustained

9    _____ Overruled

10

11

12    Dated: April 26, 2013                    Respectfully submitted,

13                                             STUART F. DELERY
                                               Acting Assistant Attorney General
14                                             Civil Division
                                               DAVID J. KLINE
15                                             Director
                                               THEODORE W. ATKINSON
16                                             United States Department of Justice
                                               Office of Immigration Litigation
17                                             District Court Section

18                                             /s/ Sarah S. Wilson
                                               SARAH S. WILSON
19                                             Trial Attorney
                                               P.O. Box 868, Ben Franklin Station
20                                             Washington, DC 20044
                                               Phone: (202) 532-4700
21                                             sarah.s.wilson@usdoj.gov

22

23

24

25

26

27

28

25

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I certify that on April 26, 2013, I served a copy of the foregoing through the
Court's CM/ECF system on the following counsel of record:

4

5    Ahilan T. Arulanantham                Judy Rabinovitz
     ACLU Foundation of Southern           ACLU Immigrants' Rights Project
6    California                            125 Broad Street 18th Floor
     1616 Beverly Boulevard                New York, NY 10004
7    Los Angeles, CA 90026                 212-549-2618
     213-977-5211                          Fax: 212-549-2654
8    Fax: 213-977-5297                     Email: jrabinovitz@aclu.org
     Email: aarulanantham@aclu-sc.org
9                                          Cody Jacobs
     Jayashri Srikantiah                   Sidley Austin LLP
10   Stanford Law School                   555 West Fifth Street Suite 4000
     Immigrants' Rights Clinic,            Los Angeles, CA 90013-1010
11   Crown Quadrangle                      213-896-6000
     559 Nathan Abbott Way                 Fax: 213-896-6600
12   Stanford, CA 94305-8610               Email: cjacobs@sidley.com
     650-724-2442
13   Fax: 650-723-4426
     Email: jsrikantiah@law.stanford.edu

14   Sean Commons
     Sidley Austin
15   555 West Fifth Street Suite 4000
     Los Angeles, CA 90013-1010
16   213-816-6000
     Fax: 213-896-6600
17   Email: scommons@sidley.com

18

19

20                                         */s/ Sarah S. Wilson*

21                                         Sarah S. Wilson

22                                         Trial Attorney
                                           United States Department of Justice

23

24

25

26

27

28