UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



**FILED**

JUL 23 2013

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

ALEJANDRO RODRIGUEZ; et al.,

               Petitioners - Appellees,

 and

EFREN OROZCO,

               Petitioner,

 v.

TIMOTHY ROBBINS, Field Office Director, Los Angeles District, Immigration and Customs Enforcement; et al.,

               Respondents - Appellants.

No. 12-56734

D.C. No. 2:07-cv-03239-TJH-RNB
U.S. District Court for Central California, Los Angeles

**MANDATE**

**RECEIVED**
**CLERK, U.S. DISTRICT COURT**

7/23/2013

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____ **DEPUTY**
DLM

The judgment of this Court, entered April 16, 2013, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure.

Costs are taxed against the appellants in the amount of $54.40.

            FOR THE COURT:
            Molly C. Dwyer
            Clerk of Court

            Rhonda Roberts
            Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALEJANDRO RODRIGUEZ; ABDIRIZAK ADEN FARAH; JOSE FARIAS CORNEJO; YUSSUF ABDIKADIR; ABEL PEREZ RUELAS, for themselves and on behalf of a class of similarly-situated individuals,<br><br>                    *Petitioners-Appellees,*<br><br>                    and<br><br>EFREN OROZCO,<br>                    *Petitioner,*<br><br>                    v.<br><br>TIMOTHY ROBBINS, Field Office Director, Los Angeles District, Immigration and Customs Enforcement; JANET NAPOLITANO, Secretary, Homeland Security; ERIC H. HOLDER, JR., Attorney General; WESLEY LEE, Assistant Field Office Director, Immigration and Customs Enforcement; RODNEY PENNER, Captain, Mira Loma Detention Center; SANDRA HUTCHENS, Sheriff of Orange County; OFFICER NGUYEN, Officer-in-Charge, Theo Lacy Facility; CAPTAIN DAVIS | No. 12-56734<br><br>D.C. No.<br>2:07-cv-03239-TJH-RNB<br><br>OPINION |

2                    RODRIGUEZ v. ROBBINS

NIGHSWONGER, Commander, Theo
Lacy Facility; CAPTAIN MIKE
KREUGER, Operations Manager,
James A. Musick Facility; ARTHUR
EDWARDS, Officer-in-Charge, Santa
Ana City Jail; RUSSELL DAVIS, Jail
Administrator, Santa Ana City Jail;
JUAN P. OSUNA, Director, Executive
Office for Immigration Review,
                        *Respondents-Appellants.*

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Senior District Judge, Presiding

Argued and Submitted
March 4, 2013—Pasadena, California

Filed April 16, 2013

Before: Kim McLane Wardlaw and Ronald M. Gould,
Circuit Judges, and Sam E. Haddon, District Judge.*

Opinion by Judge Wardlaw

_____

* The Honorable Sam E. Haddon, District Judge for the U.S. District
Court for the District of Montana, sitting by designation.

Rodriguez v. Robbins                                    3

## SUMMARY[**]

### Immigration

The panel affirmed the district court's grant of a
preliminary injunction in favor of a certified class of non-
citizens who challenge their prolonged detentions, requiring
the government to identify those detained in subclasses
pursuant to 8 U.S.C. § 1226(c) (certain criminal or terrorist
aliens) and § 1225(b) (arriving aliens), and to provide each
with an individualized bond hearing before an Immigration
Judge.

The panel held that petitioners-appellees were likely to
succeed on the merits of their claim that § 1225(b) must be
construed to authorize only six months of mandatory
detention, after which detention is authorized by § 1226(a)
and a bond hearing is required.  The panel also held that the
preliminary injunction is necessary to ensure that individuals
whom the government could not prove constitute a flight risk
or danger to public safety are not needlessly detained, and
that appellees therefore clearly showed a risk of irreparable
harm.

### COUNSEL

Theodore W. Atkinson (argued), Stuart F. Delery, August
Flentje, David J. Kline, United States Department of Justice,
Washington, D.C., for Appellants.

---

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

4                    RODRIGUEZ v. ROBBINS

Ahilan T. Arulanantham (argued), Michael Kaufman, ACLU
Foundation of Southern California, Los Angeles, California;
Judy Rabinovitz and Michael Tan, ACLU Immigrants' Rights
Project, New York, New York; Jayashri Srikantiah, Stanford
Law School Immigrants' Rights Clinic, Stanford, California;
Sean Commons and Cody Jacobs, Sidley Austin LLP, Los
Angeles, California, for Appellees.

Angel L. Tang, Marco J. Martemucci, and Elizabeth S. St.
John, Arnold & Porter LLP, Los Angeles, California, for
Amici Curiae professors and researchers of sociology,
criminology, anthropology, and law.

Sarah H. Paoletti, Elizabeth Freed, and Suniti Mehta,
University of Pennsylvania Law School Transnational Legal
Clinic, Philadelphia, Pennsylvania, for Amici Curiae
international law professors and human rights clinics and
clinicians.

---

## OPINION

WARDLAW, Circuit Judge:

    Alejandro Rodriguez, Abdirizak Aden Farah, Jose Farias
Cornejo, Yussuf Abdikadir, and Abel Perez Ruelas
("Appellees") are the named plaintiffs representing a certified
class of non-citizens who challenge their prolonged detention,
pursuant to certain federal immigration statutes, without
individualized bond hearings and determinations to justify

Rodriguez v. Robbins                     5

their continued detention.[1]    The district court entered a
preliminary injunction requiring the government to identify
all class members detained pursuant to 8 U.S.C. §§ 1226(c)
and 1225(b) (the "1226(c) subclass" and "1225(b) subclass,"
respectively), and to "provide each of them with a bond
hearing before an Immigration Judge with power to grant
their release."    Under the preliminary injunction, at the
conclusion of each bond hearing, the Immigration Judge
("IJ") "shall release each Subclass member on reasonable
conditions of supervision, including electronic monitoring if
necessary, unless the government shows by clear and
convincing evidence that continued detention is justified
based on his or her danger to the community or risk of
flight."[2]    The government appeals that order, and we affirm.

---

[1] The class consists of:

> all non-citizens within the Central District of California
> who: (1) are or were detained for longer than six
> months pursuant to one of the general immigration
> detention statutes pending completion of removal
> proceedings, including judicial review, (2) are not and
> have not been detained pursuant to a national security
> detention statute, and (3) have not been afforded a
> hearing to determine whether their detention is justified.

