**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALEJANDRO RODRIGUEZ; ABDIRIZAK ADEN FARAH; JOSE FARIAS CORNEJO; YUSSUF ABDIKADIR; ABEL PEREZ RUELAS, for themselves and on behalf of a class of similarly situated individuals, *Petitioners-Appellees/ Cross-Appellants*, | Nos. 13-56706 13-56755 D.C. No. 2:07-cv-03239-TJH-RNB |
| and | |
| EFREN OROZCO, *Petitioner*, | OPINION |
| v. | |
| TIMOTHY ROBBINS, Field Office Director, Los Angeles District, Immigration and Customs Enforcement; JEH JOHNSON, Secretary, Homeland Security; LORETTA E. LYNCH, Attorney General; WESLEY LEE, Assistant Field Office Director, Immigration and Customs Enforcement; RODNEY PENNER, Captain, Mira Loma Detention Center; SANDRA HUTCHENS, Sheriff of Orange County; NGUYEN, Officer, Officer-in-Charge, Theo Lacy Facility; | |

2    RODRIGUEZ V. ROBBINS

DAVIS NIGHSWONGER, Captain,
Commander, Theo Lacy Facility;
MIKE KREUGER, Captain, Operations
Manager, James A. Musick Facility;
ARTHUR EDWARDS, Officer-in-
Charge, Santa Ana City Jail;
RUSSELL DAVIS, Jail Administrator,
Santa Ana City Jail; JUAN P.
OSUNA,* Director, Executive Office
for Immigration Review,
                 *Respondents-Appellants/*
                        *Cross-Appellees.*

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Senior District Judge, Presiding

Argued and Submitted
July 24, 2015—Pasadena, California

Filed October 28, 2015

Before: Kim McLane Wardlaw and Ronald M. Gould,
Circuit Judges and Sam E. Haddon,** District Judge.

Opinion by Judge Wardlaw

---

* Juan P. Osuna is substituted for his predecessor, Thomas G. Snow, as
Director, Executive Office for Immigration Review, pursuant to Federal
Rule of Appellate Procedure 43(c).

** The Honorable Sam E. Haddon, District Judge for the U.S. District
Court for the District of Montana, sitting by designation.

## SUMMARY[***]

### Immigration

The panel affirmed in part and reversed in part the district court's order granting summary judgment and a permanent injunction in a class action lawsuit by non-citizens within the Central District of California challenging their prolonged detentions under civil immigration detention statutes 8 U.S.C. §§ 1225(b), 1226(a), 1226(c), and 1231(a) without individualized bond hearings or determinations to justify continued detention.

The panel affirmed the district court's permanent injunction insofar as it required automatic bond hearings and required Immigration Judges to consider alternatives to detention. The panel also held that IJs must consider the length of detention and provide bond hearings every six months for class members detained longer than twelve months, but rejected the class's request for additional procedural requirements.

The panel held that subclass members subject to prolonged detention under mandatory detention statutes §§ 1225(b) and 1226(c) are entitled to bond hearings, and that subclass members subject to discretionary detention under § 1226(a) are entitled to automatic bond hearings after six months of detention. In an issue this court had not previously addressed, the panel held that the government must provide periodic bond hearings every six months for non-citizens to

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

4                 RODRIGUEZ V. ROBBINS

challenge their continued detention. The panel, however, concluded that no certified class-member is within the § 1231(a) subclass, defined as non-citizens detained pending completion of removal proceedings, and the panel therefore reversed the summary judgment and permanent injunction as to individuals detained under § 1231(a).

The panel remanded for the district court to enter a revised injunction consistent with its instructions.

## COUNSEL

Sarah Stevens Wilson (argued), Theodore William Atkinson, Hans Harris Chen, Alisa Beth Klein, Robert I. Lester, Jaynie R. Lilley, Benjamin C. Mizer, Nicole Prairie, and Erez Reuveni, United States Department of Justice, Washington, D.C., for Respondents-Appellants/Cross-Appellees.

Ahilan Thevanesan Arulanantham (argued), Michael Kaufman (argued), Peter Jay Eliasberg, ACLU Foundation of Southern California, Los Angeles, California; Judy Rabinovitz, Michael K.T. Tan, ACLU Immigrants' Rights Project, New York, New York; Cecillia D. Wang, ACLU Immigrants' Rights Project, San Francisco, California; Jayashri Srikantiah, Stanford Law School Mills Legal Clinic, Stanford, California; Sean Ashley Commons, Wen Shen, Sidley Austin LLP, Los Angeles, California; Steven Andrew Ellis, Goodwin Procter LLP, Los Angeles, California, for Petitioners-Appellees/Cross-Appellants.

Nina Rabin, University of Arizona College of Law, Tucson, Arizona, for Amici Curiae Social Science Researchers and Professors.

James H. Moon, James J. Farrell, Nathan M. Saper, Latham & Watkins LLP, Los Angeles, California, for Amici Curiae National Association of Criminal Defense Lawyers and the Judge David L. Bazelon Center for Mental Health Law.

Sarah H. Paoletti, University of Pennsylvania Law School Transnational Legal Clinic, Philadelphia, Pennsylvania, for Amici Curiae International Law Professors and Human Rights Clinicians and Clinical Programs.

Holly Stafford Cooper, University of California Davis Law School Immigration Law Clinic, Davis, California, for Amicus Curiae University of California Davis Law School Immigration Law Clinic.

## OPINION

WARDLAW, Circuit Judge:

This is the latest decision in our decade-long examination of civil, i.e. non-punitive and merely preventative, detention in the immigration context. As we noted in our prior decision in this case, *Rodriguez v. Robbins* (*Rodriguez II*), 715 F.3d 1127 (9th Cir. 2013), thousands of immigrants to the United States are locked up at any given time, awaiting the conclusion of administrative and judicial proceedings that will determine whether they may remain in this country. In 2014, U.S. Immigration and Customs Enforcement ("ICE") removed 315,943 individuals, many of whom were detained

during the removal process.[1]  According to the most recently available statistics, ICE detains more than 429,000 individuals over the course of a year, with roughly 33,000 individuals in detention on any given day.[2]

Alejandro Rodriguez, Abdirizak Aden Farah, Jose Farias Cornejo, Yussuf Abdikadir, Abel Perez Ruelas, and Efren Orozco ("petitioners") represent a certified class of non-citizens who challenge their prolonged detention pursuant to 8 U.S.C. §§ 1225(b), 1226(a), 1226(c), and 1231(a) without individualized bond hearings and determinations to justify their continued detention.  Their case is now on appeal for the third time.  After a three-judge panel of our court reversed the district court's denial of petitioners' motion for class certification, and after our decision affirming the district court's entry of a preliminary injunction, the district court granted summary judgment to the class and entered a permanent injunction.  Under the permanent injunction, the government must provide any class member who is subject to "prolonged detention"—six months or more—with a bond hearing before an Immigration Judge ("IJ").  At that hearing, the government must prove by clear and convincing evidence that the detainee is a flight risk or a danger to the community to justify the denial of bond.  The government appeals from that judgment.  We affirm in part and reverse in part.

---

[1] U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations Report 7 (2014), https://www.ice.gov/doclib/about/offices/ero/pdf/2014-ice-immigration-removals.pdf.

[2] U.S. Immigration and Customs Enforcement, ERO Facts and Statistics 3 (2011), http://www.ice.gov/doclib/foia/reports/ero-facts-and-statistics.pdf.

## I. Background

On May 16, 2007, Alejandro Garcia commenced this case by filing a petition for a writ of habeas corpus in the Central District of California. Garcia's case was consolidated with a similar case filed by Alejandro Rodriguez, and the petitioners moved for class certification. The motion was denied on March 21, 2008.

A three-judge panel of our court reversed the district court's order denying class certification.[3] *Rodriguez I*, 591 F.3d 1105. We held that the proposed class satisfied each requirement of Federal Rule of Civil Procedure 23: The government conceded that the class was sufficiently numerous; each class member's claim turned on the common question of whether detention for more than six months without a bond hearing raises serious constitutional concerns; Rodriguez's claims were sufficiently typical of the class's because "the determination of whether [he] is *entitled* to a bond hearing will rest largely on interpretation of the statute authorizing his detention"; and Rodriguez, through his counsel, adequately represented the class. *Id.* at 1122–25. The panel also noted that "any concern that the differing statutes authorizing detention of the various class members will render class adjudication of class members' claims impractical or undermine effective representation of the class" could be addressed through "the formation of subclasses." *Id.* at 1123.

---

[3] Judge Betty Binns Fletcher was on the panel as originally constituted and authored the opinion in *Rodriguez v. Hayes* (*Rodriguez I*), 578 F.3d 1032 (9th Cir. 2009), *amended by* 591 F.3d 1105 (9th Cir. 2010). Judge Wardlaw was selected by random draw to replace Judge B. Fletcher on the panel following her death in 2012.

8                    RODRIGUEZ V. ROBBINS

The government petitioned our court for panel rehearing or rehearing en banc. In response, the panel amended the opinion to expand its explanation of why the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") does not bar certification of the class and, with that amendment, unanimously voted to deny the government's petition. The full court was advised of the suggestion for rehearing en banc, and no judge requested a vote on whether to rehear the matter. *See* Fed. R. App. P. 35. The government did not file a petition for certiorari in the United States Supreme Court.

On remand, the district court certified a class defined as:

> all non-citizens within the Central District of California who: (1) are or were detained for longer than six months pursuant to one of the general immigration detention statutes pending completion of removal proceedings, including judicial review, (2) are not and have not been detained pursuant to a national security detention statute, and (3) have not been afforded a hearing to determine whether their detention is justified.

The district court also approved the proposed subclasses, which correspond to the four statutes under which the class members are detained—8 U.S.C. §§ 1225(b), 1226(a), 1226(c), and 1231(a). The class does not include suspected terrorists, who are detained pursuant to 8 U.S.C. § 1537. Additionally, because the class is defined as non-citizens who are detained "pending completion of removal proceedings," it excludes any detainee subject to a final order of removal.

