1  AHILAN T. ARULANANTHAM (SBN 237841)
   aarulanantham@aclusocal.org
2  MICHAEL KAUFMAN (SBN 254575)
   mkaufman@aclusocal.org
3  ACLU FOUNDATION OF SOUTHERN CALIFORNIA
   1313 West 8th Street
4  Los Angeles, CA 90017
   Telephone: (213) 977-5211
5  Facsimile: (213) 977-5297

6  **Attorneys for Petitioners**
   (Additional counsel listed on following page)
7

8                **UNITED STATES DISTRICT COURT**

9            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10                     **WESTERN DIVISION**

11

12  ALEJANDRO RODRIGUEZ,            ) Case No. CV 07-3239-TJH (RNBx)
    ABDIRIZAK ADEN FARAH, YUSSUF )
13  ABDIKADIR, ABEL PEREZ RUELAS, ) **FOURTH AMENDED COMPLAINT**
    JOSE FARIAS CORNEJO, ANGEL     )
    ARMANDO AYALA, ALEX CACHO      ) Honorable Terry J. Hatter
14  CASTILLO for themselves and on behalf )
    of a class of similarly-situated )
15  individuals,                    )
                                    )
16            Petitioners,          )
                                    )
17       v.                         )
                                    )
18  WILLIAM BARR, United States     )
    Attorney General; KEVIN         )
19  MCALEENAN, Acting Secretary,    )
    Homeland Security; JAMES        )
20  MCHENRY, Director, Executive Office )
    for Immigration Review; DAVID   )
21  MARIN, Field Office Director, Los )
    Angeles District, Immigration and )
22  Customs Enforcement; DON BARNES )
    Sheriff of Orange County; OFFICER )
23  NGUYEN, Officer-in-Charge, Theo )
    Lacy Facility; LUKE SOUTH,      )
24  Commander, Theo Lacy Facility; LISA )
    VON NORDHEIM, Captain, James A. )
25  Musick Facility; TERRY NELSEN,  )
    Assistant Field Office Director, Adelanto )
26  Detention Facility,             )
                                    )
27            Respondents.          )
    _____)
28

Additional Counsel:

JUDY RABINOVITZ
jrabinovitz@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY  10004
Telephone:  (212) 549-2618
Facsimile:  (212) 549-2654

MICHAEL TAN (SBN 284869)
mtan@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS'RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone:  (415) 343-0779
Facsimile:  (415) 395-0950

JAYASHRI SRIKANTIAH (SBN 189566)
jsrikantiah@law.staford.edu
STANFORD LAW SCHOOL
IMMIGRANTS' RIGHTS CLINIC
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone:  (650) 724-2442
Facsimile:  (650) 723-4426

SEAN COMMONS (SBN 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013-1010
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

## JURISDICTION AND VENUE

1.     Petitioners Alejandro Rodriguez, Abdirizak Farah, Yussuf Abdikadir, Jose Farias Cornejo, Abel Perez Ruelas, Angel Ayala, and Alex Cacho Castillo are non-citizens who have been subjected to prolonged incarceration at the hands of the Immigration and Customs Enforcement division of the Department of Homeland Security ("ICE"). Each of them has been or likely will be incarcerated for more than six months while their immigration proceedings have been on-going without a hearing where the government has had to justify their prolonged detention. They challenge prolonged imprisonment without adequate process on constitutional grounds, on behalf of themselves and a class of similarly-situated non-citizens.

2.     Prior to the injunctions in this case, on any given day there were several hundred non-citizens who, like the Petitioners, were detained for prolonged periods without adequate custody hearings in the Central District of California. All such individuals were incarcerated by ICE for more than six months while their immigration proceedings remained on-going.

3.     This Court has subject matter jurisdiction over Petitioners' constitutional claims pursuant to 28 U.S.C. 2241 (habeas corpus), 28 U.S.C. 1651 (All Writs Act), and the Suspension Clause of Article I of the U.S. Constitution. *INS v. St. Cyr*, 533 U.S. 289, 304 (2001); *Demore v. Kim*, 538 U.S. 510, 516-17 (2003). This Court also has jurisdiction to hear this case under 28 U.S.C. 1331, which confers jurisdiction to consider federal questions. *Walters v. Reno*, 145 F.3d 1032, 1052 (9th Cir. 1998); *cf. Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005) (challenges to parole release procedures cognizable under Section 1983).[1]

4.     This Court may grant relief under 28 U.S.C. 1331 (federal question), 28 U.S.C. 1651 (All Writs Act), 28 U.S.C. 2241 and 2243 (habeas corpus), and 28 U.S.C. 2201-

---

[1] This action is both a complaint for declaratory and injunctive relief under 28 U.S.C. 1331 and a petition for writ of habeas corpus under 28 U.S.C. 2241. For ease of reference the complaint refers to "Petitioners" and "Respondents."

02 (declaratory relief).

5.    Venue is proper in the Central District of California pursuant to 28 U.S.C. 2241(d) because Petitioners and all other class members are incarcerated at Immigration and Customs Enforcement (ICE) prisons within this District. Venue is proper pursuant to 28 U.S.C. 1391(b) because a substantial part of the events giving rise to these claims occurred in this District.

## INTRODUCTION

6.    Petitioner Alejandro Rodriguez is a citizen of Mexico who came to the United States at the age of one. Prior to the filing of the original complaint in this case, he was imprisoned for over three years without a hearing concerning whether his prolonged incarceration was justified. During that time, the government refused even to consider him for release while he litigated his removal case, despite the fact that it presented a complex and novel question of law explicitly left open by the Supreme Court and the Ninth Circuit.

7.    The government released Mr. Rodriguez shortly after he filed a motion for class certification in this case, but continued to subject him to serious restraints on his liberty without allowing him to challenge them in a bond hearing. It then argued that his case was moot. The Ninth Circuit disagreed, rejected the government's other objections, and found class certification warranted. *Rodriguez v. Hayes (Rodriguez I)*, 591 F.3d 1105 (9th Cir. 2010).

8.    This Court subsequently certified the class and directed the formation of sub-classes, after which Petitioners amended the complaint. *See* Dkt. 77, Class Certification Order. This Court then granted a preliminary injunction, (Dkt. 255, Order and Preliminary Injunction), which the Ninth Circuit affirmed in *Rodriguez v. Robbins (Rodriguez II)*, 715 F.3d 1127 (9th Cir. 2013). This Court then granted summary judgment for Petitioners in part. *See* Dkt. 353, Order, Judgement and Permanent Injunction. The Ninth Circuit largely affirmed. *Rodriguez v. Robbins (Rodriguez III)*, 804 F.3d 1060 (9th Cir. 2015). The Supreme Court then granted

2

*certiorari*. After two oral arguments, the Court reversed the Ninth Circuit's holding that the immigration statutes must be construed to require adequate bond hearings, but remanded for consideration of Petitioners' constitutional claims, as well as certain questions related to class certification. *Jennings v. Rodriguez (Rodriguez IV)*, 138 S.Ct. 830 (2018). On remand, the Ninth Circuit in turn remanded to this Court, while also providing some guidance on the remanded questions. *Rodriguez v. Marin (Rodriguez V)*, 909 F.3d 252 (9th Cir. 2018). Neither the Supreme Court nor the Ninth Circuit vacated this Court's permanent injunction, which remains in place.

9.     Prior to the injunctions, on any given day, there were at least approximately 350 people, if not more, in immigration prisons throughout the Central District who had been incarcerated for more than six months – many of them for years – while their cases remained pending.