[2] The district court entered its order on September 13, 2012.  Thereafter,
a panel of our court stayed the injunction for 30 days, giving the
government until November 12, 2012 to comply with the preliminary
injunction.  At oral argument, government counsel represented that, since
bond hearings began in mid-November of 2012, about 400 hearings have
been conducted under the district court's order.  Government counsel
stated that about two-thirds of those hearings resulted in the release of the
alien on bond.

## I.

At any given time, thousands of immigrants to the United States are detained while they await the conclusion of administrative and judicial proceedings that will determine whether they may remain in this country. According to the most recently available statistics, over 429,000 detainees were held by U.S. Immigration and Customs Enforcement ("ICE") over the course of fiscal year 2011; on average, over 33,000 were detained on any given day.[3] As of late 2011, the Los Angeles Field Office of ICE oversaw the detention of over 2,000 aliens, the great majority of whom were not subject to a final order of removal. *Id.* at 1.

This appeal concerns individuals detained in southern California for six months or longer under one of two federal immigration statutes. Section 1226(c) of Title 8 of the United States Code ("Section 1226(c)" or "§ 1226(c)") subjects certain aliens who are deportable or inadmissible on account of their criminal history to mandatory detention pending proceedings to remove them from the United States.[4] If an

---

[3] U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations Facts and Statistics 3 (2011), *available at* http://www.ice.gov/doclib/foia/reports/ero-facts-and-statistics.pdf.

[4] Mandatory detention under Section 1226(c) applies to aliens who are inadmissible on account of having committed a crime involving moral turpitude or a controlled substance offense, on account of having multiple criminal convictions with an aggregate sentence of five years or more of confinement, on account of connections to drug trafficking, prostitution, money laundering, or human trafficking, on account of having carried out severe violations of religious freedom while serving as a foreign government official, or on account of having been involved in serious criminal activity and asserting immunity from prosecution; aliens who are deportable on account of having been convicted of two or more crimes

ICE official determines that an individual's criminal history triggers application of §1226(c), the alien is processed for detention. If the relevant ICE official is unsure whether § 1226(c) applies to a certain individual, he may consult an ICE attorney who is "embedded" in the field office. Detainees are permitted to ask an Immigration Judge to reconsider the applicability of mandatory detention, *see* 8 C.F.R. § 1003.19(h)(2)(ii), but such review is limited in scope and addresses only whether the individual's criminal history falls within the statute's purview. *See generally In re Joseph*, 22 I. & N. Dec. 799 (B.I.A. 1999).

Section 1225(b) of Title 8 ("Section 1225(b)" or "§ 1225(b)"), the other statute at issue here, applies to "applicants for admission," such as those apprehended at the border or at a port of entry. The statute provides that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained" for removal proceedings. 8 U.S.C. § 1225(b)(2)(A); *see also* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (providing for mandatory detention of asylum seekers "pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."). Although Section 1225(b) generally mandates

---

involving moral turpitude, an aggravated felony, a controlled substance offense, certain firearm-related offenses, or certain other miscellaneous crimes; aliens who are deportable on account of having committed a crime of moral turpitude within a certain amount of time since their date of admission for which a sentence of one year or longer has been imposed; and aliens who are inadmissible or deportable because of connections to terrorism. *See* 8 U.S.C. § 1226(c) (cross-referencing 8 U.S.C. §§ 1182(a)(2), 1227(a)(2)(A)(ii), 1227(a)(2)(A)(iii), 1227(a)(2)(B), 1227(a)(2)(C), 1227(a)(2)(D), 1227(a)(2)(A)(i), 1182(a)(3)(B), 1227(a)(4)(B)).

8                    RODRIGUEZ V. ROBBINS

the detention of aliens seeking admission pending their
removal proceedings, individuals detained under the statute
may be eligible for discretionary parole from ICE custody.
*See* 8 U.S.C. § 1182(d)(5)(A).[5]  In the Central District of
California, detainees are notified that they will be reviewed
for parole and are asked to fill out a questionnaire and to
submit to an interview with ICE officers to probe their
suitability for parole.  The agency considers the alien's
potential dangerousness and criminal history, as well as flight
risk, in making parole determinations.  If a detainee is denied
parole, he or she is notified orally and by a written form on
which the explanation for the denial is conveyed through a
checked box.  Before the district court entered the preliminary
injunction, parole was the only possible release mechanism
available to most 1225(b) subclass members.

Appellees argue that prolonged mandatory detention
under these statutes without any possibility for review of the
government's justification for their imprisonment by a neutral

---

[5] Section 1182(d)(5)(A) provides:

> The Attorney General may, except as provided in
> subparagraph (B) or in section 1184(f) of this title, in
> his discretion parole into the United States temporarily
> under such conditions as he may prescribe only on a
> case-by-case basis for urgent humanitarian reasons or
> significant public benefit any alien applying for
> admission to the United States, but such parole of such
> alien shall not be regarded as an admission of the alien
> and when the purposes of such parole shall, in the
> opinion of the Attorney General, have been served the
> alien shall forthwith return or be returned to the custody
> from which he was paroled and thereafter his case shall
> continue to be dealt with in the same manner as that of
> any other applicant for admission to the United States.

arbiter would raise grave constitutional concerns.  Thus,
relying on a related series of our decisions, Appellees
requested a preliminary injunction guaranteeing them, when
their detention exceeds six months in duration, an
individualized determination of whether their continued
detention is necessitated by any flight risk or possible danger
to the community.  The government argues that both statutes
unambiguously require mandatory detention with no limit on
the duration of imprisonment and that the Supreme Court has
repeatedly affirmed the federal government's constitutional
and statutory authority to require such detention.  We agree
with the district court that, based on our precedent, the canon
of constitutional avoidance requires us to construe the
government's statutory mandatory detention authority under
Section 1226(c) and Section 1225(b) as limited to a six-
month period, subject to a finding of flight risk or
dangerousness.