On September 13, 2012, the district court entered a preliminary injunction that applied to class members detained pursuant to two of these four "general immigration detention statutes"—§§ 1225(b) and 1226(c). Under the preliminary injunction, the government was required to "provide each [detainee] with a bond hearing" before an IJ and to "release each Subclass member on reasonable conditions of supervision . . . unless the government shows by clear and convincing evidence that continued detention is justified based on his or her danger to the community or risk of flight."

The government appealed, and on April 16, 2013, we affirmed. *See Rodriguez II*, 715 F.3d 1127. We applied the Court's preliminary injunction standard set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which requires the petitioner to "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Rodriguez II*, 715 F.3d at 1133.

Evaluating petitioners' likelihood of success on the merits, we began with the premise that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Id.* at 1134 (alterations in original) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)). "Thus, the Supreme Court has held that the indefinite detention of a once-admitted alien 'would raise serious constitutional concerns.'" *Id.* (quoting *Zadvydas*, 533 U.S. at 682).

Addressing those concerns, we recognized that we were not writing on a clean slate: "[I]n a series of decisions since

10                    RODRIGUEZ V. ROBBINS

2001, 'the Supreme Court and this court have grappled in piece-meal fashion with whether the various immigration detention statutes may authorize indefinite or prolonged detention of detainees and, if so, may do so without providing a bond hearing.'" *Id.* (quoting *Rodriguez I*, 591 F.3d at 1114). First, in *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court resolved statutory and due process challenges to indefinite detention under 8 U.S.C. § 1231(a)(6), which governs detention beyond the ninety-day removal period, where removal was not practicable—for one petitioner because he was stateless, and for another because his home country had no repatriation treaty with the United States. *See id.* at 684–86. Drawing on civil commitment jurisprudence, the Court reasoned:

> A statute permitting indefinite detention of an alien would raise a serious constitutional problem. The Fifth Amendment's Due Process Clause forbids the Government to "depriv[e]" any "person . . . of . . . liberty . . . without due process of law." Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects. *See Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). And this Court has said that government detention violates that Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, *see United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), or, in certain special and "narrow" nonpunitive "circumstances,"

> *Foucha*, *supra*, at 80, 112 S.Ct. 1780, where a special justification, such as harm-threatening mental illness, outweighs the "individual's constitutionally protected interest in avoiding physical restraint." *Kansas v. Hendricks*, 521 U.S. 346, 356, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).

*Id.* at 690 (alterations in original). To avoid those "serious constitutional concerns," the Court held that § 1231(a)(6) does not authorize indefinite detention without a bond hearing. *Id.* at 682, 699. Noting that the "proceedings at issue here are civil, not criminal," *id.* at 690, the Court "construe[d] the statute to contain an implicit 'reasonable time' limitation," *id.* at 682, and recognized six months as a "presumptively reasonable period of detention," *id.* at 701.

Although in dissent, Justice Kennedy, joined by Chief Justice Rehnquist, disagreed with the majority's application of the canon of constitutional avoidance and argued that the holding would improperly interfere with international repatriation negotiations, Justice Kennedy recognized that "both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious." *Id.* at 721. Justice Kennedy further noted that although the government may detain non-citizens "when necessary to avoid the risk of flight or danger to the community," due process requires "adequate procedures to review their cases, allowing persons once subject to detention to show that through rehabilitation, new appreciation of their responsibilities, or under other standards, they no longer present special risks or danger if put at large." *Id.*

Second, in *Demore v. Kim*, 538 U.S. 510 (2003), the Court addressed a due process challenge to mandatory detention under 8 U.S.C. § 1226(c), which applies to non-citizens convicted of certain crimes. *Id.* at 517–18. After discussing Congress's reasons for establishing mandatory detention, namely, high rates of crime and flight by removable non-citizens, *id.* at 518–21, the Court affirmed its "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings," *id.* at 526. Distinguishing *Zadvydas*, the Court in *Demore* stressed that detention under § 1226(c) has "a definite termination point" and typically "lasts for less than the 90 days we considered presumptively valid in *Zadvydas*." *Id.* at 529. Although the Court therefore upheld mandatory detention under § 1226(c), Justice Kennedy's concurring opinion, which created the majority, reasoned that "a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." *Id.* at 532.

After *Zadvydas* and *Demore*, our court decided several cases that provided further guidance for our analysis in *Rodriguez II*. In *Tijani v. Willis*, 430 F.3d 1241 (9th Cir. 2005), we held that the constitutionality of detaining a lawful permanent resident under § 1226(c) for over 32 months was "doubtful." *Id.* at 1242. "To avoid deciding the constitutional issue, we interpret[ed] the authority conferred by § 1226(c) as applying to expedited removal of criminal aliens" and held that "[t]wo years and eight months of process is not expeditious." *Id.* We therefore remanded Tijani's habeas petition to the district court with directions to grant

the writ unless the government provided a bond hearing before an IJ within sixty days. *Id.*

We next considered civil detention in the immigration context in *Casas-Castrillon v. Department of Homeland Security* (*Casas*), 535 F.3d 942 (9th Cir. 2008). There, a lawful permanent resident who had been detained for nearly seven years under § 1226(c) and then § 1226(a) sought habeas relief while his petition for review of his removal order was pending before our court. *Id.* at 944–48. Applying *Demore*, we reasoned that § 1226(c) "authorize[s] mandatory detention only for the 'limited period of [the non-citizen's] removal proceedings,' which the Court estimated 'lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal' his removal order to the [Board of Immigration Appeals ("BIA")]." *Id.* at 950 (quoting *Demore*, 538 U.S. at 529). We therefore concluded that § 1226(c)'s mandatory detention provision applies only during administrative removal proceedings—i.e. until the BIA affirms a removal order. *Id.* at 951. From that point until the circuit court has "rejected [the applicant's] final petition for review or his time to seek such review expires," the government has discretionary authority to detain the non-citizen pursuant to § 1226(a). *Id.* at 948. We noted, however, that "[t]here is a difference between detention being authorized and being necessary as to any particular person." *Id.* at 949. Because the Court's holding in *Demore* turned on the brevity of mandatory detention under § 1226(c), we concluded that "the government may not detain a legal permanent resident such as Casas for a prolonged period without providing him a neutral forum in which to contest the necessity of his continued detention." *Id.* at 949.

Soon after, in *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011), we clarified the procedural requirements for bond hearings held pursuant to our decision in *Casas* ("*Casas* hearings"). In light of "the substantial liberty interest at stake," we held that "due process requires a contemporaneous record of *Casas* hearings," and that the government bears the burden of proving "by clear and convincing evidence that an alien is a flight risk or a danger to the community to justify denial of bond." *Id.* at 1203, 1208. To evaluate whether the government has met its burden, we instructed IJs to consider the factors set forth in *In re Guerra*, 24 I. & N. Dec. 37 (BIA 2006), in particular "the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses." *Singh*, 638 F.3d at 1206 (quoting *Guerra*, 24 I. & N. Dec. at 40).

Finally, in *Diouf v. Napolitano* (*Diouf II*), 634 F.3d 1081 (9th Cir. 2011), we extended the procedural protections established in *Casas* to individuals detained under § 1231(a)(6). *Id.* at 1086. We held that "prolonged detention under § 1231(a)(6), without adequate procedural protections," like prolonged detention under § 1226(a), "would raise 'serious constitutional concerns.'" *Id.* (quoting *Casas*, 535 F.3d at 950). To address those concerns, we held that "an alien facing prolonged detention under § 1231(a)(6) is entitled to a bond hearing before an immigration judge and is entitled to be released from detention unless the government establishes that the alien poses a risk of flight or a danger to the community." *Id.* at 1092.

In *Diouf II*, we also adopted a definition of "prolonged" detention—detention that "has lasted six months and is expected to continue more than minimally beyond six

months"—for purposes of administering the *Casas* bond hearing requirement. *Id.* at 1092 n.13. We reasoned that:

> When detention crosses the six-month threshold and release or removal is not imminent, the private interests at stake are profound. Furthermore, the risk of an erroneous deprivation of liberty in the absence of a hearing before a neutral decisionmaker is substantial. The burden imposed on the government by requiring hearings before an immigration judge at this stage of the proceedings is therefore a reasonable one.

*Id.* at 1091–92.

Applying these precedents to *Rodriguez* class members detained under § 1226(c), which requires civil detention of non-citizens previously convicted of certain crimes who have already served their state or federal periods of incarceration, we have concluded that "the prolonged detention of an alien without an individualized determination of his dangerousness or flight risk would be constitutionally doubtful." *Rodriguez II*, 715 F.3d at 1137 (quoting *Casas*, 535 F.3d at 951). To avoid these constitutional concerns, we held that "§ 1226(c)'s mandatory language must be construed 'to contain an implicit reasonable time limitation, the application of which is subject to federal-court review.'" *Id.* at 1138 (quoting *Zadvydas*, 533 U.S. at 682). "[W]hen detention becomes prolonged," i.e., at the six-month mark, "§ 1226(c) becomes inapplicable"; the government's authority to detain the non-citizen shifts to § 1226(a), which provides for discretionary detention; and detainees are then entitled to bond hearings. *Id.*

In so holding, we rejected the government's attempt to distinguish *Casas* on the basis that "*Casas* concerned an alien who had received an administratively final removal order, sought judicial review, and obtained a remand to the BIA," whereas this case involves "aliens awaiting the conclusion of their initial administrative proceedings." *Id.* at 1139. We found that this argument reflected "a distinction without a difference": "'Regardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention.'" *Id.* (quoting *Diouf II*, 634 F.3d at 1087).

We also noted that our conclusion was consistent with the decisions of the two other circuits that have directly addressed this issue. In *Diop v. ICE/Homeland Security*, 656 F.3d 221 (3d Cir. 2011), the Third Circuit, applying the canon of constitutional avoidance, construed § 1226(c) to "authorize[] detention for a reasonable amount of time, after which the authorities must make an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community." *Id.* at 231. Applying that holding to the facts of the case, the Third Circuit held that the petitioner's detention, which had lasted nearly three years, "was unconstitutionally unreasonable and, therefore, a violation of the Due Process Clause." *Id.* at 233. Although the court declined to adopt a categorical definition of a "reasonable amount of time" to detain a non-citizen without a bond hearing, it read *Demore* as we do—to connect the constitutionality of detention to its length and to authorize detention only for a "limited time." *Id*. at 233–34.