10.    None of these people had received a hearing to determine whether their prolonged incarceration was warranted, and the vast majority had not received any hearing at all.[2] Thus, the government routinely incarcerated people for months or years without demonstrating why their extended imprisonment was necessary either to secure their presence at the time of removal or to protect the public safety – a dubious concern given that many class members have no criminal history, and even

---

[2] Petitioners refer interchangeably throughout this complaint to a hearing to determine whether "prolonged incarceration" is justified, a "constitutionally-adequate" hearing, and an "adequate" hearing to justify prolonged incarceration. *See Rodriguez I*, 591 F.3d at 1112 (noting that "Petitioner's requested relief includes . . . providing all members of the class constitutionally-adequate individual hearings before an immigration judge"). A hearing that is adequate to justify prolonged detention would include, at a minimum, notice to detainees of their right to the hearing, an adversarial, transcribed, in-person hearing before an immigration judge or other impartial adjudicator, counsel for detainees who are unrepresented at that hearing, and a substantive standard requiring the government to show by clear and convincing evidence that no set of release conditions could reasonably assure the detainee's presence in the event of removal or protect the community from serious danger, taking into account the length of detention at issue.

3

those who have been convicted have necessarily finished serving their sentences before their transfer to immigration   custody.

11.    This Court's permanent injunction has fundamentally changed the lives of class members. Since the injunction, all class members receive a hearing before an immigration judge to determine whether their continued imprisonment is warranted within 180 to 195 days of their initial incarceration. *See* Dkt. 425, Order. Based on government statistics, immigration judges have found that approximately 70% of class members who receive hearings under the injunction are not a danger or flight risk warranting detention, and have ordered their release on bond and other conditions. *See* Request for Judicial Notice, Exhibit B at 1-2, *Rodriguez v. Robbins*, Nos. 13-56706, 13-56755 (9th Cir. Sept. 22, 2014) ECF 24-4. Of these class members, approximately 70% post bond and have been released. *Id*.

12.    Petitioners and all the detainees they represent are held under one of four general immigration detention statutes that govern the incarceration of most non-citizens whom the government is trying to remove. *See* 8 U.S.C. 1225(b) (authorizing detention of non-citizens seeking admission); 8 U.S.C. 1226(a) (authorizing detention of non-citizens pending a determination of removability); 8 U.S.C. 1226(c) (authorizing "mandatory" detention, without hearings, of certain non-citizens who, inter alia, have been convicted of specified triggering offenses); 8 U.S.C. 1231(a) (authorizing detention of   non-citizens with final orders of removal during and after the removal period).

13.    Prior to the Court's injunctions, Respondents maintained a policy or general practice – which Petitioners contend is unlawful – of imprisoning people for prolonged periods without providing them adequate hearings. Pursuant to this unlawful policy or general practice, Respondents had incarcerated the Petitioners and each class member pursuant to one of the statutes described above for more than six months. Pursuant to Respondents' policy or general practice, during that time neither Petitioners nor any other class member had received a hearing where the government

1    had to show that their prolonged incarceration remained justified.

2    14.    Respondents' general policies and practices of prolonged incarceration without

3    hearings violate the constitutional rights of the Petitioners and other class members.

4    To remedy this on-going violation of the law, Petitioners bring this action seeking

5    declaratory and injunctive relief on behalf of themselves and a class of similarly-

6    situated persons.

7                                        **PARTIES**

8    15.    Petitioner Alejandro Rodriguez is a citizen of Mexico. He was imprisoned for

9    over three years while litigating his removal case prior to the filing of the original

10   complaint in this case. He never received a hearing to determine whether his

11   prolonged imprisonment was justified. He ultimately won his removal proceedings.

12   16.    Petitioner Abdirizak Aden Farah is a Somali refugee who was incarcerated at

13   Mira Loma Detention Center for over eight months without a hearing to determine

14   that his imprisonment was warranted. He received no explanation of any kind as to

15   why he could not be released pending completion of his removal hearings, despite

16   having a close family friend in Minnesota willing to house him and no criminal

17   history of any kind. He eventually gave up, as he was unwilling to bear further

18   imprisonment, and returned to Somalia.

19   17.    Petitioner Yussuf Abdikadir is another Somali refugee who was incarcerated by

20   ICE for approximately six months without a hearing to determine whether his

21   imprisonment was warranted. He too has received no explanation of any kind as to

22   why he could not be released pending completion of his removal proceedings, despite

23   having a sponsor in San Diego willing to house him and no criminal history of any

24   kind.

25   18.    Petitioner Abel Perez Ruelas is a Mexican national who entered the United

26   States on a visitor's visa approximately eight years ago and is now married to a U.S.

27   citizen. He was incarcerated for at least 16 months pending completion of his

28   removal proceedings. He received a bond hearing where he bore the burden to prove

                                           5

that he was not a danger or flight risk, but the judge denied bond, and later set it at an amount he could not pay. Although he was plainly eligible to adjust status in removal proceedings, he remained incarcerated without a hearing before ultimately winning his immigration case. He ultimately won his removal case.

19.    Petitioner Jose Farias Cornejo is also a Mexican national, but was a lawful permanent resident of this country, where he had lived since before his first birthday. He has been convicted of relatively minor offenses, the most serious of which was possession of a controlled substance, for which he was sentenced to 180 days in jail. However, he spent more than twice that amount of time in immigration prison while awaiting a final decision in his immigration case. Although the government never disputed his eligibility for cancellation of removal and stated in immigration court that it did not intend to oppose his application, he remained incarcerated without a hearing  until he won his case.

20.    Petitioner Angel Armando Ayala is a citizen of El Salvador who had lived in the United States since the age of eleven. He had never received a criminal sentence of longer than 90 days, but was nonetheless incarcerated by immigration authorities for over 18 months while litigating his removal case. He was never permitted to seek release on bond before an immigration judge  during that time. He was ultimately deported.

21.    Petitioner Alex Cacho Castillo is a citizen of Honduras. He fled that country due to gang violence and harm he suffered as a member of the Garifuna minority. He entered the United States without inspection, was apprehended by Border Patrol officials, passed a credible fear interview, and is now in removal proceedings. He has been imprisoned for nearly five months in Orange County Jail facilities operated under contract with ICE. He is currently incarcerated at the Theo Lacy facility. He has never received a hearing to determine whether his prolonged imprisonment is justified. He is eligible to receive one under the injunction currently entered in this case.

22.    Respondent William Barr is the Attorney General of the United States and the head of the Department of Justice, which encompasses the Board of Immigration Appeals ("BIA") and immigration judges as a subunit – the Executive Office of Immigration Review. Mr. Barr shares responsibility for implementation and enforcement of the immigration laws along with Respondent McAleenan. Mr. Barr is a legal custodian of Petitioners. Mr. Barr is sued in his official capacity.

23.    Respondent Kevin McAleenan is the Acting Secretary of Homeland Security and heads the Department of Homeland Security, the arm of the federal government responsible for enforcement of immigration laws. Mr. McAleenan is the ultimate legal custodian of Petitioners. Mr. McAleenan is sued in his official capacity.

24.    Defendant James McHenry is the Director for the Executive Office for Immigration Review ("EOIR"), which is the federal agency that operates the immigration courts. Mr. McHenry is responsible for the supervision of the Deputy Director, the Chairman of the BIA, the Chief Immigration Judge, the Chief Administrative Hearing Officer, and all agency personnel in the execution of their duties. Mr. McHenry is sued in his official capacity.