## II.

"The district court's grant of a preliminary injunction is
reviewed for abuse of discretion and should be reversed if the
district court based its decision on an erroneous legal standard
or on clearly erroneous findings of fact."  *Stormans, Inc. v.
Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009) (internal
quotation marks omitted).  "The district court's interpretation
of the underlying legal principles, however, is subject to de
novo review."  *Id.*  An overbroad injunction is an abuse of
discretion.  *Id.*

## III.

"A plaintiff seeking a preliminary injunction must
establish that he is likely to succeed on the merits, that he is

10    RODRIGUEZ V. ROBBINS

likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To determine whether the district court abused its discretion in entering the preliminary injunction, then, we consider in turn: (1) Appellees' likelihood of success on the merits; (2) whether they have established a likelihood of irreparable harm; (3) the balance of equities; and (4) where the public interest lies.[6]

## A. Likelihood of Success on the Merits

Appellees claim that the federal immigration detention statutes must be construed to require "rigorous bond

---

[6] The government suggests that Federal Rule of Civil Procedure 52(a) requires us to reverse and remand because the district court failed to make explicit findings of fact and conclusions of law in its order. Rule 52(a) directs that "the court must find the facts specially and state its conclusions of law separately." While in general "[a] district court must set forth findings of fact and conclusions of law supporting an order granting an injunction," we have held that "failure to comply with Rule 52(a) does not require reversal unless a full understanding of the question is not possible without the aid of separate findings." *FTC v. Enforma Natural Prods., Inc.*, 362 F.3d 1204, 1212 (9th Cir. 2004). In general, we will remand only "where a district court's findings and conclusions supporting the preliminary injunction are not sufficient to permit meaningful review." *Id.* Here, by virtue of Appellees' membership in the subclasses at issue, the relevant facts are inherently undisputed: Each Appellee has been held for at least six months under one of the pertinent immigration detention statutes without an opportunity to contest his detention in a bond hearing. As the government concedes, "[t]his case presents, at its core, a question of statutory and constitutional interpretation that does not turn on the facts of any individual Petitioner." The government offers no reason why meaningful review is not possible on the current record.

hearings" for members of the 1226(c) and 1225(b) subclasses. They urge that, because prolonged mandatory detention without a bond hearing would raise grave constitutional concerns, we must read the statutes in a way that permits the possibility of release on review by a neutral decision-maker. It is "a cardinal principle" of statutory interpretation that, "if a serious doubt of constitutionality is raised" by one possible construction of a statute, we must "ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62 (1932). "The canon favoring constructions of statutes to avoid constitutional questions does not, however, license a court to usurp the policy-making and legislative functions of duly-elected representatives." *Heckler v. Mathews*, 465 U.S. 728, 741 (1984). Our task is therefore to determine whether the government's reading of Sections 1226(c) and 1225(b) raises constitutional concerns and, if so, whether an alternative construction is plausible without overriding the legislative intent of Congress.

We begin with the premise that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Thus, the Supreme Court has held that the indefinite detention of a once-admitted alien "would raise serious constitutional concerns." *Id.* at 682. However, the Supreme Court has also expressed a "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Demore v. Kim*, 538 U.S. 510, 526 (2003). We therefore must determine whether the government's authority to mandatorily detain aliens under Sections 1226(c) and 1225(b) for prolonged periods raises the constitutional

concerns identified by the Supreme Court in *Zadvydas*, or whether such detention is consistent with *Demore* and, thereby, permissible.

These are not entirely new questions for our court. As noted by the previous panel that reversed the district court's denial of class certification, in a series of decisions since 2001, "the Supreme Court and this court have grappled in piece-meal fashion with whether the various immigration detention statutes may authorize indefinite or prolonged detention of detainees and, if so, may do so without providing a bond hearing." *Rodriguez v. Hayes* (*Rodriguez I*), 591 F.3d 1105, 1114 (9th Cir. 2010). After *Zadvydas* and *Demore*, we held in *Tijani v. Willis*, 430 F.3d 1241 (9th Cir. 2005), that the detention under § 1226(c) of a lawfully admitted resident alien subject to removal for over 32 months was "constitutionally doubtful." *Id.* at 1242 ("Despite the substantial powers that Congress may exercise in regard to aliens, it is constitutionally doubtful that Congress may authorize imprisonment of this duration for lawfully admitted resident aliens who are subject to removal."). "To avoid deciding the constitutional issue, we interpret[ed] the authority conferred by § 1226(c) as applying to expedited removal of criminal aliens" and held that "[t]wo years and eight months of process is not expeditious." *Id.* Thus, we remanded Tijani's petition to the district court with directions to grant a writ of habeas corpus unless the government provided a bail hearing within 60 days. *Id.*

We expanded on this reasoning in *Casas-Castrillon v. Department of Homeland Security* (*Casas*), 535 F.3d 942 (9th Cir. 2008). In *Casas*, a lawful permanent resident ("LPR") who had been detained for seven years sought habeas relief while his petition for review of his removal order was

pending before this court. *Id.* at 944–45. We interpreted *Demore* to hold "that § 1226(c) was intended only to 'govern[] detention of deportable criminal aliens pending their removal proceedings,' which the Court emphasized typically 'lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal' his removal order to the BIA." *Id.* at 948 (alteration in original) (quoting *Demore*, 538 U.S. at 527-28, 530) (emphasis omitted).  Concluding that § 1226(c) applies during only administrative removal proceedings (i.e., up until the BIA dismisses an alien's appeal but not during the pendency of judicial review), we held "that Casas' detention was authorized during this period [while he awaited judicial review] under the Attorney General's general, discretionary detention authority under § 1226(a)."[7] *Id.*  In other words,

---

[7] Section 1226(a) provides:

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this Section and pending such decision, the Attorney General--

> (1) may continue to detain the arrested alien; and

> (2) may release the alien on--

>> (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

>> (B) conditional parole; but

> (3) may not provide the alien with work authorization

§ 1226(c)'s mandatory detention provisions apply only until the BIA affirms a removal order, at which point the government's authority to detain the alien shifts to § 1226(a), where it remains until "we have rejected his final petition for review or his time to seek such review expires." *Id.*

Having concluded that Casas' continued detention was "authorized" under § 1226(a), we observed that "[t]here is a difference between detention being authorized and being necessary as to any particular person," and thus held "that the government may not detain a legal permanent resident such as Casas for a prolonged period without providing him a neutral forum in which to contest the necessity of his continued detention." *Id.* at 949. We further noted that while "[t]he Supreme Court upheld § 1226(c)'s mandatory detention provision in *Demore*, [it] did so with the specific understanding that § 1226(c) authorized mandatory detention only for the 'limited period of [the alien's] removal proceedings,'" which the Court emphasized was brief. *Id.* at 950 (alteration in original) (quoting *Demore*, 538 U.S. at 530). Because *Demore*'s holding hinged on the brevity of mandatory detention, we concluded in *Casas* that "prolonged detention of aliens is permissible only where the Attorney General finds such detention individually necessary by providing the alien with an adequate opportunity to contest the necessity of his detention." *Id.* at 951. We thus held that, under § 1226(a)'s discretionary detention regime, a bond

---

(including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

hearing is required before the government may detain an alien for a "prolonged" period. *Id.*