Likewise, in *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003), the Sixth Circuit held that, to avoid a constitutional problem,

removable non-citizens may be detained under § 1226(c) only "for a reasonable period of time required to initiate and conclude removal proceedings promptly." *Id.* at 273. Finding that the petitioner's 500-day-long detention was "unreasonable," the Sixth Circuit affirmed the district court's grant of a writ of habeas corpus. *Id.* at 265, 271. While maintaining that a "bright-line time limitation, as imposed in *Zadvydas*, would not be appropriate for the pre-removal period," the court recognized that *Demore*'s holding "rel[ies] on the fact that Kim, and persons like him, will normally have their proceedings completed within a short period of time and will actually be deported, or will be released." *Id.* at 271.

As to the *Rodriguez* subclass detained under § 1225(b), we found "no basis for distinguishing between" non-citizens detained under that section and under § 1226(c). *Rodriguez II*, 715 F.3d at 1143. The cases relied upon by the government for the proposition that arriving aliens are entitled to lesser due process protections—namely, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) and *Barrera–Echavarria v. Rison*, 44 F.3d 1441 (9th Cir. 1995) (en banc)—were decided under pre-IIRIRA law and, as such, were inapposite. *Id.* at 1140–41. We therefore held that "to the extent detention under § 1225(b) is mandatory, it is implicitly time-limited." *Id.* at 1144. As we had with § 1226(c), we explained that "the government's detention authority does not completely dissipate at six months; rather, the mandatory provisions of § 1225(b) simply expire at six months, at which point the government's authority to detain the non-citizen would shift to § 1226(a), which is discretionary and which we have already held requires a bond hearing." *Id.* (citing *Casas*, 535 F.3d at 948).

18                    RODRIGUEZ V. ROBBINS

After establishing that class members detained under § 1226(c) and § 1225(b) are entitled to bond hearings after six months of detention, we clarified that the procedural requirements set forth in *Singh* apply to those hearings. *Id.* at 1139, 1144 (citing *Singh*, 638 F.3d at 1203). These requirements include proceedings before "a neutral IJ" at which "the government bear[s] the burden of proof by clear and convincing evidence," *id.* at 1144 (citing *Singh*, 638 F.3d at 1203–04), a lower burden of proof than that required to sustain a criminal charge.

Having found that the class was likely to succeed on the merits, we turned to the other preliminary injunction factors. We found that the class members "clearly face irreparable harm in the absence of the preliminary injunction" because "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Id.* (citations omitted). The preliminary injunction safeguards constitutional rights by ensuring that "individuals whom the government cannot prove constitute a flight risk or a danger to public safety, and sometimes will not succeed in removing at all, are not needlessly detained." *Id.* at 1145. Similarly, we found that the balance of equities favored the class members because "needless prolonged detention" imposes "major hardship," whereas the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Id.* Finally, we held that the preliminary injunction was consistent with the public interest, which is "implicated when a constitutional right has been violated," and "benefits from a preliminary injunction that ensures that federal statutes are construed and implemented in a manner that avoids serious constitutional questions." *Id.* at 1146. We therefore affirmed the district court's order.

RODRIGUEZ V. ROBBINS                    19

During the pendency of *Rodriguez II*, the parties conducted discovery, and class counsel adduced extensive evidence detailing the circumstances under which class members are detained.  The parties then filed cross-motions for summary judgment, and the petitioners moved for a permanent injunction to extend and expand the preliminary injunction.

On August 6, 2013, after we issued our decision in *Rodriguez II*, the district court granted summary judgment to the class members and entered a permanent injunction.  The permanent injunction applies to class members detained under any of the four civil "general immigration detention statutes"—§§ 1225(b), 1226(a), 1226(c), and 1231(a)—and requires the government to provide each detainee with a bond hearing by his 195th day of detention.  Applying our decisions in *Casas*, *Singh*, and *Rodriguez II*, the district court further ordered that bond hearings occur automatically, that detainees receive "comprehendible notice," that the government bear the burden of proving "by clear and convincing evidence that a detainee is a flight risk or a danger to the community to justify the denial of bond," and that hearings are recorded.  However, the district court declined to order IJs to consider the length of detention or the likelihood of removal during bond hearings, or to provide periodic hearings for detainees who are not released after their first hearing.

The government now appeals from the entry of the permanent injunction, arguing that the district court—and we—erred in applying the canon of constitutional avoidance to each of the statutes at issue.  Relying on the Supreme Court's decisions in *Zadvydas* and *Demore*, the government argues that none of the subclasses are categorically entitled to

bond hearings after six months of detention. Accordingly, the government contends that we should decertify the class and instead permit as-applied challenges to individual instances of prolonged detention, which could occur only through habeas proceedings. Petitioners counter that *Rodriguez II* is the law of the case and law of the circuit, requiring us to affirm the permanent injunction as to the § 1225(b) and § 1226(c) subclasses, and that non-citizens detained pursuant to § 1226(a) and § 1231(a) are entitled to bond hearings for reasons similar to those discussed in *Rodriguez II*. Petitioners cross-appeal the district court's order as to the procedural requirements for bond hearings; they argue that the district court erred in declining to require that IJs consider the likelihood of removal and the total length of detention, and in declining to require that non-citizens detained for twelve or more months receive periodic bond hearings every six months.

## II.  Nature of Civil Immigration Detention

Class members spend, on average, 404 days in immigration detention. Nearly half are detained for more than one year, one in five for more than eighteen months, and one in ten for more than two years. In some cases, detention has lasted much longer: As of April 28, 2012, when the government generated data to produce to the petitioners, one class member had been detained for 1,585 days, approaching four and a half years of civil confinement.[4]

---

[4] The government challenges the accuracy of these figures, which are drawn from petitioners' expert report, based on disagreements with that expert's methodology. Using the government's preferred data set and process generates an average detention length of 347 days and a range of 180 to 1,037 days of civil detention for each non-citizen. Under either set

Non-citizens who vigorously pursue claims for relief from removal face substantially longer detention periods than those who concede removability.  Requesting relief from an IJ increases the duration of class members' detention by an average of two months; appealing a claim to the BIA adds, on average, another four months; and appealing a BIA decision to the Ninth Circuit typically leads to an additional eleven months of confinement.  Class members who persevere through this lengthy process are often successful:  About 71% of class members have sought relief from removal, and roughly one-third of those individuals prevailed.  However, many detainees choose to give up meritorious claims and voluntarily leave the country instead of enduring years of immigration detention awaiting a judicial finding of their lawful status.

Class members frequently have strong ties to this country:  Many immigrated to the United States as children, obtained legal permanent resident status, and lived in this country for as long as twenty years before ICE initiated removal proceedings.  As a result, hundreds of class members are married to U.S. citizens or lawful permanent residents, and have children who were born in this country.  Further, many class members hold steady jobs—including as electricians, auto mechanics, and roofers—to provide for themselves and their families.  At home, they are caregivers for young children, aging parents, and sick or disabled relatives.  To the extent class members have any criminal record—and many have no criminal history whatsoever—it is often limited to minor controlled substances offenses.  Accordingly, when class members do receive bond hearings, they often produce

---

of figures, typical class members are detained for well over 180 days.  The differences in precise numbers are not material to our decision.

22          RODRIGUEZ V. ROBBINS

glowing letters of support from relatives, friends, employers,
and clergy attesting to their character and contributions to
their communities.

Prolonged detention imposes severe hardship on class
members and their families. Civil immigration detainees are
treated much like criminals serving time: They are typically
housed in shared jail cells with no privacy and limited access
to larger spaces or the outdoors. Confinement makes it more
difficult to retain or meet with legal counsel, and the
resources in detention facility law libraries are minimal at
best, thereby compounding the challenges of navigating the
complexities of immigration law and proceedings. In
addition, visitation is restricted and is often no-contact,
dramatically disrupting family relationships. While in
detention, class members have missed their children's births
and their parents' funerals. After losing a vital source of
income, class members' spouses have sought government
assistance, and their children have dropped out of college.

Lead petitioner Alejandro Rodriguez's story is
illustrative. Rodriguez came to the United States as an infant
and has lived here continuously since then. Rodriguez is a
lawful permanent resident of the United States, and his entire
immediate family—including his parents, siblings, and three
young children—also resides in the United States as citizens
or lawful permanent residents. Before his removal
proceedings began, Rodriguez worked as a dental assistant.
In 2003, however, Rodriguez was convicted of possession of
a controlled substance and sentenced to five years of
probation and no jail time. He had one previous conviction,
for "joyriding."

In 2004, ICE commenced removal proceedings and subjected Rodriguez to civil detention. An IJ determined that Rodriguez's prior conviction for "joyriding," i.e. driving a stolen vehicle, qualified as an "aggravated felony" that rendered him ineligible for relief in the form of cancellation of removal, and therefore ordered him removed. Rodriguez appealed the IJ's decision to the BIA, which affirmed, and then to the Ninth Circuit. In July 2005, a three-judge panel of our court granted the government's motion to hold Rodriguez's case in abeyance until the Supreme Court decided a related case, *Gonzales v. Penuliar*, 549 U.S. 1178 (2007), which issued eighteen months later, in January 2007. In *Penuliar*, the Supreme Court vacated our court's opinion and remanded for further consideration in light of *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007), which held that violating a California statute prohibiting taking a vehicle without the owner's consent qualifies as a "theft offense." Between July 2005 and January 2007, while Rodriguez's case was in abeyance, ICE conducted four custody reviews on Rodriguez and repeatedly determined that Rodriguez was required to remain in detention until our court issued a decision on the merits of his claim. In mid-2007, about a month after Rodriguez had moved for class certification, however, ICE released him. At that point, Rodriguez had been detained for 1,189 days, roughly three years and three months. In April 2008, in the related case on remand from the Supreme Court, our court held that driving a stolen vehicle did not qualify as an aggravated felony. *Penuliar v. Mukasey*, 528 F.3d 603, 614 (9th Cir. 2008). On motion of the parties, we then remanded Rodriguez's petition to the BIA, which granted his application for cancellation of removal, vindicating his right to lawfully remain in the United States.