25.    Respondent David Marin is the Field Office Director for the Los Angeles District of ICE. In his official capacity, Mr. Marin is authorized to release Petitioners and has legal custody of him. He is sued in his official capacity.

26.    Respondent Don Barnes is the Sheriff of Orange County, and therefore the officer responsible for the operation of the Theo Lacy Facility and the James A. Musick Facility in Orange, California. The Theo Lacy Facility and James A. Musick Facility websites acknowledge that they house immigration detainees.  Sheriff Barnes is a legal custodian of people detained at that facility, and is sued in his official capacity.

27.    Respondent Officer Nguyen is the Officer-in-Charge at the Theo Lacy facility, and therefore the highest-ranking ICE officer at the facility. He is a legal custodian of people detained at that facility. Mr. Nguyen is sued in his official capacity.

28.    Respondent Captain Luke South is the commander of the Theo Lacy Facility, which is, according to its own website, the largest "correctional institution" in Orange County. Nonetheless, Theo Lacy incarcerates a number of immigration detainees. Captain South is a legal custodian of people detained at that facility, and is sued in his official capacity.

29.  Respondent Captain Lisa Von Nordheim manages the operations of the James A. Musick Facility, another prison in Orange County. According to its website, the Musick facility incarcerates "pre-trial and sentenced" inmates. Nonetheless, upon information and belief, it also houses class members, none of whom are criminal detainees. Ms. Von Nordheim is a legal custodian of people detained at that facility, and is sued in her official capacity.

30.   Respondent Terry Nelson is the Assistant Field Office Director at the Adelanto Detention Facility, and therefore the highest-ranking ICE officer at the facility. He is a legal custodian of people detained at that facility. Mr. Nelson is sued in his official capacity.

31.   Respondent James Janecka is the Warden of the Adelanto Detention Facility in Adelanto, California. Warden Janecka is a legal custodian of people detained at that facility, and is named in his official capacity.[3]

### FACTS AND PROCEDURAL HISTORY

**Alejandro Rodriguez**

32.    Petitioner Alejandro Rodriguez was imprisoned for over three years while he challenged the government's efforts to deport him to Mexico, a country where he has not lived since he was a baby.

---

[3] The government has taken conflicting positions in detention litigation concerning who the proper Respondent should be in habeas petitions challenging immigration detention. Petitioners have sued every official who could constitute an appropriate respondent under the different theories advanced by the government, as well as the officials who constitute the proper defendants for a complaint under Section 1331.

33.    Mr. Rodriguez came to this country in September 1979, when was one year old. He became a lawful permanent resident on June 4, 1987, when he was nine years old.[4]

34.    On or about July 29, 1998, Mr. Rodriguez pled guilty to Unlawful Driving or Taking of a Vehicle under section 10851(A) of the California Vehicle Code (CVC). For this crime he was sentenced to two years. Five years later, on or about October 21, 2003, he pled no contest and was convicted of Possession of a Controlled Substance under California Health and Safety Code section 11377(A), for which he received formal probation of 5 years under the conditions of California Prop 36. He was transferred to DHS custody after his arrest, on April 10, 2004. He was imprisoned for over three years after that transfer, until the government released him shortly after the filing of the class certification motion in this case.

35.    The government charged Mr. Rodriguez with being removable based on his drug offense on April 15, 2004. At his removal hearing, Mr. Rodriguez contested that his conviction rendered him removable, and argued in the alternative that he was eligible for relief from removal.[5]

36.    The government received a continuance to alter the charging documents in his case, after which it charged Mr. Rodriguez with being deportable on an additional ground based on his 1998 conviction for theft. Subsequently, on July 21, 2004, an

---

[4] Mr. Rodriguez narrowly missed becoming a citizen due to events beyond his control. He would have gained automatic citizenship, through his father, if his parents had legally separated prior to his 18th birthday, or if he had been under the age of 18 at the time of the enactment of the Child Citizenship Protection Act of 2000. However, his parents formally separated shortly after he turned 18, and he was 23 by the time the Act passed. See 8 U.S.C. 1431.

[5] An ICE officer initially deemed him eligible for release on bond, and set the bond at $15,000. However, Mr. Rodriguez was unable to afford the bond in that amount, and an immigration judge denied his request to lower the bond amount. Shortly after the BIA decided his case in 2004, the government revoked that bond order and ordered him detained without bond under the mandatory detention provision codified at 8 U.S.C. 1226(c).

immigration judge ordered him removed, holding that both his drug offense and his theft offense rendered him removable. The Judge held that the drug offense was a controlled substance offense triggering removal and that the theft conviction was an aggravated felony, triggering mandatory removal.[6] The immigration judge ordered him deported to Mexico. Mr. Rodriguez appealed that decision to the BIA.

37.    On December 21, 2004, the Board reversed the Judge's decision that the drug possession conviction rendered Mr. Rodriguez removable, but upheld the decision that his theft conviction was an aggravated felony.

38.    On December 28, 2004, Mr. Rodriguez timely petitioned for review of the Board's decision to the Ninth Circuit, arguing *inter alia* that his crime was not an aggravated felony as defined by the Immigration and Nationality Act. Mr. Rodriguez then sought a stay of removal, which the government opposed. Thereafter, the Ninth Circuit granted his request for a stay of removal, and therefore necessarily found that his case presents substantial legal claims. *See Maharaj v. Ashcroft*, 295 F.3d 963, 966 (9th Cir. 2002).

39.    While Mr. Rodriguez's case was pending at the Ninth Circuit, that court decided another case holding that Mr. Rodriguez's theft conviction was not an aggravated felony. The government then moved to hold his case in abeyance while it sought en banc review of that decision. The Ninth Circuit granted the motion, even though he had already been imprisoned for 15 months at that time. After en banc

---

[6]Although not charged in the immigration charging document, the government also presented evidence from court records that, on or about October 24, 2003, a man using the name Alejandro Rodriguez (who also used another name as an alias) pled guilty to California Health and Safety Code section 11550(a), Under the Influence of a Controlled Substance, and was sentenced to 120 days in jail, which he served during the same time that Mr. Rodriguez was released and reporting to the court for his conviction of October 21, 2003. The date of conviction makes it highly unlikely that Mr. Rodriguez was in fact convicted of this offense. Nonetheless, the IJ ruled that this conviction constituted a second drug offense, rendering Petitioner removable on the basis of the drug convictions.

review failed, the government sought Supreme Court review in the other case, and again requested that Mr. Rodriguez's case be held. After the Supreme Court granted cert, his case was held still further. In the end, his case was held in abeyance for over two years, but none of the decisions for which it was held established that he was subject to mandatory removal, as the immigration courts had found.

40.    Eventually, the government largely conceded that Mr. Rodriguez's convictions did not subject him to mandatory removal, and it agreed to remand his case to the immigration courts on this basis. He ultimately won cancellation of removal, over seven years after his removal proceedings began.

41.    During the three years of Mr. Rodriguez's confinement, the government never held a hearing as to whether his prolonged incarceration was justified. In fact, the only process Mr. Rodriguez received with respect to his detention was what the government calls "File Custody Reviews." The first of these occurred on March 10, 2005, when an ICE agent presumably read through his file and issued a "Decision to Continue Detention." No ICE official interviewed Mr. Rodriguez, let alone held a hearing, prior to making this decision. Instead, ICE merely gave him a questionnaire to fill out, asking for information regarding family members, employment experience, and any outstanding probation requirements. Although Mr. Rodriguez documented his work as a dental assistant and his extensive family ties, including his U.S. citizen father and sister, and his lawful permanent resident mother and brother, ICE denied his request for release, stating simply that he would remain detained until the Ninth Circuit rendered its decision. The notice offered no further explanation for the decision to continue incarceration, made no mention of how long Mr. Rodriguez had been imprisoned (eleven months at that time), and offered no suggestions as to what steps he might take to effect a different outcome in any future decisions.