Two questions left unanswered by our opinion in *Casas*—the procedural requirements for bond hearings under *Casas* and the precise definition of "prolonged" detention—have been answered in more recent opinions. First, in *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011), we provided guidance to immigration officials as to the procedures required at a *Casas* hearing. With regard to the appropriate burden of proof, we held that, "[g]iven the substantial liberty interest at stake . . . the government must prove by clear and convincing evidence that an alien is a flight risk or a danger to the community to justify denial of bond at a *Casas* hearing." *Singh*, 638 F.3d at 1203. We further held that, in considering whether the government has proven dangerousness, IJs should consider the factors identified in *In re Guerra*, 24 I. & N. Dec. 37 (B.I.A. 2006), which include the extensiveness of an alien's criminal record, the recency of his criminal activity, and the seriousness of his offenses. *Singh*, 638 F.3d at 1206 (citing *Guerra*, 24 I. & N. Dec. at 40). We also held that "due process requires a contemporaneous record of *Casas* hearings," such as a transcript or an audio recording available upon request. *Id.* at 1208.

Second, in *Diouf v. Napolitano* (*Diouf II*), 634 F.3d 1081 (9th Cir. 2011), we addressed the definition of "prolonged" detention for purposes of the *Casas* bond hearing requirement. *Diouf II* first extended the holding of *Casas* to

aliens discretionarily detained under 8 U.S.C. § 1231(a)(6).[8]
*Id.* at 1086.  Rejecting the government's preferred bases for
distinguishing *Casas*, *see id.*, we held that "an alien facing
prolonged detention under § 1231(a)(6) is entitled to a bond
hearing before an immigration judge and is entitled to be
released from detention unless the government establishes
that the alien poses a risk of flight or a danger to the
community." *Id.* at 1092.  Importantly, we indicated that an
"alien's continuing detention becomes prolonged" at the 180-
day mark.  *Id.* at 1091.

> When detention crosses the six-month
> threshold and release or removal is not
> imminent, the private interests at stake are
> profound.    Furthermore, the risk of an
> erroneous deprivation of liberty in the absence
> of a hearing before a neutral decisionmaker is
> substantial.    The burden imposed on the
> government by requiring hearings before an
> immigration judge at this stage of the
> proceedings is therefore a reasonable one.

*Id.* at 1091–92.

    With this precedent in mind, we address Appellees'
likelihood of success on the merits.  Because the legal

---

[8] Section 1231(a)(6) permits the continued detention, beyond the 90-day
statutory removal period that begins when a removal order becomes final,
of "inadmissible aliens, criminal aliens, aliens who have violated their
nonimmigrant status conditions, and aliens removable for certain national
security or foreign relations reasons, as well as any alien 'who has been
determined by the Attorney General to be a risk to the community or
unlikely to comply with the order of removal.'"  *Zadvydas*, 533 U.S. at
688 (quoting 8 U.S.C. § 1231(a)(6)).

considerations applicable to the 1226(c) and 1225(b) subclasses differ in some respects, we separately analyze Appellees' likelihood of success with respect to each subclass.

### 1. The 1226(c) subclass.

In addressing Section 1226(c), we do not write on a blank slate. In *Demore*, an LPR who conceded deportability as an aggravated felon raised a due process challenge to his mandatory detention under § 1226(c). *Demore*, 538 U.S. at 517–18, 523. The Supreme Court first reviewed at some length Congress's stated reasons for mandating detention of the aliens to whom Section 1226(c) applies, emphasizing concerns about flight and recidivism under the prior regime. *Id.* at 518–21. Ultimately, the *Demore* majority held that the government was not required to provide individualized determinations of an alien's dangerousness or flight risk to detain him during his removal proceedings. *See id.* at 523–25. Noting that the *Zadvydas* Court had already held that the government's authority to detain an alien indefinitely pending removal would be constitutionally doubtful, the *Demore* majority distinguished *Zadvydas* on two principal grounds. *Id.* at 527 (citing *Zadvydas*, 533 U.S. at 699). First, while in *Zadvydas* the petitioners challenged their indefinite detention under circumstances where removal was not practicable, thus undermining the government's interest in preventing flight, *see id.* (citing *Zadvydas*, 533 U.S. at 690), detention under Section 1226(c) "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Id.* at 528. Second, *Demore* emphasized that unlike the detention at issue in *Zadvydas*,

which had no clear termination point, Section 1226(c) applies only during the pendency of removal proceedings and thus has an inherent end point—the conclusion of proceedings:

> Under § 1226(c), not only does detention have a definite termination point, in the majority of cases it lasts for less than the 90 days we considered presumptively valid in *Zadvydas*. The Executive Office for Immigration Review has calculated that, in 85% of the cases in which aliens are detained pursuant to § 1226(c), removal proceedings are completed in an average time of 47 days and a median of 30 days . . . .  In the remaining 15% of cases, in which the alien appeals the decision of the Immigration Judge to the Board of Immigration Appeals, appeal takes an average of four months, with a median time that is slightly shorter.

*Id.* at 529 (footnote and citations omitted).  The Court thus upheld mandatory detention under § 1226(c), though the concurring opinion of Justice Kennedy—whose vote created a majority—noted that "a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." *Id.* at 532 (Kennedy, J., concurring) (citing *Zadvydas*, 533 U.S. at 684–86).

We have addressed the question of how broadly *Demore* sweeps in several decisions over the past decade.  On each of these occasions, we have consistently held that *Demore*'s holding is limited to detentions of brief duration.  *See, e.g.,*

RODRIGUEZ V. ROBBINS                    19

*Casas*, 535 F.3d at 950 ("References to the brevity of mandatory detention under § 1226(c) run throughout *Demore*."); *Tijani*, 430 F.3d at 1242 (similar); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1081 (9th Cir. 2006) ("In *Demore*, the Court grounded its holding by referencing a 'brief period' . . . of 'temporary confinement' . . . . There is no indication anywhere in *Demore* that the Court would countenance an indefinite detention.") (citations omitted).  We are by no means the only court to interpret *Demore* in this way.  For instance, in *Diop v. ICE/Homeland Security*, 656 F.3d 221 (3d Cir. 2011), the Third Circuit construed *Demore*, in light of Justice Kennedy's concurrence, as recognizing that "the constitutionality of [mandatory detention] is a function of the length of the detention." *Id.* at 232 ("At a certain point, continued detention becomes unreasonable and the Executive Branch's implementation of § 1226(c) becomes unconstitutional unless the Government has justified its actions at a hearing inquiring into whether continued detention is consistent with the law's purposes of preventing flight and dangers to the community."); *see also Ly v. Hansen*, 351 F.3d 263, 271 (6th Cir. 2003) ("[T]he Court's discussion in *Kim* is undergirded by reasoning relying on the fact that Kim, and persons like him, will normally have their proceedings completed within . . . a short period of time and will actually be deported, or will be released. That is not the case here.").