### III.  Standard of Review

"We review a grant of summary judgment *de novo*."
*Pavoni v. Chrysler Grp., LLC*, 789 F.3d 1095, 1098 (9th Cir.
2015).  "A permanent injunction 'involves factual, legal, and
discretionary components,' so we 'review a decision to grant
such relief under several different standards.'"  *Vietnam
Veterans of Am. v. C.I.A.*, 791 F.3d 1122, 1129 (9th Cir.
2015) (quoting *Momot v. Mastro*, 652 F.3d 982, 986 (9th Cir.
2011)).  "We review legal conclusions . . . de novo, factual
findings for clear error, and the scope of the injunction for
abuse of discretion."  *Id.*

### IV.  Discussion

In resolving whether the district court erred in entering
the permanent injunction, we consider, first, petitioners'
entitlement to bond hearings and, second, the procedural
requirements for such hearings.  Based on our precedents, we
hold that the canon of constitutional avoidance requires us to
construe the statutory scheme to provide all class members
who are in prolonged detention with bond hearings at which
the government bears the burden of proving by clear and
convincing evidence that the class member is a danger to the
community or a flight risk.  However, we also conclude that
individuals detained under § 1231(a) are not members of the
certified class.  We affirm the district court's order insofar as
it requires automatic bond hearings and requires IJs to
consider alternatives to detention because we presume, like
the district court, that IJs are already doing so when

determining whether to release a non-citizen on bond.[5] Because the same constitutional concerns arise when detention approaches another prolonged period, we hold that IJs must provide bond hearings periodically at six month intervals for class members detained for more than twelve months. However, we reject the class's suggestion that we mandate additional procedural requirements.

## A.  Civil Detention

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Civil detention violates the Due Process Clause except "in certain special and narrow nonpunitive circumstances, where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690 (citations omitted). Consistent with these principles, the Supreme Court has—outside of the immigration context—found civil detention constitutional without any individualized showing of need only when faced with the unique exigencies of global war or domestic insurrection. *See Ludecke v. Watkins*, 335 U.S. 160 (1948); *Korematsu v.*

---

[5] *See* 8 C.F.R. § 241.4(f) (listing factors that Department of Homeland Security ("DHS") must "weigh[] in considering whether to recommend further detention or release of a detainee," including the detainee's criminal history, evidence of recidivism or rehabilitation, ties to the United States, history of absconding or failing to appear for immigration or other proceedings, and the likelihood that the detainee will violate the conditions of release); *id.* § 1236.1(d)(1) (authorizing IJs to "detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released" and to "ameliorat[e] the conditions" of release imposed by DHS).

*United States*, 323 U.S. 214 (1944); *Moyer v. Peabody*, 212 U.S. 78 (1909).[6]    And even in those extreme circumstances, the Court's decisions have been widely criticized.    *See, e.g.*, Eugene V. Rostow, *The Japanese American Cases—A Disaster*, 54 Yale L.J. 489 (1945).  In all contexts apart from immigration and military detention, the Court has found that the Constitution requires some individualized process and a judicial or administrative finding that a legitimate governmental interest justifies detention of the person in question.

For example, in numerous cases addressing the civil detention of mentally ill persons, the Court has consistently recognized that such commitment "constitutes a significant deprivation of liberty," and so the state "must have a constitutionally adequate purpose for the confinement." *Jones v. United States*, 463 U.S. 354, 361 (1983) (citations omitted).  Further, the "nature and duration of commitment" must "bear some reasonable relation to the purpose for which the individual is committed." *Jones*, 463 U.S. at 368 (citation omitted).

Accordingly, the state may detain a criminal defendant found incapable of standing trial, but only for "the reasonable period of time necessary to determine whether there is a substantial probability that he will attain [the] capacity [to stand trial] in the foreseeable future." *Jackson v. Indiana*,

---

[6] For a thorough discussion of civil detention jurisprudence and its bearing on the constitutionality of civil detention in the immigration context, see Farrin R. Anello, *Due Process and Temporal Limits on Mandatory Immigration Detention*, 65 Hastings L.J. 363 (2014), and David Cole, *In Aid of Removal: Due Process Limits on Immigration Detention*, 51 Emory L.J. 1003 (2002).

406 U.S. 715, 738 (1972). At all times, the individual's "commitment must be justified by progress toward that goal." *Id.* Likewise, the state may detain a criminal defendant following an acquittal by reason of insanity in order to "treat the individual's mental illness and protect him and society from his potential dangerousness." *Jones*, 463 U.S. at 368. However, the detainee "is entitled to release when he has recovered his sanity or is no longer dangerous." *Id.*; *see also Foucha v. Louisiana*, 504 U.S. 71, 78 (1992) ("[K]eeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness."). Further, although the state may detain sexually dangerous individuals even after they have completed their criminal sentences, such confinement must "take[] place pursuant to proper procedures and evidentiary standards." *Kansas v. Hendricks*, 521 U.S. 346, 357 (1997). To "justify indefinite involuntary commitment," the state must prove both "dangerousness" and "some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Id.* at 358 (collecting cases).

Similarly, the Court has held that pretrial detention of individuals charged with "the most serious of crimes" is constitutional only because, under the Bail Reform Act, an "arrestee is entitled to a prompt detention hearing" to determine whether his confinement is necessary to prevent danger to the community. *Salerno*, 481 U.S. at 747. Further, "the maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act." *Id.*; *see also Schall v. Martin*, 467 U.S. 253, 263 (1984) (upholding a statute that "permits a brief pretrial detention based on a finding of a 'serious risk' that an arrested juvenile may commit a crime before his return date").

In addition, the Court has held that incarceration of individuals held in civil contempt is consistent with due process only where the contemnor receives adequate procedural protections and the court makes specific findings as to the individual's ability to comply with the court order. *See Turner v. Rogers*, 131 S. Ct. 2507, 2520 (2011). If compliance is impossible—for instance, if the individual lacks the financial resources to pay court-ordered child support—then contempt sanctions do not serve their purpose of coercing compliance and therefore violate the Due Process Clause. *See id.*

Early cases upholding immigration detention policies were a product of their time. *See Carlson v. Landon*, 342 U.S. 524 (1952) (McCarthy Era deportation of communists); *Ludecke v. Watkins*, 335 U.S. 160 (1948) (removal of German enemy aliens during World War II); *Wong Wing v. United States*, 163 U.S. 228 (1896) (Chinese exclusion). Yet even these cases recognized some limits on detention of non-citizens pending removal. Such detention may not be punitive—Congress may not, for example, impose sentences of "imprisonment at hard labor" on non-citizens awaiting deportation, *Wong Wing*, 163 U.S. at 235—and it must be supported by a legitimate regulatory purpose. Under these principles, the Court authorized the "detention or temporary confinement" of Chinese-born non-citizens "pending the inquiry into their true character, and while arrangements were being made for their deportation." *Id.* The Court also upheld executive detention of enemy aliens after the cessation of active hostilities because deportation is "hardly practicable" in the midst of war, and enemy aliens' "potency for mischief" continues "even when the guns are silent." *Ludecke*, 335 U.S. at 166. Similarly, the Court approved detention of communists to limit their

"opportunities to hurt the United States during the pendency of deportation proceedings." *Carlson*, 342 U.S. at 538. The Court recognized, however, that "purpose to injure could not be imputed generally to all aliens subject to deportation." *Id.* at 538. Rather, if the Attorney General wished to exercise his discretion to deny bail, he was required to do so at a hearing, the results of which were subject to judicial review. *Id.* at 543.

More recently, the Supreme Court has drawn on decades of civil detention jurisprudence to hold that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem." *Zadvydas*, 533 U.S. at 690. Although the state has legitimate interests in "ensuring the appearance of aliens at future immigration proceedings" and "protecting the community," post–removal period detention does not uniformly "'bear[] [a] reasonable relation to the purpose for which the individual [was] committed.'" *Id.* (second and third alterations in original) (quoting *Jackson*, 406 U.S. at 738). To avoid constitutional concerns, the Court construed 8 U.S.C. § 1231(a)(6), the statute governing post–removal period detention, to "limit[] an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." *Id.* at 689. Detention beyond that point requires "strong procedural protections" and a finding that the non-citizen is "specially dangerous." *Id.* at 691.

Soon after *Zadvydas*, the Court rejected a due process challenge to mandatory detention under 8 U.S.C. § 1226(c), which applies to non-citizens convicted of certain crimes. *Demore*, 538 U.S. at 517–18. While affirming its "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary

30            RODRIGUEZ V. ROBBINS

for their removal proceedings," *id.* at 526, the Court emphasized that detention under § 1226(c) was constitutionally permissible because it has "a definite termination point" and typically "lasts for less than . . . 90 days," *id.* at 529.

Since *Zadvydas* and *Demore*, our court has "grappled in piece-meal fashion with whether the various immigration detention statutes may authorize indefinite or prolonged detention of detainees and, if so, may do so without providing a bond hearing." *Rodriguez II*, 715 F.3d at 1134 (quoting *Rodriguez I*, 591 F.3d at 1114). As we recognized in *Casas*, "prolonged detention without adequate procedural protections would raise serious constitutional concerns." *Casas*, 535 F.3d at 950; *see also Rodriguez II*, 715 F.3d at 1144 (discussing "the constitutional concerns raised by prolonged mandatory detention"); *Singh*, 638 F.3d at 1208 ("The private interest here—freedom from prolonged detention—is unquestionably substantial."); *Diouf II*, 634 F.3d at 1085 ("When the period of detention becomes prolonged, 'the private interest that will be affected by the official action' is more substantial; greater procedural safeguards are therefore required.") (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). We have therefore held that non-citizens detained pursuant to § 1226(a) and § 1231(a)(6) are entitled to bond hearings before an IJ when detention becomes prolonged. *See Casas*, 535 F.3d at 949 (requiring bond hearings for individuals detained under § 1226(a)); *Diouf II*, 634 F.3d at 1084 (extending *Casas* to individuals detained under § 1231(a)(6)).