42.    In September 2005, ICE conducted another file custody review, which it apparently denied for similar reasons, and in March 2006 the process was repeated again. In each of these instances, the government did not even provide Mr. Rodriguez

11

with a written decision as to why he would remain incarcerated for many more months. In March 2007 the government chose to continue Mr. Rodriguez's imprisonment yet again. At the time of that last custody decision he had been incarcerated for nearly three years, yet the decision made no mention of this fact. Instead, the decision asserted that continued detention was justified because the Ninth Circuit would decide his case soon, which was incorrect.

43.    Shortly after the original class complaint in this case was filed, the government released Mr. Rodriguez from confinement, but continued to subject him to severe restraints on his liberty, including a requirement that he abide by a strict curfew and wear an electronic monitoring device at all times.

44.    Over seven years after his removal proceedings began, Mr. Rodriguez won cancellation of removal and was permitted to retain his lawful permanent resident status.

**Abdirizak Aden Farah**

45.    Abdirizak Aden Farah is a Somali refugee who was incarcerated for over eight months at the Mira Loma facility without any kind of hearing to determine whether his imprisonment was justified.

46.    Mr. Farah was born on May 5, 1987 in Kismayo, Somalia. His family lived in Mogadishu for the early part of his childhood. Thousands of refugees have fled Somalia since the country's civil war erupted nearly thirty years ago. Widespread conflict and human rights violations continue to this day. The United Nations High Commission for Refugees issued guidelines in May 2010 largely advising against the return of anyone from central or southern Somalia, including even asylum seekers whose claims had been rejected. With respect to the capital of Mogadishu (where Mr. Farah lived prior to suffering persecution), a Human Rights Watch researcher stated "Mogadishu is one of the world's most dangerous places . . . Returning people there is not just risky; it's a potential death sentence."

47.    Mr. Farah first faced persecution in Somalia as a child, when his family was

12

forced to flee Mogadishu because they were members of the minority Marehan clan who faced danger from members of the Hawiye, a powerful majority clan in Somalia. Eventually, the family was able to settle in Kismayo, a city in Somalia where the Hawiye were not powerful. Several years later, his father was shot and killed by members of a Hawiye sub-clan when he returned briefly to Mogadishu to try to sell the family home.

48.     Mr. Farah fled Somalia in April 2009 in order to escape the al-Shabaab, a militant Islamic organization. Al-Shabaab militants shot and killed his brother Mohamed because he worked as a driver for the Somali Transitional Federal Government (TFG) in the summer of 2007. These same militants nearly killed Mr. Farah in the same attack by slashing his wrist with a knife. Afterward, al-Shabaab members repeatedly accused him of working for the TFG and finally threatened to kill him if he did not join them.

49.     After the last of these threats, Mr. Farah's uncle sent money for him to flee. With the assistance of several people, he arrived by a circuitous route at the southern border of the United States, where he presented himself at the border and requested asylum on or about December 31, 2009. An asylum officer found his claim credible, and referred him for a full asylum hearing before an immigration judge.

50.     Mr. Farah had several hearings in his immigration case, the first of which took place in March 2010. At several of these, the immigration judge continued his hearing because he did not have a lawyer, while others were cancelled because the judge or the translator were not present.

51.     Mr. Farah applied for release on parole under 8 C.F.R. 212(d)(5)(A). Under these procedures, release decisions are made by a single officer, with no appeal process, and without providing a hearing of any kind. An ICE officer denied him release without meaningful explanation.

52.     After approximately 15 months of incarceration, Mr. Farah could no longer bear the hardships of continued imprisonment, including his inability to contact his

wife and child while detained. He decided he could no longer continue with his case, and was subsequently deported.

**Yussuf Abdikadir**

53.  Yussuf Abdikadir was also a Somali refugee. He was imprisoned by immigration authorities in early March 2010, and also never received a detention hearing of any kind.

54.  Mr. Abdikadir was born on October 5, 1980.[7] He lived with his family – including his parents and five siblings -- as a child in Mogadishu. He is also a member of a minority clan in Somalia.

55.  In 1991, as the Somali political structure disintegrated, a militia associated with a dominant clan, the Hawiye, attacked Mr. Abdikadir's family. They killed his two older brothers, his father, and his grandmother. They also severely mistreated other members of the family, and raped his mother.

56.  Mr. Abdikadir and his surviving family members then fled to Kenya, where they lived in various refugee camps for most of the next two decades. He married Shukri Hussein, also a Somali refugee, while in the camps, and the couple had three children. (Ms. Hussein also has a son from a prior relationship, who is now Mr. Abdikadir's step-son).

57.  Life in the refugee camps was very hard for Mr. Abdikadir and his family. Kenya granted them no permanent status, and as a result they were forced to live in the camps and denied the right to work. At the same time, the Kenyan government and international agencies failed to provide sufficient food for the refugees. He and his family would have to wait for hours during the heat of the day to obtain their small food rations, and often were mistreated by the Kenyan authorities while waiting. Mr. Abdikadir occasionally worked illegally in order to supplement his family's meager provisions, but Kenyan authorities arrested and punished him for

---

[7] Yussuf is his given name, while Abdikadir is his father's given name.

doing so. The Kenyan authorities also did little if anything to stop the bandits who would raid the camps at night, raping camp residents and pillaging their belongings.

58.    After life in the camps became too difficult, Mr. Abdikadir's mother managed to sell some land the family owned in Somalia, and used these proceeds to procure funds to allow her son to escape. Unable to return to Somalia or survive further life in the Kenyan refugee camps, Mr. Abdikadir fled. He traveled a circuitous route in search of a country with refugee protections, and ultimately arrived at the southern border of the United States seeking asylum.

59.    At the border crossing from Tijuana he presented a birth certificate and applied for asylum, entering ICE detention in March 2010. He was sent to Mira Loma shortly afterward, and passed his credible fear interview several weeks later, in approximately April 2010.

60.    Mr. Abdikadir faced substantial delays that prevented him from even submitting an application for asylum, including because he was unable to find a lawyer to represent him and speaks virtually no English.

61.    Mr. Abdikadir also applied for release on parole under 8 C.F.R. 212(d)(5)(A). As with Mr. Farah, the decision refusing to release Mr. Abdikadir was made by a single officer, with no appeal process, and without a hearing of any kind. Mr. Abdikadir requested release from this officer, and in doing so provided his birth certificate as well as a sworn affidavit from a friend of his who lives in San Diego and was willing to house and assist him. Nonetheless, his parole request was denied. The sole explanation provided was a check mark in a box next to a paragraph which states "You have not established to ICE's satisfaction that you will appear as required for immigration hearings, enforcement appointments, or other matters, if you are paroled from detention." Other than requesting a redetermination based on changed circumstances, Mr. Abdikadir had no recourse to any further process for appeal.

62.    Mr. Abdikadir suffered during his time in immigration prison, not only because of the traumatic effects of incarceration in general on those who have suffered past

15

persecution, but also because of his medical problems. Mr. Abdikadir had some kind of problem concerning his eyes – perhaps tied to light sensitivity -- that caused them to be constantly red and irritated. Although he sought medical attention for this problem at the Mira Loma Detention Center, the clinic there provided him no medication that addressed the problem.