Thus, it is clear that while mandatory detention under § 1226(c) is not constitutionally impermissible *per se*, the statute cannot be read to authorize mandatory detention of criminal aliens with no limit on the duration of imprisonment. As we held in *Casas*, "the prolonged detention of an alien without an individualized determination of his dangerousness or flight risk would be constitutionally doubtful."  535 F.3d

at 951 (internal quotation marks omitted).  Consistent with our previous decisions, we conclude that, to avoid constitutional concerns, § 1226(c)'s mandatory language must be construed "to contain an implicit 'reasonable time' limitation, the application of which is subject to federal-court review."  *Zadvydas*, 533 U.S. at 682.

The government relies heavily on *Demore* in advancing several arguments that the entry of the preliminary injunction was improper, but none is ultimately persuasive.  First, the government directs us to the statutory history of §1226(c), arguing that by enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Congress intentionally undid provisions of the 1990 and 1991 amendments to the Immigration and Nationality Act ("INA") that previously granted some discretion to the Attorney General to release criminal aliens pending removal.  The government cites *Demore*'s observation that Congress's enactment of § 1226(c) hinged on its determination that the flight of aliens released pending removal proceedings, and crimes perpetrated with frequency by those who absconded under the prior regime, were undermining national immigration policy.  *See Demore*, 538 U.S. at 518–19.  Moreover, the government argues that the statute's use of the mandatory "shall" plainly contemplates mandatory detention without a bond hearing.  It notes that § 1226(a), which was enacted contemporaneously with § 1226(c), uses discretionary language and that § 1226(c)(2) provides for narrow exceptions to mandatory detention for criminal aliens who materially assist law enforcement.  These statutes, the government contends, indicate that Congress knew how to provide for release on bond if it wished to do so.  Finally, the government argues that under *Zadvydas* and *Demore*, mandatory detention under 1226(c) without a bond hearing is

permissible because such detention has a definite termination
point.

We are not convinced by the government's reasoning,
which relies on a broad reading of *Demore* foreclosed by our
post-*Demore* cases.  Despite the Supreme Court's holding
that mandatory detention under § 1226(c) without an
individualized determination of dangerousness or flight risk
is constitutional under some circumstances, our subsequent
decisions applying *Demore* make clear that *Demore*'s reach
is limited to relatively brief periods of detention.  *See Casas*,
535 F.3d at 951.  Nothing about the district court's
preliminary injunction order requires reading the mandatory
detention requirement out of § 1226(c), because "the
mandatory, bureaucratic detention of aliens under § 1226(c)
was intended to apply for only a limited time," after which
"the Attorney General's detention authority rests with
§ 1226(a)."  *Id.* at 948.  In other words, the preliminary
injunction does not require that anyone held under § 1226(c)
receive a bond hearing.  Rather, under a fair reading of our
precedent, when detention becomes prolonged, § 1226(c)
becomes inapplicable.  "As a general matter, detention is
prolonged when it has lasted six months and is expected to
continue more than minimally beyond six months." *Diouf II*,
634 F.3d at 1092 n.13.  Therefore, subclass members who
have been detained under § 1226(c) for six months are
entitled to a bond hearing because the applicable *statutory*
law, not constitutional law, requires one.  Thus, while the
government may be correct that reading §1226(c) as anything
other than a mandatory detention statute is not a "plausible
interpretation[] of [the] statutory text," *Clark v. Martinez*,
543 U.S. 371, 381 (2005), it does not argue that reading an
implicit *temporal limitation* on mandatory detention into the
statute is implausible.  Indeed, it could not do so, because

such an argument is foreclosed by our decisions in *Tijani* and *Casas*.

The government's attempts to distinguish our post-*Demore* authority are unavailing. It is certainly true, as the government notes, that by its terms *Casas* concerned an alien who had received an administratively final removal order, sought judicial review, and obtained a remand to the BIA; thus, it did not expressly apply to aliens awaiting the conclusion of their initial administrative proceedings. But this seems to us a distinction without a difference, and the government does not present a persuasive reason why the same protections recognized in *Casas* should not apply to pre-removal order detainees. "Regardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention." *Diouf II*, 634 F.3d at 1087. Indeed, if anything, because LPRs detained prior to the entry of an administratively final removal order have not been adjudicated removable, they would seem to have a *greater* liberty interest than individuals detained pending judicial review or the pendency of a motion to reopen before the agency, and thus a greater entitlement to a bond hearing. *See id.* at 1086–87 (suggesting that a detainee who is subject to a final order of removal may have a "lesser liberty interest in freedom from detention").

The government is likewise correct that *Diouf II* by its terms addressed detention under § 1231(a)(6), not § 1226(c) or § 1225(b). But *Diouf II* strongly suggested that immigration detention becomes prolonged at the six-month mark regardless of the authorizing statute. *See, e.g., id.* at 1091–92 ("When detention crosses the six-month threshold and release or removal is not imminent, the private interests at stake are profound."). Even if *Diouf II* does not squarely

hold that detention always becomes prolonged at six months, that conclusion is consistent with the reasoning of *Zadvydas*, *Demore*, *Casas* and *Diouf II*, and we so hold.

The government's remaining argument against what it calls "a six-month blanket rule" is that such a rule would be contrary to the decisions of other circuits and to the principle that due process inherently must be determined through case-by-case adjudication. Neither contention is compelling. First, the government cites the Sixth Circuit's decision in *Ly*, 351 F.3d at 271–73, and the Third Circuit's decision in *Diop*, 656 F.3d at 234, both of which declined to establish a bright-line time limit on detention without a bond hearing. But both *Diop* and *Ly* held that there are substantive limits on the length of detention under § 1226(c), and those cases are thus contrary to the government's position that *Demore* permits mandatory detention under § 1226(c) irrespective of duration. To the extent *Diop* and *Ly* reject a categorical time limit, their reasoning in that respect is inapplicable here, both because this petition is a class action (and thus relief will perforce apply to all detainees) and because we already indicated in *Diouf II* that detention is presumptively prolonged when it surpasses six months in duration. More fundamentally, the preliminary injunction does not, as the government claims, "embrace an inflexible blanket approach to due process analysis." Rather, the injunction requires *individualized* decision-making—in the form of bond hearings that conform to the procedural requirements set forth in *Singh*. Thus, the 1226(c) subclass members are likely to succeed on the merits.