While the government falsely equates the bond hearing requirement to mandated release from detention or facial invalidation of a general detention statute, our precedents

make clear that there is a distinction "between detention being authorized and being necessary as to any particular person." *Casas*, 535 F.3d at 949. Bond hearings do not restrict the government's legitimate authority to detain inadmissible or deportable non-citizens; rather, they merely require the government to "justify denial of bond" with clear and convincing "evidence that an alien is a flight risk or danger to the community." *Singh*, 638 F.3d at 1203. And, in the end, the government is required only to establish that it has a legitimate interest reasonably related to continued detention; the discretion to release a non-citizen on bond or other conditions remains soundly in the judgment of the immigration judges the Department of Justice employs.

Prior decisions have also clarified that detention becomes "prolonged" at the six-month mark. In *Zadvydas*, the Supreme Court recognized six months as a "presumptively reasonable period of detention." 533 U.S. at 701. By way of background, the Court noted that in 1996, Congress had "shorten[ed] the removal period from six months to 90 days." *Id.* at 698. The Court then explained:

> While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time. We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months. Consequently, for the sake of uniform administration in the federal courts, we recognize that period.

32                    RODRIGUEZ V. ROBBINS

*Id.* at 701 (citation omitted); *see also Clark v. Martinez*,
543 U.S. 371, 386 (2005) (applying "the 6–month
presumptive detention period" the Supreme Court "prescribed
in *Zadvydas*"); *cf. Nadarajah v. Gonzales*, 443 F.3d 1069,
1078–79 (9th Cir. 2006) (discussing the Patriot Act's
requirement that "detention of suspected terrorists or other
threats to national security" be reviewed "at six month
intervals"). Following *Zadvydas*, we have defined detention
as "prolonged" when "it has lasted six months and is expected
to continue more than minimally beyond six months." *Diouf
II*, 634 F.3d at 1092 n.13.[7]  At that point, we have explained,
"the private interests at stake are profound," and "the risk of
an erroneous deprivation of liberty in the absence of a hearing
before a neutral decisionmaker is substantial." *Id.* at 1092.

## B.  Entitlement to a Bond Hearing

With this well-established precedent of the Supreme
Court and our Court in mind, we review the district court's
grant of summary judgment and entry of a permanent
injunction.   We consider, in turn, whether individuals
detained under §§ 1226(c), 1225(b), 1226(a), and 1231(a) are
entitled to bond hearings after they have been detained for six
months.

### 1.  The § 1226(c) Subclass

Section 1226(c) requires that the Attorney General detain
any non-citizen who is inadmissible or deportable because of

---

[7] As we noted in *Rodriguez II*, this holding does not conflict with the
Supreme Court's decision in *Demore*, 538 U.S. 510, which approved only
"brief period[s]" of detention without individualized determinations as to
dangerousness and flight risk.  *Demore*, 538 U.S. at 513, 523.

his criminal history upon that person's release from imprisonment, pending proceedings to remove him from the United States.[8]  Detention under § 1226(c) is mandatory. Individuals detained under that section are not eligible for release on bond or parole, *see* 8 U.S.C. § 1226(a); they may be released only if the Attorney General deems it "necessary" for witness protection purposes, *id.* § 1226(c)(2).

An individual detained under § 1226(c) may ask an IJ to reconsider whether the mandatory detention provision applies to him, *see* 8 C.F.R. § 1003.19(h)(2)(ii), but such review is limited in scope and addresses only whether the individual is properly included in a category of non-citizens subject to mandatory detention based on his criminal history.  *See generally In re Joseph*, 22 I. & N. Dec. 799 (BIA 1999).  At a "*Joseph* hearing," a detainee "may avoid mandatory detention by demonstrating that he is not an alien, was not

---

[8] Mandatory detention under § 1226(c) applies to non-citizens who are inadmissible on account of having committed a crime involving moral turpitude or a controlled substance offense; having multiple criminal convictions with an aggregate sentence of five years or more of confinement; having connections to drug trafficking, prostitution, commercialized vice, money laundering, human trafficking, or terrorism; having carried out severe violations of religious freedom while serving as a foreign government official; or having been involved in serious criminal activity and asserting immunity from prosecution.  It also applies to non-citizens who are deportable on account of having been convicted of two or more crimes involving moral turpitude, an aggravated felony, a controlled substance offense, certain firearm-related offenses, or certain other miscellaneous crimes; having committed a crime of moral turpitude within a certain period of time since their date of admission for which a sentence of one year or longer has been imposed; or having connections to terrorism.  *See* 8 U.S.C. § 1226(c) (cross-referencing 8 U.S.C. §§ 1182(a)(2), 1227(a)(2)(A)(ii), 1227(a)(2)(A)(iii), 1227(a)(2)(B), 1227(a)(2)(C), 1227(a)(2)(D), 1227(a)(2)(A)(i), 1182(a)(3)(B), 1227(a)(4)(B)).

convicted of the predicate crime, or that the [DHS] is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention." *Demore*, 538 U.S. at 514 n.3. "A determination in favor of an alien" at a *Joseph* hearing "does not lead to automatic release," *Joseph*, 22 I. & N. Dec. at 806, because the government retains discretionary authority to detain the individual under § 1226(a). Instead, such a determination allows the IJ to consider granting bond under the § 1226(a) standards, namely, whether the detainee would pose a danger or flight risk if released. *See id.*; *see also Demore*, 538 U.S. at 532 (Kennedy, J., concurring).

As a result of § 1226(c)'s mandatory language and the limited review available through a *Joseph* hearing, individuals are often detained for years without adequate process. *See, e.g.*, *Tijani*, 430 F.3d at 1242 (lawful permanent resident detained for more than two and a half years). Members of the § 1226(c) subclass also tend to be detained for longer periods than other class members: The longest-detained class member was confined for 1,585 days and counting as of April 28, 2012, and the average subclass member faces detention for 427 days. These lengthy detention times bear no relationship to the seriousness of class members' criminal history or the lengths of their previously served criminal sentences. In several instances identified by class counsel, a class member was sentenced to one to three months in prison for a minor controlled substances offense, then endured one or two *years* in immigration detention. Nor do these detention durations bear any relation to the merits of the subclass members' claims: Of the § 1226(c) subclass members who apply for relief from removal, roughly 40% are granted such relief, a rate even higher than that of the overall class.

In *Rodriguez II*, we held that "the prolonged detention of an alien [under § 1226(c)] without an individualized determination of his dangerousness or flight risk would be constitutionally doubtful." 715 F.3d at 1137–38 (quoting *Casas*, 535 F.3d at 951). To avoid these "constitutional concerns, § 1226(c)'s mandatory language must be construed 'to contain an implicit reasonable time limitation.'" *Id.* at 1138 (quoting *Zadvydas*, 533 U.S. at 682). Accordingly, at the six-month mark, "when detention becomes prolonged, § 1226(c) becomes inapplicable," and "the Attorney General's detention authority rests with § 1226(a)." *Id.* (citation omitted). Under *Casas*, those detainees are then entitled to a bond hearing. *See id.* (discussing *Casas*, 535 F.3d at 951).

Contrary to the government's argument, this holding is consistent with the text of § 1226(c), which requires that the government detain certain non-citizens but does not mandate such detention for any particular length of time. *See id.* at 1138–39 (The government "does not argue that reading an implicit *temporal limitation* on mandatory detention into the statute is implausible. Indeed, it could not do so, because such an argument is foreclosed by our decisions in *Tijani* and *Casas*.") (alterations in original) (citation omitted). Our holding is also consistent with the Supreme Court's decision in *Demore*, which turned on the brevity of the detention at issue. *See Demore*, 538 U.S. at 513 (holding that Congress may require detention "for the brief period necessary for [a non-citizen's] removal proceedings"); *id.* at 526 (discussing the "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings"); *id.* at 530 n.12 (emphasizing the "very limited time of the detention at stake under § 1226(c)").

Since *Rodriguez II*, no intervening changes in the law have affected our conclusions. Neither the Supreme Court nor our Circuit has had occasion to reexamine these issues, and the Third and Sixth Circuits have not changed the positions they adopted in *Diop* and *Ly*, respectively. *See Chavez-Alvarez v. Warden, York Cnty. Prison*, 783 F.3d 469, 478 (3d Cir. 2015) (finding petitioner's detention unreasonable under the *Diop* framework); *cf. Hernandez v. Prindle*, No. 15-10, 2015 WL 1636138, at *7 (E.D. Ky. Apr. 13, 2015) (citing *Ly* for the proposition that a "short" period of detention "to effectuate effective removal," "does not raise due process concerns"), *appeal dismissed* (6th Cir. 2015).

Moreover, district courts have relied on *Rodriguez II* in resolving numerous habeas petitions filed by immigration detainees. *See, e.g.*, *Castaneda v. ICE Field Office Dir.*, No. 14-1427, 2015 WL 71584, at *2–3 (W.D. Wash. Jan. 6, 2015) (addressing whether the petitioner's bond hearing complied with the requirements of *Rodriguez II*); *Garcia-Perez v. Kane*, No. 13-01870, 2014 WL 3339794, at *2 (D. Ariz. July 8, 2014) (noting that, under *Rodriguez II*, "detention always becomes prolonged at six months," but denying a habeas petition because petitioner "has not been detained for longer than six months"); *Lopez v. Napolitano*, No. 12-01750, 2014 WL 1091336, at *4–6 (E.D. Cal. Mar. 18, 2014) (extending *Rodriguez II* to a non-citizen detained under § 1226(a) pending reinstatement of a previously issued removal order); *Franco-Gonzalez v. Holder*, No. 10-02211, 2013 WL 3674492, at *10–13 (C.D. Cal. Apr. 23, 2013) (applying *Rodriguez II* in holding that a class of non-citizens detained under §§ 1225(b), 1226, and 1231 are entitled to bond hearings after six months of detention).