63.    Mr. Abdikadir was also unable to communicate with his family while in immigration prison.

**Abel Perez Ruelas**

64.    Abel Perez Ruelas is a citizen of Mexico. He was imprisoned at Mira Loma Detention Center for more than 17 months, starting on April 8, 2009.

65.    Mr. Perez Ruelas was born on January 25, 1967 in Jalisco, Mexico. In 1996, he met Maria del Rosario, with whom he had a daughter, Azirit Lessandra, one year later.

66.    He was admitted to the United States in 2002 on a visitors' visa, two years after he broke up and lost contact with with Ms. del Rosario.

67.    In approximately 2007, about five years after Mr. Perez-Ruelas came to live in the United States, he received a call from his mother, who told him that Ms. del Rosario had died in childbirth in Mexico, and that his daughter had been sent to live with her mother's parents. Since then, Mr. Perez Ruelas has been living with the hope that one day he may bring his daughter to the United States to live with him.

68.    On December 22, 2008, Mr. Perez Ruelas married Maria Navichoque Perez, a U.S. citizen. She is a nurse at the Los Angeles Jewish Home, a non-profit senior living facility in Reseda, California. The couple filed to adjust his status based on their marriage in approximately February 2009.

69.    After his marriage, Mr. Perez Ruelas became the stepfather of Maria Perez's four children, all of whom are U.S. citizens by birth.

70.    Mr. Perez Ruelas lived and worked in the United States for almost eight years prior to his imprisonment. He worked in construction, primarily with cement and

tiles. Prior to his incarceration, he regularly attended church with his wife in Pacoima and Reseda.

71.    Mr. Perez Ruelas has had three prior convictions for driving under the influence of alcohol, none for which he spent more than two months in jail. Mr. Perez Ruelas served three months of probation for his first offense in 1994; he served 10 days in jail for his second, a decade later in 2004; and he served 60 days in jail for his third, which occurred four years later. Pursuant to his sentence for the last conviction, Mr. Perez Ruelas diligently attended Alcoholics Anonymous for over a year, and continued attending AA meetings even while in immigration prison.

72.    On or about April 8, 2009, Mr. Perez Ruelas was released from jail for his last offense. Immigration and Customs Enforcement officials immediately took him into immigration custody, notwithstanding his pending application to adjust his status based on his marriage. At the time, Mr. Perez-Ruelas was in the process of becoming a lawful permanent resident of the United States.

73.    Mr. Perez Ruelas was given a bond hearing on April 21, 2009, pursuant to 8 U.S.C. 1226(a), at which he bore the burden to prove that he was not a danger or flight risk. Upon information and belief, the immigration judge knew that Mr. Perez Ruelas was married to a U.S. citizen and that he had a pending adjustment application, but nonetheless the judge denied him release on bond. He told Mr. Perez Ruelas that his prior DUI convictions made him a danger to society, even though his sentence had long since expired.

74.    With the assistance of his attorney, Mr. Perez Ruelas applied for a bond reduction in February 2010. At that hearing, the immigration judge set a bond of $5,000, an amount too high for Mr. Perez Ruelas's family to pay.

75.    Because he could not pay, Mr. Perez Ruelas remained in immigration prison – for over 16 months while awaiting adjudication of his case.

76.    On July 30, 2010, Mr. Perez Ruelas and his wife received notice that their application to adjust his status had been approved, with a priority date of March 22,

17

2009. Although he was entitled to adjust status immediately at that time, Defendants continued to imprison him for no apparent reason.

77.    On December 3, 2010, after approximately 20 months in immigration prison, Mr. Perez Ruelas's application to adjust status was granted. He thereby defeated the government's charges of removability and was permitted to remain in the United States.

**Jose Farias Cornejo**

78.    Jose Farias Cornejo is a citizen of Mexico. He spent over one year in immigration prison at Mira Loma Detention Center, starting on September 14, 2009.

79.    Mr. Farias Cornejo was born on August 14, 1984 in Michoacan, Mexico. He was brought to the United States prior to his first birthday by his parents, who were migrant farm workers. He speaks fluent English.

80.    Mr. Farias Cornejo has four siblings. All four are U.S. citizens. Mr. Farias Cornejo's mother is also a lawful permanent resident of the United States.

81.    Mr. Farias Cornejo spent his childhood years in Washington and his adolescence in California because his parents were migrant farm workers. He attended elementary school in San Diego for a few years before moving to Montclair, California to attend middle school and high school. He took special education classes at Montclair High School because of his diagnosed learning disability.

82.    After graduating from high school, Mr. Farias Cornejo worked at various jobs near his hometown in California, including in construction -- manufacturing jacuzzis and landscaping.

83.    Mr. Farias Cornejo had several prior convictions. In 2007, he was convicted of possession of methamphetamine and received substance abuse treatment as an alternative to incarceration under California Proposition 36. Mr. Farias Cornejo diligently completed his drug treatment classes, but because he could not afford to pay the mandatory fine, he was sentenced to 180 days in jail.

84.    Upon information and belief, in 2009 Mr. Farias Cornejo was convicted of a

18

misdemeanor California theft offense, for which he spent 14 days in jail. In that same
year, he was convicted of being under the influence of a controlled substance, for
which he spent 60 days in jail.

85.    Shortly after serving his last sentence, in September 2009, federal immigration
officials initiated removal proceedings against him and placed him in immigration
prison, citing their authority to mandatorily detain any individual with a prior
controlled substance offense under 8 U.S.C. 1226(c).

86.    Although the government contended that Mr. Farias Cornejo was subject to
"mandatory detention" without a bond hearing under that provision, it also
acknowledged that he was eligible for relief from removal in the form of cancellation
of removal under 8 U.S.C. 1229b, because he had not been convicted of an
"aggravated felony."

87.    Mr. Farias Cornejo was given a cancellation application on October of 2009,
but struggled to find an attorney to assist him in completing it. After five months in
confinement, he finally found an attorney, but that attorney did not file his
application. Eventually Mr. Farias Cornejo found a different attorney to represent
him, in June of this year. Through his new attorney Mr. Farias Cornejo finally filed
his cancellation application, nearly ten months after he was first placed in
immigration prison.

88.    Upon information and belief, at his cancellation hearing on August 17, 2010,
the government stated that it had no objection to his application. However, the
immigration judge told Mr. Farias Cornejo that he had an outstanding warrant, and
therefore refused to adjudicate the application. Instead, the judge set his next court
hearing for November 15, 2010, apparently on the assumption that his warrant would
be resolved prior to that time.

89.    Mr. Farias Cornejo finally had his hearing in January 2011, at which the IJ
granted him cancellation of removal. He was then released. He never had a hearing to
determine whether his imprisonment remained warranted despite being incarcerated

for over a year.

**Angel Armando Ayala**

90.    Angel Armando Ayala is a citizen of El Salvador who was born on August 20, 1976. He came to the United States with his family at the age of eleven. He attended junior high and high school in Southern California.

91.    Prior to his arrest by immigration authorities, Mr. Ayala lived with his mother, Maria, who is a United States citizen, and was also frequently in touch with his brother and sister, both of whom live in Southern California.

92.    Mr. Ayala worked in the United States his entire adult life, engaging in a variety of construction-related jobs including forklift driving, materials handling, landscaping, and in shipping and receiving.

93.    Immigration officials arrested Mr. Ayala in what apparently was a worksite raid in approximately 1994. At that time, government officials imprisoned him at the San Pedro Detention facility. He eventually had a hearing before an immigration judge who ordered him released on bond because he was eligible for relief under the Nicaraguan and Cuban Adjustment Relief Act ("NACARA"). The judge instructed him to find a lawyer to help him apply.