## 2. The 1225(b) subclass.

We next address whether the prolonged detention of "applicants for admission" under Section 1225(b) raises the

same "serious constitutional concerns" that are implicated by prolonged detention of other detained aliens. The government argues that the 1225(b) subclass members enjoy lesser constitutional protections than other detained aliens. Of course, if the statute does not raise constitutional concerns, then there is no basis for employing the canon of constitutional avoidance. *See Ma v. Ashcroft*, 257 F.3d 1095, 1106–07 (9th Cir. 2001).

The government emphasizes the "unique constitutional position of arriving aliens" to argue that prolonged detention of 1225(b) subclass members does not implicate constitutional concerns. This argument relies principally on *Shaughnessy v. United States ex rel. Mezei (Mezei)*, 345 U.S. 206 (1953) and *Barrera-Echavarria v. Rison*, 44 F.3d 1441 (9th Cir. 1995) (en banc), *superseded by statute as stated in Xi v. I.N.S.*, 298 F.3d 832, 837–38 (9th Cir. 2002)). In *Mezei*, the Supreme Court rejected a constitutional challenge to the multi-year detention on Ellis Island of an LPR returning from a 19-month trip abroad. *See* 345 U.S. at 214. Adverting to the now-defunct statutory distinction between "exclusion" and "deportation" proceedings, the Court held that:

> [A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law . . . . But an alien on the threshold of initial entry stands on a different footing: Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.

*Id.* at 212 (internal quotation marks and citations omitted). In *Barrera-Echavarria*, we applied *Mezei* to uphold the

constitutionality of prolonged detention of excludable aliens
under the pre-IIRIRA version of 8 U.S.C. § 1226(e).  44 F.3d
at 1448.  We held that the "entry fiction" doctrine, as
explained by the Supreme Court, "squarely precludes a
conclusion that [excludable aliens] have a constitutional right
to be free from detention, even for an extended time." *Id.* at
1449.

It seems clear that many, if not most, members of the
1225(b) subclass would fall into the category of aliens
described in *Mezei* and *Barrera-Echavarria* as entitled to
limited due process protection.  *See Barrera-Echavarria*,
44 F.3d at 1450 ("*Mezei* established what is known as the
'entry fiction,' which provides that although *aliens seeking
admission into the United States* may physically be allowed
within its borders pending a determination of admissibility,
such aliens are legally considered to be detained at the border
and hence as never having effected entry into this country
. . . .  Noncitizens who are outside United States territories
enjoy very limited protections under the United States
Constitution.") (emphasis added) (internal quotations and
citations omitted).  Nonetheless, we have reason to question
whether *Mezei* and *Barrera-Echavarria* are squarely apposite
to the inquiry before us.

First, both cases were decided under pre-IIRIRA law.
Because the cases apply to the former category of
"excludable aliens," it is not clear that the class of aliens to
whom *Mezei* and *Barrera-Echavarria* applied is coextensive
with the 1225(b) subclass in this case.  As we explained in *Xi*:

> The INA is no longer denominated in terms of
> "entry" and "exclusion."  IIRIRA replaced
> these terms with the broader concept of

"admission." Section 1101(a)(13), which formerly defined "entry" as "any coming of an alien into the United States, from a foreign port or place . . . ," 8 U.S.C. [§] 1101(a)(13) (1994), now defines "admission" to mean "the lawful entry of [an] alien into the United States after inspection and authorization by an immigration officer," 8 U.S.C. [§] 1101(a)(13)(A) (2002). Concomitantly, IIRIRA dropped the concept of "excludability" and now uses the defined term of "inadmissibility." Although the grounds for being deemed inadmissible are similar to those for being deemed excludable, *compare* 8 U.S.C. § 1182 (1994) *with* 8 U.S.C. § 1182 (2002), there are substantial differences between the two statutes.

298 F.3d at 838. Of course, this does not undermine *Barrera-Echavarria*'s reasoning as it relates to aliens in the 1225(b) subclass to whom the entry fiction clearly applies (likely the vast majority). But the Supreme Court has instructed that, where one possible application of a statute raises constitutional concerns, the statute as a whole should be construed through the prism of constitutional avoidance. *See Clark*, 543 U.S. at 380 (2005) ("It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation. The lowest common denominator, as it were, must govern."). Thus, the dispositive question is not whether the government's reading of § 1225(b) is permissible in some (or even most) cases, but rather whether there is any

single application of the statute that calls for a limiting construction.[9]

Under current law, § 1225(b) applies to some LPRs returning from abroad who have *not* been absent for the prolonged period described in *Mezei*.  *See* 8 U.S.C. § 1101(a)(13)(C) (setting forth six categories of LPRs who may be treated as seeking admission, only one of which

---

[9] At oral argument, government counsel contended that the district court record is devoid of any evidence suggesting that members of the 1225(b) subclass include returning LPRs.  This argument reveals a fundamental misunderstanding of class actions litigated under Rule 23(b)(2) of the Federal Rules of Civil Procedure, including this one.  *See Rodriguez I*, 591 F.3d at 1125–26.  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).  It would be illogical for us to conclude that the government's reading of the statute is permissible just because, by happenstance, there are currently no detainees in the Central District who possess the requisite constitutional status to render ICE's preferred practice illegal.  Nor could we countenance such a result in light of the Supreme Court's admonition that, "when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice.  If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court." *Clark*, 543 U.S. at 380–81.  In other words, if the canon of constitutional avoidance requires us to read the statute such that bond hearings are available to individuals who have been detained for six months, then under *Clark* such hearings must be available to everyone detained under the statute.

28                    RODRIGUEZ V. ROBBINS

relates to prolonged absences from U.S. territory).[10]  "It is
well established that if an alien is a lawful permanent resident
of the United States and remains physically present there, he
is a person within the protection of the Fifth Amendment,"
and an LPR whose absence is not prolonged is assimilated to
that same constitutional status.  *Kwong Hai Chew v. Colding*,
344 U.S. 590, 596 (1953).  For instance, an LPR who left the
United States briefly to undertake illegal activity abroad, such

---

[10] Section 1101(a)(13)(C) provides:

> An alien lawfully admitted for permanent residence in
> the United States shall not be regarded as seeking an
> admission into the United States for purposes of the
> immigration laws unless the alien–
>
> (i) has abandoned or relinquished that status,
>
> (ii) has been absent from the United States for a
> continuous period in excess of 180 days,
>
> (iii) has engaged in illegal activity after having departed
> the United States,
>
> (iv) has departed from the United States while under
> legal process seeking removal of the alien from the
> United States, including removal proceedings under this
> chapter and extradition proceedings,
>
> (v) has committed an offense identified in section
> 1182(a)(2) of this title, unless since such offense the
> alien has been granted relief under section 1182(h) or
> 1229b(a) of this title, or
>
> (vi) is attempting to enter at a time or place other than
> as designated by immigration officers or has not been
> admitted to the United States after inspection and
> authorization by an immigration officer.