Thus, *Rodriguez II* is law of the case and law of the circuit. As we recently explained, the "law of the case doctrine" provides that "a court will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247 (2013); *see also Gonzales v. U.S. Dep't of Homeland Sec.*, 712 F.3d 1271, 1278 (9th Cir. 2013); *Bernhardt v. Los Angeles County*, 339 F.3d 920, 924 (9th Cir. 2003). Likewise, pursuant to the "'law of the circuit' rule," "a published decision of this court constitutes binding authority which 'must be followed unless and until overruled by a body competent to do so.'" *Gonzalez*, 677 F.3d at 389 n.4 (quoting *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001)); *see also United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit . . . .").

The "'general rule' is that our decisions 'at the preliminary injunction phase do not constitute the law of the case.'" *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075 n.5 (9th Cir. 2015) (quoting *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007)). Because preliminary injunction decisions are often "made hastily and on less than a full record," they "may provide little guidance as to the appropriate disposition on the merits." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013) (citations omitted); *see also S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1136 (9th Cir. 2004). However, "there is an exception to the general rule for 'conclusions on

pure issues of law.'"  *Stormans*, 794 F.3d at 1075 n.5 (quoting *Alpha Delta Chi–Delta Chapter v. Reed*, 648 F.3d 790, 804–05 (9th Cir. 2011)); *see also Ranchers Cattlemen*, 499 F.3d at 1114 ("Any of our conclusions on pure issues of law, however, are binding.").

The question resolved in *Rodriguez II*—whether non-citizens subject to prolonged detention under § 1226(c) are entitled to bond hearings—is a pure question of law.  We interpreted the statute by applying the canon of constitutional avoidance, and were bound to do so by our prior precedent. The decision was not made "hastily"; it provided a "fully considered appellate ruling" on the legal issues.  *Ranchers Cattlemen*, 499 F.3d at 1114 (quoting 18 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4478.5 (2002)).  We therefore follow *Rodriguez II* as law of the case and law of the circuit.[9]

2.  The § 1225(b) Subclass

Section 1225(b) applies to "applicants for admission" who are stopped at the border or a port of entry, or who are "present in the United States" but "ha[ve] not been admitted." 8 U.S.C. § 1225(a)(1).  The statute provides that asylum

---

[9] The government's primary arguments regarding § 1226(c) are that we misconstrued *Demore* and other Supreme Court precedent, that the permanent injunction is inconsistent with the language and purpose of § 1226(c), and that bond hearings following six months of incarceration are not necessary and are an inappropriate "one size fits all" remedy. These arguments are foreclosed by *Rodriguez II*.  The government also argues that any challenges to detention under § 1226(c) must be addressed through individual as-applied claims.  This argument is foreclosed by *Rodriguez I*, which reversed the district court's denial of class certification.

seekers "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." *Id.* § 1225(b)(1)(B)(iii)(IV). As to all other applicants for admission, the statute provides that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained" for removal proceedings. *Id.* § 1225(b)(2)(A).

Under DHS regulations, non-citizens detained pursuant to § 1225(b) are generally not eligible for release on bond. 8 C.F.R. § 236.1(c)(2). If there are "urgent humanitarian reasons or significant public benefit[s]" at stake,[10] however, the Attorney General has discretion to temporarily parole such an individual into the United States, provided that the individual presents neither a danger nor a risk of flight. 8 U.S.C. § 1182(d)(5)(A). Because parole decisions under § 1182 are purely discretionary, they cannot be appealed to IJs or courts. This lack of review has proven especially problematic when immigration officers have denied parole based on blatant errors: In two separate cases identified by the petitioners, for example, officers apparently denied parole because they had confused Ethiopia with Somalia. And in a third case, an officer denied parole because he had mixed up two detainees' files.

As with § 1226(c), the government often cites § 1225(b)'s mandatory language to justify indefinite civil detention without an individualized determination as to whether the

---

[10] Under this standard, detainees are eligible for parole if they have serious medical conditions, are pregnant, are juveniles who meet certain conditions, or will be witnesses in judicial, administrative, or legislative proceedings. *See* 8 C.F.R. § 212.5(b).

detainee would pose a danger or flight risk if released. *See, e.g.*, *Nadarajah*, 443 F.3d at 1071, 1076 (asylum seeker detained for nearly five years). Section 1225(b) subclass members have been detained for as long as 831 days, and for an average of 346 days each. These individuals apply for and receive relief from removal at very high rates: 94% apply, and of those who apply, 64% are granted relief. In illustrative cases identified by the petitioners, non-citizens fled to the United States after surviving kidnapping, torture, and murder of their family members in their home countries. Upon arrival, these individuals were detained under § 1225(b), and they remained in detention until the government granted their asylum applications hundreds of days later.

In *Rodriguez II*, we extended *Casas* and held that to avoid serious constitutional concerns, mandatory detention under § 1225(b), like mandatory detention under § 1226(c), must be construed as implicitly time-limited. *Rodriguez II*, 715 F.3d at 1144. Accordingly, "the mandatory provisions of § 1225(b) simply expire at six months, at which point the government's authority to detain the alien shifts to § 1226(a), which is discretionary and which we have already held requires a bond hearing." *Id.* (citing *Casas*, 535 F.3d at 948).

In so holding, we recognized that many members of the § 1225(b) subclass are subject to the "entry fiction" doctrine, under which non-citizens seeking admission to the United States "may physically be allowed within its borders pending a determination of admissibility," but "are legally considered to be detained at the border and hence as never having effected entry into this country." *Id.* at 1140 (quoting *Barrera-Echevarria*, 44 F.3d at 1450). Such non-citizens therefore "enjoy very limited protections under the United States constitution." *Id.* (quoting *Barrera-Echevarria*, 44

F.3d at 1450).  However, even if the majority of prolonged detentions under § 1225(b) are constitutionally permissible, "the Supreme Court has instructed that, where one possible application of a statute raises constitutional concerns, the statute as a whole should be construed through the prism of constitutional avoidance." *Id.* at 1141 (citing *Clark*, 543 U.S. at 380).  Section 1225(b) applies to several categories of lawful permanent residents who are not subject to the entry fiction doctrine but may be treated as seeking admission under 8 U.S.C. § 1101(a)(13)(C).  *See id.* at 1141–42.[11]

---

[11] Section 1101(a)(13)(C) provides that:

> An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien—
>
> (i) has abandoned or relinquished that status,
>
> (ii) has been absent from the United States for a continuous period in excess of 180 days,
>
> (iii) has engaged in illegal activity after having departed the United States,
>
> (iv) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this chapter and extradition proceedings,
>
> (v) has committed an offense identified in section 1182(a)(2) of this title, unless since such offense the alien has been granted relief under section 1182(h) or 1229b(a) of this title, or
>
> (vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been

Because those persons are entitled to due process protections under the Fifth Amendment, prolonged detention without bond hearings would raise serious constitutional concerns. *See id.* at 1142–43; *see also Zadvydas*, 533 U.S. at 682 (holding that indefinite detention of a once-admitted non-citizen "would raise serious constitutional concerns"). We therefore construed the statutory scheme to require a bond hearing after six months of detention under § 1225(b). *Rodriguez II*, 715 F.3d at 1144.

The government now argues that "[d]espite years of discovery, petitioners have not identified any member of the Section 1225(b) subclass who is a [lawful permanent resident]." Petitioners represent that they have found lawful permanent residents who have been detained for more than six months under § 1225(b), although their submissions do not identify any specific individuals who fit that description. The question, however, is whether "one possible application of [the] statute raises constitutional concerns." *Rodriguez II*, 715 F.3d at 1141. Because the government concedes that detention of lawful permanent residents under § 1225(b) is possible under § 1101(a)(13)(C), "the statute as a whole should be construed through the prism of constitutional avoidance." *Rodriguez II*, 715 F.3d at 1141; *see also Clark*, 543 U.S. at 380 ("It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation. The lowest common denominator, as it were, must govern.").

---

admitted to the United States after inspection and authorization by an immigration officer.

The government also argues that lawful permanent residents treated as seeking admission are entitled to lesser due process protections than other lawful permanent residents. But the government has not provided any authority to support that proposition:  The cases cited in the government's brief address *statutory and regulatory* distinctions between lawful permanent residents treated as applicants for admission and other lawful permanent residents; they do not reflect any *constitutional* distinction between those groups. *See Gonzaga-Ortega v. Holder*, 736 F.3d 795, 8014 (9th Cir. 2013) (holding that lawful permanent residents treated as applicants for admission are not entitled to counsel under 8 C.F.R. § 292.5(b)); *Toro-Romero v. Ashcroft*, 382 F.3d 930, 936 (9th Cir. 2004) (explaining that different statutes govern exclusion of inadmissible non-citizens and removal of deportable non-citizens); *Raya-Ledesma v. INS*, 55 F.3d 418, 420 (9th Cir. 1994) (holding that "the INS limitation of § 212 relief [from deportation] to legal permanent residents who have held that status for more than seven years" does not violate an ineligible non-citizen's equal protection rights).

Finally, the government argues that, instead of requiring bond hearings, we could avoid constitutional concerns by interpreting § 1225(b) not to apply to lawful permanent residents.  This argument relies on an implausible construction of the statutes at issue.  Section 1225(b) applies to "applicants for admission," and § 1101 defines six categories of lawful permanent residents as "seeking an admission into the United States for purposes of the immigration laws."  8 U.S.C. § 1101(a)(13)(C); *see also Gonzaga-Ortega*, 736 F.3d at 801 ("Ordinarily a returning [lawful permanent resident] is not treated as an 'applicant for

admission.'  But the statute that so provides includes six exceptions . . . .").