94.    Shortly afterward, when Mr. Ayala went to the federal immigration building, he met a man acting as an attorney named Jose Quinones. Mr. Quinones offered to file Mr. Ayala's NACARA application for a fee.

95.    Mr. Quinones eventually filed the application, which was based on Mr. Ayala's mother's eligibility for NACARA.  A hearing on the application was set for October 29, 1999.

96.    Shortly before the hearing, Mr. Ayala's mother became seriously ill. Because he had to take his mother to the hospital and attend to her, Mr. Ayala could not attend the court hearing. At the hearing, the immigration judge ordered him removed in absentia, notwithstanding the fact that he was prima facie eligible for NACARA relief.

97.   A few days after the hearing, after his mother's condition had stabilized, Mr. Ayala called Mr. Quinones to discuss his immigration case. Mr. Quinones stated that the case now had to be re-opened, and that he would charge Mr. Ayala several thousand dollars to do this. When Mr. Ayala stated that he did not have such funds available, Mr. Quinones told him to contact him when he had saved up the money. He did not mention that Mr. Ayala had to file the motion within 180 days, as is required, or that he could be deported if he did not file the motion.

98.   Several years later, Mr. Quinones was suspended from practicing before the immigration courts by the Executive Office of Immigration Review. If he ever was a licensed attorney, he has presumably been disbarred.

99.   Mr. Ayala continued to live and work in the United States for the ensuing decade. Upon information and belief, he received several misdemeanor convictions for driving without a license during this time, but was not convicted of any other offense.

100.   On February 14, 2009, immigration authorities arrested Mr. Ayala at his home in Pomona, which he shared with his mother, based on his outstanding removal order from ten years earlier. They transferred him to the Mira Loma Detention Center.

101.   With the assistance of non-profit legal service provider Catholic Charities, Mr. Ayala filed a motion to reopen his case based on ineffective assistance of counsel. However, the immigration judge denied the motion, and the BIA affirmed the decision, asserting that the motion was untimely and not subject to tolling based on ineffective assistance. According to the Board, the attorney had no duty to inform Mr. Ayala of the filing deadline for the motion to reopen because the attorney never agreed to represent him with respect to the motion. Thus, the Board declined to reopen his case, notwithstanding the fact that Mr. Ayala was eligible for NACARA

relief.[8]

102.  Mr. Ayala subsequently hired attorney Shan Potts, who represented him before the Ninth Circuit. The Ninth Circuit granted Mr. Ayala a stay of removal, but ultimately denied his petition  , after which Mr. Ayala was removed.

103.  Mr. Ayala's incarceration worked a great hardship on his U.S.-citizen mother, with whom he lived prior to his arrest. She had difficulty paying rent for the apartment they shared, and also suffered from the absence of his emotional support.

**Alex Cacho Castillo**

104.  Alex Cacho Castillo is a citizen of Honduras. He has been in ICE custody – thus far in jails in Orange County – for nearly 5 months, starting on or about January 25, 2019. He is currently incarcerated at the Theo Lacy facility.

105.  Mr. Cacho Castillo was born on November 17, 2000 in the municipality of Iriona, department of Colon, in northeastern Honduras.

106. Mr. Cacho Castillo is a member of the Garifuna minority in Honduras. Although he speaks some Spanish, his best language is Garifuna.

107.  Mr. Cacho Castillo entered the United States without inspection near Mexicali. He was apprehended several miles inside the United States on the same day, by Border Patrol agents.

108.  An asylum officer conducted a credible fear interview for Mr. Cacho Castillo on February 11, 2019. According to notes taken by the officer, gang members killed his father when Mr. Cacho Castillo was about 15 years old. Roughly three years later they threatened to kill him as well, and he fled for his life. After interviewing Mr. Cacho Castillo, the asylum officer found him credible and attributed the threats of violence against him in part to his being the son of his father, and in part to his being a member of the Garifuna minority.

---

[8] Upon information and belief, Mr. Ayala has one misdemeanor conviction for drug possession from approximately 1996 and several convictions for driving without a license. None of these rendered him ineligible for NACARA.

109.  After he passed the credible fear interview, the government placed Mr. Cacho Castillo in full removal proceedings by charging him in a Notice to Appear issued on February 11, 2019. He has since had two hearings in immigration court: a master calendar hearing on March 5, 2019, and a second one on April 3, 2019, which was apparently rescheduled because the government failed to provide an interpreter. His next hearing is set for May 24, 2019.

110.  Mr. Cacho Castillo's aunt lives in New York. The government has her name and contact information. She has stated her willingness to house and support Mr. Cacho Castillo if he were released.

111.  Mr. Cacho Castillo has no criminal history of any kind.

112.  Despite the fact that he has a sponsor willing to support and house him and no criminal history, ICE has chosen not to release Mr. Cacho Castillo.

113.  Mr. Cacho Castillo has suffered greatly while incarcerated by Defendants. He is only slightly over age 18 and has never previously spent any time imprisoned. His incarceration has caused him severe emotional distress and taken a substantial toll on his psychological well-being.

## CLASS-WIDE ALLEGATIONS

114.  Petitioners were amongst approximately 350 detainees, if not more, in the Central District on any given day prior to the injunction whom the government incarcerated for more than six months without proving at an adequate hearing that their prolonged imprisonment was justified.[9] It is the government's policy or practice to incarcerate non-citizens under the immigration statutes for prolonged periods of

---

[9] This Court ordered the government to produce a "snapshot" list of all class members on a particulate date, which the government produced for the date of April 21, 2010. As of that day, there were 352 class members – people incarcerated in ICE custody in the Central District who had been in ICE custody for at least 180 days, and whose cases remained pending either before the immigration courts or before the federal courts with a stay of removal in effect.  Subsequent data provided by the government showed approximately 1,000 such people over the course of a year.

23

time pending completion of their removal proceedings without providing them with

such hearings. It would resume that policy and practice in the Central District were

this Court to vacate the permanent injunction.

115.  Petitioners bring this action on behalf of themselves and all other persons

similarly-situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), or

in the alternative, as a representative habeas action pursuant to a procedure analogous

to that provided in Rules 23(a) and 23(b)(2). *See Rodriguez I*, 591 F.3d at 1126

(allowing this case to proceed as a class action habeas petition).

116.  Petitioners represent a class of all people within the Central District of

California who 1) are incarcerated for longer than six months pursuant to the general

immigration detention statutes (i.e., 8 U.S.C. 1225(b)(1)(B)(ii), 1226(a), 1226(c), and

1231(a)) while their removal cases (including judicial review) remain pending and

the government lacks authority to effectuate their removal, and 2) have not been

afforded a hearing to determine whether their prolonged imprisonment is justified.

117.  The class includes people who were present in an ICE detention facility in the

Central District on or after the date on which the original complaint was filed as long

as they had been detained by ICE for more than six months at that time, even if they

are no longer in the Central District

118.  The class excludes people who have a final order of removal and no stay of that

removal order, such that the government has legal authority to remove them.

119.  The class excludes juveniles who are held under the care of the Office of

Refugee Resettlement. It also excludes people imprisoned pursuant to a criminal

sentence, including individuals who complete removal proceedings and any judicial

review thereof while serving such sentences.