RODRIGUEZ V. ROBBINS                    29

as alien smuggling, would clearly be included in the 1225(b) subclass; under 8 U.S.C. § 1101(a)(13)(C)(iii), he would be treated as an alien seeking admission on account of having "engaged in illegal activity after having departed the United States." *See United States v. Tsai*, 282 F.3d 690, 696 & n.5 (9th Cir. 2002). But in *Landon v. Plasencia*, 459 U.S. 21 (1982), the Supreme Court specifically held that an LPR arrested for alien smuggling upon return from a brief trip abroad *is* entitled to due process protection, specifically because *Mezei* is inapplicable in such a scenario. *See id.* at 34 (holding that *Mezei* "did not suggest that no returning resident alien has a right to due process," and that "it does not govern this case, for Plasencia was absent from the country only a few days"). As such, it is clear that the 1225(b) subclass includes at least some aliens who are not subject to the entry fiction doctrine, and thus under *Clark* the statute must be construed with these aliens in mind.[11]

This conclusion is buttressed by the fact that the government's position is facially inconsistent with our binding holding in *Nadarajah*. *Nadarajah* concerned an asylum seeker who had been granted relief but who remained detained pending review of his case by the Attorney General. 443 F.3d at 1071–75. Although we examined Nadarajah's claims under the paradigm of *Zadvydas*, and therefore considered only the possibility of "indefinite" (as opposed to "prolonged") detention, we nonetheless held that § 1225(b) is susceptible to a saving construction to avoid constitutional

---

[11] This analysis also disposes of the government's reliance on *Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094 (9th Cir. 2004), which involved an individual petition for review brought by an alien who entered the United States without inspection and thus clearly was subject to the doctrine described in *Mezei* and *Barrera-Echavarria*. *See id.* at 1095, 1097–98.

30              RODRIGUEZ V. ROBBINS

concerns.  *See id.* at 1076–78.  While this analysis does not
directly answer the central question presented by this appeal,
i.e. whether bond hearings are required at the six month mark,
it does undermine the government's arguments in two
important respects.    First, the government argues that
§ 1225(b) is too unambiguous for the doctrine of
constitutional avoidance to apply.  But it is not clear how this
could be so in light of *Nadarajah*, where we have *already*
applied the canon to this very statute.  Second, and relatedly,
the government's argument that there is no due process
"floor" for the treatment of aliens subject to §1225(b) is
difficult to reconcile with a binding decision that already
construed the statute expressly to avoid constitutional
concerns.    Thus, read together, *Plasencia*, *Clark*, and
*Nadarajah* suggest that we must construe § 1225(b) to avoid
potential constitutional concerns raised by its application to
LPRs who enjoy due process protection.

    With this premise in place, the likelihood of success of
the 1225(b) subclass is determined by the same analysis
applicable to the 1226(c) subclass, which we conclude has
demonstrated a likelihood of success.  To the extent our
holdings in *Tijani*, *Casas*, and *Diouf II* require that we
construe mandatory immigration detention authority as time-
limited and that bond hearings occur when detention becomes
"prolonged," there is no basis for distinguishing between the
two sub-classes in this regard.  Indeed, if anything it would
appear that the LPRs who fall within § 1225(b)'s purview
should enjoy *greater* constitutional protections than criminal
aliens who have already failed to win relief in their removal
proceedings, as in *Casas*.  *See Johnson v. Eisentrager*,
339 U.S. 763, 770 (1950) ("The alien, to whom the United
States has been traditionally hospitable, has been accorded a
generous and ascending scale of rights as he increases his

identity with our society.  Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.").

Appellees suggest two potential ways we could apply the canon of constitutional avoidance in construing § 1225(b). First, we could simply read a bond hearing requirement into the statute, as we did with regard to § 1231(a)(6) in the *Diouf* opinions.  *See Diouf II*, 634 F.3d at 1089; *Diouf v. Mukasey* (*Diouf I*), 542 F.3d 1222, 1234 (9th Cir. 2008) ("We have specifically construed § 1231(a)(6) to permit release on bond.") (citing *Doan v. I.N.S.*, 311 F.3d 1160, 1162 (9th Cir. 2002)).  This first suggestion, however, is problematic.  For one thing, this reading would conflict with Department of Homeland Security regulations, at least as applied to some subclass members, because current regulations unambiguously strip IJs of the authority to "redetermine conditions of custody imposed by the Service with respect to" arriving aliens.  *See* 8 C.F.R. § 1003.19(h)(2)(i)(B). Moreover, it is difficult to distinguish the statute's language from that of § 1226(c), which also provides that aliens who fall within its scope "shall" be detained and which the Supreme Court has characterized as mandating detention. *See Demore*, 538 U.S. at 513–14; *compare* 8 U.S.C. § 1226(c)(1) ("The Attorney General shall take into custody any alien who . . . ."), *with id.* § 1225(b)(2)(A) ("[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained . . . .").  Appellees argue that the existence of the parole scheme itself undermines the government's mandatory construction of the

statute, but § 1226(c) also contains a *statutory* exception to mandatory detention. *See* 8 U.S.C. § 1226(c)(2) ("The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides . . . that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding."). If anything, the existence of these narrow and explicit exceptions to both statutes' reach is evidence of their drafters' intent to make detention mandatory in all cases to which the exceptions are inapplicable. Thus, Appellees' first suggested construction is not a "fairly possible" reading of the statute as required for the canon of constitutional avoidance to apply.