The Supreme Court's decision in *Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953), is not to the contrary.  *Chew* involved a pre-IIRIRA immigration regulation that applied to "excludable" non-citizens.  *Id.* at 591 n.1.  Because the regulations were silent as to whether that category included lawful permanent residents returning from voyages abroad, the Court distinguished between the "exclusion" of newly arriving non-citizens and the "expulsion" of lawful permanent residents, thereby holding that the regulation did not authorize the Attorney General to detain arriving lawful permanent residents without hearings. *Id.* at 598–99.  Section 1101(a)(13)(C) forecloses an analogous construction of § 1225(b) because it provides that "applicants for admission" includes several groups of lawful permanent residents.  *See* 8 U.S.C. § 1101(a)(13)(C).  In any event, the government's alternative construction of § 1225(b) was never raised before the district court; the argument is therefore forfeited.  *See Munns v. Kerry*, 782 F.3d 402, 412 (9th Cir. 2015); *Saldana v. Occidental Petrol. Corp.*, 774 F.3d 544, 554 (9th Cir. 2014).

Accordingly, we adhere to *Rodriguez II*'s holding regarding the § 1225(b) subclass as law of the case and law of the circuit.  *See Gonzalez*, 677 F.3d at 390 n.4.  The government's attempts to re-litigate *Rodriguez II* are unavailing.[12]

---

[12] The government argues, among other things, that the permanent injunction entered by the district court is inconsistent with § 1225(b), DHS regulations, the political branches' plenary control of the borders, the limited constitutional protections afforded to non-citizens seeking

### 3.   The § 1226(a) Subclass

Section 1226(a) authorizes detention "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a).  The statute expressly authorizes release on "bond of at least $1,500" or "conditional parole."[13] *Id.* § 1226(a)(2).  Following an initial custody determination by DHS, a non-citizen may apply for a review or redetermination by an IJ, and that decision may be appealed to the BIA.  *See* 8 C.F.R. §§ 236.1, 1003.19.  At these hearings, the detainee bears the burden of establishing "that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight." *Guerra*, 24 I. & N. Dec. at 38.  "After an initial

---

admission to the United States, and Supreme Court precedent.  The government also argues that bond hearings are unnecessary because non-citizens detained under § 1225(b) can be released on parole.  We considered and rejected these arguments in *Rodriguez II*, and we decline to address them here.

The government also argues that we should reconsider the holding in *Rodriguez II* in light of new evidence, including as to the rates at which non-citizens abscond or commit crimes after release, and the efficacy of the parole process.  Because *Rodriguez II* involved pure questions of law, this new evidence is not material and does not alter our conclusions.

[13] "'[C]onditional parole' under §1226(a)(2)(B) is a 'distinct and different procedure' from 'parole' under § 1182(d)(5)(A))." *Garcia v. Holder*, 659 F.3d 1261, 1268 (9th Cir. 2011) (quoting *In re Castillo-Padilla*, 25 I. & N. Dec. 257, 258 (BIA 2010)).  As discussed above, § 1182(d)(5)(A) authorizes the Attorney General to temporarily release non-citizens detained under  § 1225(b) "for urgent humanitarian reasons or significant public benefit." Conditional parole under § 1226(a), by contrast, provides for release from detention if the non-citizen "would not pose a danger to property or persons" and "is likely to appear for any further proceeding."  8 C.F.R. § 236.1(c)(8).

bond redetermination," a request for another review "shall be considered only upon a showing that the alien's circumstances have changed materially since the prior bond redetermination." 8 C.F.R. § 1003.19(e). The government has taken the position that additional time spent in detention is not a "changed circumstance" that entitles a detainee to a new bond hearing.

Although § 1226(a) provides for discretionary, rather than mandatory, detention and establishes a mechanism for detainees to seek release on bond, non-citizens often face prolonged detention under that section. *See, e.g.*, *Casas*, 535 F.3d at 944 (lawful permanent resident detained for seven years); *Singh*, 638 F.3d at 1203 (lawful permanent resident detained for nearly four years). In an extreme case identified by the petitioners, a non-citizen with no criminal record entered the United States on a tourist visa and affirmatively applied for asylum, withholding of removal, and relief under the Convention Against Torture shortly after that visa expired. ICE detained him throughout the ensuing proceedings before the IJ, the BIA, and the Ninth Circuit. At the time petitioners generated their report, he had been detained for 1,234 days with no definite end in sight.

The district court's decision regarding the § 1226(a) subclass was squarely controlled by our precedents. In *Casas*, we held that a non-citizen subjected to prolonged detention under § 1226(a) is entitled to a hearing to establish whether continued detention is necessary because he would pose a danger to the community or a flight risk upon release. 535 F.3d at 949–52. Since deciding *Casas*, we have repeatedly affirmed its holding. *See Cole v. Holder*, 659 F.3d 762, 769 n.7 (9th Cir. 2011); *Singh*, 638 F.3d at 1200; *Aguilar-Ramos v. Holder*, 594 F.3d 701, 704 n.3 (9th Cir.

2010); *Makaj v. Crowther*, 294 F. App'x 328, 329–30 (9th Cir. 2008) (non-precedential memorandum disposition).

The government does not contest that *Casas* is the binding law of this circuit or that individuals detained under § 1226(a) are entitled to bond hearings. Instead, the government argues that § 1226(a) affords detainees the right to request bond hearings, *see* 8 C.F.R. § 236.1, so there is no basis for requiring the government to automatically provide bond hearings after six months of detention. This argument is foreclosed by *Casas*, which held that "§ 1226(c) must be construed as *requiring* the Attorney General to provide the alien with [a bond] hearing." 535 F.3d at 951; *see also Rodriguez II*, 715 F.3d at 1135 (citing *Casas* for the proposition that under § 1226(a), "a bond hearing is required before the government may detain an alien for a 'prolonged' period"). The record evinces the importance of *Casas*'s holding on this point: Detainees, who typically have no choice but to proceed *pro se*, have limited access to legal resources, often lack English-language proficiency, and are sometimes illiterate. As a result, many class members are not aware of their right to a bond hearing and are poorly equipped to request one. Accordingly, we conclude that class members are entitled to automatic bond hearings after six months of detention. We address the other procedural requirements for these hearings in Section IV.B, *infra*.

4. The § 1231(a) Subclass

Section 1231(a) governs detention of non-citizens who have been "ordered removed." 8 U.S.C. § 1231(a). The statute provides for mandatory detention during a ninety-day removal period. *Id.* § 1231(a)(2). Under the statute:

The removal period begins on the latest of the following:

> (i) The date the order of removal becomes administratively final.

> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

*Id.* § 1231(a)(1)(B). The removal period may be extended beyond ninety days if a detainee "fails or refuses" to cooperate in his removal from the United States. *Id.* § 1231(a)(1)(C).

"If the alien does not leave or is not removed within the removal period," he "shall be subject to supervision," but detention is no longer mandatory. *Id.* § 1231(a)(3). Rather, the Attorney General has discretion to detain certain classes of non-citizens and to impose conditions of release on others. *Id.* § 1231(a)(3), (a)(6).[14] Before releasing a detainee, the government must conclude that removal is "not practicable or not in the public interest," that the detainee is "non-violent" and "not likely to pose a threat to the community following

---

[14] To avoid "serious constitutional concerns," we have previously "construe[d] § 1231(a)(6) as requiring an individualized bond hearing, before an immigration judge, for aliens facing prolonged detention under that provision." *Diouf II*, 634 F.3d at 1086 (quoting *Casas*, 535 F.3d at 950).

release," and that the detainee "does not pose a significant flight risk" and is "not likely to violate the conditions of release." 8 C.F.R. § 241.4(e); *see also id.* § 241.4(f) (enumerating factors the review panel should "weigh[] in considering whether to recommend further detention or release of a detainee").

Here, the class is defined, in relevant part, as non-citizens who are detained "pending completion of removal proceedings, including judicial review." The class therefore by definition excludes any detainee subject to a final order of removal.

Petitioners describe the § 1231(a) subclass as individuals detained under that section who have received a stay of removal from the BIA or a court. However, if a non-citizen has received a stay of removal from the BIA pending further administrative review, then the order of removal is not yet "administratively final." 8 U.S.C. § 1231(a)(1)(B)(i). The non-citizen has not been "ordered removed," and the removal period has not begun, so § 1231(a) is inapplicable. *See Owino v. Napolitano*, 575 F.3d 952, 955 (9th Cir. 2009) ("[W]hile administrative proceedings are pending on remand, Owino will not be subject to a *final* order of removal, so § 1231 cannot apply."). Similarly, as long as a non-citizen's removal order is stayed by a court pending judicial review, that non-citizen is not subject to "the court's final order." 8 U.S.C. § 1231(a)(1)(B)(ii). In such circumstances, § 1231(a) is, again, inapplicable. *See Prieto-Romero v. Clark*, 534 F.3d 1053, 1059 (9th Cir. 2008) ("[Section] 1231(a) does not provide authority to detain an alien . . . whose removal has been stayed by a court of appeals pending its disposition of his petition for review."); *Casas*, 535 F.3d at 947 ("If an alien has filed a petition for review with this

court and received a judicial stay of removal, the 'removal period' under § 1231(a) does not begin until this court 'denies the petition and withdraws the stay of removal.'") (quoting *Prieto-Romero*, 534 F.3d at 1060).[15]

Simply put, the § 1231(a) subclass does not exist. The district court's grant of summary judgment and permanent injunction are therefore reversed to the extent they pertain to individuals detained under § 1231(a).

## C.  Procedural Requirements

In addition to challenging the class members' entitlement to automatic bond hearings after six months of detention, the government objects to the district court's order regarding the burden and standard of proof at such hearings. The government also appeals the district court's ruling that IJs must consider alternatives to detention. Petitioners cross-appeal the district court's rulings that IJs are not required to consider the ultimate likelihood of removal, assess the total length of detention, or conduct periodic hearings at six-month intervals. We address each issue in turn.