120.  Petitioners propose that the Court also certify four sub-classes in this action,

corresponding to the release procedures available to each group.

a.      Petitioners propose Mr. Farah and Mr. Abdikadir to represent a sub-class of

class members imprisoned after they arrived at a port of entry, requested asylum, and

24

passed a credible fear interview (the "Parole" Subclass). They have no mechanism to obtain their liberty other than through the discretionary parole process. Such individuals are imprisoned under 8 U.S.C. 1225(b).

b.      Petitioners propose Mr. Rodriguez, Mr. Perez Ruelas, and Mr. Cacho Castillo to represent a sub-class of class members imprisoned after being apprehended within the United States and receiving a bond hearing before an Immigration Judge that did *not* provide the procedural protections Petitioners seek (the "Bond Hearing" sub-class). Such individuals are typically imprisoned under color of 8 U.S.C. 1226(a).

c.      Petitioners propose Mr. Rodriguez and Mr. Farias Cornejo to represent a sub-class of class members imprisoned without any opportunity for release other than through the narrow witness protection exception provided in 8 U.S.C. 1226(c) and the hearing established by *Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999) (the "Mandatory" Subclass).

d.      Petitioners propose Mr. Ayala to represent a sub-class of class members who, on the government's view, can be imprisoned without any opportunity for release other than through the "Post-Order Custody Review" process (the "Post-order" Subclass). Such individuals are incarcerated under color of 8 U.S.C. 1231(a) and did not receive bond hearings before Immigration Judges until the Ninth Circuit's decision in *Diouf v. Napolitano* (*Diouf II*), 634 F.3d 1081 (9th Cir. 2011).

121.   For each putative sub-class, the number of sub-class members is too large to make joinder practicable. For each of them, there will likely be more than forty other sub-class members in this District who, like each of the Petitioners, have been imprisoned for more than six months and have not been afforded a constitutionally-adequate hearing to determine whether their prolonged incarceration is justified. Petitioners' counsel conducted a random sampling to assess numerosity in support of their Motion for Class and Subclass Certification, and at that time each subclass easily met Rule 23's numerosity requirements. *See* Dkt. 101-2, Exhibit 26, Decl. of Jennifer Stark.

122.  The proposed class and sub-classes meet the requirements of Fed. R. Civ. Pro. 23(a)(2). For the class as a whole, there are several common questions of law and fact in this case. These include 1) whether the government has a policy or general practice of imprisoning non-citizens in removal proceedings for longer than six months while their cases remain pending without providing an adequate hearing to determine whether such prolonged incarceration is justified, and 2) whether this policy or practice violates the Constitution. *Rodriguez*, 591 F.3d at 1122-24 (finding common questions).

123.  There are additional common questions of law that pertain to each subclass. These include: for the Parole Subclass, whether those subclass members are entitled to be free from prolonged arbitrary imprisonment under the Fifth or Eighth Amendments; for the Bond Hearing Subclass, whether the bond hearing they received comports with the Constitution's procedural requirements, and in particular the requirement that the government prove by clear and convincing evidence that no alternative to detention can satisfy its interests in continued incarceration; for the Mandatory Subclass, whether the Constitution permits their prolonged imprisonment without *any* bond hearing based solely on their prior convictions; and for the Post-Order Subclass, whether the Constitution permits their imprisonment without a bond hearing merely because they have a removal order, notwithstanding the fact that the removal order does not presently confer authority to physically remove them from the United States.[10]

124.  The claims of the named representative Petitioners are typical of the claims of each proposed sub-class and of the class as a whole. Like all of the proposed class members, the named Petitioners will have been imprisoned, pursuant to the

---

[10] The class and subclasses described here are identical in scope to those certified by this Court in 2011, *see* Dkt. 161, Order, *see also* Dkt. 122 at 3, Respondents' Response to Motion for Class and Subclass Certification (Respondents' brief conceding certification appropriate for constitutional as well as statutory claims), except that the "Parole Subclass" as now defined does not include lawful permanent residents returning from brief travel abroad. *See* 8 U.S.C. 1225(b)(2)(A).

government's policy and practice, for at least six months without having been afforded an adequate hearing where the government has shown that their prolonged incarceration is warranted. *Rodriguez I*, 591 F.3d at 1022-24.

125. The named Petitioners will fairly and adequately represent the interests of all members of the proposed class and sub-classes because they seek relief identical to the relief sought by all class members, and because they have no interests adverse to other class members. Moreover, the named Petitioners are represented by pro bono counsel from the ACLU of Southern California, the ACLU Immigrants' Rights Project, the Stanford Law School Immigrants' Rights Clinic, and the law firm of Sidley Austin LLP. These organizations and the attorneys working for them have extensive experience litigating on behalf of imprisoned immigrants, including in class actions. They have ably represented this class for over twelve years.

126. Respondents have acted on grounds generally applicable to the class and to each subclass through their policy and practice of imprisoning non-citizens in removal proceedings for longer than six months without providing an adequate hearing where the government has shown that their prolonged incarceration is justified, making class-wide declaratory and injunctive relief appropriate.

## LEGAL BACKGROUND

127. Petitioners argue that the government may not imprison them under color of the immigration laws for longer than six months without showing at an adequate hearing that their prolonged incarceration is justified. Petitioners make this argument on constitutional grounds.

128. "Freedom from imprisonment -- from government custody, detention, or other forms of physical restraint -- lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. For this reason, detention must always be reasonable in relation to its purpose. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). *See also Demore*, 538 U.S. at 527-29 (applying "reasonable relation" test).

129. In the immigration context, the primary purpose of detention is to effect the

alien's deportation in the event that removal proceedings are finally concluded in the

government's favor. *Zadvydas*, 533 U.S. at 699 (holding that the "statute's basic

purpose" is "to assure the alien's presence at the moment of removal"); *Demore*, 538

U.S. at 528 (upholding brief mandatory detention pending completion of removal

proceedings because it "serves the purpose of preventing deportable criminal aliens

from fleeing prior to or during their removal proceedings.").

130.  Because Petitioners and other class members suffer lengthy civil confinement,

they must be afforded rigorous procedures to ensure that their imprisonment remains

justified. *Zadvydas*, 533 U.S. at 690-92 (noting "serious" constitutional problem with

prolonged and indefinite civil detention unless "limited to specially dangerous

individuals <u>and</u> subject to strong procedural protections") (emphasis added); *Casas-

Castrillon*, 535 F.3d at 950 (holding that "prolonged detention without adequate

procedural protections would raise serious constitutional concerns" and therefore that

"due process requires adequate procedural protections to ensure that the government's

asserted justification for physical confinement outweighs the individual's

constitutionally protected interest in avoiding physical restraint.") (citing *Zadvydas*).

131.  With respect to what procedures are required for a hearing to be adequate to

justify prolonged incarceration, the government must at a minimum provide advance

notice to the prisoner and then provide a transcribed hearing before an immigration

judge where it bears the burden to show by "clear and convincing" evidence that "no

conditions of release" are sufficient to protect the government's interests in

preventing flight and danger. *See Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996)

("due process places a heightened burden of proof on the State in civil proceedings in

which the individual interests at stake . . . are both particularly important and more

substantial than mere loss of money.") (internal quotations omitted); *Foucha v.