Appellees' second suggested construction fares considerably better. Under this approach, we would simply follow *Casas* and hold that, to the extent detention under §1225(b) is mandatory, it is implicitly time-limited. This approach fits more naturally into our case law, which has suggested that after *Demore*, brief periods of mandatory immigration detention do not raise constitutional concerns, but prolonged detention—specifically longer than six months—does. This reading also has the advantage of uniformity, which the Supreme Court has suggested is an important value in matters of statutory construction. *Cf. Zadvydas*, 533 U.S. at 680 ("In order to limit the occasions when courts will need to make the difficult judgments called for by the recognition of this necessary Executive leeway, it is practically necessary to recognize a presumptively

reasonable period of detention . . . . [F]or the sake of uniform administration in the federal courts, six months is the appropriate period."). Of course, the government's detention authority does not completely dissipate at six months; rather, the mandatory provisions of § 1225(b) simply expire at six months, at which point the government's authority to detain the alien would shift to § 1226(a), which is discretionary and which we have already held requires a bond hearing. *See Casas*, 535 F.3d at 948.

Finally, we note that the discretionary parole system available to § 1225(b) detainees is not sufficient to overcome the constitutional concerns raised by prolonged mandatory detention. Indeed, any argument to that effect is clearly foreclosed by our holding in *Singh*, which held that bond hearings must be held before a neutral IJ with the government bearing the burden of proof by clear and convincing evidence. *See* 638 F.3d at 1203–04. The parole process is purely discretionary and its results are unreviewable by IJs. *Cf. Casas*, 535 F.3d at 949 ("We hold that the government may not detain a legal permanent resident such as Casas for a prolonged period without providing him a *neutral* forum in which to contest the necessity of his continued detention." (emphasis added)). Moreover, release decisions are based on humanitarian considerations and the public interest, *see* 8 U.S.C. § 1182(d)(5)(A), not whether the alien "is a flight risk or will be a danger to the community." *Singh*, 638 F.3d at 1203 (quoting *Casas*, 535 F.3d at 951). To the extent the principles of *Tijani*, *Casas* and *Diouf II* are applicable to the 1225(b) subclass, the constitutionally grounded hearing requirements set forth in *Singh* are also applicable. The government does not, and could not, contend that discretionary parole satisfies *Singh*. Thus, Appellees are likely to succeed on the merits of their claim that § 1225(b)

must be construed to authorize only six months of mandatory
detention, after which detention is authorized by § 1226(a)
and a bond hearing is required.

## B.  Irreparable Harm

Having determined that Appellees are likely to succeed on
the merits, we consider the remaining *Winter* factors.  We
conclude that, here too, the *Winter* factors favor Appellees.

Appellees clearly face irreparable harm in the absence of
the preliminary injunction.  "It is well established that the
deprivation of constitutional rights 'unquestionably
constitutes irreparable injury.'"    *Melendres v. Arpaio*,
695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*,
427 U.S. 347, 373 (1976)).   Thus, it follows from our
conclusion that the government's reading of Sections 1226(c)
and 1225(b) raises serious constitutional concerns "that
irreparable harm is *likely*, not just possible" in the absence of
preliminary injunctive relief.  *Alliance for the Wild Rockies
v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

There is no dispute that at least some individuals who
would be detained if not provided a bond hearing will be
granted conditional release under this injunction.  Moreover,
the government does not dispute that some subclass members
detained under § 1225(b) and § 1226(c) will win relief from
removal, further undermining any purported rationale for
continued detention.   Thus, the preliminary injunction is
necessary to ensure that individuals whom the government
cannot prove constitute a flight risk or a danger to public
safety, and sometimes will not succeed in removing at all, are
not needlessly detained.   Appellees have therefore clearly
shown a risk of irreparable harm.

## C. Balance of the Equities

The government provides almost no evidence that it would be harmed in any way by the district court's order, other than its assertion that the order enjoins "presumptively lawful" government activity and is contrary to the plain meaning of the statutes.  These arguments are obviously premised on the government's view of the merits because it cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns.  *Cf. Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.").[12]  Thus, in light of the major hardship posed by needless prolonged detention, we conclude that the balance of the equities favors Appellees.

## D.  The Public Interest

The government claims that "the government's interest is presumed to be the 'public's interest' in this case."  It

---

[12] The government also contends that Appellees delayed in bringing their motion for a preliminary injunction.  *See Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").  But the government identifies no prejudice that it has suffered as a result of this delay, and in any event the district court did not abuse its discretion by declining to withhold preliminary relief from a constitutionally suspect government practice on the basis that an injunction should have been requested sooner.  Moreover, as Appellees point out, the government declined to seek certiorari in *Diouf II*—on which Appellees' motion relied—only in February of 2012.  The parties thereafter engaged in settlement negotiations, which apparently stalled in March.  Thus, Appellees' June 2012 preliminary injunction motion was not particularly belated.

contends that the public interest is undermined by the heavy burden the injunction places on administrative resources and by the government's potential inability to prepare for bond hearings in time to comply with the district court's order. But the government's arguments are flawed in several respects. First, it cites *Nken v. Holder*, 556 U.S. 418 (2009), for the general proposition that the public interest always militates against enjoining government practices. But *Nken* does not contain any such holding. While the Court observed that there is "always a public interest in prompt execution of removal orders," which "may be heightened by the circumstances . . . if, for example, the alien is particularly dangerous, or has substantially prolonged his stay by abusing the processes provided to him," *id.* at 436, it did not purport to create a blanket presumption in favor of the government in all preliminary injunction cases. Moreover, the bond hearings that this injunction requires are intended to determine precisely whether each individual alien is dangerous or a flight risk and to permit the conditional release only of those who are not. By its terms, the injunction does not require the government to release anyone. Thus, *Nken* does not support the government's position.

The government's arguments regarding the resources required to implement the injunction are also not compelling. Hundreds of hearings have already occurred under the district court's order, belying any suggestion that the preliminary injunction is prohibitively burdensome. Moreover, even if the government faced severe logistical difficulties in implementing the order—a premise that Appellees dispute—they would merely represent the burdens of complying with the applicable statutes, as construed to avoid practices occasioned by an interpretation of the statutes that risks running afoul of the Constitution. "Generally, public

interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). It stands to reason that the public interest also benefits from a preliminary injunction that ensures that federal statutes are construed and implemented in a manner that avoids serious constitutional questions.

## IV.

Contrary to the government's rhetoric, this injunction will not flood our streets with fearsome criminals seeking to escape the force of American immigration law. The district court's narrowly tailored order provides individuals, whose right to be present in the United States remains to be decided, a hearing where a neutral decision-maker can determine whether they might deserve conditional release from the prison-like setting where they might otherwise languish for months or years on end. These hearings simply ensure that "the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

"[F]reedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'" *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). While ICE is entitled to carry out its duty to enforce the mandates of Congress, it must do so in a manner consistent with our constitutional values.

**AFFIRMED**.