### 1.  Burden and Standard of Proof

The government argues that the district court erred in requiring the government to justify a non-citizen's detention

---

[15] "Such aliens may be detained, however, pursuant to § 1226(a), which allows the Attorney General to detain any alien 'pending a decision on whether the alien is to be removed from the United States.'" *Prieto-Romero*, 534 F.3d at 1059. As noted, non-citizens subjected to prolonged detention under § 1226(a) are entitled to bond hearings. *See Casas*, 535 F.3d at 944, 949–51.

by clear and convincing evidence, an intermediate burden of proof that is more than a preponderance of the evidence but less than proof beyond a reasonable doubt.  As we noted in *Rodriguez II*, however, we are bound by our precedent in *Singh*, which held that "the government must prove by clear and convincing evidence that an alien is a flight risk or a danger to the community to justify denial of bond at a *Casas* hearing."  *Rodriguez II*, 715 F.3d at 1135 (quoting *Singh*, 638 F.3d at 1203).

In *Singh*, we explained that the "Supreme Court has repeatedly reaffirmed the principle that 'due process places a heightened burden of proof on the State in civil proceedings in which the individual interests at stake . . . are both particularly important and more substantial than mere loss of money.'"  638 F.3d at 1204 (alteration in original) (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996) (criminal defendant's competence to stand trial)) (citing *Foucha*, 504 U.S. at 80 (indefinite confinement of a criminal defendant acquitted by reason of insanity); *Woodby v. INS*, 385 U.S. 276, 285 (1966) (deportation of a lawful permanent resident); *Chaunt v. United States*, 364 U.S. 350, 353 (1960) (revocation of naturalized citizenship)).  In the civil commitment context, for example, the Supreme Court has recognized "the state's interest in committing the emotionally disturbed," but has held that "the individual's interest in not being involuntarily confined indefinitely . . . is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence."  *Addington v. Texas*, 441 U.S. 418, 425–27 (1979). Drawing on this jurisprudence, *Singh* concluded that "a clear and convincing evidence standard of proof provides the appropriate level of procedural protection" in light of "the substantial liberty interest at

stake." 638 F.3d at 1203–04 (citing *Addington*, 441 U.S. at 427).

The government now contends that *Singh* was wrongly decided. However, it is well established that only a full court, sitting en banc, may overrule a three-judge panel decision. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). Right or wrong, we are bound to follow *Singh* unless intervening Supreme Court authority is to the contrary. *Id.*

2.  Restrictions Short of Detention

The government also argues that the district court erred in "determin[ing] that IJs are required to consider the use of alternatives to detention in making bond determinations." As the district court's order states, however, IJs "should already be considering restrictions short of incarceration." Indeed, *Rodriguez II* affirmed a preliminary injunction that directed IJs to "release each Subclass member *on reasonable conditions of supervision, including electronic monitoring if necessary*, unless the government" satisfied its burden of justifying continued detention. 715 F.3d at 1131 (emphasis added).

The government's objections to this requirement are unpersuasive. First, the government relies on *Demore* for the proposition that the government is not required "to employ the least burdensome means" of securing immigration detainees. *Demore*, 538 U.S. at 528. But *Demore* applies only to "brief period[s]" of immigration detention. *Id.* at 513, 523. "When the period of detention becomes prolonged, 'the private interest that will be affected by the official action' is more substantial; greater procedural safeguards are therefore required." *Diouf II*, 634 F.3d at 1091 (quoting *Mathews*, 424

U.S. at 335). Further, the injunction does not require that IJs apply the least restrictive means of supervision; it merely directs them to "consider" restrictions short of detention. The IJ ultimately must decide whether any restrictions short of detention would further the government's interest in continued detention.

Second, the government argues that IJs are not empowered to impose conditions of release. However, federal regulations authorize IJs to "detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released" and to "ameliorat[e] the conditions" of release imposed by DHS. 8 C.F.R. § 1236.1(d)(1). Accordingly, if DHS detains a non-citizen, an IJ is already empowered to "ameliorat[e] the conditions" by imposing a less restrictive means of supervision than detention.[16]

Finally, the government argues that IJs lack the resources to engage in continuous monitoring of released individuals. However, the government fails to cite any law or evidence indicating that IJs, rather than DHS or ICE agents, would be responsible for implementing the conditions of release. Moreover, the record indicates that Congress authorized and funded an ICE alternatives-to-detention program in 2002, and DHS has operated such a program, called the Intensive Supervision and Appearance Program, since 2004. It is

---

[16] The authorities the government cites provide no support for this argument. One discusses DHS officers' authority to impose conditions of release and allows IJs to "ameliorat[e] those conditions," *see* 8 C.F.R. § 236.1; the other provides only that IJs may not grant relief from removal for the purpose of fulfilling the United States' treaty obligations, *see In re G-K-*, 26 I. & N. Dec. 88, 93 (BIA 2013).

abundantly clear that IJs can and do[17] consider conditions of release on bond when determining whether the government's interests can be served by detention only, and we conclude that DHS will administer any such conditions, regardless of whether they are imposed by DHS in the first instance or by an IJ upon later review.

3.  Length of Detention and Likelihood of Removal

In their cross-appeal, petitioners argue that the district court erred in failing to require IJs to consider the length of a non-citizen's past and likely future detention and, relatedly, the likelihood of eventual removal from the United States. In our prior decisions, we have not directly addressed whether due process requires consideration of the length of future detention at bond hearings. We have noted, however, that "the due process analysis changes as 'the period of . . . confinement grows,'" and that longer detention requires more robust procedural protections. *Diouf II*, 634 F.3d at 1086 (quoting *Zadvydas*, 634 F.3d 1081). Accordingly, a non-citizen detained for one or more years is entitled to greater solicitude than a non-citizen detained for six months.

---

[17] On September 10, 2015, the government provided us with the only transcript of a *Rodriguez* hearing in this record, which took place on April 28, 2015, and concerned a Mr. Kaene Dean. There, the IJ did consider and impose conditions of release in addition to bond, including monthly reporting to DHS and enrollment in a mental health treatment plan. From the transcript, it does not appear that the government presented any evidence that these conditions would be insufficient to prevent the risk of danger to the community, or even any evidence at all. However, the IJ's decision to release on bond a recidivist sexual offender whom the DOJ had released twice before in proceedings unrelated to this case under § 1226(a) and who had twice before violated the conditions of his release on bond is not before us. *See* October 2, 2015 Order.

Moreover, Supreme Court precedent provides that "detention incidental to removal must bear a reasonable relation to its purpose." *Tijani*, 430 F.3d at 1249 (Tashima, J., concurring) (citing *Demore*, 538 U.S. at 527; *Zadvydas*, 533 U.S. at 690). At some point, the length of detention could "become[] so egregious that it can no longer be said to be 'reasonably related' to an alien's removal." *Id.* (citation omitted). An IJ therefore must consider the length of time for which a non-citizen has already been detained.

As to the likely duration of future detention and the likelihood of eventual removal, however, those factors are too speculative and too dependent upon the merits of the detainee's claims for us to require IJs to consider during a bond hearing. We therefore affirm the district court's ruling that consideration of those factors "would require legal and political analyses beyond what would otherwise be considered at a bond hearing" and is therefore not appropriate. We note that *Zadvydas* and its progeny require consideration of the likelihood of removal in particular circumstances,[18] but we decline to require such analysis as a threshold inquiry in all bond hearings.

---

[18] Several of our cases have addressed petitions for habeas relief under *Zadvydas*, which requires a detainee to prove that he "is not significantly likely to be removed." *Owino*, 575 F.3d at 955; *see also Diouf v. Mukasey* (*Diouf I*), 542 F.3d 1222, 1233 (9th Cir. 2008); *Prieto-Romero*, 534 F.3d at 1065; *Nadarajah*, 443 F.3d at 1080. Those decisions instruct IJs to consider the likelihood of removal when, for instance, a detainee is stateless. *See Owino*, 575 F.3d at 955–56. However, petitioners have not identified, and we have not found, authority that supports requiring this inquiry in all bond hearings.

56                        RODRIGUEZ V. ROBBINS

4.  Periodic Hearings

The record shows that many class members are detained
well beyond the six-month mark:  Almost half remain in
detention at the twelve-month mark, one in five at eighteen
months, and one in ten at twenty-four months.  Petitioners
argue that due process requires additional bond hearings at
six-month intervals for class members who are detained for
more than six months after their initial bond hearings.  We
have not had occasion to address this issue in our previous
decisions, and it has been a source of some contention in the
district courts.  *See, e.g.*, *Vivorakit v. Holder*, No. 14-04515,
2015 WL 4593545, at *4 (N.D. Cal. July 30, 2015);
*Castaneda v. Aitken*, No. 15-01635, 2015 WL 3882755, at
*10 (N.D. Cal. June 23, 2015).

The district court here did not address this proposed
requirement.  For the same reasons the IJ must consider the
length of past detention, we hold that the government must
provide periodic bond hearings every six months so that non-
citizens may challenge their continued detention as "the
period of . . . confinement grows." *Diouf II*, 634 F.3d at 1091
(quoting *Zadvydas*, 533 U.S. at 701).

## V.  Conclusion

This decision flows from the Supreme Court's and our
own precedent bearing on the constitutional implications of
our government's prolonged civil detention of individuals,
many of whom have the legal right to live and work in our
country.  By upholding the district court's order that
Immigration Judges must hold bond hearings for certain
detained individuals, we are not ordering Immigration Judges
to release any single individual; rather we are affirming a

RODRIGUEZ V. ROBBINS                 57

minimal procedural safeguard—a hearing at which the government bears only an intermediate burden of proof in demonstrating danger to the community or risk of flight—to ensure that after a lengthy period of detention, the government continues to have a legitimate interest in the further deprivation of an individual's liberty. Immigration Judges, a specialized and experienced group within the Department of Justice, are already entrusted to make these determinations, and need not release any individual they find presents a danger to the community or a flight risk after hearing and weighing the evidence. Accordingly, we affirm all aspects of the district court's permanent injunction, with three exceptions:  We reverse as to the § 1231(a) subclass, and we hold that IJs must consider the length of detention and provide bond hearings every six months.  We hereby remand to the district court to enter a revised injunction consistent with our instructions.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**