Louisiana*, 504 U.S. 71 (1992) (requiring "clear and convincing evidence" for

commitment of insanity acquittee beyond length of permissible sentence); *United

States v. Salerno*, 481 U.S. 739, 750 (1987) (recognizing that the "no conditions of

release" standard strikes appropriate balance of interests). In addition, the Immigration Judge must specifically consider the viability of alternatives to detention, including intensive supervision programs. And the hearing must require a heightened showing based on the length of confinement at issue. Where a class member has been incarcerated for a long period of time and proceedings may not end soon, the government must make more of a showing to justify continued confinement. *United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986) (stating in pre-trial detention context that "[i]n some cases, the evidence admitted at the initial detention hearing, evaluated against the background of the duration of pretrial incarceration and the causes of that duration, may no longer justify detention."); *Tijani v. Willis*, 430 F. 3d 1241, 1242 (9th Cir. 2005) (ordering bond hearing where government bore burden of proof in part because the "forseeable process [for resolution of Petitioner's removal case] in this Court" was "a year of more"). And where a class member has been imprisoned for an additional six months, due process requires an additional periodic hearing, because the showing required to incarcerate someone for six months may not suffice to incarcerate them for six years. *Cf. Zadvydas*, 533 U.S. at 701 ("for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink").[11]

132.  Respondents' prolonged incarceration of Petitioners also violates the Eighth Amendment. Jurists have long recognized that absolute denial of a bail hearing

---

[11] This Court ordered hearings that largely comported with these requirements when it granted the preliminary injunction in this case. Dkt. 255, *aff'd by* Rodriguez II, 715 F.3d at 1127. *See also* Order Granting Motion for Preliminary Injunction, *Martinez v. Gonzales*, CV06-7609 (C.D. Cal. January 4, 2007) (ordering government to release detainee unless "the government shows by clear and convincing evidence that he is a sufficient danger or risk of flight to justify his detention in light of how long he has been detained already and the likelihood of his case being finally resolved in favor of the government in the reasonably foreseeable future.").

violates the right and renders the clause meaningless. *See Jennings*, 138 S. Ct. at 862 (Breyer, J., dissenting) ("The Eighth Amendment forbids '[e]xcessive bail.' . . . That rationale applies *a fortiori* to a refusal to hold any bail hearing at all.");[12] *Sellers v. United States*, 89 S. Ct. 36, 38 (1968) (Black, J., in chambers) ("The command of the Eighth Amendment that 'Excessive bail shall not be required' at the very least obligates judges passing upon the right to bail to deny such relief only for the strongest of reasons."); *Castañeda v. Souza*, 810 F.3d 15, 44 (1st Cir. 2015) (*en banc*) (Torruella, J., concurring) (§ 1226(c) detention is "ongoing, institutionalized infringement of the right to bail").

133.  The history of the Excessive Bail Clause confirms that the Bill of Rights requires a judicial determination regarding bail, and that it applies in deportation cases. *See* Caleb Foote, *The Coming Constitutional Crisis in Bail: I*, 113 U. Pa. L. Rev. 959, 969 (1965) (An interpretation that Congress may categorically deny access to bail proceedings "would constitute an anomaly in the American Bill of Rights . . ."); Kayla Gassman, *Unjustified Detention: The Excessive Bail Clause in Removal Proceedings*, American University Criminal Law Brief 4, no. 1 (2009): 35-50 (concluding that the history of the Excessive Bail Clause renders it applicable to immigration detention).

134.  Therefore, absent the provision of constitutionally-adequate bond hearings, the government's incarceration of Petitioners and other class members violates the Constitution.

## FIRST CAUSE OF ACTION

### Violation of Immigration and Nationality Act and Regulations

135.  Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

136.  Respondents' continued detention of Petitioners and other putative class

---

[12] Though Justice Breyer's remarks were in dissent, they addressed a constitutional question that the majority did not reach.

members under the general immigration detention statutes violates the Immigration and Nationality Act, insofar as the statutes under which they are detained do not authorize detention for a prolonged period of time absent an adequate hearing at which the government shows that their detention remains justified.[13]

## SECOND CAUSE OF ACTION

### Violation of Fifth Amendment Due Process

### (Right to a Custody Hearing)

137.  Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

138.  Respondents' continued imprisonment of Petitioners and other class members without an adequate hearing where the government shows that their prolonged incarceration remains justified violates the right to be free of prolonged non-criminal detention without adequate justification and sufficient procedural safeguards, as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution.

## THIRD CAUSE OF ACTION

### Violation of Fifth Amendment Due Process

### (Right to Procedural Protections at Custody Hearings)

139.  Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

140.  Respondents' continued imprisonment of Petitioners and other class members without an adequate hearing where the government shows that their prolonged incarceration remains justified violates the right to be free of prolonged non-criminal detention without adequate justification and sufficient procedural safeguards, as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution.

---

[13] The Supreme Court has rejected this claim as to all but the Post-Order Custody Review sub-class. *Jennings v. Rodriguez*, 138 S.Ct. 830 (2018).

141. The Due Process Clause requires that Class members imprisoned for longer than six months receive bond hearings periodically, each six months, where the government bears the burden of proof by clear and convincing evidence, and that such hearings be recorded for transcription.

## FOURTH CAUSE OF ACTION

### Violation of Eighth Amendment Right to Bail

142. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

143. Respondents' continued imprisonment of Petitioners and other class members without an adequate hearing where the government shows that their prolonged incarceration remains justified violates the right to bail as guaranteed by the Eighth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request that the Court grant the following relief:

a.    Assume jurisdiction of this matter and issue declaratory and injunctive relief as follows:

1.    Certify a class and sub-classes as appropriate under Fed. R. Civ. Pro. 23 (or other analogous procedures), as defined above;

2.    Appoint Petitioners as representatives of the class and subclasses;

3.    Appoint Petitioners' Counsel as Counsel for the Class and each subclass;

4.    Order Respondents to provide, after giving notice, individual hearings before an immigration judge for Petitioners and each member of the class, at which Respondents will bear the burden to prove by clear and convincing evidence that no reasonable conditions will ensure the detainee's presence in the event of removal and protect the community from danger, despite the prolonged length of confinement at issue; to provide such hearings every six months for so long as individuals remain

class members; and to record those hearings for transcription;

5.  Declare that Respondents' failure to provide Petitioners and other class members with adequate hearings violates the Immigration and Nationality Act and the Due Process Clause of the Fifth Amendment and the Right to Bail under the Eighth Amendment;

6.  Enjoin Respondents from failing to provide Petitioners and each member of the Class, upon notice, with adequate hearings before an immigration judge (as specified above in this Prayer);

7.  Grant Petitioners reasonable attorneys' fees, costs, and other disbursements pursuant to the Equal Access to Justice Act, 28 U.S.C. 2412;

8.  Grant such other relief as the Court deems just and equitable.

b.      Alternatively, assume jurisdiction over this matter and issue habeas relief, as follows:

1.  Grant the writ of habeas corpus;

2.  Certify a class and sub-classes as appropriate under Fed. R. Civ. Pro. 23 or other analogous procedures for representative habeas litigation, as defined above;

3.  Order the release of Petitioners and all class members unless Respondents provide, after giving notice, individual hearings before an immigration judge for Petitioners and each member of the class every six months, at which Respondents will bear the burden to prove by clear and convincing evidence that no reasonable conditions will ensure the detainee's presence in the event of removal and protect the community from danger, despite the prolonged length of confinement at issue; and unless those hearings are recorded for transcription;

4.  Grant Petitioners reasonable attorneys' fees, costs, and other disbursements pursuant to the Equal Access to Justice Act, 28 U.S.C. 2412;

33

1    5.    Grant such other relief as the Court deems just pursuant to its authority in

2    habeas corpus or otherwise.

3                                    Respectfully submitted,

4                                    ACLU OF SOUTHERN CALIFORNIA

5

Dated: May 20, 2019           By:  /s/ Ahilan T. Arulanantham
6                                    AHILAN T. ARULANANTHAM
                                     Counsel for Petitioners
